UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal No. 21-CR-687 (RC) |
| Plaintiff, | |
| v. | MR. RHINE'S MOTION FOR CHANGE OF VENUE |
| DAVID CHARLES RHINE, | |
| Defendant. | |

David Charles Rhine, through counsel, moves the Court to transfer his trial to another district because the prejudice in this District against his defense is so great that an impartial jury cannot be empaneled. If the Court denies this motion, Mr. Rhine moves in the alternative for expanded examination of prospective jurors before and during formal *voir dire*.

This case involves events at the United States Capitol Building on January 6, 2021. A transfer of venue is essential to secure Mr. Rhine's constitutional right to a fair trial, because "so great a prejudice against the defendant exists in [this District] that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a). If a transfer is denied, then only through expanded examination of prospective jurors can the defense mitigate the prejudice that would infect a trial in this District.[1]

---

[1] Judges in this district have denied motions to change venue in other January 6 cases. *See, e.g.*, *United States v. John Maron Nassif*, 21-CR-421-JDB, Dkt. No. 42 (Sep. 12, 2022); *United States v. Gabriel Augustin Garcia*, 21-CR-129-ABJ, Dkt. No. 83 (July 22, 2022); *United States v. Sean McHugh*, 21-CR-453-JDB (May 4, 2022). In *United States v. Russell Dean Alford*, 21-cr-263-TSC, the Honorable Tanya Chutkan denied the motion to change venue, but granted Mr. Alford's request for alternative relief by authorizing: (1) the preparation of a written questionnaire for distribution to prospective

MOTION FOR CHANGE OF VENUE
(*United States v. Rhine*, 21-CR-687) - 1

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

The trial in this case should be transferred to a different district because the potential for significant bias among jurors drawn from this District is simply too great. If the Court does not transfer the case, then expanded examination of prospective jurors will be essential to minimize the extent to which a trial would be infected by prejudice against the defendant.

## I.     STATEMENT OF FACTS

The government charged Mr. Rhine with four misdemeanor charges—alleging he entered or remained without authority, engaged in disorderly or disruptive conduct, and paraded, demonstrated, or picketed at the Capitol on January 6, 2021. *See* Dkt. No. 8. Extensive media coverage of the events at the Capitol that day describe the crowd as a "mob," and detail violent clashes with police, damage to government property, plots to overthrow the government, and otherwise portray those involved in an extremely negative light. The coverage has been so thorough and lasting that many news outlets have devoted entire projects to covering January 6. *See generally, e.g.*, CNN Politics Staff, *January 6 Insurrection at the US Capitol*, https://www.cnn.com/specials/politics/january-6-insurrection (last visited Oct. 10, 2022); N.Y. Times Staff, *Capitol Riot Investigations* (last visited Oct. 10, 2022), https://www.nytimes.com/spotlight/us-capitol-riots-investigations; Wash. Post Staff, *The Attack: Before, During, After*, Wash. Post, https://www.washingtonpost.com/politics/interactive/2021/jan-6-insurrection-capitol/ (last visited Oct. 10, 2022). Indeed, the District of Columbia's own Washington Post won a Pulitzer Prize for "its compellingly told and vividly presented account of the assault on Washington on January 6, 2021, providing the public with a thorough and

---

jurors, (2) allowing the parties to be present for any prescreening questioning of prospective jurors that the court conducts before the formal *voir dire* examination, and (3) allowing for the parties to follow up with individual *voir dire* questions. *See* Dkt. 46 (April 18, 2022).

MOTION FOR CHANGE OF VENUE
(*United States v. Rhine*, 21-CR-687) - 2

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

unflinching understanding of one of the nation's darkest days." The Pulitzer Prizes: 2022 Pulitzer Prizes, https://www.pulitzer.org/prize-winners-by-year (last visited Oct. 10, 2022).

