1

```
               IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
                         RICHMOND DIVISION


      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                       )
      UNITED STATES OF AMERICA         )
                                       )   Criminal No.
             v.                        )   3:19CR130
                                       )
      OKELLO T. CHATRIE                )   March 4, 2021
      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _)
```

**DAY ONE**

```
        COMPLETE TRANSCRIPT OF MOTION TO SUPPRESS
          BEFORE THE HONORABLE M. HANNAH LAUCK
                UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

```
Kenneth R. Simon, Jr., Assistant U.S. Attorney
Peter S. Duffey, Assistant U.S. Attorney
U.S. Attorney's Office
SunTrust Building
919 East Main Street, Suite 1900
Richmond, Virginia   23219

Nathan P. Judish, Assistant U.S. Attorney
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, Virginia   20530

        Counsel for the United States

Laura J. Koenig, Assistant Federal Public Defender
Paul G. Gill, Assistant Federal Public Defender
Office of the Federal Public Defender
701 E. Broad Street, Suite 3600
Richmond, Virginia   23219

        Counsel for the Defendant

            DIANE J. DAFFRON, RPR
           OFFICIAL COURT REPORTER
          UNITED STATES DISTRICT COURT
```

**Exhibit E, pg. 1**

2

1    APPEARANCES:   (Cont'd)

2    Michael W. Price, Esquire
     National Association of Criminal Defense Lawyers
3    1660 L Street, NW
     12th Floor
4    Washington, DC   20036

5           Counsel for the Defendant

6

7                   I N D E X

8
                    DIRECT   CROSS   REDIRECT
9
     SPENCER McINVAILLE        16      126      170
10
     MARLO McGRIFF            190       --       --
11

12

13
                 E X H I B I T S
14
                                              Page
15   DEFENDANT'S EXHIBITS:

16   No. 1         Geofence Warrant and Application    27

17   No. 2         Google Amicus Curiae Brief         200

18   No. 3         PDF of Raw Data                     34

19   No. 5         Three Paths Video                   61

20   No. 6         Spencer McInvaille Report           75

21   No. 7         McInvaille Supplemental Report      81

22   No. 8         CSV Google Data File               120

23   No. 11        September 2018 Oracle Submission    92

24   No. 21        McGriff Declaration 1               52

25   No. 23        McGriff Declaration 3               73

**Exhibit E, pg. 2**

3

1

2                        E X H I B I T S

3
                                                    Page
4     DEFENDANT'S EXHIBITS: (Cont'd)

5     No. 27      Every Step You Take               96

6     No. 30      AZ Ex. 18                       255

7     No. 31      AZ Ex. 19                       258

8     No. 32      AZ Ex. 20                       249

9     No. 33      AZ Ex. 24                       250

10    No. 34      AZ Ex. 202                      252

11    No. 36      AZ Ex. 209                      243

12    No. 38      AZ Ex. 219                      227

13    No. 40      AZ Ex. 236                      245

14    No. 43      2018 Privacy Policy - Redline   261

15    No. 46      McGriff Blog 1                  219

16    No. 47      McGriff Blog 2                  218

17    No. 48      2018 Quartz Article              85

18    No. 49      2018 AP Article 1               225

19    No. 53      Blumenthal-Markey Letter to FTC 233

20

21    GOVERNMENT'S EXHIBITS:

22    No. 1       CAST Report                      32

23

24

25

**Exhibit E, pg. 3**

4

1          (The proceedings in this matter commenced at

2    9:30 a.m.)

3

4          THE CLERK:  Case No. 3:19CR130, United States

5    of America versus Okello Chatrie.

6          The United States is represented by Kenneth

7    Simon, Peter Duffey, and Nathan Judish.

8          The defendant is represented by Paul Gill,

9    Laura Koenig, and Michael Price.

10         Are counsel ready to proceed?

11         MR. SIMON:  The United States is ready, Your

12   Honor.

13         MS. KOENIG:  The defense is ready, Your

14   Honor.

15         THE COURT:  Okay.

16         MS. KOENIG:  Before we begin --

17         THE COURT:  Okay.  I'm aware that we have

18   counsel for Google here.  I don't know if you want to

19   just state your name on the record because that you

20   will be representing witnesses that come forward.

21   It's really up to you.

22         MS. CARROLL:  Thank you, Your Honor.

23   Catherine Carroll, present on behalf of Google.

24         THE COURT:  Thank you.

25         MR. CARROLL:  Thank you.

**Exhibit E, pg. 4**

5

1          THE COURT:  All right.  Well, I understand

2     that you all have handled some logistics, that the

3     defense will begin presenting evidence first.  I'll

4     hear any introductory remarks that either side wants

5     to present.  And I think there's something else you

6     wanted to address, and I can't remember.

7          MS. KOENIG:  Yes, Your Honor.  We have a

8     modified sequestration order that the parties have

9     agreed to that we're asking the Court to enter.  Shall

10    I just come to the podium?

11         THE COURT:  Yes.

12         MS. KOENIG:  Each party has an advisory

13    witness.  The defense will designate Spencer

14    McInvaille, who's our expert, as our advisory witness,

15    and ask that he be allowed to remain in the courtroom

16    throughout the proceedings.

17         The government, I understand, will be

18    designating Detective Hylton, who is their case agent

19    as their advisory witness.  The government also has an

20    additional expert, Agent D'Errico, and so he will also

21    be allowed to remain in the courtroom in an expert

22    capacity.  But we are asking that the witnesses, in

23    order that the witnesses -- any other witnesses not be

24    allowed to be in the courtroom, except for during

25    their testimony.

**Exhibit E, pg. 5**

6

1          THE COURT:  All right.

2          MS. KOENIG:  And then the last piece of it is

3    that the witnesses are not allowed to discuss their

4    testimony with other witnesses.

5          THE COURT:  Right.  And, obviously, counsel

6    aren't allowed to talk about testimony that's coming

7    in.

8          MS. KOENIG:  So that is -- that's the

9    modification, Your Honor, is that the parties have

10   agreed that counsel will be able to talk to witnesses,

11   but the witnesses will not be able to talk to each

12   other.

13         THE COURT:  So that includes Google?

14         MS. KOENIG:  Correct.

15         THE COURT:  All right.  Now, I'm going to ask

16   you to spell the names on the record because I know

17   Hylton is spelled differently than a court reporter

18   might think, and just to be sure that we get

19   everything correct.

20         MS. KOENIG:  Sure.  The defense expert is

21   Spencer McInvaille.  M-c-I-N-V-A-I-L-L-E.  And

22   Detective Hylton is H-Y-L-T-O-N.  And Agent D'Errico,

23   I don't believe there's an apostrophe.  Oh, there is.

24   Okay.  D-apostrophe-E-R-R-I-C-O.  The spelling of the

25   agent was not my preparation today.  Thank you.

**Exhibit E, pg. 6**

7

1          THE COURT:  Does the government have anything

2    to add?

3          MR. SIMON:  Nothing from us, Judge.

4          THE COURT:  All right.  So we will enter the

5    modified sequestration order.  Obviously, counsel will

6    be responsible in making sure that their witnesses

7    know not to speak to each other.  My bet is they

8    already know that, given the counsel that we have in

9    front of us.  And we'll certainly allow the experts to

10   hear the evidence as it goes in.  That's not uncommon

11   and will, I think, serve the interests of the hearing

12   overall.

13          Do we have folks calling in or not?

14          THE CLERK:  Yes, ma'am.  I have the line set

15   up, but it doesn't appear that anybody is on there at

16   this time.

17          THE COURT:  Okay.  So I want you to know

18   we've had some folks ask to call in on an AT&T line.

19   Of course, it's as if we're in open court.  I've

20   okayed that.  If you are aware of anybody who you know

21   who is calling in, I'm going to require counsel to

22   inform them of our Local Rule 53 and the standing

23   order that they cannot record or transmit or give any

24   kind of broadcast of this hearing.  We are in the

25   hearing.  Ms. Daffron will create our record.  And

**Exhibit E, pg. 7**

8

 1   especially with an AT&T line, it's a little odd, and

 2   we're only really doing this because of COVID.  I just

 3   want to be sure that they are aware that even if they

 4   sort of want to save something to tell a friend, or

 5   somebody who might have an interest in the case, they

 6   just cannot.  They can order a transcript, but they

 7   can't do anything more than that.

 8           MS. KOENIG:  Your Honor, I will tell the

 9   Court that we expect that several members of the NACDL

10   staff --

11           THE COURT:  So you have to talk slower and

12   say N-A-D-C-L more clearly.

13           MS. KOENIG:  Thank you.  I expect that

14   several members, staff members, of NACDL, which is the

15   organization that Mr. Price works for, will be calling

16   in.  We are a little surprised they haven't called in

17   already.  But they have already been instructed not to

18   do any recordings or --

19           THE COURT:  We'll say it to anybody who does

20   call in.

21           THE CLERK:  Hopefully, he can hear us.

22           THE COURT:  Can we confirm that he can?

23           THE CLERK:  Mr. Shoop, can you hear us?  No.

24           THE COURT:  So we have somebody from NBC

25   calling in?

**Exhibit E, pg. 8**

9

1          THE CLERK:  Yes.

2          THE COURT:  I want to be sure that that

3    person knows.  I have to announce that so he or she

4    can hear it, too.

5          THE CLERK:  It is NBC Universal.

6          THE COURT:  Okay.  NBC Universal.  My

7    apologies for the delay.

8          MR. PRICE:  Your Honor, we just got word that

9    lots of people are on the line considering the beeps,

10   but no one can hear anything.

11         THE COURT:  They can't hear.

12         THE CLERK:  All right.  I'm going to have to

13   call Martin.

14         THE COURT:  All right.  So we have to get our

15   IT involved.  While we're waiting, what I'd like to be

16   sure is that we put on the record the motion we're

17   taking evidence for and other sort of just standard

18   things.

19         MS. KOENIG:  Yes, Your Honor.  I don't expect

20   that the defense will have any introductory remarks.

21   We will be prepared to go straight into evidence.  But

22   this is an evidentiary hearing that is in support of

23   the motion to suppress the evidence obtained pursuant

24   to the geofence warrant, and that is ECF 29, for which

25   there has been a lot of subsequent briefing.

**Exhibit E, pg. 9**

1        THE COURT:  Now, you definitely can't speak

2    that quickly, and I didn't hear at all what you said

3    at the end.

4        MS. KOENIG:  Sorry.  For which there has been

5    a lot of subsequent briefing.

6        THE COURT:  Right.  Okay.

7        So while we're waiting also, I want you to

8    know we've gone through a lot of COVID protocol

9    together.  I can see that you all have been very

10   mindful of it and will continue to be.  I'm going to

11   ask you to continue to be, certainly, all through this

12   process.

13       We have a jury trial going on in a courtroom

14   on this floor.  And so what I want you all to do is

15   not move in the hallways unless someone has allowed

16   you to do it.  We're trying to make sure that traffic

17   is not congested so that, I guess, we don't lead into

18   COVID congestion.

19       We can only do two people in an elevator at

20   any one time.  And we really are coordinating on the

21   sixth floor, and a little bit on the seventh floor,

22   with how we're moving people around.  So, certainly,

23   if you have any witnesses who are not in the

24   courtroom, be sure they know that, too.  Our biggest

25   issues with COVID have been, understandably probably,

**Exhibit E, pg. 10**

11

1    I don't want to the say anything too negative, but

2    bored witnesses waiting for their time to be called

3    and then sort of wandering around.  And we just can't

4    have that.  So I'll appreciate your indulgence in

5    that, too.

6              This is our simplest technology.  I have

7    never had an AT&T conference call not work.  My

8    apologies.  They are only hearing us in binary

9    language of beeps.  I guess we need an interpreter.  (

10             (IT is here now.)

11             THE CLERK:  You can tell your folks they

12   might have to call in again.

13             OPERATOR:  Welcome to AT&T's teleconference

14   service.  Please enter your access code followed by

15   the pound sign.  There are 12 participants on the call

16   including you.

17             MR. PRICE:  I'm just letting them to know to

18   call back.

19             THE CLERK:  Okay.  Can the people on the call

20   hear us?  Can somebody say something?

21             AN UNIDENTIFIED PERSON:  Yes, we can hear

22   you.

23             THE COURT:  Thank you all.

24             All right.  I understand now that folks who

25   have called in on the AT&T line can hear us.  We've

**Exhibit E, pg. 11**

12

 1    had some introductory scheduling issues taken care of

 2    about witnesses and presentation of evidence.

 3           I also informed folks here, and I'm going to

 4    inform folks listening in on the AT&T line, that our

 5    Local Criminal Rule 53 and our standing order

 6    prohibits any kind of broadcasting or telecasting or

 7    recording of these events.  Of course, you're welcome

 8    to listen in, but it is just as if you were in the

 9    courtroom itself.

10           We have one court reporter, who is making the

11    single record that we will have of this proceeding.

12    And it is a violation of our rules to in any way make

13    a different or separate recording or record.

14           Can everybody hear me say that?  Is there

15    anybody on the AT&T call?

16           UNIDENTIFIED PERSON:  Yes.

17           THE COURT:  All right.  So you all are on

18    notice as to that?

19           UNIDENTIFIED PERSON:  Yes.

20           THE COURT:  All right.  Okay.

21           So I will allow the defense to begin

22    presenting evidence.  I guess I want to confirm, is

23    this a continuation of evidence that we heard with

24    respect to discovery, the request for discovery, or is

25    this a whole new record?

**Exhibit E, pg. 12**

13

 1          MR. PRICE:  Your Honor, we will be repeating

 2     some of what we did in the discovery hearing but not

 3     all of it, so it's a continuation.  There will be a

 4     little bit of repetition, but hopefully not too much.

 5          THE COURT:  Right.  That's fine.  I just want

 6     to make sure that both sides -- is the government in

 7     agreement that you're actually referring to both

 8     hearings as far as the evidence that I'm taking into

 9     consideration?

10          MR. SIMON:  Judge, I think we asked that the

11     Court certainly can consider that, but the record on

12     appeal, I think, in this case will be about the

13     evidence received at this particular hearing.  And so

14     we don't necessarily think that the transcript from

15     the discovery hearing should override or overtake

16     anything today.  So we'd say focus on the evidence

17     received here today, including from their expert

18     Spencer McInvaille.  But, you know, both sides may

19     refer back to that testimony.

20          THE COURT:  Well, that's my question.  I

21     don't want disputes about what I can take into account

22     or what I can't take into account.  You've been

23     agreeing about the important issues, but it's easier

24     to sort of set the parameters from the start rather

25     than not.

**Exhibit E, pg. 13**

14

1          MS. KOENIG:  Sure.  Your Honor, from the

2    defense perspective, we have learned a lot of

3    information from the time of today past January 2020.

4    So to some extent, some of the issues that we talked

5    about before, like some of the exhibits that we have

6    on our exhibit list that we intend to introduce today,

7    we took to heart the Court's direction that we

8    shouldn't rely on past exhibits.  So we are going to

9    be referring and admitting those separately today.

10          There may be a couple of points that we may

11   not spend as much time on, like, for example, the

12   three paths video we spent quite a bit of time at the

13   discovery hearing on.  And we may not go too much in

14   depth on that simply just to save time because we have

15   a lot of witnesses and a lot of material to move

16   through.  But to the extent there is something

17   different or contradictory or something that is

18   changed, of course, today's record would control

19   simply because at least the defense has moved well

20   beyond where we were information-wise from January

21   2020.

22          THE COURT:  Right.  Which in part is --

23   although we've had, for lots of technological reasons

24   and pandemic reasons and making sure we can have

25   witnesses come in person from other places, we've had

**Exhibit E, pg. 14**

 1   delay, but we've also had delay that I think maybe

 2   will have available to us a better record.

 3          What I'm going to say is that I want you all

 4   at the end of today, presuming we go into tomorrow,

 5   just meet and get a sense if there's going to be any

 6   dispute about what we can turn back to.  And if you

 7   all want me to make any kind of speedy trial findings,

 8   I can do so now.  Is that a good way to start or is

 9   anybody objecting to the delay that we've had?  It's

10   been pretty well documented through our case, and, in

11   fact, Mr. Chatrie has asked for a couple of delays

12   himself.

13          I think we've all been on the same page with

14   respect to it, but if there should be findings on the

15   record, I'm happy to make them.

16          MS. KOENIG:  I think all the findings have

17   already been made as to that, Your Honor, and we're

18   just here today ready to move forward.  The defense

19   doesn't have any objections to the findings the Court

20   has previously made.

21          THE COURT:  Right.  Okay.

22          Mr. Simon, you're in agreement?

23          MR. SIMON:  Yes, Judge.  And I don't think

24   the Court was asking, again, about the record piece;

25   is that right?

**Exhibit E, pg. 15**

16

1           THE COURT:  I'm sorry?

2           MR. SIMON:  You weren't asking, again, Judge,

3     about our review of the record, what the Court should

4     consider?

5           THE COURT:  No.  I think you guys are going

6     to agree.  I just want to anticipate before anything

7     gets too old in our minds any piece of evidence that

8     you all think you may disagree about, we'll have a

9     hearing on that, about what to do about it, and we'll

10    do it now, not in two months, is what I'm saying.

11          MR. SIMON:  Understood, Judge.  And like

12    defense counsel know, concerns about the delay here.

13          THE COURT:  Okay.  Thank you.

14          All right.  So we're ready for the defense to

15    begin.

16          MR. PRICE:  Good morning, Your Honor.

17          THE COURT:  Good morning.

18          MR. PRICE:  Michael Price for Okello Chatrie.

19    The defense would like to call Spencer McInvaille,

20    please.

21      SPENCER MCINVAILLE, called by the defendant, first

22    being duly sworn, testified as follows:

23

24          THE COURT:  All right.  Now, as you're

25    approaching the podium and the witness stand, you all

**Exhibit E, pg. 16**

McINVAILLE – DIRECT                    17

1  may do whatever you wish with respect to your comfort

2  zone with respect to COVID.  You may take your mask

3  off as long as nobody here in this room objects.  We

4  do have these plastic barriers.  We have the

5  sanitizing wipes and hand sanitizer.

6          The only thing I would say is certainly every

7  time you leave any space, clean it off so that if

8  somebody else goes near it or sits there also, it is

9  fresh for them.  We try to follow-up on that, too.

10          THE WITNESS:  Yes, ma'am.

11          THE COURT:  All right.

12  BY MR. PRICE:

13  Q   Good morning, Mr. McInvaille.  How are you?

14  A   Good morning.

15  Q   Would you please state your full name for the

16  record.

17  A   Spencer McInvaille.

18  Q   And can you tell us who you are?

19  A   Yeah.  I'm a digital forensic examiner with

20  Envista Forensics.  I deal with cell phone location,

21  location evidence in general.  And I consult with

22  prosecutors, attorneys, and defense counsel on those

23  types of issues.

24  Q   Thank you.  And you've been previously qualified

25  as an expert in this case in the fields of digital

**Exhibit E, pg. 17**

McINVAILLE – DIRECT                    18

 1   forensic examinations, global forensics, and cellular

 2   location analysis?

 3   A   Yes, that's correct.

 4   Q   So I want to start with some basics.

 5           THE COURT:  So, Mr. Price, I'm going to ask

 6   you to move the microphone a little closer to you.

 7           And also, Mr. McInvaille, if you could speak

 8   into the microphone.  That's the way my court reporter

 9   hears you.  She's not listening to you anywhere other

10   than from her earphones.

11           And I just want to confirm the government has

12   no objection to Mr. McInvaille testifying as an

13   expert; is that correct?

14           MR. DUFFEY:  We do not, Judge.  Thank you.

15   BY MR. PRICE:

16   Q   So I want to start with some basics here.  And I

17   want to ask you what sources of location data does

18   Google use to locate phones generally?

19   A   Sure.  So for locating devices, you're generally

20   going to see GPS data, Wi-Fi locations, Bluetooth

21   locations, and cellular.  Those are the main ways that

22   Google would locate a device.

23   Q   Can you explain each of those just a little bit?

24   What's GPS?

25   A   Sure.  GPS is our Global Positioning System using

**Exhibit E, pg. 18**

McINVAILLE – DIRECT                    19

1    satellites to locate devices.  People commonly

2    associate that with how they navigate around town or

3    go places with their phone.

4       As far as Wi-Fi goes, Wi-Fi access points are

5    points on earth that we use to use data and things on

6    our phones.  As they capture where those are on earth

7    based on signal strengths from each of those points,

8    you can relatively locate a device as it pertains to

9    how close it is to a certain access point.

10      As far as cellular goes, similar principle there.

11   We know where the cell towers are.  They communicate

12   with a device.  And based on signal strengths, you can

13   determine where the device is in relation to the cell

14   phone tower.

15   Q    Are there any other sources of location data

16   besides the ones that you mentioned?

17           THE COURT:  So, Mr. Price, you're talking

18   really fast.

19   BY MR. PRICE:

20   Q    Are there any other sources of location data other

21   than GPS, Bluetooth, cellular, and Wi-Fi?

22   A    You can also use, say, IP addresses, too, to

23   locate -- to generally locate someone.

24   Q    How accurate are these sources?  Maybe you can

25   just talk about each one a little bit.

**Exhibit E, pg. 19**

McINVAILLE – DIRECT                    20

1  A   Sure.  They're going to vary.  Cell phone towers,

2  of course, cover very large areas.  There are sectors.

3  Each of them cover large areas.  While they can,

4  again, generally locate a device, they may not be the

5  most accurate, but they can give us a relative

6  location on earth.

7      Wi-Fi.  Wi-Fi only extends so far.  So it is going

8  to give you a smaller area than what the cell tower

9  probably could.

10     GPS can be very accurate.  We can see that.  It

11 can be very accurate.  Sub-meter accuracy at times

12 with open skies.

13          THE COURT:  Sub-meter or some meter?

14          THE WITNESS:  Sub-meter.

15          THE COURT:  Thank you.

16          THE WITNESS:  Smaller than 1 meter.

17          So each has their own capability of how

18 accurately you can place someone on earth or place a

19 device on earth.

20 Q   So when Google is using location information to

21 find a phone, does it matter if someone is inside?

22 Does it still work?

23 A   No, it can still locate.

24 Q   It still locates people inside or outside?

25 A   Yes.

**Exhibit E, pg. 20**

McINVAILLE – DIRECT                   21

1   Q    What are the -- what does Google do with this

2   data?  What are the repositories of location data that

3   Google keeps?

4   A    Sure.  From my research, they keep this type of

5   data in several ways.  So you have Location History

6   being that, as has been described, this journal of

7   location history for a user.  That can include each of

8   those sources that we discussed on how information is

9   gathered.  And so it associates those with date and

10  times for the device.

11       There's also Google Location Accuracy, which keeps

12  up with some of that information we've talked about

13  before with the access points, where they are on

14  earth, how they make calculations, to make

15  comparisons.

16            THE COURT:  Did you say Location Accuracy?

17            THE WITNESS:  Yes, ma'am.

18            THE COURT:  Okay.

19            I'll let you say that again.  I interrupted.

20            THE WITNESS:  That's okay.

21  A    As far as Google, there's Location History.  There

22  is Google Location Accuracy, as well as Web & App

23  Activity also tracks IP addresses, and things like

24  that, web activity application usage for general

25  location.

**Exhibit E, pg. 21**

McINVAILLE - DIRECT                     22

1          THE COURT:  Can you repeat what Location

2    Accuracy is?

3          THE WITNESS:  Sure.  So Location Accuracy is

4    going to -- is a repository of data as far as where

5    access points and things like that are located so that

6    it can be compared to other data for location

7    purposes.

8          THE COURT:  Thank you.

9    BY MR. PRICE:

10   Q   So what does Google do with all of this location

11   data?

12   A   Sure.  So this location data at this point, just

13   data in general on people and their activities, is a

14   lucrative -- it's a tangible item at this point.  It's

15   something that's used for advertising, understanding

16   consumers and their habits, things like that.  It's

17   used for advertising, essentially.

18   Q   The different kinds of advertising that Google

19   does with this?

20   A   Sure.  So you have targeted ads from understanding

21   what a person may want to -- you know, their

22   interests.  You can also target those ads based on

23   their proximity to certain places.  So if a particular

24   business would like to try to generate more activity

25   from the people that live and work around them, they

**Exhibit E, pg. 22**

McINVAILLE – DIRECT                    23

 1   can try to target those people based on pushing ads to

 2   them because of their proximity to that location.

 3   Q    So if Google offers this advertising service to

 4   businesses based on location, do the businesses get

 5   the information about user location?

 6   A    Not to my knowledge.  What the end user or the

 7   person paying for the advertising service receives is

 8   pretty much reporting on how well these ads are

 9   converting to revenue for them.

10   Q    How would you explain the difference between

11   targeting ads based on location and a law enforcement

12   request for user location data?

13   A    So as far as, again, with targeted ads for the

14   business, the business is seeing whether or not their

15   ads are becoming sales, whether or not people in the

16   area that they're trying to pay -- they're paying to

17   hopefully see these ads are coming to their business.

18        As far as in this law enforcement request or these

19   geofence warrants, the difference is, is the return is

20   different.  The return is that you are seeing

21   individual users, identifiers about those users, their

22   location, and other information provided.  So it's

23   much different.

24   Q    So just to clarify.  What personally identifiable

25   location information do businesses get when they do

**Exhibit E, pg. 23**

McINVAILLE - DIRECT                          24

1   this targeting?

2   A    None that I'm aware of.

3   Q    So we'll start with an easy one.  What's a

4   geofence warrant?

5   A    So, a geofence warrant is a request by law

6   enforcement to, in this case Google, to find out the

7   users that are in a specific area.  So a circle or box

8   is drawn around a particular area where something

9   happens.  A time frame of that incident is also given.

10  And the request is made to Google to find out who was

11  inside of that particular area during the given time

12  frame.

13  Q    And did you review the geofence warrant in this

14  case?

15  A    Yes.

16  Q    So what type of data was searched as a result of

17  the geofence warrant in this case?  Which repositories

18  of data?

19  A    So Google Location History was the searched area

20  for Google.

21  Q    Any others?

22  A    No.

23  Q    Who decided what kind of information was going to

24  get searched?

25  A    From my understanding, Google made the

**Exhibit E, pg. 24**

McINVAILLE – DIRECT                                    25

1   determination to search Google history -- Location

2   History, I'm sorry.

3   Q   So there are three kinds.  Google searched one and

4   it was up to them?

5   A   From my understanding, yes.

6   Q   Could you describe how a geofence warrant works,

7   what the stages are, how it unfolds process-wise, just

8   generally?

9   A   Sure.  So the warrant is broken up into three

10  steps.  Each of those steps gaining more information

11  as you go.  So the warrant will spell out each of

12  these steps for the process.

13       So, in Stage 1, a request is made for the

14  geofence.  So wherever the place is on earth.  In this

15  instance, it was a 150-meter circle, radius circle,

16  that was drawn around a fixed point.  And so the

17  Stage 1 request is what users were inside of the

18  circle during a one-hour time period.

19  Q   And does it end there?

20  A   No.  So it goes further into each of the steps.

21  So when that request is made, Google will respond with

22  the location of the users and an identifier for each

23  of the users who were inside of the circle at that

24  time.  So that's the steps from asking for Stage 1 to

25  the return of Stage 1.  Return of Stage 1 being a

**Exhibit E, pg. 25**

McINVAILLE – DIRECT                    26

 1   spreadsheet of device IDs, locations, and the dates

 2   and times of those locations.

 3      So once you have that information, you move into

 4   Step 2.  Step 2 requires that a determination be made

 5   of how many of those users you want to know more

 6   information about.  In Step 2, what Step 2 allows is

 7   contextual data.  So it removes the geographical

 8   limits as well as the time frame expands.  So you get

 9   more information about the movements of the people

10   chosen out of Stage 1 about where they moved before

11   and after the original geofence.  You end up with that

12   group of people.  And now you know where they came

13   from before the incident and then after.

14      Another determination needs to be made, and that's

15   Step 3.  Step 3, when you make that request to Google,

16   you're asking for all of the subscriber information or

17   all of the account information for the users that

18   you've selected.

19      So in each step, you have -- you've made the large

20   search of all users.  Then you move into Stage 2 of a

21   defined group out of that that you received.  And then

22   Step 3, again, another group that you've defined out

23   of that to finally understand and reveal who those

24   people are.

25   Q   Thank you.  I want to turn to the geofence warrant

**Exhibit E, pg. 26**

McINVAILLE – DIRECT                    27

1    in this case.  Specifically, I'd like to call your

2    attention to what's been marked Defense Exhibit 1.

3              THE COURT:  So the record is clear, Exhibit 1

4    is being shown on the screens here in the courtroom.

5    Q   Can you tell us what Exhibit 1 is, Mr. McInvaille?

6    A   This is the affidavit for a search warrant in this

7    case, the geofence warrant.

8    Q   And this is the geofence warrant you reviewed?

9    A   Yes, that's correct.

10   Q   Thank you.

11             MR. PRICE:  I'd like to admit Exhibit 1 into

12   evidence, Your Honor.

13             THE COURT:  Any objection?

14             MR. DUFFEY:  No objection, Judge.

15             THE COURT:  It will be entered.

16             MR. PRICE:  Thank you, Your Honor.

17             (Government's Exhibit No. 1 is admitted into

18   evidence.)

19   BY MR. PRICE:

20   Q   Okay.  So you just explained how geofence warrants

21   work generally.  We're looking at the warrant in this

22   case.  What happened here?  Tell us how this works.

23   A   So, again, there's a three-step process outlined

24   in this warrant, as well.  Again, a Stage 1, Stage 2,

25   and Stage 3.  So here the -- there's a time frame for

McINVAILLE – DIRECT                          28

1  May 20th of 2019.

2          THE COURT:  You have to talk about where

3  you're referring to on the piece of paper because

4  anybody reading this record is not going to have the

5  document in front of them.

6          THE WITNESS:  Yes, ma'am.  I'm under

7  Attachment 2 of the search warrant.

8  A    So it defines the time frame that's going to be

9  searched.  So it's May 20th of 2019 from 16:20 hours

10 until, on the same date, 17:20 hours.  So a one-hour

11 time period.

12     There's also a geofence drawn around a particular

13 location.  So they provide a latitude and longitude of

14 where they're going to draw this radius.  That radius

15 was 150 meters.  So the Stage 1 of that request was

16 for users located within that circle during that time

17 frame.

18         THE COURT:  Now I'm going to interrupt you

19 because it's my job to make sure the record is clear.

20 In Defense Exhibit 1, I have a document behind a

21 signed warrant that says Attachment 1, the place,

22 person or thing to be searched.  That has Roman

23 numeral -- not Roman numeral.  A numeral 1 at the

24 bottom.  And then the document I think you're showing

25 me, there's a version of it that has a page 2.  I'm

**Exhibit E, pg. 28**

McINVAILLE – DIRECT                    29

```
 1   trying to find what you're actually showing me in
 2   Exhibit 1.
 3              THE WITNESS:  I'm on Attachment 2.
 4              THE COURT:  Got it.
 5              THE WITNESS:  And it's pages 2 and 3 at the
 6   bottom.
 7              THE COURT:  My apologies.
 8              THE WITNESS:  No problem.
 9              THE COURT:  I'm with you now.
10   BY MR. PRICE:
11   Q   Okay.  So what happened at Stage 1 here,
12   specifically?
13   A   So Stage 1 was a request for all Google users for
14   that specific location.  So within that circle during
15   the hour time frame on May 20th.
16   Q   And what did Google have to do to produce that
17   information?
18   A   So from what Google has told us, they require the
19   search of all Location History accounts to complete
20   that search to find out who was inside of that circle.
21   Q   Do you know how many that was?
22   A   They stated it was numerous tens of millions of
23   accounts.
24              THE COURT:  When did they say that?
25              THE WITNESS:  That was in, I believe, Mr.
```

**Exhibit E, pg. 29**

McINVAILLE – DIRECT                     30

1    McGriff's declaration.

2              THE COURT:  I think it's Marlo McGriff.

3              THE WITNESS:  That's correct.

4              MR. PRICE:  We'll come back to it, Your

5    Honor.

6              THE COURT:  All right.

7    BY MR. PRICE:

8    Q    So after conducting a search of every Google user

9    with Location History enabled, how many users were

10   then sent back to law enforcement?

11   A    Sure.  So as a return for Stage 1, 19 unique

12   identifiers were provided with location information

13   for that one-hour time frame.

14   Q    Thank you.  And what happened after that?  What

15   happened in Stage 2?

16   A    So a Stage 2 request was made to Google.

17   Initially, a request for contextual data for all 19

18   were made.  I believe that request was made more than

19   once.  And Google responded saying that that number

20   needed to be reduced before they could respond to the

21   Stage 2 request for contextual data.

22        That number was reduced to, I believe, nine.  So

23   nine users had contextual data provided.  So that was

24   the data that provides you 30 minutes before the

25   initial time frame and 30 minutes after.  So now our

**Exhibit E, pg. 30**

McINVAILLE – DIRECT                    31

1   time frame has expanded to two hours where there are

2   no geographical limits during Stage 2 so that you can

3   see movement before and after and outside of the

4   original geofence.

5   Q    Thank you.  And then what happened in Stage 3?

6   A    So Stage 3, again, a request was made by law

7   enforcement for the Stage 3 request.  In that request,

8   they identified three users to reveal account

9   information for.

10  Q    Thank you very much.  I would like to show you a

11  slide from the report prepared by the FBI's Cellular

12  Analysis Survey Team, the CAST team, and it's marked

13  as Government's Exhibit 1.  I'd like to show you page

14  8.  Can you tell us what we're looking at here?

15  A    So this is a similar picture to what you see from

16  page 3 of attachment to --

17          THE COURT:  Can we just go through the

18  formality?  Does the government object to this being

19  placed in evidence since we're taking evidence from

20  it?

21          MR. DUFFEY:  We do not, Judge.  It's our

22  exhibit.  So no objection.

23          THE COURT:  Okay.  So Government Exhibit 1

24  will be in evidence.

25          MR. PRICE:  Thank you, Your Honor.

**Exhibit E, pg. 31**

McINVAILLE - DIRECT                    32

 1          (Government's Exhibit No. 1 is admitted into

 2   evidence.)

 3   BY MR. PRICE:

 4   Q    Sorry.  What are we looking at here?

 5   A    So this is a similar picture to what is displayed

 6   in the search warrant on attachment to page 3.  It

 7   shows the actual geofence.  So that's the large red

 8   circle here.  The point in the middle is the reference

 9   point that they provided to draw that radius from.

10   And then you see the area that's encompassed by the

11   geofence.

12   Q    What are the places immediately implicated by this

13   geofence?

14   A    Sure.  So you have the Call Federal Bank.  You

15   also have the Journey Christian Church.  There's the

16   parking lot for the church and bank, and then some of

17   the wooded area surrounding both of those.

18   Q    Thank you.  Can we go to the next slide, please.

19   So this is the next slide.  Can you tell me what

20   places are right outside the geofence as drawn?

21   A    Sure.  Special Agent -- he was able to identify

22   some of these.  And so you can, from his chart here,

23   you can see the apartments.  There's two different

24   sets of apartment complexes here.  Again, the

25   previously mentioned locations.

**Exhibit E, pg. 32**

McINVAILLE – DIRECT                    33

1      You have A.M. Davis, Inc., a company that's across

2    the street from the church.  You have the Hampton Inn

3    Hotel, which is just outside the church's parking lot.

4    There's restaurants as well as a mini storage facility

5    there.

6          THE COURT:  I'm just going to put on the

7    record this is page 9 of the same report of

8    Government's Exhibit 1.

9    Q   Okay.  I'd like you to take a look at Defense

10   Exhibit 3.  If we could bring that up.

11         MS. KOENIG:  Your Honor, this is an exhibit

12   that the Court had previously placed under seal.  It

13   is the raw data from what Google produced.  And so I

14   believe since we are broadcasting to a different

15   courtroom, it may be best to look at the paper copies

16   of this, but it is Defense Exhibit 3.

17         THE COURT:  Is there any objection to that

18   from the government?

19         MR. DUFFEY:  No objection, Judge.

20         THE COURT:  All right.  This has been placed

21   under seal because of the potentially identifying

22   information that is within it.  And so we will review

23   this document under seal.

24         MR. PRICE:  Thank you, Your Honor.

25   Q   Can you tell us what is Defense Exhibit 3?  What

**Exhibit E, pg. 33**

McINVAILLE – DIRECT                    34

1   are we looking at?

2   A   Yes.  So it's the Stage 1 return for the Google

3   geofence.  It's the letters from Google telling you

4   what they provided as well as PDF versions of the

5   Excel spreadsheets or CSVs that were from Google.

6   Q   So just to clarify, this is the raw data returns

7   from the geofence warrant?

8   A   Yes.  This is what you would use to look and see

9   where one of these devices was on the map.  It

10  provides you with locations and information about what

11  was requested in Stage 1.

12  Q   Can we take a look at column A?

13          THE COURT:  Okay.  We have to move them into

14  evidence.

15          MR. PRICE:  Excuse me.

16  Q   You reviewed this in preparation for your

17  testimony?

18  A   That's correct.

19          MR. PRICE:  I'd like to move this into

20  evidence as Defense Exhibit 3, please.

21          THE COURT:  Right.  Any objection?

22          MR. DUFFEY:  No objection.

23          THE COURT:  All right.

24          MR. PRICE:  Thank you for reminding me.

25          (Defendant's Exhibit No. 3 is admitted into

**Exhibit E, pg. 34**

McINVAILLE – DIRECT                                35

1    evidence.)

2    Q    Can we take a look at Column A, please.

3    A    Yes.

4    Q    What does it say at the top of Column A?

5    A    Column A is defined as device ID.

6    Q    What about Columns B and C?

7    A    B and C provide us a date and time.

8    Q    How about D and E?

9    A    D and E are the estimated latitudes and longitudes

10   for those records.

11   Q    So tell me more about that.  How do those

12   estimated latitude/longitude points relate to the

13   geofence warrant?

14   A    Sure.  So these specific points -- so latitude and

15   longitude is a reference of a point on earth.  And

16   these are the points that fell within the red circle

17   that we previously spoke about.  So within the

18   geofence.

19   Q    So where that latitude/longitude point is

20   determines whether it gets reported in the geofence

21   warrant returns?

22   A    That's correct.  So if this point were to have

23   fallen outside of the red circle, it would not be

24   provided.  If it falls within the red circle, it is

25   provided.

**Exhibit E, pg. 35**

McINVAILLE – DIRECT                    36

1   Q    Okay.  Now, let's look at Column G.  What's that

2   column?

3   A    That's the maps display radius in meters.

4   Q    In that column, there are some numbers, right?

5   A    Yes.

6   Q    What are those numbers?

7   A    That is the estimated radius.  So from the

8   estimated latitude and longitude, a circle is then

9   drawn, a radius circle is drawn around that point, and

10  that's the estimation that the device should be within

11  that circle by the estimate.

12          THE COURT:  Within the second circle, not the

13  original circle?

14          THE WITNESS:  Correct.  This circle is drawn

15  around the individual points for that specific user

16  for that specific record.

17  BY MR. SIMON:

18  Q    How does Google draw that display radius?

19  A    It would -- I don't know how they come up with it.

20  Q    How does it appear?

21  A    Oh, it appears -- when you draw it on the map, it

22  appears to be the estimated latitude and longitude

23  point in one place with a circle drawn around that to

24  show you the area that the phone could have been in or

25  the device could have been in.

**Exhibit E, pg. 36**

McINVAILLE – DIRECT                    37

1   Q   Google has talked about something called a

2   confidence interval.  What's a confidence interval?

3           THE COURT:  So you cannot be showing exhibits

4   you're not talking about.

5           MS. KOENIG:  Your Honor, that's my fault.  My

6   screen is locked, and I can't get out.  So if we could

7   unlock my screen, potentially I could get out to the

8   correct exhibit.

9           THE COURT:  Okay.

10          THE CLERK:  I don't have control of your

11  screen.

12          MS. KOENIG:  There's a little lock button on

13  the screen, Your Honor, on the right-hand side, and I

14  was able to change exhibits before that lock appeared.

15          THE CLERK:  Where it says "no stream

16  detected"?

17          MS. KOENIG:  Right above where it says "no

18  stream detected."

19          THE CLERK:  That's been there all along.

20          THE COURT:  I just want to be clear, this is

21  still part of Government's Exhibit 1.

22          MS. KOENIG:  Correct.  I wasn't intending to

23  go to this stage, Your Honor.  I was trying to get to

24  the next exhibit, but it is frozen.  There we go.  All

25  right.  Okay.

**Exhibit E, pg. 37**

McINVAILLE - DIRECT                          38

1          MR. PRICE:  All set?

2          MS. KOENIG:  Yes.

3          MR. SIMON:  Okay.  Sorry about that, Your

4   Honor.

5          THE COURT:  That's okay.

6          MS. KOENIG:  We're down to one paralegal in

7   the Federal Public Defender's Office.  I'm serving

8   double duty, and it is not my specialty.

9          THE COURT:  Congratulations on having a

10  paralegal.

11         MS. KOENIG:  Fair enough.

12  BY MR. PRICE:

13  Q   Google has talked about something called a

14  confidence interval.  Can you explain to us what a

15  confidence interval is?

16  A   Yes.  So they described it -- when they estimate

17  the point on earth, so the latitude and longitude, and

18  once they draw that circle around that point, the

19  display radius, they have a rating or a goal of being

20  how confident they are that they made the correct

21  estimation, and that's 68 percent is their goal in

22  determining the location on earth.

23  Q   So they're saying -- so just to clarify.  They try

24  to be -- rephrase that.  Is that a probability that

25  somebody is going to be in there or just a certainty?

**Exhibit E, pg. 38**

McINVAILLE - DIRECT                    39

1   A    It's their goal to be correct 68 percent of the

2   time by estimating this latitude/longitude and drawing

3   a circle around it, and that the phone should be

4   located or the device should be located within that

5   circle.

6              THE COURT:  At 68 percent?

7              THE WITNESS:  Correct.  That's the goal.

8              THE COURT:  And you used a phrase "confidence

9   integral"?

10             MR. PRICE:  Interval.

11             THE COURT:  You've just got to be a little

12  more clear because your witness hasn't said it.

13             MR. PRICE:  Sorry.

14             THE WITNESS:  Yes.  That was their

15  description of their confidence interval in the --

16             THE COURT:  Interval not integral?

17             THE WITNESS:  Yes, interval.  Sorry.

18             THE COURT:  Okay.  Thank you.

19  BY MR. PRICE:

20  Q    Can you tell us what this confidence interval has

21  to do with the geofence warrant?  What does it mean

22  for how the results come in?

23  A    As far as the results, we have to look at where

24  the point is referenced on earth, the maps display

25  radius, and just understand that even though it

**Exhibit E, pg. 39**

McINVAILLE – DIRECT                    40

 1   provides that radius where the device should be

 2   located, it doesn't mean that it's absolutely within

 3   that radius either.

 4   Q    So what does it do to the effective range of a

 5   geofence warrant?

 6   A    It could make it larger.

 7   Q    I want to show you another slide from the CAST

 8   report.  This will be Slide No. 20, page 20, of that

 9   PDF.

10            THE COURT:  So that's Government's Exhibit 1,

11   page 20.

12            MR. PRICE:  Thank you.

13   BY MR. PRICE:

14   Q    Mr. McInvaille, what are we looking at here?

15   A    So, again, the red circle is the original geofence

16   drawn.  Each of the pin drops that you see, the blue

17   and the red, indicate that the two differences between

18   either GPS points that were located or Wi-Fi points

19   that were located for a user.  I believe this is an

20   aggregation of all of the people for the Stage 1

21   return shown on the map.

22        And each of the blue circles that you see are

23   those display radiuses provided in the records for

24   each of those points.

25   Q    So what do those -- those blue circles, that's the

**Exhibit E, pg. 40**

McINVAILLE - DIRECT                    41

1    display radius?

2    A    Yes.   That's the estimation that Google has

3    provided for where the device could be based on their

4    estimate for that record.

5    Q    What do they tell us about the effective range of

6    the geofence in this case?

7    A    Sure.   So if you were looking at one of these

8    circles that extends outside of the geofence, so

9    there's a few that you see, you see the larger one,

10   and then you also see the others that encompass the

11   roadway to the right or to the north.

12        Since the device could be anywhere within that

13   circle, if the estimated latitude and longitude is off

14   enough that it places the device inside the circle,

15   even though it was not, that device is now included in

16   this return even though the device never actually

17   traveled within the circle.

18   Q    So I want to take a look at that big blue circle

19   there.   What is that?

20   A    That's a -- I believe that was the largest display

21   radius provided for one of the records in the Stage 1

22   return.

23            THE COURT:   Do you believe it or it is?

24            THE WITNESS:   It is.

25   Q    And what was the display radius for that point?

**Exhibit E, pg. 41**

McINVAILLE - DIRECT                    42

1   A    387 meters.

2   Q    How does that compare to the size of the radius

3   for the geofence as drawn?

4   A    You can see from the map that it's roughly twice

5   if not just a little bit larger than the original red

6   circle.  So the geofence circle.

7   Q    So the radius is about twice as large?

8   A    Yes, if not just a little more than twice.

9   Q    What about the area covered by that?

10  A    As far as like the squared area?

11  Q    Yes.

12  A    It would be a much larger area when you talk about

13  area.  Just expanding that circle greatly increases

14  the actual area that would be compassioned by that

15  circle.

16  Q    So I promised I wouldn't make you do math on the

17  stand.

18           THE COURT:  You know, you're talking to him,

19  but we need to hear you.  And so it is more formal --

20           MR. PRICE:  You can't hear me?

21           THE COURT:  I can't hear you.

22           MR. PRICE:  I said I promised Mr. McInvaille

23  I wouldn't make him do math on the stand on the fly.

24  BY MR. PRICE:

25  Q    So I'm just going to say the area of the geofence

**Exhibit E, pg. 42**

McINVAILLE - DIRECT                    43

1   as drawn, did you calculate that at some point?

2   A    I did.

3   Q    And was it approximately 71,000 meters squared?

4   A    That's correct.

5   Q    And the area of the large blue circle, did you

6   calculate that area at some point?

7   A    I did.  So the larger was, I recall, to be about

8   470,000 meters.

9   Q    Thank you.  And --

10          THE COURT:  Can you repeat the first one,

11  please.  I'm sorry.

12          THE WITNESS:  Ma'am?

13          THE COURT:  The first, the regular geofence.

14          THE WITNESS:  About 71,000 meters, I believe.

15          THE COURT:  Okay.

16  BY MR. PRICE:

17  Q    And how many times larger is 470,000 compared to

18  71,000?

19  A    Roughly, I would say six times.

20  Q    About six times?

21  A    About six times.

22  Q    So is it possible that these map display radiuses

23  could create a false positive?

24  A    Yes, if you mean could someone be outside of the

25  original geofence and actually be returned as if they

**Exhibit E, pg. 43**

McINVAILLE - DIRECT                44

```
 1    were inside the geofence.

 2    Q    How would that work?

 3    A    So if you're traveling by this geofence and the

 4    estimation that is made is incorrect enough that --

 5    let's just say you're driving down the road here and

 6    that your physical device is actually on --

 7              THE COURT:  How about you name the road?

 8              THE WITNESS:  I believe it's Price Club

 9    Drive.

10    A    If you're on Price Club Drive driving past the

11    geofence and you don't actually cross into it, if

12    Google estimates your estimated latitude and longitude

13    to be within the circle, then you would have been

14    included in this return even though the device never

15    traveled within the geofence.

16              THE COURT:  Within the blue circle?

17              THE WITNESS:  Within the red circle.

18              THE COURT:  Okay.

19    BY MR. PRICE:

20    Q    So a false positive here would be putting somebody

21    inside the geofence that wasn't there.  Is it possible

22    to have a false negative?  How would that work?

23    A    Sure.  So if you -- if the opposite occurred, if

24    you were inside of the geofence, but the estimation

25    was made that your latitude and longitude fell outside
```

**Exhibit E, pg. 44**

McINVAILLE – DIRECT                    45

 1   of the circle, then you would have not been included.

 2            THE COURT:  Wait, wait, wait.  So why don't

 3   you -- so you're saying that if you're inside the

 4   original geofence and the estimate is larger than,

 5   say, 150 meters, you wouldn't be reported?

 6            THE WITNESS:  So what causes you to be

 7   included is the estimated latitude and longitude.  If

 8   you kind of leave off the display radiuses, those blue

 9   circles, at the moment and just think of the estimates

10   of the point that's given, so the latitude and

11   longitude, if that estimate falls within the geofence,

12   you are included.  If that estimate falls outside of

13   the geofence, you are excluded.

14            So the false positive occurs when that

15   estimate is incorrect but actually falls within the

16   fence even though you weren't in the fence.  The

17   opposite, the false negative, occurs when the device

18   is actually inside the geofence but the estimate made

19   falls outside the geofence.

20            THE COURT:  So I'm looking at Column G in the

21   exhibit that's under seal.  In order to return a false

22   negative, would G have to have a number above 150?

23            THE WITNESS:  No, no.  The false positives

24   and negatives only occur due to D and F.  Excuse me, D

25   and E.  The display radius is just the error radius

**Exhibit E, pg. 45**

McINVAILLE – DIRECT                        46

 1   drawn around each point.  The estimated latitude and

 2   longitude is what's critical in determining who will

 3   or will not be returned in the geofence originally.

 4          THE COURT:  So there's nothing in this

 5   exhibit, Defense Exhibit 3, that shows you an estimate

 6   that could fall outside, a false negative?

 7          THE WITNESS:  So if the false negative

 8   occurred, that means the device would have been inside

 9   the geofence.  But by the estimate made by Google it

10   fell outside the fence, so they were not returned in

11   this, if that occurred.

12          THE COURT:  G reflects the -- tell me what G

13   reflects again.

14          THE WITNESS:  G just reflects the blue circle

15   that's drawn around these points.  And all that is is

16   the actual confidence that they place on the estimate.

17   So if you see a point on the map with a very small

18   circle, then they're giving you a smaller area that

19   the device could have been in.  A larger one, of

20   course, is a larger area the device could have been

21   in.

22          THE COURT:  I thought it was reflecting the

23   meters with which the confidence was expressed.

24   That's not true?

25          THE WITNESS:  I'm sorry?

**Exhibit E, pg. 46**

McINVAILLE - DIRECT                47

 1          THE COURT:  I thought it was expressing the

 2   meters within which the confidence was expressed.  So

 3   if it said 50, that it was within 50 meters of the

 4   longitude and latitude.  That is not correct; is that

 5   right?

 6          THE WITNESS:  That is the estimation.  That's

 7   what the display radius is for is to understand in

 8   relation to the estimated point of how far away the

 9   device should generally be from that estimate.

10          THE COURT:  Right.  So that -- maybe I'm

11   going too far in depth, but if it's more than 150, if

12   the estimate can't fall within 150 meters, it is not

13   going to be reported because the geofence only goes to

14   150 meters.

15          THE WITNESS:  Yes, but that reporting occurs

16   because of D and F, not because of G.  G is just a

17   further piece of data that's given to us to understand

18   the individual points.

19          THE COURT:  Okay.  I get it.  No one else

20   gets what I get, but I get it.  So that's good.

21          MR. PRICE:  I might give it one more try.

22   BY MR. PRICE:

23   Q   Maybe we can run through a quick hypothetical

24   here.  All the blue and red points on this exhibit are

25   inside that red line; right?

**Exhibit E, pg. 47**

McINVAILLE – DIRECT                    48

1   A    That's correct.  So they report it as being within

2   the geofence, so they were returned.

3   Q    If we suppose that there was somebody standing

4   right outside of that red circle, maybe at the Ruby

5   Tuesday Restaurant, and they had an error radius -- a

6   delay radius of, say, 100 meters.  Would that display

7   radius intersect with the geofence warrant?

8   A    It could, but that point wouldn't be returned.  If

9   that point is outside of the red circle, then it will

10  not return within this stage of the request.

11  Q    And it's also possible if we had somebody whose

12  actual location was inside that geofence, but their

13  radius extended outwards, it's possible that they

14  might be outside that geofence?  That they wouldn't

15  actually be at their marker?

16  A    It's possible.  Like if you look at the point,

17  it's kind of a long point up to the top edge of the

18  red circle as you move north.  As you see, that

19  display, the point is within the circle, but the

20  radius actually extends out just a touch over towards

21  the Hampton Inn.

22       The phone actually or the device could be to the

23  outer edge of that circle, which is outside of the

24  geofence.

25            MR. PRICE:  Does Your Honor have any

**Exhibit E, pg. 48**

McINVAILLE – DIRECT                    49

 1    questions further on that point?

 2              THE COURT:  I will think about it, and I'll

 3    ask questions.  We have Google folks coming.

 4              MR. PRICE:  Thank you, Your Honor.

 5    BY MR. PRICE:

 6    Q   So if this big blue circle is the effective range

 7    of the geofence, can you tell us which places were

 8    encompassed by it?

 9    A   For this specific device, if that's where the

10    device could be, you have -- again, you have the Price

11    Club Drive, the road, you have Hull Street included,

12    the Mini Price Storage, looks to be a few sets of

13    apartments down here to the south and southeast side

14    of it.  The A.M. Davis, Inc., again, that we spoke

15    about.  Rockwood Village Apartments is the one I -- I

16    can see it better now.  So there's two sets of

17    apartments there, as well, that are included.

18        So this device could have been anywhere around

19    that location.

20    Q   Thank you.  I'm just going to switch gears here

21    for a second.  The government likens the geofence

22    warrant to a tower dump in their briefing.  Can you

23    tell us, what's a tower dump?  And would it have been

24    useful here?

25    A   A tower dump is a similar request.  You don't

**Exhibit E, pg. 49**

McINVAILLE – DIRECT                    50

1   really know what you're asking for.  You're making a

2   request to the cell phone carriers for users, their

3   subscribers, that are using towers in the area of,

4   like, for instance, here, in the area of the bank.

5   What they're going to return is spreadsheets that are

6   going to tell you phone numbers that were using those

7   towers that service that area.

8       The kind of point of all that is normally what you

9   have is maybe one or two or more locations where

10  incidents have happened over time.  And what you're

11  looking for as a result of these tower dumps is a

12  common number or common numbers that show up in these

13  records.

14      As a result of that, based on the process of

15  elimination and the time of these incidents, if

16  they're far enough apart and unique enough in time

17  frames as far as small time frames, you would only

18  expect if several incidents occur over a three-day

19  period at different locations, that you -- if it's the

20  same person, that you should only see one or two or a

21  group of people working that specific thing.  So it's

22  a process of elimination that lets you understand when

23  you don't have a suspect or an unknown group of

24  suspects, it's meant to help you identify those

25  people.

**Exhibit E, pg. 50**

McINVAILLE – DIRECT                    51

 1        So that's a -- it's a request similar to this.  We

 2   don't know what we're looking for.  We just know that

 3   people have phones.  So we're hoping that our suspect

 4   was using one and that he will be captured within

 5   those requests.

 6   Q    So would it have been useful in this case?

 7   A    It's difficult to say how useful it would be.  You

 8   only have one location and date and time.  So if you

 9   return back a thousand records, and you end up with a

10   thousand phone numbers, you have nothing to compare it

11   to, to really understand who in that group belongs

12   there, lives there, works there, any of that, unless

13   you know the phone number you're looking for.

14   Q    Okay.  Thank you.

15        Let's go back to the beginning of Stage 1.  I

16   think I asked you this earlier, but tell us how does

17   Google know which devices are there?

18   A    So within that geofence, again, it's a location on

19   earth.  They search the user's location history.  So

20   that repository of data of location history for their

21   users and compare that latitude and longitude to see

22   which users fit into that location.  So broadly look

23   at the data and pick out the ones that fall within

24   that group.

25   Q    So how did you learn about this?

**Exhibit E, pg. 51**

McINVAILLE – DIRECT                    52

1    A    Through the declarations submitted by Google.

2          MR. PRICE:  I'd like to pull up the first

3    McGriff declaration, please.  It's Defense Exhibit 21.

4    Q    What is this document?

5    A    It's the declaration of Marlo McGriff.

6    Q    And did you review this in preparation for your

7    testimony today?

8    A    I have.

9          MR. PRICE:  Your Honor, I'd like to move this

10   into evidence, please.

11         THE COURT:  Any objection?

12         MR. DUFFEY:  No objection.

13         THE COURT:  It will be entered.

14         (Defense Exhibit No. 21 is admitted into

15   evidence.)

16   BY MR. PRICE:

17   Q    So Google has to search through everybody in the

18   Location History database.  Do you know about how many

19   people that is?

20   A    They state numerous tens of millions.

21   Q    I'd like to draw your attention to paragraph 13,

22   please.  Can you read for us paragraph 13?

23   A    Yes.  So, "In 2019, the majority of Google users

24   worldwide did not have Location History, LH, enabled

25   on their account.  While a more precise percentage is

**Exhibit E, pg. 52**

McINVAILLE - DIRECT                    53

 1   difficult to calculate in part due to fluctuating

 2   numbers of users in 2019, roughly one-third of active

 3   Google users (i.e., numbers tens of millions of Google

 4   users) had LH enabled on their accounts."

 5   Q    So to conduct the geofence search in this case,

 6   the government had Google search through everyone with

 7   Location History enabled and Google estimates that at

 8   numerous tens of millions of users?

 9   A    Correct.

10   Q    In your experience, how does that number, numerous

11   tens of millions, how does that compare to other types

12   of warrants seeking location information?

13   A    So, for -- you know, when we look at a request for

14   call detail records for a single user, of course,

15   that's a single user, normal Location History request

16   for a specific account when they name the account

17   because we know who we're looking at.  Again, that's

18   one user.

19        Probably the only thing comparable would be, say,

20   the tower dump that you asked about earlier.  But,

21   again, as far as that number of people, it's not -- it

22   wouldn't be close to that.

23   Q    So, I want to turn your attention back to the CAST

24   report.  And this is Government's Exhibit 1 at page

25   13.  Can you tell us what we're looking at here?

**Exhibit E, pg. 53**

McINVAILLE - DIRECT                    54

1   A    Yes.  This is the FBI CAST report, and there is --

2   you see the Sprint towers notated with the yellow kind

3   of antenna sign.  You have the Call Federal call out,

4   so showing you where the bank is.  You see the red

5   circle for the geofence in there.  And then a

6   parameter is outlined with blue here, which they've --

7   which they've indicated as the estimated tower dump

8   area had they conducted one with Sprint here.

9   Q    So there wasn't a tower dump in this case, just to

10  clarify?

11  A    No.  This looks to be a hypothetical of what that

12  would look like if one was conducted.

13  Q    How is this hypothetical set up?

14  A    So it's showing you three towers that would --

15  that are in proximity to the credit union.  Then you

16  also see the geofence there and how it relates to

17  those towers.

18       The blue appears to kind of indicate probably the

19  estimated coverage that you would get from those three

20  towers that are encompassed by the blue polygon.  So

21  what it's trying to show you is the area that would

22  likely be affected had that request been made.

23  Q    Would the government -- well, let me rephrase.

24  Working with this hypothetical, in your experience,

25  about how many people, how many users, would have

**Exhibit E, pg. 54**

McINVAILLE – DIRECT                              55

 1   their records searched from a tower dump of just one
 2   of these towers?
 3   A    It's hard to say just because you're relying on
 4   how many people are using their device at the time,
 5   the number of people that you have in that area.   I
 6   don't -- I have seen in past tower dump data sets a
 7   thousand users can be pulled for one of these towers.
 8   Q    So roughly a thousand for one tower?
 9   A    Possible.
10   Q    And I guess if we're doing three, how many users
11   would that be?
12   A    Sure.  If you kept that estimate, you'd be looking
13   at, if you kept a thousand being what you think could
14   be encompassed, it could be 3,000 based on three
15   towers.
16   Q    So 3,000 for the hypothetical here.  How does that
17   number compare to the numerous tens of millions in a
18   geofence warrant?
19   A    I don't know that it really does compare, but it's
20   much less than numerous tens of millions.
21   Q    I won't make you do any more math.
22   A    Thank you.
23   Q    I'll change gears here slightly.  I want to ask
24   you what this information tells you.  What sort of
25   information can you get from Location History data?

**Exhibit E, pg. 55**

McINVAILLE - DIRECT                    56

1    A    From location?

2    Q    Yeah.

3    A    So with location for a specific person, you can

4    learn a lot about a person.  You can learn about their

5    movements, the places that they frequent, places that

6    they frequently travel or places they attend.  So, for

7    instance, when people have schedules, where they go to

8    church on Wednesday.  You could see if someone

9    commonly goes to one of those particular locations,

10   where they work, where they live, pretty much anything

11   about daily life if you have enough points to look at.

12   Q    How many is enough?

13   A    How many?

14   Q    How many is enough data points?

15   A    You wouldn't need too many.  You don't need days

16   and days' worth of records.  I mean, you can learn a

17   little bit with just a small amount of data.  You may

18   not learn everything, but it doesn't take many data

19   points to pick out a way of, you know, just a few

20   locations, only one specific person could likely show

21   up to each of those locations if you know the date and

22   time that they were there.  So it wouldn't take much

23   data.

24   Q    And how many data points do you think you might

25   need to determine someone's identity?

**Exhibit E, pg. 56**

McINVAILLE – DIRECT                    57

1   A   With just a handful, again, if you know if

2   somebody shows up at four or five places in any given

3   time, you know the date and time that they were there,

4   pretty much you could learn something about that

5   person.

6   Q   So how do you know all this?

7   A   I look at location data for a living.  It's what I

8   do.  It's what I did prior to this job.  I was in law

9   enforcement and looked at data to try and get patterns

10  for people's movements.

11  Q   Have there been any studies written about this?

12  A   Sure.  I researched a few studies about Location

13  History and how that information is gathered and used

14  for ads and personalizing stuff to particular people.

15  Q   I'd like to turn your attention to what's been

16  marked as Defense Exhibit 9.  Can you tell us what

17  this is, please?

18  A   Yes.  That was a report written.  It's called

19  "Unique in the Crowd:  The Privacy" -- I'm sorry.  The

20  "no stream detected" is blocking.  It's an article

21  about location and privacy.  "The privacy bounds of

22  human mobility" is the rest of it.

23  Q   And this is a report that you reviewed in

24  preparation for your testimony today?

25  A   Yes, I've reviewed this.

**Exhibit E, pg. 57**

McINVAILLE – DIRECT                    58

1          MR. PRICE:  Your Honor, I move to admit this

2     into evidence.

3          THE COURT:  Any objection?

4          MR. DUFFEY:  Judge, I do object to this.  I

5     don't know what the relevance of moving an article in

6     that he didn't write.  He can testify about it, that

7     he read it, and talk about it, I suppose.  He's an

8     expert.  But to move the entire article into evidence

9     as if we all agree it's all factually correct, I have

10    no idea if it's correct.  I don't know who the author

11    is.  I don't believe Mr. McInvaille knows the author.

12    And so I object to it being moved wholesale into

13    evidence.  I don't object to him talking about it if

14    he wants to talk about it.  But that's my objection,

15    is to relevance.  And it's also quite clearly hearsay.

16    I understand we're at a motion to suppress, and that's

17    the Court's discretion on that.  But I just don't

18    understand the relevance of moving entire articles

19    into evidence just because he read them.  That's my

20    objection.

21         MR. PRICE:  Your Honor, Mr. McInvaille used

22    these reports in the preparation of his reports.  They

23    are not being admitted for the truth of the matter

24    even though we are under relaxed rules during our

25    hearing here today.  So we believe that it should be

**Exhibit E, pg. 58**

McINVAILLE – DIRECT                    59

 1   in evidence.  This is information that our expert

 2   relied on to draw his conclusions.

 3              THE COURT:  Well, I'm going to overrule the

 4   objection, but it's clear that we're not admitting it

 5   for the truth of what is in the article.  It is a

 6   basis for the expert's testimony, and it cannot be

 7   admitted wholesale for the purpose of what the

 8   government is concerned about, which is that without

 9   any other testimony, we don't know anything about the

10   study itself or how it was conducted.  So it's really

11   admitted as background information.

12              MR. PRICE:  Thank you, Your Honor.

13   BY MR. PRICE:

14   Q   Mr. McInvaille, can you tell us what your takeaway

15   was from this report?

16   A   Sure.  The idea here is that just a few data

17   points are revealing of a person's identity is the

18   gist.

19   Q   Do you remember how many were sufficient in this

20   case?

21   A   I believe they say four data points can tell you

22   about a person.

23   Q   So how long have you been working with location

24   data?

25   A   When I began working violent crimes.  So probably

**Exhibit E, pg. 59**

McINVAILLE – DIRECT                    60

 1  eight or nine years.

 2  Q    And in your experience, is that correct, the

 3  report's conclusion about the number of data points

 4  necessary on average to find somebody?

 5  A    I mean, it's -- not always is four points

 6  indicative of it, but yes, it can be.  It depends on

 7  those points and what they tell you, but yes.

 8  Q    So, for instance, in this case, you previously

 9  created a video visualizing the geofence data for

10  three users; is that correct?

11  A    Yes, that was the Stage 2 return.  So that

12  contextual data for some of those users.

13  Q    I'd like to show you what's been marked as Defense

14  Exhibit 5.  Is this the video you created?

15  A    Yes.

16  Q    Can you tell us what you did to create it?

17  A    Yes.  So, just using the latitude and longitude

18  here so that you can understand the paths moving,

19  again, there are display radiuses that go along with

20  these, but this is more to just understand the general

21  movement of these three devices and how they related

22  from -- here what you see in the very beginning of

23  each is where they fell within the geofence.  And then

24  as it moves along, it shows you where they were

25  before, during, and then after the geofence for that

**Exhibit E, pg. 60**

McINVAILLE – DIRECT                    61

 1   period of time.

 2   Q    Thank you.

 3             MR. PRICE:  Your Honor, I'd like to move this

 4   video into evidence.

 5             THE COURT:  No objection, is there?

 6             MR. DUFFEY:  No, Your Honor.

 7             THE COURT:  It's admitted.

 8             (Defense Exhibit No. 5 is admitted into

 9   evidence.)

10   BY MR. PRICE:

11   Q    Can we go ahead and play the video and have you

12   describe slowly what is the happening here?

13   A    Sure.

14        (Video is played.)

15   A    So, again, you have the -- this is the initial

16   return for this user.  So the user ID is in the top

17   left corner, and it shows you where they began in the

18   warrant return.

19             THE COURT:  I'm going to put on the record

20   it's not identifying as to an individual; right?  This

21   is the Google number?

22             MR. PRICE:  No, Your Honor.  We previously --

23   that's a time stamp that you're looking at there.

24   That's the number that you see.  And for

25   identification purposes, we've been referring to this

**Exhibit E, pg. 61**

McINVAILLE – DIRECT                    62

 1  user or we had in the past as Mr. Green.

 2          THE COURT:  All right.  Mr. Green.  Got it.

 3  A   So in answering that question, the user here

 4  starts at this hospital here.  And as you will see,

 5  they leave that location and travel south towards the

 6  geofence.  You can see generally the path that they

 7  take, and as they travel south, it continues down to a

 8  residential area where it finally ends and the -- as

 9  far as the data goes that we were provided ends there

10  in this residential area.

11  Q   What does it tell you about what -- what do those

12  cluster of dots over a house tell you?

13  A   Sure.  So you notice that those dots end up

14  stopping at a given point.  So here they kind of

15  cluster around a house or a few houses here in this

16  one area, meaning that the --

17          THE COURT:  You're going to have to use

18  phrases other than "in this one area," because we have

19  a written record.

20          THE WITNESS:  Sorry.

21          THE COURT:  Because we have a written record.

22          THE WITNESS:  Understood.

23  A   So you see that the path had traveled down to this

24  residential area here on the map.  There is Decoy Lane

25  is shown.  So you see that it's at an address on Decoy

**Exhibit E, pg. 62**

McINVAILLE – DIRECT                    63

 1  Lane or at least, you know, would be located very

 2  close in proximity to a few of these houses here on

 3  Decoy Lane.

 4  Q   Were you able to determine whose residence that

 5  is?

 6  A   I think you could.  I looked at tax records and

 7  things like that for these houses in the area to take

 8  a look and see if based on knowing just the location,

 9  that you could possibly determine names for people

10  there in that specific location.

11  Q   I won't ask you to put the name on the record, but

12  for Mr. Green, were you able to identify his likely

13  identity?

14  A   I was able to find some names for people from that

15  residence for tax records.  So, you know, I don't know

16  that they are positively identified, but yes, there's

17  information available for records for that area.

18  Q   Would law enforcement have access to the same sort

19  of information?

20  A   Yes, this is publicly available information.  You

21  can search it on the internet.

22  Q   Thank you.  Can we resume the video and talk about

23  Mr. Blue?

24  A   So, again, blue -- starting here, this would have

25  been the point that was returned for Stage 1 for that

**Exhibit E, pg. 63**

McINVAILLE – DIRECT                    64

1   device, and then we will see it move into the Stage 2

2   portion.  So before, during, and after the geofence.

3       So you'll see to the bottom left here underneath

4   the geofence there's the apartment complex just to the

5   south.  I don't recall the specific name of it, but

6   it's just to the south off of Price Club Drive.  So

7   you see that the user's device is located in that

8   complex and then begins to move outside of the complex

9   up north to Hull Street before traveling some more.

10           THE COURT:  Can you identify where it starts?

11   You said it starts here in the geofence.  What is

12   that?

13           THE WITNESS:  So the first point that was

14   referenced from Stage 1 for that user, the point

15   given, the estimated latitude and longitude, was there

16   at the church, the Journey Christian Church.

17   Q   Is that the first point in time or just the one

18   that you got first?

19   A   I believe that's the point that was given for that

20   user for the Stage 1.  And then now you're also seeing

21   the Stage 2 portion of that.

22   Q   So this user starts where?

23   A   At the apartment complex just to the south of the

24   geofence.  So located along the southern side of Price

25   Club Drive just south of the geofence.

**Exhibit E, pg. 64**

McINVAILLE - DIRECT                    65

1   Q   And then what happens after he leaves his house?

2   It looks like there's a point right inside the church.

3   A   Yes.  So you see that at some point during the

4   video right here, it moves from several points that

5   fall in the apartment complex and then begins to move

6   outward as if it's moving from the apartments to Hull

7   Street, which would, you know, the likely path would

8   take you past the -- down Price Club Drive and past

9   the geofence.

10              THE COURT:  Past what?

11              THE WITNESS:  The geofence.

12  BY MR. PRICE:

13  Q   So, in other words, this may be an example of a

14  false positive?

15  A   It's possible.

16  Q   Could you explain why?

17  A   So, of course, you see the point there on top of

18  the church which falls within the fence, which is how

19  you get included.  If this user was passing by and the

20  estimate was incorrect, if we assume that they were

21  driving down Price Club Drive and didn't enter the

22  parking lot and only continued down the roadway, which

23  was not included, if the estimate was incorrect and

24  thought that the device actually did travel through

25  the geofence, then this person was included even

**Exhibit E, pg. 65**

McINVAILLE - DIRECT                    66

1   though they did not pass through the geofence.

2   Q   How would that happen in terms of the location

3   data?  Was this a Wi-Fi or a GPS point?

4   A   I'm not sure, but it would be based off of a --

5   just due to the estimate, and its just inherent

6   inability to perfectly place someone on earth.

7   Q   So where does Mr. Blue wind up at the end of the

8   day?

9   A   Sure.  So you see it travel south.  It appears to

10   travel to another residence in this area.  I'm not

11   sure of the road name here, but it ends up in this

12   portion moving down to a more spread out residential

13   area just south of where the geofence was and clusters

14   around a single residence there before, I believe,

15   moving back north again.

16         THE COURT:  It's near the intersection of --

17   is it Alberta Road, counsel?

18         THE WITNESS:  Yes, I see Albert Road.  I was

19   going to try to annotate it.  Yeah, they're just south

20   of where Alberta Road intersects with this other

21   street.

22         MS. KOENIG:  Your Honor, Mr. McInvaille can

23   touch the screen and actually circle it so that it's

24   clear for everybody.

25         THE COURT:  It's three dots.  The more we can

**Exhibit E, pg. 66**

McINVAILLE – DIRECT                    67

1    tie it to something, somebody else looking at it can

2    find it, we need to do that.  All right.

3    BY MR. PRICE:

4    Q    So this is where the cluster ends for the records

5    that we have?

6    A    No, I believe it moves back north, but this is

7    where they cluster for just a moment.

8    Q    And would law enforcement be able to do anything

9    with the information about the location of that

10   residence?  Would they be able to identify the likely

11   residence?

12   A    Yeah, it's possible this is clustered enough on

13   that location that you would believe that that device

14   did travel to that address.  These are a little

15   more -- these homes are a little more disbursed than

16   the ones we spoke about on Decoy Lane.  But, again,

17   you could assume based on what you see here that that

18   device traveled to that location.  And, again, you can

19   use publicly available information as well as law

20   enforcement has other information at their disposal

21   that, yeah, you could likely determine who would

22   reside at that residence.

23   Q    Thank you.  All right.  Can we resume play here

24   and talk about Ms. Yellow?

25   A    Yes.  This is just the ending of what you see for

**Exhibit E, pg. 67**

McINVAILLE – DIRECT                    68

 1   blue.  Blue returns to the apartment complex located

 2   along Price Club Drive.  Looks like Mallard Landing

 3   Circle, that area, is where it comes back to.  That's

 4   where it started before it traveled to that residence

 5   we just spoke about and now it has returned there.

 6      So you have yellow is displayed now.  So yellow

 7   shows you the points that were given in Stage 1.

 8   Those points fall -- one falls just outside of the

 9   bank.  Others fall on top of the bank.

10      So now it's moved to the point in time before the

11   geofence.  So we're again before everything, we're

12   here at another residential area.  These points seem

13   to center around one residence, and then will

14   eventually move as the data plays through.

15              THE COURT:  Can you say where the residence

16   is, what street?

17              THE WITNESS:  Right around Buffalo Spring

18   Drive.  There's an intersection there.  It's a

19   residential home close to that intersection.

20              THE COURT:  Okay.

21   BY MR. PRICE:

22   Q   How many dots are sitting on top of one residence

23   there?

24   A   I'm not sure.  It's a few.  And then it moves

25   north to a school that's up the road from the

**Exhibit E, pg. 68**

McINVAILLE - DIRECT                    69

 1   residence.  The school is located along Bailey's

 2   Bridge Road.  So after what appears to be a stop at

 3   the school, it continues north to where you finally

 4   see this device inside the geofence.

 5       After the geofence, it moves out of the geofence

 6   up Hull Street to some of the business area there

 7   before returning back to that same residential area

 8   from where it started.

 9   Q   So based on this information, were you able to

10   identify Ms. Yellow?

11   A   To an extent.  I was able to see who owned the

12   home that those points clustered around.  And also

13   just doing research into those names learned some more

14   information about those people that's consistent with

15   what you see in some of that contextual video.

16   Q   Were you able to find social media about that

17   individual?

18   A   Yes.  So the -- looking at -- looking for just

19   publicly available social media stuff for the people

20   listed for that residence that the data clustered

21   around, you could also see that they had a school-aged

22   child, that they were just recently married.  So you

23   could learn a little bit.  You see that the school was

24   possibly -- you know, that a stop was made at the

25   school.  So it coincides with just some of the readily

**Exhibit E, pg. 69**

McINVAILLE – DIRECT                          70

1   available information.

2   Q    And the key for you here was which dots?

3   A    So, again, the residential dots, the residence

4   tells you, hey, there's, you know, that this may be

5   the specific location because they're so clustered in

6   that area, that that's the likely location, as well as

7   the school, the school being another reference point

8   just to understand something about someone.  Of course

9   you saw the bank, as well.  The bank's the center of

10  this.

11       So there was, you know, three locations there.

12  Then if you look, some of those other businesses could

13  have been traveled to as well in that area after the

14  bank before traveling back home.  So there's a few

15  locations within that that could be telling of a

16  person.

17  Q    So the most important ones for you, though, were

18  which in ascertaining Ms. Yellow's identity?

19  A    If you were going to try and figure out who that

20  person is, the home, the bank, and the school would be

21  probably the most beneficial locations.

22  Q    So three points?

23  A    Sure.

24  Q    And would this data be as identifying to you --

25  identifiable to law enforcement as it was to you?

**Exhibit E, pg. 70**

McINVAILLE – DIRECT                    71

1    A    Sure.  I mean anybody that could take a look at

2    some of this data could learn something from it.

3    Q    They would have access to the same tax records

4    that you had access to?

5    A    Yes, that's publicly available.

6    Q    And social media?

7    A    Yes.

8              THE COURT:  I'm going to interrupt you.  I

9    know I asked you not to repeat too much, but is it the

10   case that an earlier version of this video had lines

11   about where the folks went in realtime or not?

12             THE WITNESS:  No, I don't know the specific

13   path.  You can kind of understand the path, but no, I

14   couldn't pick out the individual paths.

15             THE COURT:  Fine.  Just making sure.

16   BY MR. PRICE:

17   Q    That's all we have on this exhibit.  I want to

18   shift gears a little bit now and talk to you about the

19   opt-in method or Location History.

20             THE COURT:  All right.  So I'm actually going

21   to take a break.  We've been here awhile.  Folks need

22   to stretch.  I have that it's 11:06.  I'll give us 15

23   minutes.  And so that would be 11:21.

24             You, sir, of course, will remain under oath,

25   and you can't talk to anybody about your testimony,

**Exhibit E, pg. 71**

McINVAILLE – DIRECT                    72

 1  nor can any other witness.  And we'll come back and

 2  hit this new topic in 15 minutes.  All right?

 3          MR. PRICE:  Thank you, Your Honor.

 4          THE COURT:  Okay.

 5          (Recess taken from 11:06 a.m. to 11:21 a.m.)

 6          THE COURT:  All right, sir.  Obviously,

 7  you're still under oath, and we'll continue your

 8  testimony.

 9          I should probably do this every time in case

10  other folks have joined.  If anybody is here on the

11  AT&T line, we welcome you.  I need to remind you that

12  our local rule, Criminal Rule 53, and our standing

13  order prohibits anybody from recording or broadcasting

14  or telecasting this proceeding in any way.  We have a

15  court reporter here who is creating what will be the

16  official court record.

17  BY MR. PRICE:

18  Q   All right.  Mr. McInvaille, I want to talk with

19  you a little bit about the opt-in method for Location

20  History in this case.  As a part of your work in this

21  case, you reviewed the declarations of Marlo McGriff?

22  A   That's correct.

23  Q   I'd like to show you what's been marked as Defense

24  Exhibit 23.  Can you tell us what this is?

25  A   Yes.  This is labeled the "Third Declaration of

**Exhibit E, pg. 72**

McINVAILLE - DIRECT                    73

1    Marlo McGriff."

2    Q    And you reviewed it in preparation for your

3    testimony today?

4    A    I have.

5         MR. PRICE:  I would move to admit this into

6    evidence, Your Honor.

7         MR. DUFFEY:  No objection.

8         THE COURT:  It will be admitted.

9         (Defense Exhibit No. 23 is admitted into

10   evidence.)

11   BY MR. PRICE:

12   Q    So do you know when Location History was first

13   enabled on Mr. Chatrie's account?

14   A    Based on this declaration, yes.

15   Q    When was that and how do you know?

16   A    It's indicated here.  They provided the audit

17   report from Google, which indicates when the -- when

18   the activation of location or the enabling of Location

19   History occurred.  There are times listed on here.

20   Q    And do you remember what time it was enabled on

21   his account?  I know we're having an issue here.

22   There we go.

23         MS. KOENIG:  Sorry.  I'm getting there.  Here

24   we go.

25   A    It was on July 9, 2018.  And that was at 04:09

**Exhibit E, pg. 73**

McINVAILLE – DIRECT                    74

1    UTC.  So in the a.m. for, of course, in UTC time zone.

2    Q    What is UTC?

3    A    UTC is a time standard.  So it's just a thing that

4    we reference time off of.  It's used for many

5    different types of records and everything, but, again,

6    it's just a concept of time that we can reference

7    local times off of.

8    Q    So it was enabled at 4:09 UTC.  I want to draw

9    your attention to a line on page 2 of this

10   declaration.  It says -- can you read the highlighted

11   part for us?

12   A    Yes.  So on this same page, Section C, "The user

13   opted in to LH," Location History, "either through

14   device settings or through a Google application on the

15   Samsung device."

16   Q    So can you translate that for us?  What does that

17   mean?

18   A    Yes.  So to enable Location History for an account

19   to gather Location History for a device, you must

20   enable Location History.  And there's two prescribed

21   ways of doing this.  It's either through opening up

22   the settings application on the device, logging in,

23   and opting in to Location History through that method

24   or when prompted through a supported Google

25   application.

**Exhibit E, pg. 74**

McINVAILLE – DIRECT                         75

1   Q   Could it have been enabled during the initial

2   setup of the phone?

3   A   Based on the time that Google is giving us, no, it

4   would not have been enabled at setup.

5   Q   Why not?

6   A   Setup occurred July 2nd of 2018.  This is, of

7   course, July 9, 2018.  So it was after the phone is

8   setup.

9   Q   Have you had an opportunity to examine Mr.

10  Chatrie's cell phone in this case?

11  A   I have.

12  Q   And you produced a report detailing that

13  examination; correct?

14  A   I did.

15  Q   I'd like to show you what's marked as Defense

16  Exhibit 6.  What is this?

17  A   This is my report of the examination of the

18  device.

19         MR. PRICE:  Your Honor, I'd like to move this

20  into evidence.

21         THE COURT:  Any objection?

22         MR. DUFFEY:  No, Your Honor.

23         THE COURT:  All right.  It will be entered.

24         MR. PRICE:  Thank you, Your Honor.

25         (Defense Exhibit No. 6 is admitted into

McINVAILLE − DIRECT                    76

 1    evidence.)

 2    BY MR. PRICE:

 3    Q   Can you tell us, Mr. McInvaille, how you examined

 4    the phone?  What did you use to examine the phone?

 5    A   So I went to the FBI office and was given access

 6    to the device, and using Celebrite software I was able

 7    to download or extract the data from the device so

 8    that it could be examined.

 9    Q   Were you able to determine anything from that

10    extraction about how Location History was first

11    enabled?

12    A   I was able to.

13    Q   What did your determine?

14    A   So, in my analysis, what I was looking for was

15    activity that corresponded with the timing of what

16    Google indicated was the activation or enabling of

17    Location History.  Through that, through my analysis

18    of the data that I extracted, I was able to locate the

19    installation of Google Assistant, which happened

20    within just, I believe, a minute and a half or two

21    minutes of just prior to Location History being

22    enabled.

23    Q   Can you tell us when exactly Assistant was

24    installed?  You said it was a couple minutes.

25    A   Yes, I believe on UTC, it would have been 04:06

**Exhibit E, pg. 76**

McINVAILLE – DIRECT                    77

 1  and some seconds, some milliseconds.

 2  Q    So it was about two minutes apart?

 3  A    Roughly, yes.

 4  Q    What else, if anything, was happening on the phone

 5  at that time?

 6  A    Based on my analysis, I didn't see much occurring

 7  during that time.  If I recall correctly, the only

 8  thing very close in proximity to that was Google

 9  Assistant.  I believe any activity prior to that was a

10  few hours before, and then the -- I believe the only

11  other Google application interaction that showed up

12  around that time frame was, I believe, 12 hours later,

13  if not more.

14  Q    Did you -- I know this took you quite sometime.

15  Did you look at anything else on the phone?  How did

16  you determine what else was going on on the phone at

17  that time?

18  A    So, to ensure that I feel I had adequately looked

19  at all the data, Celebrite, what it does is it takes

20  the data that's extracted --

21           THE COURT:  Can you spell that for our court

22  reporter who's not looking at your report, please.

23           THE WITNESS:  Cellebrite,

24  C-E-L-L-E-B-R-I-T-E.

25  A    So using the physical analyzer software and

**Exhibit E, pg. 77**

McINVAILLE – DIRECT                    78

1  reviewing the data extracted, that software, what it

2  attempts to do is take the data you have given it and

3  turn it into something that we all can read.

4       So it parses that information out.  Not always is

5  every detail parsed because of changes in software

6  supporting certainly applications and the level of

7  detail.  Oftentimes, you can look deeper into that

8  data into the databases to find other artifacts that

9  could be helpful.  Dates and times, locations, just

10 bits of information that can give you a better

11 understanding of what it is you're looking at.  So I

12 also try to look into that to see if I can locate

13 anything further that maybe wasn't readily available.

14      Again, my conclusion was that Google Assistant was

15 pretty much the only thing that I could find that was

16 occurring on the device during that time period.

17 Q   You were able to find evidence of -- what were you

18 able to find evidence of during that time?

19 A   That the application was installed to the device

20 at that time.

21 Q   And you said you were able to draw a conclusion

22 about how Mr. Chatrie likely enabled Location History?

23 A   That's correct.  So based on my understanding of

24 Google Assistant, Location History, and this

25 extraction, with those items occurring, so the

McINVAILLE – DIRECT                    79

1  installation of the application occurring, as well as

2  the activation of Location History just a minute or so

3  after that, knowing that through the initial setup of

4  certain applications through Google that they will

5  prompt you to enable Location History, it's my

6  conclusion that that is what would have activated or

7  been the method of activating Location History at that

8  time.

9  Q    Thank you.  So I want to talk about what that

10 opt-in screen would have looked like in Assistant.

11 And I'll turn your attention to the setup process for

12 Google Assistant.  Can you explain in a little more

13 detail how that works?

14 A    So when you -- when the application is on the

15 device, generally people will activate that

16 application by long pressing the home button.  It's

17 meant to be a convenience feature.  So it opens the

18 application.

19      During most applications, upon first use of really

20 any application, there are certain things you have to

21 do to set those applications up so that you can use

22 them; preferences, permissions, those types of things.

23      So those would be things that would be prompted to

24 the user as you begin to use your app for the first

25 time.

**Exhibit E, pg. 79**

McINVAILLE – DIRECT                           80

1  Q   Why is that process important in this case?

2  A   Well, in this case, the reason that it's important

3  is, of course, the only way that you are captured in

4  this warrant that we have here is to have Location

5  History enabled.  So that function is critical in all

6  of this.  So without it, you will not be found within

7  the warrant.  So knowing if Location History is on or

8  off, when it was activated, those things are important

9  in this matter.

10 Q   Did you attempt to determine what Mr. Chatrie

11 likely saw when he set up Google Assistant for the

12 first time?

13 A   Yes, I've tried to understand that, you know, the

14 2018 method of opt-in procedures.

15 Q   You actually prepared a supplemental report all

16 about this?

17 A   Yes.

18        MR. PRICE:  Can we bring up Defense Exhibit

19 7.

20 BY MR. PRICE:

21 Q   What is this?

22 A   This is the supplemental report that discusses the

23 opt-in.

24        MR. PRICE:  Your Honor, I'd like to move this

25 into evidence.

**Exhibit E, pg. 80**

McINVAILLE - DIRECT                    81

1          THE COURT:  Any objection?

2          MR. DUFFEY:  This is Exhibit 7?

3          THE COURT:  Exhibit 7, yes.

4          MR. DUFFEY:  No objection.

5          THE COURT:  It will be entered.

6          (Defense Exhibit No. 7 is admitted into

7   evidence.)

8   BY MR. PRICE:

9   Q    So tell us, how did you learn about this process

10  and what did you do first?

11  A    So I looked at Android devices to try and get an

12  understanding of what that procedure would be.  The

13  issue with trying to recreate some of these things is

14  that software changes over time.  Those updates when

15  you're setting up these devices often automatically

16  happen if you have them connected to Wi-Fi, which is

17  kind of a critical piece of actually setting up the

18  device as a normal person would.

19          So it kind of left me with the inability to see

20  the 2018 or a confident way of knowing that back in

21  2018 this is what it would have looked like.  So

22  instead of being able to recreate, I turned to try and

23  find information contemporaneous to that time to help

24  me understand what that would have looked like at that

25  time.

**Exhibit E, pg. 81**

McINVAILLE – DIRECT                      82

1    Q    So you tried to recreate it, but that didn't work?

2    A    Yeah, they just -- it looks different.  The setup

3    process is different than what it was.  There's

4    features that are different.  It's just not the --

5    from what I see from research and then trying to

6    recreate it, they don't look the same, and I didn't

7    feel it would be an accurate representation.

8    Q    Does it matter which phone you try and do this on?

9    A    No.  From everything that I know about this is

10   that the Android, and across the devices generally,

11   should be the same as far as this portion of the

12   setup.

13   Q    So unable to re-create it, what did you do next?

14   A    So that's when I turned to information that I

15   could find that was more in that time period of people

16   setting up these devices and showing what that

17   information actually looked like in 2018 versus now.

18   Q    And did you, through defense investigation, become

19   aware of any other information?

20   A    Yes.  So there were several articles or studies

21   that covered, you know, screenshots and different

22   information that would help you understand what those

23   setup procedures looked like for the phone or

24   applications, things of that nature.

25   Q    All right.  So, let's talk about what you found.

**Exhibit E, pg. 82**

McINVAILLE - DIRECT                    83

1    Were any of those particularly helpful to you?  Which

2    ones?

3    A   I referenced three of the items in my supplemental

4    report.  There was an article and then two studies

5    that showed pictures of the screens as they set

6    devices up.  And based on the information that they

7    provided, you could see that these were Android

8    devices with similar, from our understanding, similar

9    operating systems and things and also were around this

10   relevant time period.

11   Q   So what was the first article that you came cross

12   that you found to be helpful?

13   A   I don't know that it's the first.  It's the first

14   that I reference here.  But it's from the Quartz.  And

15   the article talks about Location History as one of

16   the -- as the topic of the article.

17   Q   What is Quarts?

18           THE COURT:  Spell it.

19           MR. PRICE:  Q-u-a-r-t-z.

20           THE COURT:  Thank you.

21   A   They have editors and people who write articles.

22   It seems to kind of pertain around technology and

23   different items.

24   Q   All right.  I'd like to show you what's been

25   marked as Defense Exhibit 48.  What are we looking at

**Exhibit E, pg. 83**

McINVAILLE - DIRECT                 84

1   here?

2   A    That appears to be that article.  Yes, that's the

3   article.

4   Q    So this is the article where you got the

5   screenshots from for your report?

6   A    Yes, lower in the report, in the article.  Yeah,

7   it was the Google Assistant permissions screen that I

8   found.

9   Q    Thank you.

10        MR. PRICE:  And I would like to move this

11   into evidence, as well, Your Honor.

12        THE COURT:  Any objection?

13        MR. DUFFEY:  Judge, same objection as the

14   other article.  If they're moving in, I guess, not for

15   the truth, then I don't know what the relevance would

16   be.

17        THE COURT:  I'm going to overrule it.  It's

18   the basis of his opinion.

19        MR. DUFFEY:  For the record, our objection is

20   as to relevance.  The point of the article doesn't

21   seem to me to be the opt-in process.  I understand

22   he's relied on some of it, and he's put that into his

23   report, and he can certainly talk about it, but we

24   object to the entire article.  And I understand the

25   Court's ruling.

**Exhibit E, pg. 84**

McINVAILLE – DIRECT                    85

```
1        THE COURT:  All right.  I'm going to make
2   essentially the same ruling, which is that you can
3   argue the weight of the evidence, certainly, and
4   cross-examine the expert with respect to it, but
5   because, at least in part, it served as the basis for
6   his expertise, it is admissible to that degree.
7        MR. PRICE:  Thank you, Your Honor.
8        (Government's Exhibit No. 48 is admitted into
9   evidence.)
10  BY MR. PRICE:
11  Q   So in addition to the Quartz screenshots, did you
12  find any others?  What was the next one that you cited
13  in your report?
14       THE COURT:  Now, wait a minute.  Now, he said
15  there is the Quartz screenshot right there in that
16  article.  Would you like to identify for the record
17  where it is?
18       MR. PRICE:  We will certainly try, Your
19  Honor.  I'm not sure that there are page numbers.  It
20  is on page 6 of the PDF itself.
21       THE COURT:  Why don't you identify what's
22  on -- like, does it say, for instance, Google Maps,
23  Google app?  That are words and headings that help.
24       MR. PRICE:  There is a heading that says
25  "Google Assistant."  And there is a screenshot below
```

**Exhibit E, pg. 85**

McINVAILLE – DIRECT                 86

 1   that which has a blue bar on top and says "Give your

 2   new assistant permission to help you."

 3             THE COURT:  Perfect.  That's great.  Thanks.

 4   BY MR. PRICE:

 5   Q    Mr. McInvaille, so this is one of the screenshots

 6   that you believed might be similar to the one that the

 7   user would have seen in July of 2018?

 8   A    Yes, it's similar.

 9             THE COURT:  Why don't you just put on the

10   record why.  Is this article dated?

11             THE WITNESS:  Yes, I believe January of 2018

12   was the date.  The reason that it's similar is, again,

13   you see a similar layout, give permission for your

14   assistant to help you.  Similar wording.  There are

15   some differences in some of them as they move along,

16   but as far as the structure and the question that is

17   being posed to the user, they are similar.

18             THE COURT:  Similar to what?

19             MR. PRICE:  I think we're going to try and

20   compare the different screenshots here, Your Honor.

21   So I just want to have all three so that we can talk

22   about their similarities and differences.

23             THE COURT:  Okay.

24   BY MR. PRICE:

25   Q    But, Mr. McInvaille, can you please read what it

**Exhibit E, pg. 86**

McINVAILLE – DIRECT                    87

1   says there under "Location History," just so we have

2   it?

3   A   Sure.  So on "Give your new assistant permission

4   to help you" is the kind of header of this permission

5   screen.  It tells you the -- it will tell you the

6   account that you're using as it's asking permission to

7   activate certain things for that account.

8        And then you have Location History, device

9   information, Voice & Audio Activity are the

10  permissions that are being asked to be given.  Each of

11  those topics have their own description and expansion

12  arrows.

13       Location History indicates that you're giving

14  permission to -- it creates a private map of where you

15  go with your signed in device.

16       Device information.  It includes contacts,

17  calendars, apps, music, battery life, and sensor

18  readings.

19       And then voice and audio activity.  Records your

20  voice, audio input, to help recognize your voice and

21  improve speech recognition.

22  Q   Thank you.  I'd like to move on and look at the

23  next screenshot that you found that you included in

24  your report.  Which one was that?

25  A   Sure.  This is from a study from Oracle.  Oracle

**Exhibit E, pg. 87**

McINVAILLE - DIRECT                88

1   is a technology company, a computer science company, I

2   believe.  They show the Google Assistant process, but

3   they also show the previous screen to what you see

4   from the article that we just mentioned from Quartz.

5       So they're showing you both the initial screen

6   that you see when you open Google Assistant for the

7   first time to set it up, as well as the subsequent

8   permission screen that we just discussed.

9       The information contained with those, besides the

10  account, of course, because these are two different

11  people setting this up, the other substance is the

12  same here for these two screens.

13      So, first, you have "Meet your Google Assistant."

14  It asks how it can help.  And then you have to either

15  skip that procedure and not completely set up or press

16  "Next" to completely set up.

17      You press "Next," that's when it takes you to the

18  permission screen that we just outlined prior to this.

19  And so then you have another piece there at the bottom

20  that was not covered because you couldn't read it, but

21  the options that you have are "No, thanks" or "Yes,

22  I'm in."

23  Q   I'd like to show you --

24          THE COURT:  Wait.  Did you identify what

25  document that came from, the Oracle?

**Exhibit E, pg. 88**

McINVAILLE - DIRECT                    89

 1          MR. PRICE:  That's what we're going to do

 2   right now.

 3          THE COURT:  Okay.

 4   BY MR. PRICE:

 5   Q   Can you tell us what we're looking at here?

 6   A   Sure.  So this is the cover page of the Oracle

 7   study.  It's "Google's Advertising and" I believe that

 8   says "Data Dominance."

 9   Q   Is this the document where you got those

10   screenshots from?

11   A   That's correct.

12   Q   You reviewed it in putting together your report?

13   A   I did.

14          MR. PRICE:  I'd like to move it into

15   evidence, Your Honor.

16          THE COURT:  What number is it?

17          MS. KOENIG:  Sorry.  This is Defense Exhibit

18   10.

19          MR. DUFFEY:  Judge, same objection.  I'd also

20   point out Oracle is in protracted litigation with

21   Google.  They are adverse to Google.  I guess that

22   goes to the weight, but I'm still objecting to

23   relevance, and I'm objecting to hearsay for the entire

24   report to come in.

25          THE COURT:  All right.  Well, for the same

**Exhibit E, pg. 89**

McINVAILLE – DIRECT                    90

1  limited purpose, I am going to admit the exhibit.  And

2  you can argue the weight of the evidence, including

3  you can cross-examine about the fact that Oracle is

4  litigating against Google for perhaps a bias of the

5  report.  All of that can be part of the record.  And

6  then it will be introduced for that limited purpose.

7          (Defense Exhibit No. 10 is admitted into

8  evidence.)

9          THE COURT:  So, Mr. Price, I'm going to tell

10 you, for us who don't know what you're doing, if

11 you're showing a screenshot, you're really having the

12 witness testify from something that's not in evidence

13 yet.  So unless you refer to where the screenshot is

14 in the report, so we know where you got it from, it

15 would be not proper for him to be testifying from the

16 Oracle document yet.

17         So if you say what part of the page of the

18 report that you're using the screenshot, that helps

19 those of us who don't know in advance what you're

20 doing to understand what you're doing.

21         I was presuming, I'll tell you, that that

22 screenshot was from this report, and it wasn't in

23 evidence yet.  So we just -- we're not with you.  So

24 you have to be -- you have to go granular into where

25 these documents are coming from.  Okay?

McINVAILLE – DIRECT                    91

1              MR. PRICE:  I will, Your Honor.

2              Can we bring up the specific page in the

3    report, please.

4    BY MR. PRICE:

5    Q    Mr. McInvaille, you don't happen to remember which

6    page it was on, do you?

7    A    I don't.

8              MR. PRICE:  Apologies for the delay, Your

9    Honor.

10             We are going to move to withdraw Exhibit 10.

11   And we'd like to show Mr. McInvaille Defense Exhibit

12   11.

13             THE COURT:  So Exhibit 10 is withdrawn.  I

14   want to be clear.  Your exhibit list indicates that

15   that's a June 2018 Oracle submission.  And so maybe

16   also referring to it by date would be helpful.

17             MR. PRICE:  Yes, Your Honor.  We are

18   referring to the September 2018 Oracle submission.

19   Apologies for the confusion.

20   BY MR. PRICE:

21   Q    I'm now showing you what's been marked as Defense

22   Exhibit 11.  Can you tell us what this is?

23   A    Yes.  This is the correct exhibit for the

24   screenshot that I show in my report.

25   Q    And what page of the Oracle submission does the

**Exhibit E, pg. 91**

McINVAILLE - DIRECT                    92

1  screenshot appear on?

2  A   The page number that I have is four here.  And it

3  is -- the paragraph surrounding it starts with

4  "Continuing through the Android smartphone setup

5  process."

6  Q   And this is where you got the screenshot for your

7  report?

8  A   That's correct, the screenshot that we're

9  referring to in the report came from this section

10  here.

11  Q   Thank you.

12         MR. PRICE:  Your Honor, I'd like to move this

13  into evidence, Exhibit 11.

14         THE COURT:  Mr. Duffey.

15         MR. DUFFEY:  Same objection as before, Judge.

16         THE COURT:  All right.  I'm going to admit it

17  for the limited purpose, not for the truth of the

18  matter, with the government's concern for the weight,

19  but as a basis for this expert's opinion, it will be

20  admitted.

21         (Defense Exhibit No. 11 is admitted into

22  evidence.)

23  BY MR. PRICE:

24  Q   How does this screenshot compare to the one from

25  Quartz that we just talked about?

**Exhibit E, pg. 92**

McINVAILLE - DIRECT                       93

1   A    Yeah.  So, again, this is -- it gives you the

2   prior screen to the permission screen.  So the "Meet

3   your Google Assistant" screen where you can make two

4   options of either "Skip" or "Next," "Next" being the

5   one that takes you to the permission screen that we

6   outlined previously with the different paragraphs or

7   the different explanations.

8   Q    Is there any difference in the text as far as

9   you're aware?

10  A    No.  The Quartz article screenshot and this

11  screenshot is consistent.  They are consistent with

12  each other as far as wording.

13  Q    Okay.  Thank you.  I want to move on to that third

14  set of screenshots that you found.  And I want to show

15  you Defense Exhibit 27.  Can we look at your report,

16  and can you show us that third set of screenshots?

17  Can you tell us what these are?

18  A    Yes.  So another set of screenshots from a

19  different study.  This study is from the Norwegian

20  Consumer Council.  Again, taking you through kind of

21  what the setup process looks like for Google

22  Assistant.  These were from the June time period of

23  2018.

24  Q    Where did you get these from?

25  A    The Norwegian Consumer Council.  I don't know if

**Exhibit E, pg. 93**

McINVAILLE - DIRECT                    94

 1   you consider it like Better Business Bureau.  It's a

 2   consumer reporting agency.  It's funded by the

 3   Norwegian Government to educate consumers on different

 4   products.

 5   Q   What did they do relevant to this case?

 6   A   Sure.  So they're showing Google features as far

 7   as setup processes, requests, and permissions, and it

 8   resolves around data collection.

 9   Q   Do they publish anything?

10   A   Yes, they publish a study on their findings in

11   different data collected by Google.

12   Q   So I would now like to show you what's been marked

13   as Defense Exhibit 27.  Is this the -- well, what is

14   this?

15   A   This is an article.  It's titled "Every Step you

16   take."  I can't actually say the name of the

17   Norwegian -- the name of their agency, but it's the --

18   they call it the Norwegian Consumer Council.

19           THE COURT:  How about you spell it?  It's on

20   the diagram; right?

21           THE WITNESS:  Bottom right of the page.  It's

22   F-O-R-B-R-U-K-E-R-R-A-D-E-T.

23   Q   And this is the document where you got those

24   screenshots from?

25   A   Yes.

**Exhibit E, pg. 94**

McINVAILLE - DIRECT                          95

1   Q   Can you tell us which page you found them on?

2   A   Working on it.  There is an -- it's page 19 of 44.

3   It's titled or the header is "Enabling Google

4   Assistant," and you see screenshots there for Google

5   Assistant.

6   Q   And you used these screenshots to prepare your

7   report?

8   A   Yes, I believe there's actually a section with

9   more of those expanded.

10           THE COURT:  Sir, did you say "I believe

11   there's more explained"?  Are you looking for more

12   documents?

13           THE WITNESS:  No.  Inside the -- inside the

14   document there's another section with, I believe, more

15   screenshots just underlying the same thing.  I pointed

16   out one of the sections that had some of those

17   screenshots in it.  I was trying to make sure that I

18   referenced all of the places where the --

19           THE COURT:  So you haven't told us about the

20   other ones yet.

21           THE WITNESS:  Ma'am?

22           THE COURT:  You haven't told us about the

23   other ones yet?

24           THE WITNESS:  No.  I'm just trying to see

25   where they were in the document, what page they were

**Exhibit E, pg. 95**

McINVAILLE – DIRECT                          96

1    on.

2              THE COURT:  In the meantime, Mr. Price, are

3    you moving this into evidence?

4              MR. PRICE:  Yes, Your Honor.

5              THE COURT:  Any objection?

6              MR. DUFFEY:  Yes, Judge.  Same objection as

7    before, irrelevance under hearsay.

8              THE COURT:  All right.  I'm going to overrule

9    for the same reasons.

10             (Government's Exhibit No. 27 is admitted into

11   evidence.)

12             THE COURT:  Can we just put on the record the

13   date of this report?  I think it's on the first page.

14             THE WITNESS:  Yes.  November 27, 2018.

15             THE COURT:  Thank you.

16   BY MR. PRICE:

17   Q   Did you receive any additional information from

18   the --

19             THE COURT:  He's still looking for pages.

20   Right?

21             THE WITNESS:  That question will answer that

22   issue.

23             THE COURT:  Okay.

24   BY MR. PRICE:

25   Q   Have you reviewed any additional screenshots

**Exhibit E, pg. 96**

McINVAILLE - DIRECT                    97

```
 1   provided by the Norwegian Consumer Council?
 2   A    Yes.   In their report, you see the page that I
 3   referenced.   I believe it was page 19.   There were
 4   more screenshots available than what is just displayed
 5   on page 19.   It expands upon some of these expansion
 6   arrows and just gives some more detail.
 7   Q    And you've seen those?
 8   A    I have.
 9   Q    Where did they come from?
10   A    They were provided to me by counsel.
11   Q    And they were what in relation to this report?
12   A    So, they were the underlying information that the
13   counsel used to create this.   So it just -- it's more
14   of the screenshots, more of the detailed shots that go
15   along with this explanation.
16   Q    And you reviewed those for your report?
17   A    I did.
18          MR. PRICE:   Can we pull up the third set of
19   screenshots from your report?
20   BY MR. PRICE:
21   Q    These are the screenshots you obtained directly
22   from the Norwegian Consumer Council?
23   A    Yes, that's where they were obtained from.
24          THE COURT:   Do you want to refer to a page in
25   the report and what exhibit number it is?
```

McINVAILLE – DIRECT                           98

 1          MR. PRICE:  We are on page 5 of the

 2     supplemental report.  So that would be Defense Exhibit

 3     7.

 4          THE COURT:  Okay.  Thank you.

 5     BY MR. PRICE:

 6     Q   Can you tell us what these screenshots show us?

 7     A   Sure.  Again, these are more screenshots for the

 8     setup for Google Assistant.  These were helpful

 9     because they just give more information than those we

10     saw in other articles.  They expanded the expansion

11     arrows.  They are also, from what we understand from

12     Google's declaration, a more accurate version of what

13     we think would have been seen during the actual setup

14     of this device that we're talking about today.

15     Q   When are these screenshots from?

16     A   These screenshots were -- I believe it was July 2.

17     Yeah.  Some were taken in August.  Some were taken in

18     July.

19     Q   So there are two sets here, two sets of

20     screenshots.  One that we're looking at now on page 4?

21     A   Yes.  Page 4 is the July 2 screenshots.

22     Q   And then we have one more set.  When are those

23     from?

24     A   August 9.  And those are on page 5, Figure 4.

25     Q   So I want to go up to the July one.  Can you tell

**Exhibit E, pg. 98**

McINVAILLE - DIRECT                    99

```
 1   us how these screens differ from the Oracle and Quartz
 2   screens that we just talked about?
 3   A   So they look very similar as far as structure.
 4   Really, the only difference is some of the wording
 5   that you see as far as the descriptions of what
 6   permissions are being given.  You're still provided
 7   with the same permission.  So Location History, device
 8   information, Voice & Audio Activity, but the
 9   explanation underneath each of those or the
10   explanations are different in these screenshots.  And
11   as I understand from Google submissions, these are the
12   screens that the user would have seen during the setup
13   of this device.
14   Q   Can you remind us, for the record, when Location
15   History was enabled?
16   A   Location History in this case was July 9th of
17   2018.  So a set of these were just before and another
18   set was just after.
19   Q   How did that affect your confidence in determining
20   which one was the likely one that was in place at that
21   time?
22   A   Again, these are close in time to the time that we
23   know Location History was enabled.  And also Google
24   has submitted saying these are the screens that the
25   user would have seen at that time, as well.  So that's
```

**Exhibit E, pg. 99**

McINVAILLE – DIRECT                    100

 1   why I lend more confidence to these being the true

 2   depiction of the opt-in process.

 3   Q   Is the language on these screens consistent with

 4   the text in Mr. McGriff's affidavit?

 5   A   With Mr. McGriff's affidavit?

 6   Q   Yes.

 7          THE COURT:  Is it Mr. or Ms.?  It's Marlo.

 8          MR. PRICE:  Mr.

 9          THE COURT:  Marlo is Mr.?

10          MR. PRICE:  Yes.

11          THE COURT:  My apologies.  Okay.  Thank you.

12   A   Yes.  So in Mr. McGriff's affidavit, he does show

13   a portion of these screens or he doesn't show a

14   screenshot, but the text from it.  So the give your

15   permission, Location History, what it says under

16   Location History, which says "Saves where you go with

17   your devices."  And then also the little footnote just

18   above the selections that you can make is included in

19   his affidavit or declaration.

20   Q   So we have the Quartz and Oracle screenshots that

21   say one thing.  And those are from when?

22   A   As I recall, probably January of '18.  That time

23   frame is my understanding.

24   Q   The beginning of 2018?

25   A   Beginning of 2018.

**Exhibit E, pg. 100**

McINVAILLE - DIRECT                    101

1    Q    And these are when relative to that?

2    A    Mid 2018.  July, August area.

3    Q    The language changed between the Norwegian

4    screenshots and the Oracle and Quartz screenshots.

5    What does that tell you?

6    A    That just tells me that Google made a change in

7    how they display this information to the user.

8    Q    Can we scroll down to the August screenshots.  So

9    there's a couple of buttons at the end there.  What do

10   those say?

11   A    So, again, this screenshot is asking for

12   permission.  It says "Give your new assistant

13   permission to help you."  And then there are the three

14   categories that you're providing permission for.  And

15   then at the very bottom you have the choices of either

16   "No, thanks" or "Turn on."

17   Q    Are the "No, thanks" and "Turn on," are those the

18   same choices available in the Quartz and Oracle

19   screenshots?

20   A    No, I don't believe they're the same questions.

21   Q    Instead it says -- looking at the Oracle one, what

22   does it say?

23   A    "No, thanks" is one, and "Yes, I'm in" is the

24   other.

25   Q    So that language there is different, as well?

McINVAILLE – DIRECT                    102

1  A    It is.

2  Q    Tell me about the long press on an Android phone.

3  What does that do?

4  A    Sure.  So the buttons on the front lower portion

5  of the phone down where your thumb would normally be

6  if you were holding the phone, kind of where you would

7  speak into the phone, down there our phones now really

8  don't have buttons on the screen anymore.  Everything

9  is touch screen.  But in the center of an Android, or

10 most Androids, you have a home button.  What you can

11 do is press, and it's called a long press.  It's kind

12 of a press and hold of that button to activate Google

13 Assistant.  So it will launch the application from

14 that long press.

15 Q    So if you press and hold the home button?

16 A    Yes.  It pops it up on the screen.

17 Q    So, in your opinion, which set of screenshots is

18 the likely one that Mr. Chatrie would have seen?

19 A    Those that we see, as in Figure 4, here in the

20 report from August, that or the others in the previous

21 figure.  Both of those are confirmed by Google as

22 being the most likely screens that would have been

23 seen by the user during this time period.

24 Q    Did you have an opportunity to compare these

25 screenshots with the screenshots that Mr. McGriff

**Exhibit E, pg. 102**

McINVAILLE – DIRECT                    103

```
 1  provided in his declaration?

 2  A   Yes.

 3  Q   Those weren't for Google Assistant, though, were

 4  they?

 5  A   No, it was just a Location History permission

 6  request.  I guess an opt-in screen for Location

 7  History.

 8  Q   So, can you tell us how these screenshots differ

 9  from the ones that Mr. McGriff provided in his

10  affidavit?

11  A   So, Mr. McGriff's is -- I wouldn't call it so much

12  as a screenshot as it's just the plain text from what

13  you would see in the screen.  So, again, in the

14  screenshots that we have here from these articles,

15  they kind of show you what the user would see in kind

16  of the way they would see as far as the screens.

17  Mr. McGriff's just holds the text.

18          THE COURT:  Mr. McGriff just what?

19          THE WITNESS:  Just the text.

20          THE COURT:  Okay.

21          THE WITNESS:  Instead of the actual screen,

22  like pictures, he's showing more of just the words

23  that would have been displayed.

24          They're different just because in Mr.

25  McGriff's, he doesn't show you each of the options
```

**Exhibit E, pg. 103**

McINVAILLE – DIRECT                    104

 1   that are being given in some of these screenshots.

 2   He's only showing Location History and then that

 3   footnote that's provided underneath it, as well as

 4   what options there are for either "No, thanks" or

 5   "Turn on."

 6            MR. PRICE:  Perhaps we can pull up

 7   Mr. McGriff's affidavit.

 8   Q   This is the third affidavit, and it has previously

 9   been marked as Exhibit --

10            THE COURT:  23.

11            MR. PRICE:  23.  Thank you.

12            Can we scroll down?  All right.

13   BY MR. PRICE:

14   Q   This is the text.  What are we looking at here?

15   A   Sure.  So it shows that the opt-in screen would

16   contain the following text:  Location History.

17       It has the "Saves where you go with your devices"

18   text that is consistent with the screenshots that we

19   were just looking at.  And then it also has, like, the

20   kind of footnote paragraph that's just above the

21   options that you have.  So "This data may be saved and

22   used in your Google service where you were signed in

23   to give you more personalized experiences.  You can

24   see your data, delete it, and change your settings at

25   account.google.com."  Then you have also the "No,

**Exhibit E, pg. 104**

McINVAILLE - DIRECT                    105

1    thanks" and "Turn on" options there.

2    Q   So in the actual screenshot, though, does the

3    language appear that way visually?

4    A   No.  There's more in the screenshots of what the

5    user would see.  So, again, they're asking permission

6    for Location History, as well as device information,

7    Voice & Audio Activity.  There are other descriptions

8    and expansion areas.  There's just more in the

9    screenshots that the user sees than what's displayed

10   there.

11   Q   And that language you just read from Mr. McGriff's

12   affidavit about how the data may be saved and used in

13   any Google service, where does that appear relative

14   the Location History prompt?

15   A   It's down the page.  It's at the very bottom of

16   the screen where the options for the selections are.

17   Q   How does it appear visually?  Is it the same

18   darkness as the other language on the page?

19   A   Is it the same -- I'm sorry?

20   Q   Font.

21   A   I'm not sure.  It does -- again, it's just the

22   words from the page.  It's not the actual screenshots.

23   The screenshots that the user sees has different icon

24   descriptions.  It's visually different and has some

25   content in the screenshots that's not in the

**Exhibit E, pg. 105**

McINVAILLE – DIRECT                    106

1   affidavit.

2           THE COURT:  Okay.  You're referring to the

3   language in the affidavit, paragraph 7; correct?  And

4   now you've turned back to page 4 of Exhibit 7, which

5   is your own report.  Are you talking about Figure 4?

6           THE WITNESS:  Yes, Figure 4, the picture to

7   the right.  What I'm referring to is that it contains

8   more information than what's put into the bottom page

9   of Mr. McGriff's declaration.

10          THE COURT:  Okay.

11  BY MR. PRICE:

12  Q   What do you mean by "more information" here?

13  A   Well, there is a request for more than just

14  Location History happening.  There are more

15  descriptions of those other permissions that are being

16  requested.  There are -- as well as expansion arrows

17  to open up and see what else is available to read.

18  It's just a little bit different than what you see in

19  his affidavit.

20          THE COURT:  So, specifically, it says -- on

21  the right-hand part of the screen, it has -- it says

22  "Location History," and it has an icon next to it, and

23  a line under it; "Device information," and an icon

24  next to it and a line under it; "Voice & Audio

25  Activity," and an icon next to it and a line under it.

McINVAILLE – DIRECT                    107

 1   And then it has, not as a footnote, it says, "This

 2   data may be saved and used in any Google service where

 3   you are signed in to give you more personalized

 4   experiences.  You can see your data, delete it and

 5   change your settings at account.google.com"; correct?

 6   That's what you're testifying to.

 7              THE WITNESS:  Yes.

 8              THE COURT:  So there are two more subsections

 9   than what is reflected in paragraph 7 of the third

10   McGriff declaration?

11              THE WITNESS:  That's right.  There's two

12   other permissions that you're being asked to provide

13   permission to.

14              THE COURT:  Okay.

15              MR. PRICE:  Thank you.

16              Can we bring up Mr. McGriff's affidavit one

17   more time?  I'd like to see the screenshots that he

18   provides or maps.

19   BY MR. PRICE:

20   Q    What are we looking at here?

21   A    This is Mr. McGriff's declaration, page 7.  These

22   are screenshots from Google Maps.

23              THE COURT:  This is Exhibit 23, McGriff

24   Declaration 3, since there are three of them.  We're

25   looking at Exhibit 23; am I correct?

**Exhibit E, pg. 107**

McINVAILLE – DIRECT                108

1           MR. PRICE:  Yes, Your Honor.  Twenty-three,

2    page 7.

3           THE COURT:  Okay.

4    BY MR. PRICE:

5    Q   So, by comparison, comparing the Assistant setup

6    screen and the Map setup screen, can you tell us along

7    the lines of what you're saying, what is different

8    between these two?

9    A   These, again, appear differently.  They're asking

10   for similar permissions but appear differently.  They

11   actually have less permissions than what you're being

12   requested from for Google Assistant.  Location History

13   is one of those.  It has the drop down.  It also has

14   the line underneath it for "saves where you go with

15   your devices."  It also has the paragraph underneath

16   it that's just above the "No, thanks" and "Turn on"

17   buttons that you saw from previous requests but here

18   now for Google Maps.

19   Q   So there's one screen for maps, one set of

20   permissions for Location History, and two options,

21   "Turn on" or "No, thanks"?

22   A   Correct.

23          MR. PRICE:  Can we go back to

24   Mr. McInvaille's report, supplemental report, Exhibit

25   7, page 5.

**Exhibit E, pg. 108**

McINVAILLE - DIRECT                    109

1    BY MR. PRICE:

2    Q    By contrast here, how many permissions is Google

3    asking for?

4    A    For Assistant, it's askings for three permissions.

5    Q    What are the options at the bottom?

6    A    "No, thanks" and "Turn on."

7    Q    Does that apply to Location History?

8    A    Yes.

9    Q    Does it apply to device information?

10   A    It applies there, too.

11   Q    Does it apply to Voice & Audio Activity?

12   A    Yes.  It applies to everything you see on the

13   screen.  The request is for all three of those items

14   at once.

15   Q    So what are the users options at that juncture?

16   A    Either to turn it on or not turn it on.

17   Q    Turn what on?

18   A    Location History, device information, Voice &

19   Audio Activity.

20   Q    So either turn all three on or don't?

21   A    Correct.

22   Q    Those little upside down triangles, what are those

23   on the screen there that we're talking about?  There

24   are three of them.  One is next to Location History.

25   One is next to device information.  One is next to

**Exhibit E, pg. 109**

1    Voice & Audio Activity.

2    A    They were referred to in some of the -- in the

3    declarations as expansion arrows.  It just expands the

4    area underneath each of those topics.  And there's

5    more information contained under each of those tabs.

6    Q    I think we have that on the screen.  If we can

7    show the language.

8        We're on page 4 of Exhibit 7.  Can you tell us

9    what we're looking at now?

10   A    Sure.  These were included due to the expansion

11   arrows actually being selected so that you can see the

12   information underneath each of the permissions being

13   given.

14   Q    But that information is not visible from that

15   first screen?

16   A    No.  Unless you click the arrow, you can't see all

17   of the data.

18   Q    Do you have to click the arrow?

19   A    No, you don't have to click the arrow to make a

20   determination of on or off.

21   Q    So, I could enable Location History without ever

22   clicking on that expansion arrow?

23   A    Right.  You don't have to see this to make a

24   selection.

25   Q    Does it say "learn more" or "more info" here?

McINVAILLE – DIRECT                111

1   A    I don't recall any of these having that option.

2   Q    What does Google say in the screenshot about

3   whether Location History is necessary for Assistant to

4   work?

5   A    So the kind of, I guess, characterization that's

6   put at the top is Assistant depends on these settings

7   in order to work correctly.  Turn these settings on

8   for this account.  It specifies the account that

9   you're making that selection for.  And then tells you

10  what permissions you're acknowledging to make

11  Assistant work correctly.

12  Q    Can you set up Assistant this way?

13          THE COURT:  Wait a minute.  Where are you

14  reading from?

15          MR. PRICE:  Right under "Give your new

16  Assistant permission to help you."  It says -- it's

17  the middle screenshot.

18          THE COURT:  So you're on page 3.  You moved

19  to page 3?

20          MR. PRICE:  I believe we're still on page 4.

21  Three screenshots in a row.  We're looking at the

22  middle one.

23          MR. DUFFEY:  Judge, I have page 3.  So I'm a

24  little confused.

25          THE COURT:  Right.  My page 3 has on the top

Exhibit E, pg. 111

McINVAILLE - DIRECT                112

1   of it "Device Information" and on the bottom "Voice &

2   Audio Activity."  And my page 3 has "Location History.

3   Saves where you go with your devices."  And that's the

4   one that has the "Meet your Google Assistant."

5          MR. PRICE:  One moment, Your Honor.  Your

6   Honor, are you looking at Exhibit 7?

7          THE COURT:  Yes.

8          MR. PRICE:  Page 4?

9          THE COURT:  I'm looking at page 3 and page 4.

10         MR. PRICE:  We have it on the screen now.

11  I'm not sure why your version -- page 3 has the Oracle

12  screenshot.  Page 4 has the one that we are looking at

13  from the Norwegian Consumer Council.

14         THE WITNESS:  The page number at the bottom

15  is different than the PDF page number is what it is.

16  Q   Okay.  What page?

17  A   Scroll down just a touch.  So, the page number at

18  the bottom right is 3.

19  Q   Okay.  My apologies.

20      So we're looking at page 3 of Exhibit 7, the

21  Norwegian Consumer Council screenshots from July 2,

22  2018.  And in the middle screen it says, "Give your

23  new Assistant permission to help you."  And then,

24  sorry, can you read that language one more time?

25  A   Yes.  So, in that middle screenshot, "Give your

**Exhibit E, pg. 112**

McINVAILLE - DIRECT                    113

1   new Assistant permission to help you."  Just

2   underneath that, "The Assistant depends on these

3   settings in order to work correctly.  Turn on these

4   settings for," and that's referring to what account

5   you're turning the setting on for.  And then it

6   indicates what settings you are either turning on or

7   not turning on.

8   Q    Thank you.  And if we're setting up Google

9   Assistant in this way, and you want to turn it on,

10  Assistant, what do you have to do?

11  A    As they indicate for it to work correctly, you

12  need to give permission to these -- to the permissions

13  shown to the user.

14  Q    You need to give permission for all three?

15  A    Yes.  You don't get to pick individually.  It's

16  all three.

17  Q    So let me ask you, what would happen to Google

18  Assistant if you disabled Location History later on?

19  A    You could still use it.

20  Q    It works?

21  A    Yeah.

22  Q    Even if Location History is not enabled?

23  A    Yes.  You don't need Location History for it to

24  work.

25  Q    So why would Google make it a requirement to set

**Exhibit E, pg. 113**

McINVAILLE – DIRECT                    114

1   up Assistant?

2   A    I'm sorry?

3   Q    Why would Google make it a requirement to start

4   Google Assistant?

5   A    I think they're asking for permission to make it

6   better.  Again, you don't have to use it, but it's a,

7   as they say, for it to work correctly or as intended,

8   the permissions help in that way.

9   Q    But it works without Location History enabled?

10  A    You can use it without Location History.

11  Q    And where on here does Google tell us that?

12  A    I'm not sure they do.  I just know that you can

13  use it without Location History being enabled.

14  Q    Thank you.  Switching gears slightly.  I want to

15  talk about Location History collection more generally.

16  When does Google collect location history information?

17  A    When the user -- if it's enabled by the user from

18  everything that I have seen as far as data outputted

19  from Location History, it's always collecting.

20  Q    Always?

21  A    Very consistently throughout the day.

22  Q    What if the user is not using Assistant?

23  A    It -- again, from seeing the times of day and

24  things that are referenced in these records that we

25  see from Location History, it appears to happen all

**Exhibit E, pg. 114**

McINVAILLE – DIRECT                    115

1   times of the day.  So when the user is sleeping, not

2   sleeping.  It's a lot of information that's being

3   gathered as far as just location is concerned.

4   Q   What if a person isn't using an app at all on

5   their phone?

6   A   I think it would still collect location

7   information.

8   Q   What if the person is not doing anything at all

9   with their phone?

10  A   It still could be collecting.

11          THE COURT:  Let me clarify that.  Do you mean

12  by not using the app at all that the app is open or

13  closed?  It doesn't matter?

14          THE WITNESS:  So the application is not

15  important here once it's enabled.  Just the phone

16  being on, not in use, or any specific application

17  being launched or not launched.  Once enabled, you are

18  now collecting your location history all the time.

19          THE COURT:  Thank you.

20  BY MR. PRICE:

21  Q   What about right now?  What if somebody in this

22  courtroom had an Android phone?  Would it be

23  collecting their location data?

24  A   It very well could be even if they're not using

25  it.

**Exhibit E, pg. 115**

McINVAILLE – DIRECT                      116

1    Q    How do you know this?

2    A    Again, based on looking at a lot of these records

3    from Location History accounts, not just geofence.  Of

4    course, you could get this data just at the account

5    level.  The time that it spans when you look at the

6    records, it consistently covers just about every hour

7    of the day, most of the time.  So, just looking at it,

8    I would assume somebody's got to sleep at some point

9    or, you know, just not using their device all the

10   time.  So it's constantly recording information.

11   Q    And did you review any of those types of records

12   in this case?

13   A    Yeah.  So the account that we're talking about

14   here was gathered by law enforcement.  So once the

15   particular account was identified, they actually did

16   another request to get the full account.  So the

17   location history associated with that account and all

18   the other data that you can normally get through that

19   type of request.

20        So, in this instance, I looked at that data.  So I

21   believe there was a 35-day period of data that was

22   provided in that request.

23   Q    Let's take a look.  I'd like to show you Defense

24   Exhibit 8, please.

25        MS. KOENIG:  Your Honor, this exhibit details

McINVAILLE - DIRECT                    117

1    very detailed specific location information for an

2    individual, Mr. Chatrie.  And so we're going to look

3    at the paper copy of this.  This is Defense Exhibit 8,

4    and we would ask that this be put in under seal.

5              THE COURT:  All right.  There's no objection

6    to that being under seal; is that right?

7              MR. DUFFEY:  No objection, Judge.

8              THE COURT:  All right.  So we'll look at the

9    sealed version, which I don't have a copy of.

10             THE WITNESS:  I don't either.

11             MS. KOENIG:  I hadn't anticipated -- we have

12   a digital copy that had been provided to the Court.  I

13   hadn't thought ahead about how to present this since

14   we have broadcasting.

15             THE COURT:  Since we have what?

16             MS. KOENIG:  The broadcasting that is being

17   shown to another courtroom.  There's no issue with

18   showing it to everybody in this room if it's up on the

19   screens.  I don't know if it's just that I could show

20   it to the witness and the lawyer screens and the Court

21   screen instead of broadcasting it to the other

22   courtroom.

23             THE COURT:  Is there anybody in the other

24   courtroom?

25             THE CLERK:  It doesn't appear that there's

**Exhibit E, pg. 117**

McINVAILLE - DIRECT                    118

1   anyone in there.

2           THE COURT:  Can we talk to the CSO and close

3   the courtroom?

4           MR. DUFFEY:  Judge, I guess I'll raise my

5   objection.  Why are we talking about search warrant

6   No. 2?  I object to relevance if we're going to get

7   into a sealed second search warrant.  It's not the

8   subject of the motion today.

9           MR. PRICE:  I'm happy to explain.

10          Your Honor, the data obtained through that

11  search warrant was Mr. Chatrie's location information

12  over a, let's see, 35-day period.  What it allows us

13  to do is to determine how frequently Google was

14  actually collecting Mr. Chatrie's location

15  information.  So that point we believe is very

16  relevant, and this goes to show that directly in this

17  case.

18          THE COURT:  I'm going to overrule the

19  objection.

20          Is the courtroom closed?  Do we have an issue

21  with the folks on the phone?  Is there anybody on the

22  phone?

23          THE CLERK:  Yes.

24          MR. PRICE:  They won't be able to see it,

25  Your Honor, so it's okay for them to hear the

**Exhibit E, pg. 118**

McINVAILLE - DIRECT                119

1   testimony about it.  We just don't want to have the

2   longitude and latitude coordinates being captured or

3   somebody being able to write them down.

4         THE COURT:  Okay.

5   BY MR. PRICE:

6   Q   All right.  So this is Defense Exhibit 8.  Can you

7   tell us what we are looking at here?

8   A   Yes.  So very similarly to what we have seen when

9   we refer to like the Stage 1, Stage 2 requests.  This

10  is account specific location history rather than a

11  group of people's location history.  But you'll see

12  very similar items throughout.  It will look very

13  similar besides just a few extra pieces of

14  information.

15        THE COURT:  I don't have this document.

16        MS. KOENIG:  Your Honor, it's a very large

17  file.  It would have taken hundreds of pages to print

18  off.  So we provided it digitally to the Court.  It's

19  in the box.com account that we had provided to the

20  Court.

21        THE COURT:  Okay.

22  BY MR. PRICE:

23  Q   Is this the CSV Google data file that you

24  reviewed?

25  A   Yes.

**Exhibit E, pg. 119**

McINVAILLE – DIRECT                    120

```
 1              THE COURT:  The what?
 2              MR. PRICE:  CSV.
 3              THE COURT:  Okay.
 4              MR. PRICE:  It's just a type of file, Your
 5   Honor.  It's a database file.
 6   BY MR. PRICE:
 7   Q   This is the file that you reviewed?
 8   A   Yes, it's a comma separated value spreadsheet.
 9              MR. PRICE:  I'd like to introduce this into
10   evidence, as well, Your Honor.
11              MR. DUFFEY:  Same objection, Judge.
12              THE COURT:  All right.  Well, I'm overruling
13   on the same basis.
14              (Defense Exhibit No. 8 is admitted into
15   evidence.)
16   BY MR. PRICE:
17   Q   So when you reviewed this file, can you tell us
18   what you found?
19   A   Yes.  So, again, this is account specific
20   information for one account rather than a group of
21   accounts.  The information contained spans, again, I
22   believe, a 35-day period.  And so you'll see that,
23   throughout this document, you'll see dates and times,
24   estimated latitudes and longitudes, those sources that
25   we talked about earlier, Wi-Fi, GPS, as well as those
```

McINVAILLE – DIRECT                    121

1   display radiuses.  All of that information is given.

2   This is where the Stage 1 and Stage 2 information

3   actually comes from for each user.

4   Q   So what were the beginning and end dates here, if

5   you recall?

6   A   I don't.  From looking at -- the bottom date here

7   is May 1st of 2019.

8   Q   And that's the start date and the end date?

9   A   At the very top it is June 4th of 2019.

10  Q   So it's 35 days?

11  A   I believe so.

12  Q   And could you tell us how many records, how many

13  lines of information are in this file?

14  A   Sure.  Can you click on the A column, please?

15  8,349.  And that may include a few rows at the top.  I

16  believe there's three rows at the top.  So it's 8,346

17  individual records, I believe.  Yes.

18  Q   And were you able to determine about how many

19  records per day that is?

20  A   Yes.  So I just took, you know, how many days that

21  was just to try and understand about how many times

22  per day on average that record got entered.  I believe

23  it's around 238 times.

24  Q   228?

25  A   Somewhere around in there.  It's an estimate.

**Exhibit E, pg. 121**

McINVAILLE – DIRECT                122

1    Q    Did you work out how many times an hour that is?

2    A    Sure.  So if you broke that down just by a 24-hour

3    period, that's, I believe, almost 10 records per hour.

4    Q    Or once every how many minutes?

5    A    Once every 10 minutes.

6    Q    Six?

7    A    Sure.  It's a lot of data.

8    Q    So 10 times an hour, once every six minutes?

9    A    Roughly.  I mean, that's the average.  Again, it's

10   not on a specific interval.  That's just an average.

11   Q    Were there any times that Google wasn't collecting

12   data?  Like, did it only collect data during business

13   hours?

14   A    No.  So I looked to try and understand, like, how

15   often per hour, but like the actual hour ranges of

16   when data was collected.  And what I did when I looked

17   at that was just try to understand, you know, at, say,

18   12 a.m. to 12:59 a.m. of every day throughout that

19   period, like, how often it gathered records.  And what

20   I noticed was that it was consistently gathering data

21   24-hours a day.  Sometimes some areas had higher

22   rates, some had lower, but regardless, there were no

23   periods of data not being collected.  It was a

24   consistent collection of data across the date, if you

25   look at it just on average for that time.

**Exhibit E, pg. 122**

McINVAILLE - DIRECT                    123

1   Q    There was no hour of the day when Google was not

2   collecting data?

3   A    There could be in certain days.  There could have

4   been a day where a particular -- but for the, again,

5   the average of across that time, you could see that it

6   generally always would collect data during hours of

7   the day.

8   Q    So even as you're sitting here, Google is

9   collecting your data?

10  A    Could be, if I had those options turned on.

11  Q    And if you did, how many times would they have

12  collected your data since you've been sitting on the

13  witness stand?

14  A    Quite a few times.  I've been here a few hours

15  now.

16  Q    So 20 or so?

17  A    It could be, yeah.

18  Q    Just one last thing.  What happens to Location

19  History, the setting, if the user deletes the

20  application that was used to enable it?

21  A    So you're saying in this instance, if Google

22  Assistant was used to opt in to Location History, but

23  then the application is then deleted?

24  Q    Uh-huh.

25  A    So if you delete that, your permissions are still

**Exhibit E, pg. 123**

McINVAILLE - DIRECT                    124

1   there.  You've enabled that permission on your account

2   even though the application that you used to do so is

3   no longer there.  It's not application based.  You're

4   activating it for your account.

5   Q   Let me make sure I understand.  Even if you delete

6   Google Assistant or even if Mr. Chatrie had deleted

7   Google Assistant, it wouldn't have affected whether

8   Google was getting his location history data?

9   A   No, because other applications are also

10  submitting -- it's still collecting because it's

11  activated for the account, not that specific app.  It

12  was just facilitated through an application.

13  Q   So it's a permission for the entire account?

14  A   It is, yes.  For that device for that account,

15  yes.

16  Q   Even though it was enabled through Assistant, if

17  you delete Assistant --

18  A   It's still going to collect.

19  Q   It's still collecting?

20  A   Yes.

21          MR. PRICE:  That's all I have, Your Honor.

22  Thank you very much.

23          THE COURT:  We probably should take a break

24  now before cross.  It's a natural breaking point, a

25  little earlier than when I normally do it.  Do you all

**Exhibit E, pg. 124**

McINVAILLE – DIRECT                    125

1    want to break for lunch?  It's 12:30.

2              MR. DUFFEY:  Fine with the government, Judge.

3              MR. PRICE:  That's fine with us, Your Honor.

4              THE COURT:  Do you need a full hour?  No.

5    Half an hour?

6              MR. DUFFEY:  Yes, ma'am.

7              MR. PRICE:  That will be sufficient.  Thank

8    you.

9              THE COURT:  All right.  So I'll give a little

10   more than half an hour.  I have it as 12:35.  We'll

11   turn at 1:15.  That will give time for folks to move

12   back and forth.  All right?

13             MR. DUFFEY:  That's fine.

14             THE COURT:  Again, sir, you're still under

15   oath.  Please don't speak to anybody about your

16   testimony.  Don't speak to your witnesses about

17   testimony.  And please wait for our CSOs to move you

18   around as you're moving in our hallways.  All right?

19             So we will take a recess, please.

20             (Luncheon recess at 12:30 until 1:17 p.m.)

21             THE COURT:  All right.  I'm going to do our

22   reminders, which is, obviously, that our witness is

23   still under oath.  Do we have anybody on the AT&T

24   line?

25             THE CLERK:  Yes.

**Exhibit E, pg. 125**

McINVAILLE – DIRECT                126

 1          THE COURT:  Anybody who is on our telephone

 2    conference, welcome.  And I need to remind you that

 3    our local rule, Criminal Rule 53, and our standing

 4    order prohibits anybody recording, transmitting or

 5    broadcasting this hearing.

 6          We have a court reporter here who's making

 7    the official record, and that's all we will have of

 8    this proceeding.

 9          All right.  Thank you.  Mr. Duffey.

10          MR. DUFFEY:  All right.  Thank you, Judge.

11

12    CROSS-EXAMINATION

13    BY MR. DUFFEY:

14    Q   So, good afternoon, sir.

15    A   Good afternoon.

16    Q   I'm Peter Duffey.  I'm with the U.S. Attorney's

17    Office.  Nice to meet you.

18       Let's start -- so we're going to talk about the

19    search warrant first.  Phase 1 you've already

20    testified to, but let's just clarify.  That's one

21    hour; right?  And a fence, 150-meter fence, around the

22    area where we say a crime was committed; right?

23    A   That's correct.

24    Q   And we got back multiple points of data from

25    Google; right?

**Exhibit E, pg. 126**

McINVAILLE - CROSS                    127

1    A    In that return, yes.

2    Q    In Phase 1?

3    A    Yes.

4    Q    In fact, the multiple points of data applied to 19

5    different devices?

6    A    Correct.

7    Q    All right.  And we talked about Defense

8    Exhibit 21, which is Mr. McGriff's affidavit,

9    paragraph 13.

10            MR. DUFFEY:  I'm sorry.  I should have warned

11   you.

12            THE COURT:  That's okay.

13   BY MR. DUFFEY:

14   Q    That's where we got the tens of millions of

15   data -- tens of millions number about their location

16   history data; right?

17   A    Correct.

18   Q    And that came from McGriff who works for Google.

19   A    That's right.

20            THE COURT:  Can you repeat the exhibit

21   number, please?

22            MR. DUFFEY:  It's Defense Exhibit 21.

23            THE COURT:  Okay.

24            MR. DUFFEY:  And I'm talking about paragraph

25   13.

McINVAILLE - CROSS                      128

1  BY MR. DUFFEY:

2  Q    So let me just ask this:  You characterize that,

3  or maybe it was Mr. Price, characterized that as a

4  search of tens of millions of people's location

5  history data; right?

6  A    Correct.

7  Q    Mr. McGriff didn't call that a search, did he?

8  A    I don't recall.  If we can pull it up.

9  Q    We'll pull it up.  But I think you know the answer

10 to this.  Let me ask this.  This is one database that

11 Google has of location history that they run the

12 parameters that we give them in a search warrant, that

13 is one hour, and longitude and latitude parameters,

14 and ask them to give us location history from those

15 parameters; right?

16 A    Correct.

17 Q    Okay.  And it's one database?

18         THE COURT:  I'm sorry.  I know the timing of

19 cross is important, but I think -- are we having

20 trouble with accessing the exhibits?

21         THE CLERK:  Laura, it's not coming up on the

22 screen.  Is your plug pushed in all the way or

23 whatever they did last time?

24         MS. KOENIG:  I think I got it.

25         MR. DUFFEY:  Thank you, Judge.  It's a fairly

McINVAILLE - CROSS                    129

```
 1  minor point.

 2           THE COURT:  We're probably going to be using

 3  this further.  So I want to start off --

 4  BY MR. DUFFEY:

 5  Q   So it's paragraph 13 that I was interested in.  So

 6  maybe if we could just scroll up a little bit to get

 7  by that, because I want to see all the words.  There

 8  we go.

 9       So paragraph 13, they're talking about the

10  majority of Google users worldwide did not have

11  Location History enabled on their account.  They

12  concede that it's difficult to come up with an exact

13  number, but one-third of active Google users, tens of

14  millions of Google users worldwide, had Location

15  History enabled on their accounts; right?

16  A   Correct.

17  Q   Now, that's where you get the tens of millions of

18  people's accounts that were searched; right?

19  A   Correct.

20  Q   Nowhere does McGriff refer to that as a search;

21  right?

22  A    No, he's telling you how many people they estimate

23  would use -- that use the Location History service

24  after he discusses that they have to search that

25  database for the people located within the fence.
```

**Exhibit E, pg. 129**

McINVAILLE - CROSS                    130

1    Q    And you would agree with me, we're talking about

2    one database; right?

3    A    The Location History database.

4    Q    Right.  That's called Sensorvault, I think?

5    A    I believe that's where they keep it, yes.

6    Q    And when you're talking about searching that,

7    you're really talking about a computer and you're

8    putting in the parameters that you want it to look

9    for; right?

10   A    That's correct.  They're using computers to do

11   that work.

12   Q    Also to be clear, the government doesn't have

13   access to the Sensorvault.  The government gets the

14   results, that is the 19 devices that Google tells us

15   complied with the parameters that we gave them; right?

16   A    That's right.

17   Q    Okay.  So to be clear, when you compared our

18   search here, our geofence search, to a tower dump, the

19   tower dump example we gave you said probably would

20   give 3,000 numbers to the government?

21   A    It's possible.

22   Q    And so we're clear on a tower dump, one, you're

23   getting 3,000 numbers; right?

24   A    Correct.

25   Q    And you're getting phone numbers; right?

**Exhibit E, pg. 130**

McINVAILLE - CROSS                131

1   A    Correct.

2   Q    Phone numbers to people's accounts; right?

3   A    Correct.

4   Q    That is not true in the geofence; right?  We're

5   getting reference numbers.

6   A    Correct.  You're getting the device ID.

7   Q    Right.  But it's a device ID that we, even

8   standing here today after over a year, we can't

9   connect these device ID reference numbers to any

10  individual cell phone numbers; right?  At least not

11  through the device number.

12  A    Directly to the phone number?  No.

13  Q    Right.  And so when you compare 19 devices, and

14  then your Defense Exhibit 3, and that's under seal.

15  So you should have that in front of you; right?

16  A    You said three?

17  Q    Three.  That's the return that we got on Phase 1.

18  A    Okay.

19  Q    Actually, I think it also contains Phase 2, but I

20  want to talk to you about Phase 1.

21       Well, it's not numbered.  So if you can click to

22  the very beginning of the actual spreadsheet, and it

23  begins in the upper left-hand corner with the No.

24  No. 1.  And that No. 1.

25            THE COURT:  Are you in Exhibit 3?

**Exhibit E, pg. 131**

McINVAILLE - CROSS                    132

1           MR. DUFFEY:  Yes, ma'am.

2           THE COURT:  So your face is away from the

3    microphone.  So we're not hearing everything.

4           MR. DUFFEY:  Let me move it over here.

5    BY MR. DUFFEY:

6    Q    So if we can go to the beginning of the

7    spreadsheet that begins with 1 and ends three or four

8    pages later at 210; right?

9    A    Correct.

10   Q    And it's only 19 different devices, but it's

11   actually 209 location plots?

12   A    That's correct.

13   Q    That's what the government got from the search

14   warrant, at least Phase 1; correct?

15   A    Correct, in one.

16   Q    Compared to 3,000 -- possibly 3,000 phone numbers

17   that are identified by their phone numbers in a tower

18   dump; right?

19   A    Correct.

20   Q    Okay.  And you testified, I think, on direct that

21   Google calculates to the best that they can that if

22   they are in our 150-meter radius, they're in, and we

23   get coordinates, and if they're out of the 150-meter

24   radius, we don't get anything from them; right?

25   A    Yes.  If that latitude and longitude falls

**Exhibit E, pg. 132**

McINVAILLE - CROSS                    133

1   outside, it won't.

2   Q    In, we get it; out, we don't get it?

3   A    Correct.

4   Q    And the latitude, longitude, and that's Column C

5   in -- excuse me -- D and E in this, those are pretty

6   precise.  Those are the points that we see you used, I

7   think, in your Mr. Blue, Mr. Green, Mr. Yellow.  We've

8   used in some of these where we're pointing; right?  So

9   that's the exact point.  And then as you move over to

10  G, maps display radius in meters, that's where they

11  say some of these we're very confident on, and they

12  give you a low number in meters; right?  And some of

13  these we're not, and they give you a slightly higher

14  number; right?

15  A    That's correct.

16  Q    So that's like their margin of error, say, in a, I

17  don't know, a political poll, they give you a margin

18  of error.  This is like Google's margin of error.

19  They're telling you how confident they are, and how

20  close this phone is likely to be to this -- to those

21  longitude and latitude marks?

22  A    That's correct.

23  Q    And some they're pretty confident in, and some

24  they tell you we're not so confident in; right?

25  A    Based on radius, right.

**Exhibit E, pg. 133**

McINVAILLE – CROSS                    134

1          THE COURT:  Based on what?

2          THE WITNESS:  The radius, how big or small it

3   is.

4   BY MR. DUFFEY:

5   Q    If we could go to Government's Exhibit 1, page 20.

6   And that's with the big blue circle.  On direct, you

7   talk a lot about this because this -- and you're

8   accurate.  This one big blue circle included

9   businesses, and streets, and apartments, and all kinds

10  of things; right?

11  A    Correct.

12  Q    All right.  And I think you testified that the

13  margin of error, so to speak, the map display radius

14  on that was 384 meters.

15  A    Somewhere around there, yes.

16  Q    That's pretty high?

17  A    Yes.

18  Q    In fact, if I can get you to look through the

19  Stage 1 returns, so let's start with the page at the

20  very beginning of the returns.  In the upper left-hand

21  corner, that's a one, and it goes down to line 33;

22  right?  Are you with me?

23  A    Yes.

24  Q    Looking at map display radius, do you see any

25  numbers in that that are even close to 384?

**Exhibit E, pg. 134**

McINVAILLE - CROSS                    135

1    A    No.

2    Q    In fact, I think it's lines two, three, four, and

3    five, maybe the first six or seven are over 50, but

4    none are more -- there's two that are 100 even, and

5    then the rest are less than 50 meters; right?

6    A    That's fair, yes.

7    Q    Is that right?

8    A    Yeah, it is.

9    Q    Okay.  Second page, likewise.  That's line 34

10   through 66.  There's not a single map radius that's

11   over 50 in that; right?

12   A    Correct.

13            THE COURT:  Wait.  Where are you?

14            MR. DUFFEY:  Going to the next page.

15   Q    And that has line 67 through 99.  I think there's

16   only two, which is line 83 and 86, are slightly over

17   50.  The rest of the display radiuses are under 50;

18   right?

19            THE COURT:  Can you remind me which exhibit

20   we are?

21            MR. DUFFEY:  We are Exhibit 3.  And then

22   we're at the third page of the spreadsheet.  And that

23   has lines 67 through 99.

24            THE COURT:  Got it.

25   BY MR. DUFFEY:

**Exhibit E, pg. 135**

McINVAILLE - CROSS                    136

1    Q    So, I'm asking you, with the exception of line 83

2    and 86, which are slightly over 50, the rest of those

3    map radius numbers are all under 50 meters; right?

4    A    Correct.

5    Q    We go to the next one, that's line No. 100 to 132,

6    the entire sheet's well under 50; right?

7    A    They're under 50, yes.

8    Q    Not a single one's over 50?

9    A    It's not --

10   Q    Much least 384?

11   A    That's right.

12   Q    Similarly, line 133 to 166, that page, I think

13   there's two.  One's 104 and one's 122.  Well, let me

14   be precise.  Line 137, slightly over 100.  And line

15   150, a little over 100.  The rest significantly lower.

16   In fact, some of them are down to 3 meters; right?

17   A    Correct.

18   Q    In your training and experience, being down to

19   3 meters is probably a GPS point; right?

20   A    It is.  A reference is GPS for those points.

21   Q    All right.  Very similarly, on the next page, line

22   166 to line 198, lots of GPS points.  Nothing --

23   excuse me.  One over 50.  Line 186 shows 73.  The rest

24   well under 50; right?

25   A    Correct.

**Exhibit E, pg. 136**

McINVAILLE - CROSS                    137

1   Q   So, finally, the last page.

2           MR. DUFFEY:  I'm getting to it, Judge.

3   Q   199 to 210, the very end of Phase 1.  The second

4   to the last one there, line 209, that's the three --

5   excuse me, 387, I think it is.  That's the blue

6   circle; right?

7   A   The largest one, yes.

8   Q   Right.  Now, if you look right above that also at

9   line 208, that's the same reference number; right?

10  A   Correct.

11  Q   So that's the same device; right?

12  A   Correct.

13  Q   And only about 30 seconds earlier, but their

14  radius -- map display radius on that is 84?

15  A   Correct.

16  Q   So they have the same device on here.  It has a

17  map radius of only 84, but the next one for some

18  reason goes to 387.

19  A   Correct.

20  Q   Do you know why it jumped to 387?

21  A   I don't.

22  Q   Do you have any idea?

23  A   I don't.

24  Q   Okay.  But you would agree with me, if we take

25  away that one anomaly, which is the only one in this

**Exhibit E, pg. 137**

McINVAILLE – CROSS                    138

 1   entire Phase 1 that's even close to 387, if you remove

 2   that one anomaly, what we're left with is a fairly

 3   concise circle.  Granted, some of them are slightly

 4   outside the geofence radius.  But it's fair to say

 5   this one, the one big blue circle, is pretty much an

 6   anomaly here; right?

 7   A    Again, it's larger than the others, and it's the

 8   only one.

 9   Q    Well, it's a lot larger than the others; right?

10   A    Yes.

11   Q    Okay.  And, in fact, the coordinates just 30

12   seconds earlier on that same device was only 84;

13   right?

14   A    Correct.

15   Q    Okay.  So, now, we've got -- as I said, Phase 1

16   was 19.  I'm calling it anonymous numbers.  I know you

17   don't agree with that, but these were 19 devices.  So

18   let's talk a little bit about the anonymity of these.

19   The reference numbers here, and those are all those

20   reference numbers in Column A from the Phase 1 thing;

21   right?  You've been looking at this for over a year;

22   right?

23   A    Correct.

24   Q    Is there some secret code to those reference

25   numbers that you've cracked that can tell you what the

**Exhibit E, pg. 138**

McINVAILLE - CROSS                    139

1    cell number is that's associated with those reference

2    numbers?

3    A    No.

4    Q    And so to your knowledge, I mean, when we're

5    talking about anonymity, those reference numbers are

6    anonymous as far as identifying any particular phone

7    number; right?

8    A    Correct.  They don't associate to a phone number.

9    Q    So we can take out the reference number.  That's

10   not what you're talking about when you say the returns

11   aren't anonymous; right?

12   A    Correct.

13   Q    Okay.  Now, as we talked about the map radius, the

14   location is not precise, and Google gives you

15   different margins of error; right?

16   A    Correct.

17   Q    Some very, very small and some larger.  But every

18   single one of these plots that we got back, Google

19   reasonably believes, at least in their mind, that

20   every single one of these by longitude and latitude

21   should be plotted within our 150-meter radius; right?

22   A    That's how they returned it, right.

23   Q    And if they found a longitude and latitude outside

24   of our radius, we don't get it; right?

25   A    Right.

**Exhibit E, pg. 139**

McINVAILLE - CROSS                              140

1  Q   So there's no search as far as the government is

2  concerned.  We don't get any information on that

3  device; right?  Is that right?

4  A   If the point falls outside of the geofence, you

5  don't get it.

6  Q   Okay.  They're not guessing at this.  They're

7  not -- it's not their discretion.  They have a set way

8  of doing this; right?

9  A   They certainly do.

10 Q   And they calculated longitude and latitude; right?

11 A   Yes.

12 Q   And they comply with the search warrant and the

13 parameters that we give them; right?

14 A   Correct.

15 Q   So at this point Phase 1, in your mind, is

16 anonymous; right?

17 A   Sure.  You only know who's inside -- you only know

18 the numbers for the people inside the circle.

19 Q   And you have these anonymous reference numbers;

20 right?

21 A   Yes.

22 Q   They don't give you any clue; right?

23 A   No, they just associate --

24 Q   So Phase 1 is anonymous just like everyone says;

25 right?

**Exhibit E, pg. 140**

McINVAILLE - CROSS                    141

 1   A    Sure.

 2   Q    Okay.  Phase 2 is where you begin to diverge a

 3   little bit; right?

 4   A    Correct.

 5   Q    Okay.  So let's talk about that.  So -- well,

 6   first, let me ask you, you said government -- the

 7   government asked in Phase 2 for all 19; right?

 8   A    Correct.

 9   Q    From Phase 1.  And I think you said, but I'm not

10   sure, was it your testimony that then Google decided

11   to give us only nine?

12   A    No.

13   Q    What did you say?

14   A    It was that 19 were requested and that Google

15   asked for them to be -- for that number to be reduced.

16   Q    Right.  Well, I think they just didn't respond.

17   But --

18          MS. KOENIG:  Judge, objection that Mr. Duffey

19   is, I think, testifying about that point instead of

20   the witness.

21          MR. DUFFEY:  Well, it was a question.

22          THE COURT:  The question is, what you think?

23   How does he know what you think?  Just rephrase it.

24          MR. DUFFEY:  All right.

25   BY MR. DUFFEY:

**Exhibit E, pg. 141**

McINVAILLE – CROSS                          142

1   Q    The point is, is that Google didn't respond to the

2   initial request.  I mean, you reviewed the emails;

3   right?

4   A    Yes.

5   Q    Google didn't respond to the government's first

6   request that we get all 19 back; right?

7   A    I think that's right, yes.

8   Q    And, in fact, a couple of times when we asked,

9   Google just didn't respond?

10  A    Correct.

11  Q    And it's also true, then, that -- and this is

12  Detective Hylton's email, I think.  He added in, in

13  the alternative, here's our nine; right?

14  A    Correct.

15  Q    And so those nine numbers weren't chosen by

16  Google.  They were chosen by Detective Hylton?

17  A    Correct.

18  Q    Okay.  Just so we're clear on that.  And all

19  nine -- did you do the plot, all nine videos, too?

20  Did you plot all nine of those?

21  A    Yes.

22  Q    And, in fact, all nine of those, if you recall,

23  all the radiuses, with, I think, the exception of one,

24  all fell -- not only the point, but the radiuses, too,

25  the map display radiuses, all fell within the

**Exhibit E, pg. 142**

McINVAILLE - CROSS                      143

 1   150-meter circle.  Does that sound right?

 2   A   I think that's correct.

 3   Q   Now, so let's talk about that.  So then it's your

 4   contention, then, though, that once we -- in Phase 2,

 5   we drop the fence.  We add a half hour to each end.

 6   That's what we did.  That's what the government asked

 7   for in the search warrant; right?

 8   A   Correct.

 9   Q   And so now we're talking about two hours on one

10   particular day with no geographical restriction and

11   just on these nine phones; right?

12   A   Correct.

13   Q   So, basically, we already know some of this

14   because we've had them in Phase 1; right?  But now

15   we're going outside the circle; right?

16   A   Correct.

17   Q   So, in some of these, your contention is it's not

18   really anonymous because they go -- I think you really

19   center on the fact that they travel -- they appear to

20   travel to a single family residence; right?

21   A   That's part of it, yes.

22   Q   Well, we'll talk about that, then.  So, when they

23   go to the residence, would you dispute that not a

24   single one of these in Phase 2 of these nine phones

25   stay at any single family residence more than an hour?

**Exhibit E, pg. 143**

McINVAILLE - CROSS                    144

 1   A   Do they stay there for more than an hour?

 2   Q   Right.

 3   A   We've only got two hours of data.  So none stayed

 4   for more -- no, none stayed for an hour.

 5   Q   Less than an hour?

 6   A   Sure.

 7   Q   Okay.  All nine phones, when you mapped them out,

 8   none of them stayed at the -- I realize you're

 9   tracking them.  They're going down roads.  At some

10   point, they're all going into the circle; right?  At

11   least that's what we say; right?

12   A   Correct.

13   Q   And then some of them go back.  But none of them

14   stay at any single family residence for more than an

15   hour; right?

16   A   Correct.

17   Q   And many of them don't even stay very long at all;

18   right?

19   A   Correct.

20   Q   Okay.  Now, you would agree with me that -- I

21   mean, how old are you?

22   A   Thirty-three now.

23   Q   All right.  You've been to people's homes and

24   stayed more than an hour; right?

25   A   Sure.

McINVAILLE - CROSS                    145

1   Q    You didn't live there; right?

2   A    That's correct.

3   Q    In fact, people get guests at their homes all the

4   time; right?

5   A    That's right.

6   Q    So you're not saying, as an expert, because you

7   can track a cell phone to at or near a residence, that

8   that means they have to live there?

9   A    That's right.  That doesn't mean they have to live

10  there, you're right.

11  Q    I understand you say it's possible, and I would

12  agree with you it's possible.  Anything's possible.

13  But that doesn't mean that they live there; right?

14  A    That's correct.

15  Q    And I think when we're talking about -- I notice

16  when you plotted on your three plot -- let me get the

17  number.  Defense Exhibit 5.  We don't have to play it,

18  but in that you plot specific points, and you show

19  them hitting at or near a single family residence.

20  And that's for Mr. Green, and Mr. Yellow, and Mr.

21  Blue; right?

22  A    Correct.

23  Q    So, I notice we don't have the map display radius

24  around those points; right?

25  A    That's correct.

**Exhibit E, pg. 145**

McINVAILLE - CROSS                    146

1   Q    Isn't it fair to say that many of those, if you

2   put up the map display radiuses, would probably

3   include the house next to it?

4   A    That's right.

5   Q    In fact, I think you said that on direct.

6   A    I did.

7   Q    In fact, it might include a third house; right?

8   A    It could include more than one, yes.

9   Q    Okay.  So, now, you don't know whether they're a

10  guess or the actual person who lives there; right?

11  And for most of these, if not all of these, you're

12  going to have to look, if you want to figure out their

13  identity, now you're looking at two, maybe three

14  houses; right?

15  A    Correct.

16  Q    And you would agree with me that if, in fact, the

17  holder of that phone was a guest, then doing the

18  things that you talked about doing, the open source

19  thing and looking at tax records or deeds or I'm not

20  sure what, you weren't real specific on what you were

21  looking at, but looking at those kinds of things, like

22  deeds, tax records, open source data, for that house,

23  if they were a guest, then you're not going to get

24  that; right?

25  A    Right.  You're going to see the person they're

McINVAILLE – CROSS                    147

 1  associated with.

 2  Q    Right.  And nobody on their tax record or maybe

 3  you get, I don't know, their power bill, no one says

 4  here's Peter Duffey's power bill, and, by the way,

 5  here's 10 of his closest friends; right?  You're not

 6  going to get that off the power bill; right?

 7  A    Correct.

 8  Q    So I think you would agree with me that if, in

 9  fact, these people were a guest in the home that

10  you're looking at, then you're not going to be able to

11  find their name from any of this open source data that

12  we talked about; right?

13  A    Probably not.

14  Q    So now we're talking about you're having to limit

15  this, and you're having to assume, I guess, or look

16  for them actually living in the house before you even

17  have really a prayer of figuring out their identity;

18  right?

19  A    For associating with the house, then, yes, you

20  would need something.

21  Q    Well, the phone is the only thing that associates

22  it to the house; right?

23  A    Correct.

24  Q    And so what we're talking about is identifying the

25  person holding the phone; right?

**Exhibit E, pg. 147**

McINVAILLE - CROSS                    148

1   A    Correct.

2   Q    And when I say "identify," and you tell me if you

3   agree with me, when we're talking about identifying a

4   human being, you're talking about their name; right?

5   A    Sure.

6   Q    Okay.  So all of these, I guess, you could go to

7   the courthouse, if you had an address, and look at the

8   deed; right?  You could get other open source data,

9   figure out who paid the taxes on the house; right?

10  A    Yes.

11  Q    That would give you the owner?

12  A    Correct.

13  Q    But you'd agree with me, if the owner was leasing

14  the house, then you're back in the dark again because

15  now there's lessees in the house, and you don't know

16  who they are; right?

17  A    That's right.

18  Q    And you won't get that from any of this open

19  source data?

20  A    Right.

21  Q    And, of course, there's Facebook; right?  I think

22  you looked on Facebook.

23  A    Correct.

24  Q    Other tax records.  All of this, you would agree

25  with me, requires fairly significant investigative

**Exhibit E, pg. 148**

McINVAILLE – CROSS                    149

1   work on your part; right?

2   A   Yeah, you have to look into the data.

3   Q   None of it come from Google; right?

4   A   Correct.

5   Q   And none of it certainly came from Google pursuant

6   to this search warrant; right?

7   A   Correct.

8   Q   Okay.  So let me ask you this:  Ultimately, if you

9   were to get, say, a person's -- even if you were able

10  to figure out what their phone number was living in a

11  house, and then you had one of our phones from Phase 2

12  going to that house, you'd still have to be able to

13  match up their phone number with this anonymous

14  reference number from our Phase 2 data; right?

15  A   Correct.

16  Q   Because there's nothing in the reference number

17  that we got pursuant to this warrant that tells you

18  what their phone number is, at least until you get to

19  Phase 3; right?

20  A   Correct.

21  Q   So even then, in order to match up that phone to

22  that person, you're going to have to probably have a

23  friendly prosecutor, and you're probably going to have

24  to do court process; right?

25  A   Yes.

**Exhibit E, pg. 149**

McINVAILLE - CROSS                    150

1   Q    You're going to have to get a search warrant;

2   right?

3   A    Yes.

4   Q    At least grand jury subpoenas to figure out who

5   the subscriber to the phone was?

6   A    Yes.

7   Q    Maybe.  And even -- and you were in law

8   enforcement for eight and a half years, so I think

9   you're going to know the answer to this.  Criminals

10  often use other people's names on their cell phones;

11  right?

12  A    People in general do that, yes.

13  Q    Okay.  And especially, say, drug dealers; right?

14  A    They can, yes, or false names more often than not.

15  Q    They do it all the time; right?

16  A    Yes.

17  Q    Or they use a girlfriend's name; right?

18  A    Correct.

19  Q    Because they don't want their name associated with

20  the phone.

21  A    Right.

22  Q    So in your, I guess, scenario of saying you can

23  maybe uncover the identity of these people, even if

24  you got a person's cell phone at this house and got

25  the subscriber information and figured out their name,

**Exhibit E, pg. 150**

McINVAILLE – CROSS                    151

 1   that still doesn't get you there; right?  Because

 2   you're not sure, one, whether or not they were the

 3   ones holding the phone on May 20th at 5 p.m., or

 4   whatever the time is, of 2019; right?

 5   A    Correct.

 6   Q    The time of this search warrant.

 7   A    Right.

 8   Q    All right.  So when -- I guess maybe it's a

 9   question of semantics, but I just want to ask you, so

10   it's your expert opinion that the information that we

11   got from Google in Phase 2 is not anonymous?

12   A    It's not that it's identifying in terms of names,

13   but, yes, it can lead you to know who that person is

14   based on being able to track where they have been.

15   Q    Okay.  In two hours of one day; right?

16   A    Correct.

17   Q    You think you can figure out who these people are?

18   A    Sure.

19   Q    All right.  Have you figured out who anyone is?

20   A    I haven't, no.

21   Q    Well, you've had over a year.  You haven't figured

22   out the identity of anyone in Phase 2?

23   A    I wasn't actually here to investigate who the

24   people were.  I was trying to determine if it would be

25   possible to do so.

**Exhibit E, pg. 151**

McINVAILLE - CROSS                    152

1   Q    Okay.  But you haven't done it yet?

2   A    No, I have not.

3   Q    Okay.  So when you say it's not anonymous, it's

4   because it could lead you, with extra work, extra

5   investigative activity, maybe lead you to possibly a

6   group of likely suspects; right?

7   A    Correct.

8   Q    And in your mind, that means that's not anonymous?

9   A    Right.

10  Q    All right.  So let's talk about, if we could, your

11  supplemental report.  And that's Defense Exhibit 7;

12  Right?

13          MR. DUFFEY:  Could we get that up?  Do you

14  mind?

15          MS. KOENIG:  Sure.

16  BY MR. DUFFEY:

17  Q    So you would agree with me, looking at your

18  report, right off the bat, you state, and I think

19  everyone appreciates your candor, that you can't

20  replicate the opt-in process that the defendant would

21  have seen.  That's on page 1 of your report.

22  A    That's right.

23  Q    So you can't be sure exactly which of these

24  screens that he saw, if any, from your report; right?

25  A    Can't be 100 percent certain.

**Exhibit E, pg. 152**

McINVAILLE – CROSS                    153

1    Q    Sure.

2    A    Right.

3    Q    And so the Quartz article, which is Defense

4    Exhibit 48, and we don't have to get that up, but

5    that's what it is, you show the screenshot in your

6    report, Defense Exhibit 7, as Figure 1; right?

7    A    Correct.

8    Q    And I think you said this, but let's make it

9    clear, this article was published January 24th of

10   2018; right?

11   A    Right.

12   Q    And I think we've established that Location

13   History on our phone -- I say "our phone" -- the

14   target cell phone here, Mr. Chatrie's phone, was

15   enabled on July 9th of 2018; right?

16   A    Right.

17   Q    So you would agree with me that the Quartz article

18   showing various screenshots was published seven or

19   eight months prior to the enabling on Mr. Chatrie's

20   phone; right?

21   A    Correct.

22   Q    Okay.  And we'll get to the Norwegian test, but

23   that shows a different -- that's from July, and that

24   shows a different screenshot; right?

25   A    The Norwegian?

McINVAILLE - CROSS                    154

1   Q    Yes.

2   A    Yes, correct.

3   Q    So either Quartz is just wrong or something

4   changed in between January and July; right?

5   A    Correct, the language changed.

6   Q    Okay.  So when we look at Figure 1, and this is

7   Figure 1 on Government's 7, this is the Quartz

8   screenshot; right?

9            THE COURT:  Just to be clear, it's Defense 7.

10           MR. DUFFEY:  Oh, I'm sorry.  Defense Exhibit

11   7.

12   BY MR. DUFFEY:

13   Q    Figure 1, this is the Quartz screenshot; right?

14   A    Correct.

15   Q    And you would agree with me, this is not entirely

16   accurate because it cuts off "No, thanks" or "Yes, I'm

17   in" at the bottom of the screenshot; right?

18   A    Yeah, it has to be scrolled down to get to those.

19   Q    Okay.  So we can assume that at the bottom there

20   is a "No, thanks" or "Yes, I'm in"; right?

21   A    Correct.

22   Q    Okay.  And can you preclude the possibility that

23   if you click "No, thanks," that there's a second

24   opt-in page that follows up this to say, like, are you

25   sure, or this is what happens if you do this?

**Exhibit E, pg. 154**

McINVAILLE - CROSS                     155

1    A    I'm not sure if there is.

2    Q    You don't know?

3    A    No, I don't.

4    Q    In fact, the Quartz article, it wasn't really the

5    point of the Quartz article to document the opt-in

6    process; right?

7    A    Right.

8    Q    They had a different subject; right?

9    A    Correct.

10   Q    It wasn't about whether or not this is truly an

11   opt-in process; right?

12   A    No.  I used the screenshot because it showed one

13   of the permission screens.

14   Q    Oh, I'm not attacking you.  I'm just pointing out

15   the point of the article wasn't about opt-in.  It just

16   happened to have screenshots in it; right?

17   A    Correct.

18   Q    Okay.  The second source you went to, the Oracle

19   report -- for the record, that's Defense Exhibit 11.

20   So if we go to page 2 of your report, Exhibit 7, so

21   Figure 3, in this screenshot that you document --

22   excuse me, Figure 2.  This is page 2.

23            MS. KOENIG:  It's page 2 of Exhibit 7.

24            MR. DUFFEY:  All right.

25   BY MR. DUFFEY:

**Exhibit E, pg. 155**

McINVAILLE - CROSS                    156

1    Q    This doesn't document at all when this screenshot
2    would have been taken; right?  Or does it?  You tell
3    me.
4    A    I think in another portion they do reference
5    when -- I know they were 2018.  I'm trying to recall.
6    I think it was -- I think it was actually closer to
7    the time frame of Quartz, if I'm --
8    Q    Before July 2018?
9    A    I do believe it was before July.
10   Q    But looking at this, you're not sure because it
11   doesn't document it in your report?
12   A    Not right here, no.
13   Q    Okay.  And, again, much like the Quartz figure,
14   the Quartz screenshot, this does not document if
15   there's any further opt-in or out-out process after
16   clicking either "No, thanks" or "Yes, I'm in"?
17   A    It does not.
18   Q    It doesn't tell you what happens next?
19   A    No, there's no screenshots for that.
20   Q    Okay.  Now, then we go to the Norwegian report,
21   and the Norwegian report itself was Defense 27, but
22   this is on page 3; right?  And the difference here, I
23   take it, is that you have to opt-in, I think you
24   testified.  It now has three things in the opt-in
25   list, I guess you would call it, that has Location

**Exhibit E, pg. 156**

McINVAILLE – CROSS                        157

1   History.  And this is Figure 3, "Location History,

2   Device information, Voice & Audio Activity"; right?

3   And those all three are on the list; right.

4   A   Yes, they were on the others, as well.

5   Q   Then you also show the expanded view of Location

6   History.  That, I guess, is that you clicked on the

7   down arrow, and that gives you an explanation of what

8   Location History is; right?

9   A   That's what they did, yes.

10  Q   Okay.  And that says "Location History saves where

11  you go with your devices"; right?

12  A   Yes.

13  Q   To save this data, Google regularly obtains

14  location data from your devices.  This data is saved

15  even when you aren't using a specific Google service,

16  such as Google Maps or Search.  That's on Figure 3;

17  right?

18  A   Yes.

19  Q   You're not contesting that a normal consumer

20  reading that could not figure out that Google is

21  saving their location history, are you?

22  A   No.

23  Q   Okay.  So it's clear, pretty much to anyone who

24  can read, that they're telling you Google is going to

25  save where you go; right?

**Exhibit E, pg. 157**

McINVAILLE - CROSS                    158

1    A    Correct.

2    Q    It also says "If you use the device without an

3    internet connection, your data may be saved to your

4    account once you return online"; right?

5    A    Correct.

6    Q    I think that goes to your point that once you

7    enable Location History, it's tracking your phone all

8    the time; right?

9    A    Right.

10   Q    Okay.  It also says, I think, that this data may

11   be saved and used in any Google service where you were

12   signed in to give you more personalized experiences;

13   right?

14   A    Yes.

15   Q    And it tells you, you can see your data, you can

16   delete it, and you can change your settings at

17   account.google.com; right?

18   A    Correct.

19   Q    That's the same language that Mr. McGriff has in

20   his affidavit; right?

21   A    Correct.

22   Q    Okay.  So there's nothing shady about that; right?

23   About McGriff's affidavit, at least to that point;

24   right?

25   A    No.

**Exhibit E, pg. 158**

McINVAILLE - CROSS                     159

1   Q   Same language.  All right.  And then at the

2   bottom, again, there's "No, thanks" or there's "Turn

3   on"; right?

4   A   Correct.

5   Q   Do you think there's any ambiguity there that you

6   are turning on Location History?

7   A   No, it's specifically asking for those three

8   permissions.

9   Q   All right.  And, essentially, and I think this is

10  Defense Exhibit 23, is McGriff's affidavit, the

11  difference really with McGriff's affidavit is that --

12  in his affidavit and his screenshot, Location History

13  stands alone; right?

14  A   Correct.

15  Q   That's really the only difference; right?

16  A   Correct.

17  Q   He doesn't define Location History any

18  differently; right?

19  A   No.

20  Q   Okay.  And there's still a "No, thanks" or "Turn

21  on" at the end of it?

22  A   Correct.

23  Q   Right.  So is there any doubt also that consumers

24  are told -- and this is true, that they can always

25  delete Location History any time they want; right?

**Exhibit E, pg. 159**

McINVAILLE - CROSS                    160

1   A   They can, yes.

2   Q   So I know Mr. Price asked you about turning off

3   or, I guess, deleting Google services or Google

4   Assistant doesn't turn off Location History?

5   A   Right, the application.

6   Q   Right.  My question is, though, regardless of

7   that, any time a consumer wants, they can go on their

8   phone and they can say stop taking my -- stop saving

9   my location history; right?

10  A   Correct.

11  Q   And then Google will stop doing it?

12  A   Correct.

13  Q   In fact, they can delete it, and then Google won't

14  have it in the Sensorvault anymore; right?

15  A   Correct.

16  Q   And if Google doesn't have it in the Sensorvault,

17  the government's not getting it even with a search

18  warrant; right?

19  A   The way I understand it, yes.

20  Q   Because it's just not there.

21  A   Right.

22  Q   So that can come either because the person never

23  turns on Location History; right?

24  A   I'm sorry?

25  Q   That can happen -- the government can, I guess,

**Exhibit E, pg. 160**

McINVAILLE – CROSS                    161

1   get thwarted on the search warrant by Google where

2   Google says "We don't have any location history."

3   That can happen for two reasons.  One is the person,

4   the holder of the phone, can have never turned on

5   Location History; right?

6   A   Right.

7   Q   Or they can at any time go back on and delete it?

8   A   Correct.

9   Q   Any time before the search warrant comes; right?

10  A   Correct.

11  Q   In which case, in both cases, Google, in response

12  to a government search warrant, would say, Sorry, we

13  don't have anything; right?

14  A   I would think so, yes.

15  Q   Okay.  And I think you've said this, again, but

16  let's make it clear.  There is no way that Google

17  saves this data without the customer in some form or

18  fashion clicking either "Yes, I'm in" or "Turn on" and

19  Location History is at least one of the items up above

20  that choice; right?

21  A   Right.

22  Q   A customer has to agree to Location History or

23  Google is not saving their location data; correct?

24  A   Yes, their location history.  It doesn't have

25  that.

**Exhibit E, pg. 161**

McINVAILLE – CROSS                    162

1    Q    From Mr. McGriff's affidavit, do you have any

2    reason to doubt his one-third of Google users

3    worldwide have Location History enabled?  That means

4    two-thirds do not; right?

5    A    Yeah, there's no way for me to know.

6    Q    Do you have any reason to doubt that?

7    A    No.

8    Q    I mean, you talked about the tens of millions

9    number on direct; right?  You got that from the

10   one-third of Google users worldwide having Location

11   History enabled; right?

12   A    Correct.

13   Q    That means three times that number of Google users

14   don't have Location History enabled; right?

15   A    That's right.

16   Q    Which means they're not -- Google has none of

17   their location data; right?

18   A    They don't have location history.

19   Q    Location history.

20   A    Yes.

21   Q    We'll get to that.

22        So, it's fair to say that tens of millions of

23   Google users have somehow figured out how to use their

24   phones without Location History enabled; right?

25   A    Right.

**Exhibit E, pg. 162**

McINVAILLE - CROSS                    163

1    Q    There's millions of people using their phones

2    without Location History enabled?

3    A    Right.

4    Q    You're not saying in your opinion these people, I

5    don't know, are just stupid because they don't know

6    how to turn it on?

7    A    I'm not saying anything about those people.

8    Q    Does that seem reasonable to you that tens of

9    millions of people would be using a phone without

10   Location History when they really wanted Location

11   History on?

12   A    I don't know why you would make the choice one way

13   or another.  That's completely up to the user.

14   Q    All right.  Okay.  Well, let me ask you this:

15   Location Services is clearly not the same thing as

16   Location History; right?

17   A    Right.

18   Q    So Location Services, enabling that, that's what

19   really gets you, I guess, according to Google, kind of

20   the fun stuff of the phone; right?  That allows the

21   phone to know where it is at all times; right?

22   A    Right.

23   Q    Realtime?

24   A    Right.

25   Q    And so if you wanted to -- you have Location

**Exhibit E, pg. 163**

McINVAILLE - CROSS                    164

 1   Services enabled, you can turn on Google Maps and say,

 2   Take me to the nearest Chick-fil-A, and it will tell

 3   you right then, Go down the road, take a right, and it

 4   will direct you there; right?

 5   A    Right.

 6   Q    Because it's tracking you realtime because you

 7   have Location Services enabled; right?

 8   A    Right.

 9   Q    And you have Google Maps enabled and all the other

10   things; right?

11   A    Right.

12   Q    But that is not the same thing as Location

13   History; right?

14   A    No.

15   Q    Because if you have Location Services enabled, you

16   can do all the fun stuff that I call it, but without

17   Location History enabled, Google's not saving any of

18   that; right?

19   A    Not that I'm aware of, no.

20   Q    It doesn't go into the vault; right?

21   A    I'm not sure.  I don't know for sure.  That would

22   be Google, but --

23   Q    Well, I'm asking you, in your expert experience,

24   if you don't have Location History enabled, Google's

25   not saving the data; right?

**Exhibit E, pg. 164**

McINVAILLE - CROSS                           165

1    A    It's not saving Location History.  I don't know if

2    they're still saving some location information is all

3    I'm saying.

4    Q    Well, do you think they're saving your Location

5    Services data when you've told them not to enable

6    Location History?

7    A    So, look -- yeah, Location History is you creating

8    that data that's being stored to you.  There's still

9    advertising data and things being collected.  I just

10   was trying to say, as far as Location History goes,

11   you can have Location Services running and either have

12   Location History either running or not.  Two different

13   things away from whether or not they still collect

14   some location data in other ways.  But as far as

15   Location History goes --

16   Q    They do not?

17   A    Right.

18   Q    So if Google tells you that the only thing the

19   government gets from a search warrant is Location

20   History, do you have any reason to doubt that?

21   A    No.

22   Q    And, therefore, I'm asking you if Location History

23   is not enabled, the government's not getting any

24   location data out of Google; right?

25   A    Correct.

**Exhibit E, pg. 165**

McINVAILLE – CROSS                    166

1   Q    We've talked real quick about our second search

2   warrant, and that's Defense Exhibit 8.  And that had a

3   whole bunch of plots; right?

4   A    Yes.

5   Q    That's the second government's search warrant that

6   focused just on Mr. Chatrie's account; right?

7   A    Correct.

8   Q    It had a whole bunch because we covered, I think,

9   a little over 30 days of him traveling around; right?

10  A    Correct.

11  Q    But you're aware that that came after he was ID'd

12  as the likely suspect of this crime; right?

13  A    I understand that.

14  Q    I mean, Google didn't pick him; right?  We picked

15  him; right?

16  A    Correct.

17  Q    And as I think I just said, this was a search

18  warrant; right?

19  A    Right.

20  Q    It was issued to Google; right?

21  A    Correct.

22  Q    Signed by a judge or a magistrate; right?

23  A    Correct.

24  Q    Okay.  And I think you were asked, but if we could

25  go back to Government's 1, page 24.  This is, in fact,

**Exhibit E, pg. 166**

McINVAILLE – CROSS                     167

1    the device ID ending in 5659; right?

2    A    Correct.

3    Q    This is Mr. Chatrie's phone?

4    A    Correct.

5    Q    That's what we said.  You would agree with me that

6    this is pretty precise information about Mr. Chatrie's

7    phone; right?

8    A    Yes, sir.

9    Q    In fact, all the red dots on the corner there are

10   GPS marks; right?

11   A    That's correct.

12   Q    And all of the map radiuses are completely within

13   the 150-meter geofence with the exception of one;

14   right?

15   A    Correct.

16   Q    And it's multiple hits both around that large

17   church and also around the bank; right?

18   A    Right.

19   Q    In your law enforcement experience, do you

20   question why the government would have gone after a

21   second search warrant on this phone?

22   A    No.

23        MR. DUFFEY:  Judge, if I could just have one

24   second, I think I'm about done.

25        All right, Judge.  Thank you.  I think I'm

**Exhibit E, pg. 167**

McINVAILLE - CROSS                    168

```
 1   done.
 2            THE COURT:  I do have one question.
 3            Sir, do you know how towers store
 4   information?  Do they store it by tower?  So if you're
 5   doing a tower dump, what are you downloading?
 6            THE WITNESS:  So the carriers will look for
 7   how they store it.  I don't know if they store it,
 8   necessarily, tower per tower, but when they do that
 9   search, they are searching based on the tower
10   location.  So they will query for, you know, in the
11   tower dump instance, a period of time for a specific
12   tower that the location referenced.  It's searched
13   based on usage of the tower.
14            THE COURT:  So you don't know if the download
15   comes from just the tower or from a bigger database?
16            THE WITNESS:  Likely going to come from a
17   larger database.  I doubt that the tower location is
18   holding all of the records.
19            THE COURT:  All right.
20            MR. DUFFEY:  May I ask two follow-ups to
21   that?
22            THE COURT:  Of course.
23   BY MR. DUFFEY:
24   Q   So, first, to be clear, when you're talking tower
25   dump, you're getting that information not from Google,
```

**Exhibit E, pg. 168**

McINVAILLE - CROSS                    169

1    you're getting that from a cell phone provider; right?

2    A    Correct.

3    Q    So that's Verizon or AT&T or T-Mobile or some of

4    those people?

5    A    Correct.

6    Q    And I think the Judge's question about what

7    database it comes from, tower dumps, we give them or

8    law enforcement gives them an address; right?  And

9    they say, Here are the likely towers that if that

10   person was near that location, here are the likely

11   towers that they were hitting off of; right?

12   A    Correct.

13   Q    That a phone would have been connecting to; right?

14   A    Yes.

15   Q    And then they get -- I guess, to clarify, the data

16   is not stored at the tower, but the data is stored and

17   saved, I guess, through each tower; right?  Meaning

18   once Verizon figures out, Okay, there's two towers

19   that are at issue here, they go back.  They're

20   searching their database just for those two towers;

21   right?

22   A    Right.

23   Q    To figure out which phones likely were hitting off

24   of those towers; right?

25   A    Correct.

**Exhibit E, pg. 169**

McINVAILLE – CROSS                           170

1   Q   Okay.  And, again, then they give up actual phone

2   numbers, not anonymous reference numbers; right?

3   A   That's right.

4   Q   Okay.

5        MR. DUFFEY:  That's all I have, Judge.

6        THE COURT:  Okay.  Thank you.

7        MS. KOENIG:  Your Honor, I'm going to try to

8   do this myself up here at the podium, but I'll need to

9   have the screen switched to the podium monitor,

10  please.  Perfect.

11       REDIRECT EXAMINATION

12  BY MS. KOENIG:

13  Q   All right, Mr. McInvaille.  Before I lose track of

14  my last thought, in terms of the tower dump, so

15  when -- is it -- how does a phone -- when we have a

16  tower dump, what is the number doing?  Like, the phone

17  that is received in the tower dump, what does it mean

18  that that phone has done with that tower?

19  A   Generally, it's because a call or a text -- in

20  most cases, it's because a call or a text has

21  occurred.

22  Q   Like, did it connect -- did that particular device

23  connect with that tower?

24  A   Yes.

25  Q   And so when the company is searching for all the

**Exhibit E, pg. 170**

McINVAILLE – REDIRECT                    171

1   devices that connected with that tower, is it just

2   looking for the phones that connected with that tower?

3   A    Yes, it's the ones that they actually have records

4   for.  So, again, kind of in that scenario of earlier

5   when you asked or when it was asked if a phone is just

6   sitting idle, while it will communicate or at least

7   interact with the network, that's not information

8   that's generally, it can be in some cases, recorded.

9       Most of what you see in the tower dump is due to

10  calls or texts.  There are other instances, but that's

11  generally what's being requested.

12  Q    If I'm a judge, and I'm issuing a warrant for,

13  like, a tower dump of Tower A, does that require the

14  phone company to look through the data for the phones

15  that connected to Tower B?

16  A    I don't think so.  I would think they would be

17  able to narrow it down just by the tower that they are

18  actually looking for.

19  Q    Because it's specific to, like, a -- they record

20  the data as to which tower it connected with; right?

21  A    Right.

22  Q    Okay.  Let's go way back to the Google account

23  itself.  And so we've talked about a Google account

24  that's at issue in this case.  Is the Google account

25  in this case a Gmail account?

**Exhibit E, pg. 171**

McINVAILLE - REDIRECT                172

1   A    Right, it is.

2   Q    So when we say "Google account," we're meaning

3   that Mr. Chatrie had a Gmail email address?

4   A    Yes.  You have to create one for an account.

5   Q    Okay.  What type of phone did Mr. Chatrie have?

6   A    It was a Samsung S9.

7   Q    Is that an Android phone?

8   A    It is.

9   Q    Who makes Android?

10  A    The Android operating system is a Google product.

11  Q    Okay.  When we go back to Mr. Duffey's questions

12  about the search that's run in the Stage 1 returns, do

13  we know how Google runs the return?

14  A    Other than looking inside of the Location History

15  database and drawing, you know, actually using the

16  latitude and longitude to figure out where at -- you

17  know, if this data would actually fall within there.

18  That's all I really know about how they conduct that

19  search through that database with the latitude and

20  longitude.

21  Q    So let's go back to that latitude and longitude

22  point, and let's talk about it in context of Wi-Fi and

23  GPS.  When we looked at Defense Exhibit 3, what are

24  the two types of sources of data, the location data,

25  that are in that Stage 1 return?

**Exhibit E, pg. 172**

McINVAILLE – REDIRECT                    173

1   A    And you're referring to the Wi-Fi and GPS portion?

2   Q    Yes.

3   A    Yes, those are two of the sources that are in

4   there.

5   Q    The GPS and Wi-Fi?

6   A    Yes.

7   Q    So what is GPS?  I know you said it was Global

8   Positioning System, but what does that mean?

9   A    So that's using satellites to locate a GPS-enabled

10  device.

11  Q    So I've got my phone in the courtroom.  If I'm

12  connecting to a GPS satellite, how does that work?

13  A    So, you don't really connect to it.  The

14  satellites are broadcasting information down that can

15  be used.  So GPS, you don't have the issues of loading

16  up the GPS system.  It's because you're just receiving

17  the information.  Your device is resolving where it is

18  based on the information it's receiving.

19  Q    And that's very accurate information?

20  A    It can be.

21  Q    And then with Wi-Fi, how do we generate Wi-Fi

22  location data if a phone connects to a router?

23  A    So, very basically, as far as how Google does it,

24  it is based on generally knowing where the access

25  point is, because they don't know the exact place

**Exhibit E, pg. 173**

McINVAILLE - REDIRECT                174

 1   within, say, your home that your access point is, but

 2   they're able to figure out that, hey, this access

 3   point is generally here at Laura's house.

 4       Based on signal strengths, they can measure to and

 5   from that device.  Then you can, with a few of those,

 6   resolve if I know where points A, B, and C are, and

 7   the phone is getting signals from A, B, and C based on

 8   signal strength, and probably some other information

 9   that they put along with that, they're able to resolve

10   a location.

11   Q   So I want to make sure because this is, I think, a

12   compact issue.  Let me make sure I understand each

13   point.

14       So, somehow Google has determined where all these

15   Wi-Fi routers are?

16   A   We, or Google users, share that information.

17   Q   How do we do that?

18   A   Your phone -- one of the things that you'll set up

19   in the initial setup of a device is whether or not you

20   want to share that type of information with Google.  I

21   don't recall the specific wording of it, but there is

22   a place in here, Would you like to share that type of

23   information?  So being able to, say, share with

24   Google, this is a -- you don't specifically tell them

25   this, but your phone will tell it, like, hey, I'm

**Exhibit E, pg. 174**

McINVAILLE – REDIRECT                    175

```
 1   here.  And this is also what I see at the time, so
 2   that it can be used later to make those type of
 3   requests.
 4   Q   And so when we see in Defense Exhibit 3 in the
 5   column that is regarding the sources, when we see a
 6   Wi-Fi connection, does it mean that that phone has
 7   actually connected to that router?
 8   A    No, it's not like going somewhere to, like, your
 9   friend's house and connecting to the Wi-Fi.  It just
10   simply sees the identifiers for that access point that
11   it's broadcasting.  A connection between those doesn't
12   have to be, like, user name/password kind of
13   connection.
14   Q   So if I'm at my house and I have a Wi-Fi router,
15   and I have shared somehow this information with Google
16   that I have a Wi-Fi router, do they keep that
17   information?
18   A   Yes.  You don't have to share it.  It could be
19   your neighbors that your neighbor's device or
20   something picked this up and shared it.  It's a
21   community effort, pretty much, through Google.
22   Q   And so if you happen to be driving past my house,
23   can your phone see my Wi-Fi router?
24   A    It's possible, depending on how far away it is,
25   things like that.  But, yes, in general, your phone
```

**Exhibit E, pg. 175**

McINVAILLE – REDIRECT                    176

1    would -- you know, say it's in close proximity to the

2    road, you could see yours and your neighbor's, as

3    well.

4    Q    So if you are -- if in the points of data that

5    list out Wi-Fi, it doesn't mean that the person was at

6    the -- like, in the building or in any way associated

7    with the router from the place that the Wi-Fi is

8    indicating there's a longitude and latitude?

9    A    Right.  It's not a user name/password interaction.

10   This is just that it sees the identifiers for that

11   specific point.

12   Q    What do you know about the ranges of Wi-Fi

13   routers?

14   A    Generally, probably looking at 150 feet or so for

15   a normal router.  I'm sure you could -- you know,

16   different sets could be bigger or smaller, but that's

17   kind of generally what people look at.

18   Q    So when Google is estimating the longitude and

19   latitude that's listed in Columns D and E of Defense

20   Exhibit 3, how are they estimating that longitude and

21   latitude?

22   A    Again, with Wi-Fi, it's because they're using

23   those -- the kind of mostly known location of access

24   points, signal strength values, to resolve a location.

25   Q    So if a Wi-Fi point, the longitude and latitude is

McINVAILLE - REDIRECT                    177

1   based on where Google thinks the Wi-Fi router itself

2   is?

3   A    That's a piece of it, yes.

4   Q    And so when you're looking at the Wi-Fi data point

5   that's plotted, the longitude and latitude, we're not

6   talking -- or are we talking about the longitude and

7   latitude that Google thinks the device was at or where

8   the connection to the Wi-Fi router is?

9   A    That's where it thinks the device was at that

10  given time.

11  Q    But within this larger radius?

12  A    Correct.

13  Q    So the phone or the device could be anywhere

14  within that blue circle?

15  A    Correct.

16  Q    Okay.  I want to turn to Defense Exhibit 3.  And

17  if you'll look -- we've been talking a lot about the

18  Stage 1 returns, which I think begin at page 6 and

19  maybe end around page 12, and I want you to look at

20  the Stage 2 returns.

21  A    Is that in the same --

22  Q    In the same exhibit.  The Stage 2 portion of

23  Exhibit 3, which is the second spreadsheet.

24  A    Okay.

25  Q    Does that portion of Exhibit 3, the Stage 2 data

**Exhibit E, pg. 177**

McINVAILLE – REDIRECT                178

1   returns, does that also have a maps display radius?

2   A   Yes, all of the Location History data does.

3   Q   Can you look through those map display radiuses

4   and tell us some of the larger numbers that you see?

5   A   On the first page, the largest is 179.  The

6   smallest, I believe, is 16, it looks like.

7   Q   Let's go to the next page.

8   A   This page, the largest is 413, it looks like.

9   That's on line 42.

10  Q   Let's go to the third page.

11  A   Line, it looks like, 75 is 164 meters.

12  Q   Then let's go to the next page.

13  A   100 meters is line 104.

14  Q   Okay.  The next page.

15  A   Line 157 is 1,797.

16  Q   And let's go to the next page after that.

17  A   Line 170 is 64.

18  Q   What's the next page after that?

19  A   156 meters, line 231.

20  Q   Next page after that.

21  A   Looks like 55, which is line 264, 55 meters.

22  Q   Can you go to the next page?

23  A   210.  It is line 292.

24  Q   Let's go to the next page after that.

25  A   Line 322 is 1,573.

**Exhibit E, pg. 178**

McINVAILLE – REDIRECT                179

1   Q   Let's just have you kind of more quickly flip

2   through and tell us if you see any other large numbers

3   that are over a thousand.

4   A   It's the page that begins on the Column 397 or Row

5   397 through 429.  Row 420 is 1,026.  The final page

6   begins with Row 661, ends in 681.  The Row 681 has

7   1,838 meters.

8   Q   Okay.  So is it fair to say that the map display

9   radius varies depending on the longitude and latitude

10  point, the individual data point?

11  A   Each point has their own display radius.

12  Q   Had the geofence swept in one of these data points

13  that had a map display radius of over a thousand feet,

14  the effective radius of the geofence would have been

15  multiple thousands of feet just in the radius, in the

16  diameter?

17  A   If you look at it as if the -- if that point had

18  fallen within the fence and that circle extended, and

19  then if the phone could be anywhere within that

20  circle, then I guess you could look at it that way.

21  Q   So is there any way for a judge or law enforcement

22  to know ahead of time what the effective radius of the

23  geofence is going to be?

24  A   I guess knowing what I know is that the only thing

25  that you can, as far as that search goes, is knowing

**Exhibit E, pg. 179**

McINVAILLE – REDIRECT                    180

1   that the estimated latitude and longitude would have

2   to fall within the circle for it to be captured.

3   Q   But the effective radius could end up being

4   thousands of feet or meters larger than that; right?

5   A   In that scenario, I guess, yes.

6   Q   I want to talk about the device ID that's listed

7   in Column A of Defense Exhibit 3.  The government

8   asked you a number of questions about whether that's

9   tied to a phone number, and you've indicated that you

10  don't have any information that it is.  Is that right?

11  A   Correct.

12  Q   Have you reviewed Ms. Rodriguez's declaration,

13  which is Defense Exhibit 24?

14  A   Yes.

15  Q   By Ms. Rodriguez, I mean Sarah Rodriguez from

16  Google.

17  A   I have.

18  Q   And in reviewing that, do you have any indication

19  that the device ID remains the same from one geofence

20  search to another?

21  A   Say that again.

22  Q   In reviewing Ms. Rodriguez's affidavit, does it

23  indicate to you whether the device ID, that number in

24  Column A, remains the same for each device from

25  geofence search to geofence search?

**Exhibit E, pg. 180**

McINVAILLE – REDIRECT                     181

1    A    The way it's described, it appears that the kind

2    of global identifier that would face out through the

3    accounts is stripped, but that that number that you

4    see within these requests is an identifier that stays

5    with that particular device, but only within the

6    Location History database.  It does not reach outside

7    of that database.

8    Q    So if I have a device ID of 123, I think they're

9    more complicated than that, but if there's a device ID

10   number of 123, and device ID No. 123 is swept up in

11   geofence warrant one, if I see device ID No. 123 in

12   geofence warrant No. 2, does that mean that that is

13   the same device?

14   A    Based on reading her declaration, I believe so.

15   Q    Is there any obligation that the law enforcement

16   officers who obtain the returns from Google have to

17   return the data after they have used it in any way?

18   A    I'm not aware of any.

19   Q    Okay.  Let's talk now about some of the questions

20   that Mr. Duffey was asking you about your follow-up

21   investigation.  As a former law enforcement officer,

22   were you a detective?

23   A    I was.

24   Q    And as a detective, is it your job to do police

25   work and follow-up work?

**Exhibit E, pg. 181**

McINVAILLE – REDIRECT                    182

1    A    That's what I did.

2    Q    Such as get search warrants?

3    A    Yes.

4    Q    And do surveillance?

5    A    Yes.

6    Q    And try to track people down from various location

7    data points?

8    A    Yes.

9    Q    Were you successful in doing that?

10   A    I believe so.

11   Q    Is that the nature of detective work is you have

12   to actually do the work?

13   A    It is.  I mean, connecting the dots is what you

14   do.

15   Q    Obviously, law enforcement officers would like

16   their jobs to be easier; right?

17   A    Sure.

18   Q    But there are sometimes stumbling blocks?

19   A    There's work to be done.

20   Q    But you still have to work around that?

21   A    Yes.

22   Q    When we were talking in advance of today, do you

23   have an example of two data points that would apply to

24   you today but nobody else probably?

25   A    Yeah.  I recall you asking me this before, and I

**Exhibit E, pg. 182**

McINVAILLE – REDIRECT                183

 1   kind of used the example of me coming here today.

 2   Q   How would that work?

 3   A   I think I'm the only person.  I haven't seen any

 4   of my neighbors, but I think I'm the only person from

 5   my cul-de-sac who traveled from Holly Springs, North

 6   Carolina, to the federal courthouse today.  I don't

 7   think there's anybody else.  So those two points would

 8   be --

 9   Q   Sufficient to identify you?

10   A   Yes.

11   Q   Okay.  And, obviously, the more points of data you

12   have, is it more likely that you're going to get a

13   precise narrowing down of who the identity is of that

14   person that's carrying that device?

15   A   Can be.  With what I do, more data is -- we always

16   want more data.  It helps everything when you can --

17   the more you know.

18   Q   I want to turn now to the screens that we were

19   talking about.  So if we go to Mr. McGriff's

20   affidavit.  And so this is Defense Exhibit 23 at page

21   3.  If you can turn to that exhibit, please.

22   A   Say that again.

23   Q   Defense Exhibit 23 at page 3.

24       I'm sorry.  So on Footnote 2 of page 3, Mr.

25   McGriff refers to, like, a second screen; right?

**Exhibit E, pg. 183**

McINVAILLE - REDIRECT                184

1   A    Yes.

2   Q    And have you been able to determine that -- and if

3   we look up, we see on that above, that page flips into

4   paragraph 8 of Defense Exhibit 23.  And that portion

5   has the Location History in bold, and then under that

6   it says "Saves where you go with your devices"?

7   A    Yes.

8   Q    And then under that it has "Location History.

9   Saves where you go with your devices"?

10  A    Yes.

11  Q    And so when Mr. McGriff seems to be talking about

12  the second screen, we've been able to determine, is

13  that really just the language that's under the drop

14  down arrow?

15  A    That's what it looks like.  This language that you

16  see in this under No. 8 is the same that we saw in

17  most of the other screenshots that actually show the

18  expansion arrow selected.

19  Q    Because when Mr. McGriff is writing this, he's

20  indicating I don't have the screenshots -- right? --

21  of activating this?  And so I'm describing what

22  language would have been presented?

23  A    I don't believe so.  I don't think he turned

24  over -- I think that's correct.

25  Q    And so when we see the "Saves where you go with

**Exhibit E, pg. 184**

McINVAILLE - REDIRECT                185

 1   your devices" language in the examples that you have

 2   put forth in Defendant's Exhibit 7, all the user has

 3   to see under Location History is "Saves where you go

 4   with your devices," in the Norwegian example,

 5   specifically, and then they can click yes, and that

 6   will turn on?

 7   A    Yes, you can.

 8   Q    And that's it?  You don't have to look at any of

 9   that other expansion arrow?

10   A    You don't have to, no.

11   Q    And going back to -- I just want to make sure I'm,

12   again, clear about turning on Google Assistant.  So if

13   I have my phone.  I just push that little circle

14   button at the bottom; right?  That's the home button?

15   A    Yeah, I believe that's the icon that's used.

16   Q    And you just hold it and press it for a couple of

17   seconds?

18   A    It's not even really a couple of seconds.  It's

19   more of just, you know, if you were clicking on

20   something on a website, how you normally just tap the

21   screen.  This is more of just a press, a longer

22   version of that touch.

23   Q    And so if you're doing that for the first time,

24   and you haven't already activated Google Assistant,

25   it's going to take you to the setup process; right?

**Exhibit E, pg. 185**

McINVAILLE – REDIRECT                186

1    A    From what I've seen, yes.

2    Q    And then when you're doing that, you either have

3    to choose yes, I'm going to do it or no, I'm not going

4    to do it to turn on Google Assistant?

5    A    Right.  You either "Skip" the setup of Google

6    Assistant or you go "Next," and have to choose

7    permissions.

8    Q    So you just have to do two clicks; right?  The

9    long press of the home button and then the "Yes, I'm

10   in"; right?  You just have to do two clicks; right?

11   Or two presses or two movements of your hand?

12   A    I guess it would actually be three.

13   Q    What would the movements be?

14   A    You're long pressing to launch the app.  When that

15   comes up, then you see the "Meet your Google

16   Assistant" screen.  You can select "Skip" or "Next."

17   If you select "Next," it takes you to the permission

18   screen where you have to make the selection of "Turn

19   on" or "No, thanks."

20   Q    So, thank you for correcting me.  So it's three

21   presses, and that could happen within probably less

22   than a second; right?

23   A    I guess, yeah, you could.

24   Q    Okay.  Is it pretty easy to turn on Google

25   Assistant, then?

**Exhibit E, pg. 186**

McINVAILLE - REDIRECT                    187

1    A    Yeah, it can be.

2    Q    And anywhere in the screens that have you found in

3    the research of what the screens themselves would have

4    looked like to a user setting up Google Assistant on

5    July 9th of 2018, does it indicate that deleting

6    information, that if you accept Location History, does

7    it ever indicate that deleting your information

8    doesn't stop you from tracking information in the

9    future?

10   A    I'm not sure.  Ask that again.

11   Q    So if we go down to the drop down menu, your

12   location history.  And the bottom says -- I'm sorry.

13   Not that.  Not that portion.  The -- so the paragraph

14   that's right above the boxes that say either "No,

15   thanks" or "Turn on."  So this is on page 4 of

16   Exhibit 7, which is the second set of the July 2, 2018

17   screenshots from the Norwegian Consumer Council.

18   A    Yes.

19   Q    That paragraph that begins "This data may be saved

20   and used in any Google service."  And the second

21   sentence says that you can delete the Location History

22   data; right?

23   A    Yes.

24   Q    Does that in any way indicate that if you delete

25   the Location History data, that it will still keep

**Exhibit E, pg. 187**

McINVAILLE - REDIRECT                    188

1   tracking Location History data in the future?

2   A    No, I don't think it indicates that it won't.  If

3   just by simply deleting your old location history, no,

4   I don't think that indicates that it will stop

5   collecting more information.

6   Q    But if I were -- like, if I had Location History

7   enabled, and I deleted at this time my location

8   history, would it still keep tracking my location

9   history even if I deleted the old information?

10  A    If you allow it to continue to be enabled, then,

11  yes, it would.

12  Q    But there's no -- when you delete it, is there a

13  portion of the deletion information that tells you

14  that you are not going -- that location history

15  information will still continue to be gathered from

16  you?

17  A    I'm not aware that that's the way that it's

18  displayed, but deleting it is not going to stop it

19  from -- deleting your old history is not going to stop

20  it from collecting.

21           MS. KOENIG:  If I can have just a moment,

22  Your Honor.

23           No further questions, Your Honor.  Thank you.

24           THE COURT:  All right.  Can this witness be

25  excused?

**Exhibit E, pg. 188**

189

1           MS. KOENIG:  He may, Your Honor.

2           THE COURT:  All right.  Excused excused or

3    subject to recall?

4           MS. KOENIG:  Subject to recall, Your Honor,

5    by the defense.

6           THE COURT:  All right, sir.  You may stand

7    down.  Thank you for your testimony.

8           Because you might be subject to recall, it's

9    still as if you're testifying.  You can't talk to

10   anybody about what you've testified to or what anybody

11   else has testified to.  Thank you.

12          (The witness was excused from the witness

13    stand.)

14          MS. KOENIG:  Your Honor, if we could take a

15   brief break before we begin the next witness.

16          THE COURT:  Yes, I think it's a good time to

17   do that.  So we could go -- we'll go until just five

18   minutes of three.  That's a little more than 15

19   minutes.

20          MS. KOENIG:  Thank you, Your Honor.

21          THE COURT:  So we'll take a recess.  Again,

22   nobody violate our sequester order that continues to

23   be in place.  All right?  Thank you.

24          (Recess at 2:35 p.m. to 2:55 p.m.)

25          THE COURT:  All right.  So we're returning

**Exhibit E, pg. 189**

 1    from our break.  I need to, if we have folks online to

 2    remind them that our Local Rule Criminal Rule 53

 3    prohibits, and our standing order, prohibits anybody

 4    from recording or broadcasting or telecasting these

 5    proceedings.  It is as if you are in court with us.

 6    And we have one court reporter making our official

 7    record.

 8            So I understand we have a new witness, who is

 9    actually in the witness box, but who needs to be

10    called and sworn.  Right?

11            MR. PRICE:  Thank you, Your Honor.  The

12    defense calls Marlo McGriff to the stand.

13

14      MARLO MCGRIFF, called by the Defendant, first

15    being duly sworn, testified as follows:

16

17            THE COURT:  All right.  Mr. McGriff, we are

18    adhering to COVID protocol here.  Obviously, you can

19    see we have plastic barriers.  We're not within 6 feet

20    of each other unless folks have taken necessary

21    precautions.  You have sanitizer there and hand

22    sanitizer.

23            When you're testifying, the only way that my

24    court reporter can hear you is through the microphone.

25    So you can either testify with or without a mask.  I

**Exhibit E, pg. 190**

McGRIFF - DIRECT                    191

1   just want to be sure that it is going through the

2   microphone so we can hear you clearly.  All right,

3   sir?

4            THE WITNESS:  Okay.

5            THE COURT:  All right.  Thank you.

6            MR. PRICE:  And, Your Honor, I just wanted to

7   remind the Court that we have agreed to treat Google's

8   witnesses, including Mr. McGriff, as adverse in this

9   case.

10            THE COURT:  All right.  I do need to remind

11   you all of one thing.  On the break, I was notified

12   that I have to attend an important conference call at

13   5 o'clock.  And so we're going to have to break before

14   5 o'clock.  Otherwise, I wouldn't do it, but it is

15   apparently enough that we have to take a break.  So we

16   will be doing that, just to give you the advance

17   notice.

18            MR. PRICE:  Understood.  Thank you, Your

19   Honor.

20

21      DIRECT EXAMINATION

22   BY MR. PRICE:

23   Q   Mr. McGriff, hi.  Good afternoon.  I'm Michael

24   Price.  I'm an attorney with Mr. Chatrie.  Thank you

25   for being here today.

**Exhibit E, pg. 191**

McGRIFF – DIRECT                192

1      You are a Location History Product Manager for

2  Google?

3  A    That's correct.

4  Q    And that means you're responsible for the Location

5  History product?

6  A    That's correct.

7  Q    And you've had that position since 2016?

8  A    That's correct.

9  Q    And you joined Google in 2011?

10 A    Yes.

11 Q    So you're very familiar with Google?

12 A    That's correct.

13 Q    And you're very, very familiar with Location

14 History in particular?

15 A    Yes.

16 Q    So you've helped develop it for the last five

17 years?

18 A    That's right.

19 Q    And now you lead the cross functional location

20 history team?

21 A    That's correct.

22 Q    So that means you're not just familiar with how

23 Location History works, but how it works with Google's

24 other services?

25 A    That's correct.

**Exhibit E, pg. 192**

McGRIFF - DIRECT                    193

1    Q    And does that include Google Assistant?

2    A    Some aspects of Assistant, yes.

3    Q    And you filed three declarations in this case;

4    correct?

5    A    That's correct.

6    Q    Your first on March 11th, 2020?

7    A    I believe so, yes.

8         MR. PRICE:  Can we bring up Defense Exhibit

9    1.

10   Q    This is the first declaration that you filed in

11   this case?

12   A    Yes.  You said this is Exhibit 1?

13   Q    Yes.  It has previously been admitted, and it's

14   Defense Exhibit 1.

15        MS. KOENIG:  21.

16        THE COURT:  21.

17        MR. PRICE:  21, I'm sorry.

18   Q    Okay.

19   A    Yes.

20   Q    Great.  So Location History was not initially

21   designed to assist law enforcement investigations, was

22   it?

23   A    That's correct.

24   Q    It was designed to support Google's Timeline

25   feature as you explain on page 9?

**Exhibit E, pg. 193**

McGRIFF - DIRECT                    194

1          THE COURT:  Are we entering this into

2    evidence?

3          MR. PRICE:  It is already in evidence, Your

4    Honor.

5          THE COURT:  No, it's not.  No. 3 is in

6    evidence.

7          MS. KOENIG:  I have Exhibit 21 is admitted

8    into evidence with Mr. McInvaille, Your Honor.

9          THE COURT:  Oh, it sure is.  My apologies.

10   It's 22 that isn't.  My apologies.

11   A   That's correct.  It mentions, if I'm looking at

12   page 9, it mentions Timeline as a feature, yes.

13         THE COURT:  So, sir, I didn't hear a word of

14   that.  So I think the microphone needs to be a little

15   closer to you.  And it's natural when you're sort of

16   looking away from the document at the document that

17   you also turn away from the microphone.  It's an

18   unnatural way to speak, but we want to be sure that we

19   get it accurately.  All right?

20         THE WITNESS:  Okay.  Sorry about that.

21   BY MR. PRICE:

22   Q   So could you repeat that answer?  Location History

23   was designed to support Google's Timeline feature;

24   correct?

25   A   That's correct.

**Exhibit E, pg. 194**

McGRIFF - DIRECT                    195

1   Q   And as you wrote in your first declaration, also

2   on page 9, "The purposes for which Google designed

3   Location History do not depend on any individual

4   stored Location History data points"?

5   A   That's correct.

6   Q   In other words, Google can infer where a person is

7   heading with their device even with a few points

8   registering along their path?

9   A   I'm not sure that I follow that question.

10  Q   Google uses Location History to infer a user's

11  location; correct?

12  A   I wouldn't use it -- I wouldn't frame it in that

13  way, but various signals are used to infer where a

14  user is.  That's how we infer a user's location.  And

15  then those inferences are stored, which create the

16  history.

17  Q   Sure.  And if somebody is traveling along a path,

18  and one dot is kind of off out of the way, Location

19  History will snap that point right back onto the path;

20  correct?

21  A   Only if it makes sense.  We do filter out like an

22  outlier because that sort of teleportation can happen.

23          THE COURT:  That sort of what?

24          THE WITNESS:  Sorry.  There can be an outlier

25  point.  But, logically, if I was here, and then

**Exhibit E, pg. 195**

McGRIFF - DIRECT                    196

1    there's one point I'm sitting in -- let's say I was

2    sitting here for an hour.  And there's one point

3    that's not where I've been sitting for the hour.

4    That's an outlier point, but yes.

5    Q   My point is, it's precise enough for what it was

6    designed to do for Timeline?

7    A   That's correct.

8    Q   And that's why you wrote, "Location History" --

9    this is also on page 9, Slide 2, this is why you

10   wrote, "Location History is sufficiently precise and

11   reliable for these purposes for which Google designed

12   Location History"; correct?

13   A   That's correct.

14   Q   That indicates, though, that there's maybe more

15   than one purpose for Location History; correct?

16   A   Yes.

17   Q   Another purpose of Location History, as you wrote

18   in the same paragraph, is to serve ads based on user

19   location?

20   A   Yes.

21   Q   And for some advertisers you also provide

22   information about store visit conversions; is that

23   true?

24   A   That's correct.

25   Q   Could you explain what store conversions are?

**Exhibit E, pg. 196**

McGRIFF - DIRECT                    197

1   A   So, for Location History, we never share anyone's

2   location history with a third party.  So there's no

3   instance where you would share with a third party that

4   I went into a particular store.  What Location History

5   is used for in terms of advertising is very

6   specifically ads measurement.  And so that is for a

7   particular campaign, how many users who saw a

8   particular ad actually went to one of those stores.

9   And that's the store visit conversion or ads

10  measurement you're referring to.

11          THE COURT:  Okay.  You're just talking too

12  quickly.  I'm so sorry.

13          THE WITNESS:  I'm sorry.

14          THE COURT:  It sounds as if that's the way

15  you normally talk, but pretend like I'm three, and

16  slow down a little, if you don't mind.

17          THE WITNESS:  Yes, absolutely.

18  BY MR. PRICE:

19  Q   So Google is doing this in a privacy protective

20  way; correct?

21  A   That's correct.

22  Q   It's not giving user location data over to stores

23  about who was around?

24  A   No.

25  Q   And businesses can also use Google to target ads

**Exhibit E, pg. 197**

McGRIFF - DIRECT                198

 1  based on a device's location?

 2  A   Not using Location History, though.

 3  Q   Right.  They're not using the user's thing.

 4  They're going to Google, and they're attempting to

 5  target ads based on geography?

 6  A   Yes.

 7  Q   Okay.  In fact, it's possible to do something

 8  called radius targeting; is that true?

 9  A   Yes, but I'm not totally familiar on the full ad

10  suite of products.

11  Q   My understanding is that it allows a business to

12  target ads to users that are within a certain distance

13  of that business.

14  A   That sounds correct, yes.

15  Q   And there's a minimum radius that advertisers can

16  select when doing that; right?  You can't make your

17  radius 4 meters or something like that?

18           THE COURT:  Okay.  Now you're also fading

19  out.

20           There you go.

21           MR. PRICE:  Sorry.

22  BY MR. PRICE:

23  Q   There's a minimum radius that advertisers must

24  adhere to.  They can't select I believe it's less than

25  a kilometer or less than a mile radius?

**Exhibit E, pg. 198**

McGRIFF - DIRECT                    199

1   A    That sounds correct.

2   Q    And those businesses don't actually get to see

3   which devices are in the area; correct?

4   A    Not that I'm aware of, no.

5   Q    And the businesses can't go back to Google and ask

6   for more information about where a particular user was

7   half an hour before or half an hour later?

8   A    No.

9   Q    They can't get any information at all about

10  individual users; correct?

11  A    Not that I'm aware of, no.

12  Q    And that's true even when you're tracking store

13  visit conversions, no exceptions?

14  A    That's correct.

15  Q    So Google filed an amicus brief in this case.  Are

16  you aware of that?

17  A    Yes.

18  Q    You're probably familiar with it.  You probably

19  helped put it together?

20  A    Yes.

21          MR. PRICE:  I'd like to bring up Defense

22  Exhibit 2.

23  Q    Is this the amicus brief?

24  A    Which --

25  Q    It's also on your screen as Defense Exhibit 2.

**Exhibit E, pg. 199**

McGRIFF - DIRECT                    200

 1   A   I don't think my screen is actually updating.

 2   It's been static on the same --

 3              MS. KOENIG:  It is different, but they are

 4   white papers with letters on them.

 5              THE WITNESS:  Maybe it just looks the same.

 6   BY MR. PRICE:

 7   Q   It should say "Brief of Amicus Curiae Google LLC."

 8   A   I see it.  Thank you.

 9   Q   So that's the amicus brief that Google filed that

10   you helped prepare?

11   A   Yes.

12              MR. PRICE:  I'd like to admit that into

13   evidence, Your Honor.

14              THE COURT:  No objection, right?

15              MR. SIMON:  No objection, Judge.

16              THE COURT:  It will be admitted for purposes

17   of the hearing, too.

18              MR. PRICE:  Thank you.

19              (Defense Exhibit No 2 is admitted into

20   evidence.)

21   BY MR. PRICE:

22   Q   So on pages 5 to 6, Slide 4, the brief goes out of

23   its way to correct a misconception in this case;

24   correct?

25   A   That's correct.

**Exhibit E, pg. 200**

McGRIFF - DIRECT                    201

1   Q    Google says that a geofence warrant is not really

2   analogous to a so-called tower dump?

3   A    Yes.

4   Q    And the brief states, "In fact, while Google

5   Location History information bears some similarities

6   to those types of data in some respects, it is

7   different in important ways that are highly relevant";

8   right?

9   A    Yes.

10  Q    And it goes on to explain, with respect to cell

11  site location information, which is how tower dumps

12  work, "When law enforcement seeks access to CSLI,"

13  cell site location information, "it is thus asking the

14  wireless carriers to produce its own business records

15  showing when a particular device connected to a cell

16  site within a particular period of time.  A request

17  for a tower dump likewise seeks the wireless carrier's

18  own business records.  In that case, identifying every

19  phone that connected to a particular cell site or

20  tower in a particular period"; correct?

21  A    Yes.

22          THE COURT:  What page are you on?

23          MR. PRICE:  That is page 9, Your Honor.

24          THE COURT:  Thank you.

25  BY MR. PRICE:

**Exhibit E, pg. 201**

McGRIFF - DIRECT                    202

1   Q    And there are only so many people that can connect

2   to one cell tower at a time; right?

3   A    That's correct.

4   Q    And so there's sort of an upper limit on the

5   number of users that can be searched as a result of a

6   tower dump?

7   A    That I don't know.

8   Q    Well, if you're choosing, say, three towers to

9   search, and there's a maximum number of people that

10  can be on one tower at a time, would you agree there's

11  a maximum, there's a cap?

12  A    That has to be some cap, yes.

13  Q    There's a natural limit?

14  A    Yeah.

15  Q    And that would be true even if the tower dump

16  involved more than one tower.  There would still be

17  that sort of upper limit.  And that differs from how

18  geofence searches work; right?

19  A    That's correct.

20  Q    That's because -- and this is on page 8 of your

21  first declaration, which is Exhibit 21, Defense

22  Exhibit 21.  You explain that's because, unlike tower

23  dumps, Google does not know which users may have saved

24  Location History data before conducting the search and

25  running computations; correct?

**Exhibit E, pg. 202**

McGRIFF - DIRECT                    203

1    A    That's correct.

2    Q    And going back to the amicus, and I apologize for

3    the -- this is Slide 7 at page 12.  Google says it

4    "has no way to know ex ante which users may have

5    Location History data indicating their potential

6    presence in particular areas at particular times"; is

7    that correct?

8    A    That's correct.

9    Q    So, unlike a tower dump, there is no way of just

10   searching Location History records for people in one

11   area in the way that you do with a tower dump by

12   looking at a tower?

13   A    That's correct.

14   Q    You have to search all of the records for every

15   user with Location History enabled; right?

16   A    Yes.

17   Q    And this is at your first declaration, page 8,

18   Slide 8.  You say in your first declaration, To

19   conduct a geofence search, Google must search across

20   all Location History data to identify users with

21   Location History data during the relevant time frame;

22   correct?

23   A    Yes.

24   Q    And you then have to run a computation against

25   every set of stored Location History coordinates to

**Exhibit E, pg. 203**

McGRIFF - DIRECT                204

1    determine which records match the geographic

2    parameters in the warrant?

3    A    Yes.

4    Q    And then, as Google explains in its amicus,

5    similarly, page 12, "In order to comply with the first

6    step of the geofence protocol, therefore, Google must

7    search across all Location History journal entries to

8    identify users with potentially responsive Location

9    History data, and then run a computation against every

10   set of coordinates to determine which Location History

11   records match the time and space parameters in the

12   warrant"?

13   A    Yes.

14   Q    So for every geofence warrant, Google has to

15   search across all Location History journal entries,

16   and then it has to run a computation against every set

17   of coordinates; correct?

18   A    Yes.

19   Q    In other words, you had to search everybody with

20   Location History enabled?

21   A    Yes.

22   Q    That's what happened in this case?

23   A    Yes.

24   Q    To look for users in the geofence provided by the

25   warrant, Google had to search literally everybody with

**Exhibit E, pg. 204**

McGRIFF - DIRECT                    205

1   Location History enabled?

2   A   Yes.

3   Q   I want to try and figure out just how many people

4   had their data searched in this case.  So Google

5   searched all accounts with Location History enabled,

6   and in your first declaration -- this would be the

7   fourth page, paragraph 13 -- you say, In 2019, roughly

8   one-third of active Google users, i.e., numerous tens

9   of millions of Google users, had their Location

10  History enabled on their accounts?

11  A   Yes.

12  Q   Numerous tens of millions.  That's a lot.

13  A   Yes.

14  Q   Can you tell us precisely how many?

15  A   At that point in time, I cannot.

16  Q   Let's try it a different way.  Google owns

17  Android; right?

18  A   That's correct.

19  Q   And you know that Android has a Twitter account?

20  A   I'm certain they do, yes.

21  Q   And occasionally it tweets updates about Android.

22  Yes?

23  A   Yes.

24  Q   And in May 2019, Android said they had 2.5 billion

25  active users; is that accurate?

**Exhibit E, pg. 205**

McGRIFF - DIRECT                      206

1   A    I have not seen that tweet.

2   Q    Well, I believe we can show it to you.  It's

3   Defense Exhibit 55.

4   A    The tweet says 2.5 billion active devices.  It

5   doesn't speak to accounts.

6   Q    As a rough estimate, would that differ

7   significantly from the number of users?

8            MR. SIMON:  Judge, I'm going to object.  He's

9   answered the question.  He said he doesn't know.  The

10  pressing on, I think particularly given the time

11  constraints, the witness had answered the question to

12  the extent he has personal knowledge.

13           THE COURT:  Just finish answering that

14  question and we will move on.

15  A    I wouldn't be able to say.

16  Q    Okay.

17           THE COURT:  Are you moving that into evidence

18  or not?  Is it just demonstrative?

19           MR. PRICE:  It was just demonstrative, Your

20  Honor.

21  BY MR. PRICE:

22  Q    If you had to take a rough estimate at the number

23  of active users in 2019, do you think it would be much

24  different than 2.5 billion?

25  A    I would not even know where to begin to make that

**Exhibit E, pg. 206**

McGRIFF - DIRECT                    207

1   assessment.

2   Q   So you don't know how many people have Location

3   History enabled?  I mean, presumably, you said you're

4   in charge of the Location History product.

5   A   Yes.  If the question is how many users were opted

6   in to Location History in 2019, I do not know that

7   number off the top of my head.  My clarifying

8   questions would be at a particular point in 2019,

9   because it's not a static number?  Or were you just

10  looking for a rough range or average?  But, again, I

11  wouldn't know that off the top of my head.

12      I remember at the time of preparing this that it

13  was roughly a third, the Android number, but I do not

14  know the Android number again off the top of my head.

15  Q   And if we take, for example, if we say 2.5 billion

16  as the Android number, a third of that would translate

17  into about 800 million, just generally.

18  A   The Android number here was referencing devices,

19  though.  I, for example, have multiple devices, but

20  only one account that I'm using across all those

21  devices.

22  Q   In your estimation as the Location History Product

23  Manager, would you estimate that there were more or

24  less than 800 million users with Location History

25  enabled at some point in 2019?

McGRIFF - DIRECT                    208

1    A    Users as in they have the account on, Location

2    History on, or Location History on and actively

3    reporting?

4    Q    Enabled on their accounts.

5    A    That I couldn't say.  That I couldn't say.

6    Q    Okay.  In any case -- all right.  We'll move on.

7         I want to talk about how Google processes Location

8    History geofence warrants.  When Google receives a

9    geofence warrant, what happens?  What is the process?

10   A    I'm not involved in the processing of the warrants

11   in any way.

12   Q    Do you know if there are any rules that Google has

13   about the size of a geofence warrant?

14   A    I know at a high level the team works to be

15   sure -- at a high level I know that there's some back

16   and forth in terms of the refinement of the request,

17   but I'm not involved in the details of that

18   refinement.

19   Q    What do you mean, back and forth about the

20   refinement of a request?

21   A    Just clarification.  Do we have the right details?

22   There's some process.  I believe there's someone else

23   who's a witness who can speak to it in detail, but I'm

24   not involved in that process at all.

25   Q    So you don't know if there's an upper limit on the

**Exhibit E, pg. 208**

McGRIFF - DIRECT                    209

 1   size of a geofence that Google would respond for?

 2   A    I am not involved in that at all day-to-day.

 3   Q    If we asked for all the data in a city over a

 4   two-week period, would Google comply with that?

 5   A    I can say with certainty they likely wouldn't, but

 6   I have no idea what their parameters are for that.

 7   Q    Do you know what the rules are for narrowing

 8   things down at each stage of the process?

 9   A    I do not.

10   Q    So when the government comes back in Stage 2 and

11   says, Well, you know, we want all of them, do you know

12   if that's okay or not?

13   A    Again, my knowledge and involvement with that

14   process is limited to something is wrong in their

15   processing, and there's an ask to understand why some

16   particular aspect of retrieving whatever they've

17   decided fits within scope is not retrieving in the way

18   that it should.

19   Q    What do you mean "not retrieving in the way that

20   it should"?

21   A    That there's some delay or some sort of just

22   general process breakdown.  I'm often engaged to --

23   not often, but when it happens, I'm engaged to assist

24   with looking into the issue, but, again, I'm not

25   involved in either the receipt of or the processing of

**Exhibit E, pg. 209**

McGRIFF - DIRECT                    210

1    or the response to.

2    Q    Okay.  You're aware that Google has notified some

3    users when they've been the subject of a geofence

4    warrant; right?

5    A    That's correct, yes.

6    Q    You're aware that just recently Google notified a

7    Minneapolis user who is the subject of a geofence

8    warrant targeting protesters following the death of

9    George Floyd?

10   A    I was not aware of that, no.

11   Q    Were you aware that Google notified a user in

12   Florida who is the subject of a geofence warrant from

13   the Gainesville Police Department?

14   A    I was not aware of that, no.

15   Q    In which cases are you aware of Google notifying

16   users of a geofence warrant?

17   A    I am not involved in any way in the day-to-day

18   processing of geofence warrants, their receipt, any

19   responses.  That is not involved in my day-to-day

20   whatsoever.

21   Q    Are you aware that Google never notified

22   Mr. Chatrie that he was the subject of a geofence

23   warrant in this case?

24   A    I would not be able to comment on that.

25   Q    I assume you don't know, then, the rules for when

**Exhibit E, pg. 210**

McGRIFF - DIRECT                    211

1    Google will notify users that they are the subject of

2    a geofence warrant?

3    A    I do not know that, I'm sorry.

4    Q    Okay.  I want to go back to your first

5    declaration, page 7.  It says, "Location History is

6    the only form of location data that Google maintains

7    that Google believes to be responsive to a geofence

8    request"?

9    A    That is correct, yes.

10   Q    And Location History is the only form of location

11   data that was produced to the government in this case?

12   A    To my knowledge, yes.

13   Q    So no Google Location Accuracy data, no Web & App

14   Activity data?

15   A    No.

16   Q    And the reason for that is because only Location

17   History -- well, let me take a step back.  When the

18   government makes a geofence request, does it specify

19   that it wants to search only Location History?

20   A    I don't believe so.

21   Q    And Google does actually maintain location data

22   apart from Location History in Web & App Activity, for

23   example?

24   A    Some location information can be captured in Web &

25   App Activity, yes.

**Exhibit E, pg. 211**

McGRIFF - DIRECT                    212

1  Q   But Location History was the only repository of

2  location data that Google searched in this case?

3  A   Yes.

4  Q   That's because only Location History is

5  sufficiently granular to be responsive and searchable?

6  A   That is my understanding, yes.

7  Q   And only Location History is able to pinpoint a

8  user's estimated location with enough precision?

9  A   That is correct.

10 Q   So Google decided that only Location History was

11 precise enough to be searched in response to a

12 geofence warrant?

13 A   That is my understanding, yes.

14 Q   Okay.  Now, even though you said pinpoint, and

15 this is page 8 of your declaration, the location data

16 points reflected in Location History are really

17 estimates; is that right?

18 A   That's correct.

19 Q   A user's actual location doesn't necessarily align

20 perfectly with any one isolated data point?

21 A   Yes.

22 Q   There's a confidence interval, a number associated

23 with each set of Location History coordinates that

24 reflects Google's confidence in those coordinates?

25 A   Yes.

**Exhibit E, pg. 212**

McGRIFF - DIRECT                213

1    Q    And this number is expressed in meters as a

2    radius?

3    A    Yes.

4    Q    And it's called the display radius; is that

5    correct?

6    A    Yes.

7    Q    So it can be visualized as a shaded circle around

8    the coordinates?

9    A    Yes.

10   Q    The magic blue circle around the blue dot?

11   A    Yes.

12   Q    And on pages 8 to 9, you say Google aims to

13   accurately capture roughly 68 percent of users with

14   this method?

15   A    Yes.

16   Q    Or, in other words, there's a 68 percent

17   likelihood that a user is somewhere inside of that

18   shaded circle, or at least that's Google's goal?

19   A    Yes.

20   Q    That means there's a 32 percent chance that

21   they're outside of that circle altogether?

22   A    Yes.

23   Q    Not necessarily at the blue dot?

24   A    Yes.

25   Q    Is it just as likely that the user's actual

**Exhibit E, pg. 213**

McGRIFF - DIRECT                      214

 1  location would be near the edge of that circle as

 2  opposed to smack dab in the middle?

 3  A   Yes.

 4  Q   So you're equally confident -- you're confident

 5  that the user is in that circle, 68 percent, but where

 6  you put those coordinates doesn't necessarily

 7  translate into that same amount of confidence.  You're

 8  still only 68 percent confident?

 9  A   That the device is within those coordinates, yes.

10  Q   Okay.  So, moving on to page 9, you stated that if

11  the estimated location, the stored coordinates in

12  Location History, falls within the radius of the

13  geofence request, then Google treats that user as

14  falling within the scope of the request; correct?

15  A   Yes.

16  Q   So, in other words, if the blue dot is inside of

17  that geofence, inside of that radius, then Google will

18  consider it responsive to the warrant?

19  A   Yes.

20  Q   You consider it responsive even if that shaded

21  circle, the confidence interval display radius, falls

22  partly outside the radius of the geofence request?

23  A   That is my understanding, yes.

24  Q   So you can have a little blue dot right close to

25  the edge of that geofence with a big display radius

**Exhibit E, pg. 214**

McGRIFF - DIRECT                    215

1  that goes way beyond it, and that user is still going

2  to be recorded in the geofence return?

3  A    Yes.

4  Q    So you consider it responsive even if the shaded

5  circle falls partly outside?  And even then, you can't

6  say where inside that circle the user was?

7  A    No.

8            THE COURT:  What question did you answer?  He

9  asked two questions.  Do you think if it's outside the

10  circle, it's responsive?

11           Why don't you rephrase the question.

12  BY MR. PRICE:

13  Q    So even if part of that display radius falls

14  outside of the geofence, it's still considered

15  responsive?

16  A    Yes.

17  Q    Even though there's a 68 percent chance that that

18  person is somewhere outside the actual geofence within

19  that display radius?

20  A    Yes, that would still be considered responsive.

21  Q    Even though there's a 32 percent chance that

22  they're not even there and somewhere else?

23  A    Yes.

24  Q    Okay.  So there's a significant likelihood that at

25  least some of the users identified as being inside the

**Exhibit E, pg. 215**

McGRIFF – DIRECT                    216

1   geofence might have been outside of that geofence?

2   A    There is a possibility, yes.

3   Q    Google has to draw the line somewhere; right?  And

4   this practice makes sense from Google's perspective?

5   A    This is the process, yes.

6   Q    The warrant didn't tell you to do it this way;

7   right?

8   A    This is the process by which we respond to these,

9   yes.

10  Q    It's Google's process.  It didn't tell you to do

11  this in the warrant?

12  A    (Nodded head affirmatively.)

13  Q    And no court told you to do that; right?

14  A    This particular process of identification?

15  Q    Yeah, to draw the line and say, well, we're going

16  to report people whose blue dots are inside, and

17  that's the way it's going to work.

18  A    This is the process that we use to respond to

19  these, yes.

20  Q    Okay.  So false positives are possible here?

21  A    Yes.

22  Q    And you say this, page 9 of your first

23  declaration, 17.  You said, "As a result, it is

24  possible that when Google is compelled to return data

25  in response to a geofence warrant, some of the users

**Exhibit E, pg. 216**

McGRIFF - DIRECT                          217

1    whose locations are estimated to be within the radius

2    described in the warrant, and whose data is therefore

3    included in data production, were in fact located

4    outside the radius"?

5    A    Yes.

6    Q    False negatives are possible, too; right?

7    A    Yes.

8    Q    So if somebody was standing -- if somebody was

9    actually right outside that geofence radius, but

10   Google estimated their location as being inside of it

11   or, I'm sorry, other way around.  If the blue dot

12   falls outside the geofence, you don't include it even

13   though the person could have been inside of that

14   geofence?

15   A    That's correct.

16   Q    Okay.  Even if part of the shaded circle falls

17   within the geofence, if that blue dot is outside,

18   nothing?

19   A    Yes.

20   Q    The warrant, once again, didn't tell you to do it

21   that way?

22   A    This is our process, yes.

23   Q    The Court didn't tell you to do it that way?

24   A    This is our process, yes.

25   Q    It's just your process.  Great.

**Exhibit E, pg. 217**

McGRIFF - DIRECT                    218

1      All right.  I want to switch gears a little bit

2  here and talk about some of the feedback that Google

3  has received about Location History.  You published a

4  blog for Google on December 9, 2019; correct?

5  A   Yes.

6  Q   It was titled "Updates to Incognito Mode and Your

7  Timeline in Maps"?

8  A   Yes.

9  Q   Let me show you Exhibit 47.  Is this the blog

10  post?

11  A   Yes.

12          MR. PRICE:  Your Honor, I'd like to introduce

13  this into evidence, please?

14          THE COURT:  Any objection?

15          MR. SIMON:  No objection, Judge.

16          THE COURT:  It will be entered.

17          MR. PRICE:  Thank you.

18          (Defense Exhibit No. 47 is admitted into

19  evidence.)

20  BY MR. PRICE:

21  Q   So you wrote --

22          MR. PRICE:  This is on 19, Laura.

23  Q   You wrote that throughout this year, we've focused

24  on making it easier to control, manage, and delete

25  your Location History information; correct?

**Exhibit E, pg. 218**

McGRIFF - DIRECT                    219

```
 1   A    Yes.
 2   Q    And earlier that year, same year, you published
 3   another blog post for Google.  This one on May 1,
 4   2019.
 5   A    Yes.
 6   Q    It was titled "Introducing Auto Delete Controls
 7   for Your Location History and Activity Data"?
 8   A    Yes.
 9   Q    Is this the blog post?
10   A    Yes.
11        MR. PRICE:  Your Honor, this is Defense
12   Exhibit 46.  We'd like to move it into evidence, as
13   well.
14        THE COURT:  Any objection?
15        MR. SIMON:  No objection.
16        THE COURT:  It will be entered.
17        (Defense Exhibit No. 46 is admitted into
18   evidence.)
19   Q    So you wrote, "We work to keep your data private
20   and secure, and we've heard your feedback that we need
21   to provide simpler ways for you to manage or delete
22   it"; correct?
23   A    Yes.
24   Q    I would like to talk about some of that feedback
25   for a second that you received.  In fact, Location
```

McGRIFF - DIRECT                    220

 1   History has received some significant media attention

 2   and received significant media attention in 2018; is

 3   that correct?

 4   A    Yes.

 5   Q    And that attention was pretty negative?

 6   A    It was mixed, yes.

 7   Q    In January 2018, there's an online type magazine

 8   called "Quartz," and they published an article

 9   discussing Location History.  Do you mean that?

10   A    Yes.

11   Q    It was titled, "If You're Using An Android Phone,

12   Google May Be Tracking Every Move You Make."  This is

13   the article?

14   A    Yes.

15           MR. PRICE:  This is Defense Exhibit 48, Your

16   Honor.  And I would like to move it into evidence.

17           MS. KOENIG:  It already is in evidence.

18           MR. PRICE:  It already is in evidence.  Thank

19   you.

20   Q    So speaking of Location History, it says,

21   "Although the product behind those transmissions is

22   opt-in, for Android users it can be hard to avoid and

23   even harder to understand"; correct?

24   A    Yes.

25   Q    And it goes on to say, "While it is not enabled on

**Exhibit E, pg. 220**

McGRIFF - DIRECT                    221

1   an Android phone by default, or even suggested to be

2   turned on when setting up a new phone, activating

3   Location History is subtly baked into setup for apps

4   like Google Maps, Photos, the Google Assistant, and

5   the primary Google app"; correct?

6   A   Yes, that's what the article says.

7   Q   And then it adds --

8              THE COURT:  There's an objection.

9              MR. SIMON:  Judge, I just object to the way

10  in which this is being entered into evidence,

11  particularly that first sentence.  I didn't object at

12  the time, but the way the record is going to read is

13  that Mr. McGriff is saying that he agrees with this.

14  I would prefer, Judge, and I think the record would be

15  clearer, if he's going to put these assertions in

16  front of the witness, ask him to assess them.

17             THE COURT:  At the very least --

18             MR. PRICE:  Your Honor, I am not -- sorry.

19             THE COURT:  Okay.  You can respond.

20             MR. PRICE:  We are not introducing these

21  articles for the truth of the matter.  We are

22  introducing them because they constitute feedback

23  which Google received.

24             THE COURT:  I know, but what you're doing is

25  saying that the declarative statements, and you're

**Exhibit E, pg. 221**

McGRIFF - DIRECT                    222

 1   starting it by saying "It says this.  Is that right?"

 2   He says yes.  It's going to create a record where you

 3   can cut off the front where you say it says this,

 4   quote it, and then say yes.

 5          So what we're trying to do is create a fair

 6   record here.  You are getting him to indicate that

 7   there are statements in this article and whether or

 8   not he knew them.  And so that is really the point.

 9          I would agree that this way it's being asked,

10   it sounds as if you're trying to get him to, although

11   you're not doing it that way, but it does sound as if

12   you're trying to get him to sound as if he's agreeing

13   with a declaration.

14          So it's sustained to that degree.  And I'll

15   just ask you to use the nuances.  You're still making

16   your point.  But do it in a different way.

17          MR. PRICE:  Okay.

18   BY MR. PRICE:

19   Q   The article here criticized Location History;

20   correct?

21   A   Yes.

22   Q   And the article looked at testing multiple phones

23   to see what this process was like; correct?

24   A   Yes, it did.

25   Q   And it faulted Google, didn't it?

**Exhibit E, pg. 222**

McGRIFF – DIRECT                223

1  A    The article did, yes.

2  Q    And it faulted it because it said that none of the

3  apps used the same language to describe what happens

4  when Location History is enabled; correct?

5  A    That is one of the things they cited, yes.

6  Q    And it also criticized Google for not explicitly

7  indicating that activation will allow every Google

8  app, not just one seeking permission, to access

9  Location History data.  So they're complaining about

10 account level nature of the setting.

11          THE COURT:  The what?

12          MR. PRICE:  Account level nature of the

13 setting.

14          THE COURT:  You need to look at the

15 microphone.

16 A    Yes, they are in the article.

17 Q    Okay.  And that account level setting, that means

18 that when you turn on Location History through one

19 app, it's on for the entire account; right?

20 A    When you opt in to Location History, you are

21 opting in for your account, yes.

22 Q    Thank you.

23      So the press didn't stop with the Quartz article.

24 I imagine you're aware that the Associated Press also

25 published an article about Location History in 2018?

**Exhibit E, pg. 223**

McGRIFF - DIRECT                    224

 1   A    Yes, I am aware of that article.

 2   Q    Is this the article?

 3   A    That is the article, yes.

 4   Q    It's titled "Google Tracks Your Movements, Like It

 5   or Not"?

 6   A    Yes, that's the title of the article.

 7   Q    Thank you.

 8            MR. PRICE:  And this is Defense Exhibit 49,

 9   Your Honor.  And we would ask to move this into

10   evidence, as well.

11            THE COURT:  Any objection?

12            MR. SIMON:  Judge, we just reiterate our

13   earlier objections.  We think it lacks relevance,

14   particularly when you have a Google witness here to

15   address the issue.  It's obviously hearsay.

16   Understanding that the rules of evidence wouldn't

17   strictly apply here, but I think the best route here

18   is to question the witness about, like, the Quartz

19   article assertions.  But I know the Court has

20   previously ruled, but we'd object to it being entered

21   into evidence.

22            THE COURT:  Right.  He's allowed to make his

23   case.  I will allow it for the limited purpose, not

24   for the truth of the matter, but to the extent it

25   has -- the witness has already testified that he was

**Exhibit E, pg. 224**

McGRIFF - DIRECT                    225

1   aware of the article.  And so I think it is relevant

2   for background information.  And you all can

3   cross-examine with respect to weight.  All right?

4           MR. SIMON:  Understood.

5           MR. PRICE:  Thank you, Your Honor.

6           Sorry.  I did move to have the article

7   introduced.  I'm not sure if there was a ruling on

8   that, Your Honor.

9           THE COURT:  Right.  I overruled the

10  objection, and so it will go in.

11          MR. PRICE:  Thank you.

12          (Defense Exhibit No. 49 is admitted into

13  evidence.)

14  BY MR. PRICE:

15  Q   So the article's main complaint here is that it

16  says, "Even with Location History paused, some Google

17  apps automatically store time-stamped location data

18  without asking."  That's just the complaint in the

19  article; correct?

20  A   That's the complaint in the article, yes.

21  Q   But it was a complaint that Google ended up taking

22  pretty seriously, especially given the interest from

23  members of the Senate, for example?

24  A   We take all complaints seriously, yes.

25  Q   Here the article actually quoted United States

**Exhibit E, pg. 225**

McGRIFF - DIRECT                226

1    Senator Mark Warner; correct?

2    A    Yes, the article does quote the Senator.

3    Q    And he complained that it's frustratingly common

4    for technology companies to have corporate practices

5    that diverge wildly from the reasonable expectations

6    of their users.  Was that his statement?

7    A    That was his statement, yes.

8    Q    You were aware that he made that statement;

9    correct?

10   A    I was aware that he made that statement, yes.

11   Q    And at the end, it quotes a Yale researcher, Sean

12   O'Brien, and he called this practice disingenuous;

13   right?

14   A    That is what he said, yes.

15   Q    So this was a pretty negative report about

16   Location History from Google's perspective; correct?

17   A    It was not a flattering report, that's correct.

18   Q    Google actually tracked the media coverage of this

19   report; correct?

20   A    As we do often for all media reports, yes.

21   Q    And Google prepared what's called an issue

22   coverage report for this article for four days?

23   A    That's correct, yes.

24   Q    I'd like to show you Defense Exhibit 38, please.

25   Are these the issue coverage reports that you were

McGRIFF - DIRECT                    227

1    referring to?

2    A    That's correct, yes.

3    Q    And it makes it clear that this story was pretty

4    widely covered; correct?

5    A    That's correct, yes.

6    Q    If we check out one of those reports --

7              THE COURT:   What exhibit are you on?

8              MR. PRICE:   Sorry.   Excuse me?

9              THE COURT:   Which exhibit?

10             MR. PRICE:   Sorry.   This is Defense Exhibit

11   38, Your Honor.

12             THE COURT:   38?

13             MR. PRICE:   Yes.   And I forgot to move it

14   into evidence.   I would move for this to be admitted

15   into evidence, as well.

16             THE COURT:   Is there any objection to Defense

17   38?

18             MR. SIMON:   No objection, Judge.

19             THE COURT:   All right.   It will enter.

20             (Defense Exhibit No. 38 is admitted into

21   evidence.)

22   BY MR. PRICE:

23   Q    So if we look at the issue coverage reports, we

24   see that Google wrote, the AP tweeted the story out,

25   which created a surge of social chatter, approximately

**Exhibit E, pg. 227**

McGRIFF - DIRECT                228

1    8,000 re-tweets.  And the story was picked up by 60

2    plus outlets, including the *New York Times*, *U.S. News*

3    *and World Report*, and the *Washington Post*; is that

4    accurate?

5    A    That's accurate.

6             THE COURT:  It's accurate that it's in there.

7    You're continuing to ask the questions in the same

8    way.  And so, you know, you're making points, but you

9    are making the points.  It's the witness who needs to

10   be able to talk about what it is that is or is not in

11   an exhibit.

12            That is what is in the exhibit.

13            MR. PRICE:  Thank you, Your Honor.

14   BY MR. PRICE:

15   Q    Google's report explained the coverage themes for

16   these stories; is that correct?

17   A    That's what's in the report, yes.

18   Q    And the report noted the top two themes for this

19   article?  It said, the report said, that 69 percent of

20   the coverage mentioned the lack of user consent/creepy

21   factor?

22   A    That's what is in the report, yes.

23   Q    And the report also noted that a third of the

24   coverage was about misleading controls?

25   A    That's in the report, yes.

**Exhibit E, pg. 228**

McGRIFF - DIRECT                    229

1    Q    Just a few days later, Google changed the language

2    on its help page.  On its Location History help page.

3    You're aware of that, I assume?

4    A    Yes.

5    Q    It was in response to this article; is that

6    correct?

7    A    Which update are you referring to specifically?

8    Is it an exhibit here?

9    Q    It was three days later.  And that would have been

10   on August 17, 2018.

11   A    Is there an exhibit here I can look at?

12   Q    Yes.  We'll get there.

13        So three days later -- sorry -- three days later

14   it was reported that Google changed its Location

15   History help page, as well; is that correct?

16   A    I can't say that we made an update three days

17   later.

18   Q    The Associated Press published an article just a

19   few days later about that change.  Are you aware of

20   that?

21   A    Is that in this book?

22   Q    We can show you the article if you'd like.  Would

23   that help?

24   A    Well, I guess, the Associate Press reported that

25   we made -- that Google made a change three days later.

**Exhibit E, pg. 229**

McGRIFF - DIRECT                230

1   Q   Yes.

2   A   So if that's in there, yes, then that is what they

3   reported.

4   Q   And you do recall Google making a change to its

5   Location History help page shortly after this article?

6   A   I recall in some period of time, yes, we made

7   updates to our pages.

8   Q   Okay.  That's fine.  The bad press, so to speak,

9   here had some ramifications for Google in terms of

10  oversight from the federal government; is that

11  correct?

12  A   It did.

13  Q   In May 2018, are you aware that two United States

14  Senators wrote a letter to the Federal Trade

15  Commission about Location History?

16  A   Yes.

17          MR. PRICE:  And this is 36, Laura.

18  Q   Is this the letter?

19          THE COURT:  Okay.  Is this Defense Exhibit

20  36?

21          MR. PRICE:  This is Defense Exhibit 53, Your

22  Honor.

23          THE COURT:  Okay.

24  Q   I'd like to show you what's marked as Defense

25  Exhibit 53.  It's a letter from two United States

**Exhibit E, pg. 230**

McGRIFF - DIRECT                    231

1  Senators; correct?

2  A    Yes.

3        MR. PRICE:  Your Honor, I would like to move

4  this letter into evidence.

5        THE COURT:  Any objection?

6        MR. SIMON:  Judge, I think there are multiple

7  letters in Exhibit 3 (sic), including Google's

8  response on January 12, 2018.  We'd obviously object

9  generally based on what we've talked about before, but

10 I understand the Court will admit it not for the truth

11 of the matter asserted, but for -- just to allow the

12 question.

13       THE COURT:  All right.  I'm going to allow

14 this for the limited purpose that we have been looking

15 at these documents.

16       So, to make a record, this is Defense Exhibit

17 53, which is a letter dated May 11, 2018, that has a

18 signature of Richard Blumenthal from the United States

19 Senate.

20       It then has something marked an attachment.

21 And the attachment says "Letter from Susan Molinari.

22 Received by Senators Blumenthal and Markey."  And that

23 is then followed by a January 12, 2018 document on

24 Google letterhead.  So it predates this May 18th

25 letter.

**Exhibit E, pg. 231**

McGRIFF – DIRECT                    232

1          And then there is something that has an

2    Attachment 4.  So you have to be clear about what

3    you're admitting and under what circumstances.

4          The United States is correct that it's

5    confusing to say we're admitting just one letter.

6    There's actually a series of documents here.

7          So you can ask questions to establish why

8    they're there, but the whole -- what so far we have

9    admitted is part of 53, the May 11, 2018 letter.

10         MR. PRICE:  Yes, Your Honor.  Thank you.  And

11   the exhibits that go along with it include previous

12   correspondence.  There's one in particular that we

13   have an interest in.  It's Attachment 4, which

14   includes a screenshot of the Google Assistant setup.

15         THE COURT:  There is no Attachment 2, letter

16   from Susan Molinari?

17         MR. PRICE:  No, Your Honor.  It's Attachment

18   4.

19         THE COURT:  No, no, no.  I'm in your exhibit

20   that you put in front of the Court.  Right after

21   Senator Blumenthal's letter, there is a page that says

22   Attachment 2, letter from Susan Molinari.  Received.

23         MR. PRICE:  We do not need to introduce that

24   into evidence.

25         THE COURT:  Because it's not there, right?

**Exhibit E, pg. 232**

McGRIFF - DIRECT                    233

1          MR. PRICE:  I have not seen it.

2          THE COURT:  Well, it's your exhibit.  Then

3    there is -- yes.

4          MR. SIMON:  Judge, it's a part of our book,

5    and it's what we've seen.  And certainly if we're

6    going to introduce the letter from the senators, we'd

7    certainly want Google's statement to the Quartz

8    article and the like.

9          THE COURT:  All right.  So there are four

10   attachments, and you're not objecting that the exhibit

11   goes in as presented because it will be the full

12   exhibit.  Is that correct, Mr. Simon?

13         MR. SIMON:  Correct, Judge.  Thank you.

14         THE COURT:  It will be admitted, then.

15         (Defense Exhibit No. 53 is admitted into

16   evidence.)

17         MR. PRICE:  Thank you, Your Honor.

18   BY MR. PRICE:

19   Q   I just want to turn to the body of the letter here

20   because it seems to put Google on notice that Location

21   History has some -- that the Senate had some concerns

22   with Location History; is that correct?

23   A   Just one point.  Where this started was a walking

24   away from the AP article which came out after this

25   letter.  This letter was sent on May 11.  The AP

**Exhibit E, pg. 233**

McGRIFF - DIRECT                234

 1   article was from August, I believe, later that year.

 2   Q   The Quartz article, I believe, preceded this and

 3   is cited in the letter --

 4   A   That's correct.

 5           THE COURT:  He's correct about the AP

 6   article; right?

 7           MR. PRICE:  Pardon me?

 8           THE COURT:  He's correct about the AP

 9   article.

10   BY MR. PRICE:

11   Q   You are correct about the AP article.

12   A   Okay.  Because I just wanted to be clear.  When

13   you had previously asked me was I aware of additional

14   scrutiny, I said yes.  Then you referenced this

15   letter, but this letter was written before that

16   article.

17       So this letter was in response to the Quartz

18   article, not the additional scrutiny that came as a

19   result of the AP article.

20   Q   Yes.

21   A   Okay.

22   Q   The letter criticized Google's Location History

23   practices for -- this is 38 -- frequently

24   mischaracterizing the service and degrades the

25   functionality of products in order to push users into

**Exhibit E, pg. 234**

McGRIFF - DIRECT                    235

 1   providing permission, so says the letter.

 2        Would you agree that's what it says?

 3   A    That's what it says in the letter, yes.

 4   Q    And the letter also says that these factors raise

 5   serious concerns -- raise serious questions about

 6   whether users are able to provide informed consent.

 7   Were you aware of that criticism, as well?

 8   A    That's what is in the letter, yes.

 9   Q    And I don't mean to be belabor this, but it does

10   go on to say that Google's policies and explanations

11   raise questions about their characterization of basic

12   consumer protection terms, such as opt-in, opt-out,

13   notice, consent, and anonymization according to the

14   letter?

15   A    That is what's in the letter, yes.

16   Q    The letter calls the consent process confusing,

17   42?

18   A    That is what's in the letter, yes.

19   Q    And it cites Attachment 4.  Attachment 4 -- is

20   that correct?  It cites Attachment 4?

21   A    That's correct, yes.

22   Q    And is this Attachment 4?

23   A    I'm sorry.  I didn't hear the question.

24   Q    Is this Attachment 4?

25   A    Yes, that is Attachment 4.

**Exhibit E, pg. 235**

McGRIFF - DIRECT                    236

1    Q    What does it show?

2    A    This is one of the Google Assistant permission

3    prompts.

4    Q    And that includes Location History; correct?

5    A    At that time it included Location History, yes.

6    Q    The letter goes on to add that most consumers do

7    not understand the level of granularity and reach of

8    Google's data collection, and that there's serious

9    questions about whether they have provided informed

10   consent and maintain reasonable ability to avoid

11   participating in this collection.  Are you aware of

12   that criticism, as well?

13   A    That is what's in the letter, yes.

14   Q    And the letter concludes by asking the FTC to open

15   an investigation into the potential deceptive acts and

16   practices used by Google to track and commoditize

17   American consumers.  Are you aware that the letter

18   called for an investigation?

19   A    I am aware that that is what's in the letter, yes.

20   Q    So in addition to the news articles, and the

21   Senate inquiry, Google got sued over Location History

22   in 2018.  Are you aware of that?

23   A    Which particular case are you referring to?

24   Q    The case is called *In re:  Google, Location*

25   *History Litigation*.  It's a class action out of the

**Exhibit E, pg. 236**

McGRIFF - DIRECT                    237

```
 1   Northern District of California.
 2   A    Yes.
 3   Q    I'd like to show you Defense Exhibit 26.  Is this
 4   the complaint in this case?
 5   A    Yes.
 6   Q    And you're aware of the complaint in the lawsuit?
 7   A    I am aware of this complaint, yes.
 8           MR. PRICE:  Your Honor, I would move to
 9   introduce the amended complaint for -- not for the
10   truth of the matter, but for the fact that it exists.
11           THE COURT:  Is there an objection?
12           MR. SIMON:  Judge, I'd object to relevance.
13   Obviously, it's hearsay through and through.  But
14   moreover, what we have, and the United States wouldn't
15   object to things like the exhibit emails that are
16   going to come from Google v. Arizona that shows
17   communications between Google as a part of that
18   litigation internal discussions.  This is literally
19   just some class action lawyer, presumably in
20   California, that decided to go after Google.
21           The fact that it exists, the witness just
22   admitted it.  Putting it in the record, I think, does
23   nothing more than continue sort of a broadside against
24   Google more than just the article.  This is just
25   accusing Google of all kinds of things.  And I don't
```

**Exhibit E, pg. 237**

McGRIFF - DIRECT                    238

1    see any relevance to this being in the record.

2              THE COURT:  These are just allegations.  Why

3    do we need to know -- has this class action completed?

4              MR. PRICE:  It hasn't, Your Honor.  The

5    reason that we are talking about these things is

6    because things like the newspaper articles, the

7    congressional inquiries, and the lawsuits appear to

8    have changed Google's behavior, changed Google's

9    policies, and, in particular, have something to do

10   with the relevant changes here to the Location History

11   language.

12             So we're trying to establish what happened,

13   what changed, why, and whether it was sufficient.

14             THE COURT:  Well, I'm not going to admit this

15   yet until you establish some fact that Google did that

16   somehow you can say comports with something in the

17   complaint.  And even then, I'm not sure.  These are

18   just allegations.  This is not -- this is not relevant

19   to facts of what we need to consider in this case

20   except that Google knew that the suit was ongoing and

21   that it was about Location History.

22             So I'm going to sustain that objection.

23             MR. PRICE:  Okay.

24   BY MR. PRICE:

25   Q   Mr. McGriff, you're still aware of the lawsuit;

**Exhibit E, pg. 238**

McGRIFF - DIRECT                239

1   correct?

2   A   I am aware of this lawsuit, yes.

3   Q   It was filed just three days after that Associated

4   Press story on August 17?

5   A   I don't know how I would know.

6   Q   It's right at the top of the page.

7   A   If the date is there, then that's when it was

8   filed, yes.

9   Q   The main allegation here, and I don't mean to

10  belabor this point either, is that Google "retains and

11  continues to collect location data" --

12           THE COURT:  Are you quoting from the

13  complaint?  Because I just said it's not admissible.

14           MR. PRICE:  I'm not admitting it, Your Honor,

15  I'm just trying to establish --

16           THE COURT:  You're quoting it.  You're

17  admitting it by saying it.

18           MR. PRICE:  Okay.  I'll move on.

19           Your Honor, the allegations in this case, we

20  understand that they are allegations.

21           THE COURT:  What I said is, if you can show

22  something that happened later that Google did that

23  then you can show was alleged in this complaint, and

24  there's some temporal proximity, then it is possible

25  that this would be admissible.  If you don't show yet

**Exhibit E, pg. 239**

McGRIFF - DIRECT                240

1    that there has been a change, no, it's not admissible.

2              MR. PRICE:  Okay.

3    BY MR. PRICE:

4    Q    There has been some discussion at Google since at

5    least 2017 about changing the Location History

6    language on the opt-in screen; is that correct?

7    A    Are you referring to the consent or are you just

8    referring to -- what language are you referring to

9    specifically?

10   Q    The language for opt-in to Location History

11   through apps in particular or at setup where it says

12   "Saves a private map of where you go."  That language

13   changed; correct?

14   A    There has been discussion for the life of the

15   product about what is the best copy to relay what the

16   feature does, yes.

17   Q    And you're aware that there are hundreds of pages

18   of emails and documents that have been submitted to

19   the Attorney General in Arizona discussing these sorts

20   of changes?

21   A    Yes, I am aware.

22   Q    Specifically, on February 2, 2017, there's an

23   email in which some Google engineers called Location

24   History a mess.  Does that sound familiar to you?

25   A    I can't recall that specific copy, but if it's in

**Exhibit E, pg. 240**

an email or document somewhere --
Q Perhaps I can refresh your recollection. Can I show you Defense Exhibit 36, please. It's up on your screen, as well.
A Just one clarification point. The screen has a black box on the side, so I can't see the text on the side, which is why I keep looking in the book.
I do see it on there as well, though.
Q I don't know how to --
A It's fine. I follow along with the book, but that's why I keep looking to the book and not the screen. It cuts it off.
Q Okay. So you can see there in the book?
A Yes.
Q And you can see that a little bit later on in that chain another Google employee described the location products as a "work in progress," and that Google was "trying to rein in the overall mess that we have with regards to data collection, consent, and storage"?
A That is what's mentioned in this, I guess, email exchange, yes.
Q And you have another Google employee who says, "How can we do a great job of respecting people's privacy when they don't want to share their location?"
A That is what's written in the exchange, yes.

McGRIFF - DIRECT                242

1   Q   And the same person says, "Can we have a

2   foreground only model?  Lots of users don't care about

3   Location History."

4   A   That is what's mentioned in the exchange, yes.

5   Q   What's a foreground only model?

6   A   I cannot even feign to understand what this person

7   is referring to.

8   Q   Does it refer to apps that are actively running as

9   opposed to passively in the background?

10  A   I believe what -- well, it's conflating several

11  points.  It's speaking to foreground only collection,

12  which would be app specific, which is inherently not

13  the nature of what Location History is or how its

14  collection works.  So this person is offering

15  suggestions.

16  Q   Okay.  Thank you.  A little bit later in that

17  exchange, you can see at the bottom of your screen, it

18  says -- there's another Google employee who wrote, "Do

19  users with significant privacy concerns understand

20  what data we are saving?  Do they know how to control

21  when we store location information?"

22  A   That is a question asked in the exchange, yes.

23  Q   And then, finally, you have a Google employee

24  writing, "We have Location as a product umbrella that

25  includes Location History and a bunch of other stuff

**Exhibit E, pg. 242**

McGRIFF - DIRECT                243

 1   that's super messy.  And it's a Critical User Journey

 2   to make sense out of this mess"?

 3   A    That is what's in the article or exchange, yes.

 4   Q    This is what Google employees were discussing in

 5   2017 or is a recognition that there was a problem?

 6   A    There was some discussion about Location History,

 7   yes.

 8          MR. PRICE:  Sorry, Your Honor.  Can I have

 9   one second?

10          THE COURT:  Pardon me?

11          MR. PRICE:  May I have one second?

12          THE COURT:  Sure.

13          MR. PRICE:  Your Honor, I would move to admit

14   Defense Exhibit 36 into evidence, please.

15          THE COURT:  Objection?

16          MR. SIMON:  No objection, Judge.

17          THE COURT:  Okay, it will be entered.

18          (Defense Exhibit No. 36 is admitted into

19   evidence.)

20   BY MR. PRICE:

21   Q    I'd like to turn your attention to Defense Exhibit

22   40.  This is another February 2017 thread where a

23   Googler says, "Personally, I can't think of a world

24   where we do a good and thorough job with runtime

25   permissions across Google apps that doesn't confuse

**Exhibit E, pg. 243**

McGRIFF - DIRECT                244

 1   the hell out of our users."  Are you aware of that

 2   email.

 3   A   I'm aware that that is a statement in this email,

 4   yes.

 5            MR. SIMON:  Judge --

 6            MR. PRICE:  I would like to move Defense

 7   Exhibit 40 into evidence, as well, Your Honor.

 8            MR. SIMON:  Judge --

 9            THE COURT:  Is there an objection?

10            MR. SIMON:  Judge, I would only ask -- I'm

11   not going to object to it being admitted, but a lot of

12   these emails, including Defense Exhibit 40, has

13   multiple pages, and I recognize that there's been prep

14   here, but just to give the witness a second to look at

15   the pages before pointing out the one sentence would

16   be, I think, helpful.

17            THE COURT:  That makes good sense.

18            So this is Defense 40, which is marked as

19   Exhibit 236 in the first page.  And I'm going to enter

20   it into evidence.

21            And I will say, with your last set of

22   questioning, you were going back and forth from one

23   page to a page previous, and that was confusing.  So I

24   agree that you should be clear and certainly allow

25   Mr. McGriff time to absorb it.

**Exhibit E, pg. 244**

McGRIFF - DIRECT                    245

1           MR. PRICE:  Thank you, Your Honor.

2           (Defendant's Exhibit No. 40 is admitted into

3    evidence.)

4    Q   This is page 5 of that PDF, of Exhibit 236.

5           THE COURT:  I confused us by saying 236.

6    It's 236 in the Arizona case.  We should use our own

7    exhibit numbers.

8    BY MR. PRICE:

9    Q   So page 5 of Defense Exhibit 40.

10          MR. SIMON:  Judge, I don't think we have

11   exact page numbers.  The bottom right of all of these

12   *Google v. Arizona* emails what appears to be, like, a

13   Bates stamp in their last five or three numbers,

14   however you want to say it, but it looks like, you

15   know, for this email it starts -- is this 236?

16          MR. PRICE:  We can move on.  I actually don't

17   have any other questions about this chain.

18          THE COURT:  Well, you just quoted something.

19   Why don't you put on the record where you quoted it

20   from.  Something about "I can't imagine where," blah,

21   blah, blah.

22   BY MR. PRICE:

23   Q   This is the fifth physical page.

24          THE COURT:  Look at the Bates number on the

25   bottom right.  You can also identify it by what the

**Exhibit E, pg. 245**

McGRIFF – DIRECT                    246

 1    first sentence is at the top of the page.

 2              MS. KOENIG:  It's not showing me the exhibit,

 3    Kathy.

 4              THE CLERK:  I think you must have turned it

 5    off.

 6              MS. KOENIG:  Let me unplug it and try it

 7    again.  There we go.

 8    BY MR. PRICE:

 9    Q    Do we have it here?  So this is the page that is

10    Bates stamp No. GOOG --

11              THE COURT:  Just the last five digits.

12              MR. PRICE:  27381.

13              THE COURT:  Thank you.  And what did you

14    place into the record?

15              MR. PRICE:  I'll read it again.  It says,

16    "Personally, I can't think of a world where we do a

17    good and thorough job with runtime permissions across

18    Google apps that doesn't confuse the hell out of our

19    users."

20              THE WITNESS:  I don't think that's on that

21    page.

22              THE COURT:  No, it's not.

23              MR. PRICE:  27379.

24              THE COURT:  All right.  It's in the first

25    full paragraph of 27379 that has a large redacted

**Exhibit E, pg. 246**

McGRIFF - DIRECT                    247

1    block right before it, and it's sent, Monday,

2    February 27, 2017, 23:37:44.  All right.  Now we know

3    where you are.

4              MR. PRICE:  Thank you for your patience.

5    BY MR. PRICE:

6    Q    So, in addition to these 2017 emails, Google

7    employees responded to the AP article in 2018, as

8    well; correct?

9    A    Is there a specific response you're speaking to or

10   just generally that we were aware of the AP article?

11   Q    Well, I'd like to show you Defense Exhibit No. 32.

12   Do you have it?

13   A    Yes, I do.

14   Q    Great.  So, you recognize this as an email chain

15   in which Google employees are expressing concerns over

16   the AP article?

17   A    The entire exchange is redacted except for one

18   section.

19   Q    There's one section that's not redacted from

20   August 13, 2018 at 9:38 a.m.

21   A    That's correct.

22   Q    And you recognize that as an email in response to

23   the 2018 Associated Press article?

24   A    That's correct, yes.

25   Q    Okay.  The email says that Google employees -- and

**Exhibit E, pg. 247**

McGRIFF - DIRECT                     248

1   this is the page we're looking at here.  It's page 4

2   of the PDF.

3             THE COURT:  No, it is Bates No. 1523.

4             MR. PRICE:  Bates No. 1523.

5             THE COURT:  We do not have page numbers on

6   the PDFs.

7             MR. PRICE:  That is true.

8   BY MR. PRICE:

9   Q    So on the page marked 1523, the email says that

10  Google employees had what they called an "Oh Shit"

11  meeting -- excuse my language, Your Honor -- meeting

12  about the AP article; is that correct?

13  A    It is my understanding that that is a regular

14  meeting that that team has.

15  Q    That's a regular meeting that the team has?

16  A    That's correct.  That's why it says "our Monday

17  morning 'Oh Shit' meeting."

18  Q    Good to know.  It says, "Both comms and policy are

19  looking for an update on where we are in terms of

20  fixing Location History."  Is that what it says?

21  A    That is what it says, yes.

22  Q    And Google prepared a PowerPoint of the impact of

23  this AP article on Location History; is that correct?

24  A    Is that an exhibit that I can --

25             MR. PRICE:  Actually, I apologize, Your

**Exhibit E, pg. 248**

McGRIFF - DIRECT          249

1    Honor.  Before we move on, I would like to introduce

2    Defense Exhibit 32 into the record.

3              MR. SIMON:  No objection, Judge.

4              THE COURT:  All right.  It will be moved into

5    evidence.

6              (Defense Exhibit No. 32 is admitted into

7    evidence.)

8              MR. PRICE:  As well as Defense Exhibit 40.

9              MS. KOENIG:  I'm sorry.  We did that one.

10             MR. PRICE:  We did that one.  Okay.

11             THE COURT:  40 you're not objecting to?

12             MR. SIMON:  Without objection, Judge.

13             THE COURT:  It will be entered.

14             (Defense Exhibit No. 40 was admitted into

15    evidence on page 244.)

16   BY MR. PRICE:

17   Q   So Google prepared a PowerPoint presentation of

18   the impact of the Associated Press article on the

19   Location History product; is that correct?

20   A   Are you referring to a specific PowerPoint?

21   Q   I am.  I'll bring it up as Defense Exhibit 33.

22   It's from August 16, 2018.

23   A   Yes, a PowerPoint was prepared for this incident

24   as we would for any incident.

25   Q   And we are on Bates No. 01458, Your Honor.

**Exhibit E, pg. 249**

McGRIFF - DIRECT                    250

1          THE COURT:  Uh-huh.  Thank you.

2    BY MR. PRICE:

3    Q   One slide here -- and this is 56, Laura -- shows a

4    large jump in searches for -- that's Location History.

5    It's Bates No. 01475.

6          THE COURT:  47 --

7          MR. PRICE:  Five.

8          THE COURT:  Five.  Okay.

9    Q   Are you aware?

10   A   Yes, I'm aware that this slide quotes a spike

11   here, yes.

12   Q   It shows a very large increase in the number of

13   search queries related to Google Location History; is

14   that correct?

15   A   That's correct.

16          MR. PRICE:  I'd like to move Defense Exhibit

17   33 into evidence.

18          THE COURT:  Any objection?

19          MR. SIMON:  No objection.

20          THE COURT:  It will be entered.

21          (Defense Exhibit No. 33 is admitted into

22   evidence.)

23   BY MR. PRICE:

24   Q   In fact, I don't know if this is surprising or was

25   surprising to you, but Google has never actually

**Exhibit E, pg. 250**

McGRIFF - DIRECT                    251

1  advertised Location History to its users; is that

2  correct?

3  A    Can you clarify what you mean by "advertise"?

4  Q    Sure.  I'll show you Defense Exhibit 34.  Tell me

5  when you have it.

6  A    34, yes.

7           MR. PRICE:  Let us get the Bates stamp number

8  for you, Your Honor, before proceeding.  I do not

9  believe -- so this does not have Bates stamps, but it

10 is on page 37 of the actual document.

11 BY MR. PRICE:

12 Q    Do you have it?

13 A    Yes.

14 Q    Okay.  It says, As of today, we have not located

15 online advertisements for Location History or Web &

16 App Activity.  If we locate any such responsive

17 materials, we will promptly produce these

18 representative examples.

19      So the question is whether Google has ever

20 advertised Location History to its users?

21 A    I see.  So it's specifically referencing

22 newspapers ads, magazines ads.  In that context, no,

23 we have not run any newspaper ads or magazine ads that

24 I'm aware of, no.

25 Q    Thank you.

**Exhibit E, pg. 251**

McGRIFF - DIRECT                    252

1          MR. PRICE:  Your Honor, I'd like to move

2    Exhibit 34 into evidence as well.

3          THE COURT:  Any objection?

4          MR. SIMON:  No objection, Judge.

5          (Defense Exhibit No. 34 is admitted into

6    evidence.)

7    BY MR. PRICE:

8    Q   Referring to Location History settings, Google

9    employees once again emailing, and this is Defense

10   Exhibit 30, had some more to say about the Associated

11   Press article.  Can you go down?  All right.

12        So this is page 7 of the actual PDF, and we'll get

13   a Bates stamp number in a second.  It is Bates 01271.

14   Are you aware of these emails?  These are from

15   August 14, 2018.

16   A   I see that these are emails, yes.

17   Q   And they're referring to location settings.  You

18   have one Google employee here who writes, "It's a bit

19   complicated, and we might need better messaging."  Do

20   you see that?

21   A   That is what the message says, yes.

22   Q   Are you aware of that?

23   A   I see that now, yes.

24   Q   And another Google employee wrote -- this is on

25   Bates 01270.  Another Google employee wrote, "I agree

**Exhibit E, pg. 252**

McGRIFF - DIRECT                    253

 1  with the article.  Location off should mean location

 2  off; not except for this case or that case."  Do you

 3  see that on the email?

 4  A   I see that that's what's written here.

 5            THE COURT:  Where is it?

 6            MR. PRICE:  This is Bates -- there you go.

 7            THE COURT:  I got it.

 8  BY MR. PRICE:

 9  Q   And then it goes on to say, "The current UI" --

10  what's UI?

11  A   User interface.

12  Q   "The current UI feels like it is designed to make

13  things possible, yet difficult enough that people

14  won't figure it out.  New exceptions, defaulted to on,

15  silently appearing in settings menus you may never

16  see."

17      So these are all responses to -- Google employees

18  responding to the 2018 AP article; is that correct?

19  A   These are people responding to the AP article,

20  yes, that's correct.

21  Q   Great.

22            MR. PRICE:  Your Honor, I would like to

23  introduce Defense Exhibit 30 into evidence, please.

24            MR. SIMON:  Judge, I would ask to -- I would

25  object to a fair amount of this coming in.  So I

**Exhibit E, pg. 253**

McGRIFF - DIRECT                     254

1   wouldn't object to 1266 through 1271, that top email

2   on 1271, getting in, but if the Court looks through

3   1271 through 1287, it's a lot of talk about stuff that

4   I don't think -- well, it's not relevant at all.  The

5   former President in is there, China restrictions in

6   there, Elon Musk, a lot of stuff that should be

7   redacted if the Court's going to allow this to be

8   introduced.

9            I would note that I think Defense Exhibit 35

10  is a cleaner version of this.  I could be wrong on

11  that.  But either way, I'd ask for the Court to admit

12  it subject to the extraneous emails at the bottom

13  starting on 1271 through 1287 being cut out.

14           MR. PRICE:  I don't think we have a problem

15  with that either.  We have no intention of asking

16  about Elon Musk or the former President.

17           THE COURT:  All right.  So the bottom half of

18  1271, which starts with "On Monday, August 13, 2018,"

19  blocked out entity "wrote," and the remainder of the

20  exhibit will be excluded and not entered into

21  evidence.

22           I agree that there seems to be some

23  duplication in Exhibit 35.

24           MR. PRICE:  Yes, Your Honor.  These emails

25  are duplicated in multiple places.  The reason that we

**Exhibit E, pg. 254**

McGRIFF - DIRECT                    255

1  chose to use this version of it was because it

2  included the original formatting from those emails.

3  So you're more able to see who's writing what, which

4  people.

5          THE COURT:  Okay.  So the front part from

6  1266 to the top of 1271 and the cover page, which has

7  no number, will be admitted.  And the rest is

8  excluded.

9          (Defense Exhibit No. 30 is admitted into

10  evidence.)

11  BY MR. PRICE:

12  Q   In fact, this email chain continues in Defense

13  Exhibit 31, and it is not all contained in one

14  exhibit.  So I direct your attention, Mr. McGriff, to

15  Defense Exhibit 31, which is the same thread of emails

16  from August 14, 2018.  And this is Bates 01289.  Let

17  me know when you have it.

18  A   I have it, yes.

19  Q   So one Google employee writes that it is

20  "Definitely confusing from a user point of view if we

21  need googlers explain it to us."

22       And a little bit further down.  Is that correct?

23  Sorry.

24  A   That is what it says, yes.

25  Q   And a little further down, user adds or an

**Exhibit E, pg. 255**

McGRIFF - DIRECT                    256

1   employee adds -- this is Bates 01290.  "Also seems

2   like we are not very good at explaining this to

3   users." Going on -- is that correct?

4   A   That is what it says.

5   Q   And then another Google -- the same Google

6   employee writes, "Indeed we aren't very good at

7   explaining this to users.  Add me to the list of

8   Googlers who didn't understand how this worked and was

9   surprised when I read the article."

10  A   That is what was written there, yes.

11  Q   So these are Google employees who are reading this

12  article and are surprised to learn how Google's

13  location settings actually work?

14  A   I would frame it as this is a group of Googlers

15  commenting on the interaction of Google settings, yes.

16  Q   That same employee goes on to say, "Of course, we

17  shouldn't have to explain this to users.  The real

18  failure is that we shipped a UI that confuses users

19  and requires explanation"; correct?

20  A   That is what it says, yes.

21  Q   And that person goes on to suggest that "We should

22  redesign the UI so it's obvious what's happening, and

23  make it easy for users to choose the settings they

24  want in one place without parsing complex details

25  about product interactions."  Is that what it says?

**Exhibit E, pg. 256**

McGRIFF - DIRECT                     257

1   A   Yes.  I have no idea what UI they are talking

2   about, but that is what it says.

3   Q   And there's only one more thing that we can read

4   on this chain.  One more user just wrote, "Please

5   don't comment!"

6   A   That is what is written, yes.

7   Q   So from these emails -- excuse me one second.

8          MR. PRICE:  Your Honor, I would like to move

9   to admit Defense Exhibit 31, please.

10          THE COURT:  Objection?

11          MR. SIMON:  Judge, subject to the same

12   objection, there's a lot of extraneous talk.  I think

13   it's at all extraneous between 1293 and 1309.  So we

14   wouldn't object to admitting it but cutting out those

15   pages.

16          MR. PRICE:  That's acceptable to us, as well.

17          THE COURT:  All right.  It will be admitted

18   through 1292, and not 1293 through 1309.  I have an

19   extraneous document in here, I think.  It looks to be

20   a LexisNexis search.  Does somebody have that at the

21   end?

22          MS. KOENIG:  It was probably my putting this

23   together too hastily, Your Honor.

24          THE COURT:  All right.  Well, to the extent

25   it just looks as if somebody looked up a particular

**Exhibit E, pg. 257**

McGRIFF - DIRECT                      258

 1  case, it seems unrelated.  So that will not be

 2  admitted either.

 3          MR. PRICE:  Thank you, Your Honor.

 4          (Defense Exhibit No. 31 is admitted into

 5  evidence.)

 6  BY MR. PRICE:

 7  Q   Okay.  So following the AP story, following -- the

 8  Google employees wrote to each other about this issue

 9  over Location History; correct?

10  A   Employees discussed the article, yes.

11  Q   And then Google changed its privacy policy --

12  correct? -- in May of 2018?

13  A   The privacy policy?

14  Q   Uh-huh.  On May 25, 2018, Google issued an update

15  to its main privacy policy.  Are you aware of that?

16  A   I don't recall that.

17  Q   Perhaps I can refresh your memory.

18          MR. PRICE:  Can we see Defense Exhibit 43,

19  please.

20  Q   I'm showing you a redline version of the policy

21  when it was enacted on May 25.

22  A   Okay.  Sorry.  This is not -- okay, yes.  There

23  was a privacy policy update in May, yes.

24  Q   And this is the privacy policy that was updated?

25  A   Yes, this is a privacy policy update from

**Exhibit E, pg. 258**

McGRIFF - DIRECT                    259

1   May 2018.

2   Q   Okay.  And the previous one had --

3   A   But -- sorry.  I guess why I'm confused, this

4   privacy policy that you're referring to here was

5   before the AP article.

6   Q   I'm sorry.  It was a change before the AP article

7   after the Senate inquiry and after the Quartz article;

8   is that correct?

9   A   I'm sorry.  There was -- the -- I think these

10  things are orthogonal.  The privacy policy was updated

11  full stop independent of inbound letters specifically

12  from senators about Location History.

13  Q   I'm not saying that -- I'm not asking you if one

14  caused the other.  I'm just asking if this was the

15  privacy policy --

16          THE COURT:  Well, you sort of are.  You're

17  saying after the AP article, Google updated its

18  privacy policy.  So you're suggesting there is a

19  relationship.  So let him answer the way he wants to

20  answer.

21  A   Yeah.  These are orthogonal events.  There are

22  many moving pieces happening all the time.  I assure

23  you, there's no way Google updated its privacy policy

24  in two weeks.  If the Senate letters were May 11, this

25  is May 25.  So this privacy policy update must have

**Exhibit E, pg. 259**

McGRIFF - DIRECT                    260

 1    been well in flight well before those letters were

 2    received, which would not be related to the AP article

 3    or the communication in that group digest about

 4    response to the AP article.

 5         So I guess that's why I'm just saying they're

 6    orthogonal.  There are a series of things that

 7    happened in the arc of everyone is always making

 8    further improvements, yes.

 9    Q    And Google had been talking about making changes

10    for quite some time to this language going back to at

11    least 2017, as we discussed earlier; correct?

12    A    In the privacy policy?

13    Q    The Location History language.

14    A    For the life of the product we have -- every

15    Google product we are always looking for ways that we

16    can provide further transparency and clarity.

17    Q    Does the feedback that you receive either in the

18    press or from members of Congress impact those

19    discussions?

20    A    I think all feedback informs those discussions on

21    a regular basis, yes.

22    Q    All right.  Great.  This privacy policy change

23    happened on May 25, 2018; is that correct?

24    A    That's correct, yes.

25    Q    Okay.  And you recognize this privacy policy

McGRIFF - DIRECT                      261

1    change?

2    A   I have not looked at this in some time.  Is there

3    a specific section?

4    Q   Yes, I just want to admit this.  So I would like

5    to know if you recognize this as Google's privacy

6    policy from May 25, 2018?

7    A   I could not certify that this is the privacy

8    policy as it stood on May 25, 2018.  It does appear to

9    be some iteration of the privacy policy at some point,

10   but that was several years ago now.

11   Q   It says that the -- if you go back up to the

12   top --

13           THE COURT:  Is there objection to him using

14   this at the very least as a demonstrative exhibit?  I

15   mean, this is essentially how this witness has

16   identified most of these exhibits.  It's not being

17   offered for the truth of the matter.  It says it's

18   May 25.  It's a redline version.  Can we at least

19   treat it on that basis?

20           MR. SIMON:  Yes, Judge.  Yes.

21           THE COURT:  Okay.  So it's admitted on that

22   limited basis.

23           MR. PRICE:  Thank you, Your Honor.

24           (Defense Exhibit No. 43 is admitted into

25   evidence.)

**Exhibit E, pg. 261**

McGRIFF - DIRECT                    262

1  Q   It says that the previous policy had been in

2  effect since December 18, 2017, right up at the top

3  there.

4           THE COURT:  You really have to --

5           MR. PRICE:  Sorry.

6  BY MR. PRICE:

7  Q   I'm at the first page at the very beginning where

8  it says "last modified," right underneath "privacy

9  policy."  There's December 18, 2017 crossed out, and

10 the next date there that's not crossed out is May 25.

11 A   Oh, I see.  That is the crossed out date.  This

12 shows that this was an update after the December 18,

13 2017 update, yes, that's correct.

14 Q   Are you aware that the previous policy, the one

15 that was in effect until December 18, 2017, did not

16 mention Location History whatsoever?

17 A   I was not aware of that, no.

18 Q   Were you aware that this is the first version that

19 mentions Location History by name?

20 A   Can you point me to the context where this

21 introduces Location History?

22 Q   Yes.  We are on page -- it was 7 of the PDF

23 itself.  It doesn't come with its internal page

24 numbers.

25           THE COURT:  So just say what headings are on

**Exhibit E, pg. 262**

McGRIFF - DIRECT                    263

1   it so we can look through the document quickly.

2   BY MR. PRICE:

3   Q   It's under the heading "Your location

4   information."  I'm at the bottom of the page that

5   contains that heading.

6   A   I would have to check to confirm, but that does

7   not ring correct to me, because we do have -- on the

8   location policies page, there is a mention and has

9   been a mention of Location History.  We did make an

10  update to that page to further refine the language

11  around Location History in 20- -- either later 2018 or

12  early 2019, but that was a refinement to existing

13  copy, not the introduction of.

14      In this particular draft where you have

15  redactions, is there a suggestion that all of this

16  content is new?

17  Q   There shouldn't be any redactions --

18  A   Sorry.  Not redactions.  I meant the crossed out

19  copy.

20  Q   This is Google's redline.  It's available on their

21  website.  The crossed out language is the old

22  language, and the language that isn't crossed out is

23  the new language.

24          THE COURT:  Okay.  I'm still not with you,

25  unfortunately.  So what part of the page is your

**Exhibit E, pg. 263**

McGRIFF - DIRECT                    264

1   Location History on?  Is it your --

2            MR. PRICE:  "Your location information."

3            THE COURT:  All right.  Now I'm with you.

4   BY MR. PRICE:

5   Q   Just to clarify, I'm asking about the privacy

6   policy that we're looking at, not the help pages.

7   A   I understand.  And this might just be my

8   misunderstanding of how it's structured or maybe how

9   it's labeled externally, but we do have on the broader

10  company policy's page under "technologies," there's a

11  whole section about location usage.  That copy was

12  refined, but it existed, which is why I'm surprised.

13  I would need to check.

14  Q   The copy that you're describing, is that the same

15  as the privacy policy or is that that something

16  different?

17  A   There's a broader privacy policy that has

18  sections, and one of those sections is like a

19  subsection.  It's, like, policies.google.com/location

20  or technologies/location, something like that.  And

21  there exists a description of the location copy.  That

22  was refined in this time period.  It wasn't

23  introduced.

24  Q   The technologies page and the copy that is there

25  is not included in the privacy policy itself?

**Exhibit E, pg. 264**

McGRIFF - DIRECT                    265

```
 1   A    I believe it is a part of the privacy policy

 2   because I think you have to go to the privacy -- I'd

 3   have to check.  I don't know.

 4            THE COURT:  He's not giving you the answer

 5   you want.  He's not able to say that this is the first

 6   time it ever appeared.  What he has just testified is

 7   that there is some kind of web policy that he is aware

 8   of, and he just said, I would be surprised if this

 9   were the first time it were in the privacy policy

10   because I'm aware that we had it in a bigger website

11   policy that had been refined.

12            So you just didn't get the answer you wanted,

13   even though you're going to argue that because it

14   doesn't have strike-throughs, this was the first time

15   it came in.  He's given you the answer he has.

16            MR. PRICE:  Thank you, Your Honor.  We will

17   move on.

18   BY MR. PRICE:

19   Q    Google changed the opt-in language for Location

20   History in 2018; correct?

21   A    By opt-in language, do you mean the consent?

22   Q    Yes.

23   A    The Location History consent itself has not

24   changed.

25   Q    The language in the consent flow didn't change at
```

McGRIFF - DIRECT                              266

1   all during 2018?

2   A    The consent flow is not the consent.   The actual

3   Location History consent has not changed.

4   Q    I'm speaking about the consent flow --

5            THE COURT:   Why don't you show an example.

6            MR. PRICE:   Laura, can we pull up

7   Mr. McInvaille's report.

8   BY MR. PRICE:

9   Q    Let me turn your attention to Defense Exhibit 7.

10           MR. PRICE:   Can you go up a little bit,

11  Laura?

12  BY MR. PRICE:

13  Q    So we see a screenshot here from early in 2018.

14  The language under Location History says "creates a

15  private map of where you go with your signed in

16  devices."

17  A    That's what is it says, yes.

18  Q    Right.   And can we go to the next figure, please.

19  This is a screenshot provided by Oracle, also in early

20  2018.   And it says "creates a private map of where you

21  go with your signed-in devices."

22  A    That is what it says.

23  Q    Right underneath Location History.

24       Can we look at the third one from the Norwegian

25  Consumer Council from July 2nd of 2018?   And in the

**Exhibit E, pg. 266**

McGRIFF - DIRECT                    267

 1   middle screenshot underneath Location History, it

 2   says, "Saves where you go with your devices."

 3   A    That is what it says, yes.

 4   Q    So that language is different from the previous

 5   two screenshots that we just discussed?

 6   A    That is not the Location History consent copy,

 7   which is in the expanded block in the third exhibit

 8   you reference, but the descriptive copy did change,

 9   yes.

10   Q    And that changed in 2018; is that correct?

11   A    That changed as a result of GDPR, yes.

12   Q    Do you know when it 2018 it changed?

13   A    When was -- I couldn't say exactly.

14            THE COURT:  As a result of what?  I'm sorry,

15   sir.

16            THE WITNESS:  Sorry.  One of the requirements

17   of GDPR was that we be able to centrally serve all

18   strings from a single data store.  So part of our

19   compliance with that policy was to standardize all of

20   these strings because they were leading from the same

21   store.  That work was in flight in 2018.

22            So depending on when the screenshots were

23   taken, you might see some slight variations as you

24   just pointed out in these two screens for the

25   descriptive copy itself, yes.

**Exhibit E, pg. 267**

McGRIFF - DIRECT                    268

1              THE COURT:  All right.  So GDPR?

2              THE WITNESS:  That's the General Data

3    Protection Regulation.

4              THE COURT:  Thank you.

5    BY MR. PRICE:

6    Q    That was a new law enacted in Europe governing the

7    privacy rights of individuals and their data?

8    A    That is correct, yes.

9    Q    So -- but Google had been discussing the need to

10   change this particular language for quite some time;

11   correct?

12   A    No.

13   Q    No?  You're not aware of the emails discussing the

14   need to change the "creates a private map" language?

15   A    Sorry.  I think some things are being conflated.

16   Which emails are you referring to?

17   Q    These are part of the *Arizona v. Google* emails,

18   the emails that Google turned over to the Arizona

19   Attorney General.

20   A    If I recall -- I would need to see the exchange,

21   because if I recall the exchange you're referring to,

22   it's referring to a different set of disclosures that

23   we were working to align our presentation, but is

24   there an example here?

25   Q    Sure.

**Exhibit E, pg. 268**

McGRIFF - DIRECT                    269

1          MR. PRICE:  Can we show Defense Exhibit 41,

2     please?  And this is Bates 57339.

3          MR. DUFFEY:  379?

4          MR. PRICE:  57339.

5     A    I see it, but to my previous point, this exchange

6     is referring to a different string of copy.  It's not

7     referring to the -- what's being discussed at the

8     bottom is not related to the "creates a private map."

9     The "creates a private map" in quotes there is like

10    the language was just like a flag of the page where

11    this language appears, but this exchange specifically

12    was in reference to the conflation with WAA that was

13    discussed, which is why it was relevant in the Arizona

14    matter.

15    Q    When did this copy appear that's being discussed?

16    A    There's that descriptive string that says "saves a

17    map of the places where you go with your signed-in

18    devices" or "creates a private map."  That is not what

19    we were discussing here.  This exchange at the bottom

20    is specifically referring to -- yeah, this was

21    broader.  I guess, maybe I'm not following the

22    connection.

23    Q    Well, the consent flow, at least the initial

24    screen with the one-line description, changed sometime

25    in 2018.  It used to say "creates a private map," and

**Exhibit E, pg. 269**

McGRIFF - DIRECT                    270

 1   it doesn't anymore.  This email exchange appears to be

 2   talking about whether to change the "creates a private

 3   map" language, which a Google employee describes as

 4   one of the most admired pieces of prose in the privacy

 5   space at Google.

 6   A   Okay.  I'm just not following.  I apologize.  This

 7   language is referring -- so, the exchange here is

 8   referring very broadly to the descriptive copy, yes.

 9   Maybe I'm missing the point.  Sorry.  What's the

10   question for me?

11   Q   It says that Google had a long, mostly political,

12   fight over the private map language.  I apologize.

13   It's on the next page.

14            THE COURT:  340?

15            MR. PRICE:  Yes, Your Honor, in the middle of

16   the page.

17   A   I'm sorry.  That is what it says, yes.

18   Q   And you don't recall what this is in reference to?

19   A   No.  It says what it's in reference to.  This is

20   in reference to the descriptive copy.  It's not

21   related to the Location History consent copy at all.

22   It's how exactly it's framed.  And this discussion is

23   in the context of the alignment of all the copy

24   because we were going to consolidate and all read from

25   the same central store.

**Exhibit E, pg. 270**

McGRIFF - DIRECT                    271

1   Q   So you're saying there was secondary copy, that

2   second screen that you're talking about, that

3   contained this language at some point?

4   A    No.   There's the LH consent copy, which has been

5   static.   That has not changed.   And then there was

6   descriptive copy that would appear in a snippet either

7   immediately before, and then there's also immediately

8   after.

9        In that time period, we were looking at refining

10  and aligning the descriptive copy strings because

11  prior to that point, they were all baked into the

12  native apps.

13       So if you had to make a change, for example, on

14  IOS, you had to submit an update to the app store.   If

15  you had to make a change on Android, you had to

16  publish a new APK.   We had to do it manually.

17       Part of what we were doing in 2018 was aligning so

18  that these were all readable from some single store.

19  And they weren't baked into the app.   Instead the app

20  was just calling to say what string should I show in

21  this WAA.

22       So there was lot of discussion around how can we

23  further refine all of those strings to make them

24  consistent with each other in terms of their framing.

25  This exchange is specifically referencing, it sounds

**Exhibit E, pg. 271**

McGRIFF - DIRECT                    272

1    like, several of the different controls.  So, yes,

2    several of the different controls and balancing the

3    pros and cons of different options.

4        They don't speak specifically to the consents

5    because the consents weren't being changed.  It's just

6    simply to the descriptive copy around the consents.

7    Q    So this is talking about a change to the

8    descriptive copy?  That one line underneath where it

9    says Location History.

10   A    The exchange is speaking to the descriptive copy

11   around the consent, that's correct.

12   Q    And one employee actually goes on to say, "My

13   preference is 'Saves where you go with this device'";

14   correct?

15   A    Yes, I see that here.

16   Q    And that is very, very similar to what the first

17   screen in the Location History consent flow, the

18   descriptive screen, ends up being changed to; correct?

19   A    That is correct, yes.

20   Q    So was it a coincidence?

21   A    So, this is from 2017, January.  So coincidence

22   with what?

23   Q    That -- you're saying that this discussion is not

24   referencing a change to the Location History

25   description during the consent flow process.

**Exhibit E, pg. 272**

McGRIFF - DIRECT                273

1   A    I apologize.  Maybe I'm getting confused.  There

2   are always discussions in flight around how we can

3   further improve our products and services and further

4   clarify.

5        This discussion from 2017 is about changes that

6   might be suggested to, it looks like, various

7   controls, including Location History, to further

8   improve transparency around them.  So that is that.

9        So, yes, it is a discussion across several

10  controls over further improvements that can be made to

11  their descriptive copy, yes.  And then you're linking

12  this to the 2018 update?  To the Location History

13  page?

14  Q    No, I'm saying --

15           THE COURT:  Exhibit 17, are you comparing it

16  back to Exhibit 17?  That's his question.  You showed

17  him Exhibit 17 -- Exhibit 7, your expert's report.  Is

18  that what you're trying to carry it back to?

19           MR. PRICE:  Excuse me?  We're talking about

20  the -- I'm sorry.

21           THE COURT:  The descriptive text on Exhibit 7

22  under Location History from 7-2-2018, which is how you

23  began this process, says "saves where you go with your

24  devices."  Is that the link you're trying to make?

25           MR. PRICE:  Yes.  I'm asking if the

**Exhibit E, pg. 273**

McGRIFF - DIRECT                274

 1  discussion here had to do with the language that we

 2  see in this language change that eventually happened

 3  in 2018.

 4  BY MR. PRICE:

 5  Q    My question for you initially was, a discussion

 6  about this language had been in the works for quite

 7  some time, since at least 2017.

 8  A    I see.  So this is why -- I don't think you can

 9  flatten it in the way that you're attempting to,

10  because of the screenshots being from a point in time.

11  For example, I could leave this courtroom right now

12  and go to a Best Buy and buy a device that's three

13  years old and take it off the shelf and take

14  screenshots.  The images that I see would be taken

15  today but be a reflection of what was baked into that

16  device when it was shipped to the shelf three years

17  ago.

18      So the screenshots here, the date of the

19  screenshots is not sequential in terms of when we

20  release the copy updates.  So the language decisions

21  being discussed here in your Exhibit 41 around "saves

22  a map," those were likely introduced into production

23  shortly after.  It is highly probable that --

24  especially because these are from a series of

25  different sources with very different narratives and

McGRIFF - DIRECT                    275

1    very different agendas.

2         Oracle is going to find the least favorable

3    example.  And so they'll use a screenshot that's

4    beneficial to them.  In a research study, they might

5    just choose to benchmark when they're looking across

6    several different sources.  And they'll take

7    screenshots that were beneficial to them.

8         So from the screenshots alone, I can't say -- and

9    you can correct me if I'm wrong -- I can't say that

10   this change was before that change or was tied to the

11   Exhibit 41 discussion.

12        Based on reading these exchanges, this 2017

13   discussion was baked and put into prod, and at some

14   point percolate into -- I'm sorry.  Into production.

15   And at some point percolated into product.  These

16   screenshots are just at different points in time in

17   the life of the product.

18        So that is how you see the evolution here is not

19   directly tied to the previous things we've been

20   discussing, like the AP article or other changes that

21   were happening in 2018.

22             THE COURT:  All right.  We're done.  So it is

23   10 minutes almost after when I said I have to leave

24   because I have a conference call that is an emergency.

25   And so I apologize for the abrupt ending, but we'll

**Exhibit E, pg. 275**

McGRIFF - DIRECT                    276

1    continue this tomorrow.

2             And, sir, you will still be under oath.  You

3    can't discuss your testimony with anyone.  That will

4    give us time.  Maybe all of us will be a little more

5    clearheaded about what relates to what, not at

6    5 o'clock in the evening.  And we'll pick up from

7    there.  So the cross will continue.

8             I'm going to remind everybody to make sure

9    that your witnesses are sequestered.  Can we start

10   tomorrow at nine?

11             MR. PRICE:  Yes, Your Honor.

12             MR. SIMON:  Yes, Your Honor.

13             MR. GILL:  That's fine, Judge.

14             THE COURT:  All right.  So we will begin

15   tomorrow at nine.  And if folks want to call in, they

16   may do so then.

17             Is there anything else I need to cover?

18             MR. SIMON:  Nothing further, Judge.

19             MR. PRICE:  Nothing further.  Thank you, Your

20   Honor.

21             THE COURT:  Okay.  My apologies for this call

22   happening, but I have no control.

23             (The proceedings were adjourned at 4:55 p.m.)

24

25

**Exhibit E, pg. 276**

277

1      I, Diane J. Daffron, certify that the foregoing is

2   a correct transcript from the record of proceedings

3   in the above-entitled matter.

4

5                        /s/
      _____    _____

6                  DIANE J. DAFFRON, RPR, CCR      DATE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

278

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF VIRGINIA
2                  RICHMOND DIVISION

3

4   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                     )
5   UNITED STATES OF AMERICA         )
                                     )    Criminal No.
    v.                               )    3:19CR130
6                                    )
    OKELLO T. CHATRIE                )    March 5, 2021
7   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _)

8                      **DAY TWO**

9      COMPLETE TRANSCRIPT OF MOTION TO SUPPRESS
        BEFORE THE HONORABLE M. HANNAH LAUCK
10            UNITED STATES DISTRICT JUDGE

11

12  APPEARANCES:

13  Kenneth R. Simon, Jr., Assistant U.S. Attorney
    Peter S. Duffey, Assistant U.S. Attorney
14  U.S. Attorney's Office
    SunTrust Building
15  919 East Main Street, Suite 1900
    Richmond, Virginia   23219
16
    Nathan P. Judish, Assistant U.S. Attorney
17  U.S. Department of Justice
    950 Pennsylvania Ave., NW
18  Washington, Virginia   20530

19          Counsel for the United States

20  Laura J. Koenig, Assistant Federal Public Defender
    Paul G. Gill, Assistant Federal Public Defender
21  Office of the Federal Public Defender
    701 E. Broad Street, Suite 3600
22  Richmond, Virginia   23219

23          Counsel for the Defendant

24          DIANE J. DAFFRON, RPR
            OFFICIAL COURT REPORTER
25         UNITED STATES DISTRICT COURT

**Exhibit E, pg. 278**

279

```
 1    APPEARANCES:  (Cont'd)

 2    Michael W. Price, Esquire
      National Association of Criminal Defense Lawyers
 3    1660 L Street, NW
      12th Floor
 4    Washington, DC   20036

 5          Counsel for the Defendant

 6

 7                    I N D E X

 8
                        DIRECT  CROSS  REDIRECT
 9
      MARLO McGRIFF          282     374     424
10
      SARAH RODRIGUEZ        445     485     499
11
      JEREMY D'ERRICO        506     550     593
12
      JOSHUA HYLTON          599     623     646
13

14

15              E X H I B I T S

16                                          Page
      DEFENDANT'S EXHIBITS:
17
      No. 18     Federal Search Warrant Application   636
18
      No. 19     State Search Warrants & Application  632
19
      No. 24     Rodriguez Declaration                449
20
      No. 41     AZ Ex. 260                           283
21
      No. 43A    Privacy Policy - Redline             301
22
      No. 44     Jan. 2019 Privacy Policy - Redline   302
23
      No. 45     Oct. 2019 Privacy Policy - Redline   322
24
      No. 51     2019 NYT Article                     303
25
```

**Exhibit E, pg. 279**

280

GOVERNMENT'S EXHIBITS:                                    Page

No. 1        CAST PowerPoint Presentation        515

No. 2        Geofence Warrant                    522

No. 3        Declaration of Marlo McGriff        375

No. 3A       Declaration of Sarah Rodriguez      486

No. 3B       Supplemental Declaration of McGriff 375

No. 3C       Third Declaration of Marlo McGriff  375

No. 4        Joshua Hylton Emails with Google    621

No. 5        Google Privacy Policy               386

No. 5A       Google Terms of Service             386

No. 6        Special Agent D'Errico's C.V.       511

No. 12       Video                               395

**Exhibit E, pg. 280**

281

1          (The proceedings in this matter recommenced

2     at 9:05 a.m.)

3          THE CLERK:  Day two.  Case No. 3:19CR130,

4     United States of America versus Okello Chatrie.

5          The United States is represented by

6     Kenneth Simon, Peter Duffey, and Nathan Judish.  The

7     defendant is represented by Laura Koenig, Michael

8     Price, and Paul Gill.

9          Are counsel ready to proceed?

10          MR. SIMON:  The United States is ready, Your

11    Honor.

12          MS. KOENIG:  The defense is ready, Your

13    Honor.  Good morning.

14          THE COURT:  All right.  Well, welcome back.

15    We have folks on AT&T.  So I just need to remind our

16    individuals who are joining us by conference call

17    through AT&T that we have a local rule, Criminal Rule

18    53, and a standing order that prohibits the separate

19    recording or transmission or broadcast of this

20    hearing.  We have our court reporter here making our

21    official court record, and there will be no other

22    record made in the case.

23          So thank you all again.  We're all ready to

24    go.  I see that Mr. McGriff is on the stand.

25          And, Mr. McGriff, I have to remind you that

**Exhibit E, pg. 281**

McGRIFF - DIRECT                     282

1   you're still under oath.  And we will continue where

2   we left off yesterday.  Thank you all very much.

3            MR. PRICE:  Thank you, Your Honor.  Good

4   morning.

5            THE COURT:  Good morning.

6   BY MR. PRICE:

7   Q    Good morning, Mr. McGriff.

8   A    Good morning.

9   Q    How are you?

10  A    Doing well.  How are you?

11  Q    I'd like to start with just a bit of housekeeping

12  from the end of the day yesterday.  We were talking

13  about Defense Exhibit 41, which is an email chain from

14  January 28, 2017, in which Google employees are

15  discussing the language used to describe Location

16  History.  Do you recognize that email?

17  A    Yes, this is the email from yesterday.

18            MR. PRICE:  I would just move to admit this

19  into evidence, Your Honor.

20            THE COURT:  Is there any objection?

21            MR. SIMON:  No objection, Judge.

22            MR. PRICE:  Thank you.

23  BY MR. PRICE:

24  Q    Now, yesterday you --

25            THE COURT:  I'm just going to say on the

**Exhibit E, pg. 282**

McGRIFF – DIRECT                    283

1    record that it's entered.  We all know it is, but I

2    hadn't gotten to that page of your exhibit list yet.

3    Pardon me.

4              (Defense Exhibit No. 41 is admitted into

5    evidence.)

6    BY MR. PRICE:

7    Q   Yesterday you testified that you didn't know the

8    precise number of users with Location History enabled

9    in 2019?

10   A   No, I do not know that precise number.

11   Q   But you did say in your affidavit that roughly a

12   third of active users had Location History enabled in

13   2019?

14   A   Active Google accounts, yes.

15   Q   And that that amounted to numerous tens of

16   millions of Google users.  Could you walk us through

17   how you got to that figure, one-third and numerous

18   tens of millions?

19   A   At the time that that was being prepared, we

20   looked at the total number of users who had Location

21   History enabled for their account.  That figure was

22   prepared over a year ago.  I believe we also looked at

23   the number of active Google accounts.  And then I

24   believe we also looked at, for Location History

25   specifically, whether or not the account was active.

**Exhibit E, pg. 283**

McGRIFF - DIRECT                    284

1  Q   Okay.  Do you recall what the whole number with

2  Location History enabled was?

3  A   I don't recall the whole numbers.  Again, we

4  prepared those, at this point, well over a year ago.

5  Q   So you came out with the figure of one-third.  How

6  did you figure out the denominator?

7  A   We looked at the total number of Google accounts

8  as provided by that team, and we asked at the time for

9  the life of the product.  The number has always

10 roughly been a third.  And so when we were preparing

11 the -- I believe it was the first brief, and then also

12 my first declaration, we verified all the numbers

13 again, and it was still roughly a third.

14 Q   But you have no recollection of what that number

15 was?

16 A   I could not recall that number off the top of my

17 head.  I'm sorry.

18 Q   So within 50 million?

19 A   I do not recall that number off the top of my

20 head.  I'm sorry.

21 Q   All right.  Shift gears a little bit.  I want to

22 call your attention to your third exhibit or your

23 third declaration, which is Exhibit 23, the second

24 page, in which you say Google's records reflect that

25 Okello opted in to the Location History service on

McGRIFF - DIRECT                    285

1    July 9, 2018; is that correct?

2    A    That is what it says, yes.

3    Q    At 4:09 UTC?

4    A    That is what it says, yes.

5    Q    And Location Reporting was enabled at the same

6    time?

7    A    That is correct, yes.

8    Q    And that can only happen, according to your

9    declaration, when the opt-in occurs through a device

10   based consent flow?

11   A    That is correct.

12   Q    In other words, you can't -- you can say you're

13   sure it happened on the phone and not on a browser on

14   a desktop?

15   A    That's correct, yes.  Excuse me.  Just to clarify.

16   That it happened on that specific device, yes.

17   Q    Thank you.  On the third page, you say that you,

18   as in Google, does not have a record of the specific

19   interface, i.e., the particular application or setting

20   opt-in screen that Mr. Chatrie used to enable Location

21   History; is that correct?

22   A    That is correct, yes.

23   Q    But as of July 9, 2018, it was possible to opt in

24   to Location History when attempting to use a feature

25   powered by Location History.  That's what you wrote?

**Exhibit E, pg. 285**

McGRIFF - DIRECT                    286

1   A    That is correct, yes.

2   Q    And it's true?

3   A    That is true, yes.

4   Q    An example would be the Google Maps application?

5   A    That is correct, yes.

6   Q    Another example would be the Google Photos

7   application?

8   A    That is correct, yes.

9   Q    And another example would be the Google Assistant

10  application?

11  A    At that time we were removing the opt-in through

12  Assistant.  I think one of the things we were looking

13  into was it still possible on that exact date, but

14  there was support roughly in that time period to opt

15  in to Location History through Assistant, yes.

16  Q    You don't mention Google Assistant in your

17  application, do you, or in your declaration?

18  A    In my application --

19  Q    Your declaration, sorry.

20  A    In my declaration, I don't believe I mentioned an

21  exhaustive list of opt-ins.

22  Q    Okay.  And just to be clear, Location History

23  could have been enabled here through the Google

24  Assistant setup?

25  A    That is possible, yes.

**Exhibit E, pg. 286**

McGRIFF - DIRECT                    287

1   Q   Okay.  The defense has an expert opinion saying

2   that based on a forensic examination of the phone,

3   Location History was enabled through the Google

4   Assistant app, which was installed at virtually the

5   same time.  You don't have any information to dispute

6   that, do you?

7   A   I do not, no.

8   Q   All right.  So with that in mind, I want to go

9   back and try and clear up a little bit of confusion

10  from yesterday.  You said that you didn't remember if

11  Google had changed its privacy policy on May 25, 2018;

12  is that correct?

13  A   I did not -- I do not recall any location specific

14  changes in the privacy policy in May 2018, that is

15  correct.

16  Q   Okay.  Now, if you were to look at a list of

17  Google's past privacy policies and see those redlines,

18  would that refresh your recollection?

19  A   Possibly.  I don't often browse the broader

20  company privacy policy.

21  Q   Okay.  I'd like to show you a screenshot, if I

22  could, of one of Google's web pages that has a list of

23  all of the previous privacy policies in it.  Do you

24  recognize that?

25  A   I see that this is the privacy policy's page, yes.

**Exhibit E, pg. 287**

McGRIFF - DIRECT                    288

1    Q    Okay.  And it's helpful, actually.  It includes

2    versions showing track changes, comparing one version

3    to the other.  Can you take a look at the bottom of

4    the page and tell us whether Google changed its

5    privacy policy on May 25, 2018?

6    A    That is what the page suggests, yes.

7    Q    And the previous policy that had been in effect

8    since December was in effect since December 18, 2017?

9    A    That is what the page suggests, yes.

10   Q    So if you click on the link for comparison of

11   these two policies, you get something that looks like

12   this.  It's a redline of the new privacy policy

13   compared to the old one.  Does that look correct to

14   you?

15   A    That is correct, yes.

16   Q    So if we go and we look at this comparison, the

17   previous privacy policy didn't mention Location

18   History by name; is that correct?

19   A    Where's the comparison, sir?

20   Q    Oh, I'm sorry.  Can you please turn your attention

21   to what has been marked as Defense Exhibit 43A.  This

22   is the same -- you should have a copy of the document.

23   This is the same document we were looking at

24   yesterday.  It has the Google web page and link at the

25   bottom.

**Exhibit E, pg. 288**

McGRIFF - DIRECT                289

1          MR. SIMON:  Judge?

2          THE COURT:  Yes.

3          MR. SIMON:  I'm going to object to, I think,

4    the continued insistence despite the witness's

5    consistent answer.  He says May 2018 wasn't the first

6    time Location History, to his knowledge, was in a

7    privacy policy.  They keep showing him May of 2018,

8    not December of 2017.  If defense counsel is insisting

9    upon this, put them both next to him, let him look at

10   both policies, and then he can assess.  But I think

11   this redline is -- he's inserting his opinion that the

12   redline, the new words are all inserted as of May of

13   2018.  And there's no indication from just looking at

14   it that that's true.  So I'd ask for more context be

15   given to the witness about these two policies.

16         THE COURT:  I'm going to allow him to use

17   this document for whatever it's worth.  It doesn't

18   independently show up that the December 18th policy

19   existed without this document in it necessarily.  But

20   I think that can be argued one way or the other as far

21   as what inference can be drawn from the document.  And

22   you have argued your inference, and they are arguing

23   theirs.

24         If they have a separate document, then they

25   will respond to your objection, but if this is the one

**Exhibit E, pg. 289**

McGRIFF - DIRECT                    290

 1  they're using, then you all will each retain your

 2  positions.  So I'm going to overrule the objection.

 3          MR. SIMON:  Understood, Judge.

 4          MR. PRICE:  Thank you, Your Honor.

 5  BY MR. PRICE:

 6  Q   So the document that you have here is a comparison

 7  of those two provided by Google; correct?

 8  A   That is correct.

 9  Q   And the crossed out lines, that's the language

10  that was taken out from the December 2017 policy?

11  A   It appears that way, yes.

12  Q   And the language that's not crossed out is the

13  policy in effect as of May 2018?

14  A   That is what it appears to show, yes.

15  Q   I'd like to turn your attention to page 6, if I

16  could.  It says --

17          THE COURT:  Let him get there.

18          MR. PRICE:  Excuse me.

19  BY MR. PRICE:

20  Q   It says at the bottom of the screen there, "You

21  can also turn on Location History if you want to save

22  and manage your location information in your account";

23  correct?

24  A   That is correct, yes.

25  Q   And that is new language that didn't appear in the

**Exhibit E, pg. 290**

McGRIFF - DIRECT                    291

1   2017 policy; correct?

2   A   That appears correct.  One question.  Can you go

3   back to the policy's page that you were showing with

4   the comparison?

5   Q   Sure.

6   A   The top of the page.  I believe all of this

7   language is captured under "technologies" to the

8   right.  I don't know if this is an active page or just

9   a screenshot.

10          THE COURT:  So, I see you're interacting with

11   the screen.

12          THE WITNESS:  Sorry.

13   A   I believe this language is -- it appears very

14   familiar from the technologies section of the privacy

15   and terms.  I don't know if this is a screenshot --

16   Q   It's a screenshot.  It's not clickable.  So long

17   as we're talking about it, it may make sense to ask

18   you, the technologies page that you see here is

19   distinct from the privacy policy part of this page;

20   correct?

21   A   It is a separate section, yes.

22   Q   And the information in the technologies page is

23   not actually in the privacy policy's page; correct?

24   A   I believe that's what was done here with this

25   change, that's correct, yes.

McGRIFF - DIRECT                    292

1   Q    Thank you.  So, I want to turn your attention back

2   to that redline of the privacy policy and specifically

3   to page 12.

4             THE COURT:  Page 12 now, not page 6?

5   BY MR. PRICE:

6   Q    So, on page 12, it mentioned Location History one

7   other time.  It says, You can turn on Location History

8   if you want traffic predictions for your daily commute

9   or you can save your YouTube watch history to get

10  better video suggestions.

11  A    That is what it says, yes.

12  Q    I want you to take a look at this document and

13  tell me if it says anything else about Location

14  History.

15  A    All 25 pages?

16            THE COURT:  Yes.

17  Q    Yes, please.

18            MR. PRICE:  Your Honor, while we're taking a

19  minute, I wanted to let you know that I'm getting word

20  from my colleagues at NACDL that people on the phone

21  cannot hear what is happening, that they were able to

22  hear at the beginning and that the audio stopped.

23            THE COURT:  Okay.  Just a second.  We'll call

24  IT.  Thanks for letting us know.

25            (AT&T is called.)

**Exhibit E, pg. 292**

McGRIFF - DIRECT                    293

1   A    That appears to be correct.   There are two

2   explicit references to Location History in the policy

3   as revised, yes.

4   Q    Thank you very much.   And those are both new

5   editions to the privacy policy?

6   A    It appears that (inaudible.)

7              THE COURT:   Wait a minute.   My court reporter

8   can't get this while the AT&T operator is talking.

9              Okay.   We'll just take a little break.   I'm

10  sorry.

11             THE CLERK:   Are folks able to hear us now?

12             A VOICE:   Yes, we can hear you now.

13             THE COURT:   All right.   Has anybody new

14  joined?   Do I need to give the same admonition?

15             THE CLERK:   I don't know the answer to that.

16             THE COURT:   All right.   I'm sorry.   We had a

17  technical drop of the call.   I do need to remind

18  anybody, if there are new folks there, that you can't

19  under our Criminal Rule 53 or our standing order

20  rebroadcast, record, or telecast any kind of recording

21  or version of this hearing.   Our court reporter is

22  creating our record here.

23             All right.   So why don't you ask the last --

24  I know, Mr. McGriff, you answered the question.   So

25  why don't we start with that, and then we can go

**Exhibit E, pg. 293**

McGRIFF - DIRECT                    294

1    forward.

2    A    There are two -- the two references you mentioned

3    are the two mentions of Location History explicitly in

4    the updated version, yes.

5    Q    Thank you.  And those appear to be new editions to

6    the privacy policy?

7    A    That is correct, yes.

8    Q    And the privacy policy doesn't say anything else

9    about Location History other than those two

10   references?

11   A    Yes, the privacy policy appears to include quite a

12   bit of additional information generally, yes.

13   Q    Thank you.  So at some point in 2018, what you

14   were calling yesterday the descriptive text for

15   Location History changed; correct?

16   A    What I was mentioning yesterday is that that

17   language changed, I believe, before 2018, yes.

18   Q    The language changed before 2018?

19   A    That is what I believe based on the document you

20   showed me yesterday, yes.

21   Q    You mean the email?

22   A    The email, yes.

23   Q    And did you see the screenshots from yesterday?

24   A    I did, yes.

25   Q    With the old language, the saves a private map

**Exhibit E, pg. 294**

McGRIFF - DIRECT                         295

 1  language going through the beginning of 2018 and the

 2  saves where you go with your signed-in devices

 3  appearing later in 2018?

 4  A    I did see those, yes.

 5  Q    You would agree that the language changed at some

 6  point?

 7  A    The language changed at some point within 20- --

 8  at some point from 2017 onward, yes.

 9  Q    But you can't say exactly when?

10  A    Not off the top of my head, no.

11  Q    Would it depend on the device that somebody was

12  using?

13  A    It would depend -- after the change is made, there

14  are a host of variables that can impact when a

15  specific user saw that change.  As I mentioned

16  yesterday, if I leave here right now and pick up any

17  device that has been sitting on a shelf for three

18  years, the language when that device starts up would

19  be dated to when it was baked into the device.

20  Q    Can I ask you about that?  I was confused

21  yesterday when you said that because my understanding

22  is that you would have to be connected to Wi-Fi and

23  signed in to your Google account in order to even be

24  asked about the permissions for Location History.  Is

25  that correct?

**Exhibit E, pg. 295**

McGRIFF - DIRECT                    296

1    A    You would need to be signed in and connected to

2    opt in to Location History, that's correct.

3    Q    And if you were connected to the internet and

4    signed in, the phone would update itself; correct?

5    A    Presumably, yes, that's correct.

6    Q    In fact, one of the first things a phone does when

7    it connects to the internet for the first time is

8    update itself; correct?

9    A    Not all screens and flows are updated, no.

10   Q    So you can't say which consent flow would have

11   been updated when?  It varies?

12   A    Not -- I mean, I don't know how to generalize this

13   statement, but there is not a call to the server for

14   every screen shown in almost any scenario.  Some of

15   that will be local.

16   Q    So sometimes it will update with new language and

17   sometimes it won't?

18   A    No.  The consent copy will not -- is read from

19   the -- well, again, I shouldn't generalize this.

20   Speaking about Location History specifically, you can

21   find a flow that references Location History, the

22   feature, that is baked into an APK.

23   Q    I'm sorry?  What?

24   A    You can find a flow that approaches the feature

25   that says Location History does this.  That is

**Exhibit E, pg. 296**

McGRIFF - DIRECT                    297

 1   potentially dated.  If it is not a screen that we can

 2   update on the server remotely, if it's not checking to

 3   get updated copy, those stale flows is what I would

 4   call it, we block those.  So those will not work.

 5   There's no way to opt in to that flow, but we are also

 6   unable to go and change that screen retroactively

 7   because it is already baked into the user interface.

 8   Q   So if it's an old consent flow, if it's one that's

 9   no longer supported, could Location History be

10   successfully enabled?

11   A   It cannot, no.

12   Q   So, in order to successfully enable Location

13   History, the language would have to be updated?

14   A   A successful opt-in needs to be a flow that is

15   currently supported.  If we no longer support the

16   flow, then that opt-in would fail silently, but,

17   again, because it's old.  We don't have a way to

18   return a message in the UI to tell the user that it

19   failed.

20       The user would attempt an opt-in.  It would fail

21   silently.  The server would say "I have an opt-in

22   request from a dated device."  And it will not

23   successfully opt the user in.  The user then would

24   notice that this happened only if they then attempted

25   another flow and were once again prompted to opt in to

**Exhibit E, pg. 297**

McGRIFF - DIRECT                298

 1   Location History.  The user would realize "I thought I

 2   already did," but they hadn't, and that's why they

 3   would be prompted again.

 4   Q    So we know in this case that Location History was

 5   successfully opted into?

 6   A    That is correct, yes.

 7   Q    So in order to do that, it would have been through

 8   the updated consent flow?

 9   A    It would have been through a currently supported

10   consent flow, that is correct, yes.

11   Q    And that would have been, at least for the

12   descriptive text, what language?

13   A    I don't know how.

14   Q    Would it be the

15   saves-where-you-go-with-your-devices or would it be

16   the creates-a-private-map language?

17   A    It would be some iteration of the copy that was

18   available at that time.  I don't know how I can

19   confirm that.  I remember from the research that we

20   did when I filed the declaration that we were not able

21   to determine the specific UI in that case.  Something

22   that we've changed since then.  We now do track this.

23   But at the time we were not.  So we were unable to

24   provide this specific screen of that opt-in at that

25   time.

**Exhibit E, pg. 298**

McGRIFF – DIRECT                299

1    Q    Okay.  All right.  Thank you.

2         Even though that language may have changed at some

3    point in time, getting rid of the private map

4    language, Google kept it around; correct?  It added it

5    to its 2019 privacy policy January 22.  Do you recall

6    that?

7    A    That that specific copy string was used again?

8    Q    Actually, I would like to turn your attention to

9    Defense Exhibit 44.  This is another redline showing

10   changes between the privacy policies.  This one

11   showing the changes in January 22, 2019.  Is that

12   correct?

13   A    That is what this appears to show, yes.

14   Q    Okay.  And if we could go down to page 4, please.

15   We see that it says that prior to January 22, with the

16   crossed out language, it says -- it used to read, You

17   can also turn on Location History if you want to save

18   and manage your location information in your account.

19   Is that correct?

20   A    That's correct.

21   Q    The old language?

22   A    Yes.

23   Q    But the new language starting on January 22, 2019,

24   reads, You can also turn on Location History if you

25   want to create a private map of where you go with your

**Exhibit E, pg. 299**

McGRIFF - DIRECT                    300

```
 1   signed-in devices; is that correct?
 2   A    That is correct, yes.
 3   Q    So the private map language came back in January
 4   of 2019?
 5   A    I never said that it went away.
 6   Q    Well, I meant compared to the descriptive text in
 7   the consent flow.  It was changed, according to your
 8   testimony earlier, that it changed at some point from
 9   saves a private map to saves where you go; correct?
10   A    Again, as I mentioned yesterday, we are always
11   looking for ways to further improve and clarify
12   products.  That a specific string was introduced does
13   not necessarily mean a previous string was retired.
14   That the decision was made by someone to include one
15   string versus the other here does not suggest that the
16   other string was deemed no longer usable or invalid.
17   The decision here on -- whoever made the decision on
18   which string to include here felt this was the best
19   for this context.
20   Q    In your opinion, is there a big difference between
21   those two phrases?
22   A    Between -- just to be clear, which two phrases?
23   Q    Saves a private map of where you go and saves
24   where you go with your device.
25   A    Big difference?  Neither changes -- either would
```

**Exhibit E, pg. 300**

McGRIFF - DIRECT                    301

1   be appended to the Location History consent, and that

2   text did not change in this period.  There seems to be

3   a limited difference in my opinion on these two.

4   Q   Okay.  Thank you.  So even though it says "create

5   a private map of where you go with your signed-in

6   devices," and this is in the privacy policy, the data

7   that gets saved doesn't get saved just on the device;

8   right?

9   A   No.

10  Q   It gets sent to Google?

11  A   That is correct, yes.

12  Q   Who uses it for advertising?

13  A   We use it at the account level to power quite a

14  few features, yes.

15  Q   And sometimes give it to the government?

16  A   We will always comply with a warrant.

17  Q   Okay.  Thank you.

18          MR. PRICE:  Just one housekeeping thing, Your

19  Honor.  I would like to move to admit both Defense

20  Exhibit 43A as well as Defense Exhibit 44 into the

21  record.

22          THE COURT:  Any objection?

23          MR. SIMON:  No objection, Judge.

24          THE COURT:  All right.  They will be entered.

25          (Defense Exhibit No. 43A and Defense Exhibit

**Exhibit E, pg. 301**

McGRIFF – DIRECT                    302

1   No. 44 are admitted into evidence.)

2   BY MR. PRICE:

3   Q   Okay.  So I'm sure you're aware that the *New York*

4   *Times* published an article about Location History in

5   April of 2019.

6   A   Yes, I'm aware of that.

7   Q   So I'd like to show you Defense Exhibit 51.  Is

8   this the article?

9   A   This is the article, yes.

10          MR. PRICE:  Your Honor, I'd move to admit

11   Defense Exhibit 51 into evidence.

12          THE COURT:  Any objection?

13          MR. SIMON:  Judge, we would object to

14   entering this article.  I think the relevance of it is

15   not there, Judge.  And I think it also is basically

16   attempting to enter a legal opinion, various legal

17   opinions, through this article.  He can question on it

18   as background information, Judge, but I think, again,

19   this just opens the record to, I think, even the

20   government putting articles in the record that show

21   the efficacy of solving violent crimes using this

22   warrant.  I'm just not sure why an article like this

23   is necessary to but in the record.

24          MR. PRICE:  Once again, we're not introducing

25   it for the truth of the matter.  We're not going into

**Exhibit E, pg. 302**

McGRIFF – DIRECT                    303

 1   any detail about what the article says.  Our interest

 2   here is in Google's response to it.

 3                THE COURT:  All right.  Well, I'll allow it

 4   in for that limited purpose.  It certainly is a public

 5   record.  I am going to say, Mr. Price, I want you to

 6   be consistent about not appearing that you are

 7   entering it in for the truth of the matter.

 8                MR. PRICE:  I will note that the next time,

 9   Your Honor.  Thank you.

10                THE COURT:  So the objection is overruled.

11                (Defense Exhibit No. 51 is admitted into

12   evidence.)

13   BY MR. PRICE:

14   Q   The title of the article is "Tracking Phones,

15   Google is a Dragnet for the Police"?

16   A   Yes, that is the title of the article.

17   Q   And the article's about geofence warrants like the

18   one in this case?

19   A   That is correct.

20   Q   And it specifically talks about Location History?

21   A   It does mention Location History, yes.

22   Q   Thank you.

23                MR. PRICE:  Your Honor, I hate to do this,

24   but I'm getting word again that the phone line has

25   gone dead.

**Exhibit E, pg. 303**

McGRIFF - DIRECT                304

1           THE COURT:  All right.  We're going to need

2      to not continue questioning while that happens.  Maybe

3      we can get IT in, please.

4           (AT&T is called.)

5           THE CLERK:  Can everyone hear us on the call?

6           A VOICE:  Yes.

7           THE COURT:  Can I ask you all, is there

8      something you hear before the phone call drops?

9           A VOICE:  No.

10          THE COURT:  And everybody has dropped off the

11     phone call, not just some?

12          A VOICE:  Yes.  I checked with a separate

13     party.

14          THE COURT:  All right.  So we're going to

15     call in our IT department and have them checking this

16     hopefully in a way that doesn't interrupt the flow of

17     our questioning here.  I have no idea what's

18     happening.  We have not had this problem before,

19     certainly with our AT&T system, but because of how

20     we're operating, I need to remind you all that you

21     can't rebroadcast this or record it pursuant to our

22     local rule and our standing order.

23          Ms. Koenig?

24          MS. KOENIG:  Your Honor, I just stood up

25     because I know that the Federal Public Defender Office

**Exhibit E, pg. 304**

McGRIFF - DIRECT                    305

 1  was having a widespread VPN connection problem earlier

 2  this morning.  And so since we are also connected with

 3  the judiciary, I don't know if it's a broader --

 4          THE COURT:  I hear the Federal Public

 5  Defender was having a widespread blah, blah, blah.

 6          MS. KOENIG:  A broader VPN connection

 7  problem.  So employees are remotely connecting in to

 8  our servers.  And that was earlier today.  I think the

 9  systems are separate, but I don't know if it indicates

10  maybe a broader issue with the AT&T connections that

11  are connected with the judiciary as well.

12          THE COURT:  All right.

13          Certainly, we'll have our IT folks look into

14  it, and we're doing the best -- we do have to keep

15  this process moving.  So I'm going to ask you to keep

16  questioning, please.

17          MR. PRICE:  Thank you, Your Honor.

18  BY MR. PRICE:

19  Q   So, Mr. McGriff, you're aware that the *New York*

20  *Times* article we were just talking about prompted

21  another email exchange between Google employees?

22  A   Is there a specific change you're referring to?

23  Q   Let me show you Defense Exhibit 37.  It's an email

24  chain that begins, I believe, the same day that the

25  *New York Times* article was published.

**Exhibit E, pg. 305**

McGRIFF – DIRECT                          306

1   A    Yes, I see that email, yes.

2   Q    Do you recognize it?

3   A    I can't say I recall it specifically, but that is

4   not to suggest that I may not have seen it in the

5   past.

6   Q    You would have been aware of emails responding to

7   the Location History story; correct?

8   A    Sorry.  Are you asking me about this specific

9   exchange?

10  Q    Generally.  You're aware of the other emails?

11  A    I'm aware that the article was discussed, yes.

12  Q    Okay.  And it was discussed here as well?

13  A    That appears to be the focus of this exchange,

14  yes.

15  Q    Thank you.

16          MR. PRICE:  Your Honor, I'd like to move

17  Defense Exhibit 37 into evidence, please.

18          MR. SIMON:  Judge, I'm not going to object

19  because, again, we've let these Google emails in.

20  These are cherry-picked emails from Arizona litigation

21  by Arizona.  This particular email has some back and

22  forth expressing legal opinions that not even this

23  witness or any witness that comes before this Court

24  will be able to express.

25          I think the Court should remove any opinions

**Exhibit E, pg. 306**

McGRIFF - DIRECT                307

 1   about this search warrant that are expressed in any of

 2   these emails.  And I think this is the email where you

 3   will have a lot of back and forth about the propriety

 4   of it.  And I think, again, it's creating a record in

 5   which you have folks who won't testify before this

 6   Court, who can't be cross-examined, who are expressing

 7   opinions about issues of material fact in this case.

 8          So I would object to this email being

 9   wholesale introduced, particularly as it relates to

10   opinions about the geofence warrant before the Court.

11          MR. PRICE:  Your Honor, the relevant opinions

12   in this email chain just relate to confusion over

13   Location History.  Again, we're not admitting it for

14   anybody's true statement about what Location History

15   does or doesn't do.  Simply to show that Google

16   employees were concerned, confused, and that's all.

17          THE COURT:  So you don't intend to quote

18   this?

19          MR. PRICE:  I do, but not for technical

20   statement or legal opinion.

21          MR. SIMON:  Judge, without that point -- not

22   to continue down this line, but we consistently

23   concede when they make that point, the reality is,

24   Judge, if that is proceeded with in depth, I don't

25   think they can come up with a nontruth-of-the-matter

**Exhibit E, pg. 307**

McGRIFF - DIRECT                    308

1    defense for these emails, particularly one talking

2    about a *New York Times* article addressing the geofence

3    warrant before -- the type of warrant before this

4    Court.  They are quoting from the article.  Some

5    expressing, Oh, this seems like a problem, and others

6    saying, Well, it doesn't.

7            I just think this sort of legal discussion in

8    emails in a record of appeal without clarification

9    creates a lot of confusion that I don't think we ought

10   to put into the record.

11           MR. PRICE:  If I quote a statement like that,

12   Mr. Simon can object.

13           THE COURT:  His point is it's in the record,

14   right?  His point is that when you put in these

15   documents in full, then it's in the record, and so

16   that anybody reading it would be reading the -- not

17   just, oh, it's for the purpose of confusion.  It's

18   that they're saying there's a problem.

19           I have not read through these emails in

20   depth.  I've certainly looked at all of your exhibits.

21   And I am -- I have some concern, especially the way

22   you've been cross-examining this witness by quoting

23   parts of the documents, that it feels as if you are

24   suggesting that the words in the documents are what

25   you are trying to put into the evidence.

**Exhibit E, pg. 308**

McGRIFF - DIRECT                    309

1        What you're having this witness say in

2   response is "I see those words are there."  I'm not

3   sure what you're getting out of that.

4        So I'm going to tell you, I'm going to admit

5   it for the limited purpose, but I'm also leaving open

6   the possibility of it being redacted or removed from

7   the record based on how it is utilized in the future.

8        But, you know, you're walking a thin line

9   here, Mr. Price.  I keep telling you, don't quote the

10  documents as if you are trying to get this witness to

11  adopt what's in them.  I know this is Exhibit 224 from

12  the Arizona case.  It says that.  Everybody is open

13  about it.  And the government is recognizing that this

14  is already a public record somewhere.  But I can tell

15  you, it doesn't say who's involved.  It doesn't say

16  what their position is.  It doesn't say in what

17  context that these emails went back and forth.  We

18  have no foundation for these emails in this court.

19  And this witness saying "I see that's what this

20  document says" is not moving this case forward very

21  much.

22        I am hoping that you will convince me in how

23  you are asking questions about these documents in the

24  future that you are not quoting certain quotes here

25  that feel as if you are trying to put in the record

**Exhibit E, pg. 309**

McGRIFF - DIRECT                310

 1    that Google has made admissions.  Okay?

 2              MR. PRICE:  Yes, Your Honor.  The point

 3    simply is that --

 4              THE COURT:  No, you don't get to summarize

 5    the point.  You're not testifying here.  Either you

 6    make the point through the witness or you don't.

 7              All right.  Please go forward.

 8    BY MR. PRICE:

 9    Q   Mr. McGriff, are you aware that some Google

10    employees expressed confusion over Location History

11    controls following the *New York Times* article?

12    A   I see that's what's discussed in this email, yes.

13    Q   And were you aware at the time that some employees

14    were concerned and confused over Location History

15    following this article?

16    A   I am aware at the time that discussion was had

17    about this article, yes.

18    Q   So when Google expressed confusion on page --

19    well, this is going to be Bates 63211 to 63212.  And

20    that person writes, "I'd want to know which of these

21    options (some? all? none?) enter me into the

22    wrongful-arrest lottery.  And I'd want that to be very

23    clear to even the least technical people."

24        Is that Google employee expressing confusion over

25    the Location History settings and concern?

**Exhibit E, pg. 310**

McGRIFF - DIRECT                    311

 1   A   I have no idea what, from this snippet, this

 2   person was attempting to convey.

 3   Q   The person didn't know which of the options were

 4   available to disable Location History?

 5   A   I don't believe --

 6           MR. SIMON:   Judge, I'm only going to say this

 7   because I think it's the way that the examination has

 8   been happening with this witness throughout.   The

 9   witness answered that question.   He didn't get the

10   answer he liked.   He is now going back and asking him

11   the same question again.   So is this what he meant?

12   Is this what he meant?   He says "I have no idea."   I

13   don't know how you get away from "I have no idea."

14   But the objection is asked and answered, Judge.

15           MR. PRICE:   I'll move on.

16           THE COURT:   Okay.

17   BY MR. PRICE:

18   Q   Could I turn your attention to page 63213?   That's

19   Bates 63213.

20           THE COURT:   I'm sorry.   What exhibit are you

21   in again?   My apologies.

22           MR. PRICE:   This is Defense Exhibit 37, Your

23   Honor.   It's page 10 of the PDF, Bates No. 63213.

24           THE COURT:   So it's Exhibit 215 from the

25   Arizona.   I misspoke earlier.

**Exhibit E, pg. 311**

McGRIFF – DIRECT                    312

1   BY MR. PRICE:

2   Q   I just want to draw your attention to one other

3   part of this email chain where another Googler

4   responding to the same thread says, "Speak as a user,

5   WTF?  More specifically I thought I had location

6   tracking turned off on my phone.  However the location

7   toggle in the quick settings was on.  So our messaging

8   around this is enough to confuse a privacy focused

9   Google-SWE.  That's not good."  Do you see that there?

10  A   I see that is what's written here, yes.

11  Q   What's an SWE?

12  A   Software engineer.

13  Q   So this is a Google software engineer expressing

14  confusion over the settings for Location History; is

15  that correct?

16  A   This is a -- what is written here is that this is

17  a Google software engineer.  It is not clear to me

18  that they are specifically referring to Location

19  History.  The location toggle that's being referenced

20  here, the toggle that appears in settings at the

21  device level is the Location Master which controls

22  location for the device, which is distinct and

23  separate from Location History.

24  Q   Right.  He seems to be very confused; right?

25  A   Well --

**Exhibit E, pg. 312**

McGRIFF - DIRECT                313

1   Q    The article that he's responding to is the *New*

2   *York Times* article which talks about Location History,

3   correct?

4   A    This article talks about location usage and

5   collection, including Location History.  This exchange

6   specifically mentions multiple settings that control

7   different levels, what access, and type of location

8   information Google has access to.  That statement

9   specifically suggests, from what's written here, does

10  not suggest that it's explicit to Location History.

11       So I would say, yes, this is a Google software

12  engineer expressing some thoughts on a location

13  toggle, which is not specified to be Location History

14  in this context.

15  Q    Okay.  Thank you very much.

16       You're aware that the *New York Times* article

17  prompted another congressional inquiry; is that

18  correct?  In 2019?

19            THE COURT:  Can we be specific?  You have now

20  introduced a second *New York Times* article; am I

21  right?

22            MR. PRICE:  No, this is the only *New York*

23  *Times* article.

24            THE COURT:  It's all April 15?

25            MR. PRICE:  Yes, Your Honor.

**Exhibit E, pg. 313**

McGRIFF - DIRECT                      314

1          THE COURT:  Just a different version.  All

2    right.

3          THE WITNESS:  Which inquiry are you referring

4    to?

5    Q   Can I show you Defense Exhibit 54, please.

6    Shortly after the *New York Times* article ran, the

7    House Committee on Energy and Commerce sent a letter

8    to Google's CEO on April 23, 2019.  Is that correct?

9    A   That is what this exhibit shows, yes.

10   Q   And this is the letter that was sent to Google's

11   CEO?

12   A   That is correct, yes.  Can I ask one

13   clarification?

14   Q   Yes.

15   A   When you say "inquiry," you mention that you

16   also -- there was another inquiry you mentioned

17   yesterday.  What do you mean by "inquiry"?  Just a

18   general outreach with questions or do you mean

19   something more formal?

20   Q   I don't think I had a specific definition.  This

21   letter expressed some concern about Sensorvault and

22   the database Google uses.  That's the database Google

23   uses to store Location History?

24   A   That's correct, yes.

25   Q   Thank you.

McGRIFF - DIRECT                    315

1    Following the *New York Times* article, Google made

2    even more changes, some of which you discussed in your

3    blog post; correct?

4         MR. PRICE:  Excuse me, Your Honor.  I would

5    move to admit the House letter into evidence for the

6    limited purpose of its existence.

7         MR. SIMON:  Judge, we're going to object on

8    relevance grounds, not merely hearsay.  I think beyond

9    that, Judge, in the interest of fairness, defense

10   counsel, at the very least, ought to find Google's

11   response to these questions and put it in the record

12   as well if we're going to put this letter in.  And we

13   at least have that with the Senate letter that also

14   wasn't relevant, but they are questions directed to

15   Google that they -- if we're going to put sort of

16   hearsay into the record on this point, that would be

17   helpful.  But the objection is relevance.  I don't see

18   the point of congressional leaders asking questions to

19   major corporations, how that plays into this hearing.

20        THE COURT:  So, I'm going to overrule the

21   objection as to purported relevance.  It's clear that

22   the defense has a theory that either it's going to

23   shore up or not with respect to how Location History

24   notifications or operations changed.

25        I do agree, though, that -- so it will be for

**Exhibit E, pg. 315**

McGRIFF – DIRECT                    316

1  establishing its relevance in greater context later.

2  And for the limited purposes that we're talking about.

3  I do agree, though, that in fairness, the answer

4  should go in absent objection from Google.

5          And so you sent in a Senate inquiry also, and

6  I think some of the responses were there.  But I want

7  you to work with the Assistant United States Attorney

8  and counsel for Google about whether or not they want

9  to shore up any responses.  That strikes me as a more

10 fulsome record than what you've offered, and you don't

11 necessarily have to offer that, but now that it's been

12 raised, I think we should close the loop.  All right?

13         MR. PRICE:  Thank you, Your Honor.

14         Just to clarify, the Senate letter was a

15 request to the FTC for an investigation.

16         THE COURT:  Right.  Right.  Well, the

17 responses that you submitted were responses to what?

18         MR. PRICE:  The request for an investigation

19 included an attachment, which was a previous letter

20 that Google -- that the senator had sent to Google

21 seeking further clarification.

22         THE COURT:  All right.  So, I'm going to have

23 you all agree.  That's the problem with this, Mr.

24 Price.  Right?  If they are using the phrase

25 "cherrypick," you are allowed to advocate, but if you

**Exhibit E, pg. 316**

McGRIFF - DIRECT                317

1  get called on it, I'm telling you, make a full and

2  fair record.  So I'm going to allow you all to caucus

3  about that, and then place on the record what your

4  decision was or Google's position is and then I will

5  make a final ruling.

6          MR. PRICE:  Thank you.

7          THE COURT:  Thanks.

8  BY MR. PRICE:

9  Q   Okay.  So we've got the *New York Times* article as

10 well as the AP article we talked about the day before,

11 the year before --

12          THE COURT:  I was thinking the AP article.

13 I've got it.  Okay.

14 BY MR. PRICE:

15 Q   And in response to this feedback, was this the

16 feedback you were describing in your blog post when

17 you talked about some of the changes that Google was

18 making to improve Location History?

19 A   These are a few of several signals of feedback

20 that we receive on a regular basis, yes.

21 Q   Okay.  Thank you.  As a result of that feedback,

22 Google made some more changes to the way Location

23 History functions, the controls for users?

24 A   I am not aware of a point in time in the life of

25 the product that we have stopped making improvements

**Exhibit E, pg. 317**

McGRIFF - DIRECT                318

 1  and changes to the product.

 2  Q   Okay.  One of those changes that you made was the

 3  new auto delete function that you wrote about in your

 4  blog post; correct?

 5  A   Auto delete was not a change specific to Location

 6  History.  It was rolled out at this point to several

 7  Google products, yes.

 8  Q   But it applies to Location History?

 9  A   It does apply to Location History, yes.

10  Q   And in your blog post, you were discussing it in

11  the context of Location History?

12  A   In the blog post, it's discussed both in the

13  context of Location History and search.

14  Q   Okay.  I want to ask you about that deletion

15  process, though.

16  A   Yes.

17  Q   Even if a user deletes their Location History

18  data, it doesn't get deleted immediately, does it?

19  A   It's near immediate.

20  Q   There's a deletion process?

21  A   That is correct.

22  Q   And Google doesn't confirm that using Google's

23  tools for deleting location data will actually delete

24  that location data, does it?

25  A   Can you clarify what you mean by confirm?

McGRIFF - DIRECT                 319

1    Q   Sure.  Let me show you Defense Exhibit 45.  It's

2    the October 29, 2019, privacy policy redline, track

3    changes version.

4           THE COURT:  I'm sorry.  What exhibit again?

5           MR. PRICE:  Defense Exhibit 45.

6    BY MR. PRICE:

7    Q   It says Google added a caveat to the -- I want to

8    turn your attention to the "retaining your

9    information" section of the privacy policy.

10          MR. PRICE:  And for the Court, this is on

11   page 15 of the PDF.  The pages are not internally

12   numbered.

13   BY MR. PRICE:

14   Q   There's a section there that says "Retaining your

15   information"?

16   A   Yes.

17   Q   And this is a new section that was added based off

18   of the track changes that you see?

19   A   Expanded?

20   Q   Added.  Added.

21   A   The crossed-out copy here --

22   Q   That's the old language.  And the non-crossed out

23   copy is the new language.

24          THE COURT:  You know what?  He is saying it's

25   expanded.  And I think you can understand that what he

**Exhibit E, pg. 319**

McGRIFF - DIRECT                    320

1   means is that this is longer text than was there

2   previously.  And so bantering with the language with

3   your witness --

4           MR. PRICE:  Maybe I misheard him.  My

5   apologies.  Excuse me.

6           THE COURT:  What?

7           MR. PRICE:  This is -- just that this was,

8   this language wasn't there before.  That's all.

9           THE COURT:  But that's not how you're

10  examining him.  So the way you cross-examine somebody,

11  without injecting your own opinion necessarily, is you

12  say that there's a paragraph that is blocked out;

13  correct?  Correct.  Is it anywhere else in the

14  retaining your information?  No.  Are there paragraphs

15  that are not blocked out?  Yes.  Would that possibly

16  be new information?

17          You don't banter with him about the answers

18  that he's giving you.  The answers that he has given

19  you are the answers that he has given you.  You cannot

20  inject functionally your own opinion about which word

21  is right.  You can cross-examine him so he adopts it,

22  but you cannot inject your own opinion.  Okay?

23          MR. PRICE:  Yes, Your Honor.

24  BY MR. PRICE:

25  Q   I would just like to turn your attention to the

**Exhibit E, pg. 320**

McGRIFF - DIRECT                    321

 1   language that says "When you delete your data, you

 2   follow a deletion process."  Do you see that there?

 3   A    Yes.

 4   Q    It says, "We follow a deletion process to make

 5   sure that your data is safely and completely removed

 6   from our servers or retained only in anonymized form";

 7   is that correct?

 8   A    Yes.

 9   Q    And when it says "retained," that's a little bit

10   different than "deleted," isn't it?

11   A    That somehow the transformed data is retained.

12   There's a subtle difference there.  It notes that it's

13   only an anonymized form.

14   Q    So it gets deleted through the deletion process

15   but retained in anonymized form?

16   A    The privacy policy is the privacy policy for

17   Google.  For Location History, it is deleted.  This is

18   generalized to speak to the company-wide policies and

19   practices.  In the case of Location History

20   specifically, it is deleted.

21   Q    So it's deleted from the Location History

22   database?

23   A    That's correct, yes.

24   Q    But it's retained in a different database?

25   A    No, that's not correct.

**Exhibit E, pg. 321**

McGRIFF - DIRECT                    322

1   Q    In anonymized form?

2   A    No.  So, this policy speaks to Google's broader

3   company-wide policies.  What this is specifically

4   noting is that in the deletion process, some

5   information might be retained in anonymized form.

6   What that's referring to is not explicitly referring

7   to Location History.

8        Location History information is also deleted by a

9   process.  There's a single store for that, as

10  mentioned in the last exhibit, Sensorvault.  That

11  deletion is permanent and final.

12  Q    Where is anonymized data that's retained, stored?

13  A    I can't speak to the broader company policy and

14  what specifically they're referring to there.  It's a

15  data type that is outside of my scope.

16  Q    Okay.

17          MR. PRICE:  Your Honor, I would like to admit

18  Defense Exhibit 45, the privacy policy, into the

19  record, into evidence.

20          MR. SIMON:  No objection, Judge.

21          THE COURT:  All right.  It will be entered.

22          (Defense Exhibit No. 45 is admitted into

23  evidence.)

24          THE COURT:  I'm going to say a couple things.

25  I'm hearing something.

**Exhibit E, pg. 322**

McGRIFF - DIRECT                    323

1          THE WITNESS:  I am, too.  It's like a radio.

2          THE COURT:  Yes.  And I want that to stop.

3     What am I hearing?

4          MS. KOENIG:  Your Honor, I heard a little bit

5     of something like that yesterday, too, and I'm

6     wondering if perhaps maybe somebody who is on the

7     audio feed may not be fully muted.  I'm not sure.

8          THE CLERK:  I can mute our mics.

9          THE COURT:  No.

10         THE CLERK:  Their mic.  Not us.  Anything

11    coming from that.

12         THE COURT:  I'm going to say, if there are

13    folks on the AT&T line who are talking, we can hear

14    you, and it is disruptive.  If you're in my courtroom

15    here in person, you're not rude enough to speak over

16    any witness who is testifying.  We don't allow it in

17    this court.  And I'm going to tell you all, either you

18    pay attention and you listen or you don't.  I'm still

19    hearing it.  What is it?

20         MS. CARROLL:  I'm being told the audio has

21    gone out again on the phone line.  So I don't know if

22    maybe they can't hear.

23         THE COURT:  Maybe they're talking about the

24    fact that it's gone out.

25         All right.  We're going to take a recess and

**Exhibit E, pg. 323**

McGRIFF - DIRECT                324

1  figure this out.  I am going to say also, I want

2  counsel table to be a little less vocal.  I don't want

3  people commenting on the type of examination that's

4  happening where I can hear it.

5          I don't want -- Mr. Chatrie, you're allowed

6  to speak to your attorney as much as you wish, but you

7  have to understand there are a lot of microphones

8  there, and it becomes background noise.

9          So, Mr. Gill, I'm just going to ask you -- I

10  don't want you not to talk to your client, of course,

11  but you have to step away from the microphones a

12  little bit because it is disruptive to what is

13  happening in our courtroom, and it's not fair to Mr.

14  McGriff or to Mr. Price that he is distracted or that

15  I am, and not looking at the right exhibit because I

16  get concerned about the demeanor and the

17  professionalism with which we're handling this case.

18          So I want somebody to tell the AT&T folks, if

19  you know, them tell them to hush.  And I will remind

20  them, but we're going to take a 15-minute recess, and

21  my hope is that we will just get the testimony in

22  efficiently and fairly and without disruption.

23          All right.

24          (Recess taken from 10:10 a.m. until 10:35 a.m.)

25          THE COURT:  All right.  Well, welcome back.

**Exhibit E, pg. 324**

McGRIFF - DIRECT                    325

1          Let me just put on record I'm pretty glad

2    we're not doing this by ZOOM, since we have everybody

3    here and are still experiencing technical

4    difficulties.

5          Can I ask if anybody on the AT&T line can

6    hear me?  So that is a no.  So let me say this:  We

7    cannot let this AT&T line trip us up like this.  We

8    are open.  I want to accommodate this, but our

9    courtroom is open, and we have a satellite courtroom

10   that we may not be running today because no one showed

11   up yesterday.  But if people were to show up, you can

12   come on in.  You're welcome to do it.  But this is far

13   too many distractions.  And it's not anybody's fault.

14         And so I'm going to ask those of you who are

15   in touch with folks, let them know we're just going

16   forward.  They're welcome to come on down here and

17   listen and do what they want to do.  But this is, you

18   know, we're an hour and 40 minutes into this

19   proceeding, and we've gotten maybe 40 minutes of

20   testimony, maybe 30.  It's not appropriate for

21   Mr. Chatrie, for our witnesses, for counsel here.

22         And so I am a fan of the First Amendment, but

23   we cannot let this proceeding be driven by folks who

24   want the courtesy of an AT&T line when we are fully

25   open and operational and they can come in here.

**Exhibit E, pg. 325**

McGRIFF - DIRECT                    326

1           I don't know whether or not it's those folks

2    talking.  I am going to just ask them not to if they

3    get back on.  We have our IT working on it.  They're

4    working with AT&T.  We have checked.  Sometimes our

5    CSOs have walkie-talkies.  It sounded a little bit

6    like that to me, but none of them are using them.  So

7    I don't exactly know what's happening.  It's quite

8    possible there are lines crossing, I would think,

9    because we keep getting jumped off of AT&T.

10           But I want to confirm, especially those of

11   you who have colleagues, that you don't object to our

12   just going through this when your colleagues can't

13   hear it.

14           MS. KOENIG:  Your Honor, from the defense's

15   perspective, we are absolutely in agreement that we

16   need to move forward now.

17           THE COURT:  All right.

18           MR. SIMON:  Likewise, Judge.  We're ready to

19   go.

20           MS. CARROLL:  Likewise for Google, as well.

21   Thank you.

22           THE COURT:  All right.  Okay.  We'll work on

23   it, but let's be productive.  We'll continue the

24   examination.

25           Obviously, Mr. McGriff, you're still under

**Exhibit E, pg. 326**

McGRIFF - DIRECT                327

1    oath.  I have to say it every time.

2    BY MR. PRICE:

3    Q   Mr. McGriff, I'd like to call your attention back

4    to Defense Exhibit 47.  This is the second blog post

5    that you wrote.  In addition to adding the auto delete

6    feature, you also wrote in your blog that "It's our

7    goal to help you stay informed about your Location

8    History"; correct?

9    A   Yes.

10   Q   And you said, "If you have chosen to turn Location

11   History on, you will receive periodic email reminders

12   that let you know what data you are saving and ways to

13   manage it"; is that correct?

14   A   Yes.

15   Q   And then in your third declaration, which is

16   Defense Exhibit 23, you also wrote about this.  You

17   said that Google sent monthly timeline updates to some

18   users; is that correct?

19   A   That's correct, yes.

20   Q   And one purpose of those updates was to remind the

21   user that the Location History setting is on?

22   A   Among other things, yes.

23   Q   But Google, again, in your affidavit, pages 8 to

24   9, you wrote that Google has no records reflecting

25   that such emails were sent to Mr. Chatrie.

**Exhibit E, pg. 327**

McGRIFF - DIRECT                    328

1    A    We do not retain records for that long for emails

2    sent, that's correct.

3    Q    So you said that one reason for that "could be

4    because no such emails were sent"?

5    A    That is possible, yes.

6    Q    But you don't know why?

7    A    Again, for the life of the product, we have

8    steadily made improvements.  We have steadily expanded

9    the suite of emails that we send related to the

10   product.  Because of the way we record the emails that

11   are sent in this context, this is too far back for us

12   to say with certainty which emails were or were not

13   sent for a specific account.

14   Q    Thank you.  I'd like to turn your attention now to

15   Defense Exhibit 7, the third page.  This is a

16   screenshot of the opt-in screen when first setting up

17   Google Assistant.  I want to just go through with you

18   here some of the terminology because I feel like we're

19   getting tripped up a little bit.

20       The line -- you've used a few different terms to

21   describe what we're seeing here in terms of text on

22   the screen.  But the line right underneath where it

23   says "Location History," in this case it says "creates

24   a private map of where you go with your signed-in

25   devices," that's the descriptive text?

**Exhibit E, pg. 328**

McGRIFF - DIRECT                    329

1    A    That's the way I would describe it, yes.

2    Q    Okay.  And if you hit that little triangle next to

3    Location History, that's the expansion arrow?

4    A    That's correct, yes.

5    Q    And can we go to page 4.  If you hit that

6    expansion arrow, then you see what's on that

7    screenshot on the far right-hand side, what you've

8    been calling the copy text; is that correct?

9    A    That full block there, that is the Location

10   History consent, yes.

11   Q    So you call that the Location History consent?

12   A    That is the consent copy, yes.

13           THE COURT:  Wait.  Are you on page 3 or 4?

14   Is this where we --

15           MR. PRICE:  This is Figure 3, and I believe

16   it's on page 4.

17           THE COURT:  It's on page 3.

18           MR. PRICE:  Page 3, I'm sorry.  Yes, page 3.

19   BY MR. PRICE:

20   Q    So that block of text, that's the consent copy

21   text?

22   A    It's the Location History consent, yes.

23   Q    The Location History consent.  Okay.  So then can

24   we go down to the next screenshot, please, on page 4.

25   Further down.

McGRIFF - DIRECT                    330

1      So, what -- do you see those buttons?  One says

2   "No, thanks" and one says "Turn on"?

3   A    Yes.

4   Q    What are those called?

5   A    That is how a user would accept what's above.  So

6   their dynamic.  As you did in the previous figure, you

7   showed when a user first lands on that screen, you

8   can't turn it on from that screen alone.  Your options

9   as the figure shows are "Skip" or "Next".  If the user

10  says "Skip," they are skipped.  They won't see the

11  subsequent screens.  If the user says "Next," then

12  they're shown what you highlighted in Figure 3.  And

13  then if the user scrolls down, they will see the "No,

14  thanks" or "Turn on."  So those buttons are dynamic.

15  Q    And the only way that you see the consent copy

16  text is if you click on that expansion arrow; right?

17  A    That's correct, the expanded copy, that's right.

18  Q    So you don't actually have to see it in order to

19  hit "Turn on"?

20  A    You have to scroll to the bottom to click "Turn

21  on," yes.

22  Q    But you don't have to see the consent copy text?

23  A    You don't have to expand it there, no.

24  Q    And this whole process, is that referred to as the

25  consent flow?

**Exhibit E, pg. 330**

McGRIFF - DIRECT                    331

1   A   That is a consent flow, yes.

2   Q   So this process is a consent flow?

3   A   That is a consent flow, yes.

4   Q   Thank you for clarifying that.

5       The text -- if we could go to the screen that

6   shows the consent copy text, please.  Thank you.

7       So this text that you see here, that's consistent,

8   in fact, the same as the text that you provided in

9   your third declaration; correct?

10  A   Yes.  Yes, it is.

11  Q   Okay.  But it looks a little bit different in

12  screenshot form than it does in plain text.  Would you

13  agree with that?

14  A   What do you mean?

15  Q   Well, laid out like this in this format, you know,

16  with the copy text hidden behind the expansion arrow,

17  it looks different than just writing out the text on a

18  piece of paper; correct?

19  A   This is, again, a fully dynamic flow.  So, yes, it

20  looks very different when you freeze on individual

21  screens and break it out in this way, yes.

22  Q   So, could we go down to the "Turn on" button.  So

23  the "Turn on" button there is highlighted in blue by

24  default?

25  A   So, it starts off not visible, but once the user

**Exhibit E, pg. 331**

McGRIFF – DIRECT                    332

 1  interacts with the page and scrolls to the bottom,

 2  yes, that button appears in blue.

 3  Q   And the "No, thanks" button is not highlighted in

 4  blue.  It kind of blends in there?

 5  A   The "No, thanks" button is not captured in a blue

 6  box, no.

 7  Q   Thank you.  And this consent flow for Google

 8  Assistant, this looks different than the consent flows

 9  that you provided in your third declaration for Google

10  Maps; correct?

11  A   Again, in any of my declarations, I never

12  attempted or suggested that I was presenting an

13  exhaustive exploration of all of our opt-ins.

14  Q   Understood.  It looks different from the consent

15  flow that you showed for Google photos as well;

16  correct?

17  A   This is a variation on a theme of that flow,

18  that's correct, yes.

19  Q   And this variation, instead of asking the user to

20  just enable Location History, there are two other

21  permissions on the screen; is that correct?

22  A   Again, this flow is dynamic.  So if a user saw

23  the -- in your Figure 3, in this exhibit, if a user

24  saw the prompt to set up Assistant, if the user

25  skipped, they would see none of the subsequent

**Exhibit E, pg. 332**

McGRIFF - DIRECT                    333

 1   screens.  If the user said "Next," they would then see

 2   whichever permissions they had not already consented

 3   to for the account that were required for this

 4   particular feature.  That is unique to this particular

 5   flow, that is correct.

 6   Q   So if you're setting up Google Assistant for the

 7   first time, and you have never enabled Location

 8   History, you've never enabled device information, and

 9   you've never enabled Voice & Audio Activity, you would

10   see all three permissions on this one screen?

11   A   At that time, that was the case, yes.

12   Q   If you would say "already enabled device

13   information" for some other reason, it wouldn't show

14   up here?

15   A   That is correct, yes.

16   Q   If I had enabled device information and Voice &

17   Audio Activity, it would only show, say, Location

18   History?

19   A   Correct.  If you had not previously opted in to

20   Location History, yes, that's correct.

21   Q   When you group permissions like this together on

22   one page, it's called bundling; right?

23   A   I don't know what its official term would be.  I

24   casually, yes, do often refer to these as a bundled

25   presentation, yes.

**Exhibit E, pg. 333**

McGRIFF - DIRECT                    334

1    Q    And bundling can make users share information that

2    they otherwise wouldn't; correct?

3    A    I don't know that that's true.

4    Q    Well, if a user doesn't agree to everything here,

5    then Google would block off access to Google

6    Assistant?

7    A    I don't believe this would prohibit or prevent a

8    user from using Google Assistant.

9    Q    So you're saying it's possible to enable Google

10   Assistant without -- enable Google Assistant for the

11   first time without enabling all three of these

12   permissions?

13   A    I am not the assistant PM, but I don't believe you

14   would be -- I couldn't say that that service would

15   completely block you if you did not consent to all of

16   these.

17   Q    If you click "Turn on," then it enables all three;

18   correct?

19   A    If a user went through the flow and scrolled to

20   the bottom, yes, they would be able to turn on and

21   enable all three, that is correct.

22   Q    And the only other option is "No, thanks"?

23   A    "No, thanks," that's correct.

24   Q    And if the user clicks "No, thanks," is Assistant

25   set up?

**Exhibit E, pg. 334**

McGRIFF - DIRECT                           335

1    A    From this particular flow and these screenshots,

2    the user could skip it entirely.  The user could

3    scroll through and say "Turn on" or the user could

4    scroll through and say "No, thanks".  I am not the

5    assistant PM, and I do not recall what restrictions

6    they had on usage.  I would be surprised if you

7    weren't able to use it at all, but, again, I'm not the

8    assistant PM.

9    Q    But you would agree if you clicked "No, thanks,"

10   Assistant will not be set up at that time; correct?

11   A    It may not be completely set up, but, again, I

12   would be surprised that would you be blocked from

13   using the feature.

14   Q    Does it say that on this page anywhere?

15   A    Say what specifically?

16   Q    That it might be possible to use the feature

17   without clicking "Turn on"?

18   A    It does not say -- again, this is a dynamic

19   screen.  So it would appear different for the user

20   based on whatever their account configuration was.  It

21   is possible that a user approaching this screen, for

22   example, had already consented to device information

23   and Video & Audio Activity, in which case they only

24   saw Location History.  I am not the assistant PM.  I

25   don't recall that Assistant would have blocked you if

**Exhibit E, pg. 335**

McGRIFF – DIRECT                    336

1   you said no.

2   Q    Well, you could set it up later, of course; right?

3   A    You could set it up at a different point.

4   Q    But you'd see the same screens, the same consent

5   flow?

6   A    That I couldn't say.  I am not an expert on

7   Assistant.

8   Q    You would agree that Location History here is an

9   account level setting?  That means if you enable it

10  here, it is enabled for all devices across your entire

11  account?

12  A    No.  If you opt in to Location History here,

13  Location History and Location Reporting would be

14  enabled on that specific device.  But if you were

15  signed into multiple other devices, Location Reporting

16  would not be enabled on those devices.  So their

17  Location History was on for the account.  Those

18  devices would not actively be contributing to your

19  Location History.

20  Q    But if you had one device, and you turned it on in

21  this way, it would be on for everything on the phone;

22  correct?  On that device?

23  A    Yes, if a user opted in to Location History

24  through this context at this point in time, July 2018,

25  Location History would have been enabled on their

**Exhibit E, pg. 336**

McGRIFF - DIRECT                    337

 1   account.  And with that, seven days later on that same

 2   device, they would see the warm welcome, as we call

 3   it.  Everything would have been enabled on that

 4   device, yes.

 5   Q   So it doesn't have to be an account level setting,

 6   does it?  In other words, it's possible to have

 7   Location Reporting only for apps that are actively

 8   using a user's location?  This is the way that an

 9   iPhone does it, for example.

10   A   I'm not sure that I follow that.

11   Q   IPhone users can choose to give an app permission

12   to use location services only when the app is in use.

13   Are you familiar with that?

14   A   I believe you're conflating Location History with

15   location services.  The same is true on an Android

16   device.  A user can choose which app has access to

17   location on the device.  Those are the app level run

18   time permissions, yes.

19   Q   So on an iPhone, you can restrict it to one app or

20   another?

21   A   On both Android and iPhone, and I believe every

22   other phone manufacturer, you can restrict location

23   access at the app level, that is correct.

24   Q   And Location History specifically?

25   A   Location History is not location services for the

**Exhibit E, pg. 337**

McGRIFF – DIRECT                    338

 1  device.

 2  Q    Correct, but I'm asking you about Location

 3  History.

 4  A    But you're making a false equivalency with what's

 5  happening on an iPhone.  On both iPhone and Android,

 6  there are runtime permissions that control whether or

 7  not an app has access to location in the background.

 8       On both iPhone and Android, a user can decide

 9  whether or not an app, a specific app, has access to

10  the location in the background or only in the

11  foreground.  Those are app level permissions.  They

12  are not tied to Location History.

13       If a user enables Location History for the

14  account, in the context of Android specifically, that

15  information is collected and stored and used in

16  Location History at the account level.

17       Individual apps can access Location History

18  information, but by policy we do not allow those apps

19  to use Location History as a workaround, for example,

20  for current location.

21       So, if a Maps user says "no, Maps, you cannot have

22  my location permission," Maps cannot call Location

23  History and say, Tell me where this user is.  Yes.

24  Q    Okay.  Thank you for clarifying.

25       We talked about this a second ago a little bit,

**Exhibit E, pg. 338**

McGRIFF - DIRECT                    339

 1   but if a user goes through and sets up Google

 2   Assistant in this way, and then later goes and pauses

 3   Location History, Google Assistant will still continue

 4   to function; correct?

 5   A   Yes, that is correct.

 6   Q   But Google doesn't inform the user at the consent

 7   flow stage that that is a possibility; correct?

 8   A   Again, the consent flow is dynamic.  So a user may

 9   or may not be presented, depending on their own

10   account activity prior, with any of these options in

11   the menu.  So what is presented to the user in the

12   context of seeing this specific flow would, again, be

13   based on the user's previous activity across Google

14   products and services.

15       Is the ask to generalize, then, across all users?

16   Q   No, no.  I'm actually asking if you can point me

17   to where in the consent copy text it says that the

18   feature, in this case Google Assistant, would still

19   function even if you pause Location History.

20   A   I don't see in the copy text that it either says

21   the feature will or will not work if the user does not

22   proceed with any of the steps, the various options of

23   this flow.

24   Q   To pause Location History, you can only do that

25   once you've enabled it through the settings panel;

McGRIFF - DIRECT                    340

1    right?

2    A    What are you referring to as a settings panel?

3    Q    The settings app on an Android phone.

4    A    Are you referring to a specific point in time or

5    just generally?

6    Q    After it has been enabled.

7    A    So, after Location History has been enabled at the

8    account level, the user can go through the settings on

9    any particular app that uses Location History, so it

10   has Location History powered features.  The user could

11   go through the device level settings on an Android

12   device, and the user could also go to

13   myactivity.google.com where they can view all the

14   activity controls and suspend it there.

15        So you can either do it directly on the device at

16   the settings level through an app on a device, any

17   device that you're signed into, or on a desktop, any

18   laptop, myactivity.google.com and make a change there.

19             THE COURT:  So, Mr. McGriff,

20   myactivity.google.com is really familiar to you, but

21   my bet is it's really hard to transcribe as quickly as

22   you say it, especially with all the dots and stuff.

23   And using phrases like "I'm not the PM," just presume

24   that not all of us knows what a PM is.  So I'm going

25   to ask you to clarify that.  I think I know what it

**Exhibit E, pg. 340**

McGRIFF – DIRECT                341

 1   is, but especially with things you're super familiar

 2   with, those things come out fast from any human being.

 3   And I'm just speaking on Ms. Daffron's behalf.

 4              THE WITNESS:  Got it.  For reference, "PM"

 5   is product manager.  So I'm not one of the assistant

 6   product managers.  And the site specifically I've been

 7   referring to as myactivity.google.com is the main

 8   settings page where you can view all of your account

 9   level settings and manage them, and that can be done

10   either through a mobile browser or on a desktop.

11   BY MR. PRICE:

12   Q    So a user would have to actively, intentionally

13   navigate to that, settings, either through the app,

14   through the settings panel, or through that website

15   that you just gave us?

16   A    That's correct.

17              MR. SIMON:  Judge, I think the answer's fine

18   because he said yes, but I was going to ask to break

19   that down because there are a number of different

20   topic areas there in that question.

21              THE COURT:  You mean, it's a compound

22   question?

23              MR. SIMON:  Correct, Judge.  My apologies.

24   That would be the objection, compound question.

25              THE COURT:  It also seems to repeat what the

**Exhibit E, pg. 341**

McGRIFF - DIRECT                342

 1   witness was saying.  But are there more than three

 2   ways to change the Location History setting other than

 3   the three you just talked about?

 4          THE WITNESS:  Those are three paths, the

 5   three paths that would be possible, yes.

 6          MR. PRICE:  Thank you.

 7   BY MR. PRICE:

 8   Q   So, if a user takes one of those paths and they

 9   find the setting to pause Location History, Google

10   provides a pop-up screen at that point; right?

11   A   There is a screen that explains -- there's a

12   screen that explains what is happening with that pause

13   of the service, yes.

14   Q   Thank you.  Could I draw your attention, please,

15   to Defense Exhibit 27, specifically pages 22 to 23.

16          THE COURT:  I'm sorry.  Remind me of the

17   exhibit number again, please.

18          MR. PRICE:  Exhibit 27, Your Honor.

19          THE COURT:  How about you put on the record

20   what we're looking at aside from the number, please.

21   Q   Mr. McGriff, can you tell us what --

22          THE COURT:  No, you can just put it on.  It's

23   already in evidence.

24          MR. PRICE:  Sorry.  This is Defense Exhibit

25   27 at page, I believe, 23.  And this is the screen

**Exhibit E, pg. 342**

McGRIFF - DIRECT                    343

 1   that pops up if you attempt to --

 2          THE COURT:  I mean name the article, sir.

 3   I'm sorry.  I'm not being clear.

 4          MR. PRICE:  Oh, I'm sorry.  This is the

 5   report from the Norwegian.  It's called "Every Step

 6   You Take."

 7          THE COURT:  All right.  There we go.

 8   BY MR. PRICE:

 9   Q   Is this the screen that would come up if you

10   successfully found a place to turn Location History --

11   to pause Location History?

12   A   In any of the numerous paths that a user could

13   take to pause the setting, yes.  This would be the

14   pause copy that appeared at that time, that's correct.

15   Q   Great.  So attempting to pause the service results

16   in this warning that says it "limits functionality of

17   some of Google's products over time, such as Maps and

18   Google Now"; is that correct?

19   A   That is correct.

20   Q   But there isn't a comprehensive explanation of all

21   the services that would be affected; correct?

22   A   That is correct, yes.

23   Q   It just mentions those two.  It doesn't mention

24   Assistant?

25   A   This was not meant to be exhaustive, that's

**Exhibit E, pg. 343**

McGRIFF – DIRECT                344

 1  correct, yes.

 2  Q    And it doesn't explain actually how the

 3  functionality would be limited for any of those

 4  specific apps?

 5  A    As mentioned previously, Location History is used

 6  and in quite a few products and services and what

 7  would be impacted would be wholly dependent on what a

 8  specific user was utilizing in their sort of

 9  experience across Google products and services.  The

10  copy here is not meant to be exhaustive or describe

11  what every user would experience in terms of change in

12  service, because that would be near impossible.  The

13  screen would have to be -- well, not impossible.  The

14  screen would have to be dynamic and specifically say

15  what was happening in that case.

16       In this case, it's clearly illustrated.  It just

17  has, you know, these would be impacted, such as these

18  would be impact services.

19  Q    But it does not say how the functionality would be

20  limited?

21  A    It does not explicitly say that, no.

22  Q    Okay.  Thank you.

23       I'd like to take a closer look at some of the

24  screenshots for this consent flow process for

25  Assistant.  If we could turn to Defense Exhibit 7 at

**Exhibit E, pg. 344**

McGRIFF - DIRECT                345

1    page 4 again, please.

2              MR. PRICE:  Can we show the one with the

3    copy.

4    BY MR. PRICE:

5    Q    So this is page 3 of Defense Exhibit 7.  And, once

6    again, we have the descriptive text in the Location

7    History that says "Saves where you go with your

8    devices"; correct?

9    A    That's correct, yes.

10   Q    And then the consent copy text on the right-hand

11   side.

12   A    That's correct, yes.

13   Q    That can only be viewed by clicking that expansion

14   arrow?

15   A    That is correct, yes.

16   Q    So it requires extra clicks, at least one, here to

17   learn, for example, that your Location History data is

18   saved with Google and not on your phone?

19   A    Location History is only available through Google.

20   Who else would it be saved with?

21   Q    Well, the descriptive text says "Saves where you

22   go with your devices"; correct?

23   A    Sorry.  Is the suggestion that the descriptive

24   text is suggesting that it's an on-device feature?

25   Q    I'm saying it does not specify one way or the

**Exhibit E, pg. 345**

McGRIFF - DIRECT                    346

1   other, does it?

2   A    I apologize.  I don't believe any of our settings,

3   any of the controls mentioned here explicitly say --

4   make a distinction of server versus on device.

5   Q    I understand that that is how it works now, but as

6   a user, where would the user find that information on

7   this page?

8   A    Just to be sure that I'm clear, you're asking

9   where would a user know that this information is being

10  saved with Google on Google servers versus on the

11  device locally?

12  Q    Correct.

13  A    That is not a distinction that is made on this

14  page, no.

15  Q    It's made on the next page, on the consent copy

16  page?

17  A    That is not a distinction of note in the consent

18  copy.  It is there, but it is not in any way meant to

19  like -- the distinction of whether data is stored on a

20  device locally or on the server is -- I apologize.  I

21  don't know how to respond to that.  It is more -- it

22  is noted in the consent copy, yes.

23  Q    Okay.  But not in the descriptive text?

24  A    No.

25  Q    Similarly, it would require an extra click here on

**Exhibit E, pg. 346**

McGRIFF - DIRECT                347

1   that expansion arrow to learn that data is being saved

2   even when you aren't using a specific Google service;

3   correct?

4   A   On this page, yes.

5   Q   And it requires an extra click, same one, for a

6   user to learn that location data is sent to Google

7   even if the internet connection becomes disabled?

8   A   Sorry.  What are you referring to?  Oh, I see.

9   Sorry.  Yes, that is correct.

10  Q   Thank you very much.

11      So that consent copy text also says some things

12  like Location History helps give -- helps Google give

13  you more personalized experiences; right?

14  A   Yes.

15  Q   Like a map of where you've been?

16  A   Yes.

17  Q   Tips about your commute?

18  A   Yes.

19  Q   Recommendations based on places you visited?

20  A   Yes.

21  Q   And useful ads?

22  A   Yes.

23  Q   Those are all positive things from Google's point

24  of view; correct?

25  A   Yes.

**Exhibit E, pg. 347**

McGRIFF - DIRECT                    348

1    Q    They're intended to explain why users might want

2    to enable Location History?

3    A    That's correct, yes.

4    Q    But there isn't any mention here about how

5    frequently Google collects Location History

6    information, is it?

7    A    There is no statement here about the frequency of

8    collection, that is correct, yes.

9    Q    And there's no mention of the quantity of location

10   records that Location History generates; correct?

11   A    There is no statement here, no, that's correct.

12   Q    And there's no mention in that consent copy text

13   that Assistant will work without Location History

14   enabled?

15   A    There is no mention that any of the products or

16   features mentioned here will work without the setting

17   enabled, that is correct.

18   Q    Thank you.  So let me shift gears a little bit.

19   Let's say I'm a user who does not want to have

20   Location History enabled on my device.  To keep

21   Location History off, I have to go through a bunch of

22   different steps, starting from the beginning, the

23   initial setup of the phone; correct?

24   A    Again, the majority of users do not have Location

25   History enabled.  For those users who have Location

**Exhibit E, pg. 348**

McGRIFF - DIRECT                    349

1    History enabled, yes, to turn it off, they can take

2    any of the numerous paths I mentioned before, yes.

3    Q    No, I guess what I'm saying is it starts off as

4    off.  The default when you start up a new phone is

5    off; correct?

6    A    Location History -- well, Location History is an

7    account level setting.  Yes, it's an account level

8    setting, and it is off by default.

9    Q    The default is off when you start up a phone, but

10   at least in 2019, the very first thing that would

11   happen after you went through the initial setup and

12   agreed to the terms would be a prompt to enable

13   Location History; correct?  Sorry.  A prompt to enable

14   Google Assistant; correct?

15   A    In 2019?

16   Q    I'm sorry.  July of 2018.

17   A    In 2018, at the beginning of the year, yes, if you

18   set up Google Assistant, you would be presented with

19   the Location History consent if you had not already

20   opted into the service, yes.

21   Q    After you do the initial setup of the phone, that

22   screen, "Meet your Google Assistant," comes up

23   immediately or came up immediately in 2018?

24   A    I cannot speak to exactly when that appears in

25   device setup or under what circumstances.  But

**Exhibit E, pg. 349**

McGRIFF - DIRECT                    350

 1  assuming a user got to this screen, yes, this would

 2  have been the flow, that's correct.

 3  Q    And, obviously, this prompts the user to enable

 4  Location History?

 5  A    This particular flow, yes, it does.

 6  Q    So, in order to keep Location History off, the

 7  user would have to skip the step and decline enabling

 8  Location History?

 9  A    Which, again, the majority of Google accounts do

10  not have Location History enabled.

11  Q    Okay.  After that initial setup process, during

12  the first use of some applications, there's also a

13  prompt to enable Location History; correct?

14  A    For some products that have Location History

15  powered features, yes, that's correct.

16  Q    So, for example, Google Maps, the first time I

17  open up Google Maps with my new setup phone, it's

18  going to ask me to enable Location History; correct?

19  A    Under some set of circumstances in the context of

20  Google Maps at that time a user would have been

21  prompted.  The notification was -- there's a

22  notification priority and depending on the user's

23  activity and behavior, the user may or may not have

24  seen that notification, but, yes, it was a

25  possibility.

**Exhibit E, pg. 350**

McGRIFF - DIRECT                    351

1   Q   So, then, to keep Location History off, I would

2   have to decline activating it through Maps, as well;

3   right?

4   A   That is correct.

5   Q   And the same thing with Google Photos; correct?

6   The first time you open Google Photos, there's a

7   prompt to enable Location History for Google Photos

8   Places; is that correct?

9   A   I'm not aware that that was featured in the same

10  way that it was featured in Maps, but for both, again,

11  I would say yes, presented as an option, which the

12  majority of our users do not opt into.

13  Q   So, again, if I wanted to keep Location History

14  off, I would have to decline the invitation to turn it

15  on when using Photos for the first time?

16  A   Yes.  The majority of our users would have

17  declined that, yes.

18  Q   And long pressing the home button on an Android

19  phone, that would also bring up the Google Assistant

20  app; correct?

21  A   In 2018, I believe so, yes.

22  Q   And so if a user hadn't enabled Assistant during

23  that initial setup process, they would be prompted to

24  do it when they pressed the home button with the long

25  press?

McGRIFF - DIRECT          352

1   A    I don't know under what circumstances a user would

2   see this specific Assistant flow.  Specifically, as

3   mentioned before, I'm not sure -- I can't say that

4   this specific flow would be the one shown at a

5   subsequent point.

6   Q    But there would be -- if Assistant is not set up,

7   the first time it comes up, you would see these

8   screens; correct?

9   A    I couldn't say definitively, actually.

10  Q    Okay.  In any event, to keep Location History off

11  from the beginning, a user would have to say no

12  multiple times; correct?

13  A    No, it would depend entirely on what a user's

14  activity actions, and across Google products and

15  services.

16  Q    So the user would have to decline the invitation

17  to set up Google Assistant initially; correct?

18  A    Assuming that a Google user saw that, yes.

19  Q    The user would have to decline the invitation when

20  opening Maps for the first time?

21  A    If the user was prompted with that opt-in flow,

22  then yes.

23  Q    And the user would have to decline it when using

24  Google Photos for the first time?

25  A    Again, across all products, that user Location

**Exhibit E, pg. 352**

McGRIFF - DIRECT                    353

1   History, if a user was prompted contextually to opt-in

2   with a Location History powered feature, then yes, the

3   user would be presented with the option to say yes or

4   no.

5   Q    Then, again, if Google Assistant came up for some

6   reason, perhaps a long press of the home button, they

7   would have to decline the invitation to set it up

8   then, too; right?

9   A    That's the one I'm not sure about.  I can't say

10  whether or not Assistant had the same flow for that

11  same type of behavior at that point.

12  Q    So, at least three times, maybe four?

13  A    No.  Again, I disagree.  A user may not -- what a

14  user is presented with would depend entirely on the

15  user's behavior.  Not every user uses Google Maps.

16  Not every user uses Google Photos.  So it is very

17  possible that a user saw -- for example, this flow

18  would have required the user to have a connection.

19  The user may have set up their device with no

20  connection, in which case they wouldn't have been

21  presented with the Assistant flow.

22       Device and their connection could mean no send, no

23  Wi-Fi, but in that scenario, the user would have seen

24  none of these prompts.

25       A user could have gone through this initial flow

**Exhibit E, pg. 353**

McGRIFF - DIRECT                    354

 1  and then never opened Google Maps and then never

 2  opened Photos.  They wouldn't have seen the other

 3  ones.

 4      So I can't say that a user -- the number of times

 5  definitively that any user would have seen any of

 6  these prompts, but I can say yes, these would have

 7  been the prompts that were available at that time.

 8  Q   So, a user who did use Google Maps and Google

 9  Photos would have been prompted in this way at least

10  three times; correct?

11  A   Could have been prompted.  Again, all of these are

12  dependent on the user's activities.  There are more

13  important things happening in Maps, for example.  So

14  if you are in an active navigation session shortly

15  after first opening Maps, no, Maps would not prompt

16  you with any opt-in request because you are in the

17  active task completion mode.  The prioritization of

18  that screen would have been too low to warn it to be

19  triggered at that time.  So it is a potential option,

20  but it's impossible to say to what percentage of users

21  and what flow and so forth.

22  Q   So it's at least possible that a user would have

23  to decline the invitation to enable Location History

24  multiple times in order to keep it off?

25  A   Yes, it is possible that a user would have seen

**Exhibit E, pg. 354**

McGRIFF - DIRECT                     355

1   the option to opt-in multiple times, yes.

2          THE COURT:  I'm pretty sure we've covered

3   that territory multiple times.  Let's move on.

4   BY MR. PRICE:

5   Q   Does this increase the chances that a user might

6   turn on Location History by accident?

7   A   It is always possible that a user goes through a

8   flow, might not fully understand or wants to revisit.

9   For that exact reason, in 2017, we introduced what we

10  call the warm welcome notification for any user who

11  opted in to Location History from Q4 2017 on, we

12  triggered a notification in Maps.  It triggered seven

13  days later.

14          Seven days was chosen because we thought at that

15  point we would have sufficient context of a user's

16  activity from a week since turning on the control.

17  And the notification said -- again, it was the warm

18  welcome.  Hey, Location History is on for your

19  account.  Any interaction with that notification

20  brought the user into Timeline where the user would be

21  able to view all the information that we had

22  collected, including the activity, the trips, the

23  places.

24          The hope in introducing that was that even if a

25  user didn't have full context or full understanding

**Exhibit E, pg. 355**

McGRIFF - DIRECT                    356

 1  about the points you've previously made, the

 2  granularity of the information, or the type of

 3  information, that the collection was happening

 4  passively, like, for example, while driving, that we

 5  understood the nuance of activity recognition.

 6      The visualization in the Timeline UI, user

 7  interface, was very explicit and clear.  So that warm

 8  welcome notification was so that a user would see it

 9  seven days later, click through, see in full context,

10  and might say, This is not what I intended.  Turn the

11  control off.  There you can access again through the

12  app Timeline.  You can turn Location History -- you

13  know, pause Location History there.

14      The user could also -- we present a full suite of

15  controls.  This is well before auto delete.  But at

16  the time we had delete by day, delete by data range.

17  All of those controls were made available in the

18  context of Timeline.

19      Again, because every product is steadily evolving,

20  I realize some users would not see the notification.

21  So we now send a warm welcome email.  So, again, this

22  speaks to that suite of emails that we send.  So seven

23  days after turning Location History on, we now send an

24  email in addition to the warm welcome email notice

25  because not every user will see the maps notification.

**Exhibit E, pg. 356**

McGRIFF - DIRECT                    357

 1  Again, not every user uses Google Maps.

 2      So the thought was if you had turned on Location

 3  History in a different context, you may not see the

 4  Map specific notification.  So now we send the email

 5  with that exact same content.

 6      That email features prominently at the top direct

 7  links to turn Location History on or off.  And in that

 8  email, we specifically provide a snippet or insight

 9  into the data that's been collected for the first

10  seven days that the user has had the control on.

11      Again, this is all to address the point you're

12  making, that a user might turn it on, and then either

13  not realize the scope or exactly what's collected, and

14  we wanted to provide that additional context.

15  Q   Thank you.  I just wanted -- that was a long

16  answer.  It is the case, based on what you just said,

17  with some qualifications that --

18          MR. SIMON:  Judge, I'm going to object to a

19  continuation of asking the witness to speculate about

20  possible accidents.  But I also think this is, again,

21  going to be a question preemptively that's been asked

22  and answered.

23          MR. PRICE:  I would just like to get a yes or

24  no to my question, because I appreciate Mr. McGriff's

25  answer, but I would really like --

**Exhibit E, pg. 357**

McGRIFF - DIRECT                     358

1          THE COURT:  You may have one follow-up and

2   not, well, how many -- what's the percentage of

3   accidents that could happen?  Is it three accidents,

4   because there's three different ways to turn it off?

5   You may ask one follow-up question.

6   BY MR. PRICE:

7   Q    Requiring users -- or if a user had to repeatedly

8   decline the invitation to enable Location History,

9   would it increase the likelihood of enabling it by

10  accident?

11  A    No.

12  Q    Repeatedly asking somebody to turn it on --

13          THE COURT:  I'm going to let him have this.

14  This is just cross-examination, Mr. Simon.

15  A    The reason I say no is the Maps, for example,

16  prompt that you're mentioning, we only triggered it --

17  I believe that logic was twice per user.  If the user

18  either abandoned, didn't respond, we would show it one

19  more time.  If the user just missed it, we would never

20  prompt them again.

21      In each of these, again, the goal is not to spam a

22  user relentlessly.  You want this on.  You want this

23  on.  So we do have controls in place to ensure.  And,

24  again, it's very nuanced.  It's not -- you know, if

25  you happened to see it but didn't respond, we'll show

**Exhibit E, pg. 358**

McGRIFF - DIRECT                    359

1    you again in a certain period of time.  It wouldn't

2    have been the next day.  There is logic behind this

3    that would say, depending on the product, don't show

4    the user this prompt again for 10 weeks or however

5    many months, until later.

6        Then there's also logic that says if you showed

7    the user and the user explicitly said no, do not show

8    the user again.

9        The logic varies by app and context, but we go out

10   of our way to ensure that we are not doing what you

11   suggest, of just pomeling and pomeling.  There is some

12   logic baked in that would stop it.  And this is at the

13   account level.

14       So signing in to a new device would not suddenly

15   restart all of those triggers.

16   Q   Google did realize it was a possibility, though,

17   correct?  That's why you sent the reminder email, for

18   example?

19   A   The possibility that someone might turn it on?

20   Q   By accident.

21   A   No.  Sorry.  I apologize.  No.  It was the

22   possibility that someone might turn it on and not

23   fully either understand the granularity of the data

24   that's being collected or simply just wouldn't know at

25   that time necessarily, and we wanted to make sure and

**Exhibit E, pg. 359**

McGRIFF - DIRECT                    360

1    reinforce that a user had full visibility into what

2    exactly we were collecting and how that information

3    was being processed.

4    Q    Remind me.  When did you start sending those

5    emails a week later?

6    A    The warm welcome notices started in 2017.  The

7    warm welcome emails, I'd have to check.  I believe, in

8    my declaration, we put a date in for the Timeline

9    monthly emails, which we sent to users every month.

10   So if you turned Location History on in any context,

11   regardless of the surface, we sent you the Timeline

12   email.  And I don't recall the exact date, but it's in

13   one of my declarations that said when those emails

14   started.

15       The warm welcome email, which we added on top of

16   that, I'd have to check to see when we introduced

17   that.  It was not -- I can say definitively it was not

18   in 2018.

19   Q    Not in 2018?

20   A    It was not in 2018.

21   Q    Thank you.  Once Location History has been

22   enabled, there's an option to pause it; is that

23   correct?

24   A    Yes.

25   Q    But there isn't an option to turn it off; correct?

**Exhibit E, pg. 360**

McGRIFF - DIRECT                    361

1   A   We use the language "pause," not "off," that's

2   correct.

3   Q   In a user pauses Location History, does it delete

4   existing data?

5   A   It does not, no.

6   Q   It only halts the collection of future data?

7   A   That is correct, yes.

8   Q   So if a user wanted to revoke consent to use past

9   Location History data, pausing it would not do the

10  trick?

11  A   That is correct, yes.

12  Q   And the process of deleting the historical

13  Location History data is completely separate from the

14  act of pausing Location History; correct?

15  A   That is correct, yes.

16  Q   And as we were talking about earlier, that data

17  may be retained in some anonymized form even if

18  deleted?

19  A   Yes.

20  Q   One last question for you here.  If the user

21  deletes the Assistant app after setting it up through

22  this consent flow, Location History stays on; correct?

23  A   Assistant is not an app in this context.  It was

24  not an app in this time frame.  So I don't believe

25  there's a process to delete Assistant.  But if a user

**Exhibit E, pg. 361**

McGRIFF – DIRECT                    362

1    were to stop using Assistant, Location History would

2    still be enabled, yes.

3    Q   And Google would continue to collect Location

4    History data even if the user stopped using Assistant

5    completely or attempted to get it off his phone?

6    A   Yes.

7            MR. PRICE:  No further questions.  Thank you.

8            THE COURT:  I have some questions, and I'll

9    allow you to address them on redirect, but I'm going

10   to ask them before the government starts because that

11   will be more efficient.  All right?  So you may have a

12   seat.  Thank you, Mr. Price.

13           MR. PRICE:  Thank you, Your Honor.

14           THE COURT:  I just want to understand,

15   generally, Mr. McGriff, a couple of things.  And maybe

16   you know the answer and maybe you don't.  Either way

17   it's fine.

18           So if Location History, say, is paused and

19   then reactivated, is the data that was collected or

20   retained during the pause time put back into Location

21   History database?  So, like, if you had a timeline,

22   and I'm talking about 2018, about this time, if you

23   had a timeline, would it be a blank or would it dump

24   back in?

25           THE WITNESS:  It would be a blank.  When you

**Exhibit E, pg. 362**

McGRIFF - DIRECT                      363

1    pause Location History, our collection is fully paused

2    at that time immediately.  So there would be no

3    information until you resume the service.

4            THE COURT:  Right.  So --

5            THE WITNESS:  It would be a blank.

6            THE COURT:  It would be a blank.  It might be

7    in the Sensorvault some way anonymized?

8            THE WITNESS:  There's no collection

9    whatsoever in Sensorvault during the time that the

10   control is paused.  All of the data in Sensorvault is

11   exclusively collected in the context of Location

12   History.  So when you pause the setting, we stop all

13   collection, and there's no additional storage in

14   Sensorvault for that period.  So you would have a

15   blank until collection resumed.

16           THE COURT:  Not even anonymized?

17           THE WITNESS:  Anonymized here is a bit of a

18   red herring.  Because this was -- that's a general

19   privacy policy for the company.  In the context of

20   us -- sorry.  In the context of Location History,

21   there would be no collection in any capacity in any

22   way if the control is paused.

23           THE COURT:  So when you hit the control, it

24   stops the passive collection like when your phone --

25   it stops it all?

**Exhibit E, pg. 363**

McGRIFF - DIRECT                    364

1        THE WITNESS:  Any location collection in the

2   context of Location History is completely stopped.

3        THE COURT:  And it's not reaccessed ever?

4        THE WITNESS:  It is not, no.

5        THE COURT:  So this is a weird question, but

6   Google tracks a lot of data.  Do you track how many

7   people actually read the privacy policy, like how long

8   the window is open?  And, you know, I'm just saying

9   because I think most people don't, but I'm wondering

10  if -- that's not evidence, obviously, and I'll take

11  whatever evidence I have.  But Google tracks a lot of

12  stuff, so I'm wondering if you track when the window

13  is up or if you know how many people actually read it.

14       THE WITNESS:  I don't know.  There are teams,

15  not my team specifically, that look very broadly on

16  the best way to present the flows.  And they look at

17  any number of signals, including user research, to

18  understand how much of these flows users embrace.

19       I can say based on that research, again, not

20  done directly by my team, we have even further refined

21  since this flow.  There have been now two iterations

22  of a presentation based on that feedback.

23       The latest flow, for example, if you were to

24  attempt to opt in to Location History through one of

25  these products, we no longer even do full screen

**Exhibit E, pg. 364**

McGRIFF - DIRECT                    365

 1   because of feedback that it takes users out of

 2   context.  So we now have what we call the bottom sheet

 3   where the same copy and messaging appears, but it

 4   comes up from the bottom.  So the user can see above

 5   the context where they attempted some activity that

 6   triggered it, and then the dialogue comes up from the

 7   bottom.

 8             That implementation, I believe, is fully

 9   rolled out now, but it has been in flight.  Again,

10   these iterations are all informed by user research

11   that that central team is doing around what would help

12   users better understand.  So this is a constant

13   evolution.

14             THE COURT:  Right.  So let's talk about

15   Location History.  Like, do you track how many people

16   hit the carrot, the triangle, to go to the bigger

17   screen?

18             THE WITNESS:  Our team does not, no.

19             THE COURT:  Right.  So when you're saying

20   there's something that comes from the bottom, would

21   that possibly be something like the Location History

22   context that would come up?

23             THE WITNESS:  Yes.  So, now, like, again,

24   this is new UI.  It was not at the time of this.  The

25   bottom sheet comes up.  It shows -- the same copy, I

McGRIFF - DIRECT                   366

 1  believe, it shows more of it now.  Again, it's all the

 2  way to not fully take over the screen, so the user

 3  stays in context.  Like you were just attempting to

 4  view historical places in Maps, but you don't have

 5  Location History on.  So where before, and I believe

 6  it's in these exhibits, you would have seen a screen,

 7  a full splash, Hey, turn it on.

 8          We now leave you in the context, You were

 9  attempting to do this, but here is where -- and

10  there's still a carrot there, I believe -- I will have

11  to check -- where a user can view more.  But, yeah,

12  that's the expansion.

13          And then, again, the evolution here is now if

14  a user did say yes in that context, then seven days

15  later we also, in addition to the notification, send

16  the email saying, By the way, this happened.  That

17  kind of a change.

18          THE COURT:  Okay.  So when you turn Location

19  History off, nothing is collected even to target ads;

20  is that right?

21          THE WITNESS:  Any ads measurement powered by

22  Location History is -- there's no new data for that

23  account available because we've stopped collection.

24          THE COURT:  Okay.  And so if you turn

25  Location History off, it also goes off in, like, Web &

**Exhibit E, pg. 366**

McGRIFF - DIRECT                    367

1   App Activity?  Does it go off all the way?

2           THE WITNESS:  So, there's location services

3   for the device completely unaffected by a user's

4   decision with Location History.  Location History is

5   the only store of precise device location.

6           What Web & App Activity is storing now is

7   only course and location.  So if I attempt some

8   activity or a service with Google, and I have opted in

9   to Web & App Activity, they would know that I

10  attempted that activity in Richmond.  And the team is

11  looking -- they coursen the location because they

12  don't need to know that I was in this building in this

13  room for their general purposes.  They just need to

14  know that I'm in Richmond.

15          So Web & App Activity would have some record

16  of, if I opted in, I did or performed some task in

17  Richmond.  If Location History -- if it was on for the

18  account, would have more granular information.  That I

19  was in this building, would be the likely inference.

20  It would understand that I walked to this building.

21  All the details that are visible in Timeline.

22          If I turned Location History off, Web & App

23  Activity would still know, if I opted in, that I was

24  in Richmond.  So when you mentioned ads, Location

25  History does not power all ads.  A lot of the -- any

**Exhibit E, pg. 367**

McGRIFF - DIRECT                    368

1   geotargeting or other use of Location for ads is

2   coming from the location services at the device level.

3          The specific type of advertising powered by

4   Location History, the store visits that were

5   mentioned, is only possible for users who have opted

6   in to Location History.  And so if they turned

7   Location History off, then there's no new information

8   coming in for the account.

9          THE COURT:  All right.  So Location Services,

10  can you turn that off, too?

11         THE WITNESS:  Yes.  Location Services is the

12  location master for your device.  You can just say

13  turn off -- no app or service on my device can have

14  access to my location.

15         THE COURT:  So if you have Location Services

16  and Location History turned off, is Google retaining

17  any data?  I mean, in its collection for --

18         THE WITNESS:  We don't have access to any

19  information.  And Location Services at the device

20  level supercedes anything else.  So if you turned

21  Location Services off, and you have Location History

22  on, Location History is not collecting any information

23  because we don't have access to it.

24         Location, both IOS and Android, position

25  location master, if you will, as an ultimate control

**Exhibit E, pg. 368**

McGRIFF - DIRECT                    369

1    to say I want this device to have any location

2    awareness or access at all.  And then once that's

3    enabled, you get the different options for each IOS.

4    Sorry.  Operating system.

5             THE COURT:  So if they're both off, nothing's

6    going in in an anonymized fashion to Sensorvault?  I

7    know I'm using, you know, human terms, not Google

8    terms.  Not that Google is inhuman.  But I do like the

9    Monday morning meetings, by the way.  I just have to

10   put that on the record.  That's just fabulous.

11            Okay.  So if they're both off, then Google

12   isn't doing this extra service for its customers from

13   your perspective, collecting information from

14   somebody's privacy perspective; correct?

15            THE WITNESS:  That's correct.  And also, just

16   to be clear, there's no anonymous collection in

17   Location History.  I just want to make that clear.

18            THE COURT:  So none of that goes to the

19   Sensorvault?

20            THE WITNESS:  If Location History is on for

21   your account, everything that's collected is

22   associated with you as a user to that account.  And

23   that is to, in part, help us with the full data

24   management of anything collected for you.  When you go

25   to Timeline and you view all of your data in Location

**Exhibit E, pg. 369**

McGRIFF - DIRECT                    370

1  History, all of those points are associated with you.

2  If you choose to delete a specific point, date, range,

3  specific visit, we are able to give those controls,

4  because all of that information is associated with you

5  as a user.

6          What's available in Timeline is a full

7  distillation of everything that has been collected for

8  your account in the context of Location History.

9          THE COURT:  Okay.  But there's no process

10  where it gets put into a greater data set?

11          THE WITNESS:  We do use an aggregate.  An

12  example would be our COVID mobility reports where we

13  take all of the user's data for a specific area.  We

14  aggregate it.  We anonymized it.  And then we perturb

15  it further by, essentially, adding noise to create a

16  representative model of the aggregate.  And we do that

17  to ensure that when we release the mobility reports,

18  saying this was the -- these were the mobility trends

19  in Richmond when the COVID restrictions were

20  implemented versus seven days later, those models are

21  actually not any of our data, even in aggregate.  It's

22  a representative model of the trends.  And those are

23  what we published in the context of the mobility

24  reports.

25          This is very similar to what we do with

McGRIFF - DIRECT                    371

 1   busyness on Maps.  I don't know if you're familiar

 2   with the feature.  On Maps, if it's a popular place,

 3   we'll show you whether or not that place is usually

 4   busy at that time.

 5              THE COURT:  Oh.

 6              THE WITNESS:  But those busyness bars are --

 7   I could delete all of my data.  It's not going to

 8   change that bar, because the bars there are actually

 9   an aggregate.  They're not -- it's not even a literal

10   aggregate.  It's kind of a sufficiently transformed

11   model that is sufficient for the decision making

12   you're doing when you're looking at Maps.  Is it busy

13   or is it not?

14              THE COURT:  Okay.  So that's a separate model

15   that happens outside the Sensorvault or --

16              THE WITNESS:  Those models are built off of

17   the data that is within Sensorvault and aggregated.

18   Those are so sufficiently transformed that they no

19   longer resemble user data.

20              THE COURT:  All right.  Okay.  Now, I'm going

21   to ask a question because this is just lore.  If you

22   have geofence or Location History, it's not just doing

23   the ground, right?  It's going up?  Like it does 3D?

24   So this is my question:  If you're doing a search,

25   could you know whether you were on the fifth floor

**Exhibit E, pg. 371**

McGRIFF – DIRECT                    372

1    here or the third floor if you were there for a

2    sufficient period of time?

3              THE WITNESS:  Is that information sometimes

4    available in terms of where we understand a device's

5    positioning to be within a building?  Yes.  I can't

6    speak to how, if at all, that factors into the warrant

7    process.  I would be shocked if they're at the point

8    of being so specific to lore as opposed to area.

9              THE COURT:  So, I can tell you I don't know

10   where I hear these things.  I've heard that you could

11   tell whether somebody is in one apartment or another

12   through a geofence.

13             THE WITNESS:  Oh.  I can't speak to the

14   warrant process.  I can say that data itself, it is

15   possible with -- it is possible at just a raw data

16   level to make some estimation of where a user is --

17   where a device is in terms of elevation, yes.  I don't

18   know how that translates to the --

19             THE COURT:  Right.  Well, I would think if

20   you have home Wi-Fi or something, right?

21             THE WITNESS:  There are -- I mean, we've

22   looked at it from several different angles over the

23   years, both in terms of emergency response, someone

24   has a distress, and how we can communicate or how it

25   can be relayed this person is on a specific floor.

**Exhibit E, pg. 372**

McGRIFF - DIRECT                373

 1  Again, all of this comes back to location inference.

 2  There are a lot of signals that are available, but

 3  they're not always available.  So a user may have

 4  Wi-Fi enabled; they may not.  And so we look at all of

 5  those signals and try to infer, to our best

 6  estimation, where you are.

 7          This is also true in the context of Maps when

 8  you're in a mall.  We will do our best to determine

 9  whether you are on the second floor of the mall or the

10  first floor of the mall if we have launched our

11  directory to help you navigate indoors.  But that's a

12  very nascent area.  It's a best guess.

13          So from my understanding of the warrant

14  process, it's not that granular, and I would kind of

15  be puzzled if they asked us for that, only because we

16  would just say okay.  We wouldn't be able to guarantee

17  it in any way.

18          THE COURT:  Right.  What it says is it's a

19  meter -- I can't remember the range.  Anyhow, I've

20  asked my questions.  So you all can follow up on that

21  or not.

22          I appreciate your putting up with my

23  layperson's terms.

24

25

**Exhibit E, pg. 373**

McGRIFF - CROSS                    374

1        CROSS-EXAMINATION

2   BY MR. SIMON:

3   Q    Good morning, Mr. McGriff.  I'm just going to

4   clarify a number of things with you because I think it

5   would be helpful for all involved.

6        What is your day-to-day job at Google?

7   A    I am a Product Manager in Geo.

8   Q    Okay.  So, in that role, what do you do on sort of

9   a day-to-day basis?

10  A    I look at all of the products and features that

11  I'm responsible for, both what is currently in

12  production, what we are currently implementing to be

13  released into production soon, and then also what we

14  might be working on in the future.

15  Q    And so those products that you have some ownership

16  over, are those, to some extent, quite involved with

17  Location History or how do you determine which

18  products you might have some ownership over?

19  A    It steadily evolves over time.  I do have

20  responsibility for Location History overall as a

21  product.  As the defense blog posts reference, I also

22  looked at several broader features for Maps, including

23  Maps incognito mode, other general location aware

24  features and functionality.  But, again, that is

25  steadily evolving over time.

**Exhibit E, pg. 374**

McGRIFF - CROSS                    375

1   Q   Okay.  And in this case, I know you were brought

2   in, in part, because of some discussion about Location

3   History; right?

4   A   That is correct, yes.

5   Q   And you submitted -- we've got a smaller binder

6   that's there and that will be used primarily here.  It

7   might go to some defense exhibits.  But in that

8   binder, there are a number of exhibits.  One's marked

9   Government's Exhibit 3.  You can take a look.  And

10  we've got Government's Exhibit 3B and Government's

11  Exhibit 3C.  Those would be the first declaration,

12  supplemental, and the third.

13      Are those the declarations that you submitted in

14  this case?

15  A   3, B, and C, that is correct, yes.

16          MR. SIMON:  Okay.  And, Judge, I'd move to

17  admit those as Government's Exhibits 3, 3B and 3C.

18  They've been admitted as defense exhibits, but --

19          THE COURT:  Right.  There's no objection,

20  right?

21          MS. KOENIG:  Right.

22          THE COURT:  They'll be admitted.

23          (Government's Exhibit Nos. 3, 3B, and 3C are

24  admitted into evidence.)

25  BY MR. SIMON:

**Exhibit E, pg. 375**

McGRIFF - CROSS                                    376

1   Q    Now, am I to understand that, as you testify here

2   today, you stand by those declarations; right?

3   A    That is correct, yes.

4   Q    And so your testimony before this Court is merely

5   to clarify through the questions that we ask you;

6   right?

7   A    That is correct, yes.

8   Q    Now, you were asked on direct a number of

9   questions about search warrants, about the geofence.

10  Let's just be clear about it.  Your job is not to

11  respond to geofence warrants, is it?

12  A    Thankfully not, no.

13  Q    In fact, you literally -- when Detective Hylton

14  testifies that he served a search warrant on Google

15  for this geofence in this case, you weren't involved

16  in that at all; right.

17  A    No.

18  Q    And you typically don't get involved unless there

19  is some specific sort of technical question about

20  Location History; right?

21  A    That is correct, yes.

22  Q    Okay.  Now, because there have been so many

23  questions asked to you about the search warrant,

24  despite it not being your job, I do want to ask you,

25  is it your understanding that a Google geofence

**Exhibit E, pg. 376**

McGRIFF - CROSS                        377

 1   warrant simply calls on Google to provide, based on

 2   probable cause determined by a magistrate, a

 3   magistrate judge, maybe an Article III judge, to

 4   provide only those devices that have coordinates that

 5   fall within a certain geofence if Google so determines

 6   that they do?

 7   A    That is my understanding, that's correct.

 8   Q    So the warrant never calls on Google to provide

 9   anything outside of the geofence warrant; is that

10   correct?

11   A    That is correct, yes.

12   Q    Not this case in particular.

13   A    That is my understanding, yes.

14   Q    Now, there have been some questions about Location

15   History information, what happened in this case.  If

16   the government's warrant asked you to give us those

17   location coordinates, that would be responsive; right?

18   A    Yes.

19   Q    And because Google wants to comply with the

20   warrant as is, it only provides Location History

21   information; right?

22   A    Yes.

23   Q    So in looking at your affidavit -- I'll get the

24   right one up.  It's paragraph 16 and 17.  It looks

25   like it's 96-1.  That's going to be your first

**Exhibit E, pg. 377**

McGRIFF - CROSS                    378

 1   declaration.  I'll let you look at those paragraphs,

 2   16 and 17.

 3             THE COURT:  This is Government's Exhibit 3?

 4             MR. SIMON:  Correct, Judge.  My apologies.

 5   A   Okay.

 6   Q   Now, can you explain -- and also maybe take a look

 7   at 21 and 22.  Can you explain why -- and they're

 8   explained in more detail in 16 and 17 and 21 and 22 of

 9   your first declaration, but why don't we have anything

10   other than Location History information returned in

11   this warrant?

12   A   As mentioned, Location History is the precise

13   device storage where you get granular information.

14   WAA would understand, if location was captured in WAA

15   with associated activity, only at a very granular

16   level that you were in Richmond.  Or it would depend

17   on if you went to very -- I have family in Halifax,

18   Virginia.  There's nothing in Halifax, Virginia.  If I

19   go there, I will probably be coursened at a WAA level

20   to being in greater Danville.

21             THE COURT:  WAA is Web & App Activity?

22             THE WITNESS:  Yes, Web & App Activity.

23   A   There are not enough people there.  So it's just

24   coursened to a level where they can guarantee a

25   certain amount of privacy.

**Exhibit E, pg. 378**

McGRIFF - CROSS                    379

1        So these other stores would not have the

2    information that Location History has in terms of the

3    level of detail.

4    Q    Okay.  And that's the same with Google Location

5    Accuracy?

6    A    Google Location Accuracy moves even farther in the

7    opposite direction.  That collection from the time of

8    collection is anonymized.  So it's not associated with

9    a specific user.

10   Q    Okay.  And so the bottom line, the reality of why

11   Google returned Location History information in this

12   case is because it's the only thing responsive to a

13   warrant for coordinates that are within a certain

14   radius at a certain time; right?

15   A    That is my understanding, yes.

16   Q    Now, talking about Google location information,

17   we'll get into sort of the business and how Google

18   does its business with location.  But the 68 percent

19   confidence interval, when we talk about that, to be

20   clear, we're not talking about that broader 150-meter

21   geofence that we draw; right?  That's not where the

22   68 percent is sort of focused on; right?

23   A    Yes.

24   Q    So it's actually focused on what we're looking at

25   as sort of the display radius; right?

**Exhibit E, pg. 379**

McGRIFF - CROSS                    380

1   A    That's correct, yes.

2   Q    So when we talk about 68 percent, we're talking

3   about 68 percent within the blue radius?

4   A    That is correct, yes.

5   Q    Not the geofence that we draw saying only give us

6   devices within this area; right?

7   A    Yes.

8   Q    Okay.  If you want to clarify, go ahead.

9   A    No, no.  Yes.  Your questions made me realize

10  earlier questions.  The answer is yes.

11  Q    Okay.  If we talk about certain points in the data

12  set that we have here, there will be Defense Exhibit

13  3, I think it is, that's under seal, has a number of

14  different data points for the anonymized reference ID

15  numbers we got at the first phase here, within that

16  geofence radius.  And there will be points that will

17  say a Wi-Fi point will be 84 meters.  And then within

18  30 seconds, there's a 387-meter display radius.  And

19  that's a Wi-Fi point.  Could you explain why that

20  might be?

21  A    All of these readings are from device sensors.

22  There could be any number of reasons why the device

23  sensors connect to different signals or record

24  different signals.  I can't offer any specific answers

25  for this case, but it is possible that you get

**Exhibit E, pg. 380**

McGRIFF - CROSS                     381

1   different readings at different times.

2   Q    Okay.  As it relates to the accuracy of Google's

3   location information, you would agree that this isn't

4   a shot in the dark for Google, that Google maintains

5   relatively good location information; right?

6   A    It is not a random number generator, no.

7   Q    And it's -- I guess to get to maybe a clearer

8   point, it is a technologically advanced assessment of

9   whether somebody is within a certain place at a

10  certain time; right?

11  A    It is a good-faith attempt to make an informed

12  decision, yes.

13  Q    And so in one particular sort of point, I guess,

14  in that -- sort of that space, is that Google has made

15  the point that Location History information might even

16  be a little bit better or much better than cell-site

17  location information; right?

18  A    That is likely true, yes.

19  Q    So to the extent that we're talking about the

20  folks being within that blue -- in the blue radius,

21  not the broader geofence, Google's got good

22  information on those devices; right?

23  A    Yes.

24  Q    Now, are Google's privacy policies online?

25  A    Yes, they are.

**Exhibit E, pg. 381**

McGRIFF - CROSS                    382

1   Q    They're publicly accessible, then; right?  And so

2   are the terms of service, presumably?

3   A    Yes.

4   Q    And if we were to go on Google today, as defense

5   counsel showed you, we'd find everything Google's ever

6   said about terms of services and privacy policies;

7   right?

8   A    Apparently, yes.

9   Q    And when Google users set up Google accounts, it's

10  my understanding that they would be agreeing to

11  Google's terms of service -- right? -- in the process?

12  A    Yes.

13  Q    And would they also be agreeing to Google's

14  privacy policy?

15  A    I believe so, yes.

16  Q    Now, if I show you -- I think you've looked at it

17  already because it's admitted -- Defense Exhibit --

18  Defense Exhibit 43A, the redlined privacy policy.  I'm

19  not going to spend a ton of time on this.

20          THE COURT:  It'd appreciate it going up on

21  the screen.

22          MS. KOENIG:  Sure.

23  BY MR. SIMON:

24  Q    When we look at this privacy policy --

25          MR. SIMON:  And, Judge, I'm looking at the

**Exhibit E, pg. 382**

McGRIFF - CROSS                    383

```
 1   first page.  It's marked May 25 on the bottom left.
 2   Q    When we read the paragraph that starts "Our
 3   privacy explains," what's cut out that it explains?
 4   A    I'm sorry.  Can you repeat that?
 5   Q    What is cut out there?  What is sort of marked
 6   out, as defense counsel's sort of insinuating that it
 7   was taken out of the policy?  But what is marked out
 8   there?
 9   A    Well, there was copy that was there that was
10   refined in some way.  So that was replaced with the
11   copy below.
12   Q    Okay.  And so in many ways, what's happening is
13   Google is sort of maybe moving things around as
14   opposed to totally deleting them or inserting them?
15   A    What's happening here is, again, as I mentioned
16   yesterday, with any product, you are always making
17   improvements.  There are always refinements.  There
18   are new technologies, new capabilities, new sensors,
19   new understandings.  So these are living documents
20   that will always evolve to reflect the current
21   context.  All of the inputs of feedback, both from
22   critics and friends, users, all of that is informing
23   in how you continually improve.
24        So the crossed-out portions are the way they stood
25   at some previous point.  The replaced copy is a -- at
```

**Exhibit E, pg. 383**

McGRIFF - CROSS                    384

 1  the time a good-faith attempt at better presenting the

 2  previous copy.

 3  Q   Okay.  And if you look with me at page 3, I'll end

 4  it here, page 3 and 4, but starting with "Information

 5  we collect," we collect from your use of our services.

 6  Do you see that?

 7  A   Yes.

 8  Q   And it then begins to provide a list of services

 9  that were in that December 18 policy; right?

10  A   Yes.

11  Q   December 18, 2017 policy.  If you go to the next

12  page, page 4, are you there with me?

13  A   Yes.

14  Q   Is "location information" on that page?

15  A   Yes, it is.

16  Q   So that would mean that location information was

17  set forth -- that you all collected location

18  information December 28th of 2017; right?

19  A   Yes.

20  Q   Okay.  Now, in both of these privacy policies,

21  would it be fair to say that Google provides folks

22  with some reasons that third parties might get

23  information on them?

24  A   I believe that is explicitly mentioned, yes.

25  Q   And one of those reasons is a legal reason; right?

**Exhibit E, pg. 384**

McGRIFF - CROSS                       385

 1   That government might come with a search warrant with

 2   probable cause; right?

 3   A    The government is crafty, yes.

 4           MR. SIMON:  Judge, I think at this point I'd

 5   move to admit -- the witness has testified that the

 6   privacy policy and terms of services are available

 7   online.  We pulled in Government's Exhibit 5 and 5A --

 8   I don't think the defense will object to this -- but

 9   move in the privacy policy effective January 22, 2019,

10   that's Government's Exhibit 5 and 5A, the terms of

11   service modified as of October 25, 2017.  We'd move to

12   admit those.

13           MS. KOENIG:  Judge, I don't believe he's

14   presented those exhibits to Mr. McGriff to identify or

15   even recognize.  So I think that's the first problem.

16   And the second, I think, is we have to establish

17   relevancy of those.  There may be a relevant reason,

18   but those were certainly something that existed

19   afterwards.

20           MR. SIMON:  Judge, we've -- the privacy

21   policy as of January 22 --

22           MS. KOENIG:  I'm sorry.  I missed the date.

23   But I think you still need to show him the exhibit.

24           MR. SIMON:  Sure.

25   BY MR. SIMON:

**Exhibit E, pg. 385**

McGRIFF - CROSS                     386

1   Q   Can you take a look at Government's Exhibits 5 and

2   5A?  Government's Exhibit 5 is long.  So I'll let you

3   flip through it.

4   A   Exhibit 5 is the privacy policy as of January 22,

5   2019, and Exhibit 5A is the terms of service as of

6   October 25, 2017.

7            MR. PRICE:  Judge, we'd now move to admit

8   Government's Exhibit 5 and 5A.

9            MS. KOENIG:  No objection at this point, Your

10  Honor.

11           THE COURT:  All right.  They are entered.

12           (Government's Exhibit Nos. 5 and 5A are

13  admitted into evidence.)

14  BY MR. SIMON:

15  Q   Mr. McGriff, just to be clear, I know we've asked

16  you about these privacy policies, but the best

17  evidence of Google's privacy policy in terms of

18  service are going to be from the online sources;

19  right?

20  A   That's correct.

21  Q   In this case, the search warrant called for those

22  location coordinates within the radius, and you've

23  noted that only Location History information was

24  responsive to the warrant; right?

25  A   That's correct, yes.

**Exhibit E, pg. 386**

McGRIFF - CROSS                     387

1   Q    And that means that if the defendant's account

2   didn't have Location History enabled, we'd get

3   nothing; right?

4   A    That is correct, yes.

5   Q    And I just want to sort of be emphatic about that.

6   It is not that he turned on Location on his device;

7   right?

8   A    That is correct.

9   Q    And so when I say that, it's not that I get a

10  phone, and I say I want to use where I am at this

11  moment; right?

12  A    That is correct, yes.

13  Q    And neither is it if I turn on Google Maps, and I

14  want realtime location services, I don't want to just

15  put in one address and go to another, just doing that

16  doesn't enable Location History, does it?

17  A    No, that is correct.

18  Q    And so when we talk about Location History, we're

19  talking about that setting that you have said

20  two-thirds of your customers have found the ability to

21  not enable; right?

22  A    That is correct, yes.

23  Q    Okay.  And that's in your declaration that

24  approximately one-third have turned it on; right?

25  A    Yes.

**Exhibit E, pg. 387**

McGRIFF - CROSS                    388

1   Q    But even after it's turned on, even after it's

2   turned on, you can delete it?

3   A    Yes.

4   Q    You mention on direct, you said we use the word

5   "pause"; right?

6   A    Yes.

7   Q    Not for deletion, but for turning it off?

8   A    That is correct.

9   Q    And so when it's paused, it is off?

10  A    It is functionally off, yes.

11  Q    Let's be clear about it.  When it's paused, there

12  is no record that would be responsive going forward

13  from Google on the defendant's account; right?

14  A    That is correct.

15  Q    So if I had Location History enabled in this case,

16  the robbery, I think, took place May 20, 2019, if I

17  paused that on May 19, 2019, and I still had location

18  on on my device, and I traveled with it the next day,

19  Location History wouldn't know where I traveled on

20  May 20 that next day; right?

21  A    That's correct.

22  Q    And by the same token, the government could come

23  to you with a warrant five times -- as many times as

24  we wanted.  We wouldn't get information on May 20,

25  2019; right?

**Exhibit E, pg. 388**

McGRIFF – CROSS                389

1   A    That is correct.

2   Q    All right.  When we talk about the deletion, you

3   mentioned near immediate deletion; right?

4   A    That is correct, yes.

5   Q    Can you clarify what that means?  If I deleted --

6   and maybe -- if you can.  If I deleted my Location

7   History information at 5 p.m. Eastern, would Google

8   turn the information over to the government if they

9   served the warrant the next morning?

10  A    By design, we will return in response to these

11  warrants whatever we have.  The deletion process

12  begins immediately.  There is some point in that

13  process where the data is not retrievable for this

14  purpose.  And the reason it's hard to put an exact

15  point in time on that is we have servers.  The data is

16  stored on tapes and servers.  It will take time to

17  propagate through the full system before data is

18  deleted from tapes.  But I am also certain that we are

19  not getting to the point of retrieving tapes from data

20  centers to respond to the warrant.

21       So there is some point in that flow where

22  eventually it's no longer accessible by the tools

23  because it's too far along in the deletion

24  propagation.  I just -- I don't have a way of putting

25  an exact time on when that happens.

**Exhibit E, pg. 389**

McGRIFF – CROSS                              390

1   Q   So in this case, we -- the robbery happened on

2   May 20, 2019.  We came to Google on June 14 of that

3   same year.  If the defendant had deleted his Location

4   History information, it wouldn't have been available

5   by that point; right?

6   A   If it was deleted the day after, I don't see how

7   it would be possible for it to still be available, no.

8   Q   But as a general matter, the near immediate

9   deletion, you're saying that happens in realtime?

10  A   The request is initiated right away.  Again, it

11  just takes time to propagate down to tapes.

12  Q   Okay.  When we've talked -- and pausing means it's

13  obviously turned off.  Deletion means it's deleted.

14  And when it's paused, it's paused?

15  A   Yes.

16  Q   I wanted to go through with you the opt-in to

17  Location History process that you've described in

18  multiple of your declarations, both the first and the

19  third, which will be 3 and 3C, if you want to

20  reference them as we go through it.

21      Google has server side protections -- correct? --

22  in terms of what information goes into the so-called

23  Sensorvault?

24  A   Yes.

25  Q   So if a user doesn't follow that consent flow,

**Exhibit E, pg. 390**

McGRIFF - CROSS                391

1    Google rejects collecting the Location History

2    information; right?

3    A    I would flip it and say that collection is not

4    initiated unless there's been a valid consent, yes.

5    Q    And the defense has shown you a number of -- a

6    number of screenshots.  And I'll get to those with

7    you.  But the opt-in on this device, I know you don't

8    have the specific user interface, but we have Location

9    History information on this phone.  It had to follow a

10   verified consent flow that Google had at that time;

11   right?

12   A    Yes.

13   Q    And that consent flow, as you noted, a verified

14   consent flow would be the same across all applications

15   and devices?

16   A    It's the same consent that was acknowledged in

17   some context, yes.

18   Q    When we talk about the consent flow that you were

19   talking about on direct for Google Assistant and the

20   consent flow generally, there is always a process by

21   which you would have to see what you're consenting to

22   on the page; right?

23   A    There is some reference to -- yes.  Yes.

24   Q    And you'd have to scroll down to get to the

25   buttons in question?

**Exhibit E, pg. 391**

McGRIFF – CROSS                           392

1              THE COURT:  The what question?

2              MR. SIMON:  I'm sorry.  The buttons.

3              THE COURT:  So, I think, especially at the

4    end of your sentences, which usually include your key

5    aspect of the question, I'm having trouble hearing it.

6              MR. SIMON:  Okay.  Apologies, Judge.

7              THE COURT:  That's fine.

8    BY MR. SIMON:

9    Q   You'd have to go down to the "Turn on" or "No,

10   thanks" buttons before you consented to, in this case,

11   Location History; right?

12   A   In that specific flow, yes.

13   Q   Now, in your supplemental declaration, and I think

14   you stated on the record that you stand by these

15   declarations, you noted that the defense expert was

16   wrong when he said all you had to do to have

17   successfully enabled Location History information was

18   click "Yes, I'm in" on Google Maps; right?

19   A   Yes.

20   Q   At the same time, the screen that the person would

21   be seeing on Google Maps does say that Google

22   periodically stores your location; right?

23   A   Yes.

24             THE COURT:  So, are you moving into evidence

25   3B?

**Exhibit E, pg. 392**

McGRIFF - CROSS                          393

1              MR. SIMON:  Judge, I think we've already

2     moved in 3B.  I moved them all in together, 3A, 3B,

3     and 3C.

4              THE COURT:  Oh, I thought you just did 3A and

5     3C.

6              MR. SIMON:  No.  If I did, I do want to move

7     in 3B.

8              THE COURT:  There's no objection, right?

9              MS. KOENIG:  That's right.

10             THE COURT:  It's in.

11    BY MR. SIMON:

12    Q   Now, with respect to the Google Assistant opt-in,

13    did you have a chance to previously watch videos that

14    the defense counsel have provided in preparation for

15    this hearing?

16    A   If I remember correctly, I saw two videos, yes.

17    Q   Did you happen to see possibly a "Got To Be

18    Mobile" video?

19    A   I believe so, yes.

20    Q   I'm going to show you what was formerly marked as

21    Defense Exhibit 8.

22             MR. SIMON:  But I've marked it, Judge, for

23    this hearing, Government's Exhibit 12.  It's a video,

24    Judge, that I just think will play for about 15

25    seconds, and then skip to a certain point in the

**Exhibit E, pg. 393**

McGRIFF - CROSS                           394

 1  video.

 2          THE COURT:  All right.  Is there any

 3  objection to the use of this exhibit?

 4          MS. KOENIG:  I don't know what the --

 5          MR. SIMON:  This is the "Got To Be Mobile"

 6  video that you provided to us in preparation for the

 7  November hearing that was no longer on the list for

 8  this hearing.

 9          But we can play it, Judge.

10          MS. KOENIG:  I think we need to have a couple

11  of questions that are laid.  So we had that on our

12  exhibit list.  I'll tell the Court that we don't know

13  when that video was made.  So if we can lay a

14  foundation about when that was created, that will be

15  helpful.

16          MR. SIMON:  Judge, ample hearsay has been

17  admitted in this hearing, one.  I think it's a YouTube

18  video.  We can do that through our expert later

19  subject to connection on the date on that.  That has a

20  date to it that defense counsel provided to us again.

21  This is how we have the video and that the witness has

22  said he's watched.  I'd like to have him watch the

23  video and say he's watched it.  And to the extent that

24  --

25          THE COURT:  Was it played in the earlier

**Exhibit E, pg. 394**

McGRIFF - CROSS                           395

1    hearing?

2            MS. KOENIG:  It wasn't.  Your Honor, this

3    video is a video that we had identified as a potential

4    exhibit for the November of 2020 hearing that we had

5    to continue.

6            All I'm saying, there is a date that is

7    associated with the video, but that is the video

8    creation date, not when the -- that is the video

9    posting date, not when the video was created,

10   necessarily.

11           THE COURT:  All right.  Well, I will admit it

12   subject to those objections.

13           You know, we're establishing a full record

14   here.

15           MS. KOENIG:  Sure.  And I appreciate that.

16           The other thing I'll just note for the Court

17   is that the video skips.  I indicate to the Court that

18   we had anticipated potentially introducing this.  We

19   just noticed some flaws with this, and I just wanted

20   to bring them to the Court's attention before we watch

21   it.

22           THE COURT:  Okay.  Well, that's different

23   than objecting to its entry.  Okay.  It's entered.

24           (Government's Exhibit No. 12 is admitted into

25   evidence.)

**Exhibit E, pg. 395**

McGRIFF - CROSS                      396

1          MR. SIMON:  Thank you, Judge.  We'll play it.

2          (Video is played.)

3   BY MR. SIMON:

4   Q   Mr. McGriff, in this video, is this what we're

5   talking about when we talk about Location History

6   information?

7   A   No.

8   Q   Okay.  This is just sort of what you would agree

9   to if you wanted Google Maps to have realtime

10  information?

11  A   Any app, yes.

12  Q   Any app.  Okay.

13         (Video is played.)

14  Q   Is this where if you were going to enable Location

15  History on this phone, a Samsung Galaxy S9, at setup,

16  is this a possible consent flow screen you'd see on

17  Location History?

18  A   This is a possible flow, yes.

19  Q   Okay.  Is Location History on the screen by

20  itself?

21  A   It is.  As I mentioned previously, the user would

22  be presented with whatever consents were not already

23  agreed to that were required or suggested required in

24  this context.  So the only one that was prompted here

25  is Location History, yes.

**Exhibit E, pg. 396**

McGRIFF - CROSS                    397

1   Q   And to get past this page, you'd have to choose --
2   what are the options there?
3   A   Two options, "No, thanks" or "Yes, I'm in."
4   Q   Okay.  And, again, the line down at the bottom
5   reminds the user.  It appears that they can go to
6   account -- myaccount.google.com; is that right?
7   A   That's correct, yes.
8   Q   To change those settings?
9   A   Yes.
10          MR. SIMON:  Judge, no further questions on
11   Government's Exhibit 12 at this point.
12          THE COURT:  All right.
13   BY MR. SIMON:
14   Q   Well, just to reiterate.  This is a possible
15   consent flow, as well -- right? -- that the defendant
16   might have encountered in July of 2018?
17   A   That's possible.  The screen immediately before is
18   saying, hey, there's Assistant.  Do you want this?
19   And this following screen, "Yes."
20   Q   Where Location History stands alone?
21   A   That's correct, yes.
22   Q   Do you have any reason to believe that that's not
23   a Samsung Galaxy S9 Plus?
24   A   I am not an expert on Samsung devices.
25   Q   Understood.

**Exhibit E, pg. 397**

McGRIFF - CROSS                     398

1          Now, I want to talk about the reality of Google

2      Assistant and sort of the value that it has, to some

3      extent.

4                THE COURT:  The value it has to what?

5                MR. SIMON:  To some extent.

6                THE COURT:  Okay.

7      BY MR. SIMON:

8      Q    The Google Assistant -- in opting in through

9      Google Assistant doesn't change that to have Location

10     History information.  You first, at least, have to

11     turn location settings on a device on; right?

12     A    That's correct.

13     Q    And that's just if I have my phone, again, I need

14     to tell my phone you can get my location.  So it

15     wouldn't change that?

16     A    Correct.

17     Q    It doesn't change that I would have to get to a

18     screen like we've just seen in Government's Exhibit

19     12, or as defense has posited, where you've got a few

20     more options.  You'd have to say either, "Yes, I'm in"

21     or "Turn on" or "No, thanks"?

22     A    That's correct.

23     Q    And at the same time you'd also have to make sure

24     that location reporting is on just beyond the device;

25     right?  It's, like, the app level setting?

**Exhibit E, pg. 398**

McGRIFF - CROSS                    399

1   A    Location reporting -- the control that is a

2   subsetting of Location History is enabled on the

3   device that you opted in on if it is a mobile device

4   that can be used for Location History.  We don't

5   support all form factors.  So, for example, you can't

6   opt in to Location History through a TV.  But if you

7   were signed into any other devices, it would not

8   enable location reporting on those devices remotely,

9   no.

10  Q    Just to be clear about your testimony on direct,

11  you don't believe that pressing "No, thanks" that's

12  set forth in Defense Exhibit 7, pages 3 and 4, that

13  that would mean you can't use Google Assistant; right?

14  A    That's not my understanding, no.

15  Q    There was some discussion of -- and, obviously,

16  you'd have to turn on the device.  And there's the

17  point about signing in to your Google account.  So you

18  still -- if I have a phone, and I have Location

19  History enabled, you could actually just sign out of

20  the Google account altogether on a phone; right?

21  A    That's correct.

22          THE COURT:  Wait, wait, wait.  What do you

23  mean by that?  Sign out --

24  BY MR. SIMON:

25  Q    So, you can help me explain it.  There are -- when

**Exhibit E, pg. 399**

McGRIFF – CROSS                          400

1    I have a phone, and I set up a phone, if I tie a

2    Google account to the phone, then the phone has my

3    Google account connected to it; right?

4    A    Yes.

5    Q    And I would have to be signed in to that Google

6    account for Location History information to be

7    accessible; right?

8    A    Yes.  You can add a Google account -- multiple

9    Google accounts to a device.  Just as easily as you

10   can add them, you can remove them.  So you can sign in

11   and out of accounts on a device, yes.

12   Q    And those application level options, talking about

13   in your declaration, particularly the third one, I

14   think it's from paragraph 25, where you talk about you

15   could say allow an application to use my location

16   sometimes, deny it, allow it only while I'm -- or

17   allow it all the time.  Those options are available on

18   both Android and iPhone?

19   A    Yes, those are the operating system, OS, level

20   controls for app access to location.

21   Q    Okay.  And there's a lot of sort of discussion

22   about privacy concerns of Google users.  You'd agree

23   that there's a sort of varying level of interest in

24   privacy by different users; right?

25   A    There are varying degrees of privacy

**Exhibit E, pg. 400**

McGRIFF - CROSS                    401

1  considerations, yes.

2  Q   So there is some discussion that some people are,

3  like, convenience seekers.  I've seen that phrase

4  used.

5  A   Yes.

6  Q   And so by that, I don't mind what Google is asking

7  for -- right? -- because what I'm interested in is

8  going from point A to point B, and I want realtime

9  traffic directions; right?

10 A   That is possible, yes.

11 Q   With respect to the two-thirds of folks who have

12 not enabled Location History, your testimony on that

13 one-third piece is that that has been consistent

14 across the time that Location History has been enabled

15 or has been a product; right?

16 A   For the life of the product, yes.

17 Q   How long has it been a product of Google's?

18 A   Many years now.

19        THE COURT:  How many?

20        THE WITNESS:  Many years now.  I believe it

21 was made a product in 2015 or 2016.

22 BY MR. SIMON:

23 Q   So over the course of those -- in this case, by

24 the time you have 2019 -- four years, the number has

25 been roughly the same, a-third of users have enabled

McGRIFF - CROSS                              402

1    it?

2    A    That's correct.

3    Q    Two-thirds have decided not to collect Location

4    History information?

5    A    That's correct.

6    Q    And, again, the only reason that you had anything

7    to give us under geofence warrant is because Location

8    History was enabled on the defendant's account?

9    A    That is correct, yes.

10   Q    There was some questions on direct about the

11   search that Google does to give us the responsive

12   information.  You don't posit -- right? --that you

13   gave us anything other than 19 devices in this case?

14   A    I have no visibility into the processing and

15   servicing of these warrants.

16   Q    Right.  So I'm making a mistake there, too, in

17   asking warrant-related questions.  But to the extent

18   that Google responds to the warrant, it is always

19   going to be for only the devices that were within a

20   radius at a certain period of time; right?

21   A    That is correct.

22   Q    And is there a possible way in which -- we've

23   talked about sort of the indexing possibly, the grid

24   and location coordinates.  Isn't there a way that

25   Google could possibly keep folks who are in Richmond

**Exhibit E, pg. 402**

McGRIFF - CROSS                      403

 1   on a certain side of town -- I'm going to use the

 2   right words here -- sort of separate them out in terms

 3   of their location coordinates just based off of where

 4   they are at a certain period of time?

 5   A    Is the question is it possible to refine the scope

 6   of the request?

 7   Q    To refine the scope -- the manner in which Google

 8   goes about getting information inside of its own

 9   servers.

10   A    Objectively, yes.  This process could be refined

11   and crafted in a number of ways, yes.

12   Q    On the Google side; right?

13   A    On all sides, yes.

14   Q    When we talk about -- but the warrant in this

15   case, specifically, you agree, just asks for folks who

16   Google determines is within a certain radius at a

17   certain period of time; right?

18   A    That's correct.

19   Q    So it would only be our interest in this case, and

20   the government's interest in other cases, to know

21   which devices were at the site of an alleged crime;

22   right?

23   A    That is my understanding, yes.

24   Q    And the manner in which Google undertakes this

25   search, that is not directed by the government; right?

**Exhibit E, pg. 403**

McGRIFF - CROSS                    404

1    A    No.

2    Q    And when I use "search" -- not to cut you off.

3    When I use "search," I'm not using that in the context

4    of sort of the Fourth Amendment.  And when you say

5    "searching the database," you're not talking about the

6    issues at hand here; right?

7        Let me ask it another way:  You're not a lawyer;

8    correct?

9    A    Far from it.

10   Q    And I'll just leave it there.

11       The discussion of anonymized devices and

12   deidentified is a phrase that Google uses; right?  The

13   release of data by Google responsive to the request,

14   particularly just focusing on the first stage here,

15   give us the devices within a certain period of time at

16   the site of an alleged crime.  That does not give us

17   the name of the individual involved; right?

18   A    That's correct.

19   Q    It does not give us a phone number of the person

20   involved; right?

21   A    That is correct.

22   Q    It doesn't tell us anything other than the

23   location coordinates that are responsive to them being

24   at the site of an alleged crime at the time alleged in

25   the warrant; correct?

**Exhibit E, pg. 404**

McGRIFF – CROSS                        405

1    A    That is correct, yes.

2    Q    The discussions of Google's business model,

3    location information matters to Google's bottom line

4    in terms of money; right?

5    A    I cannot speak to the impact on our bottom line

6    overall as a company.

7    Q    I guess to use a phrase, location information that

8    users provide you can be used as a commodity within

9    the business?

10   A    I would say -- I would generalize that slightly to

11   say that location awareness is a core component of

12   computing broadly in all contexts at this point in

13   time.

14   Q    Okay.  Computing broadly --

15   A    Just there are very few products and services

16   beyond Google that don't rely on some location

17   awareness, whether it be to understand whether or not

18   you can view content in a specific area.  I mean,

19   there are broad uses of location information generally

20   in terms of just how information technology works

21   today.

22   Q    Okay.  In looking at some of sort of the uses that

23   when Google is providing goods and services to its

24   customers and doing so in an effective way, that's a

25   part of Google's business model; right?

**Exhibit E, pg. 405**

McGRIFF - CROSS                    406

1    A    Our goal is to be effective, yes.

2    Q    And I ask that sort of basic question because when

3    we look at --

4              MR. SIMON:  Can we pull up the first

5    affidavit of Mr. McGriff.  This is Exhibit 3.

6    BY MR. SIMON:

7    Q    In paragraph 5, you sort of note that the use of

8    this information sort of allows a user to store and

9    record their movements and travels; right?

10   A    That's correct, yes.

11   Q    And you sort of used that -- this information is

12   used to do, among other things, sort of make -- sort

13   of make different -- give sort of targeted ads that

14   might be of value?

15   A    Location History isn't used for ads targeting.

16             THE COURT:  I'm sorry.  What was your answer?

17             THE WITNESS:  Location History is not used

18   for ads targeting.  It's specifically used for ads

19   measurement.

20             THE COURT:  For ads --

21             THE WITNESS:  Measurement.

22             THE COURT:  Measurement.  Okay.

23   BY MR. SIMON:

24   Q    And I think that you corrected me there.  So the

25   point is location is what is used for those types of

**Exhibit E, pg. 406**

McGRIFF - CROSS                    407

1   improvements; right?

2   A    That's correct.

3   Q    Bottom line location, not necessarily what's

4   stored as responsive to this search warrant?

5   A    That's correct.

6   Q    But they're both, in a broad sense, location?

7   A    They are all location, yes.

8   Q    But, again, the only thing we get in this case is

9   what's stored in the Sensorvault, and that's only

10  Location History?

11  A    That is correct.

12  Q    In paragraph 14, I'm just going to ask you to read

13  it and sort of explain for us what you're getting at

14  there.

15  A    Let me read the whole thing.

16       So, this specifically speaks to ads measurement,

17  and what I had previously mentioned in the context of

18  the COVID mobility reports or other sort of aggregated

19  deidentified uses of this information.  It's not from

20  an advertisement or advertising perspective.  It's not

21  that I specifically, as a user, went to a specific

22  space or place.

23       The interest in use here is the effectiveness of

24  I as -- not I at all.  That some percentage of people

25  saw this and went to this place.

**Exhibit E, pg. 407**

McGRIFF - CROSS                    408

1     So paragraph 14 is speaking at a very high level

2   to the fact that in its aggregate, anonymized form,

3   this information can be used to measure the

4   effectiveness.  And so that's the measurement, ads

5   measurement.

6     Not -- no way do we share, and never have we

7   shared, explicitly that I went to a specific place

8   with a third party.

9   Q   Understood.  But it's used in an aggregated --

10  A   Correct.

11  Q   In stepping to -- because, again, they're

12  different location services.  Just the ability to

13  track location is different than what's stored in the

14  Sensorvault as Location History.  So I'm going to ask

15  you about just the location services generally.

16  A   Okay.

17  Q   Those are -- those coordinates, not relevant to

18  this particular warrant, but if I use Google Maps,

19  say, on my phone, you all would use the coordinates

20  from Google Maps to improve services or me as a user

21  of Google Maps?

22  A   I don't know what you mean in that context.

23  Location services at the device level, that would be

24  available to Google Maps.  So depending on whether you

25  gave Maps access to -- there's those options you

**Exhibit E, pg. 408**

McGRIFF - CROSS                    409

 1  mentioned; always, never, while in use.  So if Maps

 2  did not have access to location, then it would not

 3  have location awareness.  If you granted Maps while in

 4  use, it would only have access to device location

 5  while you were using Maps, meaning Maps was in the

 6  foreground.  And if you said always, then Maps will

 7  have location access even when you're not using Maps.

 8       So in terms of Maps' specific access to location,

 9  it would be determined by those permissions and what

10  the user granted.

11  Q    Okay.  Let's say a user grants Google information

12  on its location when using Google Maps.  Do you use

13  any of that location -- this is different from

14  Location History information, but do you use any of

15  that location to sort of do things like provide

16  realtime traffic updates?

17  A    That's a great question.  Traffic updates and

18  understanding, there are any number of signals that

19  inform that.  Again, that's an aggregate.  So it's not

20  somehow my experience driving from here, three blocks

21  over, is directly going to change what you see on your

22  navigation experience.

23       But, you know, if several thousand people drove

24  this way and encountered the same issue, that in

25  aggregate would be reflected.  That location signal is

**Exhibit E, pg. 409**

McGRIFF - CROSS                    410

1   one of many signals, yes.

2   Q    Okay.  And things sort of like the -- you

3   mentioned the ads, but if I give Google my location,

4   just generally, you would ensure that I might receive

5   more relevant ads based on location; right?

6   A    Are you speaking about a specific app or do you

7   just mean Google generally being location aware?

8   Q    I mean, you can talk about it however you want to,

9   but I understand Google has a lot of products, and so

10  I don't think it's of great value to go product by

11  product.  But just in general, the use of location

12  information as provided by users, not the Location

13  History, but just location services reporting to

14  Google, do you all use that in terms of offering

15  better services to customers, and if so, how do you do

16  it?

17  A    So location is very broad.  As I mentioned, you

18  have at its coursest level location used to understand

19  are we able to deliver a certain type of content in

20  this area where we understand the user to be.  Are we

21  able to -- you know, is the user in an area where we

22  should be providing certain services to begin with?

23  That's location at its most course level.

24      Then you get down to a still course level, just a

25  granular city understanding.  If you were to open

McGRIFF – CROSS                    411

1   search right now and say "pizza near me" or "baked

2   goods," the search results would be informed by our

3   best understanding at that time of where you are.  And

4   that understanding would be directly informed by

5   whatever service -- whatever consented access we have

6   to your location.

7       So if you had completely turned off all other

8   device signals, we will have at a very course level if

9   you search for "pizza near me," the fact that that

10  request is hitting our server, we will have some

11  concept, but you might see that the pizza results are

12  all over the Richmond region.

13      If you then enabled -- you can keep going down

14  giving us more access to different controls.  You can

15  opt in to Location History on that device and actively

16  be reporting from that device and attempt that exact

17  same query, and we would have a much more refined

18  understanding of when you said "pizza near me," go

19  right outside.  There's a place next door.

20      So there are a lot of layers to the onion, but we

21  will look to -- our responsiveness or what we are

22  presenting to the user will be directly informed by

23  what we have access to in that specific context on

24  that specific device for that account.

25  Q   I wanted to ask some questions, as well, about,

**Exhibit E, pg. 411**

McGRIFF – CROSS                    412

 1   just generally, some of the exhibits that came in --

 2          THE COURT:  So, Mr. Simon.  I'm sorry to

 3   interrupt you, but do you have a while to go on your

 4   cross-examination?

 5          MR. SIMON:  I don't think a while to go,

 6   Judge, but I think 15 more minutes possibly.  I was

 7   going to ask my co-counsel if they wanted me to touch

 8   anything else.

 9          THE COURT:  Right.  You know, we are now

10   hitting in -- it's almost -- it's 20 of one.  We've

11   been sitting here for a while.  So we could either let

12   you finish if it's going to be -- but I don't want to

13   lose folks.  You know, sugar levels may be high or low

14   or whatever it is.

15          MR. SIMON:  Okay, Judge.  I think we can move

16   it along.

17          THE COURT:  Okay.  I'm not trying to rush

18   you.

19          MR. SIMON:  No, no, I understand.

20   BY MR. SIMON:

21   Q   In regards to the functionality of the phone or of

22   a device, when we're talking about, again, the ability

23   to move in realtime and get realtime, like I'm saying

24   traffic updates, that's a location at the device level

25   setting, but also maybe location reporting; right?

**Exhibit E, pg. 412**

McGRIFF - CROSS                          413

1   A   You have -- yes.

2            THE COURT:  So it's location device and

3   Location Reporting, is that what you said, Mr. Simon?

4            MR. SIMON:  Yes, Judge.

5   A   To be clear, Location Reporting is specifically

6   capital L, capital R, is a subsetting of Location

7   History.  If you do not have Location History on, you

8   can't enable Location Reporting.  Location Reporting

9   and Location History, distinctly separate from

10  location services at the device level.

11       If location services at the device level are

12  enabled, and you, for example, in your example, I

13  think you were specifically talking about Maps.  You

14  would still have the ability to get access to some

15  location awareness to use Maps.  You don't use

16  Location History to use Google Maps.

17  Q   And that's the case for, really, any realtime sort

18  of update on movements kind of application; right?

19  Location History is not needed for that?

20  A   It depends on what specifically you're referring

21  to, but, yes, there are a lot of realtime updates that

22  are possible with only current location, yes.

23  Q   With respect to the emails that are sort of, I

24  think, I use the phrase "cherrypicked" from the

25  Arizona litigation that Arizona has with Google.  Is

**Exhibit E, pg. 413**

McGRIFF - CROSS                    414

 1    it your testimony -- it's my understanding that your

 2    point is that's indicative of an ongoing sort of

 3    conversation that Google employees have.

 4    A    Google employees have a lot of opinions, yes.

 5    Q    And to the extent that they've been entered here,

 6    I think it's fair to say that you don't generally

 7    agree with those opinions as they've been expressed.

 8    A    Google employees have a lot of opinions.  I will

 9    always listen to Google employees and what they have

10    to say.

11    Q    That worked.  But I wanted to also allow you to

12    comment a bit more about Oracle.  You mentioned on

13    direct examination that Oracle will give the least

14    favorable view to Google.  Can you expand on what you

15    meant by that?

16    A    Everyone has a narrative.  Some facts fit more

17    comfortably in a narrative than others.  That is

18    certainly everyone's privilege in advancing a

19    narrative.

20    Q    Mr. McGriff, I realize I went over a number of

21    things with you, but I do want to end with sort of,

22    again, the most, in my estimation, sort of the most

23    important pieces of what we've discussed.

24        Location History is the only information

25    responsive to a geofence search warrant; correct?

**Exhibit E, pg. 414**

McGRIFF – CROSS                           415

1   A    That is correct, yes.

2   Q    And the reason that Google provided only Location

3   History information is because Web & App Activity

4   isn't responsive; right?

5   A    It is no longer responsive, that's correct, yes.

6   Q    And Google Location Accuracy or services, as it

7   was formerly known, is not responsive?

8   A    Not capable of being responsive, yes.

9   Q    And when we say "responsive," we're saying you

10  cannot put devices within a certain period of time

11  within a certain radius sufficiently to turn that

12  over; right?

13  A    It is not possible, that is correct.

14  Q    Okay.  And your testimony here today as it relates

15  to Google Assistant is that you're either going to see

16  a consent flow consistent with Location History being

17  on a page with a few other options or Location History

18  being on a page by itself; right?

19  A    Reiterating that I am not the Google Assistant

20  product manager, my understanding of that flow is that

21  it is dynamic, and depending on a user's previous

22  activities and interaction with Google products and

23  services, they would see some variation of that flow

24  if they chose to set up Assistant at that time.

25  Q    After a user enables Location History information,

**Exhibit E, pg. 415**

McGRIFF - CROSS                          416

1   separate and apart from whether they have location

2   services on, they can delete it; right?

3   A    Yes.

4   Q    Yes?

5   A    Yes.

6   Q    Okay.  And near immediate deletion occurs when

7   they seek to delete it; right?

8   A    Yes.

9   Q    And, third, they can pause it; right?

10  A    Yes.

11  Q    And pausing means it is entirely off?

12  A    There is no new collection, that's correct.

13        MR. SIMON:  No further questions, Judge.

14        THE COURT:  All right.  I'm going to ask one

15  question.  And I'm going to allow you to stand there

16  in case it prompts anything.

17        If I were to log in to a Google function on

18  someone else's phone, where does that Location History

19  go?  Does it go to the phone?

20        THE WITNESS:  If you had previously opted in

21  to Location History for your account, and then you

22  signed in to another person's phone, if you were --

23  there's a fork there.  If on your previous device, you

24  had turned Location History on and were actively

25  reporting for some period of time, and then you

**Exhibit E, pg. 416**

McGRIFF - CROSS                    417

1   immediately switched and added your account to another

2   device, then that device would start contributing to

3   your Location History.  It would not start

4   contributing to -- let's say it was my device and I

5   didn't have Location History on, you would not

6   suddenly enable Location History for my account.  The

7   collection on that device would be to your account,

8   not to my account.

9          THE COURT:  Okay.  So if I'm on my law

10  clerk's phone, and I log in to my account, say we both

11  have Location History, does the Location History go --

12  where does it go?

13         THE WITNESS:  For both of you, and you both

14  have opted in to Location History, then for both of

15  you it will be logged in your accounts on our servers.

16         THE COURT:  But if hers is off, then it just

17  goes to me?

18         THE WITNESS:  If she has not opted in to

19  Location History or if she has paused it, then there

20  would be no collection for her account from the

21  information on the device.  It would only be to your

22  account.

23         THE COURT:  All right.  I'm not sure that's

24  relevant, but I'm doing my best to make sure I have a

25  full record.

**Exhibit E, pg. 417**

McGRIFF - CROSS                    418

1          I don't want to confuse what you've said.

2    Does that prompt a question?

3          MR. SIMON:  Judge, that was a fine question

4    for me, but I have -- I do have -- I did want to ask

5    about the 68 percent thing, and it's the last

6    question.

7          THE COURT:  That's fine.  I'm really not

8    trying to rush you.  Some folks sitting just need hope

9    that they're going to stand soon.  We've gotten that

10   in their heads, and so everybody can refocus.  So do

11   your job.  You're fine.

12         MR. SIMON:  Understood, Judge.

13   BY MR. SIMON:

14   Q   I did want to explore.  We talked a little bit

15   earlier about the technological advancement piece.  I

16   was asking that in a broad way because I'm not refined

17   in that space, but the GPS points that are returned in

18   the first stage where we say give us everybody who's

19   in the geofence radius, how does Google come up with

20   those points?  How does Google assess those points?

21   A   I don't believe there's any assessment in the

22   actual sensor data reported.  So when I talk about the

23   evolution of technology, if you're using -- think

24   about the device that you were using -- the mobile

25   device that you were using in 2014 versus the device

**Exhibit E, pg. 418**

McGRIFF - CROSS                    419

1    that you're using today.  Presumably, you've updated

2    your device at least one time maybe.  The sensors on

3    your hardware will be immanently better than sensors

4    on older hardware.

5        So when I talk about improvements in technology,

6    it's in the hardware itself and the sensors

7    themselves.  We are not doing any interpretation on

8    what the sensors report.  The sensors say, "This

9    device was in this place."  And we are recording that.

10   I believe it's mentioned in one of my declarations.

11   It is captured in that suite of things that we collect

12   in the location proto.

13       And so we are just saying this device said this to

14   me at this time, captured in time, stored on server.

15   There's no editorializing of that raw location point.

16   Q   Okay.  And I guess my question is:  Do you have an

17   understanding of what goes into creating a GPS point

18   and particularly one that Google would collect?

19   A   Nothing beyond sort of the standard sensor

20   information that's collected there and put into the

21   report.

22   Q   Okay.  And what's the standard sensor information?

23   A   We're looking at -- I mean, it's the triangulation

24   of where we have -- you need to be somewhere where you

25   can actually triangulate on at least three satellites.

**Exhibit E, pg. 419**

McGRIFF - CROSS                    420

1    So the device needs to be somewhere where you can

2    bounce off of three satellites, and they can say,

3    "Based on these three readings, you are likely here."

4        To my understanding, that is the extent of the

5    limitation of GPS being captured.

6    Q    And what about in terms of Google's Wi-Fi

7    collection, Wi-Fi point collection?

8    A    If Wi-Fi scans are happening, they are yet another

9    signal that is captured.  In terms of the raw point,

10   it is, again, just another piece of information.

11   Q    Okay.  And no -- does Google sort of assess

12   anything about their Wi-Fi point accuracy?

13   A    It's difficult to build a house on a potentially

14   moving foundation.  So you could move all of these

15   access points tomorrow, and then your device might

16   think something's different.

17       I don't know if you've had this experience.  In

18   San Francisco, if you use BART, the BART station in

19   downtown San Francisco happens to think it's in

20   Oakland.  So if you open your phone there and say, "I

21   want an Uber," it will think you're in Oakland.

22   That's just how they've assigned and how they're

23   handling data through their Wi-Fi network.  So those

24   are possible, but we don't make any -- I don't have

25   any statements on the quality or how that might shift.

**Exhibit E, pg. 420**

McGRIFF - CROSS                        421

1    Q    But Google -- I guess the assessment by Google of

2    the Wi-Fi access points is in that display radius.

3    The assessment of the Wi-Fi points is in the display

4    radius, and, as you testified earlier, that 68 percent

5    goes to whether they're inside that display radius?

6    A    That's correct.

7    Q    All right.

8              MR. SIMON:  No further questions, Judge.

9              THE COURT:  All right.

10             MS. KOENIG:  Your Honor, I have a pretty

11   short redirect, and so I think no more than 10

12   minutes.  And so if that gives everybody enough

13   hope --

14             THE COURT:  I'm telling you, like, my court

15   reporter is -- it's just too much.

16             MS. KOENIG:  Okay.

17             THE COURT:  I appreciate your effort, but I

18   usually try to keep it at an hour and a half or two,

19   and that's largely because of the sort of focus that

20   certainly Ms. Daffron has, but also a witness could

21   use a break.  So I appreciate your effort, but I think

22   we are going to take a lunch break.

23             MS. KOENIG:  Okay.

24             THE COURT:  All right.  So we're now at

25   almost one.  Can we do 1:30?  Does that give people

**Exhibit E, pg. 421**

McGRIFF - CROSS                    422

 1  enough time?

 2          MR. SIMON:  That works, Judge.

 3          THE COURT:  All right.  So, I'm going to tell

 4  you that I actually don't know the status now, but as

 5  we were beginning to speak, we have learned that AT&T

 6  had opened a ticket to the problem, and it's on their

 7  end.  And they did not have a time frame for

 8  resolution.  So we may know more now, but I'm not

 9  going to ask.  We'll update you as we come back in.

10  So I think we certainly made the right call.

11          I do want us to be cognizant of time.  We

12  still have witnesses to go.  And so I really am going

13  to ask you all to -- we spent a lot of time with

14  folks, and I want the questioning to be crisp and

15  thoughtful.  I want you to do your job, but I really

16  wasn't sure we'd go over into today, and that we still

17  have as many witnesses as we do is shocking to me.

18          So I'm just going to put that bug in your

19  ear, and hope that you are -- now that we have lots of

20  foundation about how Google works and other things,

21  that we just do what we need to do from here on out.

22          MR. SIMON:  Understood, Your Honor.

23          THE COURT:  All right.  Mr. McGriff, thank

24  you.  You are coming back, apparently, just for 10

25  minutes or so.  So you're still under oath.  And I do

**Exhibit E, pg. 422**

McGRIFF – CROSS                          423

1    appreciate everybody's good efforts.  All right?

2    Thank you.

3               (Luncheon recess taken at 12:53 p.m. until

4     1:30 p.m.)

5               THE COURT:  All right.  So we're continuing

6    our hearing.  Do we have any AT&T participants?

7               THE CLERK:  No.

8               THE COURT:  No.  All right.  Well, hopefully,

9    you were able to speak with your colleagues.

10              All right.  So we're prepared for

11   cross-examination.

12              Mr. McGriff, are you chilly?

13              THE WITNESS:  Sorry.  I was outside earlier.

14              MS. KOENIG:  I think we're on redirect, but

15   it is an adverse redirect.

16              THE COURT:  Oh, adverse redirect.

17              MS. KOENIG:  It feels like a lot of cross

18   today, I will agree.

19              THE COURT:  Yeah, I got distracted.

20              Do you want us to hang that up for you, sir?

21              THE WITNESS:  No, this will be fine.  Thank

22   you.

23              THE COURT:  Okay.

24

25

**Exhibit E, pg. 423**

McGRIFF - REDIRECT                424

1        REDIRECT EXAMINATION

2    BY MS. KOENIG:

3    Q   Good afternoon, Mr. McGriff.

4    A   Hi.

5    Q   I'm Laura Koenig.  We met in the hallway outside

6    of court yesterday.

7            THE COURT:  You definitely have to talk into

8    microphone and slowly.

9            MS. KOENIG:  Thank you.

10   BY MS. KOENIG:

11   Q   I'm Laura Koenig.  We met yesterday outside of the

12   courtroom.  And I'm one of Mr. Chatrie's attorneys.

13       I have a question based on the Court's question to

14   you at the end of -- toward the end of Mr. Simon's

15   questions.  When the Court asked if Judge Lauck were

16   to put her, if she had a Google account, if she had

17   put it on her law clerk's phone, and both Judge Lauck

18   and her law clerk had enabled Location History in

19   their accounts, would the phone report the device's

20   location in the Location History timeline to both the

21   clerk's account and to Judge Lauck's account?

22   A   There are a few variables, but, to be clear, if

23   the clerk -- the actions of the clerk and the

24   Judge's -- the clerk and Judge's accounts are fully

25   separate as it pertains to Location History.  Nothing

**Exhibit E, pg. 424**

McGRIFF - REDIRECT                    425

 1   that either does impacts the other's account.  So

 2   anyone adding their account to another device or vice

 3   versa does not impact what that specific account has

 4   consented to or not.

 5       If both accounts had Location History -- it's

 6   irrelevant, but if both accounts had Location History

 7   on, and then they were added to the same device, then

 8   both accounts would be updated with information as

 9   reported from the sensors on that specific device.

10   Q   Okay.  So if the law clerk takes the phone

11   independently to her own home, it would indicate on

12   Judge Lauck's timeline in Judge Lauck's Location

13   History timeline that Judge Lauck's account or device

14   that was activated, her Location History would

15   indicate a mark at the law clerk's home?

16   A   Yes.  That is one of the reasons why, with varying

17   degrees of success, I try to always be consistent in

18   saying it is where a device is, not necessarily that

19   the person is with the device they are signed into.

20   Q   I appreciate precision.  Thank you.

21       Going back to the questions that Judge Lauck was

22   asking at the end of Mr. Price's question, I want to

23   make sure that I am clear, because there's pause and

24   deletion.  So if a user pauses Location History, the

25   data that had previously been -- the Location History

**Exhibit E, pg. 425**

McGRIFF - REDIRECT                    426

 1   data that had previously been connected and placed in

 2   the Sensorvault, pausing Location History does nothing

 3   to remove that data from Sensorvault; right?

 4   A    That is correct, yes.

 5   Q    And, similarly, if I were to delete Location

 6   History that had previously been stored in the

 7   Sensorvault, that does nothing to change -- that

 8   action by itself does nothing to change that my device

 9   will continue sending Location History data to

10   Sensorvault?

11   A    If Location History is on for the account and a

12   user goes and deletes all or some subset of the data

13   collected for that account, it will not impact the

14   fact that Location History is on for the account.  The

15   user would have to explicitly turn Location History

16   off for the account.

17   Q    And so, therefore, it would continue moving

18   forward past that deletion point collecting the data;

19   right?

20   A    That is correct, yes.

21   Q    Okay.  Government's Exhibit 12, which was that

22   video that we had a little discussion about, do you

23   remember that video?

24   A    I do.

25   Q    At the beginning of that video, I think a matter

**Exhibit E, pg. 426**

McGRIFF - REDIRECT                   427

1  of seconds into that video, there was a terms and

2  conditions screen.  Do you remember seeing that?

3  A    I do, yes.

4  Q    And that terms and conditions screen, that was

5  Samsung's terms and conditions; right?

6  A    I believe so, yes.

7  Q    Okay.  In terms of the privacy policies that we've

8  been looking at on the website versions, those are the

9  complete privacy policies that Google sets forth on

10 their website; right?

11 A    Those are our published privacy policies, yes.

12 Q    And when a user activates a cell phone, do they

13 get an abbreviated version of the privacy policy when

14 they go through the process of setup?

15 A    I don't actually know and certainly can't speak to

16 the broader ecosystem of products and services where a

17 user might create an account or see that.

18     I can't speak to the format of whether it's a --

19 of how it's presented.  I'm sorry.  I wouldn't be able

20 to say anything with certainty about that

21 presentation.

22 Q    So the answer is you don't know?

23 A    I don't know, yeah.

24 Q    When we are talking about the data that is in

25 Sensorvault, this is data that is for worldwide users;

**Exhibit E, pg. 427**

McGRIFF – REDIRECT                428

1   correct?

2   A    If you are able to create a Google account now,

3   you are able to opt in to Location History.  We don't

4   collect Location History in every area, but you are

5   able to opt in to the control if you are able to

6   create a Google account.

7   Q    So let's go through.  What areas do you not

8   collect Location History from?

9   A    I don't have the exhaustive list in my mind, but

10  they are whatever U.S.-sanctioned countries, I

11  believe.  So if you traveled to China, I believe we

12  will not collect for you there.  So that's if a U.S.

13  account holder who has opted in to Location History

14  travels to China and, you know, or for some reason we

15  detect that you're in a region where we can't collect,

16  we won't.  But I apologize.  I rarely look at that

17  list.  So I don't know all of the countries that are

18  on that list.

19  Q    Sure.  China has a few people in that country;

20  right?

21  A    Yeah.

22  Q    So any person who is living in China and has a

23  Google account, they would not be able to generate

24  Location History on their phone or through their

25  device?

**Exhibit E, pg. 428**

McGRIFF - REDIRECT                    429

1    A    It gets complicated around all the heuristics that

2    we would use to understand where a user is.  So I

3    can -- you know, how do you handle Hong Kong?  What do

4    you do if the user connects via VPN and spoofs their

5    location to say they're somewhere else?  There are

6    just a host of variables.

7        We do our best through a set of heuristics to

8    identify where we believe a user is, and in good faith

9    attempt to identify when a user is in a sanctioned

10   area.  If we believe on our side that a user is within

11   a sanctioned area, we will stop collection.  But,

12   again, some signals are more explicit than others.

13       A Chinese-based SIM, for example, would be a very

14   strong signal that this is probably a device that

15   should not be collected.

16   Q    Sure.  So when we're talking about the two-thirds

17   of active Google users that you're not collecting

18   Location History data on, that includes some of these

19   people -- right? -- that live in countries where you

20   just simply don't collect location data; right?

21   A    If I'm remembering the statement, the statement is

22   that only one-third of the accounts have the control

23   on.  So are you -- you're saying of the users who have

24   not enabled Location History for their account --

25   Q    Let's go back and look at the statement.

**Exhibit E, pg. 429**

McGRIFF – REDIRECT                           430

1    A    Yeah.

2    Q    So if you can turn to your first declaration,

3    which is Exhibit No. 21, and I believe your

4    numerous-tens-of-millions statement is in paragraph

5    13.  So the statement says, in paragraph 13, second

6    sentence, "While a more precise percentage is

7    difficult to calculate, in part due to fluctuating

8    numbers of users, in 2019 roughly one-third of active

9    Google users, i.e., numerous tens of millions of

10   Google users had LH enabled on their accounts."

11        So when we went back to Mr. Price's questions

12   earlier this --

13             THE COURT:  You just have to be sure we can

14   hear you and you're not going too fast.

15             MS. KOENIG:   Thank you.

16   BY MS. KOENIG:

17   Q    When we go back to Mr. Price's questions from this

18   morning about how it is that you got to that one-third

19   figure, it appears from what you put in paragraph 13

20   that you looked at all -- the broader number of Google

21   users in the first sentence; right?  You start with

22   the math of how many Google users do we have?

23   A    That's correct.  The number of -- specifically,

24   the statement refers to in the way this is usually

25   measured in terms of active Google users.  So it's not

**Exhibit E, pg. 430**

McGRIFF – REDIRECT                     431

 1   simply that there's an account, but it's an actual

 2   active account.

 3   Q   Sure.  Fair enough.  Active Google users.

 4       But then when you're looking at the one-third, it

 5   indicates it's one-third of active Google users who

 6   had enabled Location History on their accounts; right?

 7   A   That's correct.

 8   Q   But I think what I'm hearing you say, and I want

 9   to make sure I'm hearing you right, is that some

10   Google users who are active would not be able to

11   activate Location History simply because of where they

12   are?

13   A   Yes, that is true.

14   Q   Okay.  And going back to the question, I think,

15   that Mr. Simon was trying to ask, but I want to make

16   sure I'm clear about the answer again, he asked you,

17   like, would it be possible to segregate data points in

18   the Sensorvault by geographic location.  And I believe

19   your answer to that question was yes; right?

20   A   Sensorvault is indexed, as I mentioned -- I don't

21   remember whose question it was.  Sensorvault is

22   indexed by Google account.  So all of the tools are

23   designed to search and query generally by account.  So

24   it is not possible today to say to Sensorvault you

25   can't query by location directly.  You have to do it

**Exhibit E, pg. 431**

McGRIFF - REDIRECT                    432

 1   by account.  You need to search each account, and then

 2   see within that account do you have any coordinates

 3   that fit this area.

 4       Unfortunately, we're not able to search across all

 5   the accounts at a high level and say show us all the

 6   accounts in this area.

 7   Q    So Sensorvault is not segregated by geographic

 8   location?

 9   A    It is not, no.

10   Q    Sensorvault is also -- the data that is produced

11   in response to a geofence warrant is nothing that --

12   that that data -- Google would never otherwise produce

13   that type of data from the Sensorvault; right?

14   A    The warrant includes -- when you say "that type of

15   data," what are you --

16   Q    Yeah.  That was not a great question.  Let me

17   phrase that again.  So when you get -- the ultimate

18   result of a geofence data is that at the third stage

19   identifying information from a user's account can be

20   turned over based on the link to the device ID that is

21   stored in Location History; is that right?

22   A    That is correct.

23   Q    And aside from a geofence warrant, you would never

24   otherwise produce that information from the

25   Sensorvault?

**Exhibit E, pg. 432**

McGRIFF – REDIRECT                    433

 1   A    There is no other instance where I'm aware that we

 2   do that; that's correct.

 3   Q    It's not a practice that Google normally does to

 4   produce identifying information through the Location

 5   History database?

 6   A    That is correct, yes.

 7   Q    So it's certainly not at business practice that

 8   you have; right?

 9   A    That is correct, yes.

10   Q    Okay.  You have been the Location History Product

11   Manager since 2016?

12   A    That is correct, yes.

13   Q    And how many people are there on the Location

14   History teams?  I'm assuming there are more than one

15   team.

16   A    It is difficult to answer.  Do you mean in terms

17   of product managers, software engineers?

18   Q    Let's talk about how many -- how many different

19   kinds of teams do y'all have over at Location History?

20   Probably a few; right?

21         MR. SIMON:  Judge, I think in keeping with

22   the Court's -- I'll use the word "admonition" before

23   we left, I'm going to object as outside the scope.  I

24   did, obviously, ask about the emails, but I didn't go

25   into how many people worked with him or was he the top

**Exhibit E, pg. 433**

McGRIFF - REDIRECT                434

 1   guy as compared with 15 others under him.  I just
 2   think it's outside the scope, and we should move on to
 3   the next witness, Judge.
 4          MS. KOENIG:  Sorry.  Actually, Judge, this
 5   question is completely unrelated to the emails, but
 6   it's more related to -- Mr. Simon was asking some
 7   questions about what Google uses Location History for.
 8   I'm just trying get a sense of how many employees are
 9   dedicated to this Location History project.
10          THE COURT:  All right.  I'll allow it.
11   A   Directly in terms of fully dedicated, I believe
12   everyone involved has multiple responsibilities.
13   Fully dedicated, it would be tens.  In terms of
14   engineers, yeah, I would say tens.
15   Q   Then there are additional probably tens or dozens
16   of other people who work with you all but are not
17   fully dedicated?
18   A   Well, there are -- as I mentioned when I was asked
19   about my role, I look over Location History, but I
20   also look over a host of other features and products
21   within Maps.
22          Then you have, for example, there is a marketing
23   team that supports geo as a whole.  I don't have a
24   direct marketing need every day, so I don't have a
25   dedicated -- there's no dedicated marketing resource

**Exhibit E, pg. 434**

McGRIFF - REDIRECT                    435

 1    for our platform.  There is a dedicated resource.  We

 2    just don't call them that -- or that resource has

 3    other responsibilities.

 4    Q    Sure.

 5    A    Similarly, we have a writer that we work with.

 6    The writing team works with several teams.  So I don't

 7    include them in that group of sort of horizontal

 8    resources that we leverage that would very much be a

 9    part of our team but not fully dedicated to our team.

10    Q    Sure.

11    A    In terms of fully dedicated to our team, the best

12    reference would be software engineers, and we have

13    tens working on this project.

14    Q    Tens with an S at the end; right?

15    A    Tens with an S on the end, yeah.

16    Q    So is it fair to say that Location History is an

17    important project or product for Google?

18    A    I won't feign to know Google's broader

19    prioritizations and where we sit in that stacking.  We

20    are certainly one team within the sort of broader

21    scope of location, yes.

22    Q    And it's certainly not Google's goal to diminish

23    the number of users of Location History; right?

24    A    No.

25    Q    In fact, it would be more likely that it is

**Exhibit E, pg. 435**

McGRIFF - REDIRECT                    436

1  Google's goal to increase the users of Location

2  History; right?

3  A    That's fair, yes.

4  Q    So let's go back to what Location History does.

5  So Location History tracks where a user's device is;

6  right?

7  A    Yes, for users who opt-in, yes.

8  Q    And it can track a user every hour of the day;

9  right?

10 A    There are a host of variables involved there, but

11 yes, if a user has Location History enabled, we will

12 collect whatever we have -- whatever is accessed from

13 that device.

14 Q    And Location History can actually track a user

15 hundreds of times a day; right?

16 A    Depending on activity, yes.

17 Q    Maybe even thousands of times a day?

18 A    I don't think it would get that high.

19 Q    There are only so many minutes; right?

20 A    Well, there's also the reality if it got that

21 high, there are just general device performance

22 questions and other things, so yeah.  There is some

23 upper bound.

24 Q    Fair enough.  Location History can track a user

25 even when the user is not actually using the app from

**Exhibit E, pg. 436**

McGRIFF - REDIRECT                    437

 1  which they enabled Location History.  We have gone

 2  over that; right?

 3  A    It varies by platform, Android versus Apple, but

 4  yes.

 5  Q    And as we know, unless a -- when a user deletes

 6  the past Location History, unless a user affirmatively

 7  disables Location History, Google continues to collect

 8  the future Location History data points from that

 9  device?

10  A    Sorry.  I can't parse that.

11  Q    So when a user deletes the past Location History,

12  unless that user goes out on their own and

13  affirmatively disables Location History; right?

14  A    That is correct.  Deletion is a separate process

15  from turning on --

16  Q    Let me make this more simple.  Let me take out

17  that middle part.  So when a user deletes past

18  Location History, Google continues to collect the

19  future Location History from that device; right?

20  A    Yes.

21  Q    Okay.  And as we know, I think you've indicated

22  earlier today, Google is going to respond and turn

23  over data in response to search warrants; right?

24  A    It is my understanding that we will respond to any

25  valid request when compelled, yes.

**Exhibit E, pg. 437**

McGRIFF – REDIRECT                    438

1    Q    Okay.  And you said yesterday, and I think even

2    the exact quote you used today or statement you made

3    today was, We are always looking for ways to further

4    improve and clarify how we talk about the product;

5    right?

6    A    All products, yes.

7    Q    But also specifically included in that, Location

8    History; right?

9    A    Yes, including Location History.

10   Q    And so it would be pretty clear if the descriptive

11   text -- right? -- that line that is right below

12   Location History before you hit the drop down arrow,

13   it would be pretty clear if the descriptive text at

14   the opt-in stage said something like, If you enable

15   Location History, you'll be allowing us to track you.

16   You will be allowing us to track you every hour of

17   every day.  You will be allowing us to track you even

18   if you're not using this particular Google

19   application.  You will be allowing us to continue

20   tracking you if you delete your past Location History.

21   We turn your Location History over to law enforcement

22   when they get a valid warrant.  That would make more

23   clear what's happening; right?

24   A    That would provide additional clarity for some,

25   yes.

**Exhibit E, pg. 438**

McGRIFF - REDIRECT                    439

1    Q    But you're not going to do that; right?

2    A    I respectfully disagree with that suggestion.

3    That is entirely -- the ongoing evolution in any

4    product is to be more clear, be more precise.  We are

5    steadily looking for ways to improve all products and

6    services, including Location History.  In part, the

7    warm welcome notice, the email, the monthly emails we

8    created, the now yearly summary email that we send,

9    all of those not only tell you what we collect, but

10   give a very visual and clear tangible way.

11       So it's not just words.  Hey, here are a blurb of

12   words that most nonlawyers or privacy-minded people

13   will never read.  We actually visualize it and make it

14   very tangible.  You went from point A to point B.

15   Here is what we understand those places to be.  Here

16   is how we understand you traveled between point A and

17   point B, all with an eye toward making it very human

18   readable and consumable in a tangible way.

19   Q    Sure.  And I appreciate that that's the back-end

20   take that you all have done; right?  But those emails,

21   that presumes that someone's going to open up

22   something that they might otherwise presume is junk

23   mail; right?

24   A    That is why we have rolled out both notices that

25   were originally tied just to Maps.  And to the point

McGRIFF - REDIRECT                    440

1   you just made, in this time frame, we expanded to make

2   it an operating system notification.  So at the OS

3   level, whether or not you're using a Google product or

4   service, it just appeared Location History is enabled

5   for this account.

6        And any interaction with that notification, open

7   settings, where very promptly a user would see that is

8   on and be able to turn it off.  So it's not just that

9   we had a per product notification.  It's not that we

10  simply sent one email.  We send monthly emails.  We

11  send an annual email.  We send an email seven days

12  after opt-in.  But in addition, we now also do it at

13  the OS level.

14       So we've steadily rolled out continued

15  notifications and prompts, and on all of them at the

16  top we prominently feature the controls to disable it

17  if the content that the user sees highlighted there is

18  not what they intended.

19  Q    Sure.  But wouldn't the most clear way be to just

20  put all that in the descriptive text, so when the

21  person turns it on, they know exactly what they're

22  getting into at that moment?

23  A    That assumes that every user is reading the

24  descriptive text in detail.  What you just read would

25  have been a full page of text, so on most mobile

**Exhibit E, pg. 440**

McGRIFF - REDIRECT                    441

1    devices a wall of text appearing.

2         It's certainly possible.  I can't say that you're

3    wrong.  But I would say, again, that's a wall of text,

4    and it is not -- I'm not aware of anything that would

5    suggest that users would be more inclined to read a

6    wall of text versus a blurb of text.  I'm not aware

7    that anyone has come to the proper exact science that

8    two-thirds of a full screen versus one-third is right.

9         I think part of this evolution over the years has

10   been:  What is the way to reach users where they are?

11   So for the user who doesn't read or expand the carrot,

12   for the user who maybe moves quickly past that but

13   will see the email in seven days, for the user who

14   doesn't see emails but will get an app notification,

15   for the user who dismisses all notifications -- like,

16   you're trying to figure out the best way.  There's no

17   slam dunk for any of them would be my opinion.

18   Q    Sure.  And it sounds like it's fair to say that

19   you all are very aware at Google that people are not

20   inclined -- users are not inclined to read blocks of

21   text; right?

22   A    Some are, to be quite clear.  If they weren't,

23   Location History opt-in would be 100 percent.  Some

24   people are reading it.  The majority of users are

25   reading it and saying no.

**Exhibit E, pg. 441**

McGRIFF - REDIRECT                    442

1   Q   Or it's the people that are in China that can't

2   activate it; right?  When you're saying the majority

3   of people, you can't assume that the majority of

4   people are making an informed decision to not opt-in.

5   You don't have an evidentiary basis to say that;

6   right?

7   A   I'm sorry.  Just so I'm clear, are you suggesting

8   that we -- that Google, as a company, has majority of

9   its users in China?

10  Q   No, no, no.  I'm saying that when we are talking

11  about the other two-thirds of Google -- active Google

12  users who have not enabled Location History, you

13  indicated that that feature of the two-thirds includes

14  people who have these devices in countries where they

15  cannot enable Location History; right?

16  A   Anywhere you can create a Google account, you can

17  enable Location History.  We may not be able to

18  collect data in that region based on where you travel

19  or any kind of variables, but you can still opt-in on

20  the account level.

21      The reason for that is I can create a Google

22  account right now on a desktop or my laptop, not

23  connected to a mobile device.  I may never attach a

24  mobile device to my account.  I still have Location

25  History on for an active Google account.

**Exhibit E, pg. 442**

McGRIFF - REDIRECT                    443

1  Q   Sure.  But then if you are not -- let's say you

2  activate a Google account in China; right?  You

3  activate it in the United States.  You buy the phone

4  and you're here visiting.

5         MR. SIMON:  Judge, I'm going to object.  The

6  witness has testified that Location History --

7         MS. KOENIG:  I'll move on, Your Honor.  I'll

8  move on.  It's not an important point.

9  BY MS. KOENIG:

10  Q   But going back to the part you all are very aware

11  that some users, if not many users, will not read

12  blocks of texts; right?

13  A   I disagree with that characterization of my

14  statement.  We are aware that there are a wide range

15  of users, different proclivities in terms of what they

16  will and will not do.  Our focus is figuring out the

17  way to reach as many users as possible, which is why

18  we steadily refine the tools that we use to reach

19  users.

20       Some will resonate with some users.  Some will

21  not.  That's why we continue to refine and evolve.

22  That is what I keep referring to as the further

23  improvements.  You never stop.  You are always looking

24  at ways you can improve these flows.

25  Q   But at no time in 2018 or 2019 did we have

**Exhibit E, pg. 443**

McGRIFF – REDIRECT                    444

1    something as clear as what we decided today, that

2    language that I proposed to you, that was never

3    apparent to a user in the descriptive text; right?

4    A   We never used the copy that you just suggested in

5    any flow that I'm aware of, that is correct.

6              MS. KOENIG:  No further questions, Your

7    Honor.

8              THE COURT:  All right.  May this witness be

9    excused?

10             MS. KOENIG:  Yes.

11             MR. SIMON:  From the United States, yes,

12   Judge.

13             THE COURT:  All right.  So, Mr. McGriff, I

14   want to thank you very much for your time.  You are

15   excused.  We appreciate your coming in.  You still

16   can't talk to other witnesses certainly about what

17   you've testified to.  And, in fact, we should

18   sequester the testimony until this hearing is over.

19   All right?  Thank you, sir.

20             (The witness was excused from the witness

21    stand.)

22             MS. KOENIG:  Your Honor, next the defense

23   calls Sarah Rodriguez.

24             THE COURT:  So that is Sarah Rodriguez, Madam

25   Court Reporter.

**Exhibit E, pg. 444**

RODRIGUEZ - DIRECT                445

1          MS. KOENIG:  I'll have her spell her name.

2     Don't worry.

3

4       SARAH RODRIGUEZ, called by the Defendant, first

5     being duly sworn, testified as follows:

6

7          THE COURT:  Before you sit down, have we

8     cleaned out that area?

9          MS. KOENIG:  I don't believe we have.

10         THE COURT:  So, Ms. Rodriguez, I'm just going

11    to ask you to step aside a little bit so we can apply

12    some disinfectant.  Sorry.  That's awkward, but I'd

13    rather be safe.

14         Thank you so much for helping with that.

15         Ms. Rodriguez, my court reporter can only

16    hear you through the microphone.  So you can take your

17    mask off.  Obviously, we're cleaning things off.  And

18    you have more disinfectant, towels, and hand sanitizer

19    anytime you want to use it.  Okay?

20         THE WITNESS:  Thank you.

21      DIRECT EXAMINATION

22    BY MS. KOENIG:

23    Q   Good afternoon.

24    A   Good afternoon.

25    Q   You are here today -- oh, please tell us your

**Exhibit E, pg. 445**

RODRIGUEZ - DIRECT                    446

1  name, please.

2  A   Sarah Rodriguez.

3  Q   Can you spell your last name for the record,

4  please.

5  A   R-O-D-R-I-G-U-E-Z.

6  Q   Thank you.  And you are here today in response to

7  a defense subpoena; right?

8  A   I believe so.  I haven't seen the subpoena myself,

9  but that's what I've been told, yes.

10  Q   Fair enough.  And you work at Google; right?

11  A   That's correct.

12  Q   And you just moved into a new position very

13  recently there; right?

14  A   About a month ago, that's correct.

15  Q   And so you are currently a Tooling and Programs

16  Lead and Legal Investigation Support?

17  A   That's correct.

18            THE COURT:  A what?  What was the first word?

19            MS. KOENIG:  Tooling and Programs Lead.

20            THE COURT:  Tooling?

21            MS. KOENIG:  Tooling.

22            THE COURT:  Okay.

23  Q   Lead and Legal Investigation Support?

24  A   That's correct.

25  Q   And it seems as though you all at Google tend to

**Exhibit E, pg. 446**

RODRIGUEZ - DIRECT                    447

 1  refer to Legal Investigation Support as LIS?

 2  A    That's correct.

 3  Q    And before you were the Tooling and Programs Lead,

 4  you were a Team Lead -- right? -- for Legal

 5  Investigation Support?

 6  A    Correct.

 7  Q    And how long had you done that?

 8  A    I had done that for about two and a half years.

 9  Q    Maybe three years, one month?

10  A    Correct.

11  Q    And before that you were a legal specialist at

12  Google?

13  A    That's correct.

14  Q    What were your duties as a legal Specialist at

15  Google?

16  A    I worked on a domestic criminal team.  And our

17  team processed law enforcement requests for user data

18  coming in the form of subpoenas, court orders, and

19  search warrants.

20  Q    And you graduated from San Francisco State

21  University in 2004?

22  A    That's correct.

23  Q    That was with a Bachelor's of Arts in Liberal

24  Studies?

25  A    Correct.

**Exhibit E, pg. 447**

RODRIGUEZ - DIRECT                    448

1   Q    You have not gone to law school; right?

2   A    I have not.

3   Q    And you don't have any other advanced degrees?

4   A    That's correct.

5   Q    So your experience in the legal investigation

6   support team is practical; right?

7   A    Correct.

8   Q    In response to a subpoena to Google that

9   Mr. Chatrie had obtained in 2020, you wrote a

10  declaration; right?

11  A    Correct.

12  Q    In the big binder that is right in front of you,

13  we've got a bunch of tabs in there.  Thankfully, you

14  don't get asked about too many of them, I think.  But

15  you made a declaration on March 11 of 2020.  Does that

16  sound right?

17  A    Correct.

18  Q    And you made that declaration under oath?

19  A    Correct.

20  Q    And if you can turn to tab Defendant's Exhibit

21  24 --

22        MS. KOENIG:  And Ms. Hancock, if I can have

23  the screen over here activated, that would be helpful.

24  Q    If you'll take a look at that for just a moment.

25  It's Defense Exhibit 24.  So it should be -- there we

RODRIGUEZ - DIRECT                    449

 1  go.  Is that a copy -- is Defense Exhibit 24 a copy of

 2  the declaration that you signed on March 11, 2020?

 3  A   It appears to be.

 4          MS. KOENIG:  And, Your Honor, I move to

 5  introduce Defense Exhibit 24.

 6          THE COURT:  Any objection?

 7          MR. SIMON:  No objection, Judge.

 8          THE COURT:  All right.  It will be entered.

 9          (Defense Exhibit No. 24 is admitted into

10  evidence.)

11  BY MS. KOENIG:

12  Q   I want to turn your attention now to your

13  responsibilities when you were at your most recent

14  position at Google as the Team Lead for LIS.  Your

15  responsibilities as that Team Lead included processing

16  law enforcement requests directed at Google; right?

17  A   That's correct.

18  Q   And geofence warrants were a part of those law

19  enforcement requests; right?

20  A   That's correct.

21  Q   When did Google begin receiving geofence warrants?

22  A   To my knowledge, I believe our first came in in

23  2016.  I'm not exactly sure when within that year, but

24  that's the first that I was aware that we were

25  receiving those.

RODRIGUEZ - DIRECT                    450

1   Q   By June of 2019, how many geofence warrants had

2   Google received?

3   A   I don't know the numbers as of that month,

4   specifically.  In 2019, I believe we received around

5   9,000 total requests for warrants specifically with

6   some subset of that.

7   Q   9,000 total warrants and a portion of those

8   warrants were geofence warrants?

9   A   9,000 total geofence requests.  So, in some cases,

10  law enforcement isn't aware that they need to submit a

11  warrant.  So they may have submitted other lower level

12  legal process to obtain records.  So that's included

13  in those 9,000.  So, some subset was specific

14  warrants.

15  Q   Okay.  And a geofence warrant -- we've talked

16  about this a lot.  I'm just going to ask you a couple

17  questions to make sure that you're on the same page as

18  we all are.

19      A geofence warrant is one that requests all

20  Location History data that Google has for a particular

21  geographic area in a particular time frame; right?

22  A   That's correct.

23  Q   And the warrant does not identify, necessarily, a

24  particular suspect; right?

25  A   Not in a way that Google would typically be able

**Exhibit E, pg. 450**

RODRIGUEZ - DIRECT                     451

1   to process it.

2   Q    So when we're talking about what Google turns

3   over, Google turns over all of the Location History

4   data points within that defined area and defined time

5   frame.

6   A    I'm sorry.  Can you say that again?

7   Q    Google turns over all Location History data points

8   that you all calculate fall within that geographic

9   area and that defined time frame; right?

10  A    Correct.

11  Q    And each Location History data point is associated

12  with a device ID number; right?

13  A    Correct.

14  Q    Each data point that comes from that same device

15  will have the same device identification number.

16  A    So the device ID's reference within Location

17  History, yes, I believe that's correct.  A user may

18  have multiple devices reporting Location History, in

19  which case that device might be different per user,

20  but per device, that should be accurate, correct.

21  Q    If I have a phone right here, and I'm reporting

22  Location History, my phone has one device ID in the

23  Sensorvault database; right?

24  A    Related to your Google account.  So if another

25  Google account is associated with that same device and

**Exhibit E, pg. 451**

RODRIGUEZ - DIRECT                452

1   is reporting Location History from that device, then

2   that separate Google account may have a different --

3   Q   Thank you for that clarification.  I'm sorry.  I

4   stepped over the words.  Thank you for that

5   clarification.

6              THE COURT:  Ms. Koenig, please slow down.

7              MS. KOENIG:  Okay.

8              THE COURT:  I can barely hear you, which I'm

9   pretty sure means that Ms. Daffron can't type that

10  fast.

11             MS. KOENIG:  Okay.  Thank you.

12  BY MS. KOENIG:

13  Q   Let's turn to Defense Exhibit 3.  I'm not going to

14  put it up on the screen.  It's something that we have

15  put under seal, but if you can look at Defense Exhibit

16  3, please.

17      I'll just tell you that this is the -- what the

18  government produced to the defense as the returns in

19  the Google correspondence that were provided in

20  connection with the returns as it relates to this

21  specific case.

22  A   Okay.

23  Q   So if you turn to page 6 of Exhibit 3, which is

24  just the beginning of the first spreadsheet for the

25  Stage 1 return.

**Exhibit E, pg. 452**

RODRIGUEZ - DIRECT                    453

1   A    Okay.

2   Q    In that column, we see the label "device ID";

3   right?

4   A    Correct.

5   Q    And we just went over that the device ID -- I

6   guess the better way to phrase it would be the device

7   ID is unique to each device as it relates to one

8   account on the device?

9   A    Correct.

10  Q    So, for example, the first device ID that is

11  identified -- I'm on page 6 of Defense Exhibit 3 --

12  that has five data points that were generated for that

13  device ID; right?

14  A    Yes, that would appear to be the case.

15  Q    And then it goes on to list a bunch of other data

16  points for other device IDs; right?

17  A    Correct.

18  Q    And ID is just an abbreviation for identification?

19  A    Right.  And specifically within this Location

20  History realm.  So these device IDs are not

21  identifiers for any other specific Google account.

22  It's not cross-referenced outside of Location History.

23  Q    Sure.  And that's a point I want to talk about

24  with you.  So within Location History, if I have my

25  cell phone here, I have just one Google account that's

**Exhibit E, pg. 453**

RODRIGUEZ - DIRECT                    454

```
 1    associated with that phone.  That is my phone's device
 2    ID as it resides in the Location History database;
 3    right?
 4    A   In the context of Location History, yes, this
 5    device ID that's listed here is the one that's related
 6    to your Google account and the device that's reporting
 7    that data and stored within your Google account.
 8    Q   And so if, let's say, the Chesterfield County
 9    Police Department gets more than one -- I'm pointing
10    at them because that's who this law enforcement agency
11    is.  If they get more than one geofence warrant, and
12    my device ID number for that cell phone is swept up in
13    a warrant, warrant No. 1, and it gets swept up in a
14    second warrant, if that same device ID number shows
15    up, it's the same device attached to that one account;
16    right?
17    A   To my knowledge, that would be the case.  I'm
18    not -- our team isn't responsible for defining these
19    device identifiers.  So if there's any sort of
20    collisions on the actual side that we pull the data
21    from, I wouldn't be aware of that.
22    Q   But you have no information to the contrary;
23    right?
24    A   Correct.
25    Q   Okay.  So, in response to geofence warrants
```

**Exhibit E, pg. 454**

RODRIGUEZ – DIRECT                    455

1   generally, Google developed a process for handling

2   such warrants; right?

3   A    Correct.

4   Q    And Google requires as a part of that process that

5   the geofence warrant have a defined geographical area;

6   right?

7   A    Correct.

8   Q    Is there a geographical area that Google considers

9   too big?

10  A    Not generally.  It's very contextual to each

11  individual warrant that we review.  So it would be

12  determined based on that specialist who's handling the

13  warrant to review, and then coordinate with our legal

14  counsel to determine if it's a warrant that we need to

15  have sort of a conversation with the law enforcement

16  agent that had submitted it.

17  Q    Okay.  So, are there parameters -- and if --

18  let's -- so it sounds like there is a process; right?

19  The warrant comes in to a Google specialist; right?

20  You have to say yes or no.  I see you shaking your

21  head, but we have to make a record.

22  A    Sorry.  Yes.  So it would come into our system,

23  and then a specialist would pick that warrant up to

24  start processing it.

25  Q    And it's up to the specialist to decide if it

**Exhibit E, pg. 455**

RODRIGUEZ - DIRECT                    456

```
 1    seems too big, like, the geographic area is too big?
 2    A    It's up to the specialist to determine if it needs
 3    further review by our counsel team.
 4    Q    If the specialist thinks, eh, this just looks too
 5    big, they go to the lawyers; right?
 6    A    They'll take it to the lawyers.  There may be an
 7    intermediate step where they engage with a law
 8    enforcement officer to collect more information about
 9    the investigation itself to provide that context in
10    our consult with legal counsel.
11    Q    So that process happens -- that back and forth
12    process happens between Google and its various
13    employees and counsel and with the law enforcement
14    officer; right?
15    A    That's correct.
16    Q    So Google also -- when did Google create this
17    three-step process?
18    A    I believe there was discussion around it in 2018.
19    And the discussion also involved agencies within law
20    enforcement.  So our, like, CCIPS is an agency that
21    works -- that we often engage with -- not us
22    specifically, but our counsel engages with to discuss
23    sort of certain procedures that may be relevant for
24    the way that we -- that Google will need to handle
25    these types of requests, especially with reverse
```

**Exhibit E, pg. 456**

RODRIGUEZ - DIRECT                    457

 1   Location History being a relatively new type of

 2   request that Google has started to receive.

 3              THE COURT:  So, Ms. Rodriguez, I'm going to

 4   ask you to say the words of the agency that you just

 5   gave the initials for so our court reporter can get it

 6   on the record.

 7              THE WITNESS:  I'm not sure what it stands for

 8   exactly.  So I know it's computer crimes, but it's a

 9   federal agency that is related to the handling of

10   those types of requests.

11              THE COURT:  And the full acronym is?

12              THE WITNESS:  CCIPS, C-C-I-P-S.

13              THE COURT:  I'm sorry?

14              THE WITNESS:  C-C-I-P-S.

15              THE COURT:  Okay.  Thank you.

16   BY MS. KOENIG:

17   Q    Do you know when in 2018 that that policy was

18   developed?

19   A    I don't know exactly.

20   Q    Has that policy changed over time?

21   A    Yes.  In the early days, we didn't have a policy

22   set forth.  So there was a very, you know, sort of

23   extended processing and engagement with our counsel

24   team on the legal investigation side engaging with our

25   law enforcement and information security counsel team

**Exhibit E, pg. 457**

RODRIGUEZ - DIRECT                    458

1   to guide us through how we should be engaging with

2   these types of requests.

3   Q   How many warrants has Google objected to because

4   the geographical area was too big as it was listed in

5   the warrant?

6   A   I don't know that.

7   Q   So Google also requires that the geofence warrant

8   have a defined time frame; right?

9   A   Correct.

10  Q   And is there a time frame that Google considers to

11  be too long?

12  A   No.  Again, it would be, you know, based on the

13  context of the warrant itself in conjunction with the

14  actual area of the geofence as well.

15  Q   Would you go through that same process that if the

16  warrant comes in, the legal specialist gets it; right?

17  You've got to say yes.  I'm sorry.  I see that you

18  nodded your head.

19  A   That's correct.

20  Q   And if the specialist says, eh, I just think this

21  is too long, then they'll go to the lawyers again?

22  A   It would be the same process.  They may collect

23  information from law enforcement to provide context in

24  their conversations with counsel, and then they would

25  further discuss with counsel what the appropriate

**Exhibit E, pg. 458**

RODRIGUEZ - DIRECT                     459

1   action would be.

2   Q   So that same back and forth between Google and the

3   law enforcement agent; right?

4   A   Correct.

5             THE COURT:  That's a yes, right?

6             THE WITNESS:  Correct, yes.

7   BY MS. KOENIG:

8   Q   And, again, how many warrants has Google objected

9   to because the time frame was too long?

10  A   I don't know that.

11  Q   Are there geofence warrants that Google considers

12  too sensitive, say, like, politically to comply?

13  A   Not as a policy.  Again, it would be contextual

14  based on circumstances that are included in the search

15  warrant itself or that we may be aware of because it's

16  a very public sort of circumstance that we are -- you

17  know, know external to Google.

18  Q   And so are you aware of any examples where Google

19  has refused to comply because it was too sensitive?

20  A   No examples where we've refused to comply, no.

21  Q   Is there a policy about that or is that simple the

22  back and forth that we have talked about?

23  A   It would be the back and forth.  I mean, I think

24  there's not a policy in place, but our specialists

25  know that if there is anything that strikes them as

**Exhibit E, pg. 459**

RODRIGUEZ - DIRECT                    460

 1   being, you know, needing more information from our

 2   counsel team, then they will escalate directly to our

 3   counsel team to have that review.

 4   Q    A fair amount of discretion is initially placed

 5   with the specialist that receives the warrant; right?

 6   A    Correct.

 7   Q    All right.  So once you have the warrant that has

 8   the geographical area and the defined time frame, and

 9   you have this back and forth, the first thing that you

10   do is you turn over, at the first stage, all of the

11   Location History data points within the geofence to

12   the law enforcement officer; right?

13   A    That are within the specified time frame on the

14   warrant.

15   Q    And then you wait for the government to come back,

16   and they may ask for additional Location History data

17   points beyond the scope of the initial request?

18   A    Right.  So it would be Location History data that

19   was outside of the geofence and outside of the initial

20   time frame.

21   Q    And that's the second step of the process; right?

22   A    Correct.

23   Q    And in the second step, can the government ask for

24   all Location History data points no matter the

25   geographical area?

**Exhibit E, pg. 460**

RODRIGUEZ - DIRECT                    461

1  A    So, it would be limited to devices that were

2  identified by their device ID in the Step 1 of the

3  warrant.

4  Q    Okay.  Has Google objected to geofence warrants

5  because the geographical area in the second step was

6  too big?

7  A    We aren't applying the geographical area

8  constraint to that.  So it's really more the time

9  constraint that's applied.

10 Q    The geographical area means nothing, really, in

11 the second phase; right?

12 A    I mean, it's applicable because it's derived from

13 the Step 1 processing, but in the way that we handle

14 these types of requests, the area at that point is

15 already -- it's already narrowed by the records that

16 were produced in Step 1.

17 Q    Sure.  But for any device ID that the data is

18 returned in the second stage, there are no

19 geographical limits for that second stage?

20 A    To my knowledge, no.

21 Q    So that data could come from houses; right?

22 A    I'm not sure I understand the question.

23 Q    The location data points that are returned in the

24 second stage, it could come from houses, as an

25 example; right?

**Exhibit E, pg. 461**

RODRIGUEZ – DIRECT                    462

1   A    The phrasing is a little confusing to me.  So the

2   location information would come from the device always

3   as reported to us.  It could include a path through a

4   house.

5   Q    Let me phrase that a little bit better.  The data

6   could indicate that the device in the second stage was

7   in a house, for example; right?

8   A    Sure.  We wouldn't know that at the time, because

9   the legal specialist wouldn't review any of the data,

10  the actual content of the data itself, or plot it on a

11  map.  So it could include that.

12  Q    That device could be anywhere; right?

13  A    Correct.

14  Q    A place of worship; right?

15  A    Correct.

16  Q    Schools; right?

17  A    Correct.

18  Q    Hospitals?

19  A    Any physical location that could have a device

20  within it.

21  Q    Okay.  In the second step, has Google objected to

22  geofence warrants because the time frame that was

23  expanded in the second step was too long?

24  A    Yes.  And to qualify, the too long is in relation

25  to what was initially ordered on the warrant.  So the

**Exhibit E, pg. 462**

RODRIGUEZ - DIRECT                    463

1    warrant may also include, as in this case, specific

2    parameters, so it was plus or minus 30 minutes.

3        So if the law enforcement officer had come back

4    and said "I want an hour on either side of the

5    original time frame," that would not be permitted

6    within the context of this warrant.

7    Q    If time frame is listed -- if the expanded time

8    frame is listed in the warrant, are there any times

9    where Google has objected to say that time frame, the

10   expanded time frame in the second stage that's listed

11   in the warrant, is too long?

12   A    In the initial warrant, we may have.  I haven't

13   been involved directly with any of those types of

14   objections, but we may have.

15   Q    Would it follow that same process where the

16   specialist would identify this issue, then bring it to

17   the lawyers?

18   A    Correct.

19   Q    And then Google would go back to the law

20   enforcement officer?

21   A    That's correct.

22   Q    And there would be some sort of negotiation

23   between Google and the law enforcement officer?

24   A    There would be a conversation.  In many

25   circumstances, if there's an issue with the actual

**Exhibit E, pg. 463**

RODRIGUEZ - DIRECT                    464

1  wording of the language on the warrant itself, it may

2  be -- we may require law enforcement to obtain an

3  amended or a newly-issued warrant that addresses the

4  issue that we have identified in the warrant text.

5  Q    Okay.  Thank you.

6       Is there a time limit on when law enforcement must

7  come back to request the additional Location History

8  data in the second step?

9  A    Yes.  So our system does only retain the records

10 for a certain period of time.

11 Q    How long does it retain them for?

12 A    Roughly, 60 days.

13 Q    So from the time that the Stage 1 data is

14 produced, that data stays wherever you put it for 60

15 days?

16 A    Right.  It's sort of depending on the actual

17 processing of the warrant.  So there's certain events

18 that trigger whether that data is then collected to

19 actually purge.  But, roughly, 60 days after the

20 production of the initial stage of the warrant we

21 would be able to then respond to and produce on the

22 follow-up stages to the warrant.

23 Q    How does Google determine that 60-day limit?

24 A    That's guidance from our legal counsel.

25 Q    Okay.  And when did Google create that guidance?

**Exhibit E, pg. 464**

RODRIGUEZ – DIRECT                    465

1   A    It's evolved over time.  I don't have a specific

2   date or even month.  A lot of the evolution has

3   happened since 2018 through this most recent year.

4   Q    Has that guidance changed over time?

5   A    Yes.  In conjunction with our tooling, which is

6   what determines whether the data is automatically

7   purged at the time, that it would be, you know, 60

8   days or so.

9   Q    What do you do if the law enforcement officer

10  comes back and makes the second stage request after

11  the 60-day time frame has past?

12  A    We may ask them to submit a new warrant.

13  Q    Are there any times where you just go run the data

14  again?

15  A    It would be under the close direction of counsel

16  if we were to do sort of a secondary search,

17  basically, which is what that would be for us.

18  Q    But that would be at the discretion of Google?

19  A    At counsel's discretion.

20  Q    Google counsel's discretion; right?

21  A    Correct.

22  Q    Do you know if Google has objected because law

23  enforcement -- well, you've already answered that

24  question.  Never mind.

25       Will Google comply with if the officer comes back

**Exhibit E, pg. 465**

RODRIGUEZ - DIRECT                    466

1   in the second stage and asks for additional Location

2   History beyond the scope of the initial request on all

3   of the device IDs from the Stage 1 return?

4   A    I'm sorry.  Can you say that one more time?

5   Q    So, if -- so, Stage 1 -- like in this case --

6   right? -- we have 19 device IDs that are returned;

7   right?  You're shaking your head yes.

8   A    Yes.

9   Q    And in this case, the law enforcement officer

10  Detective Hylton, asked for the Stage 2 information,

11  the expanded data on all 19 devices; right?

12  A    Yes.

13  Q    And so Google seemed to do something; right?

14  Like, explain to us what Google did in response to

15  that.

16  A    So, based on my understanding of the events, one

17  of our specialists who was handling this specific case

18  had reached out to the detective to explain -- the way

19  the language in the warrant reads is that Step 2 is

20  supposed to be narrowed from Step 1.  So all 19

21  devices were produced in Step 1.  In order to make

22  Step 2 actually useful in identifying devices that

23  were aligned with the facts of the investigation,

24  which Google doesn't know, the law enforcement officer

25  would need to review those and determine which devices

**Exhibit E, pg. 466**

RODRIGUEZ - DIRECT                    467

 1   were relevant to the investigation and submit a

 2   request specific to those devices.

 3   Q    Okay.  So, we'll come back to the specific example

 4   in this case, but does that happen in every case that

 5   law enforcement comes back from Stage 1 and asks in

 6   Stage 2 for expanded data on every device that is

 7   listed in Stage 1?  Is there always sort of an

 8   objection to that by Google?

 9   A    Not always, no.

10   Q    When would it not happen?

11   A    If the law enforcement officer had demonstrated a

12   narrowing in their request.  So if there were a lower

13   number of devices from Stage 1 to Stage 2, then that

14   would be the only real kind of reflection to Google

15   and to our specialist team that the request from Stage

16   1 had been narrowed in the Stage 2 request.

17   Q    So Google requires that there be less device IDs

18   requested or there be data requested on fewer device

19   IDs in Stage 2 than in Stage 1?

20   A    I wouldn't say it's necessarily a requirement.

21   It's a signal to us of, you know, following the actual

22   three-stage protocol.

23   Q    So are there times, then, where Google has gotten

24   a request from law enforcement, and the law

25   enforcement officer is requesting the expanded data in

**Exhibit E, pg. 467**

RODRIGUEZ – DIRECT                  468

1    Stage 2 on all devices listed in Stage 1, presuming

2    there's more than one device -- right? -- and you

3    don't object?

4    A    It would likely be a conversation with our counsel

5    team in those circumstances in order to determine if

6    there would be a necessary conversation with law

7    enforcement at that point.

8    Q    So that same process.  Specialist has a question,

9    goes to legal counsel at Google; right?

10   A    Correct.

11   Q    Maybe there's a conversation with a law

12   enforcement officer; right?

13   A    Correct.

14   Q    Okay.  If it's -- is there any guidance that

15   Google has about how much narrowing has to happen?

16   A    There's guidance from our counsel team, but

17   nothing that's developed as sort of a policy or you

18   must adhere to this in every single circumstance.

19   Q    Is the guidance like in a percentage form, like we

20   want 25 percent less devices?  I mean, what does the

21   guidance tell you?

22   A    Not any sort of percentage form.  There is still

23   that discretion that the legal specialist has in being

24   able to apply the policies that counsel has provided

25   to us.

**Exhibit E, pg. 468**

RODRIGUEZ – DIRECT                    469

1   Q    Do you know how many warrants Google has objected

2   to because the officer requested the expanded data on

3   every device that was listed in Stage 1?

4   A    I don't know that.

5   Q    All right.  So then we get to the third step.  And

6   once you turn over the data points in the second step,

7   you wait for the government to come back and ask for

8   the identifying information on the account user for

9   the particular device IDs; right?

10  A    Correct.

11  Q    So that information, the identifying information,

12  includes an account user's email address?

13  A    Correct.

14  Q    And it includes, if you have it, a name that's

15  associated with the user account; right?

16  A    Yes.

17  Q    And is there a time limit on that when law

18  enforcement has to come back and request the third

19  step data?

20  A    Right.  It would be consistent.  Roughly, 60 days.

21  Q    Is it 60 days from the time that the second stage

22  is turned over or is it 60 days from the time of Stage

23  1?

24  A    From the second stage.

25  Q    So to get from Stage 1 to Stage 3 could be a

**Exhibit E, pg. 469**

RODRIGUEZ - DIRECT                    470

1   matter of 120 days?

2   A    Correct.

3   Q    Again, how did you determine that 60-day limit at

4   Google?

5   A    That's a counsel determination.

6   Q    Has that changed over time?

7   A    That's correct.

8   Q    That it has changed over time?

9   A    Yes.

10  Q    How long has the 60 days been in effect?

11  A    I don't have a specific date of when that was

12  launched.

13  Q    Has it been since 2018?

14  A    It's evolved since 2018, but the 60-day sort of

15  determination, I don't have a date for it.

16  Q    Okay.  If law enforcement makes the third stage

17  request outside of the time limit based on Google's

18  policy, the 60-day policy, what do you do?

19  A    So it would be a similar scenario at Stage 2 where

20  we may ask law enforcement to obtain a new warrant in

21  order to produce that information.

22  Q    Are there times where you don't necessarily ask

23  them to go back and get a second warrant?

24  A    At counsel's discretion, yes.

25  Q    Will Google comply if the officer comes back in

**Exhibit E, pg. 470**

RODRIGUEZ - DIRECT                471

1   the third step and asks for the account user

2   information from all of the device IDs listed in Stage

3   2?

4   A   I'm sorry.  What's the question?  Will Google

5   comply with that?

6   Q   Yes.

7   A   Based on the way that we understand guidance from

8   counsel is that once we've produced Stage 3

9   information, no additional information is to be

10  produced on that warrant.

11  Q   I didn't say that very well.  I'm sorry.  So if

12  you have, you know, you have a number of device IDs

13  that are listed in Stage 2 data, if the law

14  enforcement officer comes back in the Stage 3 request

15  and requests the account user information for all of

16  the device IDs listed in the second stage, will Google

17  comply with that?

18  A   Possibly.  It depends on the warrant and, you

19  know, sort of the circumstances related to that.

20  Q   So, the same back and forth process.  The

21  specialist gets the third stage request, does a gut

22  check, goes to counsel; right?

23  A   That's right.

24  Q   And if counsel thinks it's important, you all will

25  engage in further discussion with the law enforcement

**Exhibit E, pg. 471**

RODRIGUEZ – DIRECT                    472

1    officer?

2    A    Correct.

3    Q    Okay.  So let's go back to the specific requests

4    in this case.  In this particular case, Detective

5    Hylton submitted the geofence warrant to Google on

6    June 20th of 2019?

7    A    Correct.

8    Q    And the warrant was dated for June 14, 2019;

9    right?

10   A    I believe that's the case.

11   Q    You can look at your affidavit, absolutely, or

12   your declaration.  That's Defense Exhibit 24.

13   A    That's correct, June 14, 2019.

14   Q    Thank you.  And Google provided the Stage 1 return

15   information on June 28th of 2019?

16   A    That's correct.

17   Q    And then the Stage 1 return provided Location

18   History information from 19 devices; right?

19   A    Correct.

20   Q    On July 2, 2019, Detective Hylton emailed Google

21   requesting additional location data beyond the scope

22   of the initial request.  So made the second stage

23   request for all 19 devices from the Stage 1 return;

24   right?

25   A    That's correct.

**Exhibit E, pg. 472**

RODRIGUEZ – DIRECT          473

1   Q   And so July 8 of 2019, Detective Hylton leaves two

2   messages for a Google LIS specialist regarding his

3   earlier Stage 2 requests?

4   A   That's correct.

5   Q   And the Google employee called Detective Hylton

6   back that same day; right?  July 8th?

7   A   That's correct.

8   Q   And the Google employee had to explain to

9   Detective Hylton the narrowing process; right?

10  A   Correct.

11  Q   In that the warrant required Detective Hylton to

12  narrow the number of devices he was seeking the

13  expanded information for?

14  A   Right.

15  Q   They did that -- the specialist did that because

16  Detective Hylton had not narrowed the devices that he

17  was seeking the information for; right?

18  A   Correct.

19        MR. SIMON:   Judge, I think the

20  characterization of the search warrant would be better

21  and it would be more appropriate for this record if

22  she allowed the witness to, at the very least, see the

23  search warrant, what it reads, and then -- because

24  that is a lot of testifying about -- went outside the

25  scope.   I just think it would be good for the witness

**Exhibit E, pg. 473**

RODRIGUEZ – DIRECT                    474

1   to look at that.

2            THE COURT:  Is it in her declaration?

3            MS. KOENIG:  Yes.

4            THE COURT:  It's in the declaration, Mr.

5   Simon.

6            MR. SIMON:  Understood, Judge.

7            THE COURT:  She's already testified to it.

8   So overruled.

9   BY MS. KOENIG:

10  Q   So the Google employee had to specifically advise

11  Detective Hylton about the narrowing process because

12  he hadn't narrowed the list; right?

13  A   Correct.

14  Q   And in this particular case, was there a specific

15  directive that was given to Detective Hylton about how

16  much he had to narrow it from Stage 1 to Stage 2?

17  A   Not to my knowledge there weren't any indications

18  from the individual that processed the warrant that

19  that was discussed, but I wasn't involved in the call

20  directly.

21  Q   And the Google employee who talked to Detective

22  Hylton also had to advise him about what types of

23  information would be produced in the later stages of

24  the warrant; right?

25  A   Correct.

**Exhibit E, pg. 474**

RODRIGUEZ - DIRECT                    475

1  Q   Okay.  It didn't seem to Google maybe that

2  Detective Hylton was familiar with the stages of the

3  process that Google had set forth?

4  A   I couldn't characterize what -- that's what my

5  report was thinking at the time.

6  Q   Let's now go to Defense Exhibit 1.  You can flip

7  to the beginning of Defense Exhibit 1, and I'll put it

8  on the screen for you, as well.

9        THE COURT:  So, apparently, Mr. Simon, your

10  objection is sustained.

11        MS. KOENIG:  It's getting a little ahead of

12  me, Judge.

13  BY MS. KOENIG:

14  Q   All right.  So this is a warrant that's dated

15  June 14, 2019, from Detective Hylton.  Did you review

16  the geofence warrant in this case before preparing

17  your declaration?

18  A   Yes, I did.

19  Q   Did the language -- let's skip to the attachments.

20  If you go to the third page of the document, page 3

21  says Attachment 1.  And then the fourth page says

22  Attachment 2.  It's got a page number at the bottom

23  that says 2, but it is the fourth page of Exhibit 1.

24      So Attachment 2 is the language that describes the

25  three-step process that Google requires in these

**Exhibit E, pg. 475**

RODRIGUEZ – DIRECT                    476

1   geofence warrants; right?

2   A   That's correct.

3   Q   Did this language in this geofence warrant

4   regarding the three-step process that Google designed

5   seem similar to language in other geofence warrants

6   regarding the three-step process?

7   A   It appears similar.

8   Q   At some point did Google generate a template for

9   law enforcement officers to use in seeking the

10  geofence warrants?

11  A   Not to my knowledge.  But that was what I was

12  referring to before with the CCIPS sort of engagement

13  in helping to socialize the concept of these types of

14  warrants and the three-step protocol.

15  Q   So were you aware of any guidance that Google

16  helped create with CCIPS to give to law enforcement

17  officers about how to seek these warrants?

18  A   I'm not aware of the crafting of any guidance,

19  just the sort of discussions or engagement.

20  Q   Okay.  So let's go back to the first stage of the

21  process.

22            MS. KOENIG:  Actually, just a moment, Judge.

23  BY MS. KOENIG:

24  Q   Okay.  So sometimes there have been times when

25  Google has notified users that their Location History

**Exhibit E, pg. 476**

RODRIGUEZ - DIRECT                    477

1   was swept up in a geofence search; right?

2   A    Correct.

3   Q    Do the LIS specialists -- do you all issue that

4   notification?

5   A    That's correct.

6   Q    How does that happen?

7   A    Do you want me to describe the process?

8   Q    I do, yes.

9   A    So, in reviewing the search warrant, we will look

10  for the appropriate nondisclosure order within the

11  warrant.  If none exists, we may engage with law

12  enforcement to let them know that our process is to

13  notify users before disclosing data.

14       The process is somewhat different in reverse

15  Location History because we don't know the users that

16  we would notify until the third stage.  So at that

17  point in time in the processing of a reverse Location

18  History warrant, we would --

19            THE COURT:  A reverse Location History

20  warrant.

21            THE WITNESS:  Sorry about that.  I'll try to

22  be a little slower.

23  A    So in the processing of a reverse Location History

24  warrant at Stage 3 where the user would be

25  de-anonymized, we would actually disclosure the

**Exhibit E, pg. 477**

RODRIGUEZ - DIRECT                 478

1   subscriber information for that Google account prior

2   to that production if there is not a nondisclosure

3   order and a law enforcement agent has indicated that

4   they have no objection to Google notifying the users.

5   In this circumstance, our team would prepare a

6   standard form email to send to the users that we would

7   then be disclosing the information related to their

8   account.

9   Q    Okay.  I'm going to break that down, because that

10  was a little -- there are several stages of that

11  process.  So, first, you talked about if the warrant

12  has a nondisclosure order, what do you mean by that?

13  A    It's possible there's one in this warrant.

14  Q    You can take your time and look at it.

15  A    So I'm not seeing the language just in sort of a

16  cursory review here.  Within the warrant, there would

17  typically be an order from the judge indicating that

18  Google is not to disclose to any users associated with

19  the investigation or legal process.

20      It could also be a secondary legal order from the

21  warrant itself that's specific to the same order from

22  the Court that Google not notify the users related to

23  this legal process.

24  Q    But you don't see that nondisclosure order in this

25  warrant at all?

**Exhibit E, pg. 478**

RODRIGUEZ - DIRECT                    479

1    A    Not in this that I have in front of me.  Let me

2    just double check.

3    Q    Sure.  Take your time.

4              MR. SIMON:  Judge, I can clarify.  I think

5    the -- so, in part, and this will be subject to

6    Detective Hylton talking about it, there was a

7    nondisclosure order that was gotten later in the

8    process.  And I recognize now that we didn't provide

9    the nondisclosure order.  And I'm happy to do that,

10   but that's why it wasn't attached here.  It's gotten

11   at a separate time because those have to go through a

12   circuit judge is my understanding.  So that's, in

13   part, why there was a delay.

14             So I'll just note it's not attached to the

15   search warrant.

16             THE COURT:  Well, it might be important to

17   this examination.  Is there a way to get a copy of it?

18             MR. SIMON:  Sure.  I think we can figure out

19   that pretty quickly, Judge.

20             MS. KOENIG:  How quickly because I'm almost

21   done?

22             THE COURT:  How quickly because she's almost

23   done?

24             MR. SIMON:  Judge, not at this precise

25   moment.  I can represent to the Court that it wasn't

**Exhibit E, pg. 479**

RODRIGUEZ – DIRECT                    480

1   something that, in my mind, was really sort of going

2   to the heart of what we were discussing here, and

3   never really crossed my mind as something we needed to

4   turn over.  But it also wasn't given to me.  So I

5   haven't withheld it.  He's mentioned it to me, and

6   it's just my mistake for not getting it and handing it

7   over.  But I will represent we have a nondisclosure

8   order.  We'll provide it to them and do that.

9           THE COURT:  Well, do you have a sense of how

10  long it was?  Was it a day?  A couple hours?  A week?

11          DETECTIVE HYLTON:  Your Honor, it would have

12  been the day that it was actually submitted to Google.

13  I believe it was June 20.

14          THE COURT:  Well, how do you want to proceed,

15  Ms. Koenig?

16          MS. KOENIG:  I will let them produce it, and

17  we'll talk about it with Detective Hylton, I think.

18          THE COURT:  Okay.

19  BY MS. KOENIG:

20  Q   When there is a notification -- if there isn't a

21  nondisclosure order, then what was the next phase?

22  Like, what happens?  So you wait until the warrant

23  gets to Stage 3, and then you notify all of the users

24  whose information is about to be turned over in Stage

25  3?

**Exhibit E, pg. 480**

RODRIGUEZ – DIRECT                    481

1   A    Right.  So, the first step at Stage 3 is

2   evaluating if that nondisclosure order was submitted

3   prior to our processing of that Stage 3 request.  If

4   we don't have a nondisclosure order, we do engage with

5   the law enforcement officer, again, in a form email to

6   notify them that, you know, if you are to obtain a

7   nondisclosure order, you may submit it to us, but we

8   won't be able to produce subscriber information at

9   Stage 3 until you provide us with that nondisclosure

10  order or you let us know that you have no objection to

11  Google notifying the user.

12      So that process happens first.  If we receive

13  information that the law enforcement officer has no

14  objection to Google notifying, then we will move on to

15  actually notifying the users that we would be

16  producing their subscriber information in Step 3.

17      So just those users that were requested by the law

18  enforcement officer at Stage 3.

19  Q    Okay.  What does the notice tell the individual

20  whose information is about to be turned over?

21  A    It lets them know that we received legal process

22  associated with their account.  Typically provides

23  them seven days to provide us with a court-stamped

24  copy of a motion to quash, intending to, you know,

25  sort of engage within the court system on the search

**Exhibit E, pg. 481**

RODRIGUEZ - DIRECT                    482

1    warrant itself.  And we will, therefore, hold

2    production of that subscriber information until

3    they -- either the law enforcement officer agent or

4    the lawyer representing the attorney lets Google know

5    that the motion has been either approved or denied.

6    Q    So in every case where geofence warrant is

7    obtained, you will follow that process unless there's

8    a valid nondisclosure order?

9    A    Correct.

10   Q    Is there any language that you need specifically

11   in the nondisclosure order to consider it valid?

12   A    Basically, there has to be a clear order from the

13   Court that Google is not to notify in regards to this

14   legal process, notify our users in regards to this

15   legal process.

16   Q    When you say "clear order," is that subject to

17   that same kind of back and forth where Google will

18   review it and decide what they think is clear or not?

19   A    It can be.  Only -- and it would be with our legal

20   counsel depending -- so if it's within the warrant

21   itself, in some cases we may receive the affidavit,

22   and the affidavit may include a statement from the law

23   enforcement agent indicating basically the statement

24   to the judge asking for a nondisclosure order.  And in

25   that circumstance, it's not very clear to Google

**Exhibit E, pg. 482**

RODRIGUEZ - DIRECT                483

 1  whether the judge was also, you know, sort of so

 2  ordering that request from the agent.

 3      So in those circumstances, there will be that sort

 4  of coordination with our legal counsel to review and

 5  determine what the next steps would be.

 6  Q   And next steps could include going back to the law

 7  enforcement agent; right?

 8  A   Correct.

 9          MS. KOENIG:  Okay.  I have no further

10  questions, Your Honor.  Thank you.

11          THE COURT:  I have a question, and I'm going

12  to let you stand there so that -- well, actually, I'll

13  let you address it on whatever it is.

14          MS. KOENIG:  Redirect.

15          THE COURT:  Redirect.

16          MS. KOENIG:  Thank you, Your Honor.

17          THE COURT:  It's odd under the law because

18  you're an adverse witness, normally it's direct.

19          MS. KOENIG:  Your Honor, I will -- I have one

20  more thing.  Mr. Gill had provided me a possible

21  explanation of the acronym.

22  BY MS. KOENIG:

23  Q   Does CCIPS -- does it sound -- is your

24  recollection that it may stand for Computer Crimes and

25  Intellectual Property Section?

**Exhibit E, pg. 483**

RODRIGUEZ - DIRECT                    484

1   A    Sounds accurate.

2   Q    Okay.

3              MS. KOENIG:   Thank you.

4              THE COURT:   All right.   So, Ms. Rodriguez, do

5   you have any sense of what you, as a Google employee,

6   or what Google would consider realtime information?

7   We're hearing testimony about, you know, getting Maps

8   information in realtime.   Do you have any

9   understanding of what realtime means?

10             THE WITNESS:   In this context -- or I guess

11  in the Maps context, no.   In my context as a legal

12  specialist, realtime would, for the most part, mean a

13  Title III, like a wiretap or a pen register trap and

14  trace order that my team also processes.   But in the

15  context of Location History, we don't have that

16  concept.   We don't have the capability of installing

17  sort of a realtime kind of tracking process for

18  Location History data.

19             THE COURT:   So the difference I hear you

20  saying, and correct me if I'm wrong, is that realtime

21  is sort of as it's ongoing.   It's not historic.

22             THE WITNESS:   Correct.   In the context of how

23  I have been trained and engage with this material,

24  that's my understanding of what realtime would mean

25  for the legal investigations team.

**Exhibit E, pg. 484**

RODRIGUEZ – CROSS                    485

 1          THE COURT:  So within, say, you know, an hour

 2    period -- I don't know.  I don't want to go outside

 3    our record, but if there were over 50 points, so just

 4    under one per minute, that would not be considered

 5    realtime; is that right?  I know it's all different

 6    time.  So I'm not trying to put words in your mouth.

 7    So answer as you see fit.

 8          THE WITNESS:  Right.  From my perspective,

 9    all the records that we produce in response to reverse

10    Location History warrants are stored.  So it would not

11    be realtime in the context that I understand realtime.

12          THE COURT:  Okay.  That's my question.

13          THE WITNESS:  Thank you.

14      CROSS-EXAMINATION

15    BY MR. SIMON:

16    Q    Good afternoon, Ms. Rodriguez.

17    A    Good afternoon.

18    Q    The discussions with the Computer Crimes and

19    Intellectual Property Section that have been

20    mentioned, those are discussions between, I presume,

21    Google's lawyers and the folks from CCIPS; right?

22    A    Correct.

23    Q    And as far as you're concerned, those are sort of

24    the -- that's the back and forth that you mentioned,

25    primarily?

RODRIGUEZ - CROSS                486

1    A    Correct.  I have no direct involvement in that.

2    Just awareness of, you know, sort of the fact that

3    discussions are happening at that level.

4    Q    Okay.  And I know that it's already been admitted

5    by the defense, but I'll ask you, there's a smaller

6    book in front of you, a binder.  And I'll show you

7    what's marked as Government's Exhibit 3A.

8    A    Okay.

9    Q    Do you recognize that as your declaration?  I'll

10   give you a second to look at the pages there.

11   A    Yes, it would appear to be.

12           MR. SIMON:  Judge, I'd move to admit

13   Government's Exhibit 3A.

14           THE COURT:  No objection, right?

15           MS. KOENIG:  It's already been admitted, Your

16   Honor.  It was admitted --

17           MR. DUFFEY:  As a defense exhibit.

18           MS. KOENIG:  But I have no objection.

19           THE COURT:  No objection.  Yes.

20           (Government's Exhibit No. 3A is admitted into

21   evidence.)

22   BY MR. SIMON:

23   Q    When we talk about the geofence warrant, I'm just

24   going to sort of go through some of the points that

25   you've made in your declaration.  And to the extent

**Exhibit E, pg. 486**

RODRIGUEZ - CROSS                487

1    you want to clarify them, feel free.

2        But the geofence warrant calls for the anonymized,

3    deidentified location coordinates for folks who fall

4    within a certain radius.  So for a defined geographic

5    area during a defined time frame; right?

6    A    That's correct.

7    Q    And at the time the focus is the unidentified

8    suspect of that alleged crime; right?

9    A    From law enforcement's perspective?

10   Q    Correct.

11   A    To the extent that they indicate that to us, that

12   would be our understanding.

13   Q    Understood.  And when processing geofence

14   warrants, you've said you've seen sort of the period

15   between a few minutes and a few hours?

16   A    Correct.

17   Q    Okay.  And the -- that time span's limited to that

18   geographic area until the second stage when you get

19   what you've referred to as contextual -- or will get

20   contextual Location History information?

21   A    Correct.

22   Q    And I will show you what's in front of you as

23   Government's Exhibit 2.

24           MR. SIMON:  And it's not been admitted,

25   Judge, but I'll ask to question from it subject to

**Exhibit E, pg. 487**

RODRIGUEZ - CROSS                    488

1    connection --

2              THE COURT:  I'm sorry.  I'm having trouble.

3              MR. SIMON:  I'll ask for it to be admitted

4    subject to connection to our witness's testimony that

5    this is the warrant.  This is Government's Exhibit 2.

6              THE COURT:  All right.

7              MR. SIMON:  I'm going to question from it.

8    Can we bring it up?

9    BY MR. SIMON:

10   Q   If we look at what's -- there's red page numbering

11   on Government's Exhibit 2.  If you look at page 4 with

12   the red numbering as the guide, I want to highlight

13   the second full paragraph, not "for each type," but

14   starting "law enforcement officers."

15   A   Yes.

16   Q   The paragraph that says "law enforcement officers

17   will return a list."  I think it's the next one.  I'm

18   sorry.

19       Now, it's your understanding -- right? -- that

20   this is the second stage after you all have returned

21   the first stage of deidentified devices within the

22   geographical area?

23   A   Correct.  This would be the second stage.

24   Q   And in looking at -- I'm sorry.  It was the second

25   paragraph that was already highlighted.  I'm just

RODRIGUEZ – CROSS                     489

 1   jumping around a little bit.

 2       You would agree with me that in the second

 3   paragraph, it reads that law enforcement officers will

 4   review that first stage; right?

 5   A   Correct.

 6   Q   And will in an effort to narrow down the list of

 7   accounts; right?

 8   A   Correct.

 9   Q   And law enforcement officers, it reads in the next

10   sentence, will attempt to narrow the list down by

11   reviewing the time stamped location coordinates for

12   each account and comparing against the time -- the

13   known time and location information that is specific

14   to the crime; right?

15   A   Correct.

16   Q   Now, you mentioned on direct -- and we can just

17   leave that up.  You mentioned on direct the number of

18   geofence warrants -- geofence requests.  About 9,000

19   in 2019?

20   A   Right.  It was around that volume.

21   Q   And when you have the warrants, it's your

22   understanding that a judge has determined that there

23   is probable cause for this information; right?

24   A   That's my understanding.

25   Q   And to the extent that there is going to be any

**Exhibit E, pg. 489**

RODRIGUEZ - CROSS                    490

1    dispute, it's either going to be Google deciding to

2    quash that or seeking to quash that search warrant;

3    right?

4    A    If there's a dispute as to the validity of the

5    warrant?

6    Q    Yes.

7    A    Google would object to processing that warrant if

8    there were a dispute as to its validity.

9    Q    Then if, like in this instance, you comply with

10   the warrant as mandated by a judge, then a defendant

11   who is arrested in relation to that warrant can seek

12   to dispute its propriety; right?

13   A    I'm not familiar with the steps that would

14   typically come once Google produces the data.

15   Q    Understood.  And how many sort of different places

16   have signed off on these warrants in your experience?

17   Has it been limited to certain districts, certain

18   states, or is it broad?

19   A    So, we've received from many agencies within the

20   domestic United States.

21   Q    When you say "many agencies," you mean from many

22   agencies, you've received warrants signed off by

23   judges?

24   A    Correct.

25   Q    Or magistrates?

**Exhibit E, pg. 490**

RODRIGUEZ - CROSS                     491

1  A    Correct.

2  Q    In the case of responding to this warrant, I just

3  want to be clear for the record's sake with you, as

4  well as I was talking with Mr. McGriff.  The first

5  stage just calls on Google to give us the anonymized,

6  deidentified location coordinates for devices that

7  were within that radius at that specified time; right?

8  A    Devices that had reported location coordinates

9  within the geofence.

10 Q    Okay.  And then Google determines, based on the

11 location information that they have, what is

12 responsive to the warrant; right?

13 A    We would search our system, our Location History

14 storage system, in order to determine what's

15 responsive to the warrant.

16 Q    And we had some discussion about that storage

17 system earlier, but would you agree that it's possible

18 for Google to work within that storage system to index

19 sort of device information according to where the

20 latitude and longitude comes back from?

21 A    I'm not sure I understand the question.

22 Q    Okay.  So I think it's in part because I think the

23 concept is a bit foreign to me, too.  But this notion

24 of the warrant comes back.  Google then responds to

25 the first stage.  And by doing that, Google enters the

**Exhibit E, pg. 491**

RODRIGUEZ - CROSS                    492

 1  location coordinates to find out which device IDs were

 2  present; right?

 3  A    So, for -- so processing Stage 1, we would enter

 4  in the coordinates, the geofence coordinates that were

 5  provided on the warrant and the time frame, and that

 6  conducts a search across all of our Location History

 7  in order to identify the actual responsive location

 8  coordinates that are stored at the user level.  So

 9  that would -- I'm not sure if that answers your

10  question.

11  Q    Sure.  I think that just the follow-up would be

12  that Google could then sort of -- they could work

13  around the way in which they save that Location

14  History information; right?  So I could -- I'm

15  positing that I could save the location information to

16  account for users that were in a certain period at a

17  certain time, even before the government comes back

18  and requests that information; right?

19  A    At Stage 2?

20  Q    I'm just talking generally about the Location

21  History information database, the Sensorvault.  That

22  you all could take the information that is stored in

23  there and determine that we're only going to store --

24  store based off of a certain grid, a location

25  coordinate grid; right?  To say that we'll only put

**Exhibit E, pg. 492**

RODRIGUEZ - CROSS                    493

1   these devices that were here at this time here.

2   A    I think this might be a little bit outside of my

3   domain of knowledge.

4           THE COURT:  I'm going to be honest,

5   Mr. Simon.  I found that a little confusing.

6           MR. SIMON:  Understood, Judge.  And I think

7   that ultimately Mr. McGriff was probably our best

8   understanding of that issue.

9   BY MR. SIMON:

10  Q    With respect to the second step, your declaration

11  recognizes that the information that is provided at

12  Step 2 of the warrant is more than just about sort of

13  picking out a suspect; right?

14  A    So the information provided at Step 2, I think

15  this warrant might sort of outline maybe what law

16  enforcement is looking for in terms of comparing the

17  information against the known kind of facts of the

18  case that they're investigating.

19  Q    And I think that sort of brings to the point about

20  sort of the facts of the case.

21       When the search warrant is submitted to Google

22  through the enforcement database, you only get the

23  attachment that shows the process by which to complete

24  the warrant; right?  That's one piece that you get.

25  A    That Google receives?

**Exhibit E, pg. 493**

RODRIGUEZ - CROSS                    494

1    Q    Yes.

2    A    Correct.  We receive the legal process as uploaded

3    by the law enforcement agent to the LER system.

4    Q    And you don't receive the affidavit that the law

5    enforcement officer submits to the judge?

6    A    It varies.  In some circumstances, the law

7    enforcement agent may also include the affidavit.  In

8    some cases, they do not.  And it also varies whether

9    it's a requirement to submit the affidavit along with

10   the search warrant.

11   Q    Google didn't receive the affidavit in this case,

12   did it?

13   A    I didn't recall.

14   Q    Okay.  When talking about the information at the

15   second step, you note in your declaration that you can

16   do a number of things with contextual information at

17   the second step; right?

18   A    Do a number of things --

19   Q    So, in looking at paragraph 10, in particular, you

20   note that you can -- that using that contextual

21   Location History information at the second stage can

22   allow law enforcement to -- it can assist in

23   eliminating false positives and assist in determining

24   if devices were just moving through possibly?

25   A    Correct.  In paragraph 11, mentioning the, you

**Exhibit E, pg. 494**

RODRIGUEZ - CROSS                    495

 1   know, law enforcement in eliminating devices that were

 2   not in the target location for a long enough period of

 3   time.

 4   Q    And at the same time also can sort of assess --

 5   determine whether a certain ID is relevant or not

 6   relevant; right?

 7   A    Correct.

 8   Q    So that's just sort of the broader process of

 9   determining how to investigate a case.  And that will

10   be contingent upon what facts are relevant to a

11   particular crime; right?

12   A    Right.  And Google wouldn't necessarily have any

13   visibility into the actual facts of the investigation.

14   Q    Understood.

15              THE COURT:  I'm just going to be clear.  That

16   was Defense Exhibit 3A?

17              MR. SIMON:  I apologies.  That was 3A.  I

18   probably am referring to them all as 3.

19              THE COURT:  No, I'm not sure there was a

20   number on the record.  That's fine.

21   BY MR. SIMON:

22   Q    And we've had emails in this case.  I don't know

23   if you've had a chance to see those emails.  Have you

24   seen the emails between Detective Hylton and Google

25   law enforcement?

**Exhibit E, pg. 495**

RODRIGUEZ - CROSS                    496

1   A    I reviewed the materials associated with the

2   processing of the warrant when I wrote my declaration,

3   but I haven't seen anything since.

4   Q    Okay.  So when you're asked about the amount of

5   communication between Detective Hylton and Google,

6   you're not directly familiar, but maybe talking to

7   other folks about it?

8   A    Reviewing what we have associated with the

9   processing of the warrant, but -- and in conversation

10  with the individual that processed the warrant

11  directly.

12  Q    Would it surprise you if I told you that after the

13  July 1 email and the July 2 email for the second stage

14  that Detective Hylton had not heard back from Google

15  yet?

16  A    It wouldn't surprise me.

17  Q    Would it surprise you if I told you that Detective

18  Hylton was the one who actually initiated a call with

19  Google on July 8?

20  A    That they spoke to someone after calling Google?

21  Q    Correct.  That Detective Hylton was the one who

22  reached out to Google on July 8.

23  A    I do recall that there was a voicemail left for, I

24  believe, one of our counsel team members.

25  Q    So the representation that there was any

**Exhibit E, pg. 496**

RODRIGUEZ - CROSS                497

 1  information being sent from Google to Detective Hylton

 2  prior to July 8, his call on July 8, that's not

 3  correct; right?

 4  A    Well, I believe the Stage 1 was produced.

 5  Q    Sorry.  I should rephrase that.  There were not

 6  any communications from July 1 through July 8 on the

 7  side of Google until Detective Hylton called; right?

 8  A    Right.  As far as I'm aware, there was no

 9  conversation until that July 8 with an actual Google

10  representative.

11  Q    And you would agree that with respect to making

12  sense of these geofence warrants, it is important to

13  know all the facts of the case; right?

14  A    It's helpful in many circumstances.

15  Q    So when we talk about things like relevance to an

16  investigation, knowing all of the facts in terms of

17  what you have, whether it be starting with sort of

18  whether the culprit appeared to be talking to other

19  people, that would be relevant; right?

20  A    In the context of this warrant, I'm not sure how

21  relevant it would have been.  But in my processing of

22  other warrants, it has been helpful to have an

23  understanding of the facts of the case that law

24  enforcement has.

25  Q    And I just mean it, to be clear, I mean it from

**Exhibit E, pg. 497**

RODRIGUEZ – CROSS                              498

1   the context of law enforcement looking at these

2   warrants trying to make sense of what information is

3   useful.  All those facts are critical to making that

4   determination; right?

5   A   For law enforcement?

6   Q   Correct.  To determine what to request at Stage 2

7   of this warrant.

8   A   I would imagine so, that that would be helpful for

9   them to know.

10          MR. SIMON:  One moment, Judge.

11          Judge, I have been told how to ask that

12   question about indexing.  So I'm going to try it once

13   more, if you don't mind.

14   BY MR. SIMON:

15   Q   Could Google, to your understanding, index the

16   Location History in the Sensorvault by geographical

17   location instead of by account?

18   A   I honestly don't know.  I could guess that it was

19   technically possible, but I don't know what other

20   limitations may be at play because I don't monitor the

21   database or the structure of the database directly.

22   Q   Understood.

23          THE COURT:  Thank you, Mr. Simon.

24          Ms. Koenig.

25          MS. KOENIG:  Sorry, Ms. Hancock.  I will need

**Exhibit E, pg. 498**

RODRIGUEZ - REDIRECT                    499

1    one more assist with the --

2              THE CLERK:  You should be good to go.

3              MS. KOENIG:  Okay.  Great.

4

5       REDIRECT EXAMINATION.

6    BY MS. KOENIG:

7    Q   All right.  Just a few more questions, Ms.

8    Rodriguez.

9       Let's -- so, Mr. Simon was asking you about what

10   attachments would have been submitted to Google, I

11   think, and I think we can clarify this.

12      So, as we know, Google requires that there has to

13   be a defined geographical area -- right? -- before

14   they'll process the warrant?

15   A   Correct.

16   Q   And there also has to be a defined time frame;

17   right?

18   A   Correct.

19   Q   Okay.  So if you can go back to Defense Exhibit 1

20   -- I know we're switching back and forth with

21   different numbers for the same exhibits.  It's

22   confusing.

23      So if you look at the first page of Defense

24   Exhibit 1, which at the top says "Affidavit for Search

25   Warrant."  In that affidavit, in paragraph 28, that

**Exhibit E, pg. 499**

RODRIGUEZ – REDIRECT                    500

1    appears to list out the geographical area; right?

2    This is page 1 of that exhibit.  I'm sorry.  I see you

3    flipping back through.

4    A   I don't think I have -- so this starts with

5    Attachment 1 as page 1.  And I don't -- in Exhibit 1.

6    Q   Okay.  Let me show you what's on the screen.

7    There may have been a page that got flipped around.

8            THE COURT:  It's farther back in Exhibit 1.

9            MS. KOENIG:  Thank you, Your Honor.

10           THE COURT:  It's a little bit out of order, I

11   think.

12           THE WITNESS:  I can look at the screen.

13           THE COURT:  It's the last page in Exhibit 1.

14   A   I think this ends with search warrant inventory in

15   return, and then it goes back to Attachment 1.

16   Q   I am so sorry about that.  Well, let's look at the

17   screen.  Let's look at the page in Exhibit 1 which is

18   labeled "search warrant" at the top.

19   A   Okay.  I do have that.

20   Q   Okay.  So, in that page, nowhere on that page does

21   it indicate what is the time frame or the geographical

22   area to be searched; right?

23   A   That's correct.

24   Q   In fact, it says "see attached"; right?

25   A   Correct.

**Exhibit E, pg. 500**

RODRIGUEZ – REDIRECT                    501

1  Q    Okay.  And so following that, we see what's the

2  next page after that.  We see what's labeled as

3  "search inventory and return"; right?  I'm not

4  indicating you all would have seen that.

5  A    Correct.

6  Q    And then there is the Attachment 1 after that;

7  right?

8  A    Correct.

9  Q    And the Attachment 1 that follows the search

10 warrant itself appears to be identical to Attachment 2

11 in the same exhibit that is attached to the affidavit

12 in support of the application?

13 A    In the -- what you had shown on the screen before,

14 that representation, that would appear to be the case.

15 Q    In Attachment 1 here, as it is attached to the

16 search warrant, that is the document that indicates

17 the date and the time in the first bullet point;

18 right?

19 A    That's correct.

20 Q    And then on the second page of that, it indicates

21 in the geographical area above the picture with the

22 circle of the geofence what geographical area is to be

23 searched; right?

24 A    That's correct.

25 Q    And the paragraphs between those two items discuss

**Exhibit E, pg. 501**

RODRIGUEZ - REDIRECT                    502

1   the process, the three-step process that we've already

2   talked about; right?

3   A    That's correct.

4   Q    And so if all that had been submitted to Google

5   was the page that lists -- that at the top says

6   "search warrant" -- right? -- if that was all that had

7   been submitted, there was no way you would have

8   processed that; right?

9   A    Right.  If there weren't -- if it said "see

10  attached," but there weren't any corresponding

11  attachments, then that's correct, we wouldn't be able

12  to process this warrant as is.

13  Q    And if the cover page didn't indicate the

14  geographical area or the time frame; right?

15  A    Correct.  If this warrant -- as it currently looks

16  on the screen right now and in the exhibits, if that's

17  all that there was, then Google wouldn't have enough

18  information to process the warrant.

19  Q    Thank you.

20       When you are processing a warrant, does it matter

21  to Google if it's a judge that issues the geofence

22  warrant versus a person who is a magistrate that's not

23  a lawyer?

24  A    It varies by jurisdiction, as I understand it in

25  my training on the legal investigations team.  So we

**Exhibit E, pg. 502**

RODRIGUEZ – REDIRECT                503

 1  may accept search warrants signed by magistrates and

 2  we would accept search warrants signed by a judge.

 3  Q   And so the training -- or you would accept it from

 4  a jurisdiction that allows magistrates to issue such

 5  warrants; right?

 6  A   Correct.

 7  Q   And speaking of your training, when we talked

 8  about that back and forth process between Google and

 9  the law enforcement agent on the different stages of

10  the process, do you all, as LIS employees, do you get

11  training on how to handle those types of issues about

12  when you need to go to legal counsel?

13  A   Correct.  We get training.  We also have a regular

14  sort of engagement, you know, scheduled on a weekly

15  basis with our law enforcement counsel.

16  Q   And Mr. Simon had asked you about the Stage 1

17  process, and you had replied that all users have to be

18  searched.  And we've been talking about numerous tens

19  of millions.  Do you have any idea how many millions

20  we're talking about in terms of what the Stage 1

21  search is of?

22  A   I don't.

23       MS. KOENIG:  Okay.  No further questions,

24  Your Honor.  Thank you.

25       From the defense perspective, she can be

**Exhibit E, pg. 503**

RODRIGUEZ - REDIRECT                 504

1    excused from her subpoena, Your Honor.

2              MR. SIMON:  And from the United States, as

3    well, Judge.

4              THE COURT:  All right.  Well, Ms. Rodriguez,

5    I want to thank you for coming here and for

6    testifying.  You are excused.  Until we're done with

7    the proceeding, I would continue to consider you under

8    sequestration.  Just don't talk to folks about what

9    you've testified to, even though you're not subject to

10   recall.  And you probably could.  It just keeps the

11   record cleaner, if you're willing to keep things

12   close.  We do appreciate your coming.

13             THE WITNESS:  Understood.

14             THE COURT:  And you are excused.

15             THE WITNESS:  Thank you.  Do you want me to

16   sanitize this?

17             THE COURT:  If you don't mind, sir, could you

18   clean it off afterward?

19             MR. MELTON: Yes, Your Honor.

20             THE COURT:  You're good.  Thank you.

21             THE WITNESS:  Thank you.

22             (The witness was excused from the witness

23    stand.)

24             THE COURT:  In fact, since we're calling a

25   new witness, and it's been almost an hour and a half,

**Exhibit E, pg. 504**

505

 1   how about we take a 15-minute recess.  And so that

 2   will be until 3:35.  How's that?

 3           MS. KOENIG:  Your Honor, the defense has no

 4   other witnesses to present at this stage.  And I think

 5   we will be ready for the next government witness.

 6           THE COURT:  All right.  Well, that's good to

 7   know.  Even more reason to take a break.  See you in

 8   15 minutes.

 9           (Recess at 3:20 p.m. to 3:44 p.m.)

10           THE COURT:  All right.  I understand we

11   talked about some logistics, which is why we're coming

12   back a little late.  Do you all have a sense of how

13   much longer we will be going?  Can we finish today?

14           MR. SIMON:  Judge, I don't intend to -- and I

15   certainly am happy to keep an eye on the clock, but I

16   don't intend for the direct to be more than 45 minutes

17   or so.  I think a lot of it is contingent upon cross

18   in both instances.  But there are a handful of topics

19   to cover with each witness.

20           THE COURT:  Right.  So 45 minutes each?

21           MR. SIMON:  I think so, Judge.

22           THE COURT:  What do you all think?  I'm

23   willing to stay late.  Otherwise, I would think it

24   would make sense to bring the second witness in on

25   Monday.  We can't go tomorrow because all the

**Exhibit E, pg. 505**

D'ERRICO – DIRECT                    506

1    electricity is shut down.

2          MS. KOENIG:  We would prefer to get it done

3    today, if at all possible.

4          THE COURT:  Well, I think if both parties are

5    willing to stay a little late, and I apologize to the

6    inconvenience for the marshals and everybody else.  I

7    just think the better part of valor would be to

8    finish.  And so I will encourage you all to be

9    efficient while, of course, representing your clients

10   with zeal.  So we're ready.

11         MR. SIMON:  Judge, we'd call Special Agent

12   Jeremy D'Errico.

13

14      JEREMY D'ERRICO, called by the United States,

15   first being duly sworn, testified as follows:

16

17      DIRECT EXAMINATION

18   BY MR. SIMON:

19   Q   All right.  Special Agent D'Errico, can you spell

20   your name for the court reporter, please.

21   A   Yes.  My first name is Jeremy, J-E-R-E-M-Y.  My

22   last name is D'Errico, D-apostrophe-capital

23   E-R-R-I-C-O.

24   Q   And you are with the Federal Bureau of

25   Investigation; right?

**Exhibit E, pg. 506**

D'ERRICO - DIRECT                    507

1   A    Yes, I am.  I'm a special agent with the FBI.

2   Q    And how long have you been there?

3   A    I've been with the FBI since 2012.

4   Q    Okay.  In what role are you currently in there?

5   A    Currently, I'm a special agent.  Prior to being a

6   special agent with the FBI, I was a computer scientist

7   with the FBI.

8   Q    And do you have any specialized role there with

9   the FBI?

10  A    I do.  I'm part of the cellular analysis survey

11  team.  We abbreviate it as CAST.  It's a team that is

12  specially trained of about 80 special agents and task

13  force officers stationed across the country

14  specifically trained to conduct historical cell-site

15  analysis.

16  Q    Okay.  What other positions have you held while

17  you've been with the FBI?

18  A    When I first became a special agent with the FBI,

19  I was on the cyber squad investigating computer

20  intrusions and other highly technology investigations.

21  Currently, I'm on the violent crime squad where I

22  brought my technology expertise to help use advanced

23  technology in the investigations of violent crime.

24  Q    And in your work with the CAST team, do you

25  undergo any certifications or trainings?

**Exhibit E, pg. 507**

D'ERRICO – DIRECT                    508

1    A    Yes.  As part of the CAST team, we have over -- or

2    I have more than 300 hours of training to be able to

3    certify for the team.  And that starts with a basic

4    training, an overview of how to conduct historical

5    cell-site analysis.  And then from there, the top

6    students move on to the next class, which is an

7    advanced class in historical cell-site analysis.

8         From there, the top students, again, get invited

9    to what we call a field training exercise, which is

10   where we discuss more advanced topics as well as add

11   time constraints to our work simulating a command post

12   situation for, say, a fugitive or a child abduction.

13        From there, again, the top students move into a

14   four-week certification phase where we go through

15   training from the FBI from the cellular carriers,

16   including AT&T, Verizon, Sprint, T-Mobile, and U.S.

17   Cellular, as well as over a week of instruction from

18   the Florida Institute of Technology on how radio

19   frequencies work, and additional practical exercises.

20   And that culminates with a practical exam, which we

21   need to pass in order to complete the certification.

22   Q    All right.  Now, as a member of the CAST team, are

23   you called on to assess GPS data points provided by

24   cellular companies and other technology companies?

25   A    Yes, I am.

**Exhibit E, pg. 508**

D'ERRICO - DIRECT                    509

1   Q    Okay.  And same with Wi-Fi points?

2   A    Yes, correct.  Generally, any type of location

3   points.

4   Q    Okay.  And in the course of your time, have you

5   done that with -- done that assessment with Google

6   location information?

7   A    Yes, I have.  I've reviewed over a million lines

8   of Google Location History, whether it be from a

9   geofence or a location history attributed to someone's

10  accounts, as well as conducted what I call

11  observations of Google Location History data in play.

12  Q    Have you personally attempted to assess the

13  accuracy of Google location coordinates?

14  A    Yes, I have.  I've taken out equipment several

15  times to drive around, record my actual GPS location

16  with a stand alone device.  And then on another

17  device, I've collected all of the Wi-Fi access signals

18  that I could hear, as well as the signal strengths,

19  and I used Google's geolocation API, which takes the

20  information from the Wi-Fi access points and returns

21  to me a location, a latitude and a longitude and a

22  point on the map, as well as a display map radius,

23  just as they do with Location Accuracy on the Google

24  devices.

25           THE COURT:  What's a geolocation API?

**Exhibit E, pg. 509**

D'ERRICO – DIRECT                510

1          THE WITNESS:  Geolocation API, API stands for

2    Application Programmer Interface, and it is a way for

3    me to send information to Google, Google to process

4    it, and send me a response.

5          So I send them the information, and then

6    evaluate the response back.  I compare their location

7    that they provided and their maps display radius that

8    I measured with an independent device.

9    Q    Now, have you ever successfully located anyone

10   using Google location information?

11   A    Yes, I have.

12   Q    Can you tell us about that?

13   A    This is information that myself and the CAST team

14   regularly uses in child abductions, in locating

15   fugitives that do not want to be found by law

16   enforcement, and other folks that may have gone

17   missing.

18   Q    Have you been certified as an expert before?

19   A    Yes, I have.

20   Q    In what fields have you been certified?

21   A    Historical cell-site analysis and location data

22   analysis is generally the title we use.

23          MR. SIMON:  Judge, at this point I'd move the

24   Court to declare Special Agent D'Errico an expert in

25   the field of location, data analysis, including

**Exhibit E, pg. 510**

D'ERRICO - DIRECT          511

1   Google's Location History information.

2            THE COURT:  Any objection?

3            MR. SIMON:  No, Your Honor.

4            THE COURT:  Okay.

5            MR. SIMON:  And, Judge, I've handed the

6   exhibit earlier -- the witness the exhibit earlier, as

7   well as defense, Government's Exhibit 6.  It's Special

8   Agent D'Errico's C.V., and I move to admit it at this

9   time.

10           THE COURT:  Any objection?

11           MR. SIMON:  No, Your Honor.

12           THE COURT:  All right.  It will be admitted

13  as well, and he is certified as an expert.

14           (Government's Exhibit No. 6 is admitted into

15  evidence.)

16  BY MR. SIMON:

17  Q   Now, Special Agent D'Errico, have you worked with

18  geofence warrants before?

19  A   Yes, I have.

20  Q   About how many have you worked with?

21  A   Geofence warrants, at least a dozen, probably

22  more.

23  Q   Okay.  Now, did Google provide any data under this

24  geofence warrant any different than what they provided

25  to you in the past?

D'ERRICO – DIRECT                    512

1    A    The records have been consistent with this among

2    the other geofence warrants I have worked.

3    Q    Now, just to -- we've talked about geofence

4    warrants, obviously, for a few days now, but how would

5    you describe a geofence warrant?

6    A    A geofence warrant is when the government obtains

7    a search warrant commanding Google to provide all of

8    the devices that have Location History records within

9    a particular area and within a particular time frame.

10   Q    And in the course of your time assessing Google

11   geofence warrants, have you come to believe that there

12   are certain best practices in terms of putting

13   together a geofence warrant?

14   A    Yes, I have.

15   Q    Okay.  And can you tell us some of those best

16   practices particular as relates to a radius?

17   A    Yes, particularly to drawing the geofence, it

18   differs between investigations from investigation to

19   investigation.  In the example of a bank robbery,

20   we're looking for a few things.  We need to cover the

21   area of the crime, the bank, but we're also looking

22   for areas where the subject may have entered the area

23   or exited the area.  We're looking for areas where the

24   suspect may have parked a vehicle, because we know a

25   few things about bank robberies.

**Exhibit E, pg. 512**

D'ERRICO - DIRECT                513

 1        (A) They don't always park in the front space in

 2    the front of the bank to go in and rob that bank.

 3        (B) We typically see them park a little bit of a

 4    distance away, sometimes in the next parking lot.

 5        We also know that Google location records in a

 6    normal interval occur approximately every two minutes.

 7    So we need to take these calculations into effect when

 8    we're drawing a radius or a box for a geofence

 9    warrant.

10        We try not to capture roadways or other areas

11    where many people may be passing through unless it

12    could be relevant to the investigation.  Whereas, in a

13    child abduction, we may want to capture a roadway so

14    that we can talk to people that may have seen the

15    child walking across or along the roadway.

16        So it really varies based on the type of crime and

17    the layout of the crime scene area.

18    Q    Now, did you prepare a report, a presentation, in

19    anticipation of this hearing?

20    A    Yes, I did.

21    Q    I'm going to show you the pages of Government's

22    Exhibit 1 and let you take a look at those.  It's in

23    the folder in front of you.  Do you see Government's

24    Exhibit 1 there?

25    A    Yes, I do.

**Exhibit E, pg. 513**

D'ERRICO – DIRECT                    514

1    Q    Is that the presentation that you prepared?

2    A    Yes, it is.

3              MR. SIMON:  All right.  We move to admit

4    Government's Exhibit 1.  I know it's been questioned

5    on already.

6              THE COURT:  No objection?

7              MR. PRICE:  Your Honor, there is one slide

8    that we anticipate having an objection to.

9              THE COURT:  Okay.  Do you want to lay the

10   foundation for it now so it doesn't go on the record?

11             MR. PRICE:  Sure.  This would be Slide

12   No. 47.

13             THE COURT:  What is the basis of the

14   objection?

15             MR. PRICE:  Relevance, Your Honor.  It's our

16   understanding that this web page and the language on

17   it --

18             THE COURT:  Okay.  I'm having trouble with

19   your mask.

20             MR. PRICE:  It's our understanding that this

21   web page and the language on it did not exist until

22   2020, long after the events in question in this case.

23             MR. SIMON:  Judge, I think my response to

24   that objection to relevance is that we've seen

25   exhibits come in and out of evidence with no regard

**Exhibit E, pg. 514**

D'ERRICO - DIRECT                    515

1    for, I think, dates in part because it does offer some

2    context here in terms of what location services and

3    Location History mean to Google.  And I think that's

4    certainly more of a weight, particularly at this

5    hearing.  So, Judge, I'd ask to leave that slide in in

6    the presentation.

7            THE COURT:  I'm going to make the same ruling

8    I did with respect to much of what you entered in.

9    You can cross-examine about it and argue the weight of

10   it, and present the weight of it, but we're really not

11   in an evidentiary hearing in any event, and I'm trying

12   to keep the record full so that whatever arguments

13   need to be made can be supported and challenged in a

14   complete way.  So it's overruled.

15           MR. PRICE:  Thank you, Your Honor.

16           (Government's Exhibit No. 1 is admitted into

17    evidence.)

18   BY MR. SIMON:

19   Q    Now, Special Agent D'Errico, I want to talk

20   about -- you heard me earlier, I'm sure, ask witnesses

21   about GPS points and Wi-Fi points.  I want to talk

22   about, first, the Slide No. 3 here.

23           MR. SIMON:  And I'm just referring to the

24   page numbers that will be on the bottom right, Judge,

25   of each page.

**Exhibit E, pg. 515**

D'ERRICO - DIRECT                516

1  BY MR. SIMON:

2  Q   Can you explain for us what we're talking about

3  when we talk about a GPS point?

4  A   Yes.  The GPS points in the record, and those are

5  points that have a source of GPS, those points are

6  primarily captured using the Global Positioning

7  System.  And the Global Positioning System uses a

8  network of satellites that are in orbit around the

9  earth, and they are constantly broadcasting signals.

10      The phone, the mobile device, needs to hear at

11  least four of those signals in order to determine the

12  latitude, the longitude, the altitude, and the time.

13  And there's information specifically coded into those

14  satellite transmissions, those broadcasts, that allow

15  the device to do that.

16      Now, in order to get a good fix or a good location

17  with GPS, you need to be able to hear those satellites

18  or the device has to hear those satellites.  So GPS

19  does not work very well inside of buildings such as

20  this but works very well outside, and is what we

21  typically rely on for navigation, realtime navigation

22  with a GPS device or turn-by-turn navigation.

23  Q   Now, we didn't just get GPS points in the returns

24  here; right?

25  A   Correct.  We also received points that were

**Exhibit E, pg. 516**

D'ERRICO - DIRECT                    517

 1   primarily derived using Wi-Fi access points, and

 2   they're marked as Wi-Fi in the source column.

 3   Q    In Slides 4 and 5, do you explain that?

 4   A    Yes, I do.

 5   Q    Okay.  And so looking at sort of Slide 5 -- and

 6   we'll bring up both 4 and 5 next to each other.  But

 7   when we talk about Wi-Fi fingerprinting, can you

 8   explain what we're talking about there?

 9   A    Yes.  On page 5 is an illustration of Wi-Fi

10   fingerprinting, and this is a technique that is used

11   to determine the location of a device using Wi-Fi

12   access points.  And Wi-Fi access points are stationed

13   all over, right?  So if you are able to access Wi-Fi

14   on your phone, you're within range of a Wi-Fi access

15   point.

16        Now, the way that fingerprinting works is that

17   there's a two-step method.  The first step, which is

18   above the dotted line on page 5, is what we call

19   training data.  And this is when we have a phone that

20   can hear access point No. 1, access point No. 2, and

21   access point No. 3, or, in this case N, because it can

22   be more than three access points.

23        It hears these access points, doesn't necessarily

24   have to connect to those access points, but hears them

25   and can measure the signal strength of them.

**Exhibit E, pg. 517**

D'ERRICO – DIRECT                    518

1      Also at the same time, the mobile device is taking

2    a GPS coordinate.  So it's actually determining its

3    location with GPS but also collecting the Wi-Fi

4    broadcast in the area.  And what happens with this

5    data is it's sent up to Google as part of the Location

6    Accuracy service.  And that Location Accuracy service

7    is an opt-in service on Android phones that allows

8    Google to collect the approximate location of Wi-Fi

9    access points.

10           THE COURT:  I'm sorry.  Can you use the

11   phrase again?  Location what service?

12           THE WITNESS:  Location Accuracy.

13           THE COURT:  Okay.

14   BY MR. SIMON:

15   Q   In looking at Slide 6, does Google notify

16   individuals that they will be using Wi-Fi access

17   points to assess location devices?

18   A   They do.  Can I go back to Slide 5 and finish the

19   bottom?

20   Q   Sure.

21   A   I'm sorry.  So, we talked about the training data

22   set up top.  The next set comes in on the bottom of

23   that page where a phone does not collect a GPS

24   coordinate, but it does collect the Wi-Fi access

25   points and the signal strengths.  It can then send

**Exhibit E, pg. 518**

D'ERRICO – DIRECT                     519

```
 1    that information to Google, which collected a database
 2    and created a fingerprint, so to speak, and associated
 3    the same access points with similar signal strengths
 4    to determine an approximate location.
 5         So there's no need to know an exact location for
 6    every access point in the world.  What we need to know
 7    is the access points in relationship to others and
 8    approximate signal strengths.  Using that information,
 9    we are able to efficiently determine a location
10    without using GPS.
11         And there's occasions where we don't want to use
12    GPS because GPS is very expensive on the battery.  We
13    heard Mr. McGriff testify that there might be problems
14    if there were thousands of points, particularly GPS
15    points, from a device.  So Wi-Fi is a less expensive
16    but still accurate method of providing the approximate
17    location of a device.
18    Q    Okay.
19    A    Thank you.
20    Q    And to go back to my previous question, is Slide 6
21    demonstrating Google's notification to customers that
22    it uses Wi-Fi access points to assess location?
23    A    Yes, it does.
24              THE COURT:  You're so far away from the
25    microphone.
```

**Exhibit E, pg. 519**

D'ERRICO – DIRECT                           520

1          MR. SIMON:  I apologize.

2          THE COURT:  You're talking to him, but we're

3    the people who need to hear it.

4          MR. SIMON:  No, I understand.  And I moved a

5    little bit, so I'll try to maintain --

6          THE COURT:  That's fine.

7    BY MR. SIMON:

8    Q   So I'm looking at Slide 6.  Is that slide

9    demonstrating Google's notification to its customers

10   that they use Wi-Fi points to assess location?

11   A   Yes, there's two places on Google's site that

12   discussions Wi-Fi and the use of it.  So in the top

13   block, Google says, To improve location services,

14   Google uses publicly broadcast Wi-Fi data from

15   wireless access points and GPS, cell towers, and

16   sensor data.  Only publicly broadcast Wi-Fi

17   information is used to estimate the location of a

18   device.

19       In a separate article, it also talks about how you

20   can, as a Wi-Fi point owner, opt-out of Google using

21   your Wi-Fi access point in location services.

22       And on the bottom, Google also talks about their

23   Google location services, otherwise known as Google

24   Location Accuracy.  That uses information of nearby

25   Wi-Fi mobile networks and device sensors to improve

**Exhibit E, pg. 520**

D'ERRICO - DIRECT                    521

1    its location device or its location data using the

2    Android phone.

3    Q    Okay.  Now, I want to show you what we've marked

4    as --

5              THE COURT:  I'm just going to ask a question.

6    You said there's a separate article about how you can

7    turn it off.  That's not reflected on this slide;

8    right?

9              THE WITNESS:  Correct, that is not reflected

10   in the slide.

11             THE COURT:  Okay.

12   BY MR. SIMON:

13   Q    And I just want to now have you look at

14   Government's Exhibit 2.

15   A    Excuse me?

16   Q    Government's Exhibit 2.

17   A    Yes.

18   Q    Do you recognize the pages set forth in

19   Government's Exhibit 2?

20   A    Yes, I do.

21   Q    What is it?

22   A    This is the search warrant and affidavit that

23   Detective Hylton submitted for the Google geofence

24   warrant.

25   Q    Okay.  And that's a fair and accurate depiction, I

D'ERRICO – DIRECT                522

```
 1  presume, of that application?
 2  A    Yes, it is.
 3          MR. SIMON:  Judge, we move to admit
 4  Government's Exhibit 2 at this point.
 5          THE COURT:  Okay.  No objection; correct?
 6          MR. PRICE:  No objection, Your Honor.
 7          THE COURT:  Okay.  It's entered.
 8          (Government's Exhibit No. 2 is admitted into
 9  evidence.)
10  BY MR. SIMON:
11  Q    Now, let me ask you about the geographical area.
12  We've talked about that phrase throughout the few
13  days.  What geographical area was deemed relevant to
14  the search warrant in this case, looking at Slides 8
15  and 9?
16  A    And this is back in Defense Exhibit 1?
17  Q    Defense Exhibit 1, yes.
18  A    So Slide 8 on my report, Defense Exhibit 1, shows
19  a red dot towards the center of the slide with a red
20  circle around that slide.  The red dot is the center
21  of that geofence, whereas the red circle illustrates
22  the effective geofence, which is 150 meters away in
23  every direction from that center point.
24  Q    Okay.  And so this is the geofence radius we have.
25  Now, did you put slides together to sort of
```

**Exhibit E, pg. 522**

D'ERRICO - DIRECT                    523

 1  demonstrate what factual points went into developing

 2  that geofence?

 3  A   Yes, I did.   Slide 9 goes into that point.   So

 4  it's important for us to capture all areas where

 5  somebody could stash a car or hide a car, and also all

 6  areas where somebody could arrive or leave from this

 7  crime scene.

 8      So, in this case, what was done was the geofence

 9  on the right side goes up to but doesn't cover the

10  road, which is Price Club Boulevard, traveling north

11  to south and curving towards the west under the

12  geofence.   On the south side of the geofence, that

13  area covers the area behind Journey Christian Church,

14  which is the church where we received information that

15  a suspicious blue Buick was parked, and it also covers

16  the wooded area, because we know that subjects when

17  fleeing a bank robbery may not --

18  Q   Special Agent D'Errico, I'm sorry to interrupt

19  you, but can we look at, while you're explaining this,

20  Slides 10 and 11, because I think some of those points

21  might be in there; right?

22  A   Yes.   We also cover the area south because we know

23  subjects may flee through the woods and may not use

24  the road system.

25      On the left, we cover up to the adjoining

**Exhibit E, pg. 523**

D'ERRICO – DIRECT                    524

1  business, which we can see also covers some trails.

2  And then to the north, we try to cover as much of the

3  parking lot as we can but try not to cover the area

4  near the Hampton Inn.

5        And on Slide 10, we have additional information

6  laid on the map, particularly yellow markers that

7  indicate the approximate location where we saw the

8  subject via surveillance cameras from both Journey

9  Christian Church and from Call Federal Credit Union.

10       There are two triangles or partial triangles on

11  the maps with the points attached to the side of the

12  church.  The one in purple towards the bottom is the

13  field of vision of one of the cameras, one of the

14  surveillance cameras, that we were able to obtain

15  surveillance footage from.

16       The one towards the top, in orange, is, again, a

17  field of view of a second surveillance camera that we

18  were able to get coverage from or a video from during

19  the time of the robbery.

20       And then we have video surveillance from the area

21  withinside the Call Federal Credit Union.  And each

22  one of those yellow pinpoints indicates a point where

23  I observed the subject on this map.

24       So we can see that there were video observations

25  that start on the bottom with No. 1 and travel the

**Exhibit E, pg. 524**

D'ERRICO - DIRECT                525

 1  parking lot in between the church and the credit union

 2  towards the north, and then there's points,

 3  specifically points 4, 5, and 6, where the subject

 4  moves towards the Call Federal Credit Union.

 5       There's point 7, which is inside Call Federal

 6  Credit Union.  And then points 8, 9, and 10 show

 7  points where the subject was running from the Call

 8  Federal Credit Union towards the -- well, out of the

 9  field of vision but south back towards where we

10  originally saw him on video.

11  Q   Now, did you assess for your presentation -- and

12  these slides are coming up on the screen as well, if

13  it's easier to see them.  Did you assess and compare

14  the geographical area covered by the geofence in this

15  case with what's covered by a cell tower dump?

16  A   Yes, I did.

17  Q   Is that reflected in Slide 13?

18  A   Yes, it is.  Slide 13 shows the approximate area

19  of coverage that I would expect to receive if we

20  conducted a tower dump for this crime.

21  Q   Now, before you go into it, just for the record,

22  how would you describe a cell tower dump?  What is it?

23  A   A cell tower dump is when we obtain a 2703(d)

24  court order to obtain communication records from the

25  cellular providers that correspond to communications

**Exhibit E, pg. 525**

D'ERRICO - DIRECT                526

1    that happen on a particular cell tower.

2         And, typically, when we obtain tower dumps, we

3    look to obtain any cell site that would provide

4    coverage to the subject area.  In this case, the Call

5    Federal Credit Union.

6         We know that cell phone towers overlap, and that's

7    what allows us to move seamlessly from one cell tower

8    to the next cell phone tower.  So we choose three to

9    make sure we are getting complete coverage or as much

10   coverage as possible of that target area, that subject

11   area.

12   Q   And we heard earlier that cell tower dumps provide

13   phone numbers; is that right?

14   A   That's correct.  When the phone companies respond

15   back to the 2703(d) order, they provide the actual

16   phone numbers used in the communication.  So they are

17   not anonymized.  They are the actual telephone numbers

18   used in that course of the communication.

19   Q   What, if anything, does the government tell a

20   cellular telephone company to do in terms of how they

21   would provide that information?  Do we tell them how

22   to go about finding the information from the cell

23   tower?

24   A    No, we don't direct them on how to respond to the

25   Court order other than directing them to provide

**Exhibit E, pg. 526**

D'ERRICO - DIRECT                    527

1   records that cover that area.

2        So my understanding is that they use the processes

3   that they have in order to obtain those records that

4   they use in their ordinary course of business.

5   Q    And what -- you've dealt with both types of

6   warrants, geofence warrants and cell tower dumps,

7   which can come by a subpoena; right?

8   A    A cell tower dump?

9   Q    Yes.

10  A    I've only obtained them with a 2703(d) or a search

11  warrant.

12  Q    The -- but the information that comes from the

13  cell tower dump and the geofence warrant, which one

14  provides more data back?

15  A    Typically, more data is received in the tower

16  dump.  It will provide -- yeah, more information

17  typically is from a tower dump.  It does depend, but

18  usually it's a tower dump.

19  Q    When I sort of say "information," it's like each

20  phone number that comes out of there belongs to a

21  particular user; right?

22  A    That's correct.  We get the actual phone number of

23  the user that was in this area as well as the

24  direction from the tower.  So it's not just that they

25  were in that area, but it's the direction from that

**Exhibit E, pg. 527**

D'ERRICO - DIRECT                        528

```
 1   tower that we also obtain.  So an approximate location
 2   for that device.
 3   Q   Just for the record, you can subpoena, then, the
 4   subscriber information for those phone numbers; right?
 5   A   We can.  We can use a subpoena to obtain
 6   subscriber information or use other databases to
 7   attempt to determine the actual -- the person who has
 8   it in their hand.
 9   Q   Now, we've talked about the various stages of the
10   geofence warrant.  Did you go about providing a
11   summary of the records returned in the first stage for
12   your presentation?
13   A   Yes, I did.
14   Q   Okay.  I'm going to have you take a look at Slide
15   17.
16           THE COURT:  I'm going to ask a question
17   before you get there.  Looking at Slide 13, the blue
18   area, I presume, is the area where you might get
19   information from a tower dump; is a right?
20           THE WITNESS:  That's correct.  And I've
21   estimated that based on all of these towers in the
22   area because we know that towers overlap.  So we
23   estimated that the three towers that are inside the
24   blue area would be the towers that would be dumped in
25   response to a tower dump order.  And that approximate
```

**Exhibit E, pg. 528**

D'ERRICO - DIRECT                    529

 1  coverage area would be approximately the size of that

 2  blue outlined area.

 3            THE COURT:  So how big is the blue outlined

 4  area?

 5            THE WITNESS:  I didn't do an area comparison,

 6  but on the bottom of the map, Your Honor, there is a

 7  scale that indicates that it's 4 kilograms between

 8  those two points.  So width-wise, Your Honor, I would

 9  say at the widest part, and I am just eyeballing this,

10  it may be 7 or 8 kilometers wide at the widest part

11  traveling east to west.  And then traveling the area

12  north to south, this area may be about 10 kilometers

13  north to south.

14            THE COURT:  All right.

15            THE WITNESS:  Also on that map is the red

16  circle indicating the size of the geofence.

17            THE COURT:  Right.  Okay.  Thank you.

18  BY MR. SIMON:

19  Q   Now, looking at the summary of records from Phase

20  1 and Slide 17, if we look at the top here, it says,

21  Initial Google Geofence records provided by Google and

22  the first 15 of 209 records.  What's meant by the

23  first 15 of 209 records?

24  A   This is just a sample of what the records look

25  like when they come to us from Google.  And, actually,

**Exhibit E, pg. 529**

D'ERRICO – DIRECT                          530

1    they're not even this pretty.  But they contain

2    several columns of information, including a device ID

3    that's going to be unique for the device inside this

4    geofence, the date and the time, the latitude and the

5    longitude providing an approximate location.  And I

6    should say the center of the approximate location for

7    the device.  The source of the device, which is, my

8    understanding, the primary sensor that was used to

9    obtain this.

10        In this case, we saw records with GPS or Wi-Fi.

11   There's also records out there in other Geofences that

12   use cellular towers and will be reported under cell.

13        And then the last column is the map display

14   radius, which is the true area around the center point

15   where Google believes that device may be.

16   Q    Okay.  Now, did you -- and let me ask you, you

17   mentioned the map display radius.  Whenever we see

18   that, it has the same meaning across these returns;

19   right?

20   A    Correct.  That M stands for meters.

21   Q    How would you -- I think you've done it.  Would

22   you describe sort of our best understanding of map

23   display radius?

24   A    Map display radius is the area where Google

25   believes that the device is located.  So while they

**Exhibit E, pg. 530**

D'ERRICO - DIRECT                    531

```
 1   provide us latitude and longitude coordinates, that's
 2   not the actual location of where Google believes it
 3   is.  That's the center of the location where Google
 4   believes it is.
 5        If I could, I would draw maps without a center
 6   point in it and just a bubble because that's a better
 7   representation, but it's hard to get the scale or it's
 8   hard to understand how many points are then layered on
 9   there.
10        So in the maps that I have, I'll draw it with the
11   center point as well as the bubble around the display
12   radius, understanding that it's not the point that
13   Google is saying that the device is at, it's inside
14   the bubble where Google is saying that the device is.
15   Q   Okay.  Now, looking at Slide 20, did you plot all
16   the points returned in Stage 1 of the warrant?
17   A   Yes, I did.
18   Q   Okay.  Is this an indication of those plot points?
19   A   Yes, this is all 209 points for Stage 1 of this
20   search warrant return plotted on the map with both
21   their center coordinates marked by the markers, the
22   red or blue markers, and then the display radiuses
23   associated with each of those points.
24   Q   There was some discussion of the 387-meter radius
25   that one of these points provided.  Can you explain
```

**Exhibit E, pg. 531**

D'ERRICO – DIRECT                    532

1   why we had such a large radius for one point and then

2   right before that right there was a smaller radius?

3   A   Yes.  So in the records, there are two records

4   that are very close in time.  I believe it's within 30

5   seconds.  But more noteable is that they were both

6   Wi-Fi records, and they had the exact same latitude

7   and longitude.

8       The first record had a display radius of about --

9   I believe it was 84 meters.  So a smaller display

10  radius that was inside the geofence.

11      The second point, about 30 seconds later, had the

12  same exact center coordinates, but it had a much

13  larger display radius, 387 meters.  And in my

14  experience analyzing these records, that's indicative

15  to me that the device is moving, that it's traveling.

16  And for some reason, unknown to me, a new center

17  coordinate was not obtained by that phone.  But based

18  on the other sensors in the phone, such as a gyroscope

19  which determines the tilt and the angle of the phone,

20  or the accelerometer, which determines how fast a

21  phone is traveling, Google can use these sensors

22  together and determine that this phone moved, and I'm

23  going to adjust my display radius to account for that

24  movement.

25      Unfortunately, it's not as simple as just using

**Exhibit E, pg. 532**

D'ERRICO – DIRECT                    533

1    the GPS coordinates or just using the Wi-Fi

2    coordinates.  There are lots of different sensors that

3    go into these calculations.

4    Q    Now, did you ultimately -- I know you did.  You

5    reviewed the warrant in this case; right?

6    A    Yes, I did.

7    Q    And did the warrant call on Google to return any

8    information at that first phase?  We're just talking

9    about the first step of the search warrant.  Did it

10   call on Google to return any information that it

11   determined fell outside of that geofence radius?

12   A    No, it did not.  The first stage asked for

13   information regarding points inside the geofence.

14   Q    Okay.  Now, I'm looking at Slide 21.  Is this an

15   example of, again, sort of what area is covered by the

16   geofence as opposed to the cell tower radius?

17   A    That's correct.  I plotted all of those points

18   that we saw on page 20 in the geofence onto the map

19   that has the outline of the estimated tower dump area.

20   Q    Okay.  And with respect to the records that we saw

21   plotted in Slide 20, can we take a look at Slide 22.

22   Is this a fuller summary of those records?

23   A    It is.  This is a summary device-by-device that

24   lays out how many records we received for each device,

25   the first time that we received a record or the

**Exhibit E, pg. 533**

D'ERRICO - DIRECT                    534

 1  earliest record for each device, the latest record for

 2  each device, and then we also looked at the smallest

 3  display radius, and the largest display radius.

 4      And then I took a look just to see how many of

 5  those display radiuses extended beyond the geofence

 6  area and then what was the maximum distance beyond

 7  that geofence area.

 8  Q   When we say "extend beyond," again, we're talking

 9  about just that blue radius that might fall a little

10  bit outside the geofence but for which Google has

11  concluded they are inside the geofence?

12  A   Correct.  All the center points are within the

13  geofence.  And these are the map display radiuses for

14  each of those center points.

15  Q   Okay.  In looking at -- you were just testifying

16  about those two points that have, sort of within 30

17  seconds, a different -- a vastly different Wi-Fi

18  radius point.  Is that set forth in the device ID line

19  that ends 4289?

20  A   It does.  702354289.

21  Q   Okay.  Now, how many points were provided in that

22  first phase of records returned by Google?

23  A   209.

24  Q   How many of those points belong to the defendant?

25  And can you state for the record which of these

**Exhibit E, pg. 534**

D'ERRICO - DIRECT                    535

```
 1   accounts on page 22 belongs to the defendant?
 2   A    Yes.  The defendant is the device ID second from
 3   the bottom.  It's 1716665659.  And the records -- we
 4   received 38 records for that device beginning at
 5   4:20 p.m. and ending at 4:54 p.m.
 6   Q    Okay.  And if I'm looking here, it appears we
 7   don't have the header of each of these columns, but is
 8   it right that only one of his points have any radius
 9   that extends at any point?  The bubble might go a
10   little bit outside of the geofence?
11   A    That's correct.  There was one Wi-Fi point that
12   would extend 26 meters outside the radius.  And that's
13   the equivalent to a few parking spaces.
14   Q    Okay.  And, now, did you plot the defendant's
15   records?
16   A    Yes, I did.
17             MR. SIMON:  Can we look at Slides 23 and 24.
18             THE COURT:  Let me just -- 26 meters is
19   26 yards; right?
20             THE WITNESS:  Approximately.  It's not exact.
21             THE COURT:  That's two parking spaces?
22             THE WITNESS:  Oh, I'm sorry.  A few parking
23   spaces.  So a park space is typically about 3 meters
24   wide.  So that would be about, what did I say it was?
25   Twenty-six.  So about six to seven parking spaces.
```

**Exhibit E, pg. 535**

D'ERRICO - DIRECT                536

1          THE COURT:  All right.

2          THE WITNESS:  And that's width, not depth?

3          THE COURT:  Right.

4   BY MR. SIMON:

5   Q   If we look at the -- particularly Slide 24.  When

6   you talk about a point extended beyond the geofence

7   radius, which point, looking on Slide 24, is that

8   point?

9   A   The point that extends beyond is that point that's

10  furthest north.  And the center of that point is in

11  the parking lot towards the north or the furthest

12  north of the parking lot of the church.

13  Q   Would it be fair to say that a very small portion

14  of that display radius extends beyond the geofence?

15  A   Correct, a majority -- a significant majority is

16  withinside the geofence.

17  Q   And every other plot point there is well within

18  the geofence; correct?

19  A   Yes, it is.

20  Q   Now, did you also -- we've talked about Phase 1.

21  What happens in the second stage of the warrant?  How

22  does that work?

23  A   The second stage of the warrant is where Detective

24  Hylton sent to Google a list of device IDs that were

25  identified as being relevant to the investigation for

**Exhibit E, pg. 536**

D'ERRICO - DIRECT                    537

```
 1   additional location data for those device IDs.  And
 2   that would include, I believe, 30 minutes prior and 30
 3   minutes following the original geofence time frame
 4   with no restraints on location, so that we can see the
 5   path of travel for these devices.
 6   Q   Is that the -- what we heard Sarah Rodriguez refer
 7   to as sort of the second stage, being that contextual
 8   Location History information?
 9   A   That's correct.  It provides context for us so
10   that if there is somebody that is just driving by, we
11   try to eliminate them if we can.  If there is somebody
12   that is in another parking lot, still within the
13   geofence and not in the area, we try to eliminate
14   them, if we can, or we may need more additional
15   information to evaluate them as a suspect and either
16   eliminate or include them as a suspect.
17   Q   Now, did you do the same thing that you did at the
18   first stage with those second round records in terms
19   of summarizing what we got back?
20   A   Yes, I did.
21   Q   All right.  Looking at Slide 26, is this the --
22   are these the summaries of those records?
23   A   These are.  It summarizes the nine device IDs that
24   we obtained records for from Google in Stage 2.
25   Q   And it looks like the number of records this time
```

**Exhibit E, pg. 537**

D'ERRICO - DIRECT                    538

1   is a bit larger.  We've got more records; right?

2   A    That's correct.  This time we received 680

3   records.

4   Q    Okay.  And if we look at the far right, there is a

5   smallest maps display radius and a largest maps

6   display radius.  Describe those.

7   A    That's correct.  So, similar to how I analyzed the

8   Stage 1 data, I also looked at the size of the display

9   radiuses for the Stage 2 data.  And those columns

10  reflect the smallest display radius for that device

11  and the largest display radius for each device.

12  Q    And how many of those records in the second stage

13  belong to the defendant's account?

14  A    The defendant, again, device ID 1716665659, the

15  second line from the bottom.  We received 94 records

16  for the defendant's device.

17  Q    And this is a second stage that gives that

18  additional 30 minutes on each side of the time, but

19  also has no regard for -- at this point we're outside

20  of the geofence now; right?

21  A    That's correct.  We can see the path of travel for

22  each of these devices or if they were stationary for

23  this time, we could see that as well.  But it does not

24  have the geographical constraints of being immediately

25  in the area of the bank robbery.

**Exhibit E, pg. 538**

D'ERRICO - DIRECT                      539

 1   Q    And these second stage records, to the extent we

 2   get them, that's after a discussion generally between

 3   law enforcement, maybe the prosecutor and others

 4   involved; right?

 5   A    Correct.  We evaluate each of the devices and

 6   determine if this device could be a witness to the

 7   crime, could be a suspect to the crime, could be an

 8   accomplice.  We evaluate each of them to make a

 9   determination.

10   Q    And what, if anything, goes into consideration

11   of -- and particularly in this case, was there any

12   consideration of the need to not only inculpate

13   somebody, sort of inculpatory evidence, but

14   exculpatory evidence?

15   A    Absolutely.  We would like to exclude as many

16   people as possible.  And we can use the second stage

17   to do that, to make sure that we're looking at the

18   person that's actually responsible for committing this

19   crime.

20   Q    Okay.  In looking at Slides 27 and 28 -- I'm

21   sorry, 28 and 29, are these the plotting of the

22   defendant's records at Stage 2?

23   A    Yes.  So Slide 28 shows the complete records for

24   the defendant in Stage 2 from about 3:50 p.m. through

25   5:50 p.m.

**Exhibit E, pg. 539**

D'ERRICO - DIRECT                    540

1   Q    All right.  Let's look at the left side here.

2   Maybe we'll just bring it up by itself, Slide 28.

3        Can you walk us through the numbers here?  Is this

4   going in sequential order, the one through seven boxes

5   here?

6   A    Yes.  So the first records we received are on the

7   top of the page, the bubble to the right.  The box is

8   marked with a No. 1.  There's two records in that

9   area, both with the exact same latitude and longitude,

10  the exact same center point.  And those points are at

11  3:53:10 p.m. and 3:55:20 p.m.

12       The first point is 104 meters.  And then we see

13  that second point expand to nearly 1800 meters, which,

14  again, is indicative to me of travel.

15       Then we see the device show up on -- towards the

16  top left of the slide illustrated by Box 2 with a

17  similar situation, 3:57:23 p.m. and 3:59:32 p.m., two

18  records with the exact same center points, exact same

19  latitude and longitude, the first one with a smaller

20  display radius of 92 meters, and the second one with a

21  larger display radius of over 1700 meters.  Again,

22  indicative of travel.

23  Q    In looking at those two points, just to make sure

24  we're talking about this right, this is prior to the

25  robbery; right?

**Exhibit E, pg. 540**

D'ERRICO - DIRECT                    541

1    A    Yes, it is.

2    Q    And so these, again, are records at the second

3    stage that are going to give us more context about

4    where folks are moving?

5    A    That's correct.

6    Q    In looking at now -- you went through one and two.

7    The third box here, can you go through those?

8    A    Excuse me.  Which boxes?

9    Q    The third box of records on Slide 28.

10   A    Yes.  The third box contains the records in the

11   immediate vicinity.  Just about all the records for

12   the geofence.  And those are records for the time of

13   4:01 p.m. to 4:54 p.m.  And those records are in that

14   immediate vicinity of the Call Federal Credit Union

15   and Journey Christian Church.

16   Q    And so this is 54 of the records that we got at

17   the second stage?  I'm sorry.  These are records that

18   would be in both stages; right?

19   A    Correct.  Box 3 are records that would be -- not

20   all -- I don't believe all of them are in the second

21   stage, but most of them are.  They're in that area.

22   Q    Then you can -- can you walk us through what else

23   we have here?

24   A    Yes.  Box No. 4 illustrates a GPS trail.  So when

25   I map these records, I think it's important to denote

**Exhibit E, pg. 541**

D'ERRICO – DIRECT                    542

1   the source of the record.  So my red points are going

2   to be GPS-based records and my blue points are going

3   to be Wi-Fi-based records.

4       So we can see a trail in rapid succession more

5   detail than we see anywhere else on this map of points

6   from 4:58 p.m. to 5:04 p.m. with very small display

7   radiuses of 3 meters to 10 meters leading away from

8   the area of the bank robbery, down towards the area of

9   288, which is the road that traverses west to east on

10  the bottom of the map.

11  Q   Okay.  Now, did you ultimately look at some sort

12  of final records from this supplemental return?

13  A   I did.  Records 5, 6, and 7, those blocks,

14  illustrate travel back towards the Mason Dale Drive

15  area with the box with No. 7, the 18 Wi-Fi records,

16  being in that immediate area of Mason Dale Drive.

17  Q   In looking at Slide 29, is this the area of Mason

18  Dale?

19  A   Yes, it is.  I've drawn all of the Wi-Fi points

20  and the display radiuses on the map, as well as I

21  tried to point out every residence that is either

22  touched or in the area of those locations provided by

23  Google.

24  Q   What residence, ultimately, did Detective Hylton

25  conclude, based on additional investigation, belonged

**Exhibit E, pg. 542**

D'ERRICO - DIRECT                    543

1    to the defendant?

2    A    The address was 4702 Mason Dale Drive.  The box is

3    the second box down on the right side, which points

4    pretty much to the center of the screen.

5    Q    Now, using any of these particular Wi-Fi points,

6    is it apparent exactly which house is hitting these

7    Wi-Fi points?

8    A    No.  These records are not clear enough for me to

9    say go get a search warrant to arrest or conduct a

10   search of a house in this area.  Additional

11   investigative steps are needed in order to refine this

12   data and determine where this device actually was

13   located at this time.

14   Q    Okay.  And so this is -- this is the full extent

15   of the second stage that we see here?

16   A    That's correct, yes.

17   Q    Okay.  Now, looking at Slides 31 and 32, what

18   happens at the third stage of the warrant?

19   A    The third stage is where we go to Google again,

20   and we submit to them the device IDs of which we want

21   subscriber information for those device IDs.  We

22   requested three device IDs.  And Google provided four

23   things.  They provided a file that maps the device ID

24   that was in our geofence warrant to the account's

25   Google ID.  And based off that Google ID, they

**Exhibit E, pg. 543**

D'ERRICO - DIRECT                    544

1    provided the subscriber information for that account.

2    And that's because that device ID is not a unique

3    identifier across the entire Google-sphere.  It is

4    only a unique identifier within an account and within

5    this geofence.

6    Q   In looking at, on the right side, at Slide 32, is

7    that the precise subscriber information we got for

8    this defendant's device at the third stage?

9    A   That's correct.  So up top there's the table of

10   the GAIA ID, which is the Google ID with the device ID

11   that we mentioned before being associated with the

12   defendant, 1716665659.  We can see that that

13   associated Google ID is listed in the subscriber

14   information file that is on the lower part of the

15   page, which is associated with the account that

16   contains the name Jamaican Media with an email address

17   of okellochatrie55@gmail.com.

18   Q   Okay.  Does it appear, the created on date there?

19   There's a line that says "created on" on the right

20   side on Slide 32.  What is that?

21   A   Yes.  Three lines above the highlighted Google

22   account ID there is a created on date, which indicates

23   that this account was created on August 20, 2017 at

24   6:04 p.m. UTC.

25   Q   And between August 2017 and July 2018, according

**Exhibit E, pg. 544**

D'ERRICO - DIRECT                    545

 1   to Google records, Location History wasn't enabled on

 2   the relevant device; right?

 3   A   Can you repeat that question?

 4   Q   Well, let me ask it this way, because I think you

 5   have some facts about this.  When the phone that the

 6   defendant enabled Location History on, the Samsung

 7   Galaxy S9, do you have a sense of when that phone came

 8   to market?

 9   A   I do.  I believe --

10   Q   It's Slide 38.

11   A   Yes.  It came to market on March 16, 2018, which

12   is several months after the date of the creation date

13   for this Google account.

14   Q   Okay.  And I think that my question that was going

15   to be there, I'll just scratch that from the record.

16   It wasn't to the point.

17       Now, with respect to the third round of

18   information that we got on the three IDs, did you

19   ultimately plot the points for the other two devices

20   that we requested subscriber information on?

21   A   Yes, I did.

22   Q   Okay.  Let's look at the device that ends in 2662

23   and Slides 33 and 34.

24   A   Slide 33 indicates the one point that we received

25   back, the one record of Location History that we

**Exhibit E, pg. 545**

D'ERRICO - DIRECT                   546

1   received in Stage 1 for device 907512662.  And that

2   plots a center point over the Journey Christian Church

3   at about 4:35 p.m., prior to the time of the bank

4   robbery.

5   Q   Okay.  And so why go back at the second stage

6   here?

7   A   Well, there are several reasons.  So, the first

8   reason is this is a device that was present in the

9   area of the bank prior to the bank robbery.  And we

10  know that sometimes when people want to hide their

11  location, they'll turn their phones off.  And if their

12  phone is turned off, no additional Location History

13  would be reported for that device.  So it's

14  significant to us that there is a point inside the

15  geofence that occurred prior to the bank robbery with

16  no points after the bank robbery.  Because we also

17  believe that after a subject has robbed a bank, that

18  they are going to flee the area and not be -- or not

19  have any additional Location History records within

20  this geofence several minutes after the bank robbery.

21  Q   And, now, what about on the right side?  Are we

22  seeing the second stage records after we've requested

23  the second stage on this device?

24  A   That's correct.  This is a plot of the second

25  stage records which travel a bit in the area.  The

**Exhibit E, pg. 546**

D'ERRICO – DIRECT                    547

 1   first record that we have is 4:35 p.m. in the vicinity

 2   of the Journey Christian Church, and that's towards

 3   the top of the page with a call out box on the right

 4   side.   That is the same point that we saw in the last

 5   slide.

 6       The next reference point on the slide is travel

 7   towards the south ending up near box No. 2 where there

 8   are records at 4:47 and 4:53 p.m.

 9       After this box, the phone retraces some of its

10   steps north and then ends up near the apartment

11   complex just south of the Call Federal Credit Union in

12   Boxes 3 and 4.   And to me, this is indicative of a

13   trail of somebody that could have dropped off somebody

14   in the parking lot, traveled a ways, and then returned

15   to possibly pick up somebody that traveled through the

16   woods between the Call Federal Credit Union and the

17   apartment complex directly south of that area.

18   Q   Okay.   And there was a third device that we saw

19   subscriber information on; correct?

20   A   That's correct.   That was device –1662304683.

21   Q   And you plotted those points on Slides 35 and 36?

22   A   Yes, I did.

23   Q   All right.   Now, tell us, when we pull those up on

24   35 and 36, what we see in Slide 35 at Stage 1 inside

25   the geofence and why go back at Stage 2 and get

**Exhibit E, pg. 547**

D'ERRICO – DIRECT                    548

1    supplemental records on this particular record?

2    A    Yes.   These initial records that we received in

3    Phase 1 shows us three Wi-Fi points.   Two of the

4    center points are directly on top of the Call Federal

5    Credit Union and one location point is towards the

6    right that covers the area of the Journey Christian

7    Church.   These points are between 4:44 and 4:47 p.m.

8    And for the same reasons that I discussed prior, we

9    know that subjects may turn off their phone to avoid

10   transmitting Location History or device or being

11   observed on the cellular network to obscure their

12   location.

13       So with this device having points before and no

14   points after, we thought this was -- we needed

15   additional records to be able to see the context of

16   this travel.

17   Q    What about the second stage?   Is that on the right

18   side?

19   A    Yes, Slide 36 provides that context of travel for

20   us.   And the first record we see is towards the center

21   of the screen.   There is a cluster of points marked by

22   box No. 1 at 4:39 p.m.

23       There's another cluster of points that traveled

24   northeast on Hull Street towards box No. 2, which is

25   the area of the Call Federal Credit Union and the

**Exhibit E, pg. 548**

D'ERRICO - DIRECT                549

1    Journey Christian Church.  And those records are there

2    at 4:44 through 4:47 p.m.

3        And then we see the phone travel back east -- I'm

4    sorry -- travel west on Hull Street Road or appearing

5    to be traveling -- appearing to be near Hull Street

6    Road marked with box No. 3 at 4:55.

7        This becomes interesting to us because we see

8    somebody that starts away from the bank, moves towards

9    the bank, and then immediately leaves that area, which

10   could indicate that they are dropping somebody off at

11   that bank.

12   Q   Now, just let me end with a question going back to

13   Slides 23 and 24.  We've talked about the

14   investigation in this case and, in particular, I'm

15   looking at the defendant's plot points on 23 and 24

16   when they come up.  Did you and Detective Hylton reach

17   a conclusion about whether this was the account, just

18   based on Stage 1, that belonged to the person who

19   robbed the Call Federal Credit Union on May 20, 2019?

20   A   Based on several pieces of evidence, including

21   witness testimony that indicated there was a

22   suspicious blue Buick parked behind the church, which

23   is notated on Slide 24 with the green box in the area

24   where the red GPS points are clustered, combined with

25   the video observations from the Journey Christian

**Exhibit E, pg. 549**

D'ERRICO - DIRECT                    550

1  Church and the Call Federal Credit Union, and the

2  description of the individual and the visual of the

3  individual, we determined that this was likely the

4  device that belonged to -- that most resembled the

5  device that would belong to the subject of the bank

6  robbery.

7  Q   And this is based merely off of the returns that

8  came at the first stage that called for Google to only

9  return devices that it determined were inside that

10 geofence radius at the time of the crime; correct?

11 A   That's correct.  That is relying solely on that

12 Stage 1 data without evaluating any of the contextual

13 data that we received at Stage 2.

14            MR. SIMON:  No further questions, Judge.

15            THE COURT:  Cross?

16            MR. PRICE:  Yes, Your Honor.  Thank you.

17     CROSS-EXAMINATION

18 BY MR. PRICE:

19 Q   Special Agent D'Errico, I just want to pick up

20 right where you left off.  You didn't stop at Stage 1

21 in this case; correct?

22 A   No, we did not.

23 Q   You still got the Stage 2 data?

24 A   That's correct.

25 Q   And you got the Stage 3 data, as well?

**Exhibit E, pg. 550**

D'ERRICO - CROSS                        551

1    A    That's correct.

2    Q    Even though you were confident about your Stage 1

3    findings?

4    A    We were confident in that was the device; however,

5    the note that was passed to the bank robber -- or

6    passed in the bank indicated that there may be

7    additional suspects involved with this crime.  So, in

8    order to evaluate and investigate this crime fully, we

9    felt that we needed to look at the other devices that

10   could possibly be related to the investigation.

11   Q    And, in fact, you ended up requesting account

12   detail information on three of those devices; correct?

13   A    I did not.  Detective Hylton did.

14   Q    Thank you.  Have you received any specific

15   training on geofence warrants?

16   A    I have not received specific training.  My

17   training comes in the form of my education with my

18   degree as a computer scientist, my education from

19   James Madison University with a bachelor's in computer

20   science, my training from Johns Hopkins University

21   with my master's in security informatics.  This

22   training has provided me with the foundations to

23   understand these complex topics of wireless

24   communication and location data analysis.  Pair that

25   with my independent study of patents issued by Google

D'ERRICO – CROSS                    552

1   or obtained by Google and academic papers that discuss

2   how it's possible to derive approximate locations

3   using Wi-Fi access points and other reference material

4   as well.

5   Q    But you haven't received any specific trainings on

6   geofence warrants?

7   A    Google has not provided us any training on Google

8   geofence warrants.

9   Q    And there aren't any Justice Department policies

10  on Geofence warrants, are there?

11  A    I'm not aware of any policies, per se.  We have

12  policies that talk about investigative techniques that

13  we can use, but nothing that focuses particularly on a

14  geofence warrant.

15  Q    And, similarly, there aren't any Justice

16  Department procedures for obtaining geofence warrants,

17  are there?

18  A    There's not procedures, but in working with CCIPS,

19  Computer Crimes and Intellectual Property Section of

20  the Department of Justice, we are able to obtain what

21  we call a "go by," which assists us in the language

22  needed to obtain a geofence search warrant.

23  Q    A go by.  Could you explain a little bit more

24  about that?  Did you give one to somebody in this

25  case?

**Exhibit E, pg. 552**

D'ERRICO - CROSS          553

1  A   I don't recall that I provided any go bys in this

2  case.  But a go by, for us, is a document that has

3  wording and points to remember to make sure we include

4  in a search warrant.  For example, Google has specific

5  information that they need in order to process the

6  search warrant.  They need a location point.  They

7  need a radius or another shape to form that geofence.

8  They also need a time period in order to obtain the

9  records.

10      And then with the process that I understand has

11  been discussed between CCIPS and Google, we follow the

12  steps that they have laid out in order to work with or

13  in order to serve Google with this search warrant to

14  make sure that Google understands what we are

15  requesting and that we understand what we'll receive

16  back as part of that search warrant process.

17          MR. PRICE:  Your Honor, we have long

18  suspected that the government used a template of some

19  sort in this case.  We've asked for it repeatedly in

20  discovery and have not received it.  And so I would

21  request that the government provide us with a copy of

22  this go by so that we can review it.

23          MR. SIMON:  Judge, we have -- we didn't use

24  any Department of Justice go by in this case.  I think

25  it's been pretty clear that any request from

**Exhibit E, pg. 553**

D'ERRICO - CROSS                554

1    counsel -- and I'm not sure why this is coming up.

2    We've had numerous conversations in this case.  There

3    have not been any discovery issues.

4        The questions were about whether Detective

5    Hylton used go bys, what go bys he used.  We told them

6    as much as we could about that.  He's going to

7    testify.  To the extent that they're asking for some

8    Department of Justice go by, we've not declined to

9    give them anything less than what we have.

10       And they certainly have Detective Hylton's

11   federal search warrant.  So I'm not sure what the go

12   by discussion is.  Every search warrant signed by any

13   magistrate or any magistrate judge has some language

14   that is "in consultation with others."

15       So I'm not sure what the point of this

16   request is because we've given as much as we can give.

17       MR. PRICE:  Your Honor, we believe that the

18   go by is important to this case.  We think that the

19   sort of plug and play nature of some of these warrants

20   raises serious questions about the potential good

21   faith involved in the warrant process.

22       THE COURT:  But wasn't the testimony that --

23   just that they didn't use a DOJ go by?  Was access

24   given to a DOJ go by in this case to anyone?

25       THE WITNESS:  Your Honor, I didn't swear out

**Exhibit E, pg. 554**

D'ERRICO - CROSS                    555

 1  the warrant nor did I provide a go by to Detective

 2  Hylton in this investigation.

 3            MR. SIMON:  Judge, testimony would reveal, as

 4  defense counsel knows, that there was a federal search

 5  warrant obtained by Detective Hylton prior to this

 6  one, as well as, I think, another state search warrant

 7  or two.  They have those search warrants that

 8  Detective Hylton obtained previously.  Only one is

 9  under seal that they don't have.  So I'm not -- I'm

10  just not sure what we're getting at here, to be quite

11  honest.

12            THE COURT:  I don't see the relevance if it

13  hasn't been used in this case and you have other

14  information that pertain to Detective Hylton.  If

15  there's a sort of catch and replace process going on,

16  he wasn't involved.  He's using what you have the

17  information about what he used.

18            MR. PRICE:  It's also unclear to us where the

19  language in Detective Hylton's warrant, even if it

20  came from somebody else, originally came from.

21            THE COURT:  I think that's just too far

22  afield.  There's no evidence about his turning to a

23  DOJ go by.  And any warrant is going to use language

24  from previous warrants; from another agency, from

25  another law enforcement program, from the state versus

**Exhibit E, pg. 555**

D'ERRICO – CROSS                556

 1   the federal.  That's the nature of how warrants are

 2   sworn out here.  And if you have previous warrants

 3   he's used, I think that's what you're entitled to.

 4           MR. PRICE:  Okay.  Thank you, Your Honor.

 5   BY MR. PRICE:

 6   Q   You wouldn't say you know more about geofence

 7   warrants than Google; right?

 8   A   Google, the entity?  No, I would not.

 9   Q   You don't have some unique knowledge that Google

10   doesn't about geofence warrants; right?

11   A   No, not that I know of.

12   Q   So, for example, you don't know when and why

13   Location History points are collected, do you?

14   A   Yes, in particular, we do.  We know that Location

15   History points can be collected based on the testimony

16   we heard earlier when a device is set up to opt in to

17   Location History.

18       And if I could go back to the prior question, I

19   don't know that Google is doing the analysis that we

20   do on our search warrants when we see this

21   information.  And we learn a lot about this geofence

22   data and this Location History data by reviewing and

23   doing test observations and using this information in

24   the field to ultimately recover a fugitive or a phone

25   or somebody else that has committed a crime that's

**Exhibit E, pg. 556**

D'ERRICO - CROSS                557

```
 1    been in that area.

 2        So from the analytical perspective, using it in

 3    the law enforcement setting, I may have some more

 4    knowledge than Google because that is not how Google

 5    uses their data.

 6    Q   I'd like to show you an email that you sent to the

 7    government about this issue.

 8    A   Okay.

 9    Q   Page 15, please.

10            THE COURT:  Of what?

11            MR. PRICE:  I'm sorry.  This is not in

12    evidence, Your Honor.  This is a set of emails that

13    the government turned over in discovery in

14    anticipation of Special Agent D'Errico's testimony.

15            THE COURT:  All right.

16            So this is just to refresh his recollection?

17            MR. PRICE:  Yes, Your Honor.

18    BY MR. PRICE:

19    Q   Could you scroll down just a little bit.

20        So could you read the sentence that begins with

21    "Few observations"?

22    A   "Few observations.  They really don't go into how

23    they are determining location based on Wi-Fi, nor how

24    they draw their display radiuses.  I don't think we

25    need to press them for it, but it would be nice to
```

**Exhibit E, pg. 557**

D'ERRICO - CROSS                    558

1  know."

2  Q    And then a little bit further down on the page.

3  Could you read the highlighted line and the line right

4  before it?

5  A    "Here are some other things that would be good for

6  Google to explain to fully understand this data.  When

7  and why points are collected.  For example, in our

8  case, there is a very frequent collection of Location

9  History."  And that sentence continues.

10 Q    So you had confusion, at least at this point in

11 time, about when and why Location History points were

12 being collected?

13          THE COURT:  We don't know when this was

14 written, because you haven't put it on the record.

15          MR. PRICE:  Sorry.  This was written on

16 March 9, 2020.

17 A    I don't think there is confusion as to when

18 Location History points are collected.  I don't

19 understand exactly at a certain time why a location

20 point is collected, but I do understand that when the

21 device is set up appropriately, that Location History

22 will be collected.

23 Q    Thank you.  You understand how Google uses

24 location data for advertising; correct?

25 A    I do understand some ways that Google uses it, not

**Exhibit E, pg. 558**

D'ERRICO - CROSS                559

1   comprehensive.

2   Q    And that this kind of advertising is, in fact,

3   very lucrative for Google?

4   A    I don't know of Google's exact breakdown on their

5   location-based advertising.

6   Q    You didn't prepare a slide on that for your CAST

7   report?

8   A    As far as location-based advertising, no, I did

9   not.  Advertising in general, yes.  Advertising was

10  about 86 percent of Google's revenue.

11  Q    And you prepared other slides specifically about

12  how they were using location data to conduct radius

13  targeting and store conversion visits; correct?

14  A    Sure.  Is there a slide we can refer to?

15  Q    Yes, there is.

16        MR. SIMON:  Judge, I'm not obviously going to

17  object.  It's in the presentation.  I would just note

18  that I didn't ask any direct third-party

19  doctrine-related questions.

20        THE COURT:  I'm just going to let the record

21  be full.  And the whole slide is in.

22        MR. SIMON:  I understand, Judge.

23  BY MR. PRICE:

24  Q    Can I draw your attention to Slide 40, and Slide

25  50, and Slide 40, 41 and 42?

**Exhibit E, pg. 559**

D'ERRICO - CROSS                    560

1            THE COURT:  40, 41 and what?

2            MR. PRICE:  42, Your Honor.

3    Q   On Slide 40, you're demonstrating that Google is a

4    profitable company; correct?

5    A   I'm demonstrating the revenues, and particularly

6    the point of this slide is to discuss the amount of

7    advertising revenues that comprises Google's entire

8    revenue as well as the main products that Google uses.

9    That was per their 10K reports and other information.

10   Q   Thank you.  And the main Google product that

11   drives its revenue is what?

12   A   I believe it's advertising.

13   Q   Thank you.  Can we go to the next slide?

14       Here you have a slide on target ads to geographic

15   location, and you refer to something called radius

16   targeting; is that correct?

17   A   That's correct.  On Slide 41, it illustrates some

18   of the information on the Google ads help page, which

19   indicates that a company can draw a radius around a

20   location in order to target ads.

21   Q   Thank you.  Can we go to the next one.  And here's

22   a slide about store visit conversions.

23            THE COURT:  Slide about what?  You really

24   are --

25            MR. PRICE:  Store visit conversions.  Sorry,

**Exhibit E, pg. 560**

D'ERRICO - CROSS                 561

 1   Your Honor.

 2          THE COURT:   Okay.

 3   A    Yes, Slide 42 does talk about store visit

 4   conversions similar to what Mr. McGriff talked about

 5   earlier today.

 6   Q    Thank you.  And this is a method of advertising

 7   for Google based off of location?

 8   A    This is information that Google had on their

 9   website, on their Google ads site.

10   Q    And it's about advertising using location data;

11   correct?

12   A    I believe these are metrics that they can provide

13   back to folks that place ads.

14   Q    Thank you.  Okay.

15       So advertising based on location data is not the

16   same thing as serving a geofence warrant on Google;

17   correct?

18   A    Can you repeat that question, please?

19   Q    Advertising based on location data in not the same

20   as serving a geofence warrant on Google?

21   A    I don't know that I can draw that conclusion.

22   Q    Well, when businesses place ads with Google, they

23   don't receive any location data about the users and

24   devices they're trying to target; correct?

25   A    That's correct.

**Exhibit E, pg. 561**

D'ERRICO - CROSS                    562

```
 1   Q    And they can't ask for more data on where people

 2   saw their ads, can they?

 3   A    I don't know what they can ask for.

 4   Q    They can't ask for more information about where

 5   someone went 30 minutes after seeing an ad; correct?

 6   A    I don't know that information.

 7   Q    It's true for store visit conversions that Google

 8   does not provide user location data directly to those

 9   businesses?

10   A    I believe Mr. McGriff testified today that they

11   don't provide location data to folks that -- companies

12   that do ads.  I believe his testimony was that they

13   provide information in aggregate that no longer

14   resembles an individual's location.

15   Q    Correct.  And the same is true for radius

16   targeting, as well; right?

17   A    The same -- can you repeat that?

18   Q    Businesses who engage in radius targeting do not

19   get user location data as a result from Google?

20   A    I'm only aware of Mr. McGriff's testimony today.

21   Q    So the only reason the government was able to

22   obtain Location History data in this case from Google

23   was because they served them with a warrant; right?

24   A    There -- well, there are a couple of factors.

25   There was Location History turned on, and there was
```

**Exhibit E, pg. 562**

D'ERRICO – CROSS                563

1    Location History available.  And the government served

2    a search warrant for those records which were held in

3    Sensorvault because the Location History was enabled

4    on the defendant's phone, which allowed Google to be

5    responsive to the search warrant that was obtained and

6    served by the government.

7    Q    So Google wouldn't have compiled these records and

8    sent them to you if you didn't serve them with a

9    warrant; correct?

10   A    They serve them in exigent circumstances.  They

11   are responsive to law enforcement if we request, using

12   a search warrant or other legal process, for records

13   that they hold.

14   Q    Have you ever obtained geofence data without using

15   a warrant?

16   A    I take that statement back.  Google is very

17   particular about that and does not allow it on

18   exigent.  They will allow Location History on exigent

19   circumstances but still insist that we obtain a search

20   warrant on a geofence.  Thank you for allowing me to

21   correct that.

22   Q    Thank you.  And the warrant here required Google

23   to do things with location data that it would not do

24   for any business seeking to advertise through Google;

25   correct?

**Exhibit E, pg. 563**

D'ERRICO - CROSS                          564

1   A    I'm not aware of all of Google's business

2   practices.

3   Q    Would Google conduct a geofence search for an

4   advertiser?

5   A    Again, I'm not aware of Google's practices.

6           MR. SIMON:   Judge, I think we -- I'm trying

7   to be fair about this and not stand up unnecessarily.

8   We've had two Google witnesses discussing this search

9   warrant.  They've been asked questions.  They've

10  answered them.  The expert's been in the courtroom.

11  Why we're going down the path of asking FBI Special

12  Agent D'Errico about Google's internal business

13  practices, which everybody is going to agree Google is

14  the best evidence of that, I don't understand the

15  relevance and why we continue to go down this path

16  with this witness.

17          THE COURT:   Sustained.

18          MR. PRICE:   I'll move on.

19  BY MR. PRICE:

20  Q    So you compare the area of the geofence warrant in

21  this case to the area of a hypothetical tower dump;

22  correct?

23  A    Are you referring to a particular slide?

24  Q    Yes.  In your presentation, the one with the --

25  let me pull it up for you.  This would be Slide

**Exhibit E, pg. 564**

D'ERRICO - CROSS                    565

1   No. 21.

2   A    Could you repeat your question?

3   Q    So, in your report, you compare the area of the

4   geofence warrant in this case to the area of a

5   hypothetical tower dump?

6   A    Yes.  We didn't actually obtain this tower dump,

7   but based on my training and experience with cell

8   phone towers, this is the best representation that I

9   could draw of the approximate coverage area of that

10  tower dump.

11  Q    Would you agree with Google's statement in its

12  amicus brief in this case that a tower dump requires a

13  provider to produce only records of the mobile devices

14  that connected to a particular cell tower at a

15  particular time?

16  A    Yes.

17  Q    So you suppose the area of the tower dump in your

18  hypothetical based on three Sprint towers nearby the

19  bank; correct?

20  A    That's correct.  This is an example of a tower

21  dump for Sprint.  We would also do a tower dump for

22  T-Mobile, Verizon, and AT&T, or any other carrier that

23  provided service to this area.  And that drawing would

24  look different because they have towers in different

25  places.

**Exhibit E, pg. 565**

D'ERRICO - CROSS                    566

1       I chose Sprint in this case because Sprint is the

2   service provider for the defendant's phone.

3   Q   So in your hypothetical, you suppose the area of

4   this tower dump based on three Sprint towers?  That's

5   it.

6   A   No, that's not it, actually.  I drew this line

7   using many of the towers that are on this page,

8   because what we know about cell phone towers is that

9   they -- and this is information that we have learned

10  directly from the carriers because our training

11  includes training by network engineers at the

12  telephone companies, including Sprint, that when

13  they're planning out their network, they place towers

14  where they need coverage areas, and they do not place

15  towers where they do not need coverage area.  And

16  their goal is to provide a certain level of customer

17  satisfaction, and that includes providing coverage

18  area.  And that coverage area, it can be determined by

19  approximating maybe about 70 percent to the next

20  tower.

21      So in my drawing, in my estimation of the area of

22  the tower dump, I looked at each of the three towers

23  inside that I selected, and then I drew my line

24  approximately 70 percent to its nearest tower.  And

25  that's how I approximated the area of the tower dump.

**Exhibit E, pg. 566**

D'ERRICO - CROSS                        567

1    Q    So you looked at a map to see where the towers

2    were?

3    A    Yes, I plotted the Sprint towers.

4    Q    And then you drew a line around that area to

5    indicate the coverage of those towers?

6    A    I drew the line to indicate the approximate

7    coverage of the areas.  We don't know the exact

8    coverage of the areas, but based on a map and based on

9    my training and experience, this is an approximation

10   of the area that would be covered in a tower dump if

11   we were to do one for that area.

12   Q    Thank you.  And you can see on the satellite map

13   whether the area is an urban or rural area?

14   A    I can tell if there are greenery or major roads or

15   even some secondary roads.  I don't have a complete

16   listing of what is in each of these locations.

17   Q    Okay.  By looking at a map like this, you could

18   begin to approximate how many people might be affected

19   by the hypothetical tower dump here; right?

20   A    It depends on many factors.  It depends on

21   businesses.  It depends on travel.  That's not

22   something that I estimate.

23   Q    But because of your training and experience as a

24   CAST team member, you would know that each tower has a

25   maximum number of users that it can handle at one

**Exhibit E, pg. 567**

D'ERRICO - CROSS                    568

1   time?

2   A    That's true.   There is a maximum at one time.

3   Q    That's called a tower load?

4   A    I don't have an exact phrase for it, but there is

5   an upper number of which there will be a point where

6   the tower will be saturated and no additional phones

7   would be able to make any communications off of that

8   tower.

9   Q    Overloaded towers, they'll drop calls if there are

10  too many people trying to connect at the same time or

11  transfer them to another tower?

12  A    It depends.   So cellular communication is complex,

13  and there's lots of different factors at play.   So

14  just because -- let me particularize this to Sprint.

15  If we were to ask Sprint for a tower dump, Sprint

16  would be able to provide calls that were originated

17  and ended in this area during the time frame that we

18  requested.

19  Q    So in a hypothetical like this, of course dealing

20  with Sprint -- by the way, when you get tower dump

21  results from Sprint, those are only for people who use

22  the network for either phone calls or text messages;

23  correct?

24  A    I believe I just answered that.

25  Q    It doesn't include data transfers?

**Exhibit E, pg. 568**

D'ERRICO - CROSS                    569

1   A    Sprint at the time of this would not have included

2   data.

3   Q    So if you did a tower dump on just one of these

4   Sprint towers, you would have a rough idea of the

5   maximum number of users you could possibly get in an

6   hour period?

7   A    I don't have a maximum number.  I'm not aware of

8   what the maximum number is.

9   Q    Mr. McInvaille testified yesterday that according

10  to your hypothetical, you'd probably net about a

11  thousand users per tower.  Does that sound about right

12  to you?

13  A    I don't have a frame of reference for that.  I

14  would not be able to make an estimate on that.

15  Q    Do you have any information that would contradict

16  Mr. McInvaille's estimation?

17  A    I'm trying to recall back to tower dumps that I've

18  seen before.  I just -- at this point I don't have a

19  good frame of reference.

20  Q    So you don't have anything to contradict

21  Mr. McInvaille's conclusion?

22  A    I don't.  Not at this time.

23  Q    Thank you.

24       So you're aware that Location History information

25  is determined differently than cell-site location

**Exhibit E, pg. 569**

D'ERRICO - CROSS                    570

1    information; correct?

2    A    As it's -- can you rephrase that question?

3    Q    You're aware that Google Location History

4    information is calculated differently than cell-site

5    location information?

6    A    It can be, but it's not always.  It depends on how

7    the cell carriers are determining locations for

8    phones.  So a cell carrier could use the GPS sensor in

9    a phone to determine a location of the phone.

10   Q    Could a cell carrier use the Wi-Fi networks, the

11   Wi-Fi fingerprinting that you described earlier in

12   your testimony?

13   A    I don't think so.  I don't think that's part of

14   the E911 Phase 2.

15   Q    So it's calculated differently than just plain old

16   CSLI; right?

17   A    Not all information is calculated differently.

18            THE COURT REPORTER:  CSL?

19            MR. PRICE:  CSLI, cell-site location

20   information.  I apologize.

21   BY MR. PRICE:

22   Q    Location History data is usually calculated using

23   GPS or Wi-Fi; correct?

24   A    We see sources of GPS, Wi-Fi, or cell fairly

25   regularly.

**Exhibit E, pg. 570**

D'ERRICO - CROSS                     571

1   Q    There are no cell records in this case; correct?

2   A    That's correct, no cell records in this case.

3   Q    And Google prefers to use Wi-Fi or GPS before

4   using cell data; correct?

5   A    I don't know what their preferences are.

6   Q    Did you listen to Mr. McGriff's testimony

7   yesterday?

8   A    I did listen to it.

9   Q    And he explained that cell-site location is less

10  preferred because it's less accurate, generally

11  speaking?

12  A    I don't remember his exact testimony about that

13  point.

14  Q    Okay.  In any case, with GPS and Wi-Fi

15  fingerprinting, there are no cell phone towers

16  involved; correct?

17  A    That's correct.

18  Q    Okay.  So that means there's no way to get

19  Location History data just by identifying nearby cell

20  phone towers?

21  A    In this case, there were no Location History

22  records obtained using exclusively or primarily the

23  cell phone tower.  I don't know that the cell phone

24  tower was not included in the calculation for Wi-Fi or

25  GPS, but I know there were no records marked cell,

**Exhibit E, pg. 571**

D'ERRICO - CROSS                    572

1   which to me would indicate that the cell tower would

2   be the primary sensor used to determine Location

3   History.

4   Q   So you have to rely on Google to determine which

5   devices were present.  There's no way to identify a

6   couple of towers nearby; correct?

7   A   There is a way to identify a couple of towers

8   nearby, and we could have obtained a tower dump to

9   obtain that information.  In this case, we did not.

10  Q   Let me rephrase.  I mean that Google will not

11  respond to a request for Location History information

12  based on the location of a cellular tower; right?

13  They testified earlier today that they do not index

14  their Location History database in that manner.

15  A   I'm sorry.  I'm not understanding the question.

16  Q   Google testified earlier today that they do not

17  index their Location History database by location.

18  They index it by user.

19  A   Is that a question?

20  Q   Was that your recollection of Google's testimony,

21  as well?

22          THE COURT:  How did they hold stuff in the

23  Sensorvault.  That's the testimony he's talking about.

24          THE WITNESS:  Yes, I understand that -- I

25  believe it was Ms. Rodriguez that said that they have

**Exhibit E, pg. 572**

D'ERRICO – CROSS                        573

 1   their Sensorvault data indexed by user, whether it was

 2   device ID or Google account.  I believe it was indexed

 3   by Google account.

 4   BY MR. PRICE:

 5   Q   We can turn to Google's amicus, as well.  Google

 6   explains -- I believe this is page 14 of Google's

 7   amicus brief, Defense Exhibit 2.  Google says, "The

 8   steps necessary to respond to a geofence request are

 9   thus quite different from and far more intrusive than

10   responses to requests for a CSLI or tower dumps"?

11   A   Which page is that on?

12   Q   This is page 14 of the amicus brief.  It's the

13   highlighted language or will be highlighted in a

14   moment.

15   A   I see that paragraph, yes.

16   Q   You don't disagree with that, do you?

17   A   That it is more intrusive?  I don't believe that

18   it is more intrusive.

19   Q   They go on to explain, they say, A tower dump

20   requires a provider to produce only records of the

21   mobile devices that connected to a particular cell

22   tower at a particular time.  But because Location

23   History is different, Google has no way to identify

24   which of its users were present in the area of

25   interest without searching the Location History

**Exhibit E, pg. 573**

D'ERRICO - CROSS                                     574

 1  information stored by every Google user.

 2  A    I see that paragraph, yes.

 3  Q    You disagree with that?

 4  A    So, I don't -- it's hard for me to compare because

 5  I don't know exactly how the cell phone carriers store

 6  their data.  If their data is stored in a central

 7  database, then they have to search every record in

 8  their database to obtain the tower dump records.  So I

 9  don't know that I have enough information to fully

10  evaluate that.

11  Q    So you don't have enough information to contradict

12  their statement that says Google has to search across

13  all Location History journal entries -- I'm sorry.

14  We're on page 12 to 13, the bottom page 12 to the top

15  of page 13.  Instead, Google has to search across all

16  Location History journal entries to identify users

17  with potentially responsive data --

18          THE COURT:  Don't read it too fast.

19  BY MR. PRICE:

20  Q    -- in order to comply with the request.

21  A    Do I disagree with that?  No.  They need to do a

22  search of the Sensorvault database for locations that

23  are responsive to the geofence.

24  Q    And you don't have any information to contradict

25  their next statement that Google has to run a

**Exhibit E, pg. 574**

D'ERRICO - CROSS                    575

 1    computation against every set of coordinates to

 2    determine which Location History records match the

 3    time and space parameters of the warrant?

 4    A    I don't have any information to contradict that.

 5    Q    Do you know how many users had Location History

 6    enabled when Google executed the geofence warrant

 7    here?

 8    A    I only know the information that was provided by

 9    Mr. McGriff and his affidavits, which I believe he

10    talked about tens of millions.

11    Q    That's right.  Google says that roughly one-third

12    of active Google users had Location History enabled on

13    their accounts, and that that translates to numerous

14    tens of millions of Google users.  You don't disagree

15    with Google about that, do you?

16            MR. SIMON:  Judge, I'm going to object again

17    to, I think, questions that are basically attempts to

18    testify.  Asking this witness who says he has no

19    personal knowledge of Google's internal practices, the

20    Court has already sustained that objection.  I think

21    we should move off, Judge, based on relevance this and

22    also personal knowledge, asking questions about

23    Google's internal process.

24            This witness is going to consistently say

25    Google's got the best answers on their internal

**Exhibit E, pg. 575**

D'ERRICO - CROSS                     576

1   process.

2           MR. PRICE:  We can move on, Your Honor.

3           THE COURT:  Okay.  Good.

4   BY MR. PRICE:

5   Q   Regardless of the ultimate number, they're

6   searching everybody with Location History enabled at

7   the time; correct?

8   A   Again, I have to defer to Google on that.  They

9   conduct the query of their database.

10          THE COURT:  That's actually not moving on.

11          MR. PRICE:  Okay.  We can move on to the next

12  part.

13  BY MR. PRICE:

14  Q   Records from a Sprint tower dump don't show every

15  device that's in the area; correct?

16  A   No.  Records from a Sprint tower dump show the

17  devices that were making calls or receiving calls in

18  that area that were on the Sprint network.

19  Q   So, in addition to being on the Sprint network, as

20  we just discussed a second ago, a user would have to

21  be making a phone call, receiving a phone call,

22  sending or receiving a text message to show up in that

23  tower dump with Sprint?

24  A   Yes, with Sprint.  There has to be a network

25  transaction occurring.

**Exhibit E, pg. 576**

D'ERRICO - CROSS                577

1    Q    I want to get your take on whether you agree with

2    Google here.  They say, on page 9, of their amicus

3    brief --

4              THE COURT:  Wait a minute.  Didn't we just

5    have an objection to this, that this witness can't say

6    whether or not this is the best answer that Google

7    does?  So you can go through the whole brief.  He's

8    already said to you he can't agree or disagree because

9    Google knows the answer, and he doesn't.  Am I wrong

10   about that?  Well, it doesn't matter, because I'm

11   saying you can't ask it.

12             MR. PRICE:  Yes, Your Honor.

13   BY MR. PRICE:

14   Q    In fact, law enforcement did not get a tower dump

15   in this case; correct?

16   A    That's correct, we did not get a tower dump.

17   Q    And it wouldn't have been useful, at least for

18   Sprint, if the suspect did not make a phone call,

19   receive a phone call, send or receive a text message

20   during this time?

21   A    If he did not, but he did.

22   Q    A tower dump would not have registered him if he

23   did not?

24   A    That's correct.  If he did not make a call, the

25   tower dump would not register that.  If he did not

**Exhibit E, pg. 577**

D'ERRICO - CROSS                    578

1    make a call or a text or receive a call or a text.

2    Q    And even if the suspect did show up in a tower

3    dump in this case, you wouldn't have any way of

4    identifying that suspect based solely on the tower

5    dump in one instance?

6    A    That's incorrect.  So our investigative plan would

7    have been to compare the tower dump to a list of blue

8    Buicks, owners of blue Buicks, that we were prepared

9    to obtain from the Department of Motor Vehicles.

10   Whereas, one tower dump alone sometimes is not enough,

11   we did have another data set to compare it to even if

12   it was not a tower dump.

13       So in that case, this case, we were prepared to

14   obtain data from the Department of Motor Vehicles of

15   blue Buicks, the same vehicle that was reported to us

16   by a witness being behind the Journey Christian

17   Church, the suspicious vehicle, and compare the

18   registered owners of those vehicles to the phone

19   numbers in the tower dump.

20   Q    So you're saying there was another way you could

21   have worked this case without doing a geofence

22   warrant?

23   A    What I'm saying is there's many investigative

24   techniques out there, and the investigative technique

25   that we used first was the Google -- or that we used

**Exhibit E, pg. 578**

D'ERRICO – CROSS                    579

1    prior to using the tower dump was the Google geofence.

2    Q    So there was another way you could have done this,

3    but you chose not to?

4    A    I didn't make that decision.

5    Q    The government chose not to?

6    A    I think I answered that question.  The first

7    technique that we decided to use or the technique we

8    decided to use earlier was a Google geofence.  And if

9    that had not had results, that we did have other

10   investigative techniques that we could have used.

11   Q    Thank you.  You said you used 2703(d) orders to

12   obtain tower dumps.  Is that still true?

13   A    Yes, it is.

14   Q    You don't get warrants for those?

15   A    No, we do not.

16   Q    Not even after the Supreme Court's decision in

17   *Carpenter*, 2018, requiring a warrant for cell phone

18   location -- historical cell phone location

19   information?

20   A    No, it is not required.  *Carpenter* does not

21   comment on tower dumps, nor does it comment on

22   location data less than seven days.

23   Q    So it's your practice not to get warrants for

24   tower dumps?

25   A    There is discretion that a 2703(d) can be used for

**Exhibit E, pg. 579**

D'ERRICO - CROSS                580

1   a tower dump or a search warrant can be used.

2   Q    You said you don't tell companies how to conduct a

3   search in the case of a tower dump, for example?

4   A    I am not an expert in their internal systems.  We

5   provide a search warrant with the information that we

6   are requesting on their records.  They conduct the --

7   they obtain those records, however they will, and they

8   provide those to us.

9   Q    So you've never seen a search warrant for a tower

10  dump that specifies the towers to be searched?

11  A    Sometimes we do specify the towers to be dumped

12  because we have information that those towers would

13  cover the area in question.

14  Q    That is in your hypothetical, for example, with

15  Sprint?

16  A    Those are the towers that I likely would have

17  searched or requested be searched for a tower dump.

18  Q    Okay.  So when Google produces data in response to

19  a geofence warrant, they include this display radius;

20  correct?

21  A    That's correct.

22  Q    And in his first declaration, Mr. McGriff wrote

23  that a radius -- let me just pull that up.  It's

24  Defense Exhibit 21, Mr. McGriff's first declaration at

25  page 9.  And Mr. McGriff wrote, "A radius around a

**Exhibit E, pg. 580**

D'ERRICO – CROSS                    581

1   user's estimated location that shows the range of

2   location points around the stored Location History

3   coordinates that are believed to contain, with 68

4   percent probability, the user's actual location."

5   A   I see that in paragraph 25.

6   Q   And you understand that 68 percent to be Google's

7   confidence that somebody is within that display

8   radius?

9   A   I believe that is exactly what it says.  That if

10  they see those conditions 100 times, 68 percent of the

11  time that it will be inside that geofence or, excuse

12  me, inside that map display radius.

13  Q   And 68 percent is the industry standard for this;

14  right?

15  A   68 percent is approximately the industry standard,

16  yes.

17  Q   But regardless of that 68 percent confidence, if a

18  user's estimated location falls within the radius of

19  the geofence, then Google treats that user as falling

20  within the scope of the geofence; correct?

21  A   If the center point of the Location History record

22  is within the geofence, then Google does provide it

23  responsive to a search warrant.

24  Q   Even though there's no greater probability that

25  the user is in the dead center of that display radius

**Exhibit E, pg. 581**

D'ERRICO - CROSS                     582

 1    as opposed to off by the edge?

 2    A    That's correct.  Google doesn't provide a

 3    percentage that it's going to be in the northwest

 4    corner versus the northeast corner versus the south of

 5    that map display radius.

 6    Q    And the map display radius often extends the

 7    geofence as drawn?

 8    A    I don't agree with that characterization.  I don't

 9    think it often extends beyond on our Stage 1 data.

10    Q    It does -- it extends beyond the geofence in this

11    case; correct?

12    A    There are select points that extend beyond but

13    not -- nowhere near a majority of points.

14    Q    Okay.  But that fact, the fact that the display

15    radius exceeds the geofence circle, means that false

16    positives are possible when you conduct a geofence

17    warrant; correct?

18    A    It is -- I believe Google testified to it.  They

19    are making a good faith effort to determine the

20    location of that device.  Their technology is not

21    100 percent, but they are providing a good faith

22    effort in order to determine the location of that

23    device.

24    Q    So you agree with Google, false positives are

25    possible?

**Exhibit E, pg. 582**

D'ERRICO - CROSS                    583

1    A    False positives are possible.

2    Q    Was there a false positive in this case?

3    A    I don't know.

4    Q    Perhaps one of the three that made it all the way

5    to Stage 3?

6    A    Could you -- which one would you like to discuss?

7    Q    Let's take a look at your report on page 31.  The

8    user with device ID 2, ending in 2662?

9    A    907512662?

10   Q    Correct.  That was one of the three device IDs

11   that made it all the way to Stage 3; correct?

12   A    That's correct.

13   Q    Can we look at page 34 of your report.  This is

14   the Stage 2 data plotted for that device ID; correct?

15   A    That is correct.

16   Q    And there's only one point in all of that data

17   that falls within the geofence as drawn; correct?

18   A    There is one center point that is in the geofence.

19   There is another GPS point that has its display radius

20   overlapping into the geofence.

21   Q    And when you were looking at this data, did you

22   consider the time intervals between data points?

23   A    Yes, I did.

24   Q    And were you able to determine from that time,

25   from those intervals, whether this individual was

**Exhibit E, pg. 583**

D'ERRICO – CROSS                    584

1    likely walking or driving?

2    A   I don't remember my exact assessment.  Looking at

3    this data now, it appears that the person was

4    traveling at vehicle speeds.

5            MR. PRICE:  And can we please bring up

6    Defense Exhibit 5.

7    BY MR. PRICE:

8    Q   This is the three-paths video that Mr. McInvaille

9    created detailing the Stage 2 data for three of the

10   individuals caught up in this geofence.  This is the

11   user that we have referred to as Mr. Blue.  I'd like

12   to play the video for you so you can see the trail of

13   his data as it goes and touches inside of that

14   geofence.

15       (Video is played.)

16   Q   So based on the time lapse in between those points

17   and the fact that they are almost all on roads, you

18   were able to determine that that person was likely

19   driving?

20   A   Well, in that case, I can't eliminate that the

21   person ducked into that parking lot, dropped somebody

22   off, and then continued north on Price Club Boulevard.

23   Q   Can we take a look at Price Club Boulevard there

24   and ZOOM back for a second.

25       So, somebody driving along Price Club Boulevard

**Exhibit E, pg. 584**

D'ERRICO — CROSS                    585

1  from the south of our screen up to the north would

2  have to drive on the road; correct?

3  A    Yes.

4  Q    They couldn't drive through the trees and right

5  over the church and onto the road on the other side;

6  right?

7  A    That's correct.  If you're driving in a vehicle,

8  generally you need to stay on the roads.

9  Q    So, based on your training and expertise, looking

10 at this data, isn't it likely that this person was

11 driving on the road next to the geofence?

12 A    Again -- well, it appears that they approach, but

13 I cannot rule out that that person did not turn into

14 the parking lot, drop somebody off, and then resume

15 travel on that road.

16 Q    So if false positives are possible, false

17 negatives are possible, too; correct?

18 A    Yes, they are.

19 Q    Okay.  So you testified that the effective

20 geofence radius here, that was your words, "effective

21 geofence radius," was 150 meters?

22 A    That's the radius that we requested from Google,

23 and they were responsive.  All points fell withinside.

24 All of the center points for the Location History data

25 fell within that geofence.

**Exhibit E, pg. 585**

D'ERRICO - CROSS                          586

1   Q   So that's the requested geofence radius; correct?

2   A   Yes, that's the geofence radius.

3   Q   The effective geofence radius would have to take

4   into account the display radius for all the different

5   location points; correct?

6   A   It is possible that that device is outside the

7   geofence.  It is also possible that point is inside

8   the geofence.  I don't have enough information to

9   evaluate that.

10  Q   The display radius means that the geofence, when

11  it is run, as we just discussed, may pull in people as

12  a false positive who were not, in fact, inside that

13  geofence; correct?

14  A   Yes, it's possible.

15  Q   So they would be, then, outside the geofence and

16  mistakenly labeled as inside; correct?

17  A   Yes, that's possible.

18  Q   So if it is pulling in people who are outside of

19  the geofence as drawn, the effective range of that

20  geofence must be larger than the geofence as drawn?

21  A   The person could be outside the geofence.  We just

22  don't have enough information to evaluate exactly

23  where they are.

24          MR. PRICE:  Could we look at Slide 22,

25  please.  Slide 20, my apologies.

**Exhibit E, pg. 586**

D'ERRICO - CROSS                    587

1   BY MR. PRICE:

2   Q   So, in this case, the one user who had a display

3   radius of 387 meters based on Google's data, there was

4   a 68 percent chance that that person was somewhere

5   inside that very large blue circle; correct?

6   A   That's correct based on Google's testimony.   There

7   is a 68 percent chance that they're inside that

8   circle.

9   Q   So the effective range of this particular geofence

10  warrant exceeded the geofence as drawn by, what was

11  it, 290 meters?

12  A   I can't agree with that conclusion because we

13  don't know the actual location of the device.   That

14  bubble covers the entire geofence, and that device

15  could be inside the geofence.   It could be outside but

16  it could also be inside.   So I can't really evaluate

17  that because I don't have enough information to

18  determine if that device was actually inside or

19  actually outside.   And that's the thing about this

20  data.   They are estimated locations for us, so that we

21  can determine the estimated location of the device in

22  order to move forward our investigation.

23  Q   As you testified earlier, it's just as likely that

24  someone is at the center of that big blue circle as it

25  is that they are right by the edge; correct?

**Exhibit E, pg. 587**

D'ERRICO - CROSS                588

1   A   Google doesn't provide any indication where in

2   that display radius they are.  They just provide the

3   display radius, the center point, and say it's a

4   68 percent chance that they are in that area.

5   Q   So there's a 68 percent chance that, say, the user

6   was standing at the edge of that circle 290 meters

7   outside the geofence?

8   A   No, I think your math is incorrect.  What Google

9   is saying is there is a 68 percent chance that they

10  are inside that geofence.  They're not saying that

11  there's a 68 percent chance that they are at the

12  intersection of Hull Street and Price Club Boulevard,

13  and they're not saying there's a 68 percent chance

14  that they're down in the cul-de-sac at the bottom.

15  They're saying there's a 68 percent chance that the

16  device is inside that geofence.

17      And that is, yep -- and that's what they have

18  provided to us.

19  Q   That's fine.  Thank you.  You don't know exactly

20  why the display radius was so big for this particular

21  user, do you?

22  A   I don't know the exact reasons, but based on my

23  knowledge and analysis of previous Google location

24  records, this indicates that there was some travel,

25  some motion on this device, because the point prior to

**Exhibit E, pg. 588**

D'ERRICO - CROSS                    589

1    this large radius was the exact same latitude and

2    longitude as this large point, and the first point was

3    also a much smaller radius.

4    Q    So there could be any number of reasons why that

5    one point generated such a large display radius here?

6    A    I'm aware of that reason for it, but there may be

7    others, yes.

8    Q    And you don't know exactly how Google calculates

9    their display radius; correct?

10   A    No, I don't.  That's a Google question.

11   Q    That's sort of their secret sauce, isn't it?  It's

12   proprietary is what I mean to say.

13   A    I don't know.  They have not provided it to us.

14   Q    When you use Google's API to estimate your display

15   radius for the drive test that you do, you don't get

16   to see the calculations that Google does.  You just

17   send it off to them; correct?

18   A    That's correct.  I just send the information to

19   Google, and they respond back with a latitude and

20   longitude and a display radius.

21   Q    That's because their algorithm, their way of

22   calculating that display radius is considered

23   proprietary?

24   A    I don't know if they've marked it proprietary.

25   I'm not familiar with their internals.

**Exhibit E, pg. 589**

D'ERRICO - CROSS                          590

1    Q    But you do know that the display radius can be

2    quite large.  In fact, much larger than 387 meters.

3    A    I have seen large display radiuses before, yes.

4    Q    And the largest one in this case was 1,842 meters;

5    correct?

6    A    I don't know off the top of my head, but I see a

7    large one in Stage 2 data of 1,842.

8    Q    Any others?

9    A    Sure.  There's another one that's 1,797 meters.

10   Q    And there is one that is 1,838 meters, too;

11   correct?

12   A    Yes.  Those three points out of the 680 are large.

13   Q    In fact, there were three others with display

14   radii exceeding 1,000 meters here.  There are four

15   points.

16   A    In see four points listed on Slide 26.  That's

17   what I'm referring to when I look at the large map

18   display radius.

19   Q    Okay.  Thank you.  So, to sum up, you don't know

20   how big the display radius is going to be for any

21   given point before you do the geofence warrant;

22   correct?

23   A    That's correct.

24   Q    You don't know how the display radius is actually

25   calculated?

**Exhibit E, pg. 590**

D'ERRICO - CROSS                591

1    A    That's correct.

2    Q    You don't know how far beyond the geofence it's

3    going to extend?

4    A    That's correct.

5    Q    And you don't know how many hits you're going to

6    get in Stage 1?

7    A    That's correct.  That's why we ask Google for the

8    information with the search warrant.

9    Q    You haven't seen Google's policies on responding

10   to geofence warrants?

11   A    I'm assuming those are internal policies.  I have

12   not seen any.

13   Q    So you don't know how big a radius is acceptable

14   to Google?

15   A    These are -- I'm not aware of Google's internals.

16   Q    And if you get Stage 1 data, you're not certain

17   how many users Google is going to provide Stage 2 data

18   for; correct?

19   A    Google provides Stage 2 data for the users that we

20   request following the narrowing process.

21   Q    There's no fixed number of users that you have to

22   narrow it down by between Stages 1 and 2; right?

23   A    Not that I know of.

24   Q    So, it's sort of up to -- it's a bit of a

25   negotiation with Google about what is acceptable in

**Exhibit E, pg. 591**

D'ERRICO - CROSS                    592

1   terms of Stage 2 returns?

2   A   Well, it's written pretty particularly in the

3   search warrant that the government -- I believe it's

4   will attempt to narrow.  And that is that's part of

5   the process.

6   Q   And if they attempt and Google doesn't find it

7   sufficient, what happens?

8   A   Google will come back to us initially, and they

9   may say -- or they may want to have a discussion on

10  what the circumstances are.  I was not part of that in

11  this case.  I can't speak to what happened in this

12  case as far as that.

13  Q   And the same sort of discussion process would

14  happen between Stages 2 and Stages 3; correct?

15  A   I know that based on the testimony of

16  Ms. Rodriguez today.

17  Q   And the geofence warrants that you've dealt with?

18  A   Generally, when we ask for the device IDs, we have

19  narrowed it down sufficiently and Google provides

20  those.

21  Q   So you've had these discussions with Google

22  before?

23  A   No, because we have -- Google has been responsive

24  to the geofence warrants that I've submitted.

25  Q   Okay.  Thank you very much.

**Exhibit E, pg. 592**

D'ERRICO - CROSS                              593

```
 1    A    Yes.

 2              MR. PRICE:  No further questions, Your Honor.

 3              THE COURT:  All right.  Is there any

 4    redirect?

 5              MR. SIMON:  Judge, I'd ask three questions

 6    and --

 7              THE COURT:  Okay.  And then we'll take a

 8    recess.

 9        REDIRECT EXAMINATION

10    BY MR. SIMON:

11    Q    Can we pull up Government's Exhibit 1, Slide 24.

12        Special Agent D'Errico, you were asked about a lot

13    of plot points, none of which -- the large display

14    radius had nothing to do with the defendant's account;

15    correct?

16    A    That's correct.

17    Q    And if we're talking --

18              THE COURT:  Okay.  I don't know why.  I'm

19    really having trouble.  Move the microphone up so it

20    sort of captures you.

21              MR. SIMON:  I didn't fix the mic, Judge.

22    You're right.

23    BY MR. SIMON:

24    Q    Special Agent D'Errico, the discussion about the

25    display radius for that one point that was considered
```

**Exhibit E, pg. 593**

D'ERRICO - REDIRECT                    594

```
 1  relatively large, that was a different user's account,
 2  not the defendant's account; correct?
 3  A    That's correct.
 4  Q    And if we're talking about the defendant's
 5  account, we would be looking at Slide 24; right?
 6  A    That's correct.  Slide 24 shows the initial Stage
 7  1 data for the defendant's phone.
 8  Q    And so if we're talking about that 68 percent, I
 9  want to be clear about it, the 68 percent number
10  relates to the fact that the individual to Google's
11  best estimate based on its technology would be within
12  that blue display radius; right?
13  A    That's correct, that blue display radius.  And you
14  can see some of these points in yellow are right on
15  the edge of those display radiuses.  So they can be
16  anywhere in there, but these points are consistent
17  with the defendant being in those locations.
18  Q    Okay.  And with respect to the search warrant and
19  what the search warrant requests from Google, it asks
20  Google to send us back who you have determined is
21  within the red geofence radius; right?
22  A    That's correct.
23  Q    Now, the accuracy of Google points, you've done
24  some testing we talked about; right?
25  A    Yes, I have.
```

D'ERRICO - REDIRECT                595

1  Q    What have you determined about the accuracy of

2  Google's location points if you've come to a

3  percentage yourself in terms of your own location

4  points?

5  A    I don't have a particular percentage, but what

6  I've learned is that sometimes Google is a little too

7  conservative with their display radius, particularly

8  in Wi-Fi points, and that sometimes Google misses the

9  mark by several meters.  Single digit meters.  So the

10  point would fall outside of the display radius, but it

11  is still in the immediate vicinity of the area.

12       So, for example, if a point -- from this data,

13  what we're seeing is that the device is in this area.

14  This is not saying -- it's not a miss such that the

15  device is in California or Illinois or even north of

16  Richmond.  When we have seen misses by the Google

17  location data, it's by very small amounts, especially

18  in areas like this that have Wi-Fi coverage.  And that

19  actual location might be just outside of the map

20  display radius that they show.

21       So, whereas Google does aim for 68 percent inside,

22  there is a percentage that is right outside, just

23  outside that display radius based on the observations

24  that I've had.

25  Q    When you say "conservative," can you just explain

**Exhibit E, pg. 595**

D'ERRICO - REDIRECT                596

1   what you mean by that word "conservative"?

2   A    Yes.  That Google has made -- I'm sorry.  Maybe

3   that's not the right word.  Google has made that

4   display radius a little smaller than it should have

5   been.  And that if Google increased its map display

6   radius by 10, 20 meters, that point would fall inside

7   that new display radius.  So what I'm saying is when a

8   point misses, it's outside the 68 percent, it's

9   generally still in that area.  It's a near miss, not a

10  flagrant miss of putting a device in Washington, D.C.,

11  or even the other side of Chesterfield County.

12  Q    Okay.  And then, last question, looking at Slide

13  28, the supplemental records for the defendant's

14  phone, there was some talk about the large display

15  radiuses at the second stage when we've moved outside

16  of the geofence and asked for records -- for these

17  additional records for these devices.

18       Looking at, again, box 1, that's one of those

19  large points, 1797 meters.  Two minutes before, it's

20  104.  Again, what is that indicative of based on your

21  training and experience?

22  A    That's indicative of travel.  So in boxes 1, the

23  two points have the exact same latitude and longitude.

24  So there's a single marker in the middle.  And what

25  happens is that first point is a hundred-meter radius,

**Exhibit E, pg. 596**

D'ERRICO - REDIRECT                    597

1   104-meter radius.  And for some reason when the phone

2   goes to take the next measurement, which is about two

3   minutes later at 3:55, for some reason unknown to me

4   the center point is not updated to a new latitude and

5   longitude.

6       But what happens, I believe, is based on the

7   sensors in the phone, the accelerometer, which

8   determines speed, and the gyroscope, which determines

9   tilt, is that using those additional signals, it can

10  estimate approximately how far away that device is.

11      So we still deem these accurate even though they

12  are a larger circle.  It may not be as precise, but

13  it's still accurate as to the device is somewhere in

14  that area.

15          MR. SIMON:  No further questions, Judge.

16          THE COURT:  So, I'm going to ask one question

17  I really don't want to open up a can of worms, but I

18  just want to be clear.  If Google is saying in the

19  display radius, there's a 68 percent chance that the

20  device is in that radius, what does the other

21  32 percent reflect?  That it's not there?

22          THE WITNESS:  That the device would be

23  outside of that display radius.  And in my experience

24  with testing this data and doing my own measurements,

25  a lot of those points are what I would characterize as

**Exhibit E, pg. 597**

D'ERRICO - REDIRECT                598

1   near misses, which means still in the general area,

2   but maybe they're a football field away.  Maybe

3   they're 100 meters away.  Maybe they are 20 meters

4   away.  But they are still in that general area.  And

5   we are not looking at folks that are in Washington,

6   D.C. or other geographic areas.  That's been my

7   experience with this data.

8              THE COURT:  All right.

9              MR. SIMON:  Nothing further, Judge.

10             THE COURT:  Can this witness be excused?

11             MR. SIMON:  From the United States, Judge,

12   yes.

13             MR. PRICE:  For the defense, yes, Your Honor.

14             THE COURT:  All right.  Thank you, Special

15   Agent, for your time.

16             THE WITNESS:  Thank you.

17             (The witness was excused from the witness

18    stand.)

19             THE COURT:  We're going to take a recess.

20   I'd like to keep it just to 6:15.  That's only 12

21   minutes, but I am being the antithesis of an Eastern

22   District judge.  I have had trials here where somebody

23   told me at lunch to cut my witness list in half

24   because I was taking too long.  So I really just want

25   you all to get your job done, but also be mindful of

**Exhibit E, pg. 598**

599

1   everybody's time, especially with asking repetitive

2   questions.  All right.  Okay.

3            (Recess taken from 6:03 p.m. to 6:15 p.m.)

4            MR. SIMON:  DO we need to put him under oath,

5   Judge?

6            THE COURT:  Yes, of course.

7            I was going to say we're going to put him

8   under oath.  Detective Hylton, we'll ask you to stand

9   for that.

10           I'm also going to say that it's been a long

11  day, and we cannot go any more than an hour without a

12  break.  So if you guys understand that, there are a

13  lot of people here who are very tired.  And so I'm

14  going to accommodate them, of course, as I have you

15  perhaps a little too much.  So one hour per break.

16  And it really would be nice if we ended in an hour.

17           All right.

18

19      JOSHUA HYLTON, called by the United States, first

20  being duly sworn, testified as follows:

21

22      DIRECT EXAMINATION

23  BY MR. SIMON:

24  Q   Detective Hylton, can you state your name for the

25  record, please.

**Exhibit E, pg. 599**

HYLTON - DIRECT                    600

1   A   Yes, sir.  It's Joshua Hylton, spelled

2   H-Y-L-T-O-N.

3   Q   Okay.  And you're a Task Force Officer with the

4   FBI; right?

5   A   That's correct.

6   Q   And which task force are you with?

7   A   The Violent Crimes Task Force in Richmond,

8   Virginia.

9   Q   How long have you been there?

10  A   Since December of 2016, sir.

11  Q   And you've been in law enforcement since 2011;

12  right?

13  A   That's correct.

14  Q   With Chesterfield?

15  A   Yes.

16  Q   Police Department?

17  A   Yes, sir.

18  Q   Okay.  Now, when you started your career, what

19  kind of crimes did you investigate?

20  A   Initially, as a patrol officer, just the average

21  patrol-type crimes, larcenies, things of that nature,

22  assaults, vehicle infractions.  And, I believe, in

23  August 2015 I was assigned to our Persons Unit who

24  investigates violent crimes to people.

25          THE COURT:  Did you say "Persons Unit"?

HYLTON - DIRECT                601

1          THE WITNESS:  Yes, ma'am, in Chesterfield.

2          So that's what we called it at the time.  Now

3     we've broken it up into sections of robbery and

4     homicide.

5          When I was first assigned to the unit, I

6     investigated homicides or suspicious deaths, missing

7     persons cases, natural deaths, accidental deaths,

8     robberies to the person, whether it be a street

9     robbery or what we call a drug rip robbery, or, of

10    course, a commercial robbery, as well.

11          THE COURT:  Drug rip?

12          THE WITNESS:  Yes, ma'am.  Essentially, a

13    drug deal that has gone bad for one party or the other

14    where someone will attempt to purchase whatever drug

15    it might be, and then they get robbed.  I apologize

16    for the term.

17          Commercial robberies, such as bank robberies,

18    major assaults, shootings, rapes, things of that

19    nature.

20    Q    How many robberies have you investigated?

21    A    It's hard to say, as a primary investigator, but

22    at least well over 100.

23    Q    Okay.  Did any of those robberies involve alleged

24    conspiracies?

25    A    Yes, sir.

HYLTON - DIRECT                          602

1   Q    Have you gotten any training in your role as a law

2   enforcement officer?

3   A    Yes, sir.

4   Q    What's that?

5   A    Well, the Chesterfield County Basic Police

6   Academy, which lasted over seven and a half months,

7   approximately two months of field training with

8   another officer or more experienced officers.

9   Likewise, when I became a detective, we had a period

10  of training where we had to be evaluated by another

11  investigator for different cases that we were working

12  for approximately a month or so.

13       Various training that's come up over the years

14  whether it be search warrant preparation, search

15  warrant execution, various legal updates, things of

16  that nature.  Electronic data collection, examination,

17  things like that.

18  Q    So, now going to sort of the practical piece, have

19  you obtained search warrants in the past?

20  A    Yes, sir.

21  Q    Okay.  How many would you say?  And if you can't

22  estimate that, sort of what types of search warrants

23  have you obtained?

24  A    It would be hard to quantify that.  Somewhere

25  between 50 and 100 easily, I guess.  So, social

**Exhibit E, pg. 602**

HYLTON - DIRECT                    603

1    media-type search warrants; Instagram, Facebook, live

2    pings where we're trying to figure out where a suspect

3    is or a subject is based on their cell phone location.

4    Of course, the Google search warrants or geofence

5    search warrants, search warrants involving DNA

6    collection, tower dump search warrants, residential

7    search warrants, vehicle search warrants, search

8    warrants where I need to take a picture of a person's

9    body that could have been a suspect of a rape or

10   something of that nature.  Historical-type search

11   warrants.

12   Q    Is that historical location?

13   A    It could be historical location, that's correct.

14   Q    Okay.  Now, getting to the particular type of

15   warrant in this case, a geofence warrant, have you

16   obtained any geofence warrants in the past?

17   A    I have.

18   Q    How many prior to this case?

19   A    Three prior to this investigation.

20   Q    And were all of those signed by judges?

21   A    Yes, sir.

22   Q    Okay.  What type?  Was it federal or state?

23   A    The first geofence warrant I acquired was actually

24   in this district.  The Honorable Judge David Novak, I

25   believe.  And then the two subsequent search warrants

**Exhibit E, pg. 603**

HYLTON - DIRECT                    604

1    were acquired by Chesterfield Circuit Court judges.

2    Q   Okay.  Now, prior to getting the search warrant in

3    this case, did you consult with prosecutors about

4    geofence warrants?

5    A   With the prior warrants, yes.

6    Q   What, if anything, did they tell you about the

7    appropriateness of getting these types of warrants as

8    a legal matter?

9           MS. KOENIG:  Judge, objection.  That is a

10   legal conclusion which we have no witness to be able

11   to testify about what advice was given, and that is

12   not the appropriate question to be given in this case.

13   This Court is to determine whether this warrant was

14   valid.

15          MR. SIMON:  Judge, it goes to the issue of

16   good faith and, I think, hearsay as to what he was

17   told or the advice that he's gotten about the

18   propriety of these warrants is relevant.

19          THE COURT:  Why don't you just ask one

20   question in the negative?  Have you ever been told

21   it's not legal?

22          MR. SIMON:  Okay.

23   BY MR. SIMON:

24   Q   Have you ever been told it's not legal to get

25   these?

**Exhibit E, pg. 604**

HYLTON - DIRECT                605

1   A    No, sir.

2   Q    Now, the previous warrants that you obtained,

3   these previous geofence warrants, were they

4   substantially similar to the one you obtained in this

5   case?

6   A    They were mostly similar, that's correct.  A few

7   of them had more locations because of the more

8   robberies to investigate.

9   Q    Did they generally use the 150-meter radius?

10  A    All but the search warrant that's sealed

11  currently.

12  Q    Okay.  Now, prior to getting the search warrant in

13  this case, did you receive any directive from

14  leadership in your office at Chesterfield P.D.?

15  A    I did, from my lieutenant and the courts.

16  Q    Okay.  What, if anything, did they tell you about

17  where to go get your search warrant in this case?

18  A    If possible, we would acquire our search warrants

19  through a magistrate judge.  Sorry.  Not a magistrate

20  judge, a Chesterfield County magistrate.

21       If for some reason a magistrate would not sign our

22  warrants, we would schedule a meeting with an

23  assistant commonwealth's attorney.  We would speak

24  with them about the matter and then try to schedule a

25  time to see a circuit court judge.

**Exhibit E, pg. 605**

HYLTON - DIRECT                    606

1    Q    Why at that directive?

2    A    We were -- at the time we were overburdening the

3    courts, and specifically the on-call judge.  At least

4    that was my understanding of it.

5    Q    And that concern was coming from the Court?

6    A    That's correct.

7    Q    Okay.  Now, was this the first geofence warrant in

8    which you actually obtained the returns from Google?

9    A    Yes.

10   Q    Why hadn't you obtained the returns previously?

11   A    Most of the incidents I was searching or working

12   on prior to this particular geofence warrant weren't

13   ones that were immediately concerning the public's

14   welfare and safety.

15   Q    Okay.  But did you request the information back

16   from them?

17   A    Not in the same way that I did in this particular

18   investigation.  But yes, I submitted the search

19   warrants, and I was awaiting a return.

20   Q    Now, are you familiar at all with Google's

21   internal practices about how they execute these

22   warrants?

23   A    No, sir, other than I submit them to Google, along

24   with a nondisclosure order.  They receive them and

25   then process them however it is that they do that.

**Exhibit E, pg. 606**

HYLTON – DIRECT                    607

1    Q    Now, there's been some discussion about cell phone

2    dumps.  Why didn't you get a cell tower dump in this

3    case?

4    A    It may have been an investigative technique that I

5    would have done later, but in this particular

6    instance, normally I reserve a tower dump search

7    warrant for multiple crimes, multiple incidents,

8    locations, things of that nature.

9    Q    Okay.  Now, let me -- before we get into the heart

10   of the search warrant, can you explain for the Court

11   what happened on May 20, 2019?

12   A    Yes, sir.  I was on duty or rather just got off

13   duty, and I was informed by supervision that there was

14   a bank robbery that had just occurred at the Call

15   Federal Credit Union on Hull Street Road around the

16   Genito area with a loss of approximately $195,000.

17        I came back on duty to respond out to the bank

18   robbery as that was kind of my primary focus with

19   Chesterfield at the time.

20        After my response to the scene, I interviewed

21   witnesses, I reviewed surveillance camera video from

22   both -- or at that time mostly just the Call Federal

23   Credit Union Bank.

24        Through a culmination of all those investigative

25   things that I had done at that point, I learned that a

**Exhibit E, pg. 607**

HYLTON – DIRECT                    608

1   suspect had come from the southwestern corner of the

2   Journey Christian Church, which is a building adjacent

3   and to the east of Call Federal Credit Union, at

4   approximately 4:50 in the afternoon.

5       That same subject walked north in the parking lot,

6   and then towards the front of the bank itself while

7   holding what appeared to be like a cell phone to the

8   side of his face or the side of his head.

9       That party then entered the bank, and we were able

10  to get kind of a fuller shot of what he looked like.

11  It was a black male.  Witnesses described him, I

12  think, in his twenties or thirties, approximately.

13  Witness advised that he had a Jamaican accent, that he

14  had kind of a scruffy beard and braided hair

15  underneath of what was a round maybe fisherman's hat.

16  He had reflective sunglasses and a reflective traffic

17  vest.

18      He approached one teller while still having a cell

19  phone up to the side of his face.  He removes that

20  cell phone, walks up to what we call a victim teller,

21  presents a demand note.  And I guess we can get into

22  that further if you'd like.

23      But basically saying, I have your family as a

24  hostage, your loved ones as a hostage outside.  I have

25  my -- I don't recall exactly how it says.  But I know

**Exhibit E, pg. 608**

HYLTON – DIRECT                    609

1   people outside that have your family as hostage.  If I

2   see law enforcement responding, they may be hurt.  You

3   or your co-workers may be hurt.

4        The clerk advised the suspect, Hey, I don't have

5   that much money.  I don't have a $100,000 to give you.

6   At which point he produces a silver or a black firearm

7   and demands that all of the patrons and both employees

8   of the bank come to the center area just as you enter.

9        He forced everyone to the ground kneeling or

10  sitting, and, again, at gunpoint.  Demanded who had

11  access to the safe.  The manager at the time advised

12  that he did and kind of where the safe was located

13  within the bank, which was in one of the back corners.

14       The suspect at that point stood everybody up, and,

15  again, forced them all at gunpoint to the back of the

16  bank where the safe was located, ultimately, again,

17  putting everyone on the ground, and then forcing the

18  manager at the time to open the bank's vault or safe.

19  And then that's when he was able to take that money,

20  the $195,000 that I spoke of, bank bands, insinuating,

21  you know, what drawers and things that they came from.

22       Then, I believe, he collected a cell phone or two,

23  and then started to exit, and then he kind of threw

24  the cell phone devices somewhere within the business.

25  And then kind of fled that same pattern around the

**Exhibit E, pg. 609**

HYLTON – DIRECT                    610

1   front of the bank and then back towards the

2   southwestern corner of the Journey Christian Church.

3   Q    Okay.  What, if anything, did the phone trigger

4   for you in terms of investigative techniques?

5   A    For me, it meant that he could have possibly been

6   speaking with a coconspirator.  And then, obviously,

7   for the purposes of the Google geofence warrant, that

8   Google may have actually collected data that could

9   have implicated him as being in the area at the time

10  of the robbery.

11      In combination with the phone, possibly being on a

12  phone call, and then the demand note to the victim

13  teller, it told me that there was a possibility that

14  he could have a lookout, that he could have a driver

15  nearby or someone that was kind of keeping watch for

16  law enforcement.

17  Q    Okay.  Now, prior to him entering the bank --

18  we've had some testimony.  There was a witness who

19  said they saw a suspicious blue Buick behind the sort

20  of church area; right?

21  A    Yes.  That was an employee of the Journey

22  Christian Church that was leaving somewhere between

23  4:30 and 4:40 in the afternoon.

24  Q    Now, the geofence warrant in this case was

25  obtained on June 14, 2019; right?

**Exhibit E, pg. 610**

HYLTON – DIRECT                    611

1   A    Yes, approximately, like, three weeks or so after

2   the robbery occurred.

3   Q    Did you conduct any investigation in the interim?

4   A    I did.

5   Q    Did you get some leads?

6   A    We did.

7   Q    Okay.  Tell the Court a little bit about that.

8   A    I believe an estranged girlfriend or wife or

9   whatever she was called in and basically said "I know

10  who did this robbery.  It's my ex-boyfriend."  So,

11  obviously, you know, he had some physical

12  characteristics that were similar.  He actually wore a

13  fisherman style hat.

14      We were able to find him, interview him.  I

15  gave -- I believe I acquired a search warrant to

16  acquire his cell phone device.  We did some

17  examinations on his phone.  We found that he wasn't in

18  the area at the time.  He wasn't familiar with Call

19  Federal Credit Union.  He didn't frequent the area,

20  even provided an alibi, I believe.

21      And we also had another party that one of the

22  employees of a separate Call Federal Credit Union had

23  brought to our attention that also had a blue Buick

24  Lacrosse, I believe, and also came into a Richmond

25  bank earlier that day wearing a traffic vest.

**Exhibit E, pg. 611**

HYLTON - DIRECT                    612

1      So my immediate concern at the time was this might

2    be a likely suspect.  We ran that to the ground as

3    well.  We were able to identify who that party was,

4    and we were actually able to find that he was on an

5    ankle monitor for, I believe, a crime that he

6    committed in Richmond.

7      And then, of course, we were able to look at the

8    GPS plots and data and see that he was nowhere near

9    the Call Federal Credit Union in question today.

10   Q   And you go and you get the geofence warrant

11   sometime thereafter; right?

12   A   That's correct.

13   Q   I will show you what is marked as Government's

14   Exhibit 2 and what's been admitted, and that's your

15   search warrant; correct?

16   A   Yes, sir.

17   Q   That's your application?

18   A   That's correct.

19   Q   Now, when you submit this -- once you get the

20   search warrant signed off by the magistrate, is it

21   right that you submit -- what if we look at pages 4

22   and 5?

23   A   Yes, that goes along with the search warrant.

24   Q   Okay.  And what else do you submit?  Is it page

25   10?

**Exhibit E, pg. 612**

HYLTON - DIRECT                    613

1    A    I'm sorry.  The prior affidavits and 10 is going

2    to be an attachment to the actual search warrant

3    that's submitted to Google.

4    Q    Okay.  So if we look at -- I made a mistake.  If

5    we look at pages 4 and 5, we can put them next to each

6    other and take a look.  This is part of what you will

7    submit to Google; right?

8    A    Yes.  Well, specifically, this is part of the

9    affidavit to acquire the search warrant, but, yeah,

10   there's data associated with this that also goes along

11   with the search warrant attachment.

12   Q    You don't actually submit what we will go through

13   as the factual recitation of the case to Google;

14   correct?

15   A    No.

16   Q    Okay.  And the only other thing you submit in

17   addition to pages 4 and 5 would be page 8, if we look

18   at it; right?

19   A    Yes, that's correct.

20   Q    And just for purposes of the record, when I

21   mention these page numbers, I'm talking about the red

22   page numbering on Government's Exhibit 2.

23   A    Yes.

24   Q    Now, did you -- I just want to talk about the

25   substance of what you provided to the magistrate in

**Exhibit E, pg. 613**

HYLTON - DIRECT                614

1    getting this search warrant.

2            THE COURT:  Wait a minute.  The questions you

3    were just asking him about are what went to Google?

4            MR. SIMON:  Correct, Judge.

5            THE COURT:  So just give me, again, the page

6    numbers that went to Google, please.

7    BY MR. SIMON:

8    Q    Pages 4 and 5, correct, Detective Hylton?

9    A    The actual -- for me what was actually presented

10   to Google would be page 8, page 10, and page 11 as far

11   as in my affidavit and search warrant go.

12   Q    Just to be clear, you're using the word

13   "affidavit," but that's not -- you don't actually

14   submit to them the probable cause.

15   A    Yes, they don't get any probable cause narrative

16   associated with the crime itself.

17   Q    Okay.  Now, looking at page 6, did you advise the

18   magistrate of the note that the suspect left with the

19   bank teller?

20   A    Yes, sir.

21   Q    Okay.  Can we highlight that?  You mentioned

22   earlier that the note indicated that the suspect was

23   potentially working with other people.

24   A    Yes, sir.

25   Q    Can you note for us where -- and it's highlighted

**Exhibit E, pg. 614**

HYLTON - DIRECT                    615

1   on the screen for you -- sort of where in there you

2   got that inkling?

3   A   Pretty much the first and second sentence.  Would

4   you like me to read it?

5   Q   Sure.

6   A   Okay.  "I've been watching you for sometime now.

7   I got your family as hostage and I know where you

8   live, if you or your coworker alert the cops or anyone

9   your family and you are going to be hurt.  I got my

10  boys on the lookout out side.  The first cop car they

11  see am going to start hurting everyone in sight, hand

12  over all the cash.  I need at least 100k and nobody

13  will get hurt and your family will be set free.  Think

14  smartly.  Everyone safety is depending and you and

15  your coworkers action so I hope they don't try nothing

16  stupid."

17  Q   And did you also at the same time advise the

18  magistrate that the suspected bank robber had a

19  cellular telephone?

20  A   Yes, sir.

21  Q   Can we look at the paragraph starting "upon

22  investigative response"?

23  A   Yes.

24  Q   Is this the paragraph in which you advise the

25  magistrate about the cellular telephone?

**Exhibit E, pg. 615**

HYLTON – DIRECT                    616

1    A    That's correct.

2    Q    Can you go ahead and read some of this paragraph

3    starting with the first few lines?

4    A    Sure.  Upon investigative response, law

5    enforcement officials reviewed the bank's surveillance

6    video prior to the robbery and noted the UNSUB, which

7    is an unknown subject, had a cell phone in his right

8    hand and appeared to be speaking with someone on the

9    device.  Subsequently, your affiant finds it necessary

10   and prudent to request that Google provide geofencing

11   data in order to assist with the investigation.  In

12   the undersigned's training and experience, when people

13   act in concert with one another to commit a crime,

14   they frequently utilize cellular telephones and other

15   such electronic devices, to communicate with each

16   other through Wi-Fi, Bluetooth, GPS, voice calls, text

17   messages, social media accounts, applications, emails,

18   and/or cell towers in the area of victim-businesses,

19   and in this case, located at 3640 Call Federal Drive,

20   Chesterfield, Virginia 23235.  Furthermore, the

21   requested data/information would have been captured by

22   Google during the requested time.

23   Q    Okay.  And if we go to page 7, did you then advise

24   the magistrate about Google location information,

25   Google accounts, and cellular telephones, a bit more

**Exhibit E, pg. 616**

HYLTON - DIRECT                    617

 1    information there?

 2    A    Yes, sir.

 3    Q    If we look at the second paragraph, is that one of

 4    the places in which you tie the fact that Google --

 5    that folks can have Google accounts on their cellular

 6    telephones?

 7    A    Yes, sir, that's correct.

 8    Q    And then if we look at paragraph 3, as well.

 9    A    Yes, sir, that's correct, as well.

10    Q    Now, in addition to -- in this particular

11    paragraph, paragraph 3 on page 7, notes Android phones

12    as a place where Google accounts might be included.

13    Did you also advise the magistrate that Google

14    accounts could be on non-Android phones?

15    A    That's correct, through applications of similar

16    sorts.

17    Q    Now, did you tie the fact that Google location

18    information -- or Google accounts are on phones, but

19    did you also tie the fact that Google collects

20    location information from these phones?

21    A    Yes, sir.

22    Q    If we look at paragraphs 4 and 6, and I think

23    we'll have to look at them one at a time.  Look at

24    paragraph 4 here.  Is this one of the paragraphs in

25    which you advised -- in which you advise the Court

**Exhibit E, pg. 617**

HYLTON – DIRECT                618

 1  that Google location information could be captured by

 2  cellular telephones?

 3  A    Yes, sir, that's correct.

 4  Q    Now, looking at paragraph 6 on page 7 of

 5  Government's Exhibit 2, is this another paragraph in

 6  which you noted to the magistrate why location

 7  information might be on a cellular telephone?

 8  A    That's correct.

 9  Q    And why that -- and noted that that location

10  information is tied to a Google account?

11  A    Yes, that's correct.

12  Q    Now, have you in your personal experience ever

13  encountered a situation set forth in paragraph 6 there

14  using images or videos on a cellular telephone to

15  solve a crime?

16  A    Yes, sir.

17  Q    Can you tell us about that?

18  A    Sure.  In a few instances that I've investigated

19  crimes, I've had an abduction at gunpoint, knifepoint,

20  where a subject was carjacked and then taken to the

21  place of a robbery.  When we ended up developing a

22  lead or a target in that particular investigation, we

23  were able to gain probable cause, conduct a Facebook

24  search warrant for his data, and he actually had

25  multiple GPS plots showing that he was in the area of

**Exhibit E, pg. 618**

HYLTON – DIRECT                    619

1   the robbery, and actually posting pictures and things

2   of that nature associated with the robbery in the

3   general area of the parking lot of the business that

4   was robbed.

5        And similar type instances where I've worked other

6   robberies where suspects have had metadata associated

7   with an image or even video prior to and after a

8   robbery where he's taking pictures of himself,

9   flashing money subsequent to the robbery, or flashing

10  a firearm and even a mask prior to actually committing

11  a robbery.

12           MR. SIMON:  Judge, I've got a few more

13  questions, probably two or three, I think.

14  BY MR. SIMON:

15  Q   With respect to this pervasiveness of cell phones

16  in American society, did you set that forth in

17  paragraph 7 of this on page 7?

18  A   Yes, sir.

19  Q   Is that the Pew Research study set forth there?

20  A   That's correct.  Although, it was likely dated at

21  the time as that was September 2013.

22  Q   In addition to the fact that all of this

23  information is out there, and we talked about

24  paragraph 6, but did you also in paragraph 5 explain

25  for the magistrate how this information would be

**Exhibit E, pg. 619**

HYLTON – DIRECT                620

1  helpful in terms of locating an individual?

2  A   Yes, that's correct.

3  Q   Can we highlight paragraph 5 here.  Can you read

4  that?

5  A   Sure.  "This applicant knows that location data

6  can assist investigators in forming a fuller

7  geospatial understanding and timeline related to a

8  specific criminal investigation and may tend to

9  identify potential witnesses and/or suspects.  Such

10  information can also aid investigators in possibly

11  inculpating or exculpating persons of interest."

12  Q   So that paragraph notes the potential interest in

13  witnesses as well?

14  A   That's correct.

15  Q   Again, this affidavit, pages 6 and 7, that we just

16  went through, Google had no knowledge of these facts;

17  correct?

18  A   That's correct.

19  Q   And it's typical practice not to give these

20  companies the actual facts of the case; right?

21  A   That's correct.

22  Q   Now, I'm just going to end with quickly showing

23  you Government's Exhibit 4.  It's a number of pages

24  there.  Just take a look at them.  Do you recognize

25  the pages in Government's Exhibit 4?

HYLTON - DIRECT                        621

1  A    Yes.

2  Q    What are those?

3  A    These are correspondence between myself and Google

4  through email.

5  Q    Okay.  And that's an accurate reflection of those

6  emails?

7  A    Yes, sir.

8           MR. SIMON:  Judge, we move to admit and

9  publish briefly these emails.

10          MS. KOENIG:  No objection.

11          THE COURT:  All right.  They'll be entered.

12          (Government's Exhibit No. 4 is admitted into

13  evidence.)

14 BY MR. SIMON:

15 Q    Now, let me ask you just some quick questions

16 here.  The emails that were sent to Google, was there

17 a fair amount of follow-up via email?

18 A    No, I don't believe any except for the receipt of

19 the stages during the process.

20 Q    Okay.  And so when you talked with -- Sarah

21 Rodriguez mentioned that at some point you talked with

22 someone from Google on July 8.  Did you initiate that

23 communication?

24 A    I did, but I believe I called twice.

25 Q    Why did you call on July 8?

**Exhibit E, pg. 621**

HYLTON – DIRECT                    622

1   A    It was either to receive the first or to try to

2   receive Stage 1 at a faster rate of speed due to the

3   exigency of the suspect posing a danger to the public

4   and then also being a possible flight risk.

5   Q    The July 8 communications, that came after you

6   received the first round; right?

7   A    Yes, that's correct.

8   Q    So when you called on July 8, you were trying to

9   get the second round of information?

10  A    Correct.

11  Q    And prior to that you had sent two emails;

12  correct?

13  A    Yes.

14  Q    And had received no communication from Google?

15  A    That's correct.

16  Q    Throughout these emails, did you tell anything to

17  Google about the dangerousness of the situation?

18  A    I did.

19  Q    And these emails were sent in consultation with my

20  office; right?

21  A    That's correct.

22          THE COURT:  Consultation with whom?

23          MR. SIMON:  Consultation with my office.

24          THE COURT:  Okay.

25          MR. SIMON:  No further questions, Judge.

**Exhibit E, pg. 622**

HYLTON - CROSS                  623

1          THE COURT:  Is there cross?

2          MS. KOENIG:  Yes, sir.

3          MR. SIMON:  Judge, I think I moved Exhibit 4

4    in already.

5          THE COURT:  You did.

6      CROSS-EXAMINATION

7    BY MS. KOENIG:

8    Q    Good evening, Detective.

9    A    Good evening.

10   Q    I want to start with the surveillance videos.  So

11   you looked, as a part of the investigation, at the

12   widest surveillance videos that the bank had provided;

13   right?

14   A    That's correct.

15   Q    And you looked at those before June 14th of 2019?

16   A    Yes, ma'am.

17   Q    And those surveillance videos include outside

18   areas of the bank; right?

19   A    That's correct.

20   Q    And you also looked at the church surveillance

21   videos; right?

22   A    Yes, ma'am.

23   Q    And the church surveillance videos include

24   directions that face from the church toward the bank;

25   right?

**Exhibit E, pg. 623**

HYLTON - CROSS                            624

1   A    That's correct.

2   Q    And include wide swaths of that parking area;

3   right?

4   A    Yes, ma'am.

5   Q    I want to make sure, you had looked at that before

6   you filed for this warrant on June 14th of 2019;

7   right?

8   A    I believe so.

9   Q    And you also had a witness that was at the church;

10  right?

11  A    Yes, ma'am.

12  Q    And that witness said that that person saw -- that

13  that witness saw one individual walking toward a blue

14  Buick; right?

15  A    No, ma'am.  One individual inside of a blue Buick.

16  Q    I'm sorry.  And did they provide a description of

17  the person that was inside of the vehicle?

18  A    That description changed in three different

19  interviews with that individual.  I believe the

20  initial was a black male.  Then, I think, it became a

21  person or a male.  And then I don't recall what the

22  last interview was.

23  Q    All right.  When you watched the bank surveillance

24  videos, you saw no one else that you could not account

25  for except for the suspect in the fisherman's hat and

**Exhibit E, pg. 624**

HYLTON - CROSS                          625

1   the traffic vest; right?

2   A    Yes, ma'am, that's correct.

3   Q    And when you watched the church surveillance

4   videos, you saw no one else that you could not account

5   for except for the suspect in the fisherman's hat and

6   the traffic vest; right?

7   A    That's correct.

8   Q    You did not put those details in your affidavit to

9   the magistrate; right?

10  A    No, ma'am.  If they're not in there individually,

11  they're not in there.

12  Q    All right.  In going to your statement --

13  A    Actually, ma'am, I do apologize.  I did mention, I

14  believe, in a part of my affidavit where a suspicious

15  subject was seen parked behind the southwestern corner

16  of the church.

17  Q    Sure, but you didn't mention that you hadn't --

18  you had seen surveillance video and you had not seen

19  any other possible codefendants on the surveillance

20  video.

21  A    That's correct.  No other codefendants were seen.

22  Q    All right.  And you also didn't see any hostages

23  being held anywhere outside of the bank; right?

24  A    No, ma'am.

25  Q    I want to make sure I heard.  How many -- before

HYLTON - CROSS                         626

1   June 14 of 2019, how many geofence warrants had you

2   applied for?

3   A    Three.

4   Q    One is a search warrant from April 11 of 2019 in

5   Chesterfield County; right?

6   A    That's correct.

7   Q    One is a federal search warrant from February 22,

8   2019, from this courthouse, Judge Novak?

9   A    That's correct.

10  Q    What is the third one?

11  A    The third one is the one that's under seal.  It's

12  a homicide investigation.  It was also obtained in

13  April, but I -- did you say the first was obtained on

14  the 8th or April 8th?

15  Q    April 11.

16  A    April 11.  I believe the other is actually

17  April 8.

18        MS. KOENIG:  Your Honor, I don't mean to

19  belabor this point.  We have asked ad nauseam for

20  these warrants.  I have asked several times.  I have

21  emails from Mr. Simon that indicate that the only two

22  warrants that he had applied for before were the state

23  search warrant that I have identified on April 11 of

24  2019 and the federal search warrant.  I do not have a

25  copy of any third search warrant, and I'm asking for

HYLTON - CROSS                    627

1  that yet again.

2         MR. SIMON:  Judge, we've given every search

3  warrant that we can get access to in this case.  I

4  also would have to look at the briefs.  I'm pretty

5  sure we indicated three.  I don't want to say anything

6  that's wrong.

7         What I can tell you is that I know I can't

8  get access to the third.  That's an ongoing homicide

9  investigation.  And the ACA there certainly is not

10  inclined to unseal that.  That's my understanding.

11  And so that's sort of the fullest extent that I can

12  get into that.  But, as I've noted, we've given

13  everything that we have.

14         THE COURT:  All right.  I'm going to allow

15  you all to brief that up later based on the record

16  that you can establish.  Five pages each.

17         THE WITNESS:  If I can, ma'am.  That matter

18  hasn't even come up in court yet.  It's actually

19  scheduled to be January of 2022.

20  BY MS. KOENIG:

21  Q   All right.  So let's go back to your training and

22  experience.  You have not received any specific

23  training about geofence warrants; right?

24  A   No, ma'am, I have not.

25  Q   And you've not received any training specific to

**Exhibit E, pg. 627**

HYLTON - CROSS                    628

1   how to request geofence warrants; right?

2   A    No, ma'am.

3   Q    You learned about geofence warrants through other

4   police officers that you work with; right?

5   A    That's correct.

6   Q    All right.  So let's look at Defense Exhibit --

7   I'm sorry.  If we could pull up Government's Exhibit

8   2, please.  Thank you.  All right.  Government's

9   Exhibit 2 is the geofence warrant in this case; right?

10  A    Yes, ma'am.

11  Q    All right.  So let's look at Attachment 1, which

12  is on page 3.  And if you can flip in the defense

13  exhibit book to Defense Exhibit 19, please.

14  A    I apologize.

15  Q    It is the big one.

16  A    You said 19, ma'am?

17  Q    Yes.  I'll just kind of save you a little bit of

18  time.

19  A    I'd appreciate it.

20  Q    Absolutely.  So that exhibit comprises two

21  warrants.  If you'll see that there's a warrant --

22  I'll wait until you get there.

23            THE COURT:  I'm not there yet either.

24            MS. KOENIG:  Sorry, Your Honor.

25  BY MS. KOENIG:

**Exhibit E, pg. 628**

HYLTON - CROSS                    629

1  Q   All right.  So would you agree with me that that

2  exhibit contains two warrants, one of which has the

3  warrant -- the affidavit file number of 42 at the

4  beginning?

5  A   Yes, ma'am.

6  Q   And then the subsequent pages to that are related

7  to that warrant; right?

8  A   That's correct.

9  Q   And then the second warrant is affidavit file

10  No. 472; right?

11  A   Are we speaking of my search warrant at this

12  point?

13  Q   That's correct.

14  A   That's correct.

15  Q   So that's 472 is your search warrant; right?  You

16  can look at it.

17  A   Yes, ma'am.

18  Q   So look at Attachment 1 from the geofence warrant

19  in this case.  Just keep your page.  Don't change the

20  page.

21  A   Sorry.

22  Q   That's okay.  So I want you to compare Attachment

23  1 from Government's Exhibit 2 to Attachment 1 in the

24  affidavit that you filed in file No. 472.

25  A   So, just to clarify, Detective Humphries

**Exhibit E, pg. 629**

HYLTON - CROSS                          630

1   Attachment 1 versus my Attachment 1.

2   Q    Correct.  Let's just make this easier.  Detective

3   Humphries filed for the affidavit in search warrant

4   number -- the affidavit file No. 42; right?

5   A    Correct.

6   Q    Detective Humphries is somebody that you work with

7   at the Chesterfield County Police Department; right?

8   A    Yes, that's correct.

9   Q    All right.  So, again, let's look at the

10  Attachment 1 from Government's Exhibit 2 and compare

11  that to Attachment 1 in file No. 472, which is the

12  second warrant in Exhibit 19.

13  A    Yes, ma'am.

14  Q    Those are the same; right?

15  A    As far as I can see, they're pretty much the same.

16  Q    While we're on Attachment 1, let's look at file

17  No. 42, which is the first warrant, Defense Exhibit

18  19.

19  A    Okay.

20  Q    So when you look at Attachment 1 -- Attachment 1,

21  go to Detective Humphries --

22  A    Yes, I'm on Detective Humphries'.

23  Q    Okay.  Attachment 1 in Detective Humphries'

24  affidavit, which is file No. 42, is also the same as

25  the search warrant Attachment 1 in this geofence

**Exhibit E, pg. 630**

HYLTON - CROSS                631

1   warrant case, in our case; right?

2   A   Yes, ma'am.

3   Q   All right.  Let's go to Attachment 2 of

4   Government's Exhibit 2.  All right.

5       So Government's Exhibit 2, Attachment 2, please

6   compare that to your search warrant in file No. 472,

7   which you got, which is the second warrant, that's in

8   Defense Exhibit 19.

9   A   Without directing looking at them, I believe it's

10  going to be the same since I'm the one that filed it,

11  or, sorry, I'm the one that acquired it.

12  Q   And the only thing that's different, right, is the

13  date and time?

14  A   Correct.

15  Q   The crime that is associated and the geographic

16  area to be searched; right?

17  A   That's right.

18  Q   So let's compare Government Exhibit 2, Attachment

19  2, to Detective Humphries' Attachment 2 in file

20  No. 42.

21  A   Okay.

22  Q   And, again, the only substantive changes, right,

23  are the date and time that applies and the geographic

24  location; right?

25  A   Yes, ma'am.  And then the way that the --

**Exhibit E, pg. 631**

HYLTON - CROSS                        632

1    Q    There's a little formatting change; right?

2    A    Correct.

3    Q    All right.  So you did not draft either Attachment

4    1 or Attachment 2 for your June 14, 2019 warrant in

5    this case; right?

6    A    Not solely by myself, no.

7    Q    Okay.  And you mentioned already that you had

8    applied for a --

9            MS. KOENIG:  Judge, I move to admit Defense

10   Exhibit 19?

11           THE COURT:  Any objection?

12           MR. SIMON:  Judge, I would object to it being

13   entered into the record.  I think it's fairly clear

14   he's using a go by, but I don't know why we'd want a

15   different detective's search warrant in this

16   particular record.  It has nothing to do with this

17   case or the probable cause in his warrant.

18           THE COURT:  Well, she's using it to say it's

19   the same language.  So she's acknowledging they're

20   different things.

21           MR. SIMON:  Okay.

22           THE COURT:  So that's overruled.

23           (Defense Exhibit No. 19 is admitted into

24   evidence.)

25   BY MS. KOENIG:

**Exhibit E, pg. 632**

HYLTON - CROSS                          633

1   Q    And I forgot to ask you, Detective, although it is

2   apparent from the face of the application --

3              THE COURT:  You are talking to your computer.

4              MS. KOENIG:  Thank you.

5   BY MS. KOENIG:

6   Q    I forgot to ask you, did file No. 42 that

7   Detective Humphries got --

8   A    Yes.

9   Q    He got that affidavit -- he filed for that search

10  warrant on January 8 of 2019; right?

11  A    Yes, ma'am.

12  Q    All right.  So, let's turn -- you mentioned a

13  federal search warrant.  The federal search warrant

14  is -- let's look at Defense Exhibit 18.

15  A    Are we still going to be using mine as a

16  reference, as well?

17  Q    We are.  You know where I'm going.

18  A    All right.  Go ahead.

19  Q    So this is the federal search warrant that you

20  applied for; right?

21  A    Yes, ma'am.

22  Q    All right.  And you got this warrant on

23  February 22, 2019?

24  A    Uh-huh.

25  Q    And that's a yes or a no?

**Exhibit E, pg. 633**

HYLTON - CROSS                          634

1   A    Yes, ma'am.  Sorry.

2   Q    That's okay.  Let's look at Attachment A of the

3   federal warrant.  It's ECF page No. 20 at the top.

4   A    Page 20?

5   Q    Yes.

6   A    All right.  Thank you.

7   Q    So when we are looking at Attachment A and

8   comparing Attachment A -- so Attachment A is the

9   property to be searched; right?

10  A    Yes, ma'am.

11  Q    All right.  And that is a similar purpose for

12  Attachment 1 in Government's Exhibit 2; right?

13  A    That's correct.

14  Q    All right.  The language varies dramatically;

15  right?

16  A    Somewhat, and that's mostly actually due to the

17  structure of the federal warrant versus the state

18  search warrant.

19  Q    Sure.  Well, aside from -- the only thing that

20  actually is the same in terms of the language is the

21  place where Google accepts legal process in Mountain

22  View, California; right?

23  A    That's correct.  And that's actually listed in a

24  different place in my affidavit and search warrant.

25  Q    That's fine.  So, then we get locations A through

**Exhibit E, pg. 634**

HYLTON - CROSS                    635

1   O on that page; right?

2   A    Yes.

3   Q    And you put together locations A through O; right?

4   A    I did.

5   Q    You did not draft that paragraph above the

6   locations A through 0; right?

7   A    No, I didn't specifically -- that was kind of the

8   go by situation that we were referring to earlier.

9   Q    All right.  So, let's go to Attachment B in

10  Defense Exhibit 18, and that starts on page 31 of the

11  ECF at the top of that exhibit.

12  A    Okay.

13  Q    All right.  So, again, we're going to compare.  So

14  Attachment B in Defense Exhibit 18 is items to be

15  seized and searched; right?

16  A    Yes, that's correct.

17  Q    And the purpose of that attachment is similar to

18  the purpose of Attachment 2 of Government's Exhibit 2;

19  right?

20  A    Yes, ma'am.

21  Q    All right.  And that outlines the three-step

22  process -- Attachment B sets out the three-step

23  process that Google created for geofence warrants?

24  A    Yes, ma'am.

25  Q    So when we compare Attachment B in Defense Exhibit

**Exhibit E, pg. 635**

HYLTON - CROSS                    636

```
 1   18 to Attachment 2 in Government's Exhibit 2, those

 2   are different; right?

 3   A    Yes, ma'am, slightly different.

 4   Q    Slightly?

 5   A    Well, in the way that they're laid out, but the

 6   information that I'm seeking is still the same.

 7   Q    But there's not a single sentence in Attachment B

 8   in Defense Exhibit 18 that is the same as Attachment 2

 9   in Government's Exhibit 2; right?  You can take your

10   time.

11   A    Okay.

12        Not on this particular page I'm looking through

13   right now.

14   Q    It's a pretty short second page.

15   A    That's correct.

16   Q    And you also didn't write Attachment B to the

17   federal search warrant; right?

18   A    As in come up with the language myself?  No,

19   ma'am.

20   Q    Correct.  Thank you.

21             MS. KOENIG:  I move to admit Defense Exhibit

22   18, Your Honor.

23             MR. SIMON:  No objection, Judge.

24             THE COURT:  It will be entered.

25             (Defense Exhibit No. 18 is admitted into
```

**Exhibit E, pg. 636**

HYLTON - CROSS                              637

1   evidence.)

2   BY MS. KOENIG:

3   Q    When you were putting together the geofence

4   warrant in this case in Government's Exhibit 2, you

5   did not have a suspect; right?  You had a body.  You

6   didn't have any individual person; right?

7   A    That's correct.  I did not have a name attached to

8   the suspect at that time.

9   Q    All right.  And the only way you gained the

10  suspect in this case was through the geofence warrant;

11  right?

12  A    In this particular instance, yes.

13  Q    And you ultimately identified Okello Chatrie as a

14  suspect in this case?

15  A    I did.

16  Q    And you investigated Mr. Chatrie's background?

17  A    Yes, ma'am.

18  Q    You knew he was Jamaican?

19  A    I did.

20  Q    You knew he came to the United States from Jamaica

21  in 2017?

22  A    That's correct?

23          THE COURT:  You are --

24          MS. KOENIG:  I'm sorry, Your Honor.

25  BY MS. KOENIG:

**Exhibit E, pg. 637**

HYLTON - CROSS                    638

1    Q    Let's talk now about when you presented the

2    affidavit that you assembled in Government's Exhibit 2

3    to the magistrate.

4    A    Okay.

5    Q    You went to Magistrate David Bishop; right?

6    A    That's correct.

7    Q    Did you know that Mr. Bishop had never before

8    issued a geofence warrant?

9    A    I did not.

10   Q    Was he the only magistrate on duty when you

11   presented him with a geofence warrant application in

12   the case?

13   A    It's been a while.  Normally, they have two or

14   three on duty.

15   Q    How did you present it to him?

16   A    In the way that it's kind of seen here.

17   Q    I'm sorry.  Maybe I'll be more specific.  How did

18   you physically present it to him?  Did you just hand

19   it to him?

20   A    Yes, ma'am.  I walk up to him.  I hand him the

21   affidavit.  I sign it in front of him.  I swear.  Then

22   he takes that paperwork, and he reviews it himself,

23   and then decides if there's probable cause based on

24   what he's reading in the four corners of the actual

25   affidavit itself.

**Exhibit E, pg. 638**

HYLTON - CROSS                639

1   Q    Did Mr. Bishop ask you any questions about the

2   contents of the application?

3   A    I don't recall any questions asked.

4   Q    Did he seek to modify anything in the affidavit at

5   all?

6   A    No, ma'am.

7   Q    Did he just read it and sign it?

8   A    That's my understanding.  He could have consulted

9   with someone.  I wasn't sure.

10  Q    Did he read it in front of you?

11  A    I don't believe so.

12  Q    How long did it take?

13  A    I don't know.  It's been 2019.  I couldn't advise.

14  Q    More than 15 minutes?

15  A    I would assume so.

16  Q    More than 30 minutes?

17  A    I don't know.  I'm sorry.

18  Q    All right.  So, going back to the --

19          MS. KOENIG:  Let's see if we can switch

20  screens to the government's screen, Ms. Hancock.

21  BY MS. KOENIG:

22  Q    So going back to Attachment 2 of Government's

23  Exhibit 2, which is page 5, on the second page or on

24  that page, second page of Attachment 2, there is a

25  picture; right?

**Exhibit E, pg. 639**

HYLTON - CROSS                    640

1  A    Yes, ma'am.

2  Q    And that is the geofence itself; right?

3  A    That's correct.

4  Q    And so you have a description of that area above

5  the picture; right?

6  A    Yes.

7  Q    And that description says, "An area encompassing

8  the Call Federal Credit Union and an adjacent

9  business"; right?

10 A    Yes.

11 Q    That adjacent business you're referring to is the

12 Journey Christian Church?

13 A    That's correct.

14 Q    And that's the much larger building to the right

15 of the credit union in the picture that we're looking

16 at?

17 A    That's correct.

18 Q    And so you've obviously been a detective in

19 Chesterfield for a little while; right?

20 A    Yes, ma'am.

21 Q    And you went to the bank the day of the robbery;

22 right?

23 A    I did.

24 Q    You knew it was the Journey Christian Church next

25 door; right?

**Exhibit E, pg. 640**

HYLTON - CROSS                641

```
 1   A    Yes, ma'am.
 2   Q    And you knew that the Journey Christian Church is
 3   what we would call a mega church?
 4   A    It was a church within a --
 5   Q    It's a very large church.
 6   A    Yes, it's a large building, but it's actually an
 7   old Costco or something to that nature.
 8   Q    Sure.  And you know a lot of people attend that
 9   church; right?
10   A    No, ma'am.
11   Q    You don't know that?
12   A    I don't know any person to my knowledge that goes
13   to that church.
14   Q    All right.  Let's talk about the time frame for
15   the execution of the warrant.  So if we can look at
16   Government's Exhibit 4.  I guess I can pull it up on
17   mine.  Let me do that.  All right.  So you submit --
18   are you there?
19   A    Yes, ma'am.
20   Q    Okay.  So page 1.  You submit -- you get the
21   warrant on June 14, 2019; right?
22   A    That's correct.
23   Q    You submit it to Google on June 20, 2019; right?
24   A    Yes.
25   Q    You sent some follow-up information to Google on
```

**Exhibit E, pg. 641**

HYLTON - CROSS                    642

1   June 25, 2019; right?

2   A    Yes.

3   Q    And Google provides you the Stage 1 response on

4   June 28, 2019?

5   A    That's correct.

6   Q    And in the Stage 1 response, you get the location

7   data on the 19 devices?

8   A    Yes.

9   Q    And then on July 1, 2019, you make the first Stage

10  2 request?

11  A    That's right.

12  Q    On July 2, you make a second Stage 2 request?

13  A    Yes, ma'am.

14  Q    And on July 8, you make a third Stage 2 request;

15  right?

16  A    Yes, that's correct.

17  Q    And then after you make that email request on

18  July 8, 2019, that's when you leave the two messages

19  for the LIS specialist at Google; right?

20  A    Yes, ma'am.

21  Q    And that person calls you later that day; right?

22  A    They did.

23  Q    All right.  So then July 9 is when you narrow down

24  the Stage 2 request to nine devices?

25  A    That's correct.

**Exhibit E, pg. 642**

HYLTON - CROSS                    643

1   Q   And you get the second stage return on the same

2   day?

3   A   Yes, ma'am.  Looks that way.

4   Q   And then July 10, you make the Stage 3 request?

5   A   Yes.

6   Q   And then July 11, you email again asking for the

7   Stage 3 data?

8   A   Yes.

9   Q   And then July 11, you get the Stage 3 data?

10  A   That's correct.

11  Q   All right.  So I want to talk to you about search

12  warrant returns.

13  A   Okay.

14  Q   The purpose of a -- well, a search warrant return

15  is a document that notifies the Court when you execute

16  the search warrant; right?

17  A   Yes, ma'am.

18  Q   When you execute a geofence search warrant, it's

19  executed when you send it to Google; right?

20  A   That's correct.

21  Q   And you send it via the LER system; right?

22  A   Yes, ma'am, the L-E-R system, yes.

23  Q   And in return, you also report -- in the return,

24  you also report back to the Court what items you

25  gathered during the search; right?

**Exhibit E, pg. 643**

HYLTON - CROSS                    644

1   A    That's correct.

2   Q    All right.  So let's look at Government's Exhibit

3   2, which I will pull up on the screen.  No, I don't

4   have it.  Government's Exhibit 2 on page 9.

5          MS. KOENIG:  Ms. Hancock, if we could ask, if

6   we could get the government's screen, that would be

7   great.  All right.  Thank you very much.

8   BY MS. KOENIG:

9   Q    So we are looking on page 9 of Government's

10  Exhibit 2 at the "search inventory and return" on this

11  case; right?

12  A    Yes, ma'am.

13  Q    So, in the execution part on the right-hand side,

14  you indicate that the search warrant was executed on

15  July 14, 2019, at 10:30 in the morning.

16  A    That's correct.

17  Q    And that's not true; right?

18  A    That's correct, not when it was forwarded to

19  Google, that's correct.

20  Q    And we just discussed that when you forward it to

21  Google, that is the execution of the warrant; right?

22  A    Yes, ma'am, that's when Google receives the

23  warrant.

24  Q    All right.  You filed this return on June 19 of

25  2019; right?

**Exhibit E, pg. 644**

HYLTON - CROSS                    645

1    A   Yes, ma'am, that's when it was submitted

2    physically to Google through the LERS website.

3    Q   Well, we'll come back to that in a second.

4        So, in the bottom half of the search inventory and

5    return, there's a portion that has your signature.

6    I'm assuming that's right above executing officer?

7    A   Yes.

8    Q   It's about the same as my signature.  I'll tell

9    you, I'm not going to give you grief about that.

10       And then the date is June 19th of 2019; right?

11   A   That's correct.

12   Q   And the statement above that says, "The statement

13   above is true and accurate to the best of my knowledge

14   and belief"; right?

15   A   Yes, ma'am.

16   Q   And you indicate that what you had received and

17   seized pursuant to this warrant is data; right?

18   A   That's correct.

19   Q   All right.  So this is June 19th of 2019.  When we

20   go to Government's Exhibit 4 at page 1, you do not

21   submit the Google -- the geofence warrant in this case

22   to Google until June 20th, the day after you file a

23   return; right?

24   A   Yes, ma'am, that's correct.  This is their

25   response to having received it in the LERS program.

**Exhibit E, pg. 645**

HYLTON - CROSS                    646

1   Q    And you also don't receive any data, even the

2   Stage 1 data, until June 28th of 2019; right?

3   A    That's correct.  Sounds correct.

4   Q    And then you don't receive the final Stage 3 data,

5   which is ultimately what you're seeking, until July 3?

6   I'm sorry.  July 11 of 2019?

7   A    That's the Stage 3 data?

8   Q    Yes.

9   A    Yes, ma'am, that's correct.

10           MS. KOENIG:  No further questions.

11           MR. SIMON:  Judge, I just want to put on the

12   record something about the sealed search warrant.

13           THE COURT:  Okay.  So there's no further

14   questions?

15           MR. SIMON:  A question.

16           THE COURT:  All right.  It's going to be a

17   couple minutes, because we're about two minutes away

18   from one hour.

19           MR. SIMON:  Judge, I think it might literally

20   take three minutes.

21           THE COURT:  All right.

22      REDIRECT EXAMINATION

23   BY MR. SIMON:

24   Q    Detective Hylton, the search warrant that's under

25   seal, did you seek to get that record from the

**Exhibit E, pg. 646**

HYLTON - REDIRECT                    647

1   Assistant Commonwealth's Attorney?

2   A    I believe I did.

3   Q    And what, if anything, did he tell you about

4   whether he wanted keep that search warrant sealed?

5   A    She.  And she told me no, it was sealed.

6   Q    And that she wanted to keep it sealed; correct?

7   A    That's correct.

8             MR. SIMON:  No further questions, Judge.

9             THE COURT:  All right.  Can this witness be

10  excused?

11            MS. KOENIG:  From the defense' perspective,

12  yes, Your Honor.

13            MR. SIMON:  From the United States, yes.

14            THE COURT:  All right.  You may be excused,

15  sir.

16            (The witness was excused from the witness

17   stand.)

18            THE COURT:  So there's no further evidence;

19  am I right?

20            MR. SIMON:  No further evidence, Judge.

21            THE COURT:  So this is what we're going to

22  do.  We're going to take a recess.  I'm going to have

23  you guys talk about what the next process is.  I

24  presume you're going to order a transcript.  So I want

25  you to sort of talk about that, and then hopefully not

**Exhibit E, pg. 647**

648

 1   very long we'll put something on the record.

 2          If y'all need time to talk about, you know,

 3   the five-page submission about the sealed warrant, fit

 4   that in.  If you think you can't get it done tonight

 5   because folks are too blurry eyed, we can do

 6   something, I guess, by ZOOM on Monday as far as

 7   scheduling.  But I want to try to close this up,

 8   realistically, as far as what the next steps will be.

 9   All right?

10          MR. SIMON:  Understood, Judge.

11          THE COURT:  Okay.  So we're going to take a

12   brief recess.

13          Thank you, Officer Hylton.  I did that late.

14   Thank you for your testimony.

15          OFFICER HYLTON:  Yes, ma'am.

16          (Recess taken 7:15 p.m. until 7:27 p.m.)

17          THE COURT:  All right.  What are our

18   logistics?

19          MS. KOENIG:  Your Honor, we've spoken with

20   Ms. Daffron, who's let us know when the transcript can

21   be ready, and based on that, we would request that by

22   April 30th the defense submit a supplemental motion to

23   suppress that addresses the legal issues on the basis

24   of the facts and evidence presented.

25          The government would file their response on

**Exhibit E, pg. 648**

649

1    May 21st.  And then the defense would file a reply on

2    June 4.

3             In terms of the state search warrant that

4    Detective Hylton discussed that's under seal, the

5    understanding is that the government -- or my

6    understanding is that the government is going to

7    review -- because my question is whether or not

8    Attachments 1 and 2 in that warrant are different than

9    what is in Government's Exhibit 2.  And so they are

10   going to review that and get back to us, and if we

11   have any further issues past that, I'll let you know.

12             THE COURT:  Okay.

13             MS. KOENIG:  I think that addresses the

14   issues.  And I've spoken with Ms. Hancock.  Instead of

15   keeping everyone here tonight to sort out exhibits,

16   we'll sort them out next week.

17             THE COURT:  No, I think that makes great

18   sense.

19             So we'll issue that order with respect to

20   briefing.  If you all want to schedule just an

21   argument after that, we can also consider that date,

22   so that's on the record at the same time.  And I don't

23   know if you all will want that argument.  I presume

24   you might actually.  Right?

25             MS. KOENIG:  I'm sorry.

**Exhibit E, pg. 649**

650

1          THE COURT:  Will you want argument?

2          MS. KOENIG:  Yes.

3          THE COURT:  Let me see if I have a calendar.

4   I know I have a calendar because I asked my clerk for

5   one, but that was a whole day ago.

6          How about we call you about potential

7   argument dates, and that will be in the order at the

8   same time.  All right?

9          MS. KOENIG:  Yes, Your Honor.  Thank you.

10         THE COURT:  That way I can check my record.

11         And let me ask, this is just on these

12  motions.  You're going to rest on the motions that we

13  have as to the houses and the other materials?

14         MS. KOENIG:  We'll wait until the Court

15  resolves this motion, I think, before we need to

16  resolve those.

17         THE COURT:  Okay.  So they will just remain

18  in place pending, and we will -- obviously, this

19  precedes all of that.

20         MS. KOENIG:  That's right.

21         THE COURT:  All right.  So I appreciate your

22  efforts.  I do think it will be worth going through

23  the exhibits.  I have taken notes, and we have, and

24  it's important that we get the record exactly the way

25  we want it to be, including not just substituting your

**Exhibit E, pg. 650**

651

1    43A, Ms. Koenig, but also substituting the documents

2    that we excised pages out of.

3              MS. KOENIG:  That's right.

4              THE COURT:  So that we have just one full

5    record, and that everybody is agreeing upon what we

6    have.  All right?

7              MR. SIMON:  Understood, Judge.

8              THE COURT:  So, Mr. Chatrie, I apologize that

9    we go through these proceedings and talk about you in

10   the third person the whole time, but I want you to

11   know that obviously we're doing that because that's

12   how it's supposed to work.  Your attorneys are

13   speaking on your behalf, and I can see that you have

14   been engaged exactly as you should be during this

15   process.  And I want to be sure that you stay in close

16   contact with your attorneys so that you can ask them

17   any questions about what's going forward.

18             They have been very good about letting me

19   know anything that they think needs to be addressed,

20   either they think themselves and/or you want them to

21   say that.  So I definitely want you to continue to be

22   engaged in that process.

23             And I appreciate everybody's hard work.  I

24   appreciate everybody who had to stay late.  I think

25   it's better to finish tonight, but I am aware, for

**Exhibit E, pg. 651**

1   instance, Mr. Chatrie, you still have a drive, which

2   means other folks are driving with you.  So I just

3   please ask, be safe, and thank you for your good work.

4   All right?

5           THE DEFENDANT:  Thank you, Your Honor.

6           (The proceedings were adjourned at 7:30 p.m.)

7

8       I, Diane J. Daffron, certify that the foregoing is

9    a correct transcript from the record of proceedings

10   in the above-entitled matter.

11

12                  /s/
    _____    _____

13   DIANE J. DAFFRON, RPR, CCR       DATE

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit E, pg. 652**