UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. 21-CR-687 (RC) |
| Plaintiff, | ) | |
| v. | ) | MR. RHINE'S MOTION TO DISMISS COUNTS 1 AND 2 |
| DAVID CHARLES RHINE, | ) | |
| Defendant. | ) | |

The government charged Mr. Rhine with trespass and disorderly conduct in a "restricted area." Although the statutory language and legislative history make clear that the statute was intended to criminalize encroachment on areas restricted *by the Secret Service*, the government has conceded that the Secret Service did not restrict the relevant area here. Further, the statute plainly applies to restricted areas where people protected by the Secret Service are *temporarily visiting*. Yet the government alleges here only that a Secret Service protectee was present at his regular place of work. The government's charges here do not constitute crimes under 18 U.S.C. § 1752 as properly interpreted. In filing these charges against Mr. Rhine and others similarly situated, the government asks this Court to stretch the statute's meaning to an absurdly broad degree. The Court should reject this attempt.

In the alternative, should the Court accept the government's interpretation, the statute, and its use here, are unconstitutional. The government's interpretation of the statute immensely expands the government's power to prosecute people under the statute in violation of the non-delegation doctrine, the Fifth Amendment, and the First

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

Amendment. If the Court agrees with the government's interpretation, the Court must nonetheless dismiss Counts 1 and 2 because the statute is unconstitutional.

## I.   STATEMENT OF FACTS

The government charged Mr. Rhine by information with multiple misdemeanor charges related to the events of January 6, 2021. As relevant to this motion, Count 1 of the Information charges Mr. Rhine with entering and remaining in a restricted building or grounds:

> On or about January 6, 2021, in the District of Columbia, DAVID CHARLES RHINE did knowingly enter and remain in a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was temporarily visiting, without lawful authority to do so.

Dkt. No. 8 at 1. The government alleges this violated 18 U.S.C. § 1752(a)(1).

In Count 2 of the Information, the government charges Mr. Rhine with disorderly conduct in a restricted building or ground:

> On or about January 6, 2021, in the District of Columbia, DAVID CHARLES RHINE did knowingly, and with intent to impede and disrupt the orderly conduct of Government business and official functions, engage in disorderly and disruptive conduct in and within such proximity to, a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was temporarily visiting, when and so that such conduct did in fact impede and disrupt the orderly conduct of Government business and official functions.

Dkt. No. 8 at 2. The government alleges this violated 18 U.S.C. § 1752(a)(1).

Notably—the government has not alleged that the Secret Service restricted the United States Capitol. Rather, the government has confirmed that the Capitol Police, not the Secret Service, attempted to restrict the Capitol on January 6. *See United States v. Griffin*, 549 F. Supp. 3d 49, 53 (D.D.C. 2021). The government has additionally not alleged that Mr. Rhine himself took any actions or made any statements or acted in any way that was violent, offensive, or disruptive. *See* Dkt. No. 1.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1    This motion follows.

2    **II.    ARGUMENT**

3         The Court should dismiss Counts 1 and 2 of the information because (A) the
4    charges fail to allege a crime because they do not allege that the Secret Service
5    restricted the area in question; (B) the charges fail to allege a crime because they do not
6    allege that a Secret Service protectee was "temporarily visiting;" (C) the statute, and its
7    employment by the government here, violate the non-delegation doctrine; (D) the
8    statute is unconstitutionally vague and, as to Count 2, infringes on protected speech;
9    and (E) the subsection charged in Count 2 is a content-based restriction on speech,
10   which violates the First Amendment.

11        **A.    Counts 1 and 2 fail to allege an offense because they do not allege that
            the Secret Service restricted the area allegedly encroached upon.**

12        Rule 7 of the Federal Rules of Criminal Procedure provides that "the indictment
13   or information must be a plain, concise, and definite written statement of the essential
14   facts constituting the offense charged . . ." Fed. R. Crim. P. 7(c)(1). This rule performs
15   three constitutionally required functions: (1) fulfilling the Sixth Amendment right to be
16   informed of the nature and cause of the accusation; (2) preventing a person from being
17   subject to double jeopardy, as required by the Fifth Amendment; and (3) protecting
18   against prosecution for crimes based on evidence not presented to the grand jury, as
19   required by the Fifth Amendment. *See, e.g.*, *United States v. Walsh*, 194 F.3d 37, 44 (2d
20   Cir. 1999).

21        Rule 12 provides that a defendant may move to dismiss the pleadings on the basis
22   of a "defect in the indictment or information," including a "lack of specificity" and a
23   "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(iii),(v). The Supreme Court
24   held that a charging document must "fairly inform[] a defendant of the charge against
25   which he must defend" and "must be accompanied with such a statement of the facts and

MOTION TO DISMISS
(*United States v. Rhine*, 21-CR-687) - 3

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." *Hamling v. United States*, 418 U.S. 87, 117–18 (1974). Unlike an indictment, however, an information has not been subject to the probable-cause review of a grand jury. *Cf. United States v. Harmon*, 474 F. Supp. 3d 76, 86 (D.D.C. 2020) ("'[A] court's use of its supervisory power to dismiss **an indictment** directly encroaches upon the fundamental role of the grand jury.'") (quoting *United States v. Ballestas*, 795 F.3d 138, 148 (D.C. Cir. 2015)) (emphasis added).

Mr. Rhine is charged with two counts of violating 18 U.S.C. § 1752 for "entering and remaining in a Restricted Building or Grounds," and engaging in "disorderly and disruptive conduct in a Restricted Building or Grounds." When this statute was enacted, it is clear that the purpose was to designate the United States Secret Service ("USSS") to restrict areas for temporary visits by the President. *See* S. Rep. No. 91-1252 (1970). At the time of enactment, the USSS was part of the Treasury. Section 1752 grants the Treasury Secretary the authority to "designate by regulations the buildings and grounds which constitute the temporary residences of the President." 18 U.S.C. § 1752(d)(1). It also allows the Secretary "to prescribe regulations governing ingress or egress to such buildings and grounds to be posted, cordoned off, or otherwise restricted areas where the President may be visiting." 18 U.S.C. § 1752(d)(2). There is nothing in the legislative history (or the statutory language) to suggest that anyone other than the USSS has the authority to so restrict the areas surrounding any other space such that encroaching on that restricted area would be criminal under section 1752.

