UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 1:21-cr-687 (RC) |
| | : | |
| DAVID CHARLES RHINE, | : | |
| | : | |
| Defendant. | : | |

UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION
TO DISMISS COUNTS ONE AND TWO

Defendant David Charles Rhine asks this Court to dismiss Counts One and Two of the Information, charging him with, respectively, Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1), and Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2). He raises both statutory and constitutional claims. With respect to the former, the defendant contends that Counts One and Two fail to state a claim because (A) they do not allege that the Secret Service, as opposed to another agency, restricted the area surrounding the Capitol on January 6, 2021; and (B) they do not sufficiently allege that the Vice President was "temporarily visit[ing]" the U.S. Capitol on January 6, 2021, within the meaning of the statute. With respect to the statute's constitutionality, the defendant asserts that the statute is unconstitutional under the non-delegation, "major question," vagueness, and overbreadth doctrines, and that it is an impermissible content-based regulation of speech. None of these claims has merit, and, indeed, this Court has already rejected several of them in another case arising out of the January 6, 2021, attack on the U.S. Capitol.

BACKGROUND

1.      At 1:00 p.m., on January 6, 2021, a Joint Session of the United States Congress, consisting of the House of Representatives and the Senate, convened in the Capitol Building. The

Joint Session assembled to debate and certify the vote of the Electoral College of the 2020 Presidential Election.   Prior to January 6, 2021, the U.S. Capitol Police, with authority over security on the Capitol grounds, had set up security barriers on the Capitol grounds.   Below is a map of the restricted area:



With the Joint Session underway and with Vice President Mike Pence presiding, a large crowd gathered outside the U.S. Capitol.   At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building.   Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows.   Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to – and did – evacuate the chambers.

The defendant, a resident of Bremerton, Washington, traveled to Washington, D.C., in early January 2021. On January 6, 2021, at approximately 2:42 p.m., the defendant entered the U.S. Capitol Building through the Upper House Door. He was carrying cowbells and a blue flag with white stars. Although a metal detector was present at the door, the defendant walked around it and did not go through any security screening. While inside, the defendant walked through multiple locations in the Capitol and climbed stairs to the third floor.

On the third floor, the defendant was encountered by law enforcement officers with weapons drawn. The officers directed the defendant and others present to drop to the floor. The defendant complied and was patted down for weapons. An officer found that the defendant was carrying two knives and a container of pepper spray. The officer seized these items and secured the defendant's hands behind his back with flex cuffs. Officers then escorted the defendant and others along a hallway and then down to the second floor, until they reached an interior area near the Rotunda Doors. Once in the vicinity of the Rotunda Doors, the escorting officer directed the defendant to exit the building and left. After the officer left, another rioter removed the flex cuffs from the defendant's hands. The defendant then exited the building through the Rotunda Doors at approximately 3:05 p.m.

2.       Based on his actions on January 6, 2021, the defendant was arrested and later charged by Information with Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority, in violation of 18 U.S.C. § 1752(a)(1); Engaging in Disorderly or Disruptive Conduct in any Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Disorderly Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

The defendant now moves to dismiss Counts One and Two, asserting that the charges are defective because the Capitol Police (rather than the Secret Service) restricted the Capitol grounds on January 6 and because then-Vice President Pence was not "temporarily visiting" the Capitol on January 6, 2021.  He also claims that Sections 1752(a)(1) and (2) are unconstitutional.

## LEGAL STANDARDS

A defendant may move before trial to dismiss an information, or a count thereof, for "failure to state an offense."  *See* Fed. R. Crim. P. 12(b)(3)(B)(v).  The main purpose of a charging document, such as an indictment or (as here) an information, is to inform the defendant of the nature of the accusation.  *See United States v. Ballestas*, 795 F.3d 138, 148-149 (D.C. Cir. 2015) (discussing purpose of an indictment).  Thus, an information need only contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c).  When assessing the sufficiency of criminal charges before trial, an information "must be viewed as a whole and the allegations [therein] must be accepted as true."  *United States v. Bowdoin*, 770 F. Supp. 2d 142, 145 (D.D.C. 2011)).  The "key question" is whether "the allegations … , if proven, are sufficient to permit a petit jury to conclude that the defendant committed the criminal offense as charged."  *Ibid.*

## ARGUMENT

**I.    Counts One and Two of the Information Properly Allege Violations of 18 U.S.C. § 1752(a)**

Counts One and Two charge the defendant with violating Section 1752 of Title 18, which prohibits the unlawful entry into and disruptive or disorderly conduct in a "restricted building or grounds."  A "restricted building or grounds" is a "posted, cordoned off, or otherwise restricted area … where the President or other person protected by the Secret Service is or will be temporarily visiting."  18 U.S.C. § 1752(c)(1)(B).  Counts One and Two of the Information specifically allege

that the defendant entered, remained, and engaged in disorderly and disruptive conduct "in a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was temporarily visiting, without lawful authority to do so." ECF No. 8 at 1-2.  By their plain terms, Counts One and Two therefore state violations of Section 1752.

The defendant nonetheless argues that Counts One and Two fail to state violations of Section 1752 for two reasons: (A) they do not allege that the Secret Service, as opposed to another agency, restricted the area surrounding the Capitol on January 6, 2021; and (B) in the defendant's view, the Vice President Pence's presence at the Capitol on January 6, 2021, does not establish that he was "temporarily visit[ing]" the U.S. Capitol that day.  ECF No. 43, at 2-9.  Neither claim has merit.  The defendant's statutory arguments defy the plain text, structure, and purpose of the statute.  This Court correctly rejected identical claims in *United States v. Andries*, No. 1:21-cr-93 (RC), 2022 WL 768684, at *14 (D.D.C. Mar. 14, 2022).   And numerous other judges of this District have rejected permutations of the same arguments in other January 6 cases.  *See, e.g.*, *United States v. McHugh*, No. 21-cr-453, 2022 WL 296304, at *20-21 (D.D.C. Feb. 1, 2022) (Bates, J.); *United States v. Williams*, No. 1:21-cr-377, ECF No. 88 (D.D.C. Jun 8, 2022) (Howell, C.J.)*; United States v. Puma*, No. 21-cr-454, 2022 WL 823079, at *16-18 (D.D.C. Mar. 19, 2022) (Friedman, J.); *United States v. Bingert*, No. 21-cr-91, 2022 WL 1659163, at *15 (D.D.C. May 25, 2022) (Lamberth, J.); *United States v. Riley Williams*, No. 21-cr-618, ECF No. 55, at 39-43 (D.D.C. June 22, 2022) (Jackson, J.)*.*  No district judge has sided with the defendant's view.  This Court should reach the same conclusion in this case.

