KeyCite Red Flag - Severe Negative Treatment
Overruled by  U.S. v. W.R. Grace,  9th Cir.(Mont.),  May 15, 2008

628 F.2d 1139
United States Court of Appeals,
Ninth Circuit.

UNITED STATES of America, Plaintiff-Appellant,
v.
Kenneth Moses LOUD HAWK, Russ James Redner, Leonard Peltier, Dennis James Banks, Darlene Pearl Nichols, who gives her true name as Kamook Banks, and Anna Mae Aquash, also known as Annie May Pictou and Naguset Eask, Defendants-Appellees.

Nos. 76-1906, 76-2127.
|
Aug. 7, 1979.
|
Rehearing Denied Oct. 1, 1979.
|
Certiorari Denied March 3, 1980. See 100 S.Ct. 1279.

**Synopsis**
Following remand, the United States District Court for the District of Oregon, Robert C. Belloni, J., entered order **suppressing** **evidence** and dismissing counts of indictment charging defendants with firearms violations, and Government appealed. The Court of Appeals, Trask, Circuit Judge, held that: (1) delay resulting from Government's appeal from **suppression** order did not require dismissal of counts of indictment charging defendants with possession of dynamite; and (2) delay resulting from Government's appeal from **suppression** order warranted dismissal of nondynamite firearms counts of indictment. The Court also held, in a concurring opinion filed by Kennedy, Circuit Judge, that where state officials seized from defendants a substance identified as dynamite, state officials **destroyed** dynamite, pursuant to unwritten policy, based on lack of storage facilities, problems with chain of custody, and public safety considerations, federal officials did not participate in **destruction** of dynamite, defendants were prejudiced as result of **destruction** only to extent that their inability to observe **destruction** and to analyze samples deprived them of opportunity to contest Government's conclusion that substance **destroyed** was indeed explosive, but Government's secondary **evidence** that substance was dynamite was probative and reliable, Government was entitled to introduce its secondary **evidence** indicating that substance seized from defendants was dynamite.

Reversed and remanded with instructions.

Kennedy, Circuit Judge, concurred specially and filed opinion in which Browning, Chief Judge, and Eugene A. Wright, Choy, Wallace and J. Blaine Anderson, Circuit Judges, concurred.

Goodwin, Circuit Judge, concurred specially and filed opinion.

Hufstedler, Circuit Judge, dissented and filed opinion in which Ely and Hug, Circuit Judges, joined.

Ely, Circuit Judge, dissented and filed opinion.

**Procedural Posture(s):** On Appeal.

Concurring Opinion

**Attorneys and Law Firms**

**\*1141**  Sidney Lezak, U. S. Atty., Portland, Or., on brief; Charles H. Turner, U. S. Atty., Portland, Or., for plaintiff-appellant.

Schiffman & Jones (argued), Steenson, Parkinson & Lea, Portland, Or., Dennis Roberts (argued) Oakland, Cal., on brief; Ronald P. Schiffman, Portland, Or., for defendants-appellees.

Appeal from the United States District Court for the District of Oregon.

Before BROWNING, ELY, HUFSTEDLER, WRIGHT, TRASK, CHOY, GOODWIN, WALLACE, KENNEDY, ANDERSON, and HUG, Circuit Judges.[*]

TRASK, Circuit Judge, files an opinion and the judgment of the court. BROWNING, EUGENE A. WRIGHT, CHOY, WALLACE, J. BLAINE ANDERSON, and KENNEDY, Circuit Judges, concur in the result and in sections I, II, III and VI.

I

EXHIBIT A

On November 13, 1975, Leonard Peltier and companions were thought by the FBI to be traveling across the State of Oregon. Peltier was then a fugitive from the United States authorities and federal officers were attempting to take him into custody. It was thought that he might be traveling with a party of five others and going east. One other who was believed to be in this party of six and thought to be a federal fugitive was Dennis Banks. The events of the siege of Wounded Knee had occurred a short time before,[1] and the government was still in the process of tracking fugitives from that sorry affair.

Desiring to make Oregon State Police aware of this information, the Portland, Oregon FBI office sent a teletype message on that day to all Oregon law enforcement officers which stated that federal fugitives might be traveling through Oregon in a motor home and a station wagon. Both vehicles were described and the license number of the motor home was given. The message then stated that if the vehicles were sighted they should not be stopped, but the FBI notified. The next day, on November 14, at about 9:30 p. m., Oregon State Trooper Griffiths sighted the vehicles and verified their description and the license number of the motor home. He proceeded to stop the vehicles. Griffiths had not read the entire bulletin and made the stop under the impression that the bulletin required it. Findings of Fact at 1.[2] **\*1142** He then radioed for help and pulled in between the vehicles with his overhead lights flashing. Both vehicles stopped, with the station wagon about 100 yards behind the trooper's car. Trooper Griffiths got out of his car and approached the motor home on the right. He commanded the occupants of the motor home to get out. An Indian male got out, followed by two Indian women and a small child. Griffiths asked if anyone else was inside and they replied "No." At approximately the same moment the motor home accelerated swiftly forward and the man who had gotten out of it fled toward a fence along the highway. As he jumped the fence about 15 yards from the road he fired a shot in the direction of Trooper Griffiths. The trooper returned two shotgun blasts. Both of these shots missed.

As Trooper Griffiths was approaching the motor home, Corporal Kramer, also of the Oregon State Police, who had responded to the call for aid, got out of his patrol car and shined his flashlight into the rear window of the station wagon. Corporal Kramer cautiously approached the left side of the station wagon. When he reached the driver's door he ordered the driver (later identified as defendant Russ James Redner) out of the vehicle and to the rear of the station wagon where he was ordered to stand in the headlights of Kramer's patrol car. On request, the driver produced a Washington driver's license. The officer then approached the passenger's side and ordered the occupant to get out and also stand in the front of the headlights of his patrol car. The passenger was identified as defendant Loud Hawk. Griffiths meanwhile had followed the direction of the motor home and found it on the highway about one-half mile away from the initial stop. The motor was running, the lights were on and the door was shut. No occupants were found inside. Both vehicles were then locked, towed away and impounded by the Oregon State Police until a search warrant was obtained.

On Saturday, November 15, 1975, state search warrants were obtained for the search of both vehicles.[3] The Oregon State Police searched both vehicles on Saturday, November 15, 1975, pursuant to their warrants. No federal agent participated in the decision to obtain the state search warrant. Federal agents observed the search of both vehicles but did not participate directly except that federal agent Hancock entered the motor home on one occasion. The findings of the trial court on remand in part relate the subsequent events:

> "Firearms were found in the motor home, which was searched first, and federal agents were told of this fact.[4] Federal agents then suggested that the station wagon be searched for firearms. State officers opened the station wagon and found the dynamite immediately. Federal agents did not participate physically in the search of the station wagon, and no federal warrant had been obtained. Federal agents did observe the state search and photograph the dynamite as it appeared in the station wagon.

> "On November 16, the dynamite was transferred from the station wagon to a state police car by state officers. Federal agents did not participate physically but did observe and photograph the dynamite as it appeared in the trunk of the state police car. Federal agents did not advise or direct any action with respect to the removal or transportation of the dynamite. **\*1143** Federal agents made no request that any of the dynamite be preserved for their purposes. Had such a request been made, state police would have complied.

>> "The decision not to keep the dynamite was made by Trooper Fettig of the state police, pursuant to an unwritten policy defined by his practice of six years before November 1975. Trooper Fettig's practice of destroying explosives was based on the lack of state storage facilities, problems with chain of custody and

public safety considerations. Federal agents did not actively participate in Trooper Fettig's decision not to transport the dynamite for safekeeping. Federal agents were present and aware of Trooper Fettig's intended destruction of the dynamite and neither encouraged nor discouraged such action.

"The decision to destroy, like the decision not to transport the dynamite, and containers was made by Trooper Fettig, pursuant to state police policy and in his discretion. No federal agent participated in this decision. Federal agent Milam, the only federal agent present at the destruction of the dynamite and containers, rode with a state officer in a car following Trooper Fettig's to a gravel pit outside Ontario for the purpose of observing and photographing the destruction. Agent Milam neither encouraged nor discouraged the destruction of the dynamite and containers." Findings of Fact at 3.

II

A five count superseding indictment charged all of the appellees with three counts relating to possession of an unregistered and unnumbered destructive device

"consisting of a combination of parts designed and intended for use in converting a device into a destructive device; said combination of parts consisting of: (a) six (6) pocket watches, each with a hole drilled in the face with a metal screw inserted into the hole in a position with the moving hands of the watch, with a soldered battery connector and a ground wire attached with expended flash bulbs attached; (b) four (4) batteries with wires attached; and (c) two (2) expended flash bulbs with wires attached; and said device consisting of watches, timing devices, electrical blasting cap leg wires, wires, electrical blasting cap, detonating cord, batteries, and seven (7) cases of DuPont 70 percent dynamite, and said destructive device had not been registered to them in the National Firearms Registration & Transfer Record as required by section 5841, Title 26, United States Code, in violation of section 5861(j) and section 5871, Title 26, United States Code." C.T. at 113, 114, 115.

