UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 1:21-cr-687 (RC) |
| : | |
| DAVID CHARLES RHINE, : | |
| : | |
| Defendant. : | |

**UNITED STATES' OPPOSITION TO DEFENDANT'S SUPPLEMENTAL/
ALTERNATIVE MOTION TO SUPPRESS**

Defendant David Charles Rhine asks this Court to suppress the evidence obtained from the warranted searches of the defendant's person and residence. ECF No. 73. In light of the Court's recent denial of Rhine's motion to suppress evidence derived from the January 2021 geofence warrant (ECF No. 79 at 32-78), the sole remaining ground for the present motion is Rhine's assertion that the FBI's warrants to search his person and residence contained a material false statement, made with knowing, intentional, or reckless disregard for the truth. As explained below, Rhine's assertions lack merit. He has failed to make a substantial showing that an evidentiary hearing is warranted under *Franks v. Delaware*, 438 U.S. 154 (1978).

**BACKGROUND**

A. **Factual and Procedural Background**

At 1:00 p.m. on January 6, 2021, a Joint Session of the United States Congress, consisting of the House of Representatives and the Senate, convened in the Capitol Building. The Joint Session assembled to debate and certify the vote of the Electoral College of the 2020 Presidential Election. Prior to January 6, 2021, the U.S. Capitol Police, with authority over security on the Capitol grounds, had set up security barriers on the Capitol grounds. With the Joint Session underway and with Vice President Mike Pence presiding, a large crowd gathered outside the U.S.

Capitol.  At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building.  Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows.  Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to – and did – evacuate the chambers.

The defendant, a resident of Bremerton, Washington, traveled to Washington, D.C. in early January 2021.  On January 6, 2021, at approximately 2:42 p.m., the defendant entered the U.S. Capitol Building through the Upper House Door.  He was carrying cowbells and a blue flag with white stars.  Although a metal detector was present at the door, the defendant walked around it and did not go through any security screening.  While inside, the defendant walked through multiple locations in the Capitol and climbed stairs to the third floor.

On the third floor, the defendant encountered law enforcement officers with weapons drawn.  The officers directed the defendant and others present to drop to the floor.  The defendant complied and was patted down for weapons.  An officer found that the defendant was carrying two knives and a container of pepper spray.  The officer seized these items and secured the defendant's hands behind his back with flex cuffs.  Officers then escorted the defendant and others along a hallway and then down to the second floor, until they reached an interior area near the Rotunda Doors.  Once in the vicinity of the Rotunda Doors, the escorting officer directed the defendant to exit the building and left.  After the officer left, another rioter removed the flex cuffs from the defendant's hands.  The defendant then exited the building through the Rotunda Doors at approximately 3:05 p.m.

Based on his actions on January 6, 2021, the defendant was arrested and later charged by Information with Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority, in violation of 18 U.S.C. § 1752(a)(1); Engaging in Disorderly or Disruptive Conduct in any Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

### B.  The FBI's Investigation into the Defendant

1.  In the days following the January 6, 2021 attack, Rhine's wife posted a message on Facebook stating, "Leaving [Facebook], friends.  I do not support censorship in a supposed free country.  Contact me via text.  Stay well all."  Ex. A.  In response, an acquaintance of Ms. Rhine's posted the following comment: "[Y]our husband walked into the capitol building with an angry mob during a global pandemic without getting shot, that's a hell of a lot more freedom than most.."  *Id.*  Ms. Rhine then sent this acquaintance the following message:

> In response to your fb post.  The police welcomed the peaceful protestors in the capitol bldg.  David was no near the police brutality of grandma's, kid's with use of pepper spray (which can't be used on Antifa btw).  …
>
> My husband protected our country by serving the military and he with 500k other went to SAVE our country.
>
> …
>
> Please don't repeat this exchange.  Not helpful to anyone right now[.]

Ex. B at 9-10.

