**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Action No.:  21-0687 (RC) |
| | : | |
| DAVID CHARLES RHINE, | : | Re Document Nos.:    38, 39, 40, 41 |
| | : | |
| Defendant. | : | |
| | : | |

<u>**MEMORANDUM OPINION**</u>

**GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION IN LIMINE; GRANTING IN PART AND DENYING IN PART THE GOVERNMENT'S MOTIONS IN LIMINE**

## I. INTRODUCTION

Defendant David Charles Rhine is charged with four misdemeanor counts arising out of his alleged participation in the events at the Capitol on January 6, 2021. Specifically, the Government charged Defendant by information with (1) entering or remaining in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(1); (2) disorderly or disruptive conduct in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(2); (3) disorderly conduct in a Capitol building in violation of 40 U.S.C. § 5104(e)(2)(D); and (4) parading, demonstrating or picketing in a Capitol building in violation of 40 U.S.C. § 5104(e)(2)(G). *See* Information, ECF No. 8. Defendant moved in limine to preclude admission of certain evidence and argument (ECF No. 38). The Government moved in limine to limit cross-examination of witnesses from the United States Secret Service ("USSS") (ECF No. 39), to preclude admission of certain evidence and argument (ECF No. 40), and to restrict presentation of evidence about the position of U.S. Capitol Police ("USCP") surveillance cameras (ECF No. 41). All motions are ripe for consideration and the Court heard argument on them during a hearing on January 23, 2023. For

the reasons stated below, the Court grants in part and denies in part Defendant's motion and grants in part and denies in part the Government's motions.

## II.  FACTUAL BACKGROUND

At approximately 1:00 p.m. on January 6, 2021, Congress convened to count the votes of the Electoral College and certify the results of the 2020 presidential election.  Vice President Mike Pence was present to preside over the session in his role as President of the Senate.  About an hour later, at approximately 2:00 p.m., the crowd that had gathered outside the Capitol building began to force its way inside.  The Government alleges that Defendant, who resides in Bremerton, Washington, was among that crowd.  Specifically, the Government alleges that Defendant entered the capitol at approximately 2:42 p.m. wearing a dark blue hooded jacket, a red hat, and a backpack, and carrying a blue flag with white stars and white cow bells.  Gov't's Statement of Facts at 4, ECF No. 1-1.  Defendant allegedly proceeded to walk through the Capitol until he encountered a USCP officer at approximately 2:57 p.m.  *Id.* at 6.  The officer allegedly detained Defendant and conducted a search that yielded two knives and pepper spray, which USCP officers seized before placing Defendant in flex cuffs with his hands behind his back.  *Id.*  After escorting Defendant through the hallways for a few minutes, at approximately 3:02 p.m. the USCP officer that detained Defendant allegedly released him, still in flex cuffs, to attend to other responsibilities after Defendant told the officer that he would leave the building.  *Id.* at 8.  The Government alleges that one minute later an unidentified individual cut the flex cuffs from Defendant's hands, and one minute after that, at approximately 3:04 p.m., Defendant left the building.  *Id.* at 8–9.

### III.  LEGAL FRAMEWORK

"While neither the Federal Rules of Civil Procedure nor the Federal Rules of [E]vidence expressly provide for motions *in limine*, the Court may allow such motions pursuant to the district court's inherent authority to manage the course of trials." *Barnes v. Dist. of Columbia*, 924 F. Supp. 2d 74, 78 (D.D.C. 2013) (internal quotation omitted).  "Consistent with the historical origins of the practice, motions *in limine* are designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions."  *Graves v. Dist. of Columbia*, 850 F. Supp. 2d 6, 10 (D.D.C. 2011) (internal quotation omitted).  In general,

> the Federal Rules of Evidence permit the admission of "relevant evidence"—that is, evidence that "has any tendency to make a fact [of consequence] more or less probable than it would be without the evidence," Fed. R. Evid. 401—provided it is not otherwise excluded by the Rules, the Constitution of the United States, or an Act of Congress, Fed. R. Evid. 402, and its probative value is not "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Fed. R. Evid. 403.

*Id.*  "In deference to their familiarity with the details of the case and greater experience in evidentiary matters, trial judges are afforded broad discretion in rendering evidentiary rulings, a discretion which extends to assessing the probative value of the proffered evidence and weighing any factors against admissibility."  *Id.* at 11 (citing *Sprint/United Mgmt. Co. v. Mendelson*, 552 U.S. 379, 384 (2008).

### IV.  ANALYSIS

#### A.  Defendant's Motion in Limine

Defendant moves in limine to preclude the Government from introducing evidence or eliciting testimony regarding the allegation that Defendant possessed pocket knives and pepper spray while in the Capitol on January 6; to limit the Government's ability to introduce evidence of the conduct of others present at the Capitol on January 6; to preclude the use of "prejudicial

terminology" by the Government or its witnesses; and to preclude the Government from

introducing evidence not yet produced or noticed as of the date of Defendant's motion.  *See*

Def.'s Mot. Limine, ECF No. 38.  The Court addresses each of Defendant's arguments in turn.

1. Evidence of Pocket Knives and Pepper Spray

A statement of facts attached to the Complaint under which Defendant was originally

charged states that a USCP officer who searched Defendant after detaining him in the Capitol

building found "two knives and pepper spray" and seized those items.  Statement of Facts at 6.

