1      **UNITED STATES DISTRICT COURT**
       **FOR THE DISTRICT OF COLUMBIA**
2      _____

3      United States of America,      ) Criminal Action
                                       ) No. 1:21-cr-00687-RC
4                      Plaintiff,      )
                                       ) **Evidentiary Hearing**
5      vs.                             )
                                       )
6      David Charles Rhine,            ) Washington, D.C.
                                       ) **February 1, 2023**
7                      Defendant.      ) Time:  10:00 a.m.
       _____

8
               **Transcript of Evidentiary Hearing**
9                       **Held Before**
            **The Honorable Rudolph Contreras**
10              **United States District Judge**

11
                    A P P E A R A N C E S
12
       For the Government:     **Francesco Valentini**
13                             DEPARTMENT OF JUSTICE
                               950 Pennsylvania Avenue, Northwest
14                             Washington, D.C. 20530

15                             **Kelly E. Moran**
                               UNITED STATES ATTORNEY'S OFFICE
16                             FOR THE DISTRICT OF COLUMBIA
                               601 D Street, Northwest
17                             Washington, D.C. 20579

18     For the Defendant:      **Rebecca C. Fish**
                               **Joanna J. Martin** (via Zoom)
19                             FEDERAL PUBLIC DEFENDER
                               1331 Broadway, Suite 400
20                             Tacoma, Washington 98402
       _____
21
       Stenographic Official Court Reporter:
22                             Nancy J. Meyer
                               Registered Diplomate Reporter
23                             Certified Realtime Reporter
                               333 Constitution Avenue, Northwest
24                             Washington, D.C. 20001
                               202-354-3118
25

1                          **I N D E X**

2                                                    PAGE:

3       **Witnesses:**

4       **Thomas Loyd**
            Direct Examination By Mr. Valentini.............. 4
5           Cross-Examination By Ms. Fish.................... 46
            Redirect Examination By Mr. Valentini........... 64
6           Recross-Examination By Ms. Fish................. 67

7

8       **Exhibits Admitted:**

9
            Government Exhibit 110........................... 19
10          Government Exhibit 115........................... 43
            Government Exhibit 116........................... 35
11          Government Exhibit 117........................... 30
            Government Exhibit 118........................... 36
12          Government Exhibit 119........................... 11
            Government Exhibit 120........................... 22
13          Government Exhibit 508........................... 23
            Government Exhibit 1001.......................... 19
14          Government Exhibit 1002.......................... 26

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  This is Criminal Action

3    21-687, United States of America v. David Charles Rhine.

4              Counsel, please step forward to the podium and state

5    your appearances for the record.

6              MR. VALENTINI:  Good morning.  My name is Francesco

7    Valentini.  I represent the government.  At counsel table with

8    me today is AUSA Kelly Moran.

9              THE COURT:  Good morning.

10             MS. FISH:  Good morning, Your Honor.  Rebecca Fish on

11   behalf of Mr. Rhine.  At counsel table today with me are

12   paralegal Amy Strickling, investigator Michael Stortini, and my

13   client; and joining us remotely is my co-counsel Joanna Martin.

14             THE COURT:  Good morning.

15        All right.  Mr. Valentini, let's get started.

16             MR. VALENTINI:  Good morning, Your Honor.

17             THE COURT:  Good morning.

18             MR. VALENTINI:  The government calls Inspector Thomas

19   Loyd.

20             THE COURTROOM DEPUTY:  Can you say that name once

21   again.

22             MR. VALENTINI:  Absolutely.  Thomas Loyd.

23             THE COURTROOM DEPUTY:  L-o-y-d?

24             MR. VALENTINI:  Correct.  And I will ask the witness

25   to spell his name for the record.

```
 1                    THE COURTROOM DEPUTY:  Okay.

 2              Good morning, sir.

 3              (Oath administered.)

 4              THE WITNESS:  I swear.

 5              THE COURTROOM DEPUTY:  Thank you, sir.

 6                         DIRECT EXAMINATION

 7    BY MR. VALENTINI:

 8    Q.  Good morning.

 9    A.  Good morning.

10    Q.  In a clear, loud voice, will you please state and spell

11    your name for the record.

12    A.  Inspector Thomas Loyd.  Last name is spelled L-o-y-d.

13    Q.  Inspector Loyd, what do you do for a living?

14    A.  I work for the U.S. Capitol Police.

15    Q.  How long have you been with the Capitol Police?

16    A.  Thirty-two years.

17    Q.  What is your current title?

18    A.  Inspector.

19    Q.  How high a rank is inspector within the Capitol Police?

20    A.  You have the first-line officers on the street; then

21    they're supervised by sergeants; and the sergeants are

22    supervised by lieutenants; lieutenants are supervised by the

23    captains; and I supervise three captains directly.  And above

24    me there are deputy chiefs, the assistant chiefs, and the chief

25    of police.
```

1   Q.  How many Capitol Police officers, approximately, do you

2   supervise?

3   A.  Approximately 350.

4   Q.  Are you assigned to a specific division or unit within the

5   Capitol Police?

6   A.  Yes.  I'm assigned to the Capitol division.

7   Q.  And what are the responsibilities of the Capitol division?

8   A.  The safety and security of the Capitol Building itself, to

9   include the House and Senate Chambers, the Capitol visitors'

10  center building where the public comes in, and the

11  Capitol Square on the outside.

12  Q.  Inspector Loyd, so based on your responsibilities, are you

13  familiar with the U.S. Capitol Building?

14  A.  Yes.

15  Q.  Are you familiar with the Capitol Grounds?

16  A.  Yes.

17  Q.  Are you familiar with an area that's referred to as the

18  Capitol plaza?

19  A.  Yes.

20  Q.  What was your title as of January 6th, 2021?

21  A.  My title was inspector.

22  Q.  The same as today?

23  A.  Yes.

24  Q.  What were your job responsibilities at the time?

25  A.  For that particular day, I was responsible for routine

6

```
1     operations within the Capitol Building.
2     Q.  And just to be clear, you were on duty on January 6th,
3     2021?
4     A.  Yes.
5     Q.  Do you know if the Capitol Police maintains a camera
6     surveillance system?
7     A.  Yes.
8     Q.  Are you generally familiar with the Capitol Police
9     surveillance system?
10    A.  Yes.
11    Q.  How is that?
12    A.  Just from ongoing experience with the police department.
13    It's used mostly for security procedures.
14    Q.  So as part of that, do you have a general knowledge of
15    where cameras are located in and outside of the
16    Capitol Building?
17    A.  Yes.
18    Q.  Do these cameras produce footage?
19    A.  Yes.
20    Q.  And the footage itself, does it include time stamps?
21    A.  Yes.
22    Q.  And date stamps?
23    A.  Yes.
24    Q.  And in your experience, are those time stamps accurate?
25    A.  Yes.
```

1    Q.  In preparation for your testimony here today, did you

2    review certain footage captured by the Capitol Police

3    surveillance systems?

4    A.  Yes.

5    Q.  And based on your presence at the Capitol on January 6th

6    and your knowledge of that system, did that footage fairly and

7    accurately depict events that took place at the Capitol on

8    January 6th?

9    A.  Yes.

10            MS. FISH:  I apologize.  My microphone was off.

11        Objection.  I'd ask that the question be asked as to the

12   specific videos.  It's -- it's not clear that the witness

13   witnessed the entirety of the videos on the day he was working.

14            THE COURT:  All right.  I'll let that answer stand.

15   But go ahead and ask it for each video we move in.

16   BY MR. VALENTINI:

17   Q.  Inspector Loyd, I will show you what has been marked as

18   exhibit -- Government Exhibit 119.  First of all,

19   Inspector Loyd, are you able to see an exhibit on the screen

20   before you?

21   A.  Yes.

22   Q.  Did you -- did you see the -- this image in preparation for

23   this hearing?

24   A.  Yes.

25   Q.  Do you recognize the location that is depicted in this

```
 1    photograph?

 2    A.  Yes.

 3    Q.  And what is that location?

 4    A.  That would be on the east side of the building on the

 5    center steps.

 6    Q.  And are you familiar with events that transpired on

 7    January 6th on the east side of the Capitol?

 8    A.  Yes.

 9    Q.  And is the scene that is depicted in Photograph 119

10    consistent with your understanding of the events at the Capitol

11    on January 6th?

12    A.  Yes.

13           MS. FISH:  And, again, Your Honor, I would object to

14    the extent it's not clear that this is based on the witness's

15    own observations.  So I would ask that the Court strike that

16    answer.

17           THE COURT:  Go ahead.

18    BY MR. VALENTINI:

19    Q.  And to be clear, were you present on the front steps of the

20    Capitol on January 6th?

21    A.  In the morning.

22    Q.  You were not present at the time that -- you did not see

23    the specific events that are depicted in Exhibit 119, though;

24    correct?

25    A.  Correct.
```

1    Q.   In preparation for this hearing -- hearing, did you

2    compare the image in Exhibit 119 with the Capitol Police

3    CCTV footage?

4    A.   Yes.

5    Q.   I would like to focus specifically on one individual in

6    Exhibit 119, the gentleman who appears -- do you see -- let me

7    ask you this:  Do you see a gentleman who appears to be holding

8    a large blue flag with white stars?

9    A.   Yes.

10   Q.   To be clear, you don't personally know this gentleman?

11   A.   No.

12   Q.   You don't recall ever meeting this gentleman in person?

13   A.   No.

14   Q.   Now, the gentleman that we are talking about holding this

15   large blue flag is also -- does he appear to be wearing any

16   headgear?

17   A.   Yes.  A red -- a red baseball cap.

18   Q.   Are you able to discern any writing on the red baseball

19   cap?

20   A.   Yes.  In white letters, USA.

21   Q.   Is the gentleman holding the large blue flag with white

22   stars also wearing a jacket?

23   A.   Yes.  It appears to be a black jacket.

24   Q.   I'm sorry.  Could you repeat that.

25   A.   It appears to be a black jacket that he's wearing.

1    Q.   What color does his jacket appear to be?

2    A.   It appears to be black or dark blue.

3    Q.   Are you able to see the jacket -- the jacket also has a

4    hood?

5    A.   Yes.

6    Q.   Is the gentleman holding the large blue flag with white

7    stars also wearing any layers under the jacket that you just

8    described?

9    A.   Yes, a black shirt underneath the jacket.

10   Q.   Are you able to discern any additional layers around the

11   collar area?

12   A.   Yes.  There appears to be a red garment around the collar

13   area.

14   Q.   Does the gentleman appear to be holding anything in his

15   left hand?

16   A.   Yes.  It appears to be a knapsack.

17   Q.   I will show you what has been marked as Exhibit 110.

18            THE COURTROOM DEPUTY:  Mr. Valentini, do you plan to

19   admit 119, or is this just solely for the purposes of this

20   hearing?

