UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. 21-CR-0687 (RC) |
| Plaintiff, | ) ) | MR. RHINE'S SENTENCING |
| v. | ) ) | MEMORANDUM |
| DAVID CHARLES RHINE, | ) ) | |
| Defendant. | ) ) ) | |

Mr. Rhine is truly and deeply sorry that he was anywhere near the events of January 6, 2021. *See* Ex. A. Although his involvement was minimal, Mr. Rhine takes responsibility for the real harm and pain that his presence caused to those who were working at the Capitol that day, to law enforcement, and to his family and community. Throughout his life, Mr. Rhine has devoted his time, energy, and resources to improving his community and supporting people in need. He has always tried to do the right thing. He knows he cannot undo the past, so hopes to make amends by committing to substantial volunteer services to address community needs. Mr. Rhine asks this Court to sentence him to one year of probation to include 100 hours of community service.

## I.    FACTUAL BACKGROUND

Consideration of Mr. Rhine's history and characteristics, *see* 18 U.S.C. § 3553(a)(1), makes clear that Mr. Rhine is a caring, hard-working, and responsible person who has worked throughout his life to help others. He has no prior criminal history whatsoever, and a strong record of public service. Mr. Rhine has spent the last nearly two decades working as a Certified Public Accountant (CPA), including

DEFENDANT'S SENTENCING MEMORANDUM
(*United States v. Rhine*, 21-CR-687 (RC) - 1

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

providing substantial *pro bono* accounting services. He now risks losing that license as a result of his convictions here.

A.    **Mr. Rhine is a father, a veteran, and a long-time contributing community member who is devoted to supporting his family, his community, and his country.**

Mr. Rhine's upbringing gave him a strong work ethic and a commitment to public service. He grew up in a small town in New York State, the youngest of his parents' nine children. His mother worked tirelessly to make sure he and his siblings were able to enjoy happy and healthy childhoods. Although the family had modest means, Mr. Rhine's mother made sure that her children did not bear the stress of their financial situation and further taught her children to help others in their community. *See* PSR at 10.

Mr. Rhine's father had a career in public service. He worked as a teacher for many years before creating a credit union with and for his fellow teachers. Mr. Rhine's father proudly worked to help others in the community gain financial stability and to ensure that important public service careers, like teaching, were sustainable. Mr. Rhine fully embraced his parents' values—public service, hard work, and family. *See* PSR at 10.

As he reached adulthood, Mr. Rhine strived to promote these values. Mr. Rhine initially pursued further education and employment after graduating high school; then quickly signed up to serve his country at age 22. He enlisted in the U.S. Navy, where he served honorably for several years. *See* PSR at 13. In the Navy, Mr. Rhine undertook training in the safe operation of a nuclear power plant, where he earned the highest grades in his class. *See* Ex. M. He then worked primarily in operating such a plant, but also participated in patrols at sea that would take him away from base for 2-3 months at a time. *See* PSR at 13.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Mr. Rhine married his wife Susan while he was in the Navy, and his service relocated them to Bremerton, Washington. Ultimately, they built their home and family in Bremerton, where they remained after Mr. Rhine finished his military service. *See* PSR at 10–11. Mr. Rhine went back to school so that he could build a career to support his family. He earned his Bachelor's Degree and later a Master's in Public Accounting. *See* PSR at 12–13. Mr. Rhine worked as an accountant for different firms in the community for approximately seven years, before becoming a small business owner and running his own accounting firm. PSR at 13–14.

As Mr. Rhine's family, friends, and neighbors attest, Mr. Rhine has provided countless hours of *pro bono* accounting services to community members in need over the nearly two decades that he has been an accountant. This includes assisting elderly and disabled clients, single parents, and military members and families at no charge, and offering sliding scale services to others with limited financial means. Throughout his career, he has helped people in his community, regardless of their ability to pay. He has offered invaluable financial services to his clients—both paying and *pro bono*—to remain financially secure, to overcome past mistakes, and to deal with new crises (such as the pandemic or the death of a spouse). *See* Exs. B, D, H, J, L.

