**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-687 (RC)** |
| **v.** | : | |
| | : | |
| **DAVID CHARLES RHINE,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum and objections to the final Presentencing Investigation Report (PSR) in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant David Charles Rhine to one year of incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution.

I.     **Introduction**

Defendant David Charles Rhine, a 54-year-old accountant and a Navy veteran, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim.  MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum.  However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Defendant Rhine was convicted of entering or remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1); disorderly or disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); disorderly or disruptive conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  As explained in more detail herein, several factors establish that Rhine's conduct lies at the aggravated end of the spectrum for January 6 defendants convicted of misdemeanor offenses, making a sentence of one year of incarceration—a sentence at the high end of the 6- to 12-month Guidelines range— appropriate in this case.

*First*, on January 6, Rhine joined the attack on the United States Capitol with the specific intent of preventing Congress from certifying the Electoral College vote.  In an interview Rhine recorded as he stood near the East House Portico, Rhine falsely claimed that the "Capitol Police ha[d] opened up the barriers to allow the patriot protesters to get up to the building itself."  In the same interview, Rhine also declared that he had come to the Capitol to "stop the steal"—that is, to obstruct Congress' certification of the Electoral College vote.  *Second*, Rhine joined the first wave of rioters to enter the Capitol through the Upper House Door, shortly after that door was first breached.  *Third*, Rhine entered the Capitol Building with three dangerous weapons: two pocket-size folding knives and a container of pepper spray.  *Fourth*, once inside the Capitol Building, Rhine zeroed in on some of the Capitol's most sensitive places.  He first approached a door that would have given him access to the House Chamber—the very place where the Joint Session had convened (and was set to reconvene) to conduct the certification proceeding.  Then, after other rioters failed to gain access to the Chamber, Rhine proceeded to the hallways abutting the House Gallery on the floor above, around the time when Members of Congress were still

2

sheltering in place inside the Gallery.  There, Rhine tried (unsuccessfully) to open one of the doors leading to the Gallery itself.  *Fifth*, having failed to enter the House Chamber and Gallery, Rhine made his way to a Congressional office, even though the office was marked as the workspace of the Appropriations Committee.  *Sixth*, Rhine left the Capitol Building only after Capitol Police officers detained him, escorted him back downstairs to the Rotunda Door lobby, and directed him to leave.

The Court must also consider that Rhine's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings.  The facts and circumstances of Rhine's crime support a sentence of one year in prison in this case.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary repetition, the government refers to the general summary of the attack on the U.S. Capitols set forth in the Presentence Report.  ECF No. 112 at ¶¶ 8-14.

### Defendant Rhine's Role in the January 6, 2021 Attack on the Capitol

In the days leading up to January 6, 2021, Rhine traveled from his home in Washington state to Washington, D.C. to protest the results of the 2020 presidential election.  By 2 p.m. on January 6, Rhine had reached the Capitol's East Plaza, where barricades clearly marked the Capitol's restricted area.  At the time, Rhine was wearing a dark hooded jacket, a backpack, and a red baseball cap with the writing "USA" printed in large white font across the front.  He also carried a large blue flag with white stars (known as the "Navy Jack") and cowbells.  At approximately 2:20 p.m., after other rioters violently breached the barricades at a nearby location

on the East Plaza, Rhine walked by and around the barricades on the House side and crossed the plaza, entering the restricted area.  Rhine then walked up the House steps and, within minutes, reached the East House Portico, near the Upper House Door.

 

**Figure 1: Screenshot from USCP surveillance video**
**(Gov't Trial Ex. 110A.2, 2:21:32 p.m. on 1/6/21)**

**Figure 2: Screenshot from USCP surveillance video**
**(Gov't Trial Ex. 110A.7, 2:23:01 p.m. on 1/6/21)**

As Rhine stood on a terrace near the East House Portico, he gave a recorded interview. At one point during the interview, the camera panned to another rioter nearby who was walking right by Rhine with pepper spray (or some other chemical irritant) in his eyes.

