1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

DAVID CHARLES RHINE,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)

Criminal No. 21-CR-0687 (RC)

MR. RHINE'S RESPONSE TO THE
GOVERNMENT'S SENTENCING
MEMORANDUM

The Court should reject the government's sentencing recommendation because it relies on incorrect Guidelines, unsupported claims, and improper consideration of the conduct of other people. The government asks the Court to find Mr. Rhine's conduct "aggravated" without any support in the Guidelines, 18 U.S.C. § 3553, or the record in this case for its contentions. The Court should ignore these arguments.

## I.  ARGUMENT

Mr. Rhine asks this Court to reject arguments by the government that do not comport with the law or the evidence. First, the government advocates the use of incorrect Guidelines, which Probation correctly rejected. Second, the government asks the Court to find facts for purposes of sentencing that are unsupported by the evidence. Third, the government asks the Court to punish Mr. Rhine for the conduct of other people, even though Mr. Rhine had no knowledge, coordination, nor control over those people at relevant times. And finally, the government seeks a restitution order but has submitted no evidence into the record to support its claim.

RESPONSE TO GOV'T SENTENCING
MEMORANDUM
(*United States v. Rhine*, 21-CR-687 (RC)) - 1

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**A.      The government's claimed Guidelines range is incorrect.**

The government advocates the application of a higher guideline without citation to relevant interpretation of the guideline in question. *See* Dkt. No. 115 at 9–15. Specifically, the government advocates the application of U.S.S.G. § 2A2.4 to Count 2—a disorderly conduct count. But the government does not once cite to any relevant interpretation of the § 2A2.4 obstructing an officer guideline or the correct trespass guideline, U.S.S.G. § 2B2.3. *See id*. The government's arguments are unpersuasive and should be rejected.

The government argues the Court should only compare the offense charged in count 2—18 U.S.C. § 1752(a)(2) (disorderly conduct in a restricted area)—to the offense charged in count 1—18 U.S.C. § 1752(a)(1) (unlawfully entering or remaining in a restricted area). *See id*. at 12–13. However, the government ignores other offenses defined in § 1752, including one specifically related to acts of violence in a restricted area. *See* 18 U.S.C. § 1752(a)(4). As previously briefed by Mr. Rhine, this comparison does not weigh in favor of application of the obstructing an officer guideline. Rather, examination of the *guidelines* in question affirms that U.S.S.G. § 2B2.3 is the best fit. *See* Dkt. No. 110 at 5–6.

The government, citing to its own memoranda, further claims that Pre-Sentence Reports (PSRs) in other cases have used the higher guideline. *See* Dkt. No. 115 at 14–15. What the government neglects to mention is that all but one of those cases included plea agreements where the parties *stipulated* to the use of the § 2A2.4 guideline long before sentencing. *See United States v. Cramer*, 22-CR-0339-RDM at Dkt. No. 36 at 3; *United States v. Simon*, 21-CR-00346 at Dkt. No. 51 at 3; *United States v. Bromley*, 21-CR-0250-PLF at Dkt. No. 37 at 3; *United States v. LaRocca*, 21-CR-0317-TSC-1 at Dkt. No. 48 at 3; *United States v. Baggott*, 21-CR-0411-APM-2 at Dkt. No. 49 at 3;

RESPONSE TO GOV'T SENTENCING
MEMORANDUM
(*United States v. Rhine*, 21-CR-687 (RC)) - 2

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1  *United States v. Sidorski*, 21-CR-0048-ABJ at Dkt. No. 35 at 3; *United States v. Ayres*,

2  21-cr-00156-JDB-1 at Dkt. No. 53 at 3.

3      The government also fails to detail the stipulated facts of those cases that would

4  support the agreement to the obstructing an officer guideline. For example, in *United*

5  *States v. Eric Cramer*, 22-CR-0339-RDM, the parties stipulated that Mr. Cramer was

6  part of a physical confrontation with police officers on the West side of the Capitol

7  Building during which he attempted to take an officer's baton and did not release it

8  until another officer had to physically pull it back (the facts further indicate that Mr.

9  Cramer may have successfully stolen the baton). *See id.* at Dkt. No. 37 at 3–4. The

10  government further argued in that case that Mr. Cramer also grabbed a police officer's

11  arm while the officer struggled against physical force from multiple people, that he

12  participated in a violent physical breach, and that he lied to investigators. *See id.* at Dkt.

