1
2
3
4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

5

6    UNITED STATES OF AMERICA,              )    Criminal No. 21-CR-0687 (RC)
                                            )
7            Plaintiff,                      )
                                            )    MR. RHINE'S MOTION FOR BOND
8         v.                                 )    PENDING APPEAL
                                            )
9    DAVID CHARLES RHINE,                    )
                                            )
10           Defendant.                      )
     _____ )

11        Pursuant to 18 U.S.C. §§ 3141(b) & 3143(b) and Fed. R. Crim. P. 46(c) &

12   38(b)(1), David Rhine respectfully moves this Court for release pending appeal and for

13   a stay of execution of his sentence. Mr. Rhine has no prior criminal history, no

14   violations while on pretrial release, and he plans to raise in his appeal three substantial

15   legal issues. Resolution of these substantial questions in Mr. Rhine's favor would

16   reverse the custodial sentence imposed in his case, if not his convictions themselves.

17   **I.    BACKGROUND**

18        On November 19, 2021, the government filed four charges against Mr. Rhine:

19   Entering and Remaining in a Restricted Building or Grounds under 18 U.S.C.

20   § 1752(a)(1) (Count 1), Disorderly and Disruptive Conduct in a Restricted Building or

21   Grounds under 18 U.S.C. § 1752(a)(2) (Count 2), Disorderly Conduct in a Capitol

22   Building under 40 U.S.C. § 5104(e)(2)(D) (Count 3), and Parading, Demonstrating, or

23   Picketing in a Capitol Building under 40 U.S.C. § 5104(e)(2)(G) (Count 4).

24        On April 24, 2023, following a jury trial, Mr. Rhine was convicted on all counts.

25   On September 11, 2023, Mr. Rhine was sentenced to a four-month term of incarceration

26   on all counts to run concurrently, followed by a one-year term of supervised release on

MOTION FOR BOND PENDING APPEAL
(*United States v. Rhine*, 21-CR-687 (RC)) - 1

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Counts 1 and 2 to also run concurrently, and a fine. The Court permitted Mr. Rhine to self-surrender on March 1, 2024, given his substantial work obligations.

## II.    ARGUMENT

The legal standard for release pending appeal is set forth in the Bail Reform Act. A court "shall order the release" of an individual pending appeal if it finds:

> (A)    by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released . . . ; and
>
> (B)    that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in –
>
> > (i)    reversal,
> > (ii)    an order for a new trial,
> > (iii)    a sentence that does not include a term of imprisonment, or
> > (iv)    a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

18 U.S.C. § 3143(b)(1). The D.C. Circuit has held that "a substantial question is 'a "close" question or one that very well could be decided the other way.'" *United States v. Perholtz*, 836 F.2d 554, 555 (D.C. Cir. 1987) (quoting numerous cases from sister Circuits).

Here, all the requirements for § 3143(b)(1)'s mandatory release pending appeal have been satisfied. Mr. Rhine does not pose a risk of flight or danger to the community. He is not appealing his conviction for the purpose of delay, but rather to raise three substantial legal questions that affect his constitutional rights. If successful, Mr. Rhine's appeal will result in reversal or vacation of his convictions, and reversal of his custodial sentence.

### A.    Mr. Rhine is not likely to flee, nor does he pose a danger to the community.

Prior to this case, Mr. Rhine had no criminal history. Pre-Sentence Report contained at Dkt. No. 112 [hereinafter "PSR"] at 9. Rather, Mr. Rhine has a strong

MOTION FOR BOND PENDING APPEAL
(*United States v. Rhine*, 21-CR-687 (RC)) - 2

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

record of public service and a long history as a contributing community member in Bremerton, Washington. Dkt. No. 114 at 3. Mr. Rhine served honorably for years in the Navy. PSR at 13. He has worked as an accountant since approximately 2006. PSR at 13–14. Furthermore, while on pretrial release for this case, Mr. Rhine did not incur any violations of court conditions. PSR at 4. Mr. Rhine has no history of violence nor of flight and can be trusted on bond while awaiting the result of his appeal.

**B.    The appeal raises substantial questions and therefore is not made for the purpose of delay.**

Mr. Rhine's appeal will raise multiple substantial questions. None are raised for purposes of delay, but rather are raised because they involve serious legal questions that impact Mr. Rhine's basic rights. First, Mr. Rhine will appeal instructions related to Counts 1 and 2 that errantly instructed the Jury that the government need *not* prove that Mr. Rhine knew that the Vice President was or would be visiting the relevant restricted area or that the area was restricted because of the Vice President's visit to convict him on these charges under 18 U.S.C. § 1752. Second, Mr. Rhine will appeal the denial of his Motion to Dismiss Counts 3 and 4 on the ground that these restrictions contained in 40 U.S.C. § 5104 are unconstitutionally overbroad in violation of the First Amendment and unconstitutionally vague in violation of due process and the First Amendment. Third, Mr. Rhine will appeal his custodial sentence as improper punishment for his exercise of his Sixth Amendment rights.

**1.    The Jury was mis-instructed that Counts 1 and 2 under 18 U.S.C. § 1752 do *not* require the government to prove knowledge of the visit of a Secret Service protectee or a causal nexus between the restricted area and the visit of the protectee.**

Mr. Rhine's appeal will challenge the jury instructions as to Counts 1 and 2. There were two reversible errors in the instructions. First, in response to a question, the Court errantly instructed the Jury that the government need *not* prove that Mr. Rhine knew that a Secret Service protectee was visiting the restricted area. Second, also in

MOTION FOR BOND PENDING APPEAL
(*United States v. Rhine*, 21-CR-687 (RC)) - 3

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1  response to a question, the Court incorrectly instructed the Jury that the government
2  need **not** prove any causal nexus between the visit of a Secret Service protectee and the
3  restriction of the area in question.

4          First, the instructions given here failed to require the government to prove that
5  Mr. Rhine knew of the visit of a Secret Service protectee. Prior to trial, defense counsel
6  asked the Court to instruct the jury on both Counts 1 and 2 that the government must
7  prove that "Mr. Rhine knew that the building or grounds in question was restricted
8  because a person protected by the Secret Service was or would be temporarily visiting."
9  Dkt. No. 68-2 at 40, 43. Defense counsel cited to *Rehaif v. United States*, 139 S. Ct.
10 2191 (2019), in support of this argument. *Id.* The Court declined to give this instruction.
11 Later, when the Jury sent a note asking whether the knowledge element applied to the
12 Secret Service protectee's visit, the government argued that it did not, Ex. A (April 24,
13 2023 Trial Transcript) at 510:19–511:2, and the defense argued that it did, *id*. at 511:3–
14 14. The Court instructed the jury that § 1752 "does **not** require that the defendant have
15 knowledge that a Secret Service protectee is or will be visiting or the timing of that
16 visit." *Id.* at 518:1–4 (emphasis added).

17         This instruction was error. 18 U.S.C. § 1752(a)(1) makes it a federal crime to
18 "knowingly enter or remain in any restricted building or grounds." 18 U.S.C. §
19 1752(a)(2) makes it a federal crime to "knowingly, and with intent to impede[,] …
20 engage[ ] in disorderly or disruptive conduct in, or within such proximity to, any
21 restricted building or grounds[.]" Both sections of the statute impose a mens rea
22 requirement that precedes an actus reus element and a defined location where the act
23 must take place to be criminal. And the statute gives a very precise definition to that
24 location—"restricted building or grounds." This is defined, as relevant here, as: "any
25 posted, cordoned off, or otherwise restricted area— ... of a building or grounds where
26

the President or other person protected by the Secret Service is or will be temporarily visiting[.]" 18 U.S.C. § 1752(c)(1)(B).

Criminal law presumes scienter, even when the statutory text specifies none, "[b]ut the presumption applies with equal or greater force when Congress includes a general scienter provision in the statute itself." *Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019). And scienter is presumed to apply to the crime as a whole: "when a statute 'prescribes the kind of culpability that is sufficient for the commission of an offense, without distinguishing among the material elements thereof, such provision shall apply to all the material elements of the offense, unless a contrary purpose plainly appears[.]'" *Id*. quoting ALI, Model Penal Code § 2.02(4), p. 22 (1985). Multiple Judges in this District have correctly ruled that the knowledge mens rea in § 1752 applies to the visit of a Secret Service protectee.

Honorable District Judge Royce C. Lamberth held that to convict a person under these § 1752 crimes, "the government must prove that the defendants 'knowingly' committed the relevant acts in a 'restricted building or grounds,' meaning that they knew both that they were in a 'posted, cordoned off, or otherwise restricted area,' and that they knew that it was such an area 'of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting.'" *United States v. Bingert*, No. 1:21-CR-91-1-RCL, 2023 WL 3613237, at *1 (D.D.C. May 24, 2023) (quoting 18 U.S.C. § 1752(c)(1)(B)). Judge Lamberth later explained that applying the knowledge element to the full definition of restricted building or grounds "reflects the best reading of the statute." *United States v. Hostetter*, No. 1:21-CR-392-L-RCL, 2023 WL 4539842, at *1 (D.D.C. July 13, 2023).

Additionally, in *United States v. Elizalde*, Honorable District Judge Carl J. Nichols held that "knowingly," in the same two crimes under § 1752 at issue here, applies to all the elements of the crime, including the visit of a Secret Service protectee.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

*See generally* No. 1:23-CR-00170 (CJN), 2023 WL 8354932, at *2 (D.D.C. Dec. 1, 2023). Judge Nichols reasoned:

> As the Supreme Court has explained, "[a]s a matter of ordinary English grammar, we normally read the statutory term 'knowingly' as applying to all the subsequently listed elements of the crime." *Rehaif* [], 139 S. Ct. [at] 2196 [] (quotation marks omitted). Grammatically speaking, that is because an adverb like "knowingly" often modifies more than its most proximate verb .... As the Supreme Court has illustrated, if a bank official says "Smith knowingly transferred the funds to the account of his brother," "we would normally understand the bank official's statement as telling us that Smith knew the account was his brother's." [*Flores-Figueroa v. United States*, 556 U.S. 646, 650–51 (2009)]. And if a bank official says "Smith knowingly sent a bank draft to the capital of Honduras," the official has suggested that Smith knew where he sent the bank draft. *Id*. at 561. The same way, when Congress forbids "knowingly ... engaging in disorderly or disruptive conduct in ... any restricted building or grounds," 18 U.S.C. § 1752(a)(2), the ordinary understanding is that Congress has prohibited disorderly or disruptive conduct by those who know they are in a restricted building or grounds.

*Id.* at *2. Despite this straightforward grammatical reading, the government in *Elizalde*, as in this case, took the position that knowingly applied only to part of the definition of restricted building or grounds. *See id*. at *1 (government argued that knowingly required only knowledge "that the area was restricted in the colloquial sense—i.e., that there were barriers or other indicators that the public was not allowed to enter],]" but not to the visit of a Secret Service protectee).

