1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

2

_____

3

United States of America,          ) Criminal Action
                                   ) No. 1:21-cr-00687-RC
4                      Plaintiff,  )
                                   ) **_Jury Voir Dire_**
5      vs.                          )
                                   )
6      David Charles Rhine,         ) Washington, D.C.
                                   ) **April 18, 2023**
7                      Defendant.   ) Time:  10:00 a.m.
       _____

8

**Transcript of _Jury Voir Dire_
Held Before
The Honorable Rudolph Contreras
United States District Judge**

9

10

11

A P P E A R A N C E S

12

For the Government:    **Francesco Valentini**
13                      DEPARTMENT OF JUSTICE
                       950 Pennsylvania Avenue, Northwest
14                      Washington, D.C. 20530

15                      **Kelly E. Moran**
                       UNITED STATES ATTORNEY'S OFFICE
16                      FOR THE DISTRICT OF COLUMBIA
                       601 D Street, Northwest
17                      Washington, D.C. 20579

18     For the Defendant:   **Rebecca C. Fish**
                       FEDERAL PUBLIC DEFENDER
19                      1331 Broadway, Suite 400
                       Tacoma, Washington 98402

20     _____

21     Stenographic Official Court Reporter:
                       Nancy J. Meyer
22                      Registered Diplomate Reporter
                       Certified Realtime Reporter
23                      333 Constitution Avenue, Northwest
                       Washington, D.C. 20001
24                      202-354-3118

25

```
 1                    P R O C E E D I N G S

 2              (Proceedings held out of the presence of the jury

 3      venire.)

 4              THE COURT:  All right.  I looked at the exhibit that

 5      government wants to include in their opening.  What is the

 6      objection to that?

 7              MS. FISH:  Your Honor, my objection is that it has a

 8      skewed perspective.  It's an illustration.  There's no

 9      foundation for it being accurate or proportionate, and the

10      angle makes the east side of the building appear smaller than

11      it is, and that's the area that's crucial in this trial.  The

12      government has other maps I have not objected to.  So I don't

13      see the need to use this one, and I'd object on 403.

14              MR. VALENTINI:  Your Honor, Capitol Inspector Loyd

15      will testify that the rendering is a fair and accurate

16      representation of the Capitol as it appeared on January 6th,

17      2021, which is a different appearance, in some respect, than

18      the Capitol on any other day.  The -- the exhibit has been

19      offered and admitted in a number of other January 6th cases.

20      We see no basis for the objection.

21              THE COURT:  Okay.  You can use it.

22          All right.  Are we ready to bring in the next potential

23      juror?

24              MS. FISH:  Yes, Your Honor.

25              THE COURT:  All right.
```

```
 1                    MR. VALENTINI:  Yes.

 2                    (REPORTER'S NOTE:  Juror 0447 enters.)

 3                    THE COURTROOM DEPUTY:  Judge, there are two missing

 4     jurors.  So we are starting with Juror No. 0447, which is line

 5     31.

 6                    THE COURT:  Okay.  This is Juror 0447.  Ms. ████;

 7     is that correct?

 8                    THE PROSPECTIVE JUROR:  Yes.

 9                    THE COURT:  Okay.  You answered affirmatively to

10     Question No. 10, which is the one if you know or someone close

11     to you lives or works near the Capitol, and I think you

12     answered your occupation as -- in the U.S. House of

13     Representatives.

14                    THE PROSPECTIVE JUROR:  Correct.

15                    THE COURT:  So tell us about that.

16                    THE PROSPECTIVE JUROR:  So I work for a committee in

17     the House of Representatives, and I have for about almost

18     five years.

19                    THE COURT:  Okay.  And were you at the Capitol on

20     January 6th?

21                    THE PROSPECTIVE JUROR:  No.  I was working from home.

22                    THE COURT:  Okay.  And do you know -- do you know and

23     interact with folks that were there on that day and had to be

24     evacuated?

25                    THE PROSPECTIVE JUROR:  Yes.  Well, they were
```

```
 1      evacuated due to the pipe bomb threat.

 2                  THE COURT:  Okay.

 3                  THE PROSPECTIVE JUROR:  And they were sheltered in

 4      place later on.

 5                  THE COURT:  All right.  All right.

 6                  MR. VALENTINI:  Your Honor, we would not object.

 7                  MS. FISH:  Same, Your Honor.

 8                  THE COURT:  All right.

 9                  (REPORTER'S NOTE:  Juror 0447 left.)

10                  (REPORTER'S NOTE:  Juror 1166 enters.)

11                  THE COURTROOM DEPUTY:  We have Juror 1166, which is

12      line 32.

13                  THE PROSPECTIVE JUROR:  Good morning.

14                  THE COURT:  So this is Juror No. 1166.  Ms. ████████;

15      is that correct?

16                  THE PROSPECTIVE JUROR:  Yes.

17                  THE COURT:  Okay.  So you answered yes to

18      Question No. 7, which is that -- the one about you, perhaps,

19      don't think you can follow my instructions and disregard any

20      other notions, ideas, or beliefs about the law you may

21      encounter in reaching your verdict.

22                  THE PROSPECTIVE JUROR:  Yes, I believe -- yes, I did

23      put that down.

24                  THE COURT:  Okay.  Tell us about your concerns.

25                  THE PROSPECTIVE JUROR:  Can you repeat that again.
```

1    THE COURT:  Sure.  Tell us about your concerns about

2    you being able to follow that instruction.

3    THE PROSPECTIVE JUROR:  Well, in general, I'm not

4    always the best at following instructions sometimes.  Sometimes

5    I do, but then I'll go off on stuff like that.  But I think

6    right now I'm just -- given, like, the events -- a few months

7    ago, I have a lot of mixed opinions on it.  And so my opinions

8    on it are not the most popular, and you just don't -- I think

9    my biggest concern is I'm not sure if I will be able to do this

10   in a fair and -- if I will be able to judge fairly and wisely.

11   THE COURT:  And why do you think that?

12   THE PROSPECTIVE JUROR:  Because of my -- my --

13   because -- because of my opinions on the whole -- on the events

14   of January 6th.

15   THE COURT:  Which are what?

16   THE PROSPECTIVE JUROR:  I don't think that -- for

17   example, when they had the hearing last summer, I don't think

18   they presented all the evidence.  And I think there was some

19   new evidence that had come out too that showed contrary to,

20   like, what they -- they portrayed about the protesters, as

21   being violent protesters.  Like they showed stuff to the

22   contrary that could contradict the narrative that's been going

23   around.

24   THE COURT:  Okay.  But there were thousands of people

25   there and, you know, not everyone engaged in violence and

1    not -- not everyone engaged in vandalism.  And there's -- in

2    this case, there's no allegations that Mr. Rhine engaged in

3    vandalism or in violence.  So do you not think you would be

4    able to listen to the evidence in this case and judge the

5    allegations against Mr. Rhine fairly?

6              THE PROSPECTIVE JUROR:  I don't think -- I think in

7    that case, in the case of, like, there being violent versus no

8    violent -- nonviolent protesters, I would be able to judge

9    fairly.  But also knowing about some other things that happened

10   with members of Congress who were told to, like -- who --

11   who -- essentially, with people letting others in, I think

12   there's a lot of questions surrounding that; that -- that that

13   could have called into question whether or not there was

14   trespassing.

15             THE COURT:  Okay.  And what sort of evidence are you

16   aware of in that respect?

17             THE PROSPECTIVE JUROR:  Well, I'm aware of the fact

18   that according to the stories I have heard of, that there was a

19   gentleman by the name of Ray Epps who was pushing people to

20   go -- who was, like, pushing people to go into the Capitol.

21   And there's a lot of -- there's -- there are rumors and

22   questions -- and I know it's not exactly verified -- that he

23   was -- that he might have -- he might have been an agent at

24   that time that was trying to put people into -- that was trying

25   to put others into trouble.

1          THE COURT:  Okay.  And, you know, if -- if there's no

2     evidence in this case about Mr. Epps or any other person like

3     him, do you think you would be able to judge the case fairly?

4          THE PROSPECTIVE JUROR:  If there was no case against

5     him you said?

6          THE COURT:  If there was no evidence concerning

7     Mr. Epps interacting or -- or -- or communicating with the

8     defendant, do you think you would be able to judge the case

9     fairly?

10          THE PROSPECTIVE JUROR:  I think so.

11          THE COURT:  All right.  You also answered yes to the

12     question about whether you followed the news about the events

13     that took place at the Capitol on January 6th.

14          THE PROSPECTIVE JUROR:  Yes, I did.

15          THE COURT:  Tell us about that.  What have you

16     followed and where you get your news.

17          THE PROSPECTIVE JUROR:  I followed the events

18     because -- I had followed -- followed the events because --

19     well, first of all, I was, actually, in news for a little bit

20     for a couple of years.  During the time of January 6th, I was

21     not in -- I was not involved in news.

22          But I also, you know, as a video professional, was

23     involved in, like, helping produce shows that talked about --

24     that talked about the issues.  So that's kind of how I know.

25     And I had followed *The Epoch Times*, The Western Journal.  Those

1    are two news sources I could list.

2         And -- and also from -- and also, like, various accounts

3    of people -- of contacts that I knew -- that I know previously

4    at news outlets I had followed, like, their eyewitness accounts

5    and -- yeah, I've been following those sources.

6              THE COURT:  Okay.  And what sorts of things have you

7    concluded from what you've learned?

8              THE PROSPECTIVE JUROR:  Well, I've concluded that the

9    whole -- that the whole event of January 6th was planned, was

10   pretty well calculated and planned.  I think there was a lot

11   of -- I think my biggest thing was there was a lot of injustice

12   that took place; that a lot of people were put in prison just

13   for standing there without due process, without the -- without

14   the constant -- without the rights given and the constitutional

15   process.  I mean, that's what I concluded.  And that's what I

16   had heard from the reports of people who went to court.

17             THE COURT:  Okay.  All right.  You also answered yes

18   to Question No. 14, which is the one about -- the same one

19   about watching news, but about individuals.  What news about

20   specific individuals have you heard or seen?

21             THE PROSPECTIVE JUROR:  What specific individuals

22   that were part of January 6th, you said?

23             THE COURT:  Correct.

24             THE PROSPECTIVE JUROR:  To be honest, I really -- I

25   followed them, but I don't remember their names.  I don't

```
1   remember.  I just know that I heard of one individual who

2   had -- who from his eyewitness account, he had seen police

3   firing things into -- into, like, the crowds.  And one woman

4   was almost trampled, and I think she got severely injured and

5   died.  And he tried to save her, but he was arrested and put in

6   the D.C. corrections facility without due process.

7                THE COURT:  Okay.

8                THE PROSPECTIVE JUROR:  That's one -- one story I've

9   heard.

10               THE COURT:  Okay.  All right.  And you answered yes

11  to the question about you might have trouble following my

12  instruction at the end of trial; that the testimony of police

13  officers should be treated the same as testimony from any other

14  officer and that the jury should not give either greater or

15  lesser testimony to the witness simply because that witness is

16  a police officer.

17               THE PROSPECTIVE JUROR:  I believe so.  I think what

18  led me to write down that answer was that I've -- I -- I mean,

19  I do believe in justice and fairness.  I do want things to be

20  very equal.  I -- I do want to see stuff treated fairly, but

21  I've always heard -- but I've also heard from some of this news

22  that some of the police officers may be lying and all that.

23  And just -- I've had my own personal reasons to not trust the

24  justice system based on what I've heard in the news in the last

25  couple of years.
```

```
1              THE COURT:  And what are those personal reasons?

2              THE PROSPECTIVE JUROR:  I would -- if you -- can't

3     quite articulate them right now.  I would like to plead the

4     Fifth on that.

5              THE COURT:  Okay.

6              MR. VALENTINI:  Your Honor, we are ready to move to

7     strike the juror for cause.

8              MS. FISH:  Your Honor, may I ask the juror a couple

9     questions?

10             THE COURT:  Sure.

11             MS. FISH:  Thank you.

12        Good morning, Ms. ████████.

13             THE PROSPECTIVE JUROR:  Good morning.

14             MS. FISH:  I know we introduced ourselves yesterday.

15    But I'm Rebecca Fish.  I'm the attorney for Mr. Rhine.

16        I just want to clarify a couple of your responses to the

17    judge.  You indicated that you were concerned about due

18    process, but you wanted to try to be fair and follow the

19    judge's instructions.

20             THE PROSPECTIVE JUROR:  Uh-huh.

21             MS. FISH:  Understanding that the trial is due

22    process, is the process to which people are due to have their

23    rights protected, if Judge Contreras gives you an instruction

24    and says this is the law, would you be able to follow that

25    instruction?  Can you say it out loud just for the --
```

```
 1                THE PROSPECTIVE JUROR:  Yes.

 2                MS. FISH:  And understanding that this trial, there's

 3    going to be no evidence about Ray Epps.  Some of the things

 4    that you saw in the news are unlikely to come into evidence at

 5    this trial.  It's just about Mr. Rhine and the four charges

 6    against him, none of which involve violence or vandalism.

 7    Would you be able to accept the judge's instructions about what

 8    the law is around those four charges?

 9                THE PROSPECTIVE JUROR:  Yes.

10                MS. FISH:  And would you be able to apply only the

11    facts you see in trial today, not anything you might have heard

12    about on the news or from friends or other people, but only the

13    facts you're going to see in trial in the coming week?  Would

14    you be able to consider only those facts in deciding whether or

15    not Mr. Rhine was guilty?

16                THE PROSPECTIVE JUROR:  To the best of my ability, so

17    help me God.

18                MS. FISH:  Okay.  Thank you.

19                THE COURT:  All right.  You're excused, ma'am.

20                (REPORTER'S NOTE:  Juror 1945 left.)

21                THE COURT:  Mr. Valentini, you're going to move to

22    strike her, I take it?

23                MR. VALENTINI:  Yes.  I renew my motion to strike.

24    Thank you.

25                MS. FISH:  And, Your Honor, my objection would be
```

1    that, obviously, her opinions were different from any of the

2    other jurors we've seen, but they were similar in strength to,

3    for example, Juror ████████ and Juror ████████ about my -- my

4    motion to strike for cause that were overruled yesterday.

5         THE COURT:  I disagree.  One, she said -- she -- she

6    started out by saying she would have a difficult time following

7    the rules.  So that sets her off on a bad foot.

8         Two, sort of like the person I struck because they had

9    conclusions about some of the elements of one of the charges,

10   she had conclusions on the trespassing issues.

11        And her demeanor, which won't be reflected on the

12   record, was very nervous and very agitated.  And the fact -- if

13   we're going to exclude someone that worked at the Capitol, even

14   if they weren't there on that day, she took the Fifth.  So she

15   might have been one of the protesters, so we don't know.

16   She -- because she wouldn't answer.  So on that basis alone, I

17   think we can exclude her.

18        MS. FISH:  I understand the Court's general

19   reasoning.  I would object to that final bit of speculation as

20   to the reason she didn't answer.

21        THE COURT:  I asked the question.  But she took the

22   Fifth.  What did you want me to do?  Compel her?

23        MS. FISH:  No, Your Honor.  But there shouldn't be a

24   specific speculation as to the reason she --

25        THE COURT:  Well, we don't know.

1          MS. FISH:  Correct, Your Honor.  But I think that the

2    appropriate conclusion from that is we don't know why, rather

3    than to assume a particular --

4          THE COURT:  Well, I mean, taking the Fifth means that

5    she might put herself in legal jeopardy.  So we don't know what

6    that is.  I think a fair assumption might be that she was

7    involved in that or something like that.  So -- so we're

8    striking her.

9          MR. VALENTINI:  Your Honor, may I -- may I add a

10   couple of points to complete the record very quickly?

11         THE COURT:  Sure.

12         MR. VALENTINI:  The first one is, just to second

13   Your Honor's point, the juror didn't just say she was -- she

14   might be unable to follow directions.  She actually says that

15   I'm not the best at following directions and sometimes I go

16   off.

17         THE COURTROOM DEPUTY:  Judge, we're skipping around.

18   I have Juror No. 1682, line 34.

19         (REPORTER'S NOTE:  Juror 1682 enters.)

20         THE COURT:  All right.  This is Juror 1682.

21   Ms. ███████; is that right?

22         THE PROSPECTIVE JUROR:  Yes.  That's right.

23         THE COURT:  All right.  You answered yes to

24   Question 1, which is the one about a four- to six-day trial or

25   one that goes from 10:00 to 5:30 creating a special problem for

```
 1   you.

 2              THE PROSPECTIVE JUROR:  Yeah.  I just -- at this

 3   time, I was sick last week from work, and I'm still recovering

 4   from it.  So doing that this week is pretty hard.  I don't know

 5   when it would start, but I'm still not feeling well.

 6              THE COURT:  Okay.  You were here all day yesterday?

 7              THE PROSPECTIVE JUROR:  Yeah.

 8              THE COURT:  Okay.  And what -- what were the effects

 9   that you experienced from being here all day yesterday?

10              THE PROSPECTIVE JUROR:  Very tiring.  I got very

11   congested at the end of the day, and I had trouble sleeping

12   last night.

13              THE COURT:  Okay.  All right.  So you answered yes to

14   Question 9 as well about you, a member of your family, close

15   friend having received legal training.

16              THE PROSPECTIVE JUROR:  Yeah.  There's a few lawyers

17   that are -- I know a few lawyers.

18              THE COURT:  Okay.

19              THE PROSPECTIVE JUROR:  I think -- hopefully, I

20   understood the question.

21              THE COURT:  Okay.  So are any of those people you

22   know particularly close to you?

23              THE PROSPECTIVE JUROR:  Yes.

24              THE COURT:  Okay.

25              THE PROSPECTIVE JUROR:  They're in the family.
```

```
 1            THE COURT:  Who are they?

 2            THE PROSPECTIVE JUROR:  They're part of my fiancé's

 3     family.  They're his cousins.

 4            THE COURT:  His cousins?

 5            THE PROSPECTIVE JUROR:  Yeah.

 6            THE COURT:  And do you know what kind of law they

 7     practice?

 8            THE PROSPECTIVE JUROR:  I don't.

 9            THE COURT:  Okay.  So you don't know if they practice

10     criminal law?

11            THE PROSPECTIVE JUROR:  No, I don't.

12            THE COURT:  Okay.  You answered yes to

13     Question No. 12, which is the one about the news or -- about

14     the -- the events that took place at the Capitol on

15     January 6th.  Tell us what -- what news you have followed,

16     including on that day.

17            THE PROSPECTIVE JUROR:  I mean, just kind of aware of

18     the situation and what was going on.  I don't know how to

19     explain it besides that.  Just that -- what was happening,

20     trials were going on.

21            THE COURT:  Okay.  So on that day, January 6th, did

22     you watch the news as the events unfolded?

23            THE PROSPECTIVE JUROR:  I was at work as the events

24     unfolded.

25            THE COURT:  Okay.  And where -- where -- what part of
```

```
 1          the city was your work, or were you at home?

 2                    THE PROSPECTIVE JUROR:  I worked at Petworth.

 3                    THE COURT:  I'm sorry?

 4                    THE PROSPECTIVE JUROR:  I work in Petworth, D.C.

 5                    THE COURT:  In Petworth.  Okay.

 6              So did you watch the news while you were at work?

 7                    THE PROSPECTIVE JUROR:  No.

 8                    THE COURT:  So you watched -- did you watch the news

 9          when you got home that day?

10                    THE PROSPECTIVE JUROR:  Yeah.

11                    THE COURT:  Okay.  And what do you recall seeing?

12                    THE PROSPECTIVE JUROR:  I'm not sure what I recall.

13                    THE COURT:  Okay.  And since January 6th, how closely

14          have you followed the news about the events?

15                    THE PROSPECTIVE JUROR:  Just whenever it's on.

16                    THE COURT:  On television?

17                    THE PROSPECTIVE JUROR:  Yeah.  Not, like, seeking it

18          out.

19                    THE COURT:  Okay.  And there's been a handful of

20          documentaries about January 6th.  Have you watched any of

21          those?

22                    THE PROSPECTIVE JUROR:  No.

23                    THE COURT:  And the House committee investigating

24          January 6th had some hearings.  Did you watch any of those?

25                    THE PROSPECTIVE JUROR:  I watched, like, part of one,
```

```
 1    but I couldn't tell you much about it.  It's a while ago.

 2              THE COURT:  All right.  You also asked -- answered

 3    affirmatively to Question No. 14, which is if you have seen or

 4    heard anything in the news or elsewhere about specific

 5    individuals who were present at the Capitol on January 6th.

 6              THE PROSPECTIVE JUROR:  I think maybe that was just

 7    part of the -- yeah.

 8              THE COURT:  The news?

 9              THE PROSPECTIVE JUROR:  Yeah.

10              THE COURT:  Okay.  All right.

11         Ms. Fish.

12              MS. FISH:  Good morning, Ms. ███████.

13              THE PROSPECTIVE JUROR:  Good morning.

14              MS. FISH:  My name is Rebecca Fish.  I represent

15    Mr. Rhine.

16         I just wanted to follow up a little bit about the news

17    media that you watched.  Do you recall seeing any videos or

18    images of violence in what you watched?

19              THE PROSPECTIVE JUROR:  Yes.

20              MS. FISH:  Can you tell us a little bit what you saw.

21              THE PROSPECTIVE JUROR:  I don't know how best to

22    explain it.  Just -- it's -- it was just crazy to see.  People

23    breaking in.  I know lives were lost.  Just dangerous overall.

24              MS. FISH:  Can you share what, if any, emotions you

25    felt seeing that.
```

```
 1               THE PROSPECTIVE JUROR:  Very hurt.  I lived in D.C.

 2    for a few years, and I called my home.  I live very close to

 3    the Capitol.  So it's a very scary situation.  I felt lucky to

 4    have been at work at the time.  I remember being pulled aside

 5    by my principal, saying that I should stay away today because

 6    she knows where I live.  And it was extremely terrifying.

 7               MS. FISH:  Were any of your neighbors or anyone else

 8    you know directly affected?

 9               THE PROSPECTIVE JUROR:  Not my neighbors, no.

10               MS. FISH:  And when you think about January 6th

11    today, how do you feel?

12               THE PROSPECTIVE JUROR:  Upset.

13               MS. FISH:  Upset.  Do you feel like you have a good

14    idea of what happened on January 6th?

15               THE PROSPECTIVE JUROR:  I want to say yes.  But I'm

16    not going to say I'm a hundred percent correct on my knowledge.

17    I'm not going to say I know everything.

18               MS. FISH:  And do you feel you have a good idea of

19    the reasons that the people attended that rally?

20               THE PROSPECTIVE JUROR:  No.  I don't think I do.  I

21    think it's hard to understand.

22               MS. FISH:  Okay.  And it sounds like you started

23    maybe watching the committee hearing but didn't finish.  Can

24    you tell me about that.

25               THE PROSPECTIVE JUROR:  Yeah.  I think, like, my
```

1    fiancé keeps up with it more than I do.  So he was probably

2    watching it.  So I can't really recall what I saw.  It was so

3    long ago.

4              MS. FISH:  And you did say you live close to the

5    Capitol?

6              THE PROSPECTIVE JUROR:  Yes.

7              MS. FISH:  Did the events of January 6th impact your

8    life?

9              THE PROSPECTIVE JUROR:  They did.  Living so close to

10   the Capitol, being -- being barricaded, getting home that day

11   was very rough.  It was scary, yeah.

12             MS. FISH:  Is that something you still think about?

13             THE PROSPECTIVE JUROR:  Yes.  But I still hear it in

14   the news.  I still read it in the paper.  Every time the

15   Capitol is barricaded, it reminds me of it.  So, yeah, I would

16   say it's still a constant reminder.

17             MS. FISH:  Is it, like, kind of almost like a trauma

18   response?

19             THE PROSPECTIVE JUROR:  Yeah.  I wouldn't say I'm --

20   I -- I wasn't closely impacted by it, but just close enough to

21   be aware and affected by it.  So I consider myself lucky for

22   that.

23             MS. FISH:  And it's been -- it's been a little over

24   two years since that day.

25             THE PROSPECTIVE JUROR:  Yeah.

```
 1            MS. FISH:  I mean, that's still something you feel
 2     when you see barricades?
 3            THE PROSPECTIVE JUROR:  Yeah, like around the
 4     Capitol.  Like a barbed-wire barricade I find wild.  It's part
 5     of our neighborhood.
 6            MS. FISH:  And you said you think you have a decent
 7     idea of what happened on the day --
 8            THE PROSPECTIVE JUROR:  Yeah.
 9            MS. FISH:  -- on January 6th?  Do you think that idea
10     is going to change in the next week or so?
11            THE PROSPECTIVE JUROR:  No.
12            MS. FISH:  And was that a no just for the --
13            THE PROSPECTIVE JUROR:  No.
14            MS. FISH:  Thank you.
15            THE PROSPECTIVE JUROR:  Yes.
16            THE COURT:  When you say you live near the Capitol,
17     how close to the Capitol do you live?
18            THE PROSPECTIVE JUROR:  I've moved.  But -- since
19     then.  I was probably, like, ten blocks from the Capitol.  In
20     Capitol Hill.
21            THE COURT:  Okay.
22         Go ahead.
23            MR. VALENTINI:  Good morning, Ms. ███████.
24            THE PROSPECTIVE JUROR:  Good morning.
25            MR. VALENTINI:  How are you?
```

```
1              THE PROSPECTIVE JUROR:  Okay.

2              MR. VALENTINI:  So I wanted to ask you a couple of

3    questions about your exposure to news about the events of

4    January 6th.  If you were selected as a juror in this case,

5    would you -- and the -- and Judge Contreras instructed you

6    that you have to make a decision in this case based only on

7    the evidence presented in this case, would you be able to do

8    that?

9              THE PROSPECTIVE JUROR:  Yes.

10             MR. VALENTINI:  And you said before that at some

11   point you felt hurt by the events of January 6th.

12             THE PROSPECTIVE JUROR:  Yes.

13             MR. VALENTINI:  And upset?

14             THE PROSPECTIVE JUROR:  Yes.

15             MR. VALENTINI:  But you'll be able to set aside those

16   feelings?

17             THE PROSPECTIVE JUROR:  Yeah.  It's the right thing

18   to do.

19             MR. VALENTINI:  I'm sorry?

20             THE PROSPECTIVE JUROR:  I believe it's the right

21   thing to do, to put aside feelings and just take in the

22   evidence.

23             MR. VALENTINI:  You believe it's the right thing to

24   do.  But you also believe you will be able to do that?

25             THE PROSPECTIVE JUROR:  Yes.
```

1          MR. VALENTINI:  And with respect to the -- the law, I

2     expect that Judge Contreras will instruct you on what the law

3     is and what law the jurors have to apply when they go back to

4     the jury room to deliberate.  And would you be able to do that

5     too?

6          THE PROSPECTIVE JUROR:  Yes.

7          MR. VALENTINI:  And you'll be able to set aside any

8     feelings about having been upset and understandably hurt about

9     the events of January 6th?

10          THE PROSPECTIVE JUROR:  Yes.

11          MR. VALENTINI:  Thank you.  I have no further

12     questions.

13          THE COURT:  I want to get a better sense of how --

14     how disturbed you were at the time.  So, obviously, it was a

15     disturbing event.  And so give me a better idea of, you know,

16     how disturbed you were, whether you didn't eat or -- or

17     couldn't sleep or that sort of thing or -- or how long that

18     lasted, and just give me a better idea of that.

19          THE PROSPECTIVE JUROR:  Trying to think of how to

20     explain it.  I just think it's -- it's hard to understand why

21     something like that could even happen.  I understand, like,

22     D.C. is the nation's capital.  It's home to a lot of people.

23     People live just one block away.  And I -- I think if I lived

24     any closer, I would have been even more impacted than I was.

25          I just remember being scared, being confused, being

1    upset, worrying about my commute home.  I was worried about my

2    fiancé who works from home.  But, you know, we were, like, ten

3    blocks away at the time, which I think was, luckily, a safe

4    distance.  We didn't know what was going to happen next.  We

5    didn't know what was going to happen the next day.

6          I don't know if I was able to go to work the next day.

7    There's a lot of possibilities.  Anything can happen.  So just,

8    like, a lot of confusion, worry.  And it's upsetting.  It's --

9    I don't think anything like that is reasonable to happen.

10          THE COURT:  Sure.  But after things settled down, it

11   doesn't sound like you followed the news that closely.  So were

12   you still upset for an extended period of time?

13          THE PROSPECTIVE JUROR:  I was able to go about my

14   day, attend work, do what I needed to do.  So I wouldn't say

15   that it -- it stayed with me.  I don't go every day thinking

16   about it.  Just, you know, when I see it on the news, when I

17   see it in the paper, I -- I think it's terrible.

18          THE COURT:  And what are you concerned might happen?

19          THE PROSPECTIVE JUROR:  Today?

20          THE COURT:  No, any -- any day.

21          THE PROSPECTIVE JUROR:  Oh, just maybe recurring

22   events.  It could be anything.

23          THE COURT:  Okay.

24          THE PROSPECTIVE JUROR:  But, yeah, I wouldn't say it

25   affects my day-to-day.

```
1              THE COURT:  Okay.  Any follow-up questions?

2              MS. FISH:  One brief one.

3          Ms. ████, you indicated you didn't think it was a

4    reasonable thing to happen.

5              THE PROSPECTIVE JUROR:  Uh-huh.

6              MS. FISH:  When you're feeling upset about what

7    happened, understandably, do you feel upset at people who

8    participated in that event?

9              THE PROSPECTIVE JUROR:  Yes.

10             THE COURT:  Do you feel angry at people who were

11   there?

12             THE PROSPECTIVE JUROR:  I don't know if I feel angry.

13             MS. FISH:  But upset?

14             THE PROSPECTIVE JUROR:  Just upset that something

15   like that would happen in a neighborhood so small.

16             MS. FISH:  Thank you.

17             THE COURT:  Any follow-up?

18             MR. VALENTINI:  No further questions.

19             THE COURT:  Okay.  So, obviously, there were

20   thousands of people there.  When you say you feel upset to the

21   people that were there, do you include everybody or do you

22   include those that committed violence or committed vandalism,

23   that sort of thing?

24             THE PROSPECTIVE JUROR:  I guess I've never had to put

25   my feelings in perspective with that.
```

```
 1              THE COURT:  Okay.  So in this case, there's no
 2    allegation that Mr. Rhine committed violence or engaged in
 3    vandalism.  So do you think you would be able to treat someone
 4    like him fairly despite him being there?
 5              THE PROSPECTIVE JUROR:  Yes.  I would want to try to,
 6    yes.
 7              THE COURT:  Okay.
 8              THE PROSPECTIVE JUROR:  I don't know if that's a
 9    right answer.
10              THE COURT:  Okay.  Thank you.
11         Thank you.
12              THE PROSPECTIVE JUROR:  Thank you.
13              (REPORTER'S NOTE:  Juror 1682 left.)
14              MS. FISH:  And, Your Honor, I would move to -- I
15    would move to strike Ms. ██████ for cause.
16         She had a pretty significant personal and emotional
17    impact from January 6th and described having a trauma response
18    now when she sees barriers that were similar and, kind of, did
19    not quite directly answer Your Honor's last question, which was
20    whether she's upset at everyone or those that engaged in
21    vandalism.  She indicated she would try.  I'm sure she's
22    sincere in that.  But it does seem that she had a personal,
23    significant emotional reaction.
24              MR. VALENTINI:  Your Honor, we oppose the motion.
25    The juror expressed, certainly, the fact she -- she was upset
```

1    at one point, and it may be that she still harbors some

2    sentiment about being upset about the events of January 6th.

3    But one does not have to like what happened on January 6th to

4    sit on a January 6th jury.

5         And the juror -- the potential -- prospective juror was

6    quite clear that she will be able to set aside those feelings.

7    And we asked repeated questions, and every time she was

8    unambiguous in her conviction that she would be able to set

9    those aside.

10        THE COURT:  I'm going to strike her not just because

11    of her -- what she said, but also the fact that she said she

12    was sick and was fatigued and might not be able to pay

13    attention all day.  And, you know, ten blocks in D.C. is a long

14    way, but she characterized that as close and that it personally

15    impacted her, which not everyone who's ten blocks away would

16    characterize it that way.  So she had -- she personalized it in

17    a way that others might not, so.

18        MR. VALENTINI:  And could we just finish up very

19    quickly a record with respect to Juror No. 1166 before the next

20    juror is brought in?

21        THE COURT:  Sure.

22        MR. VALENTINI:  And I just wanted to make two

23    additional points.  In addition to the fact that the juror

24    indicated she will not be able to follow direction and that she

25    is not the best at following directions and sometimes she goes

1    off by her own indication, the juror also expressed that she

2    has not just heard news but she has reached conclusions about

3    facts she has heard.

4        She also related a series of conspiracy theories, which

5    cast serious doubt on her ability to be an impartial judge.

6    And she harbors what she called personal views that she will

7    not expound on -- on.  And the last -- a big problem is that

8    there was no -- the *voir dire* cannot be completed because the

9    juror invoked the Fifth Amendment.  And because of that, we

10   just don't know what we don't know.

11       Thank you.

12            THE COURT:  All right.

13            (REPORTER'S NOTE:  Juror 0776 enters.)

14            THE COURTROOM DEPUTY:  This is Juror No. 0776,

15   line 35.

16            THE COURT:  This is Juror 0776.  Ms. ███████; is that

17   correct?

18            THE PROSPECTIVE JUROR:  Yes.

19            THE COURT:  Okay.  You answered yes to

20   Question No. 1, which is the one about a four- to six-day trial

21   and going from 10:00 to 5:30 might create a special problem for

22   you.

23            THE PROSPECTIVE JUROR:  Yes.  I have an out-of-town

24   trip tomorrow until the 28th.

25            THE COURT:  Okay.  And is it something that can be

```
 1    rescheduled?

 2              THE PROSPECTIVE JUROR:  No.  It's -- I mean, it's

 3    heading overseas so it's kind of booked.

 4              THE COURT:  Okay.

 5              MS. FISH:  Your Honor, no objection to excusing the

 6    juror.

 7              MR. VALENTINI:  No objection from the government

 8    either.

 9              THE COURT:  All right.  Thank you.

10              THE PROSPECTIVE JUROR:  Okay.  Thank you.

11              (REPORTER'S NOTE:  Juror 0776 left.)

12              (REPORTER'S NOTE:  Juror 1486 enters.)

13              THE COURTROOM DEPUTY:  This is Juror No. 1486,

14    line 36.

15              THE COURT:  Good morning.

16              THE PROSPECTIVE JUROR:  Good morning, sir.

17              THE COURT:  So this is Juror 1486.  Mr. ████; is

18    that correct?

19              THE PROSPECTIVE JUROR:  Yes.

20              THE COURT:  Okay.  You answered yes to

21    Question No. 7, which is the one about you might have trouble

22    if selected to sit on the case to render a verdict solely on

23    the evidence presented at the trial and in the context of the

24    law as I will give it in my instructions, disregarding any

25    other ideas, notions, or beliefs about the law you may
```

 1    encounter.

 2              THE PROSPECTIVE JUROR:  That was 7?  Yes.  Yes.

 3              THE COURT:  Okay.  Tell us about that.

 4              THE PROSPECTIVE JUROR:  Well, I have problems with

 5    the elections and, you know, the validity of the elections.

 6    And I think that's why I was going with that; that's going to

 7    cause me problems.

 8              THE COURT:  Okay.  And I saw that you answered yes to

 9    some of those other questions that were more specific to that

10    issue.  So tell us about your concerns.

11              THE PROSPECTIVE JUROR:  Basically, I believe the

12    election was rigged.  I don't think the true winner won.

13              THE COURT:  Okay.  And do you think that your beliefs

14    about that would prevent you from treating the defendant fairly

15    based on the evidence presented in court and the law as I

16    instruct it?

17              THE PROSPECTIVE JUROR:  Yes.

18              THE COURT:  Why?

19              THE PROSPECTIVE JUROR:  Because I think it's going to

20    jade how I look at, kind of, January 6th and everything that

21    happened.  I think, you know, the people had a right to

22    protest.  I don't think the media presented it the way it

23    actually was in its totality.

24              THE COURT:  Okay.

25              THE PROSPECTIVE JUROR:  So that might be related to

1    another question.

2            THE COURT:  But if putting aside the media that

3    you've seen since then, this case is going to be determined by

4    the law as -- the facts presented in this courtroom pertaining

5    specifically to Mr. Rhine, you don't think you'd be able to put

6    aside what your ideas are outside -- that you gained outside of

7    the courtroom and base a decision concerning Mr. Rhine about

8    the facts presented in this courtroom?

9            THE PROSPECTIVE JUROR:  I don't think so.  Maybe.

10           THE COURT:  Okay.  So why do you not think so?

11           THE PROSPECTIVE JUROR:  Well, I mean, I have strong

12   feelings about January 6th and everything around it.  So I

13   don't know if that's -- I think -- I'm thinking that's going to

14   have an effect on how I would do that duty.

15           THE COURT:  Okay.  So you answered yes to Questions

16   12 and 14, which is about the media that you've watched about

17   January 6th and about specific individuals.  So tell us about

18   some of the media you've watched since then and on the day.

19           THE PROSPECTIVE JUROR:  Well, I watched the regular

20   TV broadcast during the day, earlier in the day.  So I kind of

21   saw it kind of evolve from about 12:30 until -- I've also

22   watched Infowars and some other alternative media to, you know,

23   get information on the situation.

24           THE COURT:  Okay.  And what -- as to the media you've

25   watched, both on that day and since then, what -- have you

1    drawn any conclusions about what happened on that day?

2                THE PROSPECTIVE JUROR:  Yes.

3                THE COURT:  What are they?

4                THE PROSPECTIVE JUROR:  That it was not presented

5    in -- in its totality.  I think it was other parties involved,

6    other than the people that attended, I think there was other

7    parties involved that really caused a lot of the confusion --

8                THE COURT:  Okay.

9                THE PROSPECTIVE JUROR:  -- and not necessarily the

10   people that attended just to protest the election.

11               THE COURT:  Okay.

12               THE PROSPECTIVE JUROR:  People that were protesting,

13   in my view -- protesting the election and then there was other

14   parties that were there to cause trouble that weren't connected

15   to the people that were there.

16               THE COURT:  And what sort of parties were those?

17               THE PROSPECTIVE JUROR:  Well, they haven't really

18   been identified.  But, you know, they -- they didn't have flags

19   or anything.  They had black suits on and jumpsuits and things

20   of that sort.  So, you know, I'll let the legal people do their

21   course on that, but that's my belief.

22               THE COURT:  Okay.  But those folks in the black

23   suits, you think, were operating on behalf of the government

24   or --

25               THE PROSPECTIVE JUROR:  Well, I don't know that.  I

1    don't know that.

2          THE COURT:  Okay.  And then you also answered yes to

3    Questions 25 and 26, which is -- and we've already touched on

4    this somewhat -- about the strong feelings about January 6th

5    and about the -- the election that might make it difficult for

6    you to consider this case fairly.

7          So tell us -- have you said all you have to say about

8    those issues, or are there additional things?

9          THE PROSPECTIVE JUROR:  Nothing more additionally.  I

10   think I said that the election, I believe, was illegitimate.  I

11   was watching the count.  And when I woke up really early that

12   morning, everything was totally different.  And all of the

13   stuff that happened after that, waiting weeks and weeks, it

14   wasn't -- I don't think it was right.  I don't think it was

15   legitimate.

16         THE COURT:  Okay.  Ms. Fish.

17         MS. FISH:  Thank you.

18   Good morning, Mr. ███████.

19         THE PROSPECTIVE JUROR:  Good morning.

20         MS. FISH:  My name is Rebecca Fish.  I'm the attorney

21   for Mr. Rhine.

22         So I want to follow up on a couple of the judge's

23   questions.  You know, one of the things the judge was wondering

24   is if you'd be able to set aside what you've seen in the media

25   and consider only the evidence here today.  So the evidence

1    that you're going to see today, you know, will involve no one

2    claiming that people didn't have a right to protest, you know,

3    in the area around the Capitol.

4        The evidence today is not going to include any

5    allegation that Mr. Rhine engaged in any violence or vandalism.

6    The question is really whether his personal actions crossed the

7    line from a lawful protest into a crime.

8        Do you believe that you could watch only the evidence

9    today and follow the judge's instructions to answer that

10    question?

11        THE PROSPECTIVE JUROR:  I don't know.  I don't -- I

12    don't think so.  I think I've --

13        MS. FISH:  And I understand that you believe that

14    the -- I'm guessing you're referring to the 2020 election -- is

15    that correct? -- that was invalid?

16        THE PROSPECTIVE JUROR:  The one with -- between Biden

17    and Trump, yes.

18        MS. FISH:  Yeah.  Do you still vote personally?

19        THE PROSPECTIVE JUROR:  I didn't vote that year.

20        MS. FISH:  Okay.

21        THE PROSPECTIVE JUROR:  I didn't vote that year, but

22    I'm a voter.

23        MS. FISH:  After that, have you returned to voting?

24        THE PROSPECTIVE JUROR:  No.

25        MS. FISH:  And, you know, I know you spoke with the

1    judge a bit about your concern about following the judge's

2    instructions.  During the trial, the judge will tell you what

3    the law is, which might be different than, you know, what you

4    see on TV.  Would you be able to follow his instructions about

5    the law?

6              THE PROSPECTIVE JUROR:  I can -- I can follow the

7    judge's instructions.

8              MS. FISH:  Thank you.

9              THE PROSPECTIVE JUROR:  Uh-huh.

10             MR. VALENTINI:  Good morning, Mr. █████.

11             THE PROSPECTIVE JUROR:  Good morning.

12             MR. VALENTINI:  My name is Francesco Valentini.  I

13   represent the United States.

14        In response to some of the questions, you indicated that

15   you believe the 2020 presidential election was rigged.

16             THE PROSPECTIVE JUROR:  Correct.

17             MR. VALENTINI:  And do you believe that those who

18   went to the Capitol and into the Capitol on January 6th even

19   if they did not -- were not authorized to go in, were

20   protesting?

21             THE PROSPECTIVE JUROR:  Well, say that question one

22   more time, please.

23             MR. VALENTINI:  Do you believe that those who

24   went into the Capitol without authorization were just

25   protesting?

1     THE PROSPECTIVE JUROR:  Some of them.  I don't know

2 that they weren't authorized.  I saw the video where officers

3 were ushering people in.  So I don't know that that's the case.

4     MR. VALENTINI:  And you said that you have strong

5 feelings and your strong feelings, you likely will not be able

6 to put them aside and judge this case.

7     THE PROSPECTIVE JUROR:  I don't think I'll be able to

8 put them aside, no.

9     THE COURT:  So do you think you would be fair to

10 Mr. Rhine and the government in assessing the facts of this

11 case?

12     THE PROSPECTIVE JUROR:  Well, I don't know fairness,

13 but I'm not going to be able to put what I know and what I have

14 researched aside.

15     MR. VALENTINI:  Thank you.  And I appreciate your

16 candor.

17     THE COURT:  Thank you, sir.

18     THE PROSPECTIVE JUROR:  Thank you.

19     (REPORTER'S NOTE:  Juror 1486 left.)

20     MR. VALENTINI:  Your Honor, the government moves to

21 strike the prospective juror, Mr. ████, for cause.  He

22 repeatedly, with candor that we appreciate, stated that he

23 would not be able to put aside his very strong feelings about

24 the outcome of the 2020 presidential election and what happened

25 on January 6th.  And that really is the standard for

1    impartiality and fairness.

2            MS. FISH:  And, Your Honor, without objection, I do

3    think he said he'd follow the Court's instructions, but he did

4    repeatedly say he would not be able to forget the information

5    he researched or his feelings.

6            THE COURT:  Okay.  I appreciate your candor,

7    Ms. Fish.  Thank you.

8            So we'll strike him.

9            THE COURTROOM DEPUTY:  Sorry.  Had to get the others.

10           THE COURT:  That one was struck for cause.

11       This is another one that has listed a number of strong

12   feeling questions on -- but also listed No. 1.  So pay

13   attention to No. 1 and figure out if it's dispositive.

14           MS. FISH:  Thank you, Your Honor.

15           (REPORTER'S NOTE:  Juror 1945 enters.)

16           THE COURTROOM DEPUTY:  This is Juror 1945, line 29.

17   Going backwards.  We're skipping all over the place.

18           THE COURT:  Which one is this?

19           THE COURTROOM DEPUTY:  1945, line 29.

20           THE COURT:  So this is Juror 1945.  Ms. ████?

21           THE PROSPECTIVE JUROR:  Yes.

22           THE COURT:  Okay.  So you answered yes to

23   Question No. 2, which is that you might know any of the counsel

24   or had some sort of dealings with the federal public defender

25   offices or the United States Attorney's Offices.

```
1              THE PROSPECTIVE JUROR:  I thought that the question

2     was whether I'm close to someone who had sought employment with

3     the U.S. Attorney's Office.

4              THE COURT:  Okay.  That was part of it.

5              THE PROSPECTIVE JUROR:  And my husband declined a job

6     offer there.

7              THE COURT:  And when was that?

8              THE PROSPECTIVE JUROR:  Probably 2005.

9              THE COURT:  And what office was that?  Was it in the

10    District of Columbia?

11             THE PROSPECTIVE JUROR:  Yes.

12             THE COURT:  Okay.  And so he never ended up working

13    for them?

14             THE PROSPECTIVE JUROR:  He didn't work for them.

15             THE COURT:  Okay.  Has he ever worked as a prosecutor

16    anywhere?

17             THE PROSPECTIVE JUROR:  He's an intelligence analyst.

18             THE COURT:  Intelligence analyst.  Okay.

19         All right.  You also answered yes to Question No. 7,

20    which is if you're selected to sit on this case, you must be

21    able to render a verdict solely on the evidence presented at

22    the trial and in the context of the law as I will give it in my

23    instructions disregarding other ideas, notions, or beliefs

24    about the law.

25             THE PROSPECTIVE JUROR:  I speak from the perspective
```

```
1    of someone engaged in teaching and collecting artifacts dealing

2    with conspiracy theories, particularly where Jewish history is

3    concerned.  So I find myself -- I find myself biased.

4              THE COURT:  In what way?

5              THE PROSPECTIVE JUROR:  I would be sorely

6    disappointed to send him home.

7              THE COURT:  I'm sorry?

8              THE PROSPECTIVE JUROR:  I'd be sorely disappointed to

9    send him home.

10             THE COURT:  To send who home?

11             THE PROSPECTIVE JUROR:  To send the defendant home.

12   I would be disappointed.

13             THE COURT:  You would be disappointed -- meaning, you

14   would be disappointed if he were acquitted?

15             THE PROSPECTIVE JUROR:  Yeah.

16             THE COURT:  Okay.  All right.  And -- and why is

17   that?

18             THE PROSPECTIVE JUROR:  Well, that's not easy to

19   articulate.  I find I have an emotional response.  But I -- I

20   don't live on Capitol Hill.  But I do live centrally in

21   Adams Morgan, a block away from 18th and Columbia Road.  I

22   remember that day.  I remember that there were members of the

23   mob at The LINE Hotel before or after the assault on the

24   Capitol.

25             I remember feeling vulnerable, and -- and I -- I think
```

1    that with all of this baggage -- under normal circumstances, I

2    think I would be an inappropriate choice for the jury.  I

3    understand that these are not normal circumstances and that you

4    may need to consider jurors that you wouldn't normally

5    consider.  But if this is -- if this is the time to disclose

6    bias, I think I have it.

7              THE COURT:  Okay.

8              MS. FISH:  Your Honor, I think we can excuse the

9    juror.

10             MR. VALENTINI:  I would not oppose that.

11             THE COURT:  Okay.  All right.  Thank you.

12             THE PROSPECTIVE JUROR:  All right.  Thanks.

13             (REPORTER'S NOTE:  Juror 1945 left.)

14             MS. FISH:  Your Honor, my motion to strike is based

15    on her clear preference to convict prior to hearing any

16    evidence and disclosed bias.

17             THE COURT:  Sure.  I've never heard a potential juror

18    articulate it in that way; that they would be disappointed to

19    acquit the defendant.  So that was candor.

20             (REPORTER'S NOTE:  Juror 1138 enters.)

21             THE COURTROOM DEPUTY:  This is Juror No. 1138,

22    line 30.

23             THE COURT:  This is Juror No. 1138.  Ms. ███████; is

24    that correct.

25             THE PROSPECTIVE JUROR:  Yes.

328

1          THE COURT:  Okay.  So you answered yes to Question 8,

2     which is the one about having a special disability or problem.

3     Tell us about that.

4          THE PROSPECTIVE JUROR:  I have severe hearing loss.

5     And a significant part of my hearing impairment is a difficulty

6     distinguishing among sounds -- similar sounds, sounds that

7     sound similar.  So even though I wear hearing aids, I miss a

8     lot in -- in a setting like this, in any kind of group

9     conversation.  I can guarantee you I will not catch everything

10    that is said in this courtroom in a trial.

11         THE COURT:  Okay.  So yesterday when I was asking the

12    questions, did you have trouble following everything I asked?

13         THE PROSPECTIVE JUROR:  Yes.

14         THE COURT:  Okay.

15         THE PROSPECTIVE JUROR:  I -- just to give you an

16    example, when you introduced the defendant, for a long time, I

17    thought you said Ryan, his last name was Ryan.  And it was only

18    when I read the notice by the front -- by the door of the

19    courtroom that I saw his name.  I didn't catch a lot of the

20    details of the charges.  I did hear you say January 6th so I

21    know the context, but --

22         MS. FISH:  Your Honor, I would have no objection to

23    excusing the juror given some of our anticipated evidence.

24         MR. VALENTINI:  That would not be opposed from the

25    government.

```
1              THE COURT:  Okay.  Thank you.
2              (REPORTER'S NOTE:  Juror 1138 left.)
3              THE COURT:  So Juror 1396, which is the one that I
4    said had -- listed No. 1, she apparently is not here today
5    because she had childcare and travel issues, I guess, before
6    she got a chance to tell us about them.  So we're going to skip
7    her.
8              (REPORTER'S NOTE:  Juror 0463 enters.)
9              THE COURTROOM DEPUTY:  This is Juror No. 0463,
10   line 33.
11             THE COURT:  Good morning.
12             THE PROSPECTIVE JUROR:  Good morning.
13             THE COURT:  So this is Juror 0436.
14   Ms. ██████████; is that correct?
15             THE PROSPECTIVE JUROR:  Yes, sir.
16             THE COURT:  Okay.  You answered yes to
17   Question No. 5, which is the one about prior jury service.
18             THE PROSPECTIVE JUROR:  Yes.
19             THE COURT:  Tell us about that.
20             THE PROSPECTIVE JUROR:  It's been at least ten years
21   ago.  I was on a case in which a woman killed her daughters.
22   That was a -- a grand jury selection.
23             THE COURT:  Okay.  And did the jury -- you made it
24   onto the jury?
25             THE PROSPECTIVE JUROR:  Yes.
```

1          THE COURT:  Okay.  And was the jury able to reach a

2     verdict?

3          THE PROSPECTIVE JUROR:  Yes.

4          THE COURT:  Okay.  Any other instances of jury

5     service?

6          THE PROSPECTIVE JUROR:  No.

7          THE COURT:  How long ago was that?

8          THE PROSPECTIVE JUROR:  It's been about -- about

9     seven to eight years ago.

10          THE COURT:  And it was over in Superior Court?

11          THE PROSPECTIVE JUROR:  Yes.

12          THE COURT:  Okay.  And anything about that

13     experience, either positive or negative, that you think would

14     impact your service on this case?

15          THE PROSPECTIVE JUROR:  No, sir.

16          THE COURT:  Okay.  You answered yes to

17     Question No. 12, which is the one -- the one about news about

18     the events that took place on January 6th at the Capitol.  So

19     tell us about what news you've seen, both on the day of the

20     January 6th and since then.

21          THE PROSPECTIVE JUROR:  The day of January 6th, I

22     watched the entire day.  I was off from work that day.  And I

23     saw when the ex-President was there, and I watched the -- the

24     entire day of the -- the whole program.

25          THE COURT:  Okay.  And since January 6th, what -- how

1     closely have you followed the story?

2               THE PROSPECTIVE JUROR:  Not -- not, you know,

3     intensely.

4               THE COURT:  Okay.  There's been a handful of

5     documentaries about January 6th.  Have you watched any of

6     those?

7               THE PROSPECTIVE JUROR:  No, sir.

8               THE COURT:  And the January 6th committee had some

9     hearings.  Did you watch any of those hearings?

10              THE PROSPECTIVE JUROR:  No, sir.

11              THE COURT:  Okay.  So you said you watched it very

12    intently on that day.  Did you draw any conclusions from what

13    you saw on that day?

14              THE PROSPECTIVE JUROR:  Not -- not exactly, sir.

15              THE COURT:  Okay.  You also answered yes to a very

16    similar question, which is the one about news about specific

17    individuals on that day.  Do you recall news about specific

18    individuals on that day?

19              THE PROSPECTIVE JUROR:  Not news about individuals.

20    I thought that question was about relatives that I had that

21    were -- that were police officers or something of that nature.

22    Yes, I have.

23              THE COURT:  We'll get to that question as well.

24              THE PROSPECTIVE JUROR:  Okay.

25              THE COURT:  So that's Question 20, which is whether

1    you, immediate family, or close friends worked in law

2    enforcement.  Tell us about that.

3              THE PROSPECTIVE JUROR:  I have two cousins -- two

4    first cousins that are police officers.  One was -- is now,

5    actually, a jury marshal, and the other one is a state trooper.

6              THE COURT:  Okay.  In -- where are they?  In D.C. or

7    elsewhere?

8              THE PROSPECTIVE JUROR:  In D.C. and in Maryland.

9              THE COURT:  In Maryland.  Okay.

10          So they're first cousins?

11             THE PROSPECTIVE JUROR:  Yes, sir.

12             THE COURT:  How often do you see them?

13             THE PROSPECTIVE JUROR:  Not -- not often.  Family

14    gatherings, things of that nature.

15             THE COURT:  Do you talk to them about their work?

16             THE PROSPECTIVE JUROR:  No.

17             THE COURT:  Okay.  So one of the instructions I'm

18    going to give is that you're to treat each witness the same

19    regardless of whether they're a law enforcement officer or a

20    civilian.  Do you think because you have these cousins that are

21    in law enforcement that you would tend to believe a law

22    enforcement witness more than a civilian?

23             THE PROSPECTIVE JUROR:  No, sir.

24             THE COURT:  You think you would treat them equally?

25             THE PROSPECTIVE JUROR:  Yes, sir.

```
 1              THE COURT:  Okay.  All right.  Ms. Fish.
 2              MS. FISH:  Good morning, Ms. ██████████.
 3              THE PROSPECTIVE JUROR:  Good morning.
 4              MS. FISH:  My name is Rebecca Fish.  I'm the attorney
 5      for Mr. Rhine.
 6          So I just wanted to follow up a little bit with you
 7      about the media you watched around January 6th.
 8              THE PROSPECTIVE JUROR:  Uh-huh.
 9              MS. FISH:  You said you watched the whole day unfold.
10              THE PROSPECTIVE JUROR:  Uh-huh.
11              MS. FISH:  And you said you saw the ex-President.
12      Are you refer to President -- former President Trump's speech
13      that day?
14              THE PROSPECTIVE JUROR:  Yes.
15              MS. FISH:  And can you -- after that, can you tell us
16      what kinds of things you saw on TV.
17              THE PROSPECTIVE JUROR:  Well, we saw the crowd
18      heading towards the Capitol.  You saw them more or less
19      protesting against the -- the officers that were there and
20      other people that were there.  You saw them breaking into
21      the -- the Capitol.  Saw -- I saw the lady that got shot.
22      That's -- that's about all that I remember seeing.
23              MS. FISH:  And when you say breaking in or protesting
24      the officers, do you mean you saw violence on TV?
25              THE PROSPECTIVE JUROR:  Yes.
```

```
1          MS. FISH:  And how did you feel watching that?

2          THE PROSPECTIVE JUROR:  A little afraid for the

3   officers, you know, because it seemed like they were

4   outnumbered.  But as far as anything else, I didn't feel

5   anything else about that.

6          MS. FISH:  And since that day, even if it's kind of

7   incidental, have you seen continued news coverage of what

8   happened on January 6th?

9          THE PROSPECTIVE JUROR:  Yes.

10         MS. FISH:  Have you continued to see those images of

11  violence?

12         THE PROSPECTIVE JUROR:  Yes.

13         MS. FISH:  And how do you feel today when you think

14  about what happened or see those images?

15         THE PROSPECTIVE JUROR:  Nothing -- nothing that --

16  that I can -- that I can say about, but I feel that it's a lot

17  that's going on with that incident that happened.

18         MS. FISH:  Can you explain that a little bit more.

19         THE PROSPECTIVE JUROR:  Like, the officers and the

20  people that were in the actual Capitol, you saw them draw their

21  guns.  You saw them have barricades up against the doors to

22  fight off the people that were trying to get in.  Those were

23  things that, I don't think, anybody can forget or not have

24  dreams about, more or less, if they were involved with it.

25         MS. FISH:  And how about yourself?  Are they things
```

1    you're able to forget, or are they kind of persistent images

2    for you?

3              THE PROSPECTIVE JUROR:  They go and they come, yes.

4              MS. FISH:  And do you feel like you have a good idea

5    of what happened on January 6th?

6              THE PROSPECTIVE JUROR:  Yes, I do.

7              MS. FISH:  And do you feel like you have a good idea

8    about the reasons why people went to that rally or went to the

9    Capitol that day?

10             THE PROSPECTIVE JUROR:  Yes, I do.

11             MS. FISH:  Do you think that that understanding is

12   going to change in the next week?

13             THE PROSPECTIVE JUROR:  Unless I'm told otherwise or

14   shown evidence of something different, no.

15             MS. FISH:  Thank you.

16             THE PROSPECTIVE JUROR:  Uh-huh.

17             MR. VALENTINI:  Good morning, Ms. ███████████.

18   My name is Francesco Valentini.  I represent the government.

19             THE PROSPECTIVE JUROR:  Uh-huh.

20             MR. VALENTINI:  So if you were -- if you're selected

21   as a juror in this case, we expect Judge Contreras will

22   instruct you that in deciding this case you have to rely on the

23   evidence that you hear in this case and only that evidence.

24             THE PROSPECTIVE JUROR:  Uh-huh.

25             MR. VALENTINI:  Would you be -- do you think you'll

 1    be able to abide by that instruction?

 2             THE PROSPECTIVE JUROR:  Yes.

 3             MR. VALENTINI:  So if Judge Contreras tells you

 4    that -- what the law is and that you have to apply the law as

 5    he tells you the law is, would you have -- is there any reason

 6    you would not be able to apply those instructions?

 7             THE PROSPECTIVE JUROR:  No.

 8             MR. VALENTINI:  And I believe you said that you have

 9    a -- I think the question was a pretty good idea of what

10    happened on that date.

11             THE PROSPECTIVE JUROR:  Yes.

12             MR. VALENTINI:  I think you said you had a pretty

13    good idea of what -- people went into the Capitol -- they had

14    intended?

15             THE PROSPECTIVE JUROR:  I feel that they went there

16    to protest the election.  Whether or not they meant to go into

17    the Capitol or not, they did.

18             MR. VALENTINI:  Yes.  And if the evidence in this

19    case were to show that the defendant in this case had a

20    particular intention one way or the other, would you be able to

21    apply only and rely only on the evidence that you hear in this

22    case in deciding this case?

23             THE PROSPECTIVE JUROR:  Yes.

24             MR. VALENTINI:  Okay.  Thank you very much.

25             THE COURT:  All right.  Now, you've seen some media

1    of violence and people breaking in and the like.  In this case

2    there's not going to be any evidence that -- or allegations

3    against this defendant that he committed any violence or

4    engaged in any vandalism of any sort.

5         So do you think that despite the media you've seen that

6    captures some of those events that you would be able to judge

7    this defendant based on the evidence presented in this court

8    and put aside any media you've seen?

9              THE PROSPECTIVE JUROR:  Yes.

10             THE COURT:  Okay.  All right.  Thank you.

11             THE PROSPECTIVE JUROR:  Okay.

12             (REPORTER'S NOTE:  Juror 0436 left.)

13             MS. FISH:  And, Your Honor, I would move to strike

14    for cause for reasons similar to some of the other jurors.

15         She indicated she had a good understanding of what

16    happened, why people went, and whether or not they intended to

17    go to the Capitol -- into the Capitol, they did seem -- you

18    know, a presumption of guilt there.  And she did seem to have a

19    pretty intent and, kind of, real-time personal experience with

20    the day of.

21             MR. VALENTINI:  Your Honor, the government opposes

22    the motion.  The prospective juror had limited exposure to news

23    coverage.  The juror indicated she may have some -- some

24    understanding of what happened on January 6th, what some people

25    may have intended on January 6th.  She was also very clear that

1    she would be able to approach this case with an open mind, be

2    fair to the defendant.  We oppose the motion.

3              THE COURT:  I agree.  I will deny the motion.

4         I don't think -- in this case, there's no real dispute

5    that the defendant went in.  It has to do with the -- his *mens*

6    *rea* and the real dispute.  And she didn't have any conclusions

7    with respect to that -- those sorts of elements, which is what

8    caused me to strike the person yesterday.

9              (REPORTER'S NOTE:  Juror 1944 enters.)

10             THE COURTROOM DEPUTY:  This is Juror No. 1944,

11   line 38.

12             THE COURT:  This is Juror 1944.  Ms. ███████; is that

13   correct?

14             THE PROSPECTIVE JUROR:  Yes, sir.

15             THE COURT:  Okay.  So you answered yes to the

16   question, No. 9, which is about you, a close friend, or family

17   member being a lawyer.

18             THE PROSPECTIVE JUROR:  Yes.  My sister is a lawyer.

19             THE COURT:  Okay.  What kind of law does she

20   practice?

21             THE PROSPECTIVE JUROR:  She is -- she does corporate

22   law.

23             THE COURT:  Okay.  Has she ever practiced in criminal

24   law?

25             THE PROSPECTIVE JUROR:  No, sir.

```
1              THE COURT:  Okay.  Any other lawyers in your family
2       or close friends?
3              THE PROSPECTIVE JUROR:  My father-in-law is a lawyer.
4       He is -- he works on lobby issues.
5              THE COURT:  Okay.  Does he lobby in -- in the federal
6       Congress.
7              THE PROSPECTIVE JUROR:  No, State of Indiana.
8              THE COURT:  Okay.  All right.  You also answered
9       Question No. 12, which is following the news about the events
10      of January 6th.  Tell us about that, what -- both on the day of
11      January 6th and since then, what sorts of media you've seen.
12             THE PROSPECTIVE JUROR:  Sure.  Well, I'm a D.C.
13      resident, and so because of that, January 6th was nearby.  And
14      there were road closures and events related to the -- where
15      they called the early shutdown of the city.  Where I have a
16      dog, so we needed to know what times we're able to walk her and
17      where we could go out and when.
18              I certainly watched the news on the day of to see what
19      was happening and better understand -- you know, it's very
20      close by.  So it felt like it was -- you know, something that I
21      should be aware of.  And following, I certainly have kept up
22      on -- better understanding, I think, both all of the
23      information that people received that brought them to that day,
24      a little bit about the experiences of the politicians who --
25      and other folks who were in the halls of Congress on that day
```

1    and what their experiences were like.

2         It's not something that I'd say that I covered

3    particularly closely since the events -- you know, I'd say

4    probably January, February, when the city sort of came back

5    online after that.

6         THE COURT:  Okay.  So on the day of, on January 6th,

7    you said you kept abreast of matters.  Were you working that

8    day?

9         THE PROSPECTIVE JUROR:  Yeah, I was.

10        THE COURT:  From home?

11        THE PROSPECTIVE JUROR:  Yes.

12        THE COURT:  From home.

13        So did you have it on in the background or -- or were

14   you -- would you say you were more, like, glued to the TV?

15        THE PROSPECTIVE JUROR:  No, I had it on in the

16   background.  I was supposed to host an event, virtual event.

17   So mostly it was my colleagues who were keeping me up to date

18   about whether or not it felt like we -- especially being a

19   D.C.-based organization, felt like we were going to invite

20   people to come and talk about --

21        I work on things related to conflicts abroad.  And so we

22   were trying to decide whether or not we were going to host that

23   event.  We eventually decided not to because it felt like,

24   particularly for our staff, we needed to be sure that everybody

25   was able to deal with school closures.

1          THE COURT:  Okay.  And were you able to reschedule

2     that event?

3          THE PROSPECTIVE JUROR:  We were.

4          THE COURT:  How long afterwards?

5          THE PROSPECTIVE JUROR:  It actually took us a while,

6     mostly because of the -- the -- I work in the -- in a community

7     that had a lot of holidays coming up.  And so we just needed to

8     kick it down the road.  I'm going to say three months after.

9          THE COURT:  Okay.  All right.  And then since

10    January 6th, the day of, there's been a handful of

11    documentaries on what took place that day.  Have you watched

12    any of those?

13         THE PROSPECTIVE JUROR:  No, I have not.

14         THE COURT:  And then there was a House of

15    Representatives committee investigation into January 6th that

16    held hearings.  Did you watch any of those hearings?

17         THE PROSPECTIVE JUROR:  I did not.  I listened to the

18    news, the radio, and I heard a little bit about what those

19    entailed.  But, candidly, I can't remember the specifics.

20         THE COURT:  Okay.  So do you think given the media

21    you've been exposed to that you'd be able to put those things

22    aside and judge this case fairly on the facts presented in this

23    courtroom?

24         THE PROSPECTIVE JUROR:  I do.

25         THE COURT:  Okay.  Ms. Fish.

```
 1            MS. FISH:  Good morning, Ms. ███████.

 2            THE PROSPECTIVE JUROR:  Good morning.

 3            MS. FISH:  I'm Rebecca Fish.  I'm the attorney for

 4     Mr. Rhine.

 5            I wanted to, first of all, follow up quickly about your

 6     work.  Can you tell me a little bit more about what kind of

 7     work you do.

 8            THE PROSPECTIVE JUROR:  Yeah.  I work at a private

 9     philanthropy.  I make grants that focus on the Jewish

10     community.

11            MS. FISH:  And so you indicated your work somewhat

12     focuses on foreign conflict mediation; is that right?

13            THE PROSPECTIVE JUROR:  Yeah.  I focus on the

14     Israeli-Palestinian conflict.

15            MS. FISH:  And I want to talk a little bit more

16     about the media you've seen around January 6th.  You said that

17     you've kind of had it maybe in the background on the day of and

18     have followed it a little bit since then.  In what you've seen,

19     have you seen or heard described violence that occurred that

20     day?

21            THE PROSPECTIVE JUROR:  Yes.  I have heard about

22     the -- specifically, one Capitol Police individual who was

23     talked about mostly -- I think in local news as well -- about

24     some of the injuries that they sustained.  I wouldn't say

25     that's the only thing that I've heard about for sure.  But,
```

1    yes, violence has been a part of it.

2          MS. FISH:  From, kind of, something you watched

3    unfold, including the road closures and curfews, what emotions

4    did you feel?

5          THE PROSPECTIVE JUROR:  I felt some fear.  You know,

6    a curfew is a -- just jarring.  And understanding, you know,

7    how and when I could leave my home was -- all of a sudden when

8    somebody -- when you don't have agency over something that

9    seems so simple, it's a little complicated.  It did feel

10   somewhat far away in a sense, even though it's nearby.

11        But I also definitely felt like we were going to be

12   okay.  I don't -- I don't live on Capitol Hill or right around

13   there.  It's just, you know, something that you feel like you

14   see happening on the news elsewhere and then all of a sudden

15   it's part of your life.

16         MS. FISH:  And when you think about those things now,

17   how do you feel?

18         THE PROSPECTIVE JUROR:  It feels like an odd, eerie

19   memory, kind of like the COVID period does.  This sort of,

20   yeah, static gray time.

21         MS. FISH:  Do you have any feelings of fear still?

22         THE PROSPECTIVE JUROR:  Around -- could you be more

23   specific?

24         MS. FISH:  Sure.  Specific to January 6th, the events

25   that happened on January 6th and their aftermath, does that --

1    does thinking about that still bring you any feelings of fear?

2         THE PROSPECTIVE JUROR:  I'll say that I think that

3    some of the -- some of the -- I saw one image of a sweatshirt

4    of somebody wearing a Camp Auschwitz sweatshirt.  And for me in

5    particular, that image brings me fear.  I recognize that that's

6    not -- that that was one individual.  And my grandparents were

7    Holocaust survivors.  So that image, to me, feels like a --

8    like it was sharing the message that is deeply problematic and

9    concerning for me and for my family.

10         MS. FISH:  Yeah.  And, you know, knowing you saw that

11    image of someone wearing a really terrible sweatshirt like

12    that, do you have fear about anyone else who might have been

13    present in the same gathering as this person?

14         THE PROSPECTIVE JUROR:  I work on Israeli-Palestinian

15    conflict.  And because of that, I recognize we can't put people

16    into -- we can't bring up everything that we see about one

17    person and associate that with somebody.

18         I actually think that understanding the unique

19    narratives of everybody involved is really important.  And when

20    we gloss over those things, that's how conflicts become

21    perpetuated.  So I'm concerned about the root cause for that

22    individual and what brought them to think that that was a

23    message that they wanted to share.  But at the same time, I

24    think that it's actually really dangerous for us to think about

25    globalizing.

1          MS. FISH:  And do you feel from what you've seen that

2     you have personally a good or complete idea of what happened on

3     January 6th?

4          THE PROSPECTIVE JUROR:  No, I don't.

5          MS. FISH:  And do you feel that you have an idea of

6     the reasons the various people who went to the Capitol that day

7     went there for?

8          THE PROSPECTIVE JUROR:  I think I understand some.

9     All of them, definitely not.

10          MS. FISH:  Thank you.

11          MR. VALENTINI:  Your Honor, the government has no

12     questions of Ms. ██████.  Thank you.

13          THE COURT:  Thank you, Ms. ██████.

14          THE PROSPECTIVE JUROR:  Thank you.

15          (REPORTER'S NOTE:  Juror 1944 left.)

16          MS. FISH:  No motion, Your Honor.

17          THE COURT:  All right.

18          MR. VALENTINI:  No motion from the government,

19     Your Honor.

20          THE COURT:  So the next two people have listed No. 1

21     down.

22          (REPORTER'S NOTE:  Juror 0208 enters.)

23          THE COURTROOM DEPUTY:  This is Juror No. -- to the

24     left, sir -- 0208, line 39.

25          THE COURT:  This is 0208.  Mr. ██████; is that

1    correct?

2                  THE PROSPECTIVE JUROR:  Yes.

3                  THE COURT:  Okay.  You answered yes to the first

4    question, which is the one about a trial lasting four to

5    six days or going from 10:00 to 5:30 would create a special

6    problem for you.

7                  THE PROSPECTIVE JUROR:  Yes.

8                  THE COURT:  Tell us about that.

9                  THE PROSPECTIVE JUROR:  My grandfather died on Sunday

10   morning, and I have a funeral coming up on Thursday and Friday.

11                 THE COURT:  Of this week?

12                 THE PROSPECTIVE JUROR:  This week in Chicago, yes.

13                 THE COURT:  Okay.

14                 MS. FISH:  Your Honor, no objection to excusing the

15   juror.

16                 MR. VALENTINI:  No objection, Your Honor.

17                 THE COURT:  All right.  Thank you.

18         I'm sorry for your loss.  You're excused.

19                 (REPORTER'S NOTE:  Juror 0208 left.)

20                 THE COURT:  And this next one said she has a medical

21   procedure on Thursday and Friday of this week.

22                 MS. FISH:  I have no objection, if that is the

23   reason, to excuse her, Your Honor.

24                 THE COURT:  I'll ask her about it, but assuming it's

25   what it is.

```
 1                  (REPORTER'S NOTE:  Juror 1848 enters.)

 2                  THE COURTROOM DEPUTY:  This is Juror No. 1848,

 3      line 40.

 4                  THE COURT:  So this is Juror 1848.  Ms. ████; is

 5      that correct?

 6                  THE PROSPECTIVE JUROR:  Yes.

 7                  THE COURT:  You answered yes to Question No. 1 and

 8      wrote down that you have a medical procedure on Thursday and

 9      Friday of this week.

10                  THE PROSPECTIVE JUROR:  Yes.

11                  THE COURT:  Tell us about that.

12                  THE PROSPECTIVE JUROR:  On Friday I have an endoscopy

13      and colonoscopy.  And on Thursday I have to fast and take

14      medication to prepare for it.

15                  THE COURT:  Okay.  And is that something that can be

16      easily rescheduled?

17                  THE PROSPECTIVE JUROR:  No, because there's a

18      five-day prep window.  So I would be charged for rescheduling

19      it.

20                  MS. FISH:  No objection to excusing the juror,

21      Your Honor.

22                  MR. VALENTINI:  No objection either.

23                  THE PROSPECTIVE JUROR:  Oh, thanks.

24                  (REPORTER'S NOTE:  Juror 1848 left.)

25                  THE COURT:  I hope our Thursday and Friday are more
```

```
1    pleasant than hers.

2                (REPORTER'S NOTE:  Juror 1572 enters.)

3                THE COURTROOM DEPUTY:  This is Juror No. 1572,

4    line 41.

5                THE COURT:  This is Juror 1572.  Ms. ███████; is that

6    correct?

7                THE PROSPECTIVE JUROR:  That is correct.

8                THE COURT:  Okay.  So you answered yes to the

9    question about possibly knowing some of the attorneys in the

10   case or having some relationship to the U.S. Attorney's Office

11   or the federal public defender offices.

12               THE PROSPECTIVE JUROR:  I think I might -- I thought

13   you had asked if you had applied for a job.

14               THE COURT:  Right.  So that was part of the question,

15   yeah.

16               THE PROSPECTIVE JUROR:  Okay.  It wasn't the

17   U.S. Attorney's Office, though.  It was Department of Justice,

18   I had applied for a job for before.

19               THE COURT:  Okay.  What part of the Department of

20   Justice?

21               THE PROSPECTIVE JUROR:  The tax division.

22               THE COURT:  The tax division.  Did you get the job?

23               THE PROSPECTIVE JUROR:  I did.

24               THE COURT:  Okay.

25               THE PROSPECTIVE JUROR:  But I didn't join the tax
```

 1    division.

 2              THE COURT:  Okay.  All right.  So what did you do

 3    instead?

 4              THE PROSPECTIVE JUROR:  I currently work at the IRS

 5    chief counsel's office.

 6              THE COURT:  Okay.  And do you -- do you have any hard

 7    feelings towards the Department of Justice or --

 8              THE PROSPECTIVE JUROR:  No, I do not.

 9              THE COURT:  Okay.  Do you -- as working in the IRS

10    chief counsel's office, do you work closely with the Department

11    of Justice attorneys?

12              THE PROSPECTIVE JUROR:  Yeah.

13              THE COURT:  But solely on tax cases?

14              THE PROSPECTIVE JUROR:  Solely on tax cases.

15              THE COURT:  Okay.  All right.  You answered yes to

16    the question about you, close friends, or family having legal

17    training.  That's yourself --

18              THE PROSPECTIVE JUROR:  Yes.

19              THE COURT:  -- I assume.

20              THE PROSPECTIVE JUROR:  And my husband.

21              THE COURT:  And your husband.  Okay.  Let's start

22    with you.  So other than the tax work you do now, have you ever

23    done any sort of criminal work?

24              THE PROSPECTIVE JUROR:  No.  And the only criminal

25    work I've done is in tax-type -- there's certain civil fraud

1    cases that had the potential to go criminal.  I was in private

2    practice, so working on a different side.

3              THE COURT:  Okay.  So did you ever work on a criminal

4    case when you were in private practice?

5              THE PROSPECTIVE JUROR:  I didn't.  I wasn't -- I

6    would do, like, a research project as a more junior associate

7    here and there.  But I was never, like, the main associate on

8    the criminal tax case.

9              THE COURT:  Okay.  You answered yes to Question 10,

10    which -- I forgot to ask you about your husband.  What kind of

11    law does he practice?

12              THE PROSPECTIVE JUROR:  He -- it's like a general --

13    he does oversight work.  So he worked at the House judiciary

14    committee, and now he does oversight for the Department of

15    Education, so on the other side.

16              THE COURT:  So he works on the Hill?

17              THE PROSPECTIVE JUROR:  He worked on the Hill.  He

18    left in November of 2022.  And then he is now at Department of

19    Education.

20              THE COURT:  Okay.  So he does oversight of

21    education -- within education?

22              THE PROSPECTIVE JUROR:  It's facing Congress.  So,

23    like, any sort of congressional oversight inquiries, he will

24    work within the Department of Education to respond.

25              THE COURT:  Okay.  So was he on the Hill on

1    January 6th?

2            THE PROSPECTIVE JUROR:  So he wasn't physically

3    present.  He was at home with me with our newborn, but he was

4    working in the judiciary committee -- he was employed by the

5    judiciary committee for the majority at that time.

6            THE COURT:  Okay.  And did he -- did he work closely

7    with any of the congresspeople that had a bad experience on

8    that day?

9            THE PROSPECTIVE JUROR:  Yes.

10           THE COURT:  Who was that?

11           THE PROSPECTIVE JUROR:  Well, I would say -- so he

12   worked for the congressman -- I don't know exactly, like, if

13   that person was outspoken about having a bad experience that

14   day.  But I think, generally, my concept was many people had a

15   bad experience.  But Hank Johnson was there.  And he also --

16   you know, being part of the judiciary committee of

17   Jerry Nadler.  I can't remember if he was there.  They did a

18   lot of remote work because his wife was sick.

19       You know, so I -- I don't know a hundred percent

20   remember.  But, I mean, he wouldn't have been in the Capitol

21   that day.  But his office building is one of the ones right

22   next to it, and so, like, people he worked with were -- were

23   there and stuff.

24           THE COURT:  Okay.  So would you say that because of

25   his work on the Hill at that time that you had a more personal

 1    connection to January 6th than most folks?

 2              THE PROSPECTIVE JUROR:  Yeah.  I mean, that was a

 3    hard -- I wasn't sure about the direct -- that question.  I

 4    kind of was like, I don't know what a direct connection is.

 5    But, yes, I think because of his work on the Hill, I would say

 6    I had more of -- I felt a more direct connection.

 7         And we live close to the Capitol as well.  And our

 8    friends live around the corner.  And we were at my mom's house

 9    with our newborn.  But they had seen, like, the fencing and

10    stuff everywhere.

11              THE COURT:  So how close to the Capitol do you live?

12              THE PROSPECTIVE JUROR:  I live about a mile.  I live

13    at Eastern Market, that area.

14              THE COURT:  Okay.  All right.  Did the fencing that

15    was put up inhibit either your or his commute?

16              THE PROSPECTIVE JUROR:  No.  So we were both -- I was

17    on maternity leave.  And he was working remotely at that time

18    and kind of, like, half on leave with me, so.  And we were

19    at -- I grew up in the area -- but outside of D.C.  So we were

20    at my mother's house that day.

21              THE COURT:  Okay.  All right.  You -- I think we

22    already went over Question 10, which is whether someone close

23    to you lives or works at or near the U.S. Capitol Building.

24    That was with reference to your husband?

25              THE PROSPECTIVE JUROR:  Yeah.

1          THE COURT:  And then you answered yes to the question

2     about following the events in the media about January 6th.

3     Tell us about that, both on that day and since then.

4          THE PROSPECTIVE JUROR:  Yeah.  So that day,

5     obviously, you know, I have a vivid recollection of watching

6     what was happening that day.  We were at home.  I think it was

7     more vivid to me because I was, like, holding my newborn baby.

8     And that was just very shocking to me about everything that was

9     going on and hard to believe, especially because, you know, if

10    you have kids in that newborn phase you're in kind of a haze in

11    the first couple of weeks.  So it was a very weird time.

12         And then, you know, obviously, kind of just following --

13    like, listening to various news.  We listened to NPR on the --

14    in the car.  We listened to podcasts, the January 6th hearing.

15    But I haven't read anything specific to any specific person

16    about January 6th.

17         And, you know, at some point I kind of, like, didn't

18    want to closely follow it anymore because it was just very

19    overwhelming.  So, I mean, it was general following and kind

20    of, like, hearing it and seeing news all the time just from,

21    like, having TVs on.  But it wasn't -- I wasn't, like, studying

22    it or really reading intense articles about it.

23         THE COURT:  Okay.  So there -- there's been a handful

24    of documentaries about what happened that day.  Have you

25    watched any of those?

354

1           THE PROSPECTIVE JUROR:  I have not.

2           THE COURT:  Okay.  And then the -- the House of

3     Representatives had a committee investigating January 6th that

4     held hearings.

5           THE PROSPECTIVE JUROR:  Yeah.

6           THE COURT:  Did you watch any of those hearings?

7           THE PROSPECTIVE JUROR:  I didn't watch closely, but I

8     would watch the clips and stuff.  But I don't have a specific

9     recollection.

10          THE COURT:  Sure.  Did you watch clips afterwards or

11    while they were happening?

12          THE PROSPECTIVE JUROR:  It was afterwards.  I didn't

13    watch it live.

14          THE COURT:  Okay.  All right.  You also answered yes

15    to Question 20, which is you, a close friend, or family member

16    working in law enforcement.

17          THE PROSPECTIVE JUROR:  Yeah.  I wasn't -- I just

18    have a close friend who we see -- a neighbor who we see pretty

19    regularly who works at the Department of Homeland Security.

20          THE COURT:  And do you know what he or she does?

21          THE PROSPECTIVE JUROR:  Yeah.  He's an information --

22    he's not actual -- like a police officer or anything.  So I

23    wasn't -- I just answered yes, but I wasn't sure.

24          THE COURT:  Sure.  Have you had any conversations

25    with him about January 6th?

1          THE PROSPECTIVE JUROR:  I think I've talked to, like,

2     all my friends about January 6th.  And one of -- one of his

3     close friends who we've talked to is a Secret Service officer.

4     But I don't think we've talked about it with him.  But kind of,

5     like, general terms.  Nothing related to, like, Homeland

6     Security or law enforcement-type stuff.

7          THE COURT:  Okay.  And do you think because you know

8     this person that you would treat a witness that's in law

9     enforcement differently than a civilian or give more credit to

10    their testimony?

11         THE PROSPECTIVE JUROR:  No.

12         THE COURT:  All right.  So you answered yes to

13    Question 25, which is the one about having such strong personal

14    feelings, beliefs, or opinions about the events that took place

15    on January 6th that it would make it difficult for you to

16    consider the case fairly.

17         THE PROSPECTIVE JUROR:  Yes.  Being a lawyer, I

18    understand needing to see the facts and, you know, review the

19    facts and be impartial, and I think I could do that.  But I

20    do -- I wanted to be, you know, up-front about -- these

21    questions have -- you know, I've talked about my personal

22    experience on that day.

23          So I think it's just -- it is difficult given the

24    connection, but it's -- difficult doesn't mean I can't do it.

25    It's just something that I -- you know, I thought that I wanted

1    to be up-front about it to say, hey, look, this is difficult.

2    Here are my experiences that day, you know.

3            THE COURT:  Yeah.  What makes it difficult for you?

4            THE PROSPECTIVE JUROR:  I mean, I was really scared

5    that day.  You know, having a newborn child, like I -- it's

6    kind of like that memory of, like, holding her and watching the

7    TV was just like so shocking.  And I couldn't -- there's --

8    it's just a difficult time.  So -- and my husband is -- you

9    know, was on the Hill.  Not physically there.  But working

10   there at the time, knew lots of people, you know.

11       He also worked on oversight stuff.  He worked on very --

12   like, politically sensitive topics.  And even though I know

13   that many people in D.C. are connected, it just felt -- it just

14   felt very close; right?  So it just felt personally -- really

15   affected by it.

16       And so that's how it would be difficult, but that being

17   said, you know we all have challenges to put those personal

18   biases aside in these types of situations.  So that's -- just

19   kind of felt like I should say yes to this question because I

20   just felt like this should be known.

21           THE COURT:  Sure.  And then you also answered yes

22   to the question about that some news reports have indicated

23   that certain extremist groups with white nationalists' and

24   racists' views were present at the Capitol and if you believe

25   that all or most civilians present at the Capitol shared these

1    views.

2              THE PROSPECTIVE JUROR:  Yeah.  I'm not sure what else

3    to -- I guess that I am open to hearing evidence that, one, is

4    not associated with these organizations.  But, like, in terms

5    of a gut reaction, that was kind of, like, something that I

6    felt even if I, you know -- that's just something that I was

7    like -- sorry.  This is --

8         As a gut reaction, I kind of just felt like, yeah, I

9    would agree with that.  But, you know, I'm not, like, hard on

10   that view.  And I haven't really thought about it very much,

11   honestly, about whether everyone there was part of said

12   organization or held those types of beliefs.

13             THE COURT:  Okay.  So you also answered yes to

14   Question 28, which is that all or most civilians present and on

15   the Capitol engaged in violence or intended to engage in

16   violence.

17             THE PROSPECTIVE JUROR:  Yeah.  I just -- from viewing

18   the pictures and hearing evidence -- I mean, not hearing

19   evidence.  But just in report -- news reports, I just -- to me

20   it looked like an angry mob or riot.  And to think that you

21   didn't intend to do violence, if you're part of that type of

22   crowd, I just -- I feel like you would know that violence was

23   going to happen.

24             THE COURT:  Okay.  Ms. Fish.

25             MS. FISH:  Good morning, Ms. ███████.

1             THE PROSPECTIVE JUROR:  Good morning.

2             MS. FISH:  I'm Rebecca Fish.  I'm the attorney for

3    Mr. Rhine.

4             So I want to follow up a little bit about your feelings

5    on the day of January 6th, particularly as they relate to your

6    husband's colleagues and people he knows.

7             THE PROSPECTIVE JUROR:  Yep.

8             MS. FISH:  So he was in that role on the judiciary

9    committee for how long?

10            THE PROSPECTIVE JUROR:  So when was it?  He joined in

11   2019 and -- so in total, I think he was there for three and a

12   half years.

13            MS. FISH:  But he'd already been there about

14   two years prior to January 6th?

15            THE PROSPECTIVE JUROR:  Yeah.

16            MS. FISH:  And he had co-workers who worked in those

17   office buildings next to the Capitol?

18            THE PROSPECTIVE JUROR:  Yeah.

19            MS. FISH:  And that was his usual duty station?

20            THE PROSPECTIVE JUROR:  Yeah.

21            MS. FISH:  And he worked with members of Congress?

22            THE PROSPECTIVE JUROR:  Yes.

23            MS. FISH:  And worked closely with them?

24            THE PROSPECTIVE JUROR:  Yes.

25            MS. FISH:  And he expressed, you know, admiration or

```
1    respect, caring for those people?

2              THE PROSPECTIVE JUROR:  Yes.

3              MS. FISH:  On January 6th, were you worried about

4    their safety?

5              THE PROSPECTIVE JUROR:  Yes.

6              MS. FISH:  And you indicated you were scared for

7    yourself and your family too?

8              THE PROSPECTIVE JUROR:  I mean, yes.  Not, like,

9    physically at that moment.  Just generally scared.

10             MS. FISH:  Big picture?

11             THE PROSPECTIVE JUROR:  Big-picture scared.

12             MS. FISH:  And when you think about it today, do you

13   still feel those feelings come up?

14             THE PROSPECTIVE JUROR:  I do.

15             MS. FISH:  And I also wanted to follow up a little

16   bit more on the media that you watched.

17             THE PROSPECTIVE JUROR:  Sure.

18             MS. FISH:  You said you had a vivid recollection of

19   watching that day?

20             THE PROSPECTIVE JUROR:  Yes.

21             MS. FISH:  And you continued to follow some of the

22   hearings and news coverage after that?

23             THE PROSPECTIVE JUROR:  Yes.

24             MS. FISH:  Did you see images of violence?

25             THE PROSPECTIVE JUROR:  Yes.
```

1          MS. FISH:  Can you talk a little bit about what you

2     saw.

3          THE PROSPECTIVE JUROR:  I mean, I feel like I

4     remember, kind of, like, smoke outside of the Capitol.  And

5     that picture of someone at the front of the -- the big hearing

6     building, like, at the podium.  And I remember seeing, like, in

7     the pews, I guess, people like hiding under -- taking cover

8     underneath this kind of barrier-looking-type thing.

9          MS. FISH:  Yeah.  Like, inside of the congressional

10     chambers?

11          THE PROSPECTIVE JUROR:  Yeah.  Yeah.

12          MS. FISH:  And those people taking cover, were those

13     members of Congress?

14          THE PROSPECTIVE JUROR:  Yeah.

15          MS. FISH:  Did that invoke a unique feeling for you?

16          THE PROSPECTIVE JUROR:  I don't know if it was

17     unique.  I just couldn't -- it's hard to see -- it's, like,

18     hard to -- I couldn't believe that that's what was happening --

19     right? -- in that type of setting, you know.

20          MS. FISH:  Yeah.  And I want to follow up on a couple

21     other questions the judge asked you about; for example,

22     extremist groups, nationalist groups being part of January 6th.

23          THE PROSPECTIVE JUROR:  Yeah.

24          MS. FISH:  Does that -- thinking about that still

25     cause a reaction today when you think about that?

1          THE PROSPECTIVE JUROR:  Not in the same sort of,

2    like -- that type of -- just kind of feels like part of the

3    narrative.  I don't -- I don't know.  It's not, like, as much

4    of an emotional reaction.

5          MS. FISH:  And I'm guessing -- but do you feel

6    negatively towards those groups?  Is that fair to say?

7          THE PROSPECTIVE JUROR:  Yeah.  Yeah.

8          MS. FISH:  And then also, you know, about -- kind of

9    Question 28, you described what you witnessed looked like kind

10   of an angry mob; is that right?

11         THE PROSPECTIVE JUROR:  Yes.  Yeah.

12         MS. FISH:  Can you think of anything -- anyone in

13   that crowd would have intended but to join that group?

14         THE PROSPECTIVE JUROR:  Can you repeat that.

15         MS. FISH:  So you said it looked like kind of an

16   angry mob.

17         THE PROSPECTIVE JUROR:  Yeah.

18         MS. FISH:  And what kind of conclusion did you draw

19   from seeing that image?

20         THE PROSPECTIVE JUROR:  That they, you know, intended

21   to -- you know, I don't know exactly what each person intended,

22   but it seemed like together it was, you know, we're going to

23   barge in here and take charge.

24         MS. FISH:  And do you feel like you have a pretty

25   good idea of what happened on January 6th?

```
 1                THE PROSPECTIVE JUROR:  Somewhat.  You know, it's a
 2     good -- good question.  I think so.  But yeah.
 3                MS. FISH:  And you said you talked with, like, all
 4     your friends about it?
 5                THE PROSPECTIVE JUROR:  Yeah.
 6                MS. FISH:  Have you spoken with people who were
 7     actually present and/or near the Capitol that day?
 8                THE PROSPECTIVE JUROR:  No.
 9                MS. FISH:  And do you feel like you have a good idea
10     of why the majority of people who went to -- to join that mob
11     went there?
12                THE PROSPECTIVE JUROR:  Yes.
13                MS. FISH:  Do you think that's going to change in the
14     next week?
15                THE PROSPECTIVE JUROR:  No.
16                MR. VALENTINI:  Good afternoon, Ms. ███████.
17                THE PROSPECTIVE JUROR:  Hi.
18                MR. VALENTINI:  My name is Francesco Valentini, and I
19     represent the government.
20          I wanted to follow up with -- on your answers with
21     respect to your husband's work on the Hill.  You said that on
22     January 6th, neither you nor your husband were on the Hill
23     physically.
24                THE PROSPECTIVE JUROR:  No.
25                MR. VALENTINI:  And you guys were -- you -- both you
```

1    and your husband were not in Washington, D.C.

2                THE PROSPECTIVE JUROR:  No.

3                MR. VALENTINI:  And at the time -- I may have

4    misheard, but I think you said your husband was, sort of, half

5    on leave or partial leave, if you will?

6                THE PROSPECTIVE JUROR:  Yeah.

7                MR. VALENTINI:  And how -- how long after January 6th

8    did -- did your husband return to work on the Hill?

9                THE PROSPECTIVE JUROR:  I'm not sure exactly when it

10   was, but it was pretty soon after.

11               MR. VALENTINI:  When you say "pretty soon," is it a

12   matter of days?  A matter of weeks?

13               THE PROSPECTIVE JUROR:  Maybe a week later.

14               MR. VALENTINI:  And you said that -- I think you

15   described your feelings at the time as scared?

16               THE PROSPECTIVE JUROR:  Yes.

17               MR. VALENTINI:  And disbelief?

18               THE PROSPECTIVE JUROR:  Yep.

19               MR. VALENTINI:  At the time you didn't -- you were

20   scared about the situation, you didn't feel physically scared

21   about all that was going on?

22               THE PROSPECTIVE JUROR:  Yeah.  Yeah.

23               MR. VALENTINI:  And your husband didn't feel physical

24   danger because of what was going on since the two of you were

25   not in D.C. at the time?

```
 1              THE PROSPECTIVE JUROR:  Yeah.  I mean, I -- I think
 2    there was, like, a general fear if -- what if this starts
 3    something bigger, in that sense.  But, like, on that day
 4    physically, like, there wasn't as much of -- fear.
 5              MR. VALENTINI:  I believe you also indicated some --
 6    you were asked some questions about your ability to be
 7    impartial.
 8              THE PROSPECTIVE JUROR:  Yeah.
 9              MR. VALENTINI:  And -- but did I hear correctly when
10    you said you could do that?
11              THE PROSPECTIVE JUROR:  Yeah.
12              MR. VALENTINI:  And if you're selected as a juror in
13    this case, I expect Judge Contreras will tell you that you will
14    have to decide the facts in this case and decide what to do in
15    this case in the deliberation room based on the facts that are
16    presented in evidence and only those facts.
17              THE PROSPECTIVE JUROR:  Yes.
18              MR. VALENTINI:  And you'll be able to do that?
19              THE PROSPECTIVE JUROR:  Yes.
20              MR. VALENTINI:  You also said you have, I think you
21    said, some understanding of what happened on January 6th?
22              THE PROSPECTIVE JUROR:  Yeah.
23              MR. VALENTINI:  Some understanding of why, you think?
24              THE PROSPECTIVE JUROR:  Yes.
25              MR. VALENTINI:  At least some of the people who went
```

1    into the Capitol went into the Capitol?

2                THE PROSPECTIVE JUROR:  Yes.

3                MR. VALENTINI:  But, again, if you are asked to

4    decide the questions in this particular case based only on the

5    facts presented during the trial, you'd be able to do that?

6                THE PROSPECTIVE JUROR:  Yes.

7                MR. VALENTINI:  And you'll be able to be fair and

8    impartial to the defendant in this case?

9                THE PROSPECTIVE JUROR:  Yes.

10                MR. VALENTINI:  I have no further questions.  Thank

11    you.

12                THE COURT:  All right.  Thank you.

13                THE PROSPECTIVE JUROR:  Okay.

14                (REPORTER'S NOTE:  Juror 1572 left.)

15                MS. FISH:  And, Your Honor, I move to strike

16    Ms. ███████ from the jury.

17         I think she was very candid and clear that she maintains

18    some significant bias in this case.  She's an attorney.  She

19    understands what that means, and she was clear about that's

20    what she felt.  She had a personal -- very frightening

21    experience with the events that day, made more personal by her

22    husband's work and his colleagues being in -- kind of directly

23    impacted.

24         You know, people that are one degree removed from her

25    and probably she's met were, in fact, directly impacted, were

1    sheltering for safety.  And her -- her gut assumptions about

2    people who were there -- and she did say the majority of people

3    who were there -- was that they were -- you know, maybe shared

4    beliefs with extremist groups that she views negatively.  And,

5    more importantly, that they were there intending to do

6    violence.

7        She said it's clear it was an angry mob and anyone there

8    would have realized that and wanted to break into the Capitol

9    Building.  So I think that that -- you know, she was perfectly

10   candid with the Court.  And I think that she would not be able

11   to be impartial in this case.

12       MR. VALENTINI:  Your Honor, the government opposes

13   the motion.

14       We agree that the juror was very candid, and she does

15   have a connection to the Capitol because of her husband's work.

16   But she also told us that her husband was not even in the city

17   at the time.  And it was some time, approximately a week,

18   before he was even physically back in the city.

19       As for her emotional reaction to the events of

20   January 6th, one does not have to like what happened on

21   January 6th to sit on a January 6th jury.  And she said she was

22   scared in a big-picture sense, which I believe were her words,

23   which is a reasonable reaction to what happened on January 6th.

24   And she was also, again, very clear when we asked her

25   repeatedly whether she will be able to put aside her emotional

```
 1     responses to January 6th, and she said yes.

 2              THE COURT:  All right.  I'm going to grant the

 3     motion.

 4          It's a combination of the personalization of the day

 5     because her husband worked on the Hill at the time, plus her

 6     answering yes to Questions 27 and 28, which are the questions

 7     involving racism and violence.  And very few people have

 8     answered yes to both of those.

 9          And as a lawyer, obviously, she can intellectually

10     articulate that she can put those things aside.  But I think

11     she would have a difficult time.  And she said she had some

12     certain ideas of what happened on that day, but could --

13     convinced otherwise.  But it's not the defendant's burden to

14     put on any evidence to disabuse her of those preconceived

15     notions.

16          Tanya, we're going to take a bathroom break.  So we're

17     going to take a ten-minute break.

18              (Recess taken.)

19              (REPORTER'S NOTE:  Juror 1326 enters.)

20              THE COURTROOM DEPUTY:  I have Juror No. 1326,

21     line 42.

22              THE COURT:  This is Juror 1326.  You're going to have

23     to help me with your last name.

24              THE PROSPECTIVE JUROR:  ███████.

25              THE COURT:  ████████.  Okay.
```

1          You answered yes to Question No. 9, which is the one

2     about you or a family member, a close friend being -- having

3     legal training.

4               THE PROSPECTIVE JUROR:  Yes.  That's correct.

5               THE COURT:  Tell us about that.

6               THE PROSPECTIVE JUROR:  My younger brother is an

7     attorney, primarily works in tax law and wills.

8               THE COURT:  Okay.  And do you know if he works in --

9     on criminal tax cases at all or --

10              THE PROSPECTIVE JUROR:  Not particularly.

11              THE COURT:  Okay.

12              THE PROSPECTIVE JUROR:  Yeah.

13              THE COURT:  All right.  You answered yes to

14    Question No. 10, which is if you or someone close to you lives

15    or works at or near the U.S. Capitol Building.  Tell us about

16    that.

17              THE PROSPECTIVE JUROR:  Yes.  I have lived for the

18    last, oh, eight years, in Capitol Hill.  My wife and I, we live

19    four blocks from the Capitol.  So we've had a real close

20    connection with community over the last couple years.

21              THE COURT:  Okay.  So when the fencing went up after

22    January 6th, how close to your house was that?

23              THE PROSPECTIVE JUROR:  Extremely close.

24              THE COURT:  Okay.  But you weren't within the

25    perimeter?

```
 1              THE PROSPECTIVE JUROR:  Thankfully, no.

 2              THE COURT:  Okay.  And how did that fencing disrupt

 3    your daily lives?

 4              THE PROSPECTIVE JUROR:  To be honest, it was pretty

 5    traumatic.  You know, I think in terms of day-to-day

 6    activities, sure, it's an inconvenience, you know, not being

 7    able to walk through the Capitol or see the Capitol.

 8         But more from the element of watching soldiers with

 9    AK-47s, you know, patrol your neighborhood 24/7.  It was a

10    little bit unnerving, to be totally honest.  And it's

11    definitely changed our opinions about -- unfortunately, about

12    when we have large crowds and protests coming to town.  Because

13    we are, you know, so close to the Capitol, we do have fears

14    about, you know, what happens if -- we have a basement rental.

15    What happens if, you know, someone stays in our -- in our

16    rental and, you know, does something -- something bad, so.

17              THE COURT:  So you answered yes to the question about

18    following the events on the news about January 6th.  Tell us

19    about what you watched, both on the day of January 6th and

20    since then.

21              THE PROSPECTIVE JUROR:  Yeah.  I think, obviously,

22    kept up to date with all the events that are going on, as well

23    as the investigations.  I answered this in a later question,

24    but I am a self-employed contractor with the FBI.  And, you

25    know, I think just being aware of the -- the investigative
```

1    trade craft and the things that are being -- that the FBI was

2    pursuing in order to identify the individuals who participated

3    on January 6th.

4         And then the -- some of the subsequent investigations, I

5    kept a -- not super, super in-depth, but aware of all those

6    things.  I've seen the footage of the -- the events.

7    Obviously, not the defendant, but some of the more visible

8    videos that are out on the internet.

9         THE COURT:  Okay.  And what do those videos reflect,

10   the ones that you recall seeing?

11        THE PROSPECTIVE JUROR:  I think the -- the ones that

12   I've seen the most of have been the -- some of the more violent

13   elements of -- involving struggles between the individuals

14   attending January 6th and police officers.

15        THE COURT:  Uh-huh.

16        THE PROSPECTIVE JUROR:  Individuals scaling the wall.

17   Individuals going through members of Congress's desks, stealing

18   items.  Some of the, kind of, major ones that most -- most

19   people have seen.

20        THE COURT:  Okay.  You also answered yes to a very

21   similar question, which is about news media concerning

22   individuals on that day.  Do any specific individuals stand out

23   in your mind?

24        THE PROSPECTIVE JUROR:  The -- the individual who put

25   his feet up on -- on the -- Nancy Pelosi's desk, that's --

1    that's hard to -- to forget.  And then the -- I'm drawing a

2    blank on his name, but the -- there was a couple key members

3    who were dressed in very unique ways, and I -- one, the

4    individual with curly reddish hair, I believe; that he was seen

5    taking either like a large painting or statue, something at the

6    Capitol.  It's one of the more -- I'm sorry.  I'm doing a

7    terrible job of the details, but it's one of the most

8    memorable, replayed pictures of -- of the events that day.

9              THE COURT:  Okay.

10             THE PROSPECTIVE JUROR:  But that's in terms of

11   specifics.

12             THE COURT:  Okay.  So you also answered yes to

13   Question 20, which is if you, members of your immediate family,

14   or close friends work in law enforcement.

15             THE PROSPECTIVE JUROR:  Yes.

16             THE COURT:  Tell us about that.

17             THE PROSPECTIVE JUROR:  I've been a self-employed

18   contractor with the FBI for the last six or seven years.  I

19   primarily work in software development with a focus on insider

20   threat operations.

21             THE COURT:  In- --

22             THE PROSPECTIVE JUROR:  Insider threat.

23             THE COURT:  Okay.  Insider threats to the FBI?

24             THE PROSPECTIVE JUROR:  Correct.

25             THE COURT:  Okay.  And you indicated that through

1    that position, you've had some exposure to the investigation

2    into January 6th.  Tell us about what sorts of things -- to the

3    extent you can speak about them, what sorts of things you've

4    learned.

5            THE PROSPECTIVE JUROR:  Only high-level elements.

6    Obviously, nothing specific about cases.  General understanding

7    of some of the investigative tactics, methods of pulling

8    information from open-source sources and collaborating that

9    with other sources.  But nothing specific.

10           THE COURT:  Uh-huh.  Okay.  And what have you

11   concluded as a result of what you learned in those -- learning

12   about those things?

13           THE PROSPECTIVE JUROR:  I think, overall, the

14   majority of evidence gathered to identify individuals from the

15   January 6th trials via things like Facebook, Instagram, social

16   media posts.  Basically, using that to ID people and place

17   people at certain locations at certain times.  And then using

18   that to dictate how charges are filed against those

19   individuals.

20           THE COURT:  Okay.  You answered yes to Question 22,

21   which is whether you, a member of your immediate family, or

22   close friend has ever been the victim of or a witness to a

23   crime.  Tell us about that.

24           THE PROSPECTIVE JUROR:  In 2019 I was assaulted by a

25   group of teenagers in D.C.  And then in 2015 I was robbed at

1    gunpoint by a group of teenagers in D.C.

2            THE COURT:  Okay.  And were the individuals

3    apprehended at any point?

4            THE PROSPECTIVE JUROR:  Not for the robbery.  For

5    the -- the assault, we worked with a detective for -- for some

6    time, and my wife ID'd some individuals.  But, ultimately, we

7    never received any, you know, guidance from the detectives

8    following those initial few ID sessions.

9            THE COURT:  Okay.  So you didn't have to testify at

10   trial or anything like that?

11           THE PROSPECTIVE JUROR:  Correct.  I did not.

12           THE COURT:  Okay.  Anything about those experiences,

13   either positive or negative, you think would impact how you

14   would serve as a juror in this case?

15           THE PROSPECTIVE JUROR:  I think a little bit, to be

16   honest.  The -- the assault was pretty traumatic for me, and it

17   was a little bit of -- they're not exactly parallels, but there

18   is a sense of, you know, mobs inciting violence, which I think

19   are similar in some cases.

20           THE COURT:  Okay.  All right.  You answered yes to

21   Question 25, which is the one about strong personal feelings,

22   beliefs, or opinions about the events that took place on

23   January 6th that would make it difficult for you to consider

24   the case fairly.  Tell us about that.

25           THE PROSPECTIVE JUROR:  Yeah.  I think the -- again,

1    the amount of evidence and the -- I think -- in a lot of ways,

2    we kind of consider this to be an attack on our community.  And

3    there's overwhelming evidence that IDs people at -- at the

4    January 6th events.  And I think kind of to -- the -- it was

5    pretty traumatizing.

6         My wife still frequently talks about getting stress

7    headaches and migraines because of all the helicopters and all

8    the emergency vehicles that are -- are flying overhead and

9    going next to our house.  And I think it would be -- to be

10   completely candid, I think it's pretty difficult for me to be

11   impartial in -- in this particular matter because I think I

12   just assume -- presume guilt.

13        THE COURT:  Okay.  Which leads me to Question No. 29,

14   which is the one that you would have difficulty voting not

15   guilty if -- if Mr. Rhine does not testify or if he does not

16   call witnesses to testify.

17        THE PROSPECTIVE JUROR:  Yeah.  My basic premise there

18   is, again, given the plethora of video evidence, images -- and

19   I'm making some presumptions what evidence would be presented.

20   But, of course, you know, follow the Court's instructions if

21   chosen.

22        But understanding that there are pictures that place the

23   individual at a certain place at a certain time, I -- I have

24   difficulties reconciling that with an ability to either justify

25   or provide contrary evidence to -- to that, either in some sort

```
 1        of testimony or -- or something else.  It would be tough for me

 2        to reconcile.

 3                    THE COURT:  Okay.  And then just to complete the

 4        loop, you also answered yes to Question 28; that you believe

 5        that all or most civilians present at the Capitol on

 6        January 6th engaged in violence or intended to engage in

 7        violence.

 8                    THE PROSPECTIVE JUROR:  Yeah.  I think the -- if

 9        you're entering the Capitol and you're fighting with police

10        officers trying to prevent you from entering the Capitol, I

11        think that's a pretty clear indication of an angry mob.  And

12        the angry mob is there to incite violence.  I can't really see

13        any other way around that.

14                    THE COURT:  Okay.  And you don't distinguish between

15        the people that directly were involved in violence and those

16        that were there but didn't?

17                    THE PROSPECTIVE JUROR:  I could distinguish that.

18                    THE COURT:  Uh-huh.

19                    THE PROSPECTIVE JUROR:  That's fair.  I could

20        distinguish that.

21                    THE COURT:  Okay.  Ms. Fish.

22                    MS. FISH:  Good morning, Mr. ████████.  Am I saying

23        your name right?

24                    THE PROSPECTIVE JUROR:  ████████.

25                    MS. FISH:  ████████.
```

1           THE PROSPECTIVE JUROR:  That's close enough.

2           MS. FISH:  I apologize.

3           THE PROSPECTIVE JUROR:  It's fine.

4           MS. FISH:  I'm Rebecca Fish.  I'm the attorney for

5     Mr. Rhine.

6           So I wanted to follow up on a few things you spoke

7     about.  You indicated you've been a self-employed contractor

8     with the FBI for about six years; is that correct?

9           THE PROSPECTIVE JUROR:  Correct.

10          MS. FISH:  You worked with FBI agents who are

11    officers who are investigating crimes?

12          THE PROSPECTIVE JUROR:  That's correct.

13          MS. FISH:  And you work well with those officers?

14          THE PROSPECTIVE JUROR:  That's correct.

15          MS. FISH:  Do you have a lot of respect for them?

16          THE PROSPECTIVE JUROR:  Yes.

17          MS. FISH:  And do you feel fondly towards them?

18          THE PROSPECTIVE JUROR:  Can you repeat the question.

19          MS. FISH:  Fondly.  Do you feel fondly or positively

20    toward them, generally?

21          THE PROSPECTIVE JUROR:  Generally speaking, yeah.

22          MS. FISH:  And you said that you've -- you're aware

23    of the investigative techniques that they've used to

24    investigate crimes on January 6th?

25          THE PROSPECTIVE JUROR:  At a high level.

1          MS. FISH:  But, like, for example, facial recognition

2     software used to investigate social media?

3          THE PROSPECTIVE JUROR:  I think that's generally

4     common knowledge.

5          MS. FISH:  Sure.  What other techniques are you aware

6     of that they've used?

7          THE PROSPECTIVE JUROR:  I think more along the lines

8     of what you might consider to be standard techniques of looking

9     at information from different sources and collaborating that

10    together.

11         MS. FISH:  Can you tell me what you mean by that.

12         THE PROSPECTIVE JUROR:  So if there is a picture of

13    someone from security cameras at a certain location,

14    collaborating that with other information, maybe text messages

15    or something else that would kind of collaborate that.

16         MS. FISH:  And your specialty is, actually, in using

17    software to help further investigations; is that fair to say?

18         THE PROSPECTIVE JUROR:  Yes.  It's a slightly

19    different kind of investigation.

20         MS. FISH:  Typically.  But it's still an

21    investigation; correct?

22         THE PROSPECTIVE JUROR:  Correct.

23         MS. FISH:  And -- and your understanding of the

24    techniques used is that they're good?  They're good techniques?

25         THE PROSPECTIVE JUROR:  Yes.

```
1            MS. FISH:  And you think they're reliable?

2            THE PROSPECTIVE JUROR:  Yes.

3            MS. FISH:  I think you said it was overwhelming

4     evidence?

5            THE PROSPECTIVE JUROR:  Yes.

6            MS. FISH:  And, you know, as we sit here today, your

7     assumption is that Mr. Rhine is guilty?

8            THE PROSPECTIVE JUROR:  Yes.

9            MS. FISH:  And, you know, sounds like you live very

10    close to the Capitol Building; is that fair to say?

11           THE PROSPECTIVE JUROR:  Yes.

12           MS. FISH:  And it was a really traumatic event for

13    you and your family on January 6th?

14           THE PROSPECTIVE JUROR:  Yes.

15           MS. FISH:  It's changed the way you and your wife

16    live today?

17           THE PROSPECTIVE JUROR:  It's changed our perception,

18    yes.

19           MS. FISH:  Changed your understanding of your

20    neighborhood?

21           THE PROSPECTIVE JUROR:  Yes.

22           MS. FISH:  You feel less safe?

23           THE PROSPECTIVE JUROR:  Most of the time we do.

24           MS. FISH:  You're more concerned about who you might

25    rent your extra room to?
```

```
1              THE PROSPECTIVE JUROR:  Yes.

2              MS. FISH:  You're now more worried about large

3       gatherings in Washington, D.C.?

4              THE PROSPECTIVE JUROR:  That's accurate.

5              MS. FISH:  And I believe you also mentioned that

6       you -- and I'm very sorry to hear you experienced a really

7       horrific assault yourself.

8              THE PROSPECTIVE JUROR:  Uh-huh.

9              MS. FISH:  And that seeing events on January 6th kind

10      of brought up some of that trauma again?

11             THE PROSPECTIVE JUROR:  Yes.

12             MS. FISH:  When you think about it, do you feel that

13      stress again?

14             THE PROSPECTIVE JUROR:  Some stress, yeah.

15             MS. FISH:  And, you know, in terms of what you've

16      watched, what you understand the FBI has been doing to

17      investigate, what you've seen kind of happen since January 6th,

18      do you feel like you have a pretty good idea of what happened

19      that day?

20             THE PROSPECTIVE JUROR:  I think so, yeah.

21             MS. FISH:  And do you feel like you have a good idea

22      of why people went to the Capitol that day?

23             THE PROSPECTIVE JUROR:  I think I understand the

24      stated reasons of the individuals, but I can't personally

25      understand them.
```

```
1              MS. FISH:  Sure.  But you said you kind of thought it
2       was this angry mob mentality --
3              THE PROSPECTIVE JUROR:  Yes.
4              MS. FISH:  -- there to incite violence?
5              THE PROSPECTIVE JUROR:  Yes.
6              MS. FISH:  Even if someone didn't personally engage
7       in violence?
8              THE PROSPECTIVE JUROR:  That's generally accurate.
9              MS. FISH:  And that's kind of your understanding
10      based on a lot of review of the news; is that what you said?
11             THE PROSPECTIVE JUROR:  That's correct.
12             MS. FISH:  As well as your understanding of what
13      investigations have been done so far?
14             THE PROSPECTIVE JUROR:  That's correct.
15             MS. FISH:  And that's not likely to change in the
16      next week?
17             THE PROSPECTIVE JUROR:  No.
18             MS. FISH:  Thank you.
19             MR. VALENTINI:  The government has no questions for
20      Mr. ███████.
21             THE COURT:  Okay.  Thank you.
22         Thank you.
23             THE PROSPECTIVE JUROR:  Thank you.
24             (REPORTER'S NOTE:  Juror 1326 left.)
25             MS. FISH:  Your Honor, I'd move to strike this juror
```

1    for cause.

2         I think he was clear he could not follow the burden in

3    this case and had, you know, understandable personal traumatic

4    experiences surrounding events in this case.

5         MR. VALENTINI:  The government will not oppose the

6    motion based on the knowledge about preexisting knowledge -- or

7    sort of preexisting knowledge about investigative techniques.

8         THE COURT:  Okay.  Yeah, I would have stricken him

9    regardless.  Combination of things.  One is the proximity

10   living to the Capitol and, specifically, referring to the

11   National Guard's men with guns out; and his work for the FBI in

12   which he gained some inside knowledge about the investigations;

13   the way he answered Questions 25, 28, 29; and then his

14   specific -- saying he would shift the burden to the defendant,

15   so.

16        THE COURTROOM DEPUTY:  Ready for the next one?

17        THE COURT:  I am.

18        (REPORTER'S NOTE:  Juror 0412 enters.)

19        THE COURTROOM DEPUTY:  This is Juror 0412, line 43.

20        THE COURT:  This is Juror 0412.  Mr. █████; is that

21   correct?

22        THE PROSPECTIVE JUROR:  Yes.

23        THE COURT:  You can have a seat.  Thank you.

24        So you answered yes to Question No. 5, which is the one

25   about prior jury service.  Can you tell us about that.

```
1              THE PROSPECTIVE JUROR:  I've probably been on 14 or

2      15 juries.

3              THE COURT:  Okay.  Tell us about them and where they

4      were and in what type of case they were and whether the jury

5      was able to reach a verdict.

6              THE PROSPECTIVE JUROR:  Most always in D.C.  A couple

7      in Alaska, when I lived there.  They were criminal cases.  All

8      of them criminal cases.  And we always reached a decision.

9              THE COURT:  Okay.  What types of criminal charges did

10     they involve?

11             THE PROSPECTIVE JUROR:  Drugs -- drugs.  A lot of

12     drugs.  Also reckless driving.

13             THE COURT:  Uh-huh.  And when's the last time you

14     served on a jury there?

15             THE PROSPECTIVE JUROR:  Probably two years ago.

16             THE COURT:  Okay.

17             THE PROSPECTIVE JUROR:  Here in D.C.

18             THE COURT:  And the -- anything about those

19     experiences with the criminal justice system in action you

20     think would affect your ability to serve on this jury fairly?

21             THE PROSPECTIVE JUROR:  No, not based on those.

22             THE COURT:  Okay.  So you answered yes to

23     Question 14, which is you watched -- ever seen or heard

24     anything in the news or elsewhere about specific individuals

25     who were present at the U.S. Capitol on January 6th.  Tell us
```

1    about -- a little bit about your media watching, both on

2    January 6th and since then.

3              THE PROSPECTIVE JUROR:  I was definitely watching on

4    January 6th.  I was -- I recall being aware of a protest or a

5    rally of some sort.  And I was -- posse comitatus

6    notwithstanding, I was a little surprised that there was no one

7    coming to defend our Capitol, in my opinion, and so I was kind

8    of just -- I don't know.  It was just striking for me that a

9    peaceful transfer of power wasn't happening or was -- was --

10   didn't seem to be intended to happen.

11             THE COURT:  And so that -- that day, you were working

12   from home or you were home?

13             THE PROSPECTIVE JUROR:  I'm retired.

14             THE COURT:  You're retired.  Okay.  And so you

15   watched it pretty closely or intermittently?

16             THE PROSPECTIVE JUROR:  Continuously.

17             THE COURT:  Continuously.  Okay.  And -- and since

18   then, how much media -- or how closely have you followed this

19   story?

20             THE PROSPECTIVE JUROR:  I've seen some reports of

21   arrests or reports of trials, but I've not seen outcomes or

22   paid much attention beyond that.

23             THE COURT:  Okay.  There's been a handful of

24   documentaries made about that day.  Have you watched any of

25   those?

```
1              THE PROSPECTIVE JUROR:  No, I haven't.  Huh-uh.

2              THE COURT:  There was --

3              THE PROSPECTIVE JUROR:  I kind of wanted to forget

4    it.

5              THE COURT:  There was a House committee that had

6    hearings.  Did you watch any of those?

7              THE PROSPECTIVE JUROR:  I did not watch the

8    prime-time stuff.

9              THE COURT:  All right.  You answered yes to

10   Question No. 19, which is the one that if you're selected as a

11   juror in this case, I'm going to instruct you to avoid all

12   media coverage and the like and you might have a hard time

13   following that instruction.

14             THE PROSPECTIVE JUROR:  I may have misunderstood.  I

15   thought I heard you use the word blogging as an example.  I did

16   not hear you constrain the time to the trial.  Maybe I

17   misunderstood.  Were you constraining the time to the trial or

18   after the trial?

19             THE COURT:  To the trial.

20             THE PROSPECTIVE JUROR:  Oh.  Then I would have no

21   problem.

22             THE COURT:  Okay.  You answered yes to Question 25,

23   which is the one you have such strong personal feelings,

24   beliefs, or opinions about the events that took place on the

25   Capitol on January 6th that would make it difficult for you to
```

1    consider the case fairly.

2            THE PROSPECTIVE JUROR:  I wanted to be candid that I

3    have strong feelings.  That's what I answered.  I don't -- I've

4    done juries before where I've tried to do -- I'm instructed to

5    do, and I think I've done that.  But I do have strong feelings

6    about that day, and I just --

7            THE COURT:  Sure.

8            THE PROSPECTIVE JUROR:  I wanted to answer honestly

9    about it.

10            THE COURT:  So tell us a little bit about what your

11    strong feelings are.

12            THE PROSPECTIVE JUROR:  I believe that -- I believe

13    that I'm disappointed that I live in the District of Columbia,

14    formally the territory of District of Columbia, where there is

15    no governor and no National Guard to provide some way of

16    dealing with that en masse.

17        It seems like there was a protest, and the protest

18    seemed legitimate to me, to have a rally to have that purpose.

19    And then I saw the President say he was going to follow those

20    people there, and he didn't do it.  And then the people seemed

21    to be going to a place for a purpose that was not a rally.  It

22    was not -- did not seem to be a peaceful protest to me.

23        And that was greatly disappointing; that there was no --

24    there was -- there were many people who defended the Capitol,

25    but there didn't seem to be a suitable number for what was

1    happening.

2            THE COURT:  So, obviously, there were thousands of

3    people.  Some engaged in violence.  Some engaged in vandalism.

4    Others did not.  In this case there's not any allegation that

5    Mr. Rhine participated in violence or participated in

6    vandalism.

7        Do you think you can set aside your beliefs about what

8    happened that day and the lack of a National Guard and judge

9    Mr. Rhine based on the facts that will be presented in the --

10   this courtroom?

11           THE PROSPECTIVE JUROR:  Did I just hear you state

12   facts that you said he was not involved in violence?

13           THE COURT:  There will be no allegations.

14           THE PROSPECTIVE JUROR:  There will be no allegations.

15   That would help.  But I just feel like I'm just, sort of,

16   disappointed for our government, that I live and I pay taxes in

17   a place where -- where that's the kind of defense we have for

18   our Capitol.

19           THE COURT:  Sure.  Sure.  But my question is far more

20   specific.  Obviously, none of us in this room have an ability

21   to change the facts.

22           THE PROSPECTIVE JUROR:  I would definitely try to put

23   that all aside and follow your instructions.

24           THE COURT:  Okay.  You also answered yes to

25   Question 28, which is that you believe that all civilians --

1    all or most civilians present at the Capitol engaged in

2    violence or intended to engage in violence.

3            THE PROSPECTIVE JUROR:  As I said, I saw a peaceful

4    rally, and I saw the President there speaking at a peaceful

5    rally.  It seemed that the purpose to travel to the Capitol was

6    not to be so peaceful.  And it was -- for some reason the

7    President was no longer present there, although he promised to

8    be.  So it seemed like there was some intent to do something

9    that was not peaceful.  That's my perception of what -- the two

10   events, one following the other, were that day.

11           THE COURT:  Okay.  But, again, there were thousands

12   of people there, and not everyone would have the same intent.

13   So would you be able to judge this defendant's intent based on

14   the evidence presented in that courtroom?

15           THE PROSPECTIVE JUROR:  If that were your

16   instruction, I would do my best.

17           THE COURT:  And do you think you can achieve that?

18           THE PROSPECTIVE JUROR:  I think so.  I don't have --

19   I don't have the evidence so I -- short of the evidence, I

20   would just -- I would say I would do my best -- I mean, I'm

21   here to answer the questions honestly.

22           THE COURT:  Sure.  Ms. Fish.

23           MS. FISH:  Good morning, Mr. ███████.

24           THE PROSPECTIVE JUROR:  Good morning.

25           THE COURT:  My name is Rebecca Fish.  I'm the

1      attorney for Mr. Rhine.

2          I wanted to follow up.  First, you indicated you were

3      retired.  What profession did you do before that?

4          THE PROSPECTIVE JUROR:  I was in IT technology.

5          MS. FISH:  IT.  Did you ever work for law enforcement

6      or the federal government?

7          THE PROSPECTIVE JUROR:  Huh-uh.

8          MS. FISH:  And I also wanted to follow up a little

9      bit about the -- the news media that you've watched about

10     January 6th and your experience on that day.

11         THE PROSPECTIVE JUROR:  Uh-huh.

12         MS. FISH:  So I heard you say that you were watching

13     it continuously.

14         THE PROSPECTIVE JUROR:  That day.

15         MS. FISH:  And that you saw the peaceful rally where

16     former President Trump gave a speech.  Can you tell us what you

17     saw after that.

18         THE PROSPECTIVE JUROR:  I saw images of people

19     traveling down toward the Capitol.  And it seemed like -- I

20     mean, it wasn't a parade.  It didn't feel like a parade.  So it

21     didn't seem like it was an inauguration day and here we have a

22     new President.

23         I saw the Capitol being breached.  I saw what looked

24     like an inauguration setup being walked over and crawled over.

25     And -- and I saw things broken and I saw conflict and I saw

1    violence.

2          MS. FISH:  And how did you feel watching all of that?

3          THE PROSPECTIVE JUROR:  I think I've stated that

4    here.  I was appalled that's the best we could do on that day,

5    knowing this -- there was a rally planned.  And it seemed like

6    there was a need for more -- more protection, more defense,

7    more -- and there was an important activity going on that day,

8    intended -- according to our Constitution.  So I felt bad.

9          MS. FISH:  Did you feel fearful at all for yourself

10    or the people?

11          THE PROSPECTIVE JUROR:  Not in my home at that time,

12    no.  I felt it was about our government.  And what I had been

13    taught as a child was peaceful transfer of power; how we're so

14    proud of that.  Peaceful transfer of power.  And that day was

15    electors, and it was about an important process.

16          MS. FISH:  So did it feel kind of like a -- I think

17    you described it as -- what -- what emotions did you feel

18    seeing that this normal peaceful transfer of power was being

19    disturbed?

20          THE PROSPECTIVE JUROR:  I felt that we could never

21    get it back.  We either had a chance to do it every time --

22    every four years, or we didn't if we didn't do it one time, and

23    it didn't seem that way.

24          It seemed we had a Vice President who was being

25    protected and had Secret Service protecting him while there

 1    were other Secret Service protecting someone different with a

 2    different agenda.  It seemed at the highest level to be at

 3    odds, not just sitting -- in that branch of government that was

 4    Congress, but the branch that was the executive behaving that

 5    way.

 6              MS. FISH:  Yeah.  And when you think about it today,

 7    how do you feel?

 8              THE PROSPECTIVE JUROR:  I still look back on it as a

 9    disappointment, but I -- it's not -- it's not about the

10    election than it is about the process and following the

11    process.

12              MS. FISH:  And, you know, I've heard you express

13    disappointment with the lack of response and the lack of

14    defense by the government.  How do you feel about the people

15    who participated in that -- that procession and -- and going

16    into the Capitol?

17              THE PROSPECTIVE JUROR:  I feel they had strong

18    feelings and they wanted something different to happen in the

19    election.  I did not think that was the place for that to

20    happen.  And I felt the judiciary had been involved in many

21    cases, as I was watching the news.  And as cases were

22    presented, it seemed like there were cases presented in

23    different states with regard to their elections and electors.

24    And those had pursued their means to -- to get -- to get

25    something done with those electors.

1          So it seemed like it was time to count the votes and

2    certify the votes, and that didn't happen for quite a while

3    because of this event.

4          MS. FISH:  Because of the people who --

5          THE PROSPECTIVE JUROR:  Because of that day and the

6    people who chose to interrupt that day.

7          MS. FISH:  Yeah.  And you said kind of watching even

8    people moving towards the Capitol, it was clear that was not

9    for a peaceful --

10          THE PROSPECTIVE JUROR:  My perception was that this

11    was not a peaceful rally.

12          MS. FISH:  And you --

13          THE PROSPECTIVE JUROR:  They were two separate

14    events.

15          MS. FISH:  And you said you've continued to follow

16    some of the news about this since then?

17          THE PROSPECTIVE JUROR:  I've seen -- as I said, I

18    didn't watch -- I didn't watch the commission.  I didn't go --

19    I mean, I felt like nothing -- I felt like things that I was

20    hearing briefly in the news were just confirming what I already

21    had felt.  And that probably could be through my news sources,

22    but it still felt that way.  So I haven't really watched it

23    that much beyond that.  I don't like to think about it.

24          MS. FISH:  Yeah.  And --

25          THE PROSPECTIVE JUROR:  Retirement gives you a lot of

```
 1    time to think.

 2              MS. FISH:  Sorry?

 3              THE PROSPECTIVE JUROR:  Retirement gives you a lot of

 4    time to think.

 5              MS. FISH:  I bet it does.

 6         And, you know, this is something you've thought about?

 7              THE PROSPECTIVE JUROR:  I mean, at that time I did,

 8    that whole election process, the whole --

 9              MS. FISH:  And your understanding of what happened

10    isn't likely going to change in the next week; is that fair to

11    say?

12              THE PROSPECTIVE JUROR:  Unless the purpose of this

13    case or some purpose you commit me to is to hear new

14    information and -- like I said, I will try and learn.  I want

15    to be continuously learning in my life.  But I can't say that

16    I -- I'm optimistic that's going to happen.

17              THE COURT:  Okay.  And you indicated you would try

18    to --

19              THE PROSPECTIVE JUROR:  I would follow the judge's

20    instructions --

21              MS. FISH:  -- instructions?

22              THE PROSPECTIVE JUROR:  I'm sorry.  Yes, I would.

23              THE COURT:  But you're not sure if it will be enough

24    to overcome your feelings?

25              THE PROSPECTIVE JUROR:  I want to be honest about how
```

1    I feel.  And I don't know what I'm going to hear.  So that's

2    what I'm sharing.

3              MS. FISH:  Thank you.

4              MR. VALENTINI:  Good afternoon, Mr. ▮▮▮▮.  My name

5    is Francesco Valentini, and I represent -- I'm one of the

6    prosecutors in this case.

7         You expressed disappointment in the lack of response on

8    January 6th.

9              THE PROSPECTIVE JUROR:  Uh-huh.

10             MR. VALENTINI:  And that's an understandable

11   reaction.  But my question for you is, is there anything about

12   that, that sense of disappointment, that would prevent you, if

13   you are instructed by the judge in this case, to judge this

14   case exclusively based on the facts that are presented in

15   evidence?

16             THE PROSPECTIVE JUROR:  I'm trying to understand how

17   that question differs from the question already answered.  So I

18   don't think my disappointment is directly the problem.  I think

19   my feelings are about the incidents themselves.  My

20   disappointment was with regard to the lack of the governor for

21   this territory or this district; that there was no National

22   Guard as an option, apparently, or no process to not interfere

23   with the possibility of calling out the Guard to protect us.

24   So in us, I mean the Capitol.  I mean the process.

25             MR. VALENTINI:  And you have also spoken -- you also

1    spoke about your previous jury service before.

2            THE PROSPECTIVE JUROR:  Uh-huh.

3            MR. VALENTINI:  And you said you have -- I'm not sure

4    I heard exactly the number of times you said.

5            THE PROSPECTIVE JUROR:  I think it's 14 or -- I'm not

6    exaggerating.  It's been at least that many.  I've lived in

7    D.C. since '96.  I've been called every two years -- I've only

8    been called once for this.  It was the day the -- the trial for

9    Roger -- I think an associate of the President -- was being --

10   it was the last time I was called to serve in this court -- or

11   this area.  I did not actually serve that time, though.

12           But many, many times I've served in the Superior Court,

13   and many times -- even more than the two I said in Alaska.

14   Alaska you get called maybe five or six years.  I was born

15   there.  I lived there 30 years.  And you get called maybe every

16   five or six years.  Maybe.  But it still adds up a lot of your

17   lifetime.  And here it's just become monumental in terms of the

18   number of times I've been placed on juries.

19           MR. VALENTINI:  And, sir, focusing on the times

20   when -- in which you were actually selected for the jury --

21           THE PROSPECTIVE JUROR:  Yeah, most of them.

22           MR. VALENTINI:  And you said in each of those

23   instances, the jury was able to reach a verdict?

24           THE PROSPECTIVE JUROR:  In every trial I've been on,

25   we've reached a verdict.

```
 1            MR. VALENTINI:  Let's talk about the last one you sat

 2    on.  Do you remember what the charges were?

 3            THE PROSPECTIVE JUROR:  The charges were -- I believe

 4    it was a felony.  It was in Superior Court.  I believe it was a

 5    felony for possession of a gun.  And it was the third time the

 6    person had done something and they could no longer possess a

 7    gun and they were alleged to have possessed a gun.

 8            MR. VALENTINI:  Do you remember if the jury reached a

 9    verdict of guilty or not guilty?

10            THE PROSPECTIVE JUROR:  Not guilty.

11            MR. VALENTINI:  Not guilty?

12            THE PROSPECTIVE JUROR:  Uh-huh.

13            MR. VALENTINI:  And I also wanted to ask you about

14    your response to my colleague's question about whether you have

15    a good sense of what happened on January 6th.

16            THE PROSPECTIVE JUROR:  I mean, what happened was a

17    lot of things on January 6th, but if we're talking specifically

18    at the Capitol, I saw the incidents that were reported on the

19    news.  I was watching continuously.

20            MR. VALENTINI:  And did you say that you had a pretty

21    good sense of what the people who went to the Capitol intended

22    to do?

23            THE PROSPECTIVE JUROR:  I perceived that they had

24    some purpose that did not involve peaceful protest.

25            MR. VALENTINI:  Now, if in this case, however, you
```

1    were presented with evidence about this particular defendant

2    and you were instructed that you have to decide the intent of

3    this particular defendant based only what you hear today, you

4    would be able to do that?

5              THE PROSPECTIVE JUROR:  I would attempt to do that,

6    yes.

7              MR. VALENTINI:  Thank you.  No further questions.

8              THE COURT:  All right.  Thank you.

9              (REPORTER'S NOTE:  Juror 0412 left.)

10             MS. FISH:  Your Honor, I would move to strike Juror

11    ███.

12             He answered Question 28 in the affirmative, which does

13    indicate prejudgment, and he stuck by that; that even anyone

14    who went from the Ellipse to the Capitol, he perceived, as

15    having some -- essentially, you know, intent -- *mens rea* that

16    would be consistent with the elements on -- on Charges 2 and 3.

17    And his answers as to whether he could set that aside were

18    equivocal:  where I would try to, I would hope so, you know.

19    They were not in the affirmative; absolutely I could do that.

20             I think it's also clear that he watched events closely

21    and took them very personally.  He referred to an attack on

22    us and also an attack on his very, like, national identity and

23    what he thought might be possible for the future in his

24    country.  So I do think that he cannot be relied upon to serve

25    impartially.

1          MR. VALENTINI:  Your Honor, the government would not

2     oppose the motion based primarily on, sort of, lack of clarity

3     in the responses about that question regarding the

4     National Guard that seemed -- a point, as well as some

5     inability to conclusively state that the juror would be fair

6     and impartial in this particular case.

7          THE COURT:  Okay.  I'll grant the motion based

8     primarily on his issues.

9          He seemed to have preconceived notions about the

10    *mens rea* and the government -- I mean, rather, defendant

11    doesn't have a burden to present any evidence to contradict

12    that and disabuse him of those notions.  And as both parties

13    concede, he was equivocal about whether he would be able to put

14    those aside.

15         All right.  So it's 1:13.  Let's come back -- let's take

16    a lunch break and come back at 2:15.

17              (Recess taken.)

18         THE COURT:  All right.  We're ready to go?

19         MS. FISH:  Yes, Your Honor.

20         MR. VALENTINI:  Yes.

21         THE COURT:  All right.  Let's do it.

22              (REPORTER'S NOTE:  Juror 0366 enters.)

23         THE COURTROOM DEPUTY:  Juror No. 0366, line 44.

24         THE COURT:  All right.  This is Juror 0366.

25    Mr. ████; is that correct?

```
 1              THE PROSPECTIVE JUROR:  Yes.

 2              THE COURT:  Okay.  So you answered yes to the

 3    question about prior jury service.

 4              THE PROSPECTIVE JUROR:  Yes.

 5              THE COURT:  Tell us about that.  If you can get

 6    closer to the microphone.

 7              THE PROSPECTIVE JUROR:  I served on a jury a number

 8    of years ago.  It was a very short case, about four hours,

 9    determining the punishment for a minor traffic infraction.

10              THE COURT:  And it was in D.C.?

11              THE PROSPECTIVE JUROR:  Yeah.  Yes.

12              THE COURT:  Over in Superior Court?

13              THE PROSPECTIVE JUROR:  I would assume so.  I don't

14    remember very well.

15              THE COURT:  Anything about that experience that you

16    think would impact you either positively or negatively in this

17    case?

18              THE PROSPECTIVE JUROR:  No.

19              THE COURT:  Okay.  You answered yes to the question

20    if you or someone close to you lives or works at or near the

21    U.S. Capitol Building.

22              THE PROSPECTIVE JUROR:  My family and I live on

23    Capitol Hill.  My wife works out of the Hubert Humphrey

24    Building, HHS.  So just around the corner.

25              THE COURT:  Okay.  So where on Capitol Hill?  Exactly
```

1    how far from the Capitol?

2           THE PROSPECTIVE JUROR:  Do we live?

3           THE COURT:  Yeah.

4           THE PROSPECTIVE JUROR:  Tenth and Independence.  So

5    about -- I guess about ten blocks.

6           THE COURT:  Okay.  And so, you know, after

7    January 6th, when the fencing went up and the like, how did

8    that impact your life?

9           THE PROSPECTIVE JUROR:  So it limited where we could

10   go, things that we could go to, parks.  Changed, sort of, the

11   commute, things like that.

12          THE COURT:  Would you describe that as a major or a

13   minor inconvenience or somewhere in between?

14          THE PROSPECTIVE JUROR:  It was a minor inconvenience.

15   It was significantly annoying.

16          THE COURT:  Okay.  All right.  And then with respect

17   to your wife working at HHS, which is closer to the Capitol,

18   how did it impact her?

19          THE PROSPECTIVE JUROR:  She was fairly upset.  She

20   was scared, and I remember they didn't go back to work for a

21   while.

22          THE COURT:  Okay.  So she worked from home for a

23   period of time, in addition to any time before COVID?

24          THE PROSPECTIVE JUROR:  (Nods head.)

25          THE COURT:  Okay.  All right.  You answered yes to

1    Question 12, which is if you followed the news and the events

2    that took place at the Capitol on January 6th.

3                 THE PROSPECTIVE JUROR:  Yeah.

4                 THE COURT:  Tell us about what you saw, both on

5    January 6th and since then, and what your impressions were.

6                 THE PROSPECTIVE JUROR:  I'm a critical care

7    physician.  I was on service that day, and I had been worried

8    about traffic.  So I had gone into the hospital early.

9                 THE COURT:  Which hospital?

10                THE PROSPECTIVE JUROR:  Georgetown.

11        So I came past the Capitol to get to work.  Sort of as

12   soon as the news started to show events unfolding, we

13   transitioned to, sort of, disaster planning for casualties.

14   So I was fairly -- in between doing that, glued to the news,

15   trying to figure out what was going on and what we were

16   seeing.

17        Since then, I've followed, I would say, the news

18   somewhat closely with interest over the past number of years.

19                THE COURT:  Okay.  So with respect to your work at

20   the Georgetown hospital, did Georgetown hospital receive

21   individuals that had been injured at the Capitol?

22                THE PROSPECTIVE JUROR:  I don't know.  None of them

23   were critically injured that we saw; so I didn't see any

24   patients.

25                THE COURT:  And as far as following the news since

1    then, there's been a handful of documentaries that have been

2    aired.  Have you watched any of them?

3            THE PROSPECTIVE JUROR:  No, I have not watched any

4    documentaries.

5            THE COURT:  Okay.  And the House committee on

6    January 6th had some hearings that were aired.  Did you watch

7    any of those?

8            THE PROSPECTIVE JUROR:  I watched most of those, yes.

9            THE COURT:  Okay.  You watched them live?

10           THE PROSPECTIVE JUROR:  I watched some of them live.

11   I would say first few live and then saw some recorded and

12   some -- the fragments of the rest.

13           THE COURT:  What was your impressions of what you saw

14   during those hearing -- those committee hearings, rather?

15           THE PROSPECTIVE JUROR:  I guess my aggregate

16   impression was one of significant violence, a raid against the

17   people who were supposed to protect the Capitol, and threats of

18   violence against our legislators in, sort of, an overwhelming

19   amount.  I had a lot of concern for, sort of, implications for

20   that.

21           THE COURT:  Okay.  So, obviously, there were

22   thousands of people there that day, only some of whom engaged

23   in violence or vandalism.  And in this case there are no

24   allegations that Mr. Rhine engaged in violence or vandalism.

25           Do you think you can put aside your impressions of what

1    you've seen in the media concerning vandalism and violence and

2    judge Mr. Rhine fairly based on the facts presented in this

3    courtroom?

4            THE PROSPECTIVE JUROR:  I would believe so, yes.

5            THE COURT:  Okay.  You answered also to -- yes to 14,

6    which is a very similar question, but it pertains to news about

7    specific individuals.  Do you recall any news about specific

8    individuals that were there on January 6th?

9            THE PROSPECTIVE JUROR:  I recall news about some of

10   the leaders.  Proud Boys.  I don't remember specific names,

11   but, sort of, I think a group of three and -- some of those

12   trials.

13           THE COURT:  Okay.  And, similarly, there's -- there's

14   not going to be any evidence presented that Mr. Rhine is a

15   member of the Proud Boys or any other extremist group.  Do you

16   think you would be able to put aside your beliefs about those

17   organizations and judge Mr. Rhine fairly based on the facts

18   presented in this courtroom?

19           THE PROSPECTIVE JUROR:  I believe so.

20           THE COURT:  Ms. Fish.

21           MS. FISH:  Good afternoon, Mr. ███.  I'm Rebecca

22   Fish.  I'm the attorney for Mr. Rhine.

23           I wanted to follow up a little bit about your

24   impressions of January 6th from what you saw on the news media.

25   So you indicated on that day you were working at the hospital.

1          THE PROSPECTIVE JUROR:  I was working in the hospital

2     that night but went into the hospital early.

3          MS. FISH:  And your department actually went into

4     disaster preparedness mode?

5          THE PROSPECTIVE JUROR:  Uh-huh.

6          MS. FISH:  Because you expected significant injuries,

7     critical injuries?

8          THE PROSPECTIVE JUROR:  Because we weren't sure that

9     we wouldn't see them, yeah.

10          MS. FISH:  Was that -- can you tell us about the

11     emotions you felt while that was going on.

12          THE PROSPECTIVE JUROR:  Somewhat nervous, perhaps.  I

13     was less concerned about that in many ways than sort of

14     everything else that was sort of unfolding.  We're prepared for

15     this.  This is what we do, you know.  So, in reality, was more

16     concerned about the implications of what was happening within

17     the Capitol itself.

18          MS. FISH:  And so you -- the feeling of concern you

19     had was more about just, like, what does this mean, what is

20     happening?

21          THE PROSPECTIVE JUROR:  Yeah.  And for my family who

22     were back on Capitol Hill sheltering.

23          MS. FISH:  Were your children at home that day?

24          THE PROSPECTIVE JUROR:  Uh-huh.

25          MS. FISH:  And your wife, was she --

```
1               THE COURT:  Sir, you have to answer yes or no.

2               THE PROSPECTIVE JUROR:  Yes.

3               MS. FISH:  And your wife, was she working at her home

4    or office?

5               THE PROSPECTIVE JUROR:  She was not at the office.

6    At home.

7               MS. FISH:  About ten blocks from the Capitol?

8               THE PROSPECTIVE JUROR:  Yes.

9               MS. FISH:  And what kind of feelings did you have

10   thinking about them?

11              THE PROSPECTIVE JUROR:  I was worried about them.

12              MS. FISH:  When you think of January 6th today, what

13   kind of emotions do you feel?

14              THE PROSPECTIVE JUROR:  Resentment.

15              MS. FISH:  And resentment at who?

16              THE PROSPECTIVE JUROR:  At the individuals that broke

17   into the Capitol.

18              MS. FISH:  And I want to talk a little bit more about

19   what you've learned from the media that you've watched, you

20   know, that day and following.  So you said you -- you followed

21   the congressional hearings?

22              THE PROSPECTIVE JUROR:  Uh-huh.

23              MS. FISH:  You watched all of them in some capacity?

24              THE PROSPECTIVE JUROR:  I think there were 11 of

25   them.  I watched the first few and then bits and pieces of the
```

 1    rest.

 2              MS. FISH:  The later ones.

 3         And did you hear about more violence when you -- when

 4    you watched or -- or read about those?

 5              THE PROSPECTIVE JUROR:  In what sense?

 6              MS. FISH:  Did you continue to hear about violence

 7    that happened on January 6th in those hearings?

 8              THE PROSPECTIVE JUROR:  Yes.

 9              MS. FISH:  And, overall, do you feel like from

10    watching those hearings, from reading the news, from following

11    everything you have, you have a pretty good idea of what

12    happened on January 6th?

13              THE PROSPECTIVE JUROR:  No, I -- I don't.

14              MS. FISH:  And, you know, you mentioned hearing a bit

15    about some people being there, being leaders of the Proud Boys?

16              THE PROSPECTIVE JUROR:  Uh-huh.

17              MS. FISH:  Is it fair to say you have a negative

18    feeling about the Proud Boys?

19              THE PROSPECTIVE JUROR:  Yes.

20              MS. FISH:  And do you feel like you have an idea of

21    why the -- not everyone, but the majority of people went to the

22    Capitol on January 6th?

23              THE PROSPECTIVE JUROR:  I don't.  You know, I think

24    my assumption would be that many people had their own reasons.

25              MS. FISH:  Had?

```
 1                THE PROSPECTIVE JUROR:  Had their own reasons.

 2                MS. FISH:  Had their own reasons.

 3           Do you believe that, you know, people knew or should

 4      have known that it would be violent?

 5                THE PROSPECTIVE JUROR:  I don't have a good way of

 6      answering that.  I mean, I -- I don't know what happened in the

 7      run-up.

 8                MS. FISH:  And I would just ask in terms of kind

 9      of -- you described a minor inconvenience, but very annoying --

10                THE PROSPECTIVE JUROR:  Uh-huh.

11                MS. FISH:  -- is that fair to say?  The fencing

12      and -- were there also, you know, armed police in your

13      neighborhood at that time?

14                THE PROSPECTIVE JUROR:  Yeah.

15                MS. FISH:  In terms of your kind of annoyance with

16      that situation, is there any direction that you place blame for

17      the fencing or the police in your neighborhood?

18                THE PROSPECTIVE JUROR:  Yeah.

19                MS. FISH:  Where would that be?

20                THE PROSPECTIVE JUROR:  Anybody who was present that

21      day.

22                MS. FISH:  Thank you.

23                MR. VALENTINI:  Good afternoon, Mr. ████.  My name is

24      Francesco Valentini.  I'm one of the prosecutors in this case.

25           I wanted to follow up on some of the answers that you
```

1  just gave in response to Judge Contreras and my colleague's

2  question.  The first one, as I think you said, you expressed

3  looking back on January 6th, that that day, at some point,

4  you -- you were worried about your family because they live

5  on -- closer -- they live in the Capitol Hill area.

6      Has that feeling of concern, of worry, subsided after

7  January 6th?

8      THE PROSPECTIVE JUROR:  Do you mean am I still

9  concerned for their safety?

10     MR. VALENTINI:  Right.

11     THE PROSPECTIVE JUROR:  I don't have that concern

12 currently.

13     MR. VALENTINI:  And somewhat related, though -- of

14 course, distinct -- you said that you felt a sense of annoyance

15 at the fencing that went up around the Capitol after

16 January 6th, 2021.  In the sense of annoyance, that too, has it

17 subsided since January 6th?

18     THE PROSPECTIVE JUROR:  No.  The -- my neighborhood

19 has changed.  And I think -- many of us moved here, and the

20 neighborhood co-existed with the Capitol in many ways.  And

21 it's now very clear that we don't do that.  We are at the mercy

22 of the Capitol and its security services.  And I -- I miss that

23 and resent its loss.

24     MR. VALENTINI:  And understanding the sense of

25 resentment, I expect that if you are selected as a juror in

1    this case, Judge Contreras would instruct you that in deciding

2    what to do in this case, you would have to base your decisions

3    exclusively on the evidence that you hear in this case.

4              THE PROSPECTIVE JUROR:  Uh-huh.  Yes.

5              MR. VALENTINI:  Do you think you'll be able to do

6    that?

7              THE PROSPECTIVE JUROR:  I believe so.

8              MR. VALENTINI:  I don't have any further questions.

9    Thank you.

10             THE COURT:  So let me ask you a little bit more about

11   your -- this resentment.  Again, there -- there were thousands

12   of people there.  Are you -- do you feel resentment towards

13   anyone that entered the Capitol that day or people that

14   committed violence or committed vandalism or -- or all of them

15   or some subset?

16             THE PROSPECTIVE JUROR:  So as I drove to work that

17   day, I came down past the Capitol with arrays of people who

18   pulled onto the lawn -- pickup trucks, cars -- all over the

19   grounds illegally parked.  Regardless of the violence, I

20   still have a sense that there was a lot of disregard for our --

21   where we live and the Capitol, even for folks who were not

22   violent.  And I still, you know -- the -- so if -- for anyone

23   who came and was sort of part of that, then, yes, I still have

24   some resentment of what happened to my neighborhood based on

25   that.

1          THE COURT:  So within that group that you would

2     include is anyone that entered the Capitol that day?

3          THE PROSPECTIVE JUROR:  Anybody who entered the

4     Capitol Grounds.

5          THE COURT:  Or the Capitol Building?

6          THE PROSPECTIVE JUROR:  Anybody who entered the

7     Capitol Building, yes.

8          THE COURT:  You would include as the group that you

9     resent?

10          THE PROSPECTIVE JUROR:  In many ways, I resent the

11     protesters too because there are a lot of protests here which

12     do not require people to pull onto the grass and illegally park

13     and swamp all of our services.

14          So in -- in some ways, yes, I resent pretty much

15     everybody who was there.  But my real resentment is for, of

16     course, those who were violent, which then caused the sort of

17     deployment of the federal security services and the changes in

18     the composition of my neighborhood.

19          THE COURT:  Okay.  Any follow-up questions?

20          MS. FISH:  No, Your Honor.

21          MR. VALENTINI:  No, Your Honor.

22          THE COURT:  All right.  Thank you.

23          (REPORTER'S NOTE:  Juror 0366 left.)

24          MS. FISH:  Your Honor, I would move to strike for

25     cause.

1    Primarily, he had a very personal impact from the

2  events, and he expressed continuing resentment for everyone

3  involved in even the protest.  Your Honor gave him an

4  opportunity to clarify and mitigate that state, and he

5  absolutely did the opposite and doubled down.  So I don't think

6  he can be impartial.

7    MR. VALENTINI:  The government will not oppose the

8  motion to strike.

9    THE COURT:  Okay.  We'll strike him based on the fear

10  he had for his family, the response he had to do while at the

11  hospital, and the ongoing resentment; a combination of all of

12  those things.

13    (REPORTER'S NOTE:  Juror 0091 enters.)

14    THE COURTROOM DEPUTY:  This is Juror No. 0091,

15  line 45.

16    THE COURT:  Good afternoon.

17    So this is Juror 0091.  Ms. ██████; is that correct?

18    THE PROSPECTIVE JUROR:  Yes.

19    THE COURT:  Okay.  You answered yes to the first

20  question, which is the one about a four- to six-day trial.  Go

21  ahead.

22    THE PROSPECTIVE JUROR:  I'm sorry.  Can you hear me?

23  I have cataracts in both of my eyes.  I'm scheduled for a

24  consultation on Monday for the surgery, and I didn't know if it

25  was going -- the trial would go beyond that date.

```
 1              THE COURT:  Okay.  A week from yesterday, this coming
 2    Monday, is --
 3              THE PROSPECTIVE JUROR:  This coming Monday is when
 4    I'm scheduled for my consultation, and I wasn't sure if this
 5    will run past that date.
 6              THE COURT:  Okay.  And is that something that can
 7    easily be rescheduled?
 8              THE PROSPECTIVE JUROR:  I have rescheduled a couple
 9    times.  I mean, if I have to I will, but I have rescheduled it.
10              (Off the record due to technical interference with
11    the audio system.)
12              THE COURT:  So you answered yes to Question No. 6,
13    which is the one about the court personnel in this courthouse.
14    You maybe recognizing someone.  No?
15              THE PROSPECTIVE JUROR:  No.
16              THE COURT:  Maybe -- maybe I'm misreading it.
17              (Off the record due to technical interference with
18    the audio system.)
19              THE COURT:  Okay.  All right.  So you answered yes to
20    the one about a special disability, and that's your -- is it
21    your cataracts?
22              THE PROSPECTIVE JUROR:  I have a sprained ankle, and
23    if I'm sitting for long periods of time I'm in pain.  If I take
24    pain medication, I go to sleep.
25              THE COURT:  Okay.  And is that something that if you
```

1    get -- excuse me, if you stand up every couple hours or

2    something --

3                THE PROSPECTIVE JUROR:  It might help, uh-huh.

4                THE COURT:  It will help.  Okay.  All right.

5          You also answered yes to Question 20, which is the one

6    about if you or members of your immediate family or close

7    personal friends have worked in law enforcement.

8                THE PROSPECTIVE JUROR:  Yes, I have a cousin in a

9    different -- who are both police officers --

10                THE COURT:  Okay.

11                THE PROSPECTIVE JUROR:  -- in the District of

12    Columbia.

13                THE COURT:  Okay.  Let's start with your cousin.  How

14    long has he been a police officer?

15                THE PROSPECTIVE JUROR:  He's retired.

16                (Audio interference.)

17                THE COURT:  No, I hear you.

18                THE COURTROOM DEPUTY:  John said he's coming over.

19                THE COURT:  You can bring the juror back.

20                THE COURTROOM DEPUTY:  Yes.

21                (REPORTER'S NOTE:  Juror 0091 left.)

22                (Off the record due to technical interference with

23    the audio system.)

24                THE COURT:  All right.  Bring her back.

25                (REPORTER'S NOTE:  Juror 0091 enters.)

413

```
1              THE COURTROOM DEPUTY:  Thank you.
2         Sorry for that interruption.
3              THE PROSPECTIVE JUROR:  No problem.
4              THE COURT:  So when we were last speaking, you were
5    talking about your cousin and a dear friend that worked at one
6    point or currently for MPD.  You said your cousin is already
7    retired; is that right?
8              THE PROSPECTIVE JUROR:  Both are retired.
9              THE COURT:  Both of them are retired?
10             THE PROSPECTIVE JUROR:  Yes.
11             THE COURT:  How long ago did each of them retire?
12             THE PROSPECTIVE JUROR:  It's been several years.
13             THE COURT:  It's been several years.
14        So none of them were involved on January 6th?
15             THE PROSPECTIVE JUROR:  No.
16             THE COURT:  Okay.  So your cousin, how often would
17   you say you see him?
18             THE PROSPECTIVE JUROR:  Every two or three months,
19   maybe.
20             THE COURT:  Two or three months.  Okay.  Do you talk
21   about -- when he was an officer, did you talk about his work?
22             THE PROSPECTIVE JUROR:  (Shakes head.)
23             THE COURT:  No?
24             THE PROSPECTIVE JUROR:  No.
25             THE COURT:  And how about your dear friend, how often
```

```
1    do you see that person?
2                THE PROSPECTIVE JUROR:  Maybe two or three months,
3    but we don't -- every two or three months.
4                THE COURT:  But you don't talk about his work either?
5                THE PROSPECTIVE JUROR:  No.
6                THE COURT:  Okay.  So in this case, a number of the
7    witnesses are going to be law enforcement officers.  So do you
8    think that because you have this relationship with your dear
9    friend and cousin that you would tend to believe a police
10   officer over a civilian?
11               THE PROSPECTIVE JUROR:  No.
12               THE COURT:  No.
13        You think you could treat the testimony of a civilian
14   and a police officer the same?
15               THE PROSPECTIVE JUROR:  I would just try to listen to
16   whatever is being discussed and make my decisions from their
17   point.
18               THE COURT:  Based on what the person says and their
19   demeanor?
20               THE PROSPECTIVE JUROR:  And the evidence and
21   whatever, yes.
22               THE COURT:  Okay.  All right.  Ms. Fish.
23               MS. FISH:  Good afternoon, Ms. ███████.
24               THE PROSPECTIVE JUROR:  Good afternoon.
25               MS. FISH:  I'm Rebecca Fish.  I'm the attorney for
```

1       Mr. Rhine.

2              I wanted to follow up briefly, just to make sure I

3       understood.  I couldn't hear some of your answers before.  Did

4       I hear correctly that you had a cataract that you're waiting --

5              THE PROSPECTIVE JUROR:  Both eyes.

6              MS. FISH:  -- awaiting surgery on?

7          Both eyes?

8              THE PROSPECTIVE JUROR:  Uh-huh.

9              MS. FISH:  Do you have any impaired vision from that?

10             THE PROSPECTIVE JUROR:  Sometimes it gets blurry.

11             MS. FISH:  But do your glasses mostly correct for it?

12             THE PROSPECTIVE JUROR:  Excuse me?

13             MS. FISH:  Do your glass mostly correct for any

14      vision impairment?

15             THE PROSPECTIVE JUROR:  They help.

16             MS. FISH:  Like, are you able to see video evidence?

17             THE PROSPECTIVE JUROR:  I can see video.  I can

18      see -- answer your question, yes, I can see video.

19             MS. FISH:  You don't typically find you're not

20      able -- like it's blurry when you try to watch TV or anything?

21             THE PROSPECTIVE JUROR:  No.

22             MS. FISH:  Okay.  And then I did want to follow up

23      briefly.  It sounds like neither of your -- your family or

24      friends who are in law enforcement were -- responded to

25      January 6th.

416

1          THE PROSPECTIVE JUROR:  No.

2          MS. FISH:  Have you heard about what happened on

3    January 6th, 2021?

4          THE PROSPECTIVE JUROR:  From TV.

5          MS. FISH:  From TV.  Can you tell me what you've seen

6    on TV.

7          THE PROSPECTIVE JUROR:  I saw them -- you know, this

8    is hard.  I saw what was on TV, about people going to the

9    Capitol and some entering through the building.  And some of

10   the things that was going on that they showed on TV in the

11   building.

12         MS. FISH:  Did you see that on January 6th?

13         THE PROSPECTIVE JUROR:  Did I what?

14         MS. FISH:  Did you see that on January 6th?

15         THE PROSPECTIVE JUROR:  Did I what?

16         MS. FISH:  Were you watching TV on that date, on

17   January 6th?

18         THE PROSPECTIVE JUROR:  I saw it on the news.  That's

19   how I learned about it.

20         MS. FISH:  And did you follow news story about it

21   after that date?

22         THE PROSPECTIVE JUROR:  Not really.  Whatever was

23   on the news.  I mean, I just didn't tune in to TV to watch it.

24   If I saw something on the news, that's pretty much what I saw.

25         MS. FISH:  And you said you saw people going to the

1     Capitol and some people going in.  Do you remember seeing

2     anything violent?

3               THE PROSPECTIVE JUROR:  I saw a few things that were

4     on the news, yes.

5               MS. FISH:  What kind of emotions did you feel

6     watching that?

7               THE PROSPECTIVE JUROR:  What kind of emotion?  I felt

8     sorry for a lot of the -- I had -- I felt sorry for the law

9     enforcement, some of the things that were done to them, I

10    thought, was kind of heartbreaking.

11              MS. FISH:  Yeah.  Heartbreaking?

12              THE PROSPECTIVE JUROR:  Uh-huh.

13              MS. FISH:  And when you think about that now, how do

14    you feel?

15              THE PROSPECTIVE JUROR:  Still unfortunate that it

16    happened.

17              MS. FISH:  And do you feel like you have a good idea

18    of what happened on January 6th?

19              THE PROSPECTIVE JUROR:  I can -- I can only say that

20    I saw some things that weren't -- that weren't -- was

21    heartbreaking, I'm going to put it to you that way.

22              MS. FISH:  And do you feel like you have an idea of

23    why the majority of people who were there -- civilians -- why

24    they went there?

25              THE PROSPECTIVE JUROR:  Yes.

```
 1          MS. FISH:  And what do you believe that was?

 2          THE PROSPECTIVE JUROR:  I think they were supporting

 3   a cause.

 4          MS. FISH:  Can you explain that a little bit more.

 5          THE PROSPECTIVE JUROR:  This is -- I think the people

 6   weren't pleased with the White House, what was going on in the

 7   White House at the time, and they were protesting.  And that's

 8   what I understand.  People were protesting what -- protesting

 9   what they thought was right, and -- and it wasn't pleasant to

10   see.

11          MS. FISH:  Do you think the majority of people there

12   intended to break the law or intended to do violent things?

13          THE PROSPECTIVE JUROR:  I don't know.

14          MS. FISH:  Okay.  Thank you.

15          THE PROSPECTIVE JUROR:  Uh-huh.

16          MR. VALENTINI:  Good afternoon, Ms. ██████.

17          THE PROSPECTIVE JUROR:  Yes.

18          MR. VALENTINI:  My name is Francesco Valentini.  I'm

19   one of the prosecutors in this case.

20          I'm sorry to ask you more questions about your vision.

21   I just wanted to make sure.  If you tried to look at the screen

22   in front of you -- I don't know if right now it has any images

23   on it.

24          THE PROSPECTIVE JUROR:  Beg your pardon?

25          THE COURT:  It doesn't.
```

1          MR. VALENTINI:  It doesn't.

2          From that distance, are you usually able to watch video?

3          THE PROSPECTIVE JUROR:  Yes.  Uh-huh.

4          MR. VALENTINI:  Thank you.

5          I also wanted to follow up on some of the answers to my

6     colleague's questions just now.  I believe you said that you

7     described some of the events of January 6th, 2021, as

8     unfortunate.

9          THE PROSPECTIVE JUROR:  Uh-huh.

10          MR. VALENTINI:  In this case, if you are selected

11     as a juror, I expect that Judge Contreras will tell you that

12     you have to decide this case based only on the facts of this

13     case, the evidence that is put before you.  Would you be able

14     to put aside that sentiment that things were unfortunate and

15     decide this case based only on the facts before you?

16          THE PROSPECTIVE JUROR:  Based on what is presented to

17     me --

18          MR. VALENTINI:  Yes.

19          THE PROSPECTIVE JUROR:  -- and what I hear is what I

20     want to make my decision.  And it's going to always -- I'm

21     going to always remember some of the things that I saw.  But

22     I'll be honest, it was hurting to see some things and -- I just

23     have to see what happens when I hear.

24          MR. VALENTINI:  Yes.  And if Judge Contreras asks you

25     to put any other knowledge that you have about the case aside

1    and focus only on the facts in this case, do you think you'll

2    be able to do that?

3              THE PROSPECTIVE JUROR:  I don't know.  Can I be

4    honest with you?  I don't know.

5              MR. VALENTINI:  I believe you also said that you --

6    you believe that the majority of people who went to the Capitol

7    were there to support a cause.

8              THE PROSPECTIVE JUROR:  Uh-huh.

9              MR. VALENTINI:  You don't have any view on where the

10   other -- as to why any particular person went to the Capitol

11   that day?

12             THE PROSPECTIVE JUROR:  A particular person?

13             MR. VALENTINI:  Yes.

14             THE PROSPECTIVE JUROR:  Can you explain that more.

15             MR. VALENTINI:  Well, so if you imagine that the

16   evidence is presented to you that the defendant in this case

17   went to the Capitol on January 6th, that was to -- would you

18   not have any knowledge as to why he went to the Capitol that

19   day?

20             THE PROSPECTIVE JUROR:  I'll say this:  I -- people

21   can go for a certain reason, but things could change once they

22   get there.  Or maybe someone said something to them that could

23   change their mind.  They could go with one intention.  But once

24   they get there, it could be something different.  That's the

25   way I feel about it.

```
 1                  MR. VALENTINI:  And if selected as a juror, would you

 2        approach that question with an open mind?

 3                  THE PROSPECTIVE JUROR:  Excuse me?

 4                  MR. VALENTINI:  If you're selected as a juror, you

 5        would approach that question, why the defendant went to the

 6        Capitol, with an open mind?

 7                  THE PROSPECTIVE JUROR:  Why did the individual go to

 8        the -- what was -- what was the reason the individual went to

 9        the Capitol?  What was your purpose?  Why did you -- you know,

10        that's my --

11                  MR. VALENTINI:  Thank you.

12                  THE PROSPECTIVE JUROR:  Uh-huh.

13                  THE COURT:  So, you know, you talked about seeing

14        images in the media about violence and that sort of thing.  In

15        this case there's no allegations that this defendant,

16        Mr. Rhine, engaged in violence or in any vandalism or anything

17        of that nature.

18             Do you think you would be able to put aside what -- the

19        images you've seen of those things that you described as

20        heartbreaking and -- and judge Mr. Rhine based solely on the

21        evidence presented in this courtroom?

22                  THE PROSPECTIVE JUROR:  I would try to do it based on

23        the evidence.

24                  THE COURT:  You think you could do it based just on

25        the evidence?
```

1          THE PROSPECTIVE JUROR:  I'd try to do it based on the

2    evidence.  I feel -- I'd try to base it on the evidence.

3          THE COURT:  And do you think you would be successful

4    in trying?

5          THE PROSPECTIVE JUROR:  I hope so.

6          THE COURT:  Okay.  All right.  Thank you.

7          THE PROSPECTIVE JUROR:  Uh-huh.

8          (REPORTER'S NOTE:  Juror 0091 left.)

9          MS. FISH:  Your Honor, I would move to strike Juror

10   ███████.

11         I'll defer to the Court on the inconvenience hardship.

12   I was satisfied her cataract wouldn't interfere with her

13   ability to view the evidence here would not -- to be clear.

14         But I was concerned about her equivocal answers on

15   whether she could set aside what she had seen and the emotions

16   she felt about the violence she saw.  She said she would try

17   and she hoped it would be enough, but she very -- she had many

18   opportunities and never said she thought she would be

19   successful at doing so.

20         MR. VALENTINI:  Your Honor, the government would not

21   oppose the motion.

22         THE COURT:  Okay.  We'll strike her for those

23   reasons, in combination with her medical appointment.

24         (REPORTER'S NOTE:  Juror 0710 enters.)

25         THE COURTROOM DEPUTY:  Juror No. 0710, line 46.

```
 1                    THE COURT:  Good afternoon.

 2                    THE PROSPECTIVE JUROR:  Good afternoon.

 3                    THE COURT:  So this is Juror 0710.  Ms. ██████;

 4       is that correct?

 5                    THE PROSPECTIVE JUROR:  Yes.

 6                    THE COURT:  Okay.  So you answered yes to Question 9,

 7       which is the one about you or immediate family member or a

 8       close friend having legal training.

 9                    THE PROSPECTIVE JUROR:  Yes.  My mother was a lawyer.

10       She hasn't practiced law for upwards of 30 years, but.

11                    THE COURT:  Okay.

12                    THE PROSPECTIVE JUROR:  Yeah.

13                    THE COURT:  Did she ever practice criminal law?

14                    THE PROSPECTIVE JUROR:  I know she worked in the

15       North Carolina, like, Attorney's Office, but I don't -- maybe.

16       I'm not sure.

17                    THE COURT:  Because you were a little girl or --

18                    THE PROSPECTIVE JUROR:  She gave it up when I was

19       born.  So I don't know, like, where she practiced law.

20                    THE COURT:  Okay.  You answered yes to the question

21       about if you or someone else close to you lives or works at or

22       near the U.S. Capitol Building.

23                    THE PROSPECTIVE JUROR:  I did.  I think I put an

24       asterisk on that.  I live on Capitol Hill.  It's not like -- I

25       wasn't directly affected geographically by it, but it's my
```

1    neighborhood, so.

2         THE COURT:  Sure.  How far -- how many blocks away

3    from the Capitol Building would you say you live?

4         THE PROSPECTIVE JUROR:  At the time I lived at Sixth

5    and I.  So it was probably, like, a 15-minute walk.

6         THE COURT:  Okay.  And the fencing that went up after

7    January 6th, that doesn't affect you or your commute or

8    anything like that?

9         THE PROSPECTIVE JUROR:  No.  I mean, it's a little

10   bit of drag -- of a drag when you're walking around in the

11   evening.  But, no, it doesn't affect me.

12        THE COURT:  Sure.  All right.

13   You answered yes to Question No. 12, which is if you

14   followed the news about the events that took place at the

15   U.S. Capitol on January 6th.

16        THE PROSPECTIVE JUROR:  I did.  I wouldn't say it's

17   something that I sought out, but just recognizing it was a

18   major news item for a long time.

19        THE COURT:  Sure.  Did you watch the news as it

20   unfolded on that day?

21        THE PROSPECTIVE JUROR:  I did.  I had, I would say,

22   like, a heightened interest in it just because of the proximity

23   and -- yeah.

24        THE COURT:  So were you working from home that day

25   or --

```
1              THE PROSPECTIVE JUROR:  I was.

2              THE COURT:  Okay.  And so did you -- did you continue

3    to work, or did you stop what you were doing to watch?

4              THE PROSPECTIVE JUROR:  I -- I continued to work.

5    That might be more of a reflection of my office than me, but I

6    continued to work.

7              THE COURT:  Okay.  So you had it on in the background

8    and refer to it every now and then?

9              THE PROSPECTIVE JUROR:  Yeah.  In the background is a

10   perfect way to describe it.

11             THE COURT:  Okay.  And then you answered yes to a

12   very similar question, which was about news involving specific

13   individuals on that day.  So what do you recall about specific

14   individuals?

15             THE PROSPECTIVE JUROR:  Yeah.  Again, that's nothing

16   that I feel I've put a lot of effort into seeking out.  But, of

17   course, like, there are some major headlines around -- I want

18   to say the leaders of the Proud Boys is something I know I,

19   like, have seen again in the headline form.  It's not something

20   that I've personally taken a deep dive on.

21             THE COURT:  So there's been a handful of

22   documentaries about January 6th.  Did you watch any of those?

23             THE PROSPECTIVE JUROR:  No, I have not.

24             THE COURT:  And the House had a committee

25   investigating January 6th that had some hearings.  Did you
```

1    watch any of those?

2            THE PROSPECTIVE JUROR:  I don't think I made a

3    dedicated effort to.  It might have been on in the background

4    at some point, but I don't believe I followed it start to

5    finish.

6            THE COURT:  Okay.  You answered yes to Question 20,

7    which is the one about you, a family member, close friend being

8    in law enforcement.

9            THE PROSPECTIVE JUROR:  My dad is a retired Marine.

10   And after he retired from the Marine Corps, he worked for the

11   FBI as an analyst at the academy for a couple of years.

12           THE COURT:  The academy here in Virginia?

13           THE PROSPECTIVE JUROR:  Yeah, at Quantico.

14           THE COURT:  Okay.  And did he specialize in something

15   he taught there?

16           THE PROSPECTIVE JUROR:  I am not sure exactly what he

17   taught there.  I think he was more focused on, like, putting

18   curriculum plans together.  More administrative than anything

19   else.

20           THE COURT:  Okay.  And -- and how long ago did he

21   retire from that job?

22           THE PROSPECTIVE JUROR:  That's hard to say.  My dad

23   doesn't really retire.  So from that job, I would say maybe

24   it's been five years.  It was definitely before January 6th.

25           THE COURT:  Okay.  And what does he do now?

1          THE PROSPECTIVE JUROR:  He does financial planning

2     seminars for different government groups.

3          THE COURT:  Okay.  You also answered yes to

4     Question 21, which is if you, members of your immediate family,

5     or close friends have ever been arrested for, charged with, or

6     convicted of a crime other than traffic violations.

7          THE PROSPECTIVE JUROR:  Yes.  So I'm not sure if he

8     was actually charged, but my dad and brother did get into a

9     domestic altercation that has been scrubbed from his record,

10    but there was an arrest involved.

11         THE COURT:  Okay.  A domestic altercation with each

12    other?

13         THE PROSPECTIVE JUROR:  With each other.  So that

14    might be the next question you're going to refer to.

15         THE COURT:  Okay.  If you, a member of your immediate

16    family, or close friend has ever been the victim of or a

17    witness to a crime.

18         THE PROSPECTIVE JUROR:  Yeah.  I would -- I was

19    thinking of the same scenario with the two of them.

20         THE COURT:  Sure.  And in what sense; that you were a

21    witness to or that -- that one of them was a victim?

22         THE PROSPECTIVE JUROR:  That one of them was a

23    victim.

24         THE COURT:  Okay.

25         THE PROSPECTIVE JUROR:  Yeah.

```
1              THE COURT:  Anything about that -- them going through

2     that criminal justice process that you think would impact the

3     way you view this case?

4              THE PROSPECTIVE JUROR:  No, I do not.

5              THE COURT:  Okay.  All right.  Ms. Fish.

6              MS. FISH:  Good afternoon, Ms. ██████████.

7              THE PROSPECTIVE JUROR:  Good afternoon.

8              MS. FISH:  I'm Rebecca Fish.  I'm the attorney for

9     Mr. Rhine.

10          So I wanted to follow up on a couple things quickly.  I

11    saw that you're in marketing and PR.  What kind of company do

12    you work for?

13             THE PROSPECTIVE JUROR:  I work for an agency.  It's

14    called 720 Strategies.  So we have a pretty wide variety of

15    clients; that ranges from healthcare to energy to finance.

16             MS. FISH:  And are any of your clients government --

17    government departments or offices?

18             THE PROSPECTIVE JUROR:  There is a spin-off of a

19    company called 721 that I don't work for that works

20    specifically for federal programs.

21             MS. FISH:  But your accounts don't involve those?

22             THE PROSPECTIVE JUROR:  They have a government

23    relations tilt.  But, no, I don't work directly -- well, I have

24    a new account.  It's the CDC Foundation.  I'm not sure if

25    that's considered a government program or not.
```

 1                MS. FISH:  And your work doesn't typically take you

 2      to lobby members of Congress?

 3                THE PROSPECTIVE JUROR:  No.

 4                MS. FISH:  Okay.  You don't have personal

 5      relationships with any members of Congress through your work?

 6                THE PROSPECTIVE JUROR:  No.

 7                MS. FISH:  Okay.  Just wanted to clarify.  Sometimes

 8      people do with those job titles.

 9                THE PROSPECTIVE JUROR:  Yes.  Absolutely.

10                MS. FISH:  And then I wanted to speak a little bit

11      about the news you've watched around January 6th.  Can you

12      describe a little bit what -- what types of things you saw or

13      heard about that happened on January 6th.

14                THE PROSPECTIVE JUROR:  I -- I guess for me, it --

15      when I think about it, it's just kind of, like, thinking of the

16      chaos of the day and not really knowing what was going on.  So,

17      like, day of, just -- I feel like the news cycle was very,

18      like, speculative.

19                MS. FISH:  And afterwards?

20                THE PROSPECTIVE JUROR:  Can you ask the question one

21      more time.  Sorry.

22                MS. FISH:  The news coverage you've watched about

23      what happened on January 6th after the day or during the day,

24      what kinds of things do you understand happened?

25                THE PROSPECTIVE JUROR:  Like, in terms of a time line

```
 1   of events or --

 2           MS. FISH:  Did you see violence?  Did you see

 3   peaceful protest?  Did you see vandalism?  If there's any types

 4   of things that you saw.

 5           THE PROSPECTIVE JUROR:  That would probably depend on

 6   what channel I was watching at the time.  I've seen a mix of

 7   everything.  Of course, with the news cycle, we're going to see

 8   more dramatic things more often.

 9           MS. FISH:  Is it fair to say some of the things you

10   saw were violence?

11           THE PROSPECTIVE JUROR:  Yeah.  I would say I saw some

12   things that surprised me.

13           MS. FISH:  And what -- yeah, what kind of feelings

14   did you have watching the coverage of January 6th?

15           THE PROSPECTIVE JUROR:  I guess it was probably

16   shock.

17           MS. FISH:  Did you feel any fear or anger?

18           THE PROSPECTIVE JUROR:  I didn't -- I didn't feel

19   fear.  I don't know if anger is something I would associate

20   with how I felt either.  I'm not trying to dodge your question.

21   Can you ask it one more time.

22           MS. FISH:  Sure.  What feelings do you have -- or

23   have had when you've seen some of the images, like you saw some

24   of the shocking images from January 6th?

25           THE PROSPECTIVE JUROR:  Maybe disappointment.
```

1          MS. FISH:  And when you think about it today, do you

2     have any emotions that come up?

3          THE PROSPECTIVE JUROR:  Not strong ones, no.

4          MS. FISH:  Do you feel like you have a good general

5     understanding or complete idea of what happened on January 6th?

6          THE PROSPECTIVE JUROR:  I think from a 10,000-foot

7     view, I think I have an understanding of what happened.  I am

8     somebody that can be a devil's advocate.  So I understand

9     there's, like, a lot more nuance than I'm read in on.

10          MS. FISH:  And do you think that you know why the

11     majority of people who -- who went to rally at the Capitol went

12     there?

13          THE PROSPECTIVE JUROR:  I will say I feel like I

14     understand why people were out in groups and were protesting

15     that day.  The motivations that, like, took them from Point A

16     to Point B, I'm -- I'm not going to claim to be an authority

17     on.

18          MS. FISH:  So fair to say that you don't think you

19     know why people -- you know, individuals --

20          THE PROSPECTIVE JUROR:  I know -- I know why

21     individuals are frustrated.  I think -- I think everybody knows

22     why individuals were frustrated, whether you agree with it or

23     not.  But I do know, like, the motivations that, like, had them

24     end up in the Capitol itself, I think that probably varies a

25     little bit from person to person.

1           MS. FISH:  Okay.  Thank you.

2           MR. VALENTINI:  Good afternoon, Ms. █████████.

3           THE PROSPECTIVE JUROR:  Hi.  How are you?

4           MR. VALENTINI:  Good.  How are you?

5           THE PROSPECTIVE JUROR:  Good.

6           MR. VALENTINI:  My name is Francesco Valentini.  I'm

7    one of the prosecutors in this case.

8           I just wanted to follow up on one of the last answers

9    that you gave to my colleague in response to my colleague's

10   question.

11          THE PROSPECTIVE JUROR:  Okay.

12          MR. VALENTINI:  I think you said you think you have a

13   good understanding of why people were frustrated.

14          THE PROSPECTIVE JUROR:  Yes.

15          MR. VALENTINI:  In answering that question, were you

16   referring to the people who went to the Capitol?

17          THE PROSPECTIVE JUROR:  As opposed to like myself?

18          MR. VALENTINI:  Just people out in the general public

19   around January 6th.

20          THE PROSPECTIVE JUROR:  Sorry.  Can you ask it one

21   more time.

22          MR. VALENTINI:  I understood your answer to one of my

23   colleague's questions to be that you feel you have at least

24   some sense of why people were frustrated around January 6th.

25          THE PROSPECTIVE JUROR:  Yeah.  I mean, I think people

1    made it pretty clear why they were frustrated and kind of what

2    they disagreed with.

3         MR. VALENTINI:  And could you sort of share with us

4    what your understanding of that frustration is.

5         THE PROSPECTIVE JUROR:  I think it is people that did

6    not agree with the results of the election and did not feel as

7    if the election was conducted fairly, in their minds.

8         MR. VALENTINI:  Okay.  I have no further questions.

9    Thank you.

10         THE COURT:  All right.  Thank you.

11         (REPORTER'S NOTE:  Juror 0710 left.)

12         MS. FISH:  No motion for Ms. ███████.

13         MR. VALENTINI:  No motion from the government either.

14         THE COURT:  Thank you.

15         (REPORTER'S NOTE:  Juror 0551 enters.)

16         THE COURTROOM DEPUTY:  This is Juror No. 0551,

17    line 47.

18         THE COURT:  You can have a seat.  Good afternoon.

19         THE PROSPECTIVE JUROR:  Good afternoon, Your Honor.

20         THE COURT:  So it's -- this is Juror 0551.

21    Mr. █████; is that correct?

22         THE PROSPECTIVE JUROR:  Yes, sir.

23         THE COURT:  Okay.  So you answered yes to

24    Question No. 2, which is knowing either the counsel or having

25    some affiliation or applied to the U.S. Attorney's Office or

 1     the Federal Public Defender's Office.

 2               THE PROSPECTIVE JUROR:  Yes, sir.

 3               THE COURT:  Tell us about that.

 4               THE PROSPECTIVE JUROR:  I'm currently an attorney at

 5     the Department of Energy, but up until very recently, I was an

 6     attorney at the Department of Justice in the criminal division,

 7     and in the narcotics and dangerous drug section.  So I was at

 8     DOJ for about seven years.

 9               THE COURT:  As a prosecutor?

10               THE PROSPECTIVE JUROR:  As a prosecutor and as a

11     policy, sort of, regulatory legislative attorney.

12          And the prosecutor -- he may not remember me, but the

13     lead counsel, actually, assisted my colleague and I on a DEA

14     appeal in his role as a criminal appellate attorney.  He was

15     kind enough to help moot a case with us.  We don't know each

16     other well, but we've worked on a case before.

17               THE COURT:  Did he do a good job?

18               THE PROSPECTIVE JUROR:  He did.  He asked very good

19     questions.  It was about a podiatrist who lost his DEA

20     registration.

21               MS. FISH:  Your Honor, I think I'd move to excuse

22     this juror, if there's no objection.

23               MR. VALENTINI:  No objection.

24               THE COURT:  All right.  Thank you.  You're excused.

25               THE PROSPECTIVE JUROR:  Okay.  Thank you, Your Honor.

1            Nice to see you.

2                 (REPORTER'S NOTE:  Juror 0551 left.)

3                 THE COURT:  I don't know how somebody makes the

4     transition from the narcotics and dangerous drugs to the

5     Department of Energy.

6                 (REPORTER'S NOTE:  Juror 2179 enters.)

7                 THE COURTROOM DEPUTY:  This is Juror 2179.

8                 THE COURT:  Good afternoon.

9           So this is -- this is Juror No. 2179.  Mr. ███████ is

10    that correct?

11                THE PROSPECTIVE JUROR:  That's correct.

12                THE COURT:  Okay.  You answered yes to Question No. 5

13    about prior jury service.

14                THE PROSPECTIVE JUROR:  Yes.

15                THE COURT:  Tell us about that.

16                THE PROSPECTIVE JUROR:  It was district service,

17    fender-bender civil case.

18                THE COURT:  Okay.  How long ago was that?

19                THE PROSPECTIVE JUROR:  A year.

20                THE COURT:  Okay.  Anything about participating in

21    that process that you think would impact your -- the way you

22    would approach being a juror in this case?

23                THE PROSPECTIVE JUROR:  No.

24                THE COURT:  Okay.  You answered yes to the question

25    about you, any member of your immediate family, or a close

1    friend having received legal training.

2              THE PROSPECTIVE JUROR:  My wife.

3              THE COURT:  Okay.  Tell us about her.

4              THE PROSPECTIVE JUROR:  She's a lawyer.  She works

5    currently at JPMorgan Chase.  She -- financial industry,

6    consumer protection type of industry.

7              THE COURT:  Has she ever done criminal work?

8              THE PROSPECTIVE JUROR:  No.

9              THE COURT:  Okay.  And then you answered yes to the

10   question about having followed the news about the events that

11   took place on -- at the Capitol on January 6th.

12             THE PROSPECTIVE JUROR:  Yes.

13             THE COURT:  Tell us how closely and -- you watch and

14   what you've watched, and both on the day of January 6th and

15   since then.

16             THE PROSPECTIVE JUROR:  Day of, I was working from

17   home.  Heard about it on the news pretty quickly.  Kind of took

18   over the news cycle from there and ran in the background.  A

19   number of people who had attended the event were living -- or

20   not living, but staying in the neighborhood at Airbnbs and

21   things like that, and I saw them coming up and down the street

22   afterwards and -- yeah.

23             THE COURT:  What neighborhood?

24             THE PROSPECTIVE JUROR:  Mount Pleasant.

25             THE COURT:  Mount Pleasant.  Okay.  So you say you

1    continued to work, and it was on in the background?

2              THE PROSPECTIVE JUROR:  Yes, as much as what's

3    possible that day.

4              THE COURT:  Sure.  All right.  And since that day,

5    how closely have you followed the news of that day?

6              THE PROSPECTIVE JUROR:  Just daily podcast updates

7    type of things that come on from NPR or things like that.

8              THE COURT:  Is there a specific podcast that you

9    listen to that covers this?

10             THE PROSPECTIVE JUROR:  *Up First*.

11             THE COURT:  *Up First*, which is what?  I'm not --

12             THE PROSPECTIVE JUROR:  It's like a ten-minute

13   roundup of the news.

14             THE COURT:  So just covers the daily news?

15             THE PROSPECTIVE JUROR:  Yeah.

16             THE COURT:  Okay.  It's not specific to January 6th?

17             THE PROSPECTIVE JUROR:  No.

18             THE COURT:  Okay.  There's been a handful of

19   documentaries about January 6th.  Have you watched any of them?

20             THE PROSPECTIVE JUROR:  No.

21             THE COURT:  No.  And there was a House of

22   Representatives committee investigating January 6th that had

23   hearings.  Did you watch any of those?

24             THE PROSPECTIVE JUROR:  My wife did.

25             THE COURT:  Okay.  Did you -- but you did not?

1        THE PROSPECTIVE JUROR:  We spoke about them in the

2   evenings.

3        THE COURT:  Okay.  But you didn't watch them?

4        THE PROSPECTIVE JUROR:  Not actively, no.

5        THE COURT:  Okay.  Did -- was there anything that

6   you -- that stands out about those hearings that your wife

7   conveyed to you?

8        THE PROSPECTIVE JUROR:  Not that stood out more from

9   my own experience of the chaos of the day.

10        THE COURT:  Okay.  So you talked about folks that

11   participated on that day staying in your neighborhood at

12   Airbnbs and the like.  What were your experiences with them,

13   and what did you see?

14        THE PROSPECTIVE JUROR:  There was a lot of fear in

15   the neighborhood.  They were not kind.

16        THE COURT:  Okay.  In what way?

17        THE PROSPECTIVE JUROR:  Tearing signs out of people's

18   front lawns, generally yelling at people around on the streets.

19        THE COURT:  Okay.  And did you -- did you personally

20   have an encounter with someone that had been at the rally, or

21   is this just people you saw walking up and down the street and

22   things you may have learned afterwards?

23        THE PROSPECTIVE JUROR:  Saw and learned afterwards.

24        THE COURT:  Okay.  What exactly did you see?  The

25   people pulling up signs and that sort of thing?

1          THE PROSPECTIVE JUROR:  That was from neighbors

2     who live in the area that had those taken out from their own

3     homes.

4          THE COURT:  Yeah.  So what did you personally see?

5          THE PROSPECTIVE JUROR:  Just aggressive driving

6     tactics and people yelling out from their windows, from their

7     cars.

8          THE COURT:  What sorts of things were they yelling?

9          THE PROSPECTIVE JUROR:  A lot of it was Trump

10    related.

11         THE COURT:  Okay.  All right.  So in this case,

12    there's no allegation that the defendant, Mr. Rhine, engaged in

13    violence or vandalism.  Do you think you would be able to put

14    aside what you've seen in the media or witnessed with people --

15    unruly people in your neighborhood and judge Mr. Rhine based

16    solely on the facts presented in this courtroom?

17         THE PROSPECTIVE JUROR:  Something I'd have to think a

18    lot about.  It's something that I do naturally in the course of

19    my work anyway.  So, yes, I can put aside my personal feelings.

20         THE COURT:  And what do you mean it's something you

21    do naturally in the course of your work?

22         THE PROSPECTIVE JUROR:  I'm not in the political

23    realm, but I work in pesticides.  There's lots of strong

24    feelings on either side of the industry, and I have to look at

25    just the data itself, aside from my personal feelings.

```
 1                    THE COURT:  And you think you can do that in this

 2       case?

 3                    THE PROSPECTIVE JUROR:  Yes.

 4                    THE COURT:  All right.  Ms. Fish.

 5                    MS. FISH:  Good afternoon, Mr. ███████.

 6                    THE PROSPECTIVE JUROR:  ███████.

 7                    MS. FISH:  ███████.  I apologize.  Thank you.

 8            I'm Rebecca Fish.  I'm the attorney for Mr. Rhine.

 9            I wanted to follow up on a -- to learn a little bit more

10       about your experience on January 6th.  You said you were

11       working from home?

12                    THE PROSPECTIVE JUROR:  Yep.

13                    MS. FISH:  And you described some people behaving

14       very badly in your neighborhood and yelling out of car windows.

15                    THE PROSPECTIVE JUROR:  Uh-huh.

16                    THE COURT:  You have to answer yes or no, sir.

17                    THE PROSPECTIVE JUROR:  Yes.

18                    MS. FISH:  Did -- was anyone yelling insults or

19       slurs?

20                    THE PROSPECTIVE JUROR:  No.

21                    MS. FISH:  But things related to Trump?

22                    THE PROSPECTIVE JUROR:  Yes.

23                    MS. FISH:  Did you feel like it was kind of

24       antagonistic.

25                    THE PROSPECTIVE JUROR:  When combined with everything
```

1    else, yes.

2              MS. FISH:  And your neighbors who had signs of theirs

3    stolen or torn down, can you tell me about what you learned

4    from them?

5              THE PROSPECTIVE JUROR:  In most cases, the -- people

6    were not home, but it was on the -- you know, everyone has Ring

7    cameras nowadays.  So it was more just vehicles stopping or

8    people coming up in large groups, loudly proclaiming -- or

9    talking about being there and then seeing signs that they may

10   have personally disagreed with and decided to pull them up and

11   throw them on the ground.

12             MS. FISH:  I'm sorry to hear that.

13        How long have you lived in the Washington, D.C., area?

14             THE PROSPECTIVE JUROR:  Five years.

15             MS. FISH:  Have you ever experienced something like

16   that in your neighborhood?

17             THE PROSPECTIVE JUROR:  No.

18             MS. FISH:  And did you feel like the way those people

19   were behaving was typical of all the people who were a

20   representative of the people who were at that rally?

21             THE PROSPECTIVE JUROR:  I would like to think not.

22             MS. FISH:  And in terms of -- you indicated you were

23   working from home and kind of trying to have the news on in the

24   background.  You said as much as possible.  Was that because

25   your work was distracting or because the news was distracting?

```
 1              THE PROSPECTIVE JUROR:  Both.

 2              MS. FISH:  Both.  Sounds like your work is pretty --

 3       requires a lot of attention, is that fair to say?

 4              THE PROSPECTIVE JUROR:  Yes.

 5              MS. FISH:  And can you talk about, a little bit, what

 6       kinds of things you've seen either on the day of in the news or

 7       after that in news coverage or those committee hearings, what

 8       you understand happened on January 6th.

 9              THE PROSPECTIVE JUROR:  Can you be more specific.

10              MS. FISH:  Sure.  Like, did you see images of

11       violence?  Vandalism?  Peaceful protest?  What kind of things

12       did you see happening?

13              THE PROSPECTIVE JUROR:  It started with the march

14       down to the Capitol Building, seemed peaceful enough and then

15       quickly escalated from there into violence and vandalism.

16              MS. FISH:  And seeing some of those videos or images,

17       especially of the violence and vandalism, what kind of emotions

18       did you feel?

19              THE PROSPECTIVE JUROR:  Fear for my family.

20              MS. FISH:  And when you think about it now, how do

21       you feel about January 6th?

22              THE PROSPECTIVE JUROR:  Disappointed.

23              MS. FISH:  Can you elaborate a little bit.

24              THE PROSPECTIVE JUROR:  In what it escalated to.

25              MS. FISH:  In how violent or out of control it got,
```

1    is that what you're referring to?

2                    THE PROSPECTIVE JUROR:  In part.

3                    MS. FISH:  What else are you referring to?

4                    THE PROSPECTIVE JUROR:  Just the state at which it --

5    the state of which it was allowed to get to that point.  Not

6    just from authority, but the people who were attending.

7                    MS. FISH:  Yeah.  And do you feel like you have a

8    good general idea of what happened that day?

9                    THE PROSPECTIVE JUROR:  I've always thought that

10   while things may be presented to me, there's always more to

11   learn.

12                   MS. FISH:  And we spoke about this a moment ago, but

13   do you feel like you understand or -- or have a good idea of

14   what the majority of people who went to the Capitol that day

15   intended to do?

16                   THE PROSPECTIVE JUROR:  I know what some of them

17   intended to do.

18                   MS. FISH:  Okay.  Do you think that's the majority or

19   just some?

20                   THE PROSPECTIVE JUROR:  I don't think I'm capable of

21   answering that question.

22                   MS. FISH:  Okay.  Thank you.

23                   MR. VALENTINI:  The government doesn't have any

24   questions.

25                   THE COURT:  All right.  Thank you.

```
1              THE PROSPECTIVE JUROR:  Thank you.

2              (REPORTER'S NOTE:  Juror 2179 left.)

3              MS. FISH:  And, Your Honor, while I am concerned

4    about the personal harassment he faced, I think his answers

5    were sufficiently clear that he's not extending his -- that

6    experience to others.  So no motion.

7              MR. VALENTINI:  No motion from the government.

8              THE COURT:  Okay.

9              THE COURTROOM DEPUTY:  I missed that.

10             THE COURT:  We're good.

11             THE COURTROOM DEPUTY:  We're good.  Okay.

12             (REPORTER'S NOTE:  Juror 1076 enters.)

13             THE COURTROOM DEPUTY:  This is Juror No. 1076,

14   line 49.

15             THE COURT:  Good afternoon.

16             THE PROSPECTIVE JUROR:  Good afternoon.

17             THE COURT:  So this is Juror 1076.  Ms. ████; is

18   that correct?

19             THE PROSPECTIVE JUROR:  ████, yes, sir.

20             THE COURT:  Okay.  So you answered yes to

21   Question No. 1, which is that -- and you indicated that you've

22   been away from your office for almost a week because of your

23   honeymoon and you would like to get back.

24             THE PROSPECTIVE JUROR:  Yes.  I also am -- have a

25   business trip.  It's next Wednesday.  I could be there
```

1    Thursday.  That would be fine.  But I don't really want to make

2    it -- so if the trial is six days, that would be tough.

3              THE COURT:  Okay.  And you also indicated that your

4    husband works for a member of Congress.

5              THE PROSPECTIVE JUROR:  Yes.

6              THE COURT:  And did he at the time, on January 6th?

7              THE PROSPECTIVE JUROR:  Yes.  He worked there.

8              THE COURT:  Okay.  Was your husband at the Capitol

9    that day?

10             THE PROSPECTIVE JUROR:  He was in his office in

11   Rayburn.

12             THE COURT:  In Rayburn.

13        Okay.  He had to evacuate or shelter in place?

14             THE PROSPECTIVE JUROR:  Sheltered in place.

15             THE COURT:  Okay.  All right.

16             MS. FISH:  Your Honor, I believe there's no

17   opposition to excusing this juror based on her husband's

18   experience.

19             MR. VALENTINI:  No opposition based on that.

20             THE COURT:  Okay.  Thank you.  You're excused.

21             THE PROSPECTIVE JUROR:  That's it?

22             THE COURT:  Congratulations on the honeymoon, not on

23   not being on the jury.

24             (REPORTER'S NOTE:  Juror 1076 left.)

25             (REPORTER'S NOTE:  Juror 2029 enters.)

```
 1                    THE COURTROOM DEPUTY:  This is Juror No. 2029,
 2        line 50.
 3                    THE COURT:  This is 2029.  Mr. ████████: is that
 4        correct?
 5                    THE PROSPECTIVE JUROR:  Yes.
 6                    THE COURT:  Okay.  So you answered yes to the two
 7        questions about media, just -- the first one, the general media
 8        one, and then the second one about specific individuals.  So
 9        tell us a little bit about the media you've seen both on
10        January 6th and since then.
11                    THE PROSPECTIVE JUROR:  On the 6th, I think the media
12        that I saw while I was working at home, just the various news
13        reports that were ongoing, whether it was CNN or *Washington*
14        *Post* or what have you.  I don't recall anything specific that I
15        heard in the media on that day.
16                    THE COURT:  Did you continue to work and have it on
17        in the background, or did you stop what you were doing and --
18                    THE PROSPECTIVE JUROR:  Well, I kind of multitasked.
19        No different than any other day at home.  But, no, I didn't go
20        downstairs and, like, turn on the TV and just sit there and
21        watch for the rest of the day.  I kept working and what have
22        you.
23                    THE COURT:  Okay.  And then since then, how closely
24        have you followed the story?
25                    THE PROSPECTIVE JUROR:  I follow it to the extent
```

1    that it shows up on *The Washington Post* or the local news or

2    national news.  I don't -- I haven't specifically, like, sought

3    out specific information.  But if there's an article on it --

4    you know, in the newspaper, I'm going to read the article.

5                THE COURT:  Okay.  And there's been a handful of

6    documentaries on January 6th.  Have you watched any of those?

7                THE PROSPECTIVE JUROR:  No.

8                THE COURT:  No.

9           And then there was a House committee investigating

10   January 6th that had hearings.  Did you watch any of those

11   hearings?

12               THE PROSPECTIVE JUROR:  No, I didn't watch any of the

13   hearings.

14               THE COURT:  Okay.  All right.  In the media you saw

15   on January 6th and since then, have you seen images of violence

16   and vandalism?

17               THE PROSPECTIVE JUROR:  Yes.

18               THE COURT:  Okay.  So this is a case that doesn't

19   involve any allegations of violence or vandalism by Mr. Rhine.

20   Do you think you can put aside whatever notions and images

21   you've seen in the media and just judge Mr. Rhine by the

22   evidence that's presented in this courtroom?

23               THE PROSPECTIVE JUROR:  Yes.  Absolutely.

24               THE COURT:  Okay.  Go ahead, Ms. Fish.

25               MS. FISH:  Good afternoon, Mr. ███████.  I'm Rebecca

1     Fish.  I'm the attorney for Mr. Rhine.

2              THE PROSPECTIVE JUROR:  Great.

3              MS. FISH:  And I wanted to ask you a few follow-up

4     questions.  You said that you've seen some images or

5     descriptions of violence and vandalism.

6          How did you feel when you saw or heard about those?

7              THE PROSPECTIVE JUROR:  How did I feel?  That's a

8     good question.  I guess I felt concerned, bewildered, you know,

9     that it was going on.  I didn't feel unsafe or anything.  I

10    didn't have any feelings for my own personal safety or anything

11    like that.  If I was to sum it up, it was sort of, really

12    surprise.  Like, you don't see things like that on, you know,

13    TV every day.

14             MS. FISH:  Yeah.  And when you think about the events

15    of January 6th now, what feelings come up?

16             THE PROSPECTIVE JUROR:  Feelings of, still,

17    frustration, disappointment.  Certainly not happy thoughts.  I

18    think -- there's been enough time -- right? -- that I don't

19    have any hard emotions towards it, you know, anymore.  It's

20    not -- the emotions aren't raw or anything like that.

21         It is an event that happened I wished hadn't have

22    happened.  It has had outcomes.  Different people think

23    different things about those outcomes; right?  So it's still at

24    that point where I'd kind of just -- it happened.  I don't --

25    still don't think it would have ever happened.

1         MS. FISH:  Yeah.  And when you feel that frustration

2    or disappointment, is it directed at, for example, the

3    people -- the civilians who were protesting or rioting at the

4    Capitol, or is it directed at the government?  Is it directed

5    at any group or person?

6         THE PROSPECTIVE JUROR:  Yeah.  I would say I'd

7    personally probably direct most of my disappointment towards

8    Donald Trump.  And I would say I'd probably hold everyone else

9    involved to a -- not that I hold -- but I would say my

10   strongest opinions are -- are towards Mr. Trump than any of

11   other people involved.

12        MS. FISH:  And can you just -- when you say "other

13   people involved," are you talking about anyone who was present

14   or a smaller group?

15        THE PROSPECTIVE JUROR:  Yeah.

16        MS. FISH:  When you say yes, you mean to anyone who

17   was present?

18        THE PROSPECTIVE JUROR:  Yeah, anyone who was present.

19   And, certainly, I recognize that there are different people

20   involved that did different things.  You know, like the police

21   officer that got his head smashed in the door, whatever --

22   right? -- like, that was done by a limited set of people at

23   that specific time.  It wasn't like every person there was,

24   hey, let's go bash this person's head in; right?  I'd say most

25   of the graphic and violent images were probably perpetrated by

1  a small number of individuals rather than everybody that was

2  there.

3        MS. FISH:  Do you feel from what you've seen and read

4  about and heard that you have a good understanding of what

5  happened on January 6th?

6        THE PROSPECTIVE JUROR:  I do, but I don't know if

7  it's the same understanding and belief that others have.  I

8  don't know if what I believe is true; right?  It's just -- my

9  belief is based off of what I've read.

10        MS. FISH:  Okay.  All right.  Is that -- just trying

11  to make sure I understand.  Are you saying that you're open to

12  the idea that there's more you might not know or --

13        THE PROSPECTIVE JUROR:  Of course.  Yes.

14        MS. FISH:  -- is it everyone views the same evidence

15  differently?

16        THE PROSPECTIVE JUROR:  No.  I -- I certainly believe

17  there's information out there that I do not have access to.

18        MS. FISH:  Okay.

19        THE PROSPECTIVE JUROR:  Yeah.

20        MS. FISH:  You know, and in terms of talking about,

21  you know, all the different people there that might have had

22  different roles, different actions, do you feel like you know

23  why the majority of people went to the Capitol Building that

24  day?

25        THE PROSPECTIVE JUROR:  I know what the media has

1    told me.  Do I know what an individual person was doing or

2    thinking when they went to the Capitol?  Not beyond anything

3    that I've read in the media.

4         MS. FISH:  Do you think that most people who were at

5    the Capitol that day knew or should have known it would be

6    violent?

7         THE PROSPECTIVE JUROR:  No, I don't.

8         MS. FISH:  Thank you.

9         THE PROSPECTIVE JUROR:  Uh-huh.

10        MS. FISH:  I had one other follow-up question.  Just

11   about your job.  I saw that you're in defense sales.

12        THE PROSPECTIVE JUROR:  Uh-huh.

13        MS. FISH:  Do you work with the federal government?

14        THE PROSPECTIVE JUROR:  Do I work with the federal

15   government?  I wouldn't say I work with them.  I try and sell

16   stuff to them.

17        MS. FISH:  Is it to the Department of Defense?

18        THE PROSPECTIVE JUROR:  Yes.

19        MS. FISH:  Is it to any other department?

20        THE PROSPECTIVE JUROR:  No.

21        MS. FISH:  Okay.  Thank you.

22        MR. VALENTINI:  No questions.

23        THE COURT:  Great.  Thank you.

24        (REPORTER'S NOTE:  Juror 2029 left.)

25        MS. FISH:  No motion.

1          MR. VALENTINI:  No motion.

2          THE COURT:  Okay.

3          (REPORTER'S NOTE:  Juror 1761 enters.)

4          THE COURTROOM DEPUTY:  Juror No. 1761, line 51.

5          THE COURT:  This is Juror 1761.  Mr. █████████?

6          THE PROSPECTIVE JUROR:  ██████████, yes.

7          THE COURT:  ████████.  Thank you.

8     So you answered yes to Question No. 7, which is you may

9 have trouble rendering a verdict solely on the evidence

10 presented at trial and in the context of the law on which I

11 will give my instructions.

12          THE PROSPECTIVE JUROR:  Yes.  Could you repeat the --

13 the question one more time.

14          THE COURT:  Sure.  I'll repeat the whole question.

15 So if you are selected to sit on this case, you must be able to

16 render a verdict solely on the evidence presented at the trial

17 and in the context of the law as I will give it to you in my

18 instructions, disregarding any other ideas, notions, or beliefs

19 about the law that you may encounter in reaching your verdict.

20 If you think you may be unable to do this, mark down No. 7 on

21 your note card.

22          THE PROSPECTIVE JUROR:  Yes.  That's correct.

23          THE COURT:  Okay.  Tell us about that.

24          THE PROSPECTIVE JUROR:  I think that the -- I don't

25 know if it was this question specifically, but I think it's

1   partially the high-profile nature of the case that might lead

2   me to have either preconceived notions about it and then

3   also -- yeah, I think that was mostly it.

4           THE COURT:  Okay.  So tell us a little bit about

5   your -- what might be your preconceived notions about the

6   case.

7           THE PROSPECTIVE JUROR:  I think that given that it

8   was something that happened so publicly and was highly

9   televised, it's not uncommon for a lot of people to have

10  opinions on the people that participated in the event already.

11      So for myself, I mean, I haven't done too much thinking

12  about it so far.  I think being in the courtroom and hearing

13  the evidence will definitely provide the fuller picture for me.

14  But I think at the same time, I'm still going to have the

15  images and the feelings and the thoughts of not only that day

16  but personal feelings about the previous presidential

17  administration leading up to it influence what my thoughts and

18  decisions might be.

19          THE COURT:  In what way?

20          THE PROSPECTIVE JUROR:  Not in a positive way.  But

21  I, obviously, understand that every person still deserves to

22  have their own -- you know, their own day and their own --

23  sorry.  I'm trying to find the words.  To be judged, kind of,

24  individually.  But at the same time, I think I would still see

25  it as a collective.

1      And, you know, I wasn't happy with the previous

2  administration.  I'm not happy with a lot of the

3  administrations, but the Trump administration in particular.

4  And I think that seeing a lot of individuals -- again, on my

5  preconceived notion, seeing a lot of individuals who were

6  attempting to undermine the results of a democratic election,

7  you know, I saw it as a negative thing.  So I think that --

8  going into it already seeing that as a negative, and I'm not

9  sure if that -- if that answers the question for you.

10          THE COURT:  I think it does.

11      So you answered yes to Question No. 12, which is the one

12  about following the news about the events that took place at

13  the Capitol on January 6th.  Tell us a little bit about what

14  you saw on the day of January 6th and how closely you followed

15  the story since then.

16          THE PROSPECTIVE JUROR:  Yeah.  Was that in 2021 or

17  2022?

18          THE COURT:  2021.

19          THE PROSPECTIVE JUROR:  So it was over two years ago.

20  So it's hard to remember exactly, to be completely honest with

21  you.  But I think that given the fact that I was living in D.C.

22  at the time, I just remember it being a very high -- in sense

23  of tension within the city for people who were residents here.

24  Whether or not you're politically minded or not, the fact

25  that -- you know, when there's anything of a political

1    magnitude or a potentially dangerous thing happening in the

2    city, that kind of colors your perception of events because we

3    feel so close to it.

4         And so there are personal feelings of potential danger

5    involved.  There are personal feelings of is it within my best

6    interest or my rights or my responsibilities to also get active

7    or to get out on the streets or to do something like that,

8    whether it be confronting people nonviolently or doing whatever

9    it takes to defend yourself and different things like that.

10        So, you know, watching the coverage and just kind of

11   being a little bit in shock of it -- obviously, different

12   nations and countries have their places of government

13   confronted by civilians all the time.  So I think on that

14   level, I wasn't actually as shocked or dismayed by it,

15   honestly, but I think it was the entire picture of, like I

16   mentioned before, the administration and then, again, me also

17   living here in the city and my personal feelings, which could

18   potentially be in opposition to the personal feelings of the

19   people that were so moved to participate in that event all

20   coming together to kind of, I think, give me the preconceived

21   notion of I'm in opposition to whatever is happening here

22   today.

23            THE COURT:  Okay.  So you answered yes to

24   Question No. 15, which is that I'm going to instruct the jury

25   to -- at the end of the trial to treat the testimony of police

1     officers the same as anyone else.  And why do you think you

2     might have a problem with that?

3               THE PROSPECTIVE JUROR:  Yeah.  I think that's --

4     that's something that has a lot of nuance to it, because I

5     think it depends on the different situation and the different

6     events.  Obviously, in a lot of situations I feel like the

7     testimony of police officers is kind of -- again, they're

8     people too.  So there's a lot of nuance to it.  But their

9     testimony may or may not be geared towards protecting

10    themselves or their institution.

11         So I -- me personally -- kind of always weigh that,

12    especially in instances where there's not footage backing up

13    what they're saying.  So I think that that's my general

14    feelings regarding police officer testimony.

15              THE COURT:  So do you think you would give police

16    officers less or more credence than a civilian?

17              THE PROSPECTIVE JUROR:  Again, I think it's really

18    nuanced, but I think as a blanket, probably less.

19              THE COURT:  Okay.  All right.  So you also answered

20    yes to Question No. 18, which is the jurors are the sole judges

21    of the facts but they must follow the principles of law as I

22    instruct.  The jury may not choose to follow some rules of law

23    and ignore others.  And even if the jury disagrees whether it

24    dislikes a rule of law or does not understand the reasons for

25    some of the rules, it's the jury's duty to follow those rules.

1          Why would you think you would have difficulty following

2    those legal instructions?

3          THE PROSPECTIVE JUROR:  I think on the one hand, I

4    completely get that that is the responsibility of a jury member

5    and it's what is needed and expected of a jury member who's

6    going to be participating in this process in order for the

7    process to have any semblance of credibility and -- to be

8    effective.

9          But at the same time, I also -- I just answered it

10   truthfully because I know that I don't feel that every law is

11   just.  So I'm not sure how much that's going to play into this

12   particular trial, this situation.  But that was just my --

13   because I -- I know that when we were here yesterday you listed

14   out what all the charges were and exactly what laws were

15   broken, but off the top of my head, I could not tell you all of

16   them.

17         So, yeah, like I said before, even though I may have --

18   I think that there's a balance of me having personal feelings

19   about what my preconceived notions are with the -- sorry.  I've

20   rambled on long enough now -- with the -- what the goals were

21   of the people that participated in the event, I might have my

22   own assumptions on that.

23         But at the same time, like I said it earlier, I do think

24   that there's levels to protest that citizens are entitled to,

25   and I think that with what happened on that particular day --

1    obviously, I think everybody in this city and everybody who

2    watched it had a feeling about what was going on here.  And so

3    I -- I'm getting away from the question, honestly.

4            THE COURT:  Sure.  What I'm hearing -- and you can

5    correct me if I'm wrong -- is that if I give an instruction

6    that you think is unjust, for whatever reason, that you would

7    have trouble following it?

8            THE PROSPECTIVE JUROR:  I honestly don't know what

9    kind of instruction that would be.  So, like, are you talking

10   about in terms of look at this in the lens of this law and

11   determine if this is lawful or not?

12           I mean, I can be objective.  And if you tell me what the

13   law is and I can say, okay, it's going to go -- it's either yes

14   or no, it's lawful or not; but I think that I have a strong

15   sense of whether or not I find the laws just as well.  And I

16   think that in the moment, depending on what the particular law

17   is, I might feel a type of way about, you know, rendering a

18   decision based on that, if that makes sense.

19           THE COURT:  I think so.

20           So you answered yes to Question No. 27, which is the one

21   about some news reports indicating that certain --

22           MR. VALENTINI:  We would not oppose if the juror were

23   excused.

24           THE COURT:  Okay.

25           MS. FISH:  Your Honor, that would be our request

```
 1      based on his responses.
 2              THE COURT:  Okay.  I think everyone is in agreement
 3      that you can be excused.
 4              THE PROSPECTIVE JUROR:  All right.  Thank you.
 5              (REPORTER'S NOTE:  Juror 1761 left.)
 6              THE COURT:  Hold on one moment.  Sure.  We'll take a
 7      five-minute break.
 8          Just to round out the record for that individual, he
 9      answered yes to Question 29, which is the one that he would
10      have difficulty if Mr. Rhine didn't testify.
11              MR. VALENTINI:  I think just to complete the record
12      on our end, we base the motion on the prospective juror's
13      indication that he will have difficulty following instructions
14      as given by Your Honor.
15              THE COURT:  Yeah, I think that was clear.
16              MS. FISH:  And, Your Honor, while we have a moment, I
17      did want to inquire.
18          I think we're at the point now where we have three
19      potential jurors left, and we're at 18 who haven't been struck.
20      What does the Court intend to do?  If -- if all are seated,
21      we'll have 21, which I think is lower than the number we
22      were shooting for.
23              THE COURT:  Yeah.  So we're at 18.  If Mr. Valentini
24      agrees to forfeit his peremptories, we can get -- be done.  But
25      we're going to get through all of them on the list.  And then
```

1    I've asked for more jurors.  I don't think I'll get them until

2    tomorrow, and it's a little bit unclear to me who those people

3    will be, as far as if they're people that weren't deemed

4    suitable for other January 6th cases.  So I'm -- it's a little

5    bit unclear what the next step is, and I'm going to have to

6    have a conversation with Ms. Johnson about that.

7               THE COURTROOM DEPUTY:  I have Juror No. --

8               THE COURT:  All right.  We're going to take a short

9    break.  So if we can -- yeah.

10        So I -- I don't have a lot of clarity as to what that's

11   going to be.  I'm going to have to talk to Ms. Johnson and

12   probably someone in the jury office.

13              MS. FISH:  Certainly.  Thank you, Your Honor.

14              THE COURT:  So think about the forfeiture,

15   Mr. Valentini.

16              MR. VALENTINI:  Thank you, Your Honor.  It's on our

17   mind.

18              THE COURT:  So we'll take a five-minute break for a

19   restroom break.

20              (Recess taken.)

21              (REPORTER'S NOTE:  Juror 1715 enters.)

22              THE COURTROOM DEPUTY:  This is, again,

23   Juror No. 1715.

24              THE COURT:  This is Juror 1715.  Ms. ███████; is that

25   correct?

1          THE PROSPECTIVE JUROR:  Yes.

2          THE COURT:  So you answered yes to Question No. 5,

3    which is the one about previous jury service.

4          THE PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Tell us about that.

6          THE PROSPECTIVE JUROR:  Sure.  I was on the jury

7    three times.  Two times here at the D.C. Superior Court.  One

8    time in Boston.

9          THE COURT:  Okay.  And tell us, briefly, the nature

10   of each of those cases.

11         THE PROSPECTIVE JUROR:  I'm going to be honest, but I

12   do not remember the very last one because I ended up being an

13   alternate.  But the one before that was two gentlemen who were

14   being tried at the same time.  There were several charges,

15   different ones for each of them, related to unauthorized use of

16   a vehicle.  There was a gun.  It took place at the U.S. Postal

17   Service location over by Brentwood.  Is that enough information

18   or more?

19         THE COURT:  Yes.  And was the jury able to reach a

20   verdict?

21         THE PROSPECTIVE JUROR:  Yes.

22         THE COURT:  Tell us a little bit about the one in

23   Boston.

24         THE PROSPECTIVE JUROR:  That one, I think, also was a

25   criminal case.  This was a long time ago.  Like, maybe 2004.  I

1    think it was drug related, if I recall.

2         THE COURT:  And was the jury able to reach a verdict

3    in that one?

4         THE PROSPECTIVE JUROR:  Yes.

5         THE COURT:  Okay.  Anything about either of those

6    experiences that you think would impact your -- the way you sit

7    as a juror in this case?

8         THE PROSPECTIVE JUROR:  I don't -- I don't think so.

9    I think, if anything, it has made me appreciate the process of

10   trial by jury.

11        THE COURT:  Sure.  You also answered yes to

12   Question 9, which is the one about you, immediate family

13   member, close friend having received legal training or working

14   in the legal world.

15        THE PROSPECTIVE JUROR:  Yes.  So I'm a social worker

16   in a nonprofit legal organization here in D.C.

17        THE COURT:  Okay.  And what is the organization?

18        THE PROSPECTIVE JUROR:  Children's Law Center.

19        THE COURT:  Okay.  Does that organization get

20   involved in criminal issues at all?

21        THE PROSPECTIVE JUROR:  I predominantly work on

22   family law cases.  There are instances where biological parents

23   are charged criminally for abuse and neglect or a juvenile gets

24   arrested, but we are not representing those individuals in

25   the -- the -- well, the juvenile matter, for instance, or we

 1    are representing the children; so we're not representing the

 2    parents when they're being criminally charged.  It's a separate

 3    case from family law.

 4            THE COURT:  Okay.  Anything about -- in your work for

 5    that organization and your tangential relationship to the

 6    criminal justice system that would impact the way you view a

 7    case in this instance?

 8            THE PROSPECTIVE JUROR:  I -- I can't think of

 9    anything.

10            THE COURT:  Okay.  So you answered yes to

11    Question No. 10, which is if you or someone close to you lives

12    or works at or near the U.S. Capitol Building.

13            THE PROSPECTIVE JUROR:  Yes.  That's right.  So I

14    work at Children's Law Center, which is 501 Third Street,

15    Northwest, Fifth and E -- no.  E and Third.  But either way,

16    just a few blocks from this building.  So I answered yes.

17            THE COURT:  Okay.  And were you at the office on

18    the -- on January 6th?

19            THE PROSPECTIVE JUROR:  No, I was at home.

20            THE COURT:  You were working from home.  Okay.

21        Other than that, did you feel you were directly impacted

22    by the events of that day?

23            THE PROSPECTIVE JUROR:  Directly, no.  I mean, this

24    is my city.  I care about what happens in it, so.

25            THE COURT:  Sure.

1      THE PROSPECTIVE JUROR:  I was concerned.  Sure.

2      THE COURT:  Okay.  You answered yes to

3  Question No. 14, which is the one about seeing or hearing news

4  or elsewhere about specific individuals who were present at the

5  Capitol.  So tell us a little bit about the media you were

6  exposed to, generally, about January 6th or about individuals

7  both on January 6th, the date itself, or since then.

8      THE PROSPECTIVE JUROR:  Sure.  So I think if I

9  recall -- I mean, I watched a little bit of what was happening

10  live on January 6th, when I became aware of what was occurring.

11  I don't remember specific people or a lot of the specifics.  I

12  just have a general understanding of what was occurring on the

13  whole.

14      THE COURT:  Were you working from home that day?

15      THE PROSPECTIVE JUROR:  Yes, that was the day I was

16  working from home.

17      THE COURT:  So did you drop everything and go to the

18  TV, or did you just have it in the background and continue to

19  work?

20      THE PROSPECTIVE JUROR:  I continued to work.  We

21  actually don't own a television.  One of those households.

22      I think the other reason, though, I answered yes to that

23  is because this is my second week on jury duty.  Last week a

24  different individual was going through jury selection, and so I

25  have the same amount of context that you would give here for

1    this case --

2                THE COURT:  Okay.

3                THE PROSPECTIVE JUROR:  -- from over there.  So I

4    wasn't really sure how to answer; much like do I know any of

5    the other jurors.  Some of us were in that pool.  Did we become

6    best friends?  No.  But we have chatted, yes.

7                THE COURT:  Okay.  All right.  So you covered the

8    media you were exposed to on the day of January 6th.  How

9    closely have you followed the story since then?

10               THE PROSPECTIVE JUROR:  I'm embarrassed to admit, not

11   very closely.

12               THE COURT:  Okay.  There's been a handful of

13   documentaries on the topic.  Have you watched any of those?

14               THE PROSPECTIVE JUROR:  No.

15               THE COURT:  Okay.  And there was a House committee

16   that investigated January 6th and had hearings.  Did you watch

17   any of those?

18               THE PROSPECTIVE JUROR:  I believe I saw some snippets

19   that might have been shared with me by my significant other.

20   But, generally, because of the work that I do, I try not to

21   watch too much news in general.

22               THE COURT:  Okay.  So anything stand out about the

23   snippets that your significant other shared with you?

24               THE PROSPECTIVE JUROR:  Not that I recall.  I

25   don't -- barely, unfortunately, recall them.

466

1          THE COURT:  Okay.  You also answered yes to

2    Question 22, which is if you, members of your immediate family,

3    or close personal friends have ever been the victim of or a

4    witness to a crime.  Tell us about that.

5          THE PROSPECTIVE JUROR:  Yes.  Sure.  Well, off the

6    top of my head, I've been the victim of a mugging on two

7    occasions.  And, I mean, certainly through my work, the

8    children I work with are victims of crime, so.

9          THE COURT:  Sure.  Okay.  So with respect to your two

10   muggings, how long ago did they occur?

11         THE PROSPECTIVE JUROR:  Prepandemic.  Several years

12   ago.

13         THE COURT:  Okay.

14         THE PROSPECTIVE JUROR:  Prior to 2014, I think.

15         THE COURT:  Okay.  And were the individuals

16   apprehended?

17         THE PROSPECTIVE JUROR:  No.

18         THE COURT:  No.  So you didn't testify at trial or

19   anything like that?

20         THE PROSPECTIVE JUROR:  No.

21         THE COURT:  Anything about your dealings with the

22   police department or anyone else impact your views of the

23   criminal justice system or would impact your ability to judge

24   this case fairly?

25         THE PROSPECTIVE JUROR:  I don't think so.  I think

1    I've encountered different types of police officers.  Some

2    wonderful; some leaving something to be desired.

3              THE COURT:  Okay.  All right.  Ms. Fish.

4              MS. FISH:  Thank you.

5         Good afternoon, Ms. ███████.

6              THE PROSPECTIVE JUROR:  Good afternoon.

7              MS. FISH:  I'm Rebecca Fish.  I'm the attorney for

8    Mr. Rhine.  And I wanted to follow up on a couple things.

9         Am I saying your name correctly, ███████?

10             THE PROSPECTIVE JUROR:  Yes, you are.

11             MS. FISH:  So you mentioned you had been called

12   two weeks ago or last week to potentially serve on another

13   January 6th-related jury.  Did you get to this point in

14   selection where folks were questioning you?

15             THE PROSPECTIVE JUROR:  Oh, yes.  Yes.

16             MS. FISH:  Were you struck from that jury?

17             THE PROSPECTIVE JUROR:  No.

18             MS. FISH:  No.  You --

19             THE PROSPECTIVE JUROR:  Well, let me ask a clarifying

20   question, if I may.  I wasn't -- I don't think I was struck.

21   So I -- they sent people home.  I was part of the musical

22   chairs.  So perhaps, then, because I went home, I was struck.

23             MS. FISH:  But you didn't serve on that jury?

24             THE PROSPECTIVE JUROR:  I did not.  I believe it's

25   still ongoing.

1          MS. FISH:  And I want to speak with you a little bit

2     more about your experience watching news coverage of

3     January 6th.  You mentioned that you watched a little bit live

4     on the day.  Do you recall seeing videos or images of violence

5     or vandalism?

6          THE PROSPECTIVE JUROR:  Yes.

7          MS. FISH:  And what was your emotional or personal

8     response to seeing that?

9          THE PROSPECTIVE JUROR:  It was upset.

10         MS. FISH:  You also mentioned that, you know, you're

11    a D.C. resident.  This is my city; I care about what happens

12    here.  Can you tell me a little bit more about how January 6th

13    impacted you or what it felt like happening in your city?

14         THE PROSPECTIVE JUROR:  Tough question.  Can I have a

15    moment to reflect on that?

16         MS. FISH:  Absolutely.

17         THE PROSPECTIVE JUROR:  So I have -- I think I have a

18    lot of mixed -- mixed feelings about the whole thing because --

19    so on one hand, I'm somebody who believes in the freedom of

20    speech and have been at many a D.C. demonstration and -- but

21    I'm also somebody who is -- you know, believes in treating

22    others with respect and -- and so more fall in the lines of,

23    like, civil disobedience.

24         So I think I was disappointed to see that the people who

25    were there escalated to that level.  I also understand that

1    sometimes things get out of control, even when you're -- you

2    know, you're there.  I've been at demonstrations where my peers

3    are doing things that I'm like, what are you doing.  So

4    you're -- you know, you're changing the message.

5          So I -- I think, you know, I'm -- I'm concerned about

6    the lack of respect for the Capitol and for the people who work

7    there and for our -- for our governmental processes that are --

8    that have been in place.

9          But this -- this is why it's such a hard question for

10   me.  Because on the other hand, you know, sometimes we make

11   change.  And I'm -- I'm a social worker.  I believe in systemic

12   change.  So sometimes we make efforts in unconventional ways.

13         MS. FISH:  Are you able to share a little bit some

14   specific actions you saw that were disrespectful, just so I

15   understand what you saw that was disrespectful?

16         THE PROSPECTIVE JUROR:  I think just any of the --

17   the physical violence or -- physical interactions that were

18   aggressive, I would say, between the Capitol Police and the

19   people who were coming into the Capitol.

20         MS. FISH:  Do you feel that anyone who went into the

21   building was disrespectful?

22         THE PROSPECTIVE JUROR:  Do I feel like anyone or

23   everyone?

24         MS. FISH:  Yeah, either.  Either phrasing.  Anyone

25   who went -- simply went into the building was disrespectful?

1          THE PROSPECTIVE JUROR:  No.

2          MS. FISH:  And when you think about January 6th

3    today, do you feel -- what kind of feelings come up today?

4          THE PROSPECTIVE JUROR:  That's also a tough question.

5    I think -- I generally have, sort of, some of the sentiments

6    that I shared, but I'm maybe more disappointed with some of

7    the -- the actions that were carried out and then the -- the

8    way -- what I -- what I understand from the news about our

9    former President's involvement in that.

10         Does that answer your question?

11         MS. FISH:  It does.  Thank you.

12         Do you feel from the news you've seen or conversations

13   you've had you have a good understanding of what happened on

14   January 6th?

15         THE PROSPECTIVE JUROR:  I -- I hate to say it, I

16   don't think I have a good understanding.  I think I have a

17   general understanding.

18         MS. FISH:  And do you think that you understand why

19   the majority of people -- civilians, not police -- but why the

20   majority of people went to the Capitol that day?

21         THE PROSPECTIVE JUROR:  No, I don't know that I

22   have -- I can say that, the majority of people.

23         MS. FISH:  And then I just wanted to ask about your

24   experience working with lawyers.

25         THE PROSPECTIVE JUROR:  Okay.

1          MS. FISH:  I'm a lawyer, obviously.  Opposing counsel

2     are lawyers.  I also work with social workers, and I know

3     sometimes we speak different languages.

4          Do you have any negative feelings from your work with

5     lawyers about lawyers or how they present information?

6          THE PROSPECTIVE JUROR:  With how they present

7     information?  No.  My answer would be similar to the police

8     officer question, which is I've met many wonderful, great

9     lawyers and I've met some lawyers that leave a bit to be

10     desired and maybe shouldn't be practicing anymore.

11          MS. FISH:  Fair.  Fair enough.  Thank you.

12          THE PROSPECTIVE JUROR:  Sure.

13          MR. VALENTINI:  Good afternoon, Ms. █████████.

14          THE PROSPECTIVE JUROR:  Good afternoon.

15          MR. VALENTINI:  My name is Francesco Valentini.  I'm

16     one of the prosecutors in this case.  I just wanted to follow

17     up on some of the answers that you gave in response to my

18     colleague's question -- questions.

19          If I understood you correctly, I think you said that you

20     found some of the footage of individuals participating in the

21     events of January 6th to be disrespectful.  And if I understood

22     you correctly, you said those who were involved in, I think you

23     said, the physical altercations or physical things, those you

24     would consider disrespectful.

25          I just wanted to ask you more broadly, do you feel

 1    that -- do you view the actions of those who did not

 2    participate in any act of violence but still entered the

 3    Capitol without being authorized to do so as part of a large

 4    group of people, do you -- do you view the actions of those

 5    individuals as disrespectful?

 6         THE PROSPECTIVE JUROR:  So I would say yes, insofar

 7    that it was the breaking of the law.  I think I have a hard

 8    time answering these -- these larger questions because -- so --

 9    because I -- it's -- it's hard for me to generalize.  And I

10    think part of this is because of the work that I do.  It's

11    just -- I have to look at every -- every individual and their

12    circumstances and their motivations differently.

13         And -- and part of that comes from because I work with

14    parents who abuse their children, and I work to reunify these

15    families; right?  So people do bad things.  They break the law.

16    They hurt people.  Sometimes those things can make sense, and

17    sometimes they broke the law and there's still consequences for

18    that.

19         So I just -- I have a hard time making very -- I

20    apologize, but I can't just give any real good straight answer.

21    It's complicated would be my --

22         MR. VALENTINI:  No.  Understood.  And we appreciate

23    your candor.

24         If you're selected as a juror, Judge Contreras will

25    instruct you as to what the law is and what the government must

1    prove beyond a reasonable doubt in order for the jury to find

2    the defendant guilty.  So the judge will tell you what the law

3    is.

4            And are some of these nuances you just referenced -- do

5    you think those would get in the way of applying the law as the

6    judge instructs you to apply it?

7            THE PROSPECTIVE JUROR:  I would answer no because --

8    just because I work in this profession and I have high regard

9    for judges.  And the law is what the law is.  So I have to

10   apply what the law is, whether or not I agree or disagree with

11   it.

12           MR. VALENTINI:  So even understanding there are

13   nuances to why people do certain things, if you're instructed

14   that a certain type of conduct with a certain type of intent

15   is a criminal offense, you will have no problem applying the

16   law?

17           THE PROSPECTIVE JUROR:  I don't think I would have a

18   problem, no.

19           MR. VALENTINI:  Thank you for your answers.

20           THE COURT:  Let me ask you a couple of follow-up

21   questions.  It goes back to this issue of the disrespect.

22           So, obviously, there were thousands of people there that

23   day, and only some of them engaged in violence or vandalism.

24   And, in fact, in this case there's going to be no evidence and

25   there are no allegations that Mr. Rhine engaged in violence or

1     vandalism.

2          So do you think your exposure to those sorts of images

3     and stories would -- would inhibit your ability to judge this

4     case presented solely on the facts that are presented in the

5     courtroom?

6          THE PROSPECTIVE JUROR:  I don't -- I don't think so

7     because I am just going to listen to the information that is

8     provided here today -- or not today, but during the course of

9     this trial.

10          THE COURT:  Sure.

11          THE PROSPECTIVE JUROR:  So.

12          THE COURT:  Sure.

13          And then Mr. Valentini referred to something, which I

14     think he overstated, in a certain respect, which is entering

15     the Capitol in a nonauthorized way.  That's one of the issues

16     that's actually being fought here is whether or not Mr. Rhine

17     was authorized and whether or not he knew or not he was

18     authorized.

19          Do you think you would be able to judge that question

20     based on the facts presented in this court and not on any

21     preconceived notions you might have?

22          THE PROSPECTIVE JUROR:  I think so.

23          THE COURT:  Okay.  Any follow-up questions?

24          MS. FISH:  Briefly.

25          THE COURT:  Sure.

1          MS. FISH:  Just following up very briefly on the

2     judge's questions.

3          I guess what I'm trying to understand is if, you know,

4     anyone who walked into the Capitol Building on January 6th,

5     whether you'd believe that that person was disrespectful or

6     whether you'd be able to listen to Judge Contreras's

7     instructions about what the law is on the -- the unlawful entry

8     charge.

9          Do you feel that anyone who walked into the building on

10    January 6th was disrespectful of that building?

11         THE PROSPECTIVE JUROR:  I -- no, I don't think I can

12    say anyone was.  Again, I would have to go back to what I said

13    earlier about a case-by-case basis.

14         MS. FISH:  The -- that fact alone would not put --

15    have your mind put that person in the disrespectful category;

16    is that correct?

17         THE PROSPECTIVE JUROR:  No, because -- because --

18    yes, no.  I don't think so.  No.

19         MS. FISH:  Okay.  Thank you.  I appreciate the

20    clarification.

21         THE PROSPECTIVE JUROR:  Sure.

22         THE COURT:  Any follow-up questions?

23         MR. VALENTINI:  No, Your Honor.  Thank you.

24         THE COURT:  All right.  Thank you, Ms. ████.

25         THE PROSPECTIVE JUROR:  All right.  Thank you.

```
1              (REPORTER'S NOTE:  Juror 1715 left.)

2              THE COURT:  Ms. Fish?

3              MS. FISH:  No motion, Your Honor.

4              MR. VALENTINI:  No motion, Your Honor.

5              (REPORTER'S NOTE:  Juror 2165 enters.)

6              THE COURTROOM DEPUTY:  This is Juror No. 2165.

7              THE COURT:  Good afternoon.

8              THE PROSPECTIVE JUROR:  How are you?

9              THE COURT:  Good.

10         This is Juror 2165.  Ms. ████████?

11             THE PROSPECTIVE JUROR:  Right.

12             THE COURT:  Okay.  So you answered yes to the

13    question, No. 5, the one about prior jury service.

14             THE PROSPECTIVE JUROR:  Uh-huh.

15             THE COURT:  Can you tell us about that.

16             THE PROSPECTIVE JUROR:  I was just telling her, I

17    just came off of D.C. grand jury.

18             THE COURT:  If you can talk into the microphone,

19    please.

20             THE PROSPECTIVE JUROR:  I just came off of the D.C.

21    grand jury the day before I came here.

22             THE COURT:  And how long had you served on that

23    grand jury?

24             THE PROSPECTIVE JUROR:  For 30 days.

25             THE COURT:  How many?
```

```
 1                THE PROSPECTIVE JUROR:  Thirty days.

 2                THE COURT:  Thirty days.  Okay.

 3                THE PROSPECTIVE JUROR:  And I did two years of

 4     federal grand jury.

 5                THE COURT:  You did two years of federal in this

 6     courthouse?

 7                THE PROSPECTIVE JUROR:  Yes.

 8                THE COURT:  How long ago was that?

 9                THE PROSPECTIVE JUROR:  2014 to 2016.

10                THE COURT:  Okay.  Any of your experiences on either

11     of those grand juries do you think would impact your ability to

12     be fair in this case?

13                THE PROSPECTIVE JUROR:  No.

14                THE COURT:  No.  Okay.  All right.

15           You answered yes to Question 9, which is if you, a

16     family member, or close friend has received legal training or

17     worked in the law world.  Do you remember why you wrote that

18     one down?

19                THE PROSPECTIVE JUROR:  Members of my family are

20     lawyers and policemen.

21                THE COURT:  Okay.  All right.  We'll get to the

22     policemen, so.

23           But let's first talk about the members of your family

24     that are lawyers.  What kind of law do they practice?  Who are

25     they, and what kind of law do they practice?
```

1           THE PROSPECTIVE JUROR:  My niece.  And I can't

2    remember.  I know it's not criminal.

3           THE COURT:  Okay.  It's not criminal?

4           THE PROSPECTIVE JUROR:  No.  It's not criminal, no.

5           THE COURT:  Okay.  Any other lawyers?

6           THE PROSPECTIVE JUROR:  Friends, a lot of friends

7    that are lawyers.

8           THE COURT:  Okay.  Do any of them practice criminal

9    law, do you know?

10          THE PROSPECTIVE JUROR:  No.

11          THE COURT:  Okay.

12          THE PROSPECTIVE JUROR:  Not that I can --

13          THE COURT:  All right.  You also answered yes to

14   Question No. 12, which is about following the news about the

15   events that took place on January 6th.

16          THE PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Do you remember -- so tell us a little

18   bit about what news you saw, both on January 6th and since

19   then.

20          THE PROSPECTIVE JUROR:  Pretty much all of it.

21          THE COURT:  All of it.

22          THE PROSPECTIVE JUROR:  Because I was a federal

23   employee.  I retired from the federal government.  So I'm a

24   newsperson.

25          THE COURT:  Okay.  So let's start with the day of

```
 1    January 6th.  Were you working that day, or were you home or --
 2              THE PROSPECTIVE JUROR:  I was retired.
 3              THE COURT:  You were?
 4              THE PROSPECTIVE JUROR:  Retired.
 5              THE COURT:  Retired.  Okay.  So you were home?
 6              THE PROSPECTIVE JUROR:  Yes.
 7              THE COURT:  Did you watch the news that day closely
 8    as it unfolded?
 9              THE PROSPECTIVE JUROR:  Yes.
10              THE COURT:  Okay.  What do you recall of what you saw
11    that day?
12              THE PROSPECTIVE JUROR:  To be honest with you, it was
13    like a dream.  It was like watching a movie.
14              THE COURT:  Uh-huh.  And what -- what were your
15    feelings about what you were seeing that day?
16              THE PROSPECTIVE JUROR:  I can't -- I was just like --
17    mentally I just wasn't there with it.
18              THE COURT:  Okay.  Because it was hard to understand?
19              THE PROSPECTIVE JUROR:  It was hard to understand.
20    It's like watching a movie.
21              THE COURT:  Okay.  And since -- since that day --
22              MR. VALENTINI:  Your Honor, could we ask the juror to
23    speak a little closer to the microphone.  We're having a little
24    bit of a hard time hearing.
25              THE COURT:  Since that day, how closely have you
```

1     followed the news about January 6th?

2               THE PROSPECTIVE JUROR:  Not -- kind of off and on.

3               THE COURT:  Okay.  For example, there's -- there's

4     been a handful of documentaries about January 6th.  Have you

5     watched any of them?

6               THE PROSPECTIVE JUROR:  No.

7               THE COURT:  No.

8          And there's been a House committee that investigated

9     January 6th and had hearings.  Did you watch any of those

10    hearings?

11              THE PROSPECTIVE JUROR:  I did.

12              THE COURT:  Okay.  How many of them would you think

13    you -- you watched?

14              THE PROSPECTIVE JUROR:  Several of them.  I can't put

15    the exact number on, but I know I watched several of them.

16              THE COURT:  Okay.  And did you watch them live, or

17    did you watch just news reports about them?

18              THE PROSPECTIVE JUROR:  Most of them I watched live.

19              THE COURT:  Okay.  What do you recall about what you

20    saw in those hearings?

21              THE PROSPECTIVE JUROR:  It was kind of like what I

22    recall the same day that I saw it.  It was, like, not real.

23              THE COURT:  Okay.  And -- and beyond that, what did

24    you feel?

25              THE PROSPECTIVE JUROR:  I'm still, like, in a -- not

1    reality with it.

2             THE COURT:  Okay.  All right.  You answered yes to

3    Question No. 20, which is the question about family members or

4    close friends being in law enforcement.

5             THE PROSPECTIVE JUROR:  Uh-huh.

6             THE COURT:  Tell us about that.

7             THE PROSPECTIVE JUROR:  My brother was a military

8    policeman.  Couple of family friends were just regular

9    policemen.

10            THE COURT:  In Washington, D.C.?

11            THE PROSPECTIVE JUROR:  Few in Washington, D.C., but

12   most of them were in other states.

13            THE COURT:  Okay.  With respect to your brother who

14   was in the military police, how long ago was that?

15            THE PROSPECTIVE JUROR:  Like, in the '80s.

16            THE COURT:  In the '80s?

17            THE PROSPECTIVE JUROR:  '80s.

18            THE COURT:  Washington, D.C., or someplace else?

19            THE PROSPECTIVE JUROR:  No.

20            THE COURT:  Elsewhere?

21            THE PROSPECTIVE JUROR:  He was overseas.

22            THE COURT:  Overseas.  Okay.

23        And with respect to the other folks you knew that were

24   police officers, how -- it doesn't sound like you knew them

25   particularly well or knew what they did, is it, or were they

1    close friends?

2             THE PROSPECTIVE JUROR:  They were close friends.

3             THE COURT:  They were close friends.

4         And they were officers in Washington, D.C.?

5             THE PROSPECTIVE JUROR:  Yes, D.C.  Some D.C., some

6    California, North Carolina, South Carolina.  Different places.

7             THE COURT:  Okay.  So a number of the witnesses in

8    this case are going to be police officers or other law

9    enforcement officers.  Do you think because of the work your

10   brother did and these friends you had that were police officers

11   that you would tend to give their testimony more credit than a

12   civilian, or do you think you would treat their testimony the

13   same as a civilian?

14            THE PROSPECTIVE JUROR:  The same.

15            THE COURT:  The same.  Okay.  All right.

16        You answered yes to the question about whether you, a

17   member of your immediate family, or close friend has ever been

18   arrested for, charged with, or convicted of a crime.

19            THE PROSPECTIVE JUROR:  Yes.

20            THE COURT:  Okay.  Tell us about that.

21            THE PROSPECTIVE JUROR:  It's been so long ago.  I

22   must have been 6 years old and my brother was a teenager, back

23   in the '60s.

24            THE COURT:  Okay.  And what happened?  I'm sorry.  I

25   didn't catch that.

```
 1              THE PROSPECTIVE JUROR:  Back in the '60s.

 2              THE COURT:  Someone was arrested?

 3              THE PROSPECTIVE JUROR:  My brother.

 4              THE COURT:  Your brother.

 5              THE PROSPECTIVE JUROR:  I was maybe 6.  Probably 6.

 6    I don't remember much about it.

 7              THE COURT:  Okay.

 8              THE PROSPECTIVE JUROR:  He was a teenager.

 9              THE COURT:  So that -- his journey through the

10    criminal justice system you don't think would impact your

11    ability to judge this case?

12              THE PROSPECTIVE JUROR:  No.

13              THE COURT:  Okay.  And anyone else?

14              THE PROSPECTIVE JUROR:  That's the only one.

15              THE COURT:  Okay.  And then you answered yes to

16    Question 22, which is a similar question about you, member of

17    your immediately family, or close friends having been the

18    victim of or a witness to a crime.

19              THE PROSPECTIVE JUROR:  Well, like robberies and

20    house break-ins, that type of thing.

21              THE COURT:  Okay.  You've experienced those things?

22              THE PROSPECTIVE JUROR:  Yes.

23              THE COURT:  Okay.  Let's talk about robberies.  How

24    long ago did that occur?

25              THE PROSPECTIVE JUROR:  I had a house break-in --
```

```
 1    maybe '90s.
 2              THE COURT:  In the '90s?
 3              THE PROSPECTIVE JUROR:  In the '90s.
 4              THE COURT:  Do you know if the person was caught?
 5              THE PROSPECTIVE JUROR:  No.
 6              THE COURT:  So you didn't have to testify at trial or
 7    anything?
 8              THE PROSPECTIVE JUROR:  No.
 9              THE COURT:  Okay.  And any other exposure to crimes?
10              THE PROSPECTIVE JUROR:  Well, there were several
11    house break-ins at different times, but nobody was ever caught.
12              THE COURT:  Nobody was ever caught.
13         So as part of that, those experiences, did you have to
14    deal with MPD officers to report those crimes?
15              THE PROSPECTIVE JUROR:  I did.
16              THE COURT:  Okay.  Did you -- did -- anything about
17    those experiences with the -- with the police or the criminal
18    justice system you think would impact your ability to judge
19    this case fairly?
20              THE PROSPECTIVE JUROR:  No.
21              THE COURT:  Okay.
22              THE PROSPECTIVE JUROR:  No.
23              THE COURT:  All right.  Ms. Fish.
24              MS. FISH:  Good afternoon, Ms. ███████.
25              THE PROSPECTIVE JUROR:  How are you?
```

```
 1              MS. FISH:  I'm good.  I'm good.  Thank you.

 2          I'm Rebecca Fish.  I'm the attorney for Mr. Rhine.  I

 3   know it's been a while since we did introductions.

 4          I wanted to follow up briefly.  I think you mentioned

 5   you were previously a federal employee.

 6              THE PROSPECTIVE JUROR:  Uh-huh.

 7              MS. FISH:  What kind of work did you do?

 8              THE PROSPECTIVE JUROR:  I worked for the executive

 9   secretary at the Department of Transportation.

10              MS. FISH:  At the Department of Transportation.  How

11   long did you work there?

12              THE PROSPECTIVE JUROR:  I worked for 43 years.

13              MS. FISH:  A lot.  That's great.

14          Did you ever work in any other departments or offices

15   within the federal government?

16              THE PROSPECTIVE JUROR:  No.  Well, I actually worked

17   in the Office of Public Affairs.

18              MS. FISH:  Office of Public Affairs, also within the

19   Department of Transportation?

20              THE PROSPECTIVE JUROR:  Department of Transportation.

21              MS. FISH:  Okay.  And I wanted to follow up a little

22   bit about what you saw about January 6th and how you felt about

23   that.  When you were watching coverage, either on the day of or

24   afterward, did you -- or those hearings that you followed, did

25   you hear or see violence or vandalism occurring?
```

```
1              THE PROSPECTIVE JUROR:  Yes.

2              MS. FISH:  And what kind of feelings did that bring

3    up in you?

4              THE PROSPECTIVE JUROR:  It was like -- I say it was

5    like watching a movie.  Unreal.

6              MS. FISH:  Yeah.  And that feeling of -- that it was

7    unreal, was that a little bit -- like knowing that it was

8    actually real, were there other feelings that -- that you had

9    if you -- if you thought about the fact that it was real?

10             THE PROSPECTIVE JUROR:  How could it happen here.

11             MS. FISH:  Yeah.  Did you feel any fear or concern?

12             THE PROSPECTIVE JUROR:  Not particularly, no.

13             MS. FISH:  Okay.  Did you feel any anger or

14   disappointment?

15             THE PROSPECTIVE JUROR:  Disappointment.

16             MS. FISH:  Okay.  And who were you disappointed in?

17             THE PROSPECTIVE JUROR:  Just that it happened here.

18   Just disappointed that it would happen here.

19             MS. FISH:  Here in the United States?

20             THE PROSPECTIVE JUROR:  In the United States.

21             MS. FISH:  In terms of, you know, watching a lot of

22   those congressional hearings, you probably, kind of, saw a lot

23   of evidence presented about what happened that day.

24             THE PROSPECTIVE JUROR:  Yes.

25             MS. FISH:  Do you feel like you have a good idea of
```

1    what happened on January 6th?

2            THE PROSPECTIVE JUROR:  Not particularly.  It's like

3    a little bit, but not really everything.

4            MS. FISH:  So you feel like there's more to know?

5            THE PROSPECTIVE JUROR:  Yeah, I think there's more.

6            MS. FISH:  And do you feel like you know why the

7    majority of people, civilians, went to the Capitol Building

8    that day, if you know?

9            THE PROSPECTIVE JUROR:  Excuse me?

10           MS. FISH:  Do you feel like you know why the majority

11   of people went to the Capitol Building that day?

12           THE PROSPECTIVE JUROR:  Sort of.  Sort of.

13           MS. FISH:  Sort of.

14       Can you tell me what you understand.

15           THE PROSPECTIVE JUROR:  I think they were under the

16   belief that the election was framed.

17           MS. FISH:  And do you feel like the majority of

18   people went there, you know, intending to be disruptive and do

19   violence?

20           THE PROSPECTIVE JUROR:  No.

21           MS. FISH:  Okay.  Thank you.

22           THE COURT:  Thank you.

23           MR. VALENTINI:  We have no questions.

24           THE COURT:  Okay.  So you've said that you've seen

25   some media about violence and vandalism.  In this case, there's

1    no allegation that Mr. Rhine participated in any violence or

2    vandalism.  So do you think despite you having seen those

3    images of violence and vandalism at the Capitol that you would

4    be able to base a case against Mr. Rhine based solely on the

5    evidence presented here?

6            THE PROSPECTIVE JUROR:  Yes.

7            THE COURT:  Yes.  Okay.  All right.  Thank you.

8            MS. FISH:  Your Honor, I apologize.  May I ask one?

9            THE COURT:  Sure.

10            MS. FISH:  I apologize.  I forgot this one.

11        I just wanted to ask, so when you served on the

12    grand jury -- obviously, that was different than serving on a

13    criminal jury like this and the burden of proof will be

14    different.

15            THE PROSPECTIVE JUROR:  Uh-huh.

16            MS. FISH:  Do you have any concerns about

17    distinguishing between the two types of service?

18            THE PROSPECTIVE JUROR:  No.  Because I've been on

19    both so I know the difference.

20            THE COURT:  You've been on criminal juries as well?

21            THE PROSPECTIVE JUROR:  I've been on criminal.  I've

22    done everything.  I've done it all.

23            MS. FISH:  Can you talk with us a little bit about a

24    criminal -- like a jury trial that you've served on.

25            THE PROSPECTIVE JUROR:  It's been a while.  But I

1    knew nothing about it when it came up.  So I had to listen to

2    it, both sides, and decide what was -- what was presented.

3                MS. FISH:  Was that something you served on here in

4    D.C. in Superior Court?

5                THE PROSPECTIVE JUROR:  It was down in D.C.

6                MS. FISH:  In D.C.  Do you remember how long ago that

7    was?

8                THE PROSPECTIVE JUROR:  Oh, God, that's been maybe

9    20 years.

10               MS. FISH:  Twenty years.

11            Did that case reach a verdict?

12               THE PROSPECTIVE JUROR:  Yes.

13               MS. FISH:  Okay.  Thank you.

14               THE COURT:  Mr. Valentini.

15               MR. VALENTINI:  Still no questions.

16               THE COURT:  All right.  Thank you.

17               THE PROSPECTIVE JUROR:  Thank you.

18               (REPORTER'S NOTE:  Juror 2165 left.)

19               MS. FISH:  No motion, Your Honor.

20               MR. VALENTINI:  No motion from the government.

21               THE COURT:  Okay.  So this next witness, who is the

22   last one on the list, answered a number of the questions,

23   including the catchall, and -- but also answered yes to

24   Question No. 1.  So to the extent that that's dispositive,

25   please let me know.

```
 1                    MS. FISH:  Will do.

 2                    MR. VALENTINI:  Yes.

 3                    (REPORTER'S NOTE:  Juror 1065 enters.)

 4                    THE COURTROOM DEPUTY:  This is Juror No. 1065.

 5                    THE COURT:  Good afternoon.

 6                    THE PROSPECTIVE JUROR:  Good afternoon.

 7                    THE COURT:  This is Juror No. 1065.  Ms. ███; is

 8       that correct?

 9                    THE PROSPECTIVE JUROR:  Do I sit now?

10                    THE COURT:  Yes.  Ms. ███; is that correct?

11                    THE PROSPECTIVE JUROR:  Yes.

12                    THE COURT:  Okay.  So you answered yes to

13       Question No. 1, which is the one that a trial of four to

14       six days or going from 10:00 to 5:30 would create a special

15       problem for you.

16                    THE PROSPECTIVE JUROR:  Yes, it would, because I'm

17       the primary caregiver of a special needs child.

18                    THE COURT:  Okay.  And you watch that child every

19       day?

20                    THE PROSPECTIVE JUROR:  Yes.

21                    THE COURT:  Okay.  And then you watch the child at

22       home?

23                    THE PROSPECTIVE JUROR:  Yes.

24                    THE COURT:  Okay.  And who's been watching the child?

25                    THE PROSPECTIVE JUROR:  Close friend of mine.
```

```
1              THE COURT:  Okay.  But that's not --

2              THE PROSPECTIVE JUROR:  It's not permanent.

3              THE COURT:  I'm sorry?

4              THE PROSPECTIVE JUROR:  It's not permanent.

5              THE COURT:  Okay.  All right.

6              MR. VALENTINI:  We have no objection to excusing the

7     juror.

8              MS. FISH:  Similarly, no objection, Your Honor.

9              THE COURT:  Okay.  You're excused.  Thank you.

10             THE PROSPECTIVE JUROR:  Thank you.

11             (REPORTER'S NOTE:  Juror 1065 left.)

12             THE COURT:  All right.  So we've got 20.

13        So what I'm -- I've asked for another 15 to come here

14    tomorrow at 10:00.  They're going to be jurors in the nature of

15    Ms. ███████, who has been through the process in other

16    January 6th cases.  I don't know if they were stricken for

17    cause or whether they just weren't selected or -- or --

18    Ms. ██████ said she got into the chair.  But there may be

19    people that never even got that far.

20        So how would folks like to proceed?

21             MR. VALENTINI:  So, Your Honor, we gave quite a bit

22    of thought to this.  If it was just a matter of forfeiting a

23    peremptory to one alternate, that would be one matter.  When we

24    only get three peremptories to the actual jurors who are

25    seated, that is something that the government is not prepared
```

```
 1    to do.

 2                   THE COURT:  Not?

 3                   MR. VALENTINI:  Is not prepared to do.

 4                   THE COURT:  Okay.  All right.  So you want to get

 5    started with those jurors tomorrow at 10:00?

 6                   MR. VALENTINI:  Yes.  Yes, Your Honor.  Thank you.

 7                   THE COURT:  Ms. Fish?

 8                   MS. FISH:  That's -- I don't think I can ethically

 9    forfeit peremptories.

10                   THE COURT:  I'm sorry?

11                   MS. FISH:  I don't believe I can ethically forfeit

12    peremptories.

13                   THE COURT:  No, no, no.  I understand.  I never asked

14    you to, just so the record is clear.

15                   MS. FISH:  I understand that.  You know, I -- I

16    would -- I guess now is as appropriate a time as any.  I would

17    just review my motion to change venue.  I rely on prior

18    briefing and the experience we've had today.

19                   THE COURT:  Okay.  No.  I mean, when I denied the

20    motion, I said that there would be -- you know, the way to

21    solve the problem is through rigorous *voir dire*, which we're

22    doing and continue to do.  We're close.  We need to get to 22,

23    and I think we're at 20.  So, you know, the 15 tomorrow, I'm

24    confident that we can get 2 more.  And then we'll start the

25    trial.
```

1          MS. FISH:  Thank you, Your Honor.

2          MR. VALENTINI:  Thank you, Your Honor.  I appreciate

3     the Court's understanding.

4          THE COURT:  You're excused for the day, and -- and

5     I'll see you tomorrow at 10:00.

6          (Proceedings were concluded at 4:55 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                    Dated this 29th day of August, 2023.

10

11                    /s/ Nancy J. Meyer
                      Nancy J. Meyer
12                    Official Court Reporter
                      Registered Diplomate Reporter
13                    Certified Realtime Reporter
                      333 Constitution Avenue Northwest
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

**'**

**'60s** [2] - 482:23, 483:1
**'80s** [3] - 481:15, 481:16, 481:17
**'90s** [3] - 484:1, 484:2, 484:3
**'96** [1] - 394:7

**0**

**0091** [6] - 410:13, 410:14, 410:17, 412:21, 412:25, 422:8
**0208** [4] - 345:22, 345:24, 345:25, 346:19
**0366** [4] - 397:22, 397:23, 397:24, 409:23
**0412** [4] - 381:18, 381:19, 381:20, 396:9
**0436** [2] - 329:13, 337:12
**0447** [4] - 291:2, 291:4, 291:6, 292:9
**0463** [2] - 329:8, 329:9
**0551** [4] - 433:15, 433:16, 433:20, 435:2
**0710** [4] - 422:24, 422:25, 423:3, 433:11
**0776** [4] - 315:13, 315:14, 315:16, 316:11

**1**

**1** [10] - 301:24, 315:20, 324:12, 324:13, 329:4, 345:20, 347:7, 444:21, 489:24, 490:13
**10** [5] - 291:10, 350:9, 352:22, 368:14, 463:11
**10,000-foot** [1] - 431:6
**1065** [4] - 490:3, 490:4, 490:7, 491:11
**1076** [4] - 444:12, 444:13, 444:17, 445:24
**10:00** [7] - 301:25, 315:21, 346:5, 490:14, 491:14, 492:5, 493:5
**11** [1] - 404:24

**1138** [4] - 327:20, 327:21, 327:23, 329:2
**1166** [4] - 292:10, 292:11, 292:14, 314:19
**12** [8] - 303:13, 318:16, 330:17, 339:9, 400:1, 424:13, 454:11, 478:14
**12:30** [1] - 318:21
**1326** [4] - 367:19, 367:20, 367:22, 380:24
**1396** [1] - 329:3
**14** [8] - 296:18, 305:3, 318:16, 382:1, 382:23, 394:5, 402:5, 464:3
**1486** [4] - 316:12, 316:13, 316:17, 323:19
**15** [4] - 382:2, 455:24, 491:13, 492:23
**15-minute** [1] - 424:5
**1572** [4] - 348:2, 348:3, 348:5, 365:14
**1682** [4] - 301:18, 301:19, 301:20, 313:13
**1715** [4] - 460:21, 460:23, 460:24, 476:1
**1761** [4] - 452:3, 452:4, 452:5, 459:5
**18** [3] - 456:20, 459:19, 459:23
**1848** [4] - 347:1, 347:2, 347:4, 347:24
**18th** [1] - 326:21
**19** [1] - 384:10
**1944** [4] - 338:9, 338:10, 338:12, 345:15
**1945** [6] - 299:20, 324:15, 324:16, 324:19, 324:20, 327:13
**1:13** [1] - 397:15

**2**

**2** [4] - 324:23, 396:16, 433:24, 492:24
**20** [9] - 331:25, 354:15, 371:13, 412:5, 426:6, 481:3, 489:9, 491:12, 492:23

**2004** [1] - 461:25
**2005** [1] - 325:8
**2014** [2] - 466:14, 477:9
**2015** [1] - 372:25
**2016** [1] - 477:9
**2019** [2] - 358:11, 372:24
**2020** [3] - 321:14, 322:15, 323:24
**2021** [5] - 407:16, 416:3, 419:7, 454:16, 454:18
**2022** [2] - 350:18, 454:17
**2029** [4] - 445:25, 446:1, 446:3, 451:24
**21** [2] - 427:4, 459:21
**2165** [4] - 476:5, 476:6, 476:10, 489:18
**2179** [4] - 435:6, 435:7, 435:9, 444:2
**22** [4] - 372:20, 466:2, 483:16, 492:22
**24/7** [1] - 369:9
**25** [5] - 320:3, 355:13, 373:21, 381:13, 384:22
**26** [1] - 320:3
**27** [2] - 367:6, 458:20
**28** [7] - 357:14, 361:9, 367:6, 375:4, 381:13, 386:25, 396:12
**28th** [1] - 315:24
**29** [5] - 324:16, 324:19, 374:13, 381:13, 459:9
**2:15** [1] - 397:16

**3**

**3** [1] - 396:16
**30** [4] - 327:22, 394:15, 423:10, 476:24
**31** [1] - 291:5
**32** [1] - 292:12
**33** [1] - 329:10
**34** [1] - 301:18
**35** [1] - 315:15
**36** [1] - 316:14
**38** [1] - 338:11
**39** [1] - 345:24

**4**

**40** [1] - 347:3
**41** [1] - 348:4

**42** [1] - 367:21
**43** [2] - 381:19, 485:12
**44** [1] - 397:23
**45** [1] - 410:15
**46** [1] - 422:25
**47** [1] - 433:17
**49** [1] - 444:14
**4:55** [1] - 493:6

**5**

**5** [5] - 329:17, 381:24, 435:12, 461:2, 476:13
**50** [1] - 446:2
**501** [1] - 463:14
**51** [1] - 452:4
**5:30** [4] - 301:25, 315:21, 346:5, 490:14

**6**

**6** [4] - 411:12, 482:22, 483:5
**6th** [173] - 291:20, 293:14, 295:13, 295:20, 296:9, 296:22, 303:15, 303:21, 304:13, 304:20, 304:24, 305:5, 306:10, 306:14, 307:7, 308:9, 309:4, 309:11, 310:9, 313:17, 314:2, 314:3, 314:4, 317:20, 318:12, 318:17, 320:4, 322:18, 323:25, 328:20, 330:18, 330:20, 330:21, 330:25, 331:5, 331:8, 333:7, 334:8, 335:5, 337:24, 337:25, 339:10, 339:11, 339:13, 340:6, 341:10, 341:15, 342:16, 343:24, 343:25, 345:3, 351:1, 352:1, 353:2, 353:14, 353:16, 354:3, 354:25, 355:2, 355:15, 358:5, 358:14, 359:3, 360:22, 361:25, 362:22, 363:7, 364:21, 366:20, 366:21, 366:23, 367:1, 368:22,

**369:18, 369:19, 370:3, 370:14, 372:2, 372:15, 373:23, 374:4, 375:6, 376:24, 378:13, 379:9, 379:17, 382:25, 383:2, 383:4, 384:25, 388:10, 393:8, 395:15, 395:17, 399:7, 400:2, 400:5, 401:6, 402:8, 402:24, 404:12, 405:7, 405:12, 405:22, 407:3, 407:7, 407:16, 407:17, 413:14, 415:25, 416:3, 416:12, 416:14, 416:17, 417:18, 419:7, 420:17, 424:7, 424:15, 425:22, 425:25, 426:24, 429:11, 429:13, 429:23, 430:14, 430:24, 431:5, 432:19, 432:24, 436:11, 436:14, 437:16, 437:19, 437:22, 440:10, 442:8, 442:21, 445:6, 446:10, 446:11, 447:6, 447:10, 447:15, 448:15, 450:5, 454:13, 454:14, 460:4, 463:18, 464:6, 464:7, 464:10, 465:8, 465:16, 467:13, 468:3, 468:12, 470:2, 470:14, 471:21, 475:4, 475:10, 478:15, 478:18, 479:1, 480:1, 480:4, 480:9, 485:22, 487:1, 491:16
**6th-related** [1] - 467:13

**7**

**7** [6] - 292:18, 316:21, 317:2, 325:19, 452:8, 452:20
**720** [1] - 428:14
**721** [1] - 428:19

**8**

**8** [1] - 328:1

**9**

**9** [6] - 302:14, 338:16, 368:1, 423:6, 462:12, 477:15

**A**

**abide** [1] - 336:1
**ability** [12] - 299:16, 315:5, 364:6, 374:24, 382:20, 386:20, 422:13, 466:23, 474:3, 477:11, 483:11, 484:18
**able** [70] - 293:2, 293:9, 293:10, 294:4, 294:8, 295:3, 295:8, 298:24, 299:7, 299:10, 299:14, 309:7, 309:15, 309:24, 310:4, 310:7, 311:6, 311:13, 313:3, 314:6, 314:8, 314:12, 314:24, 318:5, 320:24, 322:4, 323:5, 323:7, 323:13, 323:23, 324:4, 325:21, 330:1, 335:1, 336:1, 336:6, 336:20, 337:6, 338:1, 339:16, 340:25, 341:1, 341:21, 364:18, 365:5, 365:7, 366:10, 366:25, 369:7, 382:5, 387:13, 394:23, 396:4, 397:13, 402:16, 408:5, 415:16, 415:20, 419:2, 419:13, 420:2, 421:18, 439:13, 452:15, 461:19, 462:2, 469:13, 474:19, 475:6, 484:4
**abreast** [1] - 340:7
**abroad** [1] - 340:21
**absolutely** [5] - 396:19, 410:5, 429:9, 447:23, 468:16
**abuse** [2] - 462:23, 472:14

**academy** [2] - 426:11, 426:12
**accept** [1] - 299:7
**access** [1] - 450:17
**according** [2] - 294:18, 389:8
**account** [2] - 297:2, 428:24
**accounts** [3] - 296:2, 296:4, 428:21
**accurate** [2] - 379:4, 380:8
**achieve** [1] - 387:17
**acquit** [1] - 327:19
**acquitted** [1] - 326:14
**act** [1] - 472:2
**action** [1] - 382:19
**actions** [6] - 321:6, 450:22, 469:14, 470:7, 472:1, 472:4
**active** [1] - 455:6
**actively** [1] - 438:4
**activities** [1] - 369:6
**activity** [1] - 389:7
**actual** [3] - 334:20, 354:22, 491:24
**Adams** [1] - 326:21
**add** [1] - 301:9
**addition** [2] - 314:23, 399:23
**additional** [2] - 314:23, 320:8
**additionally** [1] - 320:9
**adds** [1] - 394:16
**administration** [4] - 453:17, 454:2, 454:3, 455:16
**administrations** [1] - 454:3
**administrative** [1] - 426:18
**admiration** [1] - 358:25
**admit** [1] - 465:10
**advocate** [1] - 431:8
**Affairs** [2] - 485:17, 485:18
**affect** [3] - 382:20, 424:7, 424:11
**affected** [4] - 306:8, 307:21, 356:15, 423:25
**affects** [1] - 311:25
**affiliation** [1] - 433:25
**affirmatively** [2] - 291:9, 305:3
**afraid** [1] - 334:2
**aftermath** [1] - 343:25
**afternoon** [28] -

362:16, 393:4, 402:21, 406:23, 410:16, 414:23, 414:24, 418:16, 423:1, 423:2, 428:6, 428:7, 432:2, 433:18, 433:19, 435:8, 440:5, 444:15, 444:16, 447:25, 467:5, 467:6, 471:13, 471:14, 476:7, 484:24, 490:5, 490:6
**afterwards** [7] - 341:4, 354:10, 354:12, 429:19, 436:22, 438:22, 438:23
**agency** [2] - 343:8, 428:13
**agenda** [1] - 390:2
**agent** [1] - 294:23
**agents** [1] - 376:10
**aggregate** [1] - 401:15
**aggressive** [2] - 439:5, 469:18
**agitated** [1] - 300:12
**ago** [22] - 293:7, 305:1, 307:3, 329:21, 330:7, 330:9, 382:15, 398:8, 413:11, 426:20, 435:18, 443:12, 454:19, 461:25, 466:10, 466:12, 467:12, 477:8, 481:14, 482:21, 483:24, 489:6
**agree** [6] - 338:3, 357:9, 366:14, 431:22, 433:6, 473:10
**agreement** [1] - 459:2
**agrees** [1] - 459:24
**ahead** [3] - 308:22, 410:21, 447:24
**aids** [1] - 328:7
**Airbnbs** [2] - 436:20, 438:12
**aired** [2] - 401:2, 401:6
**AK-47s** [1] - 369:9
**Alaska** [3] - 382:7, 394:13, 394:14
**allegation** [5] - 313:2, 321:5, 386:4, 439:12, 488:1
**allegations** [7] - 294:2, 294:5, 337:2, 386:13, 386:14,

401:24, 421:15, 447:19, 473:25
**alleged** [1] - 395:7
**allowed** [1] - 443:5
**almost** [4] - 291:17, 297:4, 307:17, 444:22
**alone** [2] - 300:16, 475:14
**altercation** [2] - 427:9, 427:11
**altercations** [1] - 471:23
**alternate** [2] - 461:13, 491:23
**alternative** [1] - 318:22
**Amendment** [1] - 315:9
**amount** [3] - 374:1, 401:19, 446:25
**analyst** [3] - 325:17, 325:18, 426:11
**anger** [3] - 430:17, 430:19, 486:13
**angry** [9] - 312:10, 312:12, 357:20, 361:10, 361:16, 366:7, 375:11, 375:12, 380:2
**ankle** [1] - 411:22
**annoyance** [3] - 406:15, 407:14, 407:16
**annoying** [2] - 399:15, 406:9
**answer** [17] - 297:18, 300:16, 300:20, 313:9, 313:19, 321:9, 385:8, 387:21, 404:1, 415:18, 432:22, 440:16, 465:4, 470:10, 471:7, 472:20, 473:7
**answered** [96] - 291:9, 291:12, 292:17, 295:11, 296:17, 297:10, 301:23, 302:13, 303:12, 305:2, 315:19, 316:20, 317:8, 318:15, 320:2, 324:22, 325:19, 328:1, 329:16, 330:16, 331:15, 338:15, 339:8, 346:3, 347:7, 348:8, 349:15, 350:9, 353:1, 354:14,

354:23, 355:12, 356:21, 357:13, 367:8, 368:1, 368:13, 369:17, 369:23, 370:20, 371:12, 372:20, 373:20, 375:4, 381:13, 381:24, 382:22, 384:9, 384:22, 385:3, 386:24, 393:17, 396:12, 398:2, 398:19, 399:25, 402:5, 410:19, 411:12, 411:19, 412:5, 423:6, 423:20, 424:13, 425:11, 426:6, 427:3, 433:23, 435:12, 435:24, 436:9, 444:20, 446:6, 452:8, 454:11, 455:23, 456:19, 457:9, 458:20, 459:9, 461:2, 462:11, 463:10, 463:16, 464:2, 464:22, 466:1, 476:12, 477:15, 478:13, 481:2, 482:16, 483:15, 489:22, 489:23, 490:12
**answering** [5] - 367:6, 406:6, 432:15, 443:21, 472:8
**answers** [11] - 362:20, 396:17, 406:25, 415:3, 419:5, 422:14, 432:8, 444:4, 454:9, 471:17, 473:19
**antagonistic** [1] - 440:24
**anticipated** [1] - 328:23
**anyway** [1] - 439:19
**apologize** [5] - 376:2, 440:7, 472:20, 488:8, 488:10
**appalled** [1] - 389:4
**appeal** [1] - 434:14
**appellate** [1] - 434:14
**applied** [3] - 348:13, 348:18, 433:25
**apply** [7] - 299:10, 310:3, 336:4, 336:6, 336:21, 473:6, 473:10
**applying** [2] - 473:5,

473:15
**appointment** [1] - 422:23
**appreciate** [7] - 323:15, 323:22, 324:6, 462:9, 472:22, 475:19, 493:2
**apprehended** [2] - 373:3, 466:16
**approach** [4] - 338:1, 421:2, 421:5, 435:22
**appropriate** [2] - 301:2, 492:16
**area** [7] - 321:3, 352:13, 352:19, 394:11, 407:5, 439:2, 441:13
**armed** [1] - 406:12
**arrays** [1] - 408:17
**arrest** [1] - 427:10
**arrested** [5] - 297:5, 427:5, 462:24, 482:18, 483:2
**arrests** [1] - 383:21
**article** [2] - 447:3, 447:4
**articles** [1] - 353:22
**articulate** [4] - 298:3, 326:19, 327:18, 367:10
**artifacts** [1] - 326:1
**aside** [32] - 306:4, 309:15, 309:21, 310:7, 314:6, 314:9, 318:2, 318:6, 320:24, 323:6, 323:8, 323:14, 323:23, 337:8, 341:22, 356:18, 366:25, 367:10, 386:7, 386:23, 396:17, 397:14, 401:25, 402:16, 419:14, 419:25, 421:18, 422:15, 439:14, 439:19, 439:25, 447:20
**assault** [4] - 326:23, 373:5, 373:16, 379:7
**assaulted** [1] - 372:24
**assessing** [1] - 323:10
**assisted** [1] - 434:13
**associate** [5] - 344:17, 350:6, 350:7, 394:9, 430:19
**associated** [1] - 357:4
**assume** [4] - 301:3, 349:19, 374:12, 398:13

**assuming** [1] - 346:24
**assumption** [3] - 301:6, 378:7, 405:24
**assumptions** [2] - 366:1, 457:22
**asterisk** [1] - 423:24
**attack** [3] - 374:2, 396:21, 396:22
**attempt** [1] - 396:5
**attempting** [1] - 454:6
**attend** [1] - 311:14
**attended** [4] - 306:19, 319:6, 319:10, 436:19
**attending** [2] - 370:14, 443:6
**attention** [4] - 314:13, 324:13, 383:22, 442:3
**attorney** [20] - 298:15, 320:20, 333:4, 342:3, 358:2, 365:18, 368:7, 376:4, 388:1, 402:22, 414:25, 428:8, 434:4, 434:6, 434:11, 434:14, 440:8, 448:1, 467:7, 485:2
**Attorney's** [6] - 324:25, 325:3, 348:10, 348:17, 423:15, 433:25
**attorneys** [2] - 348:9, 349:11
**audio** [3] - 411:11, 411:18, 412:23
**Audio** [1] - 412:16
**Auschwitz** [1] - 344:4
**authority** [2] - 431:16, 443:6
**authorization** [1] - 322:24
**authorized** [5] - 322:19, 323:2, 472:3, 474:17, 474:18
**avoid** [1] - 384:11
**awaiting** [1] - 415:6
**aware** [11] - 294:16, 294:17, 303:17, 307:21, 339:21, 369:25, 370:5, 376:22, 377:5, 383:4, 464:10

---

### B

**baby** [1] - 353:7
**background** [11] -

340:13, 340:16, 342:17, 425:7, 425:9, 426:3, 436:18, 437:1, 441:24, 446:17, 464:18
**backing** [1] - 456:12
**backwards** [1] - 324:17
**bad** [7] - 300:7, 351:7, 351:13, 351:15, 369:16, 389:8, 472:15
**badly** [1] - 440:14
**baggage** [1] - 327:1
**balance** [1] - 457:18
**barbed** [1] - 308:4
**barbed-wire** [1] - 308:4
**barely** [1] - 465:25
**barge** [1] - 361:23
**barricade** [1] - 308:4
**barricaded** [2] - 307:10, 307:15
**barricades** [2] - 308:2, 334:21
**barrier** [1] - 360:8
**barrier-looking-type** [1] - 360:8
**barriers** [1] - 313:18
**base** [5] - 318:7, 408:2, 422:2, 459:12, 488:4
**based** [36] - 297:24, 309:6, 317:15, 327:14, 337:7, 364:15, 365:4, 380:10, 381:6, 382:21, 386:9, 387:13, 393:14, 396:3, 397:2, 397:7, 402:2, 402:17, 408:24, 419:9, 414:18, 419:12, 419:15, 419:16, 421:20, 421:22, 421:24, 422:1, 439:15, 445:17, 445:19, 450:9, 458:18, 459:1, 474:20, 488:4
**basement** [1] - 369:14
**bash** [1] - 449:24
**basic** [1] - 374:17
**basis** [2] - 300:16, 475:13
**bathroom** [1] - 367:16
**became** [1] - 464:10
**become** [3] - 344:20, 394:17, 465:5

**beg** [1] - 418:24
**behalf** [1] - 319:23
**behaving** [3] - 390:4, 440:13, 441:19
**belief** [4] - 319:21, 450:7, 450:9, 487:16
**beliefs** [12] - 292:20, 316:25, 317:13, 325:23, 355:14, 357:12, 366:4, 373:22, 384:24, 386:7, 402:16, 452:18
**believes** [2] - 468:19, 468:21
**bender** [1] - 435:17
**best** [10] - 293:4, 299:16, 301:15, 305:21, 314:25, 387:16, 387:20, 389:4, 455:5, 465:6
**bet** [1] - 392:5
**better** [5] - 310:13, 310:15, 310:18, 339:19, 339:22
**between** [7] - 321:16, 370:13, 375:14, 399:13, 400:14, 469:18, 488:17
**bewildered** [1] - 448:8
**beyond** [6] - 383:22, 391:23, 410:25, 451:2, 473:1, 480:23
**bias** [3] - 327:6, 327:16, 365:18
**biased** [1] - 326:3
**biases** [1] - 356:18
**Biden** [1] - 321:16
**big** [5] - 315:7, 359:10, 359:11, 360:5, 366:22
**big-picture** [2] - 359:11, 366:22
**bigger** [1] - 364:3
**biggest** [2] - 293:9, 296:11
**biological** [1] - 462:22
**bit** [54] - 295:19, 300:19, 305:16, 305:20, 322:1, 333:6, 334:18, 339:24, 341:18, 342:6, 342:15, 342:18, 358:4, 359:16, 360:1, 369:10, 373:15, 373:17, 383:1, 385:10, 388:9, 402:23, 404:18, 405:14, 408:10,

418:4, 424:10, 429:10, 429:12, 431:25, 440:9, 442:5, 442:23, 446:9, 453:4, 454:13, 455:11, 460:2, 460:5, 461:22, 464:5, 464:9, 468:1, 468:3, 468:12, 469:13, 471:9, 478:18, 479:24, 485:22, 486:7, 487:3, 488:23, 491:21
**bits** [1] - 404:25
**black** [2] - 319:19, 319:22
**blame** [1] - 406:16
**blank** [1] - 371:2
**blanket** [1] - 456:18
**block** [2] - 310:23, 326:21
**blocks** [9] - 308:19, 311:3, 314:13, 314:15, 368:19, 399:5, 404:7, 424:2, 463:16
**blogging** [1] - 384:15
**blurry** [2] - 415:10, 415:20
**bomb** [1] - 292:1
**booked** [1] - 316:3
**born** [2] - 394:14, 423:19
**Boston** [2] - 461:8, 461:23
**Boys** [5] - 402:10, 402:15, 405:15, 405:18, 425:18
**branch** [2] - 390:3, 390:4
**breached** [1] - 388:23
**break** [13] - 366:8, 367:16, 367:17, 397:16, 418:12, 459:7, 460:9, 460:18, 460:19, 472:15, 483:20, 483:25, 484:11
**break-in** [1] - 483:25
**break-ins** [2] - 483:20, 484:11
**breaking** [5] - 305:23, 333:20, 333:23, 337:1, 472:7
**Brentwood** [1] - 461:17
**brief** [1] - 312:2
**briefing** [1] - 492:18
**briefly** [7] - 391:20,

415:2, 415:23, 461:9, 474:24, 475:1, 485:4
**bring** [5] - 344:1, 344:16, 412:19, 412:24, 486:2
**brings** [1] - 344:5
**broadcast** [1] - 318:20
**broadly** [1] - 471:25
**broke** [2] - 404:16, 472:17
**broken** [2] - 388:25, 457:15
**brother** [8] - 368:6, 427:8, 481:7, 481:13, 482:10, 482:22, 483:3, 483:4
**brought** [4] - 314:20, 339:23, 344:22, 379:10
**building** [9] - 351:21, 360:6, 416:9, 416:11, 463:16, 469:21, 469:25, 475:9, 475:10
**Building** [16] - 352:23, 366:9, 368:15, 378:10, 398:21, 398:24, 409:5, 409:7, 423:22, 424:3, 442:14, 450:23, 463:12, 475:4, 487:7, 487:11
**buildings** [1] - 358:17
**burden** [5] - 367:13, 381:2, 381:14, 397:11, 488:13
**business** [1] - 444:25

**C**

**calculated** [1] - 296:10
**California** [1] - 482:6
**cameras** [2] - 377:13, 441:7
**Camp** [1] - 344:4
**candid** [5] - 365:17, 366:10, 366:14, 374:10, 385:2
**candidly** [1] - 341:19
**candor** [5] - 323:16, 323:22, 324:6, 327:19, 472:23
**cannot** [2] - 315:8, 396:24
**capable** [1] - 443:20
**capacity** [1] - 404:23
**capital** [1] - 310:22
**Capitol** [137] - 291:11,

291:19, 294:20, 295:13, 300:13, 303:14, 305:5, 306:3, 307:5, 307:10, 307:15, 308:4, 308:16, 308:17, 308:19, 308:20, 321:3, 322:18, 322:24, 326:20, 326:24, 330:18, 333:18, 333:21, 334:20, 335:9, 336:13, 336:17, 337:17, 342:22, 343:12, 345:6, 351:20, 352:7, 352:11, 352:23, 356:24, 356:25, 357:15, 358:17, 360:4, 362:7, 365:1, 366:8, 366:15, 368:15, 368:18, 368:19, 369:7, 369:13, 371:6, 375:5, 375:9, 375:10, 378:10, 379:22, 381:10, 382:25, 383:7, 384:25, 385:24, 386:18, 387:1, 387:5, 388:19, 388:23, 390:16, 391:8, 393:24, 395:18, 395:21, 396:14, 398:21, 398:23, 398:25, 399:1, 399:17, 400:2, 400:11, 400:21, 401:17, 403:17, 403:22, 404:7, 404:17, 405:22, 407:5, 407:15, 407:20, 407:22, 408:13, 408:17, 408:21, 409:2, 409:4, 409:5, 409:7, 416:9, 417:1, 420:6, 420:10, 420:17, 420:18, 421:6, 421:9, 423:22, 423:24, 424:3, 424:15, 431:11, 431:24, 432:16, 436:11, 442:14, 443:14, 445:8, 449:4, 450:23, 451:2, 451:5, 454:13, 463:12, 464:5, 469:6, 469:18, 469:19, 470:20,

472:3, 474:15, 475:4, 487:7, 487:11, 488:3
**captures** [1] - 337:6
**car** [2] - 353:14, 440:14
**card** [1] - 452:21
**care** [3] - 400:6, 463:24, 468:11
**caregiver** [1] - 490:17
**caring** [1] - 359:1
**Carolina** [3] - 423:15, 482:6
**carried** [1] - 470:7
**cars** [2] - 408:18, 439:7
**case** [104] - 294:2, 294:4, 294:7, 295:2, 295:3, 295:4, 295:8, 309:4, 309:6, 309:7, 313:1, 316:22, 318:3, 320:6, 323:3, 323:6, 323:11, 325:20, 329:21, 330:14, 335:21, 335:22, 335:23, 336:19, 336:22, 337:1, 338:1, 338:4, 341:22, 348:10, 350:4, 350:8, 355:16, 364:13, 364:14, 364:15, 365:4, 365:8, 365:18, 366:11, 373:14, 373:24, 381:3, 381:4, 382:4, 384:11, 385:1, 386:4, 392:13, 393:6, 393:13, 393:14, 395:25, 397:6, 398:8, 398:17, 401:23, 406:24, 408:1, 408:2, 408:3, 414:6, 418:19, 419:10, 419:12, 419:13, 419:15, 419:25, 420:1, 420:16, 421:15, 428:3, 432:7, 434:15, 434:16, 435:17, 435:22, 439:11, 440:2, 447:18, 452:15, 453:1, 453:6, 461:25, 462:7, 463:3, 463:7, 465:1, 466:24, 471:16, 473:24, 474:4, 475:13, 477:12, 482:8,

483:11, 484:19, 487:25, 488:4, 489:11
**case-by-case** [1] - 475:13
**cases** [16] - 349:13, 349:14, 350:1, 368:9, 372:6, 373:19, 382:7, 382:8, 390:21, 390:22, 441:5, 460:4, 461:10, 462:22, 491:16
**cast** [1] - 315:5
**casualties** [1] - 400:13
**cataract** [2] - 415:4, 422:12
**cataracts** [2] - 410:23, 411:21
**catch** [3] - 328:9, 328:19, 482:25
**catchall** [1] - 489:23
**category** [1] - 475:15
**caught** [3] - 484:4, 484:11, 484:12
**caused** [3] - 319:7, 338:8, 409:16
**CDC** [1] - 428:24
**Center** [2] - 462:18, 463:14
**centrally** [1] - 326:20
**certain** [14] - 349:25, 356:23, 367:12, 372:17, 374:23, 377:13, 420:21, 458:21, 473:13, 473:14, 474:14
**certainly** [8] - 313:25, 339:18, 339:21, 448:17, 449:19, 450:16, 460:13, 466:7
**certify** [1] - 391:2
**chair** [1] - 491:18
**chairs** [1] - 467:22
**challenges** [1] - 356:17
**chambers** [1] - 360:10
**chance** [2] - 329:6, 389:21
**change** [11] - 308:10, 335:12, 362:13, 380:15, 386:21, 392:10, 420:21, 420:23, 469:11, 469:12, 492:17
**changed** [6] - 369:11, 378:15, 378:17, 378:19, 399:10, 407:19

**changes** [1] - 409:17
**changing** [1] - 469:4
**channel** [1] - 430:6
**chaos** [2] - 429:16, 438:9
**characterize** [1] - 314:16
**characterized** [1] - 314:14
**charge** [2] - 361:23, 475:8
**charged** [6] - 347:18, 427:5, 427:8, 462:23, 463:2, 482:18
**Charges** [1] - 396:16
**charges** [10] - 299:5, 299:8, 300:9, 328:20, 372:18, 382:9, 395:2, 395:3, 457:14, 461:14
**Chase** [1] - 436:5
**chatted** [1] - 465:6
**Chicago** [1] - 346:12
**chief** [2] - 349:5, 349:10
**child** [6] - 356:5, 389:13, 490:17, 490:18, 490:21, 490:24
**childcare** [1] - 329:5
**children** [4] - 403:23, 463:1, 466:8, 472:14
**Children's** [2] - 462:18, 463:14
**choice** [1] - 327:2
**choose** [1] - 456:22
**chose** [1] - 391:6
**chosen** [1] - 374:21
**circumstances** [3] - 327:1, 327:3, 472:12
**citizens** [1] - 457:24
**city** [12] - 304:1, 339:15, 340:4, 366:16, 366:18, 454:23, 455:2, 455:17, 458:1, 463:24, 468:11, 468:13
**civil** [3] - 349:25, 435:17, 468:23
**civilian** [8] - 332:20, 332:22, 355:9, 414:10, 414:13, 456:16, 482:12, 482:13
**civilians** [10] - 356:25, 357:14, 375:5, 386:25, 387:1, 417:23, 449:3,

455:13, 470:19,
487:7
**claim** [1] - 431:16
**claiming** [1] - 321:2
**clarification** [1] -
475:20
**clarify** [3] - 298:16,
410:4, 429:7
**clarifying** [1] - 467:19
**clarity** [2] - 397:2,
460:10
**clear** [17] - 314:6,
327:15, 337:25,
365:17, 365:19,
366:7, 366:24,
375:11, 381:2,
391:8, 396:20,
407:21, 422:13,
433:1, 444:5,
459:15, 492:14
**clients** [2] - 428:15,
428:16
**clips** [2] - 354:8,
354:10
**close** [53] - 291:10,
302:14, 302:22,
306:2, 307:4, 307:9,
307:20, 308:17,
314:14, 325:2,
332:1, 338:16,
339:2, 339:20,
349:16, 352:7,
352:11, 352:22,
354:15, 354:18,
355:3, 356:14,
368:2, 368:14,
368:19, 368:22,
368:23, 369:13,
371:14, 372:22,
376:1, 378:10,
398:20, 412:6,
423:8, 423:21,
426:7, 427:5,
427:16, 435:25,
455:3, 462:13,
463:11, 466:3,
477:16, 481:4,
482:1, 482:2, 482:3,
482:17, 483:17,
490:25, 492:22
**closely** [22] - 304:13,
307:20, 311:11,
331:1, 340:3,
349:10, 351:6,
353:18, 354:7,
358:23, 383:15,
383:18, 396:20,
400:18, 436:13,
437:5, 446:23,
454:14, 465:9,

465:11, 479:7,
479:25
**closer** [5] - 310:24,
398:6, 399:17,
407:5, 479:23
**closures** [3] - 339:14,
340:25, 343:3
**CNN** [1] - 446:13
**co** [2] - 358:16, 407:20
**co-existed** [1] -
407:20
**co-workers** [1] -
358:16
**collaborate** [1] -
377:15
**collaborating** [3] -
372:8, 377:9, 377:14
**colleague** [2] - 432:9,
434:13
**colleague's** [6] -
395:14, 407:1,
419:6, 432:9,
432:23, 471:18
**colleagues** [3] -
340:17, 358:6,
365:22
**collecting** [1] - 326:1
**collective** [1] - 453:25
**colonoscopy** [1] -
347:13
**colors** [1] - 455:2
**Columbia** [5] - 325:10,
326:21, 385:13,
385:14, 412:12
**combination** [4] -
367:4, 381:9,
410:11, 422:23
**combined** [1] - 440:25
**coming** [12] - 299:13,
341:7, 346:10,
369:12, 383:7,
411:1, 411:3,
412:18, 436:21,
441:8, 455:20,
469:19
**comitatus** [1] - 383:5
**commission** [1] -
391:18
**commit** [1] - 392:13
**committed** [6] -
312:22, 313:2,
337:3, 408:14
**committee** [20] -
291:16, 304:23,
306:23, 331:8,
341:15, 350:14,
351:4, 351:5,
351:16, 354:3,
358:9, 384:5, 401:5,
401:14, 425:24,

437:22, 442:7,
447:9, 465:15, 480:8
**common** [1] - 377:4
**communicating** [1] -
295:7
**community** [4] -
341:6, 342:10,
368:20, 374:2
**commute** [4] - 311:1,
352:15, 399:11,
424:7
**company** [2] - 428:11,
428:19
**compel** [1] - 300:22
**complete** [5] - 301:10,
345:2, 375:3, 431:5,
459:11
**completed** [1] - 315:8
**completely** [3] -
374:10, 454:20,
457:4
**complicated** [2] -
343:9, 472:21
**composition** [1] -
409:18
**concede** [1] - 397:13
**concept** [1] - 351:14
**concern** [7] - 293:9,
322:1, 401:19,
403:18, 407:6,
407:11, 486:11
**concerned** [13] -
298:17, 311:18,
326:3, 344:21,
378:24, 403:13,
403:16, 407:9,
422:14, 444:3,
448:8, 464:1, 469:5
**concerning** [5] -
295:6, 318:7, 344:9,
370:21, 402:1
**concerns** [4] - 292:24,
293:1, 317:10,
488:16
**concluded** [5] - 296:7,
296:8, 296:15,
372:11, 493:6
**conclusion** [2] -
301:2, 361:18
**conclusions** [6] -
300:9, 300:10,
315:2, 319:1,
331:12, 338:6
**conclusively** [1] -
397:5
**conduct** [1] - 473:14
**conducted** [1] - 433:7
**confident** [1] - 492:24
**confirming** [1] -
391:20

**conflict** [4] - 342:12,
342:14, 344:15,
388:25
**conflicts** [2] - 340:21,
344:20
**confronted** [1] -
455:13
**confronting** [1] -
455:8
**confused** [1] - 310:25
**confusion** [2] - 311:8,
319:7
**congested** [1] -
302:11
**congratulations** [1] -
445:22
**Congress** [10] -
294:10, 339:6,
339:25, 350:22,
358:21, 360:13,
390:4, 429:2, 429:5,
445:4
**Congress's** [1] -
370:17
**congressional** [4] -
350:23, 360:9,
404:21, 486:22
**congressman** [1] -
351:12
**congresspeople** [1] -
351:7
**connected** [2] -
319:14, 356:13
**connection** [6] -
352:1, 352:4, 352:6,
355:24, 366:15,
368:20
**consequences** [1] -
472:17
**consider** [12] - 299:14,
307:21, 320:6,
320:25, 327:4,
327:5, 355:16,
373:23, 374:2,
377:8, 385:1, 471:24
**considered** [1] -
428:25
**consistent** [1] -
396:16
**conspiracy** [2] -
315:4, 326:2
**constant** [2] - 296:14,
307:16
**Constitution** [1] -
389:8
**constitutional** [1] -
296:14
**constrain** [1] - 384:16
**constraining** [1] -
384:17

**consultation** [2] -
410:24, 411:4
**consumer** [1] - 436:6
**contacts** [1] - 296:3
**context** [6] - 316:23,
325:22, 328:21,
452:10, 452:17,
464:25
**continue** [5] - 405:6,
425:2, 446:16,
464:18, 492:22
**continued** [8] - 334:7,
334:10, 359:21,
391:15, 425:4,
425:6, 437:1, 464:20
**continuing** [1] - 410:2
**continuously** [5] -
383:16, 383:17,
388:13, 392:15,
395:19
**contractor** [3] -
369:24, 371:18,
376:7
**contradict** [2] -
293:22, 397:11
**contrary** [3] - 293:19,
293:22, 374:25
**Contreras** [11] -
298:23, 309:5,
310:2, 335:21,
336:3, 364:13,
407:1, 408:1,
419:11, 419:24,
472:24
**Contreras's** [1] -
475:6
**control** [2] - 442:25,
469:1
**conversation** [2] -
328:9, 460:6
**conversations** [2] -
354:24, 470:12
**conveyed** [1] - 438:7
**convict** [1] - 327:15
**convicted** [2] - 427:6,
482:18
**conviction** [1] - 314:8
**convinced** [1] -
367:13
**corner** [2] - 352:8,
398:24
**corporate** [1] - 338:21
**Corps** [1] - 426:10
**correct** [45] - 291:7,
291:14, 292:15,
296:23, 301:1,
306:16, 315:17,
316:18, 321:15,
322:16, 327:24,
329:14, 338:13,

500

346:1, 347:5, 348:6,
348:7, 368:4,
371:24, 373:11,
376:8, 376:9,
376:12, 376:14,
377:21, 377:22,
380:11, 380:14,
381:21, 397:25,
410:17, 415:11,
415:13, 423:4,
433:21, 435:10,
435:11, 444:18,
446:4, 452:22,
458:5, 460:25,
475:16, 490:8,
490:10
**corrections** [1] - 297:6
**correctly** [5] - 364:9,
415:4, 467:9,
471:19, 471:22
**counsel** [4] - 324:23,
433:24, 434:13,
471:1
**counsel's** [2] - 349:5,
349:10
**count** [2] - 320:11,
391:1
**countries** [1] - 455:12
**country** [1] - 396:24
**couple** [19] - 295:20,
297:25, 298:8,
298:16, 301:10,
309:2, 320:22,
353:11, 360:20,
368:20, 371:2,
382:6, 411:8, 412:1,
426:11, 428:10,
467:8, 473:20, 481:8
**course** [10] - 319:21,
374:20, 407:14,
409:16, 425:17,
430:7, 439:18,
439:21, 450:13,
474:8
**COURT** [608] - 291:6,
291:9, 291:15,
291:19, 291:22,
292:2, 292:5, 292:8,
292:14, 292:17,
292:24, 293:1,
293:11, 293:15,
293:24, 294:15,
295:1, 295:6,
295:11, 295:15,
296:6, 296:17,
296:23, 297:7,
297:10, 298:1,
298:5, 298:10,
299:19, 299:21,
300:5, 300:21,

300:25, 301:4,
301:11, 301:20,
301:23, 302:6,
302:8, 302:13,
302:18, 302:21,
302:24, 303:1,
303:4, 303:6, 303:9,
303:12, 303:21,
303:25, 304:3,
304:5, 304:8,
304:11, 304:13,
304:16, 304:19,
304:23, 305:2,
305:8, 305:10,
308:16, 308:21,
310:13, 311:10,
311:18, 311:20,
311:23, 312:1,
312:10, 312:17,
312:19, 313:1,
313:7, 313:10,
314:10, 314:21,
315:12, 315:16,
315:19, 315:25,
316:4, 316:9,
316:15, 316:17,
316:20, 317:3,
317:8, 317:13,
317:18, 317:24,
318:2, 318:10,
318:15, 318:24,
319:3, 319:8,
319:11, 319:16,
319:22, 320:2,
320:16, 323:9,
323:17, 324:6,
324:10, 324:18,
324:20, 324:22,
325:4, 325:7, 325:9,
325:12, 325:15,
325:18, 326:4,
326:7, 326:10,
326:13, 326:16,
327:7, 327:11,
327:17, 327:23,
328:1, 328:11,
328:14, 329:1,
329:3, 329:11,
329:13, 329:16,
329:19, 329:23,
330:1, 330:4, 330:7,
330:10, 330:12,
330:16, 330:25,
331:4, 331:8,
331:11, 331:15,
331:23, 331:25,
332:6, 332:9,
332:12, 332:15,
332:17, 332:24,
333:1, 336:25,
337:10, 338:3,

338:12, 338:15,
338:19, 338:23,
339:1, 339:5, 339:8,
340:6, 340:10,
340:12, 341:1,
341:4, 341:9,
341:14, 341:20,
341:25, 345:13,
345:17, 345:20,
345:25, 346:3,
346:8, 346:11,
346:13, 346:17,
346:20, 346:24,
347:4, 347:7,
347:11, 347:15,
347:25, 348:5,
348:8, 348:14,
348:19, 348:22,
348:24, 349:2,
349:6, 349:9,
349:13, 349:15,
349:19, 349:21,
350:3, 350:9,
350:16, 350:20,
350:25, 351:6,
351:10, 351:24,
352:11, 352:14,
352:21, 353:1,
353:23, 354:2,
354:6, 354:10,
354:14, 354:20,
354:24, 355:7,
355:12, 356:3,
356:21, 357:13,
357:24, 365:12,
367:2, 367:22,
367:25, 368:5,
368:8, 368:11,
368:13, 368:21,
368:24, 369:2,
369:17, 370:9,
370:15, 370:20,
371:9, 371:12,
371:16, 371:21,
371:23, 371:25,
372:10, 372:20,
373:2, 373:9,
373:12, 373:20,
374:13, 375:3,
375:14, 375:18,
375:21, 380:21,
381:8, 381:17,
381:20, 381:23,
382:3, 382:9,
382:13, 382:16,
382:18, 382:22,
383:11, 383:14,
383:17, 383:23,
384:2, 384:5, 384:9,
384:19, 384:22,
385:7, 385:10,

386:2, 386:13,
386:19, 386:24,
387:11, 387:17,
387:22, 387:25,
392:17, 392:23,
396:8, 397:7,
397:18, 397:21,
397:24, 398:2,
398:5, 398:10,
398:12, 398:15,
398:19, 398:25,
399:3, 399:6,
399:12, 399:16,
399:22, 399:25,
400:4, 400:9,
400:19, 400:25,
401:5, 401:9,
401:13, 401:21,
402:5, 402:13,
402:20, 404:1,
408:10, 409:1,
409:5, 409:8,
409:19, 409:22,
410:9, 410:16,
410:19, 411:1,
411:6, 411:12,
411:16, 411:19,
411:25, 412:4,
412:10, 412:13,
412:17, 412:19,
412:24, 413:4,
413:9, 413:11,
413:13, 413:16,
413:20, 413:23,
413:25, 414:4,
414:6, 414:12,
414:18, 414:22,
418:25, 421:13,
421:24, 422:3,
422:6, 422:22,
423:1, 423:3, 423:6,
423:11, 423:13,
423:17, 423:20,
424:2, 424:6,
424:12, 424:19,
424:24, 425:2,
425:7, 425:11,
425:21, 425:24,
426:6, 426:12,
426:14, 426:20,
426:25, 427:3,
427:11, 427:15,
427:20, 427:24,
428:1, 428:5,
433:10, 433:14,
433:18, 433:20,
433:23, 434:3,
434:9, 434:17,
434:24, 435:3,
435:8, 435:12,
435:15, 435:18,

435:20, 435:24,
436:3, 436:7, 436:9,
436:13, 436:23,
436:25, 437:4,
437:8, 437:11,
437:14, 437:16,
437:18, 437:21,
437:25, 438:3,
438:5, 438:10,
438:16, 438:19,
438:24, 439:4,
439:8, 439:11,
439:20, 440:1,
440:4, 440:16,
443:25, 444:8,
444:10, 444:15,
444:17, 444:20,
445:3, 445:6, 445:8,
445:12, 445:15,
445:20, 445:22,
446:3, 446:6,
446:16, 446:23,
447:5, 447:8,
447:14, 447:18,
447:24, 451:23,
452:2, 452:5, 452:7,
452:14, 452:23,
453:4, 453:19,
454:10, 454:18,
455:23, 456:15,
456:19, 458:4,
458:19, 458:24,
459:2, 459:6,
459:15, 459:23,
460:8, 460:14,
460:18, 460:24,
461:2, 461:5, 461:9,
461:19, 461:22,
462:2, 462:5,
462:11, 462:17,
462:19, 463:4,
463:10, 463:17,
463:20, 463:25,
464:2, 464:14,
464:17, 465:2,
465:7, 465:12,
465:15, 465:22,
466:1, 466:9,
466:13, 466:15,
466:18, 466:21,
467:3, 473:20,
474:10, 474:12,
474:23, 474:25,
475:22, 475:24,
476:2, 476:7, 476:9,
476:12, 476:15,
476:18, 476:22,
476:25, 477:2,
477:5, 477:8,
477:10, 477:14,
477:21, 478:3,

501

478:5, 478:8,
478:11, 478:13,
478:17, 478:21,
478:25, 479:3,
479:5, 479:7,
479:10, 479:14,
479:18, 479:21,
479:25, 480:3,
480:7, 480:12,
480:16, 480:19,
480:23, 481:2,
481:6, 481:10,
481:13, 481:16,
481:18, 481:20,
481:22, 482:3,
482:7, 482:15,
482:20, 482:24,
483:2, 483:4, 483:7,
483:9, 483:13,
483:15, 483:21,
483:23, 484:2,
484:4, 484:6, 484:9,
484:12, 484:16,
484:21, 484:23,
487:22, 487:24,
488:7, 488:9,
488:20, 489:14,
489:16, 489:21,
490:5, 490:7,
490:10, 490:12,
490:18, 490:21,
490:24, 491:1,
491:3, 491:5, 491:9,
491:12, 492:2,
492:4, 492:7,
492:10, 492:13,
492:19, 493:4
**Court** [9] - 330:10,
366:10, 394:12,
395:4, 398:12,
422:11, 459:20,
461:7, 489:4
**court** [6] - 296:16,
317:15, 337:7,
394:10, 411:13,
474:20
**Court's** [4] - 300:18,
324:3, 374:20, 493:3
**courthouse** [2] -
411:13, 477:6
**COURTROOM** [34] -
291:3, 292:11,
301:17, 315:14,
316:13, 324:9,
324:16, 324:19,
327:21, 329:9,
338:10, 345:23,
347:2, 348:3,
367:20, 381:16,
381:19, 397:23,

410:14, 412:18,
412:20, 413:1,
422:25, 433:16,
435:7, 444:9,
444:11, 444:13,
446:1, 452:4, 460:7,
460:22, 476:6, 490:4
**courtroom** [15] -
318:4, 318:7, 318:8,
328:10, 328:19,
341:23, 386:10,
387:14, 402:3,
402:18, 421:21,
439:16, 447:22,
453:12, 474:5
**cousin** [6] - 412:8,
412:13, 413:5,
413:6, 413:16, 414:9
**cousins** [6] - 303:3,
303:4, 332:3, 332:4,
332:10, 332:20
**cover** [2] - 360:7,
360:12
**coverage** [10] - 334:7,
337:23, 359:22,
384:12, 429:22,
430:14, 442:7,
455:10, 468:2,
485:23
**covered** [2] - 340:2,
465:7
**covers** [2] - 437:9,
437:14
**COVID** [2] - 343:19,
399:23
**craft** [1] - 370:1
**crawled** [1] - 388:24
**crazy** [1] - 305:22
**create** [3] - 315:21,
346:5, 490:14
**creating** [1] - 301:25
**credence** [1] - 456:16
**credibility** [1] - 457:7
**credit** [2] - 355:9,
482:11
**crime** [8] - 321:7,
372:23, 427:6,
427:17, 466:4,
466:8, 482:18,
483:18
**crimes** [4] - 376:11,
376:24, 484:9,
484:14
**criminal** [32] - 303:10,
338:23, 349:23,
349:24, 350:1,
350:3, 350:8, 368:9,
382:7, 382:8, 382:9,
382:19, 423:13,
428:2, 434:6,

434:14, 436:7,
461:25, 462:20,
463:6, 466:23,
473:15, 478:2,
478:3, 478:4, 478:8,
483:10, 484:17,
488:13, 488:20,
488:21, 488:24
**criminally** [2] -
462:23, 463:2
**critical** [2] - 400:6,
403:7
**critically** [1] - 400:23
**crossed** [1] - 321:6
**crowd** [3] - 333:17,
357:22, 361:13
**crowds** [2] - 297:3,
369:12
**curfew** [1] - 343:6
**curfews** [1] - 343:3
**curly** [1] - 371:4
**curriculum** [1] -
426:18
**cycle** [3] - 429:17,
430:7, 436:18

# D

**D.C** [36] - 297:6,
304:4, 306:1,
310:22, 314:13,
332:6, 332:8,
339:12, 352:19,
356:13, 363:1,
363:25, 372:25,
373:1, 379:3, 382:6,
382:17, 394:7,
398:10, 441:13,
454:21, 461:7,
462:16, 468:11,
468:20, 476:17,
476:20, 481:10,
481:11, 481:18,
482:4, 482:5, 489:4,
489:5, 489:6
**D.C.-based** [1] -
340:19
**dad** [3] - 426:9,
426:22, 427:8
**daily** [3] - 369:3,
437:6, 437:14
**danger** [2] - 363:24,
455:4
**dangerous** [5] -
305:23, 344:24,
434:7, 435:4, 455:1
**data** [1] - 439:25
**date** [8] - 336:10,
340:17, 369:22,
410:25, 411:5,

416:16, 416:21,
464:7
**daughters** [1] - 329:21
**day-to-day** [2] -
311:25, 369:5
**days** [7] - 346:5,
363:12, 445:2,
476:24, 477:1,
477:2, 490:14
**DEA** [2] - 434:13,
434:19
**deal** [2] - 340:25,
484:14
**dealing** [2] - 326:1,
385:16
**dealings** [2] - 324:24,
466:21
**dear** [3] - 413:5,
413:25, 414:8
**decent** [1] - 308:6
**decide** [8] - 340:22,
364:14, 365:4,
396:2, 419:12,
419:15, 489:2
**decided** [2] - 340:23,
441:10
**deciding** [4] - 299:14,
335:22, 336:22,
408:1
**decision** [5] - 309:6,
318:7, 382:8,
419:20, 458:18
**decisions** [3] - 408:2,
414:16, 453:18
**declined** [1] - 325:5
**dedicated** [1] - 426:3
**deemed** [1] - 460:3
**deep** [1] - 425:20
**deeply** [1] - 344:8
**defend** [2] - 383:7,
455:9
**defendant** [21] -
295:8, 317:14,
326:11, 327:19,
328:16, 336:19,
337:3, 337:7, 338:2,
338:5, 365:8, 370:7,
381:14, 396:1,
396:3, 397:10,
420:16, 421:5,
421:15, 439:12,
473:2
**defendant's** [2] -
367:13, 387:13
**defended** [1] - 385:24
**defender** [2] - 324:24,
348:11
**Defender's** [1] - 434:1
**Defense** [1] - 451:17
**defense** [4] - 386:17,

389:6, 390:14,
451:11
**defer** [1] - 422:11
**definitely** [7] - 343:11,
345:9, 369:11,
383:3, 386:22,
426:24, 453:13
**degree** [1] - 365:24
**deliberate** [1] - 310:4
**deliberation** [1] -
364:15
**demeanor** [2] -
300:11, 414:19
**democratic** [1] - 454:6
**demonstration** [1] -
468:20
**demonstrations** [1] -
469:2
**denied** [1] - 492:19
**deny** [1] - 338:3
**Department** [16] -
348:17, 348:19,
349:7, 349:10,
350:14, 350:18,
350:24, 354:19,
434:5, 434:6, 435:5,
451:17, 485:9,
485:10, 485:19,
485:20
**department** [3] -
403:3, 451:19,
466:22
**departments** [2] -
428:17, 485:14
**deployment** [1] -
409:17
**depth** [1] - 370:5
**DEPUTY** [34] - 291:3,
292:11, 301:17,
315:14, 316:13,
324:9, 324:16,
324:19, 327:21,
329:9, 338:10,
345:23, 347:2,
348:3, 367:20,
381:16, 381:19,
397:23, 410:14,
412:18, 412:20,
413:1, 422:25,
433:16, 435:7,
444:9, 444:11,
444:13, 446:1,
452:4, 460:7,
460:22, 476:6, 490:4
**describe** [3] - 399:12,
425:10, 429:12
**described** [9] -
313:17, 342:19,
361:9, 363:15,
389:17, 406:9,

419:7, 421:19, 440:13

**descriptions** [1] - 448:5

**deserves** [1] - 453:21

**desired** [2] - 467:2, 471:10

**desk** [1] - 370:25

**desks** [1] - 370:17

**despite** [3] - 313:4, 337:5, 488:2

**details** [2] - 328:20, 371:7

**detective** [1] - 373:5

**detectives** [1] - 373:7

**determine** [1] - 458:11

**determined** [1] - 318:3

**determining** [1] - 398:9

**development** [1] - 371:19

**devil's** [1] - 431:8

**dictate** [1] - 372:18

**died** [2] - 297:5, 346:9

**difference** [1] - 488:19

**different** [42] - 300:1, 320:12, 322:3, 335:14, 350:2, 377:9, 377:19, 390:1, 390:2, 390:18, 390:23, 412:9, 420:24, 427:2, 446:19, 448:22, 448:23, 449:19, 449:20, 450:21, 450:22, 455:9, 455:11, 456:5, 461:15, 464:24, 467:1, 471:3, 482:6, 484:11, 488:12, 488:14

**differently** [3] - 355:9, 450:15, 472:12

**differs** [1] - 393:17

**difficult** [13] - 300:6, 320:5, 355:15, 355:23, 355:24, 356:1, 356:3, 356:8, 356:16, 367:11, 373:23, 374:10, 384:25

**difficulties** [1] - 374:24

**difficulty** [5] - 328:5, 374:14, 457:1, 459:10, 459:13

**dire** [2] - 315:8, 492:21

**direct** [4] - 352:3,

352:4, 352:6, 449:7

**directed** [3] - 449:2, 449:4

**direction** [2] - 314:24, 406:16

**directions** [3] - 301:14, 301:15, 314:25

**directly** [10] - 306:8, 313:19, 365:22, 365:25, 375:15, 393:18, 423:25, 428:23, 463:21, 463:23

**disability** [2] - 328:2, 411:20

**disabuse** [2] - 367:14, 397:12

**disagree** [2] - 300:5, 473:10

**disagreed** [2] - 433:2, 441:10

**disagrees** [1] - 456:23

**disappointed** [13] - 326:6, 326:8, 326:12, 326:13, 326:14, 327:18, 385:13, 386:16, 442:22, 468:24, 470:6, 486:16, 486:18

**disappointing** [1] - 385:23

**disappointment** [12] - 390:9, 390:13, 393:7, 393:12, 393:18, 393:20, 430:25, 448:17, 449:2, 449:7, 486:14, 486:15

**disaster** [2] - 400:13, 403:4

**disbelief** [1] - 363:17

**disclose** [1] - 327:5

**disclosed** [1] - 327:16

**discussed** [1] - 414:16

**dislikes** [1] - 456:24

**dismayed** [1] - 455:14

**disobedience** [1] - 468:23

**dispositive** [2] - 324:13, 489:24

**dispute** [2] - 338:4, 338:6

**disregard** [2] - 292:19, 408:20

**disregarding** [3] - 316:24, 325:23, 452:18

**disrespect** [1] - 473:21

**disrespectful** [10] - 469:14, 469:15, 469:21, 469:25, 471:21, 471:24, 472:5, 475:5, 475:10, 475:15

**disrupt** [1] - 369:2

**disruptive** [1] - 487:18

**distance** [2] - 311:4, 419:2

**distinct** [1] - 407:14

**distinguish** [3] - 375:14, 375:17, 375:20

**distinguishing** [2] - 328:6, 488:17

**distracting** [2] - 441:25

**district** [2] - 393:21, 435:16

**District** [4] - 325:10, 385:13, 385:14, 412:11

**disturbed** [3] - 310:14, 310:16, 389:19

**disturbing** [1] - 310:15

**dive** [1] - 425:20

**division** [4] - 348:21, 348:22, 349:1, 434:6

**documentaries** [12] - 304:20, 331:5, 341:11, 353:24, 383:24, 401:1, 401:4, 425:22, 437:19, 447:6, 465:13, 480:4

**dodge** [1] - 430:20

**dog** [1] - 339:16

**DOJ** [1] - 434:8

**domestic** [2] - 427:9, 427:11

**Donald** [1] - 449:8

**done** [14] - 349:23, 349:25, 380:13, 385:4, 385:5, 390:25, 395:6, 417:9, 436:7, 449:22, 453:11, 459:24, 488:22

**door** [2] - 328:18, 449:21

**doors** [1] - 334:21

**doubled** [1] - 410:5

**doubt** [2] - 315:5, 473:1

**down** [16] - 292:23, 297:18, 311:10,

341:8, 345:21, 347:8, 388:19, 408:17, 410:5, 436:21, 438:21, 441:3, 442:14, 452:20, 477:18, 489:5

**downstairs** [1] - 446:20

**drag** [2] - 424:10

**dramatic** [1] - 430:8

**draw** [3] - 331:12, 334:20, 361:18

**drawing** [1] - 371:1

**drawn** [1] - 319:1

**dream** [1] - 479:13

**dreams** [1] - 334:24

**dressed** [1] - 371:3

**driving** [2] - 382:12, 439:5

**drop** [1] - 464:17

**drove** [1] - 408:16

**drug** [2] - 434:7, 462:1

**drugs** [4] - 382:11, 382:12, 435:4

**due** [9] - 292:1, 296:13, 297:6, 298:17, 298:21, 298:22, 411:10, 411:17, 412:22

**during** [7] - 295:20, 318:20, 322:2, 365:5, 401:14, 429:23, 474:8

**duty** [4] - 318:14, 358:19, 456:25, 464:23

---

# E

**early** [4] - 320:11, 339:15, 400:8, 403:2

**easily** [2] - 347:16, 411:7

**Eastern** [1] - 352:13

**easy** [1] - 326:18

**eat** [1] - 310:16

**Education** [2] - 350:15, 350:19, 350:24

**education** [2] - 350:21

**eerie** [1] - 343:18

**effect** [1] - 318:14

**effective** [1] - 457:8

**effects** [1] - 302:8

**effort** [2] - 425:16, 426:3

**efforts** [1] - 469:12

**eight** [2] - 330:9, 368:18

**either** [25] - 297:14, 316:8, 330:13, 347:22, 352:15, 371:5, 373:13, 374:24, 374:25, 389:21, 398:16, 414:4, 430:20, 433:13, 433:24, 439:24, 442:6, 453:2, 458:13, 462:5, 463:15, 469:24, 477:10, 485:23

**elaborate** [1] - 442:23

**election** [16] - 317:12, 319:10, 319:13, 320:5, 320:10, 321:14, 322:15, 323:24, 336:16, 390:10, 390:19, 392:8, 433:6, 433:7, 454:6, 487:16

**elections** [3] - 317:5, 390:23

**electors** [3] - 389:15, 390:23, 390:25

**element** [1] - 369:8

**elements** [5] - 300:9, 338:7, 370:13, 372:5, 396:16

**Ellipse** [1] - 396:14

**elsewhere** [6] - 305:4, 332:7, 343:14, 382:24, 464:4, 481:20

**embarrassed** [1] - 465:10

**emergency** [1] - 374:8

**emotion** [1] - 417:7

**emotional** [7] - 313:16, 313:23, 326:19, 361:4, 366:19, 366:25, 468:7

**emotions** [11] - 305:24, 343:3, 389:17, 403:11, 404:13, 417:5, 422:15, 431:2, 442:17, 448:19, 448:20

**employed** [4] - 351:4, 369:24, 371:17, 376:7

**employee** [2] - 478:23, 485:5

**employment** [1] - 325:2

**en** [1] - 385:16

**encounter** [4] -

292:21, 317:1,
438:20, 452:19
**encountered** [1] -
467:1
**end** [5] - 297:12,
302:11, 431:24,
455:25, 459:12
**ended** [2] - 325:12,
461:12
**endoscopy** [1] -
347:12
**Energy** [2] - 434:5,
435:5
**energy** [1] - 428:15
**enforcement** [16] -
332:2, 332:19,
332:21, 332:22,
354:16, 355:6,
355:9, 371:14,
388:5, 412:7, 414:7,
415:24, 417:9,
426:8, 481:4, 482:9
**enforcement-type** [1]
- 355:6
**engage** [4] - 357:15,
375:6, 380:6, 387:2
**engaged** [19] - 293:25,
294:1, 294:2, 313:2,
313:20, 321:5,
326:1, 337:4,
357:15, 375:6,
386:3, 387:1,
401:22, 401:24,
421:16, 439:12,
473:23, 473:25
**entailed** [1] - 341:19
**entered** [5] - 408:13,
409:2, 409:3, 409:6,
472:2
**entering** [4] - 375:9,
375:10, 416:9,
474:14
**enters** [26] - 291:2,
292:10, 301:19,
315:13, 316:12,
324:15, 327:20,
329:8, 338:9,
345:22, 347:1,
348:2, 367:19,
381:18, 397:22,
410:13, 412:25,
422:24, 433:15,
435:6, 444:12,
445:25, 452:3,
460:21, 476:5, 490:3
**entire** [3] - 330:22,
330:24, 455:15
**entitled** [1] - 457:24
**entry** [1] - 475:7
**Epoch** [1] - 295:25

**Epps** [4] - 294:19,
295:2, 295:7, 299:3
**equal** [1] - 297:20
**equally** [1] - 332:24
**equivocal** [3] -
396:18, 397:13,
422:14
**escalated** [3] - 442:15,
442:24, 468:25
**especially** [4] -
340:18, 353:9,
442:17, 456:12
**essentially** [2] -
294:11, 396:15
**ethically** [2] - 492:8,
492:11
**evacuate** [1] - 445:13
**evacuated** [2] -
291:24, 292:1
**evening** [1] - 424:11
**evenings** [1] - 438:2
**event** [14] - 296:9,
310:15, 312:8,
340:16, 340:23,
341:2, 378:12,
391:3, 436:19,
448:21, 453:10,
455:19, 457:23
**events** [51] - 293:6,
293:13, 295:12,
295:17, 295:18,
303:14, 303:22,
303:23, 304:14,
307:7, 309:3,
309:11, 310:9,
311:22, 314:2,
330:18, 337:6,
339:9, 339:14,
340:3, 343:24,
353:2, 355:14,
365:21, 366:19,
369:18, 369:22,
370:6, 371:8,
373:22, 374:4,
379:9, 381:4,
384:24, 387:10,
391:14, 396:20,
400:1, 400:12,
410:2, 419:7,
424:14, 430:1,
436:10, 448:14,
454:12, 455:2,
456:6, 463:22,
471:21, 478:15
**eventually** [1] - 340:23
**everywhere** [1] -
352:10
**evidence** [64] -
293:18, 293:19,
294:4, 294:15,

295:2, 295:6, 299:3,
299:4, 309:7,
309:22, 316:23,
317:15, 320:25,
321:4, 321:8,
325:21, 327:16,
328:23, 335:14,
335:23, 336:18,
336:21, 337:2,
337:7, 357:3,
357:18, 357:19,
364:16, 367:14,
372:14, 374:1,
374:3, 374:18,
374:19, 374:25,
378:4, 387:14,
387:19, 393:15,
396:1, 397:11,
402:14, 408:3,
414:20, 415:16,
419:13, 420:16,
421:21, 421:23,
421:25, 422:2,
422:13, 447:22,
450:14, 452:9,
452:16, 453:13,
473:24, 486:23,
488:5
**evolve** [1] - 318:21
**ex** [2] - 330:23, 333:11
**ex-President** [2] -
330:23, 333:11
**exact** [1] - 480:15
**exactly** [12] - 294:22,
331:14, 351:12,
361:21, 363:9,
373:17, 394:4,
398:25, 426:16,
438:24, 454:20,
457:14
**exaggerating** [1] -
394:6
**example** [8] - 293:17,
300:3, 328:16,
360:21, 377:1,
384:15, 449:2, 480:3
**exclude** [2] - 300:13,
300:17
**exclusively** [2] -
393:14, 408:3
**excuse** [7] - 327:8,
346:23, 412:1,
415:12, 421:3,
434:21, 487:9
**excused** [8] - 299:19,
346:18, 434:24,
445:20, 458:23,
459:3, 491:9, 493:4
**excusing** [8] - 316:5,
328:23, 346:14,

347:20, 445:17,
491:6
**executive** [2] - 390:4,
485:8
**existed** [1] - 407:20
**expect** [5] - 310:2,
335:21, 364:13,
407:25, 419:11
**expected** [2] - 403:6,
457:5
**experience** [16] -
330:13, 337:19,
351:7, 351:13,
351:15, 355:22,
365:21, 388:10,
398:15, 438:9,
440:10, 444:6,
445:18, 468:2,
470:24, 492:18
**experienced** [4] -
302:9, 379:6,
441:15, 483:21
**experiences** [11] -
339:24, 340:1,
356:2, 373:12,
381:4, 382:19,
438:12, 462:6,
477:10, 484:13,
484:17
**explain** [6] - 303:19,
305:22, 310:20,
334:18, 418:4,
420:14
**exposed** [3] - 341:21,
464:6, 465:8
**exposure** [5] - 309:3,
337:22, 372:1,
474:2, 484:9
**expound** [1] - 315:7
**express** [1] - 390:12
**expressed** [6] -
313:25, 315:1,
358:25, 393:7,
407:2, 410:2
**extended** [1] - 311:12
**extending** [1] - 444:5
**extent** [3] - 372:3,
446:25, 489:24
**extra** [1] - 378:25
**extremely** [2] - 306:6,
368:23
**extremist** [4] - 356:23,
360:22, 366:4,
402:15
**eyes** [3] - 410:23,
415:5, 415:7
**eyewitness** [2] -
296:4, 297:2

**F**

**Facebook** [1] - 372:15
**faced** [1] - 444:4
**facial** [1] - 377:1
**facility** [1] - 297:6
**facing** [1] - 350:22
**fact** [11] - 294:17,
300:12, 313:25,
314:11, 314:23,
365:25, 454:21,
454:24, 473:24,
475:14, 486:9
**facts** [27] - 299:11,
299:13, 299:14,
315:3, 318:4, 318:8,
323:10, 341:22,
355:18, 355:19,
364:14, 364:15,
364:16, 365:5,
386:9, 386:12,
386:21, 393:14,
402:2, 402:17,
419:12, 419:15,
420:1, 439:16,
456:21, 474:4,
474:20
**fair** [20] - 293:10,
298:18, 301:6,
323:9, 338:2, 361:6,
365:7, 375:19,
377:17, 378:10,
392:10, 397:5,
405:17, 406:11,
430:9, 431:18,
442:3, 471:11,
477:12
**fairly** [21] - 293:10,
294:5, 294:9, 295:3,
295:9, 297:20,
313:4, 317:14,
320:6, 341:22,
355:16, 373:24,
382:20, 385:1,
399:19, 400:14,
402:2, 402:17,
433:7, 466:24,
484:19
**fairness** [3] - 297:19,
323:12, 324:1
**fall** [1] - 468:22
**families** [1] - 472:15
**family** [38] - 302:14,
302:25, 303:3,
332:1, 332:13,
338:16, 339:1,
344:9, 349:16,
354:15, 359:7,
368:2, 371:13,
372:21, 378:13,

398:22, 403:21, 407:4, 410:10, 412:6, 415:23, 423:7, 426:7, 427:4, 427:16, 435:25, 442:19, 462:12, 462:22, 463:3, 466:2, 477:16, 477:19, 477:23, 481:3, 481:8, 482:17, 483:17

**far** [10] - 334:4, 343:10, 380:13, 386:19, 399:1, 400:25, 424:2, 453:12, 460:3, 491:19

**fast** [1] - 347:13

**father** [1] - 339:3

**father-in-law** [1] - 339:3

**fatigued** [1] - 314:12

**FBI** [9] - 369:24, 370:1, 371:18, 371:23, 376:8, 376:10, 379:16, 381:11, 426:11

**fear** [13] - 343:5, 343:21, 344:1, 344:5, 344:12, 364:2, 364:4, 410:9, 430:17, 430:19, 438:14, 442:19, 486:11

**fearful** [1] - 389:9

**fears** [1] - 369:13

**February** [1] - 340:4

**Federal** [1] - 434:1

**federal** [14] - 324:24, 339:5, 348:11, 388:6, 409:17, 428:20, 451:13, 451:14, 477:4, 477:5, 478:22, 478:23, 485:5, 485:15

**feelings** [49] - 309:16, 309:21, 310:8, 312:25, 314:6, 318:12, 320:4, 323:5, 323:23, 324:5, 343:21, 344:1, 349:7, 355:14, 358:4, 359:13, 363:15, 373:21, 384:23, 385:3, 385:5, 385:11, 390:18, 392:24, 393:19, 404:9, 430:13,

430:22, 439:19, 439:24, 439:25, 448:10, 448:15, 448:16, 453:15, 453:16, 455:4, 455:5, 455:17, 455:18, 456:14, 457:18, 468:18, 470:3, 471:4, 479:15, 486:2, 486:8

**feet** [1] - 370:25

**felony** [2] - 395:4, 395:5

**felt** [35] - 305:25, 306:3, 309:11, 339:20, 340:18, 340:19, 340:23, 343:5, 343:11, 352:6, 356:13, 356:14, 356:19, 356:20, 357:6, 357:8, 365:20, 389:8, 389:12, 389:20, 390:20, 391:19, 391:21, 391:22, 403:11, 407:14, 417:7, 417:8, 422:16, 430:20, 448:8, 468:13, 485:22

**fencing** [9] - 352:9, 352:14, 368:21, 369:2, 399:7, 406:11, 406:17, 407:15, 424:6

**fender** [1] - 435:17

**fender-bender** [1] - 435:17

**few** [13] - 293:6, 302:16, 302:17, 306:2, 367:7, 373:8, 376:6, 401:11, 404:25, 417:3, 448:3, 463:16, 481:11

**fiancé** [2] - 307:1, 311:2

**fiancé's** [1] - 303:2

**Fifth** [6] - 298:4, 300:14, 300:22, 301:4, 315:9, 463:15

**fight** [1] - 334:22

**fighting** [1] - 375:9

**figure** [2] - 324:13, 400:15

**filed** [1] - 372:18

**final** [1] - 300:19

**finance** [1] - 428:15

**financial** [2] - 427:1, 436:5

**fine** [2] - 376:3, 445:1

**finish** [3] - 306:23, 314:18, 426:5

**firing** [1] - 297:3

**First** [2] - 437:10, 437:11

**first** [14] - 295:19, 301:12, 332:4, 332:10, 342:5, 346:3, 353:11, 388:2, 401:11, 404:25, 407:2, 410:19, 446:7, 477:23

**FISH** [362] - 292:7, 298:8, 298:11, 298:14, 298:21, 299:2, 299:10, 299:18, 299:25, 300:18, 300:23, 301:1, 305:12, 305:14, 305:20, 305:24, 306:7, 306:10, 306:13, 306:18, 306:22, 307:4, 307:7, 307:12, 307:17, 307:23, 308:1, 308:6, 308:9, 308:12, 308:14, 312:2, 312:6, 312:13, 312:16, 313:14, 316:5, 320:17, 320:20, 321:13, 321:18, 321:20, 321:23, 321:25, 322:8, 324:2, 324:14, 327:8, 327:14, 328:22, 333:2, 333:4, 333:9, 333:11, 333:15, 333:23, 334:1, 334:6, 334:10, 334:13, 334:18, 334:25, 335:4, 335:7, 335:11, 335:15, 337:13, 342:1, 342:3, 342:11, 342:15, 343:2, 343:16, 343:21, 343:24, 344:10, 345:1, 345:5, 345:10, 345:16, 346:14, 346:22, 347:20, 357:25, 358:2, 358:8, 358:13, 358:16, 358:19, 358:21, 358:23,

358:25, 359:3, 359:6, 359:10, 359:12, 359:15, 359:18, 359:21, 359:24, 360:1, 360:9, 360:12, 360:15, 360:20, 360:24, 361:5, 361:8, 361:12, 361:15, 361:18, 361:24, 362:3, 362:6, 362:9, 362:13, 365:15, 375:22, 375:25, 376:2, 376:4, 376:10, 376:13, 376:15, 376:17, 376:19, 376:22, 377:1, 377:5, 377:11, 377:16, 377:20, 377:23, 378:1, 378:3, 378:6, 378:9, 378:12, 378:15, 378:19, 378:22, 378:24, 379:2, 379:5, 379:9, 379:12, 379:15, 379:21, 380:1, 380:4, 380:6, 380:9, 380:12, 380:15, 380:18, 380:25, 387:23, 388:5, 388:8, 388:12, 388:15, 389:2, 389:9, 389:16, 390:6, 390:12, 391:4, 391:7, 391:12, 391:15, 391:24, 392:2, 392:5, 392:9, 392:21, 393:3, 396:10, 397:19, 402:21, 403:3, 403:6, 403:10, 403:18, 403:23, 403:25, 404:3, 404:7, 404:9, 404:12, 404:15, 404:18, 404:23, 405:2, 405:6, 405:9, 405:14, 405:17, 405:20, 405:25, 406:2, 406:8, 406:11, 406:15, 406:19, 406:22, 409:20, 409:24, 414:23, 414:25, 415:6, 415:9, 415:11, 415:13, 415:16, 415:19, 415:22, 416:2,

416:5, 416:12, 416:14, 416:16, 416:20, 416:25, 417:5, 417:11, 417:13, 417:17, 417:22, 418:1, 418:4, 418:11, 418:14, 422:9, 428:6, 428:8, 428:16, 428:21, 429:1, 429:4, 429:7, 429:10, 429:19, 429:22, 430:2, 430:9, 430:13, 430:17, 430:22, 431:1, 431:4, 431:10, 431:18, 432:1, 433:12, 434:21, 440:5, 440:7, 440:13, 440:18, 440:21, 440:23, 441:2, 441:12, 441:15, 441:18, 441:22, 442:2, 442:5, 442:10, 442:16, 442:20, 442:23, 442:25, 443:3, 443:7, 443:12, 443:18, 443:22, 444:3, 445:16, 447:25, 448:3, 448:14, 449:1, 449:12, 449:16, 450:3, 450:10, 450:14, 450:18, 450:20, 451:4, 451:8, 451:10, 451:13, 451:17, 451:19, 451:21, 451:25, 458:25, 459:16, 460:13, 467:4, 467:7, 467:11, 467:16, 467:18, 467:23, 468:1, 468:7, 468:10, 468:16, 469:13, 469:20, 469:24, 470:2, 470:11, 470:18, 470:23, 471:1, 471:11, 474:24, 475:1, 475:14, 475:19, 476:3, 484:24, 485:1, 485:7, 485:10, 485:13, 485:18, 485:21, 486:2, 486:6, 486:11, 486:13, 486:16, 486:19, 486:21,

486:25, 487:4,
487:6, 487:10,
487:13, 487:17,
487:21, 488:8,
488:10, 488:16,
488:23, 489:3,
489:6, 489:10,
489:13, 489:19,
490:1, 491:8, 492:8,
492:11, 492:15,
493:1

**fish** [17] - 305:11,
320:16, 324:7,
333:1, 341:25,
357:24, 375:21,
387:22, 402:20,
414:22, 428:5,
440:4, 447:24,
467:3, 476:2,
484:23, 492:7

**Fish** [15] - 298:15,
305:14, 320:20,
333:4, 342:3, 358:2,
376:4, 387:25,
402:22, 414:25,
428:8, 440:8, 448:1,
467:7, 485:2

**five** [8] - 291:18,
347:18, 394:14,
394:16, 426:24,
441:14, 459:7,
460:18

**five-day** [1] - 347:18

**five-minute** [2] -
459:7, 460:18

**flags** [1] - 319:18

**flying** [1] - 374:8

**focus** [4] - 342:9,
342:13, 371:19,
420:1

**focused** [1] - 426:17

**focuses** [1] - 342:12

**focusing** [1] - 394:19

**folks** [9] - 291:23,
319:22, 339:25,
352:1, 408:21,
438:10, 467:14,
481:23, 491:20

**follow** [54] - 292:19,
293:2, 298:18,
298:24, 301:14,
305:16, 312:1,
312:17, 314:24,
320:22, 321:9,
322:4, 322:6, 324:3,
333:6, 342:5,
353:18, 358:4,
359:15, 359:21,
360:20, 362:20,
374:20, 376:6,

381:2, 385:19,
386:23, 388:2,
388:8, 391:15,
392:19, 402:23,
406:25, 409:19,
415:2, 415:22,
416:20, 419:5,
428:10, 432:8,
440:9, 446:25,
448:3, 451:10,
456:21, 456:22,
456:25, 467:8,
471:16, 473:20,
474:23, 475:22,
485:4, 485:21

**follow-up** [8] - 312:1,
312:17, 409:19,
448:3, 451:10,
473:20, 474:23,
475:22

**followed** [26] - 295:12,
295:16, 295:17,
295:18, 295:25,
296:4, 296:25,
303:15, 304:14,
311:11, 331:1,
342:18, 383:18,
400:1, 400:17,
404:20, 424:14,
426:4, 436:10,
437:5, 446:24,
454:14, 465:9,
480:1, 485:24

**following** [27] - 293:4,
296:5, 297:11,
300:6, 301:15,
314:25, 322:1,
328:12, 339:9,
339:21, 353:2,
353:12, 353:19,
369:18, 373:8,
384:13, 387:10,
390:10, 400:25,
404:20, 405:10,
454:12, 457:1,
458:7, 459:13,
475:1, 478:14

**fondly** [3] - 376:17,
376:19

**foot** [1] - 300:7

**footage** [3] - 370:6,
456:12, 471:20

**foreign** [1] - 342:12

**forfeit** [3] - 459:24,
492:9, 492:11

**forfeiting** [1] - 491:22

**forfeiture** [1] - 460:14

**forget** [5] - 324:4,
334:23, 335:1,
371:1, 384:3

**forgot** [2] - 350:10,
488:10

**form** [1] - 425:19

**formally** [1] - 385:14

**former** [3] - 333:12,
388:16, 470:9

**fought** [1] - 474:16

**Foundation** [1] -
428:24

**four** [10] - 299:5,
299:8, 301:24,
315:20, 346:4,
368:19, 389:22,
398:8, 410:20,
490:13

**fragments** [1] - 401:12

**framed** [1] - 487:16

**Francesco** [8] -
322:12, 335:18,
362:18, 393:5,
406:24, 418:18,
432:6, 471:15

**fraud** [1] - 349:25

**freedom** [1] - 468:19

**frequently** [1] - 374:6

**Friday** [5] - 346:10,
346:21, 347:9,
347:12, 347:25

**friend** [17] - 302:15,
338:16, 354:15,
354:18, 368:2,
372:22, 413:5,
413:25, 414:9,
423:8, 426:7,
427:16, 436:1,
462:13, 477:16,
482:17, 490:25

**friends** [23] - 299:12,
332:1, 339:2,
349:16, 352:8,
355:2, 355:3, 362:4,
371:14, 412:7,
415:24, 427:5,
465:6, 466:3, 478:6,
481:4, 481:8, 482:1,
482:2, 482:3,
482:10, 483:17

**frightening** [1] -
365:20

**front** [6] - 328:18,
355:20, 356:1,
360:5, 418:22,
428:18

**frustrated** [5] -
431:21, 431:22,
432:13, 432:24,
433:1

**frustration** [3] - 433:4,
448:17, 449:1

**fuller** [1] - 453:13

**funeral** [1] - 346:10

**future** [1] - 396:23

# G

**gained** [2] - 318:6,
381:12

**gathered** [1] - 372:14

**gathering** [1] - 344:13

**gatherings** [2] -
332:14, 379:3

**geared** [1] - 456:9

**general** [15] - 293:3,
300:18, 350:12,
353:19, 355:5,
364:2, 372:6, 431:4,
432:18, 443:8,
446:7, 456:13,
464:12, 465:21,
470:17

**generalize** [1] - 472:9

**generally** [10] -
351:14, 359:9,
376:20, 376:21,
377:3, 380:8,
438:18, 464:6,
465:20, 470:5

**gentleman** [1] -
294:19

**gentlemen** [1] -
461:13

**geographically** [1] -
423:25

**Georgetown** -
400:10, 400:22

**girl** [1] - 423:17

**given** [9] - 293:6,
296:14, 328:23,
341:20, 355:23,
374:18, 453:7,
454:21, 459:14

**glass** [1] - 415:13

**glasses** [1] - 415:11

**globalizing** [1] -
344:25

**gloss** [1] - 344:20

**glued** [2] - 340:14,
400:14

**goals** [1] - 457:20

**God** [2] - 299:17,
489:8

**government** [39] -
316:7, 319:23,
323:10, 323:20,
328:25, 335:18,
337:21, 345:11,
345:18, 362:19,
366:12, 380:19,
381:5, 386:16,
388:6, 389:12,

390:3, 390:14,
397:1, 397:10,
410:7, 422:20,
427:2, 428:16,
428:17, 428:22,
428:25, 433:13,
443:23, 444:7,
449:4, 451:13,
451:15, 455:12,
472:25, 478:23,
485:15, 489:20,
491:25

**governmental** [1] -
469:7

**governor** [2] - 385:15,
393:20

**grand** [7] - 329:22,
476:17, 476:21,
476:23, 477:4,
477:11, 488:12

**grandfather** [1] -
346:9

**grandparents** [1] -
344:6

**grant** [2] - 367:2,
397:7

**grants** [1] - 342:9

**graphic** [1] - 449:25

**grass** [1] - 409:12

**gray** [1] - 343:20

**great** [4] - 448:2,
451:23, 471:8,
485:13

**greater** [1] - 297:14

**greatly** [1] - 385:23

**grew** [1] - 352:19

**ground** [1] - 441:11

**grounds** [1] - 408:19

**Grounds** [1] - 409:4

**group** [11] - 328:8,
361:13, 372:25,
373:1, 402:11,
402:15, 409:1,
409:8, 449:5,
449:14, 472:4

**groups** [8] - 356:23,
360:22, 361:6,
366:4, 427:2,
431:14, 441:8

**guarantee** [1] - 328:9

**Guard** [5] - 385:15,
386:8, 393:22,
393:23, 397:4

**Guard's** [1] - 381:11

**guess** [1] - 312:24,
329:5, 357:3, 360:7,
399:5, 401:15,
429:14, 430:15,
448:8, 475:3, 492:16

**guessing** [2] - 321:14,

506

361:5
**guidance** [1] - 373:7
**guilt** [2] - 337:18, 374:12
**guilty** [8] - 299:15, 374:15, 378:7, 395:9, 395:10, 395:11, 473:2
**gun** [4] - 395:5, 395:7, 461:16
**gunpoint** [1] - 373:1
**guns** [2] - 334:21, 381:11
**gut** [3] - 357:5, 357:8, 366:1
**guys** [1] - 362:25

### H

**hair** [1] - 371:4
**half** [3] - 352:18, 358:12, 363:4
**halls** [1] - 339:25
**hand** [3] - 457:3, 468:19, 469:10
**handful** [11] - 304:19, 331:4, 341:10, 353:23, 383:23, 401:1, 425:21, 437:18, 447:5, 465:12, 480:4
**Hank** [1] - 351:15
**happy** [3] - 448:17, 454:1, 454:2
**harassment** [1] - 444:4
**harbors** [2] - 314:1, 315:6
**hard** [22] - 302:4, 306:21, 310:20, 349:6, 352:3, 353:9, 357:9, 360:17, 360:18, 371:1, 384:12, 416:8, 426:22, 448:19, 454:20, 469:9, 472:7, 472:9, 472:19, 479:18, 479:19, 479:24
**hardship** [1] - 422:11
**hate** [1] - 470:15
**haze** [1] - 353:10
**head** [6] - 399:24, 413:22, 449:21, 449:24, 457:15, 466:6
**headaches** [1] - 344:7
**heading** [2] - 316:3, 333:18
**headline** [1] - 425:19

**headlines** [1] - 425:17
**healthcare** [1] - 428:15
**hear** [22] - 307:13, 328:20, 335:23, 336:21, 364:9, 379:6, 384:16, 386:11, 392:13, 393:1, 396:3, 405:3, 405:6, 408:3, 410:22, 412:17, 415:3, 415:4, 419:19, 419:23, 441:12, 485:25
**heard** [28] - 294:18, 296:16, 296:20, 297:1, 297:9, 297:21, 297:24, 299:11, 305:4, 315:2, 315:3, 327:17, 341:18, 342:19, 342:21, 342:25, 382:23, 384:15, 388:12, 390:12, 394:4, 416:2, 429:13, 436:17, 446:15, 448:6, 450:4
**hearing** [19] - 293:17, 306:23, 327:15, 328:4, 328:5, 328:7, 353:14, 353:20, 357:3, 357:18, 360:5, 391:20, 401:14, 405:14, 453:12, 458:4, 464:3, 479:24
**hearings** [27] - 304:24, 331:9, 341:16, 354:4, 354:6, 359:22, 384:6, 401:6, 401:14, 404:21, 405:7, 405:10, 425:25, 437:23, 438:6, 442:7, 447:10, 447:11, 447:13, 465:16, 480:9, 480:10, 480:20, 485:24, 486:22
**heartbreaking** [4] - 417:10, 417:11, 417:21, 421:20
**heightened** [1] - 424:22
**held** [3] - 341:16, 354:4, 357:12
**helicopters** [1] - 374:7
**help** [8] - 299:17, 367:23, 377:17,

386:15, 412:3, 412:4, 415:15, 434:15
**helping** [1] - 295:23
**herself** [1] - 301:5
**HHS** [2] - 398:24, 399:17
**hi** [2] - 362:17, 432:3
**hiding** [1] - 360:7
**high** [5] - 372:5, 376:25, 453:1, 454:22, 473:8
**high-level** [1] - 372:5
**high-profile** [1] - 453:1
**highest** [1] - 390:2
**highly** [1] - 453:8
**Hill** [19] - 308:20, 326:20, 343:12, 350:16, 350:17, 350:25, 351:25, 352:5, 356:9, 362:21, 362:22, 363:8, 367:5, 368:18, 398:23, 398:25, 403:22, 407:5, 423:24
**history** [1] - 326:2
**hold** [3] - 449:8, 449:9, 459:6
**holding** [2] - 353:7, 356:6
**holidays** [1] - 341:7
**Holocaust** [1] - 344:7
**home** [40] - 291:21, 304:1, 304:9, 306:2, 307:10, 310:22, 311:1, 311:2, 326:6, 326:9, 326:10, 326:11, 340:10, 340:12, 343:7, 351:3, 353:6, 383:12, 389:11, 399:22, 403:23, 404:3, 404:6, 424:24, 436:17, 440:11, 441:6, 441:23, 446:12, 446:19, 463:19, 463:20, 464:14, 464:16, 467:21, 467:22, 479:1, 479:5, 490:22
**Homeland** [2] - 354:19, 355:5
**homes** [1] - 439:3
**honest** [10] - 296:24, 369:4, 369:10, 373:16, 392:25, 419:22, 420:4,

454:20, 461:11, 479:12
**honestly** [6] - 357:11, 385:8, 387:21, 455:15, 458:3, 458:8
**honeymoon** [2] - 444:23, 445:22
**Honor** [59] - 292:6, 292:7, 298:6, 298:8, 299:25, 300:23, 301:1, 301:9, 313:14, 313:24, 316:5, 323:20, 324:2, 324:14, 327:8, 327:14, 328:22, 337:13, 337:21, 345:11, 345:16, 345:19, 346:14, 346:16, 346:23, 347:21, 365:15, 366:12, 380:25, 396:10, 397:1, 397:19, 409:20, 409:21, 409:24, 410:3, 422:9, 422:20, 433:19, 434:21, 434:25, 444:3, 445:16, 458:25, 459:14, 459:16, 460:13, 460:16, 475:23, 476:3, 476:4, 479:22, 488:8, 489:19, 491:8, 491:21, 492:6, 493:1, 493:2
**Honor's** [2] - 301:13, 313:19
**hope** [3] - 347:25, 396:18, 422:5
**hoped** [1] - 422:17
**hopefully** [1] - 302:19
**horrific** [1] - 379:7
**hospital** [8] - 400:8, 400:9, 400:20, 402:25, 403:1, 403:2, 410:11
**host** [2] - 340:16, 340:22
**Hotel** [1] - 326:23
**hours** [2] - 398:8, 412:1
**House** [15] - 291:12, 291:17, 304:23, 341:14, 350:13, 354:2, 384:5, 401:5, 418:6, 418:7, 425:24, 437:21, 447:9, 465:15, 480:8
**house** [7] - 352:8,

454:20, 461:11, 479:12
**honestly** ...
352:20, 368:22, 374:9, 483:20, 483:25, 484:11
**households** [1] - 464:21
**Hubert** [1] - 398:23
**Humphrey** [1] - 398:23
**hundred** [2] - 306:16, 351:19
**hurt** [4] - 306:1, 309:11, 310:8, 472:16
**hurting** [1] - 419:22
**husband** [15] - 325:5, 349:20, 349:21, 350:10, 352:24, 356:8, 362:22, 363:1, 363:4, 363:8, 363:23, 366:16, 367:5, 445:4, 445:8
**husband's** [5] - 358:6, 362:21, 365:22, 366:15, 445:17

### I

**ID** [2] - 372:16, 373:8
**ID'd** [1] - 373:6
**idea** [25] - 306:14, 306:18, 308:7, 308:9, 310:15, 310:18, 335:4, 335:7, 336:9, 336:13, 345:2, 345:5, 361:25, 362:9, 379:18, 379:21, 405:11, 405:20, 417:17, 417:22, 431:5, 443:8, 443:13, 450:12, 486:25
**ideas** [6] - 292:20, 316:25, 318:6, 325:23, 367:12, 452:18
**identified** [1] - 319:18
**identify** [2] - 370:2, 372:14
**identity** [1] - 396:22
**IDs** [1] - 374:3
**ignore** [1] - 456:23
**illegally** [2] - 408:19, 409:12
**illegitimate** [1] - 320:10
**image** [5] - 344:3, 344:5, 344:7, 344:11, 361:19
**images** [22] - 305:18,

334:10, 334:14, 335:1, 359:24, 374:18, 388:18, 418:22, 421:14, 421:19, 430:23, 430:24, 442:10, 442:16, 447:15, 447:20, 448:4, 449:25, 453:15, 468:4, 474:2, 488:3
**imagine** [1] - 420:15
**immediate** [11] - 332:1, 371:13, 372:21, 412:6, 423:7, 427:4, 427:15, 435:25, 462:12, 466:2, 482:17
**immediately** [1] - 483:17
**impact** [17] - 307:7, 313:17, 330:14, 373:13, 398:16, 399:8, 399:18, 410:1, 428:2, 435:21, 462:6, 463:6, 466:22, 466:23, 477:11, 483:10, 484:18
**impacted** [7] - 307:20, 310:24, 314:15, 365:23, 365:25, 463:21, 468:13
**impaired** [1] - 415:9
**impairment** [2] - 328:5, 415:14
**impartial** [8] - 315:5, 355:19, 364:7, 365:8, 366:11, 374:11, 397:6, 410:6
**impartiality** [1] - 324:1
**impartially** [1] - 396:25
**implications** [2] - 401:19, 403:16
**important** [3] - 344:19, 389:7, 389:15
**importantly** [1] - 366:5
**impression** [1] - 401:16
**impressions** [4] - 400:5, 401:13, 401:25, 402:24
**in-depth** [1] - 370:5
**inability** [1] - 397:5
**inappropriate** [1] - 327:2
**inauguration** [2] - 388:21, 388:24

**incident** [1] - 334:17
**incidental** [1] - 334:7
**incidents** [2] - 393:19, 395:18
**incite** [2] - 375:12, 380:4
**inciting** [1] - 373:18
**include** [5] - 312:21, 312:22, 321:4, 409:2, 409:8
**including** [3] - 303:16, 343:3, 489:23
**inconvenience** [5] - 369:6, 399:13, 399:14, 406:9, 422:11
**Independence** [1] - 399:4
**Indiana** [1] - 339:7
**indicate** [1] - 396:13
**indicated** [19] - 298:17, 312:3, 313:21, 314:24, 322:14, 337:15, 337:23, 342:11, 356:22, 359:6, 364:5, 371:25, 376:7, 388:2, 392:17, 402:25, 441:22, 444:21, 445:3
**indicating** [1] - 458:21
**indication** [3] - 315:1, 375:11, 459:13
**individual** [13] - 297:1, 342:22, 344:6, 344:22, 370:24, 371:4, 374:23, 421:7, 421:8, 451:1, 459:8, 464:24, 472:11
**individually** [1] - 453:24
**individuals** [39] - 296:19, 296:20, 296:21, 305:5, 318:17, 331:17, 331:18, 331:19, 370:2, 370:13, 370:16, 370:17, 370:22, 372:14, 372:19, 373:2, 373:6, 379:24, 382:24, 400:21, 402:7, 402:8, 404:16, 425:13, 425:14, 431:19, 431:21, 431:22, 446:8, 450:1, 454:4, 454:5, 462:24,

464:4, 464:6, 466:15, 471:20, 472:5
**industry** [3] - 436:5, 436:6, 439:24
**influence** [1] - 453:17
**information** [14] - 318:23, 324:4, 339:23, 354:21, 372:8, 377:9, 377:14, 392:14, 447:3, 450:17, 461:17, 471:5, 471:7, 474:7
**Infowars** [1] - 318:22
**infraction** [1] - 398:9
**inhibit** [2] - 352:15, 474:3
**initial** [1] - 373:8
**injured** [3] - 297:4, 400:21, 400:23
**injuries** [3] - 342:24, 403:6, 403:7
**injustice** [1] - 296:11
**inquire** [1] - 459:17
**inquiries** [1] - 350:23
**inside** [2] - 360:9, 381:12
**insider** [3] - 371:19, 371:22, 371:23
**insofar** [1] - 472:6
**Instagram** [1] - 372:15
**instance** [2] - 462:25, 463:7
**instances** [4] - 330:4, 394:23, 456:12, 462:22
**instead** [1] - 349:3
**institution** [1] - 456:10
**instruct** [8] - 310:2, 317:16, 335:22, 384:11, 408:1, 455:24, 456:22, 472:25
**instructed** [5] - 309:5, 385:4, 393:13, 396:2, 473:13
**instruction** [9] - 293:2, 297:12, 298:23, 298:25, 336:1, 384:13, 387:16, 458:5, 458:9
**instructions** [22] - 292:19, 293:4, 298:19, 299:7, 316:24, 321:9, 322:2, 322:4, 322:7, 324:3, 325:23, 332:17, 336:6, 374:20, 386:23,

392:20, 392:21, 452:11, 452:18, 457:2, 459:13, 475:7
**instructs** [1] - 473:6
**insults** [1] - 440:18
**intellectually** [1] - 367:9
**intelligence** [2] - 325:17, 325:18
**intend** [2] - 357:21, 459:20
**intended** [16] - 336:14, 337:16, 337:25, 357:15, 361:13, 361:20, 361:21, 375:6, 383:10, 387:2, 389:8, 395:21, 418:12, 443:15, 443:17
**intending** [2] - 366:5, 487:18
**intense** [1] - 353:22
**intensely** [1] - 331:3
**intent** [7] - 337:19, 387:8, 387:12, 387:13, 396:2, 396:15, 473:14
**intention** [2] - 336:20, 420:23
**intently** [1] - 331:12
**interact** [1] - 291:23
**interacting** [1] - 295:7
**interactions** [1] - 469:17
**interest** [3] - 400:18, 424:22, 455:6
**interfere** [2] - 393:22, 422:12
**interference** [4] - 411:10, 411:17, 412:16, 412:22
**intermittently** [1] - 383:15
**internet** [1] - 370:8
**interrupt** [1] - 391:6
**interruption** [1] - 413:2
**introduced** [2] - 298:14, 328:16
**introductions** [1] - 485:3
**invalid** [1] - 321:15
**investigate** [3] - 376:24, 377:2, 379:17
**investigated** [2] - 465:16, 480:8
**investigating** [6] - 304:23, 354:3, 376:11, 425:25,

437:22, 447:9
**investigation** [4] - 341:15, 372:1, 377:19, 377:21
**investigations** [5] - 369:23, 370:4, 377:17, 380:13, 381:12
**investigative** [4] - 369:25, 372:7, 376:23, 381:7
**invite** [1] - 340:19
**invoke** [1] - 360:15
**invoked** [1] - 315:9
**involve** [6] - 299:6, 321:1, 382:10, 395:24, 428:21, 447:19
**involved** [20] - 295:21, 295:23, 301:7, 319:5, 319:7, 334:24, 344:19, 375:15, 386:12, 390:20, 410:3, 413:14, 427:10, 449:9, 449:11, 449:13, 449:20, 455:5, 462:20, 471:22
**involvement** [1] - 470:9
**involving** [3] - 367:7, 370:13, 425:12
**IRS** [2] - 349:4, 349:9
**Israeli** [2] - 342:14, 344:14
**Israeli-Palestinian** [2] - 342:14, 344:14
**issue** [2] - 317:10, 473:21
**issues** [8] - 295:24, 300:10, 320:8, 329:5, 339:4, 397:8, 462:20, 474:15
**IT** [2] - 388:4, 388:5
**item** [1] - 424:18
**items** [1] - 370:18
**itself** [4] - 403:17, 431:24, 439:25, 464:7

## J

**jade** [1] - 317:20
**January** [173] - 291:20, 293:14, 295:13, 295:20, 296:9, 296:22, 303:15, 303:21, 304:13, 304:20,

304:24, 305:5, 306:10, 306:14, 307:7, 308:9, 309:4, 309:11, 310:9, 313:17, 314:2, 314:3, 314:4, 317:20, 318:12, 318:17, 320:4, 322:18, 323:25, 328:20, 330:18, 330:20, 330:21, 330:25, 331:5, 331:8, 333:7, 334:8, 335:5, 337:24, 337:25, 339:10, 339:11, 339:13, 340:4, 340:6, 341:10, 341:15, 342:16, 343:24, 343:25, 345:3, 351:1, 352:1, 353:2, 353:14, 353:16, 354:3, 354:25, 355:2, 355:15, 358:5, 358:14, 359:3, 360:22, 361:25, 362:22, 363:7, 364:21, 366:20, 366:21, 366:23, 367:1, 368:22, 369:18, 369:19, 370:3, 370:14, 372:2, 372:15, 373:23, 374:4, 375:6, 376:24, 378:13, 379:9, 379:17, 382:25, 383:2, 383:4, 384:25, 388:10, 393:8, 395:15, 395:17, 399:7, 400:2, 400:5, 401:6, 402:8, 402:24, 404:12, 405:7, 405:12, 405:22, 407:3, 407:7, 407:16, 407:17, 413:14, 415:25, 416:3, 416:12, 416:14, 416:17, 417:18, 419:7, 420:17, 424:7, 424:15, 425:22, 425:25, 426:24, 429:11, 429:13, 429:23, 430:14, 430:24, 431:5, 432:19, 432:24, 436:11, 436:14, 437:16, 437:19, 437:22,

440:10, 442:8, 442:21, 445:6, 446:10, 447:6, 447:10, 447:15, 448:15, 450:5, 454:13, 454:14, 460:4, 463:18, 464:6, 464:7, 464:10, 465:8, 465:16, 467:13, 468:3, 468:12, 470:2, 470:14, 471:21, 475:4, 475:10, 478:15, 478:18, 479:1, 480:1, 480:4, 480:9, 485:22, 487:1, 491:16
**jarring** [1] - 343:6
**jeopardy** [1] - 301:5
**Jerry** [1] - 351:17
**Jewish** [2] - 326:2, 342:9
**job** [10] - 325:5, 348:13, 348:18, 348:22, 371:7, 426:21, 426:23, 429:8, 434:17, 451:11
**John** [1] - 412:18
**Johnson** [3] - 351:15, 460:6, 460:11
**join** [3] - 348:25, 361:13, 362:10
**joined** [1] - 358:10
**Journal** [1] - 295:25
**journey** [1] - 483:9
**JPMorgan** [1] - 436:5
**Judge** [12] - 298:23, 309:5, 310:2, 335:21, 336:3, 364:13, 407:1, 408:1, 419:11, 419:24, 472:24, 475:6
**judge** [32] - 291:3, 293:10, 294:4, 294:8, 295:3, 295:8, 298:17, 301:17, 315:5, 320:23, 322:1, 322:2, 323:6, 337:6, 341:22, 360:21, 386:8, 387:13, 393:13, 402:2, 402:17, 421:20, 439:15, 447:21, 466:23, 473:2, 473:6, 474:3, 474:19, 483:11, 484:18

**judge's** [8] - 298:19, 299:7, 320:22, 321:9, 322:1, 322:7, 392:19, 475:2
**judged** [1] - 453:23
**judges** [2] - 456:20, 473:9
**judiciary** [6] - 350:13, 351:4, 351:5, 351:16, 358:8, 390:20
**jumpsuits** [1] - 319:19
**junior** [1] - 350:6
**juries** [5] - 382:2, 385:4, 394:18, 477:11, 488:20
**juror** [40] - 298:7, 298:8, 301:13, 309:4, 313:25, 314:5, 314:20, 314:23, 315:1, 315:9, 316:6, 323:21, 327:9, 327:17, 328:23, 335:21, 337:22, 337:23, 346:15, 347:20, 364:12, 366:14, 373:14, 380:25, 384:11, 397:5, 407:25, 412:19, 419:11, 421:1, 421:4, 434:22, 435:22, 445:17, 458:22, 462:7, 472:24, 479:22, 491:7
**Juror** [107] - 291:2, 291:4, 291:6, 292:9, 292:10, 292:11, 292:14, 299:20, 300:3, 301:18, 301:19, 301:20, 313:13, 314:19, 315:13, 315:14, 315:16, 316:11, 316:12, 316:13, 316:17, 323:19, 324:15, 324:16, 324:20, 327:13, 327:20, 327:21, 327:23, 329:2, 329:3, 329:8, 329:9, 329:13, 337:12, 338:9, 338:10, 338:12, 345:15, 345:22, 345:23, 346:19, 347:1, 347:2, 347:4, 347:24, 348:2, 348:3, 348:5,

365:14, 367:19, 367:20, 367:22, 380:24, 381:18, 381:19, 381:20, 396:9, 396:10, 397:22, 397:23, 397:24, 409:23, 410:13, 410:14, 410:17, 412:21, 412:25, 422:8, 422:9, 422:24, 422:25, 423:3, 433:11, 433:15, 433:16, 433:20, 435:2, 435:6, 435:7, 435:9, 444:2, 444:12, 444:13, 444:17, 445:24, 445:25, 446:1, 451:24, 452:3, 452:4, 452:5, 459:5, 460:7, 460:21, 460:23, 460:24, 476:1, 476:5, 476:6, 476:10, 489:18, 490:3, 490:4, 490:7, 491:11
**JUROR** [903] - 291:8, 291:14, 291:16, 291:21, 291:25, 292:3, 292:13, 292:16, 292:22, 292:25, 293:3, 293:12, 293:16, 294:6, 294:17, 295:4, 295:10, 295:14, 295:17, 296:8, 296:21, 296:24, 297:8, 297:17, 298:2, 298:13, 298:20, 299:1, 299:9, 299:16, 301:22, 302:2, 302:7, 302:10, 302:16, 302:19, 302:23, 302:25, 303:2, 303:5, 303:8, 303:11, 303:17, 303:23, 304:2, 304:4, 304:7, 304:10, 304:12, 304:15, 304:17, 304:22, 304:25, 305:6, 305:9, 305:13, 305:19, 305:21, 306:1, 306:9, 306:12, 306:15, 306:20, 306:25, 307:6, 307:9, 307:13,

307:19, 307:25, 308:3, 308:8, 308:11, 308:13, 308:15, 308:18, 308:24, 309:1, 309:9, 309:12, 309:14, 309:17, 309:20, 309:25, 310:6, 310:10, 310:19, 311:13, 311:19, 311:21, 311:24, 312:5, 312:9, 312:12, 312:14, 312:24, 313:5, 313:8, 313:12, 315:18, 315:23, 316:2, 316:10, 316:16, 316:19, 317:2, 317:4, 317:11, 317:17, 317:19, 317:25, 318:9, 318:11, 318:19, 319:2, 319:4, 319:9, 319:12, 319:17, 319:25, 320:9, 320:19, 321:11, 321:16, 321:19, 321:21, 321:24, 322:6, 322:9, 322:11, 322:16, 322:21, 323:1, 323:7, 323:12, 323:18, 324:21, 325:1, 325:5, 325:8, 325:11, 325:14, 325:17, 325:25, 326:5, 326:8, 326:11, 326:15, 326:18, 327:12, 327:25, 328:4, 328:13, 328:15, 329:12, 329:15, 329:18, 329:20, 329:25, 330:3, 330:6, 330:8, 330:11, 330:15, 330:21, 331:2, 331:7, 331:10, 331:14, 331:19, 331:24, 332:3, 332:8, 332:11, 332:13, 332:16, 332:23, 332:25, 333:3, 333:8, 333:10, 333:14, 333:17, 333:25, 334:2, 334:9, 334:12, 334:15, 334:19, 335:3, 335:6, 335:10,

335:13, 335:16,
335:19, 335:24,
336:2, 336:7,
336:11, 336:15,
336:23, 337:9,
337:11, 338:14,
338:18, 338:21,
338:25, 339:3,
339:7, 339:12,
340:9, 340:11,
340:15, 341:3,
341:5, 341:13,
341:17, 341:24,
342:2, 342:8,
342:13, 342:21,
343:5, 343:18,
343:22, 344:2,
344:14, 345:4,
345:8, 345:14,
346:2, 346:7, 346:9,
346:12, 347:6,
347:10, 347:12,
347:17, 347:23,
348:7, 348:12,
348:16, 348:21,
348:23, 348:25,
349:4, 349:8,
349:12, 349:14,
349:18, 349:20,
349:24, 350:5,
350:12, 350:17,
350:22, 351:2,
351:9, 351:11,
352:2, 352:12,
352:16, 352:25,
353:4, 354:1, 354:5,
354:7, 354:12,
354:17, 354:21,
355:1, 355:11,
355:17, 356:4,
357:2, 357:17,
358:1, 358:7,
358:10, 358:15,
358:18, 358:20,
358:22, 358:24,
359:2, 359:5, 359:8,
359:11, 359:14,
359:17, 359:20,
359:23, 359:25,
360:3, 360:11,
360:14, 360:16,
360:23, 361:1,
361:7, 361:11,
361:14, 361:17,
361:20, 362:1,
362:5, 362:8,
362:12, 362:15,
362:17, 362:24,
363:2, 363:6, 363:9,
363:13, 363:16,
363:18, 363:22,

364:1, 364:8,
364:11, 364:17,
364:19, 364:22,
364:24, 365:2,
365:6, 365:9,
365:13, 367:24,
368:4, 368:6,
368:10, 368:12,
368:17, 368:23,
369:1, 369:4,
369:21, 370:11,
370:16, 370:24,
371:10, 371:15,
371:17, 371:22,
371:24, 372:5,
372:13, 372:24,
373:4, 373:11,
373:15, 373:25,
374:17, 375:8,
375:17, 375:19,
375:24, 376:1,
376:3, 376:9,
376:12, 376:14,
376:16, 376:18,
376:21, 376:25,
377:3, 377:7,
377:12, 377:18,
377:22, 377:25,
378:2, 378:5, 378:8,
378:11, 378:14,
378:17, 378:21,
378:23, 379:1,
379:4, 379:8,
379:11, 379:14,
379:20, 379:23,
380:3, 380:5, 380:8,
380:11, 380:14,
380:17, 380:23,
381:22, 382:1,
382:6, 382:11,
382:15, 382:17,
382:21, 383:3,
383:13, 383:16,
383:20, 384:1,
384:3, 384:7,
384:14, 384:20,
385:2, 385:8,
385:12, 386:11,
386:14, 386:22,
387:3, 387:15,
387:18, 387:24,
388:4, 388:7,
388:11, 388:14,
388:18, 389:3,
389:11, 389:20,
390:8, 390:17,
391:5, 391:10,
391:13, 391:17,
391:25, 392:3,
392:7, 392:12,
392:19, 392:22,

392:25, 393:9,
393:16, 394:2,
394:5, 394:21,
394:24, 395:3,
395:10, 395:12,
395:16, 395:23,
396:5, 398:1, 398:4,
398:7, 398:11,
398:13, 398:18,
398:22, 399:2,
399:4, 399:9,
399:14, 399:19,
399:24, 400:3,
400:6, 400:10,
400:22, 401:3,
401:8, 401:10,
401:15, 402:4,
402:9, 402:19,
403:1, 403:5, 403:8,
403:12, 403:21,
403:24, 404:2,
404:5, 404:8,
404:11, 404:14,
404:16, 404:22,
404:24, 405:5,
405:8, 405:13,
405:16, 405:19,
405:23, 406:1,
406:5, 406:10,
406:14, 406:18,
406:20, 407:8,
407:11, 407:18,
408:4, 408:7,
408:16, 409:3,
409:6, 409:10,
410:18, 410:22,
411:3, 411:8,
411:15, 411:22,
412:3, 412:8,
412:11, 412:15,
413:3, 413:8,
413:10, 413:12,
413:15, 413:18,
413:22, 413:24,
414:2, 414:5,
414:11, 414:15,
414:20, 414:24,
415:5, 415:8,
415:10, 415:12,
415:15, 415:17,
415:21, 416:1,
416:4, 416:7,
416:13, 416:15,
416:18, 416:22,
417:3, 417:7,
417:12, 417:15,
417:19, 417:25,
418:2, 418:5,
418:13, 418:15,
418:17, 418:24,
419:3, 419:9,

419:16, 419:19,
420:3, 420:8,
420:12, 420:14,
420:20, 421:3,
421:7, 421:12,
421:22, 422:1,
422:5, 422:7, 423:2,
423:5, 423:9,
423:12, 423:14,
423:18, 423:23,
424:4, 424:9,
424:16, 424:21,
425:1, 425:4, 425:9,
425:15, 425:23,
426:2, 426:9,
426:13, 426:16,
426:22, 427:1,
427:7, 427:13,
427:18, 427:22,
427:25, 428:4,
428:7, 428:13,
428:18, 428:22,
429:3, 429:6, 429:9,
429:14, 429:20,
429:25, 430:5,
430:11, 430:15,
430:18, 430:25,
431:3, 431:6,
431:13, 431:20,
432:3, 432:5,
432:11, 432:14,
432:17, 432:20,
432:25, 433:5,
433:19, 433:22,
434:2, 434:4,
434:10, 434:18,
434:25, 435:11,
435:14, 435:16,
435:19, 435:23,
436:2, 436:4, 436:8,
436:12, 436:16,
436:24, 437:2,
437:6, 437:10,
437:12, 437:15,
437:17, 437:20,
437:24, 438:1,
438:4, 438:8,
438:14, 438:17,
438:23, 439:1,
439:5, 439:9,
439:17, 439:22,
440:3, 440:6,
440:12, 440:15,
440:17, 440:20,
440:22, 440:25,
441:5, 441:14,
441:17, 441:21,
442:1, 442:4, 442:9,
442:13, 442:19,
442:22, 442:24,
443:2, 443:4, 443:9,

443:16, 443:20,
444:1, 444:16,
444:19, 444:24,
445:5, 445:7,
445:10, 445:14,
445:21, 446:5,
446:11, 446:18,
446:25, 447:7,
447:12, 447:17,
447:23, 448:2,
448:7, 448:16,
449:6, 449:15,
449:18, 450:6,
450:13, 450:16,
450:19, 450:25,
451:7, 451:9,
451:12, 451:14,
451:18, 451:20,
452:6, 452:12,
452:22, 452:24,
453:7, 453:20,
454:16, 454:19,
456:3, 456:17,
457:3, 458:8, 459:4,
461:1, 461:4, 461:6,
461:11, 461:21,
461:24, 462:4,
462:8, 462:15,
462:18, 462:21,
463:8, 463:13,
463:19, 463:23,
464:1, 464:8,
464:15, 464:20,
465:3, 465:10,
465:14, 465:18,
465:24, 466:5,
466:11, 466:14,
466:17, 466:20,
466:25, 467:6,
467:10, 467:15,
467:17, 467:19,
467:24, 468:6,
468:9, 468:14,
468:17, 469:16,
469:22, 470:1,
470:4, 470:15,
470:21, 470:25,
471:6, 471:12,
471:14, 472:6,
473:7, 473:17,
474:6, 474:11,
474:22, 475:11,
475:17, 475:21,
475:25, 476:8,
476:11, 476:14,
476:16, 476:20,
476:24, 477:1,
477:3, 477:7, 477:9,
477:13, 477:19,
478:1, 478:4, 478:6,
478:10, 478:12,

510

478:16, 478:20, 478:22, 479:2, 479:4, 479:6, 479:9, 479:12, 479:16, 479:19, 480:2, 480:6, 480:11, 480:14, 480:18, 480:21, 480:25, 481:5, 481:7, 481:11, 481:15, 481:17, 481:19, 481:21, 482:2, 482:5, 482:14, 482:19, 482:21, 483:1, 483:3, 483:5, 483:8, 483:12, 483:14, 483:19, 483:22, 483:25, 484:3, 484:5, 484:8, 484:10, 484:15, 484:20, 484:22, 484:25, 485:6, 485:8, 485:12, 485:16, 485:20, 486:1, 486:4, 486:10, 486:12, 486:15, 486:17, 486:20, 486:24, 487:2, 487:5, 487:9, 487:12, 487:15, 487:20, 488:6, 488:15, 488:18, 488:21, 488:25, 489:5, 489:8, 489:12, 489:17, 490:6, 490:9, 490:11, 490:16, 490:20, 490:23, 490:25, 491:2, 491:4, 491:10

**juror's** [1] - 459:12
**jurors** [12] - 291:4, 300:2, 310:3, 327:4, 337:14, 456:20, 459:19, 460:1, 465:5, 491:14, 491:24, 492:5
**jury** [50] - 297:14, 310:4, 314:4, 327:2, 329:17, 329:22, 329:23, 329:24, 330:1, 330:4, 332:5, 365:16, 366:21, 381:25, 382:4, 382:14, 382:20, 394:1, 394:20, 394:23, 395:8, 398:3, 398:7, 435:13, 445:23, 455:24, 456:22, 456:23, 457:4,

457:5, 460:12, 461:3, 461:6, 461:19, 462:2, 462:10, 464:23, 464:24, 467:13, 467:16, 467:23, 473:1, 476:13, 476:17, 476:21, 476:23, 477:4, 488:12, 488:13, 488:24
**jury's** [1] - 456:25
**Justice** [5] - 348:17, 348:20, 349:7, 349:11, 434:6
**justice** [8] - 297:19, 297:24, 382:19, 428:2, 463:6, 466:23, 483:10, 484:18
**justify** [1] - 374:24
**juvenile** [2] - 462:23, 462:25

## K

**keeping** [1] - 340:17
**keeps** [1] - 307:1
**kept** [5] - 339:21, 340:7, 369:22, 370:5, 446:21
**key** [1] - 371:2
**kick** [1] - 341:8
**kids** [1] - 353:10
**killed** [1] - 329:21
**kind** [87] - 295:24, 303:6, 303:17, 307:17, 313:18, 316:3, 317:20, 318:20, 318:21, 328:8, 334:6, 335:1, 337:19, 338:19, 342:6, 342:17, 343:2, 343:19, 350:10, 352:4, 352:18, 353:10, 353:12, 353:17, 353:19, 355:4, 356:6, 356:19, 357:5, 357:8, 360:4, 360:8, 361:2, 361:8, 361:9, 361:15, 361:18, 365:22, 370:18, 374:2, 374:4, 377:15, 377:19, 379:9, 379:17, 380:1, 380:9, 383:7, 384:3, 386:17, 389:16, 391:7, 404:9, 404:13, 406:8,

406:15, 417:5, 417:7, 417:10, 428:11, 429:15, 430:13, 433:1, 434:15, 436:17, 438:15, 440:23, 441:23, 442:11, 442:17, 446:18, 448:24, 453:23, 455:2, 455:10, 455:20, 456:7, 456:11, 458:9, 470:3, 477:24, 477:25, 480:2, 480:21, 485:7, 486:2, 486:22
**kinds** [3] - 333:16, 429:24, 442:6
**knowing** [7] - 294:9, 344:10, 348:9, 389:5, 429:16, 433:24, 486:7
**knowledge** [8] - 306:16, 377:4, 381:6, 381:7, 381:12, 419:25, 420:18
**known** [3] - 356:20, 406:4, 451:5
**knows** [3] - 306:6, 358:6, 431:21

## L

**lack** [7] - 386:8, 390:13, 393:7, 393:20, 397:2, 469:6
**lady** [1] - 333:21
**languages** [1] - 471:3
**large** [5] - 369:12, 371:5, 379:2, 441:8, 472:3
**larger** [1] - 472:8
**last** [20] - 293:17, 297:24, 302:3, 302:12, 313:19, 315:7, 328:17, 367:23, 368:18, 368:20, 371:18, 382:13, 394:10, 395:1, 413:4, 432:8, 461:12, 464:23, 467:12, 489:22
**lasted** [1] - 310:18
**lasting** [1] - 346:4
**Law** [2] - 462:18, 463:14
**law** [72] - 292:20, 298:24, 299:8, 303:6, 303:10, 310:1, 310:2, 310:3,

316:24, 316:25, 317:15, 318:4, 322:3, 322:5, 325:22, 325:24, 332:1, 332:19, 332:21, 336:4, 336:5, 338:19, 338:22, 338:24, 339:3, 350:11, 354:16, 355:6, 355:8, 368:7, 371:14, 388:5, 412:7, 414:7, 415:24, 417:8, 418:12, 423:10, 423:13, 423:19, 426:8, 452:10, 452:17, 452:19, 456:21, 456:22, 456:24, 457:10, 458:10, 458:13, 458:16, 462:22, 463:3, 472:7, 472:15, 472:17, 472:25, 473:2, 473:5, 473:9, 473:10, 473:16, 475:7, 477:17, 477:24, 477:25, 478:9, 481:4, 482:8
**lawful** [3] - 321:7, 458:11, 458:14
**lawn** [1] - 408:18
**lawns** [1] - 438:18
**laws** [2] - 457:14, 458:15
**lawyer** [8] - 338:17, 338:18, 339:3, 355:17, 367:9, 423:9, 436:4, 471:1
**lawyers** [13] - 302:16, 302:17, 339:1, 470:24, 471:2, 471:5, 471:9, 477:20, 477:24, 478:5, 478:7
**lead** [2] - 434:13, 453:1
**leaders** [3] - 402:10, 405:15, 425:18
**leading** [1] - 453:17
**leads** [1] - 374:13
**learn** [3] - 392:14, 440:9, 443:11
**learned** [8] - 296:7, 372:4, 372:11, 404:19, 416:19, 438:22, 438:23, 441:3
**learning** [2] - 372:11,

392:15
**least** [4] - 329:20, 364:25, 394:6, 432:23
**leave** [6] - 343:7, 352:17, 352:18, 363:5, 471:9
**leaving** [1] - 467:2
**led** [1] - 297:18
**left** [29] - 292:9, 299:20, 313:13, 316:11, 323:19, 327:13, 329:2, 337:12, 345:15, 345:24, 346:19, 347:24, 350:18, 365:14, 380:24, 396:9, 409:23, 412:21, 422:8, 433:11, 435:2, 444:2, 445:24, 451:24, 459:5, 459:19, 476:1, 489:18, 491:11
**legal** [12] - 301:5, 302:15, 319:20, 349:16, 368:3, 423:8, 436:1, 457:2, 462:13, 462:14, 462:16, 477:16
**legislative** [1] - 434:11
**legislators** [1] - 401:18
**legitimate** [2] - 320:15, 385:18
**lens** [1] - 458:10
**less** [6] - 333:18, 334:24, 378:22, 403:13, 456:16, 456:18
**lesser** [1] - 297:15
**letting** [1] - 294:11
**level** [5] - 372:5, 376:25, 390:2, 455:14, 468:25
**levels** [1] - 457:24
**life** [4] - 307:8, 343:15, 392:15, 399:8
**lifetime** [1] - 394:17
**likely** [3] - 323:5, 380:15, 392:10
**limited** [3] - 337:22, 399:9, 449:22
**line** [24] - 291:4, 292:12, 301:18, 315:15, 316:14, 321:7, 324:16, 324:19, 327:22, 329:10, 338:11, 345:24, 347:3,

348:4, 367:21, 381:19, 397:23, 410:15, 422:25, 429:25, 433:17, 444:14, 446:2, 452:4
**LINE** [1] - 326:23
**lines** [2] - 377:7, 468:22
**list** [3] - 296:1, 459:25, 489:22
**listed** [5] - 324:11, 324:12, 329:4, 345:20, 457:13
**listen** [6] - 294:4, 414:15, 437:9, 474:7, 475:6, 489:1
**listened** [3] - 341:17, 353:13, 353:14
**listening** [1] - 353:13
**live** [35] - 306:2, 306:6, 307:4, 308:16, 308:17, 310:23, 326:20, 343:12, 352:7, 352:8, 352:11, 352:12, 354:13, 368:18, 378:9, 378:16, 385:13, 386:16, 398:22, 399:2, 401:9, 401:10, 401:11, 407:4, 407:5, 408:21, 423:24, 424:3, 439:2, 464:10, 468:3, 480:16, 480:18
**lived** [8] - 306:1, 310:23, 368:17, 382:7, 394:6, 394:15, 424:4, 441:13
**lives** [8] - 291:11, 305:23, 352:23, 368:14, 369:3, 398:20, 423:21, 463:11
**living** [6] - 307:9, 381:10, 436:19, 436:20, 454:21, 455:17
**lobby** [3] - 339:4, 339:5, 429:2
**local** [2] - 342:23, 447:1
**location** [2] - 377:13, 461:17
**locations** [1] - 372:17
**look** [7] - 317:20, 356:1, 390:8, 418:21, 439:24,

458:10, 472:11
**looked** [4] - 357:20, 361:9, 361:15, 388:23
**looking** [3] - 360:8, 377:8, 407:3
**loop** [1] - 375:4
**loss** [3] - 328:4, 346:18, 407:23
**lost** [2] - 305:23, 434:19
**loud** [1] - 298:25
**loudly** [1] - 441:8
**lower** [1] - 459:21
**luckily** [1] - 311:3
**lucky** [2] - 306:3, 307:21
**lunch** [1] - 397:16
**lying** [1] - 297:22

# M

**ma'am** [1] - 299:19
**magnitude** [1] - 455:1
**main** [1] - 350:7
**maintains** [1] - 365:17
**major** [4] - 370:18, 399:12, 424:18, 425:17
**majority** [18] - 351:5, 362:10, 366:2, 372:14, 405:21, 417:23, 418:11, 420:6, 431:11, 443:14, 443:18, 450:23, 470:19, 470:20, 470:22, 487:7, 487:10, 487:17
**march** [1] - 442:13
**Marine** [2] - 426:9, 426:10
**mark** [1] - 452:20
**Market** [1] - 352:13
**marketing** [1] - 428:11
**marshal** [1] - 332:5
**Maryland** [2] - 332:8, 332:9
**masse** [1] - 385:16
**maternity** [1] - 352:17
**matter** [6] - 363:12, 374:11, 462:25, 491:22, 491:23
**matters** [1] - 340:7
**mean** [41] - 296:15, 297:18, 301:4, 303:17, 308:1, 316:2, 318:11, 333:24, 351:20, 352:2, 353:19,

355:24, 356:4, 357:18, 359:8, 360:3, 364:1, 377:11, 387:20, 388:20, 391:19, 392:7, 393:24, 395:16, 397:10, 403:19, 406:6, 407:8, 411:9, 416:23, 424:9, 432:25, 439:20, 449:16, 453:11, 458:12, 463:23, 464:9, 466:7, 492:19
**meaning** [1] - 326:13
**means** [3] - 301:4, 365:19, 390:24
**meant** [1] - 336:16
**media** [41] - 305:17, 317:22, 318:2, 318:16, 318:18, 318:22, 318:24, 320:24, 333:7, 336:25, 337:5, 337:8, 339:11, 341:20, 342:16, 353:2, 359:16, 370:21, 372:16, 377:2, 383:1, 383:18, 384:12, 388:9, 402:1, 402:24, 404:19, 421:14, 439:14, 446:7, 446:9, 446:11, 446:15, 447:14, 447:21, 450:25, 451:3, 464:5, 465:8, 487:25
**mediation** [1] - 342:12
**medical** [3] - 346:20, 347:8, 422:23
**medication** [2] - 347:14, 411:24
**member** [17] - 302:14, 338:17, 354:15, 368:2, 372:21, 402:15, 423:7, 426:7, 427:15, 435:25, 445:4, 457:4, 457:5, 462:13, 477:16, 482:17, 483:16
**members** [15] - 294:10, 326:22, 358:21, 360:13, 370:17, 371:2, 371:13, 412:6, 427:4, 429:2, 429:5, 466:2, 477:19, 477:23, 481:3

**memorable** [1] - 371:8
**memory** [2] - 343:19, 356:6
**men** [1] - 381:11
**mens** [3] - 338:5, 396:15, 397:10
**mentality** [1] - 380:2
**mentally** [1] - 479:17
**mentioned** [7] - 379:5, 405:14, 455:16, 467:11, 468:3, 468:10, 485:4
**mercy** [1] - 407:21
**message** [3] - 344:8, 344:23, 469:4
**messages** [1] - 377:14
**met** [3] - 365:25, 471:8, 471:9
**methods** [1] - 372:7
**microphone** [3] - 398:6, 476:18, 479:23
**might** [37] - 294:23, 297:11, 299:11, 300:15, 301:5, 301:6, 301:14, 311:18, 314:12, 314:17, 315:21, 316:21, 317:25, 320:5, 322:3, 324:23, 344:12, 348:12, 377:8, 378:24, 384:12, 396:23, 412:3, 425:5, 426:3, 427:14, 450:12, 450:21, 453:1, 453:5, 453:18, 456:2, 457:21, 458:17, 465:19, 474:21
**migraines** [1] - 374:7
**mile** [1] - 352:12
**military** [2] - 481:7, 481:14
**mind** [7] - 338:1, 370:23, 420:23, 421:2, 421:6, 460:17, 475:15
**minded** [1] - 454:24
**minds** [1] - 433:7
**mine** [1] - 490:25
**minor** [4] - 398:9, 399:13, 399:14, 406:9
**minute** [4] - 367:17, 437:12, 459:7, 460:18
**misheard** [1] - 363:4
**misreading** [1] -

411:16
**miss** [2] - 328:7, 407:22
**missed** [1] - 444:9
**missing** [1] - 291:3
**misunderstood** [2] - 384:14, 384:17
**mitigate** [1] - 410:4
**mix** [1] - 430:6
**mixed** [3] - 293:7, 468:18
**mob** [9] - 326:23, 357:20, 361:10, 361:16, 362:10, 366:7, 375:11, 375:12, 380:2
**mobs** [1] - 373:18
**mode** [1] - 403:4
**mom's** [1] - 352:8
**moment** [6] - 359:9, 443:12, 458:16, 459:6, 459:16, 468:15
**Monday** [3] - 410:24, 411:2, 411:3
**months** [6] - 293:6, 341:8, 413:18, 413:20, 414:2, 414:3
**monumental** [1] - 394:17
**moot** [1] - 434:15
**Morgan** [1] - 326:21
**morning** [27] - 292:13, 298:12, 298:13, 305:12, 305:13, 308:23, 308:24, 316:15, 316:16, 320:12, 320:18, 320:19, 322:10, 322:11, 329:11, 329:12, 333:2, 333:3, 335:17, 342:1, 342:2, 346:10, 357:25, 358:1, 375:22, 387:23, 387:24
**most** [20] - 293:8, 352:1, 356:25, 357:14, 370:12, 370:18, 371:7, 375:5, 378:23, 382:6, 387:1, 394:21, 401:8, 441:5, 449:7, 449:24, 451:4, 480:18, 481:12
**mostly** [6] - 340:17, 341:6, 342:23, 415:11, 415:13, 453:3

**mother** [1] - 423:9
**mother's** [1] - 352:20
**motion** [29] - 299:23,
300:4, 313:24,
327:14, 337:22,
338:2, 338:3,
345:16, 345:18,
366:13, 367:3,
381:6, 397:2, 397:7,
410:8, 422:21,
433:12, 433:13,
444:6, 444:7,
451:25, 452:1,
459:12, 476:3,
476:4, 489:19,
489:20, 492:17,
492:20
**motivations** [3] -
431:15, 431:23,
472:12
**Mount** [2] - 436:24,
436:25
**move** [11] - 298:6,
299:21, 313:14,
313:15, 337:13,
365:15, 380:25,
396:10, 409:24,
422:9, 434:21
**moved** [3] - 308:18,
407:19, 455:19
**moves** [1] - 323:20
**movie** [3] - 479:13,
479:20, 486:5
**moving** [1] - 391:8
**MPD** [2] - 413:6,
484:14
**mugging** [1] - 466:6
**muggings** [1] - 466:10
**multitasked** [1] -
446:18
**musical** [1] - 467:21
**must** [5] - 325:20,
452:15, 456:21,
472:25, 482:22

## N

**Nadler** [1] - 351:17
**name** [19] - 294:19,
305:14, 320:20,
322:12, 328:17,
328:19, 333:4,
335:18, 362:18,
367:23, 371:2,
375:23, 387:25,
393:4, 406:23,
418:18, 432:6,
467:9, 471:15
**names** [2] - 296:25,
402:10

**Nancy** [1] - 370:25
**narcotics** [2] - 434:7,
435:4
**narrative** [2] - 293:22,
361:3
**narratives** [1] - 344:19
**nation's** [1] - 310:22
**national** [2] - 396:22,
447:2
**National** [5] - 381:11,
385:15, 386:8,
393:21, 397:4
**nationalist** [1] -
360:22
**nationalists'** [1] -
356:23
**nations** [1] - 455:12
**naturally** [2] - 439:18,
439:21
**nature** [6] - 331:21,
332:14, 421:17,
453:1, 461:9, 491:14
**near** [8] - 291:11,
308:16, 352:23,
362:7, 368:15,
398:20, 423:22,
463:12
**nearby** [2] - 339:13,
343:10
**necessarily** [1] - 319:9
**need** [3] - 327:4,
389:6, 492:22
**needed** [3] - 311:14,
339:16, 340:24,
341:7, 457:5
**needing** [1] - 355:18
**needs** [1] - 490:17
**negative** [6] - 330:13,
373:13, 405:17,
454:7, 454:8, 471:4
**negatively** [2] - 361:6,
366:4, 398:16
**neglect** [1] - 462:23
**neighbor** [1] - 354:18
**neighborhood** [18] -
308:5, 312:15,
369:9, 378:20,
406:13, 406:17,
407:18, 407:20,
408:24, 409:18,
424:1, 436:20,
436:23, 438:11,
438:15, 439:15,
440:14, 441:16
**neighbors** [4] - 306:7,
306:9, 439:1, 441:2
**nervous** [2] - 300:12,
403:12
**never** [9] - 312:24,
325:12, 327:17,

350:7, 373:7,
389:20, 422:18,
491:19, 492:13
**new** [4] - 293:19,
388:22, 392:13,
428:24
**newborn** [5] - 351:3,
352:9, 353:7,
353:10, 356:5
**news** [101] - 295:12,
295:16, 295:19,
295:21, 296:1,
296:4, 296:19,
297:21, 297:24,
299:4, 299:12,
303:13, 303:15,
303:22, 304:6,
304:8, 304:14,
305:4, 305:8,
305:16, 307:14,
309:3, 311:11,
311:16, 315:2,
330:17, 330:19,
331:16, 331:17,
331:19, 334:7,
337:22, 339:9,
339:18, 341:18,
342:23, 343:14,
353:13, 353:20,
356:22, 357:19,
359:22, 369:18,
370:21, 380:10,
382:24, 388:9,
390:21, 391:16,
391:20, 391:21,
395:19, 400:1,
400:12, 400:14,
400:17, 400:25,
402:6, 402:7, 402:9,
402:24, 405:10,
416:18, 416:20,
416:23, 416:24,
417:4, 424:14,
424:18, 424:19,
425:12, 429:11,
429:17, 429:22,
430:7, 436:10,
436:17, 436:18,
437:5, 437:13,
437:14, 441:23,
441:25, 442:6,
442:7, 446:12,
447:1, 447:2,
454:12, 458:21,
464:3, 465:21,
468:2, 470:8,
470:12, 478:14,
478:18, 479:7,
480:1, 480:17
**newspaper** [1] - 447:4

**newsperson** [1] -
478:24
**next** [19] - 308:10,
311:4, 311:5, 311:6,
314:19, 335:12,
345:20, 346:20,
351:22, 358:17,
362:14, 374:9,
380:16, 381:16,
392:10, 427:14,
444:25, 460:5,
489:21
**nice** [1] - 435:1
**niece** [1] - 478:1
**night** [2] - 302:12,
403:2
**nobody** [2] - 484:11,
484:12
**nonauthorized** [1] -
474:15
**none** [4] - 299:6,
386:20, 400:22,
413:14
**nonprofit** [1] - 462:16
**nonviolent** [1] - 294:8
**nonviolently** [1] -
455:8
**normal** [3] - 327:1,
327:3, 389:18
**normally** [1] - 327:4
**North** [2] - 423:15,
482:6
**Northwest** [1] -
463:15
**NOTE** [52] - 291:2,
292:9, 292:10,
299:20, 301:19,
313:13, 315:13,
316:11, 316:12,
323:19, 324:15,
327:13, 327:20,
329:2, 329:8,
337:12, 338:9,
345:15, 345:22,
346:19, 347:1,
347:24, 348:2,
365:14, 367:19,
380:24, 381:18,
396:9, 397:22,
409:23, 410:13,
412:21, 412:25,
422:8, 422:24,
433:11, 433:15,
435:2, 435:6, 444:2,
444:12, 445:24,
445:25, 451:24,
452:3, 459:5,
460:21, 476:1,
476:5, 489:18,
490:3, 491:11

**note** [1] - 452:21
**nothing** [9] - 320:9,
334:15, 355:5,
372:6, 372:9,
391:19, 425:15,
489:1
**notice** [1] - 328:18
**notion** [2] - 454:5,
455:21
**notions** [12] - 292:20,
316:25, 325:23,
367:15, 397:9,
397:12, 447:20,
452:18, 453:2,
453:5, 457:19,
474:21
**notwithstanding** [1] -
383:6
**November** [1] - 350:18
**nowadays** [1] - 441:7
**NPR** [2] - 353:13,
437:7
**nuance** [3] - 431:9,
456:4, 456:8
**nuanced** [1] - 456:18
**nuances** [2] - 473:4,
473:13
**number** [13] - 324:11,
385:25, 394:4,
394:18, 398:7,
400:18, 414:6,
436:19, 450:1,
459:21, 480:15,
482:7, 489:22

## O

**object** [2] - 292:6,
300:19
**objection** [14] -
299:25, 316:5,
316:7, 324:2,
328:22, 346:14,
346:16, 346:22,
347:20, 347:22,
434:22, 434:23,
491:6, 491:9
**objective** [1] - 458:12
**obviously** [19] - 300:1,
310:14, 312:19,
353:5, 353:12,
367:9, 369:21,
370:7, 372:6, 386:2,
386:20, 401:21,
453:21, 455:11,
456:6, 458:1, 471:1,
473:22, 488:12
**occasions** [1] - 466:7
**occupation** [1] -
291:12

**occur** [2] - 466:10, 483:24
**occurred** [1] - 342:19
**occurring** [3] - 464:10, 464:12, 485:25
**odd** [1] - 343:18
**odds** [1] - 390:3
**offense** [1] - 473:15
**offer** [1] - 325:6
**Office** [7] - 325:3, 348:10, 348:17, 423:15, 433:25, 434:1, 485:17
**office** [13] - 325:9, 349:5, 349:10, 351:21, 358:17, 404:4, 404:5, 425:5, 444:22, 445:10, 460:12, 463:17, 485:18
**officer** [12] - 297:14, 297:16, 332:19, 354:22, 355:3, 412:14, 413:21, 414:10, 414:14, 449:21, 456:14, 471:8
**officers** [25] - 297:13, 297:22, 323:2, 331:21, 332:4, 333:19, 333:24, 334:3, 334:19, 370:14, 375:10, 376:11, 376:13, 412:9, 414:7, 456:1, 456:7, 456:16, 467:1, 481:24, 482:4, 482:8, 482:9, 482:10, 484:14
**offices** [4] - 324:25, 348:11, 428:17, 485:14
**Offices** [1] - 324:25
**often** [5] - 332:12, 332:13, 413:16, 413:25, 430:8
**old** [1] - 482:22
**once** [3] - 394:8, 420:21, 420:23
**one** [121] - 291:10, 292:18, 296:18, 297:1, 297:3, 297:8, 300:5, 300:9, 300:15, 301:12, 301:24, 301:25, 303:13, 304:25, 310:23, 312:2, 314:1, 314:3, 315:20, 316:21,

320:23, 321:1, 321:16, 322:21, 324:10, 324:11, 324:18, 328:2, 329:3, 329:17, 330:17, 331:16, 332:4, 332:5, 332:17, 336:20, 342:22, 344:3, 344:6, 344:16, 346:4, 346:20, 351:21, 355:2, 355:13, 357:3, 365:24, 366:20, 368:1, 371:3, 371:6, 371:7, 373:21, 374:14, 381:9, 381:16, 381:24, 383:6, 384:10, 384:23, 387:10, 389:22, 393:5, 395:1, 401:16, 406:24, 407:2, 410:20, 411:13, 411:20, 412:5, 413:5, 418:19, 420:23, 423:7, 426:7, 427:21, 427:22, 429:20, 430:21, 432:7, 432:8, 432:20, 432:22, 446:7, 446:8, 451:10, 452:13, 454:11, 457:3, 458:20, 459:6, 459:9, 461:3, 461:7, 461:12, 461:13, 461:22, 461:24, 462:3, 462:12, 464:3, 464:21, 468:19, 471:16, 474:15, 476:13, 477:18, 483:14, 488:8, 488:10, 489:22, 490:13, 491:23
**ones** [7] - 351:21, 370:10, 370:11, 370:18, 405:2, 431:3, 461:15
**ongoing** [3] - 410:11, 446:13, 467:25
**online** [1] - 340:5
**open** [6] - 338:1, 357:3, 372:8, 421:2, 421:6, 450:11
**open-source** [1] - 372:8
**operating** [1] - 319:23
**operations** [1] -

371:20
**opinion** [1] - 383:7
**opinions** [10] - 293:7, 293:13, 300:1, 355:14, 369:11, 373:22, 384:24, 449:10, 453:10
**opportunities** [1] - 422:18
**opportunity** [1] - 410:4
**oppose** [8] - 313:24, 327:10, 338:2, 381:5, 397:2, 410:7, 422:21, 458:22
**opposed** [2] - 328:24, 432:17
**opposes** [2] - 337:21, 366:12
**opposing** [1] - 471:1
**opposite** [1] - 410:5
**opposition** [4] - 445:17, 445:19, 455:18, 455:21
**optimistic** [1] - 392:16
**option** [1] - 393:22
**order** [3] - 370:2, 457:6, 473:1
**organization** [6] - 340:19, 357:12, 462:16, 462:17, 462:19, 463:5
**organizations** [2] - 357:4, 402:17
**otherwise** [2] - 335:13, 367:13
**ourselves** [1] - 298:14
**out-of-town** [1] - 315:23
**outcome** [1] - 323:24
**outcomes** [3] - 383:21, 448:22, 448:23
**outlets** [1] - 296:4
**outnumbered** [1] - 334:4
**outside** [4] - 318:6, 352:19, 360:4
**outspoken** [1] - 351:13
**overall** [3] - 305:23, 372:13, 405:9
**overcome** [1] - 392:24
**overhead** [1] - 374:8
**overruled** [1] - 300:4
**overseas** [3] - 316:3, 481:21, 481:22
**oversight** [5] - 350:13, 350:14, 350:20, 350:23, 356:11

**overstated** [1] - 474:14
**overwhelming** [4] - 353:19, 374:3, 378:3, 401:18
**own** [13] - 297:23, 315:1, 405:24, 406:1, 406:2, 438:9, 439:2, 448:10, 453:22, 457:22, 464:21

### P

**p.m** [1] - 493:6
**paid** [1] - 383:22
**pain** [2] - 411:23, 411:24
**painting** [1] - 371:5
**Palestinian** [2] - 342:14, 344:14
**paper** [2] - 307:14, 311:17
**parade** [2] - 388:20
**parallels** [1] - 373:17
**pardon** [1] - 418:24
**parents** [3] - 462:22, 463:2, 472:14
**park** [1] - 409:12
**parked** [1] - 408:19
**parks** [1] - 399:10
**part** [24] - 296:22, 303:2, 303:25, 304:25, 305:7, 308:4, 325:4, 328:5, 343:1, 343:15, 348:14, 348:19, 351:16, 357:11, 357:21, 360:22, 361:2, 408:23, 443:2, 467:21, 472:3, 472:10, 472:13, 484:13
**partial** [1] - 363:5
**partially** [1] - 453:1
**participate** [2] - 455:19, 472:2
**participated** [9] - 312:8, 370:2, 386:5, 390:15, 438:11, 453:10, 457:21, 488:1
**participating** [3] - 435:20, 457:6, 471:20
**particular** [14] - 301:3, 336:20, 344:5, 365:4, 374:11, 396:1, 396:3, 397:6, 420:10, 420:12,

454:3, 457:12, 457:25, 458:16
**particularly** [9] - 302:22, 326:2, 340:3, 340:24, 358:5, 368:10, 481:25, 486:12, 487:2
**parties** [5] - 319:5, 319:7, 319:14, 319:16, 397:12
**past** [4] - 400:11, 400:18, 408:17, 411:5
**patients** [1] - 400:24
**patrol** [1] - 369:9
**pay** [3] - 314:12, 324:12, 386:16
**peaceful** [16] - 383:9, 385:22, 387:3, 387:4, 387:6, 387:9, 388:15, 389:13, 389:14, 389:18, 391:9, 391:11, 395:24, 430:3, 442:11, 442:14
**peers** [1] - 469:2
**Pelosi's** [1] - 370:25
**people** [152] - 293:24, 294:11, 294:19, 294:20, 294:24, 296:3, 296:12, 296:16, 298:22, 299:12, 302:21, 305:22, 306:19, 310:22, 310:23, 312:7, 312:10, 312:20, 312:21, 317:21, 319:6, 319:10, 319:12, 319:15, 319:20, 321:2, 323:3, 333:20, 334:20, 334:22, 335:8, 336:13, 337:1, 337:16, 337:24, 339:23, 340:20, 344:15, 345:6, 345:20, 351:14, 351:22, 356:10, 356:13, 358:6, 359:1, 360:7, 360:12, 362:6, 362:10, 364:25, 365:24, 366:2, 367:7, 370:19, 372:16, 372:17, 374:3, 375:15, 379:22, 385:20, 385:24, 386:3,

387:12, 388:18, 389:10, 390:14, 391:4, 391:6, 391:8, 395:21, 401:17, 401:22, 405:15, 405:21, 405:24, 406:3, 408:12, 408:13, 408:17, 409:12, 416:8, 416:25, 417:1, 417:23, 418:5, 418:8, 418:11, 420:6, 420:20, 429:8, 431:11, 431:14, 431:19, 432:13, 432:16, 432:18, 432:24, 432:25, 433:5, 436:19, 438:18, 438:21, 438:25, 439:6, 439:14, 439:15, 440:13, 441:5, 441:8, 441:18, 441:19, 441:20, 443:6, 443:14, 448:22, 449:3, 449:11, 449:13, 449:19, 449:22, 450:21, 450:23, 451:4, 453:9, 453:10, 454:23, 455:8, 455:19, 456:8, 457:21, 460:2, 460:3, 464:11, 467:21, 468:24, 469:6, 469:19, 470:19, 470:20, 470:22, 472:4, 472:15, 472:16, 473:13, 473:22, 487:7, 487:11, 487:18, 491:19
**people's** [1] - 438:17
**perceived** [2] - 395:23, 396:14
**percent** [2] - 306:16, 351:19
**perception** [4] - 378:17, 387:9, 391:10, 455:2
**peremptories** [4] - 459:24, 491:24, 492:9, 492:12
**peremptory** [1] - 491:23
**perfect** [1] - 425:10
**perfectly** [1] - 366:9
**perhaps** [3] - 292:18, 403:12, 467:22

**perimeter** [1] - 368:25
**period** [3] - 311:12, 343:19, 399:23
**periods** [1] - 411:23
**permanent** [2] - 491:2, 491:4
**perpetrated** [1] - 449:25
**perpetuated** [1] - 344:21
**persistent** [1] - 335:1
**person** [23] - 295:2, 300:8, 338:8, 344:13, 344:17, 351:13, 353:15, 355:8, 361:21, 395:6, 414:1, 414:18, 420:10, 420:12, 431:25, 449:5, 449:23, 451:1, 453:21, 475:5, 475:15, 484:4
**person's** [1] - 449:24
**personal** [31] - 297:23, 298:1, 313:16, 313:22, 315:6, 321:6, 337:19, 351:25, 355:13, 355:21, 356:17, 365:20, 365:21, 373:21, 381:3, 384:23, 410:1, 412:7, 429:4, 439:19, 439:25, 444:4, 448:10, 453:16, 455:4, 455:5, 455:17, 455:18, 457:18, 466:3, 468:7
**personalization** [1] - 367:4
**personalized** [1] - 314:16
**personally** [13] - 314:14, 321:18, 345:2, 356:14, 379:24, 380:6, 396:21, 425:20, 438:19, 439:4, 441:10, 449:7, 456:11
**personnel** [1] - 411:13
**perspective** [2] - 312:25, 325:25
**pertaining** [1] - 318:4
**pertains** [1] - 402:6
**pesticides** [1] - 439:23
**Petworth** [3] - 304:2, 304:4, 304:5

**pews** [1] - 360:7
**phase** [1] - 353:10
**philanthropy** [1] - 342:9
**phrasing** [1] - 469:24
**physical** [5] - 363:23, 469:17, 471:23
**physically** [7] - 351:2, 356:9, 359:9, 362:23, 363:20, 364:4, 366:18
**physician** [1] - 400:7
**pickup** [1] - 408:18
**picture** [7] - 359:10, 359:11, 360:5, 366:22, 377:12, 453:13, 455:15
**pictures** [3] - 357:18, 371:8, 374:22
**pieces** [1] - 404:25
**pipe** [1] - 292:1
**place** [26] - 292:4, 295:13, 296:12, 303:14, 324:17, 330:18, 341:11, 355:14, 372:16, 373:22, 374:22, 374:23, 384:24, 385:21, 386:17, 390:19, 400:2, 406:16, 424:14, 436:11, 445:13, 445:14, 454:12, 461:16, 469:8, 478:15
**placed** [1] - 394:18
**places** [2] - 455:12, 482:6
**planned** [3] - 296:9, 296:10, 389:5
**planning** [2] - 400:13, 427:1
**plans** [1] - 426:18
**play** [1] - 457:11
**plead** [1] - 298:3
**Pleasant** [2] - 436:24, 436:25
**pleasant** [2] - 348:1, 418:9
**pleased** [1] - 418:6
**plethora** [1] - 374:18
**plus** [1] - 367:5
**podcast** [2] - 437:6, 437:8
**podcasts** [1] - 353:14
**podiatrist** [1] - 434:19
**podium** [1] - 360:6
**point** [14] - 301:13, 309:11, 314:1, 353:17, 373:3,

397:4, 407:3, 413:6, 414:17, 426:4, 443:5, 448:24, 459:18, 467:13
**Point** [2] - 431:15, 431:16
**points** [2] - 301:10, 314:23
**police** [29] - 297:2, 297:12, 297:16, 297:22, 331:21, 332:4, 354:22, 370:14, 375:9, 406:12, 406:17, 412:9, 412:14, 414:9, 414:14, 449:20, 455:25, 456:7, 456:14, 456:15, 466:22, 467:1, 470:19, 471:7, 481:14, 481:24, 482:8, 482:10, 484:17
**Police** [2] - 342:22, 469:18
**policeman** [1] - 481:8
**policemen** [3] - 477:20, 477:22, 481:9
**policy** [1] - 434:11
**political** [2] - 439:22, 454:25
**politically** [2] - 356:12, 454:24
**politicians** [1] - 339:24
**pool** [1] - 465:5
**popular** [1] - 293:8
**portrayed** [1] - 293:20
**position** [1] - 372:1
**positive** [3] - 330:13, 373:13, 453:20
**positively** [2] - 376:19, 398:16
**posse** [1] - 383:5
**possess** [1] - 395:6
**possessed** [1] - 395:7
**possession** [1] - 395:5
**possibilities** [1] - 311:7
**possibility** [1] - 393:23
**possible** [3] - 396:23, 437:3, 441:24
**possibly** [1] - 348:9
**Post** [2] - 446:14, 447:1
**Postal** [1] - 461:16
**posts** [1] - 372:16

**potential** [5] - 314:5, 327:17, 350:1, 455:4, 459:19
**potentially** [3] - 455:1, 455:18, 467:12
**power** [4] - 383:9, 389:13, 389:14, 389:18
**PR** [1] - 428:11
**practice** [10] - 303:7, 303:9, 338:20, 350:2, 350:4, 350:11, 423:13, 477:24, 477:25, 478:8
**practiced** [3] - 338:23, 423:10, 423:19
**practicing** [1] - 471:10
**preconceived** [8] - 367:14, 397:9, 453:2, 453:5, 454:5, 455:20, 457:19, 474:21
**predominantly** [1] - 462:21
**preexisting** [2] - 381:6, 381:7
**preference** [1] - 327:15
**prejudgment** [1] - 396:13
**premise** [1] - 374:17
**prep** [1] - 347:18
**prepandemic** [1] - 466:11
**prepare** [1] - 347:14
**prepared** [3] - 403:14, 491:25, 492:3
**preparedness** [1] - 403:4
**present** [19] - 305:5, 344:13, 351:3, 356:24, 356:25, 357:14, 362:7, 375:5, 382:25, 387:1, 387:7, 397:11, 406:20, 449:13, 449:17, 449:18, 464:4, 471:5, 471:6
**presented** [37] - 293:18, 309:7, 316:23, 317:15, 317:22, 318:4, 318:8, 319:4, 325:21, 337:7, 341:22, 364:16, 365:5, 374:19, 386:9, 387:14, 390:22, 393:14,

515

396:1, 402:2,
402:14, 402:18,
419:16, 420:16,
421:21, 439:16,
443:10, 447:22,
452:10, 452:16,
474:4, 474:20,
486:23, 488:5, 489:2
**President** [11] -
330:23, 333:11,
333:12, 385:19,
387:4, 387:7,
388:16, 388:22,
389:24, 394:9
**President's** [1] - 470:9
**presidential** [3] -
322:15, 323:24,
453:16
**presume** [1] - 374:12
**presumption** [1] -
337:18
**presumptions** [1] -
374:19
**pretty** [26] - 296:19,
302:4, 313:16,
336:9, 336:12,
337:19, 354:18,
361:24, 363:10,
363:11, 369:4,
373:16, 374:5,
374:10, 375:11,
379:18, 383:15,
395:20, 405:11,
409:14, 416:24,
428:14, 433:1,
436:17, 442:2,
478:20
**prevent** [3] - 317:14,
375:10, 393:12
**previous** [4] - 394:1,
453:16, 454:1, 461:3
**previously** [2] - 296:3,
485:5
**primarily** [5] - 368:7,
371:19, 397:2,
397:8, 410:1
**primary** [1] - 490:17
**prime** [1] - 384:8
**prime-time** [1] - 384:8
**principal** [1] - 306:5
**principles** [1] - 456:21
**prison** [1] - 296:12
**private** [3] - 342:8,
350:1, 350:4
**problem** [13] - 301:25,
315:7, 315:21,
328:2, 346:6,
384:21, 393:18,
413:3, 456:2,
473:15, 473:18,

490:15, 492:21
**problematic** [1] -
344:8
**problems** [2] - 317:4,
317:7
**procedure** [2] -
346:21, 347:8
**proceed** [1] - 491:20
**Proceedings** [1] -
493:6
**process** [18] - 296:13,
296:15, 297:6,
298:18, 298:22,
389:15, 390:10,
390:11, 392:8,
393:22, 393:24,
428:2, 435:21,
457:6, 457:7, 462:9,
491:15
**processes** [1] - 469:7
**procession** [1] -
390:15
**proclaiming** [1] -
441:8
**produce** [1] - 295:23
**profession** [2] - 388:3,
473:8
**professional** [1] -
295:22
**profile** [1] - 453:1
**program** [2] - 330:24,
428:25
**programs** [1] - 428:20
**project** [1] - 350:6
**promised** [1] - 387:7
**proof** [1] - 488:13
**prosecutor** [4] -
325:15, 434:9,
434:10, 434:12
**prosecutors** [5] -
393:6, 406:24,
418:19, 432:7,
471:16
**prospective** [4] -
314:5, 323:21,
337:22, 459:12
**PROSPECTIVE** [903] -
291:8, 291:14,
291:16, 291:21,
291:25, 292:3,
292:13, 292:16,
292:22, 292:25,
293:3, 293:12,
293:16, 294:6,
294:17, 295:4,
295:10, 295:14,
295:17, 296:8,
296:21, 296:24,
297:8, 297:17,
298:2, 298:13,

298:20, 299:1,
299:9, 299:16,
301:22, 302:2,
302:7, 302:10,
302:16, 302:19,
302:23, 302:25,
303:2, 303:5, 303:8,
303:11, 303:17,
303:23, 304:2,
304:4, 304:7,
304:10, 304:12,
304:15, 304:17,
304:22, 304:25,
305:6, 305:9,
305:13, 305:19,
305:21, 306:1,
306:9, 306:12,
306:15, 306:20,
306:25, 307:6,
307:9, 307:13,
307:19, 307:25,
308:3, 308:8,
308:11, 308:13,
308:15, 308:18,
308:24, 309:1,
309:9, 309:12,
309:14, 309:17,
309:20, 309:25,
310:6, 310:10,
310:19, 311:13,
311:19, 311:21,
311:24, 312:5,
312:9, 312:12,
312:14, 312:24,
313:5, 313:8,
313:12, 315:18,
315:23, 316:2,
316:10, 316:16,
316:19, 317:2,
317:4, 317:11,
317:17, 317:19,
317:25, 318:9,
318:11, 318:19,
319:2, 319:4, 319:9,
319:12, 319:17,
319:25, 320:9,
320:19, 321:11,
321:16, 321:19,
321:21, 321:24,
322:6, 322:9,
322:11, 322:16,
322:21, 323:1,
323:7, 323:12,
323:18, 324:21,
325:1, 325:5, 325:8,
325:11, 325:14,
325:17, 325:25,
326:5, 326:8,
326:11, 326:15,
326:18, 327:12,
327:25, 328:4,

328:13, 328:15,
329:12, 329:15,
329:18, 329:20,
329:25, 330:3,
330:6, 330:8,
330:11, 330:15,
330:21, 331:2,
331:7, 331:10,
331:14, 331:19,
331:24, 332:3,
332:8, 332:11,
332:13, 332:16,
332:23, 332:25,
333:3, 333:8,
333:10, 333:14,
333:17, 333:25,
334:2, 334:9,
334:12, 334:15,
334:19, 335:3,
335:6, 335:10,
335:13, 335:16,
335:19, 335:24,
336:2, 336:7,
336:11, 336:15,
336:23, 337:9,
337:11, 338:14,
338:18, 338:21,
338:25, 339:3,
339:7, 339:12,
340:9, 340:11,
340:15, 341:3,
341:5, 341:13,
341:17, 341:24,
342:2, 342:8,
342:13, 342:21,
343:5, 343:18,
343:22, 344:2,
344:14, 345:4,
345:8, 345:14,
346:2, 346:7, 346:9,
346:12, 347:6,
347:10, 347:12,
347:17, 347:23,
348:7, 348:12,
348:16, 348:21,
348:23, 348:25,
349:4, 349:8,
349:12, 349:14,
349:18, 349:20,
349:24, 350:5,
350:12, 350:17,
350:22, 351:2,
351:9, 351:11,
352:2, 352:12,
352:16, 352:25,
353:4, 354:1, 354:5,
354:7, 354:12,
354:17, 354:21,
355:1, 355:11,
355:17, 356:4,
357:2, 357:17,

358:1, 358:7,
358:10, 358:15,
358:18, 358:20,
358:22, 358:24,
359:2, 359:5, 359:8,
359:11, 359:14,
359:17, 359:20,
359:23, 359:25,
360:3, 360:11,
360:14, 360:16,
360:23, 361:1,
361:7, 361:11,
361:14, 361:17,
361:20, 362:1,
362:5, 362:8,
362:12, 362:15,
362:17, 362:24,
363:2, 363:6, 363:9,
363:13, 363:16,
363:18, 363:22,
364:1, 364:8,
364:11, 364:17,
364:19, 364:22,
364:24, 365:2,
365:6, 365:9,
365:13, 367:24,
368:4, 368:6,
368:10, 368:12,
368:17, 368:23,
369:1, 369:4,
369:21, 370:11,
370:16, 370:24,
371:10, 371:15,
371:17, 371:22,
371:24, 372:5,
372:13, 372:24,
373:4, 373:11,
373:15, 373:25,
374:17, 375:8,
375:17, 375:19,
375:24, 376:1,
376:3, 376:9,
376:12, 376:14,
376:16, 376:18,
376:21, 376:25,
377:3, 377:7,
377:12, 377:18,
377:22, 377:25,
378:2, 378:5, 378:8,
378:11, 378:14,
378:17, 378:21,
378:23, 379:1,
379:4, 379:8,
379:11, 379:14,
379:20, 379:23,
380:3, 380:5, 380:8,
380:11, 380:14,
380:17, 380:23,
381:22, 382:1,
382:6, 382:11,
382:15, 382:17,

382:21, 383:3, 383:13, 383:16, 383:20, 384:1, 384:3, 384:7, 384:14, 384:20, 385:2, 385:8, 385:12, 386:11, 386:14, 386:22, 387:3, 387:15, 387:18, 387:24, 388:4, 388:7, 388:11, 388:14, 388:18, 389:3, 389:11, 389:20, 390:8, 390:17, 391:5, 391:10, 391:13, 391:17, 391:25, 392:3, 392:7, 392:12, 392:19, 392:22, 392:25, 393:9, 393:16, 394:2, 394:5, 394:21, 394:24, 395:3, 395:10, 395:12, 395:16, 395:23, 396:5, 398:1, 398:4, 398:7, 398:11, 398:13, 398:18, 398:22, 399:2, 399:4, 399:9, 399:14, 399:19, 399:24, 400:3, 400:6, 400:10, 400:22, 401:3, 401:8, 401:10, 401:15, 402:4, 402:9, 402:19, 403:1, 403:5, 403:8, 403:12, 403:21, 403:24, 404:2, 404:5, 404:8, 404:11, 404:14, 404:16, 404:22, 404:24, 405:5, 405:8, 405:13, 405:16, 405:19, 405:23, 406:1, 406:5, 406:10, 406:14, 406:18, 406:20, 407:8, 407:11, 407:18, 408:4, 408:7, 408:16, 409:3, 409:6, 409:10, 410:18, 410:22, 411:3, 411:8, 411:15, 411:22, 412:3, 412:8, 412:11, 412:15, 413:3, 413:8,

413:10, 413:12, 413:15, 413:18, 413:22, 413:24, 414:2, 414:5, 414:11, 414:15, 414:20, 414:24, 415:5, 415:8, 415:10, 415:12, 415:15, 415:17, 415:21, 416:1, 416:4, 416:7, 416:13, 416:15, 416:18, 416:22, 417:3, 417:7, 417:12, 417:15, 417:19, 417:25, 418:2, 418:5, 418:13, 418:15, 418:17, 418:24, 419:3, 419:9, 419:16, 419:19, 420:3, 420:8, 420:12, 420:14, 420:20, 421:3, 421:7, 421:12, 421:22, 422:1, 422:5, 422:7, 423:2, 423:5, 423:9, 423:12, 423:14, 423:18, 423:23, 424:4, 424:9, 424:16, 424:21, 425:1, 425:4, 425:9, 425:15, 425:23, 426:2, 426:9, 426:13, 426:16, 426:22, 427:1, 427:7, 427:13, 427:18, 427:22, 427:25, 428:4, 428:7, 428:13, 428:18, 428:22, 429:3, 429:6, 429:9, 429:14, 429:20, 429:25, 430:5, 430:11, 430:15, 430:18, 430:25, 431:3, 431:6, 431:13, 431:20, 432:3, 432:5, 432:11, 432:14, 432:17, 432:20, 432:25, 433:5, 433:19, 433:22, 434:2, 434:4, 434:10, 434:18, 434:25, 435:11, 435:14, 435:16, 435:19, 435:23, 436:2, 436:4, 436:8, 436:12, 436:16,

436:24, 437:2, 437:6, 437:10, 437:12, 437:15, 437:17, 437:20, 437:24, 438:1, 438:4, 438:8, 438:14, 438:17, 438:23, 439:1, 439:5, 439:9, 439:17, 439:22, 440:3, 440:6, 440:12, 440:15, 440:17, 440:20, 440:22, 440:25, 441:5, 441:14, 441:17, 441:21, 442:1, 442:4, 442:9, 442:13, 442:19, 442:22, 442:24, 443:2, 443:4, 443:9, 443:16, 443:20, 444:1, 444:16, 444:19, 444:24, 445:5, 445:7, 445:10, 445:14, 445:21, 446:5, 446:11, 446:18, 446:25, 447:7, 447:12, 447:17, 447:23, 448:2, 448:7, 448:16, 449:6, 449:15, 449:18, 450:6, 450:13, 450:16, 450:19, 450:25, 451:7, 451:9, 451:12, 451:14, 451:18, 451:20, 452:6, 452:12, 452:22, 452:24, 453:7, 453:20, 454:16, 454:19, 456:3, 456:17, 457:3, 458:8, 459:4, 461:1, 461:4, 461:6, 461:11, 461:21, 461:24, 462:4, 462:8, 462:15, 462:18, 462:21, 463:8, 463:13, 463:19, 463:23, 464:1, 464:8, 464:15, 464:20, 465:3, 465:10, 465:14, 465:18, 465:24, 466:5, 466:11, 466:14, 466:17, 466:20, 466:25, 467:6, 467:10, 467:15, 467:17, 467:19,

467:24, 468:6, 468:9, 468:14, 468:17, 469:16, 469:22, 470:1, 470:4, 470:15, 470:21, 470:25, 471:6, 471:12, 471:14, 472:6, 473:7, 473:17, 474:6, 474:11, 474:22, 475:11, 475:17, 475:21, 475:25, 476:8, 476:11, 476:14, 476:16, 476:20, 476:24, 477:1, 477:3, 477:7, 477:9, 477:13, 477:19, 478:1, 478:4, 478:6, 478:10, 478:12, 478:16, 478:20, 478:22, 479:2, 479:4, 479:6, 479:9, 479:12, 479:16, 479:19, 480:2, 480:6, 480:11, 480:14, 480:18, 480:21, 480:25, 481:5, 481:7, 481:11, 481:15, 481:17, 481:19, 481:21, 482:2, 482:5, 482:14, 482:19, 482:21, 483:1, 483:3, 483:5, 483:8, 483:12, 483:14, 483:19, 483:22, 483:25, 484:3, 484:5, 484:8, 484:10, 484:15, 484:20, 484:22, 484:25, 485:6, 485:8, 485:12, 485:16, 485:20, 486:1, 486:4, 486:10, 486:12, 486:15, 486:17, 486:20, 486:24, 487:2, 487:5, 487:9, 487:12, 487:15, 487:20, 488:6, 488:15, 488:18, 488:21, 488:25, 489:5, 489:8, 489:12, 489:17, 490:6, 490:9, 490:11, 490:16, 490:20, 490:23, 490:25, 491:2, 491:4, 491:10

**protect** [2] - 393:23,

401:17
**protected** [2] - 298:23, 389:25
**protecting** [3] - 389:25, 390:1, 456:9
**protection** [2] - 389:6, 436:6
**protest** [14] - 317:22, 319:10, 321:2, 321:7, 336:16, 383:4, 385:17, 385:22, 395:24, 410:3, 430:3, 442:11, 457:24
**protesters** [5] - 293:20, 293:21, 294:8, 300:15, 409:11
**protesting** [11] - 319:12, 319:13, 322:20, 322:25, 333:19, 333:23, 418:7, 418:8, 431:14, 449:3
**protests** [2] - 369:12, 409:11
**Proud** [5] - 402:10, 402:15, 405:15, 405:18, 425:18
**proud** [1] - 389:14
**prove** [1] - 473:1
**provide** [3] - 374:25, 385:15, 453:13
**provided** [1] - 474:8
**proximity** [2] - 381:9, 424:22
**Public** [3] - 434:1, 485:17, 485:18
**public** [3] - 324:24, 348:11, 432:18
**publicly** [1] - 453:8
**pull** [2] - 409:12, 441:10
**pulled** [2] - 306:4, 408:18
**pulling** [2] - 372:7, 438:25
**punishment** [1] - 398:9
**purpose** [7] - 385:18, 385:21, 387:5, 392:12, 392:13, 395:24, 421:9
**pursued** [1] - 390:24
**pursuing** [1] - 370:2
**pushing** [2] - 294:19, 294:20
**putting** [2] - 318:2, 426:17

**Q**

**Quantico** [1] - 426:13
**questioning** [1] - 467:14
**Questions** [4] - 318:15, 320:3, 367:6, 381:13
**questions** [43] - 294:12, 294:22, 298:9, 309:3, 310:12, 312:1, 312:18, 314:7, 317:9, 320:23, 322:14, 324:12, 328:12, 345:12, 355:21, 360:21, 364:6, 365:4, 365:10, 367:6, 380:19, 387:21, 396:7, 408:8, 409:19, 418:20, 419:6, 432:23, 433:8, 434:19, 443:24, 446:7, 448:4, 451:22, 471:18, 472:8, 473:21, 474:23, 475:2, 475:22, 487:23, 489:15, 489:22
**quickly** [6] - 301:10, 314:19, 342:5, 428:10, 436:17, 442:15
**quite** [5] - 298:3, 313:19, 314:6, 391:2, 491:21

**R**

**racism** [1] - 367:7
**racists'** [1] - 356:24
**radio** [1] - 341:18
**raid** [1] - 401:16
**rally** [13] - 306:19, 335:8, 383:5, 385:18, 385:21, 387:4, 387:5, 388:15, 389:5, 391:11, 431:11, 438:20, 441:20
**rambled** [1] - 457:20
**ran** [1] - 436:18
**ranges** [1] - 428:15
**rather** [4] - 301:2, 397:10, 401:14, 450:1
**raw** [1] - 448:20
**Ray** [2] - 294:19, 299:3
**Rayburn** [2] - 445:11,

445:12
**rea** [3] - 338:6, 396:15, 397:10
**reach** [6] - 330:1, 382:5, 394:23, 461:19, 462:2, 489:11
**reached** [4] - 315:2, 382:8, 394:25, 395:8
**reaching** [2] - 292:21, 452:19
**reaction** [8] - 313:23, 357:5, 357:8, 360:25, 361:4, 366:19, 366:23, 393:11
**read** [9] - 307:14, 328:18, 353:15, 405:4, 431:9, 447:4, 450:3, 450:9, 451:3
**reading** [2] - 353:22, 405:10
**ready** [3] - 298:6, 381:16, 397:18
**real** [9] - 337:19, 338:4, 338:6, 368:19, 409:15, 472:20, 480:22, 486:8, 486:9
**real-time** [1] - 337:19
**reality** [2] - 403:15, 481:1
**realized** [1] - 366:8
**really** [26] - 296:24, 307:2, 319:7, 319:17, 320:11, 321:6, 323:25, 344:11, 344:19, 344:24, 353:22, 356:4, 356:14, 357:10, 375:12, 378:12, 379:6, 391:22, 416:22, 426:23, 429:16, 445:1, 448:11, 456:17, 465:4, 487:3
**realm** [1] - 439:23
**reason** [9] - 300:20, 300:24, 336:5, 346:23, 387:6, 420:21, 421:8, 458:6, 464:22
**reasonable** [4] - 311:9, 312:4, 366:23, 473:1
**reasoning** [1] - 300:19
**reasons** [12] - 297:23, 298:1, 306:19, 335:8, 337:14, 345:6, 379:24,

405:24, 406:1, 406:2, 422:23, 456:24
**Rebecca** [15] - 298:15, 305:14, 320:20, 333:4, 342:3, 358:2, 376:4, 387:25, 402:21, 414:25, 428:8, 440:8, 447:25, 467:7, 485:2
**receive** [1] - 400:20
**received** [6] - 302:15, 339:23, 373:7, 436:1, 462:13, 477:16
**recently** [1] - 434:5
**Recess** [3] - 367:18, 397:17, 460:20
**reckless** [1] - 382:12
**recognition** [1] - 377:1
**recognize** [3] - 344:5, 344:15, 449:19
**recognizing** [2] - 411:14, 424:17
**recollection** [1] - 353:5, 354:9, 359:18
**reconcile** [1] - 375:2
**reconciling** [1] - 374:24
**record** [10] - 300:12, 301:10, 314:19, 411:10, 411:17, 412:22, 427:9, 459:8, 459:11, 492:14
**recorded** [1] - 401:11
**recovering** [1] - 302:3
**recurring** [1] - 311:21
**reddish** [1] - 371:4
**refer** [3] - 333:12, 425:8, 427:14
**reference** [1] - 352:24
**referenced** [1] - 473:4
**referred** [2] - 396:21, 474:13
**referring** [5] - 321:14, 381:10, 432:16, 443:1, 443:3
**reflect** [2] - 370:9, 468:15
**reflected** [1] - 300:11
**reflection** [1] - 425:5
**regard** [3] - 390:23, 393:20, 473:8
**regarding** [2] - 397:3, 456:14
**regardless** [1] - 332:19, 381:9, 408:19

**registration** [1] - 434:20
**regular** [2] - 318:19, 481:8
**regularly** [1] - 354:19
**regulatory** [1] - 434:11
**relate** [1] - 358:5
**related** [11] - 315:4, 317:25, 339:14, 340:21, 355:5, 407:13, 439:10, 440:21, 461:15, 462:1, 467:13
**relations** [1] - 428:23
**relationship** [3] - 348:10, 414:8, 463:5
**relationships** [1] - 429:5
**relatives** [1] - 331:20
**reliable** [1] - 378:1
**relied** [1] - 396:24
**rely** [3] - 335:22, 336:21, 492:17
**remember** [30] - 296:25, 297:1, 306:4, 310:25, 326:22, 326:25, 333:22, 341:19, 351:17, 351:20, 360:4, 360:6, 395:2, 395:8, 398:14, 399:20, 402:10, 417:1, 419:21, 434:12, 454:20, 454:22, 461:12, 464:11, 477:17, 478:2, 478:17, 483:6, 489:6
**reminder** [1] - 307:16
**reminds** [1] - 307:15
**remote** [1] - 351:18
**remotely** [1] - 352:17
**removed** [1] - 365:24
**render** [3] - 316:22, 325:21, 452:16
**rendering** [2] - 452:9, 458:17
**renew** [1] - 299:23
**rent** [1] - 378:25
**rental** [2] - 369:14, 369:16
**repeat** [5] - 292:25, 361:14, 376:18, 452:12, 452:14
**repeated** [1] - 314:7
**repeatedly** [1] - 323:22, 324:4, 366:25
**replayed** [1] - 371:8
**report** [2] - 357:19,

484:14
**reported** [1] - 395:18
**REPORTER'S** [52] - 291:2, 292:9, 292:10, 299:20, 301:19, 313:13, 315:13, 316:11, 316:12, 323:19, 324:15, 327:13, 327:20, 329:2, 329:8, 337:12, 338:9, 345:15, 345:22, 346:19, 347:1, 347:24, 348:2, 365:14, 367:19, 380:24, 381:18, 396:9, 397:22, 409:23, 410:13, 412:21, 412:25, 422:8, 422:24, 433:11, 433:15, 435:2, 435:6, 444:2, 444:12, 445:24, 445:25, 451:24, 452:3, 459:5, 460:21, 476:1, 476:5, 489:18, 490:3, 491:11
**reports** [8] - 296:16, 356:22, 357:19, 383:20, 383:21, 446:13, 458:21, 480:17
**represent** [5] - 305:14, 322:13, 335:18, 362:19, 393:5
**representative** [1] - 441:20
**Representatives** [5] - 291:13, 291:17, 341:15, 354:3, 437:22
**representing** [3] - 462:24, 463:1
**request** [1] - 458:25
**require** [1] - 409:12
**requires** [1] - 442:3
**reschedule** [1] - 341:1
**rescheduled** [5] - 316:1, 347:16, 411:7, 411:8, 411:9
**rescheduling** [1] - 347:18
**research** [1] - 350:6
**researched** [2] - 323:14, 324:5
**resent** [4] - 407:23, 409:9, 409:10, 409:14

518

**resentment** [9] - 404:14, 404:15, 407:25, 408:11, 408:12, 408:24, 409:15, 410:2, 410:11
**resident** [2] - 339:13, 468:11
**residents** [1] - 454:23
**respect** [15] - 294:16, 310:1, 314:19, 338:7, 359:1, 362:21, 376:15, 399:16, 400:19, 466:9, 468:22, 469:6, 474:14, 481:13, 481:23
**respond** [1] - 350:24
**responded** [1] - 415:24
**response** [12] - 307:18, 313:17, 322:14, 326:19, 390:13, 393:7, 395:14, 407:1, 410:10, 432:9, 468:8, 471:17
**responses** [4] - 298:16, 367:1, 397:3, 459:1
**responsibilities** [1] - 455:6
**responsibility** [1] - 457:4
**rest** [3] - 401:12, 405:1, 446:21
**restroom** [1] - 460:19
**result** [1] - 372:11
**results** [2] - 433:6, 454:6
**retire** [3] - 413:11, 426:21, 426:23
**retired** [13] - 383:13, 383:14, 388:3, 412:15, 413:7, 413:8, 413:9, 426:9, 426:10, 478:23, 479:2, 479:4, 479:5
**retirement** [2] - 391:25, 392:13
**return** [1] - 363:8
**returned** [1] - 321:23
**reunify** [1] - 472:14
**review** [3] - 355:18, 380:10, 492:17
**Rhine** [43] - 294:2, 294:5, 298:15, 299:5, 299:15, 305:15, 313:2, 318:5, 318:7,

320:21, 321:5, 323:10, 333:5, 342:4, 358:3, 374:15, 376:5, 378:7, 386:5, 386:9, 388:1, 401:24, 402:2, 402:14, 402:17, 402:22, 415:1, 421:16, 421:20, 428:9, 439:12, 439:15, 440:8, 447:19, 447:21, 448:1, 459:10, 467:8, 473:25, 474:16, 485:2, 488:1, 488:4
**rigged** [2] - 317:12, 322:15
**rights** [3] - 296:14, 298:23, 455:6
**rigorous** [1] - 492:21
**Ring** [1] - 441:6
**riot** [1] - 357:20
**rioting** [1] - 449:3
**Road** [1] - 326:21
**road** [3] - 339:14, 341:8, 343:3
**robbed** [1] - 372:25
**robberies** [2] - 483:19, 483:23
**robbery** [1] - 373:4
**Roger** [1] - 394:9
**role** [2] - 358:8, 434:14
**roles** [1] - 450:22
**room** [4] - 310:4, 364:15, 378:25, 386:20
**root** [1] - 344:21
**rough** [1] - 307:11
**round** [1] - 459:8
**roundup** [1] - 437:13
**rule** [1] - 456:24
**rules** [4] - 300:7, 456:22, 456:25
**rumors** [1] - 294:21
**run** [2] - 406:7, 411:5
**run-up** [1] - 406:7
**Ryan** [2] - 328:17

### S

**safe** [2] - 311:3, 378:22
**safety** [4] - 359:4, 366:1, 407:9, 448:10
**sales** [1] - 451:11
**sat** [1] - 395:1
**satisfied** [1] - 422:12
**save** [1] - 297:5

**saw** [73] - 299:4, 305:20, 307:2, 317:8, 318:21, 323:2, 328:19, 330:23, 331:13, 333:11, 333:16, 333:17, 333:18, 333:20, 333:21, 333:24, 334:20, 334:21, 344:3, 344:10, 360:2, 385:19, 387:3, 387:4, 388:15, 388:17, 388:18, 388:23, 388:25, 395:18, 400:4, 400:23, 401:11, 401:13, 402:24, 416:7, 416:8, 416:18, 416:24, 416:25, 417:3, 417:20, 419:21, 422:16, 428:11, 429:12, 430:4, 430:10, 430:11, 430:23, 436:21, 438:21, 438:23, 446:12, 447:14, 448:6, 451:11, 454:7, 454:14, 465:18, 469:14, 469:15, 478:18, 479:10, 480:20, 480:22, 485:22, 486:22
**scaling** [1] - 370:16
**scared** [10] - 310:25, 356:4, 359:6, 359:9, 359:11, 363:15, 363:20, 366:22, 399:20
**scary** [2] - 306:3, 307:11
**scenario** [1] - 427:19
**scheduled** [2] - 410:23, 411:4
**school** [1] - 340:25
**screen** [1] - 418:21
**scrubbed** [1] - 427:9
**seat** [2] - 381:23, 433:18
**seated** [2] - 459:20, 491:25
**second** [3] - 301:12, 446:8, 464:23
**Secret** [3] - 355:3, 389:25, 390:1
**secretary** [1] - 485:9
**section** [1] - 434:7
**security** [3] - 377:13,

407:22, 409:17
**Security** [2] - 354:19, 355:6
**see** [50] - 297:20, 299:11, 299:13, 305:22, 308:2, 311:16, 311:17, 321:1, 322:4, 332:12, 334:10, 334:14, 339:18, 343:14, 344:16, 354:18, 355:18, 359:24, 360:17, 369:7, 375:12, 400:23, 403:9, 413:17, 414:1, 415:16, 415:17, 415:18, 416:12, 416:14, 418:10, 419:22, 419:23, 430:2, 430:3, 430:7, 435:1, 438:13, 438:24, 439:4, 442:10, 442:12, 448:12, 453:24, 468:24, 485:25, 493:5
**seeing** [22] - 304:11, 305:17, 305:25, 333:22, 353:20, 360:6, 361:19, 370:10, 379:9, 389:18, 400:16, 417:1, 421:13, 441:9, 442:16, 454:4, 454:5, 454:8, 464:3, 468:4, 468:8, 479:15
**seeking** [2] - 304:17, 425:16
**seem** [8] - 313:22, 337:17, 337:18, 383:10, 385:22, 385:25, 388:21, 389:23
**sees** [1] - 313:18
**selected** [14] - 309:4, 316:22, 325:20, 335:20, 364:12, 384:10, 394:20, 407:25, 419:10, 421:1, 421:4, 452:15, 472:24, 491:17
**selection** [3] - 329:22, 464:24, 467:14
**self** [3] - 369:24, 371:17, 376:7
**self-employed** [3] - 369:24, 371:17,

376:7
**sell** [1] - 451:15
**semblance** [1] - 457:7
**seminars** [1] - 427:2
**send** [4] - 326:6, 326:9, 326:10, 326:11
**sense** [19] - 310:13, 343:10, 364:3, 366:22, 373:18, 393:12, 395:15, 395:21, 405:5, 407:14, 407:16, 407:24, 408:20, 427:20, 432:24, 454:22, 458:15, 458:18, 472:16
**sensitive** [1] - 356:12
**sent** [1] - 467:21
**sentiment** [2] - 314:2, 419:14
**sentiments** [1] - 470:5
**separate** [2] - 391:13, 463:2
**series** [1] - 315:4
**serious** [1] - 315:5
**serve** [7] - 373:14, 382:20, 394:10, 394:11, 396:24, 467:12, 467:23
**served** [7] - 382:14, 394:12, 398:7, 476:22, 488:11, 488:24, 489:3
**service** [12] - 329:17, 330:5, 330:14, 381:25, 394:1, 398:3, 400:7, 435:13, 435:16, 461:3, 476:13, 488:17
**Service** [4] - 355:3, 389:25, 390:1, 461:17
**services** [3] - 407:22, 409:13, 409:17
**serving** [1] - 488:12
**sessions** [1] - 373:8
**set** [9] - 309:15, 310:7, 314:6, 314:8, 320:24, 386:7, 396:17, 422:15, 449:22
**sets** [1] - 300:7
**setting** [2] - 328:8, 360:19
**settled** [1] - 311:10
**setup** [1] - 388:24
**seven** [3] - 330:9, 371:18, 434:8

519

**several** [7] - 413:12, 413:13, 461:14, 466:11, 480:14, 480:15, 484:10
**severe** [1] - 328:4
**severely** [1] - 297:4
**shakes** [1] - 413:22
**share** [4] - 305:24, 344:23, 433:3, 469:13
**shared** [5] - 356:25, 366:3, 465:19, 465:23, 470:6
**sharing** [2] - 344:8, 393:2
**shelter** [1] - 445:13
**sheltered** [2] - 292:3, 445:14
**sheltering** [2] - 366:1, 403:22
**shift** [1] - 381:14
**shock** [2] - 430:16, 455:11
**shocked** [1] - 455:14
**shocking** [3] - 353:8, 356:7, 430:24
**shooting** [1] - 459:22
**short** [3] - 387:19, 398:8, 460:8
**shot** [1] - 333:21
**show** [2] - 336:19, 400:12
**showed** [3] - 293:19, 293:21, 416:10
**shown** [1] - 335:14
**shows** [2] - 295:23, 447:1
**shutdown** [1] - 339:15
**sick** [3] - 302:3, 314:12, 351:18
**side** [3] - 350:2, 350:15, 439:24
**sides** [1] - 489:2
**significant** [8] - 313:16, 313:23, 328:5, 365:18, 401:16, 403:6, 465:19, 465:23
**significantly** [1] - 399:15
**signs** [4] - 438:17, 438:25, 441:2, 441:9
**similar** [12] - 300:2, 313:18, 328:6, 328:7, 331:16, 337:14, 370:21, 373:19, 402:6, 425:12, 471:7, 483:16
**similarly** [2] - 402:13,

491:8
**simple** [1] - 343:9
**simply** [2] - 297:15, 469:25
**sincere** [1] - 313:22
**sister** [1] - 338:18
**sit** [9] - 314:4, 316:22, 325:20, 366:21, 378:6, 446:20, 452:15, 462:6, 490:9
**sitting** [2] - 390:3, 411:23
**situation** [7] - 303:18, 306:3, 318:23, 363:20, 406:16, 456:5, 457:12
**situations** [2] - 356:18, 456:6
**six** [10] - 301:24, 315:20, 346:5, 371:18, 376:8, 394:14, 394:16, 410:20, 445:2, 490:14
**six-day** [3] - 301:24, 315:20, 410:20
**Sixth** [1] - 424:4
**skip** [1] - 329:6
**skipping** [2] - 301:17, 324:17
**sleep** [2] - 310:17, 411:24
**sleeping** [1] - 302:11
**slightly** [1] - 377:18
**slurs** [1] - 440:19
**small** [2] - 312:15, 450:1
**smaller** [1] - 449:14
**smashed** [1] - 449:21
**smoke** [1] - 360:4
**snippets** [2] - 465:18, 465:23
**social** [5] - 372:15, 377:2, 462:15, 469:11, 471:2
**software** [3] - 371:19, 377:2, 377:17
**soldiers** [1] - 369:8
**sole** [1] - 456:20
**solely** [10] - 316:22, 325:21, 349:13, 349:14, 421:20, 439:16, 452:9, 452:16, 474:4, 488:4
**solve** [1] - 492:21
**someone** [21] - 291:10, 300:13, 313:3, 325:2, 326:1, 344:11, 352:22, 360:5, 368:14,

369:15, 377:13, 380:6, 390:1, 398:20, 411:14, 420:22, 423:21, 438:20, 460:12, 463:11, 483:2
**someplace** [1] - 481:18
**sometimes** [12] - 293:4, 301:15, 314:25, 415:10, 429:7, 469:1, 469:10, 469:12, 471:3, 472:16, 472:17
**somewhat** [7] - 320:4, 342:11, 343:10, 362:1, 400:18, 403:12, 407:13
**somewhere** [1] - 399:13
**soon** [3] - 363:10, 363:11, 400:12
**sorely** [2] - 326:5, 326:8
**sorry** [23] - 304:3, 309:19, 324:9, 326:7, 346:18, 357:7, 371:6, 379:6, 392:2, 392:22, 410:22, 413:2, 417:8, 418:20, 429:21, 432:20, 441:12, 453:23, 457:19, 482:24, 491:3, 492:10
**sort** [38] - 294:15, 300:8, 310:17, 312:23, 319:16, 319:20, 324:24, 337:4, 340:4, 343:19, 349:23, 350:23, 361:1, 363:4, 374:25, 381:7, 383:5, 386:15, 397:2, 399:10, 400:11, 400:13, 401:18, 401:19, 402:11, 403:13, 403:14, 408:23, 409:16, 421:14, 433:3, 434:11, 438:25, 448:11, 470:5, 487:12, 487:13
**sorts** [7] - 296:6, 338:7, 339:11, 372:2, 372:3, 439:8, 474:2
**sought** [3] - 325:2,

424:17, 447:2
**sound** [3] - 311:11, 328:7, 481:24
**sounds** [7] - 306:22, 328:6, 378:9, 415:23, 442:2
**source** [1] - 372:8
**sources** [6] - 296:1, 296:5, 372:8, 372:9, 377:9, 391:21
**South** [1] - 482:6
**speaking** [3] - 376:21, 387:4, 413:4
**special** [7] - 301:25, 315:21, 328:2, 346:5, 411:20, 490:14, 490:17
**specialize** [1] - 426:14
**specialty** [1] - 377:16
**specific** [34] - 296:20, 296:21, 300:24, 305:4, 317:9, 318:17, 331:16, 331:17, 343:23, 343:24, 353:15, 354:8, 370:22, 372:6, 372:9, 381:14, 382:24, 386:20, 402:7, 402:10, 425:12, 425:13, 437:8, 437:16, 442:9, 446:8, 446:14, 447:3, 449:23, 464:4, 464:11, 469:14
**specifically** [7] - 318:5, 342:22, 381:10, 395:17, 428:20, 447:2, 452:25
**specifics** [3] - 341:19, 371:11, 464:11
**speculation** [2] - 300:19, 300:24
**speculative** [1] - 429:18
**speech** [3] - 333:12, 388:16, 468:20
**spin** [1] - 428:18
**spin-off** [1] - 428:18
**spoken** [2] - 362:6, 393:25
**sprained** [1] - 411:22
**staff** [1] - 340:24
**stand** [3] - 370:22, 412:1, 465:22
**standard** [2] - 323:25, 377:8
**standing** [1] - 296:13

**stands** [1] - 438:6
**start** [6] - 302:5, 349:21, 412:13, 426:4, 478:25, 492:24
**started** [5] - 300:6, 306:22, 400:12, 442:13, 492:5
**starting** [1] - 291:4
**starts** [1] - 364:2
**State** [1] - 339:7
**state** [6] - 332:5, 386:11, 397:5, 410:4, 443:4, 443:5
**states** [2] - 390:23, 481:12
**States** [4] - 322:13, 324:25, 486:19, 486:20
**static** [1] - 343:20
**station** [1] - 358:19
**statue** [1] - 371:5
**stay** [1] - 306:5
**stayed** [1] - 311:15
**staying** [2] - 436:20, 438:11
**stays** [1] - 369:15
**stealing** [1] - 370:17
**step** [1] - 460:5
**still** [35] - 302:3, 302:5, 307:12, 307:13, 307:14, 307:16, 308:1, 311:12, 314:1, 321:18, 343:21, 344:1, 359:13, 360:24, 374:6, 377:20, 390:8, 391:22, 394:16, 407:8, 408:20, 408:22, 408:23, 417:15, 448:16, 448:23, 448:25, 453:14, 453:21, 453:24, 467:25, 472:2, 472:17, 480:25, 489:15
**stolen** [1] - 441:3
**stood** [1] - 438:8
**stop** [2] - 425:3, 446:17
**stopping** [1] - 441:7
**stories** [2] - 294:18, 474:3
**story** [7] - 297:8, 331:1, 383:19, 416:20, 446:24, 454:15, 465:9
**straight** [1] - 472:20
**Strategies** [1] - 428:14

**street** [2] - 436:21, 438:21
**Street** [1] - 463:14
**streets** [2] - 438:18, 455:7
**strength** [1] - 300:2
**stress** [3] - 374:6, 379:13, 379:14
**stricken** [2] - 381:8, 491:16
**strike** [19] - 298:7, 299:22, 299:23, 300:4, 313:15, 314:10, 323:21, 324:8, 327:14, 337:13, 338:8, 365:15, 380:25, 396:10, 409:24, 410:8, 410:9, 422:9, 422:22
**striking** [2] - 301:8, 383:8
**strong** [16] - 318:11, 320:4, 323:4, 323:5, 323:23, 324:11, 355:13, 373:21, 384:23, 385:3, 385:5, 385:11, 390:17, 431:3, 439:23, 458:14
**strongest** [1] - 449:10
**struck** [6] - 300:8, 324:10, 459:19, 467:16, 467:20, 467:22
**struggles** [1] - 370:13
**stuck** [1] - 396:13
**studying** [1] - 353:21
**stuff** [11] - 293:5, 293:21, 297:20, 320:13, 351:23, 352:10, 354:8, 355:6, 356:11, 384:8, 451:16
**subsequent** [1] - 370:4
**subset** [1] - 408:15
**subsided** [2] - 407:6, 407:17
**successful** [2] - 422:3, 422:19
**sudden** [2] - 343:7, 343:14
**sufficiently** [1] - 444:5
**suitable** [2] - 385:25, 460:4
**suits** [2] - 319:19, 319:23
**sum** [1] - 448:11
**summer** [1] - 293:17

**Sunday** [1] - 346:9
**super** [2] - 370:5
**Superior** [6] - 330:10, 394:12, 395:4, 398:12, 461:7, 489:4
**support** [1] - 420:7
**supporting** [1] - 418:2
**supposed** [2] - 340:16, 401:17
**surgery** [2] - 410:24, 415:6
**surprise** [1] - 448:12
**surprised** [2] - 383:6, 430:12
**surrounding** [2] - 294:12, 381:4
**survivors** [1] - 344:7
**sustained** [1] - 342:24
**swamp** [1] - 409:13
**sweatshirt** [3] - 344:3, 344:4, 344:11
**system** [9] - 297:24, 382:19, 411:11, 411:18, 412:23, 463:6, 466:23, 483:10, 484:18
**systemic** [1] - 469:11

---

**T**

**tactics** [2] - 372:7, 439:6
**talks** [1] - 374:6
**tangential** [1] - 463:5
**Tanya** [1] - 367:16
**taught** [3] - 389:13, 426:15, 426:17
**tax** [10] - 348:21, 348:22, 348:25, 349:13, 349:14, 349:22, 349:25, 350:8, 368:7, 368:9
**tax-type** [1] - 349:25
**taxes** [1] - 386:16
**teaching** [1] - 326:1
**tearing** [1] - 438:17
**technical** [3] - 411:10, 411:17, 412:22
**techniques** [6] - 376:23, 377:5, 377:8, 377:24, 381:7
**technology** [1] - 388:4
**teenager** [2] - 482:22, 483:8
**teenagers** [2] - 372:25, 373:1
**televised** [1] - 453:9
**television** [2] - 304:16, 464:21
**ten** [9] - 308:19, 311:2,

314:13, 314:15, 329:20, 367:17, 399:5, 404:7, 437:12
**ten-minute** [2] - 367:17, 437:12
**tend** [3] - 332:21, 414:9, 482:11
**tension** [1] - 454:23
**Tenth** [1] - 399:4
**terms** [13] - 355:5, 357:4, 369:5, 371:10, 379:15, 394:17, 406:8, 406:15, 429:25, 441:22, 450:20, 458:10, 486:21
**terrible** [3] - 311:17, 344:11, 371:7
**terrifying** [1] - 306:6
**territory** [2] - 385:14, 393:21
**testify** [6] - 373:9, 374:15, 374:16, 459:10, 466:18, 484:6
**testimony** [12] - 297:12, 297:13, 297:15, 355:10, 375:1, 414:13, 455:25, 456:7, 456:9, 456:14, 482:11, 482:12
**text** [1] - 377:14
**thankfully** [1] - 369:1
**theirs** [1] - 441:2
**themselves** [2] - 393:19, 456:10
**theories** [2] - 315:4, 326:2
**they've** [2] - 376:23, 377:6
**thinking** [9] - 311:15, 318:13, 344:1, 360:24, 404:10, 427:19, 429:15, 451:2, 453:11
**Third** [2] - 463:14, 463:15
**third** [1] - 395:5
**thirty** [2] - 477:1, 477:2
**thoughts** [3] - 448:17, 453:15, 453:17
**thousands** [7] - 293:24, 312:20, 386:2, 387:11, 401:22, 408:11, 473:22
**threat** [3] - 292:1, 371:20, 371:22

**threats** [2] - 371:23, 401:17
**three** [10] - 341:8, 358:11, 402:11, 413:18, 413:20, 414:2, 414:3, 459:18, 461:7, 491:24
**throw** [1] - 441:11
**Thursday** [6] - 346:10, 346:21, 347:8, 347:13, 347:25, 445:1
**tilt** [1] - 428:23
**tiring** [1] - 302:10
**titles** [1] - 429:8
**today** [24] - 299:11, 306:5, 306:11, 311:19, 320:25, 321:1, 321:4, 321:9, 329:4, 334:13, 359:12, 360:25, 378:6, 378:16, 390:6, 396:3, 404:12, 431:1, 455:22, 470:3, 474:8, 492:18
**together** [4] - 361:22, 377:10, 426:18, 455:20
**tomorrow** [6] - 315:24, 460:2, 491:14, 492:5, 492:23, 493:5
**took** [20] - 295:13, 296:12, 300:14, 300:21, 303:14, 330:18, 341:5, 341:11, 355:14, 373:22, 384:24, 396:21, 400:2, 424:14, 431:15, 436:11, 436:17, 454:12, 461:16, 478:15
**top** [2] - 457:15, 466:6
**topic** [1] - 465:13
**topics** [1] - 356:12
**torn** [1] - 441:3
**total** [1] - 358:11
**totality** [2] - 317:23, 319:5
**totally** [2] - 320:12, 369:10
**touched** [1] - 320:3
**tough** [4] - 375:1, 445:2, 468:14, 470:4
**toward** [2] - 376:20, 388:19
**towards** [10] - 333:18,

349:7, 361:6, 376:17, 391:8, 408:12, 448:19, 449:7, 449:10, 456:9
**town** [2] - 315:23, 369:12
**trade** [1] - 370:1
**traffic** [3] - 398:9, 400:8, 427:6
**training** [7] - 302:15, 349:17, 368:3, 423:8, 436:1, 462:13, 477:16
**trampled** [1] - 297:4
**transfer** [4] - 383:9, 389:13, 389:14, 389:18
**transition** [1] - 435:4
**transitioned** [1] - 400:13
**Transportation** [4] - 485:9, 485:10, 485:19, 485:20
**trauma** [3] - 307:17, 313:17, 379:10
**traumatic** [4] - 369:5, 373:16, 378:12, 381:3
**traumatizing** [1] - 374:5
**travel** [2] - 329:5, 387:5
**traveling** [1] - 388:19
**treat** [7] - 313:3, 332:18, 332:24, 355:8, 414:13, 455:25, 482:12
**treated** [2] - 297:13, 297:20
**treating** [2] - 317:14, 468:21
**trespassing** [2] - 294:14, 300:10
**trial** [35] - 297:12, 298:21, 299:2, 299:5, 299:11, 299:13, 301:24, 315:20, 316:23, 322:2, 325:22, 328:10, 346:4, 365:5, 373:10, 384:16, 384:17, 384:18, 384:19, 394:8, 394:24, 410:20, 410:25, 445:2, 452:10, 452:16, 455:25, 457:12, 462:10, 466:18, 474:9, 484:6, 488:24,

490:13, 492:25
**trials** [4] - 303:20, 372:15, 383:21, 402:12
**tried** [4] - 297:5, 385:4, 418:21, 461:14
**trip** [2] - 315:24, 444:25
**trooper** [1] - 332:5
**trouble** [8] - 294:25, 297:11, 302:11, 316:21, 319:14, 328:12, 452:9, 458:7
**trucks** - 408:18
**true** [2] - 317:12, 450:8
**Trump** [7] - 321:17, 388:16, 439:9, 440:21, 449:8, 449:10, 454:3
**Trump's** [1] - 333:12
**trust** [1] - 297:23
**truthfully** [1] - 457:10
**try** [15] - 298:18, 313:5, 313:21, 386:22, 392:14, 392:17, 396:18, 414:15, 415:20, 421:22, 422:1, 422:2, 422:16, 451:15, 465:20
**trying** [14] - 294:24, 310:19, 334:22, 340:22, 375:10, 393:16, 400:15, 422:4, 430:20, 441:23, 450:10, 453:23, 475:3
**tune** [1] - 416:23
**turn** [1] - 446:20
**TV** [17] - 318:20, 322:4, 333:16, 333:24, 340:14, 356:7, 415:20, 416:4, 416:5, 416:6, 416:8, 416:10, 416:16, 416:23, 446:20, 448:13, 464:18
**TVs** [1] - 353:21
**twenty** [1] - 489:10
**two** [30] - 291:3, 296:1, 300:8, 307:24, 314:22, 332:3, 345:20, 358:14, 363:24, 382:15, 387:9, 391:13, 394:7, 394:13, 413:18,

413:20, 414:2, 414:3, 427:19, 446:6, 454:19, 461:7, 461:13, 466:6, 466:9, 467:12, 477:3, 477:5, 488:17
**type** [13] - 349:25, 355:6, 357:21, 360:8, 360:19, 361:2, 382:4, 436:6, 437:7, 458:17, 473:14, 483:20
**types** [7] - 356:18, 357:12, 382:9, 429:12, 430:3, 467:1, 488:17
**typical** [1] - 441:19
**typically** [3] - 377:20, 415:19, 429:1

### U

**U.S** [13] - 291:12, 325:3, 348:10, 348:17, 352:23, 368:15, 382:25, 398:21, 423:22, 424:15, 433:25, 461:16, 463:12
**ultimately** [1] - 373:6
**unable** [2] - 301:14, 452:20
**unambiguous** [1] - 314:8
**unauthorized** [1] - 461:15
**unclear** [2] - 460:2, 460:5
**uncommon** [1] - 453:9
**unconventional** [1] - 469:12
**under** [3] - 327:1, 360:7, 487:15
**undermine** [1] - 454:6
**underneath** [1] - 360:8
**understandable** [2] - 381:3, 393:10
**understandably** [2] - 310:8, 312:7
**understood** [6] - 302:20, 415:3, 432:22, 471:19, 471:21, 472:22
**unfold** [2] - 333:9, 343:3
**unfolded** [4] - 303:22, 303:24, 424:20, 479:8

**unfolding** [2] - 400:12, 403:14
**unfortunate** [3] - 417:15, 419:8, 419:14
**unfortunately** [2] - 369:11, 465:25
**unique** [4] - 344:18, 360:15, 360:17, 371:3
**United** [4] - 322:13, 324:25, 486:19, 486:20
**unjust** [1] - 458:6
**unlawful** [1] - 475:7
**unless** [2] - 335:13, 392:12
**unlikely** [1] - 299:4
**unnerving** [1] - 369:10
**unreal** [2] - 486:5, 486:7
**unruly** [1] - 439:15
**unsafe** [1] - 448:9
**up** [77] - 305:16, 307:1, 312:1, 312:17, 314:18, 320:11, 320:22, 325:12, 333:6, 334:21, 339:21, 340:17, 341:7, 342:5, 344:16, 346:10, 352:15, 352:19, 355:20, 356:1, 358:4, 359:13, 359:15, 360:20, 362:20, 368:21, 369:22, 370:25, 376:6, 379:10, 388:2, 388:8, 394:16, 399:7, 402:23, 406:7, 406:25, 407:15, 409:19, 412:1, 415:2, 415:22, 419:5, 423:18, 424:6, 428:10, 431:2, 431:24, 432:8, 434:5, 436:21, 437:10, 437:11, 438:21, 438:25, 440:9, 441:8, 441:10, 447:1, 448:3, 448:11, 448:15, 451:10, 453:17, 456:12, 461:12, 467:8, 470:3, 471:17, 473:20, 474:23, 475:1, 475:22,

485:4, 485:21, 486:3, 489:1
**up-front** [2] - 355:20, 356:1
**updates** [1] - 437:6
**upset** [16] - 306:12, 306:13, 309:13, 310:8, 311:1, 311:12, 312:6, 312:7, 312:13, 312:14, 312:20, 313:20, 313:25, 314:2, 399:19, 468:9
**upsetting** [1] - 311:8
**upwards** [1] - 423:10
**ushering** [1] - 323:3
**usual** [1] - 358:19

### V

**Valentini** [13] - 299:21, 322:12, 335:18, 362:18, 393:5, 406:24, 418:18, 432:6, 459:23, 460:15, 471:15, 474:13, 489:14
**VALENTINI** [141] - 291:1, 292:6, 298:6, 299:23, 301:9, 301:12, 308:23, 308:25, 309:2, 309:10, 309:13, 309:15, 309:19, 309:23, 310:1, 310:7, 310:11, 312:18, 313:24, 314:18, 314:22, 316:7, 322:10, 322:12, 322:17, 322:23, 323:4, 323:15, 323:20, 327:10, 328:24, 335:25, 336:3, 336:8, 336:12, 336:18, 336:24, 337:21, 345:11, 345:18, 346:16, 347:22, 362:16, 362:18, 362:25, 363:3, 363:7, 363:11, 363:14, 363:17, 363:19, 363:23, 364:5, 364:9, 364:12, 364:18, 364:20, 364:23, 364:25, 365:3, 365:7, 365:10, 366:12, 380:19, 381:5,

393:4, 393:10, 393:25, 394:3, 394:19, 394:22, 395:1, 395:8, 395:11, 395:13, 395:20, 395:25, 396:7, 397:1, 397:20, 406:23, 407:10, 407:13, 407:24, 408:5, 408:8, 409:21, 410:7, 418:16, 418:18, 419:1, 419:4, 419:10, 419:18, 419:24, 420:5, 420:9, 420:13, 420:15, 421:1, 421:4, 421:11, 422:20, 432:2, 432:4, 432:6, 432:12, 432:15, 432:18, 432:22, 433:3, 433:8, 433:13, 434:23, 443:23, 444:7, 445:19, 451:22, 452:1, 458:22, 459:11, 460:16, 471:13, 471:15, 472:22, 473:12, 473:19, 475:23, 476:4, 479:22, 487:23, 489:15, 489:20, 490:2, 491:6, 491:21, 492:3, 492:6, 493:2
**validity** [1] - 317:5
**vandalism** [30] - 294:1, 294:3, 299:6, 312:22, 313:3, 313:21, 321:5, 337:4, 386:3, 386:6, 401:23, 401:24, 402:1, 408:14, 421:16, 430:3, 439:13, 442:11, 442:15, 442:17, 447:16, 447:19, 448:5, 468:5, 473:23, 474:1, 485:25, 487:25, 488:2, 488:3
**varies** [1] - 431:24
**variety** [1] - 428:14
**various** [4] - 296:2, 345:6, 353:13, 446:12
**vehicle** [1] - 461:16
**vehicles** [2] - 374:8, 441:7

**venue** [1] - 492:17
**verdict** [14] - 292:21,
316:22, 325:21,
330:2, 382:5,
394:23, 394:25,
395:9, 452:9,
452:16, 452:19,
461:20, 462:2,
489:11
**verified** [1] - 294:22
**versus** [1] - 294:7
**via** [1] - 372:15
**Vice** [1] - 389:24
**victim** [7] - 372:22,
427:16, 427:21,
427:23, 466:3,
466:6, 483:18
**victims** [1] - 466:8
**video** [7] - 295:22,
323:2, 374:18,
415:16, 415:17,
415:18, 419:2
**videos** [4] - 305:17,
370:8, 370:9,
442:16, 468:4
**view** [9] - 319:13,
357:10, 420:9,
422:13, 428:3,
431:7, 463:6, 472:1,
472:4
**viewing** [1] - 357:17
**views** [6] - 315:6,
356:24, 357:1,
366:4, 450:14,
466:22
**violations** [1] - 427:6
**violence** [64] - 293:25,
294:3, 299:6,
305:18, 312:22,
313:2, 321:5,
333:24, 334:11,
337:1, 337:3,
342:19, 343:1,
357:15, 357:16,
357:21, 357:22,
359:24, 366:6,
367:7, 373:18,
375:6, 375:7,
375:12, 375:15,
380:4, 380:7, 386:3,
386:5, 386:12,
387:2, 389:1,
401:16, 401:18,
401:23, 401:24,
402:1, 405:3, 405:6,
408:14, 408:19,
421:14, 421:16,
422:16, 430:2,
430:10, 439:13,
442:11, 442:15,

442:17, 447:15,
447:19, 448:5,
468:4, 469:17,
472:2, 473:23,
473:25, 485:25,
487:19, 487:25,
488:1, 488:3
**violent** [12] - 293:21,
294:7, 294:8,
370:12, 406:4,
408:22, 409:16,
417:2, 418:12,
442:25, 449:25,
451:6
**Virginia** [1] - 426:12
**virtual** [1] - 340:16
**visible** [1] - 370:7
**vision** [3] - 415:9,
415:14, 418:20
**vivid** [3] - 353:5,
353:7, 359:18
**voir** [2] - 315:8, 492:21
**vote** [3] - 321:18,
321:19, 321:21
**voter** [1] - 321:22
**votes** [2] - 391:1,
391:2
**voting** [2] - 321:23,
374:14
**vulnerable** [1] -
326:25

## W

**waiting** [2] - 320:13,
415:4
**walk** [3] - 339:16,
369:7, 424:5
**walked** [3] - 388:24,
475:4, 475:9
**walking** [2] - 424:10,
438:21
**wall** [1] - 370:16
**Washington** [9] -
363:1, 379:3,
441:13, 446:13,
447:1, 481:10,
481:11, 481:18,
482:4
**watch** [38] - 303:22,
304:6, 304:8,
304:24, 321:8,
331:9, 341:16,
354:6, 354:7, 354:8,
354:10, 354:13,
384:6, 384:7,
391:18, 401:6,
415:20, 416:23,
419:2, 424:19,
425:3, 425:22,

426:1, 436:13,
437:23, 438:3,
446:21, 447:10,
447:12, 465:16,
465:21, 479:7,
480:9, 480:16,
480:17, 490:18,
490:21
**watched** [51] - 304:8,
304:20, 304:25,
305:17, 305:18,
318:16, 318:18,
318:19, 318:22,
318:25, 330:22,
330:23, 331:5,
331:11, 333:7,
333:9, 339:18,
341:11, 343:2,
353:25, 359:16,
369:19, 379:16,
382:23, 383:15,
383:24, 388:9,
391:22, 396:20,
401:2, 401:3, 401:8,
401:9, 401:10,
404:19, 404:23,
404:25, 405:4,
429:11, 429:22,
436:14, 437:19,
447:6, 458:2, 464:9,
465:13, 468:3,
480:5, 480:13,
480:15, 480:18
**watching** [29] -
296:19, 306:23,
307:2, 320:11,
334:1, 353:5, 356:6,
359:19, 369:8,
383:1, 383:3,
388:12, 389:2,
390:21, 391:7,
395:19, 405:10,
416:16, 417:6,
430:6, 430:14,
455:10, 468:2,
479:13, 479:20,
485:23, 486:5,
486:21, 490:24
**ways** [7] - 371:3,
374:1, 403:13,
407:20, 409:10,
409:14, 469:12
**wear** [1] - 328:7
**wearing** [2] - 344:4,
344:11
**Wednesday** [1] -
444:25
**week** [19] - 299:13,
302:3, 302:4,
308:10, 335:12,

346:11, 346:12,
346:21, 347:9,
362:14, 363:13,
366:17, 380:16,
392:10, 411:1,
444:22, 464:23,
467:12
**weeks** [5] - 320:13,
353:11, 363:12,
467:12
**weigh** [1] - 456:11
**weird** [1] - 353:11
**Western** [1] - 295:25
**White** [2] - 418:6,
418:7
**white** [1] - 356:23
**whole** [10] - 293:13,
296:9, 330:24,
333:9, 392:8,
452:14, 464:13,
468:18
**wide** [1] - 428:14
**wife** [12] - 351:18,
368:18, 373:6,
374:6, 378:15,
398:23, 399:17,
403:25, 404:3,
436:2, 437:24, 438:6
**wild** [1] - 308:4
**wills** [1] - 368:7
**window** [1] - 347:18
**windows** [2] - 439:6,
440:14
**winner** [1] - 317:12
**wire** [1] - 308:4
**wisely** [1] - 293:10
**wished** [1] - 448:21
**witness** [17] - 297:15,
332:18, 332:22,
355:8, 372:22,
427:17, 427:21,
466:4, 483:18,
489:21
**witnessed** [2] - 361:9,
439:14
**witnesses** [3] -
374:16, 414:7, 482:7
**woke** [1] - 320:11
**woman** [2] - 297:3,
329:21
**won** [1] - 317:12
**wonderful** [2] - 467:2,
471:8
**wondering** [1] -
320:23
**word** [1] - 384:15
**words** [2] - 366:22,
453:23
**worker** [2] - 462:15,
469:11

**workers** [2] - 358:16,
471:2
**works** [16] - 291:11,
311:2, 339:4,
350:16, 352:23,
354:19, 368:7,
368:8, 368:15,
398:20, 398:23,
423:21, 428:19,
436:4, 445:4, 463:12
**world** [2] - 462:14,
477:17
**worried** [6] - 311:1,
359:3, 379:2, 400:7,
404:11, 407:4
**worry** [2] - 311:8,
407:6
**worrying** [1] - 311:1
**write** [1] - 297:18
**wrote** [2] - 347:8,
477:17

## Y

**year** [3] - 321:19,
321:21, 435:19
**years** [36] - 291:18,
295:20, 297:25,
306:2, 307:24,
329:20, 330:9,
358:12, 358:14,
368:18, 368:20,
371:18, 376:8,
382:15, 389:22,
394:7, 394:14,
394:15, 394:16,
398:8, 400:18,
413:12, 413:13,
423:10, 426:11,
426:24, 434:8,
441:14, 454:19,
466:11, 477:3,
477:5, 482:22,
485:12, 489:9,
489:10
**yelling** [5] - 438:18,
439:6, 439:8,
440:14, 440:18
**yesterday** [8] -
298:14, 300:4,
302:6, 302:9,
328:11, 338:8,
411:1, 457:13
**younger** [1] - 368:6
**yourself** [6] - 334:25,
349:17, 359:7,
379:7, 389:9, 455:9