1   **UNITED STATES DISTRICT COURT**
    **FOR THE DISTRICT OF COLUMBIA**

2   _____

3   United States of America,      ) Criminal Action
                                   ) No. 1:21-cr-00687-RC
4                    Plaintiff,    )
                                   ) **_Jury Voir Dire_**
5   vs.                            )
                                   )
6   David Charles Rhine,           ) Washington, D.C.
                                   ) **April 19, 2023**
7                    Defendant.    ) Time:  10:00 a.m.
    _____

8

9                   **Transcript of _Jury Voir Dire_**
                         **Held Before**
10            **The Honorable Rudolph Contreras**
                **United States District Judge**

11
                        A P P E A R A N C E S
12

13  For the Government:    **Francesco Valentini**
                          DEPARTMENT OF JUSTICE
14                        950 Pennsylvania Avenue, Northwest
                          Washington, D.C. 20530

15                        **Kelly E. Moran**
                          UNITED STATES ATTORNEY'S OFFICE
16                        FOR THE DISTRICT OF COLUMBIA
                          601 D Street, Northwest
17                        Washington, D.C. 20579

18  For the Defendant:    **Rebecca C. Fish**
                          FEDERAL PUBLIC DEFENDER
19                        1331 Broadway, Suite 400
                          Tacoma, Washington 98402
20  _____

21  Stenographic Official Court Reporter:
                          Nancy J. Meyer
22                        Registered Diplomate Reporter
                          Certified Realtime Reporter
23                        333 Constitution Avenue, Northwest
                          Washington, D.C. 20001
24                        202-354-3118

25

<u>P R O C E E D I N G S</u>

1

2          (Proceedings held in the presence of the jury

3  venire.)

4          THE COURTROOM DEPUTY:  This is Criminal Action

5  21-687, United States v. David Charles Rhine.

6          For the United States, I have Francesco Valentini,

7  Kelly Moran.  For defendant, I have Rebecca Fish.  Our court

8  reporter this morning is Nancy Meyer.

9          All parties are present.

10          THE COURT:  Good morning, everybody.

11          All right.  Well, first, let me thank you for

12  participating in this process.  The process of jury trials is a

13  very important part of our social history as a country and a

14  civic duty for its citizens.  So I appreciate you participating

15  in this process and coming.

16          So we're in the process of picking a jury, and I'm going

17  swear you in, and then we'll go through some questions.

18          THE COURTROOM DEPUTY:  Everyone, please stand and

19  raise your right hand.

20          (Oath administrated to the jury venire.)

21          COLLECTIVE JURY VENIRE:  (Affirmative.)

22          THE COURT:  All right.  So I think some of you have

23  been through this process already, but just let me give the

24  explanation that I would give to everybody.

25          So the purpose of this process in which we ask you a

1    number of questions in order to pick a jury is referred to as

2    *voir dire*, and the purpose of *voir dire* is to enable the Court

3    to determine whether any prospective juror should be excused

4    for cause and to enable the counsel for the parties to exercise

5    their individual judgment with respect to peremptory challenge;

6    that is, to challenges for which counsel need not give a

7    reason.

8         So I'll give you a brief description of the case so that

9    you may put the questions posed to you in context.  This

10   information is simply to provide context to the questions, and

11   please do not use this information to conduct research,

12   electronic or otherwise, or to gather information about the

13   people involved, the charges brought, or anything else that may

14   come up in the case.  It is important that decisions made in

15   this case be made only on evidence presented in the courtroom,

16   not anything obtained outside of the courtroom.

17        So this is a criminal case.  The government has charged

18   the defendant, David Charles Rhine, with four offenses relating

19   to his alleged conduct in or near the United States

20   Capitol Building on January 6th, 2021.

21        Count 1 charges Mr. Rhine with entering and remaining in

22   a restricted building or grounds in violation of 18 U.S.C.

23   1752(a)(1).

24        Count 2 charges Mr. Rhine with disorderly or disruptive

25   conduct in a restricted building or grounds in violation of

1    18 U.S.C. 1752(a)(2).

2         Count 3 charges Mr. Rhine with disorderly conduct in a

3    Capitol Building or Grounds in violation of 40 U.S.C.

4    5104(e)(2)(D).

5         And Count 4 charges Mr. Rhine with parading,

6    demonstrating, or picketing in a Capitol Building in violation

7    of 40 U.S.C. 5104(e)(2)(G).

8         Mr. Rhine has pleaded not guilty to all charges and is

9    presumed innocent.

10        I'm going to ask you a number of questions, and for each

11   question to which you have a response, please note the number

12   of the question on the note card that was provided to you.

13   After we have gone through all of the questions, the Court and

14   counsel may ask further questions to you individually.

15        So please remember that the questions are all designed

16   to find out how you feel about certain general issues and

17   should not be taken to suggest what the evidence in this case

18   will be.

19        So Question No. 1:  This case is expected to take four

20   to six days to try.  If this presents a special problem for

21   you, mark down No. 1 on your note card.  Also, we generally sit

22   from 10:00 a.m. to 5:30 p.m.  So if those hours present a

23   special problem, also put down No. 1 on your card.

24        I'm going to have counsel introduce themselves.

25        Ms. Fish.

 1          MS. FISH:  Thank you, Your Honor.

 2          Good morning, everyone.  I'm Rebecca Fish, and I'm the

 3    attorney representing Mr. Rhine.  With me at our counsel table

 4    are paralegal Carolynn Cohn and our investigator, Michael

 5    Stortini.

 6          THE COURT:  Mr. Valentini.

 7          MR. VALENTINI:  Good morning, everyone.  I'm

 8    Francesco Valentini, one of the prosecutors in this case.  At

 9    counsel table with me today is Assistant United States Attorney

10    Kelly Moran and our paralegal, Faith Esene.

11          THE COURT:  All right.  All right.  So Question No. 2

12    is if you or your immediate family member knows or has had any

13    business dealings with any of these attorneys or their

14    employers, the federal public defender offices or the United

15    States Attorney's Offices, mark down No. 2 on your note card.

16          Also, if you or an immediate family member has ever

17    worked at or sought employment at the federal public defender

18    offices, the Department of Justice, or the United States

19    Attorney's Offices, mark down No. 2 on your note card.

20          Ms. Fish, can you introduce your client.

21          MS. FISH:  Yes, Your Honor.

22          Good morning, everyone.  It's my pleasure to introduce

23    my client, David Rhine, who's standing here to my right.

24          THE COURT:  Okay.  Thank you.

25          Question No. 3 is if you have heard or read anything

1    about this case or the defendant in this case, David Charles

2    Rhine, or seen or heard anything in the news or elsewhere about

3    Mr. Rhine, mark down No. 3 on your note card.

4        Mr. Valentini, if you could list your proposed

5    witnesses.

6            MR. VALENTINI:  Good morning, again.

7        The government expects to call the following witnesses

8    at trial:  United States Capitol Police Inspector Thomas M.

9    Loyd; United States Secret Service Special Agent Elizabeth

10   Glavey; United States Capitol Police Officer Jeffrey Abbott;

11   and FBI Task Force Officer Marty Trevino.

12           Thank you.

13           THE COURT:  Ms. Fish, do you have any names to add to

14   that?

15           MS. FISH:  No additional names, Your Honor.

16           THE COURT:  Okay.  So Question No. 4 is if you or

17   your immediate family knows or has had any business dealings

18   with any of these proposed witnesses, mark down No. 4 on your

19   note card.

20       Question No. 5 is if you have ever served as a juror in

21   a criminal or civil case or as a member of a grand jury in

22   either federal or state court, mark down No. 5 on your note

23   card.

24       So I'm going to have you take a look around for

25   Question No. 6 at the court personnel, myself, my court

1    reporter here to my right, my courtroom deputy here to my left,

2    and my -- and my law clerk over there in the corner.  Take a

3    look at them.  And if you recognize any of them or believe

4    you've had any -- you or your family has had any business

5    dealings with any of them, write down No. 6 on your note card.

6         Also, take a look at the other jurors around you.  If

7    you know any of the other potential jurors in your group, mark

8    down No. 6 on your note card.

9         Question No. 7:  If you are selected to sit on the case,

10   you must be able to render a verdict solely on the evidence

11   presented at the trial and in the context of the law as I will

12   give it to you and my instructions, disregarding any other

13   ideas, notions, or beliefs about the law that you may encounter

14   in reaching your verdict.  If you think you may be unable to do

15   this, mark down No. 7 on your note card.

16        Question No. 8:  If you have a special disability or

17   problem, such as with your sight, hearing, or staying awake,

18   take any medication that would make serving on this jury

19   difficult or impossible, or uncomfortable because of the

20   COVID-19 pandemic, mark down No. 8 on your note card.

21        Also, if you have trouble reading, writing, or

22   understanding English or would have difficulty expressing your

23   own opinions and thoughts about this case with -- to your

24   fellow jurors, mark down No. 8 on your note card.

25        Question No. 9:  If you, any member of your immediate

 1    family, or closest friends has received legal training or

 2    worked as an attorney, paralegal, legal secretary, or

 3    other position at a law office, mark down No. 9 on your note

 4    card.

 5         Question No. 10:  If you or someone close to you lives

 6    or works at or near the U.S. Capitol Building, mark down No. 10

 7    on your note card.

 8         Question No. 11, if you or someone you know has a direct

 9    or indirect connection to the events that occurred at the

10    U.S. Capitol on January 6th, 2021, mark down No. 11 on your

11    note card.

12         Question No. 12:  If you have followed the news about

13    the events that took place at the U.S. Capitol on January 6th,

14    2021, mark down No. 12 on your note card.

15         Question No. 13:  If you ever watched video of Mr. Rhine

16    related to January 6th, 2021, on the news or on the internet,

17    mark down No. 13 on your note card.

18         Question No. 14:  If you have seen or heard anything in

19    the news or elsewhere about specific individuals who were

20    present at the U.S. Capitol on January 6th, 2021, mark down

21    No. 14 on your note card.

22         Question No. 15:  I will instruct the jury at the end of

23    the trial that the testimony of a police officer should be

24    treated the same as testimony from any other witness and that

25    the jury should not give either greater or lesser weight to the

1    testimony of a witness simply because that witness is a police

2    officer.  If you have such strong feelings or opinions about

3    police, either positive or negative, that would make it

4    difficult for you to follow this instruction, mark down No. 15

5    on your note card.

6        Question No. 16:  The burden of proof on all criminal

7    cases is proof beyond a reasonable doubt, and this burden rests

8    on the government and never shifts to the defendant.  While it

9    is a strict and heavy burden, it is not an impossible burden.

10   The government, for example, is not required to prove guilt

11   beyond all doubt.  If you would hold the government to a higher

12   burden than beyond a reasonable doubt, mark down No. 16 on your

13   note card.

14       Question No. 17:  All people charged with a crime have

15   the constitutional right not to testify at trial, and if

16   Mr. Rhine decides not to testify, I will instruct you that you

17   cannot hold his silence against him in any way.  If you would

18   have any difficulty following that instruction, mark down

19   No. 17 on your note card.

20       Question No. 18:  Jurors are the sole judges of the

21   facts, but they must follow the principles of law as I

22   instruct.  The jury may not choose to follow some rules of law

23   and ignore others.  And even if the jury disagrees with or

24   dislikes a rule of law or does not understand the reasons for

25   some of the rules, it is the jury's duty to follow these rules.

1    If you would have any difficulty following my legal

2    instructions, whatever they may be, mark down No. 18 on your

3    note card.

4        Question No. 19:  If you are selected as a juror in this

5    case, I will continue to instruct you to avoid all media

6    coverage in this case, including radio, television, podcasts,

7    social media, and other internet sources.  That is, you will be

8    forbidden from reading any newspaper articles about this case,

9    listening to any radio or podcast stories about this case, or

10   watching any TV news about this case.  You will also be

11   forbidden from Googling this case, blogging, tweeting, reading,

12   or posting comments about this case on social media sites or

13   anywhere else on the internet.

14       If you have any reservations or concerns about your

15   ability or your willingness to follow this instruction, mark

16   down No. 19 on your note card.

17       Question No. 20:  If you, members of your immediate

18   family, or any close personal friends work for or have

19   previously worked for any law enforcement agency, mark down

20   No. 20 on your note card.

21       And by law enforcement, I'm including any local police

22   or sheriff's department in or outside the District.  And it

23   includes federal law enforcement agencies like the FBI, the

24   Secret Service, the Department of Homeland Security, and the

25   U.S. Capitol Police.  It also includes any prosecutors'

1    offices, such as the U.S. Attorney's Office, a state attorney's

2    office or a district attorney's office.  So that's Question

3    No. 20.

4        Question 21:  If you, members of your immediate family,

5    or close personal friends have ever been arrested for, charged

6    with, or convicted of a crime, other than traffic violations,

7    mark down No. 21 on your note card.

8        Question 22:  If you, members of your immediate family,

9    or close personal friends have ever been the victim of or

10   witness to a crime, mark down No. 22 on your note card.

11       Question 23:  If after considering all of the evidence

12   and my instructions on the law you find the defendant guilty of

13   one or more counts in the information, it will be my job as the

14   judge, and my job alone, to determine the punishment.  The law

15   does not permit you to consider the issue of punishment because

16   there are factors having nothing to do with this trial which

17   will help me determine the appropriate sentence, if any.

18       If you would have difficulty or would be uncomfortable

19   serving as a juror knowing that you will not have any say in

20   any fine, restitution, or jail sentence that I may impose if a

21   guilty verdict is returned, mark down No. 23 on your note card.

22       Question 24:  If you have any personal beliefs, whether

23   religious, philosophical, or otherwise, such that you could not

24   after hearing all the evidence and law in this case pass

25   judgment on another person in a criminal case by returning a

1    verdict of guilty, mark down No. 24 on your note card.

2    Question 25: If you have such strong personal feelings,

3    beliefs, opinions about the events that took place at the

4    U.S. Capitol on January 6th, 2021, that would make it difficult

5    for you to consider this case fairly, mark down No. 25 on your

6    note card.

7    Question 26: If you have such strong personal feelings,

8    beliefs, or opinions about the outcome of the 2020 presidential

9    election that would make it difficult for you to consider this

10   case fairly, mark down No. 26 on your note card.

11   Question No. 27: Some news reports have indicated that

12   certain extremist groups with white nationalists and racist

13   views were present at the U.S. Capitol on January 6th, 2021.

14   If you believe that all or most civilians present at the

15   Capitol that day share these views, mark down No. 27 on your

16   note card.

17   Question 28: If you believe that all or most civilians

18   present at the Capitol on January 6th, 2021, engaged in

19   violence or intended to engage in violence, mark down No. 28 on

20   your note card.

21   Question 29: If you would have difficulty voting not

22   guilty if Mr. Rhine did not testify or if he does not call any

23   witnesses to testify on his behalf, mark down No. 29 on your

24   note card.

25   And then Question 30 is a catchall question. Having

1    heard the questions posed to you by the Court, if there is any

2    other reason why you could not sit on this jury and render a

3    fair verdict based on the evidence presented to you in the

4    context of the Court's instructions to you on the law based on

5    your political, moral, religious, philosophical beliefs or any

6    other reason, mark down No. 30 on your note card.

7         All right.  So those are the questions.  And if you can

8    follow Ms. Johnson here.  We'll bring you up one by one alone

9    in the courtroom to ask some follow-up questions.

10              (Proceedings held out of the presence of the jury

11   venire.)

12              (REPORTER'S NOTE:  Juror 1536 enters.)

13              THE COURTROOM DEPUTY:  This is Juror No. 1536.

14              THE COURT:  Good morning.

15              THE PROSPECTIVE JUROR:  Good morning.

16              THE COURT:  So this is Juror 1536.  Mr. ████; is

17   that correct?

18              THE PROSPECTIVE JUROR:  Correct.

19              THE COURT:  Okay.  So you answered yes to

20   Question No. 12, which is the one about following the news

21   about January 6th at the Capitol.

22              THE PROSPECTIVE JUROR:  (Nods head.)

23              THE COURT:  Tell us a little bit about what you've

24   watched, both on the day of January 6th and since then.

25              THE PROSPECTIVE JUROR:  What I watched?

1          THE COURT:  Yeah.

2          THE PROSPECTIVE JUROR:  Well, I was curious because

3   I'm a camera operator, a videographer.  So I was offered the

4   opportunity to film that event, and so I -- I opted not to do

5   it because I -- I felt like there would be issues.  And I had

6   heard it about a couple days before.  Like, there's some

7   rumblings, like, this is going to be a big issue.

8          And the political climate back then was pretty high.  So

9   it was -- to me as a media person, I guess, it didn't seem

10  like -- it -- it seemed like an event to film, but I didn't

11  want to be there because I felt like it would be something of

12  a -- a kerfuffle or something.  You know, an issue.

13         So I did start watching it on television because I was,

14  like, well, what is going to happen.  I have these feelings --

15  yeah, this is going to be on TV.  I'm literally, like, 10 miles

16  away.  I live about 10 miles away, whatever.  Five miles.  And

17  so I was really curious.

18         So I watched it, and it was unfolding, and -- and,

19  again, like it was -- it was sort of like -- it just happened

20  the way I kind of figured it would.  So I watched it.  I'm

21  sorry.  I think I'm rambling here.

22          THE COURT:  Sure.  And how much -- did you watch

23  it -- were you glued to the TV, or did you have it in on the

24  background or --

25          THE PROSPECTIVE JUROR:  Yeah, I was pretty glued.

1    Yeah, I didn't have anything else going on.  I didn't have any

2    other shoots.

3                THE COURT:  Sure.

4                THE PROSPECTIVE JUROR:  So I turned down that

5    same-day shoot.  And so I just stayed home, and I started

6    watching it.

7                THE COURT:  And what organization asked you to shoot

8    it?

9                THE PROSPECTIVE JUROR:  They were called Beverly Boy

10   Productions.  They do all these different -- contract work for

11   other people.  So they're a national company.

12               THE COURT:  Uh-huh.

13               THE PROSPECTIVE JUROR:  So I don't know who

14   they're -- who requested it to be covered.  But, yeah, they --

15   then they just called me as a freelancer.

16               THE COURT:  Okay.  And what do you recall?  What are

17   your recollections?  What jumps out at you as what you saw on

18   that day?

19               THE PROSPECTIVE JUROR:  I saw a lot of violence and a

20   lot of confusion, a lot of mayhem, a lot of disorganization,

21   and feeling -- I saw a lot of pain.

22               THE COURT:  Okay.  And since then, how closely have

23   you followed this story?

24               THE PROSPECTIVE JUROR:  Well, because I took in so

25   much that same day, you know, I tried to take a break from it.

```
1    I think maybe, like -- I think HBO had a quick program about
2    it, and I watched that.
3              THE COURT:  Uh-huh.
4              THE PROSPECTIVE JUROR:  So I kind of relived it.
5    And, of course, like, the news.  There was some clips and
6    things with Twitter.  All those little clips, you know, I
7    watched.  So, yeah, I got -- I got pretty deep into it.
8              THE COURT:  Sure.  Other than the HBO documentary,
9    did you watch any others?
10             THE PROSPECTIVE JUROR:  Not that I recall.  I think
11   it was -- I think it was only HBO.  Maybe Hulu.  I don't know
12   if Hulu had it.  I think it was HBO.
13             THE COURT:  Okay.  And then the -- there was a House
14   committee that investigated January 6th and had hearings.  Did
15   you watch those?
16             THE PROSPECTIVE JUROR:  I didn't watch any of those
17   hearings.
18             THE COURT:  Okay.  All right.  So you answered yes to
19   Question No. 20, which is whether you or members of your
20   immediate family or close personal friends worked for or
21   previously worked for law enforcement.
22             THE PROSPECTIVE JUROR:  Uh-huh.
23             THE COURT:  Tell us about that.
24             THE PROSPECTIVE JUROR:  My father was part of the
25   FBI.  He was head of the polygraph association.
```

```
 1                THE COURT:  Okay.

 2                THE PROSPECTIVE JUROR:  Or the polygraph division.

 3                THE COURT:  And he's no longer with the FBI?

 4                THE PROSPECTIVE JUROR:  Correct.

 5                THE COURT:  Okay.  How long ago did he leave the FBI?

 6                THE PROSPECTIVE JUROR:  I think that was maybe

 7      25 years ago.

 8                THE COURT:  Okay.

 9                THE PROSPECTIVE JUROR:  Long time.

10                THE COURT:  Okay.  Any others?

11                THE PROSPECTIVE JUROR:  My -- my brother has

12      something to do with the government in law enforcement.  I'm

13      not quite sure what it is, and so is my sister-in-law.  I think

14      she was part of, like -- I think she said NCIS sort of thing

15      going on, like forensics and things like that.  So I don't know

16      exactly what their positions are.

17                THE COURT:  Doesn't sound like you talk to them much

18      about it.

19                THE PROSPECTIVE JUROR:  Not much because it's sort of

20      over my head and -- yeah.

21                THE COURT:  Okay.  So you also answered yes to

22      Question 25, which is you have such strong personal feelings,

23      beliefs, or opinions about the events that took place on the

24      Capitol on January 6th that would make it difficult for you to

25      consider the case fairly.  Tell us about that.
```

```
1              THE PROSPECTIVE JUROR:  Well, I mean, it's only
2      because I -- I was, actually, formerly invited to attend that
3      event.  Even as a media person, I -- I turned it down.  I
4      rejected it because I felt like it would be a violent occasion,
5      event.  And so I think anyone who would consider going would
6      recognize the potential for violence and mayhem.
7              So it's hard to -- to -- to think like someone wouldn't.
8      And I can only imagine someone might be excited if they have
9      something they believe in.  And so I -- you know, I -- I try to
10     look at both sides of things.  So I -- I can understand
11     curiosity, and I have a lot of that myself.  But the older I
12     get, the more I understand that there could be repercussions to
13     my curiosities, which I've had in the past.
14             And, you know, I -- I try to go with my gut feeling and
15     my, you know, wisdom that I've accumulated.  So I think anyone
16     over, you know, a certain age would recognize the potential,
17     and some people, I think, would welcome it.  I've come across
18     people who do welcome such occasions.
19             And what comes to them may -- let be, you know.  They
20     invited it.  They wanted it.  They can have it.  But for me, as
21     someone that doesn't want to come across problems, there's --
22     there's ways that they can do it.
23             And there's -- I know that there was a clear border or
24     barrier that someone could take.  They could have been out in
25     the field.  I think they were safe in the field.  If they walk
```

 1    into the building, it could be an issue, especially if they're

 2    not invited.  So it's hard to have sympathy because I had an

 3    option --

 4            THE COURT:  Okay.

 5            THE PROSPECTIVE JUROR:  -- myself.

 6            THE COURT:  So you also answered along the same

 7    lines, yes to Question 21, and you may have answered this

 8    partly already.  But you believe that all or most civilians

 9    present at the Capitol on January 6th engaged in violence or

10    intended to engage in violence.  Tell us about that.

