1   **UNITED STATES DISTRICT COURT**
    **FOR THE DISTRICT OF COLUMBIA**

2   _____

3   United States of America,      ) Criminal Action
                                   ) No. 1:21-cr-00687-RC
4                    Plaintiff,    )
                                   ) **Jury Trial**
5   vs.                            )
                                   )
6   David Charles Rhine,           ) Washington, D.C.
                                   ) **April 21, 2023**
7                    Defendant.    ) Time:  9:45 a.m.
    _____

8

9                   **Transcript of Jury Trial**
                         **Held Before**
10          **The Honorable Rudolph Contreras**
              **United States District Judge**

11

12                   A P P E A R A N C E S

13  For the Government:     **Francesco Valentini**
                            DEPARTMENT OF JUSTICE
14                          950 Pennsylvania Avenue, Northwest
                            Washington, D.C. 20530

15                          **Kelly E. Moran**
                            UNITED STATES ATTORNEY'S OFFICE
16                          FOR THE DISTRICT OF COLUMBIA
                            601 D Street, Northwest
17                          Washington, D.C. 20579

18  For the Defendant:      **Rebecca C. Fish**
                            FEDERAL PUBLIC DEFENDER
19                          1331 Broadway, Suite 400
                            Tacoma, Washington 98402

20  _____

21  Stenographic Official Court Reporter:
                            Nancy J. Meyer
22                          Registered Diplomate Reporter
                            Certified Realtime Reporter
23                          333 Constitution Avenue, Northwest
                            Washington, D.C. 20001
24                          202-354-3118

25

1                              <u>**I N D E X**</u>

2                                                                      <u>PAGE</u>:

3     <u>**Witnesses:**</u>

4     <u>Jeffrey Abbott</u>

          Direct Examination, Cont., By Mr. Valentini...... 334
5         Cross-Examination By Ms. Fish.................... 362
          Redirect Examination By Mr. Valentini........... 369
6     <u>Marty Trevino</u>
          Direct Examination By Mr. Valentini............. 370
7         Cross-Examination By Ms. Fish................... 395

8

9     <u>**Exhibits Admitted:**</u>

10        Government Exhibit 121........................... 374
          Government Exhibit 202........................... 386
11        Government Exhibit 203........................... 387
          Government Exhibit 204........................... 390
12        Government Exhibit 205........................... 391
          Government Exhibit 206........................... 391
13        Government Exhibit 207........................... 392
          Government Exhibit 208........................... 393
14        Government Exhibit 209........................... 394
          Government Exhibit 210........................... 395

15

16

17    <u>**Closing Arguments:**</u>

18        By Ms. Moran..................................... 426
          By Ms. Fish...................................... 437
19        By Mr. Valentini................................. 453

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1

2          (Proceedings held out of the presence of the jury.)

3          THE COURT:  All right.  Ms. Fish, are you ready to

4    make your motion?

5          MS. FISH:  Regarding the --

6          THE COURT:  The photos.

7          MS. FISH:  Regarding the photos, yes, Your Honor.

8    And in the government's response, you know, obviously, the case

9    I presented -- a lot of what I'm concerned about is that the

10   government had submitted exhibits that include the Cellebrite

11   reports which has a lot of information that is not in those

12   photos, has time lines.  And the certification itself, I think,

13   bolsters things quite a bit and suggests and hints at evidence

14   that was not presented.

15          If the government is intending to purely introduce

16   photos, it's a bit less of a concern, but I -- I do believe

17   that there's still the confrontation clause issue if the

18   Cellebrite extraction is referred to and referred to as

19   authentic.

20          THE COURT:  Would you -- would you consent to

21   introduction of the photos without -- would you just

22   stipulate -- excuse me -- to the authenticity of the photos?

23          MS. FISH:  Your Honor, I think if -- if it's truly --

24   if there's no -- my concern is, essentially, the sidelining

25   of expert testimony without an opportunity to confront, and

1    if it's truly I seized the phone, these photos were returned to

2    me off the phone, that, I think, would be okay.  But what I

3    don't want to get into is -- and I know they're true and

4    accurate and not manipulated.  I don't -- if that is the

5    testimony, I would not object.  But I -- I can't stipulate to

6    the admission based on my pretrial motions that were overruled

7    quite a while ago.

8         THE COURT:  Sure.  Now -- I mean, I tend to agree

9    with you that there's some parts of the certification that go

10   beyond what is necessary.  Are there parts that could be

11   redacted that you would be okay with?

12        MS. FISH:  I just think certification would be

13   inappropriate.  If it's only going to be -- but so I would not

14   want any part of that going back to the jury.

15        THE COURT:  And I don't -- you know, I don't want --

16   I don't want to do that unless it's necessary.  So it's kind of

17   an either/or.  I mean, if you're -- if you say you won't object

18   to the introduction of the photos -- what is your position,

19   Mr. Valentini?

20        MR. VALENTINI:  Our position is there's no

21   confrontation issue so long as the testimony is narrowly

22   limited as described in the response that we filed today.  That

23   is all we expect to do.  We provided the exhibit, in part, for

24   completeness and to create a foundation for admissibility and

25   pretrial determinations about authenticity.

1          We do not plan to elicit any testimony regarding

2     metadata.  When we do that, we always have, well, an FBI

3     analyst to present that information, and we're not planning to

4     do that.  We're just planning to ask the three questions of

5     the -- I won't get into specifics about the number of

6     questions, but the essence of the testimony will be --

7          THE COURT:  Sure.  But he's not going to testify as

8     to whether he can attest to whether the photos were manipulated

9     or whether the photos were taken by the defendant or received

10    by the defendant?

11         MR. VALENTINI:  No.  The case agent will testify that

12    he seized the phone, he submitted the phone for processing to

13    the analyst at the FBI with instruction to extract materials

14    from the -- contents from the phone.  And the photos that will

15    be offered into evidence are among the materials that were

16    returned to him.

17         THE COURT:  Okay.

18         MS. FISH:  Yes.  And just with no crossing into, kind

19    of, vouching for that process, I'd be okay with that.

20         THE COURT:  Okay.  So that's where things stand.

21    I'll allow that testimony as proffered.

22         MR. VALENTINI:  Thank you, Your Honor.

23         THE COURT:  All right.

24         MS. FISH:  And just confirming, I believe the

25    government said this yesterday, but the government does not

```
 1    intend to introduce the geofence exhibits provided?

 2              MR. VALENTINI:  No, no geofence.

 3              THE COURT:  Okay.  Thank you.

 4         All right.  We have a few minutes.  Anything else you

 5    want me to address while you have me?

 6              MS. FISH:  Just scheduling, Your Honor.  Does the

 7    Court plan to do the voir dire instruction conference among

 8    counsel after we close evidence or --

 9              THE COURT:  Well, it depends on how things play out.

10    So my intent is at the beginning of the lunch period, whenever

11    that is, to give you the copies of the proposed jury

12    instructions.  If we're very close to the end, perhaps then

13    do -- have an extended lunch period, and then we'll meet at the

14    end of the lunch and then finish and then go -- go from there.

15    If the testimony goes throughout the day, then we'll do the

16    charging conference at the end of the day.

17              MS. FISH:  Thank you, Your Honor.

18              MR. VALENTINI:  Thank you, Your Honor.

19              THE COURT:  All right.  Anything else?

20              MR. VALENTINI:  Not from the government.

21              MS. FISH:  I don't believe so, Your Honor.  Thank

22    you.

23              THE COURT:  I'll be back at 10:00.

24              (Recess taken.)

25              (Proceedings held in the presence of the jury.)
```

```
 1              THE COURT:  Good morning, everybody.
 2          Are you ready to continue with the witness?
 3              MR. VALENTINI:  Yes, Your Honor.
 4              THE COURT:  Okay.  Let's bring him in.
 5          So we're going to continue with the direct examination
 6      of Officer Abbott.
 7          Good morning.
 8              THE WITNESS:  Good morning.
 9              THE COURT:  Officer Abbott, I'll remind you you're
10      still under oath.
11              THE WITNESS:  Yes, Your Honor.
12                  DIRECT EXAMINATION, continuing
13      BY MR. VALENTINI:
14      Q.  Good morning, Officer Abbott.
15      A.  Good morning.
16      Q.  When we left off yesterday, you were talking about what
17      prompted you to go to the House gallery area of the
18      U.S. Capitol on January 6th.  Could you repeat what prompted
19      you to go to that area.
20      A.  Yes.  There was basically -- once they locked down the
21      building, they requested all units to respond to the Capitol.
22      Q.  And how about the House gallery area in particular?
23      A.  Oh.  That was the shots fired call.
24      Q.  And could you explain a little bit who relayed to you that
25      there was a shot -- a call that fires -- that shots had been
```

1    fired?

2    A.  It was another officer.

3    Q.  And that officer told you that the shots had been fired in

4    the House gallery area?

5              MS. FISH:  Objection, Your Honor.  403.  Asked and

6    answered.  Hearsay.

7              THE COURT:  We don't have to get too deeply into

8    this.

9    BY MR. VALENTINI:

10   Q.  Officer Abbott, I'm going to pull up what has been marked

11   and admitted into evidence as Exhibit 105.  And I'm going to

12   skip forward to 2:47:20.

13             (A video recording was played.)

14   BY MR. VALENTINI:

15   Q.  Officer Abbott, do you recognize this area of the

16   Capitol Building?

17   A.  Yes.

18   Q.  Where is it located?

19   A.  Right outside the House galleries.

20   Q.  And could I ask you to speak a little bit closer into the

21   microphone.

22   A.  Yes.  It's located outside of the House galleries.

23   Q.  I'm going to play the exhibit for the next several

24   seconds.

25             (A video recording was played.)

ABBOTT - DIRECT

```
1    BY MR. VALENTINI:

2    Q.  Officer Abbott, I have paused the exhibit at 2:48 p.m.

3         And I'm going to circle one individual that appears in

4    the foreground of the frame who is carrying a large distinctive

5    blue flag.  Do you see that individual I've circled,

6    Officer Abbott?

7    A.  Yes.

8    Q.  Did you at some point on January 6th come into contact with

9    that individual?

10   A.  Yes.

11   Q.  Where did you come into contact with -- with that

12   individual?

13   A.  Outside the House galleries.

14   Q.  Was it in the same hallway that is now depicted in

15   Exhibit 105?

16   A.  I believe so.

17   Q.  Let me fast-forward to 2:49:24 in this exhibit.  Now I'm

18   going to continue playing this exhibit starting at 2:49:24.

19            (A video recording was played.)

20   BY MR. VALENTINI:

21   Q.  Officer Abbott, I have now paused the exhibit at 5 seconds

22   later at 2:49:29 p.m.  Do you see the same gentleman -- or

23   gentleman -- or appears to be the same as the one that you

24   identified just a few minutes ago in your testimony?

25   A.  Yes.
```

ABBOTT - DIRECT

1    Q.  Could you please circle him using the screen.

2    A.  (Witness complying.)

3    Q.  Thank you.

4        I'm going to continue playing this exhibit for another

5    20 seconds.

6            (A video recording was played.)

7    BY MR. VALENTINI:

8    Q.  I have now stopped this exhibit at 2:49:48 p.m.  Did you --

9    what did you see happen to the gentleman that you just

10   identified in your testimony?

11   A.  Got down on the floor.

12   Q.  And do you see a law enforcement officer in the far end of

13   the picture at this point in the exhibit?

14   A.  Yes.

15   Q.  What does he appear to be doing?

16   A.  Giving commands.

17   Q.  Did you also see other individuals who appear to be members

18   of the public do something in this -- in this segment of the

19   exhibit?

20   A.  Yeah.  Also, others are laying down.  Some had their hands

21   up a moment ago.

22   Q.  I'm sorry.  And just for the benefit of the court reporter,

23   may I ask you to speak into the microphone and maybe a little

24   bit slowly?

25   A.  Yes, yes.  Some are laying down and some had their hands up

1    a moment ago.

2    Q.  If you look at the still image as it stands at

3    2:49:49 p.m., is this -- well, did there come a time when you

4    reported to this hallway on January 6th, 2021?

5    A.  Yes.

6    Q.  And is this -- is the still image at 2- -- 2:49:49 p.m.

7    more or less how the scene appeared to you when you reported to

8    that hallway on January 6th, 2021?

9    A.  More or less.

10   Q.  There were rioters -- there were rioters on the ground?

11   A.  Yes, there were rioters and other officers when I got up

12   there at the time.

13   Q.  So some more officers had reported to the scene by the time

14   you got there; that's the main difference you're pointing to?

15   A.  Yes.

16       MR. VALENTINI:  Okay.  Now I'm going to skip forward

17   to 2:52:45 p.m.

18   BY MR. VALENTINI:

19   Q.  Do you see the time stamp at this point in this exhibit,

20   2:52:45 p.m.?

21   A.  Yes.

22   Q.  Do you still see a number of rioters on the ground?

23   A.  Yes.

24   Q.  Do you still -- do you -- do you see law enforcement

25   officers on the scene?

1    A.  Yes.

2    Q.  Do you recognize any of them?

3    A.  Yes, the one in the foreground.

4    Q.  Excuse me?

5    A.  Yes, the one up front there.

6    Q.  Okay.  You also recognize the one at the back?

7    A.  Well, yeah.  That -- that's me back there also, yes.

8          MR. VALENTINI:  I'm going to start playing the

9    exhibit.

10          (A video recording was played.)

11          MR. VALENTINI:  I've stopped the exhibit at

12   2:52:52 p.m.

13   BY MR. VALENTINI:

14   Q.  In the last few seconds of the exhibit, did you see

15   yourself make a -- a gesture with your hand?

16   A.  Yes.

17   Q.  Do you remember what you were conveying at this point and

18   to whom?

19   A.  Basically, to search the individuals.

20   Q.  Okay.  So you've been told -- at that point you've been

21   ordered to search the rioters who were lying on the floor?

22   A.  Yes.

23   Q.  Who -- who were giving you that order?

24   A.  Lieutenant Hopkins up front there.

25          (A video recording was played.)

 1          MR. VALENTINI:  And I've stopped the exhibit again at

 2     2:52:59 p.m.

 3     BY MR. VALENTINI:

 4     Q.  So you approached the -- the rioter who had previously been

 5     carrying the large blue flag?

 6          MS. FISH:  Objection, Your Honor, as to the phrasing.

 7     Prior ruling.

 8          THE COURT:  Overruled.

 9     BY MR. VALENTINI:

10     Q.  Your answer?

11     A.  Yes.

12          (A video recording was played.)

13          MR. VALENTINI:  And I've stopped the exhibit at

14     2:53:09 p.m.

15     BY MR. VALENTINI:

16     Q.  And when you approached that individual, you saw a large

17     blue flag on the ground?

18     A.  Yes.

19     Q.  Do you see that he was carrying -- was he carrying anything

20     else on his back?

21     A.  A backpack.

22     Q.  Okay.  So at that point what -- what was your directive?

23     What were you going to do?

24     A.  At that point I was just searching for weapons, kind of a

25     frisk.

```
1    Q.  You did complete a search?

2    A.  Yes.

3            MR. VALENTINI:  I'm playing the exhibit now.

4            (A video recording was played.)

5            MR. VALENTINI:  I've stopped the exhibit at

6    2:53:57 p.m.

7    BY MR. VALENTINI:

8    Q.  Prior to beginning the search, did you ask this individual

9    if he had any weapons on him?

10   A.  Yes.

11   Q.  And what did he answer?

12   A.  He said yes.

13           MS. FISH:  And I renew my objection.  403.  Due

14   process.

15           THE COURT:  Overruled for the same reasons previously

16   stated.

17   BY MR. VALENTINI:

18   Q.  And when you searched -- and when you searched this

19   individual, did you find any weapons on him?

20   A.  Yes.

21   Q.  What weapons did you find?

22   A.  Two folding knives and some pepper spray.

23   Q.  Okay.  Let's take those in order.  Let's start with the

24   knives.  What type of knives did you find?

25   A.  They were folding knives, curved.  I believe they're called
```

1    Karambits, about a 3-inch blade, maybe a little bit less.

2    Q.  Could they be described as utility knives?

3    A.  They could be.

4    Q.  And -- excuse me.  Did you -- if you mentioned, could you

5    repeat the size of the blade.

6    A.  It was 3 inches or less.

7    Q.  And how does that compare to the palm of your hand?

8    A.  Smaller than the palm of my hand.

9    Q.  So smaller-sized knives?

10   A.  Yes.

11   Q.  So you also found some pepper spray?

12   A.  Yes.

13   Q.  What kind of -- how -- how was this pepper spray packaged?

14   A.  It was in a canister that was manufactured.

15   Q.  How large a canister was it?

16   A.  Average, very small can, like most officers carry.

17   Personal use.

18   Q.  Do you recall where on the defendant's -- in the

19   defendant's belongings these items were found?

20   A.  I believe on the defendant.

21   Q.  Were some maybe found in the backpack?

22   A.  I don't believe so, no.  I believe he told me they were

23   items on him.

24   Q.  But you -- are you sure about that, or are you -- is your

25   memory clear about?

1    A.   I'm not a hundred percent sure on that, yes.

2    Q.   What did you do with those items?

3    A.   I placed them on -- it's kind of like a box window shelf,

4    during the search.

5    Q.   To be clear, you confiscated them?

6    A.   Yes.

7    Q.   Why did you do that?

8    A.   It's contraband inside the U.S. Capitol.

9    Q.   Meaning it's not -- those items are not allowed inside the

10    U.S. Capitol Building?

11    A.   No.

12              MR. VALENTINI:  Let me continue playing the exhibit.

13              (A video recording was played.)

14              MR. VALENTINI:  Well, actually, let me stop at

15    2:54:19.

16    BY MR. VALENTINI:

17    Q.   I should ask you, was the -- did the defendant comply with

18    your orders while you were dealing with him?

19    A.   Yes.

20    Q.   Was he ever aggressive with you?

21    A.   No.

22    Q.   Was he ever disrespectful?

23    A.   No.

24              (A video recording was played.)

25              MR. VALENTINI:  I've stopped the exhibit at

1    2:55:18 p.m.

2    BY MR. VALENTINI:

3    Q.  At some point did you instruct the defendant to get up from

4    the ground?

5    A.  I believe so.

6    Q.  Is that what we just saw on the exhibit?

7    A.  Yes.  Yes.

8    Q.  The defendant did get up?

9    A.  Yes.  I'm assuming I told him to.

10    Q.  If you didn't want him to, you wouldn't have told him?

11    A.  Right.

12              (A video recording was played.)

13    BY MR. VALENTINI:

14    Q.  What did you plan to do at that point?

15    A.  At that point I wasn't sure if they had a protocol yet of

16    exactly what they wanted to do because there were so many

17    rioters inside the building.  I wasn't sure -- I was under the

18    impression that they were going to start arresting people in

19    the galleries, was -- was what I assumed, in a mass arrest kind

20    of formation; so it would have been multiple people arrested

21    for the same reason.

22    Q.  And did you ask for directions from your superiors at that

23    point?

24    A.  Yeah.  A little bit later I saw a fellow officer and asked

25    them what they were doing with the prisoners and detainees.

```
1    And they said, ah, we'll arrest them.

2    Q.  Did you have handcuffs at that point?

3    A.  No.  I already used them that day.

4    Q.  That's when -- you say yes, you used them down at the -- at

5    the Capitol visitors center?

6    A.  Yes.

7    Q.  So how did you arrest the -- those individual if you didn't

8    have any --

9    A.  Used flex cuffs another officer gave me.

10   Q.  Another officer gave you flex cuffs?

11   A.  Yes.

12              (A video recording was played.)

13              MR. VALENTINI:  I've stopped the exhibit at 2:56:52.

14   BY MR. VALENTINI:

15   Q.  Do you see an officer handing you something at this point

16   in the exhibit?

17   A.  Yes.

18   Q.  What is he handing you?

19   A.  Flex cuffs.

20   Q.  Could you tell the jury what flex cuffs are.

21   A.  Yeah.  Flex cuffs are -- basically use them for mass

22   arrests, generally.  They're just plastic ways to detain

23   someone, kind of like handcuffs, but they're plastic, and they

24   can be adjustable for any wrist so they're easy to use.

25   Q.  Did you proceed to apply the handcuffs to the gentleman
```

1    that you were detaining?

2    A.  Yes.

3              (A video recording was played.)

4              MR. VALENTINI:  I've stopped the exhibit at 2:57:39.

5    BY MR. VALENTINI:

6    Q.  And after you applied the handcuffs to the gentleman that

7    you detained, what -- what did you decide to do?

8    A.  Basically, I was going to escort them outside the galleries

9    to what I assumed might be an assembly area for detainees.

10   Q.  And what did you understand that possible assembly area

11   would be?

12   A.  At that point I really didn't know.  I was just going to

13   follow fellow officers.  It seemed like the main point is they

14   wanted everyone out of the gallery areas.

15   Q.  Now, the galleries are on the third floor?

16   A.  Yes.

17   Q.  So the only way out of the galleries is downstairs -- going

18   down?

19   A.  Yes.

20   Q.  Now, I wanted to ask you, you said before that you saw the

21   defendant -- the -- the individual that you detained had

22   certain items around him.

23   A.  Yes.

24   Q.  And that included a large blue flag?

25   A.  Yes.

```
 1    Q.  Probably a backpack?

 2    A.  Yes.

 3    Q.  Maybe some other items?

 4    A.  Yes.

 5    Q.  But this individual was handcuffed?

 6    A.  Yes.

 7    Q.  And the -- was -- the handcuffs were behind his back?

 8    A.  Yes.

 9    Q.  So he couldn't carry those items?

10    A.  No.

11    Q.  Did -- did this individual ask you what would happen to the

12    items?

13    A.  Yes.  He, basically, wanted his items or wondering what was

14    going to happen to them.

15    Q.  So how did you address that request?

16    A.  Well, from what I remember, I was getting ready to leave, I

17    was trying to see if there was another officer to carry them.

18    I believe another rioter or protester came by.  And I said,

19    hey, if he wants to help you out, he can carry your stuff.

20    Q.  Did the other person agree to do that?

21    A.  Yes.

22    Q.  So at that point you were ready to go downstairs?

23    A.  Yes.

24    Q.  You were going to escort the person you handcuffed?

25    A.  Yes.
```

ABBOTT - DIRECT

 1    Q.  And another rioter was going to carry his items?

 2    A.  Yes.

 3              (A video recording was played.)

 4              MR. VALENTINI:  I'm going to pull down the exhibit

 5    and pull up another exhibit, which has been marked as

 6    Exhibit 106, which is also in evidence.

 7          I'm going to play -- I'm going to play this exhibit from

 8    the beginning.

 9              (A video recording was played.)

10    BY MR. VALENTINI:

11    Q.  First, let -- I've stopped the exhibit at 2:59:18 p.m.

12          Do you have a general sense of what area of the

13    Capitol Building is depicted in this exhibit?

14    A.  Yes.

15    Q.  Could you tell the jury what area this is.

16    A.  Yes.  It's a hallway that if you went from up the Rotunda,

17    it goes around the -- basically, it goes -- it ends up going to

18    the House galleries.  It's, basically, a hallway.  And bunch of

19    officers.  And then it ends up going to the Rotunda up on the

20    third floor.

21    Q.  Did there come a time on January 6th while you were

22    escorting this detainee where you took this hallway?

23    A.  Yes.

24    Q.  You didn't take it from the Rotunda to the main gallery?

25    You took it the other way around?

1    A.  Yes.

2            MR. VALENTINI:  I've paused the exhibit at

3    2:59:39 p.m.

4    BY MR. VALENTINI:

5    Q.  Do you see yourself in this exhibit?

6    A.  Yes.

7    Q.  Could you please circle yourself for the jury.

8    A.  (Witness complying.)

9    Q.  And do you see the individual whom you detained on

10   January 6th in the House gallery?

11   A.  Yes.

12   Q.  Could you please circle him.

13   A.  (Witness complying.)

14   Q.  You circled the man with the red hat?

15   A.  Yes.

16           MR. VALENTINI:  I'm going to pull down this exhibit.

17   I'm going to pull up Exhibit 107, which is also in evidence.

18   BY MR. VALENTINI:

19   Q.  Officer Abbott, is the area of the Capitol depicted in

20   Exhibit 107 also an area -- part of the route that you took

21   from the House gallery to the Rotunda?

22   A.  Yes.

23   Q.  And what area of the Capitol is it?

24   A.  It's a stairwell on the West Front right near the exterior

25   door.  Basically, goes from the Crypt all the way up to the

1      Rotunda up to the third floor to that hallway.

2      Q.  You said it was on the West Front -- or the East Front of

3      the Capitol; correct?

4      A.  Yep.  My apologies.  Yes, the East Front.

5      Q.  I'm going to ask you to please tell me if you see yourself

6      in this exhibit.

7                  (A video recording was played.)

8      A.  Yes.

9      BY MR. VALENTINI:

10     Q.  And could you please circle yourself.

11     A.  (Witness complying.)

12     Q.  And the time at this point is 3:00 p.m. and 26 seconds?

13     A.  Yes.

14     Q.  And are you still escorting the individual whom you

15     detained in the House gallery?

16     A.  Yes.

17     Q.  Could you please circle that individual as well.

18     A.  (Witness complying.)

19     Q.  Thank you.

20                 (A video recording was played.)

21                 MR. VALENTINI:  And I stopped -- I paused the exhibit

22     at 3:00 p.m. and 43 seconds.

23     BY MR. VALENTINI:

24     Q.  Do you see three other individuals coming down the same

25     staircase?

1    A.  Yes.

2    Q.  This is not law enforcement officers?

3    A.  No.

4    Q.  They appear to be rioters that day?

5    A.  Yes.

6    Q.  And is one of them carrying a large flag that looks like

7    the flag that you saw next to the individual whom you detained

8    in the House gallery?

9    A.  Yes.

10    Q.  Could you circle that flag, please.

11    A.  (Witness complying.)

12    Q.  Thank you.

13            (A video recording was played.)

14    BY MR. VALENTINI:

15    Q.  Officer Abbott, if you continue taking the staircase down

16    from this area, where does one arrive?

17    A.  Just between the Rotunda and the door that goes out to the

18    East Front.

19    Q.  I'm going to pull up the next exhibit, which is

20    Exhibit 108.  Do you see a staircase in the first frame of this

21    exhibit on the left-hand side?

22    A.  Yes.

23    Q.  And is that the staircase that we were -- is this the

24    bottom portion of the staircase that we're just looking at

25    before in Exhibit 107?

```
 1    A.  Yes.

 2              (A video recording was played.)

 3    BY MR. VALENTINI:

 4    Q.  I'm going to play the exhibit.  If you could please let me

 5    know if you are able to identify yourself at some point in this

 6    exhibit.

 7              (A video recording was played.)

 8    A.  Yes.

 9              MR. VALENTINI:  I've paused the exhibit at 3:00 p.m.

10    and 50 seconds.

11    BY MR. VALENTINI:

12    Q.  Could you, again, please circle yourself and the individual

13    you were escorting.

14    A.  (Witness complying.)

15    Q.  Thank you.

16              When you arrived to this lobby area, what was going

17    through your mind?

18    A.  It was far worse than I thought.  I realized at that point

19    I wasn't sure what I was going to do.

20    Q.  By that, you mean you're not sure what?

21    A.  I had no idea where I was going to take this individual.

22    It seemed like it had just fallen apart.  There was no other

23    officers around.

24              MR. VALENTINI:  I'm going to continue playing this

25    exhibit.
```

```
 1                    (A video recording was played.)

 2    BY MR. VALENTINI:

 3    Q.  As you stood in this lobby area escorting this individual,

 4    did other rioters come up to you?

 5    A.  Yes.

 6              MS. FISH:  Objection, Your Honor.  403.  401.

 7              THE COURT:  Overruled.

 8    A.  Yes.

 9    BY MR. VALENTINI:

10    Q.  What kind of -- what kind of things were they saying to

11    you?

12              MS. FISH:  Objection.  Hearsay.

13              MR. VALENTINI:  Your Honor, it is not offered for the

14    truth of the matter asserted.

15              THE COURT:  I'm not sure what the relevance is.

16              MR. VALENTINI:  May we approach?

17              THE COURT:  You may.

18              (Bench conference on the record.)

19              MR. VALENTINI:  The defendant will testify that part

20    of the reason why he let the detainee go is because there were

21    rioters coming after him and challenging or questioning why are

22    you detaining this particular individual, what did he do.  Part

23    of the reason why he decided to let him go is out of a safety

24    concern.

25              MS. FISH:  Your Honor, it's hearsay.  It's -- it's
```

1    prejudicial.  It has nothing to do with Mr. Rhine's own

2    contact -- conduct.  And I don't think it's necessary to

3    explain his decision.  He already testified there were no other

4    officers and it seemed out of control.  This doesn't

5    substantially change that reasoning.

6                    THE COURT:  Overruled.

7                    (Proceedings held in open court.)

8    BY MR. VALENTINI:

9    Q.  So, Officer Abbott, I was just asking you, did -- as you

10    stood in this lobby with this detained individual, did members

11    of the crowd come up to you and ask you questions?

12    A.  Yes.

13    Q.  And without referencing any particular conversation, what

14    do you recall about those questions?

15    A.  They were asking:  Why is he being arrested?  Where are you

16    taking him?

17    Q.  What was the tone of the questions, if you can describe it?

18    A.  I would say, you know, from inquisitive to slightly

19    aggressive, but not overly.

20    Q.  So not overly aggressive, but inquisitive?

21    A.  Yes, I'd say.

22    Q.  And what did you decide -- did there come a point where you

23    made a decision as to what to do with this person you had

24    detained?

25    A.  Yes.

```
1    Q.  And what did you decide?

2    A.  Well, at that point I realized there was no feasible way to

3    get him and myself out of there safely.  So at that point I

4    just basically told him if he would be -- agreeable for me to

5    let him go if he would leave the building immediately.

6    Q.  And you said there was -- you did not see a feasible way to

7    deal with this -- deal with this detainee safely in any other

8    manner?

9    A.  No.  Correct.

10   Q.  What -- what did you mean by safely?

11   A.  I -- I weighed my options of trying to go outside with the

12   individual, but I had no idea how bad it was outside the door,

13   which you can't quite see in this frame was completely blocked

14   with people.  The Rotunda, as you can see, was full of people.

15   I looked around.  There seemed to really be no place to take

16   him.

17   Q.  And did you -- did there come a time, in fact, you

18   communicated to this individual that he was free to go if he

19   exited the building immediately?

20   A.  Yes.

21   Q.  What does -- what did this individual say in response?

22   A.  He agreed, but he did ask a question, though.

23   Q.  What was the question?

24   A.  He wanted his items back, his weapons.

25   Q.  What did you say to that?
```

```
1    A.  No.
2              MS. FISH:  Objection, Your Honor.  Jencks.
3              THE COURT:  Is the objection withdrawn?
4              MS. FISH:  Your Honor, I'll make a motion at the
5    conclusion of his testimony.
6              THE COURT:  Okay.
7              (A video recording was played.)
8    BY MR. VALENTINI:
9    Q.  Officer Abbott, I have paused the exhibit at 3:02:46.
10             At this point, had you left the area?
11   A.  Yes.  I had gone slowly up the stairwell.  I believe at
12   that point our main goal was to prevent anyone from going back
13   up to the third floor.
14   Q.  So you don't know what happened to this particular detainee
15   afterwards?
16   A.  Not after I released him.
17   Q.  I'm going to -- I was -- I would like to ask you a few
18   questions about --
19             MR. VALENTINI:  We can stop publishing, please.
20   Thank you.
21   BY MR. VALENTINI:
22   Q.  -- what happened -- what you did on January 6th after you
23   left this area.
24             MS. FISH:  Objection.  Relevance.
25             MR. VALENTINI:  May we approach?
```

1            THE COURT:  Come approach.

2            (Bench conference on the record.)

3            MR. VALENTINI:  We expect that the defendant -- the

4    defendant will make much of the fact that the -- how the

5    particular weapons were disposed of.  And part of the answer

6    that we expect this defendant to -- this witness to give is

7    that January 6 was a chaotic day.  And part of explaining how

8    January 6th was a chaotic day is an understanding of what the

9    defendant did after he left that area.

10           MS. FISH:  Your Honor, the government has spent

11   substantial time trying to sideline any prejudicial information

12   about what officers went through with other people that day.

13   This is another attempt to do that.  He can ask the officer

14   what -- if he disposed of the items and why.  He doesn't need

15   to get into everything he did that day.

16           THE COURT:  If she makes it relevant during her

17   cross, you can do it on redirect.

18           MS. FISH:  And, Your Honor, just to -- I would like

19   an opportunity to sidebar.  I believe there's a *Jencks* and

20   Rule 16 violation as to his testimony about the statements

21   about the property.

22           THE COURT:  About what?

23           MS. FISH:  The -- the statements about the

24   property, about the claim that my client asked for the

25   property and Abbott said no.  I believe they are both Rule 16

ABBOTT - DIRECT

1    and *Jencks* violations, and I can address it now or after his

2    testimony.

3                THE COURT:  Afterwards.  And your position is that

4    that was never disclosed?

5                MS. FISH:  Correct, Your Honor.  And, in fact,

6    opposite statements were disclosed, and I can cross him on it.

7    But it seems like rehearsed direct, and I believe that

8    there are statements that Officer Abbott gave about what

9    my client said and what he remembered that have not been

10   produced today.

11               MR. VALENTINI:  I'll just respond very briefly.  With

12   respect to *Jencks*, I am not aware of any *Jencks* material that

13   would address this issue.  And, in any event, the direct

14   examination is not even concluded.  With respect to Rule 16, I

15   also have no idea of what type of materials they could be

16   referring to.  I'm happy to discuss this and -- at an

17   appropriate time that the Court finds agreeable.

18               THE COURT:  That would be fine.

19               (Proceedings held in open court.)

20   BY MR. VALENTINI:

21   Q.  Officer Abbott, after you left this area, did there come a

22   time when you disposed of the weapons that you seized from this

23   individual?

24   A.  Yes.  Much, much later.

25   Q.  When you say much later, do you mean much later on

1    January 6th or another date?

2    A.  No, on that date.

3    Q.  And what did you do with the weapons that you seized from

4    the defendant?

5    A.  Well, after the Capitol was secured, we went back over to

6    the House side.  And then I had realized I still had the items

7    on me.  I, at that point, had no idea who it belonged to.  I

8    had no idea what they were doing with them.  I disposed of the

9    knives in the trash.  They were -- how do I say -- they were

10   legal knives to have inside the House office buildings.  So

11   they weren't really -- and then the pepper spray I took home.

12   I didn't want to dispose of in the trash because of the

13   chemical irritant.  I disposed of them at home, emptied the

14   can, and threw it away.

15   Q.  Is the way you disposed of those items consistent with the

16   Capitol Police protocols?

17   A.  Generally, no.  Because in that situation, what you would

18   have had is you would have had contraband for destruction.  You

19   would have had to fill out a form.  And, basically, somebody --

20   it would have been destroyed through a proper channel.

21   Q.  And why is it that that process did not --

22   A.  Because of the nature of the day.  I had no idea, you

23   know, what they were doing, what -- what the status was.  Also,

24   the individual who I -- I didn't realize -- know the person's

25   name.

1    Q.  I want to take a step back and consider January 6th as a

2    whole.  On January 6th, did you ever feel that your personal

3    safety was in danger?

4              MS. FISH:  Objection.  403.

5              THE COURT:  You can answer.

6    A.  Yes.

7              MR. VALENTINI:  No further questions.

8              MS. FISH:  And, Your Honor, may I be heard at

9    sidebar?

10             THE COURT:  Yes, you may.

11             (Bench conference on the record.)

12             MS. FISH:  Your Honor, I move for the government to

13   produce all prior statements, including any rough notes by

14   Officer Abbott.  He has now testified on direct, and I would

15   request all materials under Rule 26 and the Jencks Act and the

16   case *Jencks*.

17        Additionally, I would move to strike his testimony.  I

18   believe there is a Rule 16 violation.  The government has an

19   obligation to turn over any statements my client made.  I do

20   not believe that was a surprise answer.  That seemed like a

21   very scripted direct, and he indicated statements that have

22   never previously been disclosed in the multiple reports from

23   Officer Abbott.

24             MR. VALENTINI:  Your Honor, to my knowledge, we

25   disclosed every statement, every *Jencks* material that we have

1    for this particular witness.  In the interest of streamlining

2    the trial, if Your Honor prefers to strike that particular

3    answer to that one question about the -- the one question

4    about --

5              THE COURT:  The property?

6              MR. VALENTINI:  Yeah.  At least he could have the

7    particular property back and those weapons back, the Court --

8    or the government would not oppose it.

9          But for the -- but, again, I want to be absolutely clear

10   that we have disclosed everything in our possession, to my

11   knowledge, and that the only reason why we would agree to

12   withdraw that question is out of the -- the interest of keeping

13   the trial going.

14             MS. FISH:  Has the government disclosed rough notes

15   from Officer Abbott?

16             MR. VALENTINI:  The -- yes, the case agent has --

17   he -- I will have to check.  My understanding is that rough

18   notes have been produced for every interview for which a 302

19   was created.  So I -- my understanding is that they have.

20   Again, I will have to check.  You know, I -- I will have to

21   check, Your Honor.

22             THE COURT:  All right.  I will say for the record

23   that that response didn't seem elicited.  It seemed like

24   Mr. Valentini was surprised by it and it was volunteered by

25   Officer Abbott, not elicited by Mr. Valentini.

```
1         So I will strike the -- that particular statement.

2    And then I will hear further argument once the government is

3    able to confirm that it's produced everything it needs to

4    produce.

5         MS. FISH:  Thank you, Your Honor.

6         And I'd would ask to not excuse the officer until the

7    government has confirmed that so that I can continue cross with

8    additional materials as I need to.

9         THE COURT:  Okay.

10        (Proceedings held in open court.)

11        THE COURT:  All right.  You heard a statement by

12   Officer Abbott that -- that the defendant -- the defendant

13   asked whether he could have his property back and that

14   Officer Abbott responded no.  We're going to strike that --

15   that question and response.  So you're not to rely upon that at

16   all in your deliberations.  So just put it out of your mind.

17        Go ahead.

18                        CROSS-EXAMINATION

19   BY MS. FISH:

20   Q.  Good morning, Officer Abbott.

21   A.  Good morning.

22   Q.  Now, you spoke a little bit about your day on January 6th.

23   You started the day very early in the morning?

24   A.  Yes.

25   Q.  And it's fair to say it was atypical?
```

```
 1    A.  Yes.

 2    Q.  Pretty chaotic?

 3    A.  Yes.

 4    Q.  And it was over two years ago?

 5    A.  Yes.

 6    Q.  So there are some details you don't remember as well today?

 7    A.  Yes.

 8    Q.  And you arrested two people, you indicated, in the visitors

 9    center?

10    A.  Yes.

11    Q.  And then detained the gentleman with the blue flag?

12    A.  Yes.

13    Q.  And you were somewhat having to improvise your actions that

14    day; is that fair to say?

15    A.  Yes.

16    Q.  You weren't sure what the protocols were?

17    A.  That -- well, the protocols were impossible to follow,

18    basically.

19    Q.  They were shifting?

20    A.  Yes.

21    Q.  You were doing your best to try to do the right thing?

22    A.  Yes.

23    Q.  And you spoke about a few items that you seized from the

24    man with the unique blue flag, two small folding knives?

25    A.  Yes.
```

```
1    Q.  Smaller than the palm of your hand?

2    A.  Yes, about the -- about the same size.

3    Q.  And a small canister of pepper spray?

4    A.  Yes.

5    Q.  There was no residue or anything that would indicate they

6    were used?

7    A.  No.

8    Q.  They were closed?

9    A.  Yes.

10   Q.  And you're not positive where in his belongings you found

11   them?

12   A.  No.

13   Q.  And that man, you know, volunteered, hey, I have these

14   items when you asked?

15   A.  Yes.

16   Q.  And you found them where he told you?

17   A.  Yes.

18   Q.  He was respectful?

19   A.  Yes.

20   Q.  He obeyed your directions?

21   A.  Yes.

22   Q.  And I want to talk a little more about the typical

23   protocols for items like that at the Capitol Building.

24        So you indicated you ordinarily work, kind of, in a

25   security post between the -- one of the congressional office
```

```
 1    buildings and the Capitol Building?
 2    A.  Yes.
 3    Q.  And the items in question are all legal in
 4    Washington, D.C.?
 5    A.  Yes.
 6    Q.  They're actually allowed in those congressional office
 7    buildings?
 8    A.  Yes.
 9    Q.  They're kind of typical safety items?
10    A.  Yes.
11    Q.  And it's happened before that someone, say, makes an
12    appointment with their member of Congress to come see the
13    Capitol and go to the Capitol office building and comes to the
14    U.S. Capitol with one of those items?
15    A.  Yes.
16    Q.  And, typically, what you do is you tell them, hey, you
17    can't have that?
18    A.  Yeah.  Typically, they're given two options.  One is to
19    surrender it for contraband, for destruction, or to leave the
20    building and do whatever they want with it, get rid of it or
21    take it back to their car or --
22    Q.  Okay.  So, typically, those are just confiscated and
23    disposed of?
24    A.  Yes.
25    Q.  Or the person is asked to leave?
```

```
1    A.  Yes.

2    Q.  And, normally, you would fill out a form to dispose of

3    them?

4    A.  Yes.

5    Q.  Here you didn't?

6    A.  Right.

7    Q.  But, otherwise, you disposed of them the way you would any

8    time?

9    A.  Yes.

10   Q.  And there are other items that are not allowed inside the

11   Capitol Building; correct?

12   A.  Yes.

13   Q.  Food?

14   A.  Yes.

15   Q.  Water?

16   A.  Yes.

17   Q.  Hair spray?

18   A.  Yes.

19   Q.  Knitting needles?

20   A.  Yes.

21   Q.  And people sometimes bring those in by mistake as well?

22   A.  Yes.

23   Q.  And you searched the gentleman's backpack, his

24   belongings --

25   A.  Yes.
```

```
1    Q.  -- correct?

2         There was no gas mask?

3    A.  No.

4    Q.  No chains?

5    A.  No.

6    Q.  Nothing like that that caused you concern?

7    A.  No.

8    Q.  Just ordinary items?

9    A.  Yes.

10   Q.  And I want to talk a little bit more about those plastic

11   ties that you used.  You indicated you used them to restrain

12   the man's hands behind his back?

13   A.  Yes.

14   Q.  And that you asked, kind of, another person passing by

15   to -- to carry his property?

16   A.  Yes.

17   Q.  And that person was willing to do so?

18   A.  Yes.

19   Q.  And he was just someone passing by; correct?

20   A.  Yes.

21   Q.  He was not with the man prior?

22   A.  No.

23   Q.  That man was alone when you found him?

24   A.  Yes.

25   Q.  With his hands behind his back, he would not be able to
```

```
 1    carry those items?

 2    A.  No.

 3    Q.  He couldn't use a railing?

 4    A.  No.

 5    Q.  Cell phone?

 6    A.  No.

 7    Q.  Key?

 8    A.  No.

 9    Q.  And when you got to the bottom of the stairs, you said it

10    was kind of more chaotic than you expected?

11    A.  Yes.

12    Q.  You weren't totally sure what to do?

13    A.  Correct.

14    Q.  And you would not have yourself ever undid those -- undone

15    those hand -- those plastic ties in that space?

16    A.  No.

17    Q.  Because you could accidentally cut the man?

18    A.  Yes.

19    Q.  And it would be a liability?

20    A.  Yes.

21    Q.  You told him to have someone else cut him free?

22    A.  Yes.

23    Q.  And then to take himself and go?

24    A.  Yes.

25    Q.  And then you left to deal with more important things?
```

1    A.  Yes.

2    Q.  And during that full time you were interacting with

3    Mr. Rhine, he was respectful?

4    A.  Yes.

5    Q.  He was not joining with the people who were talking to you

6    in the gallery?

7    A.  No.

8    Q.  He followed your directions?

9    A.  Yes.

10   Q.  He didn't ever physically resist you?

11   A.  No.

12   Q.  And when you asked him to move, he would move where you

13   asked?

14   A.  Yes.

15            MS. FISH:  Thank you.

16                    REDIRECT EXAMINATION

17   BY MR. VALENTINI:

18   Q.  Officer Abbott, you were asked some questions about not

19   remembering every detail about what happened on January 6th.

20   A.  Yes.

21   Q.  Was January 6th a chaotic day for you?

22   A.  Yes.

23   Q.  You've been a Capitol Police for how many years?

24   A.  A little over 18 now.

25   Q.  Have you ever worked through a day as a police officer on

1    the Capitol Police that was more chaotic than January 6th?

2    A.  No.

3            MR. VALENTINI:  No further questions.

4            THE COURT:  All right.  Okay.  You're going to be

5    excused now.  It's possible you may be recalled, but you're

6    done for now.  Thank you.

7            THE WITNESS:  Okay.  Thank you, Your Honor.

8            THE COURT:  All right.  Mr. Valentini, call your next

9    witness.

10           MR. VALENTINI:  The government calls Marty Trevino.

11           THE COURTROOM DEPUTY:  Good morning, sir.

12           (Oath administered.)

13           THE WITNESS:  I swear.

14           THE COURTROOM DEPUTY:  Thank you, sir.

15           THE COURT:  Good afternoon -- or good morning,

16   rather.

17           THE WITNESS:  Good morning, Your Honor.

18                          DIRECT EXAMINATION

19   BY MR. VALENTINI:

20   Q.  Good morning.

21   A.  Good morning, sir.

22   Q.  Could you please state and spell your name for the record.

23   A.  Marty Trevino, T-r-e-v-i-n-o.

24   Q.  Mr. Trevino, what do you do for a living?

25   A.  I'm a special agent with the United States Army and tasked

1    as a task force officer to the FBI for their task force.

2    Q.  And in lay terms, could you explain to the jury what it

3    means to be a task force officer with the FBI.

4    A.  So the FBI has a -- they call it a Joint Terrorism Task

5    Force.  It is a compilation of different federal, local, and

6    state either officers or special agents from various services:

7    Secret Service, the Army, U.S. Marshals.  It focuses on FBI

8    investigations.

9    Q.  In which FBI office are you assigned to?

10   A.  I am currently assigned to the Tacoma Resident Agency,

11   which is part of the Seattle, Washington, headquarters office.

12   Q.  And how long have you been with the Army?

13   A.  I have been with the Army on active duty and as a civilian

14   agent for 38 years.

15   Q.  And how long have you been on your assignment to the FBI?

16   A.  On this assignment, almost three years.

17   Q.  And since -- and you had other assignments with the FBI

18   before?

19   A.  Yes, sir.

20   Q.  How long total over the course of your career have you

21   spent on assignment to the FBI?

22   A.  To just the FBI, close to six years, sir.

23   Q.  What kind of -- since you left, became an FBI task force

24   officer, which kind of case have you been handling?

25           MS. FISH:  Objection, Your Honor.  Relevance.

```
1              MR. VALENTINI:  I'm happy to move on.
2              THE COURT:  Go ahead.
3    BY MR. VALENTINI:
4    Q.  What kind of training, briefly, did you undergo to become
5    an FBI task force officer?
6    A.  There is -- I went through the federal law enforcement
7    training academy down in Glynco, Georgia.  It's a 12-week
8    program.  They called it the criminal investigator training
9    program.  I went through one week once I was on the JTTF, years
10   ago, which pretty much teaches you how to be on an FBI's task
11   force.  And, obviously, I also had my credentials as an Army
12   counterintelligence agent, which I went through in 1989-1990,
13   approximately a 23-week course.
14   Q.  And did the training that you received as -- to become an
15   FBI task force officer include training on how to conduct
16   investigations according to the FBI protocols?
17   A.  Yes, sir.
18   Q.  And I would like to turn to the investigation at hand.
19   Were you involved in the investigation of an individual named
20   David Charles Rhine?
21   A.  Yes, sir.
22   Q.  Were you also involved at some point in the arrest of an
23   individual named David Charles Rhine?
24   A.  Yes, sir.
25   Q.  How did Mr. Rhine first come to your attention?
```

1    A.  Mr. Rhine initially was part of a -- an assessment, which

2    is the lowest form of an FBI investigation, through a tip.

3    Q.  And how did you personally become involved in the

4    investigation of Mr. Rhine?

5    A.  After the case had been opened as an assessment, the FBI

6    agent who had the case was moving on to a different assignment,

7    and my supervisor, special agent, asked if I could take the

8    case.

9    Q.  And at the point -- and did you accept that?

10   A.  Yes, sir, I did.

11   Q.  And what did you do when you -- well, strike that.

12        What -- what was in the case file when you took up that

13   assignment?

14   A.  There was a few interviews, the report of the initial tip,

15   plus two additional tips, some baseline-type investigative

16   activities that occurred.

17   Q.  Do you know if any photographs of the individual named

18   David Charles Rhine had been obtained at that point?

19   A.  At that point, just the DMV photo.

20   Q.  Let me show you what has been marked as Government

21   Exhibit 121, which is not in evidence.  Do you recognize this

22   photograph in Exhibit 121?  Are you able to see it on your

23   screen?

24   A.  Not yet, sir.

25        MR. VALENTINI:  I would ask for Ms. Johnson to --

```
1              THE WITNESS:  The screen is on, ma'am.

2              MR. VALENTINI:  I should have known.

3    BY MR. VALENTINI:

4    Q.  Do you recognize this photograph in Government 121?

5    A.  Yes, sir.

6    Q.  What is it?

7    A.  It is Mr. Rhine's DMV photo that was in the case file.

8    Q.  And this is a fair and accurate copy of the DMV photo that

9    you found in the FBI file?

10   A.  Yes, sir.

11             MR. VALENTINI:  The government moves for the

12   admission of Exhibit 121.

13             MS. FISH:  Objection.  Foundation.

14             THE COURT:  It's admitted.

15             (Government Exhibit 121 admitted into evidence.)

16   BY MR. VALENTINI:

17   Q.  Special Agent Trevino, how did you use this photograph as

18   part of your investigation?

19   A.  We -- I took the photo and used it through some

20   investigative techniques that we used to try to identify

21   Mr. Rhine in the Capitol through the database we had.

22   Q.  And I'm sorry.  Did you just reference a collection of

23   video information in an FBI database?

24   A.  Yes, sir.  Well, yes, sir.  It's a compilation of videos,

25   still photos that were sent into the FBI.
```

1    Q.  And are -- those videos and still photos, do they include

2    footage from Capitol Police surveillance?

3    A.  Yes, sir.

4    Q.  Do they also include other videos and photos?

5    A.  Yes, sir.

6    Q.  How many hours did you -- would you estimate that you spent

7    reviewing video in the FBI database to try to locate someone

8    who looked like the individual in this photograph?

9    A.  Approximately 300 hours.

10   Q.  Were you ultimately able to find in the FBI's database an

11   individual whom you determined matched the appearance of the

12   individual in this exhibit?

13   A.  Yes, sir.

14   Q.  After you found that first match, did you attempt to trace

15   the same individual through other location -- well, once you

16   found that first match, were you able to determine whether this

17   individual was likely to have been inside the Capitol on

18   January 6th?

19   A.  Yes, once I found the match.

20   Q.  Once you found the match, did you attempt to trace this

21   individual through the U.S. Capitol?

22   A.  Yes, sir.

23   Q.  And were you able to trace this individual to different

24   locations within the U.S. Capitol on January 6th?

25   A.  Yes, sir.

1  Q.  I'm going to pull up what has been admitted into evidence

2  as Exhibit 115A.

3         As part of your investigation, did you compare the

4  individual in this exhibit, 115A, to the -- the DMV photograph

5  of Mr. Rhine in Exhibit 121?

6  A.  Yes, sir.

7  Q.  What did you conclude?

8  A.  I concluded that it was David Rhine.

9         MS. FISH:  Objection, Your Honor.  It's lay opinion

10  with no special knowledge.

11         THE COURT:  Overruled.

12  BY MR. VALENTINI:

13  Q.  I'm going to pull up another exhibit already in evidence,

14  Exhibit 102A, and I'm going to scroll down to the third

15  photograph in this collection of still images.

16         In your investigation, did you compare the individual

17  who is captured in Exhibit 1- -- 102A carrying a large blue

18  flag to the individual in the DMV photograph?

19  A.  Yes.

20  Q.  And what did you conclude?

21         MS. FISH:  Same objection.

22         THE COURT:  Same overruling.

23  A.  That it was the same person.

24  BY MR. VALENTINI:

25  Q.  I'm going to pull up Exhibit 103A, which is also in

1    evidence and, specifically, the second page in this exhibit.

2        During your investigation, did you compare the

3    individual who is carrying a large blue flag with white stars

4    depicted in the Exhibit 103A, the second page, to the

5    individual in the DMV photograph?

6    A.  Yes.

7    Q.  And what did you conclude?

8            MS. FISH:  Same objection.

9            THE COURT:  You can have a standing objection on

10    these.

11            MS. FISH:  Thank you, Your Honor.

12    A.  It was the same individual, David Rhine.

13    BY MR. VALENTINI:

14    Q.  And I've now pulled what has been marked as Exhibit 105,

15    and I'm going to direct your attention to the third page in

16    this exhibit.

17        Do you see in this exhibit a gentleman, again, carrying

18    a large blue flag with white stars?

19    A.  Yes, sir.

20    Q.  As part of that investigation, did you compare the

21    appearance of that individual in this picture to the

22    individual -- to the individual in the DMV photograph?

23    A.  Yes, sir.

24    Q.  And what did you conclude?

25    A.  Yes, it was the same person.

378

```
 1              MR. VALENTINI:  I'm going to pull down this exhibit.
 2    BY MR. VALENTINI:
 3    Q.  Mr. Trevino, did you eventually obtain an arrest warrant
 4    for Mr. Rhine based on his involvement in the events of
 5    January 6th at the Capitol?
 6    A.  Yes.
 7    Q.  And when was that, approximately?
 8    A.  November 5th of 2021.
 9    Q.  Where did Mr. Rhine live at the time?
10    A.  Bremerton, Washington, sir.
11    Q.  That's the other Washington?
12    A.  Yes, the other Washington.
13    Q.  Did you coordinate with other agents in the Seattle area to
14    execute an arrest warrant for Mr. Rhine?
15    A.  Yes, sir.
16    Q.  And did there come a time when you and the other agents, in
17    fact, executed an arrest warrant for Mr. Rhine?
18    A.  Yes, sir.
19    Q.  And did you arrest him at his home?
20    A.  No, sir.
21    Q.  Why not?
22    A.  We -- he has family and we knew where he worked.  So it
23    was trying to keep things calm and also not involve his wife
24    and son, if possible.
25    Q.  Where did you arrest Mr. Rhine?
```

1    A.  At his place of business.

2    Q.  And when did you arrest Mr. Rhine?

3    A.  On the 9th of November.

4    Q.  What time of the day did you execute the arrest?

5    A.  Approximately 09 -- 9:00 a.m.

6         THE WITNESS:  Sorry, ma'am.

7    BY MR. VALENTINI:

8    Q.  You're a special agent for the Army?

9    A.  Yes, sir.

10   Q.  Where within the office space did you arrest Mr. Rhine?

11   A.  We met him at the front door.  And then within the foyer

12   area, we executed the arrest.

13   Q.  And this may be an obvious question, but how did you know

14   that the person you were arresting was, in fact, Mr. David

15   Charles Rhine?

16   A.  Because I'd watched 300 hours of video and tracked him

17   through the Capitol.  Zoomed in; zoomed out.  Spent a lot of

18   time.

19   Q.  So you recognized him immediately?

20   A.  Yes, sir.

21   Q.  Did you also ask the person you were arresting what his

22   name was?

23   A.  Yes, I did.

24   Q.  And did that person confirm that his name was David Rhine?

25   A.  Yes.

```
1    Q.  This was in November of 2021?

2    A.  Yes, sir.

3    Q.  And when you arrested Mr. Rhine, were you able to take a

4    good look at his facial features?

5    A.  Yes, sir.

6    Q.  His appearance?

7    A.  Yes, sir.

8    Q.  And how long -- how long did you spend with Mr. Rhine that

9    day?

10   A.  A little bit over an hour.

11   Q.  And based on your review of the DMV photograph and other

12   information, were you able to confirm that the person you were

13   arresting was, in fact, David Rhine?

14   A.  Yes, sir.

15   Q.  Let me pull up what has been marked as Exhibit 121, which

16   is the DMV photograph.  In fact, let me -- strike that.

17        Let me go back to 115A.

18        Based on the time you spent with Mr. Rhine in person,

19   were you able to positively identify the person you were

20   arresting -- the person -- were you able to -- able to

21   positively identify the person in Exhibit 115A as Mr. Rhine?

22   A.  Yes, sir.

23   Q.  I'm going to ask you the same question for Exhibit 102A.

24   Specifically, the third page.

25        Based on the time you spent with Mr. Rhine in
```

1    November 2021, were you able to positively identify him as the

2    individual in this picture on the third page of Exhibit 102A?

3    A.  Yes, sir.

4    Q.  Exhibit 103A, same question.

5        Based on the time spent with Mr. Rhine in November 2021

6    face-to-face, were you able to identify the person in Exhibit

7    103A, the second page, as Mr. Rhine?

8    A.  Yes, sir.

9    Q.  I'm going to do this for 105A as well.  We're talking about

10   the third photograph in this collection of images.

11       And, again, based on the time that you spent with

12   Mr. Rhine face-to-face in November 2021, were you able to

13   identify the individual depicted in the third photograph of

14   Exhibit 105A as Mr. Rhine?

15   A.  Yes, sir.

16   Q.  Special Agent Trevino, do you see the person you identified

17   as Mr. Rhine today in the courtroom?

18   A.  Yes, sir.

19   Q.  Can you please identify him by referring to an item of

20   clothing he's wearing.

21   A.  He's wearing a, looks like, navy blue or black jacket with

22   a black mask seated behind.

23       MR. VALENTINI:  Let the record reflect that Mr. Rhine

24   is, in fact, wearing the items of clothing that the witness

25   just identified.

```
 1            THE COURT:  It's so reflected.

 2   BY MR. VALENTINI:

 3   Q.  When you arrested Mr. Rhine in November 2021, did you

 4   exchange -- did you have any conversation with him?

 5   A.  Some.

 6            MS. FISH:  Objection, Your Honor.  Same as previous

 7   Rule 16.

 8            (REPORTER'S NOTE:  A sotto voce conference was held

 9   between Mr. Valentini and Ms. Fish.)

10            MS. FISH:  Withdrawn, Your Honor.  Understanding

11   where the government is going.

12   BY MR. VALENTINI:

13   Q.  And so by talking to him, did you have a good understanding

14   of what the voice of the individual whom you were arresting

15   sounded like?

16   A.  Yes, sir.

17            MR. VALENTINI:  I am going to play Exhibit 115.1,

18   which is already in evidence.

19            THE COURTROOM DEPUTY:  Mr. Valentini, you said 115.1

20   or --

21            MR. VALENTINI:  Correct.

22            THE COURTROOM DEPUTY:  Oh, okay.

23            (An audio-visual recording was played.)

24   BY MR. VALENTINI:

25   Q.  So were you able to positively identify the voice of the --
```

1          MR. VALENTINI:  You can still publish it, please.

2    BY MR. VALENTINI:

3    Q.  Were you able to positively identify the voice of the

4    person you arrested in November of 2021 as the same as the

5    voice of -- in Exhibit 115.1 that we just played?

6    A.  Yes, sir.

7    Q.  Special Agent Trevino, did you also obtain a warrant to

8    search Mr. Rhine's home?

9    A.  Yes.

10   Q.  And did the FBI, in fact, conduct a search of the

11   defendant's home?

12   A.  Yes, sir.

13   Q.  And were you able to find the large blue flag when you

14   searched Mr. Rhine's home?

15   A.  No, sir.

16   Q.  How about a red hat with the white USA printed on it?

17   A.  No, sir.

18   Q.  And, Special Agent Trevino, did you also obtain a warrant

19   to search Mr. Rhine's office?

20   A.  No, sir.

21   Q.  So you never searched that location?

22   A.  That's correct, sir.

23   Q.  Did the search warrant you executed in November 2021 also

24   authorize you to seize and search Mr. Rhine's cell phone?

25   A.  Yes, sir.

 1    Q.  Did you, in fact, seize a cell phone when you arrested him

 2    in November 2021?

 3    A.  Yes, sir.

 4    Q.  I would like to show you Exhibit 200, which is not yet in

 5    evidence.  I'm going to scroll you -- scroll through the

 6    exhibit.  I need to zoom in to the second portion of the second

 7    page of the exhibit.

 8         Special Agent Trevino, do you recognize the document

 9    that's been marked as Exhibit 200?

10    A.  Yes, sir.

11    Q.  What is it?

12    A.  It's a receipt for items seized.

13         MR. VALENTINI:  Government moves for the admission of

14    Exhibit 200 into evidence.

15         MS. FISH:  Your Honor, I do object as hearsay.  It's

16    not a legal record, not a business record, but I have no

17    objection to the testimony about it.

18         THE COURT:  Do you want to respond to the hearsay

19    objection?

20         MR. VALENTINI:  It's not offered for the truth of

21    what it asserts.

22         MS. FISH:  I -- if not that, I have no idea what this

23    is offered for.

24         THE COURT:  Why don't you come to the bench.

25         (Bench conference on the record.)

TREVINO - DIRECT

385

```
 1              MR. VALENTINI:  I can just skip it.  I don't need it
 2     in evidence.
 3              THE COURT:  Okay.
 4              (Proceedings held in open court.)
 5     BY MR. VALENTINI:
 6     Q.  Moving on from Exhibit 200, Special Agent Trevino, what did
 7     you do with the phone that you seized?
 8     A.  I took it into evidence and then transported it to our
 9     Seattle office.
10     Q.  Do you remember what make the phone was?
11     A.  A Samsung Galaxy Note.
12     Q.  And after you transferred the phone -- when you transferred
13     the phone -- could you please repeat your previous answer.  You
14     transferred the phone to?
15     A.  Our Seattle office, to our -- we have a -- they call them
16     CART is the name.  They look through those type of electronic
17     items for us.
18     Q.  Did you ask this unit to extract contents from this phone?
19     A.  I did.
20     Q.  Did you eventually receive contents back in response to
21     your request?
22     A.  Yes, sir.
23     Q.  I would like to show you what has been marked as
24     Exhibit 202.
25              Special Agent Trevino, is Exhibit 202 a photograph?
```

1    A.  Yes, sir.

2    Q.  Was an electronic version of this photograph among the

3    items you received back from what you called the CART unit in

4    response to your request?

5    A.  Yes, sir.

6           MR. VALENTINI:  Government moves to admit Exhibit 202

7    into evidence.

8           MS. FISH:  No objection.

9           THE COURT:  It's admitted.

10           (Government Exhibit 202 admitted into evidence.)

11   BY MR. VALENTINI:

12   Q.  So, Agent Trevino, now that this photograph is being

13   published, is this photograph one of the electronic items that

14   was returned to you in response to your request to extract the

15   contents -- contents of the Galaxy phone that you seized from

16   Mr. Rhine?

17   A.  Yes, sir.

18   Q.  What does it display?

19   A.  The U.S. Capitol.

20   Q.  Are you able to tell which side of the Capitol it depicts?

21   A.  The east side, sir.

22   Q.  Are you able to tell if there are any barricades within the

23   frame of this picture?

24   A.  Yes.  There are bike racks running along the perimeter

25   there that I can see.

1    Q.  Are you able to see a line of police officers in this

2    picture?

3    A.  Yes, sir, further inside the photo.

4    Q.  Could you please circle some of the officers who are

5    standing.

6    A.  There.  There.  Looks like there.

7            MR. VALENTINI:  You can put down -- pull down this

8    exhibit.

9    BY MR. VALENTINI:

10   Q.  I will show you what has been marked as Exhibit 203, which

11   is not yet in evidence.

12           Special Agent Trevino, do you see Exhibit 203 on your

13   screen?

14   A.  Yes, sir.

15   Q.  Is an electronic version of -- well, is it a photograph?

16   A.  Yes, sir.

17   Q.  Is it an electronic version of this photograph one of the

18   files you received from your -- from the CART team in response

19   to your request?

20   A.  Yes, sir.

21           MR. VALENTINI:  Government moves to admit Exhibit 203

22   into evidence.

23           MS. FISH:  No objection.

24           THE COURT:  It's admitted.

25           (Government Exhibit 203 admitted into evidence.)

1    BY MR. VALENTINI:

2    Q.  Now that the exhibit has been published, is this one of the

3    files that you received in response to your request for -- to

4    extract the contents of Mr. Rhine's phone?

5    A.  Yes, sir.

6    Q.  And what does this image in Exhibit 203 depict?

7    A.  The U.S. Capitol, sir.

8    Q.  Are you able to determine which side of the Capitol it

9    depicts?

10   A.  The east side, sir.

11   Q.  Do you know which -- strike that.

12          Do you see three different porticos in this exhibit?

13   A.  Yes, sir.

14   Q.  Do you see one on the left?

15   A.  Yes, sir.

16   Q.  Do you know if that is the House portico or the Senate

17   portico?

18   A.  The House, sir.

19   Q.  And if you focus on that area, do you see a line of police

20   officers midway up the House steps?

21   A.  Yes.

22   Q.  Could you please circle them for the jury.

23   A.  (Witness complying.)

24   Q.  And moving to the foreground of this picture, are you able

25   to see a set of bike racks?

```
 1    A.  Yes, sir.
 2    Q.  Those bike racks stand in between the vantage point of the
 3    person who took this picture and the paved patio on the east
 4    plaza?
 5    A.  Yes, sir.
 6    Q.  And moving to the right of this picture, do you see -- what
 7    do you see on the mid portico?
 8    A.  It looks like a group of people are on it.
 9    Q.  Are there more people in the mid portico than in the left
10    portico?
11    A.  Yes, sir.
12    Q.  But the officers on the left portico, the House portico,
13    are still forming a line at that point?
14    A.  Yes, sir.
15              MR. VALENTINI:  We can take this down.
16    BY MR. VALENTINI:
17    Q.  And I'm going to show you what has been marked as
18    Exhibit 204.
19          Same question as before.  Is -- well, is 204 a
20    photograph?
21    A.  Yes, sir.
22    Q.  Is it one -- is an electronic version of this photograph
23    one of the files that you received from the CART team at the
24    FBI in response to your request to extract the contents of
25    Mr. Rhine's phone?
```

 1    A.  Yes, sir.

 2              MR. VALENTINI:  Government moves for the admission of

 3    204 into evidence.

 4              MS. FISH:  No objection.

 5              THE COURT:  It's admitted.

 6              (Government Exhibit 204 admitted into evidence.)

 7    BY MR. VALENTINI:

 8    Q.  Special Agent Trevino, are you able to -- to tell which

 9    side -- which part of the Capitol this photograph depicts?

10    A.  Yes, sir.

11    Q.  Which side of the Capitol is that?

12    A.  The center east of the Capitol.

13    Q.  And what do you see in the center east of the Capitol?

14    A.  A large group of people.  Looks like a protest.

15              MR. VALENTINI:  You can take down Exhibit 205.

16    BY MR. VALENTINI:

17    Q.  I will show you --

18              MR. VALENTINI:  204.

19    BY MR. VALENTINI:

20    Q.  I will show you Exhibit 205, which is not yet in evidence.

21              Special Agent Trevino, is Exhibit 205 one of -- strike

22    that.

23              Is an electronic version of exhibit -- of the image

24    in Exhibit 205 one of the files you received from your

25    CART in response to your request with respect to Mr. Rhine's

```
 1    phone?
 2    A.  Yes, sir.
 3            MR. VALENTINI:  Government moves to admit Exhibit 205
 4    into evidence.
 5            MS. FISH:  No objection.
 6            THE COURT:  It's admitted.
 7            (Government Exhibit 205 admitted into evidence.)
 8    BY MR. VALENTINI:
 9    Q.  Do you recognize this photograph?  Do you recognize this
10    photograph?
11    A.  Yes, sir.
12    Q.  What does it depict?
13    A.  The U.S. Capitol Building on the east side.
14            MR. VALENTINI:  You can take this down.
15    BY MR. VALENTINI:
16    Q.  I'm going to show you Exhibit 206, which is also not in
17    evidence.  Same question as before.  Is an electronic version
18    of Exhibit 206 one of the items that you received from the FBI
19    CART Team in response to your request?
20    A.  Yes, sir.
21            MR. VALENTINI:  Government moves to admit Exhibit 206
22    into evidence.
23            MS. FISH:  No objection.
24            THE COURT:  It's admitted.
25            (Government Exhibit 206 admitted into evidence.)
```

 1    BY MR. VALENTINI:

 2    Q.  On the right-hand side -- far right-hand side of the

 3    exhibit, do you see a set of barricades?

 4    A.  Yes, sir.

 5           MR. VALENTINI:  We can take this exhibit down.

 6    BY MR. VALENTINI:

 7    Q.  I will show you what has been marked as Exhibit 207.  Same

 8    question as before.  Is this photograph -- an electronic

 9    version -- is -- strike that.

10           Is an electronic version of this photograph one of the

11    files that you received in response to your request to extract

12    the contents of Mr. Rhine's phone?

13    A.  Yes, sir.

14           MR. VALENTINI:  Government moves to admit Exhibit 207

15    into evidence.

16           MS. FISH:  No objection.

17           THE COURT:  It's admitted.

18           (Government Exhibit 207 admitted into evidence.)

19    BY MR. VALENTINI:

20    Q.  Special Agent Trevino, are you able to tell where this

21    photograph was taken from?

22    A.  It looks -- oh, yes, sir.

23    Q.  Where?

24    A.  Outside the perimeter of the U.S. Capitol.

25    Q.  Do you see the U.S. Capitol in the frame?

 1    A.  Yes, sir.  Midcenter of the photo.

 2    Q.  Are the streetlights on at this point in the exhibit?

 3    A.  Yes, sir.

 4         MR. VALENTINI:  You can take down Exhibit 207.

 5    BY MR. VALENTINI:

 6    Q.  And I will show you what has been marked Exhibit 208.  Same

 7    question as before.  Is an electronic version of Exhibit 208

 8    one of the files that you received in response to your request

 9    to the CART team with respect to Mr. Rhine's cell phone?

10    A.  Yes, sir.

11         MR. VALENTINI:  Move to admit Exhibit 208 into

12    evidence.

13         MS. FISH:  No objection.

14         THE COURT:  It's been admitted.

15         (Government Exhibit 208 admitted into evidence.)

16    BY MR. VALENTINI:

17    Q.  Special Agent Trevino, do you see the Capitol in this

18    picture?

19    A.  Yes, sir.

20    Q.  And are you able to tell which side of the Capitol is

21    depicted in this picture?

22    A.  The west side, sir.

23    Q.  And are the streetlights on in this picture?

24    A.  Yes, sir.

25         MR. VALENTINI:  And take down Exhibit 209 -- 208.

```
 1    BY MR. VALENTINI:

 2    Q.  I will show you Exhibit 209.

 3            Again, is this one of the files you received from the

 4    CART team in response to your request for -- for the extraction

 5    of Mr. Rhine's phone?

 6    A.  Yes, sir.

 7            MR. VALENTINI:  Move to admit 209 into evidence.

 8            MS. FISH:  No objection.

 9            THE COURT:  It's admitted.

10            (Government Exhibit 209 admitted into evidence.)

11    BY MR. VALENTINI:

12    Q.  Special Agent Trevino, what do you see in this photograph?

13    A.  A large crowd on the west side center of the Capitol.

14    Q.  And is -- are the streetlights on in this photograph?

15    A.  Yes, sir.

16            MR. VALENTINI:  You can pull down Exhibit 209.

17    BY MR. VALENTINI:

18    Q.  And I will show you Exhibit 210, which is also not in

19    evidence.

20            Same question as before.  Is this one of the files you

21    received from the FBI CART team in response to your request to

22    extract the contents of Mr. Rhine's phone?

23    A.  Yes.

24            MR. VALENTINI:  Move to admit 110 into evidence.

25            MS. FISH:  No objection.
```

```
 1                    THE COURT:  It's admitted.  Is that 210 or --
 2                    MR. VALENTINI:  Yes, Your Honor, 210.
 3                    (Government Exhibit 210 admitted into evidence.)
 4       BY MR. VALENTINI:
 5       Q.  And, Special Agent Trevino, is this -- what do you see in
 6       the -- Exhibit 210?
 7       A.  A large crowd on the west side of the Capitol.
 8       Q.  Are you able to tell whether the streetlights are on in
 9       this exhibit?
10       A.  Yes, sir.
11                    MR. VALENTINI:  Brief indulgence.
12             No further questions, Your Honor.
13                    THE COURT:  All right.  Thank you.
14                              CROSS-EXAMINATION
15       BY MS. FISH:
16       Q.  Good morning, Officer [sic] Trevino.  How are you doing?
17       A.  Good morning, ma'am.  I'm doing okay.
18       Q.  So I want to talk a little bit more about your work on this
19       case.  You indicated you're stationed in Washington state?
20       A.  Correct.
21       Q.  Not this Washington?
22       A.  Yes, ma'am.
23       Q.  And you were not in Washington, D.C., on January 6th?
24       A.  I was not, ma'am.
25       Q.  And I apologize.  I'm just having a little trouble --
```

1    A.  I was not, ma'am.

2    Q.  Thank you.

3        And you mentioned on direct that -- that you initiated

4    the investigation of the FBI and issued the investigation based

5    off a tip or two?

6    A.  Yes, ma'am.

7    Q.  And I just want to be clear so there's no confusion.  The

8    tip simply suggested that Mr. Rhine had been at and in the

9    Capitol Building?

10   A.  Generally, yes, ma'am.

11   Q.  There was no allegation that he was part of some nefarious

12   group?

13   A.  No, ma'am.

14   Q.  And it indicated he had been to a prior rally in D.C.?

15   A.  I'm sorry.  Could you say the question again.

16   Q.  It indicated he'd been to a prior protest or rally in

17   Washington, D.C.?

18   A.  One of the tips did, yes, ma'am.

19   Q.  One.  Not -- not anything more extensive than that?

20   A.  No, ma'am.

21   Q.  Okay.  And you indicated you did go to Mr. Rhine's home?

22   A.  Yes, ma'am.

23   Q.  And that's in Bremerton, Washington?

24   A.  Yes, ma'am.

25   Q.  And I know you know I also live in the other Washington,

1    but I'm guessing our jurors do not.

2        So can you please tell us a little bit about where

3    Bremerton, Washington, is.

4    A.  When you're looking at the state of Washington, there's an

5    area call the Peninsula, which is on the west side.  Bremerton

6    is along the Puget Sound area, water.  Beautiful area.

7    Q.  Yes.  And, typically, if you were coming from Seattle,

8    you'd take a ferry to get there?

9    A.  Some do, yes, ma'am.

10   Q.  You could take a ferry or you could drive all the way

11   around Puget Sound?

12   A.  And drive down to the Narrows Bridge and cross the

13   Gig Harbor, yes, ma'am.

14   Q.  And that would take a couple hours?

15   A.  If you were coming from Seattle, yes.

16   Q.  And, you know, the area where he lives is fairly

17   residential?

18   A.  Yes, ma'am.

19   Q.  There's a paved roadway?

20   A.  Down to his home, yes.

21   Q.  But there aren't sidewalks?

22   A.  No, ma'am.

23   Q.  And I want to, if we can, briefly pull up some of those

24   photographs we were just talking about.

25           MS. FISH:  Could we please pull up Government Exhibit

1    202, the photograph.

2    BY MS. FISH:

3    Q.  So you, helpfully, pointed out a couple things for the

4    government, and I'm hoping you can do the same for me.

5         Using your finger to draw on the screen, do you see a

6    raised stage in that photograph?

7    A.  Yes, ma'am.

8    Q.  Would you please circle it.

9    A.  (Witness complying.)

10   Q.  And that appears to be a few feet off the ground?

11   A.  Yes, ma'am.

12   Q.  There are people standing on top of it?

13   A.  Yes, ma'am.

14            MS. FISH:  And we can take that one down.

15       Could we please bring up Government's Exhibit 203.

16   BY MS. FISH:

17   Q.  And looking at the paved portion in this photograph, the

18   patio, do you see vehicles in that area?

19   A.  Yes, ma'am.

20   Q.  Do you see vehicles in the center of the patio?

21   A.  Yes, ma'am.

22   Q.  As well as on the side kind of farther away from the

23   building?

24   A.  Are you talking left or right of that area?

25   Q.  Right on the -- on the photograph.

1    A.  Yes, ma'am.

2    Q.  Would you please circle some of those vehicles to the right

3    of the photograph.

4    A.  (Witness complying.)

5    Q.  Thank you.

6         And in both of these two photographs we looked at, the

7    streetlights are not on; correct?

8    A.  They are not, ma'am.

9    Q.  Thank you.

10         MS. FISH:  No further questions.

11         MR. VALENTINI:  No further questions.

12         THE COURT:  All right.  Thank you, Agent Trevino.

13         (Witness excused.)

14         THE COURT:  Mr. Valentini.

15         MR. VALENTINI:  Excuse me?

16         THE COURT:  What are you doing next?

17         MR. VALENTINI:  We have no further witnesses.  The

18    government rests.

19         THE COURT:  Okay.

20         MS. FISH:  Your Honor, I have a motion that can be

21    made.

22         THE COURT:  Okay.  So we're going to take -- there's

23    some legal issues we have to take care of, but the government

24    has rested its case in chief.  So we'll take a 15- to 20-minute

25    break now.

```
 1              (Proceedings held out of the presence of the jury.)
 2              THE COURT:  First, let me ask the question about this
 3      issue with Officer Abbott and checking on the Rule 16 issue.
 4      How -- timing-wise, how are we going to deal with that?
 5              MS. FISH:  Your Honor, I'm -- if -- so long as the
 6      officer is available, if the government is willing to check
 7      over the lunch hour, that's even fine with me.  I don't -- no
 8      one needs to sprint back to an office at this point, Your
 9      Honor.
10              THE COURT:  Okay.  So go ahead, Ms. Fish, and make
11      your motion.
12              MS. FISH:  Your Honor, under Rule 29, I move for a
13      judgment of acquittal on all counts, all elements, all issues.
14              THE COURT:  All right.
15              MS. FISH:  I don't expand further at this time.
16              THE COURT:  Okay.
17              MR. VALENTINI:  We oppose that.
18              THE COURT:  All right.  Given the scarcity of the
19      argument and looking -- skimming the elements in the jury
20      instructions, I'll deny the motion.
21          So, Ms. Fish, have you -- has the defendant made a
22      decision about whether he wishes to testify?
23              MS. FISH:  I -- Yes, Your Honor.  Let me just confirm
24      it.
25              That's correct, Your Honor.  He will not be testifying.
```

1    And we are not calling any witnesses.

2         THE COURT:  Okay.  So if you could have Mr. Rhine

3    come to the podium.  I'm just going to ask him some questions.

4         Sir, you can take your mask off, if you want to be

5    clearer.  It's up to you.

6         THE DEFENDANT:  Sure.

7         THE COURT:  So I'm going to ask you a few questions

8    about your waiver of the right to testify.  I want to make

9    clear that I'm not reviewing that decision itself.  I'm just

10   ensuring that you have, after having consulted with your

11   attorney, made a waiver that's, you know, knowing and voluntary

12   and intelligent.

13        So do you understand that you have a constitutional

14   right to testify?

15        THE DEFENDANT:  I do.

16        THE COURT:  Okay.  And do you understand that you

17   have -- also have a constitutional right not to testify?

18        THE DEFENDANT:  I do.

19        THE COURT:  Okay.  Do you understand that the

20   decision whether to testify is for you to make?

21        THE DEFENDANT:  Yes, sir.

22        THE COURT:  Okay.  You understand that neither the

23   Court nor the defense counsel can under ordinary circumstances

24   prevent you from exercising that right to testify if you -- if

25   you want to testify?

```
 1              THE DEFENDANT:  Could you repeat the question.

 2              THE COURT:  Of course.  Of course.

 3         Do you understand that neither the Court nor defense

 4    counsel can under ordinary circumstances prevent you from

 5    exercising that right to testify?

 6              THE DEFENDANT:  I do understand, sir.

 7              THE COURT:  Okay.  Has anyone made any threats or

 8    promises to you to influence your decision?

 9              THE DEFENDANT:  Not that I'm aware of, sir.

10              THE COURT:  Okay.  Have you discussed your decision

11    whether or not to testify with your lawyer?

12              THE DEFENDANT:  Yes, I have.

13              THE COURT:  And it's you individually that have made

14    that decision, with the advice of your attorney?  But it's your

15    decision not hers?

16              THE DEFENDANT:  That is correct.

17              THE COURT:  Okay.  And that decision is not to

18    testify?

19              THE DEFENDANT:  That is correct.

20              THE COURT:  Okay.  Ms. Fish, if I can just ask you a

21    couple questions.

22         Ms. Fish, you've had sufficient opportunity to

23    thoroughly discuss this case and the decision whether to

24    testify with the defendant?

25              MS. FISH:  Yes, Your Honor.
```

1          THE COURT:  Okay.  And you're satisfied that he is

2     making this decision knowingly, intelligently, and voluntarily?

3          MS. FISH:  I am, Your Honor.

4          THE COURT:  Okay.  So he will -- he will not testify.

5     And I find that that decision is knowing, intelligent, and

6     voluntary.

7          All right.  And you decided not to call any witnesses

8     yourself or put in any documents?

9          MS. FISH:  That's correct, Your Honor.

10         THE COURT:  Okay.  So do you want to bring the jury

11    back so that you can rest?

12         MS. FISH:  Whatever will be the most efficient use of

13    time, I'm happy to do.

14         MR. VALENTINI:  I just wanted to point out, if the

15    defense wants us to confirm anything about production,

16    discovery, anything like that, we may need time to do that.

17         THE COURT:  So you want to wait to rest until that's

18    confirmed?

19         MS. FISH:  Yes, Your Honor.  That would make sense.

20    And then we could, perhaps, handle the jury instructions as

21    well while we wait for that.

22         THE COURT:  Sure.  Are they ready to be --

23         THE LAW CLERK:  I printed them yesterday.

24         THE COURT:  Okay.  All right.  So it's 11:46.  So

25    what I'll do is I'll have the jury come back at 2:00, and we

1    will -- the government will, within the next half hour or so,

2    deal with that issue, and then we'll all have lunch.  And then

3    we'll come back at -- at -- at 1:00 to have the charging

4    conference.

5         Does that work for you, Tanya?

6         THE COURTROOM DEPUTY:  (Nods head.)

7         THE COURT:  Okay.  So we'll come back at 1:00 for the

8    charging conference and dealing with any issues on the Rule 16

9    issue, and then -- and then the jury will come back at 2:00.

10        MS. FISH:  Thank you, Your Honor.

11        THE COURT:  Anything else we need to resolve?

12        THE COURTROOM DEPUTY:  You want me to tell them to

13   come back at 2:00?

14        THE COURT:  Yes.

15        And is it okay if Ms. Johnson preliminarily tells the

16   jury that you're not putting on a case?  I think they'll be

17   interested in that.

18        MS. FISH:  That's fine, Your Honor.

19        THE COURT:  Okay.  All right.  Thank you.

20        (Recess taken.)

21        THE COURT:  All right.  Let's start with the Rule 16

22   issue.

23        MR. VALENTINI:  Yes, Your Honor.  We have checked

24   during the break.  We have checked.  We don't -- first, there

25   was a reference to the Jencks Act.  We don't have any

405

1    statements of the witness that would qualify as *Jencks*, and

2    certainly no *Jencks* materials that reflects the statement that

3    has been objected to or was objected to about Mr. Rhine's

4    request with respect to the weapons as he was leaving the

5    Rotunda -- or as he was being released by Officer Abbott.

6        Just as a matter of historical facts, just to make a

7    record, we did learn of that request on April 10th in a

8    meeting, preparation for trial.  We have checked.  We did

9    not -- a memorandum of interview was not produced.  We don't

10   have any rough notes that reflect that statement.

11       Beyond that, as to Rule 16 itself, this was not -- this

12   is the opposite of a statement that's subject to Rule 16.  It's

13   not a statement that was made in response to interrogation or

14   in response to interrogation by an officer.  It is their

15   request to have something back made after the -- the -- the

16   defendant was told that he was -- he would be allowed to leave.

17   So there's no Rule 16 implication.

18       And last, but not least, I would emphasize, of course,

19   the remedy for this kind of situation would be to have the

20   statement stricken, which, out of an abundance -- and I can't

21   stress this enough.  Only out of an abundance of caution, the

22   government agreed to do while the testimony was -- been given.

23            THE COURT:  Okay.

24            MS. FISH:  Your Honor, I do maintain it's a Rule 16

25   violation, both as my client's statement certainly made while

1    he was detained and per the officer -- arrested by an officer

2    and in response to statements by the officer.  I think that's

3    easily interrogation under *Innis*, among other cases.  And it's

4    certainly material to preparing a defense, which is the other

5    rule under Rule 16 that applies.

6        So I'm disappointed that the government did not turn

7    that information over when they received it over a week before

8    trial and instead chose to cross -- or direct the witness on a

9    statement that was never produced today.

10       You know, I appreciate that -- the Court striking that

11   statement and the instruction proposed about stricken

12   statements, but I do think it, obviously, was heard by the jury

13   and is prejudicial.

14           THE COURT:  Okay.  So what, if any, additional remedy

15   are you seeking?

16           MS. FISH:  I mean, Your Honor, my -- my request was

17   to strike Officer Abbott's testimony at large.  I understand

18   the Court did not agree with that.  And I, you know, think

19   that -- obviously, argument on that statement would be

20   inappropriate.  But there's certain bells that are hard to

21   unring, Your Honor, and I am concerned about the impact on the

22   jury.

23       So I would ask the Court to -- to truly emphasize that

24   jury instruction to the jury, to disregard anything that was

25   stricken.

1          THE COURT:  Okay.

2          MR. VALENTINI:  Just to confirm, of course there

3    will be no closing on that issue.  I also want to make the

4    record extra clear there's not a request being made for a

5    mistrial.

6          MS. FISH:  Excuse me?

7          MR. VALENTINI:  There's no request being made for a

8    mistrial?

9          MS. FISH:  Your Honor, I mean, I'll make that

10   request.  I don't know if the Court is going to grant it.

11   I -- I made a request to strike Officer Abbott's testimony at

12   large, and it was not granted.

13         THE COURT:  Okay.  So I -- you're correct.  I will

14   deny the request for a mistrial.  And I will -- in my -- when I

15   make the instruction on stricken evidence, I will specifically

16   highlight that example.

17         All right.  Let's go through the jury instructions.

18         I think I resolved all the disputes that the parties

19   highlighted in their pretrial statement, but let's go through

20   it.

21         I'll just go page by page.  So any objections to

22   anything on page 1?

23         MS. FISH:  No, Your Honor.

24         MR. VALENTINI:  No, Your Honor.

25         THE COURT:  Page 2?

```
 1              MS. FISH:  No, Your Honor.

 2              MR. VALENTINI:  No, Your Honor.

 3              THE COURT:  Page 3?

 4              MS. FISH:  No, Your Honor.

 5              MR. VALENTINI:  No, Your Honor.

 6              THE COURT:  Page 4?

 7              MS. FISH:  No, Your Honor.

 8              MR. VALENTINI:  No, Your Honor.

 9              THE COURT:  So I don't believe I took any judicial

10      notice of anything; is that correct?

11              MR. VALENTINI:  That's correct.

12              MS. FISH:  That's my understanding, Your Honor.

13              THE COURT:  So we can take out reference to that on

14      page 4?

15              MS. FISH:  Yes, Your Honor.

16              MR. VALENTINI:  Yes, Your Honor.

17              THE COURT:  So on page 4, take out in the -- the --

18      IV, Evidence in the Case, take out one, two -- the fourth line

19      down, take out after the comma, "the facts of which I took

20      judicial notice."  Take that out and take out the entire

21      paragraph that says -- that begins "I may take what is called

22      'judicial notice.'"

23          Is that what the parties expect?

24              MR. VALENTINI:  Yes, Your Honor.

25              MS. FISH:  Yes, Your Honor.
```

```
1              MR. VALENTINI:  I think reference should also be

2      omitted from the title.

3              THE COURT:  I did not say that.

4              MR. VALENTINI:  Oh.

5              THE COURT:  But thank you.

6          All right.  All right.  On page 5?

7              MS. FISH:  No objection, Your Honor.

8              MR. VALENTINI:  No objection.

9              THE COURT:  Page 6?

10             MS. FISH:  And, Your Honor, I would re-raise the

11     previously briefed objections.  Do you want me to re-raise

12     those now or rely on --

13             THE COURT:  No, I can just -- if it's the same

14     objection that you raised in the pretrial statement, you can

15     just say that.

16             MS. FISH:  Sure.  It's, essentially, the same.  I

17     object to the use of until as it implies a -- that guilt will

18     be found at some point.

19             THE COURT:  All right.  And, you know, just as a

20     matter of practice, I always think the safest route is to go

21     with the tried and true, which is The Red Book instruction.  So

22     I'm -- in this instance, I'm sticking to that.

23          And with -- with respect to the part of whether it --

24     the jury has a duty to find guilt in that circumstance or may

25     find guilt, I think the circuit addressed that in *United States*
```

410

1    *v. Wilkerson* at 966 F.3d 828 at 834-35, in which the circuit

2    said a jury has no more right to find a guilty defendant not

3    guilty than it has to find a not guilty defendant guilty, which

4    I think is pretty clear direction.

5            MR. VALENTINI:  Your Honor, I hate to move us

6    backwards, but may I ask for a clarification as to page 5?  The

7    reference to the criminal information not evidence.  May -- my

8    only question is does the Court plan to send the information

9    back to the jury room or not?

10            THE COURT:  What -- what are the parties' position on

11    that?

12            MR. VALENTINI:  We're not requesting it.

13            MS. FISH:  Your Honor, if the government's not

14    requesting it, I certainly don't need it in the jury room.

15            THE COURT:  Of course.  I do -- I mean, I think we

16    made reference to the criminal information.  So we should leave

17    the instruction in.

18            MR. VALENTINI:  It was a matter of clarification.

19            THE COURT:  No, no, no.  Yeah, I understand.

20            MS. FISH:  And just to confirm, I'm sure this is the

21    Court's intent.  But the Court would submit only the

22    information outlining the charges, not the complaint that

23    includes the probable cause statement?

24            THE COURT:  I didn't intend -- if the parties don't

25    need the information to go back, I didn't intend to send

 1    anything back.

 2                MS. FISH:  Perfect, Your Honor.  Even better.

 3                THE COURT:  Only the exhibits that we entered go

 4    back.

 5          All right.  So I think we addressed all the matters on

 6    6.

 7          7?

 8                MR. VALENTINI:  No objection, Your Honor.

 9                MS. FISH:  And just the objections, Your Honor,

10    already addressed.

11                THE COURT:  Yeah.  Let me go -- hold on a second.

12          So with respect to the objection on all doubt or to be a

13    mathematical or scientific certainty, the circuit has endorsed

14    substantial and identical language as exemplary, which is

15    *Moore v. United States*, 345 F.2d 97 at 98; and in some

16    instances has accepted arguably even more relaxed formulations

17    in *United States v. Taylor*, 997 F.2d 1551.  So -- you know, so

18    I think I'll stick with the standard Red Book version.

19          All right.  Page 8?

20                MR. VALENTINI:  No objection, Your Honor.

21                MS. FISH:  No objection.

22                THE COURT:  Page 9?

23                MR. VALENTINI:  No objection, Your Honor.

24                MS. FISH:  No objection.

25                THE COURT:  Okay.  Just for clarification, for the

412

1    record, I did accept some of the defendant's proposed language

2    in there, the part about disregarding any personal feelings you

3    may have about the nature of the charges.  Although I -- on

4    some level I agree with the government that it's not

5    necessarily the right thing to do to highlight any particular

6    defense.  But given, you know, some of the sentiments expressed

7    during *voir dire*, I think it's appropriate to have some

8    reference to that.

9        All right.  Page 10?

10       MS. FISH:  No objection, Your Honor.  I would bring

11   in my request that the Court does emphasize particularly that

12   stricken evidence is not to be considered.

13       THE COURT:  Okay.  All right.  So what I would plan

14   to do is to say something -- use that specific example after it

15   says, "If, after a witness answered a question, I ruled that

16   the answer should be stricken, you should ignore both the

17   question and the answer and they should play no part in your

18   deliberations."  And at that point, "And in this case I struck

19   testimony from Officer Abbott concerning the defendant's

20   requested property be returned."  Do you not want me to

21   emphasize what it was?

22       MS. FISH:  I would prefer that the Court just say:  I

23   struck testimony during -- certain testimony of

24   Officer Abbott's.  You're not to consider that.

25       THE COURT:  Okay.  I'll accept it.

1          MR. VALENTINI:  Your Honor, while we defer to the

2    Court on how to address this, I just want to emphasize, again,

3    for the record, we are not conceding any sort of violation of

4    *Jencks*, Rule 16, Rule 26, and any basis that the defense has

5    raised.  And we only agree to some -- some sort of action out

6    of an abundance of caution.

7          THE COURT:  I understand your position.

8          All right.  Page 11?

9          MR. VALENTINI:  No objection, Your Honor.

10          MS. FISH:  No objection, Your Honor.

11          THE COURT:  Page 12?

12          MS. FISH:  No objection, Your Honor.

13          MR. VALENTINI:  No objection.

14          THE COURT:  Page 13?

15          MS. FISH:  No objection, Your Honor.

16          MR. VALENTINI:  No objection.

17          THE COURT:  Page 14, so we take out defendant as a

18    witness?

19          MS. FISH:  Agreed, Your Honor.

20          THE COURT:  And just for Mr. Valentini and

21    Ms. Moran's benefit, that Red Book instruction has actually

22    been criticized.  I don't think anyone's ever gotten reversed

23    for using it, but, certainly, the courts have not endorsed it.

24    So to the extent that you have to submit jury instructions in

25    the future, you have to -- I think it's more appropriate to

1    liken the defendant as any other witness as far as having

2    potential bias.

3              MR. VALENTINI:  Thank you, Your Honor.

4              THE COURT:  Okay.  So we'll take out XVI, the

5    defendant as a witness.

6              Page 15?

7              MS. FISH:  Your Honor, I think we're in agreement we

8    can remove Instruction XVIII, as there's no transcripts of

9    recordings here.

10             MR. VALENTINI:  We agree.

11             THE COURT:  All right.  Page 16?

12             MS. FISH:  None on this page, Your Honor.  I'll renew

13   certain things that the --

14             THE COURT:  No, I understand your objections.  And,

15   you know, I hold Judge Howell and Judge Moss in very high

16   regard, and they're both very thoughtful judges.  Perhaps I

17   wouldn't say that of all my colleagues.  But I do think that

18   they're very thoughtful, and so I have stuck with their

19   recitations.

20             MR. VALENTINI:  No objection from the government.

21             THE COURT:  All right.  All right.  So I understand

22   all your objections for the defense on those statements.  So if

23   you have any additional to the ones stated in the pretrial

24   statement, let me know.

25             MS. FISH:  Your Honor, just speaking beyond page 16,

1    on to page 17, as to Count 21 [sic], so renewing -- just

2    clarification that the knowingly applies to all of the parts of

3    the -- the *actus reus*, essentially, not simply to enter or

4    remain, which I think is not clear.

5         And then I believe this was in the pretrial statement as

6    well.  But renewing an objection to the second sentence in the

7    knowingly definition.  I think the circumstantial and direct

8    evidence instruction covers that rather than telling the jury

9    how to consider a particular element.

10         THE COURT:  All right.  So walk me back through that.

11   First to the knowingly part, where exactly are you thinking it

12   needs to be changed?

13         MS. FISH:  Your Honor, I think that this could be

14   done either in the definition of knowingly or in the second

15   element.  But, you know, right now it says the defendant did so

16   knowingly.  And one reasonable interpretation is that knowingly

17   applies to every fact in the first element.  But another --

18   there are multiple interpretations of that.

19         So I'd ask that knowingly is -- you know, is defined as,

20   you know -- or there's a sentence added that a person must know

21   all the facts that would constitute the crime to act knowingly

22   or, you know, a person must know that the area is restricted --

23   a person must know, you know, an area is restricted because a

24   Secret Service protectee is visiting.

25         MR. VALENTINI:  As to that, the instruction so -- so

1    frame would be incorrect.  There's no requirement that the

2    defendant know the reason why the area is restricted.  The

3    defendant must know that he's entering and must know that the

4    area is restricted.

5         The -- the defendant may not know, as -- as the

6    instructions used by every court in this district reflect, may

7    not know that the reason for the restriction is that the Vice

8    President was present or the fact that the Vice President was

9    present.  The defendant not know about -- not know about the

10   Vice President's presence.

11        MS. FISH:  And, Your Honor, I disagree under *Rahaif*

12   that that interpretation is correct.  I believe that knowledge

13   must extend to each of those facts.

14        MR. VALENTINI:  And from the response of the *Rahaif*

15   point, *Rahaif* made clear, as precursor cases already

16   established, that the -- the presumption of a knowledge

17   requirement applies only to the elements that are necessary

18   to -- to -- does not apply to jurisdictional facts such as, you

19   know, the presence of the Vice President.

20        THE COURT:  You've preserved your objection.  I'll

21   stick with Judge Moss's and Judge Howell's recitation of what

22   it requires.

23        All right.  Page 18?

24        MR. VALENTINI:  No objection, Your Honor.

25        MS. FISH:  Your Honor, just previously briefed in the

1    pretrial filing, add to define intent as specific intent or

2    conscious desire.

3         THE COURT:  I don't -- I don't think that language is

4    appropriate.  But let me -- just let me highlight for the

5    record back on page 17, we -- we did take out the -- the

6    reference to the immediate family of the Vice President because

7    the defendant is correct that that wasn't part of the

8    indictment.

9         All right.  So with respect to intent, there's --

10   there's not a clear instruction on intent, and I would be

11   willing to include The Red Book version of intent, which is

12   someone's intent ordinarily cannot be proved directly because

13   there is no way of knowing what a person is actually thinking,

14   but you may infer someone's intent from the surrounding

15   circumstances.

16        You may consider any statement made or acts done by the

17   defendant and all other facts and circumstances received in

18   evidence which indicate his intent.  You may infer but are not

19   required to infer that a person intends the natural and

20   probable consequences of acts he intentionally did or

21   intentionally did not do.

22        MS. FISH:  And, Your Honor, I would object to that

23   addition; (a) I don't think it defines intent.  It doesn't tell

24   us what intent actually means, which is why I proposed the

25   conscious desire language with the citation in the pretrial

1    filing.  And (b) I think it suggests a weaker evidentiary

2    standard for an essential element.

3              THE COURT:  It wasn't proposed in the pretrial.  So I

4    won't include it, unless folks desire it jointly.

5              MR. VALENTINI:  Your Honor, I will just add it's --

6    it's a very good instruction and a good idea.  But I recognize

7    it was not proposed.

8              THE COURT:  Okay.  So page 20?

9              MS. FISH:  Your Honor, the one note -- I don't have

10   an objection to the definition of the Capitol Building and

11   Grounds.  I just want to avoid confusion with the reference to

12   a document that the jurors don't have.  I don't have an

13   objection to the definition on principle.  I'm just not sure if

14   the jurors have any questions about that.

15             THE COURT:  The 1946 map?

16             MS. FISH:  Correct.

17             THE COURT:  I actually wondered about that myself.

18             MR. VALENTINI:  It could be stricken, the reference.

19             THE COURT:  Okay.  From where to where?

20             MR. VALENTINI:  Anything after "which includes" --

21   "which includes all squares, reservations, streets, roadways,

22   walks, and other areas."

23             MS. FISH:  I think that would be fine.

24             THE COURT:  So after "and its grounds," period.  And

25   everything after that in that paragraph comes out?

```
 1                    MR. VALENTINI:  Yes.  And the evidence -- the
 2          testimony in evidence established what those grounds are from
 3          multiple maps.
 4                    THE COURT:  That's not for me to decide.
 5                    MR. VALENTINI:  No, yeah.
 6                    THE COURT:  No, I understand.
 7               All right.  All right.  So page 21?
 8                    MS. FISH:  Nothing not previously in the pretrial
 9          statement, Your Honor.
10                    THE COURT:  Page 22?
11                    MS. FISH:  Again, nothing not previously raised.
12                    MR. VALENTINI:  Nothing from the government,
13          Your Honor.
14                    THE COURT:  I think there were some redacted
15          exhibits.  At least the Secret Service email, I think, had
16          redactions on it.
17                    MS. FISH:  Yes.
18                    MR. VALENTINI:  That's the only one.
19                    MS. FISH:  Yeah.
20                    THE COURT:  Okay.  So that was page 23.
21               Page 24?
22                    MS. FISH:  No objections, Your Honor.
23                    MR. VALENTINI:  No objections, Your Honor.
24                    THE COURT:  Page 25?
25                    MS. FISH:  No objections.
```

1          MR. VALENTINI:  No objection.

2          THE COURT:  Page 26?

3          MS. FISH:  No objections, Your Honor.

4          MR. VALENTINI:  No objections.

5          THE COURT:  Page 27?

6          MS. FISH:  No objections, Your Honor.

7          MR. VALENTINI:  No objections.

8          THE COURT:  Page 28?

9          MS. FISH:  Your Honor, on the Instruction XXXIII

10   regarding the alternates, I think there's a small typo, just to

11   clarify two instead of --

12          THE COURT:  Two reference, to the four, yeah, I

13   already caught that one.  It was in two places.

14          MS. FISH:  Yes, I think I spotted that.

15          THE COURT:  Okay.  Anything else about the

16   instructions?

17          MR. VALENTINI:  Not from the government.

18          MS. FISH:  No, Your Honor.

19       Just on the proposed verdict sheet, I would maintain my

20   request that not guilty appear first consistent with the

21   presumption.

22          THE COURT:  Do you have any -- other than the

23   presumption, do you have any case law that addresses that issue

24   specifically?

25          MS. FISH:  Not off the top of my head, Your Honor.  I

1    could search for something.

2         But I do think, essentially -- I understand the

3    government has the burden, but they sit closer to the jury.

4    They get to go first.  They get to do rebuttal.  They have

5    plenty of advantages.  They don't need a presumption on the

6    verdict form.

7         THE COURT:  Does the government have any case law on

8    the issue one way or the other?

9         MR. VALENTINI:  No, I don't -- we don't have any case

10   law.

11        THE COURT:  Okay.  So what I did last time I was in

12   this situation -- I don't think it makes a big difference, but

13   I understand the parties, apparently, think so, but -- so

14   I flipped a coin and had the defendant call the coin, if you

15   want to do that.

16        MS. FISH:  I mean, Your Honor, I would ask the Court

17   to formally rule for, you know, purposes --

18        THE COURT:  I don't think there's any legal basis

19   to flip it, to flip the order of it, one way or the other.

20   I -- so, you know, whoever had the pen is fairly random.  So I

21   don't think that the burden of proof requires that one go after

22   the other.  Either way.  So I think it's -- it's somewhat

23   arbitrary in what order they go.

24        And the easiest way that would be random so no one has

25   an advantage to the -- I don't think an advantage exists, but

1    to the extent anyone thinks there might be an advantage is to

2    flip a coin.

3                MS. FISH:  I understand the Court's ruling on that.

4                THE COURT:  Do you want to do that or --

5                MS. FISH:  I'd rather have the Court make a clear

6    ruling.  But I understand the Court's ruling is it will

7    randomly select one form for the other.  And so let's do it.

8                THE COURT:  Do you want to call it, Mr. Rhine?

9                MS. FISH:  I think he'd prefer not to call it,

10    Your Honor.

11                THE COURT:  Okay.  Do you want to call it, Ms. Fish?

12                MS. FISH:  Sure, Your Honor.

13                THE COURT:  Okay.  My law clerk will be the

14    officiant.

15                MS. FISH:  Tails.

16                (Coin flip by law clerk.)

17                THE LAW CLERK:  Tails.

18                MS. FISH:  Tails.

19                THE COURT:  Okay.  So the -- so the version with --

20    with not guilty goes first.

21                MS. FISH:  Thank you, Your Honor.

22                THE COURT:  Just for the record, the last time I did

23    this, the defendant won and was acquitted, so.

24                MS. FISH:  Great.  It was one of those fancy state

25    quarters so I couldn't even tell it was tails at first.

1              THE COURT:  Anything else we need to resolve before

2     we bring the jury in?

3              MS. FISH:  I don't believe so, Your Honor.

4          The one thing, unfortunately, Ms. Cohn will have to

5     leave to get a plane.  I don't think it should cause any issue

6     for the jury, but I wanted to alert the Court as to why she'll

7     be absent.

8              THE COURT:  Okay.  So you don't need any electronic

9     support during your closing?

10             MS. FISH:  I think she's taught me well.

11             THE COURT:  Okay.

12             MS. FISH:  We'll find out if that's correct.

13             THE COURT:  Have a safe trip.

14             MS. COHN:  Thank you.

15             THE COURT:  All right.  We'll get back together at

16    2:00.

17             (Recess taken.)

18             THE COURT:  All right.  I gather there was something

19    that came up.

20             MS. FISH:  Your Honor, I believe we moved the large

21    map, Exhibit 512, into evidence.  The government disagrees.

22    I'm happy to move it into evidence.  I haven't rested yet.

23    Again -- so I'm happy to move it in again, but I believe it

24    should be sent back to the jury.

25             MR. VALENTINI:  Your Honor, we don't disagree that

1    the -- the large demonstrative was admitted into evidence as

2    evidence initially, but then there were markings that were

3    written on it.  And those were not part of the -- of the

4    exhibit as admitted.  At that point it became a demonstrative.

5         If they want to move it into evidence, they can do that.

6    We don't think that the markings made during trial should

7    become part of an exhibit that goes back to the jury.  At that

8    point it became a demonstrative.  There's a version of the same

9    printout of the same map, which is in the defense binder, which

10   has no markings on it.  We think that that is what should go

11   into the jury room.

12        THE COURT:  And the jury is just to rely on their

13   memory as to the where the officer marked it?

14        MR. VALENTINI:  Yes, we think that would be

15   appropriate.  I don't think it would be appropriate to develop

16   evidence in the courtroom, actual substantive evidence.

17        MS. FISH:  It's a surprising objection to me, Your

18   Honor.  It was a government witness who did the markings.  I'm

19   happy to -- to, as my case in chief, move this exhibit into

20   evidence.

21        THE COURT:  I'm happy to let the exhibit go back to

22   the jury.

23        MS. FISH:  Thank you, Your Honor.

24        THE COURT:  Are we ready to bring the jury in?

25        MS. FISH:  One moment, Your Honor.

1          MR. VALENTINI:  Court's indulgence.

2          MS. FISH:  Your Honor, I believe we're ready.

3          THE COURT:  All right.  The government is ready as

4      well?

5          MR. VALENTINI:  Yes, Your Honor.

6          THE COURT:  All right.  Tanya.

7          MS. FISH:  Your Honor, I understand the government is

8      still assembling their exhibits to go back, and we intend to

9      have that as soon as possible.

10          THE COURT:  Thank you.

11          Just so the record is clear, Ms. Fish, you have now

12      rested your case?

13          MS. FISH:  With the Court's ruling, yes, I rest my

14      case.

15          (Proceedings held in the presence of the jury.)

16          THE COURT:  All right.  Welcome back.  And thank you

17      for your indulgence in allowing us to resolve the legal issues

18      that needed to be resolved.

19          So the defense has rested its case.  And the case -- the

20      presentation of the evidence is over.

21          So what's going to happen next is the parties are going

22      to do their closing arguments, and then I will give you the

23      final instructions, and then you'll be able to begin your

24      deliberations.

25          With that, Mr. Valentini or Ms. Moran.

1          MS. MORAN:  Good afternoon, everyone.

2          I just realized I don't have my clicker.

3          Thank you for your patience.

4          On January 6th, 2021, a mob of thousands descended upon

5     the United States Capitol.  This mob overwhelmed Capitol Police

6     and entered the Capitol Building on a day when Congress had

7     convened to fulfill their constitutional obligation to certify

8     the results of the 2020 presidential election; and the

9     defendant, David Rhine, joined that mob.

10         Let's talk about the defendant's day on January 6th,

11    2021.  By 1:10 p.m. he had walked to the Capitol at the East

12    Front.  He took photographs of the barricades he saw there and

13    photographs of the police officers holding the line behind that

14    barricade.  The defendant stopped by one of the permitted

15    protests on the House egg with his flag and cowbells.

16         By 1:40 p.m., he had walked to the barricades protecting

17    the Capitol's restricted perimeter on the East Front.  On the

18    other side of that barricade, Capitol Police stood holding the

19    line against the growing crowd.  The defendant stood along the

20    barricades just outside the restricted perimeter.  And if

21    David Rhine had stopped there, we would not be here today.

22         He had every right to come to Washington, D.C., and he

23    had every right, as we all do, to protest.  But that's not what

24    he did, and that's not what he intended to do.  Instead,

25    David Rhine watched as a mob of hundreds, maybe thousands, by

1    Inspector Loyd's estimate, overwhelmed law enforcement who were

2    trying to hold the line on the East Front of the Capitol.

3         This mob ripped down the barricade, the same barricade

4    that Mr. Rhine had stood along for nearly 40 minutes, and

5    flooded into the Capitol's restricted perimeter where the

6    vice presidential motorcade had just been parked moments

7    earlier.

8         Mr. Rhine was less than a football field away when this

9    crowd overwhelmed the police and dashed up the steps of the

10   Capitol as Capitol Police retreated back to safety.  Rhine

11   walked around the dismantled police barricades.  He climbed the

12   House stairs with the flag and cowbells still in his

13   possession.

14        We will never cease with the technical difficulties in

15   this trial.  I apologize.

16        He climbed the House stairs with the flag and cowbells

17   still in his hands, and knives and pepper spray in his

18   possession.  He gave an interview inside the restricted

19   perimeter.

20        And he entered the Capitol.  Once inside, he walked

21   directly to the door of the House gallery where members of

22   our government and their staffers sheltered inside before

23   they could be safely evacuated by Inspector Loyd and his

24   colleagues.

25        The defendant then marched in and out of the House

1    appropriations committee, still with his flag raised, and his

2    cowbells in hand.  It wasn't until he was apprehended by

3    Police Officer Abbott, handcuffed, and escorted to a door that

4    he left the Capitol Building.

5          You have now heard and seen all of the evidence in this

6    case.

7          I'm going to speak briefly about the charges and

8    about -- and explain why the government has proven beyond a

9    reasonable doubt that the defendant is guilty of each of those

10   crimes.

11         During his opening statement, my co-counsel informed you

12   that the defendant is charged with four crimes.  I want to

13   briefly review each of those charges with you and discuss how

14   Mr. Rhine's conduct on January 6th relates to the charges.

15         The first charge is entering or remaining in a

16   restricted building or grounds.  Judge Contreras is going to

17   instruct you on the law, but he will tell you that in order for

18   the United States to meet its burden, we must prove beyond a

19   reasonable doubt:

20         First, that the defendant entered or remained in a

21   restricted building or ground without lawful authority to do

22   so; and second, that the defendant did so knowingly.

23         Judge Contreras will instruct you that a restricted

24   building or ground means any posted, cordoned off, or otherwise

25   restricted area of a building or grounds where a person

1    protected by the Secret Service is or will be temporarily

2    visiting.

3        You heard testimony from Special Agent Glavey that the

4    Vice President was at the Capitol that day as part of his role

5    in the certification process and that she was charged with

6    protecting him.  You heard from Agent Glavey about the robust

7    set of security procedures in place for the Vice President's

8    visit to the Capitol and about the challenges she faced that

9    day as part of his protective detail.

10       You heard from Agent Glavey that the Vice President

11   never left the Capitol until the certification was completed.

12   And you heard from Inspector Loyd, Special Agent Glavey, and

13   Police Officer Abbott that the Capitol was closed to visitors

14   on January 6th, 2021, and that none of the rioters who entered

15   the building on January 6th were permitted to be there.

16       With all of that in mind, I submit to you, ladies and

17   gentlemen, that the government has met its burden of proving

18   that the defendant entered a restricted building or grounds

19   without lawful authority to do so.

20       The government must also prove that the defendant

21   entered this building or grounds without lawful authority and

22   that he did so knewingly -- knewingly? -- knowingly.  A person

23   acts knowingly if he realizes what he is doing and is aware of

24   the nature of his conduct and does not act through ignorance,

25   mistake, or accident.

1    The judge will tell you that in deciding whether the

2    defendant acted knowingly, you may consider all of the

3    evidence, including what the defendant did or said.  Mr. Rhine

4    climbed the House steps, and he entered the Capitol through the

5    upper House doors.  Although Mr. Rhine didn't open those doors

6    himself, he was one of the first to enter the Capitol through

7    those doors, which were opened by the rioters already inside

8    the building.

9    He knew that the doors had been previously locked

10   because he and other rioters had checked them moments earlier.

11   He was inside the Capitol within 30 seconds of those doors

12   opening.  He walked past a metal detector without stopping and

13   right to the door of the House gallery.  You heard testimony

14   from Officer Abbott, Inspector Loyd -- and Inspector Loyd that

15   the Capitol was closed to the day on the public -- closed on

16   that day to the public and that piercing alarms were squealing,

17   as Inspector Loyd put it, throughout the Capitol as locked

18   doors were forced open by rioters.

19   You watched as the defendant sees other rioters pass him

20   with tear gas in their eyes.  He knew that he wasn't allowed in

21   inside because he saw the bar- -- the barricade lined up.  He

22   stayed on the other side for a long time.  He knew because he

23   saw the lines of officers standing on the steps.  He knew

24   because he saw the rioters come past him with pepper spray in

25   their eyes.  And he knew because he told you he knew.  He said

1    they are pepper-spraying people to keep them out of the

2    building.

3        I submit to you that the government has proven beyond a

4    reasonable doubt that the defendant entered or remained in a

5    restricted building or grounds without lawful authority to do

6    so.

7        The second crime the defendant is charged with is

8    engaging in disorderly or disruptive conduct in a restricted

9    building or ground.  Judge Contreras will instruct you that the

10   government must prove beyond a reasonable doubt:

11       First, that the defendant engaged in disorderly or

12   disruptive conduct in or in proximity to any restricted

13   building or grounds; and second, that the defendant did so

14   knowingly and with the intent to impede or disrupt the orderly

15   conduct of government business or official function; and third,

16   that the defendant's conduct occurred when or so that his

17   conduct, in fact, impeded or disrupted the orderly conduct of

18   government business or official functions.

19       Disorderly conduct occurs when a person is unreasonably

20   loud or disruptive under the circumstances or interferes with

21   another person by jostling against or unnecessarily crowding

22   that person.  Disruptive conduct is a disturbance that

23   interrupts an event, activity, or the normal course of a

24   process.

25       Here, the defendant chose to join a mob that marched

1    through the Capitol, a building that was closed to the public.

2    You watched him carry his blue flag with white stars through

3    the Capitol.  You watched him shake his cowbells, and you

4    watched him give an interview on the House stairs inside the

5    restricted perimeter.  You heard him speak to his intent.  He

6    said directly that he was there to take back the Capitol and to

7    "Stop the Steal."

8         You saw him attempt to enter the House gallery where

9    members of Congress were sheltering in place.  This conduct was

10   disorderly and disruptive and, in fact, delayed the

11   certification process for many hours.  Congress could not

12   resume until the building was cleared.  He knew that the

13   certification was taking place, and he wanted to stop it from

14   happening.

15        I submit to you, ladies and gentlemen, that the evidence

16   shows beyond a reasonable doubt that the defendant is guilty of

17   knowingly engaging in disorderly or disruptive conduct in a

18   restricted building or grounds.

19        The third crime with which the defendant stands

20   charged is engaging in disorderly or disruptive conduct in

21   a Capitol Building or Grounds.  Judge Contreras will

22   instruct you that the government must prove beyond a reasonable

23   doubt:

24        First, that the defendant engaged in disorderly or

25   disruptive conduct in any of the United States Capitol

1    Buildings or Grounds; second, that the defendant did so with

2    the intent to impede, disrupt, or disturb the orderly conduct

3    of a session of Congress or either House of Congress; third,

4    that the defendant acted willfully and knowingly.

5         This charge is similar to the crime we discussed moments

6    ago with some differences.  It requires the government to prove

7    beyond a reasonable doubt that the defendant acted willfully,

8    in addition to knowingly, which we discussed under the last

9    charge.

10        A person acts willfully if he acts with the intent to do

11   something that the law forbids, to disobey or disregard the

12   law.  Willfully doesn't require proof that the defendant be

13   aware of the specific law or rule that his conduct may be

14   violating.  Again, we heard from the defendant himself in his

15   interview on the House portico that he was there to "Stop the

16   Steal" and to take the Capitol back.

17        The defendant knew that the certification was taking

18   place on January 6th.  His words and his actions, especially

19   his actions, outside the House gallery demonstrate that he was

20   intent on stopping the certification from happening.  His

21   qualification that he was not trespassing further shows that he

22   knew he may be violating a rule or law.  Remember, again, his

23   statement in the interview:  They are pepper-spraying people to

24   keep them out of the building.

25        For these reasons, I submit to you that the government

1    has proven beyond a reasonable doubt that the defendant

2    committed the crime of willfully and knowingly engaging in

3    disorderly or disruptive conduct in a Capitol Building or

4    ground.

5          And, finally, the fourth charge is willfully and

6    knowingly parading, demonstrating, or picketing in any of the

7    Capitol Buildings.  The government must first prove that the

8    defendant paraded, demonstrated, or picketed in any of the

9    United States Capitol Buildings; and second, that the defendant

10   acted willfully and knowingly.  The term demonstrate refers to

11   conduct that would be disruptive to the -- the orderly business

12   of Congress by, for example, impeding or obstructing

13   passageways, hearings, or meetings.

14         You know that the defendant carried his flag and

15   cowbells the entire time he walked around the Capitol until

16   he was apprehended and handcuffed.  You know that the

17   defendant was directly outside the House gallery door and

18   that the defendant wanted to stop the certification from

19   happening.

20         You know that the defendant and his fellow patriot

21   protesters, to use his terminology, were there to take the

22   Capitol and to take it back, to "Stop the Steal."

23         Parading has its ordinary meaning.  You saw the

24   defendant marching up and down the hallways of the Capitol

25   carrying his flag and ringing his bell, just as people in a

1    parade do.

2          From his conduct inside the Capitol and his words on the

3    House steps, I submit to you that the government has proven

4    that the defendant is guilty beyond a reasonable doubt of

5    willfully and knowingly parading, demonstrating, and picketing

6    in the Capitol Building.

7          Ladies and gentlemen, you have now seen all of the

8    evidence in this case.  The Capitol was closed to the public on

9    January 6th, and security was higher than unusual because of

10   the certification.  The defendant walked to the East Front of

11   the Capitol where he saw the barricades that were still

12   standing and where he saw law enforcement assembled to enforce

13   the perimeter.

14         You also saw that minutes later, after the violent

15   breach of those barricades by other rioters, the defendant

16   entered the restricted perimeter and walked up the House stairs

17   to the House portico.  It was there, near the House portico,

18   that the defendant gave his interview.  And in that interview,

19   you heard from the defendant himself on January 6th.  Let's

20   hear what the defendant has to say about his intent.

21         With a brief intermission.

22         (An audio-visual recording was played.)

23         MS. MORAN:  The defendant is not responsible for the

24   actions of every person who entered the Capitol on January 6th.

25   He is responsible only for his own conduct and his own choices,

1    and we are here as a result of his conduct and his choices.

2         The greatest power a mob has is in its numbers.  A

3    single drop of rain is powerless, but many drops of rain flood

4    cities.  A mob cannot exist without bodies.  And on

5    January 6th, 2021, the defendant, David Rhine, made the choice

6    to add his body to the mass of people who were overwhelming law

7    enforcement in entering the Capitol.

8         MS. FISH:  Objection, Your Honor.  Improper argument.

9         THE COURT:  Overruled.

10        MS. MORAN:  The defendant had the hopes of disrupting

11   the certification of the election and the peaceful transfer of

12   power from one administration to the next, one of the most

13   important functions in our government.  He was standing about a

14   hundred yards from where police battled off rioters before

15   retreating, overwhelmed by their sheer numbers.

16        David Rhine entered the Capitol as alarms blared, even

17   though other rioters walked out wiping tear gas from their

18   eyes.  He didn't destroy anything while he was inside the

19   Capitol, but he's not charged with doing that, and he wasn't

20   there to do that.  He was there to disrupt Congress, and he was

21   there to stop the certification of the 2020 election.

22        We ask that you review all of the evidence in this case

23   and that at the -- at the conclusion of your careful

24   deliberation you return the only verdict supported by the law,

25   a verdict of guilty on all four counts.

1          Thank you.

2          MS. FISH:  Your Honor, may I move the smaller podium?

3          THE COURT:  You may.  Whatever you wish, within

4     limits.

5          MS. FISH:  Are you-all able to see me here?  I

6     apologize.  I'm operating without my paralegal right now.  So

7     I'm having to do my own technology.

8          As we discussed a couple days ago, all you need to do to

9     follow this case is follow that unique blue flag.  That unique

10    blue flag that witness after witness followed on video, you too

11    will have the chance to follow.

12         You need to follow this flag because it will tell you

13    where Mr. Rhine was at each time.  It will tell you what he

14    could actually see and what he could not see.  This matters

15    because the government must prove that Mr. Rhine actually and

16    personally knew that he was not allowed to walk in the area

17    where he moved into; that he actually and personally intended

18    to disrupt the orderly conduct of Congress; and that he

19    actually and personally wanted to break the law.

20         And when you follow that unique blue flag and you

21    see what Mr. Rhine could see at that time, not all the things

22    he could not see, the things he had no idea about, you will

23    see that he did not intend any of those things.  Again, to

24    prove the trespass charge, the government must prove that

25    Mr. Rhine knew he was walking into an area where he was not

1    allowed.

2         Mr. Rhine began his day on that southeast egg, that

3    south lawn, where there was an approved protest.  You can see

4    that unique blue flag in the corner.  And he walked to the

5    south of that protest.  That's the direction he walked.  And we

6    see that stage with musical instruments, people gathering.

7    It's there on that south egg.

8         And we know that he stayed there for a long time.  You

9    can watch the videos, the videos we admitted, that show that

10   unique blue flag flapping in the wind at the outer edge of that

11   south egg for well over an hour.  You see it there.  And you

12   can see the stage and the protesters behind him.  You can see

13   the vehicles parked in that patio.

14        From where Mr. Rhine was standing, there is no way he

15   saw any of the violent images that the government showed you or

16   their compilation video.  The government started its case by

17   showing you truly upsetting videos of things that happened

18   elsewhere in the Capitol, of serious destructive and violent

19   crimes committed by other people.

20        But Mr. Rhine was nowhere near those.  He was nowhere

21   where he could have seen them or heard them.  A few examples:

22   The government showed you that initial breach into the

23   building itself.  That occurred on the northwest side of the

24   building.  We know at the exact same time from the video

25   evidence that Mr. Rhine was all the way on the edge of that

1    southeast egg.

2        Similarly, the government showed you people from the

3    inside of the Rotunda door trying to smash through it.  But at

4    that same time, we know that Mr. Rhine was on the outer edge of

5    that southeast terrace.  He's not superman.  He cannot see

6    through walls, let alone buildings.

7        And the government showed you people in the Senate

8    Gallery corridor.  They showed you people by that

9    parliamentarian door.  Those are both on the northwest end of

10   the building.  At that time, Mr. Rhine was barely at that

11   southeast House door on the opposite side of the building.

12       The compilation video will not help you decide this

13   case, and it does not matter to this case, not because it

14   doesn't matter in the big picture.  Certainly, those are

15   serious things, serious things for our community, for our

16   country, but they -- Mr. Rhine had no idea they were happening

17   at the time.  And everyone in this room takes those things

18   seriously, but he did not know about them on January 6th, 2021.

19   So that video will not help you decide this case.

20       A little closer to home, Mr. Rhine could not see the

21   barriers being moved on that center pathway on the east side.

22   The government has made a big deal of the idea that on the east

23   side people moved barriers, protesters, civilians -- not

24   police -- pushed through those metal bike racks.  Well, we know

25   from Inspector Loyd, someone who knows the Capitol Building

1    better than -- than most people, that that occurred in that

2    center pathway by the elevator towers.

3         And we know at that time Mr. Rhine was, again, on the

4    outer edge of that southeast egg; a football field, at least,

5    away.  But it wasn't a beautiful clear day like in my map.

6    That lawn was not empty.  I'll play you a couple -- here's the

7    video playing live, side by side.

8              (A video recording was played.)

9         MS. FISH:  Mr. Rhine's unique blue flag is on the

10   outer egg seen by that lamppost-looking structure, while people

11   are moving in the center at 1:59 p.m.  Again, these are not

12   close by and that field was not empty on January 6th.

13        We know from the videos -- this is a zoomed-in version

14   of what we saw.  Mr. Rhine is there on the outer edge.  There's

15   a lot of protesters.  There's a stage to the north of him and

16   to the west.  And there's vehicles parked in that patio, in

17   that paved space.

18        We know from the picture he took on his phone where he

19   was.  This is not an empty field.  You can tell that the raised

20   stage is to the north of him.  It is entirely blocking his

21   view.  You can't even see the elevator towers.  Those are the

22   towers that are about a story tall.  There's no way that he

23   could have seen people, human beings, in that area.

24        And while he could see the center steps, he couldn't see

25   them closely.  He is not a personal optical zoom lens.  What he

1    could see is shown in the picture on his phone.  He could see

2    that there were people up there, but he cannot see detail.  He

3    could not count how many or see minute details that might

4    appear on surveillance footage.

5         What Mr. Rhine could see very clearly was this southeast

6    stairway, these House stairs.  And as we can see, these are a

7    very different picture.  Certainly there are police officers on

8    the stairs, and there are also a number of protesters or

9    civilians walking around.

10        Now, Inspector Loyd described it as a police line, and

11   he can recognize subtleties and how police move and what

12   strategies they're likely using.  He's an extremely experienced

13   police officer.  Of course he can.  Mr. Rhine is not.

14        Mr. Rhine just sees police officers standing, and he

15   sees people in the same area.  He sees what a layperson sees.

16   He doesn't know police strategy, tactics, or formations.  And

17   what he sees is some of the protesters appearing to speak with

18   the police officers in the middle of those stairs.

19        And then he sees not in a mob, not in a crush, not in a

20   surge, but one by one people moving up the stairway and that

21   the police officers remain in place.  They continue patrolling,

22   but they don't appear to have any confrontations or to prevent

23   people from moving or to direct them out.

24        And we know this is his point of view because we see

25   that unique blue flag in the video just a few minutes later,

1    and he's walking from the south to the north.  And when he

2    walks up the stairs, again, he passes no restriction.  He's not

3    directed away by police.  He walks calmly up the stairs.  And

4    you will see him -- looking particularly at the Government's

5    G112, that video of the center area by the elevator towers;

6    that by 2:15, 2:19, the barriers in that area were gone.  He

7    could not see how they were moved or by whom, but when he

8    walked up there, they were not there.

9        On that terrace Mr. Rhine stands, meanders, admires,

10   and, yes, he expresses his political beliefs.  We talked a

11   little bit about the gentleman who appeared to be

12   pepper-sprayed.  He recites his observations, and he's not

13   cleaning anything up.  He's not misleading.  He gives an

14   interview with someone who appears to be media.  That was not

15   something a person who intends to violate the law does.

16       His calmness -- his tone is calm.  His demeanor is

17   peaceful.  And he notes, oh, this man walking behind me, it

18   looks like he said he's been pepper-sprayed.  He notes that,

19   and he hopes that the rally will remain peaceful, which is what

20   he is observing.  And it wasn't like this man walked behind him

21   and he immediately ran in the door.  This happened almost

22   15 minutes before that doorway opened.

23       And there were changes in that time.  We know from

24   Inspector Loyd that this man appears to leave that top of the

25   terrace at about 2:28 p.m. -- or almost 2:28 -- 2:27 p.m.  And

1    after that, multiple police officers leave the top of the

2    terrace.

3              (A video recording was played.)

4              MS. FISH:  One, two, three.  And four, five, six.

5    Again, Mr. Rhine was not Inspector Loyd.  He doesn't know

6    police tactics, strategies, or formations.  All he sees is that

7    there appears to be a change.  He doesn't know why.

8              Mr. Rhine could not see who opened that door.  He spent,

9    between that time and the door opening, 12 or 13 minutes,

10   standing, meandering, and admiring.  And at 2:41 p.m. we can

11   tell that Mr. Rhine is on that outer uncovered portion of that

12   terrace.  He's at the portion where you would stand to look out

13   at the grounds, at the buildings across the way.  He is not

14   next to the door.

15             And Inspector Loyd talked a bit about this terrace.

16   It's pretty big.  He said it's about a hundred feet long.  And

17   there's two rows of columns that you can see on that floor

18   plan.  Each row of columns, he said there was about 10 feet in

19   between, at least.  So that's at least 20 feet from the

20   building, plus a little more to get out to the outer terrace.

21   And he's not directly in the center of the terrace.  He's off

22   to the south side.  He was at least 25, 30 feet away from the

23   door.  He's not paying attention to it.  There are a lot of

24   people in the area.  He doesn't see who opens the door or how.

25             What he does see is people moving in an orderly fashion

1    toward the door.  This video is pretty different than some of

2    the other videos the government showed you.  There's not a

3    crush of people or a surge of people running.  People are

4    walking almost single file through the door.  And all kinds of

5    people are walking through:  people in suits, people in

6    jackets, people with masks, people with flags, people without.

7    Mr. Rhine follows.

8        And to prove the trespass charge, as well as Count 2,

9    the government also has to prove that Mr. Rhine was in or, for

10   Count 2, near a restricted area where a person protected by the

11   Secret Service is or will be visiting.  And they have to prove

12   that he was -- he crossed that restricted area for Count 1.

13       But we know from Inspector -- from Agent Glavey that the

14   Secret Service had a tight perimeter around Vice President

15   Pence that day.  They had no role in setting up those bike

16   racks.  That was the Capitol Police who decided where those

17   should go, who set them up, who staffed them.

18       And the Capitol Police set up those bike racks for their

19   own reasons that did not have to do with Mike Pence.  They set

20   them up in May of the previous year.  They had been in the same

21   place, and they hadn't changed.  There was no special signage

22   or anything to tell someone that the area was restricted for

23   Vice President Pence.

24       And Mr. Rhine never came close to Vice President Pence.

25   You heard from Agent Glavey that Vice President Pence, prior to

1    Mr. Rhine ever getting into the building, was in his office,

2    which is in the north end of the building, and that he was

3    relocated to a safe location.  She never saw, never interacted

4    with Mr. Rhine.  She never heard his name.

5         And, again, you'll follow this unique blue flag to see

6    where Mr. Rhine was.  It will show you what he expected based

7    on what he was seeing, based on how he was dressed.  It will

8    show you what he said and what he did and did not do.

9         To prove the disorderly conduct charge, the government

10   has to show that Mr. Rhine had the intent to impede or disrupt

11   the orderly conduct of government.  Similarly, for the second

12   disorderly conduct charge, the government must similarly

13   prove that he intended to impede, disrupt, or disturb the

14   orderly business of Congress and that he actually intended to

15   violate the law.  That's correct.  He doesn't have to know the

16   chapter and verse on what law was violated, but he has to

17   intend to do something illegal for him to be convicted of this

18   charge.

19        And we heard from witness after witness that it was well

20   known prior to January 6th that there were members of Congress

21   who intended to formally object to the certification of the

22   election.  Those formal objections would be part of Congress's

23   official business.  Supporting those formal objections is not

24   impeding government.  It is not impeding Congress.  It is

25   simply supporting an unpopular action during that official

1    business.

2          And we also know that even a law enforcement officer

3    like Inspector Loyd expected this rally to be peaceful.  He

4    expected it to be similar to rallies that had been held in

5    December 2020 that were large but peaceful and respectful of

6    law enforcement.  And you follow that unique blue flag, and you

7    see what Mr. Rhine was wearing, and you can tell that he

8    expected the same thing.  He had no riot gear.  He had regular

9    clothing, a bulky flag, a kind of camping chair-looking thing.

10   He was prepared for a day on the lawn.  He was prepared for a

11   peaceful rally.

12         And let's talk about what he said, the interview he

13   gave.  I would note his tone is calm.  He doesn't swear.  He

14   doesn't raise his voice.  He doesn't say anything that would

15   indicate he wants to violate the law or be disruptive.  He

16   shares his observations that he understands that police were

17   opening barriers and allowing people up because what he saw

18   looked like that.  He notes it's a peaceful protest.

19         Again, where he was on that terrace, it was pretty

20   peaceful.  People were milling around.  There were not the

21   kinds of things we saw in that compilation video.  He notes

22   it's a special moment in history, and he's not sugarcoating it.

23   He notes the man who passes behind him who appears to have been

24   pepper-sprayed.

25         And he shares his hopes, and he does express his

1    political beliefs.  He's sick and tired of the cheating and

2    lying, and he's there to "Stop the Steal."  Now, you may or may

3    not agree with Mr. Rhine's political beliefs, but his political

4    beliefs are not on trial.  His political beliefs are not

5    illegal.  And the judge will instruct you to set aside any

6    feelings you have about those when you go to deliberate on the

7    evidence.

8         And watching what Mr. Rhine does inside the building, he

9    doesn't do anything disorderly.  He's even holding that flag a

10   bit bundled.  The cowbells are cradled in his arm when he's in

11   the hallway near the House gallery.  And that window the

12   government emphasized where one could allegedly get a glimpse

13   of the west side, that's in this nook on the north hallway, as

14   Inspector Loyd explained.  You can't see anything there.  In

15   fact, it looks more like he's scolding a young person who

16   appears to have jumped on to the sill prior to him approaching.

17        Mr. Rhine inside the Capitol Building stands, meanders,

18   and admires.  He does not push anyone.  He does not jostle

19   anyone.  He does not make excessive noise.  He does not engage

20   in conduct that is otherwise disruptive.

21             (An audio-visual recording was played.)

22             MS. FISH:  During a brief moment, Mr. Rhine found

23   himself surrounded by people who were acting poorly, who were

24   trying to damage part of the building, to break it.  He

25   intervened to stop them, and we see that he then moves away.

1    He tries to get away from that.  He does not want to be part of

2    this angry mob that the government keeps talking about.

3          The rest of the time he's in the building, he's in quiet

4    hallways with very few people; hallways near the gallery, which

5    during normal times are open to the public, are where one would

6    go to watch congressional proceedings, where one might go to

7    watch a formal objection you are supporting.

8          And what does he say to the people he sees behaving

9    poorly?  Hey, hey, hey.  Don't break the doorway.  Don't

10    damage.  This is a sacred place.  Do not damage this building.

11    He would not do that if he intended to break the law to be

12    disruptive, to be damaging.

13          He's in the building barely 7 minutes and -- before he

14    ever encounters a law enforcement officer.  And the first time

15    he encounters a law enforcement officer, he immediately

16    complies with their direction.  The officer directs him to

17    leave, and he goes right back where he came from.

18               MR. VALENTINI:  Objection, Your Honor.  That's not in

19    evidence.

20               THE COURT:  Go ahead.

21          MS. FISH:  He does not linger.  He does not wait.

22    The officer tells him to leave the hallway, and he leaves.  And

23    when he's told to stop, he stops.  When he's told to get down,

24    he does.

25          Now, I do want to talk about Officer Abbott's testimony.

1    Officer Abbott testified he's trying his best to keep up with

2    an ever-shifting day on January 6th.  And he was asked to

3    search Mr. Rhine.  Mr. Rhine was entirely respectful, was not

4    combative, was entirely obedient.  And Officer Abbott said:  I

5    need to search you for weapons.  Mr. Rhine doesn't know what

6    that means.  But he's entirely open with him.  He says, you

7    know what?  I have a couple folding knives and some

8    pepper spray.

9        And Officer Abbott finds those among his belongings

10    exactly where he told them -- told you those knives were

11    smaller than the palm of his hand.  They're ordinary personal

12    safety and utility items.  They were not used.  They were not

13    opened.  People bring them to the Capitol by mistake all the

14    time.

15        They're legal in D.C.  They're allowed elsewhere on the

16    Capitol Grounds.  Just the Capitol Building has special rules,

17    and not everyone who doesn't work there knows those.  He did

18    what he usually does.  He took those items and he disposed of

19    them.  He just didn't do all the paperwork.

20        If you are concerned about those items, you must hold

21    that concern against the government.  The government had those

22    items, the government destroyed those items, and the government

23    did not produce those for you today.  So if you have any

24    questions about those items, you cannot hold those questions to

25    Mr. Rhine.  You must hold them to the government.

1      And Mr. Rhine was obedient and cooperative with

2    Officer Abbott even after Officer Abbott left him, and left

3    him in a pretty awkward position.  As Officer Abbott testified,

4    he bundled Mr. Rhine's hands behind his back.  He couldn't use

5    a key, a credit card, anything, let alone pick up his backpack

6    and other belongings.  Officer Abbott had more important things

7    to do.  He told Mr. Rhine:  Have someone cut you free, get

8    your stuff, and leave the building.  And that's what Mr. Rhine

9    does.

10     And you can see from the video that Mr. Rhine behaved

11   well for Officer Abbott.  Officer Abbott pats him on the back

12   several times.  That's not something that a police officer

13   would do with someone who is not being respectful, obedient,

14   and polite.

15     And Mr. Rhine left as instructed, and that was no easy

16   feat.  Hundreds of people were on the staircase where

17   Officer Abbott left him.  There's no clear pathway down, and

18   hundreds of people are just remaining because there are not

19   police there to require them to leave.  But Mr. Rhine is not

20   content to join them.  He does not want to.  He follows

21   Officer Abbott's instruction and makes his way deliberately and

22   persistently down those stairs.

23     The government has the burden to prove every charge

24   beyond a reasonable doubt, and not just that, but every element

25   of every charge.  I know reasonable doubt can be a little bit

1    difficult to understand.  It's not a concept we come across in

2    daily life.  It's the highest level of proof required in our

3    legal system.  It is higher than reasonable suspicious, which

4    is the level of proof a police officer needs to stop you, frisk

5    you, briefly question you.  It's higher than probable cause,

6    which is the level of suspicion a police officer needs to

7    actually detain you in jail, to arrest you.  It's higher than a

8    preponderance of the evidence.  That's more likely than not.

9    That's the standard in most civil cases.

10         So even if you think it's more likely than not that

11   Mr. Rhine knew that area was restricted, that is not enough to

12   convict.

13         It's higher than clear and convincing evidence.  That's

14   the level of proof required to terminate a parent's custody of

15   their child.  So even if you think it's highly probable that he

16   knew that area was restricted, that is not enough to convict

17   either.

18         Beyond a reasonable doubt is the highest level of proof

19   required in our legal system.  It means that there is no

20   reasonable explanation for the evidence other than guilt, and

21   that is what is required for the government to prove before you

22   can convict Mr. Rhine.

23         And any questions you have, any evidence you wish you

24   saw, testimony you wish you heard, you have to ask those of the

25   government.  Mr. Rhine has no burden to prove his innocence.

1    That burden never shifts.  He has no obligation to make a

2    statement.  In fact, he has a complete right not to, as do all

3    of us.  So any questions you have, any evidence you wish you

4    saw, you must hold those against the government because a lack

5    of evidence too is a basis for reasonable doubt.  If there's

6    simply not enough evidence for you to be firmly convinced of

7    each and every element, you must vote not guilty.

8        And as the judge will tell you, as he discussed with you

9    during jury selection, you must leave your own personal likes,

10   dislikes, preexisting beliefs at the door.  Obviously, we all

11   have opinions.  We all have preferences.  We all have heard

12   things about January 6th before.  And we probably have feelings

13   about them.

14       That was a very difficult day for everyone in this

15   courtroom.  But each of you was selected for this jury because

16   you assured the judge that you would be able to put those

17   feelings aside, the feelings you felt that day and since then,

18   and consider only the evidence presented in court this week.

19       Similarly, any feelings you have about the political

20   beliefs that Mr. Rhine expresses on those videos, you must set

21   those aside.  You must leave those at the door and not consider

22   those when determining your verdict.

23       And you must render your verdict based on what Mr. Rhine

24   knew at the time, not what he knows now, not what we can see

25   now, but what he knew at the time.

1          On January 6th, 2021, we see from Mr. Rhine's actions

2     that he did not know he was going into a restricted area, did

3     not intend to break the law, and did not intend to disrupt

4     Congress.  He came nowhere close to Vice President Pence.  He

5     did nothing violent, destructive, or disruptive.  He even

6     stopped when he saw others behaving poorly.  He stopped them.

7     He intervened.  And he obeyed every single police order he

8     received.

9          Mr. Rhine is not guilty.

10          MR. VALENTINI:  Ladies and gentlemen, good afternoon.

11     You have watched, you have heard a lot of evidence over the

12     last week.

13          But few facts are in dispute after you have watched

14     and you have heard that evidence.  One fact that is not in

15     dispute is that Mr. Rhine was on the East Front near that

16     barricade of the House egg at 1:58 or 1:59 p.m. when a violent

17     breach of the front of the east side happened less than

18     150 yards away.

19          Another fact that is not in dispute is that at 2:20 p.m.

20     that day Mr. Rhine walked along that barricade on the -- along

21     that barricade on the House egg, walked some more, and then

22     crossed the east plaza, went up the House steps, up to the east

23     portico, and he didn't linger there.

24          It is also not in dispute that when he was there, he

25     gave an interview.  It is not in dispute that when he was

1    giving that interview, a rioter walked by complaining of being

2    tear-gassed -- excuse me -- pepper-sprayed.  And Mr. Rhine

3    heard that and saw that, and he said that they're doing some

4    pepper-spraying to keep people out of the building.

5         It is also not in dispute what Mr. Rhine did after that.

6    It is not in dispute that he entered through the upper House

7    door within 20 seconds of the time when that door was breached

8    from the inside.  It's not in dispute that he lingered outside

9    the House Chamber.  It's not in dispute that he went up with

10   his large blue flag, shaking his cowbells on the third floor

11   where the House gallery was.

12        It's not in dispute that he tried to open a door to

13   the House gallery where members of Congress were sheltering

14   in place or were being evacuated.  It's not in dispute that

15   he tried to enter an office of the House Appropriations

16   Committee.

17        And it's not in dispute that in the end he was ordered

18   to the ground.  He was searched.  Two pocket knives and a

19   container of pepper spray were found on him.  He was

20   handcuffed, and he was ordered out of the building.  These

21   facts are not in dispute.

22        What Mr. Rhine wants you to believe he did -- is that

23   he was in the middle of a riot and he didn't notice.  He

24   didn't know that it was happening.  He will have you believe,

25   again, that he was standing at those barricades down near

1    the House egg and he did not notice that dozens of people

2    were forcing the barricades in the midsection of the east

3    plaza.

4          He will have you believe that even though he at least

5    saw another rioter walk by who had just been pepper-sprayed --

6    and he knew that that rioter had been pepper-sprayed -- he was

7    not allowed to go into the building.  He would like you to

8    believe that he didn't know he was allowed -- he was not

9    allowed to go into the office of the House Appropriations

10   Committee.  All -- all of these things the defendant,

11   Mr. Rhine, will have you believe, but none of these are

12   believable.

13         You are the jurors in this case, you are to decide what

14   the facts are, and you are to take your common sense into the

15   jury [sic] when you deliberate.  And none of the things that

16   you have heard, none of the possibilities, none of the "there

17   were vehicles in the way of a massive crowd on the steps in the

18   middle of the East Front," none of the, "oh, someone got

19   pepper-sprayed, but I thought it was okay to go in," none of

20   those stories are believable.  Just use your common sense.

21         In this case you don't just have circumstantial

22   evidence.  You have the defendant's own words.  I'm not going

23   to replay them again, but he gave that interview.  He said

24   clearly why he was there.  He said he was there to take the --

25   to take it back.  He said he was there to "Stop the Steal."

1          What does it mean to "Stop the Steal"?  It means to stop

2     the certification of the Electoral College.  It means to stop

3     the Joint Session of Congress from carrying out what it was

4     required constitutionally to do.  Those were the defendant's

5     words.  You heard them time and again.

6          You also heard just now in the defense closing argument

7     some reference to when the barricades were first put up on the

8     East Front of the House -- of the -- of Congress.  The thing is

9     that is completely irrelevant.  Those barricades were up on

10    January 6th because they were needed on January 6th.  Listen to

11    Judge Contreras' instructions.  You will find no relevance to

12    when those barricades were put up.

13         You also heard that the defendant was never in close

14    proximity to the Vice President.  That too is irrelevant.

15    Well, first of all, he was in the U.S. Capitol Building that

16    day.  So it's not all that far away.  But even then, there's

17    nothing in the instructions that you will hear from

18    Judge Contreras that makes that fact relevant.

19         All that matters is that the defendant knowingly entered

20    a restricted area and somewhere within that restricted area the

21    Vice President was temporarily visiting.  He doesn't need to go

22    up to the Vice President to be convicted of the offense with

23    which the defendant is charged in this case.

24         Ladies and gentlemen, you have heard a lot of evidence

25    over the last week.  We thank you for your patience.  When you

1    go in there, take all the time you need.  Look at those

2    exhibits, discuss them.  Listen to the defendant's words and

3    answer the questions that will be asked of you by the Court.

4         We ask that you find the defendant guilty on all counts.

5         Thank you.

6         THE COURT:  Thank you.

7         All right.  Now I'm going to give you the instructions.

8    It's going to take about 30, 40 minutes.  Do people need a

9    5-minute break before we do that, or do you want to go right

10   into them?  If you want to go right into them, raise your hand.

11        All right.  Let's do it.

12        Yes.

13        UNIDENTIFIED JUROR:  Will we get a copy of these,

14   or should we --

15        THE COURT:  You will get a copy.  That's the first

16   thing I will say.  So you don't have to take notes.

17        So, members of the jury, at this time it is my duty and

18   responsibility as the trial judge to give you instructions as

19   to the law that applies in this case and to the evidence that

20   has been presented.  After I conclude these instructions, you

21   will begin your deliberations.

22        I will provide you with a copy of my instructions.

23   During your deliberations, you may, if you want, refer to these

24   instructions.  While you may refer to any particular portion of

25   the instructions, you are to consider the instructions as a

1    whole, and you may not follow some and ignore others.  If you

2    have any questions about the instructions, you should feel free

3    to send me a note.  Please return your instructions to me when

4    your verdict is rendered.

5         As I explained to you at the beginning of the trial, my

6    function is to conduct this trial in an orderly, fair, and

7    efficient manner; to rule on questions of law; and to instruct

8    you on the law that applies in this case.

9         It is your duty to accept the law as I instruct you.

10   Again, you should consider all the instructions as a whole.

11   You may not ignore or refuse to follow any of them.

12        Your function as the jury is to determine what the facts

13   are in this case.  You are the sole judges of the facts.  While

14   it is my responsibility to decide what is admitted as evidence

15   during the trial, you alone decide what weight, if any, to give

16   to the evidence.  You alone decide the credibility or

17   believability of the witnesses.

18        As human beings we all have personal likes and dislikes,

19   opinions, prejudices, biases.  Generally, we are aware of these

20   things, but you also should consider the possibility that you

21   have implicit biases; that is, biases of which you may not be

22   consciously aware.

23        Personal prejudices, preferences, or biases have no

24   place in a courtroom where our goal is to arrive at a just and

25   impartial verdict.  All people deserve fair treatment in our

1    system of justice, regardless of any personal characteristic,

2    such as race, national or ethnic origin, religion, age,

3    disability, sex, gender, identity or expression, sexual

4    orientation, education, or income level.  You should determine

5    the facts solely from a fair consideration of the evidence.

6    You should decide the case without prejudice, fear, sympathy,

7    favoritism, or other consideration of public opinion.

8         You may not take anything I may have said or done as

9    indicating how I think you should decide this case.  If you

10   believe that I have expressed or indicated any such opinion,

11   you should ignore it.  The verdict in this case is your sole

12   and exclusive responsibility.

13        If any reference by me or the attorneys to the evidence

14   is different from your own memory of the evidence, it is your

15   memory that should control during your deliberations.

16        Desiring your deliberations, you may consider only the

17   evidence properly admitted in this trial.  The evidence in this

18   case consists of the sworn testimony of the witnesses, the

19   exhibits that were admitted into evidence, and the facts and

20   testimony stipulated to by the parties.

21        During the trial, you were told that the parties had

22   stipulated -- that is, agreed to -- certain facts.  You

23   should consider any stipulation of fact to be undisputed

24   evidence.

25        When you consider the evidence, you are permitted to

1  draw from the facts that you find have been proven, such

2  reasonable inferences as you feel are justified in the light of

3  your experience.  You should give any evidence such weight as

4  in your judgment it is fairly entitled to receive.

5      The statements and arguments of the lawyers are not in

6  evidence.  They are only to -- intended to assist you in

7  understanding the evidence.  Similarly, the questions of the

8  lawyers are not in evidence.  And as I told you before, the

9  opening and closing statements are not evidence.

10     A criminal information is merely the formal way of

11 accusing a person of a crime.  You must not consider it, the

12 information, as evidence of any kind.  You may not consider

13 it as any evidence of David Rhine's guilt or draw any inference

14 of guilt from it.

15     Every defendant in a criminal case is presumed to be

16 innocent.  The presumption of innocence remains with the

17 defendant throughout the trial unless and until the government

18 has proven he is guilty beyond a reasonable doubt.  This burden

19 never shifts throughout the trial.  The law does not require

20 David Rhine to prove his innocence or to produce any evidence

21 at all.

22     If you find that the government has proven beyond a

23 reasonable doubt every element of a particular offense with

24 which David Rhine is charged, it is your duty to find him

25 guilty of that offense.  On the other hand, if you find that

1    the government has failed to prove any element of a particular

2    offense beyond a reasonable doubt, it is your duty to find

3    David Rhine not guilty of that offense.

4        The government has the burden of proving David Rhine

5    guilty beyond a reasonable doubt.

6        In civil cases, it is only necessary to prove that a

7    fact is more likely than not -- more likely true than not, or,

8    in some cases, that its truth is highly probable.

9        In criminal cases, such as this one, the government's

10   proof must be more powerful than that.  It must be beyond a

11   reasonable doubt.

12       Reasonable doubt, as the name implies, is a doubt based

13   on reason, a doubt for which you have a reason based upon the

14   evidence or lack of evidence in the case.  If after careful,

15   honest, and impartial consideration of all the evidence you

16   cannot say that you are firmly convinced of the defendant's

17   guilt, then you have a reasonable doubt.

18       Reasonable doubt is the kind of doubt that would cause a

19   reasonable person, after careful and thoughtful reflection, to

20   hesitate to act in the graver or more important matters in

21   life.  However, it is not an imaginary doubt, nor doubt based

22   on speculation or guesswork.  It is a doubt based on reason.

23   The government is not required to prove guilt beyond all doubt

24   or to a mathematical or scientific certainty.  Its burden is to

25   prove guilt beyond a reasonable doubt.

1          There are two types of evidence from which you may

2     determine what the facts are in this case:  direct evidence and

3     circumstantial evidence.

4          When a witness, such as an eyewitness, asserts actual

5     knowledge of a fact, that witness's testimony is direct

6     evidence.  On the other hand, evidence of facts and

7     circumstances from which reasonable inferences may be drawn is

8     circumstantial evidence.

9          Let me give you an example.  Assume a person looked

10    out a window and saw that snow was falling.  If he later

11    testified in court about what he had seen, his testimony would

12    be direct evidence that snow was falling at the time he saw it

13    happen.

14         Assume, however, that he looked out a window and saw no

15    snow on the ground and then went to sleep and saw snow on the

16    ground after he woke up.  His testimony about what he had seen

17    would be circumstantial evidence that it had snowed while he

18    was asleep.

19         The law says that both direct and circumstantial

20    evidence are acceptable as a means of proving a fact.  The law

21    does not favor one form of evidence over another.  It is for

22    you to decide how much weight to give any particular evidence,

23    whether it is direct or circumstantial.

24         You are permitted to give equal weight to both.

25    Circumstantial evidence does not require a greater degree of

certainty than direct evidence.  In reaching a verdict in this case, you should consider all of the evidence presented, both direct and circumstantial.

One of the questions you were asked when we were selecting this jury was whether the nature of the charges itself would affect your ability to reach a fair and impartial verdict.  We asked you that question because you must not allow the nature of the charge to affect your verdict.  You must consider only the evidence that has been presented in this case in reaching a fair and impartial verdict, disregarding any personal feelings you may have about the nature of the charges or Mr. Rhine's political or social views.

The weight of the evidence is not necessarily determined by the number of witnesses testifying for either side.  Rather, you should consider all the facts and circumstances in evidence to determine which of the witnesses you believe.  You might find that the testimony of a smaller number of witnesses on one side is more believable than the testimony of a greater number of witnesses on the other side, or you may find the opposite.

The lawyers in this case sometimes objected when the other side asked a question, made an argument, or offered evidence that the objecting lawyer believed was not proper. You must not hold such objections against the lawyer who made them or the party he or she represents.  It is the lawyers'

1    responsibility to object to evidence that they believe is not

2    admissible.

3          If during the course of the trial I sustained an

4    objection to a lawyer's question, you should ignore the

5    question and you must not speculate as to what the answer would

6    have been.  If after a witness answered a question I ruled that

7    the answer should be stricken, you should ignore both the

8    question and the answer, and they should play no part in your

9    deliberations.  And in this case, I struck certain testimony

10   from U.S. Capitol Police Officer Abbott, and you are not to

11   consider that stricken testimony.

12         Likewise, exhibits as to which I have sustained an

13   objection or that I ordered stricken are not evidence, and you

14   must not consider them in your deliberations.

15         In determining whether the government has proved the

16   charges against the defendant beyond a reasonable doubt, you

17   must consider the testimony of all the witnesses who have

18   testified.  You are the sole judges of the credibility of the

19   witnesses.  You alone determine whether to believe any witness

20   and the extent to which a witness should be believed.  Judging

21   a witness's credibility means evaluating whether the witness

22   has testified truthfully and also whether the witness

23   accurately observed, recalled, and described the matters about

24   which the witness testified.

25         You may consider anything that, in your judgment,

1    affects the credibility of any witness.  For example, you may

2    consider the demeanor and the behavior of the witness on the

3    witness stand; the witness's manner of testifying; whether the

4    witness impresses you as a truthful person; whether the witness

5    impresses you as having an accurate memory; whether the witness

6    has any reason for not telling the truth; whether the witness

7    had a meaningful opportunity to observe the matters about which

8    he or she has testified; whether the witness has any interest

9    in the outcome of this case, stands to gain anything by

10   testifying, or has a friendship or hostility toward other

11   people concerned with this case.

12        In evaluating the accuracy of a witness's memory, you

13   may consider the circumstances surrounding the event, including

14   the time that elapsed between the event and any later

15   recollection of the event and the circumstances under which the

16   witness was asked to recall details of the event.

17        You may consider whether there are any consistencies or

18   inconsistencies in a witness's testimony or between the

19   witness's testimony and any previous statements made by the

20   witness.  You may also consider any consistencies or

21   inconsistencies between the witness's testimony and any other

22   evidence that you credit.  You may consider whether any

23   inconsistencies are the result of lapses in memory, mistake,

24   misunderstanding, intentional falsehood, or differences in

25   perception.

1    You may consider the reasonableness or unreasonableness,

2    the probability or improbability of the testimony of a witness

3    in determining whether to accept it as true and accurate.  You

4    may consider whether the witness has been contradicted or

5    supported by other evidence that you credit.

6    If you believe that any witness has shown him- or

7    herself to be biased or prejudiced, for or against either side

8    in this trial, or motivated by self-interest, you may consider

9    and determine whether such bias or prejudice has coated the

10   testimony of the witness so as to affect the desire and

11   capability of that witness to tell the truth.  You should give

12   the testimony of each witness such weight as in your judgment

13   it is fairly entitled to receive.

14   A police officer's testimony should be evaluated by you

15   just as any other evidence in this case.  In evaluating the

16   officer's credibility, you should use the same guidelines that

17   you apply to the testimony of any other witness.  In no event

18   should you give either greater or lesser weight to the

19   testimony of any witness merely because he or she is a police

20   officer.

21   Every defendant in a criminal case has an absolute right

22   not to testify.  David Rhine has chosen to exercise this right.

23   You must not hold that decision against him, and it would be

24   improper for you to speculate as to the reason or reasons for

25   his decision.  You must not assume the defendant is guilty

1    because he chose not to testify.

2         If evidence relevant to an issue in this case was only

3    within the power of one party to produce, was not produced by

4    that party, and its absence has not been sufficiently

5    explained, then you may, if you deem it appropriate, infer that

6    the evidence would have been unfavorable to the party who

7    failed to produce it.

8         However, you should not draw such an inference from

9    evidence that, in your judgment, was equally available to both

10   parties or which would have complicated other evidence or that

11   you think was unimportant.

12        Each count of the information charges a separate

13   offense.  You should consider each offense and the evidence

14   which applies to it separately, and you should return separate

15   verdicts as to each count.

16        The fact that you may find the defendant guilty or not

17   guilty on any one count of the information should not influence

18   your verdict with respect to any other count of the

19   information.

20        A verdict must present the considered judgment of each

21   juror, and in order to return a verdict, each juror must agree

22   on the verdict.  In other words, your verdict on each count

23   must be unanimous.

24        I'm now going to explain to you the specific counts, and

25   some of these are a little bit technical, but you'll have the

1    instructions with you, in front of you, if you want to refer to

2    them.  It might be a little bit easier than trying to memorize

3    this.

4         So Count 1 of the information charges the defendant with

5    entering or remaining in a restricted building or grounds,

6    which is a violation of federal law.  And here are the

7    elements.  In order to find the defendant guilty of this

8    offense, you must find that the government proved each of the

9    following elements beyond a reasonable doubt.

10        First, that the defendant entered or remained in a

11   restricted building or grounds without lawful authority to do

12   so.

13        And second, that the defendant did so knowingly.

14        And there's some definitions that go with this charge.

15   The term restricted building or grounds means any posted,

16   cordoned off, or otherwise restricted area of a building or

17   grounds where a person protected by the Secret Service is or

18   will be temporarily visiting.  And there's a legal citation

19   there that you'll have in the instructions.

20        The term person protected by the Secret Service includes

21   the Vice President.

22        A person acts knowingly if he realizes what he is doing

23   and is aware of the nature of his conduct and does not act

24   through ignorance, mistake, or accident.  In deciding whether

25   the defendant acted knowingly, you may consider all of the

1    evidence, including what the defendant did or said.

2        Count 2 of the information charges the defendant with

3    disorderly or disruptive conduct in a restricted building or

4    grounds, which is a violation of federal law.

5        In order to find the defendant guilty of this offense,

6    you must find that the government proved each of the following

7    elements beyond a reasonable doubt.

8        First, that the defendant engaged in disorderly or

9    disruptive conduct in or in proximity to any restricted

10   building or grounds.

11       Second, that the defendant did so knowingly and with the

12   intent to impede or disrupt the orderly conduct of government

13   business or official functions.

14       And third, that the defendant's conduct occurred

15   when, or so that, his conduct, in fact, impeded or disrupted

16   the orderly conduct of government business or official

17   functions.

18       So there's some definitions that go with this one as

19   well.  Disorderly conduct occurs when a person is unreasonably

20   loud and disruptive under the circumstances or interferes with

21   another person by jostling against or unnecessarily crowding

22   that person.

23       Disruptive conduct is a disturbance that disrupts an

24   event, activity, or the normal course of a process.

25       The terms knowingly and restricted building or grounds

1   have the same meaning for this count, then, described in the

2   instructions for Count 1.

3       Count 3.  Count 3 of the information charges the

4   defendant with disorderly conduct in a Capitol Building or

5   Grounds, which is a violation of federal law.

6       In order to find the defendant guilty of this offense,

7   you must find that the government proved each of the following

8   elements beyond a reasonable doubt.

9       First, that the defendant engaged in disorderly or

10  disruptive conduct in any of the United States Capitol

11  Buildings or Grounds.

12      Second, that the defendant did so with the intent

13  to impede, disrupt, or disturb the orderly conduct of a

14  session of Congress or either the House or -- either House of

15  Congress.

16      And third, that the defendant acted willfully and

17  knowingly.

18      And I'll go over the definitions that apply to this

19  count.  The term United States Capitol Buildings or Grounds

20  includes the United States Capitol located on First Street,

21  Southeast, in Washington, D.C., and its grounds.

22      The term disorderly or disruptive conduct has the same

23  meaning described in the instructions for Count 2 defining

24  disorderly conduct and disruptive conduct.

25      The term knowingly has the same meaning described in the

1    instructions for Count 1.

2        A person acts willfully if he acts with the intent to do

3    something that the law forbids; that is, to disobey or

4    disregard the law.  Willfully does not, however, require proof

5    that the defendant be aware of the specific law or rule that

6    his conduct may be violating.

7        Count 4.  Count 4 of the information charges the

8    defendant with parading, demonstrating, or picketing in a

9    Capitol Building, which is a violation of federal law.  In

10   order to find the defendant guilty of this offense, you must

11   find that the government proved each of the following elements

12   beyond a reasonable doubt.

13       First, that the defendant paraded, demonstrated, or

14   picketed in any of the United States Capitol Buildings.

15       And second, that the defendant acted willfully and

16   knowingly.

17       The terms parade and picket have their ordinary

18   meanings.

19       The term demonstrate refers to conduct that would

20   disrupt the orderly business of Congress by, for example,

21   impeding or obstructing passageways, hearings, or meetings, but

22   does not include activities such as quiet praying.

23       The terms United States Capitol Buildings, knowingly and

24   willfully have the same meanings described in the instructions

25   for Counts 1 and 3.

1          So I'll now give you some instructions about how you

2     should conduct your deliberations.  You will be provided with a

3     verdict form for use when you have concluded your

4     deliberations.  The form is not evidence in this case, and

5     nothing in it should be taken to suggest or convey any opinion

6     by me as to what the verdict should be.  Nothing in the form

7     replaces the instructions of law I have already given you, and

8     nothing in it replaces or modifies the instructions about the

9     elements which the government must prove beyond a reasonable

10    doubt.  The form is meant only to assist you in reaching your

11    verdict.

12         During the course of this trial, a number of exhibits

13    were admitted in evidence.  Sometimes only portions of an

14    exhibit were admitted, such as portions of a longer video; a

15    document with some words or pictures blacked out, or otherwise

16    removed; or a video played without audio.

17         There are -- excuse me.  There are a variety of reasons

18    why only a portion of an exhibit is admitted, including that

19    the other portions are inadmissible or implicate an

20    individual's privacy.

21         As you examine the exhibits and you see or hear

22    portions where there appear to be omissions, you should

23    consider only the portions that were admitted.  You should

24    not guess as to what has been taken out or why, and you

25    should not hold it against either -- hold it against either

1    party.

2        You are to decide the facts only from the evidence that

3    is before you.

4        I will be sending into the jury room with you the

5    exhibits that have been admitted into evidence.  You may

6    examine any or all of them as you consider your verdict.

7    Please keep in mind that exhibits that were only marked for

8    identification but were not admitted into evidence will not

9    be given to you to examine or consider in reaching your

10   verdict.

11       You will also be provided with a laptop to view the

12   recordings which I have admitted into evidence.  You should not

13   use the laptop for any other purpose.

14       When you return to the jury room, you should first

15   select a foreperson to preside over your deliberations and to

16   be your spokesperson here in court.  There are no specific

17   rules regarding how you should select a foreperson.  That is up

18   to you.  However, as you go about the task, be mindful of your

19   mission to reach a fair and just verdict based on the evidence.

20   Consider selecting a foreperson who will be able to facilitate

21   your discussions, who can help you organize the evidence, who

22   will encourage civility and mutual respect among all of you,

23   who will invite each juror to speak up regarding his or her

24   views about the evidence, and who will promote a full and fair

25   consideration of that evidence.

1       The question of possible punishment of the defendant in

2   the event of a conviction is not a concern of yours and should

3   not enter into or influence your deliberations in any way.  The

4   duty of imposing sentence in the event of a conviction rests

5   exclusively with me.  Your verdict should be based solely on

6   the evidence in this case, and you should not consider the

7   matter of punishment at all.

8       I would like to remind you that in some cases, although

9   not necessarily this one, there may be reports in the newspaper

10   or on the radio, internet, or television.  If there should be

11   such media coverage in this case, you may be tempted to read,

12   listen to, or watch it.  You must not read, listen to, or watch

13   such reports because you must decide this case solely on the

14   evidence presented in the courtroom.

15       If any publicity about this trial inadvertently comes

16   to your attention, do not discuss it with other jurors or

17   anyone else.  Just let me or my clerk know as soon after it

18   happens as you can, and I will then briefly discuss it with

19   you.

20       As you retire to the jury room to deliberate, I also

21   wish to remind you of an instruction I gave you at the

22   beginning of the trial.  During deliberations, you may not

23   communicate with anyone not on the jury about this case.  This

24   includes any electronic communications, such as email or text

25   or any blogging about the case.

1          In addition, you may not conduct any independent

2     investigation during deliberations.  This means you may not

3     conduct any research in person or electronically, via the

4     internet, or in any other way.

5          If it becomes necessary during your deliberations to

6     communicate with me, you may send a note to the clerk or the

7     marshal signed by your foreperson or by one or more members of

8     the jury.  No member of the jury should try to communicate with

9     me except by such a signed note.  And I will never communicate

10    with any members of the jury on any matter considering the

11    merits of this case, except in writing or orally here in open

12    court.

13         Bear in mind that you are never, under any

14    circumstances, to reveal to any person, not the clerk, the

15    marshal, or even me, how jurors are voting until after you have

16    reached a unanimous verdict.  This means that you should never

17    tell me in writing or in open court how the jury is divided on

18    any matter.  For example, 6-6 or 7-5 or 11-1, or in any other

19    fashion, whether the vote is for conviction or acquittal or on

20    any other issue in the case.

21         The attitude and conduct of the jurors at the beginning

22    of their deliberations are matters of considerable importance.

23    It may not be useful for a juror upon entering the jury room to

24    voice a strong expression of an opinion on the case or to

25    announce a determination to stand for a certain verdict.  When

1    one does that at the outset, a sense of pride may cause that

2    juror to hesitate to back away from an announced position after

3    a discussion of the case.

4         Furthermore, many jurors find it useful to avoid an

5    initial vote upon retiring to the jury room.  Calmly reviewing

6    and discussing the case at the beginning of deliberations is

7    often a more useful way to proceed.  Remember that you are not

8    partisans or advocates in this matter, but you are judges of

9    the facts.

10         The last thing I must do before you begin your

11    deliberations is to excuse the alternate jurors.  As I told you

12    before, the selection of alternates was an entirely random

13    process.  It's nothing personal.  We selected two seats to be

14    the alternate seats before any of you entered the courtroom.

15    Since the rest of you have remained healthy and attentive, I

16    can now excuse those jurors in Seats 7 and 14.

17         Before you do leave, I'm going to ask you to tear a

18    page out of your notebook and write down your name and

19    daytime phone number to Ms. Johnson.  I do this because -- I

20    have --

21              THE COURTROOM DEPUTY:  Judge, I have everything.

22              THE COURT:  So you don't know -- I do this because

23    it's possible, though unlikely, that we may need to summon you

24    back to rejoin the jury in this case in case something happens

25    to a regular juror.

1          Since that possibility exists, I am also going to

2   instruct you not to discuss the case with anyone until we call

3   you.  My earlier instruction on use of the internet still

4   applies.  Do not research this case or communicate about it on

5   the internet.  In all likelihood, we will be calling you to

6   tell you there has been a verdict and you are now free to

7   discuss the case.  There is, however, the small chance that we

8   will need to bring you back onto the jury.

9          Thank you very much for your service, and please

10  report back to the jury office to turn in your badge on your

11  way out.

12          With that, those are your instructions.

13          And Ms. Johnson here will very skillfully lead you for

14  the rest of the process.

15              (Proceedings held out of the presence of the jury.)

16          THE COURT:  All right.  Both sides can work

17  closely with Ms. Johnson to make sure that the right exhibits

18  go back.

19          MS. FISH:  Correct, Your Honor.  We're almost done, I

20  believe.

21          THE COURT:  Okay.  Perfect.  So they will -- assuming

22  they don't reach a verdict -- they will deliberate until

23  5:30 -- I do not bring everyone back at the end of the day.

24  Ms. Johnson will just release them at 5:30.  And then we'll, if

25  necessary, resume at Monday at 10 o'clock.

1          MS. FISH:  Just for the Court's preference, would the

2    Court like us to wait in the courtroom while they deliberate

3    or -- or provide a number to Ms. Johnson?  What's --

4          THE COURT:  If you provide a number and stay within a

5    reasonable period.  Not Tacoma.

6          MS. FISH:  Likely just getting coffee.

7          THE COURT:  Although it's harder and harder to get

8    coffee around here these days.

9          MS. FISH:  True.

10          THE COURT:  But, yes, there's a Starbucks on Seventh

11    Street.  So -- I think that's the closest one.

12          MS. FISH:  Perfect.  Thank you, Your Honor.

13          THE COURT:  All right.  Thank you.

14          (Recess taken at 3:40 p.m.)

15          (Proceedings were concluded at 5:30 p.m.)

16

17

18

19

20

21

22

23

24

25

1          <u>CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER</u>

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                    Dated this 17th day of July, 2023.

10

11               /s/ Nancy J. Meyer
                 Nancy J. Meyer
12               Official Court Reporter
                 Registered Diplomate Reporter
13               Certified Realtime Reporter
                 333 Constitution Avenue Northwest
14               Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

## '

'judicial [1] - 408:22

## 0

09 [1] - 379:5

## 1

1 [7] - 376:17, 407:22, 444:12, 468:4, 470:2, 471:1, 471:25
10 [1] - 412:9, 443:18, 477:25
102A [4] - 376:14, 376:17, 380:23, 381:2
103A [4] - 376:25, 377:4, 381:4, 381:7
105 [3] - 335:11, 336:15, 377:14
105A [2] - 381:9, 381:14
106 [1] - 348:6
107 [3] - 349:17, 349:20, 351:25
108 [1] - 351:20
10:00 [1] - 333:23
10th [1] - 405:7
11 [1] - 413:8
11-1 [1] - 475:18
110 [1] - 394:24
115.1 [3] - 382:17, 382:19, 383:5
115A [4] - 376:2, 376:4, 380:17, 380:21
11:46 [1] - 403:24
12 [2] - 413:11, 443:9
12-week [1] - 372:7
121 [7] - 373:21, 373:22, 374:4, 374:12, 374:15, 376:5, 380:15
13 [2] - 413:14, 443:9
14 [2] - 413:17, 476:16
15 [3] - 399:24, 414:6, 442:22
150 [1] - 453:18
1551 [1] - 411:17
16 [16] - 357:20, 357:25, 358:14, 360:18, 382:7, 400:3, 404:8, 404:21, 405:11, 405:12, 405:17, 405:24, 406:5, 413:4, 414:11, 414:25
17 [2] - 415:1, 417:5

18 [2] - 369:24, 416:23
1946 [1] - 418:15
1989-1990 [1] - 372:12
1:00 [2] - 404:3, 404:7
1:10 [1] - 426:11
1:40 [1] - 426:16
1:58 [1] - 453:16
1:59 [2] - 440:11, 453:16

## 2

2 [6] - 338:6, 407:25, 444:8, 444:10, 469:2, 470:23
20 [4] - 337:5, 418:8, 443:19, 454:7
20-minute [1] - 399:24
200 [4] - 384:4, 384:9, 384:14, 385:6
202 [5] - 385:24, 385:25, 386:6, 386:10, 398:1
2020 [3] - 426:8, 436:21, 446:5
2021 [17] - 338:4, 338:8, 378:8, 380:1, 381:1, 381:5, 381:12, 382:3, 383:4, 383:23, 384:2, 426:4, 426:11, 429:14, 436:5, 439:18, 453:1
203 [6] - 387:10, 387:12, 387:21, 387:25, 388:6, 398:15
204 [5] - 389:18, 389:19, 390:3, 390:6, 390:18
205 [6] - 390:15, 390:20, 390:21, 390:24, 391:3, 391:7
206 [4] - 391:16, 391:18, 391:21, 391:25
207 [4] - 392:7, 392:14, 392:18, 393:4
208 [5] - 393:6, 393:7, 393:11, 393:15, 393:25
209 [5] - 393:25, 394:2, 394:7, 394:10, 394:16
21 [2] - 415:1, 419:7
210 [5] - 394:18, 395:1, 395:2, 395:3, 395:6
22 [1] - 419:10

23 [1] - 419:20
23-week [1] - 372:13
24 [1] - 419:21
25 [2] - 419:24, 443:22
26 [4] - 350:12, 360:15, 413:4, 420:2
27 [1] - 420:5
28 [1] - 420:8
29 [1] - 400:12
2:00 [4] - 403:25, 404:9, 404:13, 423:16
2:15 [1] - 442:6
2:19 [1] - 442:6
2:20 [1] - 453:19
2:27 [1] - 442:25
2:28 [2] - 442:25
2:41 [1] - 443:10
2:47:20 [1] - 335:12
2:48 [1] - 336:2
2:49:24 [2] - 336:17, 336:18
2:49:29 [1] - 336:22
2:49:48 [1] - 337:8
2:49:49 [2] - 338:3, 338:6
2:52:45 [2] - 338:17, 338:20
2:52:52 [1] - 339:12
2:52:59 [1] - 340:2
2:53:09 [1] - 340:14
2:53:57 [1] - 341:6
2:54:19 [1] - 343:15
2:55:18 [1] - 344:1
2:56:52 [1] - 345:13
2:57:39 [1] - 346:4
2:59:18 [1] - 348:11
2:59:39 [1] - 349:3

## 3

3 [5] - 342:6, 408:3, 470:3, 471:25
3-inch [1] - 342:1
30 [3] - 430:11, 443:22, 457:8
300 [2] - 375:9, 379:16
302 [1] - 361:18
345 [1] - 411:15
38 [1] - 371:14
3:00 [3] - 350:12, 350:22, 352:9
3:02:46 [1] - 356:9
3:40 [1] - 478:14

## 4

4 [5] - 408:6, 408:14, 408:17, 471:7
40 [2] - 427:4, 457:8

401 [1] - 353:6
403 [4] - 335:5, 341:13, 353:6, 360:4
43 [1] - 350:22

## 5

5 [3] - 336:21, 409:6, 410:6
5-minute [1] - 457:9
50 [1] - 352:10
512 [1] - 423:21
5:30 [3] - 477:23, 477:24, 478:15
5th [1] - 378:8

## 6

6 [3] - 357:7, 409:9, 411:6
6-6 [1] - 475:18
6th [37] - 334:18, 336:8, 338:4, 338:8, 348:21, 349:10, 356:22, 357:8, 359:1, 360:1, 360:2, 362:22, 369:19, 369:21, 370:1, 375:18, 375:24, 378:5, 395:23, 426:4, 426:10, 428:14, 429:14, 429:15, 433:18, 435:9, 435:19, 435:24, 436:5, 439:18, 440:12, 445:20, 449:2, 452:12, 453:1, 456:10

## 7

7 [3] - 411:7, 448:13, 476:16
7-5 [1] - 475:18

## 8

8 [1] - 411:19
828 [1] - 410:1
834-35 [1] - 410:1

## 9

9 [1] - 411:22
966 [1] - 410:1
97 [1] - 411:15
98 [1] - 411:15
997 [1] - 411:17
9:00 [1] - 379:5
9th [1] - 379:3

## A

a.m [1] - 379:5
Abbott [40] - 334:6, 334:9, 334:14, 335:10, 335:15, 336:2, 336:6, 336:21, 349:19, 351:15, 354:9, 356:9, 357:25, 358:8, 358:21, 360:14, 360:23, 361:15, 361:25, 362:12, 362:14, 362:20, 369:18, 400:3, 405:5, 412:19, 428:3, 429:13, 430:14, 449:1, 449:4, 449:9, 450:2, 450:3, 450:6, 450:11, 450:17, 464:10
Abbott's [5] - 406:17, 407:11, 412:24, 448:25, 450:21
ability [1] - 463:6
able [31] - 352:5, 362:3, 367:25, 373:22, 375:10, 375:16, 375:23, 380:3, 380:12, 380:19, 380:20, 381:1, 381:6, 381:12, 382:25, 383:3, 383:13, 386:20, 386:22, 387:1, 388:8, 388:24, 390:8, 392:20, 393:20, 395:8, 425:23, 437:5, 452:16, 473:20
absence [1] - 467:4
absent [1] - 423:7
absolute [1] - 466:21
absolutely [1] - 361:9
abundance [3] - 405:20, 405:21, 413:6
academy [1] - 372:7
accept [5] - 373:9, 412:1, 412:25, 458:9, 466:3
acceptable [1] - 462:20
accepted [1] - 411:16
accident [2] - 429:25, 468:24
accidentally [1] - 368:17

**according** [1] - 372:16
**accuracy** [1] - 465:12
**accurate** [4] - 331:4, 374:8, 465:5, 466:3
**accurately** [1] - 464:23
**accusing** [1] - 460:11
**acquittal** [2] - 400:13, 475:19
**acquitted** [1] - 422:23
**Act** [2] - 360:15, 404:25
**act** [4] - 415:21, 429:24, 461:20, 468:23
**acted** [7] - 430:2, 433:4, 433:7, 434:10, 468:25, 470:16, 471:15
**acting** [1] - 447:23
**action** [2] - 413:5, 445:25
**actions** [5] - 363:13, 433:18, 433:19, 435:24, 453:1
**active** [1] - 371:13
**activities** [2] - 373:16, 471:22
**activity** [2] - 431:23, 469:24
**acts** [8] - 417:16, 417:20, 429:23, 433:10, 468:22, 471:2
**actual** [2] - 424:16, 462:4
**actus** [1] - 415:3
**add** [3] - 417:1, 418:5, 436:6
**added** [1] - 415:20
**addition** [3] - 417:23, 433:8, 475:1
**additional** [4] - 362:8, 373:15, 406:14, 414:23
**additionally** [1] - 360:17
**address** [5] - 333:5, 347:15, 358:1, 358:13, 413:2
**addressed** [3] - 409:25, 411:5, 411:10
**addresses** [1] - 420:23
**adjustable** [1] - 345:24
**administered** [1] - 370:12
**administration** [1] -

436:12
**admires** [2] - 442:9, 447:18
**admiring** [1] - 443:10
**admissibility** [1] - 331:24
**admissible** [1] - 464:2
**admission** [4] - 331:6, 374:12, 384:13, 390:2
**admit** [8] - 386:6, 387:21, 391:3, 391:21, 392:14, 393:11, 394:7, 394:24
**admitted** [35] - 335:11, 374:14, 374:15, 376:1, 386:9, 386:10, 387:24, 387:25, 390:5, 390:6, 391:6, 391:7, 391:24, 391:25, 392:17, 392:18, 393:14, 393:15, 394:9, 394:10, 395:1, 395:3, 424:1, 424:4, 438:9, 458:14, 459:17, 459:19, 472:13, 472:14, 472:18, 472:23, 473:5, 473:8, 473:12
**advantage** [3] - 421:25, 422:1
**advantages** [1] - 421:5
**advice** [1] - 402:14
**advocates** [1] - 476:8
**affect** [3] - 463:6, 463:8, 466:10
**affects** [1] - 465:1
**afternoon** [3] - 370:15, 426:1, 453:10
**afterwards** [2] - 356:15, 358:3
**age** [1] - 459:2
**Agency** [1] - 371:10
**agent** [8] - 332:11, 361:16, 370:25, 371:14, 372:12, 373:6, 373:7, 379:8
**Agent** [22] - 374:17, 381:16, 383:7, 383:18, 384:8, 385:6, 385:25, 386:12, 387:12, 390:8, 390:21, 392:20, 393:17, 394:12, 395:5,

399:12, 429:3, 429:6, 429:10, 429:12, 444:13, 444:25
**agents** [3] - 371:6, 378:13, 378:16
**aggressive** [3] - 343:20, 354:19, 354:20
**ago** [8] - 331:7, 336:24, 337:21, 338:1, 363:4, 372:10, 433:6, 437:8
**agree** [9] - 331:8, 347:20, 361:11, 406:18, 412:4, 413:5, 414:10, 447:3, 467:21
**agreeable** [2] - 355:4, 358:17
**agreed** [4] - 355:22, 405:22, 413:19, 459:22
**agreement** [1] - 414:7
**ahead** [4] - 362:17, 372:2, 400:10, 448:20
**alarms** [2] - 430:16, 436:16
**alert** [1] - 423:6
**allegation** [1] - 396:11
**allegedly** [1] - 447:12
**allow** [2] - 332:21, 463:7
**allowed** [11] - 343:9, 365:6, 366:10, 405:16, 430:20, 437:16, 438:1, 449:15, 455:7, 455:8, 455:9
**allowing** [2] - 425:17, 446:17
**almost** [5] - 371:16, 442:21, 442:25, 444:4, 477:19
**alone** [6] - 367:23, 439:6, 450:5, 458:15, 458:16, 464:19
**alternate** [2] - 476:11, 476:14
**alternates** [2] - 420:10, 476:12
**analyst** [2] - 332:3, 332:13
**angry** [1] - 448:2
**announce** [1] - 475:25
**announced** [1] - 476:2
**answer** [13] - 340:10, 341:11, 357:5,

360:5, 360:20, 361:3, 385:13, 412:16, 412:17, 457:3, 464:5, 464:7, 464:8
**answered** [3] - 335:6, 412:15, 464:6
**apart** [1] - 352:22
**apologies** [1] - 350:4
**apologize** [3] - 395:25, 427:15, 437:6
**appear** [7] - 337:15, 337:17, 351:4, 420:20, 441:4, 441:22, 472:22
**appearance** [3] - 375:11, 377:21, 380:6
**appeared** [2] - 338:7, 442:11
**appearing** [1] - 441:17
**applied** [1] - 346:6
**applies** [8] - 406:5, 415:2, 415:17, 416:17, 457:19, 458:8, 467:14, 477:4
**apply** [4] - 345:25, 416:18, 466:17, 470:18
**appointment** [1] - 365:12
**appreciate** [1] - 406:10
**apprehended** [2] - 428:2, 434:16
**approach** [3] - 353:16, 356:25, 357:1
**approached** [2] - 340:4, 340:16
**approaching** [1] - 447:16
**appropriate** [7] - 358:17, 412:7, 413:25, 417:4, 424:15, 467:5
**appropriations** [1] - 428:1
**Appropriations** [2] - 454:15, 455:9
**approved** [1] - 438:3
**April** [1] - 405:7
**arbitrary** [1] - 421:23
**area** [49] - 334:17, 334:19, 334:22, 335:4, 335:15, 346:9, 346:10, 348:12, 348:15, 349:19, 349:20, 349:23, 351:16,

352:16, 353:3, 356:10, 356:23, 357:9, 358:21, 378:13, 379:12, 388:19, 397:5, 397:6, 397:16, 398:18, 398:24, 415:22, 415:23, 416:2, 416:4, 428:25, 437:16, 437:25, 440:23, 441:15, 442:5, 442:6, 443:24, 444:10, 444:12, 444:22, 451:11, 451:16, 453:2, 456:20, 468:16
**areas** [2] - 346:14, 418:22
**arguably** [1] - 411:16
**argument** [6] - 362:2, 400:19, 406:19, 436:8, 456:6, 463:22
**arguments** [2] - 425:22, 460:5
**arm** [1] - 447:10
**Army** [6] - 370:25, 371:7, 371:12, 371:13, 372:11, 379:8
**arrest** [14] - 344:19, 345:1, 345:7, 372:22, 378:3, 378:14, 378:17, 378:19, 378:25, 379:2, 379:4, 379:10, 379:12, 451:7
**arrested** [8] - 344:20, 354:15, 363:8, 380:3, 382:3, 383:4, 384:1, 406:1
**arresting** [6] - 344:18, 379:14, 379:21, 380:13, 380:20, 382:14
**arrests** [1] - 345:22
**arrive** [2] - 351:16, 458:24
**arrived** [1] - 352:16
**aside** [3] - 447:5, 452:17, 452:21
**asleep** [1] - 462:18
**assembled** [1] - 435:12
**assembling** [1] - 425:8
**assembly** [2] - 346:9, 346:10
**asserted** [1] - 353:14

**asserts** [2] - 384:21, 462:4
**assessment** [2] - 373:1, 373:5
**assigned** [2] - 371:9, 371:10
**assignment** [5] - 371:15, 371:16, 371:21, 373:6, 373:13
**assignments** [1] - 371:17
**assist** [2] - 460:6, 472:10
**assume** [3] - 462:9, 462:14, 466:25
**assumed** [2] - 344:19, 346:9
**assuming** [2] - 344:9, 477:21
**assured** [1] - 452:16
**attempt** [4] - 357:13, 375:14, 375:20, 432:8
**attention** [4] - 372:25, 377:15, 443:23, 474:16
**attentive** [1] - 476:15
**attest** [1] - 332:8
**attitude** [1] - 475:21
**attorney** [2] - 401:11, 402:14
**attorneys** [1] - 459:13
**atypical** [1] - 362:25
**audio** [4] - 382:23, 435:22, 447:21, 472:16
**audio-visual** [3] - 382:23, 435:22, 447:21
**authentic** [1] - 330:19
**authenticity** [2] - 330:22, 331:25
**authority** [5] - 428:21, 429:19, 429:21, 431:5, 468:11
**authorize** [1] - 383:24
**available** [2] - 400:6, 467:9
**average** [1] - 342:16
**avoid** [2] - 418:11, 476:4
**aware** [8] - 358:12, 402:9, 429:23, 433:13, 458:19, 458:22, 468:23, 471:5
**awkward** [1] - 450:3

**B**

**backpack** [5] - 340:21, 342:21, 347:1, 366:23, 450:5
**backwards** [1] - 410:6
**bad** [1] - 355:12
**badge** [1] - 477:10
**bar** [1] - 430:21
**barely** [2] - 439:10, 448:13
**barricade** [8] - 426:14, 426:18, 427:3, 430:21, 453:16, 453:20, 453:21
**barricades** [13] - 386:22, 392:3, 426:12, 426:16, 426:20, 427:11, 435:11, 435:15, 454:25, 455:2, 456:7, 456:9, 456:12
**barriers** [4] - 439:21, 439:23, 442:6, 446:17
**based** [17] - 331:6, 378:4, 380:11, 380:18, 380:25, 381:5, 381:11, 396:4, 445:6, 445:7, 452:23, 461:12, 461:13, 461:21, 461:22, 473:19, 474:5
**baseline** [1] - 373:15
**baseline-type** [1] - 373:15
**basis** [3] - 413:4, 421:18, 452:5
**battled** [1] - 436:14
**bear** [1] - 475:13
**beautiful** [2] - 397:6, 440:5
**became** [3] - 371:23, 424:4, 424:8
**become** [4] - 372:4, 372:14, 373:3, 424:7
**becomes** [1] - 475:5
**began** [1] - 438:2
**begin** [3] - 425:23, 457:21, 476:10
**beginning** [7] - 333:10, 341:8, 348:8, 458:5, 474:22, 475:21, 476:6
**begins** [1] - 408:21
**behaved** [1] - 450:10
**behaving** [2] - 448:8, 453:6

**behavior** [1] - 465:2
**behind** [10] - 347:7, 367:12, 367:25, 381:22, 426:13, 438:12, 442:17, 442:20, 446:23, 450:4
**beings** [2] - 440:23, 458:18
**beliefs** [7] - 442:10, 447:1, 447:3, 447:4, 452:10, 452:20
**believability** [1] - 458:17
**believable** [3] - 455:12, 455:20, 463:18
**bell** [1] - 434:25
**bells** [1] - 406:20
**belonged** [1] - 359:7
**belongings** [5] - 342:19, 364:10, 366:24, 449:9, 450:6
**Bench** [4] - 353:18, 357:2, 360:11, 384:25
**bench** [1] - 384:24
**benefit** [2] - 337:22, 413:21
**best** [2] - 363:21, 449:1
**better** [2] - 411:2, 440:1
**between** [9] - 351:17, 364:25, 382:9, 389:2, 443:9, 443:19, 465:14, 465:18, 465:21
**beyond** [27] - 331:10, 405:11, 414:25, 428:8, 428:18, 431:3, 431:10, 432:16, 432:22, 433:7, 434:1, 435:4, 450:24, 451:18, 460:18, 460:22, 461:2, 461:5, 461:10, 461:23, 461:25, 464:16, 468:9, 469:7, 470:8, 471:12, 472:9
**bias** [2] - 414:2, 466:9
**biased** [1] - 466:7
**biases** [4] - 458:19, 458:21, 458:23
**big** [4] - 421:12, 439:14, 439:22, 443:16
**bike** [6] - 386:24, 388:25, 389:2,

439:24, 444:15, 444:18
**binder** [1] - 424:9
**bit** [18] - 330:13, 330:16, 334:24, 335:20, 337:24, 342:1, 344:24, 362:22, 367:10, 380:10, 395:18, 397:2, 442:11, 443:15, 447:10, 450:25, 467:25, 468:2
**black** [2] - 381:21, 381:22
**blacked** [1] - 472:15
**blade** [2] - 342:1, 342:5
**blared** [1] - 436:16
**blocked** [1] - 355:13
**blocking** [1] - 440:20
**blogging** [1] - 474:25
**blue** [22] - 336:5, 340:5, 340:17, 346:24, 363:11, 363:24, 376:17, 377:3, 377:18, 381:21, 383:13, 432:2, 437:9, 437:10, 437:20, 438:4, 438:10, 440:9, 441:25, 445:5, 446:6, 454:10
**bodies** [1] - 436:4
**body** [1] - 436:6
**bolsters** [1] - 330:13
**Book** [4] - 409:21, 411:18, 413:21, 417:11
**bottom** [2] - 351:24, 368:9
**box** [1] - 343:3
**breach** [3] - 435:15, 438:22, 453:17
**breached** [1] - 454:7
**break** [8] - 399:25, 404:24, 437:19, 447:24, 448:9, 448:11, 453:3, 457:9
**Bremerton** [4] - 378:10, 396:23, 397:3, 397:5
**Bridge** [1] - 397:12
**brief** [3] - 395:11, 435:21, 447:22
**briefed** [2] - 409:11, 416:25
**briefly** [1] - 358:11, 372:4, 397:23, 428:7, 428:13,

451:5, 474:18
**bring** [10] - 334:4, 366:21, 398:15, 403:10, 412:10, 423:2, 424:24, 449:13, 477:8, 477:23
**Building** [20] - 335:16, 343:10, 348:13, 364:23, 365:1, 366:11, 391:13, 396:9, 418:10, 426:6, 428:4, 432:21, 434:3, 435:6, 439:25, 447:17, 449:16, 456:15, 470:4, 471:9
**building** [46] - 334:21, 344:17, 355:5, 355:19, 365:13, 365:20, 398:23, 428:16, 428:21, 428:24, 428:25, 429:15, 429:18, 429:21, 430:8, 431:2, 431:5, 431:9, 431:13, 432:1, 432:12, 432:18, 433:24, 438:23, 438:24, 439:10, 439:11, 443:20, 445:1, 445:2, 447:8, 447:24, 448:3, 448:10, 448:13, 450:8, 454:4, 454:20, 455:7, 468:5, 468:11, 468:15, 468:16, 469:3, 469:10, 469:25
**Buildings** [7] - 433:1, 434:7, 434:9, 470:11, 470:19, 471:14, 471:23
**buildings** [5] - 359:10, 365:1, 365:7, 439:6, 443:13
**bulky** [1] - 446:9
**bunch** [1] - 348:18
**bundled** [2] - 447:10, 450:4
**burden** [10] - 421:3, 421:21, 428:18, 429:17, 450:23, 451:25, 452:1, 460:18, 461:4, 461:24
**business** [11] - 379:1, 384:16, 431:15, 431:18, 434:11,

445:14, 445:23,
446:1, 469:13,
469:16, 471:20

# C

**calm** [3] - 378:23,
442:16, 446:13
**calmly** [2] - 442:3,
476:5
**calmness** [1] - 442:16
**camping** [1] - 446:9
**canister** [3] - 342:14,
342:15, 364:3
**cannot** [6] - 417:12,
436:4, 439:5, 441:2,
449:24, 461:16
**capability** [1] - 466:11
**Capitol** [100] - 334:18,
334:21, 335:16,
343:8, 343:10,
345:5, 348:13,
349:19, 349:23,
350:3, 359:5,
359:16, 364:23,
365:1, 365:13,
365:14, 366:11,
369:23, 370:1,
374:21, 375:2,
375:17, 375:21,
375:24, 378:5,
379:17, 386:19,
386:20, 388:7,
388:8, 390:9,
390:11, 390:12,
390:13, 391:13,
392:24, 392:25,
393:17, 393:20,
394:13, 395:7,
396:9, 418:10,
426:5, 426:6,
426:11, 426:18,
427:2, 427:10,
427:20, 428:4,
429:4, 429:8,
429:11, 429:13,
430:4, 430:6,
430:11, 430:15,
430:17, 432:1,
432:3, 432:6,
432:21, 432:25,
433:16, 434:3,
434:7, 434:9,
434:15, 434:22,
434:24, 435:2,
435:6, 435:8,
435:11, 435:24,
436:7, 436:16,
436:19, 438:18,
439:25, 444:16,
444:18, 447:17,

449:13, 449:16,
456:15, 464:10,
470:4, 470:10,
470:19, 470:20,
471:9, 471:14,
471:23
**Capitol's** [2] - 426:17,
427:5
**captured** [1] - 376:17
**car** [1] - 365:21
**card** [1] - 450:5
**care** [1] - 399:23
**career** [1] - 371:20
**careful** [3] - 436:23,
461:14, 461:19
**carried** [1] - 414:14
**carry** [8] - 342:16,
347:9, 347:17,
347:19, 348:1,
367:15, 368:1, 432:2
**carrying** [10] - 336:4,
340:5, 340:19,
351:6, 376:17,
377:3, 377:17,
434:25, 456:3
**CART** [9] - 385:16,
386:3, 387:18,
389:23, 390:25,
391:19, 393:9,
394:4, 394:21
**Case** [1] - 408:18
**case** [69] - 330:8,
332:11, 360:16,
361:16, 371:24,
373:5, 373:6, 373:8,
373:12, 374:7,
395:19, 399:24,
402:23, 404:16,
412:18, 420:23,
421:7, 421:9,
424:19, 425:12,
425:14, 425:19,
428:6, 435:8,
436:22, 437:9,
438:16, 439:13,
439:19, 455:13,
455:21, 456:23,
457:19, 458:8,
458:13, 459:6,
459:9, 459:11,
459:18, 460:15,
461:14, 462:2,
463:2, 463:9,
463:21, 464:9,
465:9, 465:11,
466:15, 466:21,
467:2, 472:4, 474:6,
474:11, 474:13,
474:23, 474:25,
475:11, 475:20,

475:24, 476:3,
476:6, 476:24,
477:2, 477:4, 477:7
**cases** [7] - 406:3,
416:15, 451:9,
461:6, 461:8, 461:9,
474:8
**caught** [1] - 420:13
**caused** [1] - 367:6
**caution** [2] - 405:21,
413:6
**cease** [1] - 427:14
**cell** [4] - 368:5,
383:24, 384:1, 393:9
**Cellebrite** [2] - 330:10,
330:18
**center** [12] - 345:5,
363:9, 390:12,
390:13, 394:13,
398:20, 439:21,
440:2, 440:11,
440:24, 442:5,
443:21
**certain** [7] - 346:22,
406:20, 412:23,
414:13, 459:22,
464:9, 475:25
**certainly** [7] - 405:2,
405:25, 406:4,
410:14, 413:23,
439:14, 441:7
**certainty** [3] - 411:13,
461:24, 463:1
**certification** [15] -
330:12, 331:9,
331:12, 429:5,
429:11, 432:11,
432:13, 433:17,
433:20, 434:18,
435:10, 436:11,
436:21, 445:21,
456:2
**certify** [1] - 426:7
**chains** [1] - 367:4
**chair** [1] - 446:9
**chair-looking** [1] -
446:9
**challenges** [1] - 429:8
**challenging** [1] -
353:21
**Chamber** [1] - 454:9
**chance** [2] - 437:11,
477:7
**change** [2] - 354:5,
443:7
**changed** [2] - 415:12,
444:21
**changes** [1] - 442:23
**channel** [1] - 359:20
**chaotic** [6] - 357:7,

357:8, 363:2,
368:10, 369:21,
370:1
**chapter** [1] - 445:16
**characteristic** [1] -
459:1
**charge** [13] - 428:15,
433:5, 433:9, 434:5,
437:24, 444:8,
445:9, 445:12,
445:18, 450:23,
450:25, 463:8,
468:14
**charged** [7] - 428:12,
429:5, 431:7,
432:20, 436:19,
456:23, 460:24
**charges** [13] - 410:22,
412:3, 428:7,
428:13, 428:14,
463:5, 463:11,
464:16, 467:12,
468:4, 469:2, 470:3,
471:7
**charging** [3] - 333:16,
404:3, 404:8
**Charles** [4] - 372:20,
372:23, 373:18,
379:15
**cheating** [1] - 447:1
**check** [4] - 361:17,
361:20, 361:21,
400:6
**checked** [4] - 404:23,
404:24, 405:8,
430:10
**checking** [1] - 400:3
**chemical** [1] - 359:13
**chief** [2] - 399:24,
424:19
**child** [1] - 451:15
**choice** [1] - 436:5
**choices** [2] - 435:25,
436:1
**chose** [4] - 406:8,
431:25, 467:1
**chosen** [1] - 466:22
**circle** [12] - 336:3,
337:1, 349:7,
349:12, 350:10,
350:17, 351:10,
352:12, 387:4,
388:22, 398:8, 399:2
**circled** [2] - 336:5,
349:14
**circuit** [3] - 409:25,
410:1, 411:13
**circumstance** [1] -
409:24
**circumstances** [11] -

401:23, 402:4,
417:15, 417:17,
431:20, 462:7,
463:15, 465:13,
465:15, 469:20,
475:14
**circumstantial** [9] -
415:7, 455:21,
462:3, 462:8,
462:17, 462:19,
462:23, 462:25,
463:3
**citation** [2] - 417:25,
468:18
**cities** [1] - 436:4
**civil** [2] - 451:9, 461:6
**civilian** [1] - 371:13
**civilians** [2] - 439:23,
441:9
**civility** [1] - 473:22
**claim** [1] - 357:24
**clarification** [4] -
410:6, 410:18,
411:25, 415:2
**clarify** [1] - 420:11
**clause** [1] - 330:17
**cleaning** [1] - 442:13
**clear** [15] - 342:25,
343:5, 361:9, 396:7,
401:9, 407:4, 410:4,
415:4, 416:15,
417:10, 422:5,
425:11, 440:5,
450:17, 451:13
**cleared** [1] - 432:12
**clearer** [1] - 401:5
**clearly** [2] - 441:5,
455:24
**CLERK** [2] - 403:23,
422:17
**clerk** [5] - 422:13,
422:16, 474:17,
475:6, 475:14
**clicker** [1] - 426:2
**client** [3] - 357:24,
358:9, 360:19
**client's** [1] - 405:25
**climbed** [3] - 427:11,
427:16, 430:4
**close** [7] - 333:8,
333:12, 371:22,
440:12, 444:24,
453:4, 456:13
**closed** [6] - 364:8,
429:13, 430:15,
432:1, 435:8
**closely** [2] - 440:25,
477:17
**closer** [3] - 335:20,
421:3, 439:20

484

**closest** [1] - 478:11
**closing** [5] - 407:3, 423:9, 425:22, 456:6, 460:9
**clothing** [3] - 381:20, 381:24, 446:9
**co** [1] - 428:11
**co-counsel** [1] - 428:11
**coated** [1] - 466:9
**coffee** [2] - 478:6, 478:8
**Cohn** [1] - 423:4
**COHN** [1] - 423:14
**coin** [3] - 421:14, 422:2
**Coin** [1] - 422:16
**colleagues** [2] - 414:17, 427:24
**collection** [3] - 374:22, 376:15, 381:10
**College** [1] - 456:2
**columns** [2] - 443:17, 443:18
**combative** [1] - 449:4
**coming** [4] - 350:24, 353:21, 397:7, 397:15
**comma** [1] - 408:19
**commands** [1] - 337:16
**committed** [2] - 434:2, 438:19
**Committee** [2] - 454:16, 455:10
**committee** [1] - 428:1
**common** [2] - 455:14, 455:20
**communicate** [5] - 474:23, 475:6, 475:8, 475:9, 477:4
**communicated** [1] - 355:18
**communications** [1] - 474:24
**community** [1] - 439:15
**compare** [5] - 342:7, 376:3, 376:16, 377:2, 377:20
**compilation** [5] - 371:5, 374:24, 438:16, 439:12, 446:21
**complaining** [1] - 454:1
**complaint** [1] - 410:22
**complete** [2] - 341:1, 452:2

**completed** [1] - 429:11
**completely** [2] - 355:13, 456:9
**completeness** [1] - 331:24
**complicated** [1] - 467:10
**complies** [1] - 448:16
**comply** [1] - 343:17
**complying** [10] - 337:2, 349:8, 349:13, 350:11, 350:18, 351:11, 352:14, 388:23, 398:9, 399:4
**conceding** [1] - 413:3
**concept** [1] - 451:1
**concern** [6] - 330:16, 330:24, 353:24, 367:6, 449:21, 474:2
**concerned** [4] - 330:9, 406:21, 449:20, 465:11
**concerning** [1] - 412:19
**conclude** [5] - 376:7, 376:20, 377:7, 377:24, 457:20
**concluded** [4] - 358:14, 376:8, 472:3, 478:15
**conclusion** [2] - 356:5, 436:23
**conduct** [51] - 354:2, 372:15, 383:10, 428:14, 429:24, 431:8, 431:12, 431:15, 431:16, 431:17, 431:19, 431:22, 432:9, 432:17, 432:20, 432:25, 433:2, 433:13, 434:3, 434:11, 435:2, 435:25, 436:1, 437:18, 445:9, 445:11, 445:12, 447:20, 458:6, 468:23, 469:3, 469:9, 469:12, 469:14, 469:15, 469:16, 469:19, 469:23, 470:4, 470:10, 470:13, 470:22, 470:24, 471:6, 471:19, 472:2, 475:1, 475:3, 475:21
**conference** [9] -

333:7, 333:16, 353:18, 357:2, 360:11, 382:8, 384:25, 404:4, 404:8
**confirm** [7] - 362:3, 379:24, 380:12, 400:23, 403:15, 407:2, 410:20
**confirmed** [2] - 362:7, 403:18
**confirming** [1] - 332:24
**confiscated** [2] - 343:5, 365:22
**confront** [1] - 330:25
**confrontation** [2] - 330:17, 331:21
**confrontations** [1] - 441:22
**confusion** [2] - 396:7, 418:11
**Congress** [19] - 365:12, 426:6, 432:9, 432:11, 433:3, 434:12, 436:20, 437:18, 445:14, 445:20, 445:24, 453:4, 454:13, 456:3, 456:8, 470:14, 470:15, 471:20
**Congress's** [1] - 445:22
**congressional** [3] - 364:25, 365:6, 448:6
**conscious** [2] - 417:2, 417:25
**consciously** [1] - 458:22
**consent** [1] - 330:20
**consequences** [1] - 417:20
**consider** [37] - 360:1, 412:24, 415:9, 417:16, 430:2, 452:18, 452:21, 457:25, 458:10, 458:20, 459:16, 459:23, 459:25, 460:11, 460:12, 463:2, 463:9, 463:15, 464:11, 464:14, 464:17, 464:25, 465:2, 465:13, 465:17, 465:20, 465:22, 466:1, 466:4, 466:8, 467:13, 468:25, 472:23, 473:6, 473:9, 473:20, 474:6

**considerable** [1] - 475:22
**consideration** [4] - 459:5, 459:7, 461:15, 473:25
**considered** [2] - 412:12, 467:20
**considering** [1] - 475:10
**consistencies** [2] - 465:17, 465:20
**consistent** [2] - 359:15, 420:20
**consists** [1] - 459:18
**constitute** [1] - 415:21
**constitutional** [3] - 401:13, 401:17, 426:7
**constitutionally** [1] - 456:4
**consulted** [1] - 401:10
**contact** [3] - 336:8, 336:11, 354:2
**container** [1] - 454:19
**content** [1] - 450:20
**contents** [9] - 332:14, 385:18, 385:20, 386:15, 388:4, 389:24, 392:12, 394:22
**continue** [9] - 334:2, 334:5, 336:18, 337:4, 343:12, 351:15, 352:24, 362:7, 441:21
**continuing** [1] - 334:12
**contraband** [3] - 343:8, 359:18, 365:19
**contradicted** [1] - 466:4
**Contreras** [5] - 428:16, 428:23, 431:9, 432:21, 456:18
**Contreras'** [1] - 456:11
**control** [2] - 354:4, 459:15
**convened** [1] - 426:7
**conversation** [2] - 354:13, 382:4
**convey** [1] - 472:5
**conveying** [1] - 339:17
**convict** [3] - 451:12, 451:16, 451:22
**convicted** [2] - 445:17, 456:22

**conviction** [3] - 474:2, 474:4, 475:19
**convinced** [2] - 452:6, 461:16
**convincing** [1] - 451:13
**cooperative** [1] - 450:1
**coordinate** [1] - 378:13
**copies** [1] - 333:11
**copy** [4] - 374:8, 457:13, 457:15, 457:22
**cordoned** [2] - 428:24, 468:16
**corner** [1] - 438:4
**correct** [24] - 350:3, 355:9, 358:5, 366:11, 367:1, 367:19, 368:13, 382:21, 383:22, 395:20, 399:7, 400:25, 402:16, 402:19, 403:9, 407:13, 408:10, 408:11, 416:12, 417:7, 418:16, 423:12, 445:15, 477:19
**corridor** [1] - 439:8
**counsel** [4] - 333:8, 401:23, 402:4, 428:11
**Count** [13] - 415:1, 444:8, 444:10, 444:12, 468:4, 469:2, 470:2, 470:3, 470:23, 471:1, 471:7
**count** [8] - 441:3, 467:12, 467:15, 467:17, 467:18, 467:22, 470:1, 470:19
**counterintelligence** [1] - 372:12
**country** [1] - 439:16
**Counts** [1] - 471:25
**counts** [4] - 400:13, 436:25, 457:4, 467:24
**couple** [6] - 397:14, 398:3, 402:21, 437:8, 440:6, 449:7
**course** [12] - 371:20, 372:13, 402:2, 405:18, 407:2, 410:15, 431:23, 441:13, 464:3, 469:24, 472:12

**Court** [19] - 333:7, 358:17, 361:7, 401:23, 402:3, 406:10, 406:18, 406:23, 407:10, 410:8, 410:21, 412:11, 412:22, 413:2, 421:16, 422:5, 423:6, 457:3, 478:2

**COURT** [179] - 330:3, 330:6, 330:20, 331:8, 331:15, 332:7, 332:17, 332:20, 332:23, 333:3, 333:9, 333:19, 333:23, 334:1, 334:4, 334:9, 335:7, 340:8, 341:15, 353:7, 353:15, 353:17, 354:6, 356:3, 356:6, 357:1, 357:16, 357:22, 358:3, 358:18, 360:5, 360:10, 361:5, 361:22, 362:9, 362:11, 370:4, 370:8, 370:15, 372:2, 374:14, 376:11, 376:22, 377:9, 382:1, 384:18, 384:24, 385:3, 386:9, 387:24, 390:5, 391:6, 391:24, 392:17, 393:14, 394:9, 395:1, 395:13, 399:12, 399:14, 399:16, 399:19, 399:22, 400:2, 400:10, 400:14, 400:16, 400:18, 401:2, 401:7, 401:16, 401:19, 401:22, 402:2, 402:7, 402:10, 402:13, 402:17, 402:20, 403:1, 403:4, 403:10, 403:17, 403:22, 403:24, 404:7, 404:11, 404:14, 404:19, 404:21, 405:23, 406:14, 407:1, 407:13, 407:25, 408:3, 408:6, 408:9, 408:13, 408:17, 409:3, 409:5, 409:9, 409:13, 409:19,

410:10, 410:15, 410:19, 410:24, 411:3, 411:11, 411:22, 411:25, 412:13, 412:25, 413:7, 413:11, 413:14, 413:17, 413:20, 414:4, 414:11, 414:14, 414:21, 415:10, 416:20, 417:3, 418:3, 418:8, 418:15, 418:17, 418:19, 418:24, 419:4, 419:6, 419:10, 419:14, 419:20, 419:24, 420:2, 420:5, 420:8, 420:12, 420:15, 420:22, 421:7, 421:11, 421:18, 422:4, 422:8, 422:11, 422:13, 422:19, 422:22, 423:1, 423:8, 423:11, 423:13, 423:15, 423:18, 424:12, 424:21, 424:24, 425:3, 425:6, 425:10, 425:16, 436:9, 437:3, 448:20, 457:6, 457:15, 476:22, 477:16, 477:21, 478:4, 478:7, 478:10, 478:13

**court** [11] - 337:22, 354:7, 358:19, 362:10, 385:4, 416:6, 452:18, 462:11, 473:16, 475:12, 475:17

**Court's** [6] - 410:21, 422:3, 422:6, 425:1, 425:13, 478:1

**courtroom** [7] - 381:17, 424:16, 452:15, 458:24, 474:14, 476:14, 478:2

**COURTROOM** [7] - 370:11, 370:14, 382:19, 382:22, 404:6, 404:12, 476:21

**courts** [1] - 413:23

**coverage** [1] - 474:11

**covers** [1] - 415:8

**cowbells** [8] - 426:15,

427:12, 427:16, 428:2, 432:3, 434:15, 447:10, 454:10

**cradled** [1] - 447:10

**create** [1] - 331:24

**created** [1] - 361:19

**credentials** [1] - 372:11

**credibility** [5] - 458:16, 464:18, 464:21, 465:1, 466:16

**credit** [3] - 450:5, 465:22, 466:5

**crime** [6] - 415:21, 431:7, 432:19, 433:5, 434:2, 460:11

**crimes** [3] - 428:10, 428:12, 438:19

**criminal** [7] - 372:8, 410:7, 410:16, 460:10, 460:15, 461:9, 466:21

**criticized** [1] - 413:22

**cross** [5] - 357:17, 358:6, 362:7, 397:12, 406:8

**CROSS** [2] - 362:18, 395:14

**CROSS-EXAMINATION** [2] - 362:18, 395:14

**crossed** [2] - 444:12, 453:22

**crossing** [1] - 332:18

**crowd** [6] - 354:11, 394:13, 396:7, 426:19, 427:9, 455:17

**crowding** [2] - 431:21, 469:21

**crush** [2] - 441:19, 444:3

**Crypt** [1] - 349:25

**cuffs** [5] - 345:9, 345:10, 345:19, 345:20, 345:21

**curved** [1] - 341:25

**custody** [1] - 451:14

**cut** [3] - 368:17, 368:21, 450:7

**D**

**D.C** [7] - 365:4, 395:23, 396:14, 396:17, 426:22, 449:15, 470:21

**daily** [1] - 451:2

**damage** [3] - 447:24, 448:10

**damaging** [1] - 448:12

**danger** [1] - 360:3

**dashed** [1] - 427:9

**database** [4] - 374:21, 374:23, 375:7, 375:10

**date** [2] - 359:1, 359:2

**David** [19] - 372:20, 372:23, 373:18, 376:8, 377:12, 379:14, 379:24, 380:13, 426:9, 426:21, 426:25, 436:5, 436:16, 460:13, 460:20, 460:24, 461:3, 461:4, 466:22

**days** [2] - 437:8, 478:8

**daytime** [1] - 476:19

**deal** [6] - 355:7, 368:25, 400:4, 404:2, 439:22

**dealing** [2] - 343:18, 404:8

**December** [1] - 446:5

**decide** [15] - 346:7, 354:22, 355:1, 419:4, 439:12, 439:19, 455:13, 458:14, 458:15, 458:16, 459:6, 459:9, 462:22, 473:2, 474:13

**decided** [3] - 353:23, 403:7, 444:16

**deciding** [2] - 430:1, 468:24

**decision** [15] - 354:3, 354:23, 400:22, 401:9, 401:20, 402:8, 402:10, 402:14, 402:15, 402:17, 402:23, 403:2, 403:5, 466:23, 466:25

**deem** [1] - 467:5

**deeply** [1] - 335:7

**defendant** [108] - 332:9, 332:10, 342:20, 343:17, 344:3, 344:8, 346:21, 353:19, 357:3, 357:4, 357:6, 357:9, 359:4, 362:12, 400:21, 402:24, 405:16, 410:2, 410:3, 413:17, 414:1,

414:5, 415:15, 416:2, 416:3, 416:5, 416:9, 417:7, 417:17, 421:14, 422:23, 426:9, 426:14, 426:19, 427:25, 428:9, 428:12, 428:20, 428:22, 429:18, 429:20, 430:2, 430:3, 430:19, 431:4, 431:7, 431:11, 431:13, 431:25, 432:16, 432:19, 432:24, 433:1, 433:4, 433:7, 433:12, 433:14, 433:17, 434:1, 434:8, 434:9, 434:14, 434:17, 434:18, 434:20, 434:24, 435:4, 435:10, 435:15, 435:18, 435:19, 435:20, 435:23, 436:5, 436:10, 455:10, 456:13, 456:19, 456:23, 457:4, 460:15, 460:17, 464:16, 466:21, 466:25, 467:16, 468:4, 468:7, 468:10, 468:13, 468:25, 469:1, 469:2, 469:5, 469:8, 469:11, 470:4, 470:6, 470:9, 470:12, 470:16, 471:5, 471:8, 471:10, 471:13, 471:15, 474:1

**DEFENDANT** [10] - 401:6, 401:15, 401:18, 401:21, 402:1, 402:6, 402:9, 402:12, 402:16, 402:19

**defendant's** [12] - 342:18, 342:19, 383:11, 412:1, 412:19, 426:10, 431:16, 455:22, 456:4, 457:2, 461:16, 469:14

**defense** [10] - 401:23, 402:3, 403:15, 406:4, 412:6, 413:4, 414:22, 424:9, 425:19, 456:6

**defer** [1] - 413:1

**define** [1] - 417:1
**defined** [1] - 415:19
**defines** [1] - 417:23
**defining** [1] - 470:23
**definition** [4] - 415:7, 415:14, 418:10, 418:13
**definitions** [3] - 468:14, 469:18, 470:18
**degree** [1] - 462:25
**delayed** [1] - 432:10
**deliberate** [5] - 447:6, 455:15, 474:20, 477:22, 478:2
**deliberately** [1] - 450:21
**deliberation** [1] - 436:24
**deliberations** [19] - 362:16, 412:18, 425:24, 457:21, 457:23, 459:15, 459:16, 464:9, 464:14, 472:2, 472:4, 473:15, 474:3, 474:22, 475:2, 475:5, 475:22, 476:6, 476:11
**demeanor** [2] - 442:16, 465:2
**demonstrate** [3] - 433:19, 434:10, 471:19
**demonstrated** [2] - 434:8, 471:13
**demonstrating** [3] - 434:6, 435:5, 471:8
**demonstrative** [3] - 424:1, 424:4, 424:8
**deny** [2] - 400:20, 407:14
**depict** [2] - 388:6, 391:12
**depicted** [6] - 336:14, 348:13, 349:19, 377:4, 381:13, 393:21
**depicts** [3] - 386:20, 388:9, 390:9
**DEPUTY** [7] - 370:11, 370:14, 382:19, 382:22, 404:6, 404:12, 476:21
**descended** [1] - 426:4
**describe** [1] - 354:17
**described** [8] - 331:22, 342:2, 441:10, 464:23,

470:1, 470:23, 470:25, 471:24
**deserve** [1] - 458:25
**desire** [4] - 417:2, 417:25, 418:4, 466:10
**desiring** [1] - 459:16
**destroy** [1] - 436:18
**destroyed** [2] - 359:20, 449:22
**destruction** [2] - 359:18, 365:19
**destructive** [2] - 438:18, 453:5
**detail** [3] - 369:19, 429:9, 441:2
**details** [3] - 363:6, 441:3, 465:16
**detain** [2] - 345:22, 451:7
**detained** [9] - 346:7, 346:21, 349:9, 350:15, 351:7, 354:10, 354:24, 363:11, 406:1
**detainee** [4] - 348:22, 353:20, 355:7, 356:14
**detainees** [2] - 344:25, 346:9
**detaining** [2] - 346:1, 353:22
**detector** [1] - 430:12
**determination** [1] - 475:25
**determinations** [1] - 331:25
**determine** [8] - 375:16, 388:8, 458:12, 459:4, 462:2, 463:16, 464:19, 466:9
**determined** [2] - 375:11, 463:13
**determining** [3] - 452:22, 464:15, 466:3
**develop** [1] - 424:15
**difference** [2] - 338:14, 421:12
**differences** [2] - 433:6, 465:24
**different** [7] - 371:5, 373:6, 375:23, 388:12, 441:7, 444:1, 459:14
**difficult** [2] - 451:1, 452:14
**difficulties** [1] - 427:14

**dire** [2] - 333:7, 412:7
**direct** [17] - 334:5, 358:7, 358:13, 360:14, 360:21, 377:15, 396:3, 406:8, 415:7, 441:23, 462:2, 462:5, 462:12, 462:19, 462:23, 463:1, 463:3
**DIRECT** [2] - 334:12, 370:18
**directed** [1] - 442:3
**direction** [4] - 410:4, 438:5, 448:16
**directions** [1] - 344:22, 364:20, 369:8
**directive** [1] - 340:22
**directly** [5] - 417:12, 427:21, 432:6, 434:17, 443:21
**directs** [1] - 448:16
**disability** [1] - 459:3
**disagree** [2] - 416:11, 423:25
**disagrees** [1] - 423:21
**disappointed** [1] - 406:6
**disclosed** [6] - 358:4, 358:6, 360:22, 360:25, 361:10, 361:14
**discovery** [1] - 403:16
**discuss** [8] - 358:16, 402:23, 428:13, 457:2, 474:16, 474:18, 477:2, 477:7
**discussed** [5] - 402:10, 433:5, 433:8, 437:8, 452:8
**discussing** [1] - 476:6
**discussion** [1] - 476:3
**discussions** [1] - 473:21
**dislikes** [2] - 452:10, 458:18
**dismantled** [1] - 427:11
**disobey** [2] - 433:11, 471:3
**disorderly** [18] - 431:8, 431:11, 431:19, 432:10, 432:17, 432:20, 432:24, 434:3, 445:9, 445:12, 447:9, 469:3, 469:8, 469:19, 470:4, 470:9, 470:22,

470:24
**display** [1] - 386:18
**dispose** [2] - 359:12, 366:2
**disposed** [9] - 357:5, 357:14, 358:22, 359:8, 359:13, 359:15, 365:23, 366:7, 449:18
**dispute** [13] - 453:13, 453:15, 453:19, 453:24, 453:25, 454:5, 454:6, 454:8, 454:9, 454:12, 454:14, 454:17, 454:21
**disputes** [1] - 407:18
**disregard** [3] - 406:24, 433:11, 471:4
**disregarding** [2] - 412:2, 463:10
**disrespectful** [1] - 343:22
**disrupt** [10] - 431:14, 433:2, 436:20, 437:18, 445:10, 445:13, 453:3, 469:12, 470:13, 471:20
**disrupted** [2] - 431:17, 469:15
**disrupting** [1] - 436:10
**disruptive** [21] - 431:8, 431:12, 431:20, 431:22, 432:10, 432:17, 432:20, 432:25, 434:3, 434:11, 446:15, 447:20, 448:12, 453:5, 469:3, 469:9, 469:20, 469:23, 470:10, 470:22, 470:24
**disrupts** [1] - 469:23
**distinctive** [1] - 336:4
**district** [1] - 416:6
**disturb** [3] - 433:2, 445:13, 470:13
**disturbance** [2] - 431:22, 469:23
**divided** [1] - 475:17
**DMV** [9] - 373:19, 374:7, 374:8, 376:4, 376:18, 377:5, 377:22, 380:11, 380:16
**document** [3] - 384:8, 418:12, 472:15

**documents** [1] - 403:8
**done** [5] - 370:6, 415:14, 417:16, 459:8, 477:19
**door** [24] - 349:25, 351:17, 355:12, 379:11, 427:21, 428:3, 430:13, 434:17, 439:3, 439:9, 439:11, 442:21, 443:8, 443:9, 443:14, 443:23, 443:24, 444:1, 444:4, 452:10, 452:21, 454:7, 454:12
**doors** [6] - 430:5, 430:7, 430:9, 430:11, 430:18
**doorway** [2] - 442:22, 448:9
**doubt** [36] - 411:12, 428:9, 428:19, 431:4, 431:10, 432:16, 432:23, 433:7, 434:1, 435:4, 450:24, 450:25, 451:18, 452:5, 460:18, 460:23, 461:2, 461:5, 461:11, 461:12, 461:13, 461:17, 461:18, 461:21, 461:22, 461:23, 461:25, 464:16, 468:9, 469:7, 470:8, 471:12, 472:10
**down** [33] - 334:20, 337:11, 337:20, 337:25, 345:4, 346:18, 348:4, 349:16, 350:24, 351:15, 372:7, 376:14, 378:1, 387:7, 389:15, 390:15, 391:14, 392:5, 393:4, 393:25, 394:16, 397:12, 397:20, 398:14, 408:19, 427:3, 434:24, 448:23, 450:17, 450:22, 454:25, 476:18
**downstairs** [2] - 346:17, 347:22
**dozens** [1] - 455:1
**draw** [4] - 398:5, 460:1, 460:13, 467:8
**drawn** [1] - 462:7

**dressed** [1] - 445:7
**drive** [2] - 397:10, 397:12
**drop** [1] - 436:3
**drops** [1] - 436:3
**due** [1] - 341:13
**during** [23] - 343:4, 357:16, 369:2, 377:2, 404:24, 412:7, 412:23, 423:9, 424:6, 428:11, 445:25, 447:22, 448:5, 452:9, 457:23, 458:15, 459:15, 459:21, 464:3, 472:12, 474:22, 475:2, 475:5
**duty** [7] - 371:13, 409:24, 457:17, 458:9, 460:24, 461:2, 474:4

## E

**early** [1] - 362:23
**easier** [1] - 468:2
**easiest** [1] - 421:24
**easily** [1] - 406:3
**east** [12] - 386:21, 388:10, 389:3, 390:12, 390:13, 391:13, 439:21, 439:22, 453:17, 453:22, 455:2
**East** [10] - 350:2, 350:4, 351:18, 426:11, 426:17, 427:2, 435:10, 453:15, 455:18, 456:8
**easy** [2] - 345:24, 450:15
**edge** [5] - 438:10, 438:25, 439:4, 440:4, 440:14
**education** [1] - 459:4
**efficient** [2] - 403:12, 458:7
**egg** [10] - 426:15, 438:2, 438:7, 438:11, 439:1, 440:4, 440:10, 453:16, 453:21, 455:1
**either** [12] - 371:6, 415:14, 421:22, 433:3, 451:17, 463:14, 466:7, 466:18, 470:14,

472:25
**either/or** [1] - 331:17
**elapsed** [1] - 465:14
**election** [4] - 426:8, 436:11, 436:21, 445:22
**Electoral** [1] - 456:2
**electronic** [13] - 385:16, 386:2, 386:13, 387:15, 387:17, 389:22, 390:23, 391:17, 392:8, 392:10, 393:7, 423:8, 474:24
**electronically** [1] - 475:3
**element** [8] - 415:9, 415:15, 415:17, 418:2, 450:24, 452:7, 460:23, 461:1
**elements** [9] - 400:13, 400:19, 416:17, 468:7, 468:9, 469:7, 470:8, 471:11, 472:9
**elevator** [3] - 440:2, 440:21, 442:5
**elicit** [1] - 332:1
**elicited** [2] - 361:23, 361:25
**elsewhere** [2] - 438:18, 449:15
**email** [2] - 419:15, 474:24
**emphasize** [5] - 405:18, 406:23, 412:11, 412:21, 413:2
**emphasized** [1] - 447:12
**emptied** [1] - 359:13
**empty** [3] - 440:6, 440:12, 440:19
**encounters** [2] - 448:14, 448:15
**encourage** [1] - 473:22
**end** [8] - 333:12, 333:14, 333:16, 337:12, 439:9, 445:2, 454:17, 477:23
**endorsed** [2] - 411:13, 413:23
**ends** [2] - 348:17, 348:19
**enforce** [1] - 435:12
**enforcement** [11] - 337:12, 338:24, 351:2, 372:6, 427:1, 435:12, 436:7,

446:2, 446:6, 448:14, 448:15
**engage** [1] - 447:19
**engaged** [4] - 431:11, 432:24, 469:8, 470:9
**engaging** [4] - 431:8, 432:17, 432:20, 434:2
**ensuring** [1] - 401:10
**enter** [5] - 415:3, 430:6, 432:8, 454:15, 474:3
**entered** [16] - 411:3, 426:6, 427:20, 428:20, 429:14, 429:18, 429:21, 430:4, 431:4, 435:16, 435:24, 436:16, 454:6, 456:19, 468:10, 476:14
**entering** [5] - 416:3, 428:15, 436:7, 468:5, 475:23
**entire** [2] - 408:20, 434:15
**entirely** [5] - 440:20, 449:3, 449:4, 449:6, 476:12
**entitled** [2] - 460:4, 466:13
**equal** [1] - 462:24
**equally** [1] - 467:9
**escort** [2] - 346:8, 347:24
**escorted** [1] - 428:3
**escorting** [4] - 348:22, 350:14, 352:13, 353:3
**especially** [1] - 433:18
**essence** [1] - 332:6
**essential** [1] - 418:2
**essentially** [4] - 330:24, 409:16, 415:3, 421:2
**established** [1] - 416:16, 419:2
**estimate** [2] - 375:6, 427:1
**ethnic** [1] - 459:2
**evacuated** [2] - 427:23, 454:14
**evaluated** [1] - 466:14
**evaluating** [3] - 464:21, 465:12, 466:15
**event** [10] - 358:13, 431:23, 465:3, 465:14, 465:15, 465:16, 466:17,

469:24, 474:2, 474:4
**events** [1] - 378:4
**eventually** [2] - 378:3, 385:20
**ever-shifting** [1] - 449:2
**Evidence** [1] - 408:18
**evidence** [137] - 330:13, 332:15, 333:8, 335:11, 348:6, 349:17, 373:21, 374:15, 376:1, 376:13, 377:1, 382:18, 384:5, 384:14, 385:2, 385:8, 386:7, 386:10, 387:11, 387:22, 387:25, 390:3, 390:6, 390:20, 391:4, 391:7, 391:17, 391:22, 391:25, 392:15, 392:18, 393:12, 393:15, 394:7, 394:10, 394:19, 394:24, 395:3, 407:15, 410:7, 412:12, 415:8, 417:18, 419:1, 419:2, 423:21, 423:22, 424:1, 424:2, 424:5, 424:16, 424:20, 425:20, 428:5, 430:3, 432:15, 435:8, 436:22, 438:25, 447:7, 448:19, 451:8, 451:13, 451:20, 451:23, 452:3, 452:5, 452:6, 452:18, 453:11, 453:14, 455:22, 456:24, 457:19, 458:14, 458:16, 459:5, 459:13, 459:14, 459:17, 459:19, 459:24, 459:25, 460:3, 460:6, 460:7, 460:8, 460:9, 460:12, 460:13, 460:20, 461:14, 461:15, 462:1, 462:2, 462:3, 462:6, 462:8, 462:12, 462:17, 462:20, 462:21, 462:22, 462:25, 463:1, 463:2, 463:9, 463:13, 463:15,

463:23, 464:1, 464:13, 465:22, 466:5, 466:15, 467:2, 467:6, 467:9, 467:10, 467:13, 469:1, 472:4, 472:13, 473:2, 473:5, 473:8, 473:12, 473:19, 473:21, 473:24, 473:25, 474:6, 474:14
**evidentiary** [1] - 418:1
**exact** [1] - 438:24
**exactly** [3] - 344:16, 415:11, 449:10
**examination** [2] - 334:5, 358:14
**EXAMINATION** [5] - 334:12, 362:18, 369:16, 370:18, 395:14
**examine** [3] - 472:21, 473:6, 473:9
**example** [7] - 407:16, 412:14, 434:12, 462:9, 465:1, 471:20, 475:18
**examples** [1] - 438:21
**except** [2] - 475:9, 475:11
**excessive** [1] - 447:19
**exchange** [1] - 382:4
**exclusive** [1] - 459:12
**exclusively** [1] - 474:5
**excuse** [10] - 330:22, 339:4, 342:4, 362:6, 399:15, 407:6, 454:2, 472:17, 476:11, 476:16
**excused** [2] - 370:5, 399:13
**execute** [2] - 378:14, 379:4
**executed** [3] - 378:17, 379:12, 383:23
**exemplary** [1] - 411:14
**exercise** [1] - 466:22
**exercising** [2] - 401:24, 402:5
**Exhibit** [70] - 335:11, 336:15, 348:6, 349:17, 349:20, 351:20, 351:25, 373:21, 373:22, 374:12, 374:15, 376:2, 376:5, 376:14, 376:17, 376:25, 377:4,

377:14, 380:15,
380:21, 380:23,
381:2, 381:4, 381:6,
381:14, 382:17,
383:5, 384:4, 384:9,
384:14, 385:6,
385:24, 385:25,
386:6, 386:10,
387:10, 387:12,
387:21, 387:25,
388:6, 389:18,
390:6, 390:15,
390:20, 390:21,
390:24, 391:3,
391:7, 391:16,
391:18, 391:21,
391:25, 392:7,
392:14, 392:18,
393:4, 393:6, 393:7,
393:11, 393:15,
393:25, 394:2,
394:10, 394:16,
394:18, 395:3,
395:6, 397:25,
398:15, 423:21
**exhibit** [64] - 331:23,
335:23, 336:2,
336:17, 336:18,
336:21, 337:4,
337:8, 337:13,
337:19, 338:19,
339:9, 339:11,
339:14, 340:1,
340:13, 341:3,
341:5, 343:12,
343:25, 344:6,
345:13, 345:16,
346:4, 348:4, 348:5,
348:7, 348:11,
348:13, 349:2,
349:5, 349:16,
350:6, 350:21,
351:19, 351:21,
352:4, 352:6, 352:9,
352:25, 356:9,
375:12, 376:4,
376:13, 377:1,
377:16, 377:17,
378:1, 384:6, 384:7,
387:8, 388:2,
388:12, 390:23,
392:3, 392:5, 393:2,
395:9, 424:4, 424:7,
424:19, 424:21,
472:14, 472:18
**exhibits** [13] - 330:10,
333:1, 411:3,
419:15, 425:8,
457:2, 459:19,
464:12, 472:12,
472:21, 473:5,

473:7, 477:17
**exist** [1] - 436:4
**exists** [2] - 421:25,
477:1
**exited** [1] - 355:19
**expand** [1] - 400:15
**expect** [4] - 331:23,
357:3, 357:6, 408:23
**expected** [5] - 368:10,
445:6, 446:3, 446:4,
446:8
**experience** [1] - 460:3
**experienced** [1] -
441:12
**expert** [1] - 330:25
**explain** [5] - 334:24,
354:3, 371:2, 428:8,
467:24
**explained** [3] -
447:14, 458:5, 467:5
**explaining** [1] - 357:7
**explanation** [1] -
451:20
**express** [1] - 446:25
**expressed** [2] - 412:6,
459:10
**expresses** [2] -
442:10, 452:20
**expression** [2] -
459:3, 475:24
**extend** [1] - 416:13
**extended** [1] - 333:13
**extensive** [1] - 396:19
**extent** [3] - 413:24,
422:1, 464:20
**exterior** [1] - 349:24
**extra** [1] - 407:4
**extract** [7] - 332:13,
385:18, 386:14,
388:4, 389:24,
392:11, 394:22
**extraction** [2] -
330:18, 394:4
**extremely** [1] - 441:12
**eyes** [3] - 430:20,
430:25, 436:18
**eyewitness** [1] - 462:4

---

## F

**F.2d** [2] - 411:15,
411:17
**F.3d** [1] - 410:1
**face** [4] - 381:6,
381:12
**face-to-face** [2] -
381:6, 381:12
**faced** [1] - 429:8
**facial** [1] - 380:4
**facilitate** [1] - 473:20

**fact** [25] - 355:17,
357:4, 358:5,
378:17, 379:14,
380:13, 380:16,
381:24, 383:10,
384:1, 415:17,
416:8, 431:17,
432:10, 447:15,
452:2, 453:14,
453:19, 456:18,
459:23, 461:7,
462:5, 462:20,
467:16, 469:15
**facts** [20] - 405:6,
408:19, 415:21,
416:13, 416:18,
417:17, 453:13,
454:21, 455:14,
458:12, 458:13,
459:5, 459:19,
459:22, 460:1,
462:2, 462:6,
463:15, 473:2, 476:9
**failed** [2] - 461:1,
467:7
**fair** [10] - 362:25,
363:14, 374:8,
458:6, 458:25,
459:5, 463:6,
463:10, 473:19,
473:24
**fairly** [4] - 397:16,
421:20, 460:4,
466:13
**fallen** [1] - 352:22
**falling** [2] - 462:10,
462:12
**falsehood** [1] - 465:24
**family** [2] - 378:22,
417:6
**fancy** [1] - 422:24
**far** [5] - 337:12,
352:18, 392:2,
414:1, 456:16
**fashion** [2] - 443:25,
475:19
**fast** [1] - 336:17
**fast-forward** [1] -
336:17
**favor** [1] - 462:21
**favoritism** [1] - 459:7
**FBI** [26] - 332:2,
332:13, 371:1,
371:3, 371:4, 371:7,
371:9, 371:15,
371:17, 371:21,
371:22, 371:23,
372:5, 372:15,
372:16, 373:2,
373:5, 374:9,

374:23, 374:25,
375:7, 383:10,
389:24, 391:18,
394:21, 396:4
**FBI's** [2] - 372:10,
375:10
**fear** [1] - 459:6
**feasible** [2] - 355:2,
355:6
**feat** [1] - 450:16
**features** [1] - 380:4
**federal** [6] - 371:5,
372:6, 468:6, 469:4,
470:5, 471:9
**feelings** [7] - 412:2,
447:6, 452:12,
452:17, 452:19,
463:11
**feet** [5] - 398:10,
443:16, 443:18,
443:19, 443:22
**fellow** [3] - 344:24,
346:13, 434:20
**felt** [1] - 452:17
**ferry** [2] - 397:8,
397:10
**few** [12] - 333:4,
336:24, 339:14,
356:17, 363:23,
373:14, 398:10,
401:7, 438:21,
441:25, 448:4,
453:13
**field** [4] - 427:8, 440:4,
440:12, 440:19
**file** [4] - 373:12, 374:7,
374:9, 444:4
**filed** [1] - 331:22
**files** [8] - 387:18,
388:3, 389:23,
390:24, 392:11,
393:8, 394:3, 394:20
**filing** [2] - 417:1,
418:1
**fill** [2] - 359:19, 366:2
**final** [1] - 425:23
**finally** [1] - 434:5
**fine** [4] - 358:18,
400:7, 404:18,
418:23
**finger** [1] - 398:5
**finish** [1] - 333:14
**fired** [3] - 334:23,
335:1, 335:3
**fires** [1] - 334:25
**firmly** [2] - 452:6,
461:16
**first** [28] - 348:11,
351:20, 372:25,
375:14, 375:16,

400:2, 404:24,
415:11, 415:17,
420:20, 421:4,
422:20, 422:25,
428:15, 428:20,
430:6, 431:11,
432:24, 434:7,
448:14, 456:7,
456:15, 457:15,
468:10, 469:8,
470:9, 471:13,
473:14
**First** [1] - 470:20
**Fish** [3] - 382:9,
422:11, 425:11
**fish** [5] - 330:3,
400:10, 400:21,
402:20, 402:22
**FISH** [145] - 330:5,
330:7, 330:23,
331:12, 332:18,
332:24, 333:6,
333:17, 333:21,
335:5, 340:6,
341:13, 353:6,
353:12, 353:25,
356:2, 356:4,
356:24, 357:10,
357:18, 357:23,
358:5, 360:4, 360:8,
360:12, 361:14,
362:5, 362:19,
369:15, 371:25,
374:13, 376:9,
376:21, 377:8,
377:11, 382:6,
382:10, 384:15,
384:22, 386:8,
387:23, 390:4,
391:5, 391:23,
392:16, 393:13,
394:8, 394:25,
395:15, 397:25,
398:2, 398:14,
398:16, 399:10,
399:20, 400:5,
400:12, 400:15,
400:23, 402:25,
403:3, 403:9,
403:12, 403:19,
404:10, 404:18,
405:24, 406:16,
407:6, 407:9,
407:23, 408:1,
408:4, 408:7,
408:12, 408:15,
408:25, 409:7,
409:10, 409:16,
410:13, 410:20,
411:2, 411:9,
411:21, 411:24,

412:10, 412:22, 413:10, 413:12, 413:15, 413:19, 414:7, 414:12, 414:25, 415:13, 416:11, 416:25, 417:22, 418:9, 418:16, 418:23, 419:8, 419:11, 419:17, 419:19, 419:22, 419:25, 420:3, 420:6, 420:9, 420:14, 420:18, 420:25, 421:16, 422:3, 422:5, 422:9, 422:12, 422:15, 422:18, 422:21, 422:24, 423:3, 423:10, 423:12, 423:20, 424:17, 424:23, 424:25, 425:2, 425:7, 425:13, 436:8, 437:2, 437:5, 440:9, 443:4, 447:22, 448:21, 477:19, 478:1, 478:6, 478:9, 478:12

**five** [1] - 443:4

**flag** [33] - 336:5, 340:5, 340:17, 346:24, 351:6, 351:7, 351:10, 363:11, 363:24, 376:18, 377:3, 377:18, 383:13, 426:15, 427:12, 427:16, 428:1, 432:2, 434:14, 434:25, 437:9, 437:10, 437:12, 437:20, 438:4, 438:10, 440:9, 441:25, 445:5, 446:6, 446:9, 447:9, 454:10

**flags** [1] - 444:6

**flapping** [1] - 438:10

**flex** [5] - 345:9, 345:10, 345:19, 345:20, 345:21

**flip** [4] - 421:19, 422:2, 422:16

**flipped** [1] - 421:14

**flood** [1] - 436:3

**flooded** [1] - 427:5

**floor** [8] - 337:11, 339:21, 346:15, 348:20, 350:1, 356:13, 443:17,

454:10

**focus** [1] - 388:19

**focuses** [1] - 371:7

**folding** [4] - 341:22, 341:25, 363:24, 449:7

**folks** [1] - 418:4

**follow** [11] - 346:13, 363:17, 437:9, 437:11, 437:12, 437:20, 445:5, 446:6, 458:1, 458:11

**followed** [2] - 369:8, 437:10

**following** [4] - 468:9, 469:6, 470:7, 471:11

**follows** [2] - 444:7, 450:20

**food** [1] - 366:13

**footage** [2] - 375:2, 441:4

**football** [2] - 427:8, 440:4

**forbids** [2] - 433:11, 471:3

**force** [7] - 371:1, 371:3, 371:23, 372:5, 372:11, 372:15

**Force** [1] - 371:5

**forced** [1] - 430:18

**forcing** [1] - 455:2

**foreground** [3] - 336:4, 339:3, 388:24

**foreperson** [4] - 473:15, 473:17, 473:20, 475:7

**form** [10] - 359:19, 366:2, 373:2, 421:6, 422:7, 462:21, 472:3, 472:4, 472:6, 472:10

**formal** [4] - 445:22, 445:23, 448:7, 460:10

**formally** [2] - 421:17, 445:21

**formation** [1] - 344:20

**formations** [2] - 441:16, 443:6

**forming** [1] - 389:13

**formulations** [1] - 411:16

**forward** [3] - 335:12, 336:17, 338:16

**foundation** [2] - 331:24, 374:13

**four** [4] - 420:12, 428:12, 436:25, 443:4

**fourth** [2] - 408:18, 434:5

**foyer** [1] - 379:11

**frame** [6] - 336:4, 351:20, 355:13, 386:23, 392:25, 416:1

**free** [5] - 355:18, 368:21, 450:7, 458:2, 477:6

**friendship** [1] - 465:10

**frisk** [2] - 340:25, 451:4

**front** [5] - 339:5, 339:24, 379:11, 453:17, 468:1

**Front** [12] - 349:24, 350:2, 350:4, 351:18, 426:12, 426:17, 427:2, 435:10, 453:15, 455:18, 456:8

**fulfill** [1] - 426:7

**full** [3] - 355:14, 369:2, 473:24

**function** [2] - 431:15, 458:6, 458:12

**functions** [4] - 431:18, 436:13, 469:13, 469:17

**furthermore** [1] - 476:4

**future** [1] - 413:25

---

# G

**G112** [1] - 442:5

**gain** [1] - 465:9

**Galaxy** [2] - 385:11, 386:15

**galleries** [8] - 335:19, 335:22, 336:13, 344:19, 346:8, 346:15, 346:17, 348:18

**gallery** [19] - 334:17, 334:22, 335:4, 346:14, 348:24, 349:10, 349:21, 350:15, 351:8, 369:6, 427:21, 430:13, 432:8, 433:19, 434:17, 447:11, 448:4, 454:11, 454:13

**Gallery** [1] - 439:8

**gas** [3] - 367:2, 430:20, 436:17

**gassed** [1] - 454:2

**gather** [1] - 423:18

**gathering** [1] - 438:6

**gear** [1] - 446:8

**gender** [1] - 459:3

**general** [1] - 348:12

**generally** [4] - 345:22, 359:17, 396:10, 458:19

**gentleman** [8] - 336:22, 336:23, 337:9, 345:25, 346:6, 363:11, 377:17, 442:11

**gentleman's** [1] - 366:23

**gentlemen** [5] - 429:17, 432:15, 435:7, 453:10, 456:24

**geofence** [2] - 333:1, 333:2

**Georgia** [1] - 372:7

**gesture** [1] - 339:15

**Gig** [1] - 397:13

**given** [6] - 365:18, 400:18, 405:22, 412:6, 472:7, 473:9

**Glavey** [6] - 429:3, 429:6, 429:10, 429:12, 444:13, 444:25

**glimpse** [1] - 447:12

**Glynco** [1] - 372:7

**goal** [2] - 356:12, 458:24

**government** [91] - 330:10, 330:15, 332:25, 333:20, 357:10, 360:12, 360:18, 361:8, 361:14, 362:2, 362:7, 370:10, 374:11, 382:11, 384:13, 386:6, 387:21, 390:2, 391:3, 391:21, 392:14, 398:4, 399:18, 399:23, 400:6, 404:1, 405:22, 406:6, 412:4, 414:20, 419:12, 420:17, 421:3, 421:7, 423:21, 424:18, 425:3, 425:7, 427:22, 428:8, 429:17, 429:20, 431:3, 431:10, 431:15, 431:18, 432:22, 433:6, 433:25, 434:7,

**gathering** continued... **gear**

**greater** [3] - 462:25, 463:18, 466:18

435:3, 436:13, 437:15, 437:24, 438:15, 438:16, 438:22, 439:2, 439:7, 439:22, 444:2, 444:9, 445:9, 445:11, 445:12, 445:24, 447:12, 448:2, 449:21, 449:22, 449:25, 450:23, 451:21, 451:25, 452:4, 460:17, 460:22, 461:1, 461:4, 461:23, 464:15, 468:8, 469:6, 469:12, 469:16, 470:7, 471:11, 472:9

**Government** [13] - 373:20, 374:4, 374:15, 386:10, 387:25, 390:6, 391:7, 391:25, 392:18, 393:15, 394:10, 395:3, 397:25

**government's** [3] - 330:8, 410:13, 461:9

**Government's** [2] - 398:15, 442:4

**grant** [1] - 407:10

**granted** [1] - 407:12

**graver** [1] - 461:20

**great** [1] - 422:24

**greater** [3] - 462:25, 463:18, 466:18

**greatest** [1] - 436:2

**ground** [12] - 338:10, 338:22, 340:17, 344:4, 398:10, 428:21, 428:24, 431:9, 434:4, 454:18, 462:15, 462:16

**Grounds** [7] - 418:11, 432:21, 433:1, 449:16, 470:5, 470:11, 470:19

**grounds** [18] - 418:24, 419:2, 428:16, 428:25, 429:18, 429:21, 431:5, 431:13, 432:18, 443:13, 468:5, 468:11, 468:15, 468:17, 469:4, 469:10, 469:25, 470:21

**group** [3] - 389:8, 390:14, 396:12

**growing** [1] - 426:19
**guess** [1] - 472:24
**guessing** [1] - 397:1
**guesswork** [1] - 461:22
**guidelines** [1] - 466:16
**guilt** [9] - 409:17, 409:24, 409:25, 451:20, 460:13, 460:14, 461:17, 461:23, 461:25
**guilty** [24] - 410:2, 410:3, 420:20, 422:20, 428:9, 432:16, 435:4, 436:25, 452:7, 453:9, 457:4, 460:18, 460:25, 461:3, 461:5, 466:25, 467:16, 467:17, 468:7, 469:5, 470:6, 471:10

## H

**hair** [1] - 366:17
**half** [1] - 404:1
**hallway** [10] - 336:14, 338:4, 338:8, 348:16, 348:18, 348:22, 350:1, 447:11, 447:13, 448:22
**hallways** [3] - 434:24, 448:4
**hand** [14] - 339:15, 342:7, 342:8, 351:21, 364:1, 368:15, 372:18, 392:2, 428:2, 449:11, 457:10, 460:25, 462:6
**handcuffed** [5] - 347:5, 347:24, 428:3, 434:16, 454:20
**handcuffs** [5] - 345:2, 345:23, 345:25, 346:6, 347:7
**handing** [2] - 345:15, 345:18
**handle** [1] - 403:20
**handling** [1] - 371:24
**hands** [6] - 337:20, 337:25, 367:12, 367:25, 427:17, 450:4
**happy** [7] - 358:16, 372:1, 403:13,

423:22, 423:23, 424:19, 424:21
**Harbor** [1] - 397:13
**hard** [1] - 406:20
**harder** [2] - 478:7
**hat** [2] - 349:14, 383:16
**hate** [1] - 410:5
**head** [2] - 404:6, 420:25
**headquarters** [1] - 371:11
**healthy** [1] - 476:15
**hear** [4] - 362:2, 435:20, 456:17, 472:21
**heard** [26] - 360:8, 362:11, 406:12, 428:5, 429:3, 429:6, 429:10, 429:12, 430:13, 432:5, 433:14, 435:19, 438:21, 444:25, 445:4, 445:19, 451:24, 452:11, 453:11, 453:14, 454:3, 455:16, 456:5, 456:6, 456:13, 456:24
**hearings** [2] - 434:13, 471:21
**hearsay** [4] - 335:6, 353:25, 384:15, 384:18
**Hearsay** [1] - 353:12
**held** [11] - 330:2, 333:25, 354:7, 358:19, 362:10, 382:8, 385:4, 400:1, 425:15, 446:4, 477:15
**help** [4] - 347:19, 439:12, 439:19, 473:21
**helpfully** [1] - 398:3
**herself** [1] - 466:7
**hesitate** [2] - 461:20, 476:2
**high** [1] - 414:15
**higher** [5] - 435:9, 451:3, 451:5, 451:7, 451:13
**highest** [2] - 451:2, 451:18
**highlight** [3] - 407:16, 412:5, 417:4
**highlighted** [1] - 407:19
**highly** [2] - 451:15, 461:8

**himself** [5] - 368:23, 430:6, 433:14, 435:19, 447:23
**hints** [1] - 330:13
**historical** [1] - 405:6
**history** [1] - 446:22
**hold** [11] - 411:11, 414:15, 427:2, 449:20, 449:24, 449:25, 452:4, 463:24, 466:23, 472:25
**holding** [3] - 426:13, 426:18, 447:9
**home** [9] - 359:11, 359:13, 378:19, 383:8, 383:11, 383:14, 396:21, 397:20, 439:20
**honest** [1] - 461:15
**Honor** [119] - 330:7, 330:23, 332:22, 333:6, 333:17, 333:18, 333:21, 334:3, 334:11, 335:5, 340:6, 353:6, 353:13, 353:25, 356:2, 356:4, 357:10, 357:18, 358:5, 360:8, 360:12, 360:24, 361:2, 361:21, 362:5, 370:7, 370:17, 371:25, 376:9, 377:11, 382:6, 382:10, 384:15, 395:2, 395:12, 399:20, 400:5, 400:9, 400:12, 400:23, 400:25, 402:25, 403:3, 403:9, 403:19, 404:10, 404:18, 404:23, 405:24, 406:16, 406:21, 407:9, 407:23, 407:24, 408:1, 408:2, 408:4, 408:5, 408:7, 408:8, 408:12, 408:15, 408:16, 408:24, 408:25, 409:7, 409:10, 410:5, 410:13, 411:2, 411:8, 411:9, 411:20, 411:23, 412:10, 413:1, 413:9, 413:10, 413:12, 413:15, 413:19, 414:3,

414:7, 414:12, 414:25, 415:13, 416:11, 416:24, 416:25, 417:22, 418:5, 418:9, 419:9, 419:13, 419:22, 419:23, 420:3, 420:6, 420:9, 420:18, 420:25, 421:16, 422:10, 422:12, 422:21, 423:3, 423:20, 423:25, 424:18, 424:23, 424:25, 425:2, 425:5, 425:7, 436:8, 437:2, 448:18, 477:19, 478:12
**hopes** [3] - 436:10, 442:19, 446:25
**hoping** [1] - 398:4
**Hopkins** [1] - 339:24
**hostility** [1] - 465:10
**hour** [4] - 380:10, 400:7, 404:1, 438:11
**hours** [5] - 375:6, 375:9, 379:16, 397:14, 432:11
**House** [51] - 334:17, 334:22, 335:4, 335:19, 335:22, 336:13, 348:18, 349:10, 349:21, 350:15, 351:8, 359:6, 359:10, 388:16, 388:18, 388:20, 389:12, 426:15, 427:12, 427:16, 427:21, 427:25, 430:4, 430:5, 430:13, 432:4, 432:8, 433:3, 433:15, 433:19, 434:17, 435:3, 435:16, 435:17, 439:11, 441:6, 447:11, 453:16, 453:21, 453:22, 454:6, 454:9, 454:11, 454:13, 454:15, 455:1, 455:9, 456:8, 470:14
**Howell** [1] - 414:15
**Howell's** [1] - 416:21
**human** [2] - 440:23, 458:18
**hundred** [3] - 343:1, 436:14, 443:16
**hundreds** [3] - 426:25, 450:16, 450:18

## I

**idea** [11] - 352:21, 355:12, 358:15, 359:7, 359:8, 359:22, 384:22, 418:6, 437:22, 439:16, 439:22
**identical** [1] - 411:14
**identification** [1] - 473:8
**identified** [4] - 336:24, 337:10, 381:16, 381:25
**identify** [10] - 352:5, 374:20, 380:19, 380:21, 381:1, 381:6, 381:13, 381:19, 382:25, 383:3
**identity** [1] - 459:3
**ignorance** [2] - 429:24, 468:24
**ignore** [6] - 412:16, 458:1, 458:11, 459:11, 464:4, 464:7
**illegal** [2] - 445:17, 447:5
**image** [4] - 338:2, 338:6, 388:6, 390:23
**images** [3] - 376:15, 381:10, 438:15
**imaginary** [1] - 461:21
**immediate** [1] - 417:6
**immediately** [5] - 355:5, 355:19, 379:19, 442:21, 448:15
**impact** [1] - 406:21
**impartial** [4] - 458:25, 461:15, 463:6, 463:10
**impede** [6] - 431:14, 433:2, 445:10, 445:13, 469:12, 470:13
**impeded** [2] - 431:17, 469:15
**impeding** [4] - 434:12, 445:24, 471:21
**implicate** [1] - 472:19
**implication** [1] - 405:17
**implicit** [1] - 458:21
**implies** [2] - 409:17, 461:12
**importance** [1] - 475:22
**important** [4] - 368:25, 436:13,

491

450:6, 461:20
**imposing** [1] - 474:4
**impossible** [1] -
363:17
**impresses** [2] - 465:4,
465:5
**impression** [1] -
344:18
**improbability** [1] -
466:2
**improper** [2] - 436:8,
466:24
**improvise** [1] - 363:13
**inadmissible** [1] -
472:19
**inadvertently** [1] -
474:15
**inappropriate** [2] -
331:13, 406:20
**inches** [1] - 342:6
**include** [7] - 330:10,
372:15, 375:1,
375:4, 417:11,
418:4, 471:22
**included** [1] - 346:24
**includes** [6] - 410:23,
418:20, 418:21,
468:20, 470:20,
474:24
**including** [5] - 360:13,
430:3, 465:13,
469:1, 472:18
**income** [1] - 459:4
**inconsistencies** [3] -
465:18, 465:21,
465:23
**incorrect** [1] - 416:1
**independent** [1] -
475:1
**indicate** [3] - 364:5,
417:18, 446:15
**indicated** [9] - 360:21,
363:8, 364:24,
367:11, 395:19,
396:14, 396:16,
396:21, 459:10
**indicating** [1] - 459:9
**indictment** [1] - 417:8
**individual** [47] - 336:3,
336:5, 336:9,
336:12, 340:16,
341:8, 341:19,
345:7, 346:21,
347:5, 347:11,
349:9, 350:14,
350:17, 351:7,
352:12, 352:21,
353:3, 353:22,
354:10, 355:12,
355:18, 355:21,

358:23, 359:24,
372:19, 372:23,
373:17, 375:8,
375:11, 375:12,
375:15, 375:17,
375:21, 375:23,
376:4, 376:16,
376:18, 377:3,
377:5, 377:12,
377:21, 377:22,
381:2, 381:13,
382:14
**individual's** [1] -
472:20
**individually** [1] -
402:13
**individuals** [3] -
337:17, 339:19,
350:24
**indulgence** [3] -
395:11, 425:1,
425:17
**infer** [4] - 417:14,
417:18, 417:19,
467:5
**inference** [2] - 460:13,
467:8
**inferences** [2] - 460:2,
462:7
**influence** [3] - 402:8,
467:17, 474:3
**information** [20] -
330:11, 332:3,
357:11, 374:23,
380:12, 406:7,
410:7, 410:8,
410:16, 410:22,
410:25, 460:10,
460:12, 467:12,
467:17, 467:19,
468:4, 469:2, 470:3,
471:7
**informed** [1] - 428:11
**initial** [3] - 373:14,
438:22, 476:5
**initiated** [1] - 396:3
**Innis** [1] - 406:3
**innocence** [3] -
451:25, 460:16,
460:20
**innocent** [1] - 460:16
**inquisitive** [2] -
354:18, 354:20
**inside** [20] - 343:8,
343:9, 344:17,
359:10, 366:10,
375:17, 387:3,
427:18, 427:20,
427:22, 430:7,
430:11, 430:21,

432:4, 435:2,
436:18, 439:3,
447:8, 447:17, 454:8
**Inspector** [14] - 427:1,
427:23, 429:12,
430:14, 430:17,
439:25, 441:10,
442:24, 443:5,
443:15, 444:13,
446:3, 447:14
**instance** [1] - 409:22
**instances** [1] - 411:16
**instead** [3] - 406:8,
420:11, 426:24
**instruct** [9] - 344:3,
428:17, 428:23,
431:9, 432:22,
447:5, 458:7, 458:9,
477:2
**instructed** [1] - 450:15
**instruction** [15] -
332:13, 333:7,
406:11, 406:24,
407:15, 409:21,
410:17, 413:21,
415:8, 415:25,
417:10, 418:6,
450:21, 474:21,
477:3
**Instruction** [2] -
414:8, 420:9
**instructions** [30] -
333:12, 400:20,
403:20, 407:17,
413:24, 416:6,
420:16, 425:23,
456:11, 456:17,
457:7, 457:18,
457:20, 457:22,
457:24, 457:25,
458:2, 458:3,
458:10, 468:1,
468:19, 470:2,
470:23, 471:1,
471:24, 472:1,
472:7, 472:8, 477:12
**instruments** [1] -
438:6
**intelligent** [2] -
401:12, 403:5
**intelligently** [1] -
403:2
**intend** [8] - 333:1,
410:24, 410:25,
425:8, 437:23,
445:17, 453:3
**intended** [7] - 426:24,
437:17, 445:13,
445:14, 445:21,
448:11, 460:6

**intending** [1] - 330:15
**intends** [2] - 417:19,
442:15
**intent** [22] - 333:10,
410:21, 417:1,
417:9, 417:10,
417:11, 417:12,
417:14, 417:18,
417:23, 417:24,
431:14, 432:5,
433:2, 433:10,
433:20, 435:20,
445:10, 469:12,
470:12, 471:2
**intentional** [1] -
465:24
**intentionally** [2] -
417:20, 417:21
**interacted** [1] - 445:3
**interacting** [1] - 369:2
**interest** [4] - 361:1,
361:12, 465:8, 466:8
**interested** [1] - 404:17
**interferes** [2] - 431:20,
469:20
**intermission** [1] -
435:21
**internet** [4] - 474:10,
475:4, 477:3, 477:5
**interpretation** [2] -
415:16, 416:12
**interpretations** [1] -
415:18
**interrogation** [3] -
405:13, 405:14,
406:3
**interrupts** [1] - 431:23
**intervened** [2] -
447:25, 453:7
**interview** [13] -
361:18, 405:9,
427:18, 432:4,
433:15, 433:23,
435:18, 442:14,
446:12, 453:25,
454:1, 455:23
**interviews** [1] - 373:14
**introduce** [2] - 330:15,
333:1
**introduction** [2] -
330:21, 331:18
**investigation** [12] -
372:18, 372:19,
373:2, 373:4,
374:18, 376:3,
376:16, 377:2,
377:20, 396:4, 475:2
**investigations** [2] -
371:8, 372:16
**investigative** [2] -

373:15, 374:20
**investigator** [1] -
372:8
**invite** [1] - 473:23
**involve** [1] - 378:23
**involved** [3] - 372:19,
372:22, 373:3
**involvement** [1] -
378:4
**irrelevant** [2] - 456:9,
456:14
**irritant** [1] - 359:13
**issue** [14] - 330:17,
331:21, 358:13,
400:3, 404:2, 404:9,
404:22, 407:3,
420:23, 421:8,
423:5, 467:2, 475:20
**issued** [1] - 396:4
**issues** [4] - 399:23,
400:13, 404:8,
425:17
**item** [1] - 381:19
**items** [35] - 342:19,
342:23, 343:2,
343:9, 346:22,
347:3, 347:9,
347:12, 347:13,
348:1, 355:24,
357:14, 359:6,
359:15, 363:23,
364:14, 364:23,
365:3, 365:9,
365:14, 366:10,
367:8, 368:1,
381:24, 384:12,
385:17, 386:3,
386:13, 391:18,
449:12, 449:18,
449:20, 449:22,
449:24
**itself** [5] - 330:12,
401:9, 405:11,
438:23, 463:6
**IV** [1] - 408:18

---

**J**

**jacket** [1] - 381:21
**jackets** [1] - 444:6
**jail** [1] - 451:7
**January** [38] - 334:18,
336:8, 338:4, 338:8,
348:21, 349:10,
356:22, 357:7,
357:8, 359:1, 360:1,
360:2, 362:22,
369:19, 369:21,
370:1, 375:18,
375:24, 378:5,

395:23, 426:4,
426:10, 428:14,
429:14, 429:15,
433:18, 435:9,
435:19, 435:24,
436:5, 439:18,
440:12, 445:20,
449:2, 452:12,
453:1, 456:10
**Jencks** [12] - 356:2,
357:19, 358:1,
358:12, 360:15,
360:16, 360:25,
404:25, 405:1,
405:2, 413:4
**Johnson** [7] - 373:25,
404:15, 476:19,
477:13, 477:17,
477:24, 478:3
**join** [2] - 431:25,
450:20
**joined** [1] - 426:9
**joining** [1] - 369:5
**Joint** [2] - 371:4,
456:3
**jointly** [1] - 418:4
**jostle** [1] - 447:18
**jostling** [2] - 431:21,
469:21
**JTTF** [1] - 372:9
**Judge** [10] - 414:15,
416:21, 428:16,
428:23, 431:9,
432:21, 456:11,
456:18
**judge** [6] - 430:1,
447:5, 452:8,
452:16, 457:18,
476:21
**judges** [4] - 414:16,
458:13, 464:18,
476:8
**judging** [1] - 464:20
**judgment** [6] - 400:13,
460:4, 464:25,
466:12, 467:9,
467:20
**judicial** [2] - 408:9,
408:20
**jumped** [1] - 447:16
**jurisdictional** [1] -
416:18
**juror** [6] - 467:21,
473:23, 475:23,
476:2, 476:25
**JUROR** [1] - 457:13
**jurors** [10] - 397:1,
418:12, 418:14,
455:13, 474:16,
475:15, 475:21,

476:4, 476:11,
476:16
**jury** [57] - 330:2,
331:14, 333:11,
333:25, 345:20,
348:15, 349:7,
371:2, 388:22,
400:1, 400:19,
403:10, 403:20,
403:25, 404:9,
404:16, 406:12,
406:22, 406:24,
407:17, 409:24,
410:2, 410:9,
410:14, 413:24,
415:8, 421:3, 423:2,
423:6, 423:24,
424:7, 424:11,
424:12, 424:22,
424:24, 425:15,
452:9, 452:15,
455:15, 457:17,
458:12, 463:5,
473:4, 473:14,
474:20, 474:23,
475:8, 475:10,
475:17, 475:23,
476:5, 476:24,
477:8, 477:10,
477:15
**justice** [1] - 459:1
**justified** [1] - 460:2

# K

**Karambits** [1] - 342:1
**keep** [6] - 378:23,
431:1, 433:24,
449:1, 454:4, 473:7
**keeping** [1] - 361:12
**keeps** [1] - 448:2
**key** [2] - 368:7, 450:5
**kind** [21] - 331:16,
332:18, 340:24,
342:13, 343:3,
344:19, 345:23,
353:10, 364:24,
365:9, 367:14,
368:10, 371:23,
371:24, 372:4,
398:22, 405:19,
446:9, 460:12,
461:18
**kinds** [2] - 444:4,
446:21
**knewingly** [2] - 429:22
**knitting** [1] - 366:19
**knives** [13] - 341:22,
341:24, 341:25,
342:2, 342:9, 359:9,
359:10, 363:24,

427:17, 449:7,
449:10, 454:18
**knowing** [3] - 401:11,
403:5, 417:13
**knowingly** [31] -
403:2, 415:2, 415:7,
415:11, 415:14,
415:16, 415:19,
415:21, 428:22,
429:22, 429:23,
430:2, 431:14,
432:17, 433:4,
433:8, 434:2, 434:6,
434:10, 435:5,
456:19, 468:13,
468:22, 468:25,
469:11, 469:25,
470:17, 470:25,
471:16, 471:23
**knowledge** [6] -
360:24, 361:11,
376:10, 416:12,
416:16, 462:5
**known** [2] - 374:2,
445:20
**knows** [3] - 439:25,
449:17, 452:24

# L

**lack** [2] - 452:4,
461:14
**ladies** [5] - 429:16,
432:15, 435:7,
453:10, 456:24
**lamppost** [1] - 440:10
**lamppost-looking** [1]
- 440:10
**language** [4] - 411:14,
412:1, 417:3, 417:25
**lapses** [1] - 465:23
**laptop** [2] - 473:11,
473:13
**large** [19] - 336:4,
340:5, 340:16,
342:15, 346:24,
351:6, 376:17,
377:3, 377:18,
383:13, 390:14,
394:13, 395:7,
406:17, 407:12,
423:20, 424:1,
446:5, 454:10
**last** [8] - 339:14,
405:18, 421:11,
422:22, 433:8,
453:12, 456:25,
476:10
**LAW** [2] - 403:23,
422:17
**law** [44] - 337:12,

338:24, 351:2,
372:6, 420:23,
421:7, 421:10,
422:13, 422:16,
427:1, 428:17,
433:11, 433:12,
433:13, 433:22,
435:12, 436:6,
436:24, 437:19,
442:15, 445:15,
445:16, 446:2,
446:6, 446:15,
448:11, 448:14,
448:15, 453:3,
457:19, 458:7,
458:8, 458:9,
460:19, 462:19,
462:20, 468:6,
469:4, 470:5, 471:3,
471:4, 471:5, 471:9,
472:7
**lawful** [5] - 428:21,
429:19, 429:21,
431:5, 468:11
**lawn** [3] - 438:3,
440:6, 446:10
**lawyer** [3] - 402:11,
463:23, 463:24
**lawyer's** [1] - 464:4
**lawyers** [3] - 460:5,
460:8, 463:21
**lawyers'** [1] - 463:25
**lay** [2] - 371:2, 376:9
**laying** [2] - 337:20,
337:25
**layperson** [1] - 441:15
**lead** [1] - 477:13
**learn** [1] - 405:7
**least** [8] - 361:6,
405:18, 419:15,
440:4, 443:19,
443:22, 445:4,
455:4
**leave** [16] - 347:16,
355:5, 365:19,
365:25, 405:16,
410:16, 423:5,
442:24, 443:1,
448:17, 448:22,
450:8, 450:19,
452:9, 452:21,
476:17
**leaves** [1] - 448:22
**leaving** [1] - 405:4
**left** [18] - 334:16,
351:21, 356:10,
356:23, 357:9,
358:21, 368:25,
371:23, 388:14,
389:9, 389:12,
398:24, 428:4,

429:11, 450:2,
450:15, 450:17
**left-hand** [1] - 351:21
**legal** [10] - 359:10,
365:3, 384:16,
399:23, 421:18,
425:17, 449:15,
451:3, 451:19,
468:18
**lens** [1] - 440:25
**less** [7] - 330:16,
338:7, 338:9, 342:1,
342:6, 427:8, 453:17
**lesser** [1] - 466:18
**level** [7] - 412:4,
451:2, 451:4, 451:6,
451:14, 451:18,
459:4
**liability** [1] - 368:19
**lieutenant** [1] - 339:24
**life** [2] - 451:2, 461:21
**light** [1] - 460:2
**likelihood** [1] - 477:5
**likely** [7] - 375:17,
441:12, 451:8,
451:10, 461:7, 478:6
**liken** [1] - 414:1
**likewise** [1] - 464:12
**limited** [1] - 331:22
**limits** [1] - 437:4
**line** [8] - 387:1,
388:19, 389:13,
408:18, 426:13,
426:19, 427:2,
441:10
**lined** [1] - 430:21
**lines** [2] - 330:12,
430:23
**linger** [2] - 448:21,
453:23
**lingered** [1] - 454:8
**listen** [4] - 456:10,
457:2, 474:12
**live** [3] - 378:9,
396:25, 440:7
**lives** [1] - 397:16
**living** [1] - 370:24
**lobby** [3] - 352:16,
353:3, 354:10
**local** [1] - 371:5
**locate** [1] - 375:7
**located** [3] - 335:18,
335:22, 470:20
**location** [3] - 375:15,
383:21, 445:3
**locations** [1] - 375:24
**locked** [3] - 334:20,
430:9, 430:17
**look** [5] - 338:2, 380:4,
385:16, 443:12,

457:1
**looked** [6] - 355:15, 375:8, 399:6, 446:18, 462:9, 462:14
**looking** [7] - 351:24, 397:4, 398:17, 400:19, 440:10, 442:4, 446:9
**looks** [8] - 351:6, 381:21, 387:6, 389:8, 390:14, 392:22, 442:18, 447:15
**loud** [2] - 431:20, 469:20
**lowest** [1] - 373:2
**Loyd** [12] - 427:23, 429:12, 430:14, 430:17, 439:25, 441:10, 442:24, 443:5, 443:15, 446:3, 447:14
**Loyd's** [1] - 427:1
**lunch** [5] - 333:10, 333:13, 333:14, 400:7, 404:2
**lying** [2] - 339:21, 447:2

**M**

**ma'am** [24] - 374:1, 379:6, 395:17, 395:22, 395:24, 396:1, 396:6, 396:10, 396:13, 396:18, 396:20, 396:22, 396:24, 397:9, 397:13, 397:18, 397:22, 398:7, 398:11, 398:13, 398:19, 398:21, 399:1, 399:8
**main** [4] - 338:14, 346:13, 348:24, 356:12
**maintain** [2] - 405:24, 420:19
**man** [10] - 349:14, 363:24, 364:13, 367:21, 367:23, 368:17, 442:17, 442:20, 442:24, 446:23
**man's** [1] - 367:12
**manipulated** [2] - 331:4, 332:8
**manner** [3] - 355:8, 458:7, 465:3

**manufactured** [1] - 342:14
**map** [4] - 418:15, 423:21, 424:9, 440:5
**maps** [1] - 419:3
**marched** [2] - 427:25, 431:25
**marching** [1] - 434:24
**marked** [13] - 335:10, 348:5, 373:20, 377:14, 380:15, 384:9, 385:23, 387:10, 389:17, 392:7, 393:6, 424:13, 473:7
**markings** [4] - 424:2, 424:6, 424:10, 424:18
**marshal** [2] - 475:7, 475:15
**Marshals** [1] - 371:7
**Marty** [2] - 370:10, 370:23
**mask** [3] - 367:2, 381:22, 401:4
**masks** [1] - 444:6
**mass** [3] - 344:19, 345:21, 436:6
**massive** [1] - 455:17
**match** [4] - 375:14, 375:16, 375:19, 375:20
**matched** [1] - 375:11
**material** [3] - 358:12, 360:25, 406:4
**materials** [6] - 332:13, 332:15, 358:15, 360:15, 362:8, 405:2
**mathematical** [2] - 411:13, 461:24
**matter** [10] - 353:14, 405:6, 409:20, 410:18, 439:13, 439:14, 474:7, 475:10, 475:18, 476:8
**matters** [7] - 411:5, 437:14, 456:19, 461:20, 464:23, 465:7, 475:22
**mean** [10] - 331:8, 331:17, 352:20, 355:10, 358:25, 406:16, 407:9, 410:15, 421:16, 456:1
**meandering** [1] - 443:10
**meanders** [2] - 442:9, 447:17

**meaning** [5] - 343:9, 434:23, 470:1, 470:23, 470:25
**meaningful** [1] - 465:7
**meanings** [2] - 471:18, 471:24
**means** [12] - 371:3, 417:24, 428:24, 449:6, 451:19, 456:1, 456:2, 462:20, 464:21, 468:15, 475:2, 475:16
**meant** [1] - 472:10
**media** [2] - 442:14, 474:11
**meet** [2] - 333:13, 428:18
**meeting** [1] - 405:8
**meetings** [2] - 434:13, 471:21
**member** [2] - 365:12, 475:8
**members** [9] - 337:17, 354:10, 427:21, 432:9, 445:20, 454:13, 457:17, 475:7, 475:10
**memorandum** [1] - 405:9
**memorize** [1] - 468:2
**memory** [7] - 342:25, 424:13, 459:14, 459:15, 465:5, 465:12, 465:23
**mentioned** [2] - 342:4, 396:3
**merely** [2] - 460:10, 466:19
**merits** [1] - 475:11
**met** [2] - 379:11, 429:17
**metadata** [1] - 332:2
**metal** [2] - 430:12, 439:24
**microphone** [2] - 335:21, 337:23
**mid** [2] - 389:7, 389:9
**midcenter** [1] - 393:1
**middle** [3] - 441:18, 454:23, 455:18
**midsection** [1] - 455:2
**midway** [1] - 388:20
**might** [6] - 346:9, 422:1, 441:3, 448:6, 463:16, 468:2
**Mike** [1] - 444:19
**milling** [1] - 446:20
**mind** [5] - 352:17, 362:16, 429:16,

473:7, 475:13
**mindful** [1] - 473:18
**minute** [1] - 441:3
**minutes** [9] - 333:4, 336:24, 427:4, 435:14, 441:25, 442:22, 443:9, 448:13, 457:8
**misleading** [1] - 442:13
**mission** [1] - 473:19
**mistake** [5] - 366:21, 429:25, 449:13, 465:23, 468:24
**mistrial** [3] - 407:5, 407:8, 407:14
**misunderstanding** [1] - 465:24
**mob** [10] - 426:4, 426:5, 426:9, 426:25, 427:3, 431:25, 436:2, 436:4, 441:19, 448:2
**modifies** [1] - 472:8
**moment** [5] - 337:21, 338:1, 424:25, 446:22, 447:22
**moments** [3] - 427:6, 430:10, 433:5
**Monday** [1] - 477:25
**Moore** [1] - 411:15
**Moran** [1] - 425:25
**MORAN** [3] - 426:1, 435:23, 436:10
**Moran's** [1] - 413:21
**morning** [9] - 334:1, 334:7, 334:8, 334:14, 334:15, 362:20, 362:21, 362:23, 370:11, 370:15, 370:17, 370:20, 370:21, 395:16, 395:17
**Moss** [1] - 414:15
**Moss's** [1] - 416:21
**most** [5] - 342:16, 403:12, 436:12, 440:1, 451:9
**motion** [5] - 330:4, 356:4, 399:20, 400:11, 400:20
**motions** [1] - 331:6
**motivated** [1] - 466:8
**motorcade** [1] - 427:6
**move** [16] - 360:12, 360:17, 369:12, 372:1, 393:11, 394:7, 394:24, 400:12, 410:5, 423:22, 423:23,

424:5, 424:19, 437:2, 441:11
**moved** [6] - 423:20, 437:17, 439:21, 439:23, 442:7
**moves** [9] - 374:11, 384:13, 386:6, 387:21, 390:2, 391:3, 391:21, 392:14, 447:25
**moving** [7] - 373:6, 385:6, 388:24, 389:6, 440:11, 441:20, 441:23, 443:25
**multiple** [5] - 344:20, 360:22, 415:18, 419:3, 443:1
**musical** [1] - 438:6
**must** [44] - 415:20, 415:22, 415:23, 416:3, 416:13, 428:18, 429:20, 431:10, 432:22, 434:7, 437:15, 437:24, 445:12, 449:20, 449:25, 452:4, 452:7, 452:9, 452:20, 452:21, 452:23, 460:11, 461:10, 463:7, 463:8, 463:24, 464:5, 464:14, 464:17, 466:23, 466:25, 467:20, 467:21, 467:23, 468:8, 469:6, 470:7, 471:10, 472:9, 474:12, 474:13, 476:10
**mutual** [1] - 473:22

**N**

**name** [8] - 359:25, 370:22, 379:22, 379:24, 385:16, 445:4, 461:12, 476:18
**named** [3] - 372:19, 372:23, 373:17
**narrowly** [1] - 331:21
**Narrows** [1] - 397:12
**national** [1] - 459:2
**natural** [1] - 417:19
**nature** [7] - 359:22, 412:3, 429:24, 463:5, 463:8, 463:11, 468:23
**navy** [1] - 381:21
**near** [8] - 349:24,

435:17, 438:20,
444:10, 447:11,
448:4, 453:15,
454:25
**nearly** [1] - 427:4
**necessarily** [3] -
412:5, 463:13, 474:9
**necessary** [7] -
331:10, 331:16,
354:2, 416:17,
461:6, 475:5, 477:25
**need** [19] - 357:14,
362:8, 384:6, 385:1,
403:16, 404:11,
410:14, 410:25,
421:5, 423:1, 423:8,
437:8, 437:12,
449:5, 456:21,
457:1, 457:8,
476:23, 477:8
**needed** [2] - 425:18,
456:10
**needles** [1] - 366:19
**needs** [5] - 362:3,
400:8, 415:12,
451:4, 451:6
**nefarious** [1] - 396:11
**never** [16] - 358:4,
360:22, 383:21,
406:9, 427:14,
429:11, 444:24,
445:3, 445:4, 452:1,
456:13, 460:19,
475:9, 475:13,
475:16
**newspaper** [1] - 474:9
**next** [9] - 335:23,
351:7, 351:19,
370:8, 399:16,
404:1, 425:21,
436:12, 443:14
**noise** [1] - 447:19
**none** [8] - 414:12,
429:14, 455:11,
455:15, 455:16,
455:18, 455:19
**nook** [1] - 447:13
**normal** [3] - 431:23,
448:5, 469:24
**normally** [1] - 366:2
**north** [5] - 440:15,
440:20, 442:1,
445:2, 447:13
**northwest** [2] -
438:23, 439:9
**note** [5] - 418:9,
446:13, 458:3,
475:6, 475:9
**NOTE** [1] - 382:8
**Note** [1] - 385:11

**notebook** [1] - 476:18
**notes** [10] - 360:13,
361:14, 361:18,
405:10, 442:17,
442:18, 446:18,
446:21, 446:23,
457:16
**nothing** [11] - 354:1,
367:6, 419:8,
419:11, 419:12,
453:5, 456:17,
472:5, 472:6, 472:8,
476:13
**notice** [5] - 408:10,
408:20, 408:22,
454:23, 455:1
**November** [10] -
378:8, 379:3, 380:1,
381:1, 381:5,
381:12, 382:3,
383:4, 383:23, 384:2
**nowhere** [3] - 438:20,
453:4
**number** [10] - 332:5,
338:22, 441:8,
463:14, 463:17,
463:19, 472:12,
476:19, 478:3, 478:4
**numbers** [2] - 436:2,
436:15

## O

**o'clock** [1] - 477:25
**Oath** [1] - 370:12
**oath** [1] - 334:10
**obedient** [3] - 449:4,
450:1, 450:13
**obeyed** [2] - 364:20,
453:7
**object** [7] - 331:5,
331:17, 384:15,
409:17, 417:22,
445:21, 464:1
**objected** [3] - 405:3,
463:21
**objecting** [1] - 463:23
**objection** [56] - 335:5,
340:6, 341:13,
353:6, 353:12,
356:2, 356:3,
356:24, 360:4,
371:25, 374:13,
376:9, 376:21,
377:8, 377:9, 382:6,
384:17, 384:19,
386:8, 387:23,
390:4, 391:5,
391:23, 392:16,
393:13, 394:8,

394:25, 409:7,
409:8, 409:14,
411:8, 411:12,
411:20, 411:21,
411:23, 411:24,
412:10, 413:9,
413:10, 413:12,
413:13, 413:15,
413:16, 414:20,
415:6, 416:20,
416:24, 418:10,
418:13, 420:1,
424:17, 436:8,
448:7, 448:18,
464:4, 464:13
**objections** [15] -
407:21, 409:11,
411:9, 414:14,
414:22, 419:22,
419:23, 419:25,
420:3, 420:4, 420:6,
420:7, 445:22,
445:23, 463:24
**obligation** [3] -
360:19, 426:7, 452:1
**observations** [2] -
442:12, 446:16
**observe** [1] - 465:7
**observed** [1] - 464:23
**observing** [1] - 442:20
**obstructing** [2] -
434:12, 471:21
**obtain** [3] - 378:3,
383:7, 383:18
**obtained** [1] - 373:18
**obvious** [1] - 379:13
**obviously** [5] - 330:8,
372:11, 406:12,
406:19, 452:10
**occurred** [5] - 373:16,
431:16, 438:23,
440:1, 469:14
**occurs** [2] - 431:19,
469:19
**offense** [11] - 456:22,
460:23, 460:25,
461:2, 461:3,
467:13, 468:8,
469:5, 470:6, 471:10
**offered** [5] - 332:15,
353:13, 384:20,
384:23, 463:22
**office** [15] - 359:10,
364:25, 365:6,
365:13, 371:9,
371:11, 379:10,
383:19, 385:9,
385:15, 400:8,
445:1, 454:15,
455:9, 477:10

**officer** [33] - 335:2,
335:3, 335:10,
337:12, 344:24,
345:9, 345:10,
345:15, 347:17,
357:13, 362:6,
369:25, 371:1,
371:3, 371:24,
372:5, 372:15,
400:6, 405:14,
406:1, 406:2,
424:13, 441:13,
446:2, 448:14,
448:15, 448:16,
448:22, 450:12,
451:4, 451:6, 466:20
**Officer** [44] - 334:6,
334:9, 334:14,
335:15, 336:2,
336:6, 336:21,
349:19, 351:15,
354:9, 356:9, 358:8,
358:21, 360:14,
360:23, 361:15,
361:25, 362:12,
362:14, 362:20,
369:18, 395:16,
400:3, 405:5,
406:17, 407:11,
412:19, 412:24,
428:3, 429:13,
430:14, 448:25,
449:1, 449:4, 449:9,
450:2, 450:3, 450:6,
450:11, 450:17,
450:21, 464:10
**officer's** [2] - 466:14,
466:16
**officers** [22] - 338:11,
338:13, 338:25,
342:16, 346:13,
348:19, 351:2,
352:23, 354:4,
357:12, 371:6,
387:1, 387:4,
388:20, 389:12,
426:13, 430:23,
441:7, 441:14,
441:18, 441:21,
443:1
**official** [6] - 431:15,
431:18, 445:23,
445:25, 469:13,
469:16
**officiant** [1] - 422:14
**often** [1] - 476:7
**omissions** [1] -
472:22
**omitted** [1] - 409:2
**once** [7] - 334:20,

362:2, 372:9,
375:15, 375:19,
375:20, 427:20
**one** [65] - 336:3,
336:23, 339:3,
339:5, 339:6, 351:6,
351:16, 361:3,
364:25, 365:14,
365:18, 372:9,
386:13, 387:17,
388:2, 388:14,
389:22, 389:23,
390:21, 390:24,
391:18, 392:10,
393:8, 394:3,
394:20, 396:18,
396:19, 398:14,
400:8, 408:18,
415:16, 418:9,
419:18, 420:13,
421:8, 421:19,
421:21, 421:24,
422:7, 422:24,
423:4, 424:25,
426:14, 430:6,
436:12, 441:20,
443:4, 447:12,
448:5, 448:6,
453:14, 461:9,
462:21, 463:4,
463:18, 467:3,
467:17, 469:18,
474:9, 475:7, 476:1,
478:11
**ones** [1] - 414:23
**open** [11] - 354:7,
358:19, 362:10,
385:4, 430:5,
430:18, 448:5,
449:6, 454:12,
475:11, 475:17
**opened** [5] - 373:5,
430:7, 442:22,
443:8, 449:13
**opening** [5] - 428:11,
430:12, 443:9,
446:17, 460:9
**opens** [1] - 443:24
**operating** [1] - 437:6
**opinion** [5] - 376:9,
459:7, 459:10,
472:5, 475:24
**opinions** [2] - 452:11,
458:19
**opportunity** [4] -
330:25, 357:19,
402:22, 465:7
**oppose** [2] - 361:8,
400:17
**opposite** [4] - 358:6,

405:12, 439:11, 463:20

**optical** [1] - 440:25
**options** [2] - 355:11, 365:18
**orally** [1] - 475:11
**order** [11] - 339:23, 341:23, 421:19, 421:23, 428:17, 453:7, 467:21, 468:7, 469:5, 470:6, 471:10
**ordered** [4] - 339:21, 454:17, 454:20, 464:13
**orderly** [13] - 431:14, 431:17, 433:2, 434:11, 437:18, 443:25, 445:11, 445:14, 458:6, 469:12, 469:16, 470:13, 471:20
**orders** [1] - 343:18
**ordinarily** [2] - 364:24, 417:12
**ordinary** [6] - 367:8, 401:23, 402:4, 434:23, 449:11, 471:17
**organize** [1] - 473:21
**orientation** [1] - 459:4
**origin** [1] - 459:2
**otherwise** [5] - 366:7, 428:24, 447:20, 468:16, 472:15
**outcome** [1] - 465:9
**outer** [7] - 438:10, 439:4, 440:4, 440:10, 440:14, 443:11, 443:20
**outlining** [1] - 410:22
**outset** [1] - 476:1
**outside** [11] - 335:19, 335:22, 336:13, 346:8, 355:11, 355:12, 392:24, 426:20, 433:19, 434:17, 454:8
**overly** [2] - 354:19, 354:20
**overruled** [7] - 331:6, 340:8, 341:15, 353:7, 354:6, 376:11, 436:9
**overruling** [1] - 376:22
**overwhelmed** [4] - 426:5, 427:1, 427:9, 436:15
**overwhelming** [1] - 436:6

**own** [8] - 354:1, 435:25, 437:7, 444:19, 452:9, 455:22, 459:14

## P

**p.m** [2] - 336:2, 336:22, 337:8, 338:3, 338:6, 338:17, 338:20, 339:12, 340:2, 340:14, 341:6, 344:1, 348:11, 349:3, 350:12, 350:22, 352:9, 426:11, 426:16, 440:11, 442:25, 443:10, 453:16, 453:19, 478:14, 478:15
**packaged** [1] - 342:13
**page** [42] - 377:1, 377:4, 377:15, 380:24, 381:2, 381:7, 384:7, 407:21, 407:22, 407:25, 408:3, 408:6, 408:14, 408:17, 409:6, 409:9, 410:6, 411:19, 411:22, 412:9, 413:8, 413:11, 413:14, 413:17, 414:6, 414:11, 414:12, 414:25, 415:1, 416:23, 417:5, 418:8, 419:7, 419:10, 419:20, 419:21, 419:24, 420:2, 420:5, 420:8, 476:18
**palm** [4] - 342:7, 342:8, 364:1, 449:11
**paperwork** [1] - 449:19
**parade** [2] - 435:1, 471:17
**paraded** [2] - 434:8, 471:13
**parading** [4] - 434:6, 434:23, 435:5, 471:8
**paragraph** [2] - 408:21, 418:25
**paralegal** [1] - 437:6
**parent's** [1] - 451:14
**parked** [3] - 427:6, 438:13, 440:16
**parliamentarian** [1] - 439:9

**part** [27] - 331:14, 331:23, 349:20, 353:19, 353:22, 357:5, 357:7, 371:11, 373:1, 374:18, 376:3, 377:20, 390:9, 396:11, 409:23, 412:2, 412:17, 415:11, 417:7, 424:3, 424:7, 429:4, 429:9, 445:22, 447:24, 448:1, 464:8
**particular** [15] - 334:22, 353:22, 354:13, 356:14, 357:5, 361:1, 361:2, 361:7, 362:1, 412:5, 415:9, 457:24, 460:23, 461:1, 462:22
**particularly** [2] - 412:11, 442:4
**parties** [8] - 407:18, 408:23, 410:24, 421:13, 425:21, 459:20, 459:21, 467:10
**parties'** [1] - 410:10
**partisans** [1] - 476:8
**parts** [3] - 331:9, 331:10, 415:2
**party** [5] - 463:25, 467:3, 467:4, 467:6, 473:1
**pass** [1] - 430:19
**passageways** [2] - 434:13, 471:21
**passes** [2] - 442:2, 446:23
**passing** [2] - 367:14, 367:19
**past** [2] - 430:12, 430:24
**pathway** [3] - 439:21, 440:2, 450:17
**patience** [2] - 426:3, 456:25
**patio** [5] - 389:3, 398:18, 398:20, 438:13, 440:16
**patriot** [1] - 434:20
**patrolling** [1] - 441:21
**pats** [1] - 450:11
**paused** [6] - 336:2, 336:21, 349:2, 350:21, 352:9, 356:9
**paved** [4] - 389:3, 397:19, 398:17, 440:17

**paying** [1] - 443:23
**peaceful** [8] - 436:11, 442:17, 442:19, 446:3, 446:5, 446:11, 446:18, 446:20
**pen** [1] - 421:20
**Pence** [6] - 444:15, 444:19, 444:23, 444:24, 444:25, 453:4
**Peninsula** [1] - 397:5
**people** [53] - 344:18, 344:20, 355:14, 357:12, 363:8, 366:21, 369:5, 389:8, 389:9, 390:14, 398:12, 431:1, 433:23, 434:25, 436:6, 438:6, 438:19, 439:2, 439:7, 439:8, 439:23, 440:1, 440:10, 440:23, 441:2, 441:15, 441:20, 441:23, 443:24, 443:25, 444:3, 444:5, 444:6, 446:17, 446:20, 447:23, 448:4, 448:8, 449:13, 450:16, 450:18, 454:4, 455:1, 457:8, 458:25, 465:11
**pepper** [19] - 341:22, 342:11, 342:13, 359:11, 364:3, 427:17, 430:24, 431:1, 433:23, 442:12, 442:18, 446:24, 449:8, 454:2, 454:4, 454:19, 455:5, 455:6, 455:19
**pepper-sprayed** [7] - 442:12, 442:18, 446:24, 454:2, 455:5, 455:6, 455:19
**pepper-spraying** [3] - 431:1, 433:23, 454:4
**per** [1] - 406:1
**percent** [1] - 343:1
**perception** [1] - 465:25
**perfect** [3] - 411:2, 477:21, 478:12
**perhaps** [3] - 333:12, 403:20, 414:16
**perimeter** [10] - 386:24, 392:24,

**426:17, 426:20, 427:5, 427:19, 432:5, 435:13, 435:16, 444:14
**period** [4] - 333:10, 333:13, 418:24, 478:5
**permitted** [4] - 426:14, 429:15, 459:25, 462:24
**persistently** [1] - 450:22
**person** [48] - 347:20, 347:24, 354:23, 365:25, 367:14, 367:17, 376:23, 377:25, 379:14, 379:21, 379:24, 380:12, 380:18, 380:19, 380:20, 380:21, 381:6, 381:16, 383:4, 389:3, 415:20, 415:22, 415:23, 417:13, 417:19, 428:25, 429:22, 431:19, 431:21, 431:22, 433:10, 435:24, 442:15, 444:10, 447:15, 460:11, 461:19, 462:9, 465:4, 468:17, 468:20, 468:22, 469:19, 469:21, 469:22, 471:2, 475:3, 475:14
**person's** [1] - 359:24
**personal** [11] - 342:17, 360:2, 412:2, 440:25, 449:11, 452:9, 458:18, 458:23, 459:1, 463:11, 476:13
**personally** [4] - 373:3, 437:16, 437:17, 437:19
**phone** [25] - 331:1, 331:2, 332:12, 332:14, 368:5, 383:24, 384:1, 385:7, 385:10, 385:12, 385:13, 385:14, 385:18, 386:15, 388:4, 389:25, 391:1, 392:12, 393:9, 394:5, 394:22, 440:18, 441:1, 476:19
**photo** [6] - 373:19,

374:7, 374:8, 374:19, 387:3, 393:1
**photograph** [34] - 373:22, 374:4, 374:17, 375:8, 376:4, 376:15, 376:18, 377:5, 377:22, 380:11, 380:16, 381:10, 381:13, 385:25, 386:2, 386:12, 386:13, 387:15, 387:17, 389:20, 389:22, 390:9, 391:9, 391:10, 392:8, 392:10, 392:21, 394:12, 394:14, 398:1, 398:6, 398:17, 398:25, 399:3
**photographs** [5] - 373:17, 397:24, 399:6, 426:12, 426:13
**photos** [14] - 330:6, 330:7, 330:12, 330:16, 330:21, 330:22, 331:1, 331:18, 332:8, 332:9, 332:14, 374:25, 375:1, 375:4
**phrasing** [1] - 340:6
**physically** [1] - 369:10
**pick** [1] - 450:5
**picket** [1] - 471:17
**picketed** [2] - 434:8, 471:14
**picketing** [3] - 434:6, 435:5, 471:8
**picture** [15] - 337:13, 377:21, 381:2, 386:23, 387:2, 388:24, 389:3, 389:6, 393:18, 393:21, 393:23, 439:14, 440:18, 441:1, 441:7
**pictures** [1] - 472:15
**piercing** [1] - 430:16
**place** [11] - 355:15, 379:1, 429:7, 432:9, 432:13, 433:18, 441:21, 444:21, 448:10, 454:14, 458:24
**placed** [1] - 343:3
**places** [1] - 420:13
**plan** [6] - 332:1, 333:7, 344:14, 410:8, 412:13, 443:18

**plane** [1] - 423:5
**planning** [2] - 332:3, 332:4
**plastic** [4] - 345:22, 345:23, 367:10, 368:15
**play** [9] - 333:9, 335:23, 348:7, 352:4, 382:17, 412:17, 440:6, 464:8
**played** [29] - 335:13, 335:25, 336:19, 337:6, 339:10, 339:25, 340:12, 341:4, 343:13, 343:24, 344:12, 345:12, 346:3, 348:3, 348:9, 350:7, 350:20, 351:13, 352:2, 352:7, 353:1, 356:7, 382:23, 383:5, 435:22, 440:8, 443:3, 447:21, 472:16
**playing** [7] - 336:18, 337:4, 339:8, 341:3, 343:12, 352:24, 440:7
**plaza** [3] - 389:4, 453:22, 455:3
**plenty** [1] - 421:5
**plus** [2] - 373:15, 443:20
**pocket** [1] - 454:18
**podium** [2] - 401:3, 437:2
**point** [40] - 336:8, 337:13, 338:19, 339:17, 339:20, 340:22, 340:24, 344:3, 344:14, 344:15, 344:23, 345:2, 345:15, 346:12, 346:13, 347:22, 350:12, 352:5, 352:18, 354:22, 355:2, 355:3, 356:10, 356:12, 359:7, 372:22, 373:9, 373:18, 373:19, 389:2, 389:13, 393:2, 400:8, 403:14, 409:18, 412:18, 416:15, 424:4, 424:8, 441:24
**pointed** [1] - 398:3
**pointing** [1] - 338:14
**police** [27] - 369:25, 387:1, 388:19,

426:13, 427:9, 427:11, 436:14, 439:24, 441:7, 441:10, 441:11, 441:13, 441:14, 441:16, 441:18, 441:21, 442:3, 443:1, 443:6, 446:16, 450:12, 450:19, 451:4, 451:6, 453:7, 466:14, 466:19
**Police** [12] - 359:16, 369:23, 370:1, 375:2, 426:5, 426:18, 427:10, 428:3, 429:13, 444:16, 444:18, 464:10
**polite** [1] - 450:14
**political** [7] - 442:10, 447:1, 447:3, 447:4, 452:19, 463:12
**poorly** [3] - 447:23, 448:9, 453:6
**portico** [11] - 388:16, 388:17, 389:7, 389:9, 389:10, 389:12, 433:15, 435:17, 453:23
**porticos** [1] - 388:12
**portion** [7] - 351:24, 384:6, 398:17, 443:11, 443:12, 457:24, 472:18
**portions** [5] - 472:13, 472:14, 472:19, 472:22, 472:23
**position** [7] - 331:18, 331:20, 358:3, 410:10, 413:7, 450:3, 476:2
**positive** [1] - 364:10
**positively** [5] - 380:19, 380:21, 381:1, 382:25, 383:3
**possession** [3] - 361:10, 427:13, 427:18
**possibilities** [1] - 455:16
**possibility** [2] - 458:20, 477:1
**possible** [6] - 346:10, 370:5, 378:24, 425:9, 474:1, 476:23
**post** [1] - 364:25
**posted** [2] - 428:24, 468:15
**potential** [1] - 414:2

**power** [3] - 436:2, 436:12, 467:3
**powerful** [1] - 461:10
**powerless** [1] - 436:3
**practice** [1] - 409:20
**praying** [1] - 471:22
**precursor** [1] - 416:15
**preexisting** [1] - 452:10
**prefer** [2] - 412:22, 422:9
**preference** [1] - 478:1
**preferences** [2] - 452:11, 458:23
**prefers** [1] - 361:2
**prejudice** [2] - 459:6, 466:9
**prejudiced** [1] - 466:7
**prejudices** [2] - 458:19, 458:23
**prejudicial** [3] - 354:1, 357:11, 406:13
**preliminarily** [1] - 404:15
**preparation** [1] - 405:8
**prepared** [2] - 446:10
**preparing** [1] - 406:4
**preponderance** [1] - 451:8
**presence** [7] - 330:2, 333:25, 400:1, 416:10, 416:19, 425:15, 477:15
**present** [4] - 332:3, 416:8, 416:9, 467:20
**presentation** [1] - 425:20
**presented** [7] - 330:9, 330:14, 452:18, 457:20, 463:2, 463:9, 474:14
**preserved** [1] - 416:20
**preside** [1] - 473:15
**President** [15] - 416:8, 416:19, 417:6, 429:4, 429:10, 444:14, 444:23, 444:24, 444:25, 453:4, 456:14, 456:21, 456:22, 468:21
**President's** [2] - 416:10, 429:7
**presidential** [2] - 426:8, 427:6
**presumed** [1] - 460:15
**presumption** [5] - 416:16, 420:21, 420:23, 421:5,

460:16
**pretrial** [10] - 331:6, 331:25, 407:19, 409:14, 414:23, 415:5, 417:1, 417:25, 418:3, 419:8
**pretty** [7] - 363:2, 372:10, 410:4, 443:16, 444:1, 446:19, 450:3
**prevent** [4] - 356:12, 401:24, 402:4, 441:22
**previous** [4] - 382:6, 385:13, 444:20, 465:19
**previously** [8] - 340:4, 341:15, 360:22, 409:11, 416:25, 419:8, 419:11, 430:9
**pride** [1] - 476:1
**principle** [1] - 418:13
**printed** [2] - 383:16, 403:23
**printout** [1] - 424:9
**prisoners** [1] - 344:25
**privacy** [1] - 472:20
**probability** [1] - 466:2
**probable** [5] - 410:23, 417:20, 451:5, 451:15, 461:8
**procedures** [1] - 429:7
**proceed** [2] - 345:25, 476:7
**Proceedings** [10] - 330:2, 333:25, 354:7, 358:19, 362:10, 385:4, 400:1, 425:15, 477:15, 478:15
**proceedings** [1] - 448:6
**process** [9] - 332:19, 341:14, 359:21, 429:5, 431:24, 432:11, 469:24, 476:13, 477:14
**processing** [1] - 332:12
**produce** [6] - 360:13, 362:4, 449:23, 460:20, 467:3, 467:7
**produced** [6] - 358:10, 361:18, 362:3, 405:9, 406:9, 467:3
**production** [1] - 403:15
**proffered** [1] - 332:21
**program** [2] - 372:8, 372:9

**promises** [1] - 402:8
**promote** [1] - 473:24
**prompted** [2] - 334:17, 334:18
**proof** [8] - 421:21, 433:12, 451:2, 451:4, 451:14, 451:18, 461:10, 471:4
**proper** [2] - 359:20, 463:23
**properly** [1] - 459:17
**property** [8] - 357:21, 357:24, 357:25, 361:5, 361:7, 362:13, 367:15, 412:20
**proposed** [7] - 333:11, 406:11, 412:1, 417:24, 418:3, 418:7, 420:19
**protected** [4] - 429:1, 444:10, 468:17, 468:20
**protectee** [1] - 415:24
**protecting** [2] - 426:16, 429:6
**protective** [1] - 429:9
**protest** [6] - 390:14, 396:16, 426:23, 438:3, 438:5, 446:18
**protester** [1] - 347:18
**protesters** [6] - 434:21, 438:12, 439:23, 440:15, 441:8, 441:17
**protests** [1] - 426:15
**protocol** [1] - 344:15
**protocols** [5] - 359:16, 363:16, 363:17, 364:23, 372:16
**prove** [23] - 428:18, 429:20, 431:10, 432:22, 433:6, 434:7, 437:15, 437:24, 444:8, 444:9, 444:11, 445:9, 445:13, 450:23, 451:21, 451:25, 460:20, 461:1, 461:6, 461:23, 461:25, 472:9
**proved** [6] - 417:12, 464:15, 468:8, 469:6, 470:7, 471:11
**proven** [7] - 428:8, 431:3, 434:1, 435:3, 460:1, 460:18, 460:22

**provide** [3] - 457:22, 478:3, 478:4
**provided** [4] - 331:23, 333:1, 472:2, 473:11
**proving** [3] - 429:17, 461:4, 462:20
**proximity** [3] - 431:12, 456:14, 469:9
**public** [7] - 337:18, 430:15, 430:16, 432:1, 435:8, 448:5, 459:7
**publicity** [1] - 474:15
**publish** [1] - 383:1
**published** [2] - 386:13, 388:2
**publishing** [1] - 356:19
**Puget** [2] - 397:6, 397:11
**pull** [15] - 335:10, 348:4, 348:5, 349:16, 349:17, 351:19, 376:1, 376:13, 376:25, 378:1, 380:15, 387:7, 394:16, 397:23, 397:25
**pulled** [1] - 377:14
**punishment** [2] - 474:1, 474:7
**purely** [1] - 330:15
**purpose** [1] - 473:13
**purposes** [1] - 421:17
**push** [1] - 447:18
**pushed** [1] - 439:24
**putting** [1] - 404:16

---

## Q

**qualification** [1] - 433:21
**qualify** [1] - 405:1
**quarters** [1] - 422:25
**questioning** [1] - 353:21
**questions** [25] - 332:4, 332:6, 354:11, 354:14, 354:17, 356:18, 360:7, 369:18, 370:3, 395:12, 399:10, 399:11, 401:3, 401:7, 402:21, 418:14, 449:24, 451:23, 452:3, 457:3, 458:2, 458:7, 460:7, 463:4
**quiet** [2] - 448:3, 471:22

**quite** [3] - 330:13, 331:7, 355:13

---

## R

**race** [1] - 459:2
**racks** [6] - 386:24, 388:25, 389:2, 439:24, 444:16, 444:18
**radio** [1] - 474:10
**Rahaif** [3] - 416:11, 416:14, 416:15
**railing** [1] - 368:3
**rain** [2] - 436:3
**raise** [4] - 409:10, 409:11, 446:14, 457:10
**raised** [6] - 398:6, 409:14, 413:5, 419:11, 428:1, 440:19
**rallies** [1] - 446:4
**rally** [5] - 396:14, 396:16, 442:19, 446:3, 446:11
**ran** [1] - 442:21
**random** [4] - 421:20, 421:24, 476:12
**randomly** [1] - 422:7
**rather** [4] - 370:16, 415:8, 422:5, 463:14
**re** [2] - 409:10, 409:11
**re-raise** [2] - 409:10, 409:11
**reach** [3] - 463:6, 473:19, 477:22
**reached** [1] - 475:16
**reaching** [4] - 463:1, 463:10, 472:10, 473:9
**read** [2] - 474:11, 474:12
**ready** [8] - 330:3, 334:2, 347:16, 347:22, 403:22, 424:24, 425:2, 425:3
**realize** [1] - 359:24
**realized** [4] - 352:18, 355:2, 359:6, 426:2
**realizes** [2] - 429:23, 468:22
**really** [3] - 346:12, 355:15, 359:11
**reason** [11] - 344:21, 353:20, 353:23, 361:11, 416:2, 416:7, 461:13, 461:22, 465:6, 466:24

**reasonable** [35] - 415:16, 428:9, 428:19, 431:4, 431:10, 432:16, 432:22, 433:7, 434:1, 435:4, 450:24, 450:25, 451:3, 451:18, 451:20, 452:5, 460:2, 460:18, 460:23, 461:2, 461:5, 461:11, 461:12, 461:17, 461:18, 461:19, 461:25, 462:7, 464:16, 468:9, 469:7, 470:8, 471:12, 472:9, 478:5
**reasonableness** [1] - 466:1
**reasoning** [1] - 354:5
**reasons** [5] - 341:15, 433:25, 444:19, 466:24, 472:17
**rebuttal** [1] - 421:4
**recalled** [2] - 370:5, 464:23
**receipt** [1] - 384:12
**receive** [3] - 385:20, 460:4, 466:13
**received** [15] - 332:9, 372:14, 386:3, 387:18, 388:3, 389:23, 390:24, 391:18, 392:11, 393:8, 394:3, 394:21, 406:7, 417:17, 453:8
**Recess** [4] - 333:24, 404:20, 423:17, 478:14
**recitation** [1] - 416:21
**recitations** [1] - 414:19
**recites** [1] - 442:12
**recognize** [10] - 335:15, 339:2, 339:6, 373:21, 374:4, 384:8, 391:9, 418:6, 441:11
**recognized** [1] - 379:19
**recollection** [1] - 465:15
**record** [16] - 353:18, 357:2, 360:11, 361:22, 370:22, 381:23, 384:16, 384:25, 405:7, 407:4, 412:1, 413:3,

417:5, 422:22, 425:11
**recording** [27] - 335:13, 335:25, 336:19, 337:6, 339:10, 339:25, 340:12, 341:4, 343:13, 343:24, 344:12, 345:12, 346:3, 348:3, 348:9, 350:7, 350:20, 351:13, 352:2, 352:7, 353:1, 356:7, 382:23, 435:22, 440:8, 443:3, 447:21
**recordings** [2] - 414:9, 473:12
**Red** [4] - 409:21, 411:18, 413:21, 417:11
**red** [2] - 349:14, 383:16
**redacted** [2] - 331:11, 419:14
**redactions** [1] - 419:16
**redirect** [1] - 357:17
**REDIRECT** [1] - 369:16
**refer** [3] - 457:23, 457:24, 468:1
**reference** [13] - 374:22, 404:25, 408:13, 409:1, 410:7, 410:16, 412:8, 417:6, 418:11, 418:18, 420:12, 456:7, 459:13
**referencing** [1] - 354:13
**referred** [2] - 330:18
**referring** [2] - 358:16, 381:19
**refers** [2] - 434:10, 471:19
**reflect** [3] - 381:23, 405:10, 416:6
**reflected** [1] - 382:1
**reflection** [1] - 461:19
**reflects** [1] - 405:2
**refuse** [1] - 458:11
**regard** [1] - 414:16
**regarding** [6] - 330:5, 330:7, 332:1, 420:10, 473:17, 473:23
**regardless** [1] - 459:1
**regular** [2] - 446:8, 476:25

**rehearsed** [1] - 358:7
**rejoin** [1] - 476:24
**relates** [1] - 428:14
**relaxed** [1] - 411:16
**relayed** [1] - 334:24
**release** [1] - 477:24
**released** [2] - 356:16, 405:5
**relevance** [4] - 353:15, 356:24, 371:25, 456:11
**relevant** [3] - 357:16, 456:18, 467:2
**religion** [1] - 459:2
**relocated** [1] - 445:3
**rely** [3] - 362:15, 409:12, 424:12
**remain** [4] - 415:4, 441:21, 442:19
**remained** [4] - 428:20, 431:4, 468:10, 476:15
**remaining** [3] - 428:15, 450:18, 468:5
**remains** [1] - 460:16
**remedy** [2] - 405:19, 406:14
**remember** [6] - 339:17, 347:16, 363:6, 385:10, 433:22, 476:7
**remembered** [1] - 358:9
**remembering** [1] - 369:19
**remind** [3] - 334:9, 474:8, 474:21
**remove** [1] - 414:8
**removed** [1] - 472:16
**render** [1] - 452:23
**rendered** [1] - 458:4
**renew** [2] - 341:13, 414:12
**renewing** [2] - 415:1, 415:6
**repeat** [4] - 334:18, 342:5, 385:13, 402:1
**replaces** [2] - 472:7, 472:8
**replay** [1] - 455:23
**report** [2] - 373:14, 477:10
**reported** [3] - 338:4, 338:7, 338:13
**reporter** [1] - 337:22
**REPORTER'S** [1] - 382:8
**reports** [4] - 330:11, 360:22, 474:9,

474:13
**represents** [1] - 463:25
**request** [25] - 347:15, 360:15, 385:21, 386:4, 386:14, 387:19, 388:3, 389:24, 390:25, 391:19, 392:11, 393:8, 394:4, 394:21, 395:2, 405:7, 405:15, 406:16, 407:4, 407:7, 407:10, 407:11, 407:14, 412:11, 420:20
**requested** [2] - 334:21, 412:20
**requesting** [2] - 410:12, 410:14
**require** [5] - 433:12, 450:19, 460:19, 462:25, 471:4
**required** [7] - 417:19, 451:2, 451:14, 451:19, 451:21, 456:4, 461:23
**requirement** [2] - 416:1, 416:17
**requires** [3] - 416:22, 421:21, 433:6
**research** [2] - 475:3, 477:4
**reservations** [1] - 418:21
**Resident** [1] - 371:10
**residential** [1] - 397:17
**residue** [1] - 364:5
**resist** [1] - 369:10
**resolve** [3] - 404:11, 423:1, 425:17
**resolved** [2] - 407:18, 425:18
**respect** [10] - 358:12, 358:14, 390:25, 393:9, 405:4, 409:23, 411:12, 417:9, 467:18, 473:22
**respectful** [5] - 364:18, 369:3, 446:5, 449:3, 450:13
**respond** [3] - 334:21, 358:11, 384:18
**responded** [1] - 362:14
**response** [21] - 330:8, 331:22, 355:21, 361:23, 362:15,

385:20, 386:4, 386:14, 387:18, 388:3, 389:24, 390:25, 391:19, 392:11, 393:8, 394:4, 394:21, 405:13, 405:14, 406:2, 416:14
**responsibility** [4] - 457:18, 458:14, 459:12, 464:1
**responsible** [2] - 435:23, 435:25
**rest** [6] - 403:11, 403:17, 425:13, 448:3, 476:15, 477:14
**rested** [4] - 399:24, 423:22, 425:12, 425:19
**restrain** [1] - 367:11
**restricted** [34] - 415:22, 415:23, 416:2, 416:4, 416:17, 426:20, 427:5, 427:18, 428:16, 428:21, 428:23, 428:25, 429:18, 431:5, 431:8, 431:12, 432:5, 432:18, 435:16, 444:10, 444:12, 444:22, 451:11, 451:16, 453:2, 456:20, 468:5, 468:11, 468:15, 468:16, 469:3, 469:9, 469:25
**restriction** [2] - 416:7, 442:2
**rests** [2] - 399:18, 474:4
**result** [2] - 436:1, 465:23
**results** [1] - 426:8
**resume** [2] - 432:12, 477:25
**retire** [1] - 474:20
**retiring** [1] - 476:5
**retreated** [1] - 427:10
**retreating** [1] - 436:15
**return** [5] - 436:24, 458:3, 467:14, 467:21, 473:14
**returned** [4] - 331:1, 332:16, 386:14, 412:20
**reus** [1] - 415:3
**reveal** [1] - 475:14
**reversed** [1] - 413:22

**review** [3] - 380:11, 428:13, 436:22
**reviewing** [3] - 375:7, 401:9, 476:5
**Rhine** [106] - 369:3, 372:20, 372:23, 372:25, 373:1, 373:4, 373:18, 374:21, 376:5, 376:8, 377:12, 378:4, 378:9, 378:14, 378:17, 378:25, 379:2, 379:10, 379:15, 379:24, 380:3, 380:8, 380:13, 380:18, 380:21, 380:25, 381:5, 381:7, 381:12, 381:14, 381:17, 381:23, 382:3, 386:16, 396:8, 401:2, 422:8, 426:9, 426:21, 426:25, 427:4, 427:8, 427:10, 430:3, 430:5, 436:5, 436:16, 437:13, 437:15, 437:21, 437:25, 438:2, 438:14, 438:20, 438:25, 439:4, 439:10, 439:16, 439:20, 440:3, 440:14, 441:5, 441:13, 441:14, 442:9, 443:5, 443:8, 443:11, 444:7, 444:9, 444:24, 445:1, 445:4, 445:6, 445:10, 446:7, 447:8, 447:17, 447:22, 449:3, 449:5, 449:25, 450:1, 450:7, 450:8, 450:10, 450:15, 450:19, 451:11, 451:22, 451:25, 452:20, 452:23, 453:9, 453:15, 453:20, 454:2, 454:5, 454:22, 455:11, 460:20, 460:24, 461:3, 461:4, 466:22
**Rhine's** [22] - 354:1, 374:7, 383:8, 383:14, 383:19, 383:24, 388:4, 389:25, 390:25, 392:12, 393:9,

394:5, 394:22, 396:21, 405:3, 428:14, 440:9, 447:3, 450:4, 453:1, 460:13, 463:12
**rid** [1] - 365:20
**right-hand** [2] - 392:2
**ringing** [1] - 434:25
**riot** [2] - 446:8, 454:23
**rioter** [6] - 340:4, 347:18, 348:1, 454:1, 455:5, 455:6
**rioters** [18] - 338:10, 338:11, 338:22, 339:21, 344:17, 351:4, 353:4, 353:21, 429:14, 430:7, 430:10, 430:18, 430:19, 430:24, 435:15, 436:14, 436:17
**ripped** [1] - 427:3
**roadway** [1] - 397:19
**roadways** [1] - 418:21
**robust** [1] - 429:6
**role** [2] - 429:4, 444:15
**room** [9] - 410:9, 410:14, 424:11, 439:17, 473:4, 473:14, 474:20, 475:23, 476:5
**Rotunda** [9] - 348:16, 348:19, 348:24, 349:21, 350:1, 351:17, 355:14, 405:5, 439:3
**rough** [4] - 360:13, 361:14, 361:17, 405:10
**route** [2] - 349:20, 409:20
**row** [1] - 443:18
**rows** [1] - 443:17
**Rule** [17] - 357:20, 357:25, 358:14, 360:15, 360:18, 382:7, 400:3, 400:12, 404:8, 404:21, 405:11, 405:12, 405:17, 405:24, 406:5, 413:4
**rule** [6] - 406:5, 421:17, 433:13, 433:22, 458:7, 471:5
**ruled** [2] - 412:15, 464:6
**rules** [2] - 449:16, 473:17
**ruling** [5] - 340:7,

422:3, 422:6, 425:13
**running** [2] - 386:24, 444:3

# S

**sacred** [1] - 448:10
**safe** [2] - 423:13, 445:3
**safely** [4] - 355:3, 355:7, 355:10, 427:23
**safest** [1] - 409:20
**safety** [5] - 353:23, 360:3, 365:9, 427:10, 449:12
**Samsung** [1] - 385:11
**satisfied** [1] - 403:1
**saw** [28] - 340:16, 344:6, 344:24, 346:20, 351:7, 426:12, 430:21, 430:23, 430:24, 432:8, 434:23, 435:11, 435:12, 435:14, 438:15, 440:14, 445:3, 446:17, 446:21, 451:24, 452:4, 453:6, 454:3, 455:5, 462:10, 462:12, 462:14, 462:15
**scarcity** [1] - 400:18
**scene** [3] - 338:7, 338:13, 338:25
**scheduling** [1] - 333:6
**scientific** [2] - 411:13, 461:24
**scolding** [1] - 447:15
**screen** [5] - 337:1, 373:23, 374:1, 387:13, 398:5
**scripted** [1] - 360:21
**scroll** [3] - 376:14, 384:5
**search** [13] - 339:19, 339:21, 341:1, 341:8, 343:4, 383:8, 383:10, 383:19, 383:23, 383:24, 421:1, 449:3, 449:5
**searched** [6] - 341:18, 366:23, 383:14, 383:21, 454:18
**searching** [1] - 340:24
**seated** [1] - 381:22
**seats** [2] - 476:13, 476:14
**Seats** [1] - 476:16
**Seattle** [6] - 371:11,

378:13, 385:9, 385:15, 397:7, 397:15
**second** [18] - 377:1, 377:4, 381:7, 384:6, 411:11, 415:6, 415:14, 428:22, 431:7, 431:13, 433:1, 434:9, 445:11, 468:13, 469:11, 470:12, 471:15
**seconds** [9] - 335:24, 336:21, 337:5, 339:14, 350:12, 350:22, 352:10, 430:11, 454:7
**Secret** [8] - 371:7, 415:24, 419:15, 429:1, 444:11, 444:14, 468:17, 468:20
**secured** [1] - 359:5
**security** [3] - 364:25, 429:7, 435:9
**see** [80] - 336:5, 336:22, 337:9, 337:12, 337:17, 338:19, 338:22, 338:24, 339:14, 340:19, 345:15, 347:17, 349:5, 349:9, 350:5, 350:24, 351:20, 355:6, 355:13, 355:14, 365:12, 373:22, 377:17, 381:16, 386:25, 387:1, 387:12, 388:12, 388:14, 388:19, 388:25, 389:6, 389:7, 390:13, 392:3, 392:25, 393:17, 394:12, 395:5, 398:5, 398:18, 398:20, 437:5, 437:14, 437:21, 437:22, 437:23, 438:3, 438:6, 438:11, 438:12, 439:5, 439:20, 440:21, 440:24, 441:1, 441:2, 441:3, 441:5, 441:6, 441:24, 442:4, 442:7, 443:8, 443:17, 443:24, 443:25, 445:5, 446:7, 447:14,

447:25, 450:10, 452:24, 453:1, 472:21
**seeing** [1] - 445:7
**seeking** [1] - 406:15
**seem** [1] - 361:23
**sees** [9] - 430:19, 441:14, 441:15, 441:17, 441:19, 443:6, 448:8
**segment** [1] - 337:18
**seize** [2] - 383:24, 384:1
**seized** [8] - 331:1, 332:12, 358:22, 359:3, 363:23, 384:12, 385:7, 386:15
**select** [3] - 422:7, 473:15, 473:17
**selected** [2] - 452:15, 476:13
**selecting** [2] - 463:5, 473:20
**selection** [2] - 452:9, 476:12
**self** [1] - 466:8
**self-interest** [1] - 466:8
**Senate** [2] - 388:16, 439:7
**send** [4] - 410:8, 410:25, 458:3, 475:6
**sending** [1] - 473:4
**sense** [5] - 348:12, 403:19, 455:14, 455:20, 476:1
**sent** [2] - 374:25, 423:24
**sentence** [3] - 415:6, 415:20, 474:4
**sentiments** [1] - 412:6
**separate** [2] - 467:12, 467:14
**separately** [1] - 467:14
**serious** [3] - 438:18, 439:15
**seriously** [1] - 439:18
**service** [1] - 477:9
**Service** [8] - 371:7, 415:24, 419:15, 429:1, 444:11, 444:14, 468:17, 468:20
**services** [1] - 371:6
**session** [2] - 433:3, 470:14
**Session** [1] - 456:3
**set** [8] - 388:25, 392:3,

429:7, 444:17, 444:18, 444:19, 447:5, 452:20
**setting** [1] - 444:15
**Seventh** [1] - 478:10
**several** [2] - 335:23, 450:12
**sex** [1] - 459:3
**sexual** [1] - 459:3
**shake** [1] - 432:3
**shaking** [1] - 454:10
**shares** [2] - 446:16, 446:25
**sheer** [1] - 436:15
**sheet** [1] - 420:19
**shelf** [1] - 343:3
**sheltered** [1] - 427:22
**sheltering** [2] - 432:9, 454:13
**shifting** [2] - 363:19, 449:2
**shifts** [2] - 452:1, 460:19
**shot** [1] - 334:25
**shots** [3] - 334:23, 334:25, 335:3
**show** [16] - 373:20, 384:4, 385:23, 387:10, 389:17, 390:17, 390:20, 391:16, 392:7, 393:6, 394:2, 394:18, 438:9, 445:6, 445:8, 445:10
**showed** [6] - 438:15, 438:22, 439:2, 439:7, 439:8, 444:2
**showing** [1] - 438:17
**shown** [2] - 441:1, 466:6
**shows** [2] - 432:16, 433:21
**sic** [3] - 395:16, 415:1, 455:15
**sick** [1] - 447:1
**side** [33] - 351:21, 359:6, 386:20, 386:21, 388:8, 388:10, 390:9, 390:11, 391:13, 392:2, 393:20, 393:22, 394:13, 395:7, 397:5, 398:22, 426:18, 430:22, 438:23, 439:11, 439:21, 439:23, 440:7, 443:22, 447:13, 453:17, 463:14, 463:18, 463:19,

463:22, 466:7
**sidebar** [2] - 357:19, 360:9
**sideline** [1] - 357:11
**sidelining** [1] - 330:24
**sides** [1] - 477:16
**sidewalks** [1] - 397:21
**signage** [1] - 444:21
**signed** [2] - 475:7, 475:9
**sill** [1] - 447:16
**similar** [2] - 433:5, 446:4
**similarly** [5] - 439:2, 445:11, 445:12, 452:19, 460:7
**simply** [4] - 396:8, 415:3, 445:25, 452:6
**single** [3] - 436:3, 444:4, 453:7
**sit** [1] - 421:3
**situation** [3] - 359:17, 405:19, 421:12
**six** [2] - 371:22, 443:4
**size** [2] - 342:5, 364:2
**sized** [1] - 342:9
**skillfully** [1] - 477:13
**skimming** [1] - 400:19
**skip** [3] - 335:12, 338:16, 385:1
**sleep** [1] - 462:15
**slightly** [1] - 354:18
**slowly** [2] - 337:24, 356:11
**small** [5] - 342:16, 363:24, 364:3, 420:10, 477:7
**smaller** [4] - 342:8, 342:9, 364:1, 437:2, 449:11, 463:17
**smaller-sized** [1] - 342:9
**smash** [1] - 439:3
**snow** [4] - 462:10, 462:12, 462:15
**snowed** [1] - 462:17
**social** [1] - 463:12
**sole** [3] - 458:13, 459:11, 464:18
**solely** [3] - 459:5, 474:5, 474:13
**someone** [11] - 345:23, 365:11, 367:19, 368:21, 375:7, 439:25, 442:14, 444:22, 450:7, 450:13, 455:18
**sometimes** [3] - 366:21, 463:21,

500

472:13
**somewhat** [2] - 363:13, 421:22
**somewhere** [1] - 456:20
**son** [1] - 378:24
**soon** [2] - 425:9, 474:17
**sorry** [4] - 337:22, 374:22, 379:6, 396:15
**sort** [2] - 413:3, 413:5
**sotto** [1] - 382:8
**Sound** [2] - 397:6, 397:11
**sounded** [1] - 382:15
**south** [6] - 438:3, 438:5, 438:7, 438:11, 442:1, 443:22
**Southeast** [1] - 470:21
**southeast** [6] - 438:2, 439:1, 439:5, 439:11, 440:4, 441:5
**space** [3] - 368:15, 379:10, 440:17
**speaking** [1] - 414:25
**Special** [16] - 374:17, 381:16, 383:7, 383:18, 384:8, 385:6, 385:25, 387:12, 390:8, 390:21, 392:20, 393:17, 394:12, 395:5, 429:3, 429:12
**special** [8] - 370:25, 371:6, 373:7, 376:10, 379:8, 444:21, 446:22, 449:16
**specific** [6] - 412:14, 417:1, 433:13, 467:24, 471:5, 473:16
**specifically** [4] - 377:1, 380:24, 407:15, 420:24
**specifics** [1] - 332:5
**speculate** [2] - 464:5, 466:24
**speculation** [1] - 461:22
**spell** [1] - 370:22
**spend** [1] - 380:8
**spent** [9] - 357:10, 371:21, 375:6, 379:17, 380:18, 380:25, 381:5, 381:11, 443:8
**spokesperson** [1] -

473:16
**spotted** [1] - 420:14
**spray** [10] - 341:22, 342:11, 342:13, 359:11, 364:3, 366:17, 427:17, 430:24, 449:8, 454:19
**sprayed** [7] - 442:12, 442:18, 446:24, 454:2, 455:5, 455:6, 455:19
**spraying** [3] - 431:1, 433:23, 454:4
**sprint** [1] - 400:8
**squares** [1] - 418:21
**squealing** [1] - 430:16
**staffed** [1] - 444:17
**staffers** [1] - 427:22
**stage** [5] - 398:6, 438:6, 438:12, 440:15, 440:20
**staircase** [6] - 350:25, 351:15, 351:20, 351:23, 351:24, 352:1
**stairs** [11] - 368:9, 427:12, 427:16, 432:4, 435:16, 441:6, 441:8, 441:18, 442:2, 442:3, 450:22
**stairway** [2] - 441:6, 441:20
**stairwell** [2] - 349:24, 356:11
**stamp** [1] - 338:19
**stand** [5] - 332:20, 389:2, 443:12, 465:3, 475:25
**standard** [3] - 411:18, 418:2, 451:9
**standing** [10] - 377:9, 387:5, 398:12, 430:23, 435:12, 436:13, 438:14, 441:14, 443:10, 445:25
**stands** [5] - 338:2, 432:19, 442:9, 447:17, 465:9
**Starbucks** [1] - 478:10
**stars** [3] - 377:3, 377:18, 432:2
**start** [4] - 339:8, 341:23, 344:18, 404:21
**started** [2] - 362:23, 438:16
**starting** [1] - 336:18

**state** [5] - 370:22, 371:6, 395:19, 397:4, 422:24
**statement** [22] - 360:25, 362:1, 362:11, 405:2, 405:10, 405:12, 405:13, 405:20, 405:25, 406:9, 406:11, 406:19, 407:19, 409:14, 410:23, 414:24, 415:5, 417:16, 419:9, 428:11, 433:23, 452:2
**statements** [14] - 357:20, 357:23, 358:6, 358:8, 360:13, 360:19, 360:21, 405:1, 406:2, 406:12, 414:22, 460:5, 460:9, 465:19
**States** [13] - 370:25, 409:25, 411:15, 411:17, 426:5, 428:18, 432:25, 434:9, 470:10, 470:19, 470:20, 471:14, 471:23
**stationed** [1] - 395:19
**status** [1] - 359:23
**stay** [1] - 478:4
**stayed** [2] - 430:22, 438:8
**Steal** [6] - 432:7, 433:16, 434:22, 447:2, 455:25, 456:1
**step** [1] - 360:1
**steps** [8] - 388:20, 427:9, 430:4, 430:23, 435:3, 440:24, 453:22, 455:17
**stick** [2] - 411:18, 416:21
**sticking** [1] - 409:22
**still** [19] - 330:17, 334:10, 338:2, 338:6, 338:22, 338:24, 350:14, 359:6, 374:25, 375:1, 376:15, 383:1, 389:13, 425:8, 427:12, 427:17, 428:1, 435:11, 477:3
**stipulate** [2] - 330:22, 331:5
**stipulated** [2] -

459:20, 459:22
**stipulation** [1] - 459:23
**stood** [5] - 353:3, 354:10, 426:18, 426:19, 427:4
**stop** [10] - 343:14, 356:19, 432:13, 434:18, 436:21, 447:25, 448:23, 451:4, 456:1, 456:2
**Stop** [6] - 432:7, 433:15, 434:22, 447:2, 455:25, 456:1
**stopped** [14] - 337:8, 339:11, 340:1, 340:13, 341:5, 343:25, 345:13, 346:4, 348:11, 350:21, 426:14, 426:21, 453:6
**stopping** [2] - 430:12, 433:20
**stops** [1] - 448:23
**stories** [1] - 455:20
**story** [1] - 440:22
**strategies** [2] - 441:12, 443:6
**strategy** [1] - 441:16
**streamlining** [1] - 361:1
**Street** [2] - 470:20, 478:11
**streetlights** [5] - 393:2, 393:23, 394:14, 395:8, 399:7
**streets** [1] - 418:21
**stress** [1] - 405:21
**stricken** [1] - 405:20, 406:11, 406:25, 407:15, 412:12, 412:16, 418:18, 464:7, 464:11, 464:13
**strike** [11] - 360:17, 361:2, 362:1, 362:14, 373:11, 380:16, 388:11, 390:21, 392:9, 406:17, 407:11
**striking** [1] - 406:10
**strong** [1] - 475:24
**struck** [3] - 412:18, 412:23, 464:9
**structure** [1] - 440:10
**stuck** [1] - 414:18
**stuff** [2] - 347:19, 450:8
**subject** [1] - 405:12
**submit** [7] - 410:21,

413:24, 429:16, 431:3, 432:15, 433:25, 435:3
**submitted** [2] - 330:10, 332:12
**substantial** [2] - 357:11, 411:14
**substantially** [1] - 354:5
**substantive** [1] - 424:16
**subtleties** [1] - 441:11
**sufficient** [1] - 402:22
**sufficiently** [1] - 467:4
**sugarcoating** [1] - 446:22
**suggest** [1] - 472:5
**suggested** [1] - 396:8
**suggests** [2] - 330:13, 418:1
**suits** [1] - 444:5
**summon** [1] - 476:23
**superiors** [1] - 344:22
**superman** [1] - 439:5
**supervisor** [1] - 373:7
**support** [1] - 423:9
**supported** [2] - 436:24, 466:5
**supporting** [3] - 445:23, 445:25, 448:7
**surge** [2] - 441:20, 443:3
**surprise** [1] - 360:20
**surprised** [1] - 361:24
**surprising** [1] - 424:17
**surrender** [1] - 365:19
**surrounded** [1] - 447:23
**surrounding** [2] - 417:14, 465:13
**surveillance** [2] - 375:2, 441:4
**suspicion** [1] - 451:6
**suspicious** [1] - 451:3
**sustained** [2] - 464:3, 464:12
**swear** [2] - 370:13, 446:13
**sworn** [1] - 459:18
**sympathy** [1] - 459:6
**system** [3] - 451:3, 451:19, 459:1

**T**

**T-r-e-v-i-n-o** [1] - 370:23
**Tacoma** [2] - 371:10,

478:5
**tactics** [2] - 441:16, 443:6
**tails** [2] - 422:15, 422:25
**Tails** [2] - 422:17, 422:18
**tall** [1] - 440:22
**Tanya** [2] - 404:5, 425:6
**task** [8] - 371:1, 371:3, 371:23, 372:5, 372:10, 372:15, 473:18
**Task** [1] - 371:4
**tasked** [1] - 370:25
**taught** [1] - 423:10
**Taylor** [1] - 411:17
**teaches** [1] - 372:10
**team** [5] - 387:18, 389:23, 393:9, 394:4, 394:21
**Team** [1] - 391:19
**tear** [4] - 430:20, 436:17, 454:2, 476:17
**tear-gassed** [1] - 454:2
**technical** [2] - 427:14, 467:25
**techniques** [1] - 374:20
**technology** [1] - 437:7
**television** [1] - 474:10
**temporarily** [3] - 429:1, 456:21, 468:18
**tempted** [1] - 474:11
**tend** [1] - 331:8
**term** [7] - 434:10, 468:15, 468:20, 470:19, 470:22, 470:25, 471:19
**terminate** [1] - 451:14
**terminology** [1] - 434:21
**terms** [4] - 371:2, 469:25, 471:17, 471:23
**terrace** [9] - 439:5, 442:9, 442:25, 443:2, 443:12, 443:15, 443:20, 443:21, 446:19
**Terrorism** [1] - 371:4
**testified** [9] - 354:3, 360:14, 449:1, 450:3, 462:11, 464:18, 464:22, 464:24, 465:8

**testify** [17] - 332:7, 332:11, 353:19, 400:22, 401:8, 401:14, 401:17, 401:20, 401:24, 401:25, 402:5, 402:11, 402:18, 402:24, 403:4, 466:22, 467:1
**testifying** [4] - 400:25, 463:14, 465:3, 465:10
**testimony** [24] - 330:25, 331:5, 331:21, 332:1, 332:6, 332:21, 333:15, 336:24, 337:10, 356:5, 357:20, 358:2, 360:17, 384:17, 405:22, 406:17, 407:11, 412:19, 412:23, 419:2, 429:3, 430:13, 448:25, 451:24, 459:18, 459:20, 462:5, 462:11, 462:16, 463:17, 463:18, 464:9, 464:11, 464:17, 465:18, 465:19, 465:21, 466:2, 466:10, 466:12, 466:14, 466:17, 474:22
**text** [1] - 474:24
**thinking** [2] - 415:11, 417:13
**thinks** [1] - 422:1
**third** [16] - 346:15, 348:20, 350:1, 356:13, 376:14, 377:15, 380:24, 381:2, 381:10, 381:13, 431:15, 432:19, 433:3, 454:10, 469:14, 470:16
**thoroughly** [1] - 402:23
**thoughtful** [3] - 414:16, 414:18, 461:19
**thousands** [2] - 426:4, 426:25
**threats** [1] - 402:7
**three** [5] - 332:4, 350:24, 371:16, 388:12, 443:4
**threw** [1] - 359:14

**throughout** [4] - 333:15, 430:17, 460:17, 460:19
**ties** [2] - 367:11, 368:15
**tight** [1] - 444:14
**timing** [1] - 400:4
**timing-wise** [1] - 400:4
**tip** [4] - 373:2, 373:14, 396:5, 396:8
**tips** [2] - 373:15, 396:18
**tired** [1] - 447:1
**title** [1] - 409:2
**today** [7] - 331:22, 358:10, 363:6, 381:17, 406:9, 426:21, 449:23
**together** [1] - 423:15
**tone** [3] - 354:17, 442:16, 446:13
**took** [13] - 348:22, 348:25, 349:20, 359:11, 373:12, 374:19, 385:8, 389:3, 408:9, 408:19, 426:12, 440:18, 449:18
**top** [4] - 398:12, 420:25, 442:24, 443:1
**total** [1] - 371:20
**totally** [1] - 368:12
**toward** [2] - 444:1, 465:10
**towers** [4] - 440:2, 440:21, 440:22, 442:5
**trace** [3] - 375:14, 375:20, 375:23
**tracked** [1] - 379:16
**training** [5] - 372:4, 372:7, 372:8, 372:14, 372:15
**transcripts** [1] - 414:8
**transfer** [1] - 436:11
**transferred** [2] - 385:12, 385:14
**transported** [1] - 385:8
**trash** [2] - 359:9, 359:12
**treatment** [1] - 458:25
**trespass** [2] - 437:24, 444:8
**trespassing** [1] - 433:21
**Trevino** [21] - 370:10, 370:23, 370:24,

374:17, 378:3, 381:16, 383:7, 383:18, 384:8, 385:6, 385:25, 386:12, 387:12, 390:8, 390:21, 392:20, 393:17, 394:12, 395:5, 395:16, 399:12
**trial** [20] - 361:2, 361:13, 405:8, 406:8, 424:6, 427:15, 447:4, 457:18, 458:5, 458:6, 458:15, 459:17, 459:21, 460:17, 460:19, 464:3, 466:8, 472:12, 474:15, 474:22
**tried** [3] - 409:21, 454:12, 454:15
**tries** [1] - 448:1
**trip** [1] - 423:13
**trouble** [1] - 395:25
**true** [5] - 331:3, 409:21, 461:7, 466:3, 478:9
**truly** [4] - 330:23, 331:1, 406:23, 438:17
**truth** [5] - 353:14, 384:20, 461:8, 465:6, 466:11
**truthful** [1] - 465:4
**truthfully** [1] - 464:22
**try** [4] - 363:21, 374:20, 375:7, 475:8
**trying** [9] - 347:17, 355:11, 357:11, 378:23, 427:2, 439:3, 447:24, 449:1, 468:2
**turn** [4] - 360:19, 372:18, 406:6, 477:10
**two** [17] - 341:22, 363:4, 363:8, 363:24, 365:18, 373:15, 396:5, 399:6, 408:18, 420:11, 420:12, 420:13, 443:4, 443:17, 454:18, 462:1, 476:13
**type** [4] - 341:24, 358:15, 373:15, 385:16
**types** [1] - 462:1
**typical** [2] - 364:22,

365:9
**typically** [4] - 365:16, 365:18, 365:22, 397:7
**typo** [1] - 420:10

## U

**U.S** [14] - 334:18, 343:8, 343:10, 365:14, 371:7, 375:21, 375:24, 386:19, 388:7, 391:13, 392:24, 392:25, 456:15, 464:10
**ultimately** [1] - 375:10
**unanimous** [2] - 467:23, 475:16
**uncovered** [1] - 443:11
**under** [14] - 334:10, 344:17, 360:15, 400:12, 401:23, 402:4, 406:3, 406:5, 416:11, 431:20, 433:8, 465:15, 469:20, 475:13
**undergo** [1] - 372:4
**undid** [1] - 368:14
**undisputed** [1] - 459:23
**undone** [1] - 368:14
**unfavorable** [1] - 467:6
**unfortunately** [1] - 423:4
**UNIDENTIFIED** [1] - 457:13
**unimportant** [1] - 467:11
**unique** [10] - 363:24, 437:9, 437:20, 438:4, 438:10, 440:9, 441:25, 445:5, 446:6
**unit** [2] - 385:18, 386:3
**United** [13] - 370:25, 409:25, 411:15, 411:17, 426:5, 428:18, 432:25, 434:9, 470:10, 470:19, 470:20, 471:14, 471:23
**units** [1] - 334:21
**unless** [3] - 331:16, 418:4, 460:17
**unlikely** [1] - 476:23
**unnecessarily** [2] -

431:21, 469:21
**unpopular** [1] -
445:25
**unreasonableness** [1]
- 466:1
**unreasonably** [2] -
431:19, 469:19
**unring** [1] - 406:21
**unusual** [1] - 435:9
**up** [59] - 335:10,
337:21, 337:25,
338:11, 339:5,
339:24, 344:3,
344:8, 348:5,
348:16, 348:17,
348:19, 349:17,
349:25, 350:1,
351:19, 353:4,
354:11, 356:11,
356:13, 373:12,
376:1, 376:13,
376:25, 380:15,
388:20, 397:23,
397:25, 398:15,
401:5, 423:19,
427:9, 430:21,
434:24, 435:16,
441:2, 441:20,
442:2, 442:3, 442:8,
442:13, 444:15,
444:17, 444:18,
444:20, 446:17,
449:1, 450:5,
453:22, 454:9,
456:7, 456:9,
456:12, 456:22,
462:16, 473:17,
473:23
**upper** [2] - 430:5,
454:6
**upsetting** [1] - 438:17
**USA** [1] - 383:16
**useful** [3] - 475:23,
476:4, 476:7
**utility** [2] - 342:2,
449:12

### V

**Valentini** [9] - 331:19,
361:24, 361:25,
370:8, 382:9,
382:19, 399:14,
413:20, 425:25
**VALENTINI** [188] -
331:20, 332:11,
332:22, 333:2,
333:18, 333:20,
334:3, 334:13,
335:9, 335:14,
336:1, 336:20,

337:7, 338:16,
338:18, 339:8,
339:11, 339:13,
340:1, 340:3, 340:9,
340:13, 340:15,
341:3, 341:5, 341:7,
341:17, 343:12,
343:14, 343:16,
343:25, 344:2,
344:13, 345:13,
345:14, 346:4,
346:5, 348:4,
348:10, 349:2,
349:4, 349:16,
349:18, 350:9,
350:21, 350:23,
351:14, 352:3,
352:9, 352:11,
352:24, 353:2,
353:9, 353:13,
353:16, 353:19,
354:8, 356:8,
356:19, 356:21,
356:25, 357:3,
358:11, 358:20,
360:7, 360:24,
361:6, 361:16,
369:17, 370:3,
370:10, 370:19,
372:1, 372:3,
373:25, 374:2,
374:3, 374:11,
374:16, 376:12,
376:24, 377:13,
378:1, 378:2, 379:7,
381:23, 382:2,
382:12, 382:17,
382:21, 382:24,
383:1, 383:2,
384:13, 384:20,
385:1, 385:5, 386:6,
386:11, 387:7,
387:9, 387:21,
388:1, 389:15,
389:16, 390:2,
390:7, 390:15,
390:16, 390:18,
390:19, 391:3,
391:8, 391:14,
391:15, 391:21,
392:1, 392:5, 392:6,
392:14, 392:19,
393:4, 393:5,
393:11, 393:16,
393:25, 394:1,
394:7, 394:11,
394:16, 394:17,
394:24, 395:2,
395:4, 395:11,
399:11, 399:15,
399:17, 400:17,

403:14, 404:23,
407:2, 407:7,
407:24, 408:2,
408:5, 408:8,
408:11, 408:16,
408:24, 409:1,
409:4, 409:8, 410:5,
410:12, 410:18,
411:8, 411:20,
411:23, 413:1,
413:9, 413:13,
413:16, 414:3,
414:10, 414:20,
415:25, 416:14,
416:24, 418:5,
418:18, 418:20,
419:1, 419:5,
419:12, 419:18,
419:23, 420:1,
420:4, 420:7,
420:17, 421:9,
423:25, 424:14,
425:1, 425:5,
448:18, 453:10
**vantage** [1] - 389:2
**variety** [1] - 472:17
**various** [1] - 371:6
**vehicles** [6] - 398:18,
398:20, 399:2,
438:13, 440:16,
455:17
**verdict** [29] - 420:19,
421:6, 436:24,
436:25, 452:22,
452:23, 458:4,
458:25, 459:11,
463:1, 463:7, 463:8,
463:10, 467:18,
467:20, 467:21,
467:22, 472:3,
472:6, 472:11,
473:6, 473:10,
473:19, 474:5,
475:16, 475:25,
477:6, 477:22
**verdicts** [1] - 467:15
**verse** [1] - 445:16
**version** [14] - 386:2,
387:15, 387:17,
389:22, 390:23,
391:17, 392:9,
392:10, 393:7,
411:18, 417:11,
422:19, 424:8,
440:13
**via** [1] - 475:3
**Vice** [17] - 416:7,
416:8, 416:10,
416:19, 417:6,
429:4, 429:7,

429:10, 444:14,
444:23, 444:24,
444:25, 453:4,
456:14, 456:21,
456:22, 468:21
**vice** [1] - 427:6
**video** [40] - 335:13,
335:25, 336:19,
337:6, 339:10,
339:25, 340:12,
341:4, 343:13,
343:24, 344:12,
345:12, 346:3,
348:3, 348:9, 350:7,
350:20, 351:13,
352:2, 352:7, 353:1,
356:7, 374:23,
375:7, 379:16,
437:10, 438:16,
438:24, 439:12,
439:19, 440:7,
440:8, 441:25,
442:5, 443:3, 444:1,
446:21, 450:10,
472:14, 472:16
**videos** [9] - 374:24,
375:1, 375:4, 438:9,
438:17, 440:13,
444:2, 452:20
**view** [4] - 440:21,
441:24, 473:11
**views** [2] - 463:12,
473:24
**violate** [3] - 442:15,
445:15, 446:15
**violated** [1] - 445:16
**violating** [3] - 433:14,
433:22, 471:6
**violation** [8] - 357:20,
360:18, 405:25,
413:3, 468:6, 469:4,
470:5, 471:9
**violations** [1] - 358:1
**violent** [5] - 435:14,
438:15, 438:18,
453:5, 453:16
**visit** [1] - 429:8
**visiting** [5] - 415:24,
429:2, 444:11,
456:21, 468:18
**visitors** [3] - 345:5,
363:8, 429:13
**visual** [3] - 382:23,
435:22, 447:21
**voce** [1] - 382:8
**voice** [6] - 382:14,
382:25, 383:3,
383:5, 446:14,
475:24
**voir** [2] - 333:7, 412:7

**voluntarily** [1] - 403:2
**voluntary** [2] - 401:11,
403:6
**volunteered** [2] -
361:24, 364:13
**vote** [3] - 452:7,
475:19, 476:5
**voting** [1] - 475:15
**vouching** [1] - 332:19

### W

**wait** [4] - 403:17,
403:21, 448:21,
478:2
**waiver** [2] - 401:8,
401:11
**walk** [3] - 415:10,
437:16, 455:5
**walked** [16] - 426:11,
426:16, 427:11,
427:20, 430:12,
434:15, 435:10,
435:16, 436:17,
438:4, 438:5, 442:8,
442:20, 453:20,
453:21, 454:1
**walking** [6] - 437:25,
441:9, 442:1,
442:17, 444:4, 444:5
**walks** [3] - 418:22,
442:2, 442:3
**walls** [1] - 439:6
**wants** [4] - 347:19,
403:15, 446:15,
454:22
**warrant** [6] - 378:3,
378:14, 378:17,
383:7, 383:18,
383:23
**Washington** [15] -
365:4, 371:11,
378:10, 378:11,
378:12, 395:19,
395:21, 395:23,
396:17, 396:23,
396:25, 397:3,
397:4, 426:22,
470:21
**watch** [5] - 438:9,
448:6, 448:7, 474:12
**watched** [8] - 379:16,
426:25, 430:19,
432:2, 432:3, 432:4,
453:11, 453:13
**watching** [1] - 447:8
**water** [2] - 366:15,
397:6
**ways** [1] - 345:22
**weaker** [1] - 418:1

**weapons** [11] - 340:24, 341:9, 341:19, 341:21, 355:24, 357:5, 358:22, 359:3, 361:7, 405:4, 449:5
**wearing** [4] - 381:20, 381:21, 381:24, 446:7
**week** [5] - 372:9, 406:7, 452:18, 453:12, 456:25
**weighed** [1] - 355:11
**weight** [7] - 458:15, 460:3, 462:22, 462:24, 463:13, 466:12, 466:18
**welcome** [1] - 425:16
**West** [2] - 349:24, 350:2
**west** [6] - 393:22, 394:13, 395:7, 397:5, 440:16, 447:13
**white** [4] - 377:3, 377:18, 383:16, 432:2
**whole** [3] - 360:2, 458:1, 458:10
**wife** [1] - 378:23
**Wilkerson** [1] - 410:1
**willfully** [13] - 433:4, 433:7, 433:10, 433:12, 434:2, 434:5, 434:10, 435:5, 470:16, 471:2, 471:4, 471:15, 471:24
**willing** [3] - 367:17, 400:6, 417:11
**wind** [1] - 438:10
**window** [4] - 343:3, 447:11, 462:10, 462:14
**wiping** [1] - 436:17
**wise** [1] - 400:4
**wish** [5] - 437:3, 451:23, 451:24, 452:3, 474:21
**wishes** [1] - 400:22
**withdraw** [1] - 361:12
**withdrawn** [2] - 356:3, 382:10
**witness** [41] - 334:2, 357:6, 361:1, 370:9, 381:24, 405:1, 406:8, 412:15, 413:18, 414:1, 414:5, 424:18, 437:10, 445:19,

462:4, 464:6, 464:19, 464:20, 464:21, 464:22, 464:24, 465:1, 465:2, 465:3, 465:4, 465:5, 465:6, 465:8, 465:16, 465:20, 466:2, 466:4, 466:6, 466:10, 466:11, 466:12, 466:17, 466:19
**Witness** [11] - 337:2, 349:8, 349:13, 350:11, 350:18, 351:11, 352:14, 388:23, 398:9, 399:4, 399:13
**WITNESS** [7] - 334:8, 334:11, 370:7, 370:13, 370:17, 374:1, 379:6
**witness's** [7] - 462:5, 464:21, 465:3, 465:12, 465:18, 465:19, 465:21
**witnesses** [11] - 399:17, 401:1, 403:7, 458:17, 459:18, 463:14, 463:16, 463:17, 463:19, 464:17, 464:19
**woke** [1] - 462:16
**won** [1] - 422:23
**wondered** [1] - 418:17
**wondering** [1] - 347:13
**words** [7] - 433:18, 435:2, 455:22, 456:5, 457:2, 467:22, 472:15
**worse** [1] - 352:18
**wrist** [1] - 345:24
**write** [1] - 476:18
**writing** [2] - 475:11, 475:17
**written** [1] - 424:3

# X

**XVI** [1] - 414:4
**XVIII** [1] - 414:8
**XXXIII** [1] - 420:9

# Y

**yards** [2] - 436:14, 453:18
**year** [1] - 444:20
**years** [6] - 363:4, 369:23, 371:14,

371:16, 371:22, 372:9
**yesterday** [3] - 332:25, 334:16, 403:23
**you-all** [1] - 437:5
**young** [1] - 447:15
**yourself** [9] - 339:15, 349:5, 349:7, 350:5, 350:10, 352:5, 352:12, 368:14, 403:8

# Z

**zoomed** [3] - 379:17, 440:13
**zoomed-in** [1] - 440:13