**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————

| | | |
|---|---|---|
| United States of America, | ) | Criminal Action |
| | ) | No. 1:21-cr-00687-RC |
| Plaintiff, | ) | |
| | ) | **Sentencing** (via Zoom) |
| vs. | ) | |
| | ) | |
| David Charles Rhine, | ) | Washington, D.C. |
| | ) | **September 11, 2023** |
| Defendant. | ) | Time:  2:00 p.m. |

———————————————————————

**Transcript of Sentencing** (via Zoom)
**Held Before**
**The Honorable Rudolph Contreras**
**United States District Judge**

A P P E A R A N C E S

For the Government:        **Francesco Valentini**
(via Zoom)                  DEPARTMENT OF JUSTICE
                           950 Pennsylvania Avenue, Northwest
                           Washington, D.C. 20530

                           **Kelly E. Moran**
                           UNITED STATES ATTORNEY'S OFFICE
                           FOR THE DISTRICT OF COLUMBIA
                           601 D Street, Northwest
                           Washington, D.C. 20579

For the Defendant:         **Rebecca C. Fish**
(via Zoom)                 **Joanna J. Martin**
                           FEDERAL PUBLIC DEFENDER
                           1331 Broadway, Suite 400
                           Tacoma, Washington 98402

Also Present:              Sherry Baker, Probation Officer

———————————————————————

Stenographic Official Court Reporter:
                           Nancy J. Meyer
                           Registered Diplomate Reporter
                           Certified Realtime Reporter
                           333 Constitution Avenue, Northwest
                           Washington, D.C. 20001
                           202-354-3118

1          P R O C E E D I N G S

2          (REPORTER'S NOTE:  This hearing was held during the
COVID-19 pandemic restrictions and is subject to the
3     limitations of technology associated with the use of
technology, including but not limited to telephone and video
4     signal interference, static, signal interruptions, and other
restrictions and limitations associated with remote court
5     reporting via telephone, speakerphone, and/or
videoconferencing.)

6

7          THE COURTROOM DEPUTY:  This is Criminal Action

8     21-687, United States v. David Charles Rhine.

9          Counsel, please state your appearances for the record.

10         MR. VALENTINI:  Good afternoon, Your Honor.  My name

11    is Francesco Valentini for the United States.  Also

12    participating in the videoconference today is Kelly Moran,

13    United States -- AUSA, also on behalf of the United States.

14         MS. FISH:  Good afternoon, Your Honor.  Rebecca Fish

15    and Joanna Martin with the Federal Public Defender for the

16    Western District of Washington appearing on behalf of our

17    client, David Rhine, who is present on the Zoom conference.

18         THE COURT:  Mr. Rhine, I know I scheduled this via

19    Zoom at your request, but if you can confirm, again, that that

20    is your preference rather than appearing in person, which, as

21    you can see from the video, we're in the courtroom.  Any member

22    of the public could come in and watch, if they wish; although

23    the gallery is empty.  And you could be here in person if you

24    wish.

25         But is it your desire to do this via Zoom?

1          THE DEFENDANT:  Yes, Your Honor.  Good afternoon.

2    Thank you for asking.  Yes, it is.

3          THE COURT:  All right.  And, first, I'll apologize

4    for coming onto this call late.  We had a status conference in

5    a six-co-defendant January 6th case.  And six people have lots

6    to say, and so it ran long.  So I apologize for that.

7          So, defense counsel and Mr. Rhine, have you reviewed the

8    presentence report as revised following the defense and the

9    government submissions?

10          MS. FISH:  Yes, Your Honor.

11          THE COURT:  Okay.  Other than those issues already

12    briefed, are there any additional objections?

13          MS. FISH:  No, Your Honor.  No additional objections

14    that have not been raised in one of our filings.

15          THE COURT:  Okay.  So under Federal Rule of Criminal

16    Procedure 32(i)(3)(A), the Court will accept the presentence

17    report as its findings of fact on issues not in dispute.

18          Defendant has been convicted after a jury trial of

19    entering and remaining in a restricted building or grounds in

20    violation of 18 U.S.C. 1752(a)(1); disorderly and disruptive

21    conduct in a restricted building or grounds in violation of

22    18 U.S.C. 1752(a)(2); disorderly conduct in a Capitol Building

23    in violation of 40 U.S.C. 5104(e)(2)(D); parading,

24    demonstrating, or picketing in a Capitol Building in violation

25    of 40 U.S.C. 5104(e)(2)(G).

1          The parties have set forth a number of disputes about

2     the applicable guidelines in their papers.

3          First, the parties fiercely debate whether

4     Guideline §2A2.4, obstructing or impeding officers, or 2B2.3,

5     trespass, should apply to Count 2.  This decision is important

6     because it impacts the bottom-line range.  If 2A2.4 is applied,

7     the range is 6 to 12 months; whereas, if 2B2.3 is applied, the

8     range is 0 to 6 months.

9          Probation has applied 2B2.3 and, thus, agrees with the

10    defendant that the range is 0 to 6 months.  The government

11    argues that 2A2.4 applies and, thus, advocated the 6- to

12    12-month range.  I have closely read the relevant transcripts

13    in *Broadnax*, Judge Friedman's case; in *Vargas*, Judge Moss's

14    case; which despite being decided by two of my most thoughtful

15    colleagues reach opposite conclusions.  Both sides raise good

16    points.  Neither guideline is a perfect fit, and I'm supposed

17    to somehow decide which is the best fit.

