# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 21-cr-687 (RC) |
| v. : | |
| : | |
| DAVID CHARLES RHINE, : | |
| : | |
| Defendant : | |

## GOVERNMENT'S OPPOSITION TO MOTION FOR BOND PENDING APPEAL

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes Defendant David Charles Rhine's motion for bond pending appeal (ECF No. 124). Bond pending appeal is not justified in Rhine's case under 18 U.S.C. § 3143(b) because Rhine has failed to establish by clear and convincing evidence that he does not pose a danger to the community or that his appeal will raise a substantial question likely to result in reversal, a new trial, or a shorter sentence on all four counts of conviction, as required under 18 U.S.C. § 3143(b). Accordingly, Rhine's motion should be denied.

### I.     BACKGROUND AND PROCEDURAL HISTORY

#### A.  Rhine's Participation in the January 6 Attack

On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election. While the certification process was proceeding, a large crowd gathered outside the United States Capitol, entered the restricted grounds, and forced entry into the Capitol building. As a result, the Joint Session and the entire official proceeding of the Congress was halted until law enforcement was able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials.

In the days leading up to January 6, 2021, Rhine traveled from his home in Washington State to Washington, D.C. to protest the results of the 2020 presidential election. By 2 p.m. on January 6, Rhine had reached the Capitol's East Plaza, where barricades clearly marked the Capitol's restricted area. Rhine was carrying a large and distinctive blue flag with white stars (known as the "Navy Jack") and cowbells. At approximately 2:20 p.m., after other rioters violently breached the barricades at a nearby location on the East Plaza, Rhine walked by and around the barricades on the House side and crossed the plaza, entering the restricted area. Rhine then walked up the House steps and, within minutes, reached the East House Portico, near the Upper House Door.

As Rhine stood on a terrace near the East House Portico, he gave a recorded interview. At one point during the interview, the camera panned to another rioter nearby who was walking right by Rhine with pepper spray (or some other chemical irritant) in his eyes.


Screenshot from Rhine's interview on 1/6/21
(Gov't Trial Ex. 115A.1)


Screenshot from Rhine's interview on 1/6/21
(Gov't Trial Ex. 115A.2)

In the recorded interview, Rhine looked directly into the camera and stated:

> This is our 1776 moment. This is our building. The Capitol Police have opened up the barriers to allow the patriot protesters to get up to the building itself. And, so far, we are seeing a peaceful protest. And it is a real special moment in history to be here to defend against all enemies foreign and domestic. And hopefully… Yeah, it looks like they are doing some pepper spraying to keep people out of the building here. But, it's challenging times here on the Capitol Steps, so.
>
> …

> Hopefully, we can keep people peaceful. But this is our building. We own this building. We are not trespassing. It is time for us to take this and to take it back. … We are sick and tired of the cheating. We are here to stop the steal. And that's why we came.

At approximately 2:42 p.m., Rhine entered the U.S. Capitol Building through the Upper House Door, only moments after other rioters had opened that door from the inside, triggering a sharp-sounding alarm. Although a metal detector was present at the door, Rhine walked around it and did not go through any security screening. As Rhine walked into and through the Capitol, he continued to carry his large blue flag with white stars. Rhine also repeatedly rattled his cowbells. Shortly after entering the building, Rhine approached a door that led to the House Chamber. That door was locked, and other rioters attempted to breach that door but were unsuccessful.

After the rioters' attempts to enter the House Chamber proved unsuccessful, Rhine walked up a nearby set of stairs to the Capitol's third floor, reaching the hallway on the east side of the House Gallery. Rhine then proceeded westward along the hallway immediately to the north of the House Gallery. Upon reaching a door that connected the hallway to the House Gallery, Rhine deviated from his path, walked towards the door, and, when the door was within arm's reach, motioned towards the door handle. The door, however, was locked, as the House Gallery, which on January 6 was used to seat Members of the House, was in lockdown and Members of Congress were still sheltering in place inside.