The events of January 6 were covered more in the District of Columbia than in other parts of the country. An analysis by Select Litigation on behalf of the Federal Public Defender for the Eastern District of Virginia examined data from the District of Columbia in comparison to the Atlanta Division of the Northern District of Georgia, a district chosen for its demographic similarities to the District of Columbia. *See* Ex. A at 5–6. Analysts examined media coverage—print, internet, and broadcast—across the two districts. January 6 was consistently covered more heavily in the District of Columbia than in the Atlanta market.

In 2021, the Washington Post ran approximately twice as many stories about the events of January 6 than the Atlanta Journal-Constitution (the dominant newspaper in the Atlanta area). From November 2021 through January 2022, the Washington Post ran more than 6 times as many stories as the Atlanta Journal-Constitution. *See* Ex. A at 9. Further, the number of hits for web-based coverage of January 6 was four times greater in the Washington, D.C., area than in the Atlanta area. *See id*. Finally, broadcast news outlets in Washington, D.C., broadcast approximately 7,300 stories about January 6, compared to about 4,000 broadcast in Atlanta. *See id*. at 10.

Furthermore, the events of January 6, have been heavily studied and analyzed by institutions in the District of Columbia. The U.S. House of Representatives empaneled a Select Committee to investigate the events of January 6th. From July 2021, to this month, the Select Committee has held hearings, taken witness testimony, examined evidence, and published many of its hearings and findings. *See generally* Select Committee to Investigate the January 6th Attack on the United States Capitol, https://january6th.house.gov/ (last visited Oct. 10, 2022); Congress.gov: Select

MOTION FOR CHANGE OF VENUE
(*United States v. Rhine*, 21-CR-687) - 3

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

Committee to Investigate the January 6th Attack on the United States Capitol, https://www.congress.gov/committee/house-select-committee-to-investigate-the-january-6th-attack-on-the-united-states-capitol/hlij00 (last visited Oct. 10, 2022). The Committee's investigation continues to reveal new information about the events of January 6, and has, unsurprisingly, continued to be closely covered by news media. *See, e.g.*, *Here's Every Word from the Sixth Jan. 6 Committee Hearing on its Investigation*, NPR, June 28, 2022, https://www.npr.org/2022/06/28/1108396692/jan-6-committee-hearing-transcript (transcript of hearing, testimony of Cassidy Hutchinson); Amber Phillips, *A Guide to the Biggest Moments in the Jan. 6 Hearings so Far*, Wash. Post, July 21, 2022, https://www.washingtonpost.com/politics/2022/07/21/january-6-hearings-guide/;

Academia local to the District of Columbia are also analyzing and publishing information about the events of January 6, 2021. The George Washington University (GWU)'s Program on Extremism launched a "Capitol Hill Siege" project, where it hosts events, publishes reports, and amasses and tracks data related to the events of January 6, 2021. *See* George Washington U., Program on Extremism: Capitol Hill Siege, https://extremism.gwu.edu/Capitol-Hill-Siege (last visited Oct. 10, 2022).

This academic coverage, centered in the District of Columbia, broadly paints those who were present at the Capitol on January 6 as having bad intentions and potentially posing a danger to the community. For example, GWU characterized all who went to the capitol alone—or not as a part of an organized group—as "inspired believers" in its initial analysis. According to GWU: "Many of the individuals responsible for storming the Capitol were brazen opportunists who took advantage of the unrest to enter the building and achieve personal or political objectives, despite lacking a well-devised plan to do so in advance." George Washington U., Program on Extremism, "This Is Our House": A Preliminary Assessment of the Capitol Hill Siege

MOTION FOR CHANGE OF VENUE
(*United States v. Rhine*, 21-CR-687) - 4

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

Participants, at 36, Mar. 2021, *available at* https://extremism.gwu.edu/sites/g/files/zaxdzs2191/f/This-Is-Our-House.pdf. GWU noted that the large number of "inspired believers"[2] accused of committing crimes on January 6 is "a reminder of the lone actor terrorism threat posed by domestic violent extremists – a threat which may be inspired by the events of January 6th." *Id.*