The USSS's duties and responsibilities are outlined in 18 U.S.C. § 3056, which include:

> (e)(1): When directed by the President, the United States Secret Service is authorized to participate, under the direction of the Secretary of Homeland Security, in the planning, coordination, and implementation of security operations at special events of national significance, as determined by the President.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

(2) At the end of each fiscal year, the President through such agency or office as the President may designate, shall report to the Congress—
> (A) what events, if any, were designated special events of national significance for security purposes under paragraph (1); and
> (B) the criteria and information used in making each designation. §3056(e)(1)(2)(A)(B).

The statute does not state that any other agency is permitted to designate events for security purposes and only explains that the USSS would be under the designation of the Department of Homeland Security instead of the Treasury Department. The statute makes the exclusive role of the USSS even clearer in § 3056(g), which states:

> The **United States Secret Service shall be maintained as a distinct entity** within the Department of Homeland Security **and shall not be merged with any other Department function**. **No personnel and operational elements of the United States Secret Service shall report to an individual other than the Director of the United States Secret Service**, who shall report directly to the Secretary of Homeland Security without being required to report through any other official of the Department.

18 U.S.C. § 3056(g) (emphases added).

The Information charges Mr. Rhine with remaining or entering without lawful authority well as disorderly conduct in a "restricted building or grounds," however it does not allege that the USSS designated the area in question as being restricted. Nor could it do so now because in *United States v. Griffin*, 549 F. Supp. 3d 49 (D.D.C. 2021), the government conceded that it was the United States Capitol Police that attempted to designate the area as restricted that day and not the USSS. *Id*. at 53. The court in *Griffin* denied a motion to dismiss a § 1752 charge on the ground that the statute (Congress) did not specifically state who must designate the "restricted areas."[1]

However, the plain language of 18 U.S.C. § 1752(c)(B), defines "restricted building or grounds" as a "building or grounds where the President or other person

---

[1] Mr. Rhine acknowledges that there are now several other District Court Judges who have rejected similar arguments. However, Mr. Rhine maintains this motion is meritorious.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

protected by the Secret Service is or will be temporarily visiting." Since it is the Secret Service who protects the President or "other person," it is the Secret Service who must designate the area "restricted." The legislative history bolsters this interpretation.[2]

The court in *Griffin* also hypothesized that the President would be unable to rely on the military fortification at Camp David already in existence when he visits that facility if the Secret Service was not the only entity with the statutory authority to restrict the area. See *Griffin*, 549 F. Supp. 3d at 57. However, Camp David is a military installation and is not a "public forum" that needs an entity to "cordon off" areas and restrict them in light of a Presidential visit. Military bases have security and are not otherwise open to the public. And each military installation is subject to other laws that protect the facility, and those within it, from intruders. *See, e.g.*, 18 U.S.C. § 1382 (barring any person from entering any military installation for any purpose prohibited by law). Military bases are heavily guarded and have entrance and exit points and are different than federal buildings that need sections to be "cordoned" off in order for the general public to know which area is restricted. For these reasons, the example offered by the *Griffin* court is inapposite and does not support the court's decision. Indeed, there is also a trespass law that criminalizes intrusion into non-public areas of the Capitol Building by the public. *See* 40 U.S.C. § 5104(e)(2)(A), (B). However, the government does not allege that Mr. Rhine violated that law. Rather, the government advocates an exceedingly broad interpretation of section 1752 to criminalize presence in public areas of a public government building.

[2] Congress enacted 18 U.S.C. § 1752 as part of the Omnibus Crime Control Act of 1970. Public Law 91- 644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan 2. 1971). At that time, the USSS was a part of the Treasury Department. The Senate Judiciary Committee report accompanying the current version of section 1752 noted that there was no federal statute that specifically authorized the Secret Service to restrict areas where the President maintains temporary residences and the senators explained that the key purpose of the bill was to provide that authority to the Secret Service. S. Rep. No. 91-1252 (1970).

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Furthermore, if a deficiency in a statute creates an absurd result or creates arbitrary enforcement, it should not be enforced until it is amended to provide clarity and provide fair notice to a defendant. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The *Griffin* Court's reasoning creates a different kind of absurd result—that anyone claiming to be a part of law enforcement could post a sign designating an area as restricted and a person could then be prosecuted federally for trespassing because they "willfully" ignored the sign if a Secret Service protectee planned to visit the area.

**B.     Counts 1 and 2 fail to allege an offense because they do not allege that a person protected by the Secret Service was "temporarily visiting" the relevant area.**

Under the plain language of 18 U.S.C. § 1752, the statute does not apply here. Section 1752 prohibits conduct in or near "any restricted building or grounds." The statute expressly defines the term "restricted buildings or grounds" as follows:

> (1) the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—
> > (A) of the White House or its grounds, or the Vice President's official residence or its grounds;
> > (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or
> > (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance.

18 U.S.C. § 1752(c); *see United States v. Samira Jabr*, 18-CR-0105, Dkt. No. 31 at 12, (D.D.C., May 16, 2019), *aff'd*, 4 F.4th 97 (D.C. Cir. 2021).

Counts 1 and 2 charge Mr. Rhine with conduct "in a restricted building and grounds, that is, any posted, cordoned-off and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was ***temporarily visiting*** . . ." Dkt. No. 8, (emphasis added). The government's attempt to shoehorn Mr. Rhine's conduct into the statute fails. Accordingly, those two counts should be dismissed.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

The "United States Capitol and its grounds" do not automatically constitute "restricted buildings or grounds" under any prong of section 1752(c)(1). Nor did the Capitol grounds become "restricted grounds" on January 6, 2021, because of a "temporary vice-presidential visit," as the government asserts. The plain meaning of "temporary" is "lasting for a time only." Black's Law Dictionary, Temporary (11th Ed., 2019). "Visiting" is defined as "invited to join or attend an institution for a limited time." Merriam-Webster, Visiting, https://www.merriam-webster.com/dictionary/visiting (last visited Oct. 15, 2022). Together, the phrase "temporarily visiting" connotes temporary travel to a location where the person does not normally live or work on a regular basis. The former Vice President was not "temporarily visiting" the Capitol on January 6, 2021. The Capitol is a federal government building in the District of Columbia, where he lived and worked. Moreover, he actually worked at the Capitol Building and grounds—it was his place of employment. In his official capacity as the "President of the Senate," he had a permanent office "within the United States Capitol and its grounds." The Vice President was not "visiting" the Capitol Building, he was working there, carrying out his sworn official duties by "presiding," over the vote count ceremony. *See* 3 U.S.C. § 15 ("Congress shall be in session on the sixth day of January succeeding every meeting of the electors. The Senate and House of Representatives shall meet in the Hall of the House of Representatives at the hour of 1 o'clock in the afternoon on that day, and ***the President of the Senate shall be their presiding officer***.") (emphasis added).