A.   **Section 1752 Does Not Require the Secret Service to Restrict the Protected Area**

The defendant's claim that 18 U.S.C. § 1752 applies only where the Secret Service restricts the protected area is meritless.

In relevant part, 18 U.S.C. § 1752 ("Restricted building or grounds") provides:

> (a)    Whoever—
>
> (1) knowingly enters or remains in any restricted building or grounds without lawful authority to do so;
>
> (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions;
>
> …
> (c)    In this section—
>
> (1) the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—
>
> (A) of the White House or its grounds, or the Vice President's official residence or its grounds;
>
> (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or
>
> (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance.
>
> (2) the term "other person protected by the Secret Service" means any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection.

18 U.S.C. § 1752. In short, Section 1752 prohibits the unlawful entry into a restricted or otherwise cordoned off area where "a person protected by the Secret Service is or will be temporarily visiting." *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 98 (D.D.C. 2019), *aff'd* 831 F. App'x

513 (D.C. Cir. 2021). Section 1752 therefore "focuses on perpetrators who knowingly enter a restricted area around a protectee, not on how it is restricted or who does the restricting." *United States v. Griffin*, 549 F. Supp. 3d 49, 54 (D.D.C. 2021).

To determine the meaning of a statute, the Court "look[s] first to its language, giving the words used their ordinary meaning." *Levin v. United States*, 568 U.S. 503, 513 (2013) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)). Here, the plain text of the statute is "unambiguous," so the "judicial inquiry is complete." *Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020).

Section 1752's text is clear. It proscribes certain conduct in and around "any restricted building or grounds." *See* 18 U.S.C. § 1752(a). The statute provides three definitions for the term "restricted buildings and grounds," *see* § 1752(c)(1), including "any posted, cordoned off, or otherwise restricted area … of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting," § 1752(c)(1)(B). Through a cross-reference, Section 1752 makes clear – and the defendant does not appear to dispute – that "person[s] protected by the Secret Service" include the Vice President and the Vice President-elect. § 1752(c)(2); *see* § 3056(a)(1). The proscribed conduct within a "restricted building or grounds" includes, as relevant here, knowingly and unlawfully entering or remaining, § 1752(a)(1), and knowingly and with intent to impede or disrupt government business, engaging in "disorderly or disruptive conduct" that "in fact, impedes or disrupts" government business," § 1752(a)(2).

That straightforward analysis has a straightforward application to the facts alleged in the defendant's case. The Information alleges that, on January 6, 2021, a protected person was present inside the Capitol building or on the Capitol grounds, and that some portion of the Capitol building and grounds was posted, cordoned off, or otherwise restricted, making it a "restricted building or

grounds" under § 1752(c)(1). The Information further alleges that the defendant knowingly and without lawful authority entered and remained in that restricted building and grounds. It also alleges that the defendant, knowingly and with the intent to impede or disrupt government business, engaged in disorderly conduct that resulted in a disruption to government business. In short, the allegations closely track the statutory language.

Looking outside Section 1752's language, the defendant urges (ECF No. 46 at 5-7) the Court to import an extra-textual requirement that the Secret Service be required to designate the restricted area. That is so, the defendant claims, because (1) Section 1752(c)(B) defines "restricted building or grounds" as a "building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting"; and (2) "it is the Secret Service who protects the President or 'other person,'" so it is the Secret Service who must make the designation of a restricted area. ECF No. 46 at 6. The defendant's syllogism does not work.

As this Court has already explained, the defendant's theory contravenes the "unambiguous statutory text." *Andries*, 2022 WL 768684, at *14. That is because "[a]bsent from the text is any mention of a requirement that any specific entity must restrict or cordon off the area, let alone a requirement that only the Secret Service may be the restricting entity." *Id.* Section 1752 is directed not at the Secret Service, but at ensuring the protection of the President and the office of the Presidency. *See* S. Rep. 91-1252 (1970). Indeed, "the only reference in the statute to the Secret Service is to its protectees. Section 1752 says nothing about who must do the restricting." *Griffin*, 549 F. Supp. 3d at 55. As this Court remarked in rejecting an identical claim in another January 6 case, "[w]hen the words of a statute are unambiguous, the judicial inquiry is complete." *Andries*, 2022 WL 768684, at *14 (internal quotation marks and citations omitted).

The defendant's contrary suggestions rely on legislative history and policy considerations. But this Court has already explained that "such factors do not permit the Court to add a requirement

to unambiguous statutory text." *Andries*, 2022 WL 768684, at *14.  In any event, the defendant's arguments lack merit.

The defendant points (ECF No. 46 at 6 n.2) to a Senate Judiciary Committee indicating that, when Section 1752 was first enacted in 1970, "no Federal statute … specifically authorize[d] [the Secret Service] to restrict entry to areas where the President maintains temporary residences or offices," S. Rep. No. 91-1252, at 7 (1970), and that Congress wanted to end a patchwork of state and local laws and inconsistent assistance from local authorities.  *Andries*, 2022 WL 768684, at *14.  But, as this Court has already explained, the fact that "Congress may have envisioned the Secret Service as the *primary* restrictor of areas visited by the President and other protected officials, and that it may have primarily been concerned with presidential travel in areas within the control of state authorities, does not mean that it meant to make the Secret Service the *exclusive* restrictor."  *Id.*  Rather, "[t]he statements in the Senate Judiciary Committee report are consistent with Congress's apparent choice to leave the statutory text open-ended so that other competent entities, such as the U.S. Capitol Police or state officials when they were capable of doing so, could restrict areas around protected officials."  *Id.*

In response, the defendant contends that, when Section 1752 was first enacted, the Secret Service was part of the Treasury Department and "Section 1752 grants the Treasury Secretary the authority to 'designate by regulations the buildings and grounds which constitute the temporary residences of the President,'" as well as other related authorities.  ECF No. 46 at 4 (purporting to quote 18 U.S.C. § 1752(d)(1)).  The defendant is wrong.  The *current* version of 18 U.S.C. § 1752 does no such thing.  As this Court has explained, "Congress removed all references to the Treasury in 2006 and did not replace them with any references to regulations of the Department of Homeland Security, the Secret Service's new home."  *Andries*, 2022 WL 768684, at *15; *see* Pub. L. 109-177, Title VI, Sec. 602, 120 Stat. 192 (Mar. 9, 2006).  Congress, therefore, was clearly aware that

the prohibitions in 18 U.S.C. § 1752 could turn on decisions made by the Secret Service but chose not to include that in the revised statute.  Congress's decision in 2006 to eliminate those references makes clear that, "[a]s it stands today, the statute defines restricted areas (as relevant here) in terms of their physical characteristics ('posted, cordoned off, or otherwise restricted') and in terms of who is present within the area (Secret Service protectees).  It does not say who must restrict the area, by, for example, cordoning it off or setting up signs prohibiting entry."  *Andries*, 2022 WL 768684, at *15.[1]