Count I charged the violation as above; Count II again described the same destructive device and charged violation of the provision requiring identification by serial number as required by section 5842(c) of Title 26, and 27 CFR 179.102 and violation of sections 5861(i) and 5871.

Count III again described the same destructive device but with violation of different registration requirements.

Count IV charged Loud Hawk with wilfully transporting weapons in interstate commerce which had their serial numbers obliterated, to wit: four Valmet semi-automatic rifles; one Colt AR-15 Cal. 223; three Smith & Wesson .357 Magnums and a Swiss-made 7.5 mm handgun, in violation of Title 18, section 922(k), United States Code.

Count V charged only Dennis James Banks, who was a fugitive when the indictment was returned.

Because the dynamite which was being transported was destroyed by Oregon State Police who had apprehended the defendants, the district court dismissed the dynamite counts with prejudice pursuant to Rule 48(b), Fed.R.Crim.P., on grounds of unlawful suppression of evidence. When the government then declined to proceed with the firearms count until it could appeal the ruling on the dynamite counts, the district judge dismissed the indictment with prejudice. The federal government then appealed the Order Dismissing the Indictment. On June 11, 1976, the appeals of the suppression order and the order dismissing the *1144 indictment were consolidated by this court. Nos. 76-1906 and 76-2127, July 26, 1977.

A panel of this court considered the matter after oral argument and by a divided vote affirmed the judgment of the district court. Application for en banc reconsideration was made and this court en banc directed a remand to the district court for the purpose of obtaining an evidentiary hearing and to make findings of fact with respect to the following matters:

"1. Did any agent of the federal government participate in the destruction of the evidence? The factual findings should include the nature and extent of the federal participation, if any, in:

"(a) The search for, and possession of, the evidence destroyed;

"(b) The decision not to transport the dynamite for safekeeping;

"(c) The decision to destroy, and the actual destruction of, the dynamite and containers;

"(d) Any other actions or inactions relevant to the destruction of the evidence; and

"(e) Any other actions or inactions to preserve samples or secondary evidence.

"2. What prejudice, if any, was suffered by the defendants as a result of the destruction of the evidence?

"In this order, the term 'dynamite' is used to designate the material that was contained in the cartons and that was destroyed.

"This court retains jurisdiction of this case and requests the district court to hold hearings and make findings pursuant to this limited remand within 45 days of the date of this Order, or as soon thereafter as practicable." Order of Remand, March 6, 1978.

The district court held an evidentiary hearing on May 9 and 10, 1978, and made findings at its conclusion. Wherever possible in this opinion, matters of fact are taken from the facts developed at that remand hearing and noted in the district court's findings.

III

Throughout the consideration of the case there continues to be uncertainty voiced by the district court and by the defendants as to the nature of the substance contained in the boxes which were **destroyed**. The district court in its Order **Suppressing Evidence** makes reference to the fact that "State Police Officers discovered what appeared to be seven cases of DuPont Gelex 2-70% dynamite." Following the evidentiary hearing on remand, the court refers to the explosive as "(t)he substance at issue which I shall call dynamite for the purpose of these findings. . . ." (Emphasis added).

Officer Fettig, the explosives expert of the Oregon State Police, who was dispatched to investigate the explosive problem, went to the impounded station wagon and, in his words "opened the driver's right rear door and noticed in the inner compartment of the station wagon, with the seats laid down, that in a greenish black visquine bag there was dynamite."[5] There was no doubt or equivocation in his judgment or his statement of fact stating that "there was dynamite." Each of the seven boxes was marked "High Explosives Dangerous" and on the side had the following markings:

**\*1145**  "50 lbs Gelex 2 1 X 8 70% Strength D73MAO 7B"

together with the logo of the DuPont company prominently displayed. Inside were red cylindrical sticks with heavy wrapping paper covering the contents and marked:

"Explosives Dangerous Gelex 2 70% Strength
E I Dupont De Nemours & Co. (Inc.)."

and again carrying the number D73MAO 7B, with a last letter as Q or A, or Y.

There was no testimony or other evidence to prove that it was not dynamite. Certainly it could be detonated and would explode because it did. A witness put on the stand by appellees, Ronald McCreary, qualified as an expert on the basis of using dynamite in road building, which was part of his occupation as a civil engineer. He looked at the pictures of the explosion and stated that the substance did not seem to have the explosive characteristics of the dynamite he was familiar with. Yet, he stopped short when asked the direct question whether he knew that it was dynamite or not, and acknowledged that he did not know.[6]

Photographs were taken of the explosives in the station wagon to show the cartons or boxes of Gelex 2 and the identity of the manufacturer with the serial numbers of the individual sticks so that they could be identified. They were in fact identified by employees of DuPont, manufacturer of the dynamite, by witnesses Bishop and Ursic. Bishop was a magazine keeper of explosives manufactured by the DuPont Company in the March 1973 trial period at its Washington plant. He identified a bill of lading, a cardex file showing the manufacture and shipment of dynamite from the Washington plant and a pack report showing where the material was manufactured and sent to the magazine for storage. The witness testified that the documents reflected the manufacture of 46 cases of Gelex 2 dynamite in 1973. Most important, he testified that those records "list the serial numbers or identification numbers that appear on those sticks of dynamite," i. e., the sticks in the 46 cases. No questions were asked on cross-examination.

Anthony Ursic was the assistant manager of that particular plant (at DuPont, Washington) in 1973. That plant, he testified, manufactured explosives, "dynamite essentially." From exhibit 17, he testified that "(t)he envelope contains paper that is used to wrap dynamite. And it's similar to the type we use at our plant." Evidentiary Hearing, R.T. at 177.

"Q. Looking at the records you have in Government's Exhibit 17, can you tell where the dynamite which is contained in wrappers 1 through 7 was manufactured and when?

"A. Yeah. Actually, the code date here is for Gelax (sic) 2 is 974 MAO 7B, which is similar to the code date on here.

"Q. And what does that

"A. So this indicates that 46 cases were made and shipped to a customer in Montana.

"Q. And when they were shipped, were they full cases of dynamite?

"A. Yes."

Evidentiary Hearing, R.T. at 180-81.

When the DuPont employees testified, they referred to the cartons, the wrappers, the substance inside the wrappers, all in terms of "Gelex" or dynamite. They apparently had not been instructed to use a particular name "dynamite" as an artificial or symbolic term for an unknown substance. **\*1146** They referred to the substance as "dynamite" or "Gelex" as a name for a particular DuPont dynamite product.

Finally, neither the indictment nor the statute requires that the explosive be "dynamite." It is couched in broader terms and refers to a "destructive device."[7]

It does not require that the parts be put together and ready for ignition or detonation if the parts are also available from which a destructive device may be readily assembled. United States v. Shafer, 445 F.2d 579, 583 (7th Cir.), cert. denied, 404 U.S. 986, 92 S.Ct. 448, 30 L.Ed.2d 370 (1971). Under the circumstances in which it was being transported, with firearms and bomb components and ammunition, the explosive here belies any contention that the group was on a peaceful agrarian mission, or that the explosive was to be used to dislodge stumps.

IV

The appellees have pointed to nothing in the circumstances we are concerned with that establishes that the federal authorities participated with the state authorities in destroying the dynamite. From the very beginning, when the FBI sent out its all points bulletin, the federal authorities made it plain that they did not want state authorities to interfere. The state trooper did not comply. He disregarded the admonition.[8] When the vehicles were secure, they were in state possession and not federal possession. The State of Oregon obtained its own search warrant from a state official and conducted its own search of the vehicles. The state used its own fingerprint expert to examine the vehicles. It called in its own explosives expert, Officer Fettig, to determine what to do with the explosives. That expert made his own decision without calling upon the federal officers. There is no evidence of any connivance or even conference between the two groups of law enforcement officers as to the handling of the problem.

The legal principles we are to look to for a solution to the problem here are well established. When the government loses or **destroys** tangible **evidence** prior to trial, a motion to **suppress** secondary **evidence** such as photographs, testimony of witnesses, etc., will be granted by the trial court if the defendant can show (1) bad faith or connivance on the part of the government, and (2) that he was prejudiced by the loss or **destruction** of the **evidence**. United States v. Sewar, 468 F.2d 236 (9th Cir. 1972), cert. denied, 410 U.S. 916, 93 S.Ct. 972, 35 L.Ed.2d 278 (1973); see also United States v. Young, 535 F.2d 484, 488 (9th Cir.), cert. denied, 429 U.S. 999, 97 S.Ct. 525, 50 L.Ed.2d 609 (1976); United States v. Heiden, 508 F.2d 898, 902 (9th Cir. 1974); United States v. Henry, 487 F.2d 912 (9th Cir. 1973).