On January 10, 2021, a tipster called the FBI to report that an individual named David Rhine, who resided in Bremerton, Washington, had entered the U.S. Capitol building on January 6, 2021.  Def. Exs. F, I at 12.  The tipster also provided the suspect's cell phone number and partial home address.  *Id.*  The tipster indicated that Ms. Rhine had made a post to Facebook that Rhine

had entered the Capitol building on January 6. The tipster further stated that he had confronted Rhine about being in the Capitol building and told Rhine that he needed to make a report about his part in the riot. According to the tipster, Rhine did not deny entering the Capitol building but said that the Capitol police had moved the barriers to let people in. *Id.*

On January 12, 2021, a second tipster submitted an online tip to the FBI that, based on second-hand knowledge, an individual named David Rhine had been inside the Capitol during the riot. Def. Ex. F, I at 12. The second tipster also provided the suspect's business phone number and business address. *Id.*

Based on a search of open-source information and law enforcement databases, the FBI identified the suspect as the David Rhine, the defendant in this case. Def. Ex. F, I at 12. The defendant's cell phone and other identifying information also matched the information provided by the tipster. *Id.* Location records obtained from Verizon pursuant to a search warrant confirmed that, during the January 6, 2021 riot, the defendant's cell phone connected to a cell site in Washington, D.C. whose coverage area included the interior of the U.S. Capitol building. Def. Ex. F, I at 12. And location-history data returned by Google in response to a geofence warrant identified a device associated with the defendant's account as having been present within a geographic area corresponding approximately to the U.S. Capitol building in the afternoon of January 6. Def. Ex. F, I at 13; s*ee* ECF No. 76 at 43-44. Specifically, Google's geofence returns showed that the defendant's cell phone was present in at least 26 points within the geofence, of which 22 were in the Capitol itself, between 2:24 p.m. and 4:37 p.m. on January 6. ECF No. 76 at 43-44.

On March 16, 2021, an FBI Special Agent interviewed by phone the tipster who had called into the FBI on January 10 and prepared a report of the interview. Def. Ex. B. As summarized in the interview report, the tipster stated that he had no indication that Rhine had traveled to

4

Washington, D.C. in January 2021 until a friend informed him "of [Ms. Rhine's] Facebook post." *Id.* at 1.  The tipster then described that "message" as stating that Ms. Rhine was proud of her husband because he had been at the January 6th rally and had entered the Capitol.  The interview report further relays that the tipster did not "see [Ms. Rhine's] actual post," but had "seen a screen shot sent to [the tipster] by his friend." *Id.*  The tipster also reported that he had reached out to Rhine via text message about his participation in the Capital riot, urging him to turn himself in to law enforcement. *Id.*  According to the tipster, Rhine responded that he did not see anything or do anything illegal and that he would not turn himself in. *Id.*  The FBI's interview report further notes that the tipster was willing to provide the FBI with screenshots of the "Facebook posts and private text messages," but needed more time to verify that the tipster's source agreed to reveal their information to the FBI. *Id.* at 2.

The FBI agent's handwritten notes corroborate the interview report.  As relevant here, they state: "Did not see the post/other acqu[aintance] saw the post[.]" Def. C at 1.  They further state: "Have a direct text conversation" and "Facebook private message exchange[.]" *Id.*  They note: "Facebook – does not"—a reference to the fact that the tipster was not himself on Facebook. *Id.* at 2.  And they separately state: "Pictures of the post from [Ms. Rhine]." *Id.*

On March 17, 2021, the day after the FBI interview, the tipster followed up on his promise to provide the relevant screenshots.  Ex. B, C.  The tipster emailed the interviewing agent screenshots of the tipster's own text messages with Rhine and his wife.  Ex. B at 2-8.  The screenshots confirmed that the tipster had urged Rhine to contact law enforcement. *Id.*  They further confirmed that, in response, Rhine did not deny that he had entered the Capitol's restricted area on January 6, and that he attempted instead to justify his breach as follows: "I witnessed ZERO violence.  I saw no 'proud boys.'  Capitol police removed barriers and let people in." *Id.* at 4.