As part of the investigation into Defendant's conduct on January 6, the FBI twice interviewed the

officer who searched Defendant—on July 19, 2021 and August 24, 2021—and the FBI's written

summaries of those interviews are attached to Defendant's motion.  *See* Gov't's Opp'n to Def.'s

Mot. Limine at 3, ECF No. 58; Attch. 1 to Def.'s Mot. Limine, FBI Summary of July 19, 2021

Interview, ECF No. 38-1; Attch. 3 to Def.'s Mot. Limine, FBI Summary of August 24, 2021

Interview, ECF No. 38-3.  According to the summary of the July 19 interview, the officer said

that an unidentified USCP officer asked him to search Defendant, at which point he found "three

knives and pepper s[p]ray in his belongings."  Attch. 1 to Def.'s Mot. Limine, ECF No. 38-1.

According to the summary of the August 24 interview, the officer said that he "confiscated two

knives and a pepper spray container" from Defendant.  Attch. 3 to Def.'s Mot. Limine at 1.  In

the same interview, after providing a description of each of the items seized, the officer

explained that he "believed the pepper spray was in [Defendant's] bag and the two knives in his

coat."  *Id.*  He said that he "disposed of the two knives in his office break room trash" and "took

the pepper spray home, emptied the spray in the woods behind his house, and threw the empty

canister into the trash."  *Id.* at 1–2.  He stated that "January 6, 2021 was very chaotic and [he] felt

that was the best way to dispose of the pepper spray and canister."  *Id.* at 2.  The same day as the

interview, the officer sent the FBI an email "with website links to items similar to the knives and pepper spray he confiscated from [Defendant]." *Id.*; *see* Attach. 2 to Def.'s Mot. Limine, ECF No. 38-2.  Defendant argues that the Government should not be permitted to introduce evidence concerning the knives or pepper spray because it is not relevant under Rules 401 and 402, because it risks unfair prejudice under Rule 403, and because its introduction would violate Defendant's Fifth Amendment due process and Sixth Amendment fair trial rights.  *See* Def.'s Mot. Limine at 3–5.

Taking relevance first, the Government notes that both 18 U.S.C. § 1752(a)(2) and 40 U.S.C. § 5104(e)(2)(D), under which Defendant is charged in Counts Two and Three, respectively, "require proof of disorderly and disruptive conduct plus a specific intent: the intent, respectively, to impede or disrupt government business (Count Two), and an orderly session of Congress (Count Three)."  Gov't's Opp'n to Def.'s Mot. Limine at 5.  The Government argues that the "fact that the defendant entered the U.S. Capitol Building armed with two knives and a container of pepper spray is probative of the defendant's specific intent as he entered and remained in the building: to be ready in case things turned violent."  *Id.*  The Court cannot agree that evidence of wanting to be "ready in case things turned violent" is necessarily the same as evidence of intent to engage in disorderly or disruptive conduct, but nonetheless finds that the evidence of Defendant's possession of knives and pepper spray probative as to the latter. Relevance under Rule 401 is a low bar, merely requiring that evidence have "any tendency" to make a fact of consequence more or less probable.  Fed. R. Evid. 401.  Surely, if the jury found that Defendant brought knives and pepper spray with him to the Capitol, it would tend to show that he intended to engage in disorderly or disruptive conduct while he was there.  The officer's

testimony on this subject is therefore relevant and significantly probative as to Defendant's mental state.

A somewhat closer question is whether it risks unfair prejudice.  Evidence is unfairly prejudicial if it prejudices a defendant's case "for reasons other than its probative value," *United States v. Wallace*, 124 F. App'x. 165, 167 (4th Cir. 2005) (citation omitted), such as by creating "an undue tendency to suggest decision on an improper basis," *United States v. Gartmon*, 146 F.3d 1015, 1021 (D.C. Cir. 1998) (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)).  Defendant first argues that the probative value of the evidence is diminished by the "inferential leaps" required in order to see its relevance, and by the fact that it "is dependent on the recollection of an Officer questioned months after a 'very chaotic' day about a single interaction that day."  Def.'s Mot. Limine at 4.  The Court disagrees.  As noted above, it is not a circuitous path from a finding that Defendant brought knives and pepper spray when he went to the Capitol to a finding that he intended to engage in disorderly or disruptive conduct while there.  Defendant's primary concern actually appears to be the reliability of the officer's recollection, but the proper audience for that concern is the jury and the proper avenue to express it is rigorous cross-examination.  Indeed, Defendant seems to acknowledge as much in his reply. *See* Def.'s Reply in Support of Mot. Limine at 2, ECF No. 66 (explaining that "there is ample ground to impeach the officer's proposed testimony" and referring to the officer's account as "problematic" and "unreliable"); *cf. Williams v. Johnson*, 747 F. Supp. 2d 10, 14 (D.D.C. 2010) ("In light of their limited purpose [to narrow evidentiary issues at trial], motions *in limine* should not be used to resolve factual disputes . . . ." (internal quotation omitted)).

Defendant also argues that the prejudicial effect of the evidence is high.  He asserts that evidence concerning the knives and pepper spray "would do little more than unfairly suggest to

the jury that Mr. Rhine was a violent or dangerous person—a person who *could have* caused harm." Def.'s Mot. Limine at 4 (emphasis in original). While there is some risk that the jury could use evidence that Defendant possessed knives and pepper spray as an improper basis to assume guilt, that risk will be mitigated by clear jury instructions explaining the Government's burden to prove beyond a reasonable doubt each element of the charged offenses. More importantly, the risk does not "substantially outweigh" the significant probative value of this evidence concerning Defendant's mental state. *See Gartman*, 146 F.3d at 1021 ("[T]he balance [under Rule 403] should generally be struck in favor of admission when the evidence indicates a close relationship to the event charged." (citation omitted)); *United States v. Wilkins*, 538 F. Supp. 3d 49, 73 (D.D.C. 2021) ("While there is prejudice inherent in this evidence, it is only that which stems from the legitimate probative force of the evidence and is directly related to the central question in this case."). The Court cautions, however, that the Government is limited to introducing evidence of the knives and pepper spray in order to show Defendant's mental state, and may not cross the line into arguing that his possession of those items shows that he is generally a violent or dangerous person.