21            MR. VALENTINI:  For purposes of this hearing, we're

22   not admitting any exhibits into evidence.  My understanding of

23   the purpose of the hearing is that we are trying to establish

24   authentication.  So unless at some level we are -- the Court

25   wants to have these exhibits admitted for purpose of the

 1    hearing; otherwise, I don't think they need to be admitted.

 2            THE COURT:  Whatever the parties want to do.  We're

 3    here to authenticate.  But if the parties -- if we authenticate

 4    and the parties want to agree that they can be admitted at

 5    trial, I'm fine with that.  But if you want to do a separate

 6    process at trial, I'm fine with that as well.  You know, I'm

 7    trying to save time of the trial and the jury.

 8            MS. FISH:  Your Honor, I guess for purposes of the

 9    record, it might make sense for us to admit exhibits for the

10    purposes of this hearing only, and then based on the Court's

11    ruling we can move forward at trial.

12            THE COURT:  That's fine.

13            MR. VALENTINI:  So I will ask the Court to admit

14    Exhibit 119 for purpose of this hearing.

15            THE COURT:  It's admitted.

16            (Government Exhibit 119 admitted into evidence.)

17    BY MR. VALENTINI:

18    Q.  Inspector Loyd, do you recognize Exhibit 110?

19    A.  Yes.

20    Q.  What is it?

21    A.  It's a picture of the House steps on the east side of the

22    Capitol Building.

23    Q.  Does it appear to be a video obtained from the

24    Capitol Police CCTV system?

25    A.  Yes.

1    Q.  And could you please repeat.  What area of the Capitol does

2    it appear to depict?

3    A.  The House steps on the east side of the Capitol Building.

4    Q.  And without providing any specific information about the

5    position of the camera, are you able to describe from which

6    direction the -- the image is recording?

7    A.  Yes.  The camera is facing west.

8    Q.  Inspector Loyd, could you -- do you see a time stamp in

9    the -- time stamp in the top left corner of Exhibit 110?

10   A.  Yes.

11   Q.  Could you read that time stamp for the record.

12   A.  2:14 p.m.

13   Q.  Inspector Loyd, I will fast-forward to 7 minutes later, at

14   2:12 p.m.  And I will play starting at 2:21 p.m. for a few

15   seconds.

16            (A video recording was played.)

17   BY MR. VALENTINI:

18   Q.  Inspector Loyd, do you see --

19            MR. VALENTINI:  Well, let the -- for the record, I

20   have stopped the recording at 2:12:07 p.m.

21   BY MR. VALENTINI:

22   Q.  Inspector Loyd, do you see a gentleman in the bottom of the

23   screen carrying a blue flag with white stars?

24   A.  Yes.

25   Q.  Does the flag appear to be the same flag with white stars

1    that you saw in Exhibit 119?

2    A.  Yes.

3    Q.  Focusing on the gentleman carrying -- holding the

4    flag, does that gentleman appear to be wearing a red

5    baseball cap?

6    A.  Yes.

7              (A video recording was played.)

8    BY MR. VALENTINI:

9    Q.  And if you're able to see, does the red baseball cap appear

10   to have any writing on it?

11   A.  Some- -- something in white writing on the top of it.

12   Q.  Does the gentleman in -- wearing the red cap and holding

13   the blue flag with white stars appear to be wearing a jacket?

14   A.  Yes.

15   Q.  What type of jacket is he wearing?

16   A.  A black jacket.

17   Q.  And what color of -- I'm sorry.  And does that jacket

18   appear to have a hood?

19   A.  Yes.

20   Q.  Does the gentleman holding the large blue flag with white

21   stars appear to be carrying anything on his back?

22   A.  A backpack.

23   Q.  Inspector Loyd, I will play about 31 seconds -- 30 seconds

24   of this exhibit.

25              (A video recording was played.)

 1    BY MR. VALENTINI:

 2    Q.  We have now stopped the playing of this exhibit at time

 3    stamp 2:21:31 p.m.; right?

 4    A.  Yes.

 5    Q.  Let me quickly zoom in on the face of the individual at the

 6    bottom of the screen.  Are you able to see the facial features

 7    of the individual wearing the red cap and carrying the large

 8    blue flag?

 9    A.  Yes.

10    Q.  Let me put up, if I can, side by side, Exhibit 119.  Do the

11    facial features of the individual depicted in time stamps

12    2:21:31 in Exhibit 110 appear to be identical to the facial

13    features of the individual depicted in Exhibit 119?

14            MS. FISH:  Objection, Your Honor.  Lack of basis for

15    the comparison.

16            THE COURT:  I'm sorry?

17            MS. FISH:  Objection, Your Honor.  Lack of basis for

18    the witness to make this statement.  He has no special

19    knowledge and no better ability to compare than the Court does.

20            THE COURT:  All right.  He can answer for whatever

21    it's worth.

22    A.  Yes, it appears to be the same person.

23    BY MR. VALENTINI:

24    Q.  Let me pull up what has been marked as Exhibit 1001.

25    Inspector Loyd, do you recognize Exhibit 1001?

1    A.   Yes.

2    Q.   What is it?

3    A.   That's the east plaza of the U.S. Capitol on January 6th.

4    Q.   And, again, do you recognize as surveillance video obtained

5    from the Capitol Police CCTV system?

6    A.   Yes.

7    Q.   Is it fair to say that the image that's depicted in

8    Exhibit 1001 includes the front steps where the -- are

9    depicted -- the east side that you identified in Exhibit 119?

10   A.   Yes.

11   Q.   Inspector Loyd, if I can ask you to focus for a moment in

12   the area in the middle of the portico.  Do you see a door in

13   the general location?

14   A.   Yes.

15   Q.   And does that door have a name?

16   A.   That's the main Rotunda door into the Capitol.

17   Q.   Let me fast-forward Exhibit 1001 to time about 6 minutes

18   and 43 seconds into the exhibit at about 6 -- I'm sorry, at

19   about 3:06:43.  And I am going to zoom in to the Rotunda --

20   Rotunda door area.

21        I'm going to start playing this exhibit, Inspector Loyd.

22   And will you stop me at some point if you see a white -- a

23   large blue flag with white stars?

24   A.   Yes.

25   Q.   Can you point on the screen where you see the -- the large

1    blue flag with white stars?

2    A.   (Witness complying.)

3    Q.   Could you please draw.

4    A.   Yeah, I drew on it.

5    Q.   Oh, thank you.

6         Let me play this exhibit until about time stamp 3:07:20.

7             (A video recording was played.)

8    BY MR. VALENTINI:

9    Q.   Inspector Loyd, has the large blue flag with white stars

10   moved over the last segment of the exhibit?

11   A.   Yes.  The gentleman was traveling east down the Rotunda

12   stairs.

13   Q.   Let me continue playing this exhibit until time stamp

14   3:08:02.

15            (A video recording was played.)

16   BY MR. VALENTINI:

17   Q.   Inspector Loyd, has the gentleman holding the large blue

18   flag with white stars moved over the course of the last

19   segment?

20   A.   Yes.

21   Q.   Inspector Loyd, what -- does the gentleman holding the

22   large blue flag with white stars appear to be wearing any

23   headgear?

24   A.   Yes, the red hat.

25   Q.   And are you able to see if the red hat appears to have any

1    writing on it?

2    A.  I see -- I see some white on the hat.  I can't make out the

3    writing from that picture.

4    Q.  And is the large blue flag with white stars, does it appear

5    to be the same flag based on Exhibit 119?

6    A.  Yes.

7    Q.  Does the appearance of the gentleman holding the flag

8    appear to be the same appearance as the gentleman -- gentleman

9    depicted in Exhibit 119?

10   A.  Yes.

11   Q.  If you could please describe the posture of the gentleman

12   holding the large blue flag with white stars in time stamp

13   3:08:02 in Exhibit 1001.

14   A.  Yes.  He's holding the flag up with his right arm.

15   Q.  And shifting back to Exhibit 119.  Could you please

16   describe the posture of the gentleman holding the large blue

17   flag with white stars in Exhibit 119.

18   A.  Yes.  He's holding it straight up with his right arm.

19   Q.  Does the posture appear to be identical?

20   A.  Yes.

21   Q.  On Exhibit 119 do you see three individuals immediately in

22   the front of the gentleman who's holding the large blue flag

23   with white stars?

24   A.  Yes.

25   Q.  Do all three -- well, sorry.  Do you see three individuals?

1    A.  Yes.

2    Q.  And do they all -- do they all appear to be wearing

3    headgear?

4    A.  Yes.

5    Q.  Could you please describe the pattern of the headgear of

6    the three individuals.

7    A.  The gentleman to the right with the blue sweatshirt on has

8    a red hat, appears to have Trump on the top of it.  The young

9    lady to his right has a blue hat with red stripes.  It appears

10   to be -- Trump written on it with 45 also.  And the young lady

11   below her has a blue hat with an American flag on it.

12   Q.  Is it fair to say that for all three individuals the color

13   pattern includes red, white, and blue?

14   A.  Yes.

15   Q.  Switching over to Exhibit 1001, the same time stamp we were

16   looking at a minute ago at 3:08:02, are you able to see three

17   individuals in the immediate vicinity of the gentleman who is

18   holding the large blue flag with white stars?

19   A.  Yes.

20   Q.  Could you please circle them on the screen.

21   A.  (Witness complying.)

22   Q.  What -- could you please describe the general color scheme,

23   if any, that these three individuals appear to be wearing on

24   their hats.

25   A.  I can see the colors of blue and white.

1    Q.  And in which direction do the three individuals appear to

2    be turning?

3    A.  They're facing north.

4    Q.  And going back to Exhibit 119, which direction does the

5    woman at the bottom of the image appear to be facing?

6    A.  She's facing north but looking down at her phone.

7    Q.  And, Inspector Loyd, does that appear to be the case for

8    the woman depicted in Exhibit 1001 at the bottom?

9    A.  Yes.

10   Q.  Inspector Loyd, I'm going to show you another photograph

11   which is marked as Exhibit 120.

12             MR. VALENTINI:  Before we do that, I would move to

13   admit Exhibit 1001 and 110 into evidence for purposes of this

14   hearing only.

15             MS. FISH:  For purposes of this hearing and the

16   record, Your Honor, no objection.

17             THE COURT:  All right.  They're both admitted.

18             (Government Exhibit 1001 and 110 admitted into

19   evidence.)

20   BY MR. VALENTINI:

21   Q.  Inspector Loyd, did you see -- did you review exhibit --

22   what has been marked as Exhibit 120 in preparation for this

23   hearing?

24   A.  Yes.

25   Q.  As you look at Exhibit 120 today, what does it appear to

1    be?