In addition to his professional service to the community, Mr. Rhine has volunteered his time and energy to support numerous community projects. For many years he served on the board of the non-profit U.S.S. Turner Joy Floating Ship Museum. Mr. Rhine worked with other board members to right the organization's finances, restore the historic ship, and establish a stable way to operate the ship as a museum—which has been a significant learning resource for his community, as well a source of tourism revenue. He also served on his local estate planning counsel, to improve resources in this arena for his community. And he has volunteered with numerous environmental efforts, including restoration of the local Oyster and Shellfish

population—which is beneficial for the animals themselves, the ecosystem, and the water quality. *See* Exs. B, D, H, I, L.

Finally, Mr. Rhine has consistently shown generosity with his energy and emotional support. He has served as a father figure not only for his own son, but also for his nephews and for his son's friends after their own fathers left their families. *See* Exs. C, D, E, H. As his nephew explains, "My brother and I would not be the successful men we are today without his incredible influence and generosity." Ex. E. In addition to these significant mentoring roles, Mr. Rhine is emotionally generous and kind in everyday interactions as well. For example, another parent in his community recalls Mr. Rhine being one of the only people who made an effort to get to know her and her special needs child and to make them feel welcome and supported. *See* Ex. K.

Those who know Mr. Rhine describe him as a "boy scout" and rule follower, Ex. B; a caring person, Ex. C; a "gentle soul," Ex. F;  a person with "integrity beyond challenge," Ex. J; and above all, generous and kind, Ex. E, G, H, K. Mr. Rhine has consistently disavowed violence. *See* Exs. B, F, H.[1] And he always tries to do the right thing and speak up respectfully when he sees unfairness. *See* Exs. D, J. Mr. Rhine's service to his family, community, and country, in ways big and small, demonstrates his character.

**B.**   **The evidence indicates that Mr. Rhine intended to participate in a peaceful demonstration, complied completely with directives by law enforcement, and attempted to stop destructive behavior by others.**

Evaluation of the evidence presented in this case demonstrates that Mr. Rhine did not act maliciously, violently, or in collaboration with others. Rather the facts and

---

[1] The government may argue that Mr. Rhine's prior lawful possession of firearms and personal protection items is cause for concern. However, this is not so. As noted in the PSR, Mr. Rhine only began to own such items after he was robbed at gunpoint, *see* PSR at 11, exercising his core Second Amendment right to protect himself and his home. He has been entirely compliant with his bond and removed his firearms. *See id.*

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

circumstances of the offense are extremely mitigated. The evidence at trial indicated that Mr. Rhine attended a permitted protest on the Capitol grounds by himself. Just like responsible law enforcement members, Mr. Rhine believed the demonstration would be peaceful and respectful. *See* Testimony of Inspector Lloyd. The evidence further demonstrated that Mr. Rhine was not in a position to see other people move barriers or open doors to the Capitol. *See id*. The government has recently affirmed its understanding of the sophisticated and pervasive efforts by high-ranking government officials and other public figures to convince members of the public that the 2020 election results were the result of fraud. *See United States v. Trump, et. al.*, 23-cr-00257-TSC, at Dkt. No. 1. Mr. Rhine had no part in those efforts, in plotted criminal acts, or in any acts of violence. Rather, Mr. Rhine simply believed the information spread by these powerful people, and wanted to exercise his First Amendment rights.

The government introduced evidence of a video recording taken by unknown person(s), edited in unknown ways and for unknown reasons, in which Mr. Rhine was purported to make a statement. *See* PSR at 6. That statement included statements of political belief: "This is our 1776 moment. This is our building. . . . And it is real special moment in history to be here to defend against all enemies foreign and domestic. . . . It is time for us to take this and take it back . . . We are sick and tired of the cheating. We are here to stop the steal." *Id*. It also included expressions of his desire to protest peacefully: "we are seeing a peaceful protest. . . . Hopefully we can keep people peaceful." *Id*.

None of these statements are true threats, obscenity, or any other type of unprotected speech. *See Counterman v. Colorado*, 143 S. Ct. 2106, 2113 (2023) (reciting parameters of First Amendment protection). Rather, they are core, protected, First Amendment political speech. The D.C. Circuit has been absolutely clear that "A sentence based to any degree on activity or beliefs protected by the first amendment is

constitutionally invalid." *United States v. Lemon*, 723 F.2d 922, 938 (D.C. Cir. 1983). These statements cannot be used to increase Mr. Rhine's sentence.