 

**Figure 3: Screenshot from Rhine's interview on 1/6/21**
**(Gov't Trial Ex. 115A.1)**

**Figure 4: Screenshot from Rhine's interview on 1/6/21**
**(Gov't Trial Ex. 115A.2)**

In the recorded interview, Rhine made the following statements:

> This is our 1776 moment.  This is our building.  The Capitol Police have opened up the barriers to allow the patriot protesters to get up to the building itself.  And, so far, we are seeing a peaceful protest. And it is a real special moment in history to be here to defend against all enemies foreign and domestic.  And hopefully… Yeah, it looks like they are doing some pepper spraying to keep people out of the building here.  But, it's challenging times here on the Capitol Steps, so.
>
> …

4

> Hopefully, we can keep people peaceful.  But this is our building.
> We own this building.  We are not trespassing.  It is time for us to
> take this and to take it back. … We are sick and tired of the
> cheating.  We are here to stop the steal.  And that's why we came.

At approximately 2:42 p.m., Rhine entered the U.S. Capitol Building through the Upper House Door, only moments after other rioters had opened that door from the inside, triggering a sharp-sounding alarm.  Although a metal detector was present at the door, Rhine walked around it and did not go through any security screening.



**Figure 5: Screenshot from USCP surveillance video**
**(Gov't Trial Ex. 102A.3, 2:42:23 p.m. on 1/6/21)**

As Rhine walked into and through the Capitol, he continued to carry his large blue flag with white stars.  Rhine also repeatedly rattled his cowbells.  Shortly after entering the building, Rhine approached a door that led to the House Chamber.  That door was locked.  As Rhine stood outside the door for a few seconds and other rioters tried to force the door open, Rhine could be heard saying, "Hey, hey, don't break the door" and "Don't damage.  This is a sacred place."



**Figure 6: Screenshot from third-party video capturing Rhine inside the Capitol Building (Gov't Trial Ex. 117 at 0:01)**

After the rioters' attempts to enter the House Chamber proved unsuccessful, Rhine walked up a nearby set of stairs to the Capitol's third floor, reaching the hallway on the east side of the House Gallery. Rhine then proceeded westward along the hallway immediately to the north of the House Gallery. Upon reaching a door that connected the hallway to the House Gallery, Rhine deviated from his path, walked towards the door, and, when the door was within arm's reach, motioned towards the door handle. The door, however, was locked, as the House Gallery, which on January 6 was used to seat Members of the House, was in lockdown and Members of Congress were still sheltering in place inside.



**Figure 7: Screenshot from USCP surveillance video**
**(Gov't Trial Ex. 104A.2, 2:47:04 p.m. on 1/6/21)**

Rhine then continued westward, until he reached the northwest corner of the hallway adjacent to the House Gallery.  There, Rhine entered a Congressional office, even though a sign affixed above that office's door indicated that the office belonged to the Appropriations Committee.



**Figure 8: Screenshot from USCP surveillance video**
**(Gov't Trial Ex. 111, 2:48:49 p.m. on 1/6/21)**



**Figure 9: Screenshot from USCP surveillance video**
**(Gov't Trial Ex. 111, 2:48:52 p.m. on 1/6/21)**

Moments later, as Rhine was marching back eastward along the same hallway, he was detained by police officers with guns drawn.  The detaining officers directed Rhine and others present to drop to the floor.  Rhine complied and was frisked for weapons.  An officer found that

Rhine was carrying two pocket-size folding knives and a container of pepper spray.  The officer seized the items and secured Rhine's hands behind his back with flex cuffs.

The same officer then escorted Rhine and others along a hallway and down to the second floor, until they reached an interior area near the Rotunda Doors.  Once in the vicinity of the Rotunda Doors, the escorting officer directed Rhine to exit the building.  The officer left, and another rioter removed the flex cuffs from Rhine's hands.  Rhine exited the Capitol Building through the Rotunda Doors at approximately 3:05 p.m.

*The Charges*

On November 4, 2021, the United States charged Rhine by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On November 9, 2021, law enforcement officers arrested him at his office in Gig Harbor, Washington. On November 19, 2021, the United States charged Rhine by a four-count information with the same four offenses identified in the complaint: 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  After resolving several pretrial motions and holding an evidentiary hearing (*see, e.g.*, ECF Nos. 78, 84, 87, 91), the Court set a jury trial for April 17, 2023.  After a five-day trial, the jury found Rhine guilty on all counts.  ECF No. 102.