13  No. 48.

14      Similarly in *United States v. Baggott*, 21-CR-0411-APM, the parties stipulated

15  that Mr. Baggott was among the first group of people to enter the Capitol building

16  through broken windows. Furthermore, the parties agreed that Mr. Baggott was part of

17  a group pushing against a police line using their batons to try to clear the area. During

18  this physical struggle, Mr. Baggott grabbed an officer's baton. *See id.* at Dkt. No. 50 at

19  3–4. Likewise, in *United States v. Sidorski*, the parties stipulated that Mr. Sidorski

20  observed civilians pushing and fighting police officers and himself entered the

21  confrontation, placing his hand on a police officer's shoulder. *See* 21-CR-0048-ABJ at

22  Dkt. No. 36 at 4–5.[1]

23

24  [1] The only case cited by the government where the parties did *not* stipulate to the §

25  2A2.4 guideline was *United States v. Vargas*, 21-CR-0047-RDM. In that case, trial
evidence indicated that Mr. Vargas personally opened a gate to allow himself and
others to move into a cordoned off area. After which, Mr. Vargas climbed up

26  scaffolding to a platform where he encouraged a large crowd to chant—the crowd soon
began physically fighting police officers. In multiple different locations, *Mr. Vargas*

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

It is unsurprising that Judges applied § 2A2.4 in these cases, where the parties *stipulated* to the use of this guideline and to facts establishing actual obstruction of law enforcement officers. Indeed, the Guidelines command "in the case of a plea agreement (written or made orally on the record) containing a stipulation that specifically establishes a more serious offense than the offense of conviction, determine the offense guideline section in Chapter Two applicable to the stipulated offense." U.S.S.G. § 1B1.2. Nonetheless, as the government concedes, the Court in *United States v. Ayres* found the § 2A2.4 guideline applicable in that case particularly, but rejected the proposition that it applies to all § 1752(a)(2) convictions.

In *United States v. Brodnax*, Honorable Judge Paul L. Friedman held that § 2B2.3 was the appropriate guideline for a § 1752(a)(2) conviction on more aggravated facts than those present here. *See generally* 21-CR-0411 at Dkt. No. 61. Mr. Brodnax was convicted of the same four charges as Mr. Rhine. And it was undisputed that Mr. Brodnax engaged in conduct similar to Mr. Rhine's, but under more aggravated circumstances. The parties there agreed that Mr. Brodnax entered the Capitol Building through a door next to a broken window that other people were climbing through. Mr.

---

*was part of dense crowds who physically pushed and fought police lines*. Mr. Vargas ultimately pushed his way through one such line to enter the Rotunda. *See id.* at Dkt. No. 79 at 2–10. And when a police officer specifically tried to detain Mr. Vargas, he physically resisted:

> Metropolitan Police Officer Lee Lepe's body worn camera footage in Government Exhibit 306 shows multiple officers, including Officer Lepe, holding onto Vargas's clothing and tactical vest. During this encounter, Officer Lepe ordered Vargas to get on the ground. Vargas ignored this command, and instead, after Officer Lepe freed his grip on him, went off to the side and recorded a "selfie" video of himself exclaiming that "we took over this motherfucker, we took over this Capitol."

*Id.* at Dkt. No. 79 at 10. This evidence includes actual resisting and physically obstructing law enforcement. It stands in stark contrast to the evidence here, in Mr. Rhine's case.

RESPONSE TO GOV'T SENTENCING
MEMORANDUM
(*United States v. Rhine*, 21-CR-687 (RC)) - 4

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Brodnax spent several minutes in famous rooms in the Capitol, crossing over velvet rope barriers to explore further and take pictures. Mr. Brodnax was then part of a group that pushed past a police line inside the building, though he remained several feet back from the front of the confrontation and did not make physical contact with any police officer. Mr. Brodnax then stood with the group outside a locked door while others shouted, "Break it down!" Mr. Brodnax did not join in the chant. Mr. Brodnax remained in the building for over an hour before leaving. *See id*. at Dkt. No. 32 at 3–4. After considering the issue thoroughly, Judge Friedman concluded that § 2B2.3 was the correct guideline for Mr. Brodnax's § 1752(a)(2) conviction. *See* Dkt. No. 61.

So too here, the Court should apply the U.S.S.C. § 2B2.3 guideline to Count 2. Probation was correct to sustain Mr. Rhine's objection to the draft PSR, *see* Dkt. No. 110 at 4–6, and correctly concluded that the evidence and charge did not support the § 2A2.4 guideline. *See* Dkt. No. 112 at 8–9.