Judge Nichols rejected the government's various attempts to justify its inconsistent position. Contrary to the government's arguments, "knowingly" applies to the full definition of "restricted building or grounds." The government asked the Court to decline such reading because the definition appears in a different subsection than the

crime(s) and because the mens rea is not repeated in the definition of restricted building or grounds.[1]

As Judge Nichols explained, the government's position would treat the actus reus element differently from the mens rea element with no basis for doing so. The government recognized that Congress's very specific definition of "restricted building or grounds" applies to the actus reus element but asked to use a colloquial meaning of the term for the mens rea element. To no avail:

> After all, the government concedes that it must prove that Elizalde in fact entered or remained in a statutorily defined "restricted building or grounds"—i.e., that for actus reus purposes, "restricted building or grounds" means what the statutory definition says. []. But the government argues that that very term has a different meaning for mens rea purposes. Such a result would be highly anomalous in any circumstance, but especially here, where Congress expressly defined the term.[] Because Congress has done so, "we must follow that definition, even if it varies from [the] term's ordinary meaning." *Van Buren v. United States*, 141 S. Ct. 1648, 1657 (2021) (quotation omitted).

> Thus, to know that an area is a "restricted building or grounds," one must know that the area is of the sort described in the statutory definition. After all, a building or grounds is not a "restricted building or grounds" unless the building or grounds meets all the requirements of the statutory definition. *See id.* A defendant therefore lacks the requisite knowledge if all he knows is that the building or grounds is "restricted" in the colloquial sense. Here, that means Elizalde must know that the area was a "posted cordoned off, or otherwise restricted area ... of a building or grounds where [a] person protected by the Secret Service is or will be temporarily visiting." *Id.*

*Id.* at *3.

---

[1] The Court also noted that not even the government advocated a reading that "knowingly" applied only to the actions themselves and did not apply to those actions being in or near a "restricted building or grounds." Under such reading, "the government would not have to prove that Elizalde knew anything about the area in which he allegedly entered or remained, or in or around which he allegedly engaged in disorderly or disruptive conduct; instead, it would need to prove only that Elizalde knowingly took his physical actions." *Id.* at *2.

MOTION FOR BOND PENDING APPEAL
(*United States v. Rhine*, 21-CR-687 (RC)) - 7

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1    Furthermore, nothing about the structure of the statute indicates a different

2  reading. First,

3      Congress had no need to include "knowingly" in the statutory definition.
      No party disputes that Congress did not need to repeat the actus reus terms
4      in the statutory definition in order to have the statutory definition apply for
      actus reus purposes. The same is true for the mens rea term. Congress
5      already required knowledge of the "restricted building or grounds" element
      by using "knowingly" in the substantive provisions; it specified what
6      "restricted building or grounds" means by defining the term. Moreover, it
      would have been exceptionally strange for Congress to include a mens rea
7      element in the definition: A particular defendant's knowledge is irrelevant
      to whether a given area is a "restricted building or grounds"; knowledge
8      matters only when it comes to determining whether an individual violated
      the statute by engaging in a particular action in a "restricted building or
9      grounds."

10

11  *Id*. at *4. Additionally, the Supreme Court has previously held that "knowingly" carries

12  through to terms of art, even where the definition of those terms may appear in a

13  separate subsection.

14      As Judge Nichols recognized, the Supreme Court did just this in *Rehaif*, where

15  the mens rea for the crime was defined in 18 U.S.C § 924(a)(2) (providing criminal

16  penalties for "[w]hoever knowingly violates subsection ... (g) ... of section 922"), and

17  the actus reus and relevant triggering conditions (conditions that made it unlawful to

18  possess a firearm) were defined in 18 U.S.C. § 922(g) (providing "it shall be unlawful"

19  for certain individuals, e.g., felons, "aliens" unlawfully in the country, or certain others

20  to possess firearms). *Id*. at *4. Thus § 924 defined the mens rea and referred to § 922(g)

21  for definitions of the actus reus ***and*** status rendering that actus unlawful. The *Rehaif*

22  Court was asked to decide whether "knowingly" in § 924 applied to all elements

23  defining the crime in § 922(g) or *only* to one: namely, whether or not "the Government

24  must prove that a defendant knew both that he engaged in the relevant conduct (that he

25  possessed a firearm) and also that he fell within the relevant status (that he was a felon,

26  an alien unlawfully in this country, or the like)?" *Rehaif*, 139 S. Ct. at 2194.

MOTION FOR BOND PENDING APPEAL
(*United States v. Rhine*, 21-CR-687 (RC)) - 8

As Judge Nichols explained, "The Supreme Court answered in the affirmative .... In other words, because 'knowingly' modified the phrase 'subsection ... (g) ... of section 922' in § 924(a)(2), it also modified the content of that phrase, which was provided by an entirely different section of the United States Code—18 U.S.C. § 922(g)." *Elizalde*, 2023 WL 8354932, at *4. So too here. "Knowingly" in 18 U.S.C. § 1752(a)(1) & (a)(2) applies within each section to "restricted building or grounds." Just as in *Rehaif*, "knowingly" therefore applies to "the content of that phrase." *Elizalde*, 2023 WL 8354932, at *4.

Nor do arguments that the government's advocated reading would make it easier to punish people for actions in or near restricted areas, and thus better "ensure powerful and effective protection of Secret Service protectees[,]" justify the inconsistent application of knowingly. *Id*. at *5 (quoting the government's brief). As Judge Nichols explained:

> when "Congress may have been concerned about criminalizing the conduct of a broader class of individuals, concerns about practical enforceability are insufficient to outweigh the clarity of the text." *Flores-Figueroa*, 556 U.S. at 656. And here, Congress may well have acted cautiously to avoid sweeping up conduct that poses little threat to a Secret Service protectee. It seems unlikely that someone who ends up near a Secret Service protectee by happenstance, without knowing that the protectee is present, is there to cause the protectee harm. It is hardly absurd, then, to think that Congress may have written the statute to avoid unnecessarily sweeping up low-risk individuals—such as someone who seeks to shorten his walk home by crossing a cordoned off construction site that, unbeknownst to him, the President plans to visit later that day.

*Id*. at *5. Even if Congress enacted the statute in order to safeguard Secret Service protectees, "courts have long refused to 'simplistically ... assume that whatever furthers the statute's primary objective must be the law.'" *Id.* (quoting *Rodriguez v. United States*, 480 U.S. 522, 526 (1987) (per curiam)).

And this past Friday, Honorable District Judge Christopher r. Cooper similarly held that "knowingly" in § 1752 applies to the full definition of "restricted building or grounds" in a thoroughly reasoned memorandum opinion. *See United States v. Groseclose*, 21-CR-311 (CRC), Dkt. No. 99 (Jan. 5, 2024). As such, the government must prove that a person knows that a place is restricted or cordoned off ***and*** that a Secret Service protectee is or will be visiting.

Judge Nichols, Judge Lamberth, and Judge Cooper correctly interpreted § 1752. As detailed above, the plain text of the statute, apparent congressional intent, and Supreme Court case law all support the consistent application of "knowingly" to the full statutory definition of "restricted building or grounds" in § 1752.

Second, and exacerbating the above errant instruction, the jury was also mis-instructed about the required nexus between the visit of a Secret Service protectee and the restriction. While deliberating, the jury sent a question asking for clarification of the term restricted building or grounds: "Does the term 'restricted building or grounds' describe the area because the secret service was present [ ] or does the term 'restricted building or grounds' describe an area with posted signs describing it is restricted, or cordoned off, or otherwise restricted?" Dkt. No. 100 at 1. Despite defense counsel's objection, the Court instructed the jury: "The definition of, quote, restricted building or grounds, end quote, does not require that any restrictions had been created because of a specific visit by a Secret Service protectee." Ex. A at 517:7–10.

This was improper because principles of statutory interpretation affirm that there must be a causal nexus between the restriction and a visit of a Secret Service protectee under 18 U.S.C. § 1752. The errant instruction relieved the government of its burden to prove that the building or grounds were restricted ***because*** the Vice President was or would be visiting.

MOTION FOR BOND PENDING APPEAL
(*United States v. Rhine*, 21-CR-687 (RC)) - 10

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

The instruction provided here gave the word "where" in § 1752's definition of a restricted area its broadest possible meaning—that a restricted area under the statute was any location that both happened to be cordoned off in some way and that happened to be a place where a Secret Service protectee was visiting. But that is not the only reasonable reading of the statute, and this interpretation is inconsistent with Congress's apparent intent, the canon of constitutional avoidance, and the rule of lenity.

The statute under which Mr. Rhine was charged and convicted defines a "restricted area" as:

> any posted, cordoned off, or otherwise restricted area—
> (A) of the White House or its grounds, or the Vice President's official residence or its grounds;
> (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or
> (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance[.]

18 U.S.C. § 1752(c)(1). As relevant here, the Court was tasked with interpreting the meaning of "any posted, cordoned off, or otherwise restricted area ... of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting[.]" *Id*.

However, the "where" in that definition is susceptible to multiple interpretations. It could mean a place that happens to be cordoned off and happens to be visited by a Secret Service protectee, with no connection between the two. Or it could mean a place that is restricted/cordoned off because a Secret Service protectee is visiting the place. "When words have several plausible definitions, context differentiates among them. That is just as true when the choice is between ordinary and specialized meanings, ... as it is when a court must choose among multiple ordinary meanings[.] *United States v. Hansen*, 599 U.S. 762, 775 (2023) (internal citations omitted).

MOTION FOR BOND PENDING APPEAL
(*United States v. Rhine*, 21-CR-687 (RC)) - 11

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Here, the definition's context is within a Chapter defining crimes against the President and other Secret Service protectees. *See* 18 U.S.C. Ch. 84. And the definition at issue here is given equal footing with restricted or cordoned off areas: "(A) of the White House or its grounds, or the Vice President's official residence or its grounds;" and "(C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance[.]" 18 U.S.C. § 1752(c)(1). The statutory context demonstrates that the "restriction" in the definition has the purpose of protecting Secret Service protectees.

As the Supreme Court has made clear, "[s]tatutory history is an important part of this context." *Hansen*, 599 U.S. at 775. The statutory history here further evidences Congress's intent to criminalize actions against Secret Service protectees, and intrusions on restrictions created to protect them, not intrusions on *any* restricted areas. The statute was initially enacted to criminalize certain trespass into and crimes in areas designated to protect the President, namely:

> (i) any building or grounds designated by the Secretary of the Treasury as temporary residences of the President or as temporary offices of the President and his staff, or
> (ii) any posted, cordoned off, or otherwise restricted area of a building or grounds where the President is or will be temporarily visiting,
> in violation of the regulations governing ingress or egress thereto[.]