11            THE PROSPECTIVE JUROR:  Yes.  From -- from what I

12    watched the -- the day of -- I'm not even speaking of edited

13    content, Twitter things.  It's, like, from what I watched from

14    the live broadcasts, it seemed to me that they had intention to

15    make a stand, make an issue, to move forward, to make a

16    statement, to cause harm, to cause destruction.  That's what I

17    saw.

18            THE COURT:  Okay.  So, obviously, there were

19    thousands of people there, and not everyone engaged in

20    violence.  Do you think you could put your preconceived notions

21    aside and, you know, base the decision solely on the facts

22    presented in this courtroom?

23            THE PROSPECTIVE JUROR:  Yeah, probably.  I mean, if I

24    heard all the -- the -- if I heard the case and it was -- if I

25    can understand his position or someone's position, yeah,

1    because I -- I try to have empathy.  I try to think about what

2    brought them through those steps.  Even if it's, like, just

3    right step, left step, what are those steps that took the

4    person in there.

5        I mean, I could have been -- I could have been in --

6    inside that building as a media person and find myself in court

7    for trespassing.  And I would have to defend myself and say,

8    well, I was hired for a job, and then I was -- part of my job

9    is to do this.  And so I was following the story, and I find

10   myself in position.  So I would hope a jury would understand my

11   story.

12       And so I -- as a media person, I try to do the same

13   thing.  I try to follow someone's story into why or how they

14   were brought into the predicament or current predicament or

15   what have you.  So given the information, I believe I can

16   understand and come to a conclusion that I feel is -- is

17   appropriate.

18       THE COURT:  So one of the other questions I asked you

19   was about the -- you know, that the defendant has a right not

20   to testify himself or to put on any evidence and it's the

21   government's burden to prove the case beyond a reasonable

22   doubt.  So if you don't hear from the defendant, would you find

23   it very difficult to acquit him?

24       THE PROSPECTIVE JUROR:  Well, if we were speaking of,

25   like, just lawyer and what's legal and what's not legal, then

1    it's just -- it's just -- really, just determining the

2    black-and-white issues.  And, of course, I can do the same

3    thing.

4         If -- if I was putting myself -- if I was here in court

5    and I -- I can -- I can see where -- situations where you would

6    want just the lawyers to do their thing, you know.  Despite

7    whatever the topic might be, that might be the best course for

8    his actions.  And I can understand that.  If that is, then --

9    then so be it.  So, yeah, if he doesn't -- if someone doesn't

10   sit on the stand, I can still give a determination without

11   bias.

12             THE COURT:  Okay.  Ms. Fish.

13             MS. FISH:  I wore the wrong earrings today.  I

14   apologize.

15        Good morning, Mr. █████.

16             THE PROSPECTIVE JUROR:  Good morning.

17             MS. FISH:  I want to follow up on a couple of things

18   you talked about.  So you mentioned you turned down a job to

19   actually film the -- the events of January 6th live.  Did you

20   have friends or colleagues who work in your field who were

21   there?

22             THE PROSPECTIVE JUROR:  No, not that I know of.

23             MS. FISH:  Do you have certain companies or -- or

24   stations that you work for regularly in your job?

25             THE PROSPECTIVE JUROR:  Yes.

1          MS. FISH:  And did they cover the events?

2          THE PROSPECTIVE JUROR:  I don't know.

3          MS. FISH:  Presumably the company that hired you,

4   when you declined, hired someone else?

5          THE PROSPECTIVE JUROR:  Possibly.  Probably.  They

6   were -- they were trying to.  So I don't know if they were

7   successful.  But, yeah, they were trying to.

8          MS. FISH:  And how long have you been working as a

9   videographer?

10         THE PROSPECTIVE JUROR:  Since 2001.

11         MS. FISH:  So quite a while.

12         THE PROSPECTIVE JUROR:  Uh-huh.

13         MS. FISH:  Have you covered protests and

14  demonstrations before?

15         THE PROSPECTIVE JUROR:  I have.

16         MS. FISH:  Have you covered events at the

17  Capitol Building before?

18         THE PROSPECTIVE JUROR:  Yes.

19         MS. FISH:  Would you say you're pretty familiar with

20  the space?

21         THE PROSPECTIVE JUROR:  Yes.

22         MS. FISH:  From -- that's over 20 years you've been

23  doing that job?

24         THE PROSPECTIVE JUROR:  Yes.

25         MS. FISH:  Have you lived in Washington, D.C., that

1    whole time?

2              THE PROSPECTIVE JUROR:  No.

3              MS. FISH:  How long have you been in

4    Washington, D.C.?

5              THE PROSPECTIVE JUROR:  I lived around D.C., the

6    area, for 20 years.  My whole life.  But I've lived inside D.C.

7    for the last four or five years now.

8              MS. FISH:  Okay.  But the work you have done as a

9    videographer has been largely in Washington, D.C.?

10              THE PROSPECTIVE JUROR:  Yes.

11              MS. FISH:  And I want to follow up as well about your

12    reasons for declining the job offer.  Can you talk a little bit

13    more about that.

14              THE PROSPECTIVE JUROR:  Yes.

15              MS. FISH:  So you mentioned you -- you personally

16    feared it would become violent that day.  Can you tell us why.

17              THE PROSPECTIVE JUROR:  Well, one of the narratives

18    was there was a lot of negativity towards -- you know, I'm

19    trying to bring myself back four years ago -- or three years

20    ago, whatever it was.  So it was a lot of, like, negative talk

21    about media and the -- journalism and -- and CNN and -- and all

22    that stuff.

23         So as a media person, I was like, well, this is, like,

24    an unsafe environment.  But at the same time, you know, I

25    think -- yeah, so it was basically on the level of, like, who I

```
 1    am or what I do, I didn't feel like I would have been a welcome
 2    participant.  As -- most protests, they usually want more
 3    media.  So I felt -- this is the first time I ever felt it was
 4    the opposite.  It was like we -- this is a closed party sort of
 5    thing.  We're not inviting you.
 6              MS. FISH:  So you were actually worried you
 7    personally might be targeted by people who attended?
 8              THE PROSPECTIVE JUROR:  Yes.
 9              MS. FISH:  And that was based on some of the rhetoric
10    calling the media fake and that kind of thing; is that --
11              THE PROSPECTIVE JUROR:  Yes.  That was one of the
12    things, yes.
13              MS. FISH:  Had you heard of or known of colleagues
14    who had been targeted by people at --
15              THE PROSPECTIVE JUROR:  None personally.
16              MS. FISH:  Have you heard any stories about it?
17              THE PROSPECTIVE JUROR:  Yes.  Well, since then, yes.
18              MS. FISH:  And that was --
19              THE PROSPECTIVE JUROR:  Well, not before it.
20    Actually, maybe I did with Trump and all that.
21              MS. FISH:  So you've --
22              THE PROSPECTIVE JUROR:  Trump rallies.
23              MS. FISH:  -- heard at some other Trump rallies where
24    media were targeted or attacked?
25              THE PROSPECTIVE JUROR:  Yes.
```

 1          MS. FISH:  And that gave you some personal fear?

 2          THE PROSPECTIVE JUROR:  Yes.

 3          MS. FISH:  You also described watching events unfold

 4   live and damage and pain.  Can you tell us what feelings you

 5   were personally feeling while watching that.

 6          THE PROSPECTIVE JUROR:  Yeah.  Personally, I was

 7   feeling, like, fear and concern.  And I didn't -- I didn't see

 8   an end to it.  It was like -- sort of like watching a tsunami.

 9   It was, like, there was nothing you can -- you've just got to

10   wait it out, almost like.  It was like, oh, this isn't going to

11   end until -- you know, until they're ready to end it sort of

12   thing.

13          MS. FISH:  And when you think about it today, how do

14   you feel?

15          THE PROSPECTIVE JUROR:  About the same, yeah.

16          MS. FISH:  And do you feel -- it sounds like you've

17   watched, you know, news; you followed Twitter clips; that

18   you've seen about -- you know, other video that was taken that

19   day.  Do you feel like you have a good understanding of what

20   happened on January 6th?

21          THE PROSPECTIVE JUROR:  Yes.

22          MS. FISH:  Like a pretty complete understanding?

23          THE PROSPECTIVE JUROR:  Yes.

24          MS. FISH:  And I believe you already said this.  But,

25   you know, you said even watching it that day live, unedited, it

1    was clear that people intended violence and damage?

2             THE PROSPECTIVE JUROR:  Yes.

3             MS. FISH:  And that appeared to be the majority of

4    people who went there?

5             THE PROSPECTIVE JUROR:  Well, I mean, again, like,

6    you know, speaking as a camera operator, you only see what's in

7    the frame.  And I know there were a lot -- it was a big land,

8    lot of people out there, lot of curiosity.  But I think the

9    people who entered the Capitol were there to cause harm.

10            MS. FISH:  And it's unlikely that your understanding

11   is going to change in the next week?

12            THE PROSPECTIVE JUROR:  Well, I mean, I can -- any

13   information is new information.  So I -- I'm not going to

14   disregard it.  I wouldn't say I wouldn't change my mind.  I

15   don't know what I don't know, so.

16            MS. FISH:  So you wouldn't disregard new information?

17            THE PROSPECTIVE JUROR:  I won't disregard new

18   information.

19            MS. FISH:  And -- but you also already have

20   information in your mind --

21            THE PROSPECTIVE JUROR:  Yes.

22            MS. FISH:  -- is that fair?

23            And I want to speak a little bit more as well about the

24   judge's questions about whether Mr. Rhine testifies or puts on

25   a case.  You know, you said I could understand why it must be

```
 1   best for the lawyers to do the presenting.  You would be
 2   disappointed if you don't hear from him?
 3                THE PROSPECTIVE JUROR:  Yes.
 4                MS. FISH:  Thank you.
 5                MR. VALENTINI:  Good morning, Mr. ████.
 6                THE PROSPECTIVE JUROR:  Good morning.  Yes.
 7                MR. VALENTINI:  I'm Francesco Valentini, one of the
 8   prosecutors in this case.
 9           I wanted to, first, follow up on your answer about the
10   fact that you were presented the opportunity to film some of
11   the events on January 6th.  Were you presented the opportunity
12   to film events at the Capitol or at some other location on
13   January 6th?
14                THE PROSPECTIVE JUROR:  It was on the Capitol
15   Grounds.  So it wasn't, like -- it was where that rally was.
16   So where Trump was -- that stage, just outside the Capitol.
17   They were having the big stage thing, the rally.  I don't
18   remember what it was called, but it was a rally.  That's
19   specifically where it was happening.  And I think that's where
20   I was specifically invited.  Whatever happened inside the
21   Capitol, I was not invited to go with the crowd.  It was just
22   to film what was happening at that rally.
23                MR. VALENTINI:  And you said you've been to the
24   Capitol before?
25                THE PROSPECTIVE JUROR:  Yes.
```

1          MR. VALENTINI:  And you are somewhat familiar with

2     the grounds of the Capitol?

3          THE PROSPECTIVE JUROR:  Yes.

4          MR. VALENTINI:  And, again, maybe you already

5     answered this.  But was your invitation to cover a rally --

6     invitation to cover a rally at the Capitol or at the Ellipse in

7     front of the White House?

8          THE PROSPECTIVE JUROR:  Good question.  You know, it

9     was two different -- so there was a walk.  I'm sure -- yeah,

10    yeah.  So, yeah, I think it was the Ellipse where the actual --

11    it was definitely where the rally was.  It was where the rally

12    was.  So, yeah, the Ellipse is where that rally was happening.

13    Yeah, I stand corrected.

14         MR. VALENTINI:  I know you're familiar with

15    Washington, D.C.  That's quite a ways from the Capitol itself.

16         THE PROSPECTIVE JUROR:  Yeah, I guess -- yes.  Yeah.

17         MR. VALENTINI:  The opportunity was not to cover

18    events at the Capitol when it was presented to you on

19    January 6th but the rally that the former President was --

20         THE PROSPECTIVE JUROR:  Correct.

21         MR. VALENTINI:  -- possibly --

22         THE PROSPECTIVE JUROR:  Correct.

23         MR. VALENTINI:  -- supposed to give at the Ellipse?

24         THE PROSPECTIVE JUROR:  Correct.

25         MR. VALENTINI:  You also, I think, referenced --

1    before you made a reference that you base some views about

2    January 6th, and I think you qualified and said, just based on

3    what you've seen on TV.  And if I heard you correctly, you

4    contrasted that with not even editing content.  Did you edit

5    content about January 6th?

6            THE PROSPECTIVE JUROR:  Did I edit content?

7            MR. VALENTINI:  Yeah.

8            THE PROSPECTIVE JUROR:  No.

9            MR. VALENTINI:  Oh, okay.  Did you --

10           THE PROSPECTIVE JUROR:  What I mean is, like, from

11   the difference between watching it live on television and then,

12   like, watching clips from, like, Twitter or CNN.  Like little

13   clips, those are edited.  That's what I meant by that.

14           MR. VALENTINI:  Thank you for the clarification.

15       But as part of your work, you never edited content about

16   January 6th?

17           THE PROSPECTIVE JUROR:  No, never had -- I never had

18   footage in my possession and never -- I never edited any of

19   that content.

20           MR. VALENTINI:  Thank you.

21       You also, I think, drew a distinction between people who

22   went into the Capitol Building.  And you said that you have a

23   view at this point that some of the -- that those people may

24   have intended harm.  But as the judge mentioned before, even

25   people who went into the Capitol Building, not everyone caused

1    violence, not everyone engaged in violence; right?

2         So if you were asked as a juror in this case to keep an

3    open mind and judge this case based only on the facts presented

4    at trial, do you think you'll be able to do that?

5         THE PROSPECTIVE JUROR:  Could you repeat the

6    beginning of that question again.

7         MR. VALENTINI:  If you -- as a -- I expect that if

8    you are selected as a juror in this case, Judge Contreras will

9    tell you what the law requires, which is that, as a juror, you

10   will have to decide -- make your decisions in this case based

11   on the facts presented at trial and only those facts.

12        Would you be able to follow that instruction?

13        THE PROSPECTIVE JUROR:  Yes.  Yes, I would.

14        MR. VALENTINI:  You said yes, you would?

15        THE PROSPECTIVE JUROR:  Yes, I would.

16        MR. VALENTINI:  Thank you.

17        THE PROSPECTIVE JUROR:  Yes.  Thank you.

18        THE COURT:  All right.  Thank you.

19        THE PROSPECTIVE JUROR:  Thank you.

20        THE COURT:  Just follow Ms. Johnson.

21        THE PROSPECTIVE JUROR:  Okay.  Thank you.  Thank you

22   for your time.

23        (REPORTER'S NOTE:  Juror 1436 left.)

24        MS. FISH:  Your Honor, I move to strike Juror ██████

25   for cause.

1      He had a very specific, fixed understanding of what

2   happened on January 6th.  He said he did not think it was

3   likely to change.  While he was open to new information, he

4   still had his own information.  He hesitated substantially in

5   trying to answer whether he could disregard all the information

6   he had.

7      He expressed personal fear of being attacked and,

8   therefore, not taking a job at that rally due -- based on the

9   groups he believed -- or the -- I guess the support of Trump at

10   that rally.

11      Additionally, he -- he had a very clear, preconceived

12   belief that anyone who walked in the building intended to do

13   harm.  And I don't just think he could be fair in this case.  I

14   know, additionally, he did hesitate with Your Honor's questions

15   about the burden of proof and the presumption of innocence, and

16   indicated he'd be disappointed if Mr. Rhine exercised his right

17   to silence.

18          MR. VALENTINI:  Your Honor, this is a close call.  I

19   think that most of what the juror had to say about January 6th,

20   to the extent that the motion is based on exposure to

21   January 6th, I think we've come to learn by the end of the

22   *voir dire* that the juror actually may not have understood as

23   much about January 6th as he stated early on in the *voir dire*.

24      He's, obviously, very conscientious and probably making

25   an effort to be extra clear about what he knew and what he

1    didn't know.  Based on the limited statements about the burden

2    and the ability to judge the case if the defendant were to not

3    take the stand, however, we would not oppose the motion.

4         THE COURT:  I grant the motion.  I agree with defense

5    counsel.  It's -- he just said too many things that it would

6    make it virtually impossible for him to side with the defendant

7    if the defendant didn't take the stand based on his

8    preconceived notions and his fear.

9         So this next one is someone who wrote down No. 1 and a

10   number of other numbers too.  Let's try to figure out if No. 1

11   is dispositive.

12        (REPORTER'S NOTE:  Juror 1427 enters.)

13        THE COURTROOM DEPUTY:  This is Juror No. 1427.

14        THE COURT:  Good morning.

15        THE PROSPECTIVE JUROR:  Good morning.

16        THE COURT:  So this is Juror 1427.  Ms. ███████;

17   is that correct?

18        THE PROSPECTIVE JUROR:  Correct.

19        THE COURT:  Okay.  So you answered yes to

20   Question No. 1, which is that a trial that takes four to

21   six days or goes from 10:00 to 5:30 might create a problem for

22   you.

23        THE PROSPECTIVE JUROR:  Yes.

24        THE COURT:  Tell us about that.

25        THE PROSPECTIVE JUROR:  I'm a teacher.  I teach

1    second grade.  And more than half of my class is not on grade

2    level.  And so for me to miss two days, ten days is -- it's --

3    is a -- it does directly impact me, but it directly impacts

4    them.

5         And we're closing out.  We're almost at the end of the

6    year.  So it's a significant time that would be lost in the

7    classroom.

8         THE COURT:  And what is it that happens if you're

9    called to jury duty?  They send a substitute teacher for you?

10        THE PROSPECTIVE JUROR:  Yes, they would send a

11   substitute teacher, but she wouldn't be teaching the

12   information that they need at the time.

13        THE COURT:  Okay.  So you answered yes to

14   Question No. 7, which is if you're selected -- you put 7 with a

15   question mark.  That if you're selected to sit on this case,

16   you have to be able to render a verdict solely on the evidence

17   presented at the trial and in the context of the law as I will

18   give it to you and my instructions; and that you might have

19   trouble doing that.

20        THE PROSPECTIVE JUROR:  I wasn't clear on the

21   question, and I didn't know -- you know, I figured we could

22   clarify now.  Because the first part of it says would you have

23   any trouble with -- say it again, please.

24        THE COURT:  Okay.  I'll repeat the entire question.

25   So it says, "If you are selected to sit on this case, you must

1    be able to render a verdict solely on the evidence presented at

2    the trial and in the context of the law as I will give it to

3    you in my instructions, disregarding any other notions, ideas,

4    or beliefs about the law that you may encounter in reaching

5    your verdict.  If you think you may be unable to do this, mark

6    down No. 7."

7            THE PROSPECTIVE JUROR:  Okay.  And so I think the

8    solely -- based on just solely what's presented, the later

9    questions address the -- the fact that I have seen other things

10   regarding the case.

11           THE COURT:  Okay.

12           THE PROSPECTIVE JUROR:  The -- what's happened --

13           THE COURT:  Okay.

14           THE PROSPECTIVE JUROR:  -- on January 6th.

15           THE COURT:  Like in the media and that sort of thing?

16           THE PROSPECTIVE JUROR:  Correct.  And that came

17   later.  So that's why I wasn't sure.

18           THE COURT:  Okay.  So that's the next question, which

19   is 12, if you follow the news about the events that took place

20   at the U.S. Capitol on January 6th.  So tell us about what

21   you've seen in the media, both on January 6th and since then,

22   and what stands out in your mind.

23           THE PROSPECTIVE JUROR:  On January 6th I watched the

24   live casting of what was going on as it was progressing.  And

25   it was just -- it was very disturbing.  It made me very --

1    just -- it was just concerning.  Just made -- me and my husband

2    both -- we were just amazed at what was taking place.

3          THE COURT:  Okay.  And -- and what -- what -- what

4    did you see that made you so amazed?

5          THE PROSPECTIVE JUROR:  People pushing across

6    barricades, going, actually, on the Capitol stairs; shouting;

7    screaming; pushing police officers; stepping on police

8    officers.  Just -- everything that I -- that they showed,

9    that's what I saw, and those things disturbed me.

10          THE COURT:  All right.  And since -- so were you off

11    from work that day, or was it after you got home from work?

12          THE PROSPECTIVE JUROR:  I don't know what day was --

13    we were off, I believe -- was it a voting day or -- seemed like

14    I was home.  I was definitely home when it occurred.  It was

15    breaking news, actually.

16          THE COURT:  Okay.  All right.  And since that day,

17    how closely have you followed this story?