18          Further complicating matters, defendant asked me to

19    consider the forthcoming zero-point offender reduction which

20    the Sentencing Commission has decided to apply retroactively,

21    which does not impact the calculations if I apply probation's

22    calculations but would if I agree with the government's

23    calculations.

24          Finally, the government asserts that if I apply

25    Guideline 2B2.3, I should add a 2-point enhancement to reflect

1    Mr. Rhine's possession of dangerous weapons:  two folding

2    knives and the container of pepper spray.  But the government's

3    unorthodox destruction of this evidence prevents me from

4    performing a firsthand assessment of whether these items, in

5    fact, constitute dangerous weapons.  Accordingly, I don't

6    intend to apply this enhancement.

7        In the end, there's no scenario in which I intend to

8    impose a sentence of incarceration of greater than 6 months.

9    So the debate is largely academic.  So as a result, I will just

10   apply the calculations made by probation.

11       Using the 2021 sentencing guidelines as set forth in

12   the presentence report, Counts 1 and 2 are grouped because

13   they involve the same victim and two or more acts or

14   transactions connected by a common criminal objective or

15   constituting part of a common scheme or plan.  As such, I apply

16   the offense level of the count that produces the highest

17   offense level.  Counts 1 and 2 result in the same number.  And

18   the guidelines don't apply to Counts 3 and 4 because they're

19   Class B misdemeanors.

20       So the base offense level is 4.  Applying that 2B2.3

21   trespass guideline, there's an added 2 points because the

22   trespass occurred in a restricted building, the U.S. Congress

23   building, which results in a total offense level of 6.

24       No criminal history resulting in criminal history points

25   results in a criminal history category of I.

1        So based on a total offense level of 6 and a criminal

2    history category of I, the applicable guidelines range is

3    0 to 6 months.

4        Would the government like to address the Court regarding

5    sentencing?

6        MR. VALENTINI:  Yes, Your Honor.  I understand that

7    Your Honor has already determined the guidelines that will

8    apply.  So I will not -- I understand that Your Honor does not

9    intend to hear argument on the guidelines calculations; is that

10   correct?

11       THE COURT:  That's correct.

12       MR. VALENTINI:  Okay.  So moving on to the -- the

13   sentencing decision.  The government, as Your Honor knows, is

14   recommending a sentence of one year of imprisonment and one

15   year of probation.

16       This is a substantial sentence.  It is not a sentence

17   that we recommend often in January 6th cases that involve

18   convictions under 1752 and 5104.  And we never recommend this

19   sentence lightly.

20       But as we explained in our sentencing memorandum,

21   Mr. Rhine's conduct on January 6th lies --

22       THE COURT:  Mr. Valentini, you froze there for a bit.

23   So go back a minute or two.

24       MR. VALENTINI:  As we explained in our sentencing

25   memorandum, Mr. Rhine's conduct on January 6th lays at the

1    aggravated end of the spectrum of 1752 cases.  This case could

2    have easily met the requirements of a felony charge under

3    18 U.S.C. 1512, and so it should warrant a substantial

4    sentence.

5          The Court presided over the defendant's trial and is

6    familiar with the evidence; so we will not replay the many

7    videos -- video exhibits that we showed at trial.  But I do

8    want to highlight some of the factors that support our

9    sentencing recommendation.

10          The first one is the defendant's true intent and

11    motivation in this case.  On January 6th when Mr. Rhine engaged

12    in disorderly and disruptive conduct inside the

13    Capitol Building, he did not do so aimlessly.  In fact, on the

14    steps of the Capitol, the defendant declared precisely what his

15    intent was on that day.  His intent was to "Stop the Steal."

16    And this Court is aware that "Stop the Steal" is a code word

17    for a dark motive, for obstructing the certification of the --

18    the certification of the Electoral College.

19          And why does that matter?  That matters because that is

20    the same intent that really underlies felonious charges under

21    1512(c)(2).  Now, of course, we did not charge a 1512(c)(2) in

22    this case.  And so the statutory maximum is what it is.  But

23    that should not undermine or diminish the culpability of the

24    intent behind Mr. Rhine's actions in this case.

25          The second factor is how the defendant contributed to

1    the riot, to the obstruction of the certification.  And

2    Mr. Rhine was one -- as mentioned in our sentencing memo, he

3    was one of the first ones to enter to the upper House door when

4    it was first breached.  Then Mr. Rhine went directly to the

5    House Chamber.  He -- we acknowledge he clearly did not want to

6    see anything inside the Capitol damaged.  And we acknowledge

7    that, but he was there waiting around when others were trying

8    to enter the House Chamber, and then he relocated and went up

9    to the third floor to the House gallery, another sensitive area

10    within the Capitol.

11        And then once he was there and after he tried -- and,

12    Your Honor, I know this is disputed.  But Your Honor can check

13    out the exhibit and review the exhibits again, if you have any

14    doubt.  After he attempts to open one of the doors to the

15    House gallery and that failed, the defendant goes into -- or at

16    least on the threshold of the House appropriation committee

17    room, which is another sensitive place.

18        And the third factor that I want to mention is the

19    defendant carried, as Your Honor mentioned, two pocket-sized

20    curved knives and a container of pepper spray into the

21    Capitol Building.  The testimony at trial by Officer Abbott was

22    unequivocal, and the defendant did not meaningfully contest

23    that testimony at trial.

24        Yet now at sentencing Mr. Rhine tries, again, to deflect

25    responsibility and he quibbles as to whether pocket knives or

1   curved knives with a blade of about less than 3 inches -- or

2   about 3 inches are really dangerous weapons.  And I appreciate

3   Your Honor's ruling on the guidelines issue.  But that remains

4   an aggravating factor for sentencing, and it is a factor that

5   Your Honor should take into account in selecting an appropriate

6   sentence under the 3553 factors.