Rhine then continued westward, until he reached the northwest corner of the hallway adjacent to the House Gallery. There, Rhine briefly entered a Congressional office. Moments later, as Rhine was marching back eastward along the same hallway, he was detained by police officers with guns drawn. The detaining officers directed Rhine and others present to drop to the floor. Rhine complied and was frisked for weapons. An officer found that Rhine was carrying

3

two pocket-size folding knives and a container of pepper spray. The officer seized the items and secured Rhine's hands behind his back with flex cuffs.

The same officer then escorted Rhine and others along a hallway and down to the second floor, until they reached an interior area near the Rotunda Doors. Once in the vicinity of the Rotunda Doors, the escorting officer directed Rhine to exit the building. The officer left, and another rioter removed the flex cuffs from Rhine's hands. Rhine exited the Capitol Building through the Rotunda Doors at approximately 3:05 p.m.

### B. Procedural History

In November 2021, Rhine was charged by information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). The case proceeded to a jury trial in April 2023. After a five-day trial, the jury found Rhine guilty on all counts. ECF No. 102. In September 2023, the Court sentenced Rhine to concurrent terms of four months of imprisonment on each of the four counts of conviction, one year of supervised release, a $7,376 fine, and a mandatory assessment. The Court set a delayed surrender date of March 1, 2024.

## II.  LEGAL STANDARD

Rhine moves for bond pending appeal under 18 U.S.C. § 3143(b). Under 18 U.S.C. § 3143(b)(1), a defendant who has been sentenced to a term of imprisonment "shall … be detained" unless the court finds that the defendant has established two criteria:

> (A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released [with conditions]; and
>
> (B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—
>
>> (i) reversal,
>>
>> (ii) an order for a new trial,

> (iii) a sentence that does not include a term of imprisonment, or
>
> (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

18 U.S.C. § 3143(b)(1)(A)-(B). A substantial question is "a 'close' question or one that very well could be decided the other way." *United States v. Perholtz*, 836 F.2d 554, 555 (D.C. Cir. 1987) (per curiam). The requirements for "reversal" and "an order for a new trial" requires reversal or a new trial on all counts, not just a single count or a subset of the counts of conviction. *Id.* at 557 (explaining that defendants "cannot be released unless the appeal raises a substantial question likely to result in reversal of *all counts* on which imprisonment is imposed") (emphasis added). If a judicial officer finds that a defendant is eligible for release because the appeal is "likely" to result in "a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process," the remedy is not immediate release; rather, "the judicial officer shall order the detention terminated at the expiration of the likely reduced sentence." 18 U.S.C. § 3143(b)(1)(B). It is the defendant's burden to make the requisite showing under 18 U.S.C. § 3143(b)(1)(B). *Perholtz*, 836 F.2d at 555-556 (referring to "the required showing on the part of the defendant"); *United States v. Libby*, 498 F. Supp. 2d 1, 3 (D.D.C. 2007).

### III. DISCUSSION

#### A. Rhine Has Not Shown by Clear And Convincing Evidence That He Is Not Likely to Pose a Danger to the Safety of the Community

At the outset, Rhine has failed to show by clear and convincing evidence, as he must pursuant to 18 U.S.C. § 3143(b)(1), that he is not likely to pose a danger to the safety of the community, especially in the volatile context of the upcoming election year. Although Rhine

appears to have been compliant with the terms of his release, and although he did not himself engage in hands-on violence on January 6, 2021, Rhine's conduct on that day, his righteousness about his illegal acts, and his actions since January 6 all show a real and pressing need to deter and incapacitate the defendant from this type of illegal conduct.

On January 6, Rhine ignored the obvious indications that his presence on the Capitol grounds was unauthorized—including physical barricades, police officers manning those barricades, and tear gas—and placed himself near the front of the mob that invaded the Capitol through the Upper House Door at approximately 2:42 p.m.  Minutes earlier, Rhine had given an interview as he stood unlawfully near the East House Portico.  In that interview, Rhine, in this Court's words, "made it clear that he was there to 'Stop the Steal.'"  Sent. Tr. 21.  That statement shows that Rhine was acting with the "intent to take part in the blocking of the certification that day," as the Court correctly observed at sentencing.  Sent Tr. 21.  And there is more.  In the same interview, Rhine also declared, with appalling "righteousness," that he "had a right to go into the Capitol Building because it's his House."  *Id.* at 30 (statement of the Court, paraphrasing the defendant's words).  That chilling statement, too, "goes directly to whether he can be deterred in the future."  *Id.* at 30 (Court's explanation at sentencing).