In addition to these qualitative reports, the GWU's "Capitol Hill Siege" project maintains a database and tracker for court cases. *See* George Washington U., Program on Extremism: Capitol Hill Siege Cases, https://extremism.gwu.edu/capitol-hill-siege-cases (last visited Oct. 10, 2022). This database includes court filings for all January 6 cases charged, including Mr. Rhine's. Indeed, the database makes it quite simple for any user to search for (or even Google) Mr. Rhine's name and read the charging documents in his case. *See id.*

The government included marked up photographs and messages in its complaint. *See* Dkt. No. 1. And, more distressingly, included an allegation that Mr. Rhine was carrying two knives and pepper spray. *See id.* at 6. As argued in a separate motion, the government does not have these items it claims to have seized from Mr. Rhine, and no evidence of them should be admissible at trial. Yet, due to the inclusion of the claim in the complaint, numerous media outlets have repeated the claim, and have distributed the surveillance pictures in the complaint. *See, e.g.*, Andrew Binion, *Bremerton Man Accused of Being at Jan. 6 Riot, Found with Knives and Pepper Spray*, Kitsap Sun, Nov. 11, 2021, https://www.kitsapsun.com/story/news/2021/11/11/bremerton-man-

---

[2] In a later report, GWU added another category of participant to its analysis— "spontaneous clusters": people "alleged to have conducted coordinated violent activities with other unaffiliated individuals during the commission of the siege." Bennet Clifford & Jon Lewis, George Washington U., Program on Extremism, "This Is the Aftermath": Assessing Domestic Violent Extremism One Year After the Capitol Siege," at 20, Jan. 2022, *available at* https://extremism.gwu.edu/sites/g/files/zaxdzs2191/f/This%20is%20the%20Aftermath.pdf (last visited Oct. 10, 2022).

MOTION FOR CHANGE OF VENUE
(*United States v. Rhine*, 21-CR-687) - 5

**FEDERAL PUBLIC DEFENDER**
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

accused-being-jan-6-riot-knives-pepper-spray/6380634001/; Lewis Kamb, *Where the Washington Residents Charged with Breaching the Capitol Are Now*, Seattle Times, Jan 6, 2022, https://www.seattletimes.com/seattle-news/law-justice/a-year-later-where-are-the-washington-residents-charged-with-breaching-the-capitol/; Jimmy Bernhard, *These Are the Washingtonians Facing Charges Related to the Jan. 6 Capitol Riot*, King5, January 6, 2022, https://www.king5.com/article/news/crime/jan-6-capitol-riot-insurrection-washington-state-cases/281-891443b6-04ae-4eaf-9ee5-da1291b29fe8.

The extensive and negative media coverage, concentrated in the District of Columbia, has led to widespread pre-judgement by potential jurors in the district of people charged in January 6 cases. Unsurprisingly, nearly all potential jurors in the District of Columbia are aware of the events of January 6, and the vast majority have been exposed to negative media coverage of those events. *See* Ex. A at 2–3. A nationwide CBS poll revealed that residents of Washington D.C. are substantially more likely than other Americans to attribute criminal motives to the events of January 6. For example, while 63 percent of adults surveyed nationwide described the events of January 6 as an attempt to overthrow the election, 85 percent of Washington D.C. residents surveyed agreed with this description. *See id*. at 4.

Select Litigation's carefully designed survey revealed that potential jurors in the District of Columbia hold substantially more bias against people charged in January 6 cases than potential jurors in the Atlanta Division of the Northern District of Georgia (a demographically comparable area). While 54 percent of people surveyed in the Atlanta Division expressed an unfavorable view of people charged in January 6 cases, fully 84 percent of people surveyed in the District of Columbia expressed this view. Again, 54 percent of Atlanta Division potential jurors expressed the belief that people charged in January 6 cases are guilty, but 71 percent of District of Columbia potential jurors held this belief. *See* Ex. A at 6–7.