Past cases support this plain, common-sense reading of the statute, as they involve conduct in and near areas where the President and Vice President were clearly "temporarily visiting." *See, e.g.*, *United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005) (defendant entered and remained in a restricted area at an airport in South Carolina where the President was visiting for a political rally); *Blair v. City of Evansville, Ind.*, 361 F. Supp.2d 846 (S.D. Indiana 2005) (defendant charged with 18 U.S.C. § 1752 at protest

MOTION TO DISMISS
(*United States v. Rhine*, 21-CR-687) - 8

FEDERAL PUBLIC DEFENDER
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

during Vice President's visit to a center in Evansville, Indiana). These cases all involve the President and Vice President actually traveling outside of D.C., where they live and work, and "visiting" another location for a "temporary" purpose. As a result, those cases are consistent with the plain meaning of section 1752(c)(1)(B).

Here, by contrast, former Vice President Pence was not traveling to a speaking event or a political rally. He was meeting with other government officials in a federal government building where he had a permanent office as part of his official duties as Vice President/President of the Senate. Thus, he was not "temporarily visiting" the Capitol building as required by the plain language of 18 U.S.C. § 1752. The allegation in Counts 1 and 2 that "the Vice President was temporarily visiting" the "United States Capitol and its grounds," Dkt. No. 8, fail to allege the required element of section 1752 that a person protected by the Secret Service be temporarily visiting a restricted area.

### C. The statute, and its use by the government against Mr. Rhine and similarly situated people, violate the non-delegation doctrine.

The Court should dismiss Counts 1 and 2, charges under section § 1752, because the statute violates the non-delegation doctrine and thus violates due process. The statute delegates to the executive branch the power to define a crime and provides no meaningful intelligible principle in this delegation. Furthermore, the government's interpretation of the statute to allow it to charge Mr. Rhine under the statute here constitutes a power grab by the Executive Branch without any clear authorization for such delegation from Congress. The Court should dismiss the counts charged under this statute.

The Constitution establishes a tripartite system of government that divides power among the three federal branches. While the branches must work together, no branch can do a task exclusively assigned to another branch. "[D]iffus[ing] power" in three separate, co-equal branches helps to "secure liberty[.]" *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring). The non-delegation doctrine protects

MOTION TO DISMISS
(*United States v. Rhine*, 21-CR-687) - 9

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

the constitutional separation of powers by prohibiting Congress from delegating its core legislative powers to another branch. As Chief Justice Marshall explained, Congress may not "delegate . . . powers which are strictly and exclusively legislative." *Wayman v. Southard*, 10 Wheat. 1, 42–43 (1825). This protects "'the integrity and maintenance of the system of government ordained by the Constitution.'" *Mistretta v. United States*, 488 U.S. 361 (1989) (quoting *Field v. Clark*, 143 U.S. 649, 692 (1892)).

The core of the "legislative function" that the Constitution prohibits Congress from delegating is a "determination of . . . legislative policy" that results in the "promulgation" of "a defined and binding rule of conduct[.]" *Yakus v. United States*, 321 U.S. 414, 424 (1944). The prohibition against Congress delegating its core legislative function has particular salience in the criminal context. "[D]efining crimes," the Supreme Court has said, is a "legislative function," *United States v. Evans*, 333 U.S. 483, 486 (1948), and Congress cannot delegate away "the inherently legislative task" of determining what conduct "should be punished as crimes," *United States v. Kozminski*, 487 U.S. 931, 949 (1988).

Of course, Congress may "seek[] assistance, within proper limits, from its coordinate Branches." *Touby v. United States*, 500 U.S. 160, 165 (1991). "Thus, Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors." *Id*. That means Congress can permit an executive-branch official to fill in the details of a legislative scheme, as long as Congress "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the authority] is directed to conform." *Mistretta*, 488 U.S. at 372 (quoting *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406 (1928)).

In 1935, the Supreme Court for the first time struck down a statute on non-delegation grounds. See *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Ref. Co. v. Ryan*, 293 U.S. 388 (1935). First, in *Panama Refining*, the

MOTION TO DISMISS
(*United States v. Rhine*, 21-CR-687) - 10

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Court struck down a statute authorizing the President to criminalize the interstate transportation of petroleum "produced or withdrawn" in violation of state law. 293 U.S. at 406, 414–19. Next, in *Schechter Poultry*, the Court struck down a statute authorizing the President to create a "code of fair competition" for the poultry industry. 295 U.S. at 525, 529–34. With these statutes, Congress had failed to lay out a "legislative objective," "[p]rescribe the method of achieving that objective," and lay "down standards to guide" the exercise of executive discretion in achieving that objective. *See Yakus*, 321 U.S. at 423.

Since *Panama Refining* and *Schechter Poultry*, Congress has generally provided an intelligible principle when enacting statutes that include delegated authority. This has avoided non-delegation problems for a long time. *See Mistretta*, 488 U.S. at 373 (citing cases). For example, in *Touby*, the Court held that Congress did not violate the non-delegation doctrine in the Controlled Substances Act. 500 U.S. at 165–66. There, the defendant argued that Congress had violated the non-delegation doctrine by allowing executive-branch officials to "schedule a drug temporarily" and then attaching criminal liability to manufacturing that substance. *Id*. at 165–66. The Court did not dispute that giving an executive branch official the ability to define what constituted criminal behavior was a delegation. The Court held, however, that it was a permissible delegation because Congress gave the executive branch official sufficient guidance. *Id*. at 166. Specifically, Congress, by statute, had allowed the Attorney General to schedule a drug temporarily only "'to avoid an imminent hazard to the public safety.'" *Id*. (quoting 21 U.S.C. § 811(h)(1)). Congress further listed by statute "three factors" for the Attorney General to use to make that determination. *Id*. (citing 21 U.S.C. §§ 811(c)(4)–(6), 811(h)(3)). This detailed guidance meant the statute did not violate the non-delegation doctrine. *Id*.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1   The Supreme Court has recently made clear that the lower federal courts should

2   approach with caution the government's attempt to read narrowly the requirement of an

3   intelligible principle. Rather the Court has viewed such claims of authority by agencies

4   with great skepticism. In *Gundy v. United States*, 139 S. Ct. 2116 (2019), the Court

5   addressed whether Congress violated the non-delegation doctrine in the Sex Offender

6   Registration and Notification Act ("SORNA"). In SORNA, Congress provided that the

7   "Attorney General shall have the authority to specify the applicability" of the Act to those

8   convicted of sex offenses before the Act took effect. 34 U.S.C. § 20913(d). Justice

9   Kavanaugh did not take part in the case.

10   A sharply divided Court upheld the delegation. The four-Justice plurality

11   reaffirmed that Congress "may not transfer to another branch 'powers which are strictly

12   and exclusively legislative.'" 139 S. Ct. at 2123. It held, however, that Congress had not

13   done that in SORNA. Congress had "supplied an intelligible principle" to the Attorney

14   General to guide his "use of discretion." *Id*. The plurality, reviewing SORNA's test and

15   structure, affirmed that Congress meant for "SORNA's registration requirements to apply

16   to pre-Act offenders." *Id*. at 2124. The "Attorney General's role," then, was "limited":

17   he had to "apply SORNA to pre-Act offenders as soon as he thought it feasible to do so."