        The defendant's reliance on 18 U.S.C. § 3056, which outlines the duties and responsibilities of the Secret Service, is equally unavailing.  The defendant points (ECF No. 46 at 4-5) to 18 U.S.C. § 3056(e), but that provision assigns the Secret Service a role in determining restricted areas only in connection with "special events of national significance, as determined by the President," *id.* § 3056(e)(1).  While such events also implicate the penalties of Section 1752 (see 18 U.S.C. § 1752(c)(1)(C)), they only do under a separate "definition of restricted area not relevant here."  *Andries*, 2022 WL 768684, at *15.  *Compare* 18 U.S.C. § 1752(c)(1)(B) (defining "restricted buildings or grounds" to include any restricted area of "building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting"), *with id.* § 1752(c)(1)(C) (separately defining "restricted buildings or grounds" to include any restricted area

---

[1]        To be clear, even before 2006, "Congress did not say that only the Treasury Secretary could restrict the areas a protected official was temporarily visiting.  Like the current version, the 1970 version said nothing about 'who must do the restricting.'"  *Andries*, 2022 WL 768684, at *15.  Rather, "Congress knew how to provide the Treasury with authority related to restricted areas—it gave Treasury the narrow authority to regulate the 'ingress and egress' to such areas—but it chose not to locate the authority to restrict in the first place with the Treasury."  *Id.*

of "a building or grounds so restricted in conjunction with an event designated as a special event of national significance").[2]

**B.      Vice President Pence Was Temporarily Visiting the Capitol on January 6, 2021**

The defendant also contends that Counts One and Two fail to allege an offense because, in his view, Vice President Pence was not "temporarily visiting" the Capitol on January 6.  That contention lacks merit.

The defendant's reading of Section 1752 contravenes the statute's plain terms, structure, and purpose.  As another judge in this District concluded earlier this year, "[c]ommon sense easily resolves this debate" in the government's favor.  *United States v. Williams*, No. 1:21-cr-377 (BAH), ECF No. 88, at 5 (D.D.C. Jun 8, 2022).  This Court and multiple other district judges of this Court have reached the same conclusion.  *See McHugh*, 2022 WL 296304, at *20-21; *Andries*, 2022 WL 768684, at *16-17; *Puma*, 2022 WL 823079, at *16-18; *Bingert*, 2022 WL 1659163, at *15; *Riley Williams*, No. 21-cr-618, ECF No. 55, at 39-43.  And nothing in the defendant's motion, which mostly just rehashes the flawed arguments raised by other January 6 defendants, warrants a different result.

1.      As noted, to determine the meaning of a statute, the Court "look[s] first to its language, giving the words used their ordinary meaning."  *Levin*, 568 U.S. at 513 (internal quotation omitted).  Here, subsection 1752(c)(1)(B) defines "restricted buildings or grounds," in relevant part, as "any posted, cordoned off, or otherwise restricted area … of a building or grounds

---

[2]      The defendant also cites 18 U.S.C. § 3056(g), which provides that the Secret Service "shall be maintained as a distinct entity within the Department of Homeland Security and shall not be merged with any other Department function."  *See also id.* ("No personnel and operational elements of the United States Secret Service shall report to an individual other than the Director of the United States Secret Service.").  Nothing in that provision suggests that only protected areas restricted by Secret Service personnel can trigger 18 U.S.C. § 1752(a).

where the President or other person protected by the Secret Service is or will be *temporarily visiting*." (Emphasis added). In turn, the verb "visit" means, *inter alia*, "to go to see or stay at (a place) for a particular purpose (such as business or sightseeing)" or "to go or come officially to inspect or oversee."[3] And the adverb "temporarily" adds that the protectee's visit must occur "during a limited time."[4]

As a textual matter, then, either definition of "visit" plainly describes the Secret Service protectee's activities on January 6. Vice President Pence was physically present at the U.S. Capitol for a particular purpose: he presided over Congress's certification of the 2020 Presidential Election, first in the joint session, and then in the Senate chamber. While not specifically alleged in the Information, two other Secret Service protectees (members of the Vice President's immediate family), also came to the U.S. Capitol that day for a particular purpose: to observe these proceedings while they were ongoing and Vice President Pence was present. Furthermore, as President of the Senate, Vice President Pence oversaw the vote certification. And all three protectees visited the Capitol temporarily – *i.e.*, during a limited time. Given the nature of the presence of the Vice President (and his family members), the U.S. Capitol plainly qualified as a building where "[a] person protected by the Secret Service [was] … temporarily visiting," 18 U.S.C. § 1752(c)(1)(B). *See Andries*, 2022 WL 768684, at *16 ("Vice President Pence was 'temporarily visiting' the Capitol on January 6, 2021 if he went to the Capitol for a particular purpose, including a business purpose, and for a limited time only. Plainly he did. He went to the Capitol for the business purpose of carrying out his constitutionally assigned role in the electoral count proceeding; he intended to and did stay there only for a limited time." (citation omitted)); *Williams*, No. 1:21-cr-377, ECF No. 88, at 5-6 (adopting the "plain reading of the words" in

---

[3]     https://www.merriam-webster.com/dictionary/visit (last visited Nov. 30, 2022).
[4]     https://www.merriam-webster.com/dictionary/temporarily (last visited Nov. 30, 2022).

subsection 1752(c)(1)(B) urged by the government); *McHugh*, 2022 WL 296304, at \*21 (reaching "a commonsense conclusion: the Vice President was 'temporarily visiting' the Capitol"); *Puma*, 2022 WL 823079, at \*17 (under the plain language of Section 1752, the Vice President "was temporarily visiting the Capitol on January 6, 2021: he was there for a limited time only in order to preside over and participate in the Electoral College vote certification."); *Riley Williams*, No. 21-cr-618, ECF No. 55, at 40-41 ("Taken together then, as was plain even before the dictionary was consulted, the phrase "temporarily visiting" means being somewhere for a limited period of time, and there is no linguistic reason why the phrase could not include being there for a business purpose.").