Thus, returning to the specific questions asked on the remand and commenting on them seriatim, the first question addressed by this court to the trial court on remand was whether any agent of the federal government participated in the destruction of the evidence and the nature and extent of that federal participation. There was no finding on remand that there was any federal participation in that destruction.

(a) It was the state trooper who found the defendants in their two vehicles, stopped them on his own responsibility and took charge of the evidence on behalf of the state. At this point the only shred of argument to the contrary is that the stop and impounding of the vehicles was triggered by the teletype message put out by the FBI. But that message directed the state police not to take the persons or vehicles into custody. State Police Officer Griffiths said simply but unequivocally that he made the stop because he thought that was the thing to do despite the bulletin's direction to the contrary. He was acting as an Oregon police officer

**\*1147** and not as an adjunct of the federal government, but contrary to its admonition.

(b) The decision not to transport the dynamite for safekeeping was made by Officer Fettig of the Oregon State Police. He testified that it was his responsibility what to do with the explosives and that he was guided solely by his own judgment based on a six-year state policy.

(c) The decision to destroy the explosives was again that of Officer Fettig. It was in accordance with the state policy of long standing and not a decision of the moment after consulting the federal authorities. There was no evidence to the contrary. No evidence or finding indicated there was even any discussion with federal authorities at the scene or elsewhere concerning the manner of disposition of the explosives. Fettig (with assistance of Griffiths, an Oregon State Trooper) transferred the explosives to Fettig's automobile and organized the three-car convoy that took the dynamite away with one state car leading, the second with Fettig and the explosive and the last car affording protection from the rear.

(d) There was no evidence or finding as to the question of taking samples or preserving other secondary evidence. Both a state police officer and a federal officer took photographs which were made available to the court. Testimonial evidence was available from the officers who witnessed the destruction and the officers testified and were cross-examined and the photographs and dynamite wrappers were introduced.

(e) With respect to the last question addressed to the district court, it concerned "any other actions or inactions" in regard to the destruction of the dynamite. The district court here calls attention to the cross-examination of John O'Rourke, Special Agent in Charge of Oregon, who came to Ontario before the dynamite was destroyed. The testimony of several FBI agents makes it clear that their interest was in locating federal fugitives and particularly Leonard Peltier. O'Rourke was asked if he knew whether Beverly Axelrod, an attorney for the defendants, was in Ontario. He said that he did, and then the inquiry was whether he made any effort to inform her of the impending destruction of the dynamite. He replied that he had not. Likewise, Axelrod never inquired of O'Rourke to be allowed to witness the destruction.

The situation thus remains highly problematical. It is also unclear whether Axelrod was at this time and on this trip actually working for Loud Hawk. She was not produced, nor did she testify at any of the hearings. Throughout the entire proceedings, Loud Hawk was represented by Schiffman and Jones, a law firm of Portland, Oregon. At the trial, which took place in 1976, the court inquired of Loud Hawk as it did of the others, who their attorneys were, and Loud Hawk then stated he was represented by Lawyer Jones and was satisfied with his services. Axelrod does not appear of record as an attorney at any place in the record we have been able to find. Finally, the point that is attempted to be made, that federal agents failed to have defendants' attorneys examine the dynamite before its destruction, is even less convincing when we remember that O'Rourke was never shown to have had any authority to stop or postpone the destruction of the evidence in the first place. Neither would he have any reason to look for Axelrod and invite her to witness the state's destruction of the dynamite.

The appellees rely on Lustig v. United States, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949), to prove that there was federal participation in the search and in the subsequent destruction. Lustig was a principal in a counterfeiting operation which appeared to be in operation in a hotel room. Greene, a Secret Service agent, was suspicious of the activity but apparently did not believe he had enough evidence for a break-in or even to obtain a warrant. He gave the information to the city police who proceeded to obtain an arrest warrant but no **\*1148** search warrant. The city officers entered the room illegally while Greene remained at the police headquarters awaiting their telephone call. As soon as a search warrant was obtained the police officers called Greene who then joined them in making the search. He helped the city police in the search, selecting evidence that would help a federal prosecution and accepting other evidence the local officers gave to him. The Court said:

> "The crux of that doctrine is that a search is a search by a federal official if he had a hand in it; it is not a search by a federal official if evidence secured by state authorities is turned over to the federal authorities on a silver platter. . . .
>
> "Though state officers preceded Greene in illegally rummaging through the bags and bureau drawers in Room 402, they concerned themselves especially with turning up evidence of violations of the federal counterfeiting laws after Greene joined them. He was an expert in counterfeiting matters and had a vital share in sifting the evidence as the search proceeded. He exercised an expert's discretion in selecting or rejecting evidence that bore on counterfeiting. The fact that state officers preceded him in

breach of the rights of privacy does not negative the legal significance of this collaboration in the illegal enterprise before it had run its course. Greene himself acknowledged such participation by his remark about 'leaving the room after we had gathered all this evidence together.' " Lustig v. United States, 338 U.S. 74, 78-79, 69 S.Ct. 1372, 1374, 93 L.Ed. 1819.

In the case before us there was certainly not participation in the Lustig manner. The federal officers here did not have a part in the search of the car or in the destruction of the dynamite. Their major concern was with the whereabouts of Leonard Peltier and they hoped to find him among the travelers.

The opinions of this court in United States v. Higginbotham, 539 F.2d 17 (9th Cir. 1976), and United States v. Trenary, 473 F.2d 680 (9th Cir. 1973), are also of no assistance to appellees. In Higginbotham, the appellant was convicted on a Dyer Act charge. Shortly after appellant's arrest, an officer of the Boise, Idaho, Police Department put together a photographic display composed of 18 photographs, one of which was that of appellant. During pretrial proceedings, appellant's photograph was readily identified from among the pictures constituting the display. At trial the display could not be produced because it had been broken up and the pictures returned by local police to their files. Before this court, appellant complained that the failure to produce the display denied him due process. The contention was rejected, Judge Kilkenny stating:

> "Here is a proper place to emphasize that the fifteen photographs were never in the possession of the prosecutor, the FBI or any other United States Government agency. The Boise police, under these facts, cannot be said to be acting on behalf of the federal government but rather on behalf of the State of Idaho. Cf. United States v. Smith, 433 F.2d 1266 (CA5 1970). Under such circumstances we should be reluctant to impute to the federal government the mistakes, particularly relatively innocent ones, committed by local police. Moreover, the demand to produce these photographs might well be likened to an attempt to require production under the Jencks Act of statements in the possession of state police. See Beavers v. United States, 351 F.2d 507 (CA9 1965), where the statements were never in possession of the United States and production was not required. By analogy, it is evident that the United States is in no way responsible for the actions of the Boise police in disposing of the fifteen photographs by inadvertence or otherwise." Id. at 21.

In Trenary there was a conviction for conspiracy to import marijuana from Mexico. The marijuana and duffle bags containing it had been destroyed by the Mexican police before trial. There being no charge of bad faith or negligence by the United States, secondary evidence was admissible **\*1149** at the trial. Trenary is another example of the refusal of this court to impute to the federal government the loss or destruction of evidence by other authorities over whom it has no authority or control.

V

The final questions addressed to the trial court concerned prejudice. Under the law of the circuit, even if there should be a finding of participation in the destruction, there must also be a showing by the defendants that they have been prejudiced by the loss of the evidence. United States v. Sewar, 468 F.2d 236 (9th Cir. 1972) and cases supra. Prejudice was suffered by the defendants, the trial court says, "to the extent that their inability to observe the destruction and to analyze samples of it deprived them of the opportunity to contest the government's conclusion that the substance destroyed was indeed explosive." We have already noted the weakness of the testimony of witness McCreary, who examined the photographs of the explosion and who then declined to express any opinion as to the question whether the explosion was of dynamite or not.

The last finding of the trial court was that the defendants "were also prejudiced by the destruction of the cartons and plastic bag which contained the dynamite in that they were deprived of the opportunity to determine by fingerprinting who might have handled those items."

We find the fingerprinting argument a little difficult to follow. Let us assume that X, Y and Z are being prosecuted for possession of contraband and that the fingerprints of X are found on the contraband. This evidence might be used against X, but it does not affect Y and Z, whose prints were not found. As to defendants here, lack of their fingerprints is exculpatory, if anything. Absence of fingerprints has little significance to prove or disprove handling. The handlers might have worn gloves; they might have removed their prints; or they might have employed someone else to lift the dynamite. It is only where there are fingerprints that such identification is helpful, and then helpful to the prosecutor, if to anyone, in establishing an identity not otherwise discovered. Here,

there is no prejudice to the defendants in the destruction of the boxes and the plastic covering or any other part of the explosives as a result of possible destruction of fingerprints.