5

In the same March 17 email, the tipster also provided two photographs that the tipster described as "Facebook screenshots." Ex. C at 3. In those screenshots, as noted above, Ms. Rhine responded as follows to a Facebook comment that had denounced her husband's entry into the Capitol building:

> In response to your fb post. The police welcomed the peaceful protestors in the Capitol bldg. David was no near the police brutality of grandma's, kid's with use of pepper spray (which can't be used on Antifa btw).
>
> …
>
> Please don't repeat this exchange. Not helpful to anyone right now[.]

Ex. B at 9-10. In the accompanying email, the tipster explained that he had received the "Facebook screenshots" from an acquaintance: "The Facebook screenshots are not messages that I exchanged. I was given those and was told I could share them with you[.]" Ex. C at 3.

In the summer of 2021, the FBI reviewed extensive CCTV surveillance video from the U.S. Capitol building. Def. Ex. F, I at 15-22; Ex. D. Through these efforts, the FBI identified Rhine in the CCTV footage and traced him through U.S. Capitol building based on his clothing and appearance. Def. Ex. F, I at 15-22; Ex. D. The FBI created a detailed timeline of Rhine's whereabouts within the Capitol building. Ex. D.

In September 2021, two FBI agents interviewed the tipster in person. Def. Ex. E. During the interview, the tipster confirmed that the individual identified by the FBI as Rhine in the CCTV footage from inside the Capitol was, in fact, Rhine. Def. Ex. F, I at 14-15; Def. Ex. E.

On November 5, 2021, the government applied for—and a magistrate issued—warrants to search the defendant's person and residence, including his cell phone. In the supporting affidavits, the FBI agent described the evidence supporting probable cause: (i) the tipsters' initial information, Def. Ex. F, I at 12; (ii) the Verizon cell-site data showing that, on January 6, Rhine's cell phone

connected to a cell tower whose coverage area included the Capitol building, Def. Ex. F, I at 12; (iii) the Google geofence data showing that, on January 6, a device associated with Rhine's Google account was present within or around the Capitol on January 6, 2021 between 2:24 pm and 4:47 pm, as the riot was unfolding, Def. Ex. F, I at 13; (iv) a screenshot of Rhine's text exchange with the tipster, in which Rhine attempted to excuse—but did not deny—entering the Capitol on January 6:



Def. Ex. F, I at 13-14; (v) other information provided by the tipster at the March 2021 interview, Def. Ex. F, I at 13-14; (vi) the investigators' review of the relevant CCTV footage, their identification of the Rhine's appearance on January 6, and their trace of the defendant throughout

the Capitol building, Def. Ex. F, I at 15-23; and (vi) the tipster's identification of the defendant in one of the screenshots obtained from the CCTV footage, Def. Ex. F, I at 14-15.  The affidavits also mentioned that the tipster "did not see the actual post [by Ms. Rhine], but saw a screen shot sent to him by his friend referring to [Rhine] entering the U.S. Capitol building 26 on January 6, 2021." Def. Ex. F, I at 13-14.

In preparation for trial, on January 9 and 10, 2023, the government reinterviewed the tipster.  During this interview, the tipster indicated that, while he had learned of a Facebook "post" involving Ms. Rhine and its content from an acquaintance, he did not recall personally seeing the "post," or a screenshot of the post.  *See* Def. Ex. L.  According to the tipster, as of January 2023, he was not in possession of a screenshot of a Facebook "post" from January 2021, and he did not recall personally seeing the Facebook "post." *Id.*  Out of an abundance of caution, and given the pendency of Rhine's motion to suppress the fruit of the geofence evidence, the government informed the defense and the Court of the newly clarified information regarding Ms. Rhine's Facebook "post."