Defendant also argues that testimony concerning the knives and pepper spray would "create a sideshow because . . . counsel for Mr. Rhine would cross-examine the officer regarding the inconsistencies, errors, and lack of reliability of this evidence." Def.'s Mot. Limine at 4. First, the Court disagrees that this would be a "sideshow." As explained above, whether Defendant possessed knives and pepper spray is directly probative as to his mental state. Second, as presented to the Court, the record on this subject is limited to the two FBI interview summaries and the email the officer sent to the FBI after his second interview. At this stage, the

Court has no reason to think that there is a risk of jury confusion that substantially outweighs the probative value of the evidence.

Finally, Defendant argues that introduction of this evidence would violate his rights to due process and a fair trial because the government "destroy[ed]" the primary evidence—the knives and pepper spray canister.  *Id.* at 5.  But as the Government points out, the evidence in question was inculpatory, not exculpatory, and therefore its alleged destruction in no way "hamper[ed] [his] preparation for trial."  *See Cal. v. Trombetta,* 467 U.S. 479, 486, 488–89 (1984) ("Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense . . . .[The] evidence must . . . possess an exculpatory value that was apparent before the evidence was destroyed . . . ." (citation omitted)).  Defendant argues that *Trombetta*'s requirement that the destroyed evidence be exculpatory only binds a district court deciding whether dismissal is appropriate.  *See* Def.'s Mot. Limine at 5.  Defendant argues that the question of whether secondary remedies like suppression are appropriate should be decided based on an overall assessment of the "negative impact on a criminal defendant's constitutional rights" created by the destruction of the evidence, irrespective of its inculpatory nature.  Def.'s Mot. Limine at 5.  After hearing argument on this point, the Court granted leave to Defendant to file a supplemental submission directing the Court to any case that stands for this proposition.  Defendant's supplemental filing identifies two out-of-Circuit cases.  *See* Def.'s Notice of Suppl. Auth., ECF No. 77.  Defendant first cites to *United States v. Loud Hawk*, 628 F.2d 1139 (9th Cir. 1979), *overruled on other grounds by United States v. W.R. Grace*, 526 F.3d 499 (9th Cir. 2008).  Notably, in *Loud Hawk*, the Ninth Circuit *reversed* a district court order suppressing evidence destroyed by law enforcement.  *Id.* at 1151.  In doing so, however, the Court outlined a test that

Defendant argues should apply here: "[w]hen the government loses or destroys tangible evidence prior to trial, a motion to suppress secondary evidence such as photographs, testimony of witnesses, etc., will be granted . . . if the defendant can show (1) bad faith or connivance on the part of the government, and (2) that he was prejudiced by the loss or destruction of evidence." *Id.* at 1146.

Defendant claims that application of the *Loud Hawk* test here compels suppression, and looks for support to his second case, *United States v. Williams*, No. C 05-0383, 2006 WL 1230477 (N.D. Cal. May 15, 2006). But *Williams* is not analogous to the present case. The defendant in that case was charged with possession of a firearm with an obliterated serial number under 18 U.S.C. § 922(k). *Id.* at *1. Days before trial, the government "learned during a conversation with a criminalist with the San Francisco Police Department that the gun's appearance had been altered in an attempt to restore the serial numbers." *Id.* After finding that the gun itself was inadmissible because "its appearance has been changed in a fundamental way by the restoration attempts and it no longer looks like it did while in [the defendant's] possession," the court held that photographs of the gun also were inadmissible under the *Loud Hawk* test. *Id.* at *2–3. Specifically, the court held that "the photos do not accurately depict it and are of such poor quality that [the defendant] will be significantly impaired in his ability to defend against the charge." *Id*. at *3. The court emphasized the "substantial" prejudice to the defendant caused by the alteration of the evidence, explaining that "the appearance of the weapon, and specifically the appearance of the serial numbers, is [the defendant's] whole case." *Id.*

By contrast, here, as explained above concerning the Rule 403 analysis, there is limited prejudice to Defendant from the destruction of the primary evidence. Unlike *Williams*, in which

the appearance of the serial number on the gun was central to a charge that included obliteration of the serial number as an element, here, the physical characteristics of the knives and pepper spray are largely irrelevant.  It is the mere fact of Defendant's alleged possession of those items that is probative as to his mental state.  The Court is thus unconvinced by Defendant's argument that the unavailability of the primary evidence "seriously hamper[s] . . . his ability to argue that the evidence was not seized from him or that it consisted of basic self-defense items."  Def.'s Notice of Suppl. Auth. at 3.  The Court cannot see how presentation to the jury of the physical knives and pepper spray would aid the Defendant in arguing that they were not seized from him, and Defendant has ample ability to make his point about self-defense on cross-examination.  For example, the FBI's summary of the August 24, 2021 interview with the seizing officer includes the officer's description that the pepper spray was the type "used for self defense," was "a little bigger than a key chain type, not bear spray," had "no indication the pepper spray was used[,]" and "did not have any residue on the exterior."  Attch. 3 to Def.'s Mot. Limine at 1.