2    A.  On the center steps of the Capitol on the east side.

3    Q.  I'm going to zoom into a portion on the left-hand side of

4    Exhibit 120.  Do you see a large blue flag with white stars?

5    A.  Yes.

6    Q.  Does it appear to be the same flag that you saw in

7    Exhibit 110?

8    A.  Yes.

9    Q.  Does it appear to be the same flag that you saw before in

10   Exhibit 119?

11   A.  Yes.

12   Q.  Do you see a gentleman standing in the immediate vicinity

13   of that flag who's wearing a red hat?

14   A.  Yes.

15   Q.  Does that red hat appear to be the same red hat depicted in

16   Exhibit 110?

17   A.  Yes.

18   Q.  And in Exhibit 119?

19   A.  Yes.

20   Q.  Are you able to discern any writing on the red hat of the

21   gentleman standing next to the large blue flag with white

22   stars?

23   A.  I can't make out the writing, but it's definitely white.

24   Q.  And is that writing consistent with the writing that you

25   identified before in Exhibit 110?

1    A.  Yes.

2    Q.  And Exhibit 119?

3    A.  Yes.

4    Q.  Are you able to discern the facial features of the

5    gentleman in the red hat that you just identified -- that you

6    just saw in Exhibit 120?

7    A.  Yes.  It appears to be the same person.

8           MS. FISH:  And, Your Honor, I'd renew my objection to

9    the facial identification.

10          THE COURT:  All right.  It's noted.

11   BY MR. VALENTINI:

12   Q.  One more feature about Exhibit 110.  Do you see a red flag

13   immediately behind the large blue flag with white stars?

14   A.  Yes.

15   Q.  And let me also ask you, do you see -- let me just pull

16   Exhibit 1001 -- let me jump to -- jump back to time stamp

17   3:07:49.

18          Inspector Loyd, are you able to see a large white [sic]

19   flag with white stars in time stamp 3:07:49 in Exhibit 1001?

20   A.  Yes.

21   Q.  And where does it appear to be positioned?  I'm sorry.  And

22   are you able to -- do you also see a red flag in the immediate

23   vicinity of the large blue flag with white stars?

24   A.  Yes, immediately to the left of it.

25          MR. VALENTINI:  Okay.  At this point I would ask -- I

```
 1    would move to admit Exhibit 120 into evidence for purpose of

 2    this hearing only.

 3             MS. FISH:  No objection, Your Honor.

 4             THE COURT:  It's admitted.

 5             (Government Exhibit 120 admitted into evidence.)

 6    BY MR. VALENTINI:

 7    Q.  Inspector Loyd, let me show you what --

 8             (An audio-visual recording was played.)

 9    BY MR. VALENTINI:

10    Q.  -- what has been marked as Exhibit 117.  Inspector Loyd,

11    before this -- this hearing, did you review Exhibit 117?

12    A.  Yes.

13    Q.  And what is it?

14    A.  That is the main door that leads into the House Chamber

15    across from the upper House door.

16    Q.  Taking a step back.  Does -- is Exhibit 117 a photograph or

17    a video?

18    A.  Right now it's a photograph.  It may be a video, if you

19    play it.

20    Q.  Based on your knowledge of the Capitol, do you recognize

21    the area or -- and building in Exhibit 117?

22    A.  Yes.

23    Q.  What area is it?

24    A.  That's right outside the House Chamber.  That door leads

25    into the House Chamber and is adjacent to the upper House door.
```

1    Q.  Let me show you what has been marked as Exhibit 508.  Do

2    you recognize what -- Exhibit 508?

3    A.  Yes.

4    Q.  What is it?

5    A.  That's the blueprint of the second floor of the

6    U.S. Capitol Building.

7            MR. VALENTINI:  I would move to admit into evidence

8    Exhibit 508 for purpose of this hearing only.

9            MS. FISH:  No objection, Your Honor.

10            THE COURT:  It's admitted.

11            (Government Exhibit 508 admitted into evidence.)

12    BY MR. VALENTINI:

13    Q.  Let me zoom in.  Inspector Loyd, are you able to identify

14    or -- to identify the general location of -- depicted in the

15    first frame of Exhibit 117?

16    A.  Yes.

17    Q.  Could you please circle it on --

18    A.  (Witness complying.)

19    Q.  January 6th, Inspector Loyd, did there come a time when you

20    went to the House side of the U.S. Capitol Building?

21    A.  Yes.

22    Q.  What prompted you to go there?

23    A.  I initially went to the Senate Chamber because that's where

24    the rioters had first breached the building and made their way

25    up to.  Outside the Senate Chamber, I was relatively satisfied

1    of a lockdown that had been accomplished there.  Deputy Chief

2    Waldow showed up shortly after I did.  And then I met with

3    Deputy Chief Waldow and asked permission to go from the

4    Senate Chamber down to check on the status of the House

5    Chamber.

6    Q.  And what do you set out to do once you arrive in the

7    general area of the House Chamber?

8    A.  At the House Chamber, when I first arrived there, there

9    weren't any protesters in that particular area, but they

10   eventually made their way down to the House Chamber.

11   Q.  Of what -- do you recall approximately what time you

12   arrived in the -- to the House -- House side of the Capitol?

13   A.  Between 2:30 and 2:40.

14   Q.  What did you do once rioters arrived in that area?

15   A.  I noticed -- they attempted to breach the main House door

16   to get into the House Chamber, and they were unable to do that.

17   Then they made their way around to the east side of the House

18   Chamber, to the east side of the Speaker's Lobby, and they

19   began to break into the east side of the Speaker's Lobby.  So I

20   went to the west side of the Speaker's Lobby and evacuated the

21   House of Representatives out the west side of the House

22   Chamber.

23   Q.  Inspector Loyd, I think you just mentioned the House main

24   door.  Could you circle or identify the location of the House

25   main door, if I --

```
1    A.  Yes.
2    Q.  I believe you also mentioned that rioters went from there
3    to the east side -- the east entrance to the Speaker's Lobby?
4    A.  Yes.
5    Q.  Could you please draw in a line what kind of path the
6    rioters followed, to the best of your recollection.
7    A.  (Witness complying.)
8    Q.  And, Inspector Loyd, you said that you went to -- at some
9    point you went to the west side -- the west entrance of the
10   Speaker Lobby?
11   A.  Yes.
12   Q.  And could you identify the path that you took to arrive at
13   that location.
14   A.  (Witness complying.)
15   Q.  And could you identify approximately what time -- what --
16   what time you -- you -- you went from the House main door to
17   the east entrance to the Speaker Lobby and then over to the
18   west entrance of the Speaker Lobby?
19   A.  This is all approximately between 2:40 and 3 o'clock.
20   Q.  And you also mentioned before a location within the Capitol
21   that's referred to as the upper House door?
22   A.  Yes.
23   Q.  Could you please circle the upper House door on
24   Exhibit 508.
25   A.  (Witness complying.)
```

1   Q.  So from the interior of the upper House door, is there a

2   direct line of sight to the door that is depicted in

3   Exhibit 117?

4   A.  Yes.

5   Q.  And before this hearing, did you compare the events

6   recorded in Exhibit 117 to the Capitol Police surveillance

7   video?

8   A.  Yes.

9   Q.  Let me pull up what has been marked as Exhibit 1002.  Is

10  Exhibit 1002 footage from the CCTV recordings of the

11  Capitol Police?

12  A.  Yes.

13  Q.  Did you review this footage in preparation for this

14  hearing?

15  A.  Yes.

16          MR. VALENTINI:  At this point I would like to move

17  for the admission of Exhibit 1002 for the purpose of this

18  hearing only.

19          MS. FISH:  No objection, Your Honor.

20          THE COURT:  It's admitted.

21          (Government Exhibit 1002 admitted into evidence.)

22  BY MR. VALENTINI:

23  Q.  Without getting into any specifics about camera location,

24  does the footage in Exhibit 1002 capture the view from,

25  approximately, the upper House door?

1    A.  Yes.

2    Q.  And which direction does it look out into?

3    A.  It's facing west.

4    Q.  Do you see the door in the background of Exhibit 1002 at

5    time stamp 2:40?

6    A.  Yes.

7    Q.  Is that the same door that's captured in the initial frame

8    of Exhibit 117?

9    A.  Yes.

10   Q.  And what's behind that door?

11   A.  That goes into the House Chamber.

12   Q.  Let me switch back to Exhibit 117.

13              (An audio-visual recording was played.)

14              MR. VALENTINI:  I apologize.  We'll have to play it

15   again because I had a zoom function on it.  I apologize.

16              THE COURT:  I agree.

17              (An audio-visual recording was played.)

18   BY MR. VALENTINI:

19   Q.  Inspector Loyd, do you see a gentleman standing by the door

20   with a large blue flag with white stars in Exhibit 117?

21   A.  Yes.

22   Q.  What is the gentleman wearing?

23   A.  He's wearing a black jacket, appears to be a red baseball

24   cap covered up with a black hood.

25   Q.  Inspector Loyd, do you see two other individuals in the

1    immediate vicinity of the gentleman holding the large blue flag

2    with white stars?

3    A.   Yes.   I see a gentleman who's facing the other gentleman

4    with a green piece of garment, possibly hoodie, around his

5    neck.   And to his right, I see a gentleman with lighter hair or

6    grayer hair.

7    Q.   And is -- the gentleman with the lighter hair or grayer

8    hair, would it be fair to describe that hair as fairly long?

9    A.   Yes.

10   Q.   Let me switch back to Exhibit 1002.   And I'm going to jump

11   to time stamp 2:44:06.   Now I'm going to start playing from

12   2:44:06.   In fact, I will now start playing.

13            (A video recording was played.)

14   BY MR. VALENTINI:

15   Q.   Do you see a gentleman standing by the door with a large

16   blue flag with white stars?

17   A.   Yes.

18   Q.   Now, again, does it appear to be the same flag as in

19   Exhibit 119?

20   A.   Yes.

21   Q.   And Exhibit 120?

22   A.   Yes.

23   Q.   And Exhibit 117?

24   A.   Yes.

25   Q.   Does the gentleman appear to be wearing a dark jacket with

1    a hood -- with a hood turned up?

2    A.  Yes.

3    Q.  Is that the same clothing as the gentleman holding the

4    large blue flag with white stars in Exhibit 117?

5    A.  Yes.

6    Q.  Does the gentleman in Exhibit 1002 in this still frame

7    appear to be wearing a red hat under the dark-hooded jacket?

8    A.  Yes.

9    Q.  That too is the same as in Exhibit 117?

10   A.  Yes.

11   Q.  And in this exhibit, 1002, do you see two other gentlemen

12   in the immediate vicinity of the individual holding the large

13   blue flag with white stars?