The evidence further showed that Mr. Rhine did no more than walk and stand while at the Capitol. And that he walked in hallways and antechambers that would typically be open to the public under normal conditions. The one time another person engaged in vandalism in front of him, Mr. Rhine tried to intervene. He yelled at them to stop, and told them to show respect for the building. *See* PSR at 6. Mr. Rhine was in the Capitol building for barely seven minutes before a police officer ordered him to stop, an order with which he immediately complied. Further, the evidence revealed that Mr. Rhine was entirely cooperative with law enforcement officers who contacted him, and even complied with their directives long after they left him amidst the crowd. *See* PSR at 7–8. The evidence affirms that Mr. Rhine's involvement in the events of January 6, 2021, was minimal.

## C. The charges and conviction alone, have substantial negative consequences for Mr. Rhine and his family.

Mr. Rhine and his family have already experienced significant negative consequences, merely from these charges being filed. Numerous press outlets parroted the government's accusations against Mr. Rhine, accusations related to the decried events of January 6, 2021, and the highly contentious argument over the 2020 election results. Because of this, Mr. Rhine lost his privacy, and was scorned by many in his community. Some customers no longer wished to work with him. He stepped down from the U.S.S. Turner Joy board to avoid negative impact on the organization's efforts. And people pestered him, and even worse his family, about the charges. *See* Exs. B, C, D, H, I.

Mr. Rhine could not abide the pain this was causing his wife and son. He encouraged them to relocate, to live closer to his wife's family, so that his son could

DEFENDANT'S SENTENCING MEMORANDUM
(*United States v. Rhine*, 21-CR-687 (RC)) - 6

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

have a normal social experience. His wife and son indeed did relocate. While overall, this has reduced the stress and harassment his son faces, it also meant that Mr. Rhine was separated from his family. Mr. Rhine has stayed in Bremerton to continue serving his remaining clients and running his business, and to comply with his bond in this case. The past two-and-a-half years have been lonely and difficult for Mr. Rhine and his family. And any custodial or similar sanction that further limits Mr. Rhine's ability to parent his son would harm his son most of all. *See* Exs. B, C, H.

Furthermore, the convictions in this case put Mr. Rhine's CPA license at risk. Under Washington law, any criminal conviction in any jurisdiction can be grounds for revocation of a CPA license or other discipline. *See* Wash. Admin. Code 4-30-142(8). Because of this consequence, and the uncertainty it presents for Mr. Rhine's future ability to work and operate his business, he has already begun to prepare his business to be closed or transferred to other ownership. He has supported co-workers who have sought employment elsewhere given the uncertainty. And he is preparing for the likelihood that he will need to learn a new profession.

### D. Mr. Rhine is sincerely remorseful and has learned and grown significantly since January 6, 2021.

Mr. Rhine is ashamed that he was anywhere near the Capitol on January 6, 2021. He was as shocked as the rest of the country to see the horrors that unfolded that day. And like most people, he saw these events on television. Still, Mr. Rhine is truly sorry for his role in the events that day. He recognizes that his presence at the Capitol contributed to the fear, pain, and trauma that impacted so many people. He takes responsibility for this and is working to make amends for his poor decision. *See* Ex. A.

Mr. Rhine recognizes the harm that his presence caused so many public servants present at the Capitol that day—including leaders and members of Congress and police officers—as well as his family and community. In his own words:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

I wish that I could erase all the pain, grief, hurt, fear, and disappointment that everyone felt because of where I was on that dreadful day, and the footsteps that I took. But I cannot erase any of it. All I can do is ask for mercy and forgiveness from those I have harmed and continue the journey of self-reflection I have taken since that day.

*Id*. Mr. Rhine's remorse is something he has felt and expressed consistently over the past two-and-a-half years, as his friends and family recognize. *See, e.g.*, Exs. B, E, F, G. And it something he will live with for the rest of his life.

## II.   ARGUMENT

Mr. Rhine, through counsel, asks this Court to sentence him to one year of probation, to include 100 hours of community service. This sentence will best advance the goals of sentencing. Mr. Rhine agrees with Probation that no custodial sentence is warranted here. *See* Probation Sentencing Recommendation at Dkt. No. 113. However Mr. Rhine would still like to take responsibility by making amends and restoring the community through community service.