## III.   Statutory Penalties

Rhine now faces sentencing on four misdemeanor offenses: entering or remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count One); disorderly or disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Two); disorderly or disruptive conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Three); and parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Four).   Rhine faces up to one year of

imprisonment, one year of supervised release, and a fine of up to $100,000 on Counts One and Two (*see* 18 U.S.C. §§ 1752(b)(2), 3571(b)(5), and 18 U.S.C. § 3583(b)(3)) and up to six months of imprisonment and a fine of up to $5,000 on Counts Three and Fourth (*see* 40 U.S.C. § 5109(b) and 18 U.S.C. § 3571(b)(6)).

## IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.   The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing.  *Id.* at 49.  As explained below, and as reflected in the PSR's initial Guidelines computation (*see* ECF No. 109 at ¶¶ 22-39, 42, 85), Rhine's total offense level under the Guidelines is 10 and his criminal history category is I, for an advisory Guidelines range of 6 to 12 months of imprisonment.

A.    <u>Analysis for Each Count</u>

**Count One: 18 U.S.C. § 1752(a)(1)—entering and remaining in a restricted building or grounds**

| | |
|---|---|
| **Base Offense Level**: The Statutory Appendix lists two guidelines for a Section 1752 offense, U.S.S.G. §2A2.4 (Obstructing or Impeding Officers) and §2B2.3 (Trespass).  The Guidelines direct that, if Appendix A specifies more than one guideline, the court should use the "most appropriate" guideline for the offense conduct charged in the count of conviction.  *See* §1B1.2 n.1.  For Count One, the most applicable guideline for Count One is § 2B2.3.  That section provides that an offense involving trespass has a base offense level of four.  U.S.S.G. § 2B2.3(a). | **4** |
| **Specific Offense Characteristics**: On January 6, 2021, the U.S. Capitol was | **+2** |

| | |
|---|---|
| restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B).  Therefore, a two-level enhancement applies. U.S.S.G. § 2B2.3(b)(1)(A)(vii). | |
| **Specific Offense Characteristics**: The defendant possessed one or more dangerous weapons when he committed the instant offense.  The trial evidence established that the defendant possessed two pocket knives and a container of pepper spray when he unlawfully entered the Capitol building.  Therefore, a two-level enhancement applies.  U.S.S.G. § 2B2.3(b)(2) (two-level enhancement applies if "a dangerous weapon (including a firearm) was possessed"); *id.* n.1 (incorporating definition of "dangerous weapon" from "the Commentary to §1B1.1 (Application Instructions)"); *id.*  § 1B1.1 n.1(E) ("dangerous weapon" includes any "instrument capable of inflicting death or serious bodily injury"). | +2 |
| **Victim Related Adjustment:** None | 0 |
| **Adjustment for Role in the Offense:** None | 0 |
| **Adjustment for Obstruction of Justice:** None | 0 |
| **Adjusted Offense Level (Subtotal):** | 8 |
| **Chapter Four Enhancement:** None | 0 |
| **Acceptance of Responsibility:** None | 0 |
| **Total** | 8 |

**Count Two: 18 U.S.C. § 1752(a)(2)—disorderly and disruptive conduct in a restricted building or grounds**

| | |
|---|---|
| **Base Offense Level**: As noted, the Statutory Appendix lists two guidelines for a Section 1752 offense, U.S.S.G. §2A2.4 (Obstructing or Impeding Officers) and §2B2.3 (Trespass).  As explained in more detail below, the "most appropriate" guideline for Count Two is § 2A2.4.  That section provides that an offense involving obstructing or impeding officers has a base offense level of ten. U.S.S.G. § 2A2.4(a). | 10 |
| **Victim Related Adjustment:** None | 0 |
| **Adjustment for Role in the Offense:** None | 0 |
| **Adjustment for Obstruction of Justice:** None | 0 |
| **Adjusted Offense Level (Subtotal):** | 10 |
| **Chapter Four Enhancement:** None | 0 |
| **Acceptance of Responsibility:** None | 0 |
| **Total** | 10 |

**Counts Three and Four: 40 U.S.C. § 5104(e)(2)(D) and (G)—disorderly and disruptive conduct in a Capitol building and parading, demonstrating, and picketing in a Capitol building**

Pursuant to U.S.S.G. § 1B1.9, the Sentencing Guidelines do not apply to any count of conviction that is a Class B or C misdemeanor or infraction.