The government makes a single contorted argument to suggest that the facts of this case warrant application of the § 2A2.4 guideline:

> In this case, there is at least one identifiable officer whose official functions were impeded by Rhine's presence and conduct in the Capitol Building: Officer Jeffrey Abbott, who testified at Rhine's trial. As noted, Rhine penetrated as deep into the Capitol Building as the hallway outside the third-floor Gallery, in close proximity of the area used by members of Congress to conduct the Joint Session. As a result of Rhine's presence in that sensitive area at a sensitive juncture, police officers ordered him to the ground and detained him. Officer Abbott, who had reported to the area in response to a report that shots had been fired, was then directed to search Rhine and, after he found two folding knives and a container of pepper spray, to handcuff Rhine and escort him to the Rotunda Door area. See Trial Tr. 334-355 (4/22/23). ***Rhine's presence and conduct therefore squarely diverted Capitol Police officers' resources—and Officer Abbott's time and attention in particular—from other pressing law-enforcement needs in the midst of a riot.***

Dkt. No. 115 at 13–14 (emphasis added). Essentially, the government argues that Mr. Rhine obstructed law enforcement because, even though he complied entirely with directives, Officer Abbott spent time searching and detaining him. This argument strains credulity. If accepted, would mean that people "obstruct" law enforcement any time that law enforcement chooses to search or detain them. A person does not obstruct law enforcement or interfere with the prosecution of a crime any time law enforcement expends time to detain or investigate them. Rather, as previously briefed, obstruction requires intentional resistance to or interference with law enforcement doing its job. *See* Dkt. No. 110 at 4–6.

The Court should apply guideline U.S.S.G. § 2B2.3, not U.S.S.G. § 2A2.4 to Count 2.

**B.    The government claims facts that are unsupported by the record.**

The government asks this Court to sentence Mr. Rhine to the *statutory maximum* allowable sentence by claiming facts that are not supported by the evidence.[2] The government incorrectly asserts that Mr. Rhine lied to an unknown videographer, implies that Mr. Rhine intended to break into the House Chamber, claims that he tried to open a door to the House Gallery, alleges that he entered a Congressional Office, and argues that Mr. Rhine had dangerous weapons. *See generally* Dkt. No. 115. None of these claims are supported by the evidence. And none indicate aggravating conduct, as the government claims.

First, the government claims that Mr. Rhine "falsely claimed" that police had moved barriers to allow protestors to approach the Capitol Building in a video of

---

[2] Even the claims made by the government, had they been proven, would not support a sentence of the *statutory maximum* in custody. Neither 18 U.S.C. § 3553, the Guidelines, nor common sense suggest such a sentence even if the government's claims were established.

RESPONSE TO GOV'T SENTENCING
MEMORANDUM
(*United States v. Rhine*, 21-CR-687 (RC)) - 6

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1   unknown origin.[3] Dkt. No. 115 at 2. However, the evidence contradicts this

2   characterization. As demonstrated at trial, Mr. Rhine was not in the vicinity of the area

3   where barriers were removed on the East side of the Capitol Building. All he could see

4   from his vantage point was civilians walking up to the building and police moving their

5   position. Indeed, for 20 minutes police milled peacefully with protestors in front of Mr.

6   Rhine as protestors moved up to the Capitol Building. *See generally* Testimony of

7   Inspector Lloyd; Trial Exs. G112, D112-B, D112-C, D112-D, D112-E, D130, D130-A,

8   D130-B, D130-C, D131, D131-A, D131-B, D131-C, D512. There is no evidence

9   whatsoever that Mr. Rhine made any intentional lies. As the government also chose to

10  emphasize, the video in question depicts Mr. Rhine narrating his immediate

11  observations faithfully, *see* Trial Ex. G115.1. The government provides no support for

12  its contention that Mr. Rhine knowingly lied in the video in question. The Court should

13  reject the government's insinuation that Mr. Rhine lied about his observations.