PL 91-644, January 2, 1971, 79 Stat. 580, Title V, § 13. The statue was soon amended to allow the Secretary of the Treasury (the Department then in charge of the Secret Service) to designate and restrict areas around Secret Service protectees beyond the president, and to extend the criminal penalties to cover violations of these restrictions as well. *See* PL 97–308 (HR 4468), PL 97–308, Oct. 14, 1982, 96 Stat 1451. Years later, Congress reorganized the language in the Statute under a sub-title "interference with national special security events," where it criminalized certain acts in a "posted, cordoned off, or otherwise restricted area of a building or grounds where the President

or other person protected by the Secret Service is or will be temporarily visiting[,]" and added higher penalties for more serious crimes. PL 109–177, § 602, March 9, 2006, 120 Stat 192. Finally, under the Federal Restricted Buildings and Grounds Improvement Act of 2011, Congress amended the statute to the format used today—first defining criminal acts in or near restricted buildings or grounds, then separately defining the term "restricted buildings or grounds." PL 112-98, March 8, 2012, 126 Stat 263.[2]

Throughout its history, the statute has focused on criminalizing incursions into restrictions **created to protect** Secret Service protectees. This is clear from the types of places listed as restricted for which incursions are criminalized, from the titles or subtitles of the Acts amending the statute, and from the current Chapter and focus of the statute—to criminalize certain acts against Secret Service protectees. Here, "the context of these words—the water in which they swim—indicates" Congress's intent. *Hansen*, 599 U.S. at 775. Namely, that the restriction must be in place for the purpose of protecting a visiting Secret Service protectee.

In addition, the canon of constitutional avoidance supports this interpretation. "Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018). As Mr. Rhine previously argued in a Motion to Dismiss these charges, a broad reading of the statute that provides for no causal nexus between the restriction and the visit of a Secret Service protectee would render the statute unconstitutionally vague and overbroad, and raise non-delegation issues. *See* Dkt. No. 46 at 15:18–21, 16:12–16 ("Under this reading, the DOJ could prosecute a person federally for walking past a sign posted by a local Parks and

---

[2] The statute was later amended to add a crime of flying an unmanned aircraft into a restricted area, a change not relevant to this issue.

MOTION FOR BOND PENDING APPEAL
(*United States v. Rhine*, 21-CR-687 (RC)) - 13

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Recreation Department in Indiana indicating a park was closed after dusk if the First Lady planned to visit that park the next morning. Such broad reading is extreme, and raises serious constitutional concerns regarding federalism and separation of powers.").

In denying Mr. Rhine's Motion to Dismiss the charges under an argument that the statute was unconstitutional, the Court indicated that narrower interpretation of the statute saved it from such constitutional concerns:

> Defendant also makes a three-sentence argument that the statute "includes no causal nexus between restriction of the area and the visit, or anticipated visit, of a Secret Service protectee," Def.'s 1st MTD at 24. But this is precisely the function of § 1752(c), which defines "restricted buildings or grounds" to include a restricted area of "a building or grounds where [a Secret Service protectee] is or will be temporarily visiting." § 1752(c)(l)(B).

Dkt. No. 79 at 22 n.7.

When the jury question arose, asking the Court to explain whether or not a causal nexus was required between the restriction and the visit of the Secret Service protectee, defense counsel argued that the Court should answer yes—a causal nexus is required. Ex. A at 505:9–13. Government counsel argued it was ***not*** required. Ex. A at 506:4–12. Defense counsel reiterated that a causal nexus is required to avoid causing the statute to be constitutionally infirm. Ex. A at 506:17–20. And after being allowed time to review the Court's prior Order, defense counsel also drew the Court's attention to its prior ruling finding the statute was not unconstitutional because it required such a causal nexus. *Id*. at 513:12–514:9, 515:24–516:8. Nonetheless, the Court instructed the Jury: "The definition of, quote, restricted building or grounds, end quote, does not require that any restrictions had been created because of a specific visit by a Secret Service protectee." *Id*. at 517:7–10.

This Court's first analysis was correct. Here, the statute is susceptible to more than one reasonable interpretation. As such, if one interpretation could render the

MOTION FOR BOND PENDING APPEAL
(*United States v. Rhine*, 21-CR-687 (RC)) - 14

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

statute unconstitutional, "'it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'" *Rodriguez*, 583 U.S. at 296 (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)). The interpretation on which the jury was instructed indeed raises "serious doubt" about the constitutionality of the statute. *Id*. It renders the statute unconstitutionally vague. *See Hill v. Colorado*, 530 U.S. 703, 732 (2000) (statutes whose vagueness fails to give fair notice of the proscribed conduct or invites arbitrary or discriminatory enforcement are unconstitutional). This interpretation also makes the statue overbroad, infringing on First Amendment protected activity by making "disorderly conduct" near an exceedingly broad array of potential locations a federal crime. *See City of Houston v. Hill*, 482 U.S. 451, 459 (1987) (Criminal statutes "that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application."). And the government's interpretation accrues to itself substantially more authority than Congress intended, in violation of the major-questions doctrine. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (Courts should reject an executive agency's claim of far broader powers under a statute absent "clear congressional authorization" of such broad power); *see also Ciminelli v. United States*, 598 U.S. 306, 315 (2023) (rejecting interpretation of federal criminal statute that "vastly expands federal jurisdiction without statutory authorization."). Instead of the interpretation that raises "serious doubt" about the statute's constitutionality, the Court should adopt the reasonable interpretation that § 1752 criminalizes incursions into areas that are restricted in order to protect visiting Secret Service protectees. *Rodriguez*, 583 U.S. at 296.

Finally, the rule of lenity advises a narrower interpretation of the statute. The rule provides that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *United States v. Bass*, 404 U.S. 336, 347 (1971) (internal

MOTION FOR BOND PENDING APPEAL
(*United States v. Rhine*, 21-CR-687 (RC)) - 15

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

citations omitted). "Under that rule, any reasonable doubt about the application of a penal law must be resolved in favor of liberty." *Wooden v. United States*, 595 U.S. 360, 388 (2022) (Gorsuch, J., concurring). If ambiguity remains after the Court applies the above canons of statutory interpretation, then the rule of lenity requires the narrower interpretation of § 1752—that it requires a causal nexus between the restriction and the visit of the Secret Service protectee.

### 2. 40 U.S.C. §§ 5104(e)(2)(D) & 5104(e)(2)(G) are restrictions on speech that violate the First Amendment.

Mr. Rhine's appeal will challenge the constitutionality under the First Amendment of his convictions for Counts 3 and 4. Mr. Rhine was convicted in Count 3 of violating 40 U.S.C. § 5104(e)(2)(D), which prohibits disorderly conduct in the Capitol intended to impede, disrupt, or disturb congressional proceedings; and in Count 4 with violating 40 U.S.C. § 5104(e)(2)(G), which prohibits "parad[ing], demonstrate[ing], or picket[ing] in any of the Capitol Buildings." Both sections of the statute are content- and viewpoint-based restrictions on speech. The restrictions are overbroad in light of their stated purposes in violation of the First Amendment. Additionally, they are unconstitutionally vague in violation of the First Amendment and the Due Process Clause.[3]

Prior to trial, Mr. Rhine moved to dismiss Counts 3 and 4 on these grounds. *See* Dkt. No. 47. Among other things, Mr. Rhine pointed out some of the facts that make the Capitol Building (or significant portions of it) a public forum. Indeed, multiple parts of the Building are regularly used for press conferences, broadcast interviews, and public events and classes. *See* Dkt. No. 62 at 5–6. Mr. Rhine also argued that even if the Capitol Building were a non-public forum, the crimes at issue under § 5104 are impermissible viewpoint-based restrictions on speech because the statute specifically

---

[3] Courts have traditionally treated "vagueness and overbreadth as logically related and similar doctrines." *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983).

exempts Members of Congress and their staff. And Mr. Rhine further cited to an example of a Member of Congress engaging in disorderly and disruptive conduct within the Capitol Building without prosecution or legal consequences. *See* Dkt. No. 47 at 24–26 (citing exemption contained in 40 U.S.C. § 5104(e)(3) and Congressman Joe Wilson's unpunished act of shouting "you lie" at President Barack Obama during his State of the Union address).

The Court denied Mr. Rhine's Motion, reasoning that the Capitol Building is a non-public forum, *see* Dkt. No. 79 at 31, that the restrictions were "'reasonable in light of the purpose served by the forum[]' ... to permit 'Congress peaceably to carry out its lawmaking responsibilities' and to permit 'citizens to bring their concerns to their legislators.'" *Id.* at 32 (quoting *Cornelius v. NAACP Legal Def and Educ. Fund*, 473 U.S. 788, 806 (1985), and *United States v. Nassif*, 628 F. Supp. 3d 169, 180 (D.D.C. 2022) (quoting *Bynum v. U.S. Capitol Police Bd.*, 93 F. Supp. 2d 50, 55 (D.D.C. 2000)), respectively). Without addressing Mr. Rhine's argument regarding the statutory exemption of Members of Congress and their staff from § 5104's restrictions on speech, the Court found "that § 5104(e)(2)(G) is clearly viewpoint neutral, as it 'contains nothing limiting its application to a particular viewpoint.'" Dkt. No. 79 at 33 (quoting *Nassif*, 2022 WL 4130841, at *5).

### a.    First Amendment standards

Criminal statutes "that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application." *City of Houston v. Hill*, 482 U.S. 451, 459 (1987). "The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002). Of particular concern for a criminal statute such as § 5104, "the penalty to be imposed is relevant in determining whether

MOTION FOR BOND PENDING APPEAL
(*United States v. Rhine*, 21-CR-687 (RC)) - 17

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

demonstrable overbreadth is substantial." *New York v. Ferber*, 458 U.S. 747, 775 (1982). For this reason, the Court has long allowed individuals to "attack overly broad statutes even though the conduct of the person making the attack is clearly unprotected and could be proscribed by a law drawn with the requisite specificity." *Id.* at 769; *see also Hansen*, 599 U.S. at 769 (in the First Amendment context, "the overbreadth doctrine instructs a court to hold a statute facially unconstitutional even though it has lawful applications, and even at the behest of someone to whom the statute can be lawfully applied.").

"If the challenger demonstrates that the statute 'prohibits a substantial amount of protected speech' relative to its 'plainly legitimate sweep,' then society's interest in free expression outweighs its interest in the statute's lawful applications, and a court will hold the law facially invalid" on overbreadth grounds. *Id.* at 770. "Overbroad laws 'may deter or "chill" constitutionally protected speech,' and if would-be speakers remain silent, society will lose their contributions to the 'marketplace of ideas.'" *Id.* at 769–70 (quoting *Virginia v. Hicks*, 539 U.S. 113, 119 (2003)). "To guard against those harms, the overbreadth doctrine allows a litigant (even an undeserving one) to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak." *Hansen*, 599 U.S. at 770. Still, the government carries the burden of justifying the speech restrictions in § 5104. "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 804 (2000).