18          THE PROSPECTIVE JUROR:  That's -- January 6th kind of

19    stopped me from watching because it just seems to mount -- it

20    just seemed that there was always something going on, something

21    associated with our former President.  And so I just kind of,

22    like, you know, I need to just let this go, and I'll pick it up

23    as I go along.

24          THE COURT:  Okay.  And by let it go, you mean you

25    don't watch any news anymore?  You don't watch news on that

1    subject?

2              THE PROSPECTIVE JUROR:  I don't watch news that's

3    based on that subject.  Local news mostly.

4              THE COURT:  So since January 6th -- so there's been a

5    handful of documentaries.  You haven't watched any of those?

6              THE PROSPECTIVE JUROR:  No.

7              THE COURT:  No.  And the -- the House committee that

8    investigated January 6th had some hearings that were televised.

9    Did you watch any of those or listen to them?

10             THE PROSPECTIVE JUROR:  I think I probably watched

11   maybe a part of one or two.

12             THE COURT:  Okay.  Anything stand out about what you

13   saw during those hearings?

14             THE PROSPECTIVE JUROR:  Those particular hearings, I

15   watched -- what stood out to me was -- and I probably did watch

16   more.  I think it was after that that I stopped watching.  But

17   I remember them showing the officer who was redirecting some of

18   the individuals who were in the Capitol looking for the Speaker

19   of the House and how they went into the -- the House of

20   Representatives, I believe, the Senate, whichever one.  They

21   broke through the barricade and had the plastic things looking

22   for senators and -- you know, just looking for the officials to

23   do harm, it seemed to me.

24             THE COURT:  Okay.  All right.  So you answered yes to

25   Question 17, which is all people charged with a crime have the

1    constitutional right not to testify at trial and if Mr. Rhine

2    decides not to testify, I will instruct you that you cannot

3    hold his silence against him in any way.  So you indicated that

4    you might have some difficulty following that instruction.

5                THE PROSPECTIVE JUROR:  Yes, I would.

6                THE COURT:  Tell us why.

7                THE PROSPECTIVE JUROR:  Just because I feel -- I

8    don't know.  I feel very close to -- not close to.  I feel like

9    this particular situation is one where I want to hear from the

10   person accused.

11               THE COURT:  Uh-huh.

12               THE PROSPECTIVE JUROR:  In their own words, I want to

13   hear what they have to say.

14               THE COURT:  And if you don't hear from that person,

15   you think you would be -- it would be very difficult for you to

16   acquit?

17               THE PROSPECTIVE JUROR:  Yes.

18               THE COURT:  Yeah.  Okay.

19               MS. FISH:  Your Honor, I believe we can excuse the

20   juror at this point.

21               MR. VALENTINI:  No objections.

22               THE COURT:  Okay.  All right.  Thank you.

23               THE PROSPECTIVE JUROR:  Okay.  Thank you.

24               (REPORTER'S NOTE:  Juror 1427 left.)

25               MS. FISH:  Your Honor, additional reasons I would

1    move to strike the juror for cause based on her answer to the

2    last question alone.  I just -- she can't follow an essential

3    instruction.

4                THE COURT:  Okay.

5                MR. VALENTINI:  I'm not opposing the motion.

6                THE COURT:  Okay.  I agree.  And she answered

7    positively to some of the other problematic questions as well.

8                (REPORTER'S NOTE:  Juror 0819 enters.)

9                THE COURTROOM DEPUTY:  This is Juror No. 0819.  If

10   you'd like to set your belongings in the chair.

11               THE PROSPECTIVE JUROR:  Hello.

12               THE COURT:  Hello.  Good morning.

13               THE PROSPECTIVE JUROR:  Good morning.

14               THE COURT:  So this is Juror 0819.  Ms. ███; is that

15   correct?

16               THE PROSPECTIVE JUROR:  That's correct.  Yes,

17   Your Honor.

18               THE COURT:  Okay.  You answered yes to Question 2,

19   which is the one about whether you recognize counsel or have

20   any dealings or applied to the federal public defender offices,

21   Department of Justice, or U.S. Attorney's Office.

22               THE PROSPECTIVE JUROR:  So I personally don't know

23   any counsel, and I have not applied for employment.  I think

24   the question also asked whether immediate family had done so.

25   And my -- my husband -- we're both attorneys -- had, I think,

1    applied for the Department of Justice and also the

2    U.S. Attorney's Office.

3              THE COURT:  Okay.  Did he get either of those jobs?

4              THE PROSPECTIVE JUROR:  He did not.  He works

5    somewhere else in the federal government.

6              THE COURT:  He works?

7              THE PROSPECTIVE JUROR:  He works elsewhere in the

8    federal government.

9              THE COURT:  And we'll get to that question later, so.

10         And that's Question 9, which is whether you, an

11   immediate family member, or close friend has received legal

12   training or worked in an office law.  So let's start with you.

13             THE PROSPECTIVE JUROR:  Yes, Your Honor.  I am an

14   attorney.

15             THE COURT:  Okay.  What --

16             THE PROSPECTIVE JUROR:  I'm with the Office of the

17   Director of National Intelligence.

18             THE COURT:  Okay.  And in -- do you have a specific

19   portfolio in that office?

20             THE PROSPECTIVE JUROR:  I do, Your Honor.  Yes.  It's

21   related mostly to internal administration and operations.

22             THE COURT:  Of the office itself?

23             THE PROSPECTIVE JUROR:  Of the agency itself, yes,

24   Your Honor.

25             THE COURT:  So you -- you're not involved in any of

1      the intelligence concerning domestic organizations?

2              THE PROSPECTIVE JUROR:  Not directly, Your Honor.

3      Obviously, in our office we discuss issues broadly.  So

4      that's not to say that I have never encountered those issues

5      before.

6              THE COURT:  All right.  And then tell us about your

7      husband, what he does, and what he's done in the past.

8              THE PROSPECTIVE JUROR:  Yes.  May I approach the

9      bench?

10             THE COURT:  Sure.

11             (REPORTER'S NOTE:  A sotto voce conference was held

12     between the judge and the prospective juror.)

13             THE COURT:  So as you might guess, you know, that's

14     an answer to a question that is not suitable for being on the

15     public record.  But I'm comfortable that that position has

16     nothing to do with the issues in this case.

17         All right.  Any other attorneys?

18             THE PROSPECTIVE JUROR:  In my immediate family,

19     Your Honor?

20             THE COURT:  Yeah.

21             THE PROSPECTIVE JUROR:  My father used to be a

22     practicing lawyer, but he no longer is one.

23             THE COURT:  Okay.  And did he ever practice criminal

24     law?

25             THE PROSPECTIVE JUROR:  No, Your Honor.

 1                THE COURT:  Okay.  What kind of lawyer was he?

 2                THE PROSPECTIVE JUROR:  Mostly corporate law.

 3                THE COURT:  Corporate law.  Okay.  All right.

 4                THE PROSPECTIVE JUROR:  Oh, and -- sorry.  My

 5     father-in-law used to be a prosecutor in Miami-Dade County.

 6                THE COURT:  Okay.  And how long ago was that?

 7                THE PROSPECTIVE JUROR:  That would have been during

 8     the '80s and '90s, I believe.

 9                THE COURT:  And during the time in which you knew him

10     or --

11                THE PROSPECTIVE JUROR:  No.  Before I -- before I

12     knew him.

13                THE COURT:  Okay.  Did you ever have long

14     conversations with him about his work as a prosecutor?

15                THE PROSPECTIVE JUROR:  I've heard one or two war

16     stories, but nothing -- nothing specific.

17                THE COURT:  Nothing that would impact the way you

18     look at this case?

19                THE PROSPECTIVE JUROR:  No, Your Honor.

20                THE COURT:  All right.  You answered yes to

21     Question 10, which is if you or someone close to you lives or

22     works at or near the U.S. Capitol Building.  Tell us about

23     that.

24                THE PROSPECTIVE JUROR:  Yes.  In January 2021 my

25     husband and I were renting a home that is about a mile from the

1    Capitol.  We've since moved, but we still live within the

2    vicinity -- within the Capitol Hill neighborhood.  So -- and

3    then in terms of folks who worked on the Hill, we have two

4    close friends who are attorneys for the Office of Legislative

5    Counsel at the Senate.

6          THE COURT:  Let's start first with living on the Hill

7    at that time.

8          THE PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Were you impacted directly by the events

10   of that day?

11         THE PROSPECTIVE JUROR:  Besides public service --

12   public safety notices to avoid certain areas, we were not

13   directly impacted.  I myself was actually out in northern

14   Virginia visiting family on that day.

15         THE COURT:  Okay.  And your husband was not there

16   either?

17         THE PROSPECTIVE JUROR:  He was at home, but he was

18   not directly impacted.

19         THE COURT:  Okay.  And -- and the fencing that went

20   up afterwards, did that directly impact you, other than a minor

21   inconvenience?

22         THE PROSPECTIVE JUROR:  No.  Other than sort of

23   diverting travel routes, commute routes, no.

24         THE COURT:  Okay.  All right.  And then you indicated

25   that you knew -- you had some friends that worked on the Hill

1    at that time?

2         THE PROSPECTIVE JUROR:  Yes, Your Honor.

3         THE COURT:  Were they directly impacted in a way that

4    they shared with you?

5         THE PROSPECTIVE JUROR:  Besides -- they -- as far as

6    I recollect, they were not there that day themselves.

7    Obviously, in terms of impacting, sort of, their work schedule,

8    I assume so.  But nothing that has been -- nothing anything

9    further that was shared with me.

10         THE COURT:  Nothing about them being fearful that day

11    for their own safety or anything like that?

12         THE PROSPECTIVE JUROR:  I mean, there were certainly

13    discussions about that, just in terms of overall safety for

14    anyone who worked there.  But as I mentioned, they were not

15    there themselves that day.

16         THE COURT:  Okay.

17         THE PROSPECTIVE JUROR:  Uh-huh.

18         THE COURT:  You answered yes to Question No. 12,

19    which is if you have followed the news about the events that

20    took place at the Capitol on January 6th.  So tell us a little

21    bit about what you watched on the day of and since then, how

22    closely you followed this story.

23         THE PROSPECTIVE JUROR:  Yes.  So as I mentioned, on

24    the day of I was out in northern Virginia visiting family.  But

25    because my husband was at home, I -- and we had been discussing

1    the issue -- or as soon as we saw news alerts that day, I

2    watched television coverage pretty much almost the entire day,

3    in part to monitor for his safety.

4          Since then, I've kept an eye on the news in terms of

5    just seeing how the election results were handled and then also

6    the -- sorry, the certification was handled and then also just

7    generally keeping tabs on the trials.  Nothing specific.  But

8    just as they come up in the news, I've -- I've either read

9    articles or heard news stories.

10         THE COURT:  And there's been a handful of

11   documentaries on the -- that day.  Have you watched any of

12   those?

13         THE PROSPECTIVE JUROR:  No, I haven't watched any

14   documentaries on those.

15         THE COURT:  And then the House committee

16   investigating January 6th had some hearings.  Did you watch

17   those?

18         THE PROSPECTIVE JUROR:  I did watch some of those on

19   and off, yes, Your Honor.

20         THE COURT:  Okay.  And how many of those would you

21   say you watched?

22         THE PROSPECTIVE JUROR:  Probably, altogether, maybe I

23   watched two or three hours of coverage.

24         THE COURT:  Okay.  Anything stand out about what you

25   saw during the committee hearings?

1          THE PROSPECTIVE JUROR:  Nothing as far as I can

2    recollect specifically.

3          THE COURT:  Okay.  And then you answered a similar

4    question, which is about the same -- the news coverage about

5    specific individuals.

6          THE PROSPECTIVE JUROR:  And when I answered that

7    question, I only meant insofar as if there were articles about

8    specific trials and I saw them or heard about them on the

9    radio, then I would have encountered that information.

10         THE COURT:  Okay.

11         THE PROSPECTIVE JUROR:  Yep.

12         THE COURT:  Do you remember anything that you read

13   about a specific trial that might impact how you viewed this

14   case?

15         THE PROSPECTIVE JUROR:  No, Your Honor.

16         THE COURT:  Okay.  You answered the -- yes to the

17   question about you, member of your immediate family, or close

18   personal friend working in law enforcement.  We already talked

19   about your father-in-law.  But anyone else?

20         THE PROSPECTIVE JUROR:  Not law enforcement, per se,

21   but I do have close personal friends -- at least one close

22   personal friend from law school -- who is an AUSA in Chicago.

23         THE COURT:  In Chicago.  Okay.

24       And how often do you interact with that person?

25         THE PROSPECTIVE JUROR:  We probably text a couple

1    times a week, and then we see each other a few times a year.

2              THE COURT:  Okay.  Do you -- it's a he or a she?

3              THE PROSPECTIVE JUROR:  She, Your Honor.

4              THE COURT:  She.  Do you talk much about her work?

5              THE PROSPECTIVE JUROR:  Yes, in the sense that when

6    we're catching up, I hear about her trials and things like

7    that.

8              THE COURT:  Anything about what you've learned from

9    her and her work that would impact how -- the way you look at

10   this case?

11             THE PROSPECTIVE JUROR:  No, Your Honor.

12             THE COURT:  Okay.  You also answered yes to

13   Question No. 22, which is if you, members of your immediate

14   family, or close personal friends have ever been the victim of

15   or a witness to a crime.

16             THE PROSPECTIVE JUROR:  Yes.  Last winter, some --

17   somebody stole the license plates off of one of our cars that

18   was parked on the street and that was later used on vehicles

19   that were involved in multiple robberies in Virginia.  We have

20   not been involved in any sort of investigations besides being

21   informed by the relevant police department about that incident.

22             THE COURT:  So you didn't have to testify at any

23   trial or anything like that?

24             THE PROSPECTIVE JUROR:  No, huh-uh.  Yeah.

25             THE COURT:  Anything about that experience in dealing

1    with the police that might impact the way you look at this

2    case?

3                THE PROSPECTIVE JUROR:  No, Your Honor.

4                THE COURT:  Okay.  All right.  Ms. Fish.

5                MS. FISH:  I wore hoop earrings, which is not wise

6    with the mask.

7                THE PROSPECTIVE JUROR:  Same with me.

8                MS. FISH:  Good morning, Ms. ███.

9                THE PROSPECTIVE JUROR:  Good morning.

10               MS. FISH:  I wanted to follow up on a few things.

11        First, you mentioned in your job sometimes, obviously,

12   people talk around the office.  You do learn about some of the

13   intelligence investigation, including into groups in the

14   country that cause concern for your office.  Is that right?

15               THE PROSPECTIVE JUROR:  Yes and no.  So as I

16   mentioned, my prime portfolio is involved -- related to the

17   internal administration of the agency, which means that we

18   necessarily intersect with all of the directors and centers in

19   the agency.

20        So we might be helping out with an issue that another

21   attorney has related to a portfolio; related to, for example, a

22   database that might contain names, that sort of thing.  So,

23   again, just out of an abundance of caution, mentioning that our

24   work might at some points overlap with the work -- work of

25   other attorneys whose portfolios might involve issues that

1    intersect with domestic terrorism.

2              MS. FISH:  But you're not aware of, like, the

3    substance of the investigation that might be going on into --

4              THE PROSPECTIVE JUROR:  Not into any specific

5    investigations, no.

6              MS. FISH:  Okay.  I also wanted to follow up a little

7    bit about your friend who's the AUSA in Chicago.

8              THE PROSPECTIVE JUROR:  Yes.

9              MS. FISH:  When you speak about her work with her,

10   does she sometimes complain about opposing counsel?

11             THE PROSPECTIVE JUROR:  Not in terms of -- not in

12   terms of -- no, I would not say she complains about opposing

13   counsel.

14             MS. FISH:  Do you feel like you have any kind of

15   feelings about defense attorneys -- I'm just asking.  I'm a

16   defense attorney -- that, you know -- based on particularized

17   exposure to what your friend deals with in her job, any, you

18   know, concerns about information that's not shared or how

19   defense attorneys conduct themselves in court or anything?

20             THE PROSPECTIVE JUROR:  No.  No.

21             MS. FISH:  I also want to follow up on -- a little

22   bit more about the -- your experience on January 6th, what you

23   watched and everything.

24             THE PROSPECTIVE JUROR:  Yes.

25             MS. FISH:  So you indicated that day you watched

1    pretty closely.

2              THE PROSPECTIVE JUROR:  Yes.

3              MS. FISH:  All day long?

4              THE PROSPECTIVE JUROR:  I would say -- I mean, I

5    don't remember exactly -- I don't remember the exact time line,

6    but I did watch for at least a few hours, live news coverage.

7              MS. FISH:  And can you tell us some of the things you

8    saw in that news coverage.

9              THE PROSPECTIVE JUROR:  Sure.  I saw footage of folks

10   scaling the walls of the Capitol complex, footage from inside

11   the building, including doors being smashed, people being

12   injured.  So that sort of thing, yeah.

13             MS. FISH:  And how did you feel watching that

14   footage?

15             THE PROSPECTIVE JUROR:  I mean, given that there was

16   also a personal component just because my husband was at home

17   not too far away, I was fairly stressed out.  So from a

18   personal perspective, as I said, fairly stressed, yeah.

19             MS. FISH:  And I think you mentioned you were afraid

20   for your husband's safety.  Is that --

21             THE PROSPECTIVE JUROR:  Yes.  I mean, I don't think

22   necessarily -- I didn't necessarily think that -- because he

23   was not there on the grounds that day, I didn't necessarily

24   think anything was going to happen to him immediately.  But, of

25   course, just -- we -- for example, we had been warned to stay

1    away from the park that was near us because there might have

2    been protesters gathering there.  So just sort of general

3    public safety fears, yeah.

4            MS. FISH:  And then after January 6th, you said there

5    was some fencing in your neighborhood.

6            THE PROSPECTIVE JUROR:  Just the Capitol fencing,

7    yeah.

8            MS. FISH:  Did you also have a heightened police

9    presence in your neighborhood after that?

10           THE PROSPECTIVE JUROR:  I don't think so, no.

11           MS. FISH:  And it sounds like you followed a bit

12    after -- after that you followed some of the news articles

13    about trials, some of the committee hearings; is that right?

14           THE PROSPECTIVE JUROR:  Yes.

15           MS. FISH:  From that you know some of the trials that

16    happened in this courthouse.  Are there additional things you

17    feel like you learned in the news coverage that you watched

18    after January 6th?

19           THE PROSPECTIVE JUROR:  In terms of what happened

20    that day?

21           MS. FISH:  Yes.

22           THE PROSPECTIVE JUROR:  I mean, I think I watched all

23    that from -- with the perspective of any sort of average news

24    viewer.  So just learning about, you know, warnings that had

25    been sent to domestic law enforcement that were not necessarily

1    acted upon, that sort of thing.  Yes, I did learn more about

2    what happened that day.  Yeah.  Yeah.

3            MS. FISH:  And do you feel like you have a pretty

4    good idea of what happened on January 6th?

5            THE PROSPECTIVE JUROR:  Yes, I do.

6            MS. FISH:  And do you feel like you have a good idea

7    of why the majority of people, civilians, went to the Capitol

8    that day?

9            THE PROSPECTIVE JUROR:  Based on whatever -- based on

10   the news coverage that I've heard, yes, I do.  Yeah.

11           MS. FISH:  What is that?

12           THE PROSPECTIVE JUROR:  The idea that there were

13   folks who believed that the election results of the November --

14   the 2020 presidential election were not accurately counted

15   and -- resulting in an inaccurate presidential election result,

16   which meant that whatever certification was going on that day

17   was actually not appropriate, so.

18           MS. FISH:  Do you believe that most people went

19   with the intent to stop that certification, kind of, no matter

20   what?

21           THE PROSPECTIVE JUROR:  I think -- my understanding,

22   at least from what I've gleaned and from news coverage, again,

23   is that a lot of folks just didn't know necessarily what was

24   going to be the result of that day; whether it was going to be

25   a protest or whether it was going to be to actually stop the

```
 1    certification.
 2               MS. FISH:  And do you feel like your understanding of
 3    what happened on January 6th is likely to change in the next
 4    week?
 5               THE PROSPECTIVE JUROR:  No, I don't think so.
 6               MS. FISH:  Thank you, Ms. ███.
 7               THE PROSPECTIVE JUROR:  Thanks.
 8               MR. VALENTINI:  Good morning, Ms. ███.
 9               THE PROSPECTIVE JUROR:  Good morning.
10               MR. VALENTINI:  I'm Francesco Valentini.  I'm one of
11    the prosecutors in this case.
12           I wanted to follow up on one of the answers that you
13    gave in response to my colleague's question --
14               THE PROSPECTIVE JUROR:  Yes.
15               MR. VALENTINI:  -- about your emotional reaction to
16    date.  I think you said you were fairly stressed out because
17    your husband was in -- within -- he was at home that day.
18               THE PROSPECTIVE JUROR:  Yes.  That's correct.
19               MR. VALENTINI:  You said home is generally within
20    1 mile of the Capitol?
21               THE PROSPECTIVE JUROR:  Within 1 mile of the Capitol.
22    So we at that time were renting right off of Lincoln Park,
23    which is a straight shot down East Capitol Street, yeah.  Yeah.
24               MR. VALENTINI:  And the feeling of being fairly
25    stressed out, did it subside after January 6th?
```

1      THE PROSPECTIVE JUROR:  It definitely subsided.  It

2  definitely dropped in the immediate 24 hours after.  And then I

3  think -- as anybody else who lived in the neighborhood, it

4  probably lingered at a much lower level for a couple weeks

5  afterwards.