7         Carrying knives and pepper spray into the Capitol was

8   a spectacularly dangerous choice.  And it was even more

9   dangerous when Mr. Rhine approached very sensitive areas

10   within the Capitol, when he was in the vicinity at least of

11   the House Chamber and the vicinity of the House gallery that

12   day.

13         Now, the defendant has tried to tell the Court that he's

14   remorseful for what he did, and I would urge the Court to take

15   those statements with a grain of salt.  How can Mr. Rhine be

16   truly sorry for what he did when he's not ever acknowledged

17   that he knew that he was not allowed to go into the Capitol?

18   How can Mr. Rhine be truly remorseful when he suggests that

19   bringing knives and pepper spray -- pepper spray to a riot that

20   unfolded inside the Capitol was, after all, not such a big

21   deal?

22         Your Honor, this defendant is not remorseful.  He's just

23   sorry for what this prosecution and what this set of events has

24   caused in his life.  And I understand that, and those are

25   perfectly understandable feelings.  But that is not the stuff

1     of acceptance of responsibility.

2          Mr. Rhine's conduct, Your Honor, on January 6th was

3     serious, it was reckless, and it was dangerous.  And there's no

4     indication that the defendant has learned from those mistakes.

5     A sentence --

6          THE COURT:  Mr. Valentini, you froze a little bit

7     again.  Let me have the court reporter tell you where you

8     froze.

9          MR. VALENTINI:  I apologize.

10          THE COURT REPORTER:  "And there's no indication that

11     the defendant has learned from those mistakes."

12          MR. VALENTINI:  And I'm sorry.  I did not hear that.

13          THE COURTROOM DEPUTY:  "And there's no indication

14     that the defendant has learned from those mistakes."

15          MR. VALENTINI:  A sentence of one year of

16     imprisonment followed by one year of supervised release is,

17     therefore, appropriate and is not greater than necessary to

18     carry out, to fulfill the sentencing -- the objective of

19     sentencing under 3553(a).

20          Thank you, Your Honor.

21          THE COURT:  All right.  Thank you, Mr. Valentini.

22          Ms. Fish.

23          MS. FISH:  Thank you, Your Honor.

24          And I'd like to start by acknowledging and thanking the

25     Court for allowing many of Mr. Rhine's immediate family members

1    to attend this hearing remotely.  I know that means a lot to

2    him and to his family.

3         I'd like to start out with talking about Mr. Rhine as a

4    person.  This is a factor that, I believe, the government has

5    not accounted for and, likely, was not aware of the totality of

6    his characteristic at the time they wrote their memorandum

7    given that our memorandum -- memoranda --

8         THE COURT:  Hold on a second, Ms. Fish.  There's

9    someone on a hospital bed who has appeared.

10        Okay.  Go ahead.

11        MS. FISH:  As detailed in my memorandum and, more

12   importantly, in the countless letters from family members,

13   friends, community members, clients of Mr. Rhine's, the two

14   most common words I heard to describe him and -- were kind and

15   generous.  And this is utterly consistent with my experience

16   with Mr. Rhine.

17        He is someone who learned from a young age the value of

18   public service and the importance of trying to understand

19   others and to give back to his community.  It's something he's

20   done throughout his life, through his service in the Navy,

21   through his numerous hours of pro bono accounting assistance to

22   members of the community, and through his explicit volunteer

23   work with different community organizations.

24        This includes his work with the USS Turner Joy museum,

25   which is now a thriving educational and, really, local

1    attraction in the city of Bremerton here in Washington state.

2    He has worked with environmental causes to help restore and

3    preserve our natural habitat, something that is of huge import

4    to our community here in Washington; and he has volunteered in

5    smaller ways.

6        Another thing that was, I think, impactful to learn

7    about Mr. Rhine is the ways that he has helped those in his

8    community without any formal volunteering role.  When his

9    nephew's father left their family, he stepped in to support

10   them.  He stepped in not only as an uncle but to serve the role

11   almost as a father, to help mentor, and a person they still

12   look to for assistance as a parent.

13       He did the same for some of his sons' friends when their

14   father left them as well.  He opened his home and allowed them

15   and their mother to lean on his family and really be a part of

16   his family so that they could have all the support they needed

17   as they grew up.  These were things that Mr. Rhine does not

18   brag about, that he would be hesitant to bring up in a

19   conversation himself, but they are things that everyone around

20   him recognizes and values immensely.

21       In terms of the circumstances of the charged conduct

22   here, I think it's important -- and I'm sure the Court will

23   not confuse my legal objections with Mr. Rhine's own

24   perspective.  Certainly, I -- as his attorney, you know, it is

25   my obligation to advocate for the appropriate guideline for

1    him, and that has nothing to do with his own view and his own

2    sincere remorse.

3        The government has not stated once that he ever bragged

4    about his conduct or made statements that were violent or

5    offensive.  He has been sincerely remorseful for a long time,

6    and his letter to the Court is sincere.  It is his own words,

7    and it is an expression that he's wanted to make to the Court

8    for a long time.

9        Obviously, I cannot advise the client to make those

10   statements prior to a trial.  And, you know, his respect for

11   his attorney's advice has nothing to do with the sincerity of

12   his remorse.  I think it's important to note, also, that the

13   people who do actually know Mr. Rhine have all affirmed how

14   remorseful he is and how shameful he is about -- since that day

15   and that he's expressed that to them prior -- long prior to

16   this hearing.  So I don't believe there's any basis to doubt

17   the sincerity of his remorse.