Then, as an alarm blared, Rhine entered the Capitol building, even though he knew that he had two pocket knives and a container of pepper spray in his belongings.  Inside the Capitol, he proceeded immediately to a door that led to the House chamber.  Having found that door locked, Rhine looked for a different route.  He ascended to the third floor, attempted to open a door leading to the House Gallery (where members of Congress were still sheltering in place), and then entered a congressional office—even though that office was marked as the workspace of the Appropriations Committee and even though Rhine was still carrying knives and pepper

6

spray in his belongings. Rhine left the House Gallery area only after being ordered to the floor at gunpoint, frisked, handcuffed, escorted to the Rotunda Door Lobby, and personally instructed to leave.

Nothing Rhine has done since January 6, 2021, suggests any mitigating consideration. He has not accepted responsibility for his conduct on January 6, as this Court observed at sentencing. Sent. Tr. 24, 26 ("What defendant fails to appreciate is that all of those defendants pleaded guilty, usually to just the parading charge and, thus, were rewarded for their acceptance of responsibility. That is not the case here."), 30. Indeed, Rhine did not even "cooperate with probation in submitting financial information about his assets or liabilities"—"a further example of his lack of acceptance of responsibility." *Id.* at 18.

In sum, although the defendant appears to have been compliant with his release conditions, Rhine's actions on January 6, 2021, Rhine's "surety" in "the righteousness of his illegal behavior" (Sent Tr. 23), and Rhine's actions since January 6, 2021, all paint the picture of someone who must be "deterred from doing the same again" in the future. *Id.* This real and pressing need for deterrence and incapacitation precludes a finding, by clear and convincing evidence, that Rhine is not likely to pose a danger to the safety of the community if his day of reckoning is further delayed. For that reason alone, Rhine's motion should be denied.

### B. Rhine Has Not Identified a Substantial Question for Appeal That Is Likely to Result in a Reversal, Retrial, or Shorter Sentence on All Counts

Rhine's motion also fails at step two of the Section 3143(b) inquiry: Rhine has failed to identify substantial questions of law or fact that are likely to result in the reversal or retrial of *all* counts of conviction, or in a shorter sentence on *all* counts.

As noted, Rhine was convicted of four distinct offenses—18 U.S.C. § 1752(a)(1) and (2) (Counts 1 and 2, respectively) and 40 U.S.C. § 5104(e)(2)(D) and (G) (Counts 3 and 4,

respectively)—and was sentenced to four concurrent terms of four months in prison, with each term corresponding to a count of conviction. ECF No. 120 at 1-3. To prevail on his motion for bond pending appeal, therefore, Rhine must show that his appeal will raise questions of law or fact that are likely to result in reversal, retrial, or a shorter sentence on *all four* counts of conviction. *See* 18 U.S.C. § 3143(b)(1)(B); *Perholtz*, 836 F.2d at 557 ("[defendants] cannot be released unless the appeal raises a substantial question likely to result in reversal of all counts on which imprisonment is imposed"). The three questions identified in Rhine's motion fall short of that requirement.

### 1. Rhine Has Not Identified a Substantial Question for Appeal with Respect to His Convictions Under 40 U.S.C. § 5104(e)(2)(D) and (G) (Counts 3 and 4)

Rhine asserts (at 16) that, on appeal, he "will challenge the constitutionality under the First Amendment of his convictions for Counts 3 and 4," on the theory that 40 U.S.C. §§ 5104(e)(2)(D) and (G) are "content- and viewpoint-based restrictions on speech," "overbroad in light of their stated purposes," and "unconstitutionally vague." *Id.* But, as Rhine acknowledges (*id.*), these are the same claims[1]—and, indeed, essentially the same arguments— that he pressed unsuccessfully in his pretrial motion to dismiss. *See* ECF No. 47 at 3-18 ("The Court should dismiss Counts 3 and 4 because Section 5104 is unconstitutionally vague on its face."), 19-24 ("Section 5104 is a content-based restriction on speech that cannot survive strict scrutiny."), 24-26 ("Both subsections of section 5104(e) discriminate based on the identity of the speaker.").