MOTION FOR CHANGE OF VENUE
(*United States v. Rhine*, 21-CR-687) - 6

**FEDERAL PUBLIC DEFENDER**
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

To date, only one person charged in a January 6 case has been acquitted, and he was acquitted in a bench trial, without a jury. *See* Aadit Tambe, et. al., *More Than 840 Suspects Have Been Charged in the Jan. 6 Capitol Riot*, Wash. Post, July 26, 2022, [https://www.washingtonpost.com/national-security/interactive/2022/jan-6-capitol-riot-charges-sentences/?tid=ptv_rellink](https://www.washingtonpost.com/national-security/interactive/2022/jan-6-capitol-riot-charges-sentences/?tid=ptv_rellink); *United States v. Matthew Martin*, 21-CR-00394-TNM, Dkt. No. 39 (Apr. 6, 2022).

Mr. Rhine now brings this motion for change of venue.

## II.  ARGUMENT

### A.  The Court should transfer Mr. Rhine's trial to another district so that he will not be denied his right to a fair trial.

The Fifth Amendment's Due Process Clause and the Sixth Amendment's Jury Trial Clause guarantee Mr. Rhine the right to a fair trial by an impartial jury. *Skilling v. United States*, 561 U.S. 358, 378–79 (2010). Ordinarily, the trial should be held in, and the jury should be drawn from, "the State and district wherein the crime shall have been committed," U.S. Const. amend. VI. But "if extraordinary local prejudice will prevent a fair trial—a 'basic requirement of due process'"—then "[t]he Constitution's place-of-trial prescriptions . . . do not impede transfer of the proceeding to a different district at the defendant's request," *Skilling*, 561 U.S. at 378 (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). This is not an ordinary case as it involves events, and interpretations of events, about which much of the public already holds fixed opinions that are prejudicial to Mr. Rhine and his defense. Where "so great a prejudice against the defendant exists in the [venue] district that the defendant cannot obtain a fair and impartial trial there," a court "***must*** transfer the proceeding . . . to another district," Fed. R. Crim. P. 21(a) (emphasis added).

Moreover, in "the extreme case," *Skilling*, 561 U.S. at 381, where "[the] trial atmosphere [has been] utterly corrupted by press coverage," *id*. at 380 (quoting *Murphy*

MOTION FOR CHANGE OF VENUE
(*United States v. Rhine*, 21-CR-687) - 7

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

*v. Florida*, 421 U.S. 794, 798–99 (1975)), a court must presume prejudice from the pretrial publicity. Unlike "actual prejudice," which only can be confirmed through *voir dire*, *see id*. at 385–95, presumed prejudice presents a threat to due process that cannot be negated by jurors' *voir dire* responses. *See id*. at 379 (noting that because of presumptive prejudice in *Rideau v. Louisiana*, 373 U.S. 723 (1963), the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the *voir dire*," that trial in the contested venue violated due process (quoting *Rideau*, 373 U.S. at 727)).

In *Skilling*, the Supreme Court identified three factors for the lower courts to consider in deciding whether a presumption of prejudice is warranted[3]: (1) the size and composition of the community the jury is drawn from, (2) the pervasiveness and tenor of media coverage, and (3) the length of time between the relevant events and trial. *Id*. at 382–83. Each of those considerations weighs strongly in favor of presumed prejudice in this case.

### 1. The pool of potential jurors in the District of Columbia is unusually small and geographically compact.

The Supreme Court in *Skilling* concluded that "the size and characteristics of the community in which the crime occurred" militated against a presumption of prejudice. *Skilling*, 561 U.S. at 382. There, the defendant was a former executive at Enron during that company's well known accounting scandal, and the community was Houston, where "more than 4.5 million individuals eligible for jury duty resided," *id*. The Court observed that, "[g]iven this large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empaneled is hard to sustain." *Id*.

---

[3] The Court also identified a fourth factor that could not inform a trial court's advance determination but that reviewing courts may consider in deciding whether prejudice should have been presumed: whether the jury in the contested venue convicted on fewer than all counts. *Skilling*, 561 U.S. at 383–84.