18   *Id*. at 2125–26. As a result, the plurality affirmed the defendant's conviction.

19   Justice Alito concurred, concluding that he could not "say that the statute lacks a

20   discernable standard" under the Court's case law. *Id*. at 2131. He stated, however, that

21   he might vote differently in the future with a full Court. *Id*.

22   Justice Gorsuch in dissent, joined by Chief Justice Roberts and Justice Thomas,

23   disagreed with the majority about the scope of the delegated authority. *Id*. at 2131–33

24   (Gorsuch, J., dissenting). More generally, the dissenters believed that the Court should

25   expand the non-delegation doctrine and that the delegation in SORNA failed that stricter

26   standard. *See id*. at 2133–42. *Gundy* suggests, then, that courts should construe the

1   "intelligible principle" narrowly. And that suggests that this Court should approach with

2   caution any government attempt to interpret it broadly.

3         More recently, the Court struck down regulatory schemes and agency actions

4   under the non-delegation doctrine's "major questions" doctrine. In *West Virginia v.*

5   *E.P.A.*, the Court considered whether a statute that delegated to the Environmental

6   Protection Agency (EPA) the power to determine the "best system of emission reduction"

7   (BSER) prior to setting emissions guidelines allowed the agency to set new future limits

8   or goals for the nation's overall mix of energy sources (as opposed to simply regulating

9   conduct at a power plant level). *See* 142 S. Ct. 2587, 2607 (2022).

10        To resolve the question presented, the Court invoked the major questions

11  doctrine—namely, whether context and history indicate that Congress intended to

12  delegate the power in question to the agency. "Where the statute at issue is one that

13  confers authority upon an administrative agency, that inquiry must be 'shaped, at least in

14  some measure, by the nature of the question presented'—whether Congress in fact meant

15  to confer the power the agency has asserted." *Id.* at 2607–08 (quoting *FDA v. Brown &*

16  *Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).

17        The Court recited recent examples of agency overreach—agencies attempting to

18  exercise authority beyond that delegated to them by Congress. For example, the Court

19  invalidated the Food and Drug Administration (FDA)'s attempt to severely regulate and

20  even ban tobacco products under its delegated authority over drugs and devices. *Brown*

21  *& Williamson,* 529 U.S. at 160. The Court struck down the EPA's interpretation of the

22  word "air pollutant" in a way that would have given the EPA the power to regulate

23  millions of smaller businesses that had not previously been subject to EPA regulation.

24  *Utility Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014). And last year, the Court

25  rejected the Centers for Disease Control and Prevention (CDC)'s attempt to institute a

26  nationwide eviction moratorium in order to prevent the spread of COVID-19. *Alabama*

1   *Assn. of Realtors v. Department of Health and Human Servs.*, 141 S. Ct. 2485, 2487–90

2   (2021). *See West Virginia*, 142 S. Ct. at 2607–08.

3          Notably, in all instances, the agency's reading of the statute in question was

4   plausible. Yet the Court rejected readings that substantially expanded an agency's reach

5   or authority because, "given the various circumstances, 'common sense as to the manner

6   in which Congress [would have been] likely to delegate' such power to the agency at

7   issue, [] made it very unlikely that Congress had actually done so." *West Virginia*, 142 S.

8   Ct. at 2609 (quoting *Brown & Williamson*, 529 U.S. at 133). The Court recognized that

9   "in certain extraordinary cases, both separation of powers principles and a practical

10  understanding of legislative intent make us 'reluctant to read into ambiguous statutory

11  text' the delegation claimed to be lurking there.'" *Id.* (quoting *Utility Air*, 572 U.S. at

12  324). A mere "plausible reading" of the text is insufficient. Instead, the agency must

13  demonstrate "clear congressional authorization" for the power claimed. *Id.*

14         The government's charges under section 1752 here violate the non-delegation

15  doctrine both because section 1752 lacks an "intelligible principle" for its enforcement,

16  *see Gundy*, 139 S. Ct. at 2123, and because there is no "clear congressional

17  authorization," *see West Virginia*, 142 S. Ct. at 2609, for the government's use of the

18  statute to prosecute Mr. Rhine and others similarly situated here. The Court should

19  therefore dismiss Counts 1 and 2 of the Information.

20         First, section 1752 fails to provide an intelligible principle for the Secret Service

21  (or, per the government, any law enforcement agency) to define restricted areas and

22  times. The statute prohibits encroachment on any restricted buildings or grounds, defined

23  as "any posted, cordoned off, or otherwise restricted area . . . of a building or grounds

24  where the President or other person protected by the Secret Service is or will be

25  temporarily visiting[.]" 18 U.S.C. § 1752(c)(1)(B).

26

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

The statute does not provide any parameters, purposes, or other guidance to the Secret Service in deciding the spatial area to restrict or the length of time to so restrict it (for example, it does not even require that the restriction be "reasonable" or "necessary to protect the safety of the protected person"). Under the statute, the Secret Service could restrict 20 miles of public roadway because the President wanted to walk his dog around the block without having to look for cars, and a person who dared to cross into that area would be made criminal by the Secret Service's restriction. Additionally, the statute criminalizes encroachment on a restricted area where a Secret Service protectee "is or will be" temporarily visiting. *Id*. There is no intelligible principle that limits or guides the length of time before a protectee's visit during which the Secret Service may restrict the space. For example, if the First Lady planned to give a speech at a college, the Secret Service, under the statute, may elect to restrict access to the college's auditorium and surrounding classrooms for a month ahead of the planned visit—making it criminal for any professor or student to try to hold class in their usual space during that time.