> 2.     The defendant's contrary contentions lack merit, and this Court properly rejected them in *Andries*. The defendant insists that the phrase "temporarily visiting" "connotes temporary travel to a location where the person does not normally live or work on a regular basis," ECF No. 46 at 8 – a carveout that, in the defendant's view, applies here because the Capitol was the Vice President's "place of employment" in his official capacity as the "President of the Senate" and the Vice President has an office in the Capitol building. *Id.* But this Court already rejected an analogous argument in *Andries*, and for good reason. "[Al]though there is some intuitive appeal to [the] suggestion that a person does not 'visit' a place where he maintains an office, dictionary definitions of the term do not impose such a limitation." *Andries*, 2022 WL 768684, at \*16. In addition, this Court has explained, "there are situations in which it would be quite natural to say that a person 'temporarily visits' a place where she has an office" – as in the case of "a CEO of an international corporation who normally works from headquarters in New York, but who maintains an office for her occasional use at the firm's satellite location in London." *Id.* Indeed, Section 1752(c)(1)(B) defines the restricted area by reference to the location of the protectee, not the location of his or her physical offices. When Vice President Pence traveled to the U.S. Capitol on

January 6 to oversee the Joint Session of Congress, he was "visiting" the building.  And because

Vice President Pence intended to leave at the close of tshe session, this visit was "temporar[y]."

The defendant also cites cases where either the President or Vice President were "traveling

outside of D.C. … and 'visiting' another location for a 'temporary' purpose."  ECF No. 46 at 8-9

(citing *United States v. Bursey,* 416 F.3d 301 (4th Cir. 2005) (airport hangar); *Blair v. City of*

*Evansville, Ind.*, 361 F. Supp.2d 846 (S.D. Indiana 2005) (location in Evansville, Indiana).  But

"the fact that those situations clearly qualify does not mean that the relevant situation on January

6 cannot count as well."  *Williams*, No. 21-cr-377, ECF No. 88, at 6.

For the reasons already articulated in *Andries*, this Court should reject the defendant's

statutory claims.

## II.     The Defendant's Claims Under the Non-Delegation Doctrine Lack Merit

The defendant next contends that Counts One and Two of the Information should be

dismissed because Section 1752(a)(1) and (2) are facially unconstitutional under the non-

delegation doctrine.  ECF No. 46 at 9-17.  In his view, Section 1752 "delegates to the executive

branch the power to define a crime and provides no meaningful intelligible principle in this

delegation."  *Id.* at 9.  The defendant's claim lacks merit.

1.      The Constitution provides that "[a]ll legislative Powers herein granted shall be

vested in a Congress of the United States." U.S. Const. Art. I, § 1. The Supreme Court has

explained that "[t]his text permits no delegation of those powers." *Whitman v. American Trucking*

*Ass'ns*, 531 U.S. 457, 472 (2001).  It "ha[s] recognized, however, that the separation-of-powers

principle, and the nondelegation doctrine in particular, do not prevent Congress from obtaining the

assistance of its coordinate Branches."  *Mistretta v. United States*, 488 U.S. 361, 372 (1989).  The

Constitution does not "deny[] to the Congress the necessary resources of flexibility and practicality

… to perform its function."  *Yakus v. United States*, 321 U.S. 414, 425 (1944) (citation omitted).

The Supreme Court "ha[s] 'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.'" *American Trucking*, 531 U.S. at 474-475 (quoting *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting)).  And it has recognized that "Congress is not confined to that method of executing its policy which involves the least possible delegation of discretion to administrative officers." *Yakus*, 321 U.S. at 425-426.  Instead, the "extent and character of [the] assistance" that Congress may seek from another Branch in a particular context "must be fixed according to common sense and the inherent necessities of the governmental co-ordination" at issue, *J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928)—matters that Congress is typically best positioned to assess.  *See Mistretta*, 488 U.S. at 372; *see also id.* at 416 (Scalia, J., dissenting).

The Court has accordingly held that Congress may confer discretion on the Executive to implement and enforce the laws so long as it supplies an "intelligible principle" defining the limits of that discretion.  *Mistretta*, 488 U.S. at 372 (quoting *J.W. Hampton*, 276 U.S. at 409).  The Court has further clarified that the vesting of authority in an Executive Branch official is "constitutionally sufficient" under that intelligible-principle standard "if Congress clearly delineates [1] the general policy, [2] the public agency which is to apply it, and [3] the boundaries of th[e] delegated authority." *Id.* at 372-373 (quoting *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)).  In determining whether a statute supplies an intelligible principle, a court should consider the "'words of a statute … in their context and with a view to their place in the overall statutory scheme,'" and may "look[] to 'history and purpose' to divine the meaning of language."  *Gundy v. United States*, 139 S. Ct. 2116, 2126 (2019) (plurality opinion) (brackets and citations omitted).

Consistent with those principles, the Supreme Court has upheld against a nondelegation challenge nearly every statutory provision it has confronted. "From the beginning of the Government," Congress has enacted, and the Court has upheld, statutes "conferring upon executive

15

officers power to make rules and regulations … for administering the laws which did govern." *United States v. Grimaud*, 220 U.S. 506, 517 (1911).  For example, early Congresses enacted a series of statutes that conferred on the President the power to impose or lift trade sanctions and tariffs. *Marshall Field & Co. v. Clark*, 143 U.S. 649, 683-689 (1892). The Court rejected a nondelegation challenge to one such statute in 1813, *see The Cargo of the Brig Aurora v. United States*, 11 U.S. (7 Cranch) 382, 388 (1813), and again in 1892, *see Marshall Field*, 143 U.S. at 681-694.  And in the 90 years since the Court articulated the "intelligible principle" standard, it has similarly upheld numerous statutes against nondelegation challenges.[5]

In the Nation's history, the Court has viewed only two statutes as exceeding Congress's authority on non-delegation grounds.  *American Trucking*, 531 U.S. at 474 (discussing *Panama Ref. Co. v. Ryan*, 293 U.S. 388 (1935), and *A. L. A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)).  In 1935, the Court concluded that two provisions of the National Industrial Recovery Act, ch. 90, 48 Stat. 195 – enacted in response to the Great Depression – contained "excessive delegations" because Congress "failed to articulate any policy or standard that would serve to confine the discretion of the authorities to whom Congress had delegated power."