VI

In its second assignment of error, the government contends that the district court incorrectly dismissed the indictment against appellees. The district court's order dismissing the indictment was founded on Rule 48(b) of the Federal Rules of Criminal Procedure. That rule authorizes the court to dismiss an indictment whenever there has been "unnecessary delay in bringing a defendant to trial." The government argues that the delay in prosecuting appellees has not been "unnecessary," and consequently that the district court abused its discretion in dismissing the indictment. Assuming arguendo that the district court did not err in dismissing the indictment, the government contends that the court below did err in dismissing the indictment with prejudice. While dismissal with prejudice is authorized by Rule 48(b), the government points out that such power is to be utilized with caution and only after a forewarning to the prosecution that dismissal with prejudice will result from a failure to proceed to trial. United States v. Simmons, 536 F.2d 827, 834 (9th Cir. 1976), cert. denied 429 U.S. 854, 97 S.Ct. 148, 50 L.Ed.2d 130, see also United States v. Charnay, 577 F.2d 81, 84 (9th Cir. 1978). The government argues that the trial court failed both to exercise the requisite caution and to provide the required forewarning, and thus improperly dismissed the indictment with prejudice.

In examining the government's second assignment of error, the merits of its arguments are best demonstrated if the dynamite and nondynamite counts are analyzed separately.

The dynamite counts. The delay in prosecuting appellees on the dynamite counts *1150 has not been unnecessary under Rule 48(b). The government had a statutory right to appeal the suppression order as it applied to the dynamite counts. The delay has been necessary to permit the meaningful exercise of that statutory right.

The government has been granted the right by statute to appeal suppression orders entered by the district court. That right is set forth in 18 U.S.C. s 3731. Section 3731 provides in pertinent part:

> "An appeal by the United States shall lie to a court of appeals from a decision or order of a district courts suppressing . . . evidence . . . not made after the defendant has been put in jeopardy . . . if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding."

The government's right to appeal is available conditionally. First, the appeal is not available if the defendant has been put in jeopardy. Second, the appeal must not be taken for purpose of delay. Third, the evidence suppressed must be substantial proof of a fact material in the proceeding. Clearly, these conditions were met in the context of the dynamite counts. (1) Appellees have yet to be placed in jeopardy. (2) The appeal was not taken for purpose of delay. The delay in bringing appellees to trial was necessary to permit the government to effectively exercise its statutory right to appeal. (3) The suppressed evidence was critical in establishing a necessary element of the alleged offenses, the existence of an explosive device.

In summary, the government had a statutory right to appeal the suppression order if certain conditions were met. Those conditions were satisfied as to the dynamite counts. Delay was necessary to permit the government to effectively take its appeal. Clearly, such a delay, necessary to give effect to a statutory right, cannot be deemed "unnecessary" for purposes of Rule 48(b). Therefore, we hold that the district court erred in dismissing the dynamite counts pursuant to Rule 48(b); we reverse that portion of the district court's order dismissing these counts; and remand the cause to the district court with instructions to reinstate the indictment as to these counts.

The nondynamite firearms counts. The delay in prosecuting appellees on the nondynamite counts of the indictment has been unnecessary for Rule 48(b) purposes. As previously discussed, the government's right (via section 3731) to appeal a district court's order suppressing evidence is conditional. One of the conditions is that the evidence suppressed must be substantial proof of a fact material in the proceeding. This condition must be met before appeal of the suppression

order can properly be taken. Despite the government's protests to the contrary, the suppressed evidence (dynamite) is not substantial proof of any material fact in the nondynamite counts of the indictment. The trial court found as much. Given the government's failure to satisfy this condition, its appeal of the suppression order as it relates to the nondynamite counts was improper and the delay in prosecution occasioned by this appeal has been unnecessary under Rule 48(b). Therefore, we find that the court below properly dismissed these counts of the indictment.

Having determined that the trial court properly dismissed the nondynamite counts of the indictment, we turn now to the propriety of dismissing those counts with prejudice. In United States v. Simmons, supra, at 834, this circuit held that even though dismissal with prejudice is authorized by Rule 48(b), trial courts should utilize such power with caution and only after a forewarning to the prosecution that dismissal with prejudice will result from a failure to proceed to trial. The government argues that the requisite caution and forewarning required by Simmons were absent in the trial court's dismissal of the nondynamite counts with prejudice. We agree.

We find the record devoid of any forewarning to the prosecution that the nondynamite counts of the indictment would be dismissed with prejudice. The district ***1151** court's entry dismissing these counts contains no reference to a forewarning of impending dismissal with prejudice. The remainder of the record is equally as barren.

Any attempts to create the requisite forewarning from a declaration made by the United States attorney at a hearing conducted several days prior to dismissal must also fail. At the hearing the government counsel observed: "(W)e will suffer a dismissal at this time if the Court should choose to do so rather than go to trial on the imperfect case that we would have to present if we were forced to trial now." 12 R.T. at 6. This statement cannot be a sufficient forewarning to satisfy the requirement of Simmons. First, the statement was made by the government, not the trial court. It is the trial court that is required to forewarn the prosecutor, not vice versa. Second, and far more important, the government's statement indicates that it was prepared to suffer dismissal. Nothing is said concerning its preparedness to suffer dismissal with prejudice. As indicated in Simmons, at 837, it is not enough to forewarn that dismissal may result from a failure to proceed to trial. Rather, the prosecution must be forewarned that the dismissal will be with prejudice.

Given the failure of the trial court to provide the forewarning mandated by Simmons, we reverse that portion of the trial court's order dismissing the nondynamite counts with prejudice and remand the cause to the district court for further consideration of its dismissal of these counts in light of this opinion.

In conclusion, we reverse the orders of the district court granting appellees' motions to suppress and to dismiss the indictment with prejudice. Further, we remand the cause to the district court with instructions: (1) to deny appellees' motion to suppress, (2) to reinstate the indictment as to the dynamite counts, and (3) to reconsider its dismissal of the nondynamite counts with prejudice in light of this opinion.

SO ORDERED.


KENNEDY, Circuit Judge, files a separate concurring opinion in which BROWNING, EUGENE A. WRIGHT, CHOY, WALLACE, and J. BLAINE ANDERSON, Circuit Judges, concur.

KENNEDY, Circuit Judge, concurring:
This case presents the opportunity to state certain controlling rules where evidence has been lost or destroyed in a criminal case. Some of our earlier cases, where the proper outcome was perhaps clearer than in the present instance, did not provide extensive analysis of the interests at stake or of the reasons behind the adoption of a particular approach. Loss or destruction of evidence probative in a criminal case occurs in circumstances so variant that we cannot set forth here the applicable rules for every case but certain principles of broad application may be stated with assurance and serve to resolve this appeal.

When criminal **evidence** is lost or **destroyed**, the court must protect a complex of interests, some conflicting. Our principal concern is to provide the accused an opportunity to produce and examine all relevant **evidence**, to insure a fair trial. Absent special circumstances, we do not reverse convictions or dismiss criminal charges based on events that do not cause harm to the accused; and so the degree of prejudice from loss or **destruction** of the **evidence** should be weighed. Other considerations which bear upon the right to a fair trial are also present if intentional or culpable government action has caused the loss or **destruction**. The significant interest in such cases is to avoid the impairment of judicial integrity that would occur if the prosecution

were allowed to manipulate court processes, and protective rulings or sanctions may be required both to insure a fair trial in a specific case and to deter future violations. The degree of government fault is relevant, for if suppression of secondary evidence or other protective rulings and sanctions were automatic in every case in which the Government is responsible for the loss of the evidence, then we would not give proper recognition to the responsibility of the Government to prosecute criminal **\*1152** cases. This right should not be forfeited in every instance where a government official has erred. In a rare case, government action may be so culpable that deterrence of future violations and protection of judicial integrity become the principal concern, and then only a plausible suggestion of prejudice or none at all would be required for suppression of evidence or the imposition of other sanctions, such as dismissal of the charges. In the more frequent case, the Government's responsibility for loss of the evidence is caused by actions that are, alternatively, negligent in some degree, or inadvertent, or done intentionally but with an element of good faith, and in these instances a somewhat greater degree of prejudice may be tolerated. In cases of severe prejudice, suppression or other sanctions would be appropriate without regard to the good faith or culpability of the Government. However, in other cases, proper reconciliation of these competing interests requires us to resort to the familiar judicial process of balancing the factors in a given case.