## ARGUMENT

The Court should deny the defendant's motion to suppress without a *Franks* hearing.  To obtain a *Franks* hearing, Rhine must make a substantial show that (1) the affidavit contained false statements; (2) the statements were material to the issue of probable cause; and (3) the false statements were made knowingly and intentionally, or with reckless disregard for the truth.  Rhine has not made and cannot make any of these showings.  *First*, even without the contested information—*i.e.*, even assuming that the tipster did not personally see a screenshot of Ms. Rhine's incriminatory Facebook statements—the remainder of the warrant affidavits amply established probable cause that Rhine participated in the January 6 riot and unlawfully entered the Capitol building on that day.  That evidence included incriminating cell-site data obtained from Verizon;

9

Rhine's cell phone's positive hits on Google's geofence; the FBI's detailed trace of Rhine through the Capitol building; and Rhine's own text message to the tipster, in which Rhine purported to justify his breach of the Capitol's restricted area by blaming the Capitol Police. In light of this constellation of evidence, Rhine has not shown—and cannot show—that the alleged inaccuracy was material to probable cause. *Second*, what Rhine characterizes as a false statement was, at most, a misunderstanding about the characterization of a communication as a Facebook "post" as opposed to a "message." The record establishes that the tipster saw—and then forwarded to the FBI—a screenshot of a message (which, according to the tipster, was sent through Facebook) that Ms. Rhine wrote to an acquaintance in which Ms. Rhine referred to her husband entering the U.S. Capitol building on January 6, 2021. Whether that communication was a "Facebook post," a Facebook message, a text message, or something else is beside the point. It does not support Rhine's claim that the warrant affidavits contained any false statements. *Third*, at a minimum, any inaccuracy was not reckless, much less knowing or intentional.

## I.    Legal Standards

In order to invoke a *Franks* hearing, a criminal defendant must make "[]a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" and that "the allegedly false statement is necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155-156 (1978). To obtain a *Franks* hearing, the defendant "must show that (1) the affidavit contained false statements; (2) the statements were material to the issue of probable cause; and (3) the false statements were made knowingly and intentionally, or with reckless disregard for the truth." *United States v. Becton*, 601 F.3d 588, 594 (D.C. Cir. 2010) (internal quotation marks omitted). To warrant a *Franks* hearing, the "movant's attack on the affidavit supporting the warrant 'must be more than conclusory.'" *Id.* (quoting *Franks*, 438 U.S. at 171).

10

The D.C. Circuit has defined recklessness in the context of *Franks* by reference to "precedents in the area of libel and the [F]irst [A]mendment," where "reckless disregard for the truth requires a showing that" the speaker "'in fact entertained serious doubts as to the truth of his publication.'" *United States v. Davis*, 617 F.2d 677, 694 (D.C. Cir. 1979) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)); *accord United States v. Ali*, 870 F. Supp. 2d 10, 28 (D.D.C. 2012). To satisfy this "subjective test" of recklessness, a defendant must show either "actual deliberation" or that "there existed 'obvious reasons to doubt the veracity of the informant or the accuracy of his reports.'" *Davis*, 617 F.2d at 694 (quoting *St. Amant v. Thompson*, 390 U.S. at 732) (footnote omitted). *See also United States v. Kunen*, 323 F. Supp. 2d 390, 395 (E.D.N.Y. 2004) ("Most Circuits that have had occasion to address the issue have adopted a subjective test for recklessness similar to that used in first Amendment liable cases." (internal alterations omitted)).

As explained below, Rhine has failed to make any of the requisite showings for a *Franks* hearing.

## II.     Rhine Has Failed to Show that the Alleged Inaccuracy in the Warrant Affidavits Was Material to Probable Cause

Rhine's demand for a *Franks* hearing fails, first, because ample other, independent evidence in the warrant affidavits established probable cause that Rhine participated in the January 6 riot and unlawfully entered the Capitol building on that day. Even putting aside the contested information about Ms. Rhine's Facebook statements (and even putting aside the tipster's credibility writ large), the affidavits set forth overwhelming evidence of Rhine's criminal activities on January 6:

(i)     Another tipster had submitted an online tip to the FBI to report that, based on second-hand knowledge, Rhine had been inside the Capitol during the January 6 attack. Def. Ex.