Moreover, while Defendant alleges and the Government concedes that the evidence here was destroyed intentionally, Defendant makes no allegation of "bad faith or connivance."  *Loud Hawk*, 628 F.2d at 1146; *see* Attch. 3 to Def.'s Mot. Limine at 1–2 (relaying the seizing officer's explanation that he "disposed of the two knives in his office break room trash" and "emptied the spray in the woods behind his house" before throwing the empty canaster in the trash because "January 6, 2021 was very chaotic and [he] felt that was the best way to dispose of [it]").  This case is thus more similar to *United States v. Lillard*, 929 F.2d 500 (9th Cir. 1991), in which the Ninth Circuit applied the *Loud Hawk* test in the context of the defendant's argument that the district court improperly considered testimony about the quantity of chemicals seized at his laboratory because the government destroyed the chemicals before they could be weighed.

*Lillard*, 929 F.2d at 504.  The court found that the testimony was properly admitted, as "[t]here was no evidence of government misconduct, and [the defendant] failed to demonstrate prejudice" by putting on his own witnesses or cross-examining the government witnesses.  *Id.*  The court explained that "destruction of evidence is a constitutional problem only under extreme conditions, which were not alleged here."  *Id.* (citing *Trombetta*, 467 U.S. at 488–89).

*Loud Hawk* is not the law in this Circuit.  *See United States v. Burnett*, 827 F.3d 1108, 1116 (D.C. Cir. 2016) (upholding district court's admission of secondary evidence concerning heroin seized from a rental car that was destroyed by the government, explaining that "[t]o make out a claim that the destruction of evidence violated the Due Process Clause, the *defendant* bears the burden of proving that the government failed *in bad faith* to preserve *material* and *potentially exculpatory* evidence." (emphases in original) (internal quotation omitted)).  But even if it was, because Defendant has failed to demonstrate bad faith by the government in destroying the knives and pepper spray or, more importantly, any prejudice from their unavailability, the Court would see no violation of Defendant's constitutional rights in admitting the officer's testimony about them.

2.  Vicarious Liability and Conduct of Others

Defendant first asks the Court to preclude argument or evidence in support of a theory of vicarious liability, but the Government has expressly disclaimed reliance on such a theory, so the issue is moot.  *See* Def.'s Mot. Limine at 8; Gov't's Opp'n to Def.'s Mot. Limine at 7.[1]

---

[1] Certain of Defendant's arguments also appear to request an order precluding the Government from arguing any theory of accomplice liability.  *See* Def.'s Mot. Limine at 6–8 (noting that the "government's theory of prosecution here does not appear to be that Mr. Rhine actually aided or abetted another person who engaged in disorderly or disruptive conduct, or paraded, demonstrated, or picketed" and that the government "does not expressly argue for vicarious liability," but claiming that "in practical terms, that is the import of [the Government's] 'collective action' arguments.").  To the extent this is the case, Defendant's request is denied

However, Defendant also argues that "the government should be precluded from introducing videos, photographs, or other evidence (including testimony) of serious acts of violence by other people, of any misconduct by others who were not within Mr. Rhine's view or immediate vicinity, or of damage and injuries caused by other people."  Def.'s Mot. Limine at 9.  The Government argues in response that evidence of the conduct of others is relevant for two purposes.

First, the Government argues that "[w]here other rioters near the defendant did something that he could have observed, or where the defendant talked or wrote about the conduct of other rioters, their conduct is probative of his mens rea and motive."  Gov't's Opp'n to Def.'s Mot. Limine at 9.  Defendant does not disagree that such evidence is probative as to Defendant's mental state, relying instead on an argument that the Government hypocritically argued for a stricter standard for admissibility with respect to defense evidence of law enforcement inaction. *See* Def.'s Reply in Support of Mot. Limine at 3–4.  The Court agrees with the parties that evidence of the conduct of others that Defendant was aware of or reasonably could have observed, as established through witness testimony or by proffer to the Court, is probative as to his mental state and admissible.  As for Defendant's objection to the "imbalanced standard" requested by the government, as discussed *infra* Section IV.B.2, the Court adopts a similar standard concerning the admissibility of evidence of law enforcement inaction.  Def.'s Mot. Limine at 3 (emphasis omitted).

---

because "a defendant [may] be convicted as an aider and abettor absent any specific allegation to that effect in the indictment[.]"  *United States v. Lam Kwong-Wah*, 924 F.2d 298, 302 (D.C. Cir. 1991) ("[A]n indictment need not specifically include an aiding and abetting charge because, whether specified or not, the federal statute creating liability for aiding and abetting, 18 U.S.C. § 2(b), is considered embodied in full in *every* federal indictment." (internal quotations omitted)).

Second, the Government argues that, because Count 2 (18 U.S.C. § 1752(a)(2)) and Count 3 (40 U.S.C. § 5104(e)(2)(D)) require proof of disorderly or disruptive conduct, and because Count 2 further requires that Defendant's conduct in fact impeded or disrupted Congress, "the nature of these crimes requires proof of collective action."  Gov't's Opp'n to Def.'s Mot. Limine at 8–9.  The Government appears to argue that proof of the conduct of others is relevant for these purposes regardless of whether Defendant was aware of it or could have perceived it.  The Government explains that it plans to present testimony from law enforcement officers on duty at the Capitol on January 6 explaining (1) that the Capitol was closed to the public on January 6; (2) that "no member of the mob submitted to security checks," and (3) that "Capitol Police assessed every member of the mob to be an active threat."  *Id.* at 8.  Based on this testimony, the Government will argue that, "[g]iven a variety of factors, including the size of the crowd and the existence of multiple breach points, Congress was forced to recess" and that Defendant "was in the building, and Capitol Police officers had to expel him (and others) before Congress could return from recess."  *Id.*  The Government argues that doing all of this to prove that Defendant's conduct was disruptive "requires evidence of the conduct of other rioters."  *Id.* at 8–9.