14   A.  Yes.

15   Q.  Do you see an individual with what could be described as

16   longish gray hair to the immediate right of the gentleman

17   holding the large blue flag?

18   A.  Yes.

19   Q.  Do you also see another individual facing the gentleman

20   holding the -- the large blue flag with what appears to be a

21   hooded sweatshirt?

22   A.  Yes.

23   Q.  Those two gentlemen appear to be the same as in

24   Exhibit 117?

25   A.  Yes.

```
1              MR. VALENTINI:  At this time I would like to admit

2    Exhibit 117 into evidence for this hearing.

3              MS. FISH:  No objection.

4              THE COURT:  It's admitted.

5              (Government Exhibit 117 admitted into evidence.)

6    BY MR. VALENTINI:

7    Q.  Let me pull up Exhibit 116.  Before this hearing, did you

8    review the video which has been marked as Exhibit 116 -- or did

9    you review portions of the video that has been marked as

10   Exhibit 116?

11   A.  Yes.

12   Q.  Let me show you the portion of the video that's been marked

13   as Exhibit 116, starting at approximately 10:51.

14             MR. VALENTINI:  And for the record, I will play this

15   portion of Exhibit 116 until approximately time mark 11:09.

16             (An audio-visual recording was played.)

17   BY MR. VALENTINI:

18   Q.  Inspector Loyd, is this segment of Exhibit 116 the same

19   segment of Exhibit 116 that you reviewed in preparation for

20   this hearing?

21   A.  Yes.

22   Q.  Let me go back to time stamp 10:51.  Do you recognize the

23   door depicted in this portion of the exhibit?

24   A.  Yes.

25   Q.  Is it the same door that we saw in the previous exhibit,
```

1    Exhibit 117?

2    A.  Yes.

3    Q.  Is this the same door that is visible from the upper House

4    door?

5    A.  Yes.

6    Q.  Where does that door lead to?

7    A.  Into the House Chamber.

8    Q.  Let me play again the first 3 seconds of this segment of

9    Exhibit 117 from approximately -- approximately time 10:51

10   until 10:54.

11           (An audio-visual recording was played.)

12   BY MR. VALENTINI:

13   Q.  Turns out we played until 10:56.

14           Did you see two individuals in the background kicking in

15   to -- this door?

16   A.  Yes.

17   Q.  Did you see an individual in the forefront holding a baton

18   or stick or some sort of long cylinder object?

19   A.  Yes.

20   Q.  And did the gentleman who was holding the cylinder-looking

21   object, was he wearing any headgear?

22   A.  You'll have to play it again.  I don't remember.

23   Q.  Yep.

24           (An audio-visual recording was played.)

25   A.  Yes, he was.  Red hat.

```
1    BY MR. VALENTINI:

2    Q.  Now, to be clear, this is not the same gentleman that --

3    that you discussed in previous exhibits?

4    A.  Correct.  No.

5    Q.  And is it fair to say that approximate time mark ten- --

6    10:50 --

7              (An audio-visual recording was played.)

8    BY MR. VALENTINI:

9    Q.  -- to 10:55, this gentleman wearing a red hat moves

10   forward towards the door and starts knocking on the door

11   several times?

12   A.  Yes.

13   Q.  Let me play the next few seconds of this exhibit.

14             (An audio-visual recording was played.)

15   BY MR. VALENTINI:

16   Q.  Now, in fact, did you see the -- a gentleman wearing a --

17   carrying a large blue flag with white stars appear in this

18   exhibit?

19   A.  Yes.

20   Q.  And was he in the background or the foreground of this

21   exhibit?

22   A.  The background.

23   Q.  Did you also see another gentleman wearing a bright red

24   jacket walk towards the gentleman with the red hat who's

25   knocking on the door?
```

```
 1              MS. FISH:  Objection, Your Honor.  At this point
 2     we've been leading quite a lot.  So I would ask --
 3              THE COURT:  Overruled.  Go ahead.
 4     BY MR. VALENTINI:
 5     Q.  Let's go back to Exhibit 1002.  And we'll jump forward to
 6     time stamp 2:42:21 -- -25, and I will play approximately
 7     8 seconds of this exhibit until 2:44:33.
 8              (A video recording was played.)
 9     BY MR. VALENTINI:
10     Q.  Did you see a gentleman walk by the camera carrying a large
11     white flag with white stars?
12     A.  I see a blue flag with white stars.
13     Q.  I'm sorry.  Yes, I meant to say a large blue flag with
14     white stars.
15     A.  Yes.
16     Q.  And what was the gentleman holding this flag wearing?
17     A.  A black jacket, appears to be a red baseball cap with a
18     black hoodie going over the top of it.
19     Q.  And the clothing and appearance are consistent with the
20     gentleman holding a large blue flag with white stars that we
21     saw in Exhibit 116?
22     A.  Yes.
23     Q.  I would ask you to pay attention to that gentleman's path
24     of travel.
25              (A video recording was played.)
```

```
1    BY MR. VALENTINI:

2    Q.  Does the gentleman holding the -- which direction has the

3    gentleman holding the large blue flag with white stars turned

4    by time stamp 2:42:48?

5    A.  Yes, he was originally walking west and made a left and was

6    heading south.

7    Q.  We'll play this exhibit until time stamp 2:43:05.

8              (A video recording was played.)

9    BY MR. VALENTINI:

10   Q.  Do you see a gentleman with a red hat in front -- right in

11   front of the door in the background?

12   A.  Yes.

13   Q.  Now, this gentleman, again, is not the gentleman holding

14   the large blue flag with white stars?

15   A.  No.

16   Q.  Does the gentleman appear to be using a -- the cylinder

17   object to bang on the door?

18   A.  Yes.

19   Q.  I will play this exhibit until time stamp 2:43:32.

20             (A video recording was played.)

21   BY MR. VALENTINI:

22   Q.  Now, does -- the gentleman in the red hat by now appears to

23   have taken a couple steps back?

24   A.  Yes.

25   Q.  Let's play what happens next.  And then I will ask you to
```

1    compare it to what we saw in Exhibit 116.

2              (A video recording was played.)

3    BY MR. VALENTINI:

4    Q.  What does the gentleman in the red hat do?

5    A.  He banged on the door with his right hand.

6    Q.  Did you also see the same gentleman take a few steps

7    forward towards the door before banging on the door?

8    A.  Yes.

9    Q.  And what appeared on this frame after the gentleman in the

10   red hat banged on that door?

11   A.  The appearance of the blue flag with the white stars.

12   Q.  Is the sequence of events consistent with what you saw in

13   Exhibit 116?

14   A.  Yes.

15   Q.  Does it appear to be a depiction of the same sequence of

16   events?

17   A.  Yes.

18            MR. VALENTINI:  At this point I will ask to move

19   Exhibit 116 into evidence for purpose of this hearing only.

20            MS. FISH:  No objection.

21            THE COURT:  It's admitted.

22            (Government Exhibit 116 admitted into evidence.)

23   BY MR. VALENTINI:

24   Q.  Let me show you what's been marked as Exhibit 118.  Now,

25   before this hearing did you review portions of the videos that

1    have been marked as Exhibit 118?

2    A.  Yes.

3    Q.  Let me jump forward to time stamp 1:02:10 in this exhibit.

4    I apologize.  We're going to jump to 1:02:15 in this exhibit.

5    And I will stop -- I will play until 1:02:41.

6            (An audio-visual recording was played.)

7    BY MR. VALENTINI:

8    Q.  Is this a portion of Exhibit 118 that you reviewed in

9    preparation for this hearing?

10   A.  Yes.

11   Q.  Does it appear to be the same video that's reflected in

12   Exhibit 116 that you just reviewed here today?

13   A.  Yes.

14           MR. VALENTINI:  At this point I would move for the

15   admission into evidence for purpose of this hearing only of

16   Exhibit 118.

17           MS. FISH:  No objection, Your Honor.

18           THE COURT:  It's admitted.

19           (Government Exhibit 118 admitted into evidence.)

20   BY MR. VALENTINI:

21   Q.  Let me show you what has been marked as Video Exhibit 115.

22   Before this hearing, Inspector Loyd, did you review portions of

23   the video that has been marked as Exhibit 115?

24   A.  Yes.

25   Q.  Let me jump forward to time mark 5:02 on this exhibit.

```
 1                    (An audio-visual recording was played.)

 2      BY MR. VALENTINI:

 3      Q.   Inspector Loyd, I've played the exhibit from time mark 5:02

 4      until time mark 5:47.  Is that correct?

 5      A.   Yes.

 6      Q.   Is that the same portion of Exhibit 115 that you reviewed

 7      in preparation for this hearing?

 8      A.   Yes.

 9      Q.   Are you able to determine by watching this segment of

10      Exhibit 115 the location where this video was recorded?

11      A.   The gentleman who was talking earlier was at the top of the

12      House steps.

13      Q.   Okay.  Let's go back to -- when you say "the top of the

14      House steps," you mean on the east side?

15      A.   On the east side.

16      Q.   Of the Capitol Building, just to be clear?

17      A.   Yes.  Yes.

18      Q.   Let's go back to time stamp 5:02.  Do you see the gentleman

19      in the foreground speaking into what appears to be a

20      microphone?

21      A.   Yes.

22      Q.   And just to be clear, you've never met or seen this

23      gentleman before?

24      A.   No.

25      Q.   Or at least you have no recollection of ever seeing or
```

1    meeting this gentleman before?

2    A.  No.

3    Q.  Let me play until 5:06.

4           (An audio-visual recording was played.)

5    BY MR. VALENTINI:

6    Q.  Does the gentleman depicted in Exhibit 115 appear to be

7    holding a large blue flag with white stars?

8    A.  Yes.

9    Q.  Is that the same type -- is that the same type of flag that

10   we saw in previous exhibits, including Exhibits 110, 1001,

11   1002?

12   A.  Yes.

13   Q.  And the same flag that we saw in Exhibit 119 as well?

14   A.  Yes.

15   Q.  Now, the gentleman speaking into the microphone in

16   Exhibit 115 is also wearing a red hat with white writing?

17   A.  Yes.

18   Q.  Is that the same type of hat with the same type of writing

19   that we saw on previous exhibits?

20   A.  Yes.

21   Q.  Including Exhibits 110, 1001, and 1002?

22   A.  Yes.

23   Q.  Same thing for the jacket that the gentleman is wearing;

24   right?

25   A.  Yes.

1    Q.  It appears to be the same jacket that the gentleman

2    depicted in Exhibits 110, 1001, 1002 was wearing?

3    A.  Yes.

4    Q.  Let's play the exhibit until time stamp 5:35.

5              (An audio-visual recording was played.)