### A.   A probationary sentence is more than sufficient to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment.

Custody is not necessary "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense[.]" 18 U.S.C. § 3553(a)(2)(A). Rather, a probationary sentence—and particularly one that allows Mr. Rhine to make amends in the community—sufficiently punishes him for his conduct.

As discussed above, Mr. Rhine's involvement in the events of January 6, 2021, was minimal. This is correctly recognized by the misdemeanor status of the convictions as well as the Guidelines range—which is the lowest possible range.[2] Both Congress

---

[2] Probation has correctly calculated Mr. Rhine's Guidelines range in the final PSR. As detailed in his objections to the PSR, Mr. Rhine does believe that the Court should reduce his Guidelines offense level by two levels to implement the forthcoming "zero-point offender" reduction. This reduction will protect judicial economy particularly as the Sentencing Commission recently voted in favor of formally making the Amendment

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

and the Sentencing Commission have thus recognized that the conduct for which Mr. Rhine was convicted does not require a substantial punishment, and may require no custodial sanction at all.

As detailed in his letter to the Court, Mr. Rhine is most affected by the fear and negative impact that his presence had on those who were working at the Capitol that day, to law enforcement, members of congress, and the community. Such impact was never his intention, nor was it something he would ever promote. Any actions that endanger or cause fear are wholly against Mr. Rhine's principle values and commitment to his community, which includes those members of law enforcement and congress. Still he recognizes the impact he in fact caused, and is deeply remorseful for this harm. *See* Ex. A. A custodial sanction is not necessary to impress upon Mr. Rhine the seriousness of the offense.

In addition, Mr. Rhine has already experienced substantial negative consequences stemming from the charges in this case, and further collateral consequences are likely. Mr. Rhine and his family experienced social scorn and backlash due to the publicity surrounding these charges. This caused Mr. Rhine's wife and child to relocate to a place where his son could have a normal social experience. He has now lived separately from them for over two years. Furthermore, Mr. Rhine has lost business and stepped down from valued volunteer roles. He has had to prepare to close or transfer his business given the uncertainty of his situation. Once judgment is entered, he is at risk of losing his CPA license. *See* Wash. Admin. Code 4-30-142(8).

---

retroactive. *See* U.S. Sentencing Comm'n., Public Meeting Recording (August 24, 2023, 3:00 p.m.), *available at* https://www.ussc.gov/policymaking/meetings-hearings/public-meeting-august-24-2023. Mr. Rhine maintains that the Court should apply the reduction. However, he also acknowledges that his Guidelines as calculated by Probation already indicate the lowest possible range—0-6 months—so the reduction would not change his Guidelines range.

DEFENDANT'S SENTENCING MEMORANDUM
(*United States v. Rhine*, 21-CR-687 (RC)) - 9

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Instead of a custodial sanction, Mr. Rhine proposes a probationary sentence that includes a term of community service. As discussed above, Mr. Rhine has participated in community service throughout his life. He is committed to improving his community and to helping others, particularly in times of need. A term of community service, rather than custody, would require Mr. Rhine to take additional time away from his family and his work. But that time would be productive, and would be used to make amends in the community.

**B.      Mr. Rhine has already been thoroughly deterred from criminal conduct.**

As Mr. Rhine's utter lack of criminal history and the numerous letters from friends and family indicate, he is not inclined to criminal activity. Further, his horror and shame at what transpired on January 6, 2021, has further deterred him from even attending a demonstration, now that he has seen what can happen. Mr. Rhine presents no risk of recidivism and no sanction is needed to deter him. *See* 18 U.S.C. § 3553(a)(2)(B).

Prison and high-intensity supervision are designed for people who are at high risk of recidivism because they lack many of Mr. Rhine's strengths—job skills, supportive community, and stability. But analysis of multiple studies over time reveals that "more intense correctional interventions . . . can ***increase the failure rates of low-risk offenders***. . . . [Similarly] intensive supervision . . . ***increases the recidivism rates of lower-risk offenders***." Christopher T. Lowenkamp & Edward J. Latessa, *Understanding the Risk Principle: How and Why Correctional Interventions Can Harm Low-Risk Offenders*, Topics in Community Corrections, at 6 (2004), https://www.researchgate.net/publication/228601026_Understanding_the_risk_principle_How_and_why_correctional_interventions_can_harm_low-risk_offenders (emphasis added). *See also* Dep't of J., Nat'l Inst. Of J., *Five Things About Deterrence*

DEFENDANT'S SENTENCING MEMORANDUM
(*United States v. Rhine*, 21-CR-687 (RC)) - 10

FEDERAL PUBLIC DEFENDER
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

(June 5, 2016), https://nij.ojp.gov/topics/articles/five-things-about-deterrence#addenda
(recognizing that prisons do not deter future criminal conduct and may actually have the
opposite effect). A custodial sanction here would be counterproductive and would
actually impede the goals of sentencing.