B.  Grouping Analysis

Under U.S.S.G. § 3D1.2(a) through (c), "closely related counts" group.  Here, Counts One and Two are grouped ("Group One") because they involve the same victim (Congress) and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.  U.S.S.G. § 3D1.2(b).  Group One has an offense level of 10 because Count Two, which has the higher offense level of Counts One and Two, has an offense level of 10.

C.  Guidelines Range

Rhine has no criminal convictions and, accordingly, is in criminal history category I. Based on a total offense level of 10 and a criminal-history category of I, Rhine's Guidelines range is 6 to 12 months of imprisonment.

D.  The Final PSR's Guidelines Computation Is Incorrect

In the draft PSR, the Probation Office correctly determined that the most appropriate guideline for Count Two is § 2A2.4(a) (obstructing or impeding officers), for a total offense level of 10 and an advisory Guidelines range of 6 to 12 months of imprisonment.  *See* ECF No. 109 at ¶¶ 22-39, 42, 85.  In the final PSR, however, the Probation Office sustained Rhine's objection to the application of § 2A2.4(a) for Count Two, stating that "no information has been presented that the defendant obstructed, impeded, or assaulted law enforcement officers."  ECF No. 112 at p. 22.  The final PSR instead applies the "trespass" guideline (§ 2B2.3) to Count Two, *id.* at ¶ 27; leaves Rhine's possession of dangerous weapons, which is relevant to the applicability of the two-level enhancement under § 2B2.3(b)(2), unresolved, *id.* at pp. 22-23; and computes a total offense level of 6, for an advisory Guidelines range of 0 to 6 months of imprisonment, *id.* at ¶¶ 31-35, 89.  The final PSR's Guidelines computation is incorrect and,

indeed, inconsistent with the Probation Office's determination of the same issue in several other January 6 cases.

### 1.   The Base Offense Level for Count Two is 10 under U.S.S.G. § 2A2.4

The Sentencing Guidelines provide that a defendant convicted of an 18 U.S.C. § 1752 offense is subject to either U.S.S.G. § 2A2.4, which is titled "Obstructing or Impeding Officers," or U.S.S.G. § 2B2.3, which is entitled "Trespass." *See* U.S.S.G., App. A.  If more than one Guidelines provision may apply to a particular offense, the court should "use the guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted." U.S.S.G. § 1B1.2 n.1.   The "most appropriate" of the two potentially applicable guideline provisions is the one that best reflects the "offense conduct charged" in the count of conviction, based on a consideration of the elements of the offense.   U.S.S.G. § 1B1.2 n.1; *accord id.* § 1B1.2(a).

a.   Under this standard, the most appropriate guideline for a Section 1752(a)(2) offense is that found in U.S.S.G. § 2A2.4.   Section 1752(a)(2) criminalizes "engag[ing] in disorderly or disruptive conduct" that "in fact, impedes or disrupts the orderly conduct of Government business or official functions."   18 U.S.C. § 1752(a)(2).   As noted above, Section 2A2.4 is entitled "Obstructing or Impeding Officers," a title that parallels Section 1752(a)(2)'s requirement that the defendant have "in fact" "impede[d] or disrupt[ed] . . . Government business or official functions" undertaken by government officials.   *See* 18 U.S.C. § 1752(a)(2) and U.S.S.G. § 2A2.4.