14          Second, the government suggests that Mr. Rhine intended to break into the house

15  chamber, *see, e.g.*, Dkt. No. 115 at 6 ("After the rioters' attempts to enter the House

16  Chamber proved unsuccessful, Rhine walked up a nearby set of stairs . . ."), 17 ("He

17  immediately zeroed in on the House Chamber"), 18. The evidence shows precisely the

18  opposite. The video evidence demonstrates that Mr. Rhine made no attempt to enter the

19  House Chamber but rather was briefly near a door, after he tried to prevent others from

20  opening it. He in no way "zeroed in" on the door or made any attempt whatsoever to

21  open it. *See* Trial Exhibits G116, G117. As the government reluctantly acknowledges,

22  Mr. Rhine actually tried to prevent others from breaking through that door. When other

23  people tried to kick the door, Mr. Rhine shouted at them: "Hey, hey, don't break the

24

25  ───────────────

26  [3] As previously argued, the content of the video is unreliable given the lack of
    foundation regarding its creation, purpose, and evident manipulation. *See* Dkt. Nos. 68,
    84.

doorway. This is a sacred place. Do not damage this building." G116. The Court should reject the government's argument that Mr. Rhine intended to break through this door.

Third, the government wrongly claims that Mr. Rhine tried to break open a door to the House Gallery. *See* Dkt. No. 115 at 3 ("Rhine tried (unsuccessfully) to open one of the doors leading to the Gallery itself."), 6, 7, 17, 18, 24 ("Rhine tried to open a door to the House Gallery"). This argument should be rejected for two reasons. First, the evidence does *not* show that Mr. Rhine tried to open a door to the House Gallery. Video indicates he approached a door and quickly turned away. *See* Trial Exhibit G104. There is no evidence of any attempt to break through the door. And second, evidence confirmed that under ordinary circumstances members of the public can watch Congressional proceedings from precisely that gallery. *See* Testimony of Inspector Lloyd. While high-ranking government and police officials may have known that some Members of Congress were seated in the gallery on that date, *see id*., there is no evidence that Mr. Rhine would have known this.

Fourth, the government errantly asserts that Mr. Rhine entered a private Congressional Office. *See* Dkt. No. 115 at 3, 7, 8. This is not so. Rather, surveillance video indicates that Mr. Rhine stood in a doorway. A small wooden sign above the doorway appeared to say "Approp" in faint lettering. *See* Trial Exhibit G111. Yet a neon exit sign was more prominently visible beside the door. *See id*. Furthermore, the surveillance video shows that the door in question remains open for the very short time between Mr. Rhine passing behind the door and again emerging from it. *See id*. In addition, the government's own witness testified that the door led to a type of lobby that would have been open to the public under normal circumstances. *See* Testimony of Inspector Lloyd. Far from indicating some invasion of private space, this video depicts a confused person trying to find an exit.

RESPONSE TO GOV'T SENTENCING
MEMORANDUM
(*United States v. Rhine*, 21-CR-687 (RC)) - 8

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Finally, the government has not demonstrated that Mr. Rhine possessed dangerous weapons. The government repeatedly claims and argues that Mr. Rhine possessed multiple dangerous weapons. *See* Dkt No. 115 at 2, 7, 10, 11, 15, 16, 24. But it fails to support these allegations with sufficient or reliable evidence. The government claims that Mr. Rhine "was carrying two pocket-size folding knives and a container of pepper spray." *Id.* at 8. As previously argued, the testimony in question does not reliably establish that Mr. Rhine actually possessed any such items, nor the nature or type of any items possessed. *See* Dkt. Nos. 38, 63, 77. Indeed, Officer Abbott affirmed he could not remember precisely where he recovered the alleged items and that he threw them away without photographing or otherwise recording their seizure, in contravention of department policy. *See* Dkt. No. 38; Testimony of Office Abbott. This testimony is not reliable enough to establish that Mr. Rhine possessed these items, nor the number and type.

Furthermore, without evidence to support its argument, the government argues that "[p]lainly, curved folding knives with blades of approximately 3 inches are "instrument[s] capable of inflicting death or serious bodily injury." U.S.S.G. § 1B1.1 n.1(E). This is not so. Officer Abbott also testified that he remembered the pocket knife being smaller than the palm of his hand and the pepper spray canister being very small—his understanding was the items were perfectly legal in the District of Columbia, but simply were not permitted inside the Capitol Building. *See* Testimony of Officer Abbott.