Political or public issue speech, at the core of the First Amendment, receives heightened protection. "'[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)). Such speech is "'at the heart of the First Amendment's protection.'" *Id.* at 451–

52 (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–59 (1985)). And the heightened protection for such speech "reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Id.* at 452 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).

Speech of public concern is not only that made by officials or that made in a formal or business-like manner:

> Speech deals with matters of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community," *Connick*, supra, at 146, 103 S.Ct. 1684, or when it "is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public," *San Diego [v. Roe*, 543 U.S. 77, 83–84 (2004) (per curiam)] .... The arguably "inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Rankin v. McPherson*, 483 U.S. 378, 387 [] (1987).

*Snyder*, 562 U.S. at 453 (additional citations omitted). Courts examine the "content, form, and context" of speech and expressive conduct to determine whether it is of public concern; in doing so, "no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." *Id.* at 453–54.

Here, the expressive conduct restricted is that which advocates a viewpoint and that made at the seat of government. Also restricted is speech with the purpose of impeding government action, again made at the site of the federal legislature, where citizens have historically petitioned their government. Restrictions on this speech should be closely scrutinized, as the purpose, type, and locus of this speech make clear it is of public concern.

First Amendment protections further vary based on the location of the speech. Members of the public have strong free speech rights in traditional public fora—parks,

MOTION FOR BOND PENDING APPEAL
(*United States v. Rhine*, 21-CR-687 (RC)) - 19

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

streets, sidewalks, and the like. The government may impose reasonable time, place, and manner restrictions consistent with the purpose of the forum, but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited. *See Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009).

However, in a nonpublic forum, the government can restrict speech "as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view." *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677–78 (1998) (quoting *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 800 (1985)). In a nonpublic forum a speaker cannot be excluded because of their viewpoint, and their exclusion must otherwise be reasonable in light of the purpose of the property. *Arkansas Educ. Television Comm'n*, 523 U.S. at 682; *see also Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 691–92 (1992) (O'Connor, J., concurring) (at minimum, the Supreme Court "ha[s] required some explanation as to why certain speech is inconsistent with the intended use of the forum.").

Ultimately, whether a place is a public or non-public forum is not dispositive to overbreadth analysis. *See Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 573–74 (1987) ("Because we conclude that the resolution is facially unconstitutional under the First Amendment overbreadth doctrine regardless of the proper standard, we need not decide whether LAX is indeed a public forum, or whether the *Perry* standard is applicable when access to a nonpublic forum is not restricted."). Indeed, "[m]uch nondisruptive speech—such as the wearing of a T-shirt or button that contains a political message ... is still protected speech even in a nonpublic forum. *Id*. at 576.

1

2

**b.      Large portions of the Capitol Building qualify as a public forum.**

3

The Court erred in holding that the Capitol Building in its entirety is a non-

4

public forum. The Capitol Grounds are a public forum.[4] *Cmty. for Creative Non-*

5

*Violence v. Kerrigan*, 865 F.2d 382, 387 (D.C. Cir. 1989) ("There is no doubt that the

6

Capitol Grounds are a public forum"); *Lederman v. United States*, 291 F.3d 36, 42

7

(D.C. Cir. 2002) ("the entire Capitol Grounds *are* a public forum") (emphasis in

8

original). The Capitol Buildings located within these grounds have been the sites of

9

historic demonstrations of monumental importance. Indeed, in what was possibly the

10

"first organized, sustained sit-in demonstration against Jim Crow" in the nation,

11

interracial groups attempted sit-ins in protest of the House of Representatives

12

restaurant's segregation policy.[5] The "capitol crawl" of 1990, culminating in a

13

demonstration in the Rotunda of the Capitol Building, is credited with serving as the

14

catalyst for the Americans with Disabilities Act.[6]

15

The D.C. Circuit has reasoned that only smaller, private portions of the Capitol

16

Building are exempt from the conclusion that the Capitol Grounds, including the

17

Capitol Building within them, are public fora. In striking down a restriction on

18

19

20

---

[4] The Capitol Grounds are defined in 40 U.S.C. § 5102. The Grounds include "all squares, reservations, streets, roadways, walks, and other areas" identified in a designated 1946 map. § 5102. The map in question is available through the Library of Congress at https://www.loc.gov/resource/g3852u.ct005312/. The map's legend states that "[t]he shaded areas indicate properties comprising the United States Capitol Grounds." The United States Capitol, while also a "Capitol Building" under the statutory definition, is within a such a shaded area. Thus, it is part of the Capitol Grounds, although the House and Senate office buildings are not.

21

22

23

24

[5] Craig Simpson, *Origins of the civil rights sit in—U.S. Capitol: 1934*, Washington Area Spark, https://washingtonareaspark.com/2018/02/26/origins-of-the-civil-rights-sit-in-u-s-capitol-1934/ (last accessed Jan. 2, 2024).

25

[6] Lauren Lantry, *On 30th Anniversary of Disability Civil Rights Protest, Advocates Push for More*, ABC News, March 12, 2020, https://abcnews.go.com/US/30th-anniversarydisability-civil-rights-protest-advocates-push/story?id=69491417.

26

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

demonstrations on the Capitol Grounds, the D.C. Circuit recognized only distinct portions of the Capitol Building that were not traditionally public:

> The Capitol Grounds **(excluding such places as the Senate and House floors, committee rooms, etc.)** have traditionally been open to the public; indeed, thousands of people visit them each year. Thus we cannot agree with the defendants that the Capitol Grounds have ever been characterized by the serenity and quiet of a hospital or library.

*Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 584 (D.D.C.), *aff'd*, 409 U.S. 972, (1972) (emphasis added). In contrast to a courthouse—where public opinion is not meant to sway judicial decision-making—public opinion is expected to influence legislators who work at the Capitol Building: "the fundamental function of a legislature in a democratic society assumes accessibility to such opinion." *Id*.; *see also Hodge v. Talkin*, 799 F.3d 1145, 1161 (D.C. Cir. 2015) ("politicians are expected to be appropriately responsive to the preferences of the public, and therefore are expected to accommodate public expression on the grounds of the legislative chamber.") (internal quotations omitted).

Similarly, in *Lederman*, the D.C. Circuit declared unconstitutional a regulation establishing "no-demonstration zones" within the Capitol Grounds that included, as relevant in that case, a sidewalk abutting the Capitol Building. 291 F.3d at 46. In doing so, the Court rejected the government's attempts to justify the sidewalk as an area of "specialized" use in defense of its broad ban on demonstrative activities—neither Congressional Members' need to quickly and easily access the Capitol Building nor the need to maintain a security perimeter around the Building justified the ban on demonstrations and expressive activity while tourists and other members of the public were allowed in the area. *See id*. at 42–43. Nor was the lack of a history of

MOTION FOR BOND PENDING APPEAL
(*United States v. Rhine*, 21-CR-687 (RC)) - 22

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

demonstrations on the sidewalk in question persuasive—indeed, the unconstitutional

regulation prohibiting demonstrations likely led to this result. *Id.*[7]

Like the sidewalk at issue in *Lederman*, large portions of the Capitol Building

are open to the public and regularly accessed by tourists and others.[8] And such parts of

the Capitol Building have historically been the sites of important protests and

demonstrations. *Supra* notes 5 and 6. Yet, § 5104 broadly prohibits "demonstrations"

and activity advocating a viewpoint in ***all*** parts of the Capitol Building.

The primary District Court decision on the topic, and the decision upon which

this and other District Courts relied, *Bynum v. United States Capitol Police Bd.*, held

---

[7] In addition, the District of Columbia Court of Appeals has plainly found that large portions of the Capitol Building are public fora. *See Wheelock v. United States*, 552 A.2d 503, 506 (D.C. 1988) (treating Capitol Rotunda as public forum); *Markowitz v. United States*, 598 A.2d 398, 404 (D.C. 1991) (not extending *Wheelock* to back hallway with private congressional offices). As that Court explained:

> The general concepts of First Amendment freedom are given added impetus as to speech and peaceful demonstration in Washington, D.C., by the clause of the Constitution which assures citizens their right to assemble peaceably at the seat of government and present grievances." *A Quaker Action Group v. Morton*, 170 U.S.App.D.C. 124, 131, 516 F.2d 717, 724 (1975). The courts in this jurisdiction have long recognized that "[t]he United States Capitol is a unique situs for demonstration activity" and "is a place traditionally open to the public— thousands visit each year—to which access cannot be denied broadly or absolutely, [a fact which must be weighed] against the government's interest in protecting against possible 'damage to buildings and grounds, obstruction of passageways, and even dangers to legislators and staff.'" *Kroll v. United States*, 590 F.Supp. 1282, 1289, 1290 (D.D.C.1983) (quoting *Jeannette Rankin Brigade* [], 342 F.Supp. [at] 583–85 [].

*Wheelock*, 552 A.2d at 506.

[8] *See* Dkt. No. 62 at 6 (listing public events and programs at the Capitol Building); Architect of the Capitol, Performance and Accountability Report, Fiscal Year 2023, at 2, *Message from the Acting Architect of the Capitol* (Nov. 15, 2023), https://www.aoc.gov/sites/default/files/2023-12/aoc-performance-and-accountability-report-fy-2023-508.pdf (the Capitol hosted over 3.5 million visitors in FY 2023). Visitors regularly access the rotunda, galleries, halls and other large portions of the Capitol Building. *See generally* U.S. Capitol Visitor Center, Visit the U.S. Capitol, https://www.visitthecapitol.gov/visit (last visited Jan. 2, 2024); U.S. Capitol Visitor Center, Watching Congress in Session, https://www.visitthecapitol.gov/visit/know-before-you-go/watching-congress-in-session (last visited Jan. 2, 2024).

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

that the Capitol Building was not a public forum, but used reasoning aligned with time, place, and manner restrictions (the type allowed for public forums) in its analysis. The *Bynum* Court explained:

> As the seat of the legislative branch of the federal government, the inside of the Capitol might well be considered to be the heart of the nation's expressive activity and exchange of ideas. After all, every United States citizen has the right to petition his or her government, and the Houses of Congress are among the great democratic, deliberative bodies in the world. But it also has been recognized that the expression of ideas inside the Capitol may be regulated in order to permit Congress peaceably to carry out its lawmaking responsibilities and to permit citizens to bring their concerns to their legislators. There are rules that members of Congress must follow, as well as rules for their constituents. To that end, Congress enacted the statute at issue here so that citizens would be "assured of the rights of freedom of expression and of assembly and the right to petition their Government," without extending to a minority "a license ... to delay, impede, or otherwise disrupt the orderly processes of the legislature which represents all Americans." H. REP. NO. 90–745 at 2, reprinted in 1967 U.S.C.C.A.N. 1739, 1740. The type of controls that Congress legitimately may use to regulate the manner in which ideas are expressed inside the Capitol therefore excludes its classification as a traditional public forum.