6      MR. VALENTINI:  You said a couple weeks afterwards --

7      THE PROSPECTIVE JUROR:  Yeah.

8      MR. VALENTINI:  But there's no feelings of being

9  stressed out about --

10      THE PROSPECTIVE JUROR:  No.

11      MR. VALENTINI:  -- what happened at the Capitol?

12      THE PROSPECTIVE JUROR:  No.

13      MR. VALENTINI:  More generally, I expect if you're

14  selected as a juror in this case, Judge Contreras will instruct

15  you that you will have to base any decision that you make in

16  the jury room with the other jurors only based on the facts

17  that you hear in this trial and instructions that the judge --

18  Judge Contreras will give you.

19      Do you think that you will have any difficulty doing

20  that?

21      THE PROSPECTIVE JUROR:  No.

22      MR. VALENTINI:  Thank you.

23      THE COURT:  All right.  Thank you.

24      THE PROSPECTIVE JUROR:  Thank you.

25      (REPORTER'S NOTE:  Juror 0819 left.)

1          MS. FISH:  Your Honor, I'll move to strike Juror ▮

2     for cause based on her strong feelings the day of, with her

3     husband in close proximity to the Capitol Building and her

4     pretty fixed ideas of what happened that she indicated were not

5     likely to change.

6          MR. VALENTINI:  Your Honor, the government opposes

7     the motion.  I think the juror told us that any feeling of

8     being -- I think I'm quoting her -- was fairly stressed out

9     subsided initially the day of and were, essentially, gone

10     within a couple of weeks.

11          As to any preconceived ideas, not only would the juror

12     put those asides, she also explained those -- those ideas as

13     fairly neutral, including leaving open the possibility that

14     individuals were just going to the Capitol to protest.

15          THE COURT:  Yeah, I agree with you.  I'll deny the

16     motion.  You know, she did, one, articulate that the concern

17     subsided fairly quickly.  But more importantly, she said that

18     they stayed on Capitol Hill.  They moved and stayed on

19     Capitol Hill, which is clearly indicative that that fear

20     subsided.

21          So she's on.

22          (REPORTER'S NOTE:  Juror 1223 enters.)

23          THE COURTROOM DEPUTY:  This is Juror No. 1223.

24          THE COURT:  Good morning.

25          THE PROSPECTIVE JUROR:  Good morning.

1          THE COURT:  So this is Juror 1223.  Ms. ███████;

2     is that correct?

3          THE PROSPECTIVE JUROR:  It is.

4          THE COURT:  Okay.  So you answered yes to the

5     question about either knowing these counsel or having dealings

6     with their offices, the Department of Justice, U.S. Attorney's

7     Office, or federal public defender's offices, or applying for

8     positions.  Tell us about that.

9          THE PROSPECTIVE JUROR:  Sure.  So I'm former

10    colleagues with Bridget Fitzpatrick.  We were at the SEC

11    together.  I've socialized with her occasionally, and she's

12    very good friends with a friend of mine.

13          MS. FISH:  We would not oppose excusing the juror.

14          MR. VALENTINI:  No objection.

15          THE COURT:  All right.  Thank you.

16          THE PROSPECTIVE JUROR:  Okay.

17          THE COURT:  You're excused.

18          (REPORTER'S NOTE:  Juror 1223 left.)

19          MR. VALENTINI:  For the record, Bridget Fitzpatrick

20    is the First Assistant United States Attorney.

21          THE COURT:  Under the current U.S. Attorney?

22          MR. VALENTINI:  Yes.

23          MS. FISH:  Your boss.

24          (REPORTER'S NOTE:  Juror 0649 enters.)

25          THE COURTROOM DEPUTY:  This is Juror No. 0649.

1        THE PROSPECTIVE JUROR:  Hello.

2        THE COURT:  Hello.  So this is Juror 0649.

3    Ms. ████████; is that correct?

4        THE PROSPECTIVE JUROR:  That's correct.

5        THE COURT:  Okay.  You answered yes to

6    Question No. 1 [sic], which is the one of you, a member of your

7    immediate family, or close friends having received legal

8    training or worked in a law office.

9        THE PROSPECTIVE JUROR:  That's correct.

10        THE COURT:  Tell us about that.

11        THE PROSPECTIVE JUROR:  Do you need her name or --

12        THE COURT:  Well, just how close of a relationship

13    and what they do.

14        THE PROSPECTIVE JUROR:  Well, she's a paralegal, and

15    we've been friends since childhood.

16        THE COURT:  Okay.  And what -- where does she work?

17        THE PROSPECTIVE JUROR:  I don't recall the name of

18    the firm at the moment, but it is a Washington, D.C., firm.

19        THE COURT:  Okay.  Do you know what kind of work she

20    does?

21        THE PROSPECTIVE JUROR:  She's a paralegal.

22        THE COURT:  Okay.  But specifically?

23        THE PROSPECTIVE JUROR:  Not -- not specifics.

24        THE COURT:  Okay.  So --

25        THE PROSPECTIVE JUROR:  Yeah.

1          THE COURT:  -- so you don't talk a lot about the

2     specifics about her?

3          THE PROSPECTIVE JUROR:  No.

4          THE COURT:  Okay.  All right.  You answered yes to

5     Question 12, which is the one about following the news about

6     the events that took place at the Capitol on January 6th.

7          THE PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Tell us about what -- one, what you saw

9     on that day and what you have seen since then and what stands

10    out in your mind.

11         THE PROSPECTIVE JUROR:  Okay.  I'll answer, first,

12    that I haven't watched or followed anything lately.  But

13    when -- on the day and few days, you know, weeks following

14    that, just off and on -- just repeatedly seeing everything that

15    transpired, with everything that happened outside of the

16    Capitol leading into the Capitol.

17         THE COURT:  Okay.  And so let's talk a little bit

18    about that day.  Were you home?

19         THE PROSPECTIVE JUROR:  Working from home.

20         THE COURT:  Working from home?

21         THE PROSPECTIVE JUROR:  Yes.

22         THE COURT:  And did you continue to work, or did you

23    stop everything and watch the TV or --

24         THE PROSPECTIVE JUROR:  No, I continued to work and,

25    like, gazing over here and there, depending on what I was

1    working on at the moment.

2              THE COURT:  So it was kind of in the background --

3              THE PROSPECTIVE JUROR:  Yes.

4              THE COURT:  Okay.  And since then, how often would

5    you say you watch things concerning January 6th?

6              THE PROSPECTIVE JUROR:  I haven't lately.

7              THE COURT:  Okay.  And how long has it been since you

8    kind of really watched things?

9              THE PROSPECTIVE JUROR:  It's been some months, yeah,

10   I think once it kind of started to die down a little from the

11   news.  Where when it started, it was like every day all day

12   long.  And once it kind of started waning, I kind of got away

13   from it.

14             THE COURT:  Okay.  Now, when you -- when you say when

15   it started it was kind of all day long, it was on all day long

16   or you watched it all day long?

17             THE PROSPECTIVE JUROR:  Because my husband and I

18   watch CNN or MSNBC.  So they were kind of, you know, talking

19   about it.

20             THE COURT:  Sure.

21             THE PROSPECTIVE JUROR:  Just all during the day.

22             THE COURT:  But --

23             THE PROSPECTIVE JUROR:  But it was on in the

24   background while we were working from home.

25             THE COURT:  Okay.  Okay.  And there's been a handful

 1    of documentaries about that day.  Have you watched any of

 2    those?

 3              THE PROSPECTIVE JUROR:  No.

 4              THE COURT:  No.  And then the -- there was a House

 5    committee that investigated January 6th and had some hearings.

 6    Did you watch any of those?

 7              THE PROSPECTIVE JUROR:  I didn't follow too much of

 8    that, no.

 9              THE COURT:  Okay.  By too much --

10              THE PROSPECTIVE JUROR:  I mean, initially, you know,

11    you -- you watched the news and you hear there's the -- they

12    were forming a committee or the committee has been formed and

13    they were doing, you know, I guess, their investigation of it.

14    But to follow it, no.

15              THE COURT:  And you didn't watch any of the hearings

16    live?

17              THE PROSPECTIVE JUROR:  No.

18              THE COURT:  You answered yes to Question 21, which is

19    if you, members of your immediate family, or close personal

20    friends have ever been arrested for, charged with, or convicted

21    of a crime.

22              THE PROSPECTIVE JUROR:  Uh-huh.

23              THE COURT:  Tell us about that.

24              THE PROSPECTIVE JUROR:  It was my brother.  He worked

25    at a D.C. hospital, and he was accused of assaulting a patient,

1    which he served six months for that.  He's now deceased.

2              THE COURT:  Okay.  And did you -- did you feel that

3    as part of that process he was treated fairly?

4              THE PROSPECTIVE JUROR:  No, I don't.

5              THE COURT:  Okay.  Why not --

6              THE PROSPECTIVE JUROR:  I feel like he was coerced

7    into pleading guilty.  His representation wasn't there at the

8    time that he decided to plead guilty.  I think he was afraid

9    of -- you know, they tell you plead guilty, you won't do as

10   much time.  If you go to trial, you'll get more time.  So I

11   felt like he did it under pressure.

12             THE COURT:  Okay.  And anything about his experience

13   through that process you think would shape the way you look at

14   this case?

15             THE PROSPECTIVE JUROR:  No, I don't think so.  I

16   don't believe it would.

17             THE COURT:  Okay.  All right.  And then you answered

18   yes to Question 28, which is if you believe that all or most

19   civilians present at the Capitol on January 6th, 2012, engaged

20   in violence or intended to engage in violence.

21             THE PROSPECTIVE JUROR:  That's just a personal

22   opinion of mine.  Just -- I just feel like -- I don't think

23   most people were there for good.

24             THE COURT:  Okay.  But, obviously, there were --

25   there were thousands of people there, only some who engaged in

```
 1    violence.

 2                 THE PROSPECTIVE JUROR:  Yeah.

 3                 THE COURT:  And, in fact, in this case you're not

 4    going to hear any allegations --

 5                 THE PROSPECTIVE JUROR:  Okay.

 6                 THE COURT:  -- that Mr. Rhine engaged in violence or

 7    in vandalism or anything -- on those things.  Do you think you

 8    would be able to set aside your personal views and what you may

 9    have learned in the past and base a decision solely on the

10    evidence presented?

11                 THE PROSPECTIVE JUROR:  Yeah.  Upon hearing, you

12    know, testimony and everything, I -- I believe that everyone

13    does deserve a fair trial and should not be judged beforehand.

14                 THE COURT:  Okay.  All right.

15           Ms. Fish.

16                 MS. FISH:  Thank you.

17           Good morning, Ms. ███████.

18                 THE PROSPECTIVE JUROR:  Hi.  How are you?

19                 MS. FISH:  Good.  How are you doing?

20                 THE PROSPECTIVE JUROR:  Good.

21                 MS. FISH:  I wanted to follow up, first, a little bit

22    about your experience and what you saw your brother go through

23    when he was charged with a crime.  You indicated that his

24    attorney was not very good.  Did he have a public defender?

25                 THE PROSPECTIVE JUROR:  I believe so, yes.
```

```
1              MS. FISH:  So I'm also a public defender.  And I just
2     wanted to know what your feelings are towards public defenders,
3     generally.
4              THE PROSPECTIVE JUROR:  Generally, I don't have an
5     opinion about public defenders, except that in most cases, they
6     have heavy workloads, you know, defending most people who can't
7     afford an attorney on their own.  So I've -- honestly, I don't
8     have an opinion one way or another.
9              MS. FISH:  Okay.  You don't have any opinions about,
10    like, the honesty or helpfulness of the public defender?
11             THE PROSPECTIVE JUROR:  No.
12             MS. FISH:  I also wanted to speak about the news that
13    you watched on January 6th or about January 6th.
14             THE PROSPECTIVE JUROR:  Okay.
15             MS. FISH:  Can you tell us some of the things that
16    you saw on the news or on the coverage of that.
17             THE PROSPECTIVE JUROR:  Just mostly what was shown
18    was, you know, everyone rallying, going towards the Capitol,
19    and then everything that transpired after that, you know.  The
20    chaos erupting and them forcing their way -- the ones who
21    did -- inside.  And everything that transpired inside the --
22    the chaos inside.  And I do recall the one woman being -- one
23    of the people who were trying to get inside one of the -- the
24    rooms was shot.  I don't recall her name, but that's one of the
25    things that, like, kind of stood out.  And the officers that
```

 1    were being, you know, charged.  Just -- just all the chaos,

 2    basically.

 3              MS. FISH:  And some of the violence --

 4              THE PROSPECTIVE JUROR:  Yeah.

 5              MS. FISH:  -- and destruction?

 6         And you indicated kind of from seeing that that your

 7    understanding was that the people who went there intended to do

 8    bad things, essentially.

 9              THE PROSPECTIVE JUROR:  I think most.

10              MS. FISH:  Most people.  And that would include,

11    like, violence?

12              THE PROSPECTIVE JUROR:  Yes.

13              MS. FISH:  And vandalism or property destruction?

14              THE PROSPECTIVE JUROR:  Yeah.

15              MS. FISH:  Maybe theft?

16              THE PROSPECTIVE JUROR:  Yeah.

17              MS. FISH:  And that's, you know, from the news you've

18    watched on the day?

19              THE PROSPECTIVE JUROR:  Yes.

20              MS. FISH:  As well as news coverage you've heard

21    since then?

22              THE PROSPECTIVE JUROR:  Uh-huh.

23              MS. FISH:  Something you've thought about a little

24    bit?

25              THE PROSPECTIVE JUROR:  Little bit.

1              MS. FISH:  And do you think it's likely that that

2      understanding of what happened is going to change in the next

3      week?

4              THE PROSPECTIVE JUROR:  As I've stated before, you

5      know, hearing the evidence, testimony and things like that.

6      So I would base, you know, my decision upon hearing all of

7      that.

8              MS. FISH:  And I want to just clarify a little bit

9      about that.  When you say hearing testimony, would you want to

10     hear from Mr. Rhine to make your decision?

11             THE PROSPECTIVE JUROR:  Sure, I would love to hear

12     from him.

13             MS. FISH:  If you don't hear from him, do you think

14     your kind of general understanding --

15             THE PROSPECTIVE JUROR:  No.

16             MS. FISH:  -- of what happened --

17             THE PROSPECTIVE JUROR:  I know sometimes people

18     choose not to testify, but I would have to honestly say I would

19     go based on evidence --

20             THE COURT:  Okay.

21             THE PROSPECTIVE JUROR:  -- that's presented.

22             MS. FISH:  Okay.  Would you be disappointed if you

23     don't hear from him?

24             THE PROSPECTIVE JUROR:  No.

25             MS. FISH:  Okay.  Thank you.

```
 1              MR. VALENTINI:  Good morning, Ms. ███████.

 2          THE PROSPECTIVE JUROR:  Good morning.

 3              MR. VALENTINI:  I'm Francesco Valentini, one of the

 4      prosecutors in this case.

 5          Good morning.

 6          THE PROSPECTIVE JUROR:  Good morning.

 7              MR. VALENTINI:  I also wanted to follow up about your

 8      brother's experience when he was charged with an offense and

 9      how that case was resolved.

10          THE PROSPECTIVE JUROR:  He ended -- the charge was

11      rape.  And he ended up -- I believe it was six months because

12      he -- he pleaded guilty to the charges.

13              MR. VALENTINI:  You expressed that you -- your

14      disappointment with how he was treated by the system in

15      general.

16          THE PROSPECTIVE JUROR:  Yeah, he was -- from my

17      understanding, before his representation got there, his public

18      defender -- I guess he was still being -- he's had

19      conversations, I guess, with the arresting officers and kind of

20      got into his head about if you don't plead and go to trial,

21      you're going to get this amount of time.  I think, you know,

22      just saying it would be best for him to plead and not go to

23      trial.  And he was afraid of possibly having to do a lot of

24      time because he pled not guilty.

25          He -- he was adamant about not doing it to this person.
```

 1    He actually worked on that floor, and the floor that he worked

 2    on was the psychiatric ward.  And he was adamant about, you

 3    know, he was there doing what he was supposed to do that day.

 4    And he was accused of doing something to a patient, but he was

 5    adamant that he didn't do it.  I've never known him to be that,

 6    you know, type of person who would commit a crime like that.

 7    So he was afraid.  And he did his time, released.  And he did,

 8    you know, the best he could once that was over.

 9             MR. VALENTINI:  And I thank you for sharing that.

10    I'm sure there's difficult memories to that.  So thank you for

11    sharing that.

12             Do you think that anybody in the prosecution treated

13    your brother unfairly?

14             THE PROSPECTIVE JUROR:  I wasn't, like -- the day

15    that he went to -- you know, to court, that -- I was not there.

16    So what's happening with him being sentenced, that was

17    conversations we had with him.  So I don't know in detail what

18    went on with the prosecutors.

19             MR. VALENTINI:  But you wouldn't hold what happened

20    to your brother, which you perceived as unfair, against

21    prosecutors in other cases?

22             THE PROSPECTIVE JUROR:  Not -- not in whole, no.  Not

23    totally, no.  No.

24             MR. VALENTINI:  And you wouldn't hold it against the

25    police in general?

 1              THE PROSPECTIVE JUROR:  No.  I mean, police were

 2     doing their job.  So, no, I would not.

 3              MR. VALENTINI:  Thank you.  I have no further

 4     questions.

 5              THE PROSPECTIVE JUROR:  Okay.

 6              THE COURT:  Thank you.

 7              THE PROSPECTIVE JUROR:  Okay.  That's it?

 8              THE COURT:  That's it for now.

 9              (REPORTER'S NOTE:  Juror 0649 left.)

10              MS. FISH:  Your Honor, I would move to strike

11     Juror ██████ for cause primarily based on her answer to

12     Question 28 and her preexisting belief that people intended to

13     do harm and, you know, commit a variety of more serious crimes

14     if they went into the Capitol Building based with no evidence

15     in front of her.

16          You know, she certainly expressed her intent to try to

17     follow the Court's rules, but her -- her viewpoint was pretty

18     fixed.  She -- and she, I thought, was a bit noncommittal on

19     whether she could ignore that viewpoint if Mr. Rhine does not

20     testify.

21              MR. VALENTINI:  Your Honor, the government opposes

22     the motion.  The juror expressed some incomplete views about

23     what she had heard from public coverage of January 6th, but

24     nothing that suggests that she would not be able to be a fair

25     and impartial juror in this case.

 1          THE COURT:  I agree.  I'm going to deny the motion.

 2      I thought she answered the questions, actually, very

 3  well, the questions posed by defense counsel in -- as the

 4  context of her brother's case, which -- she felt was wrongly

 5  accused, in which to decide whether guilt or innocence based on

 6  the evidence presented in this courtroom.

 7      All right.  So that gets us, by my count, to 22.  Does

 8  anyone have a contrary view?

 9          MS. FISH:  No, Your Honor.

10      And, Your Honor, I did want to just inquire so we can

11  exercise our peremptories thoughtfully.  I understand we each

12  have three and then one for each alternate.  So I wanted to

13  just clarify whether -- how jurors from the later part will be

14  filled in after those strikes.

15          THE COURT:  They're just in order in which we've

16  heard from them.

17          MS. FISH:  So the Alternate No. 7 will be in order as

18  No. 7, not at the very end?

19          THE COURT:  Well, this is how I propose you do it,

20  but I'm open to suggestions.  That you give your three

21  peremptories to Ms. Johnson, and then we'll figure out who the

22  14 are.

23      You can see who's in Seat 7 and who's 14.  And then

24  decide -- not -- I'm not going to seat the individuals.  We're

25  going to do this on paper.  Then you can see who's -- who's in

1    Seat 7 and who's in 14.  And then you can decide whether you

2    want to exercise.

3              MS. FISH:  Perfect, Your Honor.  That's what I wanted

4    to understand.

5              THE COURT:  And the folks from yesterday and before

6    are not coming back until 2:00.  So you have some time to think

7    about it.  So just when you're ready to -- with the three, give

8    them to Ms. Johnson.  We'll figure out who the 14 are, and then

9    you can exercise the additional one.

10             MS. FISH:  Perfect, Your Honor.  Thank you.

11             MR. VALENTINI:  Thank you very much.

12        And just one bit of a nuance maybe.  In terms of

13   exercising the three peremptories on paper, is the Court's plan

14   to have each side do one in turn?

15             THE COURT:  No.  At the same time.  You just provide

16   the three at the same time.

17             MR. VALENTINI:  The reason why I'm asking is because

18   I've been in situations in which sometimes both sides exercise

19   a peremptory directed at the same juror.

20             THE COURT:  And that's just the way it will fall.

21             MR. VALENTINI:  Understood.  Thank you.

22             THE COURT:  All right.

23             THE COURTROOM DEPUTY:  So the other jurors that we

24   have, we're going to let them sit there?

25             THE COURT:  Let them sit there, yeah.

1          All right.  Thank you.

2            (Recess taken.)

3            THE COURT:  All right.  Folks have had a chance to

4  exercise their strikes, both for their three, plus the

5  alternates?

6            MR. VALENTINI:  Yes, Your Honor.

7            MS. FISH:  Yes, Your Honor.

8            THE COURT:  Okay.  Anyone intend to file any sort of

9  motion?

10          MS. FISH:  No *Batson* motion.

11          MR. VALENTINI:  No motion for the government,

12  Your Honor.

13          THE COURT:  Okay.  So we have our 14, 12 plus 2

14  alternates.  And we'll seat them at 2:00 p.m.

15          MS. FISH:  Thank you, Your Honor.

16          MR. VALENTINI:  Thank you.

17          THE COURT:  All right.  Enjoy your lunch.

18           (Recess taken.)

19           (REPORTER'S NOTE:  Later proceedings were heard and

20  transcribed in the above-entitled matter under separate file.)

21

22

23

24

25

1          <u>CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER</u>

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4   Certified Realtime Reporter, do hereby certify that the above

5   and foregoing constitutes a true and accurate transcript of my

6   stenograph notes and is a full, true, and complete transcript

7   of the proceedings to the best of my ability.