18       Furthermore, I disagree with the government's

19   characterization of the evidence.  And I won't belabor the

20   point, Your Honor, but, you know, the phrase "Stop the "Steal,"

21   the government described as being a code word for a dark

22   motive.  Certainly, that may be the case for some people, but

23   that's not the case for Mr. Rhine.

24       That was a very popular political slogan at the time

25   that some people might have had a -- you know, in the instance

1    here -- motive, and other people genuinely thought that there

2    was fraud going on and they needed to protest that.  There's

3    nothing about that that indicates any dark motive on the part

4    of Mr. Rhine, other than to express his views.

5         And the government, again, does not point to any conduct

6    that is as aggravated as in many of the cases that I cited for

7    the Court in my memorandum where the Court imposed noncustodial

8    sentences and indeed -- or in other cases that I cited to

9    regarding the application of the appropriate guideline for

10   section 1752.

11        You know, many other cases where people were convicted

12   of misdemeanors involved people who did, in fact, have some

13   sort of physical altercation with police or property

14   destruction or made statements that, you know, were truly

15   disrespectful and/or indicated a clear intent to break the law.

16   That is not so for Mr. Rhine.

17        And as I briefed as well, I think it would be

18   inappropriate to use any protected First Amendment speech to

19   enhance his sentence, and the D.C. Circuit has plainly rejected

20   such a proposition before.

21        Instead, the Court looks to the 3553 factors to

22   determine what sentence is enough but not more than necessary

23   to achieve those goals of sentencing.  And while I made a

24   slightly different recommendation than the probation office,

25   I think the probation office's reasoning is sound here.

1    The probation office, like, as in our recommendation,

2    recognized that custodial time is not going to serve any

3    purpose here.

4        Mr. Rhine is already well aware of the seriousness of

5    the offense.  It is not something he brags about or is proud of

6    or otherwise does not take seriously.  He takes it extremely

7    seriously, and he -- he always will.

8        In addition, I disagree with the government that this is

9    at the aggravated end of misdemeanor convictions.  There are

10   numerous people who have been convicted of misdemeanors who, as

11   I indicated, engaged in actual property theft or destruction or

12   were part of physical altercations with police.  That is not

13   Mr. Rhine.

14       His conduct, I believe, is of the mitigated act.  You

15   know, essentially, the conduct is walking through an area

16   where barriers had already been moved, walking through a

17   door that had already been opened, telling other people not

18   to kick a door, walking up a hallway, getting a bit confused,

19   and then stopped by law enforcement.  He was in the building

20   about 7 minutes prior to the first law enforcement officer

21   stopping him.  I don't think this is conduct that demonstrates

22   a serious risk of danger or a need for an exceptionally high

23   sentence.

24       In terms of deterrence, I believe that our sentence

25   [sic] of probation is more than sufficient for deterrence.

1    Truly, Mr. Rhine is thoroughly already deterred.  We propose a

2    term of substantial community service because we believe that

3    is a more appropriate way for him to make amends for the

4    seriousness of the offense and to actually restore his

5    community, not simply, you know, spend kind of unproductive

6    time in jail but to actually give back to the community.  And

7    we believe that that would be the appropriate way to reflect

8    the seriousness of the offense.

9        The probation office recommended a fine.  That's another

10   way that the Court can impose that type of sentence in a way

11   that is more productive than jail time.

12       But, ultimately, there simply is no showing that a year

13   in custody, let alone any time in custody, is necessary to

14   achieve any of the goals of sentencing.

15       Mr. Rhine does not pose a danger to public safety.  The

16   numerous letters from family, friends, clients, community

17   members affirm that he is a beacon in his community.  He is

18   someone who ensures the community is not only safe but also

19   supportive, and that people aren't falling through the cracks

20   and aren't slipping into poverty and losing the basic safety

21   net that they need to keep their families healthy.

22       And he's not in need of rehabilitation in the

23   traditional sense.  While I've noted that there is a likelihood

24   that Mr. Rhine may lose his CPA license once judgment is

25   entered in this case due to the regulations regarding a CPA

1   license in the state of Washington, he -- he understands he may

2   need to learn a new profession.

3        However, I do believe the qualities he already

4   possesses, his strong work ethic, his commitment to public

5   service, and his diligence will enable him to do that well.  So

6   I do not believe he is in need of substantial support from

7   probation to achieve that goal, if -- if, indeed, he loses his

8   CPA license.

9        In short, Your Honor, I would ask the Court to follow

10  our recommendation and impose a term of probation to include

11  a substantial requirement of community service.  I proposed

12  a hundred hours, but, you know, I would certainly defer to

13  the Court on the appropriate hours of community service

14  required.

15       I do believe that Mr. Rhine has demonstrated his sincere

16  contrition; that he's demonstrated that custodial time is not

17  necessary to achieve any goal of sentence; and that this is not

18  a case that is outside the norm of these misdemeanor

19  convictions.

20       THE COURT:  All right.  I have one technical question

21  for you.  The law in this circuit has changed as far as

22  discussing the discretionary terms of supervision at the time

23  of sentencing.  So we have to discuss those.

24       Those were set forth in paragraph 106 of the PSR, and

25  you did at -- within your papers object to paragraph 3, which

1    is the travel requirement.  And I will modify that in order to

2    accommodate your concerns.  But do I take it by you focusing on

3    paragraph 3 to indicate that you don't have objections to the

4    others?