This Court carefully considered—and correctly rejected—each of Rhine's First

---

[1] To the extent the First Amendment claims identified in Rhine's current motion are different from the claims he pressed unsuccessfully before trial, they will be reviewed on appeal only for plain error, *see* Fed. R. Crim. Proc. 52(b); as such, they would face an even more daunting hurdle.

8

Amendment claims before trial. *See* ECF No. 79. This Court correctly concluded (1) that "the interior of the Capitol buildings is a nonpublic forum," *id.* at 31-33 (citing *United States v. Nassif*, 628 F. Supp. 3d 169, 180 (D.D.C. 2022) (Bates, J.)); (2) that 40 U.S.C. § 5104(e)(2)(G) is "'reasonable in light of the purpose served by the forum[]' ... to permit 'Congress peaceably to carry out its lawmaking responsibilities' and to permit 'citizens to bring their concerns to their legislators,'" *id.* at 32; (3) that "§ 5104(e)(2)(G) is clearly viewpoint neutral, as it 'contains nothing limiting its application to a particular viewpoint,'" *id.* at 33-35; (4) that 40 U.S.C. § 5104(e)(2)(D) satisfies the requirements of "intermediate scrutiny" because it is "narrowly tailored" to the government's substantial interest in "'public safety and order'" and "leaves open ample alternative channels of communication," *id.* at 34-35; and (5) that "[b]ecause § 5104(e)(2)(D) and (e)(2)(G), by their plain text, are agnostic as to content, they are not content-based restrictions," *id.* at 35-36 (also rejecting Rhine's reliance on Section 5104(e)(3)'s exemption for government officials as "squarely rejected by the Supreme Court" in *McCullen v. Coakley*, 573 U.S. 464, 483 (2014)).[2]

Other judges in this district who have considered the same claims have reached the same conclusion. *See, e.g.*, *United States v. Baez*, No. CR 21-0507 (PLF), 2023 WL 3846169, at *7 (D.D.C. June 2, 2023) (Friedman, J.); *United States v. Nassif*, 628 F. Supp. 3d 169, 177-184 (D.D.C. 2022) (Bates, J.). Indeed, in the hundreds of January 6 prosecutions involving charges and convictions under 40 U.S.C. §§ 5104(e)(2)(D) and (G), no judge in this district has discerned

---

[2] Rhine chides the Court (at 17) for "[not] addressing Mr. Rhine's argument regarding the statutory exemption of Members of Congress and their staff from § 5104's restrictions on speech." As noted in the text, however, the Court addressed that precise argument on pages 35 and 36 of its pretrial order (ECF No. 79), where it rejected the argument as "squarely" foreclosed by the Supreme Court's decision in *McCullen v. Coakley*, 573 U.S. 464, 483 (2014). *See* ECF No. 79 at 35-36.

any First Amendment defect in Section 5104(e)(2)(D) and (G) or the application of those provisions to rioters who, like Rhine, participated in the January 6 attack on the U.S. Capitol.[3] As this track record confirms, the First Amendment question alleged by Rhine is not substantial.

### 2. Rhine Has Not Identified a Substantial Question for Appeal with Respect to Sentencing

Rhine also asserts (at 39-43) that, on appeal, he will challenge the concurrent four-month terms of incarceration imposed at sentencing on the ground that they constitute an "impermissible … trial penalty." *Id.* at 39. More specifically, Rhine plans to argue that this Court "improperly penalized [him] for exercising his constitutional right to trial by jury" when, at sentencing, it observed that Mr. Rhine "never accepted responsibility for his actions, forcing a rare misdemeanor jury trial … which required the government and the court to expend significant resources." *Id.* at 41. This statement, in Rhine's view, ran afoul of (purported) case law from other jurisdictions restricting district courts authority to "lay on extra time [on defendants] for going to trial." *United States v. Jones*, 997 F.2d 1475, 1480, 1482 (D.C. Cir. 1993) (Mikva, J., dissenting).