MOTION FOR CHANGE OF VENUE
(*United States v. Rhine*, 21-CR-687) - 8

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

The District of Columbia is far smaller than that; the population is approximately 670,050 as of July 1, 2021, with approximately 18.2 percent being under the age of 18, leaving a voting-age population under 550,000.[4] The events of January 6 have impacted D.C. residents much more directly than persons outside the District. The city's mayor ordered a citywide curfew, declared a state of emergency for more than two weeks after January 6, and discouraged out-of-towners from attending the Presidential Inauguration on January 20 because of road closures and heightened security.[5] Thousands of National Guardsmen—ultimately, tens of thousands—"streamed into the region" in the days after January 6 and leading up to the Inauguration.[6] And, as D.C. residents are particularly aware, the aftershocks of January 6 continue to reverberate in concerns and security measures in anticipation of follow-up protests.[7]

---

[4] U.S. Census Bureau Quickfacts: District of Columbia, https://www.census.gov/quickfacts/DC (last visited Oct. 10, 2022).

[5] *Mayor Bowser Orders Citywide Curfew Beginning at 6PM Today*, DC.gov (Jan. 6, 2021), https://mayor.dc.gov/release/mayor-bowser-orders-citywide-curfewbeginning6pm-today; *Mayor Bowser Issues Mayor's Order Extending Today's Public Emergency for 15 Days*, DC.gov (Jan 6, 2021), https://mayor.dc.gov/release/mayor-bowser-issues-mayor%E2%80%99s-order-extending-today%E2%80%99s-public-emergency-15-days-a1; Jane Recker, *DC Mayor Says Americans Should Not Come to Washington for the Inauguration*, Washingtonian (Jan. 11, 2021), https://www.washingtonian.com/2021/01/11/dc-mayor-says-americansshould-not-come-to-washington-for-theinauguration/.

[6] Ellen Mitchell, *Army: Up to 25,000 National Guard in DC for Biden inauguration*, The Hill (Jan. 15, 2021), https://thehill.com/policy/defense/534497-army-up-to-25000-national-guard-in-dc-for-biden-inauguration/.

[7] Colleen Long et al., *In Edgy Washington, Police Outnumber Jan. 6 Protesters*, U.S. News (Sept. 18, 2021), https://www.usnews.com/news/politics/articles/2021-09-18/police-say-theyre-ready-for-rally-supporting-jan-6-rioters ("In a city still on edge after the Jan. 6 insurrection, law enforcement bore down in large numbers on the Capitol on Saturday over concerns that a rally in support of the jailed rioters would turn violent."); Billy House & Chris Strohm, *Jan. 6 Anniversary Will Bring Heightened Security to Capitol*, Bloomberg (Jan. 3, 2022), https://www.bloomberg.com/news/articles/2022-01-03/jan-6-anniversary-will-bring-heightened-security-to-capitol (reporting that "Capitol Police, federal and local agencies

MOTION FOR CHANGE OF VENUE
(*United States v. Rhine*, 21-CR-687) - 9

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

In addition, the events of January 6 impacted many people employed by agencies at the Capitol Building, and the agencies themselves. Indeed, many of the agencies who work at the Capitol or responded on January 6, employ thousands of people. As of September 2020, the U.S. Capitol Police employed 2,249 people.[8] In Fiscal Year 2021, the Metropolitan Police Department employed 4,197 people.[9] In 2021, the House of Representatives employed 9,034 people.[10] And the Senate employed 5,717 people.[11] Additionally, the Architect of the Capitol—the steward of the Capitol Building and others—employs over 2,000 people.[12] Easily over 20,000 people work for these impacted agencies, to name a few. The impact of the events of January 6 on people present, people employed by relevant agencies, people ordered to stay in place for security, and people who may regularly pass through the area, was extremely broad.