Further, Congress did not specify what methods should be used to restrict access, whether it be by creating barriers, staffing security, etc. Congress did not specify the manner of restricting—including what type of notice needs to be given to individuals pertaining to the restricted nature of certain areas. Finally, the statute requires ***no causal nexus*** between the restriction and the temporary visit of a Secret Service protectee. Without such guidance, the statute is impermissibly would allow the Executive branch to define a crime. As such, it is unconstitutional and Counts 1 and 2 must be dismissed.

Second, the government's use of the statute against Mr. Rhine, and others similarly situated, violates the major questions doctrine. As detailed above, the government through the Department of Justice (DOJ) seeks here to exercise its authority under section 1752 for encroachment on an allegedly restricted area that (1) was restricted

MOTION TO DISMISS
(*United States v. Rhine*, 21-CR-687) - 15

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

by the Capitol Police, ***not*** the Secret Service; and (2) was a Secret Service protectee's place of employment, ***not*** a place he was temporarily visiting.

As detailed above, both the plain language of the statute ***and the history and context of the statute*** make clear that Congress, under the statute, intended to delegate to the DOJ the authority to prosecute people who encroached on the Secret Service's restrictions in areas where protectees were temporarily visiting. *See* Section I.A, I.B, *supra*.[3] The government here advocates for an interpretation of the statute that allows the DOJ to prosecute anyone who encroaches on an area restricted by ***any agency*** if the area also happens to be a place where a protectee of the Secret Service is or will be ***present***, even if it is their regular and official place of work. *See id*. This is an ***exceedingly broad*** interpretation of the DOJ's authority under the statute and a substantial expansion of the DOJ's authority. Under this reading, the DOJ could prosecute a person federally for walking past a sign posted by a local Parks and Recreation Department in Indiana indicating a park was closed after dusk if the First Lady planned to visit that park the next morning. Such broad reading is extreme, and raises serious constitutional concerns regarding federalism and separation of powers.

Even if the government's interpretation were "plausible," neither the statute nor the legislative history evidence a "clear congressional authorization" for the DOJ to exercise its authority under section 1752 at this magnitude. *West Virginia*, 142 S. Ct. at 2609. Just as in *West Virginia*, *Brown & Williamson*, *Utility Air*, and *Alabama Assn. of Realtors*, the government's interpretation and use of section 1752 represent an extreme expansion of its claimed authority under the statute. As in those case, the Court should reject the government's power grab here, because "given the various circumstances, 'common sense as to the manner in which Congress [would have been] likely to delegate'

---

[3] The history, context, and pattern of enforcement of section 1752 is detailed at length in *United States v. Couy Griffin*, 21-CR-00092-TNM, Dkt. No. 30 at 6–13.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

such power to the agency at issue, [] made it very unlikely that Congress had actually done so." *West Virginia*, 142 S. Ct. at 2609 (quoting *Brown & Williamson*, 529 U.S. at 133). Just as in *Utility Air*, the government's reading of the statute gives it the power to control "millions" more people than the statute has ever before regulated. 573 U.S. at 324.

Notably, Congress **separately** created a crime of trespass and disorderly conduct applicable to the Capitol Building and grounds. *See* 40 U.S.C. § 5104(e)(2)(A), (B) (trespass into non-public areas of the Capitol), and (D) (disorderly conduct). This is the criminal statute that Congress enacted to protect government officials, including the Vice President and President of the Senate, at the Capitol. Congress specifically *did not* make criminal trespass into *any* part of the Capitol, as the Capitol is a public government building and a traditional public forum.

The DOJ is seemingly dissatisfied with Congress's decisions about what conduct at the Capitol should be deemed criminal. But this dissatisfaction does not give the DOJ authority to re-write the criminal code. The DOJ's interpretation of section 1752 does just that. It makes criminal that which Congress elected *not to* make criminal. Even if the government has convinced some Courts in this district that its reading of section 1752 is "plausible," it has not and cannot demonstrate a "clear congressional authorization" for the DOJ to use section 1752 to prosecute Mr. Rhine and others similarly situated. *West Virginia*, 142 S. Ct. at 2609. The Court should therefore dismiss Counts 1 and 2 of the Information.

### D.    The statute—18 U.S.C. § 1752—is unconstitutionally vague and infringes on protected speech because it fails to make clear the special or temporal parameters of its use.

The Court should dismiss Counts 1 and 2 of the information because the statute is unconstitutionally vague and overbroad. If the Court rejects Mr. Rhine's arguments in sections I.A and I.B above, and accepts the government's reading of the statute, then

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

section 1752 is so broad and its parameters so unclear that an ordinary person could not discern what conduct is criminalized by the statute. Furthermore, this breadth and vagueness invites arbitrary enforcement of the statute. Indeed, Count 2—disorderly conduct—additionally encroaches on constitutionally protected speech and risks chilling the exercise of First Amendment rights. The Court should dismiss Counts 1 and 2 because the statute is unconstitutionally vague.

### 1. Vague or overbroad criminal laws violate the core of due process and may not stand.

The government violates the Fifth Amendment's Due Process Clause "by taking away someone's life, liberty, or property" based on a "vague" criminal law. *Johnson v. United States*, 576 U.S. 591, 595 (2015). "A statute can be impermissibly vague for either of two independent reasons." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). First, a statute is impermissibly vague if it "fails to give ordinary people fair notice of conduct it punishes[.]" *Johnson*, 576 U.S. at 595. Second, a statute is impermissibly vague if it "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732. The vagueness "doctrine guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018). The prohibition on vagueness in criminal laws is a bedrock constitutional requirement, and "a statute that flouts it 'violates the first essential of due process.'" *Johnson v. United States*, 576 U.S. at 595 (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)).

A statute can be unconstitutionally vague either facially or as applied.[4] A statute fails to provide constitutionally sufficient notice, and will be facially void for

---

[4] Mr. Rhine does not waive any as-applied challenges, but he recognizes that they are premature at this juncture. *See United States v. Andries*, No. CR 21-93 (RC), 2022 WL 768684, at *1 (D.D.C. Mar. 14, 2022).

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

vagueness, if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); *see also Johnson*, 576 U.S. at 595 ("Our cases establish that the Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement.").

In *Kolender v. Lawson*, the Supreme Court emphasized the fundamental importance of "the requirement that a legislature establish minimal guidelines to govern law enforcement" and cautioned that this is even more important than the notice component of the vagueness doctrine. 461 U.S. 352, 357–58 (1983). To be clear, transgressing either provides a basis to declare a statute void for vagueness, but the Supreme Court has emphasized the importance of the second component as a check on law enforcement power and protection against targeting of disfavored groups. The Supreme Court admonished that where the legislature fails to clearly delineate what conduct is prohibited, "a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Id.* at 358 (quoting *Smith v. Goguen*, 415 U.S. 566, 575 (1974)).