---

[5]     *See, e.g.*, *Gundy*, 139 S. Ct. at 2128-2130 (plurality opinion) (authority to specify how sex-offender registration statute applies to individuals who committed sex offenses prior to the statute's enactment); *id.* at 2130-2131 (Alito, J., concurring in the judgment); *American Trucking*, 531 U.S. at 472-476 (authority to set nationwide air-quality standards limiting pollution); *Loving v. United States*, 517 U.S. 748, 771-774 (1996) (authority to set aggravating factors for death penalty in courts martial); *Touby v. United States*, 500 U.S. 160, 165-167 (1991) (authority to temporarily designate controlled substances); *Mistretta*, 488 U.S. at 374-377 (Sentencing Guidelines); *Lichter v. United States*, 334 U.S. 742, 785-786 (1948) (authority to set standards for recovery of excessive profits from military contractors); *Fahey v. Mallonee*, 332 U.S. 245, 247, 249-250 (1947) (authority to set rules for reorganization, etc., of savings-and-loan associations); *American Power & Light*, 329 U.S. at 105 (authority to set standards for prevention of unfair or inequitable distribution of voting power among security holders); *Yakus*, 321 U.S. at 425-427 (authority to set commodity prices); *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 600 (1944) (authority to set natural-gas wholesale prices); *National Broad. Co. v. United States*, 319 U.S. 190, 225-226 (1943) (authority to set standards for broadcast licensing); *J. W. Hampton*, 276 U.S. at 407-411 (authority to set tariffs).

*Mistretta*, 488 U.S. at 373 & n.7 (emphasis added).   The Court held those provisions invalid because "one … provided literally no guidance for the exercise of discretion, and the other … conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'"   *American Trucking*, 531 U.S. at 474. Since 1935, the Court has "upheld, again without deviation, Congress' ability to delegate power under broad standards."  *Mistretta*, 488 U.S. at 373.

2.       The defendant contends (ECF No. 46 at 14-16) that Section 1752(a) violates the non-delegation doctrine on the theory that it (i) "fails to provide an intelligible principle for the Secret Service [or other law enforcement agency] to define restricted areas"; (ii) does "not specify what methods should be used to restrict access times"; and (iii) "requires no causal nexus between the restriction and the temporary visit of a Secret Service protectee."

The defendant's non-delegation challenge to Section 1752 fails for a basic reason: Section 1752 does not purport to delegate to the Secret Service or any other agency the authority to define restricted areas in this first place.  As this Court explained in *Andries*, "[a]bsent from the text" of the statute "is any mention of a requirement that any specific entity must restrict or cordon off the area, let alone a requirement that only the Secret Service may be the restricting entity."  *Andries*, 2022 WL 768684, at *14.  Again, "the statute defines restricted areas (as relevant here) in terms of their physical characteristics ('posted, cordoned off, or otherwise restricted') and in terms of who is present within the area (Secret Service protectees)."  *Id.* at *15 (citation omitted).  Far from posing any non-delegation issue, moreover, "this open-ended structure makes policy sense": "[i]t extends the law's protection of Secret Service protectees to areas where sufficient physical restrictions may already exist, such as military facilities, or where partner federal or local authorities are willing to assist with setting restrictions (such as the Capitol Police on January 6), without requiring the Secret Service to set up unnecessary additional physical restrictions."  *Id.*

Here, for example, it was not Section 1752, but two other provisions – 2 U.S.C. § 1961 *et seq.* and 18 U.S.C. § 3056 – that granted the Capitol Police and the Secret Service the authority to define a restricted area within the Capitol Grounds on January 6, 2021.  *See* 2 U.S.C. §§ 1961(a) ("The Capitol Police shall police the United States Capitol Buildings and Grounds."), § 1963 ("It shall be the duty of the Capitol police … to prevent any portion of the Capitol Grounds and terraces from being used as playgrounds or otherwise, so far as may be necessary to protect the public property, turf and grass from destruction or injury."), § 1966 ("[T]he United States Capitol Police is authorized to protect, in any area of the United States, the person of any Member of Congress, officer of the Congress … and any member of the immediate family of any such Member or officer[.]"); 18 U.S.C. § 3056 (authorizing the Secret Service to "protect … the Vice President … and [his] immediate famil[y]").  The defendant, for good reason, does not contend that the Secret Service or Capitol Police exceeded their respective authorities in defining the restricted area within the Capitol Grounds on January 6, 2021, much less does he show that those agencies' carefully defined sources of law enforcement authority are somehow invalid.  In fact, in his non-delegation argument, the defendant does not even acknowledge that those sources of authority exist.  Because the defendant has failed to identify (much less discuss) the relevant delegations of authority, his non-delegation doctrine fails before it even gets off the ground.

The defendant also contends (ECF No. 46 at 15) that the statute "violates the major questions doctrine" – the statutory interpretation principle that, "in certain extraordinary cases, both separation of powers principles and a practical understanding of legislative intent make [the courts] 'reluctant to read into ambiguous statutory text'" delegation of regulatory authority over a "major question" and "something more than a merely plausible textual basis for the agency action is necessary." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022).  The defendant is incorrect.

In support of his "major question" theory, the defendant rehashes (ECF No. 46 at 17) the same statutory arguments this Court already rejected in *Andries* (and that are discussed above). The defendant then conclusorily declares the government's interpretation – which, again, this Court already adopted in *Andries* – is "exceedingly broad" and a threat to "federalism and separation of powers." But the defendant's *ipse dixit* is meritless. In relevant part, Section 1752(a)(1) and (2) merely authorize prosecution of individuals who knowingly enter, remain, or engage in disorderly or disruptive conduct in "any posted, cordoned off, or otherwise restricted area  … of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." 18 U.S.C. § 1752(c)(1)(B). That run-of-the-mill delegation of criminal enforcement authority bears no resemblance to the "extraordinary cases" in which regulatory "agencies" have been found to have improperly "asserted highly consequential power beyond what Congress could reasonably be understood to have granted." *See West Virginia*, 142 S. Ct. at 2609 (applying "major question" doctrine to the EPA's claim that the Clean Air Act "empowers it to substantially restructure the American energy market" by "setting performance standards" for existing coal-fired power plants that "include[] a requirement that such facilities reduce their own production of electricity, or subsidize increased generation by natural gas, wind, or solar sources"). Nothing in the Supreme Court's decision in *West Virginia* or in the "major question" doctrine supports the defendant's non-delegation claim in this case.