The proper balance is that between the quality of the Government's conduct and the degree of prejudice to the accused. The Government bears the burden of justifying its conduct and the defendant bears the burden of demonstrating prejudice. See United States v. Mays, 549 F.2d 670, 677, 678 (9th Cir. 1977). In weighing the conduct of the Government, the court should inquire whether the evidence was lost or destroyed while in its custody, whether the Government acted in disregard for the interests of the accused, whether it was negligent in failing to adhere to established and reasonable standards of care for police and prosecutorial functions, and, if the acts were deliberate, whether they were taken in good faith or with reasonable justification. Federal courts have greater authority and control over the actions of federal officers than over the officers of a state, and the nature and degree of federal participation is relevant although not dispositive. It is relevant also to inquire whether the government attorneys prosecuting the case have participated in the events leading to loss or destruction of the evidence, for prosecutorial action may bear upon existence of a motive to harm the accused.

Against all this must be weighed the degree of prejudice to the defendant. In analyzing prejudice, the court must consider a wide number of factors including, without limitation, the centrality of the evidence to the case and its importance in establishing the elements of the crime or the motive or intent of the defendant; the probative value and reliability of the secondary or substitute evidence; the nature and probable weight of factual inferences or other demonstrations and kinds of proof allegedly lost to the accused; the probable effect on the jury from absence of the evidence, including dangers of unfounded speculation and bias that might result to the defendant if adequate presentation of the case requires explanation about the missing evidence.

We adopted a flexible approach, consistent with the balancing test proposed here, in United States v. Higginbotham, 539 F.2d 17 (9th Cir. 1976) (alternate holding).[1] In that opinion the court stated that in destruction of evidence cases, "the following factors should be considered: (1) the degree of negligence or bad faith involved, (2) the importance of the lost evidence, and (3) the sufficiency of the other evidence adduced at the trial to sustain the conviction."[2] **\*1153** Id. at 21. The proposed test is also quite similar to the test which the First Circuit has adopted. In United States v. Picariello, 568 F.2d 222 (1st Cir. 1978) the court articulated what it called a three-pronged examination which considered "first, was the evidence material to the question of guilt or the degree of punishment; second, was defendant prejudiced by its destruction; and third, was the government acting in good faith when it destroyed the evidence." Id. at 227. The appropriate test as set forth here is more detailed than in Higginbotham or Picariello with the purpose to provide more guidance when this question arises in later cases.[3]

In an analogous area, that of prearrest delay, this circuit has adopted a balancing test similar to the one proposed here. United States v. Mays, 549 F.2d 670, 677 (9th Cir. 1977). Where the police delay in arresting a defendant or in otherwise notifying him that he is under investigation, he may later contend he had no notice to preserve evidence such as records, and that testimony of witnesses or his own recollection of the day in question may be blurred by the passage of time. These cases present concerns which closely parallel those in destruction of evidence cases, including fairness to the defendant, the discouraging of police or prosecutorial misconduct, preserving the integrity of the judicial system, and protecting society's interest in the prosecution of criminal violations. In United States v. Mays, supra, this court rejected

the two absolute approaches suggested by the parties: that prejudice alone is sufficient or that both prejudice and improper intentional delay must be shown. It adopted instead a test which balances all the circumstances, including the prejudice to the defendant and the reason for the police delay. Such a balancing test seems equally appropriate for the case at hand.[4]

The test proposed here is not of constitutional dimensions. The Supreme Court in United States v. Augenblick, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969) has stated that destruction of evidence becomes a problem of constitutional dimensions only in the most extreme case:

> The Court of Claims, in a conscientious effort to undo an injustice, elevated to a constitutional level what it deemed to be an infraction of the Jencks Act and made a denial of discovery which "seriously impeded his right to a fair trial" a violation "of the Due Process Clause of the Constitution." . . . But apart from trials conducted in violation of express constitutional mandates, a constitutionally unfair **\*1154** trial takes place only where the barriers and safeguards are so relaxed or forgotten . . . that the proceeding is more a spectacle . . . or trial by ordeal . . . than a disciplined contest.

Id. at 356, 89 S.Ct. at 534. Rarely will the unfairness that might be caused by the destruction of evidence rise to the level of making the proceedings "a spectacle or trial by ordeal." The rule advanced here is simply a judicially-created rule designed to prevent police misconduct and permit as fair a trial as possible.

Turning to the facts of this case, we examine first the reasonableness of the Government's conduct. The starting point is the findings of the district court. In its initial decision, the court found as follows: The police did not act in bad faith in destroying the evidence. Dynamite is a dangerous substance that should only be handled and stored by experts. The Oregon State Police did not have adequate facilities in which to store this dynamite. There was a commercial magazine located about 60 miles away, however, and the dynamite could have been transported there with relative safety. In its supplemental findings on remand, the district court found that the decision not to keep the dynamite was made by officer Fettig of the state police pursuant to an unwritten policy. The practice of destroying explosives was based on the lack of state storage facilities, problems with chain of custody, and public safety considerations. The record indicates that Fettig's principal responsibility for the state police was as a bomb and explosives expert, for which he was highly qualified. He effected frequent and routine destruction of explosives, although it appears that in almost all such cases the explosives were not relevant to any pending criminal investigation. It is unclear the extent to which the supplemental finding that the decision not to transport was based on "public safety considerations" negates the prior finding that the dynamite could have been transported with "relative safety;" but, there were at least some safety considerations which militated against transporting the dynamite. It should be noted that in addition to destroying the dynamite itself, the police also destroyed the containers in which the dynamite was stored when found. This was apparently done because, as the defendants' expert witness explained, when dynamite is improperly stored, nitroglycerin from the dynamite sticks sometimes seeps into the container, making the container itself highly explosive. Moreover, officer Fettig testified that the reason fingerprints were not taken was that the cartons were wet, and it was unlikely identifiable fingerprints could have been detected.

It is clear that accepted standards of police conduct require that a sample should be obtained whenever it is possible and safe to do so, and we think the enforcement officials, state and federal, erred in not considering the possibility of taking a sample before destroying all the evidence. However, in view of the exigencies of the situation and the police policy of destroying all explosives, this error in judgment ought not be weighed too heavily against the Government.

In this case, the error is neither intensified nor diminished by the actions of federal agents. The dynamite was discovered during a search of the vehicles pursuant to a state search warrant while the vehicles were in the custody of the state police. The district court found that the decision to destroy the evidence was made by officer Fettig, pursuant to state police policy and in his discretion. No federal agent participated in this decision. The one federal agent who was present at the destruction of the dynamite and containers neither encouraged nor discouraged the destruction. The court also found, however, that if the federal agent had requested that a sample be preserved, the state police would have complied. The federal agent was not responsible for the decision, but neither can he be given full exoneration from it. The practical necessity for a federal officer to maintain a good relationship with state police does tend to excuse the federal agent's determination in this delicate situation to **\*1155** allow the state to proceed to render the area safe without requesting an evidentiary sample. It is our conclusion that the actions

of both the state police in destroying all the evidence and the federal agent in not preventing that destruction can be excused substantially, although it cannot be recommended as the standard for future cases.

We next consider the prejudice to the defendant. The most important part of our analysis of the degree of prejudice in this case is an evaluation of the reliability or trustworthiness of the remaining secondary evidence. The evidence includes, among other things, photographs and eyewitness descriptions of the boxes which were found in the impounded vehicle and the red cylindrical sticks contained in the boxes. Each of the seven boxes was marked "High Explosives Dangerous" and on the side had the following markings:

"50 lbs Gelex 2 1 X 8 70% Strength D73MAO 7B"

together with the logo of the DuPont company prominently displayed. Inside were red cylindrical sticks with heavy wrapping paper covering the contents and marked:

"Explosives Dangerous Gelex 2 70% Strength
E I Dupont De Nemours & Co. (Inc.)."

and again carrying the number D73MAO 7B, with a last letter as Q or A, or Y. A representative from The DuPont Co. was shown seven wrappers that had been saved by the police before destroying the dynamite. He identified the wrappers as having come from a DuPont plant in Washington. By consulting other records, he was able to determine that the code numbers on the wrappers were the same as the numbers on dynamite shipped to a customer in Montana. He confirmed that the shipment to Montana was of full cases of dynamite, not just wrappers. In addition, a chemical analysis of the wrappers indicated the presence of six of the seven ingredients necessary to make dynamite.

We consider this secondary evidence to be probative and reliable. The evidence also includes photographs taken by the police when several of the sticks were detonated with blasting caps. The defendants did produce an expert who on direct examination testified that in his opinion the photographs did not show dynamite exploding and that the pictures were completely consistent with an explosion of only the blasting caps themselves. The district court found that this testimony "cast substantial doubt on the assertion that the photographs showed the detonation of dynamite." Worded this way, the finding seems to suggest that the testimony of the expert raised substantial doubt as to whether the substance seized was dynamite. To the extent that the finding implies this, it must be deemed erroneous. On cross-examination the expert explained that the photographs could also show an incomplete detonation of dynamite. The testimony of this expert simply demonstrates that the photographs of the detonation are not completely reliable. A determination that the photographs are inconclusive evidence is far different from a determination that there is substantial doubt whether the substance seized was dynamite. The testimony of the expert supports only the former proposition, not the latter. In ascertaining the degree of prejudice, it is necessary to evaluate all the secondary evidence, not just one piece of it.