11

F, I at 12;

(ii)     Based on a search of open-source information and law enforcement databases, the FBI identified Rhine as the suspect, Def. Ex. F, I at 12;

(iii)    Cell-site records provided by Verizon pursuant to a search warrant confirmed that Rhine's cell phone connected to a cell tower providing service to an area that included the interior of the Capitol building, Def. Ex. F, I at 12;

(iv)    Location-history data returned by Google pursuant to a geofence warrant confirmed that a device associated with Rhine's cell phone number was within or around the Capitol building on January 6 between the time of 2:24 pm and 4:47 pm, Def. Ex. F, I at 13;[1]

(v)     When the tipster confronted Rhine, via text, about this participation in the January 6 attack, Rhine did not deny his participation. Instead, in a text message that was reproduced in the warrant affidavits, Rhine sought to downplay his conduct at the Capitol by claiming that he witnessed no violence, that he saw "no proud boys," and that "Capitol police removed barriers and let people in." Def. Ex. F, I at 14. In the same text exchange, Rhine's wife wrote—in a statement that was also reproduced in the warrant affidavit—that "David had no idea and was nowhere near any of the violence. … The majority are and were peaceful protestors," *id.*:

---

[1] This Court has denied Rhine's motion to suppress evidence derived from the geofence warrant. ECF No. 79 at 36-78. The geofence evidence and its fruit are, therefore, properly considered in determining whether sufficient other evidence supported the magistrate's finding of probable cause.



(vi)   Based on a comparison of the CCTV footage from inside the Capitol with Rhine's most recent driver's license, in July 2021, the FBI identified Rhine in the CCTV footage. Def. Ex. F, I at 15.  The FBI then tracked Rhine through multiple CCTV surveillance cameras throughout the Capitol.  The warrant affidavits in turn reproduced nine such screenshots, with supporting explanations.  Der. Ex. F, I at 15-24; Ex. D.[2]

---

[2]   As noted, in September 2021, the tipster confirmed the FBI's identification of Rhine in a screenshot from the surveillance footage. Def. Ex. F, I at 14-15. Rhine now asserts that the FBI "relied on [the tipster's] identification to then pull further images of the person identified by the tipster." ECF No. 73 at 8. Rhine's chronology is wrong. Using Rhine's driver's license photograph and other information, the FBI had created a detailed timeline of Rhine moving through the Capitol by July 26, 2021, Ex. D—nearly two months before the tipster confirmed

13

This constellation of evidence—ranging from cell-site data to Google location-history data, from Rhine's and his wife's own admissions in text messages to photographs capturing Rhine roaming inside the Capitol—independently established compelling evidence of Rhine's criminal activities on January 6, 2021. At a minimum, it far exceeded the requisite "fair probability" needed for probable cause. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). For that reason alone, this Court should deny Rhine's request for a *Franks* hearing.

### III. Rhine Has Identified No False Statement, Much Less a False Statement Made Intentionally, Knowingly, or With Reckless Disregard to the Truth

Although this Court need not reach the issue, Rhine has also failed to make the requisite substantial showing that the warrant affidavits contained a false statement, much less a false statement made intentionally, knowingly, or with reckless disregard to the truth. As explained below, Rhine's contentions point, at most, to some confusion about whether the tipster's "Facebook screenshots" captured a Facebook "post," a Facebook "message," or a text message.

Rhine's motion hinges on the allegation that the italicized portion of the following statement in the warrant affidavits—which was drawn from the FBI report of the tipster's March 2021 interview—was false: "[The tipster] did not see [Ms. Rhine's] actual [Facebook] post, but *saw a screen shot sent to him by his friend referring to RHINE entering the U.S. Capitol building 26 on January 6, 2021*." Def. Ex. F, I at 13 (italics added). The relevant documents demonstrate that the italicized statement was neither false nor misleading.

As noted above, the tipster not only received—but actually forwarded to the FBI—a screenshot of a message sent by Ms. Rhine regarding her husband's activities on January 6, 2021.

---

Rhine's identification in September 22, 2021, Ex. E. Furthermore, while Rhine contends that the alleged inaccuracy bolstered the tipster's reliability (ECF No. 73 at 8-9), none of the evidence discussed in the text—the cell-site evidence, the geofence returns, Rhine's and his wife's statements in text messages, and the FBI's identification of Rhine in the CCTV footage—turns on the tipster's credibility.