The Court agrees that the situational context around Defendant while he was allegedly present in the Capitol is relevant to the jury's assessment of whether Defendant's conduct was disorderly or disruptive.  *See* Jury Instructions at 9, *United States v. Bledsoe*, No. 21-cr-0204 (D.D.C. July 21, 2022), ECF No. 215 (instructing the jury that disorderly conduct under 18 U.S.C. § 1752(a)(2) "occurs when a person is unreasonably loud and disruptive *under the circumstances*" and "is a disturbance that interrupts an event, activity, or the *normal course of a process*" (emphasis added)).  But the Court cannot agree that the situational context *not* around

Defendant has equal relevance to the jury's assessment of the nature of his conduct. The Government cites to *United States v. Rivera*, No. 21-0060, in which the court issued Findings of Fact and Conclusions of Law after a bench trial in another January 6 case. The court explained that, under 18 U.S.C. § 1752(a)(2), a defendant's conduct need not be the "*but for* cause of a disruption" to Congress; rather, it is enough if the defendant "contributed to that disruption." Findings of Fact and Conclusions of Law at 13, *United States v. Rivera*, No. 21-0060 (D.D.C. June 17, 2022), ECF No. 62. The Government highlights the court's metaphor that, "[j]ust as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood." *Id*. But the causation question that the *Rivera* court confronted is different from the evidentiary relevance question presented here, and there is an important distinction between the *Rivera* court's holding that the presence of other sufficient causes of congressional disruption does not defeat liability under § 1752(a) and the Government's claim that evidence of every contributing cause is necessarily relevant. The Government is really asking the Court to invert and twist the *Rivera* court's metaphor to find that evidence of a wet field tends to prove that a particular rain drop fell—that evidence of a lot of disorderly or disruptive conduct is proof that Defendant's conduct was disorderly or disruptive too. But as noted above, this is only true to the extent that Defendant knew or could perceive what the others around him were doing, such that a jury could reasonably infer a connection between his conduct and theirs.

Accordingly, the Court holds that evidence of the conduct of others at the Capitol on January 6 that Defendant was aware of or reasonably could have perceived because it occurred near him such that he could have seen or heard it is relevant and admissible because it speaks to the nature of his conduct under the circumstances and his mental state. For example, the Government may show evidence of what was happening in Defendant's vicinity as he

approached, entered, and walked through the Capitol.  The Government can lay this foundation

through witness testimony or by proffer to the Court.  However, the Government may not offer

evidence of the conduct of others that Defendant was not aware of and could not have perceived,

as any minimal probative value of such evidence is substantially outweighed by a danger of

unfair prejudice.[2]

An important exception to these rules is that the Government may present evidence of

unauthorized individuals' presence and conduct in or around the Capitol—for example through

use of a compilation video showing USCP surveillance footage in and around the Capitol before

and during the events in question, which the Government indicated during the January 23, 2023

hearing it plans to show the jury—for the limited purpose of demonstrating that Congress was in

fact impeded or disrupted under 18 U.S.C. § 1752(a)(2).[3]  As another court in this District

pointed out regarding a compilation video used in another January 6 case, "placing [Defendant's]

actions in the context of . . . everything else that the Capitol Police were dealing with that day to

try to maintain control" is relevant to the jury's assessment of whether Congress was in fact

disrupted.  Hearing Tr. at 7, *United States v. Vargas-Santos*, No. 21-cr-0047 (D.D.C. Dec. 7,

2022) (Moss, J.).[4]  The Government must take care, however, that its presentation of evidence

for this narrow purpose is not cumulative.

---

[2] The Government may request an exception to this general rule, outside the presence of
the jury, should circumstances arise at trial that the Government feels change the relevance
analysis.

[3] The Court will entertain the parties' suggestions as to an appropriate limiting instruction
to ensure that the jury's consideration of any such evidence is confined to this limited purpose.
The Court will also entertain any objections to specific scenes in the compilation video presented
by Defendant to the Court not later than one week prior to the pretrial conference.

[4] The Government provided a copy of this hearing transcript to the Court and defense
counsel.  *See* Notice of Suppl. Auth. at 1 n.1, ECF No. 85.

### 3.  Prejudicial Terminology

Defendant asks the Court to preclude use of "inflammatory, value-laden, or legally conclusory words" to describe the events of January 6 or those who went to the Capitol that day. Def.'s Mot. Limine at 10.  Defendant notes that "[i]t is not possible to anticipate" a complete list of objectionable words, but lists "riot," "rioter," "insurrection," insurrectionist," "mob," and "trespass," as examples.  *Id.*  Defendant seems to be most concerned with attempts to describe him as a "rioter" or "insurrectionist."[5]  *See* Def.'s Reply in Support of Mot. Limine at 4.