6    BY MR. VALENTINI:

7    Q.  Did you hear the gentleman speaking into the microphone say

8    something about the Capitol steps?

9    A.  Yes.

10   Q.  What did you hear the gentleman say?

11   A.  That it was their building and --

12   Q.  Let me try again.

13   A.  Yes.

14             (An audio-visual recording was played.)

15   BY MR. VALENTINI:

16   Q.  What did you hear him saying?

17   A.  About the Capitol steps.

18   Q.  Okay.  Let me pull up what has been marked as Exhibit 110.

19   In fact, it's been admitted for the purpose of this hearing,

20   admitted as Exhibit 110.

21        Let me skip to time stamp 2:21:08.  In fact, let me skip

22   to 2:22:28.  Let me zoom in to the right-hand side of the

23   frame.

24        Do you see a large blue flag with white stars on the

25   right-hand side of the frame?

1    A.   Yes.

2    Q.   Could you please circle it on the screen.

3    A.   (Witness complying.)

4    Q.   I'd like to ask you to follow that flag as it moves in this

5    video.

6              (A video recording was played.)

7    BY MR. VALENTINI:

8    Q.   I'll stop there at time stamp 2:23:01.

9         Inspector Loyd, where has the gentleman holding the

10   large white flag -- large blue flag with white stars traveled

11   or moved over the course of the segment of the video?

12   A.   He has walked up the House steps on the House side of the

13   Capitol on the east front.

14   Q.   Let me continue playing this exhibit.

15             (A video recording was played.)

16   BY MR. VALENTINI:

17   Q.   Inspector Loyd, I'm going to ask you to pay attention to

18   the large blue flag with white stars as someone moves in and

19   out of view of the exhibit.

20             (A video recording was played.)

21   BY MR. VALENTINI:

22   Q.   Inspector Loyd, I've stopped the recording at approximately

23   time stamp 2:23:59.

24        At 2:23:59 where, approximately, is the gentleman

25   holding the large blue flag with white stars?

1   A.  He's at the top of the House steps or the little portico,

2   actually, to the south of the House steps.

3   Q.  And is that the general same location based on your

4   understanding and knowledge of the Capitol Grounds as the

5   recording in Exhibit 115?

6   A.  Yes.

7              (A video recording was played.)

8   BY MR. VALENTINI:

9   Q.  And I've played this exhibit until time stamp 12:13.  I'm

10  going to ask you to please continue paying attention to the

11  large blue flag with white stars.  And for the record, I mean

12  time stamp 12:13, which is -- time marked 12:13, which is time

13  stamp 2:26:13 on the top left corner of the exhibit.

14             (A video recording was played.)

15  BY MR. VALENTINI:

16  Q.  I've stopped the exhibit at time stamp 2:26:13.

17             Inspector Loyd, do you see another person in close

18  proximity of the gentleman holding the large blue flag with

19  white stars?

20  A.  Yes.

21  Q.  And could you circle that person on the screen, please.

22  A.  (Witness complying.)

23  Q.  Thank you.

24             Does that person appear to be facing the gentleman

25  holding the large blue flag with white stars?

```
1    A.  Yes.

2    Q.  And does that person appear to be holding something in

3    front of the person's figure?

4    A.  Yes.

5    Q.  And is that object that person is holding -- understanding

6    that the image is from fairly far away -- is it consistent with

7    recording equipment?

8    A.  Yes.

9    Q.  I'm going to continue playing the exhibit for another,

10   approximately, 53 seconds.

11              (A video recording was played.)

12   BY MR. VALENTINI:

13   Q.  I'm going to ask you to pay attention to the pattern of

14   travel of the individual holding the large blue flag, as well

15   as the other person we just discussed.

16              (A video recording was played.)

17   BY MR. VALENTINI:

18   Q.  In the segment -- I have stopped the exhibit at time stamp

19   2:27:07.  In the segment of the exhibit that you just saw, do

20   the two individual -- individuals that we just described appear

21   to interact?

22   A.  Yes.

23   Q.  Did they appear to move together in the same direction?

24   A.  Yes.

25   Q.  And which direction was that?
```

1    A.   They walked west, towards the edge of the building.

2    Q.   Would that be towards the portico?

3    A.   I'm sorry?

4    Q.   Would that be towards the -- the columns?

5    A.   Yes.

6    Q.   And is the area towards which the two individuals moved

7    consistent with the location of the recording of Exhibit 115?

8    A.   Yes.

9              MR. VALENTINI:  At this time I would move to admit

10   Exhibit 115 into evidence for purposes of this hearing.

11             MS. FISH:  No objection, Your Honor.

12             THE COURT:  It's admitted.

13             (Government Exhibit 115 admitted into evidence.)

14             MR. VALENTINI:  Your Honor, I have no further

15   questions of this witness.

16             THE COURT:  All right.  If you could go back to 115.

17   It seemed like there was a couple that looked like they had

18   been exposed to tear gas.

19             (An audio-visual recording was played.)

20             MR. VALENTINI:  I will start playing at this moment.

21   Your Honor will stop me when you see the frame that you're

22   interested in.

23             THE COURT:  Start playing, yeah.

24             (An audio-visual recording was played.)

25             THE COURT:  Do those two folks appear in the -- in

1   the CCTV video?

2            MR. VALENTINI:  Your Honor, I would ask -- let me

3   show the witness exhibit -- I'm sorry.  I'm going to jump

4   forward to time stamp 2:27:06 -- 2:27:54.

5        Actually, before I do that, let me go back to 115 so we

6   can find some distinctive markers.

7            (An audio-visual recording was played.)

8   BY MR. VALENTINI:

9   Q.  So I've stopped Exhibit 115 at time mark 5:24.

10       Inspector Loyd, do you see a couple that is depicted

11  in -- at this time in this still image?

12  A.  Yes.

13  Q.  And could you point -- well, is the couple one gentleman

14  and one woman?

15  A.  Yes.

16  Q.  Is the gentleman wearing some distinctive patterned pants?

17  A.  Yes.  It appears to be American flag emblems on his pants.

18  Q.  And is the woman in the couple wearing a jacket?

19  A.  Yes, it appears to be camouflage.

20  Q.  So now let me go back to 1002.  No.  110.  And I'm going to

21  go to time stamp 2:27:54.  I'm going to zoom in to the general

22  area of the terrace on the House side.

23       I'm going to ask you, Inspector Loyd, to see if you can

24  spot a couple that turns approximately at the column that I'm

25  pointing to with the cursor.

```
 1                    (A video recording was played.)
 2    BY MR. VALENTINI:
 3    Q.  Do you see a gentleman -- a couple that's just turned at
 4    the column and is now going down the steps at time mark
 5    2:27:57?
 6    A.  Yes.
 7    Q.  And the individual on the right inside of that couple
 8    appear to be wearing some stars -- some red, white, and blue
 9    patterned pants?
10    A.  Yes.
11    Q.  And admitting that the picture is from fairly far away,
12    does the jacket that's worn by the other individual and the
13    couple appear to be consistent with a camouflage pattern?
14    A.  Yes.
15              MR. VALENTINI:  Your Honor, I have no further
16    questions of this witness.
17              THE COURT:  All right.
18         Okay.  Mr. Valentini, just so we can cross-reference
19    here, I have you having admitted all the exhibits except 501
20    and 1003; is that right?
21              MR. VALENTINI:  Your Honor, I would move for the
22    admission of 501 and 1003 for purpose of this hearing only.
23              THE COURT:  But we did look at them?
24              THE COURTROOM DEPUTY:  No.
25              MR. VALENTINI:  I will not move for the admission
```

1    then.

2                        CROSS-EXAMINATION

3    BY MS. FISH:

4    Q.  Good morning, officer -- or, Inspector Loyd.

5    A.  Good morning.

6    Q.  Thank you for being here today.

7    A.  Thank you.

8                THE COURT:  Are you comfortable taking off your mask?

9                MS. FISH:  I am.  It's up to the Court.

10               THE COURT:  Yeah, you can.

11          Do you need a break, Nancy?

12               THE COURT REPORTER:  (Shakes head.)

13   BY MS. FISH:

14   Q.  You were working at the Capitol on January 6th; correct?

15   A.  Yes.

16   Q.  As you testified before, you were on the west side of the

17   Capitol for quite a while?

18   A.  I was on the west side outside for approximately an hour

19   and ten minutes.

20   Q.  And then you were in the area near the Senate Chamber?

21   A.  Yes.

22   Q.  And you came to the House side around 2:25, 2:30?

23   A.  Yes.

24   Q.  And then you began evacuating members of the House out the

25   west side of the building; correct?

1    A.   Yes.

2    Q.   So the videos that you reviewed today of the east side of

3    the Capitol Building, you did not personally witness any of

4    that; correct?

5    A.   No.

6    Q.   And same for the videos that we reviewed today of the

7    interior of the building?  You did not personally witness any

8    of that; correct?

9    A.   No.

10   Q.   Your testimony today is simply based on review of those

11   videos?

12   A.   Yes.

13   Q.   And I want to talk a little bit more about the

14   Capitol Building itself.  The Capitol Building covers almost

15   175,000 square feet; is that correct?

16   A.   I'll take your word for it, yes.

17   Q.   About 4 acres?

18   A.   I'll take your word for it.

19   Q.   It has about 540 rooms?

20   A.   I'll take your word for it.

21   Q.   And more doors than you or I could likely count; correct?

22   A.   Yes.

23   Q.   It's about 350 feet wide from east to west?

24   A.   I'll take your word for it.

25   Q.   And about 750 feet long from north to south?

```
 1    A.  I'll take your word for it.

 2    Q.  It has five levels?

 3    A.  Oh.  Five -- five or six.  Five or six.

 4    Q.  Five or six levels?

 5    A.  Yes.

 6    Q.  So there's one basement level; is that correct?

 7    A.  There's a subbasement, a basement, one, two, three, four.

 8    Q.  So there's four floors that rise out of the ground?

 9    A.  Yes.

10    Q.  And the total height is a little over 287 feet tall?

11    A.  I'll take your word for it.

12    Q.  Fair to say that you can't see the whole Capitol Building

13    at once, is that --

14    A.  That's fair.

15    Q.  And the building is also fairly ornate; correct?

16    A.  Yes.

17    Q.  There are columns, decorative columns, on all sides of the

18    building?

19    A.  Yes.

20    Q.  There are decorative floors on all floors of the building?

21    A.  Yes.

22    Q.  There are elaborate doors on many walls in the building?

23    A.  Yes.

24    Q.  And many of those doors look similar?

25    A.  Yes.
```

1   Q.   Many of those columns look similar?

2   A.   Yes.

3   Q.   There are multiple stairways coming up to the building?

4   A.   Yes.

5   Q.   On the east side there are at least three?

6   A.   Three main ones going up, yes.

7   Q.   And on the west side?

8   A.   West side, you have two, the north and the south.

9   Q.   And then there's also smaller stairways on the ends of the

10  building; correct?