On the other hand, research has recognized that restorative justice programs—
which often involve some form of community service—are more effective at preventing
recidivism and increasing compliance with other rules. *See* Jeff Latimer, Craig
Dowden, Danielle Muise, *The Effectiveness of Restorative Justice Practices: A Meta-
Analysis*, 85.2 Prison J. 127, 127–44 (Jun. 2005). These outcomes are added benefits to
the core purpose of restorative justice programs—to repair harm caused. *See* Shannon
M. Sliva, et. Al., *Fulfilling the Aspirations of Restorative Justice in the Criminal
System? The Case of Colorado*, 28 Kan. J.L. & Pub. Pol'y 456, 461–62 (2019). Mr.
Rhine's recommended sentence will best advance the goal of deterrence.

### C.    Mr. Rhine poses no danger to the public and is not in need of rehabilitative treatment.

A custodial sanction will also not further any other goal of sentencing. Mr. Rhine
poses no danger to the public. *See* 18 U.S.C. § 3553(a)(2)(C). Indeed, the evidence at
trial showed that the one time he saw another person attempt an act of vandalism, he
intervened to try to stop them. He is known in his community as generous, kind, and
gentle. And Mr. Rhine has spent the past two-and-a-half years atoning for his, albeit
small, role in the events of January 6, 2021. The goal of community safety has already
been achieved as to Mr. Rhine.

Furthermore, Mr. Rhine is not in need of any rehabilitative services. *See* 18
U.S.C. § 3553(a)(2)(D). As detailed above, he has excelled in his past schooling as well
as in his lengthy and positive career. He has used his spare time to serve his
community, including to bring a valued community organization and cause back to a

DEFENDANT'S SENTENCING MEMORANDUM
(*United States v. Rhine*, 21-CR-687 (RC)) - 11

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

functioning state. Mr. Rhine has no history of mental illness or substance use disorder. *See* PSR at 12. He is not in need of any typical rehabilitative services. As indicated above, Mr. Rhine is at risk of losing his CPA license once judgment is entered in this case. However, he is prepared to employ his strong work ethic and patience to learn a new profession and again provide for his family.[3]

> **D.    A non-custodial sentence will avoid unwarranted sentencing disparities with similarly situated people.**

A probationary sentence here is necessary to avoid unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a)(6). As recognized in the PSR, people with similar offense levels[4] and criminal histories as Mr. Rhine typically receive no or minimal custodial time. *See* PSR at 21. Furthermore, counsel is aware of over 200 cases where people were accused of similar conduct and charges as Mr. Rhine, or more aggravated conduct and charges, and courts imposed non-custodial sentences. *See* U.S. Attorney's Office, District of Columbia, Capitol Breach Cases, "See Sentences Handed Down in Capitol Breach Cases," Tables 1–3 (Aug. 15, 2023), https://www.justice.gov/file/1593211/download. In addition to these non-custodial sentences, another approximately 23 people were sentenced only to intermittent confinement, and many more to short terms of confinement for a variety of charges arising on January 6, 2021. *See id*.

---

[3] Mr. Rhine acknowledges that another purpose of sentencing is to provide any necessary restitution. *See* 18 U.S.C. § 3553(a)(7). However, as previously briefed, the government has presented no evidence nor claim for lawful restitution here. *See* Dkt. No. 110 at 1–4.