The contrast with Section 1752(a)(2)'s neighboring provision, Section 1752(a)(1), makes even clearer that Section 2A2.4, not 2B2.3, is the appropriate guidelines provision.   Section 1752(a)(1) criminalizes merely "knowingly enter[ing] or remain[ing] in any restricted building

or grounds without lawful authority"—functionally, illegal trespass on Capitol grounds. 18 U.S.C. § 1752(a)(1).  The most appropriate guidelines provision for that offense is thus plainly Section 2B2.3, which covers "Trespass."[2]  But an offense like Section 1752(a)(2), which requires that the defendant both have engaged in disorderly or disruptive conduct and in fact have impeded government officials conducting official business, is not captured by a mere "Trespass" guideline.  It does, however, correspond closely to an "Obstructing or Impeding Officers" guideline.

Moreover, even if one assumed that Section 2A2.4 does not *perfectly* reflect the offense conduct of a Section 1752(a)(2) offense, that does not mean that Section 2B2.3 applies.  There is no default rule favoring the more lenient guidelines provision.  Instead, the only question under the guidelines is which of the two guidelines provisions better captures—even if only slightly better—the offense conduct.  And here, a guidelines provision for "Obstructing or Impeding Officers" clearly is closer to reflecting the offense conduct (disorderly and disruptive conduct that impeded government officials) than a Guidelines provision for "Trespass," which does not reflect disorderly or disruptive conduct, or interference with government officials, at all.

Finally, although the "most appropriate" guideline should be determined only by the "offense conduct charged"—that is, the elements of the Section 1752(a)(2) offense—the facts of this case also favor application of Section 2A2.4.  In this case, there is at least one identifiable officer whose official functions were impeded by Rhine's presence and conduct in the Capitol Building: Officer Jeffrey Abbott, who testified at Rhine's trial.  As noted, Rhine penetrated as deep into the Capitol Building as the hallway outside the third-floor Gallery, in close proximity of the area used by members of Congress to conduct the Joint Session.  As a result of Rhine's

---

[2] Indeed, the PSRs in cases involving Section 1752(a)(1) offenses appear to have overwhelmingly applied U.S.S.G. § 2B2.3 to that offense.

presence in that sensitive area at a sensitive juncture, police officers ordered him to the ground and detained him.  Officer Abbott, who had reported to the area in response to a report that shots had been fired, was then directed to search Rhine and, after he found two folding knives and a container of pepper spray, to handcuff Rhine and escort him to the Rotunda Door area.  *See* Trial Tr. 334-355 (4/22/23).  Rhine's presence and conduct therefore squarely diverted Capitol Police officers' resources—and Officer Abbott's time and attention in particular—from other pressing law-enforcement needs in the midst of a riot.

It appears that in several other PSRs in separate cases, the Probation Office has agreed with the United States that Section 2A2.4 and its base offense level of 10 is the appropriate guideline for convictions under Section 1752(a)(2).  *See, e.g.*, *United States v. Cramer*, No. 22-cr-339-RDM, Dkt. 48 at 13 (sentencing memorandum setting forth PSR calculations); *United States v. Vargas Santos*, No. 21-cr-47-RDM, Dkt. 79 at 14-15 (same); *United States v. Simon*, No. 21-cr-346-BAH, Dkt. 59 at 20 (same); *United States v. Bromley*, No. 21-cr-250-PLF, Dkt. 42 at 18 (same); *United States v. LaRocca*, et al., 21-cr-317-TSC, Dkt. 62 at 12 (same); *United States v. Baggott*, 21-cr-411-APM, Dkt. 67 at 17-18 (same); *United States v. Sidorski*, 21-cr-48-ABJ, Dkt. 42 at 19-20 (same); *United States v. Ayres*, 21-cr-156-JDB, Dkt. 61 at 6-7 (same).  And judges have overwhelmingly applied Section 2A2.4 in those cases: Judge Moss in *Cramer* and *Vargas Santos*; Judge Howell in *Simon*; Judge Friedman in *Bromley*; Judge Chutkan in

*LaRocca*; Judge Berman Jackson in *Sidorski*;[3] Judge Mehta in *Baggott*; and Judge Bates in

*Ayres*.[4]  The same result should apply in this case.