Multiple courts have recognized that the government must do more than baldly claim that an item is a dangerous weapon in order to sustain the Guidelines enhancement. The government carries the burden to establish a factual basis for a Guidelines enhancement. *See United States v. Burke*, 888 F.2d 862, 869 (D.C. Cir. 1989). It cannot do so on this record. For example, both the Eleventh Circuit and the

RESPONSE TO GOV'T SENTENCING
MEMORANDUM
(*United States v. Rhine*, 21-CR-687 (RC)) - 9

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Third Circuit have rejected government arguments that certain pepper spray canisters were dangerous weapons when the government presented information pertaining to the known brand of the pepper spray and claims about its effect (but did not, for example, actually do chemical tests or enlist a doctor's opinion). *See United States v. Harris*, 44 F.3d 1206, 1216 (3d Cir. 1995); *United States v. Perez*, 519 F. App'x 525, 528 (11th Cir. 2013). In both of those cases, the Courts correctly recognized that an item's ability to cause *some* injury and incapacitation was not enough to satisfy the Guidelines definition, requiring that the instrument be "capable of inflicting death or serious bodily injury[.]" U.S.S.G. § 1B1.1 (cmt. n.1(E)); *see id*.

Here too, the government claims that a 3-inch pocket knife "plainly" is capable of causing *death* or *serious bodily injury*, but submits no evidence to support this claim. Officer Abbott testified to zero examination of the items he seized, including no inspection of whether any pocket knife even had a functional or sharp blade. No medical professional or scientist opined about the capability of a small pocket knife of unknown sharpness or functionality to cause more than a bruise or easily treated laceration. And the government destroyed any evidence that could have been examined to reach any conclusions. The government has not and cannot demonstrate that Mr. Rhine had any dangerous weapon, as defined in the Guidelines. Therefore, the Court, like Probation, should not apply the two-level enhancement at § 2B2.3(b)(2).

The Court should reject the government's claimed facts that are not supported by record evidence.

### C.   The government improperly seeks to punish Mr. Rhine for other people's conduct.

The government argues that Mr. Rhine's own lack of engaging in any violence is not a mitigating factor because violence was committed by others, yet fails to acknowledge that Mr. Rhine did not personally witness any of the violence of which it

complains. *See* Dkt. No. 115 a 16–17. The government emphasizes repeatedly the great harm done by other people at the Capitol on January 6, 2021. The government argues that when bad conduct by others is present, "its *presence* becomes an aggravating factor and, indeed, ordinarily the basis for additional, even more serious charges." Dkt. No. 115 at 17 (emphasis in original). The government provides no legal support for this contention. And the only bad conduct the government identifies that Mr. Rhine actually witnessed was that of other people attempting to open a door—something he tried to stop. *See id.*

The Court should not accede to the government's pleas to hold Mr. Rhine responsible for the conduct of other people. It is clear from the evidence that Mr. Rhine had no coordination with others and certainly no control over others. The government's emphasis of violence done by other people is not relevant to sentencing. Rather, Mr. Rhine, like many others, first saw such violence on television, after the conduct charged here. Indeed, he is ashamed and remorseful about what he saw. *See* Ex. A. But Mr. Rhine saw none of that at the time of the charged conduct—he witnessed nobody assaulting police officers. And the only time he witnessed attempted property damage, he tried to stop it. Mr. Rhine cannot be punished for the actions of other people he had no knowledge of nor control over.

Furthermore, the government's attempts to punish Mr. Rhine more harshly than similarly situated people because of his prior military service is without merit. The government argues Mr. Rhine's history of serving his country is an aggravating factor, reasoning, "As a former seaman responsible for operating nuclear-powered ships, Rhine was uniquely positioned to appreciate the risks posed by the mob's intrusion into a sensitive government building. . . . More fundamentally, it is troubling that Rhine, who previously served in the Armed Forces, would betray the Military's core values— including the protection of the Nation's democratic institutions—and participate in an

RESPONSE TO GOV'T SENTENCING MEMORANDUM
(*United States v. Rhine*, 21-CR-687 (RC)) - 11

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

attack on our democracy." Dkt. No. 115 at 19. Mr. Rhine served honorably and was honorably discharged from the Navy. The government presents zero evidence that he received training in crowd control or ordinary law enforcement functions in that role. Rather, he primarily worked in the operation of a nuclear power plant. Mr. Rhine in no way invoked his military status, his standing as a veteran, nor any military training or access in the conduct charged here. There is no basis to increase Mr. Rhine's sentence because of his status as a veteran—to do so would be unjust.