*Bynum v. U.S. Capitol Police Bd*., 93 F. Supp. 2d 50, 55–56 (D.D.C. 2000). The basis for *Bynum*'s "somewhat surprising conclusion" that the Capitol Building as a whole is not a public forum, *see id*. at 56, is rooted in recognition that speech in the Capitol may be subject to time, place, and manner regulations, which are allowed in public fora, *see Jeannette Rankin Brigade*, 342 F. Supp. at 584. Indeed, the time, place, and manner of protests on sidewalks, in parks, and on the Capitol Grounds are commonly regulated, yet those places are still public fora. Application of controlling law, including D.C. Circuit case law, indicates that at least publicly accessible portions of the Capitol (Rotunda, public hallways, galleries, etc.) are public fora.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1

2

         **c.**     **The restrictions in § 5104 are overbroad in restricting substantial First Amendment-protected activity in the large portions of the Capitol that are public fora.**

3

To justify a restriction in a public forum, the government must demonstrate that

4

it is a "[r]easonable time, place, and manner restriction[]" or that "any restriction based

5

on the content of the speech [] satisf[ies] strict scrutiny, that is, the restriction must be

6

narrowly tailored to serve a compelling government interest[.]" *Pleasant Grove City,*

7

*Utah*, 555 U.S. at 469 (citations omitted). "[R]estrictions based on viewpoint are

8

prohibited[.]" *Id.*

9

Even if the crimes defined in § 5104 were mere "time, place, and manner"

10

restrictions, the government cannot show that they are narrowly tailored to the forum

11

and government interest in question. The D.C. Circuit made clear that the Supreme

12

Court demands a close fit between such restrictions and interests advanced by them:

13

14

15

16

17

18

> The decision in *Grace* makes it clear that the "narrowly tailored" portion of the time, place or manner test requires that there be a real nexus between the challenged regulation and the significant governmental interest sought to be served by the regulation. If the regulation does not meaningfully advance the interest, the regulation cannot withstand constitutional scrutiny if it restricts free expression in a public forum. It is not enough that a regulation is facially reasonable, or that a governmental interest is significant; rather, it must be shown that a reasonable regulation is narrowly tailored to substantially serve a significant governmental interest.

19

*Cmty. for Creative Non-Violence v. Kerrigan*, 865 F.2d 382, 388 (D.C. Cir. 1989).

20

Here a full ban on demonstrative activity contained in § 5104(e)(2)(D) does not

21

narrowly advance a significant government interest. The Capitol Police interpret and

22

enforce the demonstrating restriction in the statute to apply to nearly any form of

23

conduct that expresses a viewpoint, including quiet, calm, and non-disruptive conduct.[9]

24

25

26

---

[9] Capitol Police Regulation §12.1.10 defines "demonstration activity" to include "any protest, rally, march, vigil, gathering, assembly, projecting of images or similar conduct engaged in for the purpose of expressing political, social, religious or other similar ideas, views or concerns protected by the First Amendment of the United States Constitution." Traffic Regulations for the United States Capitol Grounds, Feb. 17, 2019 *available at*

MOTION FOR BOND PENDING APPEAL
(*United States v. Rhine*, 21-CR-687 (RC)) - 25

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1    Similarly, the breadth of the "disorderly conduct" restriction is evidenced by

2    Mr. Rhine's conviction here—for essentially walking while carrying a flag. The term is

3    undefined by the statute and open to exceedingly broad interpretation. For example,

4    Black's Law Dictionary defines disorderly conduct as "Behavior that tends to disturb

5    the public peace, offend public morals, or undermine public safety." Conduct:

6    Disorderly Conduct, Black's Law Dictionary (11th Ed., 2019). Indeed, the Court in this

7    case included "interfer[ing] with another person by jostling against or unnecessarily

8    crowding that person" in the definition. Dkt. No. 105 at 17. Prohibitions on **all** of this

9    conduct in **all** parts of the Capitol Building—including those that are public fora—do

10   not narrowly advance government interests.

11           The purported interest advanced by the statute is to ensure that citizens would be

12   "assured of the rights of freedom of expression and of assembly and the right to petition

13   their Government," without extending "license for a minority to delay, impede, or

14   otherwise disrupt the orderly processes of the legislature which represents all

15   Americans." H. REP. NO. 90-745, reprinted in 1967 U.S.C.C.A.N. 1739, 1740. The

16   statute was enacted specifically in *response* to political protests at the time. *Id*. And

17   even the drafters recognized that it criminalized a "wide range" of purportedly

18   disorderly and disruptive conduct. *Id*. at 1742.

19           The exceedingly broad restrictions are not narrowly tailored to serve these

20   purposes. For one, they hinder rather than advance the goal of assuring citizens their

21   right to "freedom of expression and of assembly and the right to petition their

22

23   ─────────────────────

     https://www.uscp.gov/sites/uscapitolpolice.house.gov/files/wysiwyg_uploaded/US%20Capitol

24   %20Grounds%20Traffic%20Regulations_Amended%20February%202019.pdf; *see also*
     United States Capitol Police Guidelines for Conducting an Event on United States Capitol

25   Grounds, Oct. 6, 2014, *available at*
     https://www.uscp.gov/sites/uscapitolpolice.house.gov/files/wysiwyg_uploaded/Guidelines%20

26   and%20Application%20for%20Conducting%20an%20Event%20on%20U.S.%20Capitol%20G
     rounds.pdf.

FEDERAL PUBLIC DEFENDER
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Government[.]" *Id*. at 1740. For two, § 5104 criminalizes substantial conduct that does not "disrupt the orderly processes of the legislature[.]" *Id*. A person who walks through the Rotunda with a flag may be prosecuted. A family that silently holds up photos of a lost loved one in the Gallery to implore Congress to pass gun control legislation may be prosecuted. A person who stands in front of Thomas Jefferson's statue in Statuary Hall to speak about his abuses against enslaved African Americans may be prosecuted. This breadth of prohibition does nothing to advance the goal of preventing "disrupt[ion of] the orderly processes of the legislature" while it hinders the goal of protecting citizens' First Amendment rights.

Another fatal flaw to narrow tailoring is § 5104's exemption of Members of Congress and their staff. *See* 40 U.S.C. § 5104(e)(3). Even if the statute was enacted to prevent disruption of the business of Congress, the exemption of Members and their staff from restrictions even on "disorderly conduct" does not further the government's interest. A regulation that is *under*inclusive—that restricts some but not all of the conduct that impacts the government interest—is not narrowly tailored. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2375–76 (2018).

Members of Congress have given ample reasons to subject them to the same restrictions as the public at large if Congress truly wanted to promote the goals of order and effective government. Nearly from Congress's inception Members of Congress have engaged in conduct and speech that § 5104 now prohibits others from engaging in. Famously, in 1856, **on the Senate Floor,** a Representative promoting slavery beat an abolitionist senator with a cane until he lost consciousness.[10] And Members of Congress during that time regularly brought weapons to and fought one another at the Capitol. *Id*. As Mr. Rhine previously highlighted, in more recent years, a Member of

---

[10] Becky Little, *Violence in Congress Before the Civil War: From Canings and Stabbings to Murder*, HISTORY Channel, July 24, 2019 (updated Oct. 16, 2023), https://www.history.com/news/charles-sumner-caning-cilley-duel-congressional-violence.

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

Congress has rudely shouted and disrupted an official address to Congress at the Capitol.[11]

In this past year alone, Members of Congress have reportedly engaged in an alarming number of violent threats, demonstrative speech, disruptive conduct, and even a physical assault while in the Capitol Building. For example, in July 2023, Representative Eric Swalwell led House Democrats in an organized chant of "shame" directed at House Republicans for a vote to censure a Member. Following this demonstration, Representative Swalwell reportedly argued with Representative Kevin McCarthy, culminating in Swalwell calling McCarthy a gendered slur while the two were engaged in official business. Witnesses stated that this in turn led to a later confrontation between the two involving threats of physical assault and further profane insults.[12] In November 2023, Representative Tim Burchett reported that Representative McCarthy elbowed him with force in the back while Representative Burchett was speaking with a reporter, seemingly in retaliation for his vote to remove Representative McCarthy from the Speaker of the House position. In response, Representative Burchett reportedly confronted and yelled at Representative McCarthy.[13] The same week, Senator Markwayne Mullin challenged a witness to a physical fight and stood up from his chair seemingly to initiate said fight during a Senate Hearing at the Capitol. Senator

[11] *See* Carl Hulse, *In Lawmaker's Outburst, a Rare Breach of Protocol*, N.Y. Times, Sep. 9, 2009, https://www.nytimes.com/2009/09/10/us/politics/10wilson.html?searchResultPosition=1.

[12] *See* Kelby Vera, *Eric Swalwell Called Kevin McCarthy A 'P\*\*\*y' During House Dust-Up: Report*, HuffPost, July 27, 2023, https://www.huffpost.com/entry/eric-swalwell-kevin-mccarthy-fight_n_64c2df44e4b021e2f2924b09.

[13] *See* Annie Grayer & Melanie Zanona, *GOP Rep. Tim Burchett Accuses Kevin McCarthy of Elbowing Him in the Kidneys, Ex-Speaker Denies It*, CNN, Nov. 14, 2023, https://www.cnn.com/2023/11/14/politics/burchett-mccarthy-elbowing-fight/index.html; Azi Paybarah, Marianna Sotomayor, & Liz Goodwin, *McCarthy Accused of Elbowing Lawmaker, While Fight Nearly Breaks Out in Senate*, Wash. Post, Nov. 15, 2023, https://www.washingtonpost.com/politics/2023/11/14/kevin-mccarthy-elbow-senate-fight/.

MOTION FOR BOND PENDING APPEAL
(*United States v. Rhine*, 21-CR-687 (RC)) - 28

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Mullin repeatedly ignored Senator Bernie Sanders's pleas for him to behave professionally and continued his behavior for several minutes.[14]

The conduct of any of these Members of Congress would fall within the ambit of disorderly conduct or, in some instances, demonstrating as defined in § 5104. Were they civilians, these Members of Congress could face criminal penalties. But they did not. Such disparate treatment demonstrates § 5104's poor fit for advancing the government's interest in preventing disruption of Congress's business. Its underinclusiveness—its exemption of Members of Congress and staff—inhibit this goal. Meanwhile, as discussed above, an exceedingly broad range of expressive conduct by civilians—much of which is not disruptive at all—is restricted by the statute. This "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011).