8

9                    Dated this 29th day of August, 2023.

10

11              /s/ Nancy J. Meyer
                Nancy J. Meyer
12              Official Court Reporter
                Registered Diplomate Reporter
13              Certified Realtime Reporter
                333 Constitution Avenue Northwest
14              Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

594

538:19, 544:22,
545:6

**'** 

**'80s** [1] - 563:8
**'90s** [1] - 563:8

**0**

**0649** [4] - 577:24,
577:25, 578:2, 589:9
**0819** [4] - 560:8,
560:9, 560:14,
575:25

**1**

**1** [10] - 525:21, 526:19,
526:21, 526:23,
554:9, 554:10,
554:20, 574:20,
574:21, 578:6
**10** [5] - 530:5, 530:6,
536:15, 536:16,
563:21
**10:00** [2] - 526:22,
554:21
**11** [2] - 530:8, 530:10
**12** [7] - 530:12,
530:14, 535:20,
556:19, 565:18,
579:5, 592:13
**1223** [4] - 576:22,
576:23, 577:1,
577:18
**13** [2] - 530:15, 530:17
**14** [7] - 530:18,
530:21, 590:22,
590:23, 591:1,
591:8, 592:13
**1427** [4] - 554:12,
554:13, 554:16,
559:24
**1436** [1] - 552:23
**15** [2] - 530:22, 531:4
**1536** [3] - 535:12,
535:13, 535:16
**16** [2] - 531:6, 531:12
**17** [3] - 531:14,
531:19, 558:25
**1752(a)(1)** [1] - 525:23
**1752(a)(2)** [1] - 526:1
**18** [4] - 525:22, 526:1,
531:20, 532:2
**19** [2] - 532:4, 532:16

**2**

**2** [6] - 525:24, 527:11,
527:15, 527:19,
560:18, 592:13
**20** [6] - 532:17,
532:20, 533:3,

**2001** [1] - 544:10
**2012** [1] - 582:19
**2020** [2] - 534:8,
573:14
**2021** [9] - 525:20,
530:10, 530:14,
530:16, 530:20,
534:4, 534:13,
534:18, 563:24
**21** [4] - 533:4, 533:7,
541:7, 581:18
**22** [4] - 533:8, 533:10,
568:13, 590:7
**23** [2] - 533:11, 533:21
**24** [3] - 533:22, 534:1,
575:2
**25** [4] - 534:2, 534:5,
539:7, 539:22
**26** [2] - 534:7, 534:10
**27** [2] - 534:11, 534:15
**28** [4] - 534:17,
534:19, 582:18,
589:12
**29** [2] - 534:21, 534:23
**2:00** [2] - 591:6,
592:14

**3**

**3** [3] - 526:2, 527:25,
528:3
**30** [2] - 534:25, 535:6

**4**

**4** [3] - 526:5, 528:16,
528:18
**40** [2] - 526:3, 526:7

**5**

**5** [2] - 528:20, 528:22
**5104(e)(2)(D)** [1] -
526:4
**5104(e)(2)(G)** [1] -
526:7
**5:30** [2] - 526:22,
554:21

**6**

**6** [3] - 528:25, 529:5,
529:8
**6th** [47] - 525:20,
530:10, 530:13,
530:16, 530:20,
534:4, 534:13,
534:18, 535:21,
535:24, 538:14,

539:24, 541:9,
543:19, 547:20,
549:11, 549:13,
550:19, 551:2,
551:5, 551:16,
553:2, 553:19,
553:21, 553:23,
556:14, 556:20,
556:21, 556:23,
557:18, 558:4,
558:8, 565:20,
566:16, 570:22,
572:4, 572:18,
573:4, 574:3,
574:25, 579:14,
580:5, 581:5,
582:19, 584:13,
589:23

**7**

**7** [9] - 529:9, 529:15,
555:14, 556:6,
590:17, 590:18,
590:23, 591:1

**8**

**8** [3] - 529:16, 529:20,
529:24

**9**

**9** [3] - 529:25, 530:3,
561:10

**A**

**a.m** [1] - 526:22
**Abbott** [1] - 528:10
**ability** [2] - 532:15,
554:2
**able** [7] - 529:10,
552:4, 552:12,
555:16, 556:1,
583:8, 589:24
**above-entitled** [1] -
592:20
**abundance** [1] -
569:23
**accumulated** [1] -
540:15
**accurately** [1] -
573:14
**accused** [4] - 559:10,
581:25, 588:4, 590:5
**acquit** [2] - 542:23,
559:16
**acted** [1] - 573:1
**actions** [1] - 543:8
**actual** [1] - 550:10

**adamant** [3] - 587:25,
588:2, 588:5
**add** [1] - 528:13
**additional** [4] -
528:15, 559:25,
572:16, 591:9
**additionally** [2] -
553:11, 553:14
**address** [1] - 556:9
**administration** [2] -
561:21, 569:17
**afford** [1] - 584:7
**afraid** [4] - 571:19,
582:8, 587:23, 588:7
**afterwards** [3] -
564:20, 575:5, 575:6
**age** [1] - 540:16
**agencies** [1] - 532:23
**agency** [4] - 532:19,
561:23, 569:17,
569:19
**Agent** [1] - 528:9
**ago** [5] - 539:5, 539:7,
545:19, 545:20,
563:6
**agree** [4] - 554:4,
560:6, 576:15, 590:1
**alerts** [1] - 566:1
**allegations** [1] - 583:4
**alleged** [1] - 525:19
**almost** [3] - 547:10,
555:5, 566:2
**alone** [3] - 533:14,
535:8, 560:2
**alternate** [1] - 590:12
**Alternate** [1] - 590:17
**alternates** [2] - 592:5,
592:14
**altogether** [1] - 566:22
**amazed** [2] - 557:2,
557:4
**amount** [1] - 587:21
**answer** [6] - 549:9,
553:5, 560:1,
562:14, 579:11,
589:11
**answered** [23] -
535:19, 538:18,
539:21, 541:6,
541:7, 550:5,
554:19, 555:13,
558:24, 560:6,
560:18, 563:20,
565:18, 567:3,
567:6, 567:16,
568:12, 577:4,
578:5, 579:4,
581:18, 582:17,
590:2
**answers** [1] - 574:12

**apologize** [1] - 543:14
**appeared** [1] - 548:3
**applied** [3] - 560:20,
560:23, 561:1
**applying** [1] - 577:7
**approach** [1] - 562:8
**appropriate** [3] -
533:17, 542:17,
573:17
**area** [1] - 545:6
**areas** [1] - 564:12
**arrested** [2] - 533:5,
581:20
**arresting** [1] - 587:19
**articles** [4] - 532:8,
566:9, 567:7, 572:12
**articulate** [1] - 576:16
**aside** [2] - 541:21,
583:8
**asides** [1] - 576:12
**assaulting** [1] -
581:25
**Assistant** [2] - 527:9,
577:20
**associated** [1] -
557:21
**association** [1] -
538:25
**assume** [1] - 565:8
**attacked** [2] - 546:24,
553:7
**attend** [1] - 540:2
**attended** [1] - 546:7
**attorney** [7] - 527:3,
530:2, 561:14,
569:21, 570:16,
583:24, 584:7
**Attorney** [3] - 527:9,
577:20, 577:21
**attorney's** [2] - 533:1,
533:2
**Attorney's** [6] -
527:15, 527:19,
533:1, 560:21,
561:2, 577:6
**attorneys** [7] - 527:13,
560:25, 562:17,
564:4, 569:25,
570:15, 570:19
**AUSA** [2] - 567:22,
570:7
**average** [1] - 572:23
**avoid** [2] - 532:5,
564:12
**awake** [1] - 529:17
**aware** [1] - 570:2

**B**

**background** [3] -

595

536:24, 580:2,
580:24
**bad** [1] - 585:8
**barricade** [1] - 558:21
**barricades** [1] - 557:6
**barrier** [1] - 540:24
**base** [5] - 541:21,
551:1, 575:15,
583:9, 586:6
**based** [22] - 535:3,
535:4, 546:9, 551:2,
552:3, 552:10,
553:8, 553:20,
554:1, 554:7, 556:8,
558:3, 560:1,
570:16, 573:9,
575:16, 576:2,
586:19, 589:11,
589:14, 590:5
**Batson** [1] - 592:10
**become** [1] - 545:16
**beforehand** [1] -
583:13
**beginning** [1] - 552:6
**behalf** [1] - 534:23
**belief** [2] - 553:12,
589:12
**beliefs** [7] - 529:13,
533:22, 534:3,
534:8, 535:5,
539:23, 556:4
**belongings** [1] -
560:10
**bench** [1] - 562:9
**best** [4] - 543:7, 549:1,
587:22, 588:8
**between** [3] - 551:11,
551:21, 562:12
**Beverly** [1] - 537:9
**beyond** [4] - 531:7,
531:11, 531:12,
542:21
**bias** [1] - 543:11
**big** [3] - 536:7, 548:7,
549:17
**bit** [14] - 535:23,
545:12, 548:23,
565:21, 570:7,
570:22, 572:11,
579:17, 583:21,
585:24, 585:25,
586:8, 589:18,
591:12
**black** [1] - 543:2
**black-and-white** [1] -
543:2
**blogging** [1] - 532:11
**border** [1] - 540:23
**boss** [1] - 577:23
**Boy** [1] - 537:9

**break** [1] - 537:25
**breaking** [1] - 557:15
**Bridget** [2] - 577:10,
577:19
**brief** [1] - 525:8
**bring** [2] - 535:8,
545:19
**broadcasts** [1] -
541:14
**broadly** [1] - 562:3
**broke** [1] - 558:21
**brother** [5] - 539:11,
581:24, 583:22,
588:13, 588:20
**brother's** [2] - 587:8,
590:4
**brought** [3] - 525:13,
542:2, 542:14
**Building** [10] - 525:20,
526:3, 526:6, 530:6,
544:17, 551:22,
551:25, 563:22,
576:3, 589:14
**building** [6] - 525:22,
525:25, 541:1,
542:6, 553:12,
571:11
**burden** [8] - 531:6,
531:7, 531:9,
531:12, 542:21,
553:15, 554:1
**business** [3] - 527:13,
528:17, 529:4

## C

**camera** [2] - 536:3,
548:6
**cannot** [2] - 531:17,
559:2
**Capitol** [54] - 525:20,
526:3, 526:6, 528:8,
528:10, 530:6,
530:10, 530:13,
530:20, 532:25,
534:4, 534:13,
534:15, 534:18,
535:21, 539:24,
541:9, 544:17,
548:9, 549:12,
549:14, 549:16,
549:21, 549:24,
550:2, 550:6,
550:15, 550:18,
551:22, 551:25,
556:20, 557:6,
558:18, 563:22,
564:1, 564:2,
565:20, 571:10,
572:6, 573:7,

574:20, 574:21,
574:23, 575:11,
576:3, 576:14,
576:18, 576:19,
579:6, 579:16,
582:19, 584:18,
589:14
**card** [35] - 526:12,
526:21, 526:23,
527:15, 527:19,
528:3, 528:19,
528:23, 529:5,
529:8, 529:15,
529:20, 529:24,
530:4, 530:7,
530:11, 530:14,
530:17, 530:21,
531:5, 531:13,
531:19, 532:3,
532:16, 532:20,
533:7, 533:10,
533:21, 534:1,
534:6, 534:10,
534:16, 534:20,
534:24, 535:6
**Carolynn** [1] - 527:4
**cars** [1] - 568:17
**case** [50] - 525:8,
525:14, 525:15,
525:17, 526:17,
526:19, 527:8,
528:1, 528:21,
529:9, 529:23,
532:5, 532:6, 532:8,
532:9, 532:10,
532:11, 532:12,
533:24, 533:25,
534:5, 534:10,
539:25, 541:24,
542:21, 548:25,
549:8, 552:2, 552:3,
552:8, 552:10,
553:13, 554:2,
555:15, 555:25,
556:10, 562:16,
563:18, 567:14,
568:10, 569:2,
574:11, 575:14,
582:14, 583:3,
587:4, 587:9,
589:25, 590:4
**cases** [3] - 531:7,
584:5, 588:21
**casting** [1] - 556:24
**catchall** [1] - 534:25
**catching** [1] - 568:6
**caused** [1] - 551:25
**caution** [1] - 569:23
**centers** [1] - 569:18
**certain** [5] - 526:16,

534:12, 540:16,
543:23, 564:12
**certainly** [2] - 565:12,
589:16
**certification** [4] -
566:6, 573:16,
573:19, 574:1
**chair** [1] - 560:10
**challenge** [1] - 525:5
**challenges** [1] - 525:6
**chance** [1] - 592:3
**change** [6] - 548:11,
548:14, 553:3,
574:3, 576:5, 586:2
**chaos** [3] - 584:20,
584:22, 585:1
**charge** [1] - 587:10
**charged** [8] - 525:17,
531:14, 533:5,
558:25, 581:20,
583:23, 585:1, 587:8
**charges** [7] - 525:13,
525:21, 525:24,
526:2, 526:5, 526:8,
587:12
**Charles** [2] - 525:18,
528:1
**Chicago** [3] - 567:22,
567:23, 570:7
**childhood** [1] - 578:15
**choose** [2] - 531:22,
586:18
**civil** [1] - 528:21
**civilians** [5] - 534:14,
534:17, 541:8,
573:7, 582:19
**clarification** [1] -
551:14
**clarify** [2] - 555:22,
586:8, 590:13
**class** [1] - 555:1
**classroom** [1] - 555:7
**clear** [5] - 540:23,
548:1, 553:11,
553:25, 555:20
**clearly** [1] - 576:19
**clerk** [1] - 529:2
**client** [2] - 527:20,
527:23
**climate** [1] - 536:8
**clips** [5] - 538:5,
538:6, 547:17,
551:12, 551:13
**close** [19] - 530:5,
532:18, 533:5,
533:9, 538:20,
553:18, 559:8,
561:11, 563:21,
564:4, 567:17,
567:21, 568:14,

576:3, 578:7,
578:12, 581:19
**closed** [1] - 546:4
**closely** [4] - 537:22,
557:17, 565:22,
571:1
**closest** [1] - 530:1
**closing** [1] - 555:5
**CNN** [3] - 545:21,
551:12, 580:18
**coerced** [1] - 582:6
**Cohn** [1] - 527:4
**colleague's** [1] -
574:13
**colleagues** [3] -
543:20, 546:13,
577:10
**comfortable** [1] -
562:15
**coming** [1] - 591:6
**comments** [1] -
532:12
**commit** [2] - 588:6,
589:13
**committee** [8] -
538:14, 558:7,
566:15, 566:25,
572:13, 581:5,
581:12
**commute** [1] - 564:23
**companies** [1] -
543:23
**company** [2] - 537:11,
544:3
**complain** [1] - 570:10
**complains** [1] -
570:12
**complete** [1] - 547:22
**complex** [1] - 571:10
**component** [1] -
571:16
**concern** [3] - 547:7,
569:14, 576:16
**concerning** [1] -
557:1, 562:1, 580:5
**concerns** [2] - 532:14,
570:18
**conclusion** [1] -
542:16
**conduct** [5] - 525:11,
525:19, 525:25,
526:2, 570:19
**conference** [1] -
562:11
**confusion** [1] - 537:20
**connection** [1] - 530:9
**conscientious** [1] -
553:24
**consider** [5] - 533:15,
534:5, 534:9,

539:25, 540:5
**considering** [1] -
533:11
**constitutional** [2] -
531:15, 559:1
**contain** [1] - 569:22
**content** [6] - 541:13,
551:4, 551:5, 551:6,
551:15, 551:19
**context** [7] - 525:9,
525:10, 529:11,
535:4, 555:17,
556:2, 590:4
**continue** [2] - 532:5,
579:22
**continued** [1] - 579:24
**contract** [1] - 537:10
**contrary** [1] - 590:8
**contrasted** [1] - 551:4
**Contreras** [3] - 552:8,
575:14, 575:18
**conversations** [3] -
563:14, 587:19,
588:17
**convicted** [2] - 533:6,
581:20
**corner** [1] - 529:2
**corporate** [2] - 563:2,
563:3
**correct** [16] - 535:17,
535:18, 539:4,
550:20, 550:22,
550:24, 554:17,
554:18, 556:16,
560:15, 560:16,
574:18, 577:2,
578:3, 578:4, 578:9
**corrected** [1] - 550:13
**correctly** [1] - 551:3
**Counsel** [1] - 564:5
**counsel** [13] - 525:4,
525:6, 526:14,
526:24, 527:3,
527:9, 554:5,
560:19, 560:23,
570:10, 570:13,
577:5, 590:3
**count** [1] - 590:7
**Count** [4] - 525:21,
525:24, 526:2, 526:5
**counted** [1] - 573:14
**country** [1] - 569:14
**counts** [1] - 533:13
**County** [1] - 563:5
**couple** [6] - 536:6,
543:17, 567:25,
575:4, 575:6, 576:10
**course** [4] - 538:5,
543:2, 543:7, 571:25
**court** [7] - 528:22,

528:25, 542:6,
543:4, 570:19,
588:15
**COURT** [166] - 526:7,
527:11, 527:24,
528:13, 528:16,
535:14, 535:16,
535:19, 535:23,
536:1, 536:22,
537:3, 537:7,
537:12, 537:16,
537:22, 538:3,
538:8, 538:13,
538:18, 538:23,
539:1, 539:3, 539:5,
539:8, 539:10,
539:17, 539:21,
541:4, 541:6,
541:18, 542:18,
543:12, 552:18,
552:20, 554:4,
554:14, 554:16,
554:19, 554:24,
555:8, 555:13,
555:24, 556:11,
556:13, 556:15,
556:18, 557:3,
557:10, 557:16,
557:24, 558:4,
558:7, 558:12,
558:24, 559:6,
559:11, 559:14,
559:18, 559:22,
560:4, 560:6,
560:12, 560:14,
560:18, 561:3,
561:6, 561:9,
561:15, 561:18,
561:22, 561:25,
562:6, 562:10,
562:13, 562:20,
562:23, 563:1,
563:3, 563:6, 563:9,
563:13, 563:17,
563:20, 564:6,
564:9, 564:15,
564:19, 564:24,
565:3, 565:10,
565:16, 565:18,
566:10, 566:15,
566:20, 566:24,
567:3, 567:10,
567:12, 567:16,
567:23, 568:2,
568:4, 568:8,
568:12, 568:22,
568:25, 569:4,
575:23, 576:15,
576:24, 577:1,
577:4, 577:15,
577:17, 577:21,

578:2, 578:5,
578:10, 578:12,
578:16, 578:19,
578:22, 578:24,
579:1, 579:4, 579:8,
579:17, 579:20,
579:22, 580:2,
580:4, 580:7,
580:14, 580:20,
580:22, 580:25,
581:4, 581:9,
581:15, 581:18,
581:23, 582:2,
582:5, 582:12,
582:17, 582:24,
583:3, 583:6,
583:14, 586:20,
589:6, 589:8, 590:1,
590:15, 590:19,
591:5, 591:15,
591:20, 591:22,
591:25, 592:3,
592:8, 592:13,
592:17
**Court** [3] - 525:2,
526:13, 535:1
**Court's** [3] - 535:4,
589:17, 591:13
**courthouse** [1] -
572:16
**courtroom** [6] -
525:15, 525:16,
529:1, 535:9,
541:22, 590:6
**COURTROOM** [6] -
535:13, 554:13,
560:9, 576:23,
577:25, 591:23
**cover** [4] - 544:1,
550:5, 550:6, 550:17
**coverage** [12] - 532:6,
566:2, 566:23,
567:4, 571:6, 571:8,
572:17, 573:10,
573:22, 584:16,
585:20, 589:23
**covered** [3] - 537:14,
544:13, 544:16
**COVID-19** [1] - 529:20
**create** [1] - 554:21
**crime** [8] - 531:14,
533:6, 533:10,
558:25, 568:15,
581:21, 583:23,
588:6
**crimes** [1] - 589:13
**criminal** [5] - 525:17,
528:21, 531:6,
533:25, 562:23
**crowd** [1] - 549:21

**curiosities** [1] -
540:13
**curiosity** [2] - 540:11,
548:8
**curious** [2] - 536:2,
536:17
**current** [2] - 542:14,
577:21

# D

**D.C** [8] - 544:25,
545:4, 545:5, 545:6,
545:9, 550:15,
578:18, 581:25
**Dade** [1] - 563:5
**damage** [2] - 547:4,
548:1
**database** [1] - 569:22
**date** [1] - 574:16
**David** [3] - 525:18,
527:23, 528:1
**days** [6] - 526:20,
536:6, 554:21,
555:2, 579:13
**dealing** [1] - 568:25
**dealings** [5] - 527:13,
528:17, 529:5,
560:20, 577:5
**deals** [1] - 570:17
**deceased** [1] - 582:1
**decide** [4] - 552:10,
590:5, 590:24, 591:1
**decided** [1] - 582:8
**decides** [2] - 531:16,
559:2
**decision** [5] - 541:21,
575:15, 583:9,
586:6, 586:10
**decisions** [2] -
525:14, 552:10
**declined** [1] - 544:4
**declining** [1] - 545:12
**deep** [1] - 538:7
**defend** [1] - 542:7
**defendant** [9] -
525:18, 528:1,
531:8, 533:12,
542:19, 542:22,
554:2, 554:6, 554:7
**defender** [7] - 527:14,
527:17, 560:20,
583:24, 584:1,
584:10, 587:18
**defender's** [1] - 577:7
**defenders** [2] - 584:2,
584:5
**defending** [1] - 584:6
**defense** [5] - 554:4,
570:15, 570:16,