5              MS. FISH:  Correct, Your Honor.  The only other one

6    that I believe, actually, I made in the PSR objections and was

7    adopted in the final PSR was to remove the drug testing

8    requirements, simply as I don't think it's indicated here.  And

9    that's at the discretion of the Court.  I believe that was in

10   the final PSR.

11             THE COURT:  Okay.  And I will do that.

12             Okay.  Mr. Rhine, do you wish to address the Court?

13             THE DEFENDANT:  Thank you, Your Honor.

14             At the advice of counsel, I prefer to allow my sincere

15   and heartfelt words in my letter that I submitted to you to --

16   to represent how I feel today, and I appreciate your -- your

17   generosity and leniency.  Thank you, sir.

18             THE COURT:  All right.  Thank you.

19             So let's start with the fine.  The maximum fine in the

20   matter is $100,000 for Counts 1 and 2 and $5,000 for Counts 3

21   and 4.  Unfortunately, defendant didn't cooperate with

22   probation in submitting financial information about his assets

23   or liabilities, a further example of his lack of acceptance of

24   responsibility.  Although defendant qualified for

25   court-appointed counsel, perhaps because his business may be

1    struggling due to his involvement in the underlying offense, he

2    has a strong track record of gainful employment, generated

3    strong income from his business, and seems to have a great deal

4    of equity in his home.  Accordingly, I intend to impose a fine

5    to help defray some of the costs of his incarceration and

6    supervision.

7         The Court is to impose a sentence sufficient but not

8    greater than necessary to comply with the purposes set forth in

9    the subsection.  I'm to consider the nature and circumstances

10   of the offense and the history and characteristics of the

11   defendant and impose a sentence that reflects the seriousness

12   of the offense, promotes respect for the law, and provides just

13   punishment for the offense.

14        Of course, the offense is serious.  A number of my

15   colleagues have spoken eloquently about this.  Defendant took

16   part in the mob riot that took place at the Capitol on

17   January 6th, 2021.  Many of the rioters engaged in violence and

18   some destroyed property.  I have watched numerous videos of

19   rioters engaging in hand-to-hand combat with police officials.

20   It was not a peaceful event.  More than a hundred law

21   enforcement officers were injured on that day.  Moreover, the

22   Capitol sustained over $1.5 million in property damage.

23        Many of the rioters intended to block the certification

24   of the votes for President Joe Biden.  It depends -- given his

25   words in that interview -- on the videotaped interview, it

seems defendant was among them.  And although the rioters failed to block the certification, they delayed it for several hours.  The security breach forced lawmakers to hide inside the House gallery until they could be evacuated to undisclosed locations.  In short, the rioters' actions threatened the peaceful transfer of power, a direct attack on our nation's democracy.

With that said, no evidence has been presented that shows defendant assaulting law enforcement or destroying property.  To the contrary, when he saw rioters kicking a door, he admonished them to convince them to stop.

After entering the Capitol Building through the upper House door that moments earlier had been opened from the inside by rioters, defendant wandered around the House side of the building.  He approached doors that led directly to the House Chamber.  However, the doors were locked, as the House gallery was in lockdown and members of Congress were still sheltering in place inside.  Defendant entered a congressional office of the appropriations committee and wandered around two separate floors of the complex.

Eventually, he was detained by Capitol Police officers who placed him in flex cuffs.  The officer escorted him downstairs to the Rotunda and directed him to leave.  After another rioter cut off the flex cuffs, the defendant complied with the officer's direction and exited through the Rotunda

1    doors.

2         In total, he was in the building approximately 22

3    minutes.

4         Unlike many of the other January 6th defendants,

5    Mr. Rhine did not celebrate his exploits on social media after

6    the event.  However, during the event at issue, he gave a

7    videotaped interview in which he made it clear that he was

8    there to "Stop the Steal," illustrating his intent to take part

9    in the blocking of the certification that day.

10        The riot was successful in delaying the certification in

11   large part because of the numbers of participants involved

12   which simply overwhelmed the outnumbered law enforcement

13   officers present.  Because defendant contributed to those

14   numbers, he must be held accountable for his actions and the

15   result to which his actions contributed.

16        Moreover, defendant never accepted responsibility for

17   his actions, forcing a rare misdemeanor jury trial, which is --

18   which is his right, which required the government and the Court

19   to expend significant resources and required members of the

20   public to take time out from their busy lives.  Therefore,

21   despite the fact that I have not imposed incarceration

22   sentences to other misdemeanants, all of them pleaded guilty.

23   So defendant is not in that category of getting a reward of a

24   reduced sentence.

25        As previously indicated, defendant has no criminal

1    history like other January 6th defendants I have sentenced.

2    And he has no history of violence.

3        Defendant is a 50-year-old -- 54-year-old man with a

4    master's degree and a CPA license.  He served honorably in the

5    Navy for eight years and appears to have been gainfully

6    employed the entirety of his adult life.

7        He currently owns and operates an accounting, tax

8    preparation, and financial services firm and is reported to

9    provide significant amounts of time to provide pro bono

10   accounting services, as well as participating in other

11   community service.

12       Defendant's upbringing is unremarkable, in particular in

13   comparison to the types of defendants I normally see.  His

14   parents were married for 63 years; so defendant was raised in

15   an intact family.  Defendant's father was a local

16   schoolteacher; although this is not a lucrative profession, it

17   does provide a steady paycheck that can be relied upon from

18   month to month and year to year.  Thus, although defendant

19   described his family as poor, struggling to provide basic

20   necessities, it does not approach the level of depravation

21   experienced by many of the defendants that appear before me.

22       And certainly defendant has lived a solidly middle-class

23   life as an adult.  Furthermore, his upbringing was free of

24   physical abuse, drug use, or violence.