Rhine's claim is premised on equal parts obfuscating the law and mischaracterizing the record. Begin with the law. Although a "district court may not pressure a defendant into expressing remorse such that the failure to express remorse is met with punishment," *United States v. Lawrence*, 662 F.3d 551, 562 (D.C. Cir. 2011), no federal court of appeals has held that district courts are precluded from considering a defendant's lack of remorse and failure to accept responsibility in distinguishing more lenient sentences imposed on other defendants. To the contrary, in *Lawrence* (which the defendant cites in his motion), the D.C. Circuit expressly

---

[3] Another January 6 defendant, John Nassif, has challenged the constitutionality of 40 U.S.C. §§ 5104(e)(2)(D) and (G), in an appeal currently pending before the court of appeals. *See United States v. Nassif*, No. 23-3069 (D.C. Cir. oral argument held on Sept. 29, 2023).

recognized that "[o]ther circuits have held that lack of remorse is a proper consideration at sentencing" and cited those decisions with approval. *Id.* (citing, *e.g.*, *United States v. Cruzado-Laureano*, 527 F.3d 231, 237 (1st Cir. 2008)); *see also Cruzado-Laureano*, 527 F.3d at 237 (rejecting the argument that, "despite its seeming relevance, [a defendant's] lack of remorse is 'prohibited by law' from being considered because reliance on his refusal to accept responsibility violates his constitutional right to maintain his innocence" (citation omitted)). Since then, the D.C. Circuit has reaffirmed the same principles, including earlier this month in *United States v. Alford*, 89 F.4th 943 (D.C. Cir. 2024), which rejected a similar contention advanced by another January 6 defendant. In *Alford*, the court of appeals explained that a defendant's "decision to exercise his right to trial meant that he did not receive a sentencing reduction for acceptance of responsibility, as he likely would have had he pleaded guilty. … [The defendant] was entitled to put the government to its burden of proof, but electing to do so meant foregoing benefits that other defendants obtained by striking plea bargains." *Id.* at 954. *See also United States v. Mejia*, 597 F.3d 1329, 1344 (D.C. Cir. 2010) (affirming a sentence as reasonable where the disparity in sentences between two co-defendants was "entirely explained" by one defendant receiving an "acceptance-of-responsibility reduction for his having pleaded guilty").

      This Court's reasoning at sentencing is consistent with these well-settled principles. In distinguishing more lenient sentences imposed on other January 6 defendants convicted of misdemeanor offenses, the Court explained that, unlike those defendants, Rhine "never accepted responsibility for his actions, forcing a rare misdemeanor jury trial, which … is his right, [but] which required the government and the Court to expend significant resources and required members of the public to take time out from their busy lives." Sent. Tr. 21. For that reason, the Court declined to place Rhine "in that category of getting a reward of a reduced sentence." *Id.*;

11

*see also id.* at 26 ("What defendant fails to appreciate is that all of those defendants pleaded guilty, usually to just the parading charge and, thus, were rewarded for their acceptance of responsibility. That is not the case here."). Then, in response to Rhine's objection, the Court made clear that it "did not impose a penalty" but, rather, "assessed, as is a central tenet of the guidelines, that there's a reward for acceptance of responsibility, which didn't occur here." *Id.* at 30. This Court's reasoning was sound, and nothing in the Court's words at sentencing gives rise to a "substantial question" for appeal.

Rhine's argument, in contrast, turns on misreading the sentencing record. Rhine seizes on the Court's observation that Rhine "never accepted responsibility for his actions, forcing a rare misdemeanor jury trial" (Sent. Tr. 21), but takes that statement out of context. For one thing, in his lead quotation (at 41), Rhine elides, via an ellipsis, the Court's acknowledgment that going to trial was, of course, Rhine's right ("which is his right"). As in *Alford*, that contemporaneous statement undermines any claim that, at sentencing, the court improperly punished the defendant for exercising his right to a jury trial. 89 F.4th at 954 n.6.[4] For another, and more importantly, Rhine simply refuses to accept what the Court plainly and repeatedly explained (Sent Tr. 21, 26, 30): that, in comparing the sentencing options appropriate in Rhine's case to the sentences imposed on other January 6 misdemeanants, Rhine's choice not to accept responsibility by admitting guilt was a key distinguishing factor that qualified those defendants, but not Rhine, for a benefit at sentencing. Again, nothing in that unremarkable explanation gives rise to a substantial question for appeal.[5]

---

[4] In a later iteration of the same quotation (at 42), Rhine includes the Court's acknowledgment.