Finally, the government's allegations in this case, by their nature, stoke partisan passions that, in this District, would be overwhelmingly hostile toward Mr. Rhine. The charges against him include that he "impede[d] and disrupt[ed] the orderly conduct of

---

are beefing up security at the U.S. Capitol complex ahead of this week's anniversary of the Jan. 6 insurrection," and "added police power will be significant and visible").

[8] *See* U.S. Capitol Police, Human Capital Strategic Plan 2021-2025, at 12, 2021 *available at* https://www.uscp.gov/sites/uscapitolpolice.house.gov/files/wysiwyg_uploaded/USCP%20Human%20Capital%20Strategic%20Plan%20for%202021-2025.pdf.

[9] *See* Metropolitan Police Department, Annual Report 2021, at 38, 2021, *available at* https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/AR_2021_FINAL_lowres.pdf.

[10] *See* Congressional Research Service, House of Representatives Staff Levels in Member, Committee, Leadership, and Other Offices, 1977-2021, at 10, Sep. 2, 2021, *available at* https://crsreports.congress.gov/product/pdf/R/R43947#:~:text=Since%201975%2C%20the%20House%20has,work%20part%20time%20were%20authorized.

[11] *See* Congressional Research Service, Senate Staff Levels in Member, Committee, Leadership, and Other Offices, 1977-2020, at 6, Oct. 19, 2020, *available at* https://sgp.fas.org/crs/misc/R43946.pdf.

[12] *See* Architect of the Capitol, *Who we Are*, https://www.aoc.gov/about-us/who-we-are (last visited Oct. 10, 2022).

MOTION FOR CHANGE OF VENUE
(*United States v. Rhine*, 21-CR-687) - 10

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

Government business and official functions" and "inten[ded] to impede, disrupt, and disturb the orderly conduct of a session of Congress or either House of Congress," Dkt. 8 at 2—specifically, the certification of President Biden's Electoral College victory. Conscientiously held political views are no reason to disqualify any juror, but those views nevertheless serve to heighten the prejudice against Mr. Rhine's defense in this District, where President Biden received more than 92 percent of the vote in the 2020 Election.[13]

In the District of Columbia, both "the size and [the] characteristics of the community" lend strong support for a presumption of prejudice that would prevent a fair trial in the District.

> **2.    Media coverage and government publications regarding the events at the Capitol Building on January 6, 2021, have been pervasive and persistent.**

It is almost impossible to overstate the extent and the negative tenor of media coverage of the events that Mr. Rhine's charges link him to. And because that coverage has overwhelmingly assigned collective fault to those who gathered at the Capitol Building on January 6—the prejudicial effects of media coverage are unusually widespread and evenly distributed across the accused. In *Skilling*, the Court noted that presumed prejudice could arise from media coverage that "readers or viewers could not reasonably be expected to shut from sight" as jurors. 561 U.S. at 382. That is a fitting description of January 6 coverage, given both the amount of coverage and its content.

That is especially important here, because the government has charged Mr. Rhine with mental states that cannot easily be inferred from his own conduct, viewed in isolation. It seems inevitable that the case against him will depend on imputing to him the intentions actually exhibited by others at the Capitol that day.

---

[13] General Election 2020: Certified Results, D.C. Bd. of Elections (Dec. 2, 2020), https://electionresults.dcboe.org/election_results/2020-General-Election.

MOTION FOR CHANGE OF VENUE
(*United States v. Rhine*, 21-CR-687) - 11

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

This coverage has not focused significantly on Mr. Rhine, so neither he nor any other January 6 defendant is personally notorious like 9/11 plotters Osama Bin Laden and Zacarias Moussaoui, or Enron executives Kenneth Lay and Jeffrey Skilling. But that's largely beside the point. There is no equivalent "face of" January 6, 2021, among those who were present at the Capitol. What will matter in this case is not individualized prejudice, but prejudice to all, which already is firmly rooted for the most crucial issues in this case. Given the amount of surveillance video from the Capitol premises, the details of Mr. Rhine's conduct on January 6 are unlikely to be contested much at trial. Instead, the most disputed element for most counts likely will be *mens rea*—a matter that, "[e]xcept in extraordinary circumstances, . . . cannot be proved by direct evidence" and must be inferred from circumstantial evidence. *United States v. Haldeman*, 559 F.2d 31, 115 (D.C. Cir. 1976).