The potential for arbitrary enforcement is an even more acute concern when a statute is enforced against disfavored social groups. In such cases, a vague statute may "furnish[] a convenient tool for 'harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure.'" *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170 (1972) (quoting *Thornhill v. Alabama*, 310 U.S. 88, 97-98 (1940)).

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

2.    **Courts apply heightened scrutiny when the breadth or vagueness of a law may chill or intrude upon First Amendment protected activities.**

Where First Amendment concerns are implicated, scrutiny of vagueness and overbreadth is heightened given the possibility that a criminal statute may intrude upon constitutionally protected activity. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010). "To trigger heightened vagueness scrutiny, it is sufficient that the challenged statute regulates and potentially chills speech which, in the absence of any regulation, receives some First Amendment protection." *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001).

The First Amendment provides that "Congress shall make no law . . . abridging . . . the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." Criminal statutes "that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application." *City of Houston v. Hill*, 482 U.S. 451, 459 (1987). When a law chills First Amendment protected activities, "[t]he objectionable quality of vagueness and overbreadth does not depend upon absence of fair notice to a criminally accused or upon unchanneled delegation of legislative powers, but upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application." *N.A.A.C.P. v. Button,* 371 U.S. 415, 432–33 (1963).

A statute is constitutionally overbroad if it prohibits constitutionally protected activity—here, speech protected under the First Amendment. "The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002). Of particular concern for a criminal statute such as section 5104, "the penalty to be imposed is relevant in determining whether demonstrable

MOTION TO DISMISS
(*United States v. Rhine*, 21-CR-687) - 20

FEDERAL PUBLIC DEFENDER
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

overbreadth is substantial." *New York v. Ferber*, 458 U.S. 747, 775 (1982). For this reason, the Court has long allowed individuals to "attack overly broad statutes even though the conduct of the person making the attack is clearly unprotected and could be proscribed by a law drawn with the requisite specificity." *Id*. at 769.

The Court recognizes a compelling reason justifying permitting people to challenge statutes for overbreadth even if their own personal conduct is not constitutionally protected. This doctrine is necessary due to "the sensitive nature of protected expression" and concern that laws that facially infringe First Amendment rights will have a chilling effect upon constitutionally protected activity. *Id*. at 768. In such cases, "persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions by a statute susceptible of application to protected expression." *Id*. (quoting *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 634 (1980)). Given this, the law recognizes that people whose conduct the Constitution does not protect should be able to challenge overbroad laws as a protective mechanism for people whose conduct is constitutionally protected.

In the First Amendment context, "a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449, n. 6 (2008)). In conducting an overbreadth analysis, a court must first construe the statute. *United States v. Williams*, 553 U.S. 285, 293 (2008). The next step is to ask whether the statute, properly construed, "criminalizes a substantial amount of protected expressive activity." *Id*. at 297; *United States v. Montgomery*, No. CR 21-46 (RDM), 2021 WL 6134591, at *23 (D.D.C. Dec. 28, 2021).

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

### 3.    Both subsections of section 1752(a) are unconstitutionally vague and overbroad.

Both 18 U.S.C. § 1752(a)(1) (trespass) and (a)(2) (disorderly conduct) are unconstitutionally vague and overbroad. If the Court accepts the government's reading of the statute, then transgressing any restriction by any agency—be it local or federal—when a Secret Service protectee happens to be visiting *or* plans to visit is a federal crime. This is an exceedingly broad reading of the statute, and gives neither ordinary people nor law enforcement a clear understanding of what is criminal. Additionally, many of the same reasons the statute lacks an "intelligible principle" to guide its enforcement (discussed above), it also is unconstitutionally vague.

First, the statute is overbroad and vague because the government's interpretation makes criminal any encroachment past the restriction of ***any*** agency. And, the statute on its face requires no nexus between the agency restricting an area and the visit or planned visit of a Secret Service protectee. This breadth invades actions that are commonly understood to be the purview of states and localities, or sometimes not criminal at all.

Second, the statute is overbroad and vague for its lack of temporal or spatial limits. There is no indication of the length of time before the visit of a protectee that an area may be "restricted" under the statute. Under the statute, an area could be restricted for an hour before a planned visit, a day, a week, a month, a year. No boundary nor notice is given to allow ordinary people to conform their behavior to the law. The statute further applies to any "area" that has been restricted, and where a protectee is or will be temporarily visiting. 18 U.S.C. § 1752(c). There is no limit, nor even guidance (e.g. reasonable, or necessary to protect the protectee), to give notice on the scope of "area" that may be restricted.

The Supreme Court has similarly found vagueness in statutes that rest on the fuzzy boundary standards of "neighborhood" and "locality." In *Connally*, 269 U.S. 285,

the Court held that "both terms are elastic and, dependent upon the circumstances, may be equally satisfied by areas measured by rods or by miles." *Id*. at 395. *Connally* concerned an Oklahoma statute requiring that "not less than the current rate of per diem wages in the locality where the work is performed shall be paid to laborers . . ." *Id*. at 388. Criminal penalties were imposed for violations. The Court found the statute unconstitutionally vague. The vagueness problem was not just with the terms "neighborhood" and "locality":

> Certainly, the expression "near the place" leaves much to be desired in the way of a delimitation of boundaries; for it at once provokes the inquiry, "how near?" . . . The result is that the application of the law depends not upon a word of fixed meaning in itself, or one made definite by statutory or judicial definition, or by the context or other legitimate aid to its construction, but upon the probably varying impressions of juries as to whether given areas are or are not to be included within particular localities. The constitutional guaranty of due process cannot be allowed to rest upon a support so equivocal.

269 U.S. at 395. The term "area" is equally vague.

Third, under the government's interpretation, the statute is exceedingly broad and vague as to the events or "visits" that may occasion qualifying restrictions. Under the government's interpretation, the Vice President was "temporarily visiting" his regular place of work. Under this interpretation, essentially *anywhere* except possibly a protectee's home is a place they are "temporarily visiting." This could be any public space and many private spaces. This includes public government buildings and sites of interest. This could include religious institutions and places of worship, should a protectee plan to or actually visit.