Finally, the defendant observes that Congress "separately created a crime of trespass and disorderly conduct applicable to the Capitol Building and grounds" under 40 U.S.C. 5104(e)(2)(D) and (G). But the defendant points to no basis in text, context, or logic to conclude that Congress intended Section 5104 to become *the exclusive* means of protecting Secret Service protectees when they are temporarily visiting the Capitol. In fact, the defendant has it backward. Whereas Section 1752's trespass and disorderly conduct provisions are Class A misdemeanors punishable by up to

one year in prison (and become felonies if the defendant carries or uses a dangerous weapon, *see* 18 U.S.C. § 1752(b)(1)(A)), the offenses in 40 U.S.C. § 5104 are Class B misdemeanors punishable by no more than six months in prison.  See 18 U.S.C. §§ 1752(a), (b)(2), 3559(a)(6), (7); 40 U.S.C. 5104(e)(2)(D), (G), 5109(b).  Under the defendant's theory, therefore, Secret Service protectees would perversely receive *weaker* protections in the restricted areas of the U.S. Capitol – the site of sacred constitutional proceedings such as the Certification of the Electoral College and the State of the Union – than in any other restricted area they temporarily visit anywhere and at any time in the United States.  Nothing in Section 1752's text or contexts requires such an absurd result.  *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").

## III.   The Defendant's Vagueness and Overbreadth Claims Lack Merit

The defendant next contends (ECF No. 46 at 17-24) that Section 1752, as interpreted by the government and by this Court in *Andries*, is unconstitutionally vague and overbroad.  The defendant's arguments, which mostly just repackage the defendant's policy views under a constitutional rubric, lack merit.[6]

### A.   Legal Principles

Vagueness.  The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the government from depriving any person of "life, liberty, or property, without due process of law."  U.S. Const. amends. V, XIV.  An outgrowth of the Due Process Clause, the "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to

---

[6]     The defendant incorrectly conflates overbreadth and vagueness as if they were synonymous.  *See* ECF No. 46 at 22-24 (listing various grounds why the statute is allegedly "overbroad and vague," without distinguishing between the two doctrines).  This response analyzes the defendant's arguments under each rubric separately.

give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).  To ensure fair notice, "'[g]enerally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.'"  *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982)).  To avoid arbitrary enforcement, the law must not "vest[] virtually complete discretion" in the government "to determine whether the suspect has [violated] the statute." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

A statute is not unconstitutionally vague simply because its applicability is unclear at the margins, *Williams*, 553 U.S. at 306, or because a reasonable jurist might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010).  "'Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.'"  *Bronstein*, 849 F.3d at 1107 (quoting *Rose v. Locke*, 423 U.S. 48, 50 (1975) (per curiam)).  Rather, a provision is impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application.  *Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974).  The "touchstone" of vagueness analysis "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

A statutory provision is therefore "not rendered unconstitutionally vague because it 'do[es] not mean the same thing to all people, all the time, everywhere.'"  *Bronstein*, 849 F.3d at 1107 (quoting *Roth v. United States*, 354 U.S. 476, 491 (1957)).  A statute is instead vague where it fails to specify any "standard of conduct . . . at all."  *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971).

21

"As a general matter," however, a law is not constitutionally vague where it "call[s] for the application of a qualitative standard … to real-world conduct; 'the law is full of instances where a man's fate depends on his estimating rightly … some matter of degree.'" *Johnson*, 576 U.S. at 603-604 (quoting *Nash v. United States*, 229 U.S. 373, 377 (1913)).

Overbreadth.  In the First Amendment context, as in others, "[f]acial challenges are disfavored." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008).  Facial overbreadth challenges – in which a defendant asserts that a statute, constitutionally applied to her, is nevertheless invalid because it would be unconstitutional in a "substantial number" of *other* cases, *id.* at 449 n.6 (internal quotation marks omitted) – are even more exceptional.  "'Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment,'" overbreadth is "'strong medicine'" to be employed "'only as a last resort.'" *Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999) (quoting *New York v. Ferber*, 458 U.S. 747, 769 (1982)); *cf. Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (noting the "substantial social costs created by the overbreadth doctrine when it blocks application of a law to … constitutionally unprotected conduct") (emphasis omitted).

The Supreme Court has therefore "vigorously enforced the requirement that a statute's overbreadth be *substantial* … relative to the statute's plainly legitimate sweep." *Williams*, 553 U.S. at 292.  "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984).  Rather, "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Id.* at 801.  And laws that are "not specifically addressed to speech" are far

less likely to present such a danger.  *Hicks*, 539 U.S. at 124; see *id.* (observing that "an overbreadth challenge" to such a law will "[r]arely, if ever, … succeed").

## B. Sections 1752(a)(1) and (2) Are Neither Unconstitutionally Vague Nor Overbroad

The defendant has failed to meet the demanding standards of establishing unconstitutional vagueness or facial overbreadth.  First, the defendant chides (ECF No. 46 at 22) this Court's interpretation of Section 1752(a) and (c)(1)(B) for criminalizing "any encroachment past the restriction of *any* agency" and for "requir[ing] no nexus between the agency restricting an area and the visit or planned visit of a Secret Service protectee."  But these features of the statute do not implicate any vagueness problem.  Contrary to the defendant's suggestion, Section 1752(a) does not proscribe strict-liability offenses.  To prove a violation of 18 U.S.C. § 1752(a)(1) or (2), the government must prove that the defendant actually knew that the area was restricted.  In addition, Section 1752(a)(1) and Section 1752(a)(2) each have separate scienter requirements that further narrow and clarify the reach of the statute.  Section 1752(a)(1) requires proof that the defendant knew that his encroachment was "without lawful authority."  And Section 1752(a)(2) requires proof that defendant engaged in disruptive or disorderly conduct both "knowingly" and "with intent to impede or disrupt the orderly conduct of Government business or official functions." These exacting mens rea and scienter requirements provide citizens with ample notice that their entry into (or disorderly conduct within) a restricted area violates 18 U.S.C. 1752(a)(1) and (2). *See Gonzales v. Carhart*, 550 U.S. 124, 149 (2007) (explaining that "scienter requirements alleviate vagueness concerns," "narrow the scope of [a statute's] prohibition and limit prosecutorial discretion.").

Nor does the absence of an agency-specific limitation invite arbitrary enforcement by criminalizing common activities or giving law enforcement undue discretion. *Griffin*, 549 F. Supp.