The trial court found further prejudice to the defendants because they lost an opportunity to show whose fingerprints were on the boxes. This too was error. There is no question that the boxes were in the defendant's station wagon. And even if the prints of third persons, and not the defendants', were discovered on the boxes such evidence would not be exculpatory of necessity. Moreover, the testimony was that fingerprints were not likely to be discovered on the wet boxes in any event.

All must concede that the secondary evidence is less reliable than chemical tests of the substance itself and that, as the explosive quality or no of the substance is an **\*1156** essential element of the offense, the loss of the evidence does bear upon an issue that lies at the core of the case. In view, however, of the convincing and probative value of the secondary evidence as presented in the record at this point, it cannot be said that the defendants have met their burden of showing prejudice in any significant degree. The defendants have not made any offer of proof from which the trier of fact might infer the substance was other than dynamite, and in this posture of the case the secondary evidence is a satisfactory substitute for a physical sample. If at trial the defendants can make a plausible argument that the substance was something other than from what all appearances it must have been, the trier of fact can weigh the credibility of such arguments against any perceived defects in the Government's proof by secondary means. The prejudice in the case is slight or nonexistent, and the Government's conduct, while consisting in part of some errors in judgment, was on the whole reasonable and taken in good faith.

The dissent complains that, having remanded the case, we now accord no deference to the district court's findings. All of the subsidiary findings in the record developed with care by the district judge have put the case in the proper perspective.

Perhaps the remand should have stopped short of asking the trial court to draw the ultimate conclusion as to whether or not there is prejudice, absent a statement of its definition and the factors that are to be considered in making that determination. Having now stated at some length the applicable rules for this case, we reach the conclusion that secondary evidence offered by the Government should not be suppressed.

The appropriate order now is to reverse the trial court's ruling suppressing the secondary evidence and to remand the case for further proceedings.

GOODWIN, Circuit Judge, specially concurring.
I concur generally in Judge Trask's opinion. The district court judgment must be reversed on both points. The dismissal with prejudice was unwarranted, and the "finding" that a federal officer participated in a significant degree in the destruction of the contents of the boxes taken from the station wagon is clearly erroneous. The evidence was that the agent of the Federal Bureau of Investigation was an observer and nothing more. Accordingly, the discussion of the consequences of federal participation is obiter.

HUFSTEDLER, Circuit Judge, dissenting, with whom ELY and HUG, Circuit Judges, concur:
I regret that I cannot concur with the majority of my brothers either in reversing the district court's suppression order or in reversing the dismissal of the indictment upon the Government's refusal to proceed to trial after its motions for continuances were denied.

I

The **suppression** order issue is very narrow: Are the district court's specific findings of prejudice from the **destruction** of **evidence** clearly erroneous? The simple answer is "no." In seeking to avoid this result, the majority has devised a hypothetical scale on which it weighs non-competing interests against one another, discovers that prejudice is not prejudice, and thereby announces a result in favor of the Government. I am unable to find any support for the majority's rationale either in prior case law or, if we were writing on a clean slate, in logic.

Three counts of the indictment were based on possession of a "destructive device." The material destroyed included the very substance that the Government charged was the "destructive device."[1] *1157 None of the material was saved to permit independent testing of the substance.[2] The district court found that the destruction of the substance was prejudicial to the defendants because it prevented them from examining the primary evidence. The majority opinion concedes that the defendants did suffer prejudice from the destruction of the primary evidence, and it observes that "the secondary evidence is less reliable than chemical tests of the substance itself and that, as the explosive quality or no of the substance is an essential element of the offense, the loss of the evidence does bear upon an issue that lies at the core of the case." In short, the district court's finding of prejudice on this point is fully supported by the record. Under United States v. Heiden (9th Cir. 1974) 508 F.2d 898, which the majority acknowledges is undiminished as authority in this Circuit (Kennedy, J., Op'n at 1153 n.3), all appellate inquiry should end with "affirmed."

That result is unsatisfactory to the majority, and therefore, it is required to explain why the fact of prejudice is nevertheless not prejudice justifying **suppression**. The majority opinion tells us that the prejudice is inadequate because the defendants did not make "any offer of proof from which the trier of fact might infer the substance was other than dynamite, and in this posture of the case the secondary **evidence** is a satisfactory substitute for a physical sample." As I translate this elliptical statement, the majority says that the defendants had the burden of proving that the substance **destroyed** was not dynamite, and if they failed to carry that burden, they could not claim prejudice from the **destruction** of the **evidence**. The reasoning is upside down. The defendants made a prima facie showing of prejudice and it is the Government's burden to show that the loss of the primary **evidence** was harmless. The **destruction** of the **evidence**, for which the Government is responsible, is the very act that makes identification of the substance impossible and thus creates the prejudice to the defendants. Thus, the majority opinion has inexplicably required the defendants to come up with proof that the Government itself has **destroyed**.

The majority opinion suggests that the defendants can nevertheless carry this impossible burden. "(S)econdary evidence is a satisfactory substitute for a physical sample" because it can be weighed against whatever defense argument can be made "that the substance was something other than from what all appearances it must have been." I do not know how to weigh this smoke, and I do not understand how either the defendants or the district court could have been expected to do so.

The district court found that "(d)efendants were also prejudiced by the destruction of the cartons and plastic bag which contained the dynamite in that they were deprived of the opportunity to determine by fingerprinting who might have handled these items." (Findings of Fact at 5.) The majority says that this finding is clearly erroneous because the fingerprint evidence "would not be exculpatory of necessity." (Kennedy, J., Op'n at 1155.) I am unable to follow the majority's reasoning. The presence or absence of fingerprints on the cartons would have been relevant to the issues. The destruction of the evidence prevented the defendants from being able to prove the absence of their fingerprints. The destruction also foreclosed the possibility of proving that persons other than the defendants handled the cartons and bags. The fact that fingerprint evidence would not "necessarily" have been exculpatory is irrelevant. The fact is inescapable that relevant evidence was destroyed, and the very act of destruction prevents anyone from determining how helpful that evidence might have been to the defendants.[3]

**\*1158**  Prejudice stems from the fact that the Government prevented defendants from finding out for themselves. (United States v. Tsutagawa (9th Cir. 1974) 500 F.2d 420, 423 ("The thrust of Mendez-Rodriguez is to prevent the basic unfairness of allowing the government to determine which witnesses will not help either side and then to release those witnesses, for all practical purposes, beyond the reach of the defendant. The vice lies in the unfettered ability of the government to make the decision unilaterally." (citation omitted)); United States v. Mendez-Rodriguez (9th Cir. 1971) 450 F.2d 1; United States v. Bryant (1971) 142 U.S.App.D.C. 132, 138, 439 F.2d 642, 648 ("Where Brady and its progeny applicable only when the exact content of the non-disclosed materials was known, the disclosure duty would be an empty promise, easily circumvented by suppression of evidence by means of destruction rather than mere failure to reveal.") Cf. Brady v. Maryland (1963) 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.)

As we held in Heiden, supra, we will reverse a conviction when there has been a loss or destruction of evidence if the defendant can show "(1) bad faith or connivance on the part of the Government or (2) that he was prejudiced by the loss of the evidence." (508 F.2d at 902.) A fortiori, in reviewing an order to suppress, rather than a conviction, a showing of prejudice to the defendant from the destruction of evidence will sustain a suppression order, regardless of the purity of the governmental motives in destroying the evidence.

The majority opinion correctly recognizes that we are pursuing separate and distinctive interests in situations of this kind: deterring governmental misconduct, protecting a defendant's right to a fair trial, and preserving the integrity of the judicial process. None of these interests is appropriately protected by balancing one of these interests against the other. Each of these interests is independently important, and none of them can be weighed against the others. Thus, for example, we have no interest whatever in injuring a defendant's right to a fair trial to reward governmental innocence in destroying evidence.[4]

The district court, on remand, particularly decided the facts implicating the Government's involvement in the investigation and apprehension of the defendants as well as governmental participation in the destruction of the evidence. It specifically found that the Government acted in good faith, and it also found that the defendants were prejudiced by the destruction of the evidence. All of those findings are fully supported by the record, and we cannot reach a contrary conclusion unless we forthrightly admit that we are substituting our judgment for the judgment of the district court on these factual questions.[5]

## **\*1159**  II

The district court correctly dismissed with prejudice both the dynamite and firearms counts. I agree with the majority opinion that delay in prosecuting the defendants on the dynamite counts was not unnecessary under Rule 48(b), because the Government had a statutory right to appeal the suppression order as it applied to the dynamite counts. However, dismissal of the dynamite counts was appropriate on other grounds. Suppression of the secondary evidence was tantamount to a dismissal of the dynamite counts because, without that evidence, proof of the existence of the charged offense was lacking. Thus, outright dismissal of those counts would also have been appropriate. (Cf. United States v. Roviaro (1957) 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (trial court should have entered dismissal when Government suppressed information that was important to certain counts); United States v. Reynolds (1953) 345 U.S. 1, 12, 73 S.Ct. 528, 97 L.Ed. 727.)