14

*See* Ex. C ("The Facebook screenshots are not messages that I exchanged. I was given those and was told I could share them with you[.]"); Ex. B at 9-10. The message captured in that screenshot referred to Rhine's entry into the Capitol on January 6: "The police welcomed the peaceful protestors in the capitol bldg. David was no near the police brutality of grandma's, kid's with use of pepper spray (which can't be used on Antifa btw)." *Id.* at 9. Indeed, the message expressly referred back to the acquaintance's Facebook post ("in response to your fb post," *id.*) in which the acquaintance had denounced Rhine's unauthorized entry into the Capitol. *See* Ex. A at 1 ("[Y]our husband walked into the capitol building with an angry mob during a global pandemic …"). It is, therefore, true—not false or misleading—that the tipster saw a screenshot of a statement by Ms. Rhine referring to Rhine entering the U.S. Capitol building on January 6, 2021. Def. Ex. F, I at 13. And it is likewise true that the tipster received the screenshot from a mutual acquaintance. *Id.*

Against this backdrop, the tipster's more recent statements that he never saw a screenshot of Ms. Rhine's Facebook "post" reveal merely some confusion about the tool or platform used by Ms. Rhine to send the incriminatory message: did the screenshot capture a Facebook "message," a Facebook "post," or a text message? Consistent with the tipster's characterization of the screenshots as "Facebook screenshots" (Ex. C), the warrant affidavits described the communication as a "Facebook post." *See* Def. Ex. B; Def. Ex. F, I at 13. In his January 9 and 10, 2023 pretrial interview, in contrast, the tipster evidently understood the investigators' questions referencing a "post" as limited to other types of communications—possibly only public postings—which the tipster didn't remember personally seeing. Whatever may be said of that confusion,[3] it does not obscure the fact that the tipster did, in fact, receive, see, and later forward to the FBI

---

[3]     The government did not immediately recognize the misunderstanding, which prompted the government to submit, out of an abundance of caution, a clarification in connection with the then-pending motion to suppress the geofence evidence.

screenshots of Ms. Rhine's incriminating message to her acquaintance (Ex. B at 9-10). That disposes of Rhine's assertions that the warrant affidavits contained material falsehoods. At a minimum, nothing suggests that the FBI agents acted with recklessness vis-à-vis the truth of what is asserted in the warrant affidavits.

Rhine's contrary contentions lack merit. Rhine points to the tipster's recent statements that he did not remember actually seeing a screenshot of Ms. Rhine's incriminating Facebook "post." ECF No. 73 at 7. But, as already explained, the tipster's confusion—nearly two years after his FBI interview—about the type of messages at issue cannot refute what the documentary record makes clear: the tipster saw—and forwarded to the FBI—a screenshot of a message in which Ms. Rhine attempted to explain away her husband's entry into the Capitol building on January 6, 2021.[4] There is, therefore, no merit to Rhine's claim that the warrant affidavits were false or misleading. Rhine's assertion (ECF No. 73 at 9-10) that the FBI agents acted with reckless disregard for the truth (or worse), which is based on the same misapprehension of the documentary evidence, is even more far-fetched.

## CONCLUSION

The defendant's request for a *Franks* hearing and motion to suppress should be denied.

Dated: January 27, 2023

---

[4] Nor was anything material omitted from the warrant affidavits, contrary to Rhine's assertions (ECF No. 73 at 7): again, the tipster *did* follow up after the March 2021 interview, at which point he provided screenshots of Ms. Rhine's incriminatory message to the FBI, as the tipster had indicated during the interview.

16

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: */s/ Francesco Valentini*
FRANCESCO VALENTINI
D.C. Bar No. 986769
Trial Attorney
United States Department of Justice, Criminal Division
Detailed to the D.C. United States Attorney's Office
601 D Street NW
Washington, D.C. 20530
(202) 598-2337
francesco.valentini@usdoj.gov