Rule 403 "does not generally require the government to sanitize its case, to deflate its witnesses' testimony, or to tell its story in a monotone."  *Gartman*, 146 F.3d at 1021; *Old Chief*, 519 U.S. at 187 (emphasizing the importance of a party's discretion to tell a "colorful story with descriptive richness").  However, "the use of insults or slurs in lawyers' arguments" is inappropriate, though insulting language may be permissible if "tied to specific conduct at issue in the trial."  *Gartmon*, 146 F.3d at 1024.  That is, insulting language may not be "used as a generalized attack on [a defendant's] character," but may be used "as a description of the manner in which he" performed the offense conduct.  *Id.*

The Merriam-Webster Dictionary defines the noun form of  "riot" as "a violent public disorder" and the verb form of  "riot" as "to create or engage in a riot."  *Riot*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/riot (last visited Feb. 17, 2023).  It defines the noun form of "mob" as "a large and disorderly crowd of people" and the verb form of "mob" as "to crowd about and attack or annoy."  *Mob*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/mob (last visited Feb. 17, 2023).  Riot and mob

---

[5] The Government acknowledged during the hearing held on January 23, 2023 that it will not use the term "trespass."

are not legal terms, and it would be exceedingly difficult to accurately characterize the events of

January 6 in a way that would reveal their use to be overstatement.  Accordingly, the Court will

allow the Government and its witnesses to describe the scene at the Capitol as a "riot" or "mob,"

with the important exception that the Government may not argue or elicit testimony that

Defendant has a general character of a rioter or someone who participates in mobs.  The terms

"insurrection" and "insurrectionist" are a different story.  Merriam-Webster defines insurrection

as "an act or instance of revolting against civil authority or an established government."

*Insurrection*, MERRIAM-WEBSTER.COM, https://www.merriam-

webster.com/dictionary/insurrection (last visited Feb. 17, 2023).  These terms thus imply intent

in a way that separates them from generic terms like "riot" or "mob."  These terms also may tend

to connect Defendant to other January 6 defendants charged with seditious conspiracy, a charge

that Defendant, like the vast majority of other January 6 defendants, does not face.  *See, e.g.*,

Alan Feuer, *Oath Keepers Leader Urged Trump to Invoke the Insurrection Act*, N.Y. TIMES (Oct.

7, 2022), https://www.nytimes.com/2022/10/07/us/politics/oath-keepers-stewart-rhodes-trial-

letter-trump.html.  Accordingly, the Government may not argue or elicit testimony that

Defendant participated in an "insurrection" or is an "insurrectionist" absent a specific showing,

outside the presence of the jury, that use of those terms is "an accurate description" that is "tied

to specific conduct at issue in the trial."  *Gartmon*, 146 F.3d at 1024.[6]

---

[6] The Court notes, however, that accidental use of "insurrection," "insurrectionist," or
"trespass" will not necessarily be grounds for a mistrial.  *See United States v. McLendon*, 378
F.3d 1109, 1112 (D.C. Cir. 2004) ("The single most important consideration in ruling on a
motion for a mistrial is the extent to which the defendant was unfairly prejudiced.").

### 4.  Unproduced Evidence

Finally, Defendant asks the Court to rule that the Government may not introduce any evidence that it has yet to produce or notify Defendant about.  As ordered after the hearing on January 23, 2023, the Court sets a date of two weeks before the start of trial, April 3, 2023, for the close of discovery.  Any evidence produced after that date may not be introduced by the Government.

### B.  The Government's Motions in Limine

The Government moves in limine to limit cross-examination of a witnesses from the USSS, to preclude certain arguments and evidence, and to preclude evidence concerning the position of U.S. Capitol Police cameras.  The Court addresses these motions in turn.

### 1.  Motion to Limit Cross-Examination of USSS Witness

On grounds that the "nature of the Secret Service's role in protecting the Vice President and his family implicates sensitive information related to that agency's ability to protect high-ranking members of the Executive branch, and by extension, national security," the Government asks the court to preclude questioning USSS witnesses about (1) "Secret Service protocols related to the locations where protectees or their motorcades are taken at the Capitol or other government buildings when emergencies occur;" or (2) "[d]etails about the nature of Secret Service protective details, such as the number and type of agents the Secret Service assigns to protectees."  Gov't Mot. Limit Cross-Exam. at 2, ECF No. 39.  The Government states that it intends to offer only "limited testimony about the Secret Service's protection of certain officials on January 6, 2021" in order to establish that the "Capitol and its grounds were 'restricted' for purposes of 18 U.S.C. § 1752(a)," under which Counts 1 and 2 were charged.  *Id.* at 3–4.

As the Government points out, Defendant does not appear to oppose the two limitations requested.  *See* Def.'s Opp'n to Gov't's Mot. to Limit Cross-Exam. at 1, 5–6, ECF No. 49 ("Mr. Rhine, through counsel, does not intend to inquire about the Secret Service's detailed procedures, evacuation routes, or details for the current protection of the Vice President and their family . . . . Mr. Rhine does not intend to cross-examine a Secret Service witness about the specific personnel and measures in place currently to protect the Vice President and her family.").  Defendant instead emphasizes that he must be able to cross-examine the USSS witness concerning the following five topics:

> (1) the precise location of then-Vice President Mike Pence from 2:24 p.m. to 4:47 p.m . . . (2) the precise boundaries of any 'restricted area' during this time; (3) how this area was restricted, including by what visible indicators; (4) the purpose for the restriction; and (5) whether the means or area of restriction was atypical or otherwise did not clearly indicate that the area was restricted to protect a secret-service protectee.