11  A.   Yes.

12  Q.   And those stairways have many porticos or terraces?

13  A.   Correct.

14  Q.   And those terraces have columns?

15  A.   Correct.

16  Q.   Okay.  And many of those look similar?

17  A.   Yes.

18  Q.   Give me a moment.

19       And I want to talk a little bit about the video footage

20  we saw today from the U.S. Capitol Police surveillance system.

21  You testified that you're familiar with that from your career

22  at the U.S. Capitol Police?

23  A.   Yes.

24  Q.   You've used it for security purposes?

25  A.   Yes.

1    Q.  And in your experience, that is taken by cameras that are

2    maintained by the Capitol Police?

3    A.  Yes.

4    Q.  And it is -- contains date stamps and time stamps?

5    A.  Yes.

6    Q.  Now, we also watched some videos that did not contain date

7    stamps or time stamps; correct?

8    A.  Yes.  Yes.

9    Q.  Those would be Government's 115, Government's 116,

10   Government's 117, and Government's 118?

11   A.  Yes.

12   Q.  We saw two photographs that did not contain date stamps or

13   time stamps; correct?

14   A.  Yes.

15   Q.  Those would be Government's 119 and Government's 120?

16   A.  Yes.

17   Q.  As far as you understand, those are not the product of

18   U.S. Capitol Police surveillance; correct?

19   A.  Correct.

20   Q.  You do not know who made those videos?

21   A.  No.

22   Q.  You do not know what equipment was used?

23   A.  No.

24   Q.  You do not know what time those were made?

25   A.  No.

1    Q.  You did not know whether they were cut?

2    A.  No.

3    Q.  You do not know whether they were otherwise edited?

4    A.  No.

5    Q.  You do not know how far away, you know, a camera or

6    telephone [sic] was when it captured that?

7    A.  No.

8    Q.  And you do not know what was omitted?

9    A.  No.

10   Q.  You do not know where the government found those videos?

11   A.  No.

12   Q.  And the Capitol Police footage we saw, that does not record

13   audio; is that correct?

14   A.  Correct.

15   Q.  And the videos we saw today are consistent with what you've

16   seen in other Capitol Police surveillance footage; correct?

17   A.  Yes.

18   Q.  There's no sharper version that you've seen?

19   A.  No.

20   Q.  So I'd like to talk a little bit about the exterior

21   Capitol Police videos we watched today.

22            MS. FISH:  And, Your Honor, I would request -- if --

23   if the Court would allow, I wanted to ask the Court prior to

24   asking this question to ask within, like, a range of a hundred

25   feet the approximate distance.  Is that acceptable to the Court

1    based on the prior ruling of the camera -- exterior cameras?

2              THE COURT:  I don't understand your question

3    entirely.

4              MS. FISH:  Your Honor, the Court had -- had asked,

5    essentially, that I -- I ask the Court before questioning a

6    witness about potential information that could indicate a

7    location of a surveillance camera.  I'd like to ask the witness

8    about the distance from the building within, you know, a 50- or

9    100-foot range to keep it fairly general.  I wanted to ask the

10   Court if that's acceptable.

11             THE COURT:  Any objection?

12             MR. VALENTINI:  No objection within the parameters.

13             THE COURT:  Go ahead.

14             MS. FISH:  Thank you.

15        So if we can pull up Government's Exhibit 1001.  I

16   apologize.  It's -- yeah, 1001.  I apologize, Your Honor.  I'm

17   just figuring out the courtroom technology.

18             THE COURTROOM DEPUTY:  Would it be possible for you

19   to --

20             MS. FISH:  Yeah, let me just -- there's only one that

21   I might ask government counsel to pull up that I don't have

22   here.

23   BY MS. FISH:

24   Q.  I'm pulling up what was previously admitted as Government's

25   Exhibit 1001.  Do you recognize that, Inspector Loyd?

1    A.   Yes.

2    Q.   And is it fair to say that that is taking footage from

3    about 300 to 400 feet from the building?

4    A.   I wouldn't dispute that.

5    Q.   That sounds like a decent estimate?

6    A.   Decent estimate, yes.

7    Q.   And from this view, you could not count, for example, the

8    number of people on the steps?

9    A.   No.

10   Q.   You can't distinguish how many heads are there, for

11   example?

12   A.   No.

13   Q.   You can't see facial features?

14   A.   No.

15   Q.   And you can't see most clothing?

16   A.   No.

17   Q.   And then if I could pull up Government's 110.

18        And I pulled up what is marked as Government's 110.  And

19   this is -- you testified previously this is also the east side

20   of the building?

21   A.   Yes.

22   Q.   And is it fair to say that that camera is between 100 and

23   200 feet from the building?

24   A.   Yeah.  It's approximately 120 feet from the camera to the

25   bottom of the steps, yes.

1   Q.  So we -- in this particular still, you can see what I

2   believe are some police officers on the stairs?

3   A.  Yes.

4   Q.  You can't see exactly what they're wearing?

5   A.  No.  Just dark clothing.  A couple of them are wearing a

6   visibility vest.

7   Q.  You can't see their faces?

8   A.  No.

9   Q.  You can't see their facial hair?

10  A.  No.

11  Q.  And I want to turn to a couple of videos we discussed that

12  are not from the U.S. Capitol Police.  I'm pulling up what was

13  previously marked as Government's 115.

14          Now, you testified that you reviewed a portion of that

15  video; is that correct?

16  A.  A portion of it, yes.

17  Q.  You did not review the whole video?

18  A.  No.

19  Q.  You did not -- let's see.  I'll skip to the portion that

20  you reviewed, which, I believe you testified, started at 5:02

21  run time; is that correct?

22  A.  Sounds -- sounds correct.

23  Q.  So I'm going to start a tiny bit before that at 4:52 run

24  time and press play.

25          (An audio-visual recording was played.)

1   BY MS. FISH:

2   Q.  So just before we arrived at 5:02, the portion you

3   testified about previously, did you notice a cut in that video?

4   A.  Could you play it again.  I did not.

5   Q.  Absolutely.  So I'm starting now at 4:55 run time.

6           (An audio-visual recording was played.)

7   A.  Yeah.  It went from panning to just his face.  Yes, there

8   was a break.

9   BY MS. FISH:

10  Q.  And it appeared to be at a different location?

11  A.  No.  It appeared to be on the House -- on the House steps.

12  If you can run it again, I'll take another look at it.

13  Q.  Sure.

14          (An audio-visual recording was played.)

15  A.  Yeah, the panning is from the top of the House steps.

16  BY MS. FISH:

17  Q.  So the panning you -- you recognize is the top of the House

18  steps?

19  A.  Yes.

20  Q.  In that pan you were able to see the patio in front of the

21  east side?

22  A.  Yes.

23  Q.  And some of the background?

24  A.  Yes.

25  Q.  The shot that we see now has a fairly shallow focus; is

1    that fair to say.

2    A.  Yes.

3    Q.  The person in the front is in pretty clear focus?

4    A.  Yes.

5    Q.  And the background is fairly blurry?

6    A.  Yes and no.  I can see the Supreme Court in the background

7    at some point during this video.

8    Q.  Okay.  Right -- right now you can see a column, is that

9    fair to say, on the left side?

10   A.  Yes.

11   Q.  And some blurry shapes on the right side?

12   A.  Yes.

13   Q.  Okay.  And you testified you were at the Capitol Building

14   on January 6th?

15   A.  Yes.

16   Q.  Do you recall hearing swelling music like we just heard

17   while you were there?

18   A.  No, I don't recall that.

19   Q.  Do you recall hearing any band being there to play violins

20   or trumpets?

21   A.  No.

22   Q.  I'm going to press play again.

23            (An audio-visual recording was played.)

24   BY MS. FISH:

25   Q.  And I'm stopping now at run time 5:13.  On this video do

1    you hear swelling music?

2    A.  Yes.

3    Q.  I might not be using the best adjective.  How would you

4    describe that music you're hearing?

5    A.  I will not dispute that as your definition.

6    Q.  Somewhat cinematic?

7    A.  Yes.

8    Q.  All right.  And in this video, it appears that there's a

9    column very close to the person in the foreground?

10   A.  Yes.

11   Q.  You testified previously about the layout of the east

12   terrace by the House door, that southeast balcony?

13   A.  Yes.

14   Q.  Are there columns on the outer edge of that balcony?

15   A.  The -- the small portico, no.  That's got a little fence

16   around it.  But the main top of the building, yes, has columns.

17   Q.  So if -- if we're starting at the Capitol Building, there's

18   a portion that has columns that is covered on that porch coming

19   out away from the building?

20   A.  Yes.

21   Q.  And then there's another portion that does not have columns

22   and is uncovered; is that fair to say?

23   A.  Yes.

24   Q.  All right.  And I'm going to keep playing this a bit

25   longer.  And I'm playing again, beginning at 5:14 run time.

```
 1                  (An audio-visual recording was played.)

 2     BY MS. FISH:

 3     Q.  And I'm stopping at 5:36.  A few seconds ago, did you

 4     notice a cut in the video?

 5     A.  If you could play it again.

 6     Q.  Absolutely.  I'll start at 5:25 so -- or 5:28 so we're not

 7     repeating the whole video again.

 8                  (An audio-visual recording was played.)

 9     A.  Yes.

10     BY MS. FISH:

11     Q.  And was that around 5:33 run time, more or less?

12     A.  Yes.

13     Q.  And you do not know what was cut out of that video?

14     A.  No.

15     Q.  You do not know whether the person taking the video asked

16     any questions?

17     A.  No.

18     Q.  You did not know whether there was more to the statement

19     being made on the video?

20     A.  No.

21     Q.  And I want to return one more time to Government's 110.

22                  (A video recording was played.)

23     BY MS. FISH:

24     Q.  And the government asked you to look at a face on this

25     video at 2:21:31 time stamp.  So I'll skip ahead to that.
```

```
 1                    (A video recording was played.)
 2     BY MS. FISH:
 3     Q.  I'm playing.  It's 2:21:28, -29, -30, -31, and I've paused
 4     it there.  You testified on direct examination that you could
 5     make out facial features in this still.
 6     A.  Yes.
 7     Q.  And the government zoomed in a bit.
 8     A.  I'm sorry?
 9              MR. VALENTINI:  My objection was that the question
10     misstates the testimony on direct.
11              THE COURT:  Could you repeat the question.
12     BY MS. FISH:
13     Q.  You testified on direct you could make out facial features
14     of the person in this still.
15              MR. VALENTINI:  Objection.  Your Honor, the testimony
16     on direct was with the image zoomed in.  It was not -- the
17     testimony referred to the image as zoomed in, not as is
18     presented currently in this exhibit.
19     BY MS. FISH:
20     Q.  As zoomed in.
21              THE COURT:  You can answer.
22     BY MS. FISH:
23     Q.  That was your testimony?
24     A.  I'm sorry.  Can you repeat the question.
25     Q.  Sure.  Sorry, Inspector.  Your testimony on direct was that
```

1    this still zoomed in, you could make out facial features on

2    this person?