[4] As noted above, Mr. Rhine maintains that his Adjusted Offense Level should be a 4 rather than a 6 after the application of the forthcoming "zero point offender" guideline (as either a departure or a variance), though his Guidelines range would remain the same. *See* Dkt. No. 110 at 7–8.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1    This Court has not sentenced anyone convicted of the § 1752 or § 5104

2    misdemeanor charges stemming from January 6, 2021, to custodial time. *See United*

3    *States v. Barnard*, 21-CR-0235-RC-1; *United States v. Witcher*, 21-CR-0235-RC-2;

4    *United States v. Marquez*, 21-CR-0136-RC; *United States v. Prado*, 21-CR-0403-RC;

5    *United States v. Williams*, 21-CR-0388-RC; *United States v. Stepakoff*, 21-CR-0096-

6    RC; *United States v. Chapman*, 21-CR-0676-RC; *United States v. W.J. Sywak*, 21-CR-

7    0494-RC-2; *United States v. W.M. Sywak*, 21-CR-0494-RC-1; *United States v. Laurens*,

8    21-CR-0450-RC; *United States v. Cunningham*, 21-CR-0603-RC; *United States v.*

9    *Torre*, 21-CR-0143-RC; *United States v. Connor*, 21-CR-0586-RC-1; *United States v.*

10   *Ferrigno*, 21-CR-0586-RC-2; *United States v. Lunyk*, 21-CR-0410-RC. This has

11   included cases were people entered a senator's workspace and rifled through his papers

12   and effects, *see Connor*, 21-CR-0586-RC-1 at Dkt. No. 41; and yelled chants at police

13   officers while inside the Capitol, *see Marquez*, 21-CR-0136-RC at Dkt. No. 22,

14   *Laurens*, 21-CR-0450-RC at Dkt. No. 28; among other aggravated conduct.

15   The one person convicted only of misdemeanors arising from January 6, 2021,

16   that this Court has sentenced to custodial time was in *United States v. Williams*, 22-CR-

17   0265-RC. Mr. Williams was convicted of trespass in a restricted area and theft of

18   government property after he was part of the first group to breach the police line and

19   enter the Capitol, he stole a police officer's bag and riot helmet, and he physically

20   pushed police officers along with others while inside the Capitol building. *See id*. at

21   Dkt. No. 64. This Court gave him a six-month custodial sentence. *See id*. at Dkt. No.

22   75. The evidence of Mr. Rhine's conduct here is similar or less serious than that of the

23   14 people convicted of misdemeanor offenses arising on January 6, 2021, that this

24   Court sentenced to non-custodial sentences.

25   Additionally, recently adopted Guidelines commentary also supports a non-

26   custodial sentence for someone, like Mr. Rhine. The new commentary (to become

DEFENDANT'S SENTENCING MEMORANDUM
(*United States v. Rhine*, 21-CR-687 (RC)) - 13

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

effective in November) states that for someone who received the forthcoming "zero-point offender" departure, which the Commission voted to make retroactive, *see supra,* n.2, and have a Guidelines range in Zone A or B of the sentencing table, a sentence other than a sentence of imprisonment is generally appropriate. *See* U.S. Sentencing Comm'n., Amendments to the Sentencing Guidelines, at 80 (April 27, 2023), https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf. This forthcoming commentary is intended to implement a pre-existing Congressional directive, in 18 U.S.C. § 994(j). *See id.*

A custodial sanction here would create an unwarranted sentencing disparity between Mr. Rhine and similarly situated people. In particular, it would be an impermissible punishment for his assertion of his right to trial. While people may be afforded a benefit in terms of an acceptance of responsibility adjustment under the guidelines, no person may be punished for maintaining their constitutional rights. Here, there is no basis in fact to punish Mr. Rhine more harshly than others convicted of misdemeanor offenses. His conduct was as mitigated or more mitigated than others, he did not lie to police or present false testimony, and he has demonstrated his sincere contrition to this Court and to his community. The Court should impose a non-custodial sentence.

///

///

///

///

///

///

///

DEFENDANT'S SENTENCING MEMORANDUM
(*United States v. Rhine*, 21-CR-687 (RC)) - 14

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**III.     CONCLUSION**

This Court should sentence Mr. Rhine to one year of probation, to include 100 hours of community service. The goals of sentencing have by in large already been achieved. This sentence would allow Mr. Rhine to make amends and to turn his sincere remorse into real assistance to the community.

DATED this 28th day of August 2023.

Respectfully submitted,

*s/ Rebecca Fish*
WA State Bar Number: 57488
Assistant Federal Public Defender
1331 Broadway, Suite 400
Tacoma, WA 98402
Phone: (253) 593-6710
Email: Becky_Fish@fd.org

Attorney for David Rhine

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**