> ### 2.   Rhine Possessed At Least Two Dangerous Weapons in Committing His Crimes (U.S.S.G. § 2B2.3(b)(2))

To the extent the Court determines that Section 2B2.3 provides the appropriate guideline

for Count Two, it should then apply a two-level enhancement under U.S.S.G. § 2B2.3(b)(2) to

reflect the fact that Rhine's offense involved the possession of dangerous weapons.  Section

2B2.3(b)(2) directs courts to increase the offense level by 2 levels "[i]f a dangerous weapon

(including a firearm) was possessed."  The term "dangerous weapon," in turn, is defined to

include any "instrument capable of inflicting death or serious bodily injury."  U.S.S.G. § 1B1.1

n.1(E), § 2B2.3 n.1 (incorporating definition of "dangerous weapon" from U.S.S.G. § 1B1.1

commentary).  Here, Officer Abbott testified at trial that he seized from Rhine two "curved" (or

"Karambit"-style) "folding knives," with "about a 3-inch blade, maybe a little bit less," as well

as a container of pepper spray.  Trial Tr. 341-342 (4/21/23).  Plainly, curved folding knives with

blades of approximately 3 inches are "instrument[s] capable of inflicting death or serious bodily

injury."  U.S.S.G. § 1B1.1 n.1(E).  Accordingly, if the Court determines that Section 2B2.3

---

[3] Judge Berman Jackson applied Section 2A2.4 because the parties agreed to it and the case involved obstruction of a law enforcement officer.  She did not endorse application of Section 2A2.4 in all cases involving convictions under 18 U.S.C. § 1752(a)(2).

[4] The exception appears to be *United States v. Brodnax*, 21-cr-350-PLF, where Judge Friedman found that Brodnax's conviction under 18 U.S.C. § 1752(a)(2) triggered application of U.S.S.G. § 2B2.3, not U.S.S.G. § 2A2.4.  But Judge Friedman drew support for that conclusion from two cases—*United States v. Montanez*, 36 F.4th 824 (8th Cir. 2022), and *United States v. Duran*, 891 F. Supp. 629 (D.D.C. 1995)—that did not involve 18 U.S.C. § 1752(a)(2) and are distinguishable on that basis.  *See Montanez*, 36 F.4th at 827 (concluding, after "[g]iving due deference" to the district court in that case, that U.S.S.G. § 2A2.4 was the most analogous guideline for a violation of 18 U.S.C. § 231(a)(3)); *Duran*, 891 F. Supp. at 634 (concluding that U.S.S.G. § 2A2.4, and not U.S.S.G. § 2A2.2 (aggravated assault), was the appropriate guideline for a violation of 18 U.S.C. § 111(a) and (b) because the defendant's conduct in that case did not involve a deliberate attempt to harm a Secret Service agent).

provides the appropriate guideline for both Counts One *and* Two, it should then apply a two-level enhancement under U.S.S.G. § 2B2.3(b)(2), resulting in a total offense level of 8.

## V.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence.  In this case, as described below, the Section 3553(a) factors weigh in favor of one year of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).  The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021).  While assessing Rhine's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.  Notably, for a misdemeanor defendant like Rhine, the absence of violent or destructive acts is not a mitigating factor.  Had Rhine engaged in such conduct, he would have faced additional criminal charges.

As noted above, several factors underscore the gravity of Rhine's conduct on January 6. *First*, Rhine's own words on the steps of the Capitol on January 6 demonstrate that he acted with the specific intent of preventing Congress from certifying the Electoral College vote.  Again, Rhine declared, "It is time for us to take this and to take it back.  … We are sick and tired of the cheating.  We are here to stop the steal."  *Second*, Rhine joined the first wave of rioters to enter the Capitol through the Upper House Door, less than 30 seconds after other rioters first breached that door from the inside.  *Third*, Rhine carried multiple dangerous weapons into the Capitol: two

pocket-size folding knives and a canister of pepper spray. *Fourth*, once inside the Capitol Building, Rhine did not limit himself to passively demonstrating. He immediately zeroed in on the House Chamber and, after that, on the House Gallery—two of the most sensitive locations in the entire Capitol complex that day. *Fifth*, when presented with the opportunity, Rhine also violated a Congressional committee's office space, ignoring the sign affixed immediately above that office's door. *Sixth*, Rhine left the Capitol Building only after Capitol Police officers detained him, escorted him back downstairs to the Rotunda Door lobby, and directed him to leave. These factors place Rhine's conduct on January 6 at the aggravated end of the spectrum for defendants convicted of misdemeanor offenses.