And the government again imputes the intent of others for that of Mr. Rhine. Mr. Rhine never has and never would express disdain or opposition to democracy. He was not a powerful government official or political operative willfully seeking to subvert a democratic vote. *Cf. United States v. Trump, et. al.*, 23-cr-00257-TSC, at Dkt. No. 1. Mr. Rhine's honest belief at the time that further investigation of the election votes was needed is indicative of the sophisticated means that *others* used to promote this idea. *See id*. Rather, as the countless people who actually know Mr. Rhine attest, he values democracy, loves his country, and strives to do the right thing. *See* Dkt. No. 114 at Exs. B–L. The Court should reject the government's attempts to impute the purposes of others, or government counsel's assumptions, on Mr. Rhine.

### D. The government has not submitted evidence to support its claim for restitution.

The government carries the burden of presenting evidence to support any request for restitution. As Mr. Rhine previously briefed (and Probation agreed), restitution is allowed, but not mandatory, only for Counts 1 and 2. *See* 18 U.S.C. § 3663(a)(1) (allowing restitution for convictions for any offense under Title 18); *see also* 18 U.S.C. § 3663A(a)(1), (c) (not listing any statute of conviction here as one for which restitution would be mandatory). Restitution is only permitted if, and to the extent that, a person was "directly and proximately harmed as a result of the commission of an offense for

RESPONSE TO GOV'T SENTENCING
MEMORANDUM
(*United States v. Rhine*, 21-CR-687 (RC)) - 12

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1    which restitution may be ordered[.]" 18 U.S.C. § 3663(a)(2). The Court may not impose

2    restitution beyond the limits set by statute. *United States v. Papagno*, 639 F.3d 1093,

3    1096 (D.C. Cir. 2011). As Mr. Rhine previously briefed in more detail, the government

4    carries the burden of proving an identifiable victim who was directly and proximately

5    harmed by Mr. Rhine's offense conduct by a preponderance of the evidence. *See* 18

6    U.S.C. § 3664(e); Dkt. No. 110 at 1–4. And the government has conceded as much. *See*

7    Dkt. No. 115 at 25.

8         Nonetheless, the government requests a $500 restitution order without

9    submitting any evidence of who the identified victim is nor how Mr. Rhine's charged

10   conduct here directly and proximately harmed them. *See* Dkt. No. 115 at 26. The

11   government merely claims "Because the defendant in this case engaged in criminal

12   conduct in tandem with hundreds of other defendants charged in other January 6 cases,

13   and [his or her] criminal conduct was a 'proximate cause' of the victims' losses if not a

14   'cause in fact,' the Court has discretion to apportion restitution and hold the defendant

15   responsible for [his or her] individual contribution to the victims' total losses." *Id.*

16   (quoting *Paroline v. United States*, 572 U.S. 434, 458 (2014)). The government not

17   only fails to explain how Mr. Rhine's charged conduct "directly and proximately"

18   harmed a victim and who the victim was, 18 U.S.C. § 3663(a)(2), but also relies on

19   *Paroline* improperly. In fact, *Paroline* wrestled with the question of whether people

20   who merely *viewed* as opposed to *created* child pornography caused harm to the victim

21   for which restitution could be ordered. The Court determined they did, and provided

22   guidance for courts to determine the direct and proximate harm caused by such viewers.

23   The Court's guidance from *Paroline* is inapplicable and unnecessary here.

24        Rather, although the government has submitted no record evidence to support its

25   restitution claim, presumably it pertains to property damage and injuries caused by

26   people *other than* Mr. Rhine on January 6, 2021. The government has not pointed to

RESPONSE TO GOV'T SENTENCING
MEMORANDUM
(*United States v. Rhine*, 21-CR-687 (RC)) - 13

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Mr. Rhine's direct or proximate role in any of that harm. Therefore, the Court should impose no restitution order. For his part, Mr. Rhine is sincerely sorry he was at the Capitol at all on January 6, 2021. He hopes to make amends through community service.

## II.    CONCLUSION

The Court should not be swayed by the government's arguments that contradict the law, the evidence, and common sense. Instead, the Court should independently evaluate the evidence in this case in formulating a sentence that is sufficient but not more than necessary to achieve the goals of sentencing. *See* 18 U.S.C. § 3553(a).

DATED this 5th day of September 2023.

Respectfully submitted,

*s/ Rebecca Fish*
WA State Bar Number: 57488
Assistant Federal Public Defender
1331 Broadway, Suite 400
Tacoma, WA 98402
Phone: (253) 593-6710
Email: Becky_Fish@fd.org

Attorney for David Rhine