Furthermore, both sections of § 5104 are content-based restrictions on speech. Restrictions based on content may be explicit (e.g., no political speech) or may be more subtle: including laws "defining regulated speech by its function or purpose" and "laws that, though facially content neutral, cannot be 'justified without reference to the content of the regulated speech,' or were adopted by the government 'because of disagreement with the message' conveyed." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 156 (2015) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

Section 5104(e)(2)(D) prohibits disorderly or disruptive conduct but does not define either term. But § (D) goes further to punish that conduct based on its **purpose**, namely when done "with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that

---

[14] Mary Clare Jalonick, *GOP Senator Challenges Teamsters Head to a Fight in a Fiery Exchange at a Hearing*, Assoc. Press, Nov. 14, 2023, https://apnews.com/article/senate-mullin-obrien-teamsters-fight-hearing-153e28d131973d1e10b539491c9e94a6.

MOTION FOR BOND PENDING APPEAL
(*United States v. Rhine*, 21-CR-687 (RC)) - 29

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress[.]" 40 U.S.C. § 5104(e)(2)(D).[15] The crime defined by this section is content-based because it criminalizes speech based on its purpose. *Reed*, 576 U.S. at 156.

Similarly, § 5104(e)(2)(G) prohibits speech based on its content as it restricts speech with the function and purpose of expressing a viewpoint. Section G prohibits parading, demonstrating, or picketing without further clarification on these terms. Yet the common meaning of these terms makes clear that they all have a function of advocating a viewpoint—and generally a political or religious viewpoint at that. "Demonstration" is defined in plain language as "a public display of group feelings ***toward a person or cause***[,]"[16] and "picket" as "a person posted by a labor organization at a place of work affected by a strike" or "a protest or strike involving pickets."[17] While "parade" is associated with organized commemoration of a holiday or events of public significance,[18] these generally have religious or even political significance.[19] The context and combination of these three verbs, "the water in which they swim[,]" *Hansen*, 599 U.S. at 775, indicates Congress's intent that they restrict expressive

---

[15] For example, loud speech with the purpose of corralling a class of second graders visiting the Capitol is not criminal. Loud speech for the purpose of making a viral TikTok video is not criminal, even if it is in fact disruptive. Loud speech or disruptive clapping and cheering expressing support for Congress as it passes a bill is not criminal. But loud speech for the purpose of voicing opposition to a bill or discouraging a vote from proceeding is. The statute's discrimination based on the ***purpose*** of expressive conduct is a content-based restriction, not a manner-based restriction.

[16] Meriam-Webster, Demonstration, https://www.merriam-webster.com/dictionary/demonstration (last visited Nov. 30, 2023) (emphasis added).

[17] Meriam-Webster, Picket, https://www.merriam-webster.com/dictionary/picket (last visited Nov. 30, 2023).

[18] Meriam-Webster, Parade, https://www.merriam-webster.com/dictionary/parade (last visited Nov. 30, 2023).

[19] Meriam-Webster, Holiday, https://www.merriam-webster.com/dictionary/holiday (last visited Nov. 30, 2023); Office of Personnel Mgmt., 2023 Holiday Schedule https://www.opm.gov/policy-data-oversight/pay-leave/federal-holidays/#url=2023 (last visited Nov. 30, 2023).

MOTION FOR BOND PENDING APPEAL
(*United States v. Rhine*, 21-CR-687 (RC)) - 30

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

activity based on its function—that of advocating a particular viewpoint. *See also Nassif*, 628 F. Supp. 3d at 183 (Section 5104(e)(2)(G) "prohibits taking part in an organized demonstration or parade that advocates a particular viewpoint"); *United States v. Sheppard*, No. CR 21-203 (JDB), 2022 WL 17978837, at *6 (D.D.C. Dec. 28, 2022) (same). Section 5104(e)(2)(G) is a content-based restriction on speech because it criminalizes expressive conduct that has a political or religious message.

These content-based restrictions do not pass strict scrutiny for the same reasons they are not constitutional "time, place, and manner" restrictions. The statute criminalizes substantial conduct—much of which is not disruptive at all (for example a group wearing t-shirts that advocate a political position, or a person walking quietly with a flag)—for civilians. Yet, it entirely exempts Members of Congress and their staff, leading to substantial disruptive conduct and expression going unpunished and undeterred. *See supra*. In addition, as discussed further below, § 5104 contains *viewpoint*-based restrictions. Such restrictions are entirely prohibited in public fora. *Pleasant Grove City, Utah*, 555 U.S. at 469.

> **d.    Even if the Capitol Building is a nonpublic forum, both §§ 5104(e)(2)(D) & 5104(e)(2)(G) are unconstitutional restrictions on speech based on viewpoint.**

Even if the Court finds the Capitol Building (or large portions of it) are not a public forum, the relevant restrictions in § 5104 do not pass constitutional muster. While the government may restrict First Amendment activity in a nonpublic forum, such restrictions must be "viewpoint neutral" and "reasonable in light of the purpose served by the forum." *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. at 806, 105 S. Ct. 3439; *see Longo v. United States Postal Service*, 983 F.2d at 12. Here, the restrictions in § 5104 are neither.

First, § 5104 contains viewpoint-based restrictions on speech. Viewpoint discrimination is an egregious form of content discrimination. *Rosenberger v. Rector &*

MOTION FOR BOND PENDING APPEAL
(*United States v. Rhine*, 21-CR-687 (RC)) - 31

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

*Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). The Supreme Court has made clear that the First Amendment does not tolerate such restrictions that discriminate based on the identity of the speaker and the serious doubt such restrictions must receive:

> Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints …. ***Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others*** …. As instruments to censor, these categories are interrelated: Speech restrictions based on the identity of the speaker are all too often simply a means to control content.

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) (internal citations omitted) (emphasis added).

The subsections of § 5104 at issue here unconstitutionally restrict First Amendment expression based on its viewpoint. Certain speakers are explicitly exempt from this statute. *See* 40 U.S.C. § 5104(e)(3). Members of Congress and employees or officers are not subject to these restrictions on speech. They may express their views through coordinated demonstration, inappropriate and disruptive shouting, and even profane and threatening language in all parts of the Capitol Building without fear of prosecution. *See supra* notes 10–13 (detailing various instances of Members of Congress engaging in such conduct in the Capitol Building). Yet the views of citizens, political outsiders, are treated differently than those of these politicians. What is criminal conduct for an average citizen is permitted of politicians.[20]

---

[20] For example, as Mr. Rhine previously highlighted, *see* Dkt. No. 47 at 25, when civilian guest Jaime Guttenberg interrupted then-President Trump's State of the Union Address in the Capitol Building in 2020 by shouting "What about victims of gun violence, like my daughter?" (Mr. Guttenberg's daughter had been killed in the mass shooting at a high school in Parkland, Florida), his conduct was considered criminal and Capitol Police escorted Mr. Guttenberg out of the room and detained him. *See* Mahita Gajanan, *Father of Parkland Shooting Victim Escorted from State of the Union After Protest*, Time, Feb. 5, 2020, https://time.com/5778312/fred-guttenberg-state-of-the-union-protest/. However, in 2009, when then-Member of Congress Joe Wilson shouted, "you lie," interrupting then-President Obama during an address to Congress at the Capitol, he faced no police or legal consequences. Even though numerous elected officials

---

MOTION FOR BOND PENDING APPEAL
(*United States v. Rhine*, 21-CR-687 (RC)) - 32

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1    Section 5104 thus discriminates on viewpoint. It protects the views of those

2    presently in political power—Members of Congress and their staff. And it restricts the

3    expression of the views of those not in political power—civilians. Such viewpoint

4    discrimination renders the statute unconstitutional, even in a non-public forum.

5    Additionally, § 5104's restrictions on speech are not reasonable in light of the

6    purpose of the Capitol. Indeed, a District Court struck down a Capitol regulation

7    broadly prohibiting expressive conduct and demonstrations in the Capitol Building,

8    **despite** finding that Building was a nonpublic forum, because the restriction was too

9    broad and so not reasonable in light of the purpose of the forum:

> While the regulation is justified by the need expressed in the statute to
> prevent disruptive conduct in the Capitol, it sweeps too broadly by inviting
> the Capitol Police to restrict behavior that is in no way disruptive, such as
> "speechmaking ... or other expressive conduct ...." Traffic Regulations for
> the Capitol Grounds § 158. Because the regulation's proscriptions are not
> limited to the legitimate purposes set forth in the statute, it is an
> unreasonable and therefore an unconstitutional restriction on speech. *See*
> *Board of Airport Commissioners of the City of Los Angeles v. Jews for*
> *Jesus, Inc.*, 482 U.S. 569, 575, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987)
> (general prohibition of First Amendment activity in airport cannot be
> justified even if airport is nonpublic forum "because no conceivable
> government interest would justify such an absolute prohibition of speech").
> For these reasons, . . . the regulation is both unreasonable and
> unconstitutionally overbroad.

*Bynum*, 93 F. Supp. 2d at 57. The regulation challenged there indeed bears remarkable

similarities to the present Capitol Police policy interpreting § 5104. *Compare id.* at 53

*with supra* note 8. And "[i]n evaluating [a] facial challenge, [courts] must consider the

[government]'s authoritative constructions of the [law], including its own

implementation and interpretation of it." *Forsyth Cnty., Ga. v. Nationalist Movement*,

505 U.S. 123, 131 (1992). Just like the regulation in *Bynum*, § 5104 is not a reasonable

---

condemned Representative Wilson's conduct, he was not detained or escorted from the room.
*See* Carl Hulse, *In Lawmaker's Outburst, a Rare Breach of Protocol*, N.Y. Times, Sep. 9, 2009,
https://www.nytimes.com/2009/09/10/us/politics/10wilson.html?searchResultPosition=1.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

restriction on speech in the Capitol Building, *even if* it is deemed a nonpublic forum, because it sweeps far too broadly.

Even if the defined crimes at issue here may have some legitimate scope, they are defined so broadly that they "criminalize[] a substantial amount of protected expressive activity." *United States v. Williams*, 553 U.S. 285, 297 (2008). The statute purports to advance the government's interests in ensuring that "people with strong feelings [are] assured of the rights of freedom of expression and of assembly and the right to petition their Government," but also to ensure that "a minority [of such people are not given license] to delay, impede, or otherwise disrupt the orderly processes of the legislature which represents all Americans." 1967 U.S.C.C.A.N. at 1740. Congress's stated intent was that the statute should restrict the vocal minority—further evidence of and explanation for the statute's viewpoint discrimination. Yet the statute was still drafted so broadly that it does not reasonably advance its other legitimate purposes of preventing disruption of the orderly business of Congress.