570:19, 590:3
**definitely** [4] - 550:11,
557:14, 575:1, 575:2
**demonstrating** [1] -
526:6
**demonstrations** [1] -
544:14
**deny** [2] - 576:15,
590:1
**department** [2] -
532:22, 568:21
**Department** [5] -
527:18, 532:24,
560:21, 561:1, 577:6
**deputy** [1] - 529:1
**DEPUTY** [6] - 535:13,
554:13, 560:9,
576:23, 577:25,
591:23
**described** [1] - 547:3
**description** [1] - 525:8
**deserve** [1] - 583:13
**designed** [1] - 526:15
**despite** [1] - 543:6
**destruction** [3] -
541:16, 585:5,
585:13
**detail** [1] - 588:17
**determination** [1] -
543:10
**determine** [3] - 525:3,
533:14, 533:17
**determining** [1] -
543:1
**die** [1] - 580:10
**difference** [1] - 551:11
**different** [2] - 537:10,
550:9
**difficult** [8] - 529:19,
531:4, 534:4, 534:9,
539:24, 542:23,
559:15, 588:10
**difficulty** [7] - 529:22,
531:18, 532:1,
533:18, 534:21,
559:4, 575:19
**dire** [4] - 525:2,
553:22, 553:23
**direct** [1] - 530:8
**directed** [1] - 591:19
**directly** [6] - 555:3,
562:2, 564:9,
564:13, 564:18,
564:20, 565:3
**Director** [1] - 561:17
**directors** [1] - 569:18
**disability** [1] - 529:16
**disagrees** [1] - 531:23
**disappointed** [1] -
549:2, 553:16,

597

586:22
**disappointment** [1] -
587:14
**discuss** [1] - 562:3
**discussing** [1] -
565:25
**discussions** [1] -
565:13
**dislikes** [1] - 531:24
**disorderly** [2] -
525:24, 526:2
**disorganization** [1] -
537:20
**dispositive** [1] -
554:11
**disregard** [4] - 548:14,
548:16, 548:17,
553:5
**disregarding** [2] -
529:12, 556:3
**disruptive** [1] - 525:24
**distinction** [1] -
551:21
**District** [1] - 532:22
**district** [1] - 533:2
**disturbed** [1] - 557:9
**disturbing** [1] -
556:25
**diverting** [1] - 564:23
**division** [1] - 539:2
**documentaries** [4] -
558:5, 566:11,
566:14, 581:1
**documentary** [1] -
538:8
**domestic** [3] - 562:1,
570:1, 572:25
**done** [3] - 545:8,
560:24, 562:7
**doors** [1] - 571:11
**doubt** [4] - 531:7,
531:11, 531:12,
542:22
**down** [41] - 526:21,
526:23, 527:15,
527:19, 528:3,
528:18, 528:22,
529:5, 529:8,
529:15, 529:20,
529:24, 530:3,
530:6, 530:10,
530:14, 530:17,
530:20, 531:4,
531:12, 531:18,
532:2, 532:16,
532:19, 533:7,
533:10, 533:21,
534:1, 534:5,
534:10, 534:15,
534:19, 534:23,

535:6, 537:4, 540:3,
543:18, 554:9,
556:6, 574:23,
580:10
**drew** [1] - 551:21
**dropped** [1] - 575:2
**due** [1] - 553:8
**during** [5] - 558:13,
563:7, 563:9,
566:25, 580:21
**duty** [2] - 531:25,
555:9

---

**E**

**early** [1] - 553:23
**earrings** [2] - 543:13,
569:5
**East** [2] - 574:23
**edit** [2] - 551:4, 551:6
**edited** [4] - 541:12,
551:13, 551:15,
551:18
**editing** [1] - 551:4
**effort** [1] - 553:25
**either** [7] - 528:22,
530:25, 531:3,
561:3, 564:16,
566:8, 577:5
**election** [5] - 534:9,
566:5, 573:13,
573:14, 573:15
**electronic** [1] - 525:12
**Elizabeth** [1] - 528:9
**Ellipse** [4] - 550:6,
550:10, 550:12,
550:23
**elsewhere** [3] - 528:2,
530:19, 561:7
**emotional** [1] - 574:15
**empathy** [1] - 542:1
**employers** [1] -
527:14
**employment** [2] -
527:17, 560:23
**enable** [2] - 525:2,
525:4
**encounter** [2] -
529:13, 556:4
**encountered** [2] -
562:4, 567:9
**end** [7] - 530:22,
547:8, 547:11,
553:21, 555:5,
590:18
**ended** [2] - 587:10,
587:11
**enforcement** [8] -
532:19, 532:21,
532:23, 538:21,

539:12, 567:18,
567:20, 572:25
**engage** [3] - 534:19,
541:10, 582:20
**engaged** [7] - 534:18,
541:9, 541:19,
552:1, 582:19,
582:25, 583:6
**English** [1] - 529:22
**enjoy** [1] - 592:17
**entered** [1] - 548:9
**entering** [1] - 525:21
**enters** [5] - 535:12,
554:12, 560:8,
576:22, 577:24
**entire** [2] - 555:24,
566:2
**entitled** [1] - 592:20
**environment** [1] -
545:24
**erupting** [1] - 584:20
**Esene** [1] - 527:10
**especially** [1] - 541:1
**essential** [1] - 560:2
**essentially** [2] - 576:9,
585:8
**event** [4] - 536:4,
536:10, 540:3, 540:5
**events** [15] - 530:9,
530:13, 534:3,
539:23, 543:19,
544:1, 544:16,
547:3, 549:11,
549:12, 550:18,
556:19, 564:9,
566:19, 579:6
**evidence** [14] -
525:15, 526:17,
529:10, 533:11,
533:24, 535:3,
542:20, 555:16,
556:1, 583:10,
586:5, 586:19,
589:14, 590:6
**exact** [1] - 571:5
**exactly** [2] - 539:16,
571:5
**example** [3] - 531:10,
569:21, 571:25
**except** [1] - 584:5
**excited** [1] - 540:8
**excuse** [1] - 559:19
**excused** [2] - 525:3,
577:17
**excusing** [1] - 577:13
**exercise** [6] - 525:4,
590:11, 591:2,
591:9, 591:18, 592:4
**exercised** [1] - 553:16
**exercising** [1] -

591:13
**expect** [2] - 552:7,
575:13
**expected** [1] - 526:19
**expects** [1] - 528:7
**experience** [5] -
568:25, 570:22,
582:12, 583:22,
587:8
**explained** [1] - 576:12
**exposure** [2] - 553:20,
570:17
**expressed** [4] - 553:7,
587:13, 589:16,
589:22
**expressing** [1] -
529:22
**extent** [1] - 553:20
**extra** [1] - 553:25
**extremist** [1] - 534:12
**eye** [1] - 566:4

---

**F**

**fact** [4] - 549:10,
556:9, 583:3
**factors** [1] - 533:16
**facts** [6] - 531:21,
541:21, 552:3,
552:11, 575:16
**fair** [5] - 535:3,
548:22, 553:13,
583:13, 589:24
**fairly** [4] - 534:5,
534:10, 539:25,
571:17, 571:18,
574:16, 574:24,
576:8, 576:13,
576:17, 582:3
**Faith** [1] - 527:10
**fake** [1] - 546:10
**fall** [1] - 591:20
**familiar** [3] - 544:19,
550:1, 550:14
**family** [18] - 527:12,
527:16, 528:17,
529:4, 530:1,
532:18, 533:4,
533:8, 538:20,
560:24, 561:11,
562:18, 564:14,
565:24, 567:17,
568:14, 578:7,
581:19
**far** [3] - 565:5, 567:1,
571:17
**father** [4] - 538:24,
562:21, 563:5,
567:19
**father-in-law** [2] -

563:5, 567:19
**FBI** [5] - 528:11,
532:23, 538:25,
539:3, 539:5
**fear** [5] - 547:1, 547:7,
553:7, 554:8, 576:19
**feared** [1] - 545:16
**fearful** [1] - 565:10
**fears** [1] - 572:3
**federal** [8] - 527:14,
527:17, 528:22,
532:23, 560:20,
561:5, 561:8, 577:7
**feelings** [10] - 531:2,
534:2, 534:7,
536:14, 539:22,
547:4, 570:15,
575:8, 576:2, 584:2
**fellow** [1] - 529:24
**felt** [7] - 536:5, 536:11,
540:4, 546:3,
582:11, 590:4
**fencing** [1] - 564:19,
572:5, 572:6
**few** [4] - 568:1,
569:10, 571:6,
579:13
**field** [2] - 540:25,
543:20
**figure** [3] - 554:10,
590:21, 591:8
**figured** [2] - 536:20,
555:21
**file** [2] - 592:8, 592:20
**filled** [1] - 590:14
**film** [6] - 536:4,
536:10, 543:19,
549:10, 549:12,
549:22
**fine** [1] - 533:20
**firm** [2] - 578:18
**first** [7] - 546:3, 549:9,
555:22, 564:6,
569:11, 579:11,
583:21
**First** [1] - 577:20
**fish** [6] - 526:25,
527:20, 528:13,
543:12, 569:4,
583:15
**FISH** [97] - 527:1,
527:21, 528:15,
543:13, 543:17,
543:23, 544:1,
544:3, 544:8,
544:11, 544:13,
544:16, 544:19,
544:22, 544:25,
545:3, 545:8,
545:11, 545:15,

598

546:6, 546:9, 546:13, 546:16, 546:18, 546:21, 546:23, 547:1, 547:3, 547:13, 547:16, 547:22, 547:24, 548:3, 548:10, 548:16, 548:19, 548:22, 549:4, 552:24, 559:19, 559:25, 569:5, 569:8, 569:10, 570:2, 570:6, 570:9, 570:14, 570:21, 570:25, 571:3, 571:7, 571:13, 571:19, 572:4, 572:8, 572:11, 572:15, 572:21, 573:3, 573:6, 573:11, 573:18, 574:2, 574:6, 576:1, 577:13, 577:23, 583:16, 583:19, 583:21, 584:1, 584:9, 584:12, 584:15, 585:3, 585:5, 585:10, 585:13, 585:15, 585:17, 585:20, 585:23, 586:1, 586:8, 586:13, 586:16, 586:22, 586:25, 589:10, 590:9, 590:17, 591:3, 591:10, 592:7, 592:10, 592:15

**Fish** [1] - 527:2
**Fitzpatrick** [2] - 577:10, 577:19
**five** [2] - 536:16, 545:7
**fixed** [3] - 553:1, 576:4, 589:18
**floor** [2] - 588:1
**folks** [6] - 564:3, 571:9, 573:13, 573:23, 591:5, 592:3
**follow** [24] - 531:4, 531:21, 531:22, 531:25, 532:15, 535:8, 535:9, 542:13, 543:17, 545:11, 549:9, 552:12, 552:20, 556:19, 560:2, 569:10, 570:6, 570:21, 574:12, 581:7, 581:14,

583:21, 587:7, 589:17
**follow-up** [1] - 535:9
**followed** [9] - 530:12, 537:23, 547:17, 557:17, 565:19, 565:22, 572:11, 572:12, 579:12
**following** [8] - 528:7, 531:18, 532:1, 535:20, 542:9, 559:4, 579:5, 579:13
**footage** [4] - 551:18, 571:9, 571:10, 571:14
**forbidden** [2] - 532:8, 532:11
**Force** [1] - 528:11
**forcing** [1] - 584:20
**forensics** [1] - 539:15
**formed** [1] - 581:12
**former** [3] - 550:19, 557:21, 577:9
**formerly** [1] - 540:2
**forming** [1] - 581:12
**forward** [1] - 541:15
**four** [5] - 525:18, 526:19, 545:7, 545:19, 554:20
**frame** [1] - 548:7
**Francesco** [4] - 527:8, 549:7, 574:10, 587:3
**freelancer** [1] - 537:15
**friend** [6] - 561:11, 567:18, 567:22, 570:7, 570:17, 577:12
**friends** [14] - 530:1, 532:18, 533:5, 533:9, 538:20, 543:20, 564:4, 564:25, 567:21, 568:14, 577:12, 578:7, 578:15, 581:20
**front** [2] - 550:7, 589:15

## G

**gather** [1] - 525:12
**gathering** [1] - 572:2
**gazing** [1] - 579:25
**general** [5] - 526:16, 572:2, 586:14, 587:15, 588:25
**generally** [6] - 526:21, 566:7, 574:19, 575:13, 584:3, 584:4
**given** [2] - 542:15,

571:15
**Glavey** [1] - 528:10
**gleaned** [1] - 573:22
**glued** [2] - 536:23, 536:25
**Googling** [1] - 532:11
**government** [11] - 525:17, 528:7, 531:8, 531:10, 531:11, 539:12, 561:5, 561:8, 576:6, 589:21, 592:11
**government's** [1] - 542:21
**grade** [2] - 555:1
**grand** [1] - 528:21
**grant** [1] - 554:4
**greater** [1] - 530:25
**grounds** [4] - 525:22, 525:25, 550:2, 571:23
**Grounds** [2] - 526:3, 549:15
**group** [1] - 529:7
**groups** [3] - 534:12, 553:9, 569:13
**guess** [7] - 536:9, 550:16, 553:9, 562:13, 581:13, 587:18, 587:19
**guilt** [2] - 531:10, 590:5
**guilty** [10] - 526:8, 533:12, 533:21, 534:1, 534:22, 582:7, 582:8, 582:9, 587:12, 587:24
**gut** [1] - 540:14

## H

**half** [1] - 555:1
**handful** [3] - 558:5, 566:10, 580:25
**handled** [2] - 566:5, 566:6
**hard** [2] - 540:7, 541:2
**harm** [6] - 541:16, 548:9, 551:24, 553:13, 558:23, 589:13
**HBO** [4] - 538:1, 538:8, 538:11, 538:12
**head** [4] - 535:22, 538:25, 539:20, 587:20
**hear** [13] - 542:22, 549:2, 559:9, 559:13, 559:14,

568:6, 575:17, 581:11, 583:4, 586:10, 586:11, 586:13, 586:23
**heard** [19] - 527:25, 528:2, 530:18, 535:1, 536:6, 541:24, 546:13, 546:16, 546:23, 551:3, 563:15, 566:9, 567:8, 573:10, 585:20, 589:23, 590:16, 592:19
**hearing** [6] - 529:17, 533:24, 583:11, 586:5, 586:6, 586:9
**hearings** [10] - 538:14, 538:17, 558:8, 558:13, 558:14, 566:16, 566:25, 572:13, 581:5, 581:15
**heavy** [2] - 531:9, 584:6
**heightened** [1] - 572:8
**held** [2] - 535:10, 562:11
**hello** [4] - 560:11, 560:12, 578:1, 578:2
**help** [1] - 533:17
**helpfulness** [1] - 584:10
**helping** [1] - 569:20
**hesitate** [1] - 553:14
**hesitated** [1] - 553:4
**hi** [1] - 583:18
**high** [1] - 536:8
**higher** [1] - 531:11
**Hill** [6] - 564:2, 564:3, 564:6, 564:25, 576:18, 576:19
**himself** [1] - 542:20
**hired** [3] - 542:8, 544:3, 544:4
**hold** [5] - 531:11, 531:17, 559:3, 588:19, 588:24
**home** [14] - 537:5, 557:11, 557:14, 563:25, 564:17, 565:25, 571:16, 574:17, 574:19, 579:18, 579:19, 579:20, 580:24
**Homeland** [1] - 532:24
**honestly** [2] - 584:7, 586:18
**honesty** [1] - 584:10
**Honor** [33] - 527:1,

527:21, 528:15, 552:24, 553:18, 559:19, 559:25, 560:17, 561:13, 561:20, 561:24, 562:2, 562:19, 562:25, 563:19, 565:2, 566:19, 567:15, 568:3, 568:11, 569:3, 576:1, 576:6, 589:10, 589:21, 590:9, 590:10, 591:3, 591:10, 592:6, 592:7, 592:12, 592:15
**Honor's** [1] - 553:14
**hoop** [1] - 569:5
**hope** [1] - 542:10
**hospital** [1] - 581:25
**hours** [4] - 526:22, 566:23, 571:6, 575:2
**House** [7] - 538:13, 550:7, 558:7, 558:19, 566:15, 581:4
**Hulu** [2] - 538:11, 538:12
**husband** [10] - 557:1, 560:25, 562:7, 563:25, 564:15, 565:25, 571:16, 574:17, 576:3, 580:17
**husband's** [1] - 571:20

## I

**idea** [3] - 573:4, 573:6, 573:12
**ideas** [5] - 529:13, 556:3, 576:4, 576:11, 576:12
**ignore** [2] - 531:23, 589:19
**imagine** [1] - 540:8
**immediate** [16] - 527:12, 527:16, 528:17, 529:25, 532:17, 533:4, 533:8, 538:20, 560:24, 561:11, 562:18, 567:17, 568:13, 575:2, 578:7, 581:19
**immediately** [1] - 571:24
**impact** [6] - 555:3, 563:17, 564:20, 567:13, 568:9, 569:1

599

**impacted** [4] - 564:9, 564:13, 564:18, 565:3
**impacting** [1] - 565:7
**impacts** [1] - 555:3
**impartial** [1] - 589:25
**important** [1] - 525:14
**importantly** [1] - 576:17
**impose** [1] - 533:20
**impossible** [3] - 529:19, 531:9, 554:6
**inaccurate** [1] - 573:15
**incident** [1] - 568:21
**include** [1] - 585:10
**includes** [2] - 532:23, 532:25
**including** [5] - 532:6, 532:21, 569:13, 571:11, 576:13
**incomplete** [1] - 589:22
**inconvenience** [1] - 564:21
**indicated** [8] - 534:11, 553:16, 559:3, 564:24, 570:25, 576:4, 583:23, 585:6
**indicative** [1] - 576:19
**indirect** [1] - 530:9
**individual** [1] - 525:5
**individually** [1] - 526:14
**individuals** [5] - 530:19, 558:18, 567:5, 576:14, 590:24
**information** [16] - 525:10, 525:11, 525:12, 533:13, 542:15, 548:13, 548:16, 548:18, 548:20, 553:3, 553:4, 553:5, 555:12, 567:9, 570:18
**informed** [1] - 568:21
**injured** [1] - 571:12
**innocence** [2] - 553:15, 590:5
**innocent** [1] - 526:9
**inquire** [1] - 590:10
**inside** [8] - 542:6, 545:6, 549:20, 571:10, 584:21, 584:22, 584:23
**insofar** [1] - 567:7
**Inspector** [1] - 528:8
**instruct** [6] - 530:22,

531:16, 531:22, 532:5, 559:2, 575:14
**instruction** [6] - 531:4, 531:18, 532:15, 552:12, 559:4, 560:3
**instructions** [7] - 529:12, 532:2, 533:12, 535:4, 555:18, 556:3, 575:17
**Intelligence** [1] - 561:17
**intelligence** [2] - 562:1, 569:13
**intend** [1] - 592:8
**intended** [8] - 534:19, 541:10, 548:1, 551:24, 553:12, 582:20, 585:7, 589:12
**intent** [2] - 573:19, 589:16
**intention** [1] - 541:14
**interact** [1] - 567:24
**internal** [2] - 561:21, 569:17
**internet** [3] - 530:16, 532:7, 532:13
**intersect** [2] - 569:18, 570:1
**introduce** [3] - 526:24, 527:20, 527:22
**investigated** [3] - 538:14, 558:8, 581:5
**investigating** [1] - 566:16
**investigation** [3] - 569:13, 570:3, 581:13
**investigations** [2] - 568:20, 570:5
**investigator** [1] - 527:4
**invitation** [2] - 550:5, 550:6
**invited** [5] - 540:2, 540:20, 541:2, 549:20, 549:21
**inviting** [1] - 546:5
**involve** [1] - 569:25
**involved** [5] - 525:13, 561:25, 568:19, 568:20, 569:16
**issue** [7] - 533:15, 536:7, 536:12, 541:1, 541:15, 566:1, 569:20
**issues** [7] - 526:16, 536:5, 543:2, 562:3,

562:4, 562:16, 569:25
**itself** [3] - 550:15, 561:22, 561:23

## J

**jail** [1] - 533:20
**January** [48] - 525:20, 530:10, 530:13, 530:16, 530:20, 534:4, 534:13, 534:18, 535:21, 535:24, 538:14, 539:24, 541:9, 543:19, 547:20, 549:11, 549:13, 550:19, 551:2, 551:5, 551:16, 553:2, 553:19, 553:21, 553:23, 556:14, 556:20, 556:21, 556:23, 557:18, 558:4, 558:8, 563:24, 565:20, 566:16, 570:22, 572:4, 572:18, 573:4, 574:3, 574:25, 579:6, 580:5, 581:5, 582:19, 584:13, 589:23
**Jeffrey** [1] - 528:10
**job** [12] - 533:13, 533:14, 542:8, 543:18, 543:24, 544:23, 545:12, 553:8, 569:11, 570:17, 589:2
**jobs** [1] - 561:3
**Johnson** [4] - 535:8, 552:20, 590:21, 591:8
**journalism** [1] - 545:21
**Judge** [3] - 552:8, 575:14, 575:18
**judge** [6] - 533:14, 551:24, 552:3, 554:2, 562:12, 575:17
**judge's** [1] - 548:24
**judged** [1] - 583:13
**judges** [1] - 531:20
**judgment** [2] - 525:5, 533:25
**jumps** [1] - 537:17
**Juror** [23] - 535:12, 535:13, 535:16, 552:23, 552:24, 554:12, 554:13,