25       Although defendant is currently living apart from his

 1   wife and child, the family continues to be supportive of him

 2   and intend to reunite after the conclusion of these

 3   proceedings.  Thus, defendant appears to have a stable

 4   environment for his rehabilitation.

 5        The Court is to impose a sentence that affords adequate

 6   deterrence to criminal conduct, protects the public from

 7   further crimes of the defendant.

 8        The events of January 6th involved a rather

 9   unprecedented confluence of events spurred by then

10   President Trump and a number of his prominent allies who bear

11   much responsibility for what occurred on that day.

12        Since his arrest, defendant seems to have done well on

13   release status; although, as I indicated earlier, surprisingly

14   did not provide the paperwork requested by probation.

15        Due to his lack of criminal history or evidence of

16   violence, the Court would normally be confident that Mr. Rhine

17   is unlikely to reoffend, will not be emotionally swept up in

18   irrational actions, and will not be a risk to the public.

19   However, the defendant's videotaped interview revealed the

20   righteous belief in his cause, providing him the right to

21   commit the instant offense.  This troubles the Court, and I am

22   concerned that a person with such surety and the righteousness

23   of his illegal behavior might not be deterred from doing the

24   same again.

25        The Court is to provide the defendant with needed

1    educational or vocational training, medical care, or other

2    correctional treatment in the most effective manner.  No needs

3    have been brought to my attention.

4        I'm to assess the kinds of sentences available.  Given

5    the nature of the crime and the defendant's lack of criminal

6    history or violence, the Court is considering a period of

7    months of incarceration, up to a year of supervision,

8    community service, and the fine previously discussed.  Although

9    the Court is mindful that probation has not recommended a

10   custodial sentence, the Court disagrees with that position

11   due to the lack of acceptance of responsibility, putting him in

12   a different position than the other misdemeanants I've

13   sentenced.

14       The Court is also considering the terms of supervision

15   proposed in the PSR:  community service to make amends to the

16   community and proposed by the defendant as well, financial

17   disclosure and restrictions to assist in monitoring the

18   defendant's ability to pay the financial impositions, and the

19   no possession of firearms and/or dangerous weapons during the

20   term of supervision to protect the probation officers during

21   supervision.

22       Defendant objected to the third paragraph of the

23   discretionary standards of supervision, paragraph 106 of the

24   presentence report, concerning travel outside of the judicial

25   district of supervision.  The Court will note in the judgment

1  and commitment order that advance permission is unnecessary to

2  visit his mother in Alabama during medical emergencies and

3  visit the residence of his wife and child while they remain

4  living apart.

5         The Court is to impose a sentence that considers the

6  sentencing range established for the applicable category of

7  offense committed by the applicable category of defendant as

8  set forth in the guidelines.

9         As the Court previously discussed, the Court is

10  considering up to 6 months of incarceration that is within the

11  guidelines ranges proposed by the defendant and probation.

12         No pertinent policy statements issued by the Sentencing

13  Commission have been brought to my attention.

14         The Court is to impose a sentence that avoids

15  unwarranted sentencing disparities among defendants with

16  similar records who have been found guilty of similar conduct.

17  The government has provided a chart that lists a number of the

18  January 6th defendants' sentencings, but there is not enough

19  granular information in that chart to make apt comparisons.

20         The parties have referred to a handful of cases they

21  view as good comparators in their respective sentencing memos.

22  First, defendant points out that the Court has never sentenced

23  a January 6th misdemeanant to a term of incarceration, and that

24  is true.  Instead, I opted for a few months of home

25  confinement.

1    What defendant fails to appreciate is that all of those

2    defendants pleaded guilty, usually to just the parading charge

3    and, thus, were rewarded for their acceptance of

4    responsibility.  That is not the case here.

5    Thus, the Court has looked at other January 6th

6    misdemeanants who were convicted of the same crimes after a

7    jury trial.  The Court was able to identify *Alford,* in front of

8    Judge Chutkan, in which the defendant received 12 months of

9    incarceration; *Niemela*, in front of Judge Cooper, in which the

10    defendant received 11 months of incarceration; and *Vargas*, in

11    front of Judge Moss, in which the defendant received 4 months

12    of incarceration.

13    So all the comparator cases I have identified resulted

14    in terms of incarceration ranging from 4 months to 12 months.

15    As I indicated, because I'm not contemplating imposing a

16    sentence above six months, I do not deem it an unwarranted

17    sentencing disparity in what I am considering.

18    The Court is to impose a need -- impose a sentence that

19    provides restitution to any victims of the offense.  The

20    parties dispute resolution -- restitution.  The government is

21    seeking $500 in restitution, which is the amount agreed to by

22    misdemeanants who plead guilty.  The Court is not confident

23    that the government has drawn a sufficient connection between

24    the defendant's conduct and the monetary harm.

25    The Court is concerned with creating bad law on appeal

1    with this slim record.  Perhaps if the government made a

2    proffer of overtime hours expended by MPD and Capitol Police to

3    deal with the actual breach of the Capitol in clearing of the

4    building during the relevant time periods, the Court would

5    include that -- would conclude that $500 is quite reasonable,

6    even perhaps low.  But on the current record, the Court will

7    not impose restitution.

8         I'll now indicate the sentence to be imposed, but

9    counsel will have one more opportunity to make any legal

10   objections before the sentence is imposed.

11        Ms. Fish, any objections to any of the factors I've

12   considered?