[5] Rhine also appears to take issue (at 41-42) with the Court's unwillingness to credit certain self-serving statements Rhine made in a letter he submitted in lieu of allocating at sentencing. The

12

       **3.**      **Rhine Has Not Identified a Substantial Question for Appeal with Respect to the Jury Instructions for Counts 1 and 2 That Is Likely to Result in Reversal, a New Trial, or a Shorter Sentence on All Counts**

Finally, Rhine asserts (at 3-16) that, on appeal, he will argue that "[t]he [j]ury was misinstructed" with respect to Counts 1 and 2—which charged him with violations of 18 U.S.C. § 1752—because Section 1752 does not require the government to prove (i) "knowledge of the visit of a Secret Service protectee"; or (ii) "a causal nexus between the restricted area and the visit of the protectee." *Id.* at 3. That claim also fails.

       **a.**      ***Rhine's claim as to Counts 1 and 2 is unavailing because any question as to those counts is not likely to result in reversal, a new trial, or a shorter sentence on all counts***

At the threshold, this Court need not even consider whether any alleged instructional errors on Counts 1 and 2 constitute a "substantial question" under 18 U.S.C. § 3143(b)(1)(B) because Rhine would not be entitled to release pending appeal in any event. As already explained, Rhine was convicted of two other counts—under 40 U.S.C. § 5104(e)(2)(D) and (G) in Counts 3 and 4, respectively—that resulted in concurrent four-month terms of incarceration and as to which Rhine's appeal has not identified any substantial question for appeal. *See supra* pp. 8-10. Similarly, Rhine's sentencing claim—which, as noted, would put the D.C. Circuit at odds with the law of all other circuits to have considered the role of lack of remorse at sentencing—falls far short of raising a substantial question likely to result in a shorter sentence as to all counts. *See supra* pp. 10-12. And, to his credit, Rhine does not contend—and has therefore waived any claim—that, if his convictions on Counts 1 and 2 were vacated, it would somehow be appropriate (let alone "likely") for this Court to reconsider Rhine's concurrent four-month terms of incarceration on Counts 3 and 4. *See* ECF No. 124 at 4]3-45 (discussing the

---

Court, of course, had discretion to assign Rhine's self-serving letter whatever weight and credibility it deemed appropriate.

"likely" implications of vacatur and/or reversal on the sentences for the corresponding counts, but offering no argument that vacatur of Counts 1 and 2 would likely result in shorter sentences on Counts 3 and 4).

Nor would any such contention have merit. In sentencing Rhine to concurrent four-month terms of incarceration, the Court appropriately selected the sentence that it deemed "sufficient but not greater than necessary to comply with the purposes" of 18 U.S.C. § 3553(a). Sent Tr. 19. As required by the statute, this Court considered "the nature and circumstances of the offense and the history and characteristics of the defendant" and then "impose[d] a sentence that reflect[ed] the seriousness of the offense, promote[d] respect for the law, and provide[d] just punishment for the offense." *Id.* At no point did the Court state that it was increasing the sentence for Counts 3 and 4 on account of Rhine's convictions on Counts 1 and 2. Rather, the Court explained that Rhine's "offense [was] serious," as Rhine "took part in the mob riot that took place at the Capitol on January 6th, 2021"—an event that was "not … peaceful," that "delayed [the certification of the Electoral College vote] for several hours," that "forced lawmakers to hide inside the House gallery until they could be evacuated," and that resulted in the injury of "[m]ore than a hundred law enforcement officers" and "over $1.5 million in property damage." *Id.* The Court further explained that, "given his words … on the videotaped interview," Rhine appeared to be one of the "[m]any … rioters [who] intended to block the certification of the votes for President Joe Biden." *Id.* at 19-20; *see also id.* at 21 (explaining that Rhine's words in the recorded interview "illustrat[e] his intent to take part in the blocking of the certification that day"). Similarly, with respect to deterrence, the Court underscored that "the defendant's videotaped interview revealed [Rhine's] righteous belief in his cause, providing him the right to commit the instant offense." *Id.* at 23. This righteousness "trouble[d] the Court,"