Prejudicial views about the intentions of January 6 defendants are not confined to D.C., but they are significantly more pervasive and more negative here. The Select Litigation survey[14] starkly demonstrates that reality. For instance, 63 percent of national respondents said they would describe the actions of "people who forced their way into the U.S. Capitol on January 6, 2021," with the phrase "Trying to overturn the election and keep Donald Trump in Power."[15] Far more D.C. residents—85 percent—said the same.[16] That disparity also persisted for the proportion of people who characterized the events of January 6 as "Trying to overthrow the US government," with 54 percent of national respondents, compared to 72 percent of D.C. respondents.[17]

---

[14] A full summary of the survey ("Ex. A") is filed as an exhibit with this motion. The survey compares responses by D.C. residents with those nationally and those by residents of an alternative venue, the Northern District of Georgia, which contains Atlanta.
[15] Ex. A at 4–5.
[16] *Id.*
[17] *Id.*

MOTION FOR CHANGE OF VENUE
(*United States v. Rhine*, 21-CR-687) - 12

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

Most D.C. residents have prejudged the guilt of January 6 defendants who have been criminally charged, like Mr. Rhine. Residents of both this District and the Northern District of Georgia were asked for their "Opinion of whether people arrested for Jan 6 activities are guilty or not guilty of the charges brought against them."[18] Among Georgia respondents, 54 percent answered "Guilty," 10 percent said "Not guilty," and the remaining 36 percent volunteered a response recorded as either "Depends" or "Don't know/refused."[19] Respondents in this District, however, were much more convinced of defendants' guilt and much less ambivalent in their answers: 71 percent said "Guilty"; just 3 percent said "Not guilty"; 16 percent volunteered a response recorded as "Depends"; and 10 percent volunteered a "Don't know/refused" response.[20]

In short, this is a case in which "a pattern of bitter prejudice throughout the community . . . render[s] the *voir dire* an unsatisfactory device for selection of an impartial jury." *United States v. Ehrlichman,* 546 F.2d 910, 916 n.8 (D.C. Cir. 1976). There is no obvious recent example of another event that has drawn media coverage as extensive as the coverage surrounding the events here. The jury pool, in this District especially, will comprise "readers or viewers [who] could not reasonably be expected to shut from sight" what they have read and seen. *Skilling*, 561 U.S. at 382. In those circumstances, prejudice should be presumed; in fact, prejudice is plainly apparent in the survey responses of the large majority of D.C. residents who already have decided that defendants with charges like Mr. Rhine's are guilty.

---

[18] *Id.* at 7.
[19] *Id*. The only answers the question provided were "Guilty" and "Not guilty." Among the 36 percent who volunteered a different answer, 19 percent gave a "Depends" response, and the other 17 percent, a "Don't know/refused" response. *Id.*
[20] *Id.*

MOTION FOR CHANGE OF VENUE
(*United States v. Rhine*, 21-CR-687) - 13

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

The extent and tone of media coverage weighs heavily in favor of presumed prejudice.

### 3. The events of January 6, and ensuing investigation, remain fresh in prospective jurors' minds.

In *Skilling*, the Supreme Court noted that the argument for presumed prejudice was weakened by the passage of time: "[O]ver four years elapsed between Enron's bankruptcy and Skilling's trial. Although reporters covered Enron-related news throughout this period, the decibel level of media attention diminished somewhat in the years following Enron's collapse." 561 U.S. at 383. But *Skilling* doesn't provide a useful analogy for this case. Media attention here was much more intense from the outset; trial will be held just over two years after relevant events; and the reckoning over January 6 continues to generate front-page news. The investigation and actions of a House Select Committee regularly feature prominently in print, television, and internet media. Beginning on June 9, 2021, and continuing to this past week, the House Select Committee has held prime-time hearings into the events of January 6th. These hearings have clearly resurrected the graphic images of police confrontations, destruction, and chaos at the Capitol that day.