Fourth, the statute provides scant guidance on what "restriction" renders an area off limits. The statute applies to "any posted, cordoned off, or otherwise restricted area." This vague and all-encompassing description of a restricted area does not allow ordinary citizens notice of how to discern if and when an area is restricted under the

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

statute. Even Honorable John D. Bates of this District reasoned, "Congress's failure to specify how an area becomes 'restricted' just means that the statute does not require any particular method for restricting a building or grounds." *United States v. McHugh*, 21-CR-00453-JDB, 2022 WL 296304 at *18 (D.D.C. 2022). The area could thus be restricted by a person in plain clothes telling people to take another route, by a simple "closed" or "private event" sign with no attendant, by a line of chalk, etc. There is nothing to even require that the restriction be visual or at the place of the restricted area, thus an area could be restricted by a broadcast on the radio that a particular street will be closed or a notice on an agency's website. The aspect of the statute is so vague and overbroad that no ordinary citizen could know what to expect.

Finally, the statute includes no causal nexus between restriction of the area and the visit, or anticipated visit, of a Secret Service protectee. For example, a local utility agency could tape off a portion of a street because a sewer main burst. If the Vice President happened to pass through the street or even planned to later that day, a person who crossed the tape to get a better look at the sewer main would be guilty of a federal crime.

Section 1752 is thus so broad and so vague that it "fails to give ordinary people fair notice of conduct it punishes[.]" *Johnson*, 135 S. Ct. at 2556. Of even greater concern, the lack of parameters defining or offering guidance for enforcement of the statute invites unequal enforcement—a harm of immense concern. *See Kolender*, 461 U.S. at 357–58. Congress's failure to clearly define the crime allows "policemen, prosecutors, and juries to pursue their personal predilections." *Id.* at 358. The statute is unconstitutional, and the Court should dismiss Counts 1 and 2.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

    4.       **The subsection—18 U.S.C. § 1752(a)(2)—charged in Count 2 further infringes on First Amendment protected activity and must be dismissed.**

The breadth and vagueness of the disorderly conduct charge under section 1752 additionally violates the First Amendment. In addition to the defects discussed above, the statute leaves key terms—namely "disorderly or disruptive conduct"—undefined. This lack of clarity, and breadth of the prohibited conduct, chills substantial protected speech and invites arbitrary enforcement.

First, the statute criminalizes "disorderly or disruptive conduct." 18 U.S.C. § 1752(a)(2). However, the statute provides no definition of these terms. Notably, disorderly conduct is not a crime at common law, instead, the common law criminalized only breaching the peace, which generally required actions that reasonably would cause another to respond violently. Francis Barry McCarthy, *"Vagrancy and Disorderly Conduct,"* 4 Encyclopedia of Crime and Justice 1589, 1589 (Sanford H. Kadish ed., 1983). However, modern criminalization of disorderly conduct tends to be broader than the old common law crime of breach of the peace. Black's Law Dictionary defines disorderly conduct as "Behavior that tends to disturb the public peace, offend public morals, or undermine public safety." Conduct: Disorderly Conduct, Black's Law Dictionary (11th Ed., 2019).[5]

However, in contrast to disorderly conduct statutes in many other jurisdictions, section 1752 never defines this term. For example, here, in the surrounding District of Columbia, disorderly conduct is defined as:

(a) In any place open to the general public, and in the communal areas of multi-unit housing, it is unlawful for a person to:

---

[5] Black's Law Dictionary defines "disruptive conduct" as "Disorderly conduct in the context of a governmental proceeding." Conduct: Disruptive Conduct, Black's Law Dictionary (11th Ed., 2019).

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

(1) Intentionally or recklessly act in such a manner as to cause another person to be in reasonable fear that a person or property in a person's immediate possession is likely to be harmed or taken;

(2) Incite or provoke violence where there is a likelihood that such violence will ensue; or

(3) Direct abusive or offensive language or gestures at another person (other than a law enforcement officer while acting in his or her official capacity) in a manner likely to provoke immediate physical retaliation or violence by that person or another person.

(b) It is unlawful for a person to engage in loud, threatening, or abusive language, or disruptive conduct, with the intent and effect of impeding or disrupting the orderly conduct of a lawful public gathering, or of a congregation of people engaged in any religious service or in worship, a funeral, or similar proceeding.

(c) It is unlawful for a person to engage in loud, threatening, or abusive language, or disruptive conduct with the intent and effect of impeding or disrupting the lawful use of a public conveyance by one or more other persons.

(c-1) It is unlawful for a person to engage in loud, threatening, or abusive language, or disruptive conduct in a public building with the intent and effect of impeding or disrupting the orderly conduct of business in that public building.

(d) It is unlawful for a person to make an unreasonably loud noise between 10:00 p.m. and 7:00 a.m. that is likely to annoy or disturb one or more other persons in their residences.

(e) It is unlawful for a person to urinate or defecate in public, other than in a urinal or toilet.

(f) It is unlawful for a person to stealthily look into a window or other opening of a dwelling, as defined in § 6-101.07, under circumstances in which an occupant would have a reasonable expectation of privacy. It is not necessary that the dwelling be occupied at the time the person looks into the window or other opening.

(g) It is unlawful, under circumstances whereby a breach of the peace may be occasioned, to interfere with any person in any public place by jostling against the person, unnecessarily crowding the person, or placing a hand in the proximity of the person's handbag, pocketbook, or wallet.

D.C. Code Ann. § 22-1321. The District of Columbia definition is substantially different than the definition offered by Black's Law Dictionary.

And the plain language definition of these terms offers yet another definition. Merriam-Webster defines conduct as "a mode or standard of personal behavior

MOTION TO DISMISS
(*United States v. Rhine*, 21-CR-687) - 26

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

especially as based on moral principles" or "the act, manner, or process of carrying on[.]"[6] Disorderly is defined as "engaged in conduct offensive to public order" or "characterized by disorder[.]"[7] And disruptive is defined as "disrupting or tending to disrupt some process, activity, condition, etc." or "causing or tending to cause disruption."[8] Thus, under the plain language, engaging in personal behavior in a way that lacked order would be disorderly conduct. As would carrying on in a way that interrupted the normal course. The lack of a clear definition fails to give an ordinary person notice of what conduct is criminal.

What these varying potential definitions have in common is their breadth. They all cover conduct that may not naturally seem criminal—for example being loud after 10:00 p.m., behaving in a way that *tends to* be distasteful to popular morals, or carrying on in a way that lacks order. This immense breadth naturally includes (and as discussed below, targets) expressive conduct protected by the First Amendment.

As criminalized in section 1752, disorderly conduct includes potentially conduct covered by any definitions above. Section 1752's narrowing mechanism is to criminalize only conduct or speech "with intent to impede or disrupt the orderly conduct of Government business or official functions" and which "in fact, impedes or disrupts the orderly conduct of Government business or official functions[.]" 18 U.S.C. § 1752(a)(2).[9] However, even as narrowed the statute criminalizes protected political

---

[6] Merriam-Webster, Conduct, https://www.merriam-webster.com/dictionary/conduct (last visited Oct. 14, 2022).