3d at 57.  Regardless of which agency defined the restricted area, knowingly entering, remaining,

and engaging in disorderly and disruptive conduct within that restricted area is "no trap awaiting

the unwary."  *Id.*  The absence of a statutory limitation on the agency imposing the restricted area

therefore does not support the defendant's vagueness challenge.

The absence of an agency-specific limitation likewise does not give rise to any overbreadth

concern.  To begin with, the identity of the agency imposing the restriction has no logical

connection to the interest protected by the overbreadth doctrine: whether the statute might, in many

if not most applications, "compromise *recognized First Amendment protections* of parties not

before the Court."  *Taxpayers for Vincent*, 466 U.S. at 801 (emphasis added).  Furthermore, even

assuming that federalism concerns (ECF No. 46 at 22) are relevant for purposes of overbreadth

analysis, the identity of the restricting agency would still be beside the point.  In all its applications,

Section 1752(c)(1)(B) requires proof that "the President or other person protected by the Secret

Service is or will be temporarily visiting."  That requirement alone provides a clear federal nexus

to the proscribed conduct, disposing of any federalism concerns.

Second, the defendant observes that the statute applies irrespective of the restricted area's

"temporal or spatial limits."  ECF No. 46 at 22.  But the restricted area's size and duration have

no logical bearing on the defendant's notice that his conduct is unlawful.  Again, to obtain a

conviction under Section 1752(a), the government must prove, beyond a reasonable doubt, that the

defendant had actual knowledge that the area was restricted.  Further, as noted, Sections 1752(a)(1)

and Section 1752(a)(2) each impose additional mens rea and scienter requirements as well.  Section

1752's extensive mens rea and scienter requirements readily distinguish Section 1752(a)

prosecutions from prosecutions under the provision at issue in *Connally v. Gen. Const. Co.*, 269

U.S. 385, 395 (1926) (quoted at ECF No. 46 at 23), where criminal penalties turned on nothing

24

more than the jury's interpretation of terms like "neighborhood" and "locality." *Connally*, 269 U.S. at 395.

Contrary to the defendant's suggestion (ECF No. 46 at 22-23), the absence of temporal or spatial limits in Section 1752(c)(1)(C) also does not render Section 1752 overbroad.  Restricted areas are, by definition, nonpublic fora under the Supreme Court's First Amendment analysis – *i.e.*, areas where, "[i]n addition to [imposing] time, place, or manner regulations," the state may restrict speech and expressive conduct "as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 47 (1983); *see also Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992) (same).  Furthermore, Section 1752's operative prohibitions – entering, remaining, and disorderly or disruptive conduct – principally target conduct rather than speech, and, as noted, those prohibitions are limited by exacting mens rea and scienter requirements.  *See Williams*, 553 U.S. at 294 (focusing on scienter requirement in determining that statute was not overbroad).  Because Section 1752 restricts primarily non-expressive conduct in a nonpublic forum, the defendant has failed to show that the absence of temporal and spatial limitations renders the statute "substantial[ly]" overbroad relative to its "plainly legitimate sweep." *Washington State Grange*, 552 U.S. at 449 n.6 (internal quotation marks omitted).

To be sure, as with any time, place, and manner restriction, it is possible to hypothesize outlandish scenarios in which restricted areas are so large in size, so long in duration, or so divorced from any substantial government interest that they cannot constitutionally support a conviction under Section 1752.  But, again, that is not the standard for overbreadth.  The Supreme Court has made clear that "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Taxpayers for*

*Vincent*, 466 U.S. at 800.  Rather, "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Id.* at 801.  Here, the defendant's own prosecution – which involved physically trespassing into the restricted Capitol on the heels of others who had forcibly breached the building – is illustrative of the numerous constitutionally legitimate applications of the statute.  Far from showing a "realistic danger" of constitutionally problematic applications in other cases, *Taxpayers for Vincent*, 466 U.S. at 801, the defendant fails to identify a single actual example of a prosecution based on protected speech.  Nothing calls for the "strong medicine," *Los Angeles Police Dep't*, 528 U.S. at 39 (internal quotation marks omitted), of overbreadth invalidation.

Finally, the defendant contends that Section 1752 is unconstitutionally vague and overbroad because it (i) does not specify which types of "'visits' … may occasion qualifying restrictions"; (ii) does not require a "causal nexus between restriction of the area and the visit … of a Secret Service protectee"; and (iii) provides scant guidance on what 'restriction' renders an area off limits."  ECF No. 46 at 23-24.  But none of these features has any logical connection to whether the defendant has reasonable notice that his conduct is subject to criminal prosecution. The reason is by now familiar: no defendant can be convicted under the statute's relevant provisions unless the government proves beyond a reasonable doubt that the defendant knew that the area on which he encroached was in fact restricted.  Section 1752(a)(1) additionally requires proof that the defendant knew he lacked lawful authority to be on the premises.  And Section 1752(a)(2) requires proof that he knowingly engaged in disorderly or disruptive conduct, with the specific intent "to impede or disrupt the orderly conduct of Government business or official functions."  These requirements more than adequately protect a Section 1752 defendant against the possibility that he might be unfairly convicted without notice.  *See Carhart*, 550 U.S. at 149.

Nor does the absence of the limitations favored by the defendant have any logical connection to overbreadth – *i.e.*, to whether the statute might, in many if not most application, "compromise recognized *First Amendment* protections of parties not before the Court." *Taxpayers for Vincent*, 466 U.S. at 801 (emphasis added).  At a minimum, none of the defendant's quibbles establish that Section 1752(a) is "substantial[ly]" overbroad relative to its "plainly legitimate sweep" under the First Amendment.  *Washington State Grange*, 552 U.S. at 449 n.6 (internal quotation marks omitted).

### C.     Section 1752(a)(2)'s Prohibition on "Disorderly or Disruptive Conduct" Is Not Unconstitutionally Vague Or Overbroad

The defendant also contends (ECF No. 46 at 25-28) that Section 1752(a)(2)'s reference to "disorderly or disruptive conduct" renders that provision unconstitutionally vague and overbroad because the phrase is not specifically defined in the statute.  The defendant is incorrect.