As the majority recognizes, the non-dynamite firearms counts were properly dismissed because delay in prosecution had been unnecessary under Rule 48(b). The majority nevertheless reverses the district court's order on the ground that the Government had not been adequately warned that the dismissal would be with prejudice. The record shows that the prosecution had ample forewarning, and it made its own choice not to go forward on the non-dynamite counts.

The Government deliberately decided to submit to dismissal of the firearms counts, rather than to go to trial, because it erroneously believed that it had a right to appeal the suppression order as it related to the non-dynamite counts. The suppression order was entered on March 31, 1976. On April 19, 1976, the Government filed a notice of appeal and a motion requesting a continuance of the trial date, May 12, 1976. The district court denied the Government's motion for a continuance on April 20, 1976. On April 23, 1976, the Government informed the court that it would refuse to go to trial on May 12. On April 26, 1976, we denied the Government's motion for a continuance of the trial date. The Government then told the district court that it would suffer a dismissal, rather than go to trial, because it believed it would win the appeal. A government attorney told the court: "we will take our chances on getting this Court reversed by the Ninth Circuit with respect to that evidence and . . . will suffer a dismissal at this time if the Court should choose to do so rather than go to trial on the imperfect case that we would have to present if we were forced to trial now." (12 R.T. at 6 (April 26, 1976).) More than two weeks later, on the scheduled trial date, the case was called for trial and the Government refused to proceed. The district court then entered a dismissal with prejudice.

The crucial issue is whether the Government knew, or should have known, the consequences of its refusal to proceed to trial on the scheduled trial date. The record unmistakably establishes the prosecutor's knowledge that dismissal with prejudice was one of the consequences of a Rule 48(b) dismissal. (United States v. Simmons (9th Cir. 1976) 536 F.2d 827.) The prosecutor told the district court: "We believe the court lacks jurisdiction to dismiss this indictment with or without prejudice in view of the Government's good faith intent (to appeal)." The majority opinion's conclusion that a dismissal with prejudice is an abuse of the district court's discretion under the circumstances is in conflict with our decision in United States v. Charnay (9th Cir. 1978) 577 F.2d 81.[6]

**\*1160** Nothing in United States v. Simmons, supra, supports the majority's view that a dismissal cannot be made with prejudice unless the district court gives the prosecutor formal on-the-record warning that a Rule 48(b) dismissal includes a dismissal with prejudice. On the contrary, Simmons itself indicates that the forewarning can come from sources other than the district court. Such sources include the district's speedy trial plan (536 F.2d at 837) or federal legislation (536 F.2d at 836 ("the (Speedy Trial) Act clearly forewarns the United States Attorney that he must comply with the applicable time limits or face the possibility that the indictment or information will be dismissed with prejudice.")).

The prosecutor knew that if he did not proceed to trial on the scheduled trial date, the case would be dismissed and that the district court had authority to dismiss it with prejudice. The prosecution's choice was both knowing and intelligent. To be sure, the strategy misfired because government counsel labored under a misapprehension of law relating to the right to appeal the suppression order affecting the non-dynamite counts. These events provide no legal foundation for relieving the Government of the consequences of the Government's exercise of prosecutorial discretion.

I would affirm.

ELY, Circuit Judge (dissenting):
I respectfully dissent.

While I thoroughly share all of the views of my Sister Hufstedler, my conscience impels that I set forth a few comments of my own. I do this reluctantly, even sorrowfully.

When our full court originally reviewed this appeal, all the judges then involved applied their dedicated efforts to the end that the difficult issues be correctly and justly resolved. The majority concluded that the district judge had not made critical findings, and had not reached critical conclusions, with required specificity. I disagreed, believing that the facts then before us proved, indubitably, that the challenged incriminatory **evidence** should have been **suppressed**. I repeat a portion of that which I wrote in dissenting from the majority's original unpublished en banc decision that the cause should be remanded:

> As I see it, the fact of the Government's active participation (in the **destruction** of critical **evidence**) is beyond doubt. I say this for the following reasons:

    1. The original apprehension of the vehicles was made by Oregon police upon notification by federal agents, pursuant to a federal warrant.

    2. Federal agents attended the search for, and the removal of, the dynamite from one of the vehicles.

    3. The instruction to destroy the material was issued by a state officer, one McCollum, and McCollum was not produced as a witness at the suppression hearing. From this the district judge could fairly draw the inference that McCollum had received his directions from federal officers.

    4. At least one federal authority was present when the alleged explosive was destroyed, and there was no evidence whatsoever that he gave instructions, or made any request, that any samples be retained for analysis by the accuseds.

The last point, above enumerated, is of particular significance because of the defense contention that the substance had been extensively exposed to moisture and could not be detonated without the utilization of additional explosive material. We do not know whether such was necessary or utilized, and this failure of proof most certainly cannot be attributed to the appellees. In the circumstances therefore, I submit that the critical finding of active federal participation, uncontested, was supported by substantial evidence and, in fact, could not properly have been **\*1161** otherwise. I should add that warrants were executed by federal officers and that no state charges were instituted.

In any event, the majority's original decision to remand the cause so as to allow the district judge to engage in a more intricate exploration and issue the required determinations indicates to me that the majority then felt that, from the evidence relating to the issue of suppression, the ultimate conclusions could be either in favor of the appellants or in favor of the prosecution.

The district judge, after further review, supplied us with the guidance the majority originally thought to be desired. Now before us is a finding of fact which reads:

> Federal agents were present and aware of (Oregon State) Trooper Fettig's intended destruction of the dynamite and neither encouraged nor discouraged such action.

Another critical finding is as follows:

> John O'Rourke, Special Agent in Charge of Oregon, was in Ontario before the dynamite was destroyed. He new that Beverly Axelrod, counsel for defendants was also in Ontario before the destruction of the dynamite. O'Rourke made no effort to inform Axelrod of the impending destruction of the dynamite, of which he was aware. Axelrod never asked O'Rourke to be allowed to witness the destruction of the dynamite. No representative of defendants witnessed the destruction.

And, of what ought to be of paramount significance, we now have the district judge's critical legal conclusion that:

> Defendants were prejudiced to the extent that their inability to observe the destruction of the dynamite or to analyze samples of it deprived them of the opportunity to contest the government's conclusion that the substance destroyed was indeed explosive. Defendants' only argument on this point is now limited to analysis of the photographs of the destruction of the dynamite. The testimony of witness McCreary concerning the photographs of the destruction of the dynamite cast substantial doubt on the assertion that the photographs showed the detonation of dynamite. The fact that defendants were denied the opportunity to witness the destruction or to examine samples of the dynamite therefore appears to have prejudiced defendants substantially on the issue of the nature of the substance destroyed.
>
> Defendants were also prejudiced by the destruction of the cartons and plastic bag which contained the dynamite in that they were deprived of the opportunity to determine by fingerprinting who might have handled these items.

And now, what happens? Not only does the majority disregard the critical determinations of the district judge, but also it holds that the judge was clearly wrong in making a determination based upon conflicting testimony. In sum, the majority now does no more in affirming the convictions that it might have done upon the record before us in the original en banc proceedings. In fact it does less, for it accords absolutely no weight or deference to the careful review of the district judge upon remand and the guidance with which the district judge has now favored us, and which, in the first en banc disposition, the majority wrote that it wanted. I do not asperse the good faith or the motives of any of my colleagues. All of them know that I hold each in the highest esteem. Notwithstanding, I record my belief that the proceedings in this appeal, with two hearings before the full court, and all the deliberations that followed, reflect a futile exercise.

**All Citations**

628 F.2d 1139

# Footnotes

\*    The Honorable Joseph T. Sneed has recused himself from consideration of this matter.

1    The incident at Wounded Knee, involving a 71 day occupation of the town, had ended May 8, 1973, but there were apparently federal indictments outstanding for some participants, including Peltier and Banks.

2    Trooper Griffiths' exact testimony at the remand hearing was as follows:

"MR. TURNER: It's an "all-points bulletin," and it was used by Trooper Griffiths to stop these two vehicles. I might note for the Court that

"THE COURT: You can read it. The objection is overruled.