*Id.* at 2.  The Government makes no claim that any of these areas of inquiry should be restricted, and in fact specifically disclaims any intent to "preclude the defendant from eliciting" information concerning the precise location of then-Vice President Pence during the relevant period.  Gov't's Reply in Support of Mot. to Limit Cross-Exam. at 2, ECF No. 52 (explaining that such location information "has already been disclosed in the trial of another January 6, rioter" (citing *United States v. Cuoy Griffin*, No. 21-cr-92, ECF No. 105 at 222–23 (D.D.C. 2022)).

Based on the limited daylight, if any, between the parties on these issues at present, the Court denies the Government's motion for a pretrial order on this subject and will rule on any objections to specific questions at trial.[7]  *See Barnes*, 924 F. Supp. 2d at 79 ("[I]n some instances

---

[7] As the Court noted during the hearing on January 23, 2023, the Court expects Defense counsel to seek leave, outside the presence of the jury, to ask any questions that approach the sensitive areas identified by the Government.

it is best to defer rulings until trial, [when] decisions can be better informed by the context, foundation, and relevance of the contested evidence within the framework of the trial as a whole." (citation omitted)).

### 2.  Motion to Preclude Evidence and Argument

The Government moves to preclude Defendant from arguing or introducing evidence to support an entrapment by estoppel theory or arguing that law enforcement inaction rendered his conduct legal by default and to preclude Defendant from arguing or presenting evidence of any alleged inaction by law enforcement unless he specifically observed or was otherwise aware of it.  *See* Gov't's Mot. Preclude Ev. and Arg., ECF No. 40.

### a.  Entrapment by Estoppel

To "win an entrapment-by-estoppel claim, a defendant criminally prosecuted for an offense must prove (1) that a government agent actively misled him about the state of the law defining the offense; (2) that the government agent was responsible for interpreting, administering, or enforcing the law defining the offense; (3) that the defendant actually relied on the agent's misleading pronouncement in committing the offense; and (4) that the defendant's reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation."  *United States v. Chrestman*, 525 F. Supp. 3d 14, 31 (D.D.C. 2021) (quoting *United States v. Cox*, 906 F.3d 1170, 1191 (10th Cir. 2018)).  This "narrowly tailored defense" is only available in "very limited circumstances" where "the challenged prosecution offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Id.* at 30 (internal quotations omitted) (analyzing three Supreme Court cases in which the entrapment by estoppel defense was recognized).  Appropriately, during the hearing held on January 23, 2023, Defendant disavowed

any intent to rely on the entrapment by estoppel defense or other argument that inaction by law enforcement by default rendered Defendant's conduct legal, so the Court denies the Government's motion as moot. *See Chrestman*, 525 F. Supp. 3d at 32 ("[A]s applied generally to charged offenses arising out of the January 6, 2021 assault on the Capitol, an entrapment by estoppel defense is likely to fail."); Mem. & Order at 3, *United States v. Williams*, No. 21-cr-377 (D.D.C. June 8, 2022), ECF No. 87 ("Settled caselaw makes clear that law officer inaction— whatever the reason for the inaction—cannot sanction unlawful conduct.").

### b.  Relevance of Law Enforcement Inaction

The Government concedes that evidence of inaction by law enforcement "may be relevant to the defendant's state of mind on January 6, 2021," but argues that such evidence is "admissible only if defendant can establish his awareness of the alleged inaction by officers" either by "good faith proffer outside the presence of the jury" or by "using other evidence already before the jury." Gov't's Mot. Preclude Ev. and Arg. at 4 (cleaned up). Defendant responds that evidence of inaction by law enforcement is relevant not only for its probative value as to state of mind, but also for its probative value as to whether the Capitol was in fact "restricted" under 18 U.S.C. § 1752. *See* Def.'s Opp'n to Mot. Preclude Ev. and Arg. at 2.

The Court agrees that evidence of law enforcement inaction is only probative as to Defendant's mental state to the extent that he was aware of or could have perceived it. *See* Mem. & Order at 3, *United States v. Williams*, No. 21-cr-377 (D.D.C. June 8, 2022), ECF No. 87 ("As a logical matter . . . any action or inaction of which defendant was not aware cannot possibly have had any effect on his state-of-mind and is inadmissible as irrelevant . . . ."). Contrary to Defendant's suggestion that such a holding would "force Mr. Rhine to the stand to testify about precisely what he recalls witnessing or not," Def.'s Opp'n to Gov't's Mot. Preclude Ev. and

Arg. at 2, Defendant can establish his awareness of the alleged inaction in "any number of ways, such as a good faith proffer outside the presence of the jury or using other evidence to show that [he] was adequately nearby the alleged inaction at the correct time."  Mem. & Order at 3, *United States v. Williams*, No. 21-cr-377 (D.D.C. June 8, 2022), ECF No. 87 (cleaned up).

However, a closer question is whether evidence of such inaction may be probative as to whether the area was in fact restricted, regardless of whether Defendant was aware of it.  Recall that Counts 1 and 2 charge Defendant with entering or remaining in any "restricted building or grounds" and engaging in disorderly or disruptive conduct in or near any "restricted building or grounds," under 18 U.S.C. § 1752(a)(1) and (a)(2), respectively.  *See* Information at 1–2.  The statute defines "restricted building or grounds" to mean "any posted, cordoned off, or otherwise restricted area" of, as relevant here, "a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting."  § 1752(c)(1)(B).