3    A.   Yes.

4    Q.   You could not tell what color eyes this person had?

5    A.   No.

6    Q.   You could not tell whether this person had any braces or

7    dental devices?

8    A.   No.

9    Q.   You could tell this person maybe had a nose?

10   A.   Yes.

11   Q.   And some eyes?

12   A.   Yes.

13   Q.   And a mouth?

14   A.   Yes.

15   Q.   But you could not describe the shape of that person's eyes?

16   A.   No.

17   Q.   Or the shape of that person's nose?

18   A.   No.

19   Q.   Or the shape of that person's mouth?

20   A.   No.

21   Q.   And when you reviewed the videos and photographs provided

22   to you by government counsel in preparation for today -- you

23   reviewed the items that they provided you; correct?

24   A.   Correct.

25   Q.   You did not review all possible surveillance footage in

1    preparation for today's testimony?

2    A.   No.

3    Q.   Or all possible video found on the internet in preparation

4    for today's testimony?

5    A.   No.

6    Q.   When you were at the Capitol on January 6th, you saw

7    several civilians in protest gear; is that correct?

8    A.   Correct.

9    Q.   Or protest clothing?

10   A.   Yes.

11   Q.   A lot of people were wearing red hats?

12   A.   Yes.

13   Q.   A lot of people were carrying flags?

14   A.   Yes.

15   Q.   Many flags were blue?

16   A.   Yes.

17   Q.   Many flags had stars?

18   A.   The American flags I saw, yes.

19   Q.   And there were a lot of American flags?

20   A.   Yes.

21   Q.   Which include a portion that is blue with white stars?

22   A.   Yes.

23   Q.   There were also variations on American flags?

24   A.   Yes.

25   Q.   That had stars?

```
 1    A.  Yes.
 2    Q.  There were, we established, a lot of people wearing red
 3    hats?
 4    A.  Yes.
 5    Q.  There were a lot of people wearing winter clothing?
 6    A.  Yes.
 7    Q.  This was January; correct?
 8    A.  Yes.
 9    Q.  A lot of people wearing dark jackets?
10    A.  Yes.
11    Q.  A lot of people wearing jackets with hoods?
12    A.  Yes.
13    Q.  And a lot of people carrying bags?
14    A.  Yes.
15    Q.  And it's fair to say that a lot of people there had
16    noses?
17    A.  Yes.
18    Q.  And eyes?
19    A.  Yes.
20    Q.  And mouths?
21    A.  Yes.
22    Q.  Okay.  And I want to talk with you a little bit more about
23    who might have been in the vicinity of the videos we showed
24    today.
25         On January 6th the building was closed to the public; is
```

1    that correct?

2    A.  Correct.

3    Q.  And the grounds were closed to the public?

4    A.  On the west side, the entire west square was closed to the

5    public, yes.  On the east side, the paved plaza area was closed

6    to the public.

7    Q.  Thank you.

8        So the lawn area -- I think they're called the eggs

9    were --

10   A.  Yes, the House and Senate egg.

11   Q.  -- open; is that correct?

12   A.  Yes.

13   Q.  And then the paved area was closed to the public?

14   A.  Yes.

15   Q.  And the stairways were closed to the public?

16   A.  Yes.

17   Q.  And the terraces were closed to the public?

18   A.  Yes.

19   Q.  And you're not aware of any of your officers who you

20   supervised who were taking cell-phone footage of events that

21   day and posting it online?

22   A.  I'm not aware of it, no.

23   Q.  Okay.  You're not aware of members of Congress who were

24   doing that?

25   A.  No.

1    Q.  You are aware of people who were trespassing who were doing

2    that?

3    A.  Yes.

4              MS. FISH:  No further questions, Your Honor.

5              THE COURT:  All right.  Thank you.

6          Ms. Fish, I thought you objected to the use of the term

7    trespass.

8              MS. FISH:  I do in front of a jury, Your Honor.

9              THE COURT:  I see.  I see.

10                        REDIRECT EXAMINATION

11   BY MR. VALENTINI:

12   Q.  Inspector Loyd, you were --

13             MR. VALENTINI:  Your Honor, do you mind if I remove

14   my mask?

15             THE COURT:  You can remove it.

16   BY MR. VALENTINI:

17   Q.  Inspector Loyd, you were asked some questions about ornate

18   columns at the Capitol?

19   A.  Yes.

20   Q.  You were asked some questions about many rooms in the

21   Capitol?

22   A.  Yes.

23   Q.  Let me show you, again, Government Exhibit 116.  And,

24   again -- again, I'm going to start at time stamp 1:50.

25             (An audio-visual recording was played.)

1    BY MR. VALENTINI:

2    Q.   Inspector Loyd, did you have any doubt that that door is

3    across from the upper House door?

4    A.   No.

5    Q.   Let me show you Exhibit 116.   Excuse me.   Exhibit 117.

6              (A video recording was played.)

7    BY MR. VALENTINI:

8    Q.   Inspector Loyd, do you have any doubt that that door is

9    across from the upper House door?

10   A.   No.

11             (An audio-visual recording was played.)

12   BY MR. VALENTINI:

13   Q.   Inspector Loyd, let me show you Exhibit 118 at running time

14   1:02:15.   Inspector Loyd, do you have any doubt that the door

15   depicted in this image is across from the upper House door?

16   A.   No doubt.

17             (An audio-visual recording was played.)

18   BY MR. VALENTINI:

19   Q.   Inspector Loyd, let me show you Exhibit 115 at running time

20   5:03.   Do you have any doubt that the footage that you were

21   showed before on Exhibit 115 was taken on the outside of the

22   House portico?

23   A.   No doubt.

24   Q.   Inspector Loyd, let me show you Exhibit 119.   You testified

25   before that this picture depicts the front steps of the

1    Capitol; correct?

2    A.  Yes.

3    Q.  Do you have any doubt about that location and

4    identification?

5    A.  No.

6    Q.  Inspector Loyd, let me ask you -- let me ask you about

7    Exhibit 120.  Before you testified that this photograph depicts

8    the front steps of the Capitol as well?

9    A.  Correct.

10   Q.  On the east side?

11   A.  Yes.

12   Q.  Do you have any doubt about the location of this picture?

13   A.  No.

14   Q.  Inspector Loyd, how long have you worked for the Capitol?

15   A.  I've worked for the Capitol Police for 32 years.  I've been

16   assigned to the Capitol for the last four and a half.

17   Q.  Are you intimately familiar with the Capitol Building?

18   A.  Yes.

19   Q.  The Capitol plaza?

20   A.  Yes.

21   Q.  With the appearance of the Capitol from -- from the

22   outside?

23   A.  Yes.

24   Q.  Inspector Loyd, you were also asked about many flags

25   containing some blue on January 6th?

```
 1    A.  Yes.

 2    Q.  You were asked some questions about flags containing stars

 3    on January 6th?

 4    A.  Yes.

 5    Q.  And you were asked questions about individuals wearing

 6    jackets on January 6th?

 7    A.  Yes.

 8    Q.  Do you have any recollection of any individual that

 9    possessed the distinctive large blue flag with white stars, the

10    distinctive jacket, and the distinctive headgear that the

11    individual with -- identified in these exhibits today?

12    A.  I'm only familiar with that one I've seen today.

13              MR. VALENTINI:  Your Honor, I have no further

14    questions.

15              THE COURT:  All right.  Thank you.

16              MS. FISH:  May I?  Very briefly, Your Honor.

17              THE COURT:  I'm sorry?

18              MS. FISH:  May I recross very briefly?

19              THE COURT:  May you recross very briefly?

20              MS. FISH:  Yes, Your Honor.

21              THE COURT:  Very briefly.

22                        RECROSS-EXAMINATION

23    BY MS. FISH:

24    Q.  Inspector Loyd, the government asked you about any doubts

25    you had.
```

```
 1    A.  Uh-huh.

 2    Q.  Is it fair to say you have not reviewed all of the

 3    surveillance footage available?

 4    A.  Correct.

 5    Q.  You have not reviewed all of the otherwise taken footage

 6    available?

 7    A.  Correct.

 8    Q.  You do not know what every person at the Capitol looked

 9    like that day?

10    A.  Correct.

11    Q.  And many doors around the House Chamber have a similar

12    appearance?

13    A.  Yes.

14    Q.  Many columns on the outside of the Capitol have a similar

15    appearance?

16    A.  Yes.

17              MS. FISH:  Thank you.  No further questions.

18              THE COURT:  Thank you.

19          Thank you, Inspector.

20              THE WITNESS:  Thank you.

21              (Witness excused.)

22              THE COURT:  All right.  How do you -- how do you guys

23    want to proceed?  Do you want to make argument, or do you want

24    me to just take it under advisement?  I'll go however you wish.

25              MS. FISH:  I'm prepared to argue, if the Court is
```

1    willing to hear argument.

2            THE COURT:  I'm willing to hear argument.  I mean,

3    I've done this before; so I don't need extensive argument.  But

4    go ahead.

5            MR. VALENTINI:  Your Honor, I assume we'll go first

6    since, since it's the government's --

7            THE COURT REPORTER:  Can we take a short break?

8            THE COURT:  We'll take a short break.  Ten-minute

9    break.

10           (Recess taken.)

11           MR. VALENTINI:  Good morning, Your Honor, and may it

12   please the Court, again.

13       Your Honor just mentioned that you are familiar with

14   these issues; that you have done these before.

15           THE COURT:  Yeah.  Let me ask you a specific -- yes.

16   The answer is yes.

17       But let me ask you a specific question about 115, which

18   is the -- the edited one.  What portions of that do you intend

19   to have the jury watch?

20           MR. VALENTINI:  Only the portion that we have asked

21   Inspector Loyd to authenticate today.  Off the top of my -- of

22   my memory, the time marks would be from 5:02 until

23   approximately the end of the interview.  That is the extent

24   of the exhibit that we would like to offer into evidence at

25   trial.

1          THE COURT:  Okay.  And does that include -- because

2     there is one part where he appears -- where it does appear to

3     be edited.  Does your span include that span, or is it just an

4     unedited portion?