On the other side of the scale, at trial, Rhine made much of the fact that, at one point, he made passing reference to other rioters that they should not break or damage the Capitol Building because "[t]his is a sacred place." But even that statement is of minimal (if any) mitigating value. At the threshold, as already noted, the absence of violent or destructive acts should never be viewed as mitigating. Rather, when such conduct is present, its *presence* becomes an aggravating factor and, indeed, ordinarily the basis for additional, even more serious charges. More fundamentally, Rhine's passing reminder does not materially change the culpability calculus. The reason is apparent: a rioter cannot, by paying lip service to non-violence, diminish his own responsibility in creating the mob-like conditions that permit violent rioters to act unchallenged in the first place. Much less do such passing statements meaningfully outweigh the many other aggravating factors present in this case. In short, the nature and the circumstances of this offense establish the clear need for a substantial period of incarceration in this case.

**B.  The History and Characteristics of Rhine**

Rhine, who is 54 years old, served in the United States Navy between 1992 and 2000. While in the Navy, Rhine worked as a Submarine Nuclear Propulsion Plant Operator.  PSR at ¶¶ 66-67.  More recently, Rhine has worked as an accountant, ultimately establishing his own firm and serving clients in several countries.  *Id.* at ¶¶ 71-72.

Rhine's personal and professional background aggravates his culpability in connection with January 6, 2021. Having seen other rioters breach the barricades near the East Plaza and having concluded, based on his own personal observations, that the police were "doing some pepper spraying to keep people out of the building," Rhine had no excuse for persevering in the takeover of the Capitol on January 6.  He cannot blame his poor judgment on lack of maturity, on naivety, or on social isolation during the COVID-19 pandemic.  Nor was Rhine's decision to join a violent riot on January 6 a spur-of-the-moment decision.  Rhine traveled to Washington, D.C. from Washington State, a substantial journey that gave Rhine ample time and opportunity to reflect on what he might encounter in Washington, D.C.  Yet, despite all those opportunities for better judgment and despite all his life experiences, Rhine settled on the illegal choice.

Rhine chose to ignore unmistakable indications that breaching the restricted perimeter, let alone the Capitol Building, was unlawful. Those unmistakable indications included, as noted, Rhine's own eyewitness knowledge that the police were pepper spraying rioters to keep them out of the Capitol Building.  Undeterred, Rhine chose to enter the Capitol through the Upper House Door only moments after it was first breached.  Rhine also chose to bring into the Capitol two folding knives and a container of pepper spray.  Rhine chose to zero in on the House Chamber and the House Gallery.  Rhine chose to invade the workspace of the House Appropriation Committee.  And Rhine chose to boast about the dark motive behind his illegal actions: "It is

time for us to take this and to take it back. … We are sick and tired of the cheating.  We are here to stop the steal."

Rhine's prior military service renders these choices particularly troubling.  As a former seaman responsible for operating nuclear-powered ships, Rhine was uniquely positioned to appreciate the risks posed by the mob's intrusion into a sensitive government building.  It is, therefore, particularly disturbing that, on January 6, Rhine chose to ignore the fact that other rioters had unlawfully breached the barricades on the East Side and that some had been pepper sprayed by the police.  Rhine's past work on military installations also makes it disturbing that he chose to ignore the obvious illegality of entering a place as sensitive as the United States Capitol while carrying two folding knives and a container of pepper spray in his belongings.  More fundamentally, it is troubling that Rhine, who previously served in the Armed Forces, would betray the Military's core values—including the protection of the Nation's democratic institutions—and participate in an attack on our democracy.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

19

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).  General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a substantial term of incarceration.  Rhine's own recorded words underscore the need for specific deterrence.  As he stood immediately outside the Capitol, Rhine made clear his disturbing agenda in joining the riot: "It is time for us to take this and to take it back. … We are here to stop the steal."  Rhine also stated that, in his world view, joining the January 6 attack was akin to "defend[ing] against all enemies foreign and domestic."  He declared that, while "[h]opefully, we can keep people peaceful," he had a non-negotiable right to invade the Capitol: "[T]his is our building.  We own this building.  We are not trespassing."