The exceedingly broad restrictions are not narrowly tailored to serve these purposes. For one, they extinguish rather than advance the goal of assuring citizens their right to "freedom of expression and of assembly and the right to petition their Government[.]" *Id*. at 1740. And, as discussed above, § 5104 criminalizes substantial conduct that does not "disrupt the orderly processes of the legislature[.]" *Id*. This breadth of prohibition does nothing to advance the goal of preventing "disrupt[ion of] the orderly processes of the legislature" while it hinders the goal of protecting citizens' First Amendment rights.

> **e.    Section 5104's vagueness also infringes on substantial protected speech, in violation of the First Amendment and due process.**

A related doctrine may also render a restriction unconstitutional. "The void-for-vagueness doctrine requires that a penal statute define the criminal offense with

MOTION FOR BOND PENDING APPEAL
(*United States v. Rhine*, 21-CR-687 (RC)) - 34

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

sufficient definiteness that ordinary people can understand what conduct is prohibited

and in a manner that does not encourage arbitrary and discriminatory enforcement."

*Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Additionally, vagueness of a statute is a

matter of special concern when it is paired with criminal penalties, *Reno v. Am. C.L.*

*Union*, 521 U.S. 844, 872 (1997). And vagueness must be carefully scrutinized when it

could chill the exercise of First Amendment rights:

> A law is unconstitutionally vague if it fails to give a person of ordinary
> intelligence a reasonable opportunity to know what is prohibited, if it fails
> to provide explicit standards to those who enforce it, or if it operates to
> inhibit the free exercise of First Amendment freedoms by chilling such
> exercise by its uncertain meaning.

*Bynum v. U.S. Capitol Police Bd*., 93 F. Supp. 2d 50, 59 (D.D.C. 2000) (citing *Grayned*

*v. City of Rockford*, 408 U.S. 104, 108–09 (1972)).

"A statute can be impermissibly vague for either of two independent reasons."

*Hill v. Colorado*, 530 U.S. 703, 732 (2000). First, a statute is impermissibly vague if it

"fails to give ordinary people fair notice of conduct it punishes[.]" *Johnson v. United*

*States*, 576 U.S. 591, 595 (2015). Second, a statute is impermissibly vague if it

"authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530

U.S. at 732. When a law chills First Amendment protected activities, "[t]he

objectionable quality of vagueness and overbreadth does not depend upon absence of

fair notice to a criminally accused or upon unchanneled delegation of legislative

powers, but upon the danger of tolerating, in the area of First Amendment freedoms, the

existence of a penal statute susceptible of sweeping and improper application."

*N.A.A.C.P. v. Button,* 371 U.S. 415, 432–33 (1963).

Section 5104(e)(2)(D) criminalizes among other things "disorderly or disruptive

conduct." However, the statute provides no definition of these terms. Notably,

disorderly conduct is also not a crime at common law, instead, the common law

criminalized only breaching the peace, which generally required actions that reasonably

MOTION FOR BOND PENDING APPEAL
(*United States v. Rhine*, 21-CR-687 (RC)) - 35

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

would cause another to respond violently. Francis Barry McCarthy, "Vagrancy and Disorderly Conduct," 4 Encyclopedia of Crime and Justice 1589, 1589 (Sanford H. Kadish ed., 1983). However, modern criminalization of disorderly conduct tends to be broader than the old common law crime of breach of the peace. Black's Law Dictionary defines disorderly conduct as "Behavior that tends to disturb the public peace, offend public morals, or undermine public safety." Conduct: Disorderly Conduct, Black's Law Dictionary (11th Ed. 2019). In contrast to disorderly conduct statutes in many other jurisdictions, § 5104 never defines this term. The lack of a clear definition fails to give an ordinary person notice of what conduct is criminal.

Section 5104(e)(2)(G) flatly prohibits all parading, demonstrating, and picketing in a Capitol Building. The statute does not define or clarify these terms. The subsection does not limit itself to disruptive speech, protests, gatherings, or even audible oral expressions of ideas. The statute also does not limit itself to organized or concerted conduct, as those terms colloquially imply, but rather criminalizes these actions by an "individual or group of individuals[.]" 18 U.S.C. § 1752(e)(2). The statute thus suggests a single person holding a sign may be picketing. A person who sits on the floor in front of a staircase to call attention to a lack of convenient accommodations for people with disabilities may be demonstrating, as may a person who asks every employee they see where a gender neutral bathroom is despite knowing that none exists at the Capitol. The statute is sufficiently vague that ordinary people are likely to have difficulty in understanding what is prohibited.

Of great concern for both subsections is that this vagueness (as well as their overbreadth, discussed above) invite arbitrary and discriminatory enforcement. Beyond the explicit exemption of Members of Congress and their staff, the vagueness of the statute invites law enforcement to treat people differently based on the views they express. A Capitol Police Officer may allow a group of students wearing coordinated t-

MOTION FOR BOND PENDING APPEAL
(*United States v. Rhine*, 21-CR-687 (RC)) - 36

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

shirts reciting statistics about children killed by gun violence in the United States as they walk through the Capitol Building to continue without intervention, if sympathetic to their message. Yet the same Police Officer may arrest a similar group of students wearing coordinated t-shirts reciting statistics about children killed by the Israeli Military in Gaza, if concerned about or not sympathetic to their message.

The threat of prosecution under such a vague statute chills First Amendment-protected activity. "It makes no difference whether such prosecutions or proceedings would actually be commenced. It is enough that a vague and broad statute lends itself to selective enforcement against unpopular causes." *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 435 (1963). "So long as the statute remains available to the [government] the threat of prosecutions of protected expression is a real and substantial one. Even the prospect of ultimate failure of such prosecutions by no means dispels their chilling effect on protected expression." *Dombrowski v. Pfister*, 380 U.S. 479, 494 (1965).

### f.    The § 5104 crimes are also unconstitutional as applied here.

In Counts 3 and 4, Mr. Rhine was convicted of violating crimes under an unconstitutional statute. These crimes under § 5104 are facially unconstitutional and unconstitutional as applied in this case. A litigant need not succeed on their facial First Amendment challenge to succeed on their as-applied claims. *See Hodge v. Talkin*, 799 F.3d 1145, 1156 (D.C. Cir. 2015). Courts undertake a similar analysis for as-applied challenges as for facial challenges, but with a focus on the actual facts of the case: First, courts "decide whether [the activity at issue] is speech protected by the First Amendment." *Cornelius v. NAACP Legal Defense & Education Fund, Inc.*, 473 U.S. 788, 797 (1985). Second, they determine whether the restriction on that speech is neutral, or if it is content- or viewpoint-based, to determine the level of scrutiny to

MOTION FOR BOND PENDING APPEAL
(*United States v. Rhine*, 21-CR-687 (RC)) - 37

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

apply. Third, courts apply that level of scrutiny—"strict scrutiny for content-based statutes and intermediate scrutiny for content-neutral statutes." *Green v. United States Dep't of Just.*, 54 F.4th 738, 745 (D.C. Cir. 2022) (internal citations omitted).

Here, the conduct underlying Mr. Rhine's conviction was plainly expression protected by the First Amendment. Evidence at trial indicated that, on January 6, 2021, Mr. Rhine attended a permitted political protest on the Capitol Grounds. He later walked into the Capitol Building, and around some of its hallways in or abutting areas that are generally publicly accessible, while carrying a large flag and cowbells. He uttered no threats, did no vandalism, and committed no acts of violence. He walked through the building with his flag for a matter of minutes before he was stopped by law enforcement, whom he obeyed completely. *See* PSR at 6–7 (summarizing).

People other than Mr. Rhine committed numerous crimes at the Capitol that day, including acts of vandalism and violence. *See id.* at 5–6 (summarizing). However, the evidence demonstrated that Mr. Rhine was not coordinating with other people, rather he was walking alone. His flag did not match that of other civilians at the Capitol on that date, but rather was unique to him. The only evidence tying Mr. Rhine to others was a statement he made on the terrace of the Capitol that expressed a viewpoint similar to that made by other people demonstrating at the Capitol on that date. Mr. Rhine stated he and others were there to "stop the steal," expressed his frustration with cheating, and recounted his observations of a peaceful protest, that he hoped would remain peaceful, and that was a "special moment in history." *Id*. at 6.

First, the evidence in this case demonstrates that Mr. Rhine's conduct was plainly protected by the First Amendment. He verbally expressed his political views and he carried a flag, unique to himself, to further express his political views. He did not personally engage in threats or other conduct that would remove his speech from the Amendment's protection, nor did he coordinate with anyone doing so.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Second, as discussed above, § 5104 employs content- and viewpoint-based restrictions on speech. As such, its application to Mr. Rhine here triggers strict scrutiny.

Third, applying strict scrutiny, Mr. Rhine's convictions under § 5104 do not further the government's interests in protecting free speech by preventing a minority of civilians to impede or disrupt the orderly conduct of government. While the conduct of *others* certainly disrupted Congress's business on January 6, 2021, Mr. Rhine's did not. He was calm, quiet, and nonviolent. The only time Mr. Rhine so much as raised his voice was to intervene to stop unknown men from kicking a door—Mr. Rhine told them to show respect for the Capitol Building, calling it a "sacred place." *Id.* at 6.

Criminalizing Mr. Rhine's peaceful conduct, particularly in the absence of any evidence of coordination with other people committing crimes, does not further the government's interest in limiting disruption of Congress's business. Rather, it punishes Mr. Rhine for his political speech—at the core of the First Amendment's protections.

### 3. The custodial sentence imposed on Mr. Rhine was punishment for his exercise of his constitutional rights that violated due process.

The district court's trial penalty at sentencing was impermissible. A person cannot be punished for choosing to exercise a protected statutory or constitutional right. *United States v. Goodwin*, 457 U.S. 368, 372 (1982). "To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978).

Although the D.C. Circuit has left "dangling the important question as to whether a trial judge can lay on extra time for going to trial," multiple other "circuits have unanimously acknowledged [that] when a judge increases a criminal defendant's sentence specifically because he pleaded [not] guilty, the constitutional concerns are serious." *United States v. Jones*, 997 F.2d 1475, 1480, 1482 (D.C. Cir. 1993) (Mikva,

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

J., dissenting)[21]; *see United States v. Monroe*, 943 F.2d 1007, 1018 (9th Cir. 1991)

("[W]here a disparity in sentences suggests that a defendant who pleaded not guilty was

being penalized for exercising his constitutional right to a trial, the reasons for the

disparity must appear in the record."); *United States v. Frost*, 914 F.2d 756, 774 (6th

Cir. 1990) ("[I]t is improper for a district judge to penalize a defendant for exercising

his constitutional right to plead not guilty and go to trial, no matter how overwhelming

the evidence of his guilt."); *United States v. Crocker*, 788 F.2d 802, 809 n.3 (1st Cir.