554:16, 559:24, 560:8, 560:9, 560:14, 575:25, 576:1, 576:22, 576:23, 577:1, 577:18, 577:24, 577:25, 578:2, 589:9, 589:11
**juror** [19] - 525:3, 528:20, 532:4, 533:19, 552:2, 552:8, 552:9, 553:19, 553:22, 559:20, 560:1, 562:12, 575:14, 576:7, 576:11, 577:13, 589:22, 589:25, 591:19
**JUROR** [251] - 535:15, 535:18, 535:22, 535:25, 536:2, 536:25, 537:4, 537:9, 537:13, 537:19, 537:24, 538:4, 538:10, 538:16, 538:22, 538:24, 539:2, 539:4, 539:6, 539:9, 539:11, 539:19, 540:1, 541:5, 541:11, 541:23, 542:24, 543:16, 543:22, 543:25, 544:2, 544:5, 544:10, 544:12, 544:15, 544:18, 544:21, 544:24, 545:2, 545:5, 545:10, 545:14, 545:17, 546:8, 546:11, 546:15, 546:17, 546:19, 546:22, 546:25, 547:2, 547:6, 547:15, 547:21, 547:23, 548:2, 548:5, 548:12, 548:17, 548:21, 549:3, 549:6, 549:14, 549:25, 550:3, 550:8, 550:16, 550:20, 550:22, 550:24, 551:6, 551:8, 551:10, 551:17, 552:5, 552:13, 552:15, 552:17, 552:19, 552:21, 554:15, 554:18, 554:23, 554:25, 555:10, 555:20,

556:7, 556:12, 556:14, 556:16, 556:23, 557:5, 557:12, 557:18, 558:2, 558:6, 558:10, 558:14, 559:5, 559:7, 559:12, 559:17, 559:23, 560:11, 560:13, 560:16, 560:22, 561:4, 561:7, 561:13, 561:16, 561:20, 561:23, 562:2, 562:8, 562:18, 562:21, 562:25, 563:2, 563:4, 563:7, 563:11, 563:15, 563:19, 563:24, 564:8, 564:11, 564:17, 564:22, 565:2, 565:5, 565:12, 565:17, 565:23, 566:13, 566:18, 566:22, 567:1, 567:6, 567:11, 567:15, 567:20, 567:25, 568:3, 568:5, 568:11, 568:16, 568:24, 569:3, 569:7, 569:9, 569:15, 570:4, 570:8, 570:11, 570:20, 570:24, 571:2, 571:4, 571:9, 571:15, 571:21, 572:6, 572:10, 572:14, 572:19, 572:22, 573:5, 573:9, 573:12, 573:21, 574:5, 574:7, 574:9, 574:14, 574:18, 574:21, 575:1, 575:7, 575:10, 575:12, 575:21, 575:24, 576:25, 577:3, 577:9, 577:16, 578:1, 578:4, 578:9, 578:11, 578:14, 578:17, 578:21, 578:23, 578:25, 579:3, 579:7, 579:11, 579:19, 579:21, 579:24, 580:3, 580:6, 580:9, 580:17, 580:21, 580:23, 581:3, 581:7, 581:10,

600

581:17, 581:22,
581:24, 582:4,
582:6, 582:15,
582:21, 583:2,
583:5, 583:11,
583:18, 583:20,
583:25, 584:4,
584:11, 584:14,
584:17, 585:4,
585:9, 585:12,
585:14, 585:16,
585:19, 585:22,
585:25, 586:4,
586:11, 586:15,
586:17, 586:21,
586:24, 587:2,
587:6, 587:10,
587:16, 588:14,
588:22, 589:1,
589:5, 589:7

**jurors** [7] - 529:6,
529:7, 529:24,
531:20, 575:16,
590:13, 591:23

**jury** [12] - 525:1,
528:21, 529:18,
530:22, 530:25,
531:22, 531:23,
535:2, 535:10,
542:10, 555:9,
575:16

**jury's** [1] - 531:25

**Justice** [4] - 527:18,
560:21, 561:1, 577:6

## K

**keep** [1] - 552:2
**keeping** [1] - 566:7
**Kelly** [1] - 527:10
**kept** [1] - 566:4
**kerfuffle** [1] - 536:12
**kind** [20] - 536:20,
538:4, 546:10,
557:18, 557:21,
563:1, 570:14,
573:19, 578:19,
580:2, 580:8,
580:10, 580:12,
580:15, 580:18,
584:25, 585:6,
586:14, 587:19
**knowing** [2] - 533:19,
577:5
**known** [2] - 546:13,
588:5
**knows** [2] - 527:12,
528:17

## L

**land** [1] - 548:7
**largely** [1] - 545:9
**last** [3] - 545:7, 560:2,
568:16
**lately** [2] - 579:12,
580:6
**law** [32] - 529:2,
529:11, 529:13,
530:3, 531:21,
531:22, 531:24,
532:19, 532:21,
532:23, 533:12,
533:14, 533:24,
535:4, 538:21,
539:12, 539:13,
552:9, 555:17,
556:2, 556:4,
561:12, 562:24,
563:2, 563:3, 563:5,
567:18, 567:19,
567:20, 567:22,
572:25, 578:8
**lawyer** [3] - 542:25,
562:22, 563:1
**lawyers** [2] - 543:6,
549:1
**leading** [1] - 579:16
**learn** [3] - 553:21,
569:12, 573:1
**learned** [3] - 568:8,
572:17, 583:9
**learning** [1] - 572:24
**least** [3] - 567:21,
571:6, 573:22
**leave** [1] - 539:5
**leaving** [1] - 576:13
**left** [7] - 529:1, 542:3,
552:23, 559:24,
575:25, 577:18,
589:9
**legal** [7] - 530:1,
530:2, 532:1,
542:25, 561:11,
578:7
**Legislative** [1] - 564:4
**lesser** [1] - 530:25
**level** [3] - 545:25,
555:2, 575:4
**license** [1] - 568:17
**life** [1] - 545:6
**likely** [4] - 553:3,
574:3, 576:5, 586:1
**limited** [1] - 554:1
**Lincoln** [1] - 574:22
**line** [1] - 571:5
**lines** [1] - 541:7
**lingered** [1] - 575:4
**list** [1] - 528:4

**listen** [1] - 558:9
**listening** [1] - 532:9
**literally** [1] - 536:15
**live** [10] - 536:16,
541:14, 543:19,
547:4, 547:25,
551:11, 556:24,
564:1, 571:6, 581:16
**lived** [4] - 544:25,
545:5, 545:6, 575:3
**lives** [2] - 530:5,
563:21
**living** [1] - 564:6
**local** [2] - 532:21,
558:3
**location** [1] - 549:12
**look** [8] - 528:24,
529:3, 529:6,
540:10, 563:18,
568:9, 569:1, 582:13
**looking** [3] - 558:18,
558:21, 558:22
**lost** [1] - 555:6
**love** [1] - 586:11
**lower** [1] - 575:4
**Loyd** [1] - 528:9
**lunch** [1] - 592:17

## M

**majority** [2] - 548:3,
573:7
**mark** [34] - 526:21,
527:15, 527:19,
528:3, 528:18,
528:22, 529:7,
529:15, 529:20,
529:24, 530:3,
530:6, 530:10,
530:14, 530:17,
530:20, 531:4,
531:12, 531:18,
532:2, 532:15,
532:19, 533:7,
533:10, 533:21,
534:1, 534:5,
534:10, 534:15,
534:19, 534:23,
535:6, 555:15, 556:5
**Marty** [1] - 528:11
**mask** [1] - 569:6
**matter** [2] - 573:19,
592:20
**mayhem** [2] - 537:20,
540:6
**mean** [14] - 540:1,
541:23, 542:5,
548:5, 548:12,
551:10, 557:24,
565:12, 571:4,

571:15, 571:21,
572:22, 581:10,
589:1
**means** [1] - 569:17
**meant** [3] - 551:13,
567:7, 573:16
**media** [14] - 532:5,
532:7, 532:12,
536:9, 540:3, 542:6,
542:12, 545:21,
545:23, 546:3,
546:10, 546:24,
556:15, 556:21
**medication** [1] -
529:18
**member** [7] - 527:12,
527:16, 528:21,
529:25, 561:11,
567:17, 578:6
**members** [6] - 532:17,
533:4, 533:8,
538:19, 568:13,
581:19
**memories** [1] - 588:10
**mentioned** [8] -
543:18, 545:15,
551:24, 565:14,
565:23, 569:11,
569:16, 571:19
**mentioning** [1] -
569:23
**Miami** [1] - 563:5
**Miami-Dade** [1] -
563:5
**Michael** [1] - 527:4
**might** [16] - 540:8,
543:7, 546:7,
554:21, 555:18,
559:4, 562:13,
567:13, 569:1,
569:20, 569:22,
569:24, 569:25,
570:3, 572:1
**mile** [3] - 563:25,
574:20, 574:21
**miles** [3] - 536:15,
536:16
**mind** [5] - 548:14,
548:20, 552:3,
556:22, 579:10
**mine** [2] - 577:12,
582:22
**minor** [1] - 564:20
**miss** [1] - 555:2
**moment** [2] - 578:18,
580:1
**monitor** [1] - 566:3
**months** [3] - 580:9,
582:1, 587:11
**moral** [1] - 535:5

**Moran** [1] - 527:10
**morning** [25] - 527:2,
527:7, 527:22,
528:6, 535:14,
535:15, 543:15,
543:16, 549:5,
549:6, 554:14,
554:15, 560:12,
560:13, 569:8,
569:9, 574:8, 574:9,
576:24, 576:25,
583:17, 587:1,
587:2, 587:5, 587:6
**most** [12] - 534:14,
534:17, 541:8,
546:2, 553:19,
573:18, 582:18,
582:23, 584:5,
584:6, 585:9, 585:10
**mostly** [4] - 558:3,
561:21, 563:2,
584:17
**motion** [11] - 553:20,
554:3, 554:4, 560:5,
576:7, 576:16,
589:22, 590:1,
592:9, 592:10,
592:11
**mount** [1] - 557:19
**move** [5] - 541:15,
552:24, 560:1,
576:1, 589:10
**moved** [2] - 564:1,
576:18
**MSNBC** [1] - 580:18
**multiple** [1] - 568:19
**must** [4] - 529:10,
531:21, 548:25,
555:25

## N

**name** [3] - 578:11,
578:17, 584:24
**names** [3] - 528:13,
528:15, 569:22
**narratives** [1] - 545:17
**national** [1] - 537:11
**National** [1] - 561:17
**nationalists** [1] -
534:12
**NCIS** [1] - 539:14
**near** [4] - 525:19,
530:6, 563:22, 572:1
**necessarily** [6] -
569:18, 571:22,
571:23, 572:25,
573:23
**need** [4] - 525:6,
555:12, 557:22,

601

578:11
**negative** [2] - 531:3, 545:20
**negativity** [1] - 545:18
**neighborhood** [4] - 564:2, 572:5, 572:9, 575:3
**neutral** [1] - 576:13
**never** [8] - 531:8, 551:15, 551:17, 551:18, 562:4, 588:5
**new** [4] - 548:13, 548:16, 548:17, 553:3
**news** [35] - 528:2, 530:12, 530:16, 530:19, 532:10, 534:11, 535:20, 538:5, 547:17, 556:19, 557:15, 557:25, 558:2, 558:3, 565:19, 566:1, 566:4, 566:8, 566:9, 567:4, 571:6, 571:8, 572:12, 572:17, 572:23, 573:10, 573:22, 579:5, 580:11, 581:11, 584:12, 584:16, 585:17, 585:20
**newspaper** [1] - 532:8
**next** [5] - 548:11, 554:9, 556:18, 574:3, 586:2
**noncommittal** [1] - 589:18
**none** [1] - 546:15
**northern** [2] - 564:13, 565:24
**NOTE** [12] - 535:12, 552:23, 554:12, 559:24, 560:8, 562:11, 575:25, 576:22, 577:18, 577:24, 589:9, 592:19
**note** [35] - 526:11, 526:12, 526:21, 527:15, 527:19, 528:3, 528:19, 528:22, 529:5, 529:8, 529:15, 529:20, 529:24, 530:3, 530:7, 530:11, 530:14, 530:17, 530:21, 531:5, 531:13, 531:19, 532:3, 532:16, 532:20,

533:7, 533:10, 533:21, 534:1, 534:6, 534:10, 534:16, 534:20, 534:24, 535:6
**nothing** [12] - 533:16, 547:9, 562:16, 563:16, 563:17, 565:8, 565:10, 566:7, 567:1, 589:24
**notices** [1] - 564:12
**notions** [4] - 529:13, 541:20, 554:8, 556:3
**November** [1] - 573:13
**nuance** [1] - 591:12
**number** [4] - 525:1, 526:10, 526:11, 554:10
**numbers** [1] - 554:10

## O

**objection** [1] - 577:14
**objections** [1] - 559:21
**obtained** [1] - 525:16
**obviously** [6] - 541:18, 553:24, 562:3, 565:7, 569:11, 582:24
**occasion** [1] - 540:4
**occasionally** [1] - 577:11
**occasions** [1] - 540:18
**occurred** [2] - 530:9, 557:14
**offense** [1] - 587:8
**offenses** [1] - 525:18
**offer** [1] - 545:12
**offered** [1] - 536:3
**office** [10] - 530:3, 533:2, 561:12, 561:19, 561:22, 562:3, 569:12, 569:14, 578:8
**Office** [6] - 533:1, 560:21, 561:12, 561:16, 564:4, 577:7
**Officer** [2] - 528:10, 528:11
**officer** [3] - 530:23, 531:2, 558:17
**officers** [4] - 557:7, 557:8, 584:25, 587:19
**offices** [6] - 527:14, 527:18, 533:1, 560:20, 577:6, 577:7
**Offices** [1] - 527:15,

527:19
**officials** [1] - 558:22
**often** [2] - 567:24, 580:4
**older** [1] - 540:11
**once** [3] - 580:10, 580:12, 588:8
**one** [34] - 527:8, 533:13, 535:8, 535:20, 542:18, 545:17, 546:11, 549:7, 554:9, 558:11, 558:20, 559:9, 560:19, 562:22, 563:15, 567:21, 568:17, 574:10, 574:12, 576:16, 578:6, 579:5, 579:8, 584:8, 584:22, 584:23, 584:24, 587:3, 590:12, 591:9, 591:12, 591:14
**ones** [1] - 584:20
**open** [4] - 552:3, 553:3, 576:13, 590:20
**operations** [1] - 561:21
**operator** [2] - 536:3, 548:6
**opinion** [3] - 582:22, 584:5, 584:8
**opinions** [6] - 529:23, 531:2, 534:3, 534:8, 539:23, 584:9
**opportunity** [4] - 536:4, 546:10, 549:11, 550:17
**oppose** [2] - 554:3, 577:13
**opposes** [2] - 576:6, 589:21
**opposing** [3] - 560:5, 570:10, 570:12
**opposite** [1] - 546:4
**opted** [1] - 536:4
**option** [1] - 541:3
**order** [3] - 525:1, 590:15, 590:17
**organization** [1] - 537:7
**organizations** [1] - 562:1
**otherwise** [2] - 525:12, 533:23
**outcome** [1] - 534:8
**outside** [5] - 525:16, 532:22, 549:16, 579:15

**overall** [1] - 565:13
**overlap** [1] - 569:24
**own** [5] - 529:23, 553:4, 559:12, 565:11, 584:7

## P

**p.m** [2] - 526:22, 592:14
**pain** [2] - 537:21, 547:4
**pandemic** [1] - 529:20
**paper** [2] - 590:25, 591:13
**parading** [1] - 526:5
**paralegal** [5] - 527:4, 527:10, 530:2, 578:14, 578:21
**park** [1] - 572:1
**Park** [1] - 574:22
**parked** [1] - 568:18
**part** [9] - 538:24, 539:14, 542:8, 551:15, 555:22, 558:11, 566:3, 582:3, 590:13
**participant** [1] - 546:2
**particular** [2] - 558:14, 559:9
**particularized** [1] - 570:16
**parties** [1] - 525:4
**partly** [1] - 541:8
**party** [1] - 546:4
**pass** [1] - 533:24
**past** [3] - 540:13, 562:7, 583:9
**patient** [2] - 581:25, 588:4
**people** [29] - 525:13, 531:14, 537:11, 540:17, 540:18, 541:19, 546:7, 546:14, 548:1, 548:4, 548:8, 548:9, 551:21, 551:23, 551:25, 557:5, 558:25, 569:12, 571:11, 573:7, 573:18, 582:23, 582:25, 584:6, 584:23, 585:7, 585:10, 586:17, 589:12
**per** [1] - 567:20
**perceived** [1] - 588:20
**peremptories** [3] - 590:11, 590:21, 591:13

**peremptory** [2] - 525:5, 591:19
**perfect** [2] - 591:3, 591:10
**permit** [1] - 533:15
**person** [12] - 533:25, 536:9, 540:3, 542:4, 542:6, 542:12, 545:23, 559:10, 559:14, 567:24, 587:25, 588:6
**personal** [19] - 532:18, 533:5, 533:9, 533:22, 534:2, 534:7, 538:20, 539:22, 547:1, 553:7, 567:18, 567:21, 567:22, 568:14, 571:16, 571:18, 581:19, 582:21, 583:8
**personally** [6] - 545:15, 546:7, 546:15, 547:5, 547:6, 560:22
**personnel** [1] - 528:25
**perspective** [2] - 571:18, 572:23
**philosophical** [2] - 533:23, 535:5
**pick** [2] - 525:1, 557:22
**picketing** [1] - 526:6
**place** [7] - 530:13, 534:3, 539:23, 556:19, 557:2, 565:20, 579:6
**plan** [1] - 591:13
**plastic** [1] - 558:21
**plates** [1] - 558:17
**plead** [4] - 582:8, 582:9, 587:20, 587:22
**pleaded** [2] - 526:8, 587:12
**pleading** [1] - 582:7
**pleasure** [1] - 527:22
**pled** [1] - 587:24
**plus** [2] - 592:4, 592:13
**podcast** [1] - 532:9
**podcasts** [1] - 532:6
**point** [2] - 551:23, 559:20
**points** [1] - 569:24
**police** [11] - 530:23, 531:1, 531:3, 532:21, 557:7, 568:21, 569:1, 572:8, 588:25, 589:1

**Police** [3] - 528:8, 528:10, 532:25
**political** [2] - 535:5, 536:8
**polygraph** [2] - 538:25, 539:2
**portfolio** [3] - 561:19, 569:16, 569:21
**portfolios** [1] - 569:25
**posed** [3] - 525:9, 535:1, 590:3
**position** [5] - 530:3, 541:25, 542:10, 562:15
**positions** [2] - 539:16, 577:8
**positive** [1] - 531:3
**positively** [1] - 560:7
**possession** [1] - 551:18
**possibility** [1] - 576:13
**possibly** [3] - 544:5, 550:21, 587:23
**posting** [1] - 532:12
**potential** [3] - 529:7, 540:6, 540:16
**practice** [1] - 562:23
**practicing** [1] - 562:22
**preconceived** [4] - 541:20, 553:11, 554:8, 576:11
**predicament** [2] - 542:14
**preexisting** [1] - 589:12
**presence** [2] - 535:10, 572:9
**present** [7] - 526:22, 530:20, 534:13, 534:14, 534:18, 541:9, 582:19
**presented** [15] - 525:15, 529:11, 535:3, 541:22, 549:10, 549:11, 550:18, 552:3, 552:11, 555:17, 556:1, 556:8, 583:10, 586:21, 590:6
**presenting** [1] - 549:1
**presents** [1] - 526:20
**President** [2] - 550:19, 557:21
**presidential** [3] - 534:8, 573:14, 573:15
**pressure** [1] - 582:11
**presumably** [1] -

544:3
**presumed** [1] - 526:9
**presumption** [1] - 553:15
**pretty** [10] - 536:8, 536:25, 538:7, 544:19, 547:22, 566:2, 571:1, 573:3, 576:4, 589:17
**previously** [2] - 532:19, 538:21
**primarily** [1] - 589:11
**prime** [1] - 569:16
**principles** [1] - 531:21
**problem** [4] - 526:20, 526:23, 529:17, 554:21
**problematic** [1] - 560:7
**problems** [1] - 540:21
**Proceedings** [1] - 535:10
**proceedings** [1] - 592:19
**process** [2] - 582:3, 582:13
**Productions** [1] - 537:10
**program** [1] - 538:1
**progressing** [1] - 556:24
**proof** [3] - 531:6, 531:7, 553:15
**property** [1] - 585:13
**propose** [1] - 590:19
**proposed** [2] - 528:4, 528:18
**prosecution** [1] - 588:12
**prosecutor** [2] - 563:5, 563:14
**prosecutors** [6] - 527:8, 549:8, 574:11, 587:4, 588:18, 588:21
**prosecutors'** [1] - 532:25
**prospective** [2] - 525:3, 562:12
**PROSPECTIVE** [251] - 535:15, 535:18, 535:22, 535:25, 536:2, 536:25, 537:4, 537:9, 537:13, 537:19, 537:24, 538:4, 538:10, 538:16, 538:22, 538:24, 539:2, 539:4, 539:6, 539:9, 539:11,

539:19, 540:1, 541:5, 541:11, 541:23, 542:24, 543:16, 543:22, 543:25, 544:2, 544:5, 544:10, 544:12, 544:15, 544:18, 544:21, 544:24, 545:2, 545:5, 545:10, 545:14, 545:17, 546:8, 546:11, 546:15, 546:17, 546:19, 546:22, 546:25, 547:2, 547:6, 547:15, 547:21, 547:23, 548:2, 548:5, 548:12, 548:17, 548:21, 549:3, 549:6, 549:14, 549:25, 550:3, 550:8, 550:16, 550:20, 550:22, 550:24, 551:6, 551:8, 551:10, 551:17, 552:5, 552:13, 552:15, 552:17, 552:19, 552:21, 554:15, 554:18, 554:23, 554:25, 555:10, 555:20, 556:7, 556:12, 556:14, 556:16, 556:23, 557:5, 557:12, 557:18, 558:2, 558:6, 558:10, 558:14, 559:5, 559:7, 559:12, 559:17, 559:23, 560:11, 560:13, 560:16, 560:22, 561:4, 561:7, 561:13, 561:16, 561:20, 561:23, 562:2, 562:8, 562:18, 562:21, 562:25, 563:2, 563:4, 563:7, 563:11, 563:15, 563:19, 563:24, 564:8, 564:11, 564:17, 564:22, 565:2, 565:5, 565:12, 565:17, 565:23, 566:13, 566:18, 566:22, 567:1, 567:6, 567:11, 567:15, 567:20, 567:25,