13        MS. FISH:  Yes, Your Honor.  First, I'd object to the

14   Court's consideration of evidence not in the record here.  The

15   Court noted that it had reviewed countless videos of people

16   engaging in violence, assaulting officers, and other bad

17   outcomes from the conduct of other people on January 6th.  And

18   so I'd object to the consideration of that evidence in the

19   sentencing of Mr. Rhine.

20        Second, Your Honor, I do object to the Court's use of

21   Mr. Rhine's First Amendment protected statements to enhance his

22   sentence.  The Court reasoned that the interview shows he

23   believed in the righteousness of his offense.  While I do not

24   draw the same conclusion from that interview, I do object,

25   regardless, on the use of his First Amendment protected speech

1    to enhance his sentence.

2            THE COURT:  I don't think -- I don't think

3    trespassing is First Amendment protected, but go ahead.

4            MS. FISH:  Thank you.

5        It's my objection to the use of the -- the -- the

6    statement and the Court's reliance on the "Stop the Steal"

7    statement --

8            THE COURT:  Okay.

9            MS. FISH:  -- in that interview.

10        And, finally, Your Honor, I do have concerns about the

11    Court, essentially, applying a trial penalty.  While,

12    certainly, people can get the credit of accepting

13    responsibility formally is in the guidelines, that is not a

14    dispute that we had here, and it wouldn't change his

15    guidelines.

16        Furthermore, the -- the purpose behind kind of a more

17    nebulous, not guidelines-tied acceptance of responsibility is,

18    really, is the person contrite and remorseful.  And I believe

19    Mr. Rhine has demonstrated he is in that explicit -- an

20    explicit plea to the elements of the offense is not necessary

21    to genuine remorse.

22        And then, finally, I would just note, Your Honor, with

23    respect to the comparison cases noted for people convicted

24    after trial of misdemeanor offenses, as is included in some of

25    my briefing; for example, Mr. Alford testified at trial, and

1    the Court found that he testified falsely at trial.  So there

2    was an obstruction of justice enhancement, I believe, in that

3    case.

4         And as detailed in -- briefly, regarding the guidelines,

5    Mr. Vargas -- the evidence in Mr. Vargas's case indicated that

6    he personally opened a gate for a restricted area, climbed a

7    wall, egged on people, engaged in bad conduct, and physically

8    struggled with police at multiple locations.  So I do think

9    that the conduct is in those cases is -- is not similar to the

10   conduct here.

11        THE COURT:  All right.

12        Mr. Valentini.

13        MR. VALENTINI:  Yes, Your Honor.  We would restate

14   our objection to the Court's decision.  Our factual finding --

15   and I understand it's just a factual finding; that we restate

16   our objection to the factual finding with respect to

17   restitution.

18        In addition, if I may have the opportunity to briefly

19   address a few of the things that Ms. Fish just stated.

20        First of all, I do not hear in the Court's statement and

21   explanation of its sentence any indication of a trial penalty.

22   I understood Your Honor to be expressing the position, which is

23   perfectly consistent with circuit law, that defendants who do

24   accept responsibility are -- sometimes receive a benefit from

25   receiving [sic] responsibility, not a penalty for going to

1    trial.

2        I also wanted to briefly address the claim that Ms. Fish

3    made that Your Honor applied some sort of penalty for speech.

4    As I understood Your Honor's explanation, Your Honor just

5    imposed a -- consider as part of its sentence the intent with

6    which the defendant carried out the offense that he committed.

7    And the fact that that intent was conveyed in a recorded

8    interview does not place that evidence beyond the Court's

9    consideration.

10        With those clarifications, I -- I -- we have no

11    additional objections beyond, of course, the objections to the

12    guidelines that we already articulated in the papers.

13        THE COURT:  All right.  And I agree with your points,

14    Mr. Valentini.  I did not impose a penalty.  I assessed, as is

15    a central tenet of the guidelines, that there's a reward for

16    acceptance of responsibility, which didn't occur here.  And I

17    am making my decision based on the comparators.  And I intend

18    to impose a sentence within this -- the range set by the

19    comparators.

20        And with respect to the speech, as I indicated, his --

21    his righteousness in believing he had a right to go into the

22    Capitol Building because it's his House goes directly to

23    whether he can be deterred in the future, and the "Stop the

24    Steal" comment goes directly to whether he intended to

25    obstruct the certification, both relevant issues in this

1    context.

2         All right.  With that said, Mr. Rhine, it is the

3    judgment of the Court that you, David Charles Rhine, are hereby

4    sentenced to serve a four-month term of incarceration on

5    Counts 1 through 4 to run concurrently, followed by a one-year

6    term of supervised release on Counts 1 and 2 to run

7    concurrently.

8         You are further ordered to pay a special assessment of

9    $25 on Counts 1 and 2 and $10 on Counts 3 and 4, for a total of

10   $70.

11        The Court finds that you have an ability to pay a fine

12   and, therefore, imposes a fine of $7,376.  The Court waives

13   imposition of interest on unpaid amounts.

14        You are not ordered to make restitution to the Architect

15   of the Capitol as requested by the government.

16        The financial obligation shall be paid in a lump sum

17   within 30 days.  But if the defendant is unable to pay this

18   amount in a lump sum, it shall be paid at a rate of no less

19   than $250 per month beginning 30 days after release from

20   incarceration.

21        The special assessment and the fine are payable to the

22   Clerk of the Court of the District of Columbia.

23        While on supervision, you shall not use or possess an

24   illegal controlled substance, and you shall not commit another

25   federal, state, or local crime.  You shall also abide by the

1    general conditions of supervision adopted by the U.S. probation

2    officer that were set forth in paragraph 106 of the presentence

3    report and to which the defendant did not object, except to

4    paragraph 3 which, as I indicated, will be modified.  And I

5    will waive the drug testing requirement as well.

6          And you shall abide by the federal special conditions

7    that were all set forth in the presentence report:  the

8    financial information disclosure requirement, the financial

9    restrictions that are detailed -- will be detailed in the

10    judgment and commitment order to assess your ability to pay the

11    financial impositions.

12          And I'm going to impose community service.  You must

13    complete 60 hours of community service during your period of

14    supervision.  The probation officer will supervise the

15    participation in the program by approving the program.  You

16    must provide written verification of completed hours to the

17    probation officer.

18          There's the firearm restriction during the period that

19    you're under supervision, which requires you, as you've

20    complied to date, of removing firearms, destructive devices, or

21    other dangerous weapons from areas of your residence over which

22    you have access or control until the term of supervision

23    expires.

24          Ms. Fish, other than those objections previously raised,

25    any other reason why the sentence should not be imposed as just

1    stated?

2         MS. FISH:  No, Your Honor.  I'd just reiterate my

3    earlier objections.

4         THE COURT:  Okay.  Any other things, either counsel,

5    that we need to cover before that sentence is imposed?

6         MS. FISH:  Yes, Your Honor.

7         I would ask if the Court could set a somewhat delayed

8    self-surrender date for two reasons.  One, the first and

9    foremost being, for Mr. Rhine to be able to, essentially, close

10   his business and make sure that his customers have their files

11   and are able to transfer to someone who can help them for next

12   year's tax season.  He's been working extremely long hours

13   doing that.  I believe that has been, you know, 12- or 16-hour

14   days trying to do that thus far, but it takes quite a bit of

15   time.  And he's also required to make certain disclosures as

16   part of his CPA license in February about the prior year.

17        So if the Court is willing, I would ask the Court to set

18   a March 1st surrender date.

19        The other thing that the delayed self-surrender date

20   would enable is for me to in -- in the interim apply for bond

21   in the Court of Appeals pending appeal under their standard

22   process.

23        THE COURT:  Mr. Valentini.

24        MR. VALENTINI:  Your Honor, while a slightly delayed

25   surrender date is something that the government would not

1    necessarily oppose, a surrender date of March of 2024, if I

2    heard Ms. Fish correctly, is excessive and is not supported by

3    any of the reasons offered by defense counsel.  Anything beyond

4    a 30- to 60-day delay in surrender and a surrender date is just

5    not warranted in light of the slim record that defendant's

6    counsel just articulated.

7         THE COURT:  Let me hear from probation.  Ms. Baker,

8    do you have any objection to March 1st?

9         THE PROBATION OFFICER:  Your Honor, March 1st is an

10   extensive period of time.  I would not oppose or object

11   somewhere meeting between the government and defense.  Not

12   until March, but maybe a little bit longer than 60 days.

13        THE COURT:  All right.  I'll give the defendant

14   until March.  Winding down a business of that nature can't

15   be easy.  So there's no reason for such a short sentence like

16   this one to rush things and, you know, possibly impact his

17   clients.

18        MS. FISH:  Thank you, Your Honor.

19        THE COURT:  Mr. Rhine, you were convicted by a jury

20   verdict.  You have the right to appeal your conviction and

21   sentence.  You have the right to apply for leave to appeal in

22   forma pauperis; that means without cost.  And if you request

23   and qualify, the Clerk of the Court will prepare and file a

24   notice of appeal on your behalf; although I note that you're

25   represented by very able counsel who can assist you in that

1     process.

2          But most importantly, with few exceptions, any notice of

3     appeal has to be filed within 14 days of the entrance of the --

4     the entry of the judgment, which I suspect it will take a

5     couple days to get that docketed.  So 14 days from that point,

6     if you choose to file an appeal.

7          Ms. Fish, probation recommended transferring

8     jurisdiction of the supervision to the Western District of

9     New York.  I don't know if that's set in stone yet.  But what

10    is your position?

11         MS. FISH:  Your Honor, I have no objection to that.

12    If the Court is willing -- or -- and I can touch base with

13    probation as well.  But it might make sense to wait a bit prior

14    to transferring jurisdiction just to confirm that that will be

15    the location where he is living.

16         THE COURT:  Ms. Baker, is that possible to -- we

17    don't have to do this today; is that right?

18         THE PROBATION OFFICER:  Yes, that's correct.  That is

19    correct.

20         THE COURT:  Okay.  All right.  And, of course, given

21    the delayed surrender date of voluntary surrender as

22    recommended by probation is fine by me.

23         Anything else we need to cover today, Mr. Valentini?

24         MR. VALENTINI:  No, Your Honor.  Thank you.

25         THE COURT:  Ms. Fish?

1          MS. FISH:  No, Your Honor.  Thank you.

2          THE COURT:  All right.  Thank you, Mr. Rhine.

3     You're excused.

4          (Proceedings were concluded at 3:16 p.m.)

5          (REPORTER'S NOTE:  Proceedings recorded by mechanical
      stenography.  Transcript produced by computer-aided
6     transcription.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4    Certified Realtime Reporter, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of my

6    stenograph notes and is a full, true, and complete transcript

7    of the proceedings to the best of my ability.

8

9                    Dated this 14th day of September, 2023.

10

11                    /s/ Nancy J. Meyer
                      Nancy J. Meyer
12                    Official Court Reporter
                      Registered Diplomate Reporter
13                    Certified Realtime Reporter
                      333 Constitution Avenue Northwest
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25