14

causing "concern[] that a person with such surety and the righteousness of his illegal behavior might not be deterred from doing the same again." *Id.* Each of these considerations was sound, and none suggests (much less supports) any speculation that, without Count 1 and 2, Rhine's sentence on the remaining counts would have been shorter—a claim that, as noted, Rhine has waived in any event.

The upshot is clear: even assuming *arguendo* that Rhine's claim as to Counts 1 and 2 raised a substantial question (which it doesn't, *see infra*), and even assuming that the question is "likely" to result in vacatur of those counts (which it isn't, *see infra*), Rhine still cannot show that a decision in his favor on Counts 1 and 2 is likely to lead to reversal, vacatur, or a shorter sentence on all counts. For that reason alone, Rhine's insistence on purported instructional errors as to Counts 1 and 2 is unavailing.

      **b.**  **In any event, Rhine has failed to raise a substantial question likely to result in any relief, even as to Counts 1 and 2**

In any event, Rhine has failed to raise a substantial question likely to result in a new trial even as to Counts 1 and 2.[6]

First, Rhine claims (at 3-10) that the Court erred in declining to specifically instruct the jury (Tr. 415-416, 468) that Section 1752 requires proof of the defendant's knowledge that the Vice President was or would be visiting the building or grounds containing the restricted area. He relatedly faults the Court for stating, in response to a jury question, that Section 1752 "does not require that the defendant have knowledge that a Secret Service protectee is or will be visiting or the timing of that visit." Tr. 518. Regardless of the merits of his legal argument

---

[6] For good reason, Rhine does not appear to claim that, under his reading of the statute, the evidence presented at trial was insufficient to support the jury's verdict. Accordingly, a judgment of acquittal on those counts would be off the table. Rhine claims only that the jury instructions and this Court's answer to the jury's questions were erroneous.

regarding the knowledge required to violate Section 1752(a)—which is currently the subject of litigation in the D.C. Circuit in *United States v. Griffin*, No. 22-3042 (D.C. Cir. oral argument held Dec. 4, 2023), and was most recently addressed by the government in *United States v. Irwin et al.*, No. 1:21-cr-589, ECF No. 102 (RDM) (D.D.C. supp'l gov't mem. filed Jan. 29, 2024) (attached)—any such instructional error would be harmless based on the evidence presented at trial. *See Neder v. United States*, 527 U.S. 1, 18-1919 (1999) (failure to instruct on an element of the offense is subject to harmless-error review, which asks whether "it [is] clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error").

At trial, the jury viewed video evidence showing that Rhine waited at length on the East Side of the Capitol before entering the restricted area, which he did after other rioters violently breached that side of the perimeter at a nearby location. The jury also watched and heard an interview that Rhine recorded after he had unlawfully entered the restricted area, as he stood near the House Portico. As already noted, in that interview, Rhine declared among other things:

> This is our 1776 moment. … And it is a real special moment in history to be here to defend against all enemies foreign and domestic. … But this is our building. We own this building. We are not trespassing. It is time for us to take this and to take it back. … We are sick and tired of the cheating. We are here to stop the steal. And that's why we came.

This interview—and Rhine's declared intent to "stop the steal" in particular—established not only that Rhine knew of the certification proceeding set to take place at the Capitol that day, but also, as this Court observed at sentencing, that he was acting with the specific "intent to take part in the blocking of the certification that day." Sent. Tr. 21. It would defy logic to suppose that someone who, in January 2021, understood that a certification proceeding was set to happen at the Capitol on January 6, 2021, and who travelled from Washington State to Washington, D.C. to take part in blocking that proceeding, was somehow oblivious to the fact the Vice President

was also supposed to be present at that proceeding.

In this case, moreover, Rhine's own conduct inside the Capitol forecloses any such possibility. Rhine did not merely enter and remain in the Capitol building. Once inside the building, he headed directly for the House Chamber. When he found the doors to the chamber locked, he attempted to enter the House Gallery on the floor above. The House Chamber and the House Gallery were, of course, precisely the areas where the Joint Session (which included the Vice President) was supposed to convene to certify the election. Against this backdrop, any error in instructing the jury with respect to the defendant's knowledge of the Vice President's presence at the Capitol that day was harmless and is not likely to result in any relief on appeal.

Second, the defendant faults the Court for telling the jury, in response to a jury note, that "[t]he definition of ... 'restricted building or grounds' ... does not require that any restrictions had been created *because* of a specific visit by a Secret Service protectee." Tr. 517 (emphasis added). This claim, too, is insubstantial. As the Court explained in rejecting the defendant's theory during trial, nothing in Section 1752's plain text supports such a causal requirement. As this Court highlighted at the close of trial, Sections 1752(a)(1) and (2) criminalize "offense conduct ... without reference to any Secret Service protectee." *Id.* at 2. Nor does anything in Section 1752(c)(1)(B)'s related definition of "restricted building or grounds" support imposing an atextual causal link between the requirement that the area be "'posted, cordoned off, or otherwise restricted'" and the requirement that the area be within a "'building or ground where the President or other person protected by the Secret Service is or will be temporarily visiting.'" *Id.*

The absence of any such textual clue is particularly revealing because Congress knows how to require such causal links when it wishes to do so. Indeed, Congress did so in the very

17

next prong of subsection 1752(c)(1), where it included, under the definition of "restricted building or grounds," "any posted, cordoned off, or otherwise restricted area . . . of a building or grounds *so restricted in conjunction with* an event designated as a special event of national significance." 18 U.S.C. § 1752(c)(1)(C) (emphasis added). As this Court explained, "Congress could have used similar language in subparagraph (c)(1)(B)[.] … That Congress declined to do so strongly suggests that it did not intend to require proof of causation." ECF No. 104 at 2.

In addition, Rhine's atextual causal requirement would defy the statute's purpose, as this Court has also observed. ECF No. 104 at 2-3. The fact that "§ 1752 does not say 'who must restrict the area … makes policy sense,' as it 'extends the law's protection of Secret Service protectees to areas where sufficient physical restrictions may already exist, such as military facilities, or where partner federal or local authorities are willing to assist with setting restrictions (such as the Capitol Police on January 6), without requiring the Secret Service to set up unnecessary additional physical restrictions.'" ECF No. 104 at 2-3 (quoting *United States v. Andries*, No. 21-cr-0093, 2022 WL 768684, at *15 (D.D.C. March 14, 2022)). So, too, "here, reading § 1752 to require that an area must have been restricted because of a specific visit by a Secret Service protectee would sharply limit the 'law's protection of Secret Service protectees' in ways inconsistent with the security interests served by the statute." *Id.* at 3. Not surprisingly, Rhine has pointed to no decision in any jurisdiction adopting his strained and atextual construction of the statute. His claim therefore does not raise any substantial question for appeal.[7]

---

[7] In the same order, the Court also addressed and rejected Rhine's meritless accusation (which Rhine repeats in his current motion, ECF No. 124 at 14-16) that the Court's pretrial rulings had already decided the question in the defendant's favor. *See* ECF No. 104 at 3 n.1.

IV.     **CONCLUSION**

For all these reasons, and for the reasons set forth in the briefings referenced herein, Rhine's motion for bond pending appeal and to stay execution of his sentence should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Francesco Valentini*
Francesco Valentini
D.C. Bar No. 986769
Deputy Chief
Capitol Siege Section, Breach and Assault
United States Attorney's Office (DC)
601 D Street NW
Washington, D.C.  20530
(202) 598-2337
francesco.valentini@usdoj.gov

*/s/ Kelly Moran*
Kelly Moran
Assistant United States Attorney
NY Bar No. 5776471
601 D Street NW
Washington, D.C. 20530
(202) 252-2407
kmoran1@usa.usdoj.gov