And even if news coverage has declined some over time, entertainment media has produced new content, including documentaries by several major media companies.[21]

---

[21] See, e.g., Four Hours at the Capitol (HBO 2021), https://www.hbo.com/documentaries/four-hours-at-the-capitol; 24 Hours: Assault on the Capitol (ABC News 2021), https://www.hulu.com/series/24-hours-assault-on-the-capitol; Day of Rage (N.Y. Times 2021), https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trumpsupporters.html.

MOTION FOR CHANGE OF VENUE
(*United States v. Rhine*, 21-CR-687) - 14

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

**B.   If the Court denies the motion to change venue, the Court should order expanded examination of potential jurors before and during formal *voir dire* to mitigate prejudice.**

If the Court concludes that prejudice should not be presumed or cannot yet determine whether it should be, then the parties' opportunity for expanded examination of prospective jurors is absolutely essential for a fair trial. *See Haldeman*, 559 F.2d at 63 ("[I]f an impartial jury actually cannot be selected, that fact should become evident at the *voir dire*."). For instance, although the Supreme Court did not find presumed prejudice in *Skilling*, it acknowledged that "the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron," and noted approvingly that the district court's "extensive screening questionnaire and followup [sic] *voir dire* were well suited to that task." 561 U.S. at 384.

Views prejudicial to Mr. Rhine's defense are so widespread in this District's jury pool that empaneling a sufficiently impartial jury might not be possible. But if it is possible, such a jury could be identified only through expanded examination that allows the parties a thorough opportunity to explore individual prejudices. To accomplish that, Mr. Rhine would ask the Court to permit the three devices described in the introduction to this motion: (1) a questionnaire to be sent, after review and approval by the Court, to summoned prospective jurors; (2) the right for the parties to be present during any pre-screening questioning the Court conducts before formal *voir dire*; and (3) individual questioning during *voir dire*. The facts that show why these measures are necessary are the same facts relied upon in Mr. Rhine's motion for change of venue. Those facts—relating to the District's characteristics, pretrial media coverage, and the undissipated immediacy of January 6, 2021—demonstrate an undeniable and intolerable risk that actual prejudice would prevent a fair trial, regardless of whether the Court concludes that the facts establish presumed prejudice.

MOTION FOR CHANGE OF VENUE
(*United States v. Rhine*, 21-CR-687) - 15

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

Should the Court deny Mr. Rhine's motion for change of venue, he asks this court to adopt the jury screening procedure set forth by Judge Tanya Chutkan in *United States v. Russell Dean Alford,* Case No. 1:21-cr-263-TSC. This procedure would, first, provide for a written questionnaire to be prepared and distributed to prospective jurors. The parties would meet and confer regarding the questionnaire before submitting it for Court approval. Second, to allow the parties to be present for any pre-screening questioning of prospective jurors that the Court would conduct before the beginning of the *voir dire* examination. Third, the parties would be permitted to ask reasonable follow up questions of individual jurors during *voir dire*.

### III.   CONCLUSION

Mr. Rhine, through counsel, respectfully asks this Court to transfer venue for his trial to another district so that he may vindicate his Fifth and Sixth Amendment rights to a fair trial by a fair and impartial jury. Should the Court disagree, Mr. Rhine asks the Court to order expanded examination of prospective jurors before and during formal *voir dire* to mitigate bias.

DATED this 17th day of October 2022.

Respectfully submitted,

*s/ Rebecca Fish*
*s/ Joanna Martin*
Assistant Federal Public Defenders
Attorneys for David Charles Rhine

MOTION FOR CHANGE OF VENUE
(*United States v. Rhine*, 21-CR-687) - 16

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710