[7] Merriam-Webster, Disorderly, https://www.merriam-webster.com/dictionary/disorderly (last visited Oct. 14, 2022).

[8] Merriam-Webster, Disruptive, https://www.merriam-webster.com/dictionary/disruptive (last visited Oct. 14, 2022). Disrupt is defined as, among other things, "to interrupt the normal course or unity of[.]" Merriam-Webster, Disrupt, https://www.merriam-webster.com/dictionary/disrupt (last visited Oct. 14, 2022).

[9] As discussed below, this element actually renders the statute a content based restriction on speech.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

speech. For example, the statute could criminalize a protestor loudly reading the names of military members killed in combat from the audience of a speech by the President (within the "restricted area" of the event) in order to protest a war, and effectively causing the President to stop their speech.

The breadth and vagueness of the disorderly conduct crime contained in section 1752 invites the arbitrary and selective enforcement that is a primary evil the Fifth Amendment is meant to prevent. *See Kolender*, 461 U.S. at 357–58. Further, the law chills First Amendment protected speech. *See N.A.A.C.P. v. Button,* 371 U.S. 415, 432–33 (1963).

### E.   The disorderly conduct statute charged in Count 2—18 U.S.C. § 1752(a)(2)—is an unconstitutional content-based restriction on speech.

The statute at issue here prohibits speech based on its content—namely, it restricts speech and expressive conduct based on its subject matter and purpose—here, political speech. Such speech is at the heart of the First Amendment and any prohibition of it is presumptively unconstitutional. Generally, "A regulation of speech is facially content based under the First Amendment if it 'target[s] speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (U.S. Apr. 21, 2022) (quoting *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015)).

This statute "explicitly regulates expression based on content . . . [so] is presumptively invalid, and the Government bears the burden to rebut that presumption." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (internal quotations omitted). Furthermore, the proscribed speech is not exempt from First Amendment protection. "The First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits. The First

1  Amendment itself reflects a judgment by the American people that the benefits of its

2  restrictions on the Government outweigh the costs. Our Constitution forecloses any

3  attempt to revise that judgment simply on the basis that some speech is not worth it."

4  *Id.* at 470. The First Amendment only tolerates restrictions "on a few historical

5  categories of speech—including obscenity, defamation, fraud, incitement, and speech

6  integral to criminal conduct[.]" *Id.*

7       Importantly, a restriction is content-based if it treats different ***topics*** or ***subjects***

8  of speech differently, even if it remains ***viewpoint*** neutral. "[I]t is well established that

9  '[t]he First Amendment's hostility to content-based regulation extends not only to

10  restrictions on particular viewpoints, but also to prohibition of public discussion of an

11  entire topic.'" *Reed*, 576 U.S. at 169 (quoting *Consolidated Edison Co. of N. Y. v.*

12  *Public Serv. Comm'n of N. Y.*, 447 U.S. 530, 537 (1980)). The Court explained: "a

13  speech regulation targeted at specific subject matter is content based even if it does not

14  discriminate among viewpoints within that subject matter. . . . For example, a law

15  banning the use of sound trucks for political speech—and only political speech—would

16  be a content-based regulation, even if it imposed no limits on the political viewpoints

17  that could be expressed." *Id.*

18       Further, "a regulation of speech cannot escape classification as facially content-

19  based simply by swapping an obvious subject-matter distinction for a 'function or

20  purpose' proxy that achieves the same result." *City of Austin, Texas*, 142 S. Ct. at 1474.

21  And even a facially content neutral restriction may indeed be content-based "[i]f there

22  is evidence that an impermissible purpose or justification underpins a facially content-

23  neutral restriction, for instance, that restriction may be content based." *Id.* at 418, 142 S.

24  Ct. at 1475.

25       A content-based restriction on speech is presumptively invalid. The Constitution

26  "demands that content-based restrictions on speech be presumed invalid . . . and that the

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Government bear the burden of showing their constitutionality." *Ashcroft v. A.C.L.U.*, 542 U.S. 656, 660 (2004). Indeed, "content-based restrictions on speech have been permitted, as a general matter, only when confined to the few []historic and traditional categories [of expression] long familiar to the bar.[]" *United States v. Alvarez*, 567 U.S. 709, 717 (2012). These include incitement, obscenity, defamation, and speech integral to criminal conduct. *Id*. at 717–18. The political speech restricted by section 1752 does not fall into any of these categories.

1.   **Section 1752(a)(2)—disorderly conduct—restricts speech and expressive conduct based on its purpose to impede or disrupt congressional proceedings.**

On its face, section 1752(a)(2) restricts speech and expressive conduct that has a political purpose. As such, it is a content based restriction. *See City of Austin, Texas*, 142 S. Ct. at 1474. The statute makes it a crime to "engage[] in disorderly or disruptive conduct," in or near a restricted area where a Secret Service protectee is or will be visiting "with intent to impede or disrupt the orderly conduct of Government business or official functions[.]" 18 U.S.C. § 1752(a)(2). Thus, the statute criminalizes certain speech, including "disruptive" conduct, *only if* it has the purpose of impeding or disrupting government business.

For example, a person who attends a speech by the Vice President and shouts, "you should be ashamed of yourself, stop funding fossil fuel," disrupting the speech, could be criminalized under the statute. However, a person at the same event who shouts, "we love you, you're doing a great job" would not be. Nor would a person who shouts, "speak louder, please!"

Section 1752(a)(2) is indeed a content-based restriction on speech. *See City of Austin, Texas*, 142 S. Ct. at 1474 (when a regulation restricts speech based on its "function or purpose" to achieve a content based restriction, it is a content based

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

restriction on speech). As such, it violates the First Amendment and Count 2 must be dismissed.

## III.   CONCLUSION

Mr. Rhine respectfully asks the Court to dismiss Counts 1 and 2 of the Information. These Counts fail to allege a crime. Should the Court disagree, the statute under which these Counts are charged is unconstitutional in violation of multiple provisions of the First and Fifth Amendments.

DATED this 17th day of October 2022.


Respectfully submitted,


*s/ Rebecca Fish*
*s/ Joanna Martin*
Assistant Federal Public Defenders
Attorneys for David Charles Rhine

MOTION TO DISMISS
(*United States v. Rhine*, 21-CR-687) - 31

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**