Because "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers," "the first step" is to consider what the statute says.  *Williams*, 553 U.S. at 293.  Here, Section 1752(a)(2) presents no ambiguity.  By singling out "disorderly or disruptive" conduct, the statute targets conduct rather than speech.  Furthermore, the statute substantially clarifies the bounds of the prohibited conduct by adding two key requirements.  First, the defendant must act "with intent to impede or disrupt the orderly conduct of Government business or official functions."  18 U.S.C. § 1752(a)(2).  Second, the conduct must "in fact[] impede[] or disrupt[] the orderly conduct of Government business or official functions."  *Id.*  As relevant here, then, Section 1752(a)(2) targets *only* conduct that (i) occurs within (or in in proximity to) a restricted area where a Secret Service protectee is temporarily visiting; *and* (ii) is intended to "impede or disrupt the orderly conduct of Government business or official functions";

*and* (iii) in fact "impedes or disrupts the orderly conduct of Government business or official functions."

Given these limitations, Section 1752(a)(2) would pass muster, in nearly all its applications, under any standard of scrutiny. It surely passes muster under the permissive reasonableness standard that applies where, as in all applications of Section 1752(a)(2), the statute merely imposes viewpoint- and content-neutral restrictions in a nonpublic forum. *See Perry Education Ass'n*, 460 U.S. at 47; *accord United States v. Cassiagnol*, 420 F.2d 868, 873 (4th Cir. 1970) (rejecting overbreadth and vagueness challenges to prohibition on "'unseemly or disorderly conduct' … on federal property which is intended to and does interfere with, delay, or impede the normal and orderly conduct of government business on such federal property"). Indeed, the defendant in this case has not identified a single actual example of a prosecution under Section 1752(a)(2) that would constitute an unconstitutional application of the statute. And the defendant's own hypothetical illustration of Section 1752(a)(2)'s overbreadth – *i.e.*, "a protestor loudly reading the names of military members killed in combat from the audience of a speech by the President (within the "restricted area" of the event) in order to protest a war, and effectively causing the President to stop their speech" – demonstrates that Section 1752(a)(2)'s carefully calibrated prohibition is, in fact, constitutional in virtually all of its applications. At a minimum, the defendant has failed to show that Section 5104(e)(2)(G) is "substantial[ly]" overbroad relative to its "plainly legitimate sweep." *Washington State Grange*, 552 U.S. at 449 n.6 (internal quotation marks omitted).

The defendant chides Section 1752(a)(2) for not expressly defining the phrase "disorderly or disruptive conduct," thus leaving open the possibility that (in theory) the phrase could take on a broad meaning. ECF No. 46 at 24-27. But the defendant's quest for the broadest possible definition of the that phrase (ECF No. 46 at 27-28) is unavailing for a simple reason: by its plain

terms, the statute *does* limit its prohibition to disorderly or disruptive conduct to the conduct that "in fact, impedes or disrupts the orderly conduct of Government business or official functions." 18 U.S.C. § 1752(a)(2).  The defendant's overbreadth and vagueness claims therefore fail.

## IV.   Section 1752(a)(2) Is Not An Impermissible Content-Based Infringement on Protected Speech

The defendant contends (ECF No. 46 at 28-31) that Section 1752(a)(2)'s prohibition on disorderly and disruptive conduct in a restricted building or grounds is an "unconstitutional content-based restriction on speech."  He is again incorrect.

The First Amendment imposes limits on laws that "restrict expression because of its message, its ideas, its subject matter, or its content."  *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (citation omitted).  "A regulation of speech is facially content based under the First Amendment if it 'target[s] speech based on its communicative content' – that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'"  *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (quoting *Reed v. Town of Gilbert, Arizona*, 576 U.S. 155, 163 (2015)).  A content-based restriction on speech generally can generally stand only if "it passes strict scrutiny – that is, unless it is justified by a compelling government interest and is narrowly drawn to serve that interest."  *Brown v. Entertainment Merchs. Ass'n*, 564 U.S. 786, 799 (2011).  To succeed in a "facial attack" (apart from an overbreadth challenge, *see supra*), the defendant "would have to establish 'that no set of circumstances exists under which [Section 1752(a)(2)] would be valid,' or that the statute lacks any 'plainly legitimate sweep.'"  *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citations omitted).

The defendant's facial challenge to Section 1752(a)(2) as a content-based regulation of speech fails at the threshold because the provision does not target speech at all, much less speech based on its communicative content.  Section 1752(a)(2) criminalizes certain conduct – *i.e.*,

"disorderly or disruptive conduct [that] … in fact, impedes or disrupts the orderly conduct of Government business or official functions" – not speech as such.  As the events of January 6 demonstrate, Section 1752(a)(2) can be violated in myriad ways that involve no protected expressive communication at all – for example, by assaulting law enforcement officers, threatening government officials, or carrying cowbells and a large flag alongside other rioters in a restricted area where government business is being conducted, or just physically invading the restricted area where the government business is being conducted.

Because Section 1752(a)(2) does not facially regulate pure speech or highly expressive conduct, it may be classified as a content-based regulation only if it "swap[s] an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result."  *City of Austin, Texas v. Reagan Nat'l Advert. of Austin*, LLC, 142 S. Ct. 1464, 1474 (2022); *see also  United States v. O'Brien*, 391 U.S. 367, 376 (1968) (refusing to "accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea").[7]  Contrary to the defendant's assertions (ECF No. 46 at 30), Section 1752(a)(2)'s requirement that the defendant act "with intent to impede or disrupt the orderly conduct of Government business or official functions" is not such a proxy.  As already noted, the statute applies only to conduct that "in fact[] impedes or disrupts the orderly conduct of Government business or official functions."  18 U.S.C. § 1752(a)(2).  The statute's further scienter requirement merely ensures that only the most deliberate acts of obstruction are subject to prosecution – it singles out the defendant's willfulness vis-à-vis his wrongdoing, not political motive.  At a minimum, because at least many of the statute's applications regulate not speech but

---

[7]     Contrary to the defendant's suggestion (ECF No. 46 at 29-30), the Supreme Court's recent decision in *City of Austin rejected* a rule whereby "any classification that considers function or purpose is always content based."  142 S. Ct. at 1474.

only conduct, Section 1752(a)(2) has a "plainly legitimate sweep."  *Stevens*, 559 U.S. at 473 (citation omitted); *see Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449-450 (2008).  For that reason alone, the defendant's facial challenge fails.

## CONCLUSION

For these reasons, the defendant's motion to dismiss Counts One and Two of the Information should be denied.

Dated: November 30, 2022

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:  */s/ Francesco Valentini*
FRANCESCO VALENTINI
D.C. Bar No. 986769
Trial Attorney
United States Department of Justice, Criminal Division
Detailed to the D.C. United States Attorney's Office
601 D Street NW
Washington, D.C. 20530
(202) 598-2337
francesco.valentini@usdoj.gov