"MR. TURNER: Is the offer received, Your Honor?

"THE COURT: Yes, You can read it.

"MR. TURNER: Thank you. Did you

"THE COURT: That's what you asked him to do, isn't it?

"MR. TURNER: Yes, sir.

"MR. SCHIFFMAN: Just the final portion of it. My objection is if he reads any of it, he read the entire document.

"MR. TURNER: I have no objection to that, Your Honor.

"THE COURT: All right. Well, read the part that the lawyer asked you to read, and on cross-examination if the lawyer wants to read some more, he can do it.

"Q (By Mr. Turner:) Would you read the last line, sir.

"A If vehicle is sighted, do not stop but advise FBI, Portland, immediately for more details."

"Q All right. Mr. Griffiths, did any Federal officer or agent tell you to disregard that portion of the APB?

"A No.

"Q And could you explain to the Court why you felt it was important to stop these vehicles?

"A The proximity to the state line was a major factor.

"Q Well, how close were you to the state State of Idaho, I take it?

"A Yes, Several miles.

"Q All right.

"A And it was my decision to stop the vehicles. I felt it had to be done right then.

"Q All right. Thank you very much."

R.T. at 54, Evidentiary Hearing, May 9, 10, 1978.

3   Federal search warrants were obtained the following day and executed on the 16th after the Oregon State Highway officers had completed their search. R.T. 1, 9.

4   Among the firearms found were semi-automatic rifles, police shotguns, handguns, more than 2,600 rounds of ammunition, 150 blasting caps, nine empty pineapple training hand grenades, pocket watches with the faces drilled to permit preparation of time bombs plus other bomb-making equipment such as batteries, wire, cable, etc.

5   Officer Fettig described himself as an explosives technician. He had at that time been with the Oregon State Police about six years. He had been in the military service for 25 years as an explosive ordnance disposal expert. He had been an explosives disposal man in World War II overseas for three and one-half years. Back in the United States he was assigned to Aberdeen Proving Grounds. He was an instructor in explosives and explosive devices, chemical and biological warfare. From there he was sent on special assignment clearing bomb ranges that were being returned to the owners after use as practice bombing ranges. In 1950, he was reassigned as an advisor to the Secret Service on bomb disposal procedures for the protection of the President and Vice President of the United States. In 1953, he was assigned to the Far East Command as an explosive ordnance technician on Okinawa and more recently he retired from the Army and has been employed by the Oregon State Police. He testified that he had destroyed on the average between 7,500 and 9,000 pounds of dynamite every year since he has been with the Oregon State Police.

6   Testimony of defendant witness Ronald McCreary was as follows:

"Q Now, did I understand your testimony that this appeared to be an incomplete detonation of dynamite? Is that a fair statement?

"A No, I said it was an incomplete combustion of some materials. I do not know what they are.

"Q Oh, you don't know whether it's dynamite or not?

"A Oh, no. I wasn't there.

"Q And you can't tell from the photographs?

"A No."

R.T. at 235, Evidentiary Hearing, May 9, 10, 1978.

7   26 U.S.C. s 5845(f) reads in part as follows:

  "The term 'destructive device' means (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket . . . or (F) similar device."

8   See Note 2, supra.

1   The balance test of Higginbotham is helpful, but the same cannot be said for the discussion in that case of federal participation. We cannot accept the implication that the destruction of evidence by state officers acting alone, no matter how egregious their conduct or how important the evidence destroyed, could never be sufficient for a federal court to invoke a protective rule to guard the rights of the defendant or the integrity of the judicial process. In Higginbotham itself, the particular evidence was of minimal importance and the conduct of the state police was at worst careless.

2   It appears that a type of balancing was used in this circuit, even before Higginbotham. In United States v. Sewar, 468 F.2d 236 (9th Cir. 1972), cert. denied, 410 U.S. 916, 93 S.Ct. 972, 35 L.Ed.2d 278 (1973), the defendant had been subjected to a blood alcohol test. After the test was performed the sample was destroyed by a technician who thought the sample was no longer necessary. The court stated that "(n)ot every blunder by investigators should result in the exclusion of relevant competent, important evidence," 468 F.2d at 237, and concluding that in the circumstances, using the remaining secondary evidence would not be "so unfair as to require its exclusion," id. at 238.

3   We think this test is consistent with the result in United States v. Heiden, 508 F.2d 898 (9th Cir. 1974). Heiden states that where evidence has been lost or destroyed the conviction will be reversed if the defendant can show "(1) bad faith or connivance on the part of the Government, or (2) that he was prejudiced by the loss of the evidence." As the discussion in Heiden demonstrates, "prejudice" as used there means serious impairment of the accused's ability to present his defense. In cases of severe prejudice the Heiden formulation would lead to the same result as under the test set forth in this case.

4   A similar problem to the one faced here arises when the Government intentionally deports potential witnesses before the defendant has had an opportunity to interview them. See United States v. Mendez-Rodriquez, 450 F.2d 1 (9th Cir. 1971). This circuit has held that despite good faith on the part of the Government, the defendant need not show that the testimony of the lost witnesses would have been favorable, although he must demonstrate at least some possibility that the testimony could have been of benefit. See United States v. Orozco-Rico, 589 F.2d 433 (9th Cir. 1978); United States v. McQuillan, 507 F.2d 30, 33 (9th Cir. 1974). In these cases, even a small possibility of prejudice is sufficient despite good faith government conduct. We do not believe, however, that a similar approach is required in destruction of evidence cases. Deportation of witnesses involves the fundamental and specifically guaranteed right of compulsory process for obtaining witnesses provided by the sixth amendment. The sixth amendment is in no way implicated in the case at hand.

1   Thus, this case is unlike those in which corroborating, impeaching, or collateral evidence was destroyed. (E. g., United States v. Harris (9th Cir. 1976) 543 F.2d 1247 (FBI agent's rough notes destroyed; violation of Jencks Act); United States v. Carrasco (9th Cir. 1976) 537 F.2d 372 (informer's diary destroyed).)

2   This facet distinguishes Loud Hawk from those cases where a sufficient sample was retained. (E. g., United States v. Young (9th Cir. 1976) 535 F.2d 484 (bulk of drug seizure destroyed but samples retained); United States v. Heiden, supra, 508 F.2d 898 (semble).

3   The Oregon State Police and the FBI attempted to take fingerprints from both vehicles and many of the objects within them. However, they did not attempt to discover fingerprints on either the plastic bags or the

|   |   |
|---|---|
|   | cardboard boxes, and the destruction therefore prevented those defendants not traveling in the station wagon from rebutting the dynamite counts with evidence that their fingerprints were not on the dynamite containers. |
| 4 | I am unable to find support for the majority's balancing formulation from any of the cases cited from our Circuit or elsewhere. (United States v. Higginbotham (9th Cir. 1976) 539 F.2d 17 (negligent loss of photographs by state officers, in which federal officers played no part, did not deny due process); United States v. Mays (9th Cir. 1977) 549 F.2d 670 (insufficient showing of prejudice justifying dismissal of indictment for pretrial delay); United States v. Picariello (1st Cir. 1978) 568 F.2d 222 (citing Heiden in listing factors to consider without weighing any of them).) |
| 5 | Brother Trask, in his separate opinion, argues that the federal Government was not sufficiently implicated in the destruction of evidence to warrant suppression. Both the facts as found by the district court specifically and the underlying record reveal that the investigation was a cooperative venture between federal and state law enforcement agencies from the start. To be sure, the search was physically conducted by state officers, and state officers undertook the physical destruction of the evidence. The FBI agents, who had advance notice of the destruction, were not simply bystanders during the event. The FBI's hands were displayed prominently throughout the transactions from the search through the destruction of the evidence, thus invoking the principles of Lustig v. United States (1949) 338 U.S. 74, 78, 69 S.Ct. 1372, 93 L.Ed. 1819; Byars v. United States (1927) 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520; United States v. Bryant (1971), 142 U.S.App.D.C. 132, 141, 439 F.2d 642, 651. |
| 6 | In Charnay, we held that the district court did not abuse its discretion in dismissing with prejudice an indictment under Rule 48(b). The first continuance was requested by the Government to try to locate a missing witness. The court had told government counsel that if the witness was not located at the time the case was scheduled for trial, the indictment would be dismissed. Nothing was said about a dismissal with prejudice. On the date set for trial, the witness still had not been located and the Government renewed its request for a continuance to locate the witness. The court denied the motion and dismissed the indictment with prejudice. In upholding the district court, we said: "In these circumstances the court exercised all the requisite caution, and it was entirely proper for it to dismiss the indictment pursuant to Rule 48(b). Indeed, on this record, we doubt that any other prudent course was open to the trial judge." (577 F.2d at 84.) |

---

End of Document    © 2023 Thomson Reuters. No claim to original U.S. Government Works.