Defendant argues that "inaction by law enforcement in demarcating the alleged restricted area, or removal of barriers, is relevant to challenge" whether the area was in fact restricted, "whether or not Mr. Rhine personally witnessed these events."  Def.'s Opp'n to Gov't's Mot. Preclude Ev. and Arg. at 2.  The Government responds that, because § 1752(c)(1) includes the clause "otherwise restricted," its "plain terms . . . do not require that the restricted area be cordoned off, set off with barriers, or demarcated in any particular way."  Gov't's Reply in Support of Mot. Preclude Ev. and Arg. at 3, ECF No. 53.  Accordingly, the Government argues that "while the presence of signs, cordons, and barriers can—and does—prove that the area surrounding the Capitol was indeed restricted, the *absence* of any particular means of demarcation in any particular location at any particular time does not tend to disprove the same element."  *Id.*  The Court is reluctant to subscribe to this kind of heads-I-win, tails-you-lose

logic.  To whatever extent the presence of signs, cordons, or barriers tends to prove that an area was restricted, their absence necessarily tends to prove that it was not, even if the Government is ultimately able to establish that the area was nonetheless "otherwise restricted."  However, the relevant area to assess is necessarily limited to the alleged location of Defendant—he must have been "in," 18 U.S.C. § 1752(a)(1), or at least "within such proximity to," § 1752(a)(2), the restricted area.  Evidence that law enforcement removed barriers on the opposite side of the Capitol from where Defendant is alleged to have been is therefore of substantially reduced probative value to the jury's assessment of whether the latter area was restricted.  That reduced probative value is substantially outweighed by the risk that prolonged inquiry on this topic will waste time or confuse the jury.  Accordingly, the Court holds that evidence of law enforcement inaction or removal of barriers is relevant and admissible only to the extent that Defendant was aware of it or reasonably could have perceived it, or that it occurred in close proximity to the locations where Defendant is alleged to have entered or been in the Capitol before he was there such that it reasonably bears on whether the area was restricted, as established through presentation of evidence or by proffer to the Court.

3.  Motion to Preclude Evidence Regarding Position of Capitol Surveillance Cameras

The Government moves under Rule 403 to preclude Defendant from cross-examination that probes the "exact locations of Capitol Police surveillance cameras" or from using at trial exhibits maps the government provided Defendant "which show each camera's physical location."  Gov't's Mot. Preclude Camera Ev. at 1–2, ECF No. 41.  The Government argues that this is necessary "in light of ongoing security needs of the Capitol" in order to protect "national security."  *Id.* at 4–5.  In particular, publication of precise camera locations would not only reveal

what the cameras can see, but also would permit the public to "learn about the parts of the Capitol where cameras were not installed." *Id.* at 5.

Defendant argues that the "height and distance of camera locations bears on the weight given to the depictions and on jurors' understanding of the depictions."[8] Def.'s Opp'n to Gov't's Mot. Preclude Camera Ev. at 3, ECF No. 51.  But as the Government points out, a "general description, and the footage from the camera itself, will make clear what the camera recorded and what it did not."  Gov't's Mot. Preclude Camera Ev. at 4.  That is, knowledge of the "height and distance" of the camera location would not supplement the jurors' ability to assess the depictions with their own eyes based on the footage itself.  As another court in this District held in rejecting similar arguments, "[i]n any given video, defendant either is or is not visible, and the framing of the camera image should make generally clear the boundaries of the camera's field of view, without requiring further details as to the camera's exact position, aiming, characteristics, and appearance."  Min. Order, *United States v. Williams*, No. 21-cr-377 (D.D.C. June 8, 2022).

The Court finds evidence of the precise locations of Capitol surveillance cameras, including maps showing those locations, irrelevant under Rule 401 and therefore presumptively inadmissible.  However, to the extent Defendant develops evidence to show that such location

---

[8] Defendant also argues that *United States v. Foster*, 986 F.2d 541 (D.C. Cir. 1993) supports his position.  *See* Def.'s Opp'n to Gov't's Mot. Preclude Camera Ev. at 3–4.  However, as the Government points out, *Foster* involved a factually distinct situation concerning eye-witness testimony of an officer who observed the defendant using binoculars from thirty-to-forty feet above and 150 yards away.  *See* Gov't's Reply in Support of Mot. Preclude Camera Ev. at 2–3, ECF No. 54.  The security concerns implicated by revealing the precise location of Capitol surveillance cameras were not present in *Foster*.  More importantly, as the Government points out, "whereas no recording of the officer's observation was available in *Foster*, the whole point in this motion is that USCP camera footage will be available and admitted into evidence."  *Id.* at 3 (referencing *United States v Harley*, 682 F.2d 1018, 1021 (D.C. Cir. 1982), in which the D.C. Circuit upheld a restriction on disclosure of the location of a law enforcement observation post on grounds that video recorded from that vantage point was available).

information is relevant and necessary to his defense at trial, he may raise the issue outside the presence of the jury.  And as the Government acknowledges, the Court's ruling does not prevent Defendant from "prob[ing] what Capitol Police's cameras show, and what they don't, by asking about the general location of each camera."  Gov't's Mot. Preclude Camera Ev. at 4.

## V.  CONCLUSION

For the foregoing reasons, Defendant's Motion in Limine (ECF No. 38) is **GRANTED IN PART AND DENIED IN PART** and the Government's Motions in Limine (ECF Nos. 39, 40, 41) are **GRANTED IN PART AND DENIED IN PART**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  February 17, 2023                                    RUDOLPH CONTRERAS
                                                             United States District Judge