5          MR. VALENTINI:  No.  Yes, Your Honor, there is a cut

6     in the middle of the -- the -- of the portions that we intend

7     to offer into evidence.  That question does not go to

8     authenticity.  Authenticity only asks the question whether the

9     trier of fact -- whether there's sufficient evidence for the

10    trier of fact to determine that what -- that -- that the

11    exhibit is what it purports to be.

12         What does it purport to be?  It purports to be a

13    montage, an edited version of an interview of the defendant.

14    Now, there may be separate objections, which we can address now

15    or I'm happy to address at trial, which have to do with

16    completeness or whether the -- the -- the exhibit as available

17    on the open -- as an open-source exhibit may implicate.  I'm

18    happy to address that.  106 will be -- Rule of Evidence 106

19    will be the proper basis for that exhibit.  106, however, it's

20    a rule of inclusion.  It allows a party to include more of what

21    exists to provide completeness.

22         THE COURT:  No, I -- I got you.  I just -- my

23    reference is to when I did the research on this the last time I

24    had to deal with these issues, Judge Howell in one of her cases

25    had an edited video in which she only allowed an unedited

1    portion in.  So I'm just trying to nail down what exactly it is
2    you wanted to get in.  And if so, if it does span the cut, why
3    should I allow the whole thing in rather than just a subsection
4    of an unedited portion?
5            MR. VALENTINI:  Your Honor, we think that it would be
6    appropriate to -- there's no -- certainly, it's relevant.
7    There's no un- -- undue prejudice from admitting the exhibit as
8    is.  To the extent the Court is concerned about the impression
9    that this is a -- a single un- -- continuous and unedited
10   video, we will be very happy to -- happy to break up the
11   exhibit into two and have one portion, the first portion, and
12   then the second portion after the break.
13           That will remove any implication from the -- that a
14   finder of fact could, in theory, perhaps theoretically draw --
15   and I'm sure that could be addressed in cross-examination as
16   well -- that this was actually an unedited portion of the
17   video.  So that would completely address the concern about
18   the -- the exhibit appearing to be something other than an
19   edited version of an interview.  We would be happy to proceed
20   in that fashion if that would address the Court's concern.
21           But there is no completeness concern in the sense
22   that -- the interviewee says what he said.
23           THE COURT:  Uh-huh.  Okay.  Go ahead.
24           I don't remember what Judge Howell's reasoning was, but
25   I'll go back and look at it.

1          MR. VALENTINI:  And very briefly, again, as -- as

2     Your Honor mentioned, you have done this before.  You have

3     done -- you have addressed these issues in the Fitzsimons case.

4     In that case, your oral ruling, I believe, at the verdict time

5     got the law exactly right.  The standard question at this point

6     for authenticity purposes is merely -- and I'm quoting from

7     your ruling -- whether the government's showing regarding the

8     open-source videos could permit a reasonable fact-finder to

9     find that they are, in fact, what the government claims.

10          And in this -- and -- and that finding can be based

11     exclusively under Rule 901(4) [sic], for example, primarily, on

12     a comparison with the Capitol Police CCTV video.  That is what

13     Your Honor relied in Fitzsimons, and that is largely what we

14     are asking Your Honor to rely in this case as well.

15          In applying those standards, I can go exhibit by exhibit

16     and tie up the authentication, if Your Honor would benefit from

17     that, but I also don't want to take the Court's time.

18          THE COURT:  Sure.  I think I got it.

19          MR. VALENTINI:  Thank you very much.

20          THE COURT:  Let's hear from Ms. Fish.

21          MS. FISH:  Thank you, Your Honor.

22          I don't think the government has made the requisite

23     showing here, and I'll start specifically with 115.  That's

24     the, quote, unquote, interview video.  I believe the government

25     has failed to make a showing for several reasons.  First, the

1    testimony regarding the location of a man with a blue flag and

2    another person who could not really be distinguished on the

3    video is pretty thin to establish that this is the time and

4    place where that took place.  There's no view that is

5    consistent with that video.

6         And Officer [sic] Loyd testified that the video depicts

7    someone very close to a column, and there are no columns in the

8    area of the terrace that the government pointed to and asked

9    the Court to look to as foundation for that exhibit.  So that

10   is inconsistent.

11        Additionally, you know, the -- Officer Loyd's testimony,

12   I think, establishes that the likely source of these videos is

13   not reliable.  He testified that those were not from

14   Capitol Police surveillance video; that as far as he

15   understands, they were not otherwise taken by Capitol Police or

16   members of Congress.  They're taken by unknown people that

17   Inspector Loyd would classify as committing a crime.  So I

18   think that he's also demonstrated that the videos are not by

19   reliable makers, and the government has presented no evidence

20   to the contrary.

21        Furthermore, as to the, quote, unquote, interview video

22   itself, I did note a couple other objections besides

23   foundation.  And I think -- I -- I disagree with the

24   government.  I think that video particularly does cause undue

25   prejudice, and it is -- you know, I'm not saying this just

1    because it's prejudicial.  I'm saying it because it is truly

2    undue here because, as the government notes and the Court

3    notes, that video has clearly been edited.

4         The government has labeled it an interview, yet we never

5    hear a single interview question.  We don't know what is

6    prompting statements, what statements were cut out, what

7    context was cut out.  There's cinematic music amped behind or

8    in front of the vocals.  There's a lot of prejud- -- and

9    prejudicial factors in how that video has been manipulated and

10   edited.  And there is no source to explain what was done to it

11   or to -- to get the remainder of the footage, to -- to show raw

12   footage that would actually show a complete statement.

13        So this is not a situation where we have, for example, a

14   recorded interrogation with the police officer where the

15   prosecutor wants to introduce some portions and under the rule

16   of completeness we can actually say, hey, here's the complete

17   statement.  We have no access to that.  The government does not

18   know where this video came from, and it seems to have been

19   produced by someone who manipulated it heavily and who, you

20   know, does not have any creditability before the Court.

21        So I think that that video is -- is -- in particular

22   should be excluded, both because the, you know, purported

23   comparative CCTV footage does not actually match up with that

24   video and because there's plenty of indicia of unreliability of

25   that video.

1          I would also note the government had Inspector Loyd

2     recite his lack of doubt about any of his location

3     identifications, yet he could not explain a feature that was

4     unique to those locations.  That gave him that lack of doubt.

5     In fact, he testified that many parts of the Capitol have

6     similar-looking columns on the exterior and many parts of the

7     interior have similar-looking doors.

8          So I don't think his testimony helps actually establish

9     the location and, certainly, does not establish the time.  As

10    he testified, he did not personally witness any of this.  He's

11    comparing videos the same way Your Honor can compare videos.

12         As to the remainder of the videos, I think there are

13    similar issues, at least as to authenticity in terms of there

14    being no direct witness who can say, yes, that video is what I

15    saw that day in that space at that time.  No witness can

16    actually say this happened at this place at this time.  It's

17    simply comparing videos to videos.

18         I'm sure the Court is well aware there's a D.C. Circuit

19    case, *United States v. Blackwell*, 694 F.2d 1325.  In that case,

20    the Court ultimately admitted a photograph.  However, the

21    foundation for that photograph was laid by the defendant

22    testifying themself.  In that case, essentially, police seized

23    a photograph of a person that they subsequently arrested for

24    unlawful possession of a firearm, and they found an older

25    picture, a black-and-white picture, of that person in a

1    particular apartment.  And they could testify the apartment

2    looked similar, the person looked similar, but they could not

3    establish when that picture was taken.

4         The D.C. Circuit held, essentially, that had that

5    been -- the police officer's testimony been it, there would

6    have been a lack of foundation; yet in that case the person

7    themselves took the stand and established that they were in

8    that place at that time.

9         Here we do not have that.  All we have is someone

10   comparing video footage of something he did not personally

11   observe, and he cannot establish the time and -- and arguably

12   could not establish the date.

13        But even if the Court finds the date is established, the

14   timing is very important for relevance.  Certainly, statements

15   made at 4:00 p.m. or 1:00 p.m. are very different than

16   statements made at 2:00 p.m.  So I do think the lack of

17   establishing that specific time impacts the relevance and can

18   cause undue prejudice in this case as well.

19        So I would ask the Court to exclude all of the

20   open-source materials.  And I'm happy to answer questions about

21   any of the specific issues.

22        THE COURT:  I don't have any questions.  Thank you.

23        Did you want to respond to anything, Mr. Valentini?

24        MR. VALENTINI:  No, Your Honor.  I don't think I need

25   to respond.

```
1              I do want to make a brief clarification about

2     Exhibit 115.  Because I noticed today that when we played in

3     the courtroom, the audio of the music seems to be louder than

4     the interviewee's voice.  And there's actually more when the

5     exhibit is played -- was played before coming to the

6     courthouse -- the courtroom today that is actually discernible

7     of what the interviewee said.  So I just wanted to alert the

8     Court to that and the fact that we would work with the

9     courtroom technicians to make sure that the audio reflects what

10    is audible in playing the exhibit on the computer.

11             THE COURT:  So when you play it on the computer, all

12    of what he said is audible, not just the second half of what he

13    says?

14             MR. VALENTINI:  Yes.  I don't want to make a

15    representation about all of it, but I'm happy to play directly

16    from my computer, for the Court's benefit, if the Court is

17    interested.

18             THE COURT:  All right.  At some point.

19        All right.  Anything else we have to deal with today?

20             MR. VALENTINI:  Not from the government, Your Honor.

21             MS. FISH:  Your Honor, I'd just ask the Court if the

22    Court intends to hold a hearing on our *Franks* motion.

23             THE COURT:  I haven't fully decided that yet.  I

24    think it's unlikely, but I'll -- I haven't fully decided that.

25             MS. FISH:  Thank you, Your Honor.
```

1          Just -- we're scheduled to return to Washington state

2     tomorrow.  So I just want to ensure it wouldn't be something

3     where we'd need to extend our trip now.

4               THE COURT:  No.  Have a safe trip home.

5          Anything else we need to resolve today?

6               MR. VALENTINI:  No, Your Honor.  Not from the

7     government.

8               MS. FISH:  No, Your Honor.

9               THE COURT:  All right.  I'll issue an order on this,

10    as well as the other motions *in limine*, as quickly as

11    practical.

12          Thank you.  You're excused.

13               (Proceedings were concluded at 12:08 p.m.)

14               (Proceedings recorded by mechanical stenography.

15    Transcript produced by computer-aided transcription.)

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4    Certified Realtime Reporter, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of my

6    stenograph notes and is a full, true, and complete transcript

7    of the proceedings to the best of my ability.

8

9                      Dated this 25th day of March, 2023.

10

11                      /s/ Nancy J. Meyer
                        Nancy J. Meyer
12                      Official Court Reporter
                        Registered Diplomate Reporter
13                      Certified Realtime Reporter
                        333 Constitution Avenue Northwest
14                      Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25