And, along the way, Rhine falsely claimed that "[t]he Capitol Police have opened up the barriers to allow the patriot protesters to get up to the building itself."

Rhine, in other words, participated in the January 6 attack based on an apocalyptic, conspiratorial view of the political process and the conviction that he was entitled to take things in his own hands to correct a perceived electoral injustice.  Nothing Rhine has done or said since January 6 suggests that he has abandoned that dangerous mindset, much less that he is remorseful for what he did on January 6.  A meaningful deprivation of liberty will hopefully underscore for Rhine the difference between political advocacy and violent rioting, as well the criminal nature of his conduct in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5]  This Court must sentence Rhine based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases.  To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES."  The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).  In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  18 U.S.C. § 3553(a).  After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009); *see also id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)").  If

anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31-FYP, 8/26/22 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

While no previously sentenced case contains the same aggravating factors present here (and the government submits that there are in fact no mitigating factors in this case), the Court may consider, for reference, the sentence imposed in *United States v. Alford*, No. 21-cr-263-TSC. Like Rhine, Alford was charged with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). Like Rhine, Alford was found guilty and convicted on all counts after a five-day jury trial. Like Rhine, Alford repeatedly walked past obvious signs that the Capitol building and grounds were restricted until he found an unobstructed entrance into the Capitol building. Like Rhine, Alford entered the Capitol through a door that other rioters had opened from the inside only moments earlier, knowing that they had opened it from the inside—Alford through the Rotunda Door and Rhine though the Upper House Door. Finally, like Rhine, Alford progressed as deep into the Capitol Building as he could, until he was forced by police officers toward the exit.

One distinction between the cases is that, whereas Alford used social media to celebrate his participation in the riot and spread disinformation about the riot, Rhine does not appear to have maintained a comparable social-media footprint. But Rhine still seized on his own opportunity to publicly celebrate the riot, spread lies about the Capitol Police's actions, and disseminate false information about the January 6 attack when he gave a recorded interview near the East House Portico—an interview that later became available on the internet. Furthermore,

Rhine's conduct was more egregious than Alford's in several significant respects. Unlike Alford, Rhine carried dangerous weapons (two knives and a container of pepper spray) into the Capitol Building. Unlike Alford, Rhine tried to open a door to the House Gallery, around the time when Members of Congress were sheltering in place. And unlike Alford, Rhine made his way into a Congressional committee's office, ignoring a sign that designated that workspace as such. For his offenses on January 6, Alford was sentenced to 12 months of incarceration. The same sentence is both necessary and appropriate on the comparable facts of this case.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.   Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C.

Cir. 2011).  First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."  *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).  Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA.  *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii).  *See Fair*, 699 F.3d at 512 (citation omitted). Because Rhine was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664.  *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA).  Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury.  *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b).  Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim.  *United States v. Bikundi*, 926 F.3d 761,

791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).  The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[6]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for [his or her] individual contribution to the victims' total losses.  *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"); *see also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

---

[6] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

More specifically, the Court should require Rhine to pay $500 in restitution. This amount fairly reflects Rhine's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, $500 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Rhine to one year of incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution, in addition to the applicable mandatory assessments. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his conduct.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:    */s/ Francesco Valentini*
Francesco Valentini
D.C. Bar No. 986769
Trial Attorney
United States Department of Justice, Criminal Division
Detailed to the D.C. United States Attorney's Office
601 D Street NW
Washington, D.C.  20530
(202) 598-2337
francesco.valentini@usdoj.gov

*/s/ Kelly Moran*
Kelly Moran
Assistant United States Attorney
NY Bar No. 5776471
601 D Street NW
Washington, D.C. 20530
(202) 252-2407
kmoran1@usa.usdoj.gov