1986) ("The judge's remarks on how the presentation of a frivolous case and the

ensuing waste of judicial resources could be factors in determining the sentence to be

imposed are sufficient to establish that there was a reasonable likelihood of

vindictiveness."); *United States v. Hutchings*, 757 F.2d 11, 14 (2d Cir. 1985) ("The

'[a]ugmentation of sentence' based on a defendant's decision to 'stand on [his] right to

put the Government to its proof rather than plead guilty' is clearly improper." (quoting

*United States v. Araujo*, 539 F.2d 287, 291–92 (2nd Cir. 1976)); *United States v. Roe*,

670 F.2d 956, 973 (11th Cir. 1982) ("[T]he sentencing court may not present the

defendant with a choice between admitting his guilt and enduring a harsher sentence for

failing to do so."); *United States v. Wright*, 533 F.2d 214, 216 (5th Cir. 1976) ("[A] trial

court may not pressure defendants, who have been found guilty following a trial by

jury, to confess their guilt prior to the imposition of sentence"); *Hess v. United States*,

496 F.2d 936, 938 (8th Cir. 1974) ("This circuit has joined a host of other courts in

recognizing that whether a defendant exercises his right to trial by jury to determine his

guilt or innocence must have no bearing on the sentence imposed.").

---

[21] The D.C. Circuit has held that "a district court may not pressure a defendant into expressing remorse such that the failure to express remorse is met with punishment .... It is unclear, however, whether these principles extend to a district court's consideration of a defendant's lack of remorse with respect to mitigation or leniency under either the Guidelines or 18 U.S.C. § 3553(a)." *United States v. Lawrence*, 662 F.3d 551, 562 (D.C. Cir. 2011) (internal citations omitted).

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1      Here, the Court improperly penalized Mr. Rhine for exercising his constitutional

2  right to trial by jury. At sentencing, the Court stated that Mr. Rhine "never accepted

3  responsibility for his actions, forcing a rare misdemeanor jury trial … which required

4  the government and the court to expend significant resources." Ex. B (September 11,

5  2023, Sentencing Transcript) at 21:16–20. The Court explicitly stated that it would

6  sentence Mr. Rhine to time in custody when it had not done so for similarly situated

7  defendants *because* Mr. Rhine exercised his right to trial: "Therefore, despite the fact

8  that I have not imposed incarceration sentences to other misdemeanants, all of them

9  pleaded guilty. So defendant is not in that category of getting a reward of a reduced

10  sentence." Ex. B at 21:20–25.[22] Instead, the Court explained that the *only* relevant

11  comparable cases it would consider for purposes of avoiding unwarranted disparities

12  were to people *convicted after jury trial* of similar crimes, *id*. at 26:5–14.

13      Defense counsel objected to this reasoning as a "trial penalty." *Id.* at 28:9–15.

14  Counsel explained that a guilty plea would not change Mr. Rhine's guidelines range

15  (which was zero to six months), highlighted differences in the conduct of the

16  defendants in the cases the Court relied on as comparable, and emphasized that

17  Mr. Rhine had demonstrated his sincere contrition and remorse. *Id*. at 28:11–29:10.

18  Indeed, in Mr. Rhine's letter to the Court, he expressed his "sincerest and humblest

19  apologies for the trauma that [he] caused others by being present at the Capitol on

20  January 6, 2021." Dkt. No. 114-1. He explained his horror when he later saw the

21  serious violence and damage perpetrated by people at the Capitol on that day: "Seeing

22  our beautiful Capitol being disrespected and seeing the violent conflict that occurred

23

24  ---

[22] The Court again distinguished Mr. Rhine from other similarly situated people because he did
25  not plead guilty, in explaining its disagreement with U.S. Probation, who recommended no
custodial sentence. *See id*. at 24:8–13. It did so again in explaining why it would give Mr.
Rhine a disparate sentence. *Id.* at 26:1–4 ("What defendant fails to appreciate is that all of
26  those defendants pleaded guilty, usually to just the parading charge and, thus, were rewarded
for their acceptance of responsibility. That is not the case here.").

MOTION FOR BOND PENDING APPEAL
(*United States v. Rhine*, 21-CR-687 (RC)) - 41

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

left me feeling horrified and broken." *Id*. In addition, he demonstrated his growth and

his immense regret and remorse for his actions:

> I wish I could go back in time and reverse the decisions that I made on that
> day. I wish I could erase all the pain, grief, hurt, fear, and disappointment
> that everyone felt because of where I was on that dreadful day, and the
> footsteps that I took. But I cannot erase any of it .... My decisions on
> January 6, 2021, caused many people pain. Admitting this has led me to
> make changes in my own life, which are, and which will affect the lives of
> others .... I present myself before you today, wanting to express that I
> accept responsibility for my actions, and for my remorse in being any part
> of that day.

*Id*. While the Court emphasized a short recorded statement of Mr. Rhine's taken on

January 6, 2021, as factoring into its decision, *see id*. at 23:19–24, the Court did not

discuss Mr. Rhine's letter, *see generally id*.

      The Court responded to defense counsel's objections by indicating its reasoning

merely related to the guidelines and by re-affirming its limit on consideration of

comparable cases to only those where people were convicted post-trial:

> I did not impose a penalty. I assessed, as is a central tenet of the guidelines,
> that there's a reward for acceptance of responsibility, which didn't occur
> here. And I am making my decision based on the comparators. And I intend
> to impose a sentence within this -- the range set by the comparators.

*Id*. at 30:14–19. The Court imposed a four-month custodial sentence (in addition to a

fine and supervised release with conditions). *Id.* at 31:2–6.

      The record here indicates that the four-month sentence was punishment for

Mr. Rhine's exercise of his right to trial. The only alternate explanation offered by the

Court was that its decision was driven by the guidelines. However, the two-level

reduction that *could* have been imposed for the acceptance of responsibility guideline

under U.S.S.G. § 3E1.1(a) would not have changed Mr. Rhine's guideline range, which

was already the lowest possible range of zero to six months, *id*. at 6:1–3. Indeed, the

Court declined to reduce Mr. Rhine's offense level under the then-forthcoming but

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

retroactive "zero-point offender" guideline reasoning that it would not change his guideline range and would be "largely academic." *Id*. at 4:18–5:10. This reasoning belies the Court's explanation that it was sentencing Mr. Rhine more harshly because it "assessed, as is a central tenet of the guidelines, that there's a reward for acceptance of responsibility, which didn't occur here." *Id*. at 30:14–16. Furthermore, the Court's categorization of similarly situated defendants based ***solely*** on whether they were convicted after a jury trial or after a plea, rather than based on their offense conduct, demonstrates that its harsh treatment of Mr. Rhine was punishment for his exercise of his right to trial. And the Court's remarks that Mr. Rhine "forc[ed] a rare misdemeanor jury trial, which is -- which is his right, which required the government and the Court to expend significant resources and required members of the public to take time out from their busy lives" further evidences the vindictive purpose of the four-month custodial sentence. *See Crocker*, 788 F.2d at 809 n.3 ("judge's remarks on how the presentation of a frivolous case and the ensuing waste of judicial resources could be factors in determining the sentence to be imposed are sufficient to establish that there was a reasonable likelihood of vindictiveness.").

> ### C.    Resolution of any of these substantial questions in Mr. Rhine's favor would likely result in a new trial, a sentence that does not include imprisonment, or dismissal of charges.

Each of these issues presents a substantial question. If the appellate court answers these questions in Mr. Rhine's favor, each would result in either reversal of the conviction or of the custodial sentence. As a result, denying Mr. Rhine bond pending appeal raises a serious risk of subjecting him to custodial punishment that was imposed in violation of his constitutional rights.

First, if the appellate court finds the jury instructions for Count 1 and Count 2 were improper, the error would not be harmless, but rather would require reversal and a new trial. Even if the Court applies harmless error analysis, *see Neder v. United States*,

MOTION FOR BOND PENDING APPEAL
(*United States v. Rhine*, 21-CR-687 (RC)) - 43

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

527 U.S. 1, 15 (1999) (applying harmless error review to errant jury instruction on the elements of the crime charged), the record here makes clear that the errors were harmful. An error of this type may only be deemed harmless if the government proves that the error was "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967). This inquiry asks "whether the Government has shown beyond a reasonable doubt that the error at issue did not have an effect on the verdict, not merely whether, absent the error, a reasonable jury could nevertheless have reached a guilty verdict." *United States v. Cunningham*, 145 F.3d 1385, 1394 (D.C. Cir. 1998). And "[w]here there is uncertainty as to the effect on the verdict, the error cannot be deemed harmless; rather, the court must treat the error as having affected the verdict." *Id.*

The government cannot make such a showing on this record. The jury deliberation in this case lasted for hours and spanned over a weekend. Furthermore, both errant instructions arose ***in response to*** specific Jury questions about the elements of the crimes charged. *See* Dkt. No. 100; Ex. A at 505:9–13, 511:3–14, 517:7–10, 518:1–4. Yet the jury returned its verdict shortly after receiving the errant instructions in question. This record indicates that the Jury had doubts as to whether the evidence supported the elements of the charges in question if those elements were interpreted correctly. As such, the instructional errors require reversal.

Second, if the appellate court concludes 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G) are unconstitutional, Mr. Rhine's convictions on Counts 3 and 4 will be vacated.

Third, if the appellate court finds that Mr. Rhine received a vindictive custodial sentence as punishment for his exercise of his right to trial, his sentence must be reversed as such vindictiveness is a violation of due process. *Bordenkircher*, 434 U.S. at 363. On remand, Mr. Rhine would likely receive no custodial sentence—

MOTION FOR BOND PENDING APPEAL
(*United States v. Rhine*, 21-CR-687 (RC)) - 44

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1  similar to those imposed for the numerous people convicted of similar crimes and

2  offense conduct, *see* Dkt. No. 114 at 12–14 (and cases cited therein).

3  **III.    CONCLUSION**

4      The requirements of 18 U.S.C. § 3143(b)(1) are satisfied here. As such,

5  Mr. Rhine respectfully moves for release pending appeal and stay of execution of his

6  sentence.

7      DATED this 8th day of January 2024.

8                              Respectfully submitted,

9

10                              s/ *Rebecca Fish*

WA State Bar Number: 57488

11  Assistant Federal Public Defender

1331 Broadway, Suite 400

12  Tacoma, WA 98402

Phone: (253) 593-6710

13  Email: Becky_Fish@fd.org

14  Attorney for David Rhine

MOTION FOR BOND PENDING APPEAL
(*United States v. Rhine*, 21-CR-687 (RC)) - 45

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**