568:3, 568:5, 568:11, 568:16, 568:24, 569:3, 569:7, 569:9, 569:15, 570:4, 570:8, 570:11, 570:20, 570:24, 571:2, 571:4, 571:9, 571:15, 571:21, 572:6, 572:10, 572:14, 572:19, 572:22, 573:5, 573:9, 573:12, 573:21, 574:5, 574:7, 574:9, 574:14, 574:18, 574:21, 575:1, 575:7, 575:10, 575:12, 575:21, 575:24, 576:25, 577:3, 577:9, 577:16, 578:1, 578:4, 578:9, 578:11, 578:14, 578:17, 578:21, 578:23, 578:25, 579:3, 579:7, 579:11, 579:19, 579:21, 579:24, 580:3, 580:6, 580:9, 580:17, 580:21, 580:23, 581:3, 581:7, 581:10, 581:17, 581:22, 581:24, 582:4, 582:6, 582:15, 582:21, 583:2, 583:5, 583:11, 583:18, 583:20, 583:25, 584:4, 584:11, 584:14, 584:17, 585:4, 585:9, 585:12, 585:14, 585:16, 585:19, 585:22, 585:25, 586:4, 586:11, 586:15, 586:17, 586:21, 586:24, 587:2, 587:6, 587:10, 587:16, 588:14, 588:22, 589:1, 589:5, 589:7
**protest** [2] - 573:25, 576:14
**protesters** [1] - 572:2
**protests** [2] - 544:13, 546:2
**prove** [2] - 531:10, 542:21

**provide** [2] - 525:10, 591:15
**provided** [1] - 526:12
**proximity** [1] - 576:3
**psychiatric** [1] - 588:2
**public** [15] - 527:14, 527:17, 560:20, 562:15, 564:11, 564:12, 572:3, 577:7, 583:24, 584:1, 584:2, 584:5, 584:10, 587:17, 589:23
**punishment** [2] - 533:14, 533:15
**purpose** [1] - 525:2
**pushing** [2] - 557:5, 557:7
**puts** [1] - 548:24
**putting** [1] - 543:4

**Q**

**qualified** [1] - 551:2
**questions** [18] - 525:1, 525:9, 525:10, 526:10, 526:13, 526:14, 526:15, 535:1, 535:7, 535:9, 542:18, 548:24, 553:14, 556:9, 560:7, 589:4, 590:2, 590:3
**quick** [1] - 538:1
**quickly** [1] - 576:17
**quite** [3] - 539:13, 544:11, 550:15
**quoting** [1] - 576:8

**R**

**racist** [1] - 534:12
**radio** [3] - 532:6, 532:9, 567:9
**rallies** [2] - 546:22, 546:23
**rally** [12] - 549:15, 549:17, 549:18, 549:22, 550:5, 550:6, 550:11, 550:12, 550:19, 553:8, 553:10
**rallying** [1] - 584:18
**rambling** [1] - 536:21
**rape** [1] - 587:11
**reaching** [2] - 529:14, 556:4
**reaction** [1] - 574:15
**read** [3] - 527:25, 566:8, 567:12
**reading** [3] - 529:21,

603

532:8, 532:11
**ready** [2] - 547:11, 591:7
**really** [3] - 536:17, 543:1, 580:8
**reason** [4] - 521:20, 535:2, 535:6, 591:17
**reasonable** [3] - 531:7, 531:12, 542:21
**reasons** [3] - 531:24, 545:12, 559:25
**Rebecca** [1] - 527:2
**received** [3] - 530:1, 561:11, 578:7
**Recess** [2] - 592:2, 592:18
**recognize** [4] - 529:3, 540:6, 540:16, 560:19
**recollect** [2] - 565:6, 567:2
**recollections** [1] - 537:17
**record** [2] - 562:15, 577:19
**redirecting** [1] - 558:17
**reference** [1] - 551:1
**referenced** [1] - 550:25
**referred** [1] - 525:1
**regarding** [1] - 556:10
**regularly** [1] - 543:24
**rejected** [1] - 540:4
**related** [5] - 530:16, 561:21, 569:16, 569:21
**relating** [1] - 525:18
**relationship** [1] - 578:12
**released** [1] - 588:7
**relevant** [1] - 568:21
**religious** [2] - 533:23, 535:5
**relived** [1] - 538:4
**remaining** [1] - 525:21
**remember** [6] - 526:15, 549:18, 558:17, 567:12, 571:5
**render** [4] - 529:10, 535:2, 555:16, 556:1
**renting** [1] - 563:25, 574:22
**repeat** [2] - 552:5, 555:24
**repeatedly** [1] - 579:14
**repercussions** [1] -

540:12
**reporter** [1] - 529:1
**REPORTER'S** [12] - 535:12, 552:23, 554:12, 559:24, 560:8, 562:11, 575:25, 576:22, 577:18, 577:24, 589:9, 592:19
**reports** [1] - 534:11
**representation** [2] - 582:7, 587:17
**Representatives** [1] - 558:20
**representing** [1] - 527:3
**requested** [1] - 537:14
**required** [1] - 531:10
**requires** [1] - 552:9
**research** [1] - 525:11
**reservations** [1] - 532:14
**resolved** [1] - 587:9
**respect** [1] - 525:5
**response** [2] - 526:11, 574:13
**restitution** [1] - 533:20
**restricted** [2] - 525:22, 525:25
**rests** [1] - 531:7
**result** [2] - 573:15, 573:24
**resulting** [1] - 573:15
**results** [2] - 566:5, 573:13
**returned** [1] - 533:21
**returning** [1] - 533:25
**rhetoric** [1] - 546:9
**Rhine** [19] - 525:18, 525:21, 525:24, 526:2, 526:5, 526:8, 527:3, 527:23, 528:2, 528:3, 530:15, 531:16, 534:22, 548:24, 553:16, 559:1, 583:6, 586:10, 589:19
**robberies** [1] - 568:19
**room** [1] - 575:16
**rooms** [1] - 584:24
**routes** [2] - 564:23
**rule** [1] - 531:24
**rules** [4] - 531:22, 531:25, 589:17
**rumblings** [1] - 536:7

## S

**safe** [1] - 540:25
**safety** [6] - 564:12, 565:11, 565:13, 566:3, 571:20, 572:3
**same-day** [1] - 537:5
**saw** [14] - 537:17, 537:19, 537:21, 541:17, 557:9, 558:13, 566:1, 566:25, 567:8, 571:8, 571:9, 579:8, 583:22, 584:16
**scaling** [1] - 571:10
**schedule** [1] - 565:7
**school** [1] - 567:22
**screaming** [1] - 557:7
**se** [1] - 567:20
**Seat** [2] - 590:23, 591:1
**seat** [2] - 590:24, 592:14
**SEC** [1] - 577:10
**second** [1] - 555:1
**Secret** [2] - 528:9, 532:24
**secretary** [1] - 530:2
**Security** [1] - 532:24
**see** [7] - 543:5, 547:7, 548:6, 557:4, 568:1, 590:23, 590:25
**seeing** [3] - 566:5, 579:14, 585:6
**seem** [1] - 536:9
**selected** [7] - 529:9, 532:4, 552:8, 555:14, 555:15, 555:25, 575:14
**Senate** [2] - 558:20, 564:5
**senators** [1] - 558:22
**send** [2] - 555:9, 555:10
**sense** [1] - 568:5
**sent** [1] - 572:25
**sentence** [2] - 533:17, 533:20
**sentenced** [1] - 588:16
**separate** [1] - 592:20
**serious** [1] - 589:13
**served** [2] - 528:20, 582:1
**service** [1] - 564:11
**Service** [2] - 528:9, 532:24
**serving** [2] - 529:18, 533:19
**set** [2] - 560:10, 583:8

**shape** [1] - 582:13
**share** [1] - 534:15
**shared** [3] - 565:4, 565:9, 570:18
**sharing** [2] - 588:9, 588:11
**sheriff's** [1] - 532:22
**shifts** [1] - 531:8
**shoot** [2] - 537:5, 537:7
**shoots** [1] - 537:2
**shot** [2] - 574:23, 584:24
**shouting** [1] - 557:6
**showed** [1] - 557:8
**showing** [1] - 558:17
**shown** [1] - 584:17
**sic** [1] - 578:6
**side** [2] - 554:6, 591:14
**sides** [2] - 540:10, 591:18
**sight** [1] - 529:17
**significant** [1] - 555:6
**silence** [3] - 531:17, 553:17, 559:3
**similar** [1] - 567:3
**simply** [2] - 525:10, 531:1
**sister** [1] - 539:13
**sister-in-law** [1] - 539:13
**sit** [8] - 526:21, 529:9, 535:2, 543:10, 555:15, 555:25, 591:24, 591:25
**sites** [1] - 532:12
**situation** [1] - 559:9
**situations** [2] - 543:5, 591:18
**six** [4] - 526:20, 554:21, 582:1, 587:11
**smashed** [1] - 571:11
**social** [2] - 532:7, 532:12
**socialized** [1] - 577:11
**sole** [1] - 531:20
**solely** [7] - 529:10, 541:21, 555:16, 556:1, 556:8, 583:9
**someone** [10] - 530:5, 530:8, 540:7, 540:8, 540:21, 540:24, 543:9, 544:4, 554:9, 563:21
**sometimes** [4] - 569:11, 570:10, 586:17, 591:18
**somewhat** [1] - 550:1

**somewhere** [1] - 561:5
**soon** [1] - 566:1
**sorry** [3] - 536:21, 563:4, 566:6
**sort** [16] - 536:19, 539:14, 539:19, 546:4, 547:8, 547:11, 556:15, 564:22, 565:7, 568:20, 569:22, 571:12, 572:2, 572:23, 573:1, 592:8
**sotto** [1] - 562:11
**sought** [1] - 527:17
**sound** [1] - 539:17
**sounds** [2] - 547:16, 572:11
**sources** [1] - 532:7
**space** [1] - 544:20
**Speaker** [1] - 558:18
**speaking** [3] - 541:12, 542:24, 548:6
**Special** [1] - 528:9
**special** [3] - 526:20, 526:23, 529:16
**specific** [9] - 530:19, 553:1, 561:18, 563:16, 566:7, 567:5, 567:8, 567:13, 570:4
**specifically** [4] - 549:19, 549:20, 567:2, 578:22
**specifics** [2] - 578:23, 579:2
**stage** [2] - 549:16, 549:17
**stairs** [1] - 557:6
**stand** [7] - 541:15, 543:10, 550:13, 554:3, 554:7, 558:12, 566:24
**standing** [1] - 527:23
**stands** [2] - 556:22, 579:9
**start** [1] - 536:13, 561:12, 564:6
**started** [5] - 537:5, 580:10, 580:11, 580:12, 580:15
**state** [2] - 528:22, 533:1
**statement** [1] - 541:16
**statements** [1] - 554:1
**States** [8] - 525:19, 527:9, 527:15, 527:18, 528:8, 528:9, 528:10, 577:20

**stations** [1] - 543:24
**stay** [1] - 571:25
**stayed** [3] - 537:5, 576:18
**staying** [1] - 529:17
**step** [2] - 542:3
**stepping** [1] - 557:7
**steps** [2] - 542:2, 542:3
**still** [4] - 543:10, 553:4, 564:1, 587:18
**stole** [1] - 568:17
**stood** [2] - 558:15, 584:25
**stop** [3] - 573:19, 573:25, 579:23
**stopped** [2] - 557:19, 558:16
**stories** [4] - 532:9, 546:16, 563:16, 566:9
**Stortini** [1] - 527:5
**story** [6] - 537:23, 542:9, 542:11, 542:13, 557:17, 565:22
**straight** [1] - 574:23
**street** [1] - 568:18
**Street** [1] - 574:23
**stressed** [6] - 571:17, 571:18, 574:16, 574:25, 575:9, 576:8
**strict** [1] - 531:9
**strike** [4] - 552:24, 560:1, 576:1, 589:10
**strikes** [2] - 590:14, 592:4
**strong** [5] - 531:2, 534:2, 534:7, 539:22, 576:2
**stuff** [1] - 545:22
**subject** [2] - 558:1, 558:3
**subside** [1] - 574:25
**subsided** [4] - 575:1, 576:9, 576:17, 576:20
**substance** [1] - 570:3
**substantially** [1] - 553:4
**substitute** [2] - 555:9, 555:11
**successful** [1] - 544:7
**suggest** [1] - 526:17
**suggestions** [1] - 590:20
**suggests** [1] - 589:24
**suitable** [1] - 562:14
**support** [1] - 553:9
**supposed** [2] -

550:23, 588:3
**sympathy** [1] - 541:2
**system** [1] - 587:14

**T**

**table** [2] - 527:3, 527:9
**tabs** [1] - 566:7
**targeted** [3] - 546:7, 546:14, 546:24
**Task** [1] - 528:11
**teach** [1] - 554:25
**teacher** [3] - 554:25, 555:9, 555:11
**teaching** [1] - 555:11
**televised** [1] - 558:8
**television** [4] - 532:6, 536:13, 551:11, 566:2
**ten** [1] - 555:2
**terms** [6] - 564:3, 565:7, 565:13, 566:4, 570:11, 570:12, 572:19, 591:12
**terrorism** [1] - 570:1
**testifies** [1] - 548:24
**testify** [10] - 531:15, 531:16, 534:22, 534:23, 542:20, 559:1, 559:2, 568:22, 586:18, 589:20
**testimony** [6] - 530:23, 530:24, 531:1, 583:12, 586:5, 586:9
**text** [1] - 567:25
**theft** [1] - 585:15
**themselves** [4] - 526:24, 565:6, 565:15, 570:19
**therefore** [1] - 553:8
**Thomas** [1] - 528:8
**thoughtfully** [1] - 590:11
**thoughts** [1] - 529:23
**thousands** [2] - 541:19, 582:25
**three** [8] - 545:19, 566:23, 590:12, 590:20, 591:7, 591:13, 591:16, 592:4
**today** [3] - 527:9, 543:13, 547:13
**together** [1] - 577:11
**took** [6] - 530:13, 534:3, 537:24, 539:23, 542:3,

556:19, 565:20, 579:6
**topic** [1] - 543:7
**totally** [1] - 588:23
**towards** [3] - 545:18, 584:2, 584:18
**traffic** [1] - 533:6
**training** [3] - 530:1, 561:12, 578:8
**transcribed** [1] - 592:20
**transpired** [3] - 579:15, 584:19, 584:21
**travel** [1] - 564:23
**treated** [5] - 530:24, 582:3, 587:14, 588:12
**trespassing** [1] - 542:7
**Trevino** [1] - 528:11
**trial** [18] - 528:8, 529:11, 530:22, 531:15, 533:16, 552:4, 552:11, 554:20, 555:17, 556:2, 559:1, 567:13, 568:23, 575:17, 582:10, 583:13, 587:20, 587:23
**trials** [5] - 566:7, 567:8, 568:6, 572:13, 572:15
**tried** [1] - 537:25
**trouble** [3] - 529:21, 555:19, 555:23
**Trump** [5] - 546:20, 546:22, 546:23, 549:16, 553:9
**try** [9] - 526:20, 540:9, 540:14, 542:1, 542:12, 542:13, 554:10, 589:16
**trying** [5] - 544:6, 544:7, 545:19, 553:5, 584:23
**tsunami** [1] - 547:8
**turn** [1] - 591:14
**turned** [3] - 537:4, 540:3, 543:18
**TV** [5] - 532:10, 536:15, 536:23, 551:3, 579:23
**tweeting** [1] - 532:11
**Twitter** [4] - 538:6, 541:13, 547:17, 551:12
**two** [6] - 550:9, 555:2, 558:11, 563:15,

564:3, 566:23
**type** [1] - 588:6

**U**

**U.S** [14] - 530:6, 530:10, 530:13, 530:20, 532:25, 533:1, 534:4, 534:13, 556:20, 560:21, 561:2, 563:22, 577:6, 577:21
**U.S.C** [4] - 525:22, 526:1, 526:3, 526:7
**unable** [2] - 529:14, 556:5
**uncomfortable** [2] - 529:19, 533:18
**under** [3] - 577:21, 582:11, 592:20
**understood** [2] - 553:22, 591:21
**unedited** [1] - 547:25
**unfair** [1] - 588:20
**unfairly** [1] - 588:13
**unfold** [1] - 547:3
**unfolding** [1] - 536:18
**United** [8] - 525:19, 527:9, 527:14, 527:18, 528:8, 528:9, 528:10, 577:20
**unlikely** [1] - 548:10
**unsafe** [1] - 545:24
**up** [17] - 525:14, 535:8, 535:9, 543:17, 545:11, 549:9, 557:22, 564:20, 566:8, 568:6, 569:10, 570:6, 570:21, 574:12, 583:21, 587:7, 587:11

**V**

**Valentini** [6] - 527:6, 527:8, 528:4, 549:7, 574:10, 587:3
**VALENTINI** [51] - 527:7, 528:6, 549:5, 549:7, 549:23, 550:1, 550:4, 550:14, 550:17, 550:21, 550:23, 550:25, 551:7, 551:9, 551:14, 551:20, 552:7, 552:14, 552:16, 553:18, 559:21,

560:5, 574:8, 574:10, 574:15, 574:19, 574:24, 575:6, 575:8, 575:11, 575:13, 575:22, 576:6, 577:14, 577:19, 577:22, 587:1, 587:3, 587:7, 587:13, 588:9, 588:19, 588:24, 589:3, 589:21, 591:11, 591:17, 591:21, 592:6, 592:11, 592:16
**vandalism** [2] - 583:7, 585:13
**variety** [1] - 589:13
**vehicles** [1] - 568:18
**venire** [1] - 535:11
**verdict** [8] - 529:10, 529:14, 533:21, 534:1, 535:3, 555:16, 556:1, 556:5
**vicinity** [1] - 564:2
**victim** [2] - 533:9, 568:14
**video** [2] - 530:15, 547:18
**videographer** [2] - 536:3, 544:9, 545:9
**view** [2] - 551:23, 590:8
**viewed** [1] - 567:13
**viewer** [1] - 572:24
**viewpoint** [2] - 589:17, 589:19
**views** [5] - 534:13, 534:15, 551:1, 583:8, 589:22
**violation** [4] - 525:22, 525:25, 526:3, 526:6
**violations** [1] - 533:6
**violence** [16] - 534:19, 537:19, 540:6, 541:9, 541:10, 541:20, 548:1, 552:1, 582:20, 583:1, 583:6, 585:3, 585:11
**violent** [2] - 540:4, 545:16
**Virginia** [3] - 564:14, 565:24, 568:19
**virtually** [1] - 554:6
**visiting** [2] - 564:14, 565:24
**voce** [1] - 562:11
**voir** [4] - 525:2, 553:22, 553:23

**voting** [2] - 534:21,
557:13

# W

**wait** [1] - 547:10
**walk** [2] - 540:25,
550:9
**walked** [1] - 553:12
**walls** [1] - 571:10
**waning** [1] - 580:12
**war** [1] - 563:15
**ward** [1] - 588:2
**warned** [1] - 571:25
**warnings** [1] - 572:24
**Washington** [5] -
544:25, 545:4,
545:9, 550:15,
578:18
**watch** [17] - 536:22,
538:9, 538:15,
538:16, 557:25,
558:2, 558:9,
558:15, 566:16,
566:18, 571:6,
579:23, 580:5,
580:18, 581:6,
581:15
**watched** [31] - 530:15,
535:24, 535:25,
536:18, 536:20,
538:2, 538:7,
541:12, 541:13,
547:17, 556:23,
558:5, 558:10,
558:15, 565:21,
566:2, 566:11,
566:13, 566:21,
566:23, 570:23,
570:25, 572:17,
572:22, 579:12,
580:8, 580:16,
581:1, 581:11,
584:13, 585:18
**watching** [12] -
532:10, 536:13,
537:6, 547:3, 547:5,
547:8, 547:25,
551:11, 551:12,
557:19, 558:16,
571:13
**ways** [2] - 540:22,
550:15
**week** [4] - 548:11,
568:1, 574:4, 586:3
**weeks** [4] - 575:4,
575:6, 576:10,
579:13
**weight** [1] - 530:25
**welcome** [3] - 540:17,

540:18, 546:1
**whichever** [1] - 558:20
**white** [2] - 534:12,
543:2
**White** [1] - 550:7
**whole** [3] - 545:1,
545:6, 588:22
**willingness** [1] -
532:15
**winter** [1] - 568:16
**wisdom** [1] - 540:15
**wise** [1] - 569:5
**witness** [5] - 530:24,
531:1, 533:10,
568:15
**witnesses** [4] - 528:5,
528:7, 528:18,
534:23
**woman** [1] - 584:22
**words** [1] - 559:12
**wore** [2] - 543:13,
569:5
**workloads** [1] - 584:6
**works** [5] - 530:6,
561:4, 561:6, 561:7,
563:22
**worried** [1] - 546:6
**write** [1] - 529:5
**writing** [1] - 529:21
**wrongly** [1] - 590:4
**wrote** [1] - 554:9

# Y

**year** [2] - 555:6, 568:1
**years** [6] - 539:7,
544:22, 545:6,
545:7, 545:19
**